# EXHIBIT 17

# Manage or delete your Location History

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

🏛 web.archive.org/web/20180818024224/https://support.google.com/accounts/answer/3118687

Your Location History helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or traffic predictions for your daily commute.

You control what's saved in your Location History, and you can delete your history at any time.

**Note:** Some of these steps work only on Android 8.0 and up. Learn how to check your Android version.
Learn what applies in Android 4.1 through 4.3 or for iPhone and iPad.

## Turn Location History on or off

You can turn off Location History at the account level at any time.

This setting does not affect other location services on your device, like Google Location Services and Find My Device. Some location data may be saved as part of your activity on other services, like Search and Maps. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.

You can also turn off Location services for a device. Learn how.

### Turn Location History on/off using device settings (Android 2.3 & up)

1. On your Android phone or tablet, open your device's Settings app ⚙ › **Google** › **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

### Turn Location History on/off using a website

1. Go to the Activity controls section of your Google Account. You might need to sign in.
2. Turn **Location History** on or off.
3. Confirm the change. This setting will change for your Google Account and all devices associated with it.

If you use a work or school account, your administrator might turn this setting on or off for you.

# Delete Location History

You can delete all of your Location History or only parts of it. If you delete your entire history, some apps may not work correctly.

## Delete Location History using device settings (Android 2.3 & up)

**IMPORTANT**: Deleting your Location History in the Settings app is permanent. You can't reverse or undo it. Deleting your Location History may cause problems in some apps.

## Delete Location History using a website

You can delete individual locations, locations by date, or your whole location history on the Location History website.

1. Go to maps.google.com/locationhistory. You might need to sign in.
2. Pick how to delete your Location History:

**Note**: The Location History website isn't available in South Korea.

# Usage & diagnostics for Location History

When you turn on Location History, you also let your device send diagnostic information to Google about what's working and not working for Location History.

All usage and diagnostics information is used in accordance with Google's privacy policy.

## What information your device could share

Your device may send information to Google for improving Location History. For example, your device may send information when Location services aren't working properly.

Sent information could include:

- Quality and length of your connections to mobile networks, GPS, Wi-Fi networks, or Bluetooth
- State of your location settings
- Restarts and crash reports
- Apps used for turning Location History on or off
- Battery levels

## How shared information helps Google improve

Usage and diagnostics information can help improve Google apps, products, and Android devices. For example, Google can use information to improve:

- **Battery life**:
  Google can use information about what's using the most battery on your device to help

reduce battery consumption for commonly used features.

- **Location accuracy**:
  Google can use information from location sensors and settings to help improve location estimates for apps and services.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 18

# Turn location on or off for your Android device

web.archive.org/web/20180816040916/https://support.google.com/accounts/answer/3467281

When location is on, you can get information based on where your device has been. For example, you can get automatic commute predictions or better search results.

When an app is using your device's precise location, the top of your screen will show Location ⊙ .

**Note:** Some of these steps work only on Android 9.0 and up.  <u>Learn how to check your Android version</u>.

## Turn location on or off

When you have location turned on, your device uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location.

If you turn off location, it will also be turned off for all apps. Many features also won't work.

1. Open your device's Settings app.
2. Tap **Security & location**  ›  **Location**.
    **Note**: If you don't see "Security & location," tap **Location**.
3. If you see "Mode," go to the steps for  <u>Android 8.1 and below</u>.
4. Turn **Use location** on or off.

**Tip**: If you change your location setting often,  <u>learn how to quickly change settings</u>.

## Share your location for help in an emergency

To help first responders find you quickly, dial an emergency number. For example, dial:

- 911 in the US
- 112 in Europe
- 999 in some other places

Your device will send its location automatically using Android Emergency Location Service (ELS), if ELS works in your country and on your mobile network.

### How emergency location sharing works

ELS turns on only when you call or text an emergency number.

ELS finds and sends your location by turning on location and using Google's Location services during your emergency call. If needed, ELS can turn on mobile data. When you finish the call or text, your settings go back to how you had them.

## If you're using Android 8.1 & below

Pick your device's location accuracy mode

You can choose your location mode based on accuracy, speed, and battery use.

1. Open your device's Settings app.
2. Tap **Security & Location** ❯ **Location**.
   **Note**: If you don't see "Security & Location," tap **Location**.
3. Tap **Mode**. Then pick:
   - **High accuracy**: This mode uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Battery saving**: This mode uses sources that use less battery, like Wi-Fi and mobile networks. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Device only**: This mode uses only GPS. It doesn't use Google's Location services to provide location information. It can estimate your device's location more slowly and use more battery.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 19

# Manage location settings for Android apps

web.archive.org/web/20180729104542/https://support.google.com/accounts/answer/6179507

You can let apps use your device's location to do things for you or give you information. For example, apps can use your device's location to see commute traffic or find nearby restaurants.

**Note:** Some of these steps work only on Android 8.0 and up.  <u>Learn how to check your Android version</u>.

## See which apps use your location

1. Open your device's Settings app  ⚙️ .
2. Tap **Security & Location**  ›  **Location**.
3. Under "Recent location requests," see the apps that recently checked your location. For more information about an app, like its battery or data use, tap it.

## Turn Google's Location services on or off

To help improve location for apps, Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

You can turn Google's Location services on or off at any time.

<u>Turn on Google's Location services</u>
1. Open your device's Settings app  ⚙️ .
2. Tap **Security & Location**  ›  **Location**  ›  **Mode**.
3. Choose **High accuracy** or **Battery saving**. Both modes can use Wi-Fi,  mobile networks, and sensors to determine location.

<u>Turn off Google's Location services</u>
1. Open your device's Settings app  ⚙️ .
2. Tap **Security & Location**  ›  **Location**.
3. You can turn off Google's Location services in 2 ways:
   - Tap **Mode**  ›  **Device only**. This mode uses only GPS to determine location.
   - Turn off **Location**. Turning off location for your device also turns it off for all apps. Many features will be turned off.

## If asked to change location settings

If an app must use your location, it can ask whether you want to change your location settings.

How apps ask you to change location settings

Apps ask you to change your location settings in different ways:

- **"Change location setting?"**
  The app needs your location turned on. Location services give the app data that it needs to work properly.
- **"Improve location accuracy?"**
  Location is already on, but you can turn on more settings or sensors to better determine location.
- **Location mode**
  Using a different mode would improve accuracy. For example, the app could ask you to let your device use available Wi-Fi and mobile networks to find locations. The app will choose the setting that uses the least battery.
- **Wi-Fi connection**
  Scanning for Wi-Fi networks helps find locations. The app can ask you to turn on Wi-Fi, or to let your device scan for Wi-Fi networks.
- **Google Location services**
  Let Google's Location services help apps find locations. Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 20

# Americans' Views on Mobile Etiquette

pewinternet.org/2015/08/26/chapter-1-always-on-connectivity/

August 26, 2015



Internet & Technology

Report

August 26, 2015

# Chapter 1: Always on Connectivity

By Lee Rainie and Kathryn Zickuhr

For most Americans, the cellphone is no longer an auxiliary or supplementary device to their landline telephone. Roughly nine-in-ten Americans own a cellphone and nearly two-thirds own a smartphone. Recent research from the U.S. government shows that almost 43% of adults live in a cellphone-only household — that is, without a landline. As mobile devices become more common and essential, Americans are creating and navigating new norms around these gadgets' use in social gatherings and public spaces.

Cellphones can be a source of instant connection — and constant distraction. Many are concerned that people's attention to mobile devices in public and in social spaces prompts them to live "Alone Together," as the title of MIT professor Sherry Turkle's book puts it. Such a life, in her view, is socially stunted and damaging to communities. On the other hand, researcher Keith Hampton, who has studied how people use mobile devices in public spaces, has found evidence that cellphones are not encroaching on group social interactions, but rather are serving to fill time during periods of waiting and other interstitial moments.

These are intriguing and important issues. Norms of etiquette are not just small-scale social niceties. They affect fundamental human interactions and the character of public spaces. That is why Pew Research Center conducted a survey on the subject.

The poll found that Americans have varied and nuanced views on the new contours of civil behavior. They are sorting through the neo-etiquette of mobile life — sometimes attesting that constant connectivity brings social payoffs and other times lamenting what screen distractions do to social gatherings; sometimes appreciating the instantaneous availability of

1/3

people and information and other times feeling aggrieved when others want to take advantage of that; sometimes declaring the importance of being present with others and other times glancing at screens while in-person conversation swirls around them.

This chapter starts to explore these cross-pressures with a look at the basics of "always-on" connectivity.

## Americans' cellphones are generally with them and rarely turned off

Fully 92% of American adults own a cellphone, including the 67% who own a smartphone. As cellphones and smartphones become more widely adopted and play a larger role in people's daily communications, their owners often treat them like body appendages. Nine-in-ten cellphone owners (90%) say they "frequently" carry their phone with them, while 6% say they "occasionally" have their phones with them. Just 3% say they only "rarely" have their cellphones with them and 1% of cellphone owners say they "never" have their phone with them.

Though the vast majority of members of all age groups carry their phones with them frequently, there are still some differences by age. For instance, cellphone owners ages 30 to 49 are more likely to have their cell phone with them frequently (95%) than any other age group; cellphone owners ages 65 and older are least likely to carry their phone with them frequently (81%).



Beyond that, the majority of cell owners almost always keep their phones on. Most cell owners say they turn their phone off either rarely (45%) or never (31%). Cell owners under age 50 are most likely to say they never turn their phone off, and cell owners ages 65 and older are most likely to say they frequently do. Still, over half of these older adults still say they rarely or never turn off their phone.

Most smartphone owners say they rarely (47%) or never (36%) turn their phones off. Just 4% of smartphone owners say they turn their phones off frequently, and 14% say they turn them off occasionally. However, "feature phone" owners (those who do not own smartphones) are more likely to turn their phones off at least some of the time: 16% say they turn them off frequently and 24% say they turn them off occasionally. Still, a majority still say they turn their cellphones off either rarely (40%) or never (20%).

## A share of smartphone users say they use their phones' apps or browsers "continuously"

Those who own smartphones are more likely than other mobile phone users to have their phone with them and powered on. Some 94% of smartphone owners carry their phone with them frequently and 82% say they never or rarely turn their phones off.

In addition, most smartphone owners take advantage of other features of their device, with 59% reporting they use apps on their phones at least several times a day and 27% saying they use them "continuously."

Web browsing is somewhat less intense in usage: most smartphone owners browse the web on their phones at least several times a day, although only 14% use their phones' browser continuously (roughly half the proportion who continuously use apps).

As with many other technology-related activities, there are substantial differences between age groups. Younger smartphone owners use apps and browse the web on their phones more often than older adults. Some 43% of smartphone owners ages 18 to 29 describe their app usage as "continuous," compared with 26% of smartphone owners in the next highest age group (ages 30 to 49). Meanwhile, among older smartphone owners, just 7% use apps on a continuous basis and about half (48%) of those 65 and older say they use apps on their phones once a day or less.



**Smartphone Owners Live Always-On Lives**

*% of mobile phone owners in each group who ...*

Source: Pew Research Center American Trends Panel survey, May 30-June 30, 2014. N=3,042 cell users

**PEW RESEARCH CENTER**

# EXHIBIT 21

**Written Testimony of Keith Enright**

**Chief Privacy Officer, Google**

**United States Senate Committee on Commerce, Science, and Transportation**

**Hearing on "Examining Safeguards for Consumer Data Privacy"**

**September 26, 2018**

Chairman Thune, Ranking Member Nelson, and distinguished members of the Committee: thank you for the opportunity to appear before you this morning. I appreciate your leadership on the important issues of data privacy and security, and I welcome the opportunity to discuss Google's work in these areas.

My name is Keith Enright, and I am the Chief Privacy Officer for Google. I have worked at the intersection of technology, privacy, and the law for nearly 20 years, including as the functional privacy lead for two other companies prior to joining Google in 2011. In that time, I have been fortunate to engage with legislators, regulatory agencies, academics, and civil society to help inform and improve privacy protections for individuals around the world.

I lead Google's global privacy legal team and, together with product and engineering partners, direct our Office of Privacy and Data Protection, which is responsible for legal compliance, the application of our privacy principles, and generally meeting our users' expectations of privacy. This work is the effort of a large cross-functional team of engineers, researchers, and other experts whose principal mission is protecting the privacy of our users.

Across every single economic sector, government function, and organizational mission, data and technology are critical keys to success. With advances in artificial intelligence and machine learning, data-based research and services will continue to drive economic development and social progress in the years to come. Doctors use data to save lives; farmers rely on data to increase yields; and charities analyze data to better serve our communities. I have had the privilege of working with government agencies to better leverage data to advance their mission and provide improved care and benefits to Americans efficiently and reliably. Businesses of all types and sizes, far beyond those represented at this hearing today, collect and use data. In my previous experience, I saw first-hand the transformative efforts by traditional brick and mortar retail businesses to improve efficiency, reduce costs, and delight consumers through the innovative use of data.

At Google, we combine cutting-edge technology with data to build products and services that improve people's lives and enhance their productivity, help grow the economy,[1] improve

---

[1] Last year, Google's tools helped provide $283 billion of economic activity in the U.S. for more than 1.5 million businesses, website publishers, and nonprofits nationwide (https://economicimpact.google.com/).

accessibility[2] and make the web safer and more secure.[3] With partners, we are working to tackle big societal challenges and enable medical[4] and scientific breakthroughs.[5] These types of benefits all rely on the collection and use of data, and must come with, and not at the expense of, privacy and security.

**Privacy That Works For Everyone**

We acknowledge that we have made mistakes in the past, from which we have learned, and improved our robust privacy program.

The foundation of our business is the trust of people that use our services. To maintain user trust, we must clearly explain how our products use personal information, and to provide easy-to-find and use controls to manage privacy. We also invest in research and development of cutting-edge privacy and security engineering techniques, sharing what we learn to benefit the broader ecosystem.

Google's approach to privacy stems directly from our founding mission: to organize the world's information and make it universally accessible and useful. Providing most of our products for free is a key part of meeting that mission, and ads help us make that happen. With advertising, as with all our products, users trust us to keep their personal information confidential and under their control. We do not sell personal information. Period.

As the world becomes increasingly data-focused, there is, rightly, increased focus on the impacts on consumers and whether there should be better rules of the road for data privacy. We understand that Congress may be legislating on privacy and we support that effort.  We look forward to constructively engaging with you as your work develops.

To that end, I want to briefly cover four key issues that we believe are critical elements to this discussion: transparency, control, data portability, and security. These components are also central to Google's recently released framework for responsible data protection regulation, which I will discuss as well.

**Informing Users And Explaining Our Practices**

First, transparency is a core value of our approach to serving users. Google strives to be upfront about the data we collect, why we collect it, and how we use it. We get that privacy policies are not users' first choice in reading material, but we work to make ours clear and

---

[2] For example, we have used data analysis and machine learning to enable closed captioning on over 1 billion YouTube videos in 10 languages making them accessible to the over 300 million deaf or hard of hearing people around the world (https://youtube.googleblog.com/2017/02/one-billion-captioned-videos.html).
[3] Google Safe Browsing (https://safebrowsing.google.com) helps protect over three billion devices every day, and it is free and publicly available for developers and other companies to use.
[4] Working with physicians and other healthcare experts, we've developed  systems that can detect diabetic eye disease (https://ai.googleblog.com/2016/11/deep-learning-for-detection-of-diabetic.html) and breast cancer tumors (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html), help predict medical outcomes (https://ai.googleblog.com/2018/05/deep-learning-for-electronic-health.html), and even shed light on connections between cardiovascular disease and images of the eye (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html).
[5] We've shown machine learning can help predict molecular properties, which could aid everything from pharmaceuticals to photovoltaics to basic science (https://ai.googleblog.com/2017/04/predicting-properties-of-molecules-with.html). Another example is that Google's AI technology helped discover the first 8-planet system outside our own (https://www.blog.google/technology/ai/hunting-planets-machine-learning/).

concise. Outside experts have praised ours as best in class.[6] Just this year we updated our Privacy Policy to be easier to understand, with informative videos that explain our practices and settings. In addition to making our privacy controls easy to find in user accounts and through Google Search, we have also made them immediately accessible from the Privacy Policy so that users can make decisions about their account settings as they learn about our practices.

We also look for ways to add transparency into our products directly, so that users can understand the privacy implications of their choices  in context. For example, if you add a Google Drive file to a shared folder, we'll check to make sure you intend to share that file with everyone who has access to that folder. With Why This Ad,[7] you are able to click or tap on an icon in each ad to find out why you are seeing that particular ad and understand more about how Google's system makes these decisions. Another example is if someone wants to install a new app on their Android mobile phone, they can see the types of personal information that apps can access right on the screen before deciding whether to install it. If they change their mind or want to learn more, they can learn about the different permissions, and disable specific ones.  Finally, our Transparency Report[8] provides information to the public on how government actions can affect the free flow of information online. We are always working to expand the information we provide to users.

**Google Account Controls**

Second, with regard to user control, our privacy tools are built for everyone. Different people have different preferences about how they want their information to be used, and preferences can vary over time, so we build products and controls that do not presume all users are the same. For instance, a Search user can choose not to sign in when they search, and a Chrome user can choose to use Chrome's Incognito mode. For users who have a Google account, we put their privacy and security settings in a single place -- Google Account [9] -- so users don't have to visit several different apps or pages to see their data and set their preferences for how Google should store and use their information.

Google was one of the first companies to offer users this type of centralized dashboard[10] in 2009, and we continue to develop and improve these and other tools to make them more robust and intuitive. These efforts are working: in 2017, nearly 2 billion people visited their Google Account controls.[11]

I particularly want to call attention to our Security Checkup[12] and Privacy Checkup[13] tools, which respectively, help users identify and control the apps that have access to their Google account data, and guide users to review and change their security and privacy settings. These

---

[6] Time Magazine and the Center for Plain Language ranked Google number one among technology companies for best privacy policy (http://time.com/3986016/google-facebook-twitter-privacy-policies/).
[7] https://support.google.com/ads/answer/1634057?hl=en
[8] https://transparencyreport.google.com/?hl=en
[9] https://myaccount.google.com/intro?hl=en-US
[10] Dashboards are a recognized best practice (https://www.ivir.nl/publicaties/download/PrivacyBridgesUserControls2017.pdf).
[11] See: https://www.blog.google/technology/safety-security/improving-our-privacy-controls-new-google-dashboard/, https://www.blog.google/technology/safety-security/celebrating-my-accounts-first-birthday/, and https://googleblog.blogspot.com/2015/06/privacy-security-tools-improvements.html for more information.
[12] https://myaccount.google.com/security-checkup
[13] https://myaccount.google.com/privacycheckup?otzr=1

checkups help users make decisions about what information they are sharing, who they are sharing it with, and what to expect when they share it. It is not enough to just have these tools available: we actively encourage users to do privacy and security reviews by reminding them to use these tools through service-wide promotions and individual prompts.

Google Account is where users can:
- download a copy of their personal information;
- see or delete their Google activity, such as search queries or browsing, by date, product, or topic;
- disable personalized ads or see the information Google uses to personalize their ads; and
- locate a lost or stolen phone.

**Privacy From The Ground Up**

Protecting users is about more than just being transparent and offering control -- it requires building products that reflect our privacy commitments and principles at every stage of their development. Doing this properly requires a comprehensive data protection program that includes privacy design reviews, engineers dedicated to privacy to review code and data flows, and a system to manage and address any issues discovered before users are put at risk. Google has had such a program for over seven years, and we continue to expand and refine it.

**Data Portability**

Third, we believe data portability is a key way to drive innovation, facilitate competition, and best serve our users - that's why we have been working on it for over a decade.[14]

Google has always believed that people should use our products because they provide unique value and features. Download Your Data[15] is a practical tool that lets users backup or archive important information, organize information between multiple accounts, recover from account hijacking, and explore the data stored in their account.

Currently, users average around one million exports per month covering eight billion files. We enable export from more than 50 Google products, even offering the option to import data directly into our competitors' systems. If a user wants to try out a new product or service or even switch because they think it is better, they should be able to do so as easily as possible, not be locked into an existing service.

Portability is one way we ensure that users can trust Google with their data. This is why we led the development of the Data Transfer Project,[16] an open-source platform that enables you to move a copy of your data directly from one account to another without downloading and reuploading. For people who rely on phones and mobile networks for connectivity, this is a tremendous improvement. We're grateful for our industry partners' contributions to this project, and look forward to working with others.

---

[14] https://publicpolicy.googleblog.com/2009/09/introducing-dataliberationorg-liberate.html
[15] https://support.google.com/accounts/answer/3024190?hl=en
[16] See website (https://datatransferproject.dev/) and white paper (https://datatransferproject.dev/dtp-overview.pdf) for more information.

**Security**

Fourth, security considerations are paramount in all of these efforts. The security threat landscape that we see is increasingly complex and wide ranging. Securing the infrastructure that provides Google's services is critical in light of the growing and sophisticated nature of many threats directed at our services and users.

All Google products are built with strong security protections at their core to continuously and automatically detect threats and protect users. We devote significant resources to fortify Google's infrastructure and this includes continuous and proactive efforts to identify and block a wide range of security risks. The insights we've gained serving billions of people around the world help us stay ahead.

We have also worked to help our users improve their own cybersecurity posture. For example, we have offered two-step verification to our users since 2011,[17] and last year, we unveiled the Advanced Protection Program,[18] which provides the strongest account protection that Google offers.

Our focus on security is not limited to Google's users. We share technologies and collaborate with partners to help people stay safer whenever they are online. In 2007, we launched the first version of our Safe Browsing tool.[19] This tool helps protect users from phishing, malware, and other potential attacks by examining billions of URLs, software, and website content. We have made Safe Browsing free and publicly available to webmasters and developers so that they can protect their websites and applications from malicious actors.

Finally, it is important to note that small and midsize businesses are leveraging Google's cloud technology to protect the security and confidentiality of their business data. In the past, many such businesses managed their own online security infrastructure, putting them at a disadvantage. Now, these small and midsize businesses can avail themselves of the security expertise previously only available to the largest, most sophisticated enterprises, significantly reducing their information technology costs while vastly improving the security, confidentiality, integrity, and availability of business critical data.

**Toward A Comprehensive Baseline Privacy Framework**

Now, more than any time I've seen in my career in privacy, there is an interest in setting out baseline privacy requirements in law. We welcome this: a healthy data ecosystem requires people feel comfortable that all entities who use personal information will be held accountable for protecting it.[20]

The U.S. approach to privacy is admirable for its focus on protecting consumers while encouraging innovation and investment, but there is room for improvement. To demonstrate

---

[17] https://www.google.com/landing/2step/
[18] https://google.com/advancedprotection/
[19] https://safebrowsing.google.com/
[20] Comments filed in U.S. Department of Commerce, Docket No. 100402174-0175-01 and Docket No. 101214614−0614−01 : Information Privacy and Innovation in the Internet Economy (2010).

our commitment to the goal of comprehensive baseline privacy legislation, we recently put forward principles for a responsible data framework. The framework is based on the Fair Information Practices Principles (FIPPs), OECD Privacy Principles, Asia-Pacific Economic Cooperation (APEC) Privacy Framework, aspects of the European General Data Protection Regulation (GDPR), and our 20 years of experience offering services that depend on information, privacy protections, and user trust. It includes many of the principles I have talked about today: transparency, control, data portability, and security.

I am submitting a copy of Google's framework with my testimony. We hope it can contribute to this Committee's work.

Our framework is high-level, and of course, the manner in which general principles are implemented will matter a great deal. We urge the Committee to take into consideration the impacts on service functionality, the consumer benefits of free and low-cost products, the future of the open web and app ecosystem, the unique compliance needs of new entrants and small businesses, and competitive market dynamics.

**Conclusion**

Privacy and security work is never finished. Our work will continue, and we stand ready to do our part in building a better ecosystem for everyone. Sound practices and smart regulations can help, particularly when they are applied across the board to those making decisions regarding the collection and use of personal data. We share your goals of ensuring consumers are protected and businesses have an opportunity to innovate and grow.

Thank you again for the opportunity to tell you about our continued efforts in this space. We look forward to continuing to work with Congress on these important issues. I welcome any questions you might have.

# EXHIBIT 22

# Americans' Attitudes About Privacy, Security and Surveillance

pewinternet.org/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/

May 20, 2015



Internet & Technology

Report

May 20, 2015

By Mary Madden and Lee Rainie

The cascade of reports following the June 2013 government surveillance revelations by NSA contractor Edward Snowden have brought new attention to debates about how best to preserve Americans' privacy in the digital age. At the same time, the public has been awash with news stories detailing security breaches at major retailers, health insurance companies and financial institutions. These events – and the doubts they inspired – have contributed to a cloud of personal "data insecurity" that now looms over many Americans' daily decisions and activities. Some find these developments deeply troubling and want limits put in place, while others do not feel these issues affect them personally. Others believe that widespread monitoring can bring some societal benefits in safety and security or that innocent people should have "nothing to hide."

Americans' views about privacy and surveillance are relevant to policymaking on these matters. Key legal decisions about the legitimacy of surveillance or tracking programs have hinged on the question of whether Americans think it is reasonable in certain situations to assume that they will be under observation, or if they expect that their activities will not be monitored. A federal appeals court recently ruled that a National Security Agency program that collects Americans' phone records is illegal. In striking down the program, Judge Gerald Lynch wrote: "Such expansive development of government repositories of formerly private records would be an unprecedented contraction of the privacy expectations of all Americans. Perhaps such a contraction is required by national security needs in the face of the dangers of contemporary domestic and international terrorism. But we would expect such a momentous decision to be preceded by substantial debate, and expressed in unmistakable language."

Two new Pew Research Center surveys explore these issues and place them in the wider context of the tracking and profiling that occurs in commercial arenas. The surveys find that Americans feel privacy is important in their daily lives in a number of essential ways. Yet, they have a pervasive sense that they are under surveillance when in public and very few feel they have a great deal of control over the data that is collected about them and how it is used. Adding to earlier Pew Research reports that have documented low levels of trust in sectors that Americans associate with data collection and monitoring, the new findings show Americans also have exceedingly low levels of confidence in the privacy and security of the records that are maintained by a variety of institutions in the digital age.

While some Americans have taken modest steps to stem the tide of data collection, few have adopted advanced privacy-enhancing measures. However, majorities of Americans expect that a wide array of organizations should have limits on the length of time that they can retain records of their activities and communications. At the same time, Americans continue to express the belief that there should be greater limits on government surveillance programs. Additionally, they say it is important to preserve the ability to be anonymous for certain online activities.

## Most Americans hold strong views about the importance of privacy in their everyday lives.

The majority of Americans believe it is important – often "very important" – that they be able to maintain privacy and confidentiality in commonplace activities of their lives. Most strikingly, these views are especially pronounced when it comes to knowing what information about them is being collected and who is doing the collecting. These feelings also extend to their wishes that they be able to maintain privacy in their homes, at work, during social gatherings, at times when they want to be alone and when they are moving around in public.

When they are asked to think about all of their daily interactions – both online and offline – and the extent to which certain privacy-related values are important to them, clear majorities say these dimensions are at least "somewhat important" and many express the view that these aspects of personal information control are "very important."

Survey results from early 2015 show:

- 93% of adults say that being in control of  *who* can get information about them is important; 74% feel this is "very important," while 19% say it is "somewhat important."
- 90% say that controlling *what* information is collected about them is important—65% think it is "very important" and 25% say it is "somewhat important."

At the same time, Americans also value having the ability to share confidential matters with another trusted person. Nine-in-ten (93%) adults say this ability is important to them, with 72% saying it is "very important" and 21% saying it is "somewhat important."

## Permission and publicness are key features that influence views on surveillance.

Americans say they do not wish to be observed without their approval; 88% say it is important that they not have someone watch or listen to them without their permission (67% feel this is "very important" and 20% say it is "somewhat important").

However, far fewer (63%) feel it is important to be able to "go around in public without always being identified." Only 34% believe being able to go unnoticed in public is "very important" and 29% say it is "somewhat important" to them. In both cases, all adults, regardless of age or gender, express comparable views.



**Americans Hold Strong Views About Privacy in Everyday Life**

*In response to the following question: "Privacy means different things to different people today. In thinking about all of your daily interactions – both online and offline – please tell me how important each of the following are to you . . ."*

% of adults who say ...

| | Very important | Somewhat important | Not very important | Not at all important | Don't know | NET Important | NET Not Important |
|---|---|---|---|---|---|---|---|
| Being in control of who can get info about you | | 74% | | 19% | 3 11 | 93% | 4% |
| Being able to share confidential matters with someone you trust | | 72 | | 21 | 2 11 | 93 | 4 |
| Not having someone watch you or listen to you without your permission | | 67 | 20 | | 8 12 | 88 | 9 |
| Controlling what information is collected about you | | 65 | 25 | | 5 11 | 90 | 6 |
| Not being disturbed at home | | 56 | 29 | 9 22 | | 85 | 11 |
| Being able to have times when you are completely alone, away from anyone else | | 55 | 30 | 9 22 | | 85 | 10 |
| Having individuals in social/work situations not ask you things that are highly personal | 44 | 36 | | 13 2 4 | | 79 | 15 |
| Being able to go around in public without always being identified | 34 | 29 | 25 | 6 4 | | 63 | 31 |
| Not being monitored at work | 28 | 28 | 22 6 | 15 | | 56 | 27 |

Source: Pew Research Center's Privacy Panel Survey #4, Jan. 27, 2015-Feb. 16, 2015 (N=461). Refused responses not shown.

**PEW RESEARCH CENTER**

The findings above come from a survey conducted Jan. 27 to Feb. 16, 2015, among 461 adults on the GfK Knowledge Panel. It has a margin of error of plus or minus 5.8 percentage points. The findings cited below in the Summary section come from a separate survey of 498 adults on the same Knowledge Panel; that survey was conducted between Aug. 5 and Sept. 2, 2014, and has a margin of error of plus or minus 5.6 percentage points.

## Americans have little confidence that their data will remain private and secure.

For all of the 11 entities we asked about in the fall 2014 survey – from government agencies to credit card companies to social media sites – only small minorities say they are "very confident" the records maintained by these organizations will remain private and secure.

- Just 6% of adults say they are "very confident" that **government agencies** can keep their

records private and secure, while another 25% say they are "somewhat confident."

- Only 6% of respondents say they are "very confident" that **landline telephone companies** will be able to protect their data and 25% say they are "somewhat confident" that the records of their activities will remain private and secure.
- **Credit card companies** appear to instill a marginally higher level of confidence; 9% say they are "very confident" and 29% say they are "somewhat confident" their data will stay private and secure.



**Few Express Confidence That Their Records Will Remain Private and Secure**

*% of adults who say they are ... that the records of their activity maintained by various companies and organizations will remain private and secure*

Legend: ■ Very confident  ■ Somewhat confident  ■ Not too confident  ■ Not at all confident  ■ Don't know

| | Very confident | Somewhat confident | Not too confident | Not at all confident | Don't know |
|---|---|---|---|---|---|
| Your credit card companies | 9 | 29 | 21 | 25 | 12 |
| Government agencies | 6 | 25 | 23 | 31 | 11 |
| Your landline telephone company | 6 | 25 | 21 | 29 | 15 |
| Your cellular telephone company | 5 | 26 | 25 | 31 | 11 |
| Your email provider(s) | 3 | 26 | 26 | 30 | 11 |
| Your cable TV company | 5 | 23 | 24 | 29 | 16 |
| Companies or retailers you do business with | 4 | 22 | 28 | 33 | 10 |
| Your search engine provider(s) | 2 | 14 | 25 | 41 | 15 |
| The online video sites you use | 1 | 10 | 24 | 42 | 19 |
| The social media sites you use | 1 | 10 | 24 | 45 | 18 |
| The online advertisers who place ads on websites you visit | 1 | 6 | 23 | 53 | 13 |

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498). Refused responses not shown.

**PEW RESEARCH CENTER**

Online service providers are among the least trusted entities when it comes to keeping information private and secure. When asked about search engine providers, online video sites, social media sites and online advertisers, the majority felt "not too confident" or "not at all confident" that these entities could protect their data:

- 76% of adults say they are "not too confident" or "not at all confident" that records of their activity maintained by the **online advertisers** who place ads on the websites they visit will remain private and secure.
- 69% of adults say they are not confident that records of their activity maintained by the **social media sites** they use will remain private and secure.

- 66% of adults say they are not confident that records of their activity maintained by **search engine providers** will remain private and secure.
- 66% say they are not confident that records of their activity collected by the **online video sites** they use will remain private and secure.

## Few feel they have "a lot" of control over how much information is collected about them in daily life and how it is used.

When asked how much control they feel they have over how much information is collected about them and how it is used in their everyday lives, only a small minority of Americans say they have "a lot" of control over their personal data collection and its use.

When thinking about a range of activities that might take place on a typical day, 9% say they feel they have "a lot" of control over how much information is collected about them and how it is used, while 38% say they have "some control." Another 37% feel they have "not much control," and 13% feel they personally have "no control at all" over the way their data is gathered and used.

## A very small number say they have changed their behavior to avoid being tracked recently, but many were already engaged in more common or less technical privacy-enhancing measures.

At the time of the mid-2014 survey, the vast majority of respondents – 91% – had not made any changes to their internet or cellphone use to avoid having their activities tracked or noticed. Only 7% reported that they had made these kinds of changes in "recent months."

At the same time, a much larger group had engaged in some everyday obfuscation tactics and privacy-enhancing measures. These activities were not necessarily in direct response to news of government monitoring programs, but, rather, represent a set of measures that respondents may have engaged in out of broader concerns about their personal info. Some of the more common activities include:

- Clearing cookies or browser history (59% have done this).
- Refusing to provide information about themselves that wasn't relevant to a transaction (57% have done this).
- Using a temporary username or email address (25% have done this).
- Giving inaccurate or misleading information about themselves (24% have done this).
- Deciding not to use a website because they asked for a real name (23% have done this).

## Advanced measures, such as the use of proxy servers and encryption are less common.

This survey included somewhat more expansive questions about advanced privacy-enhancing measures such as the use of proxy servers, virtual private networks and encryption across a variety of communications channels, following up on findings reported earlier this year. However, even with comparatively broader language, just one-in-ten Americans said they had adopted these more sophisticated steps to shield their information:

- 10% of adults say they have encrypted their phone calls, text messages or email.
- 9% say they have used a service that allows them to browse the Web anonymously, such as a proxy server, Tor software, or a virtual personal network.

## Most want limits on the length of time that records of their activity can be retained.

There is wide variation across the length of time that respondents feel is reasonable for businesses and other organizations to store their data. Additionally, there is considerable variance on their views depending on the kind of organization that retains the records of the activity. In general, and even though it may be necessary to provide certain functionality, people are less comfortable with online service providers – such as search engine providers and social media sites – storing records and archives of their activity.

- 50% of adults think that **online advertisers** who place ads on the websites they visit should not save records or archives of their activity for any length of time.
- 44% feel that the **online video sites** they use shouldn't retain records of their activity.
- 40% think that their **search engine** provider shouldn't retain information about their activity.
- 40% think that **social media sites** they use shouldn't save data about their activity.

At the other end of the spectrum, the vast majority of adults are comfortable with the idea that credit card companies might retain records or archives of their activity. Just 13% think that credit card companies "shouldn't save any information."

## Those who have greater awareness of the government monitoring programs are more likely to believe that certain records should not be saved for any length of time.



**Those Who Have Heard "a Lot" About Government Surveillance Hold Stronger Views About Certain Data Retention Limits**

*% of U.S. adults who say the following organizations <u>should not save any information</u> about their activity*

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498).

**PEW RESEARCH CENTER**

Those who have had the most exposure to information about the government surveillance programs also have some of the strongest views about data retention limits for certain kinds of organizations. These differences are particularly notable when considering social media sites. Among those who have heard "a lot" about the government collecting communications data as part of anti-terrorism efforts, 55% say that the social media sites they use should not save any information regarding their activity, compared with 35% of those who have heard "a little" about the government monitoring programs.

## 65% of American adults believe there are not adequate limits on the telephone and internet data that the government collects.

When asked to think about the data the government collects as part of anti-terrorism efforts, 65% of Americans say there are not adequate limits on "what telephone and internet data the government can collect."  Just 31% say they believe that there are adequate limits on the kinds of data gathered for these programs. The majority view that there are not sufficient limits on what data the government gathers is consistent across all demographic groups. Those who are more aware of the government surveillance efforts are considerably more likely to believe there are not adequate safeguards in place; 74% of those who have heard "a lot" about the programs say that there are not adequate limits, compared with 62% who have heard only "a little" about the monitoring programs.

## 55% of Americans support the idea of online anonymity for certain activities, but many are undecided on the issue.

In the current survey, the majority of adults (55%) said that people should have the ability to

use the internet completely anonymously for certain kinds of online activities. Another 16% do not think people should be able to remain anonymous when they are online; 27% said they don't know.

Men are more likely than women to think people should be able to engage in certain online activities anonymously (61% vs. 49%), but support for internet anonymity does not vary by age. Education is a predictor, but income is not; adults with at least some college education are significantly more likely than those who have not attended college to believe that people should have the ability to use the internet anonymously (66% vs. 40%).

## Even as they expect online anonymity, most assume that motivated people and organizations could uncover private details.

Many believe they are particularly vulnerable to people or organizations who have a motive to learn private details about their past. When considering how difficult it would be for a *motivated* person or organization to learn private details about their past that they would prefer to keep private, 64% of adults said it would be "not too" or "not at all" difficult for a motivated person or organization to uncover that sensitive information. Just 20% felt it would be "very" or "somewhat" difficult.

Men and women report similar responses, but those ages 50 and older (76%) are significantly more likely to believe it would be "not too" or "not at all difficult" when compared with those under the age of 50 (54%). Similarly, those with a college degree are more likely than those who have not attended college to feel more exposed (70% vs. 58%).

## More about these surveys

The majority of the analysis in this report is based on a Pew Research Center survey conducted between Aug. 5, 2014, and Sept. 2, 2014, among a sample of 498 adults ages 18 or older. The survey was conducted by the GfK Group using KnowledgePanel, its nationally representative online research panel. GfK selected a representative sample of 1,537 English-speaking panelists to invite to join the subpanel and take the first survey in January 2014. Of the 935 panelists who responded to the invitation (60.8%), 607 agreed to join the subpanel and subsequently completed the first survey (64.9%), the results of which were reported in November 2014. This group has agreed to take four online surveys about "current issues, some of which relate to technology" over the course of a year and possibly participate in one or more 45- to 60-minute online focus group chat sessions. For the second survey whose results are reported here, 498 of the original 607 panelists participated. A random subset of the subpanel is occasionally invited to participate in online focus groups. For this report, a total of 26 panelists participated in one of three online focus groups conducted during December 2014. Sampling error for the total sample of 498 respondents is plus or minus 5.6 percentage points at the 95% level of confidence.

An additional survey related to Americans' views about the importance of privacy was conducted between Jan. 27 and Feb. 16, 2015, among a sample of 461 adults ages 18 or older. The sample was drawn from the same 607 adults who agreed to participate in the

subpanel on privacy. It has a margin of error of plus or minus 5.8 percentage points.

For more information on the Privacy Panel, please see the <u>Methods</u> section at the end of this report.

## Acknowledgements

The authors would like to acknowledge the generous contributions of the various outside reviewers who offered their insights at various stages of this project. In particular, we would like to thank Tiffany Barrett, danah boyd, Mary Culnan and all of the attendees of the Future of Privacy Forum Research Seminar Series, Urs Gasser, Chris Hoofnagle, Michael Kaiser, Kirsten Martin and Bruce Schneier. In addition, the authors are grateful for the ongoing editorial, methodological and production-related support provided by the staff of the Pew Research Center.

While we greatly appreciate all of these contributions, the authors alone bear responsibility for the presentation of these findings, as well as any omissions or errors.

# EXHIBIT 23

# Anonymity, Privacy, and Security Online

pewinternet.org/2013/09/05/anonymity-privacy-and-security-online

September 5, 2013



Report

September 5, 2013

By Lee Rainie, Sara Kiesler, Ruogu Kang and Mary Madden

## Anonymity online

Most internet users would like to be anonymous online at least occasionally, but many think it is not possible to be completely anonymous online. New findings in a national survey show:

- 86% of internet users have taken steps online to remove or mask their digital footprints— ranging from clearing cookies to encrypting their email, from avoiding using their name to using virtual networks that mask their internet protocol (IP) address.
- 55% of internet users have taken steps to avoid observation by specific people, organizations, or the government

Still, 59% of internet users do not believe it is possible to be completely anonymous online, while 37% of them believe it is possible.

A section of the survey looking at various security-related issues finds that notable numbers of internet users say they have experienced problems because others stole their personal information or otherwise took advantage of their visibility online—including hijacked email and social media accounts, stolen information such as Social Security numbers or credit card information, stalking or harassment, loss of reputation, or victimization by scammers.

- 21% of internet users have had an email or social networking account compromised or taken over by someone else without permission.
- 13% of internet users have experienced trouble in a relationship between them and a family member or a friend because of something the user posted online.
- 12% of internet users have been stalked or harassed online.
- 11% of internet users have had important personal information stolen such as their Social Security Number, credit card, or bank account information.
- 6% of internet users have been the victim of an online scam and lost money.
- 6% of internet users have had their reputation damaged because of something that

happened online.

- 4% of internet users have been led into physical danger because of something that happened online.
- 1% of internet users have lost a job opportunity or educational opportunity because of something they posted online or someone posted about them.

Some 68% of internet users believe current laws are not good enough in protecting people's privacy online and 24% believe current laws provide reasonable protections.

Most internet users know that key pieces of personal information about them are available online—such as photos and videos of them, their email addresses, birth dates, phone numbers, home addresses, and the groups to which they belong. And growing numbers of internet users (50%) say they are worried about the amount of personal information about them that is online —a figure that has jumped from 33% who expressed such worry in 2009.

People would like control over their information, saying in many cases it is very important to them that only they or the people they authorize should be given access to such things as the content of their emails, the people to whom they are sending emails, the place where they are when they are online, and the content of the files they download.

**About this survey**

This survey by the Pew Research Center's Internet Project was underwritten by Carnegie Mellon University. The findings in this report are based on data from telephone interviews conducted by Princeton Survey Research Associates International from July 11-14, among a sample of 1,002 adults ages 18 and older.  Telephone interviews were conducted in English by landline and cell phone. For results based on the total sample, one can say with 95% confidence that the error attributable to sampling is plus or minus 3.4 percentage points and for the results from 792 internet and smartphone users in the sample, the margin of error is 3.8 percentage points.  More information is available in the Methods section at the end of this report.

## A closer look at key findings

**86% of internet users have tried to use the internet in ways to minimize the visibility of their digital footprints**

The chart below shows the variety of ways that internet users have tried to avoid being observed online.

## The strategies people use to be less visible online
*% of adult internet users who say they have done these things online*



Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**55% of internet users have taken steps to hide from specific people or organizations**

Beyond their general hope that they can go online anonymously, the majority of internet users have tried to avoid observation by other people, groups, companies, and government agencies. Hackers, criminals and advertisers are at the top of the list of groups people wish to avoid.



## Who users try to avoid
*% of adult internet users who say they have used the internet in ways to avoid being observed or seen by ...*

Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**Users report that a wide range of their personal information is available online, but feel strongly about controlling who has access to certain kinds of behavioral data and communications content.**

Users know that there is a considerable amount of personal information about them available online. Among the list of items queried, photos were the most commonly reported content posted online; 66% of internet users reported that an image of them was available online. And half (50%) say that their birth date is available.



**Personal information online**

*% of adult internet users who say this information about them is available online*

| | |
|---|---|
| A photo of you | 66% |
| Your birth date | 50% |
| Your email address | 46% |
| Your employer / company you work for | 44% |
| Things you've written using your name | 38% |
| Your home address | 30% |
| Which groups / orgs you belong to | 29% |
| Your cell number | 24% |
| Your home phone number | 21% |
| Video of you | 21% |
| Your political party / affiliation | 20% |

**Source:** Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

Another set of questions focused on the kinds of "data exhaust" that is generated as a result of everyday forms of online communications, web surfing and application use. Respondents were asked how much they cared "that only you and those you authorize should have access" to certain kinds of behavioral data and communications content and there was notable variance in the answers. The content of email messages and the people with whom one communicates via email are considerably more sensitive pieces of information when compared with other online activities and associated data trails.

## How much do you care that only you and those you authorize should have access to this information?

*% of adult internet users who say it is important—or not—to them to control these types of information*



Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

# EXHIBIT 24



University of Pennsylvania
**ScholarlyCommons**

Departmental Papers (ASC)                                    Annenberg School for Communication

4-14-2010

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

Chris Jay Hoofnagle

Jennifer King

Su Li

Joseph Turow
*University of Pennsylvania*, jturow@asc.upenn.edu

Follow this and additional works at: http://repository.upenn.edu/asc_papers

Part of the Communication Technology and New Media Commons, Consumer Protection Law Commons, Privacy Law Commons, and the Public Relations and Advertising Commons

Recommended Citation
Hoofnagle, C., King, J., Li, S., & Turow, J. (2010). How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?. Retrieved from http://repository.upenn.edu/asc_papers/399

Electronic copy available at: http://ssrn.com/abstract=1589864

This paper is posted at ScholarlyCommons. http://repository.upenn.edu/asc_papers/399
For more information, please contact libraryrepository@pobox.upenn.edu.

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

**Abstract**

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are." Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults. This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In this telephonic (wireline and wireless) survey of internet using Americans (N=1000), we found that large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. Where there were differences, over half of the young adult-respondents did answer in the direction of older adults. There clearly is social significance in that large numbers of young adults agree with older Americans on issues of information privacy.

A gap in privacy knowledge provides one explanation for the apparent license with which the young behave online. 42 percent of young Americans answered all of our five online privacy questions incorrectly. 88 percent answered only two or fewer correctly. The problem is even more pronounced when presented with offline privacy issues – post hoc analysis showed that young Americans were more likely to answer no questions correctly than any other age group.

We conclude then that that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

**Keywords**

behavioral advertising, online advertising, privacy, transparency, consumer protection, social networking, age, young

**Disciplines**

Communication | Communication Technology and New Media | Consumer Protection Law | Privacy Law | Public Relations and Advertising

**Comments**

Electronic copy available at: http://ssrn.com/abstract=1589864

Cookie:TShram@google.com/mobile
Cookie:TShram@www.msnbc.msn.com/id/2
Cookie:TShram@tvguide.com/PartnerGrid
Cookie:TShram@www.de
Cookie:TShram@voip.fabphone.co.uk/voip/promo
Cookie:TShram@www.c
Cookie:TShram@www.co
Cookie:TShram@www.ebay.com/rtm/main
Cookie:TShram@stat.upe.d
Cookie:TShram@www.comcastsupport.comedCookie:TShram@user
Cookie:TShram@bing.com/search
Cookie:TShram@
Cookie:TShram@onlinestores.metaservices.microsoft.com/swervices/witching
Cookie:TShram@
Cookie:TShram@www.google.
Cookie:TShram@ytsa.net/tase
Cookie:TShram@community.adobe.com/help/api/thumbs
Cookie:TShram@google.com/verify
Cookie:TShram@google.ca/verify
Cookie:TShram@www.microsoft.com/windows.mobile
SNID
27=1JR2BZwybn9ozsGG7nzQprKfpqOX_Ai6QDcxTmOf4Q=SSDlBYXE3on3iWwc
google.com/verify
9728
2320728704
30067751
406026352
30030938
*
ach-search
UjiezX7sFgNwJhrie19zsC69Vu8=
community.adobe.com/help/api/v1/thumbs/
1536
2784647552
30759988
3564042032
30025733
*
sik_client_guid
47aeeb428-73bc-ada9-bb60-728dc6567a7
www.comcastsupport.com/sdcxuser/rrn/
1088
284664448
30089887
2560430544
30016461
*
SynZCSI
K_25_503=10036:80001
tvguide.com/PartnerGrid

# HOW DIFFERENT ARE YOUNG ADULTS FROM OLDER ADULTS WHEN IT COMES TO INFORMATION PRIVACY ATTITUDES & POLICIES?

## APRIL 14, 2010

> "We suggest...that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data." (see page 20)

**Chris Hoofnagle**
UC Berkeley School of Law, Berkeley Center for Law and Technology

**Jennifer King**
UC Berkeley School of Information

**Su Li**
UC Berkeley School of Law, Center for the Study of Law and Society

**Joseph Turow**
Annenberg School for Communication, University of Pennsylvania

Electronic copy available at: http://ssrn.com/abstract=1589864

**Chris Jay Hoofnagle**, J.D., is director of the Berkeley Center for Law & Technology's information privacy programs and senior fellow to the Samuelson Law, Technology & Public Policy Clinic. He is an expert in information privacy law. Hoofnagle co-chairs the annual Privacy Law Scholars Conference. He is licensed to practice law in California and Washington, DC.

**Jennifer King**, MIMS, is a Ph.D. candidate at the UC Berkeley School of Information. Most recently she was a researcher at the Samuelson Law, Technology, and Public Policy Clinic at UC Berkeley's School of Law.  Her research areas include information privacy and security, usability and human-computer interaction, video surveillance and other sensor networks. With Chris Hoofnagle, King has published three reports exploring Californians' privacy attitudes, available at SSRN.com.

**Su Li**, Ph.D., recently joined Berkeley Law as its new Statistician in Empirical Legal Studies.  Her research interests include gender and social inequality, economic sociology, social network analysis, and the sociology of education.  Li received her Ph.D. in Sociology and a Master's in Mathematical Models for Social Science at Northwestern University. An expert in quantitative methodology, Li was Assistant Professor of Sociology at Wichita State University before joining Berkeley Law.

**Joseph Turow**, Ph.D., is Robert Lewis Shayon Professor of Communication at the Annenberg School for Communication, University of Pennsylvania. Among his several books are *Niche Envy: Marketing Discrimination in the Digital Age* (MIT Press, 2006) and *Breaking Up America: Advertisers and the New Media World* (U of Chicago Press, 1997). Since 1999 he has conducted national telephone surveys that have moved forward public discourse on digital media, marketing, and privacy. Several can be found at the Annenberg Public Policy Center website, APPCPenn.org.

This survey was supported by the Rose Foundation for Communities and the Environment, Tim Little, Executive Director, under grant 025629-003, Chris Jay Hoofnagle, Principal Investigator; and by The Annenberg School for Communication— Michael Delli Carpini, Dean.

Electronic copy available at: http://ssrn.com/abstract=1589864

## Overview

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are."[1] Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults.[2] This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In July 2009, we commissioned a nationally representative telephone survey (landline and cellular) of Americans in order to understand the public's views of both online and offline privacy issues. Our first report from this effort, *Americans Reject Tailored Advertising and Three Activities that Enable It*,[3] released in October 2009, investigated Americans' comprehension of online tailored advertising and related privacy concerns. In this report, we compare young adults and older adults with respect to attitudes toward online privacy protection, whether they carry out certain privacy-protecting behaviors, their public policy preferences regarding privacy, and their knowledge of information privacy law that might affect them in their everyday lives. We found that expressed attitudes towards privacy by American young adults (aged 18-24) are not nearly as different from those of older adults as many suggest. With important exceptions, large percentages of young adults are in harmony with older Americans when it comes to sensitivity about online privacy and policy suggestions. For example, a large majority of young adults:

---

[1] Ariel Maislos, chief executive of Pudding Media, quoted in Louise Story, *Company Will Monitor Phone Calls to Tailor Ads,* New York Times, Sept. 24, 2007, available at: http://www.nytimes.com/2007/09/24/business/media/24adcol.html.

[2] Marwick, A., Murgia-Díaz, D., and Palfrey, J. (2010). Youth, Privacy and Reputation Literature Review. Berkman Center for Internet and Society, Harvard University.

[3] Joseph Turow et al., *Americans Reject Tailored Advertising and Three Activities that Enable It*, SSRN ELIBRARY (2009), http://ssrn.com/paper=1478214.

- Has refused to give information to a business in cases where they felt it was too personal or not necessary;
- Believes anyone who uploads a photo of them to the internet should get their permission first, even if taken in public;
- Believes there should be a law that gives people the right to know all the information websites know about them; and
- Believes there should be a law that requires websites to delete all stored information about an individual.

In view of these findings, why would so many young adults act in social networks and elsewhere online in ways that would seem to offer quite private information to all comers?  A number of answers present themselves, including suggestions that people 24 years and younger approach cost-benefit analyses related to risk differently than do individuals older than 24.  An important part of the picture, though, must surely be our finding that higher proportions of 18-24 year olds believe incorrectly that the law protects their privacy online and offline more than it actually does.  This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

## Background

Popular writings and comments suggest that America's youngest adults do not care about information privacy, particularly online. As evidence, many point to younger internet users' adoption and prolific use of blogs, social network sites, posting of photos, and general documenting and (over)sharing of their life's details online, from the mundane to the intimate, for all the world to consume.  "Young adults**,"** exhorted one newspaper article to that segment of its readers, "you might regret that scandalous Facebook posting as you get older."[4]   More broadly, Robert Iger, CEO of Disney, recently commented categorically that "kids don't care" about privacy issues, contending that complaints generally came from much older consumers.  Indeed, he said that when

---

[4] Roger [no surname], "There is No Privacy," *Virginia Pilot*, April 4, 2009, p. B9.

he talked to his adult children about their online privacy concerns "they can't figure out what I'm talking about."[5]

Iger is not alone in making claims about differences between young people—even college students—and older members of the population when it comes to giving out personal information online.  Anecdotes abound detailing how college-age students post photos of themselves unclothed and/or drunken, for the entire world—including potential employers—to see.  It is not a leap to argue that these actions are hard-wired into young people.  One psychological study found that adolescents (aged 13-16) and what they termed "youths" (those aged 18-22) are "more inclined toward risky behavior and risky decision making than are 'adults' (those older than 24 years) and that peer influence plays an important role in explaining risky behavior during adolescence."  Their finding was more pronounced among adolescents than among the youths, but differences between youths and adults were striking in willingness to take risks—particularly when group behavior was involved.[6]   Although the authors do not mention social media, the findings are clearly relevant to these situations. There the benefits of looking cool to peers may outweigh concerns about negative consequences, especially if those potential consequences are not likely to happen immediately. A related explanation for risky privacy behavior on social-networking sites is that they encourage users to disclose more and more information over time.

Young people's use of social media does not in itself mean that they find privacy irrelevant.[7]   Indeed, the Pew Internet & American Life Project found in 2007 that teenagers used a variety of techniques to obscure their real location or personal details on social networking sites.[8]   That study fits with the findings of other researchers, who have

---

[5] Gina Keating, "Disney CEO Bullish on Direct Marketing to Consumers," Reuters, July 23, 2009, http://www.reuters.com/article/idUSTRE56M0ZY20090723?pageNumber=2&virtualBrandChannel=0

[6] Margo Gardner and Laurence Steinberg, "Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study," *Developmental Psychology* 41:4, 625-635.  No one 23 or 24 years of age was in the sample.

[7] Raynes-Goldie, Kate. "Aliases, creeping, and wall cleaning: Understanding privacy in the age of Facebook" *First Monday* [Online], Volume 15 Number 1 (2 January 2010); Lenhart, Amanda and Madden, Mary. "Teens, Privacy, and Online Social Networks." Pew Internet & American Life Project, April 18. 2007. Available at: http://www.pewinternet.org/Reports/2007/Teens-Privacy-and-Online-Social-Networks.aspx; and more generally danah boyd's excellent bibliography of Social Networking Studies at: http://www.danah.org/researchBibs/sns.html.

[8] Lenhart and Madden, *Id*.

urged the importance of reframing the issue to ask *what dimensions* of privacy younger adults care about.[9]   While differences between young adults and those older than they may be important, other more subtle commonalities may be ignored. In recent years older age groups have rushed to social networking in large numbers with discussions of personal issues and details. A common anecdotal observation is that young adults and adolescents are more likely than their elders to post racy photos or document episodes of untoward behavior.   If research shows this distinction is accurate, the question nevertheless remains whether the same, higher, or lower percentages of Americans over 24 years old reveal more subtle but important private information about themselves that might lead to embarrassing and unfortunate incidents, such as identity theft.

In spite of vigorous social concerns and discussions, there does not appear to be research that shows definitively that young adults are fundamentally different from older Americans when it comes to privacy attitudes. Moreover, comparisons of what people of different ages do online must be placed within a context of how they understand the norms and laws of privacy in their society.  What, if anything, have they done to protect their privacy? What do they believe about privacy norms when presented with the opportunity to think rationally about them?  And what protections do they believe laws afford them when they do present themselves in various online environments?   The extent to which Americans of different ages have similar or different answers to these questions will suggest whether they converge on similar policy approaches despite seemingly different decisions in the heat of online activities. That is the topic we chose for this study.

In our earlier report on tailored advertising we compared age groups' responses to three questions that asked, "Please tell me whether or not you want websites you visit to show you *ads* [another question substituted *discounts* and a third *news*] that are tailored to your interests."   We found that while young adults' concerns were lower compared to other age categories, substantial proportions nevertheless said they did not want tailoring of ads, discounts, and news (55%, 37%, and 54% respectively).  Moreover, the percentages saying no rose to very high levels when the young adults were told that the information required to tailor advertisements would come from following them on the

---

[9] See Raynes-Goldie (2010).

website they were visiting (67% said no), on other websites they have visited (86% said no) and what they do offline—for example, in stores (90% said no).[10] The findings led us to believe that these tendencies might apply to young adults' approaches to privacy in general.  We hypothesized a dual dynamic:  A smaller percentage of young adults than older adults would evidence privacy concerns, but that percentage would still be large, typically exceeding 50% of young adults.  We did find this dynamic at work. But we also noted that differences in privacy attitudes and practices between young adults and older ones were at times so small as to not be statistically significant.

## Methods

In 2009, we commissioned a survey on behalf of the Berkeley Center for Law and Technology at the University of California, Berkeley School of Law in order to gauge the American public's attitudes towards and knowledge of the rules and practices surrounding the collection and use of personal information.   In this report, we present a summary of our findings for a subset of our survey questions.[11] These questions were part of a survey of Americans' opinions about and understanding of a variety of online and offline privacy issues. We cast our population net broadly. We included people in our study if they were 18 years or older said yes to one of the following questions: "Do you go on online or use the internet, at least occasionally?" and "Do you send or receive email, at least occasionally?"

The survey was conducted from June 18 to July 2, 2009 by Princeton Survey Research Associates International. PSRA conducted telephone interviews with a nationally representative, English-speaking sample of 1,000 American adults living in the continental United States. A combination of landline (n=725) and wireless (n=275) random digit dial (RDD) samples was used to represent all adults in the continental United States who have access to either a landline or cellular telephone. The interviews averaged 20 minutes. Based on a seven callback procedure and using the American Association of Public Opinion research (AAPOR) RR3 method, a standard for this type of survey, the overall response rates were a typical 18 percent for the landline sample and

---

[10] *Id*. at Fn. 3.

[11] *Id*.

22 percent for the cellular sample. Statistical results are weighted to correct known demographic discrepancies.[12] The margin of sampling error for the complete set of weighted data is ±3.6 percent at the 95 percent confidence level. The margin of error is higher for smaller subgroups within the sample.

Table 1 presents the characteristics of the sample. For this report, we created cross-tabulations of a subset of our survey questions to compare responses across typical age categories (18-24, 25-34, 35-44, 45-54, 55-64, and 65+). Because some people didn't reveal their age, the total for this study's sample is 975 individuals. We considered chi-square values for each table significant at the level of $p < .05$. When the chi-square tests were significant, we used two sample t-tests to discover whether there are statistically significant differences between the 18-24 year olds and all the older adults (i.e. 18-24 compared to 25-65+). We also used Scheffe post-hoc tests to examine if any two age groups are significantly different from each other (e.g. 18-24 vs. 25-34 or 18-24 vs. 35-44) on each possible answer to the question being asked in the tables. For both t-tests and Scheffe tests[13] we considered significance to be at the level of $p < .05$.

All tables presented in this paper are based on the weighted sample of the data,

---

[12] A two-stage procedure was used to weight this dual-frame sample. A first-stage weight was applied to account for the overlapping sample frames. The first stage weight balanced the phone use distribution of the entire sample to match population parameters. The phone use parameter was derived from an analysis of the most recently available National Health Interview Survey (NHIS) data along with data from recent dual-frame surveys. (See Blumberg SJ, Luke JV, "Wireless substitution: Early release of estimates from the National Health Interview Survey, July-December, 2008." National Center for Health Statistics. May 2009.) This adjustment ensures that the dual- users are appropriately divided between the landline and cell sample frames.

The second stage of weighting balanced the total sample demographics to population parameters. The total sample was balanced to match national population parameters for sex, age, education, race, Hispanic origin, region (U.S. Census definitions), population density, and telephone usage. The basic weighting parameters came from a special analysis of the Census Bureau's 2008 Annual Social and Economic Supplement (ASEC) that included all households in the continental United States. The population density parameter was derived from Census 2000 data. The telephone usage parameter came from the analysis of NHIS data.

We conducted all analyses in this report using SPSS on a weighted random sample. Due to the unique way that SPSS handles weight, we applied the standardized weight in all analyses so that the sample was corrected by population proportion but not by population size. That is, the sample size was not inflated to the original population size in our analysis. Using the standardized weight prevents the risk of unduly reducing standard errors in significance tests and thereby prevents the risk of having type I errors in the analysis.

[13] Since Tables 15 and 16 involve indexed variables, on top of the tests on the comparisons of percentages we conducted additional t-tests and Scheffe tests to compare the means of the created indexed variables. See text for details.

with a valid sample size of 975. However, applying weights causes rounding errors in cross-tabulations, which is the reason that the Ns in all tables, except for Table 11, appear as a number other than 975.

**Table 1:  Characteristics of U.S. Adults in Sample (N=1,000)\***

|  | % |
|---|---|
| **Sex** | |
| Male | 48 |
| Female | 52 |
| **Age** | |
| 18-24 | 14 |
| 25-34 | 21 |
| 35-44 | 20 |
| 45-54 | 19 |
| 55-64 | 15 |
| 65+ | 8 |
| Refused | 3 |
| **Race** | |
| White | 78 |
| Black or African American | 9 |
| Asian or Pacific Islander | 4 |
| American Indian or Alaskan Native | 1 |
| Mixed Race | 2 |
| Other/Don't Know/Refused | 6 |
| **Hispanic or Latino Background?** | |
| Yes | 11 |
| No | 88 |
| Don't Know/Refused | 1 |
| **Household Income** | |
| Under $30,000 | 21 |
| $30,000 to under $50,000 | 19 |
| $50,000 to under $75,000 | 17 |
| $75,000 and Over | 33 |
| Don't Know/Refused | 10 |
| **Region of the Country** | |
| Northeast | 19 |
| Midwest | 22 |
| South | 33 |
| West | 26 |

*When the numbers don't add to 100% it is because of a rounding error.

## Findings

The following tables will elaborate on a basic theme:  Large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. For most of the questions we asked, there is a statistically significant difference between the youngest adults and older age categories. However, even in these cases over half of the young adult-respondents did answer in the direction of older adults.  There clearly is *social significance* in that large numbers of young adults—in some cases, 80-90 percent—agree with older Americans on issues of information privacy.

**Table 2 – Refused to Provide Information**

| Have you ever refused to give information to a business or a company because you thought it was not really necessary or was too personal? | Total | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 88% | 82% | 84% | 91% | 93% | 92% | 85% |
| *No, have not* | 11% | 18% | 13% | 9% | 7% | 7% | 14% |
| *Don't know/refused* | 1% | 0% | 3% | 0% | 0% | 1% | 1% |
| *Total* | 974 | 139 | 206 | 197 | 195 | 151 | 86 |

$x^2$= 34.158, df = 10, $p$ < .001

**Table 3 – Uploading Where I am Recognizable**

| Generally speaking, anyone who uploads a photo or video of me to the internet where I am clearly recognizable should first get my permission. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Strongly agree or Agree* | 86% | 84% | 81% | 86% | 90% | 91% | 88% |
| *Strongly disagree or Disagree* | 13% | 16% | 18% | 13% | 9% | 9% | 8% |
| *Don't know/refused* | 1% | 0% | 2% | 1% | 1% | 0% | 3% |
| *Total* | 973 | 140 | 206 | 197 | 195 | 150 | 85 |

$x^2$= 22.8, df = 10, $p$ < .05; Differences are significant but not related to young adults vs. older adults.   See text.

**Table 4 – Right To Know**

| Do you think there should be a law that gives people the right to know everything that a website knows about them, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 68% | 62% | 68% | 73% | 71% | 64% | 69% |
| *No, law is not necessary* | 30% | 35% | 31% | 24% | 28% | 31% | 30% |
| *Don't know/refused* | 2% | 3% | 2% | 3% | 1% | 5% | 1% |
| *Total* | 976 | 141 | 206 | 197 | 196 | 150 | 86 |

$x^2$= 12.3, df = 10, p = .27 : Differences not significant

**Table 5 – Right To Delete**

| Do you think there should be a law that requires websites and advertising companies to delete all stored information about an individual, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 92% | 88% | 91% | 90% | 94% | 94% | 90% |
| *No, law is not necessary* | 8% | 11% | 7% | 10% | 5% | 5% | 9% |
| *Don't know/refused* | 1% | 1% | 1% | 0% | 1% | 1% | 1% |
| *Total* | 975 | 139 | 207 | 197 | 195 | 150 | 87 |

$x^2$= 10.6, df = 10, p = .39 : Differences not significant

These dynamics are visible quite clearly in Tables Two through Five, which report on Americans' sensitivity regarding privacy issues. Large proportions of all age groups have refused to provide information to a business for privacy reasons. They agree or agree strongly with the norm that a person should get permission before posting a photo of someone who is clearly recognizable to the internet, even if that photo was taken in public. They agree that there should be a law that gives people the right to know "everything that a website knows about them." And they agree that there should be a law that requires websites and advertising companies to delete "all stored information" about an individual. In the case of the first issue (see Table Two), a statistically significant lower proportion of 18-24 year olds agrees with these positions, but this proportion of young adults agreeing or agreeing strongly was nevertheless over 80%.[14] With respect to

---

[14] In Table 2, when comparing the 18-24 year olds to the rest of the sample, the differences in the percentages between the two groups are statistically significant at .05 level according to a two-sample t-test. Interestingly, the Scheffe tests of differences between 18-24 year olds and each of the other groups show no significance at .05 level. With respect to Table 3, although answers to this question are

the other three issues (see Tables Three through Five), the differences between the 18-24 year olds and the other adults are not statistically significant: both young and old alike are in agreement.

Privacy Practices

We also sought to determine whether young adults were different from other adult categories when it came to common privacy-related practices—whether they read privacy policies, how frequently they erase their browser cookies, whether or not they had ever changed their mind about an online purchase because of a privacy or security concern, and how frequently they check their credit report.  In the case of reading privacy policies, there are no statistical differences among age groups.  As Table 6 shows, about half the adult population, including young adults, says it reads policies often or sometimes. When it comes to erasing cookies (Table 7), 58% of young adults say they erase cookies often or sometimes.  Statistical tests beyond the chi-square also indicate that age differences are essentially not statistically significant.  The t-test tells us that the only statistically significant finding involves the higher proportion of 18-24 year olds answering "hardly ever" compared to the rest of adults.  The Scheffe test finds no significance at all between the answers of young adults and the other age groups when it comes to erasing cookies.

About half of young adults have changed their mind about a purchase because of some privacy concern.  Post hoc comparisons of the data in Table 8 show no significant difference between young adults and the rest of the population.

We did find a difference regarding checking credit reports.  A substantially lower percentage of 18-24 year olds does that, with statistically significant differences from the other age groups centering on their answers of "about once a year," and "less often than once a year."  Young adults have a significantly higher proportion of people who answered  "never" than the other age groups.[15] This distinction between young adults and the others is understandable because credit reports become relevant to older adults, as they buy homes and use credit cards that are not cosigned by their parents.

significantly related to age, neither Scheffe tests nor t-tests show clear patterns of significance between young adults and the rest of the sample or between the youngest adults and each of the older groups.
[15] The comparison between the 18-24 year olds and the rest of the sample was statistically significant at .05 level according a two sample t-test.

**Table 6 – Reading Privacy Policies**

| Do you read the privacy policies of websites ... | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 14% | 14% | 12% | 16% | 15% | 14% | 15% |
| *Sometimes* | 36% | 37% | 32% | 40% | 34% | 39% | 36% |
| *Hardly ever* | 32% | 31% | 32% | 28% | 37% | 32% | 27% |
| *Never* | 18% | 16% | 24% | 16% | 13% | 14% | 22% |
| *Don't know/refused* | 1% | 1% | 0% | 1% | 0% | 1% | 0% |
| *Total* | 974 | 141 | 207 | 196 | 195 | 149 | 86 |

$x^2$= 21.9, df = 20, $p$ = .349 : Differences not significant

**Table 7 – Erasing Cookies**

| When using the internet, do you erase your cookies . . . | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 39% | 33% | 36% | 51% | 40% | 39% | 33% |
| *Sometimes* | 24% | 25% | 31% | 19% | 20% | 28% | 16% |
| *Hardly ever* | 17% | 25% | 12% | 18% | 20% | 13% | 13% |
| *Never* | 12% | 14% | 14% | 7% | 12% | 13% | 17% |
| *Not familiar with cookies* | 6% | 4% | 3% | 3% | 5% | 7% | 17% |
| *Don't know/refused* | 3% | 0% | 4% | 3% | 4% | 1% | 5% |
| *Total* | 974 | 139 | 206 | 196 | 195 | 150 | 88 |

$x^2$= 73.7, df = 25, $p$ < .001

**Table 8 – Changing Mind About Purchase**

| Have you ever changed your mind about buying something online because of a privacy or security concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 56% | 49% | 55% | 66% | 58% | 56% | 41% |
| *No, have not* | 38% | 44% | 39% | 29% | 38% | 39% | 47% |
| *Does not shop online* | 6% | 7% | 6% | 5% | 4% | 5% | 12% |
| *Don't know/refused* | 0% | 0% | 0% | 1% | 1% | 1% | 0% |
| *Total* | 974 | 140 | 207 | 196 | 196 | 150 | 85 |

$x^2$= 27.7, df = 15, $p$ < .05

**Table 9 – Checked Credit Report**

| In general, how often do you check your credit report? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *At least once a month* | 10% | 14% | 9% | 12% | 5% | 9% | 9% |
| *Every few months (quarterly)* | 18% | 13% | 19% | 17% | 17% | 22% | 17% |
| *About once a year* | 34% | 16% | 40% | 39% | 40% | 33% | 31% |
| *Less often than once a year* | 18% | 5% | 17% | 24% | 21% | 21% | 20% |
| *Never* | 19% | 48% | 14% | 8% | 17% | 15% | 21% |
| *Don't know/refused* | 1% | 4% | 1% | 1% | 1% | 1% | 1% |
| *Total* | 972 | 139 | 206 | 197 | 194 | 150 | 86 |

$x^2$= 144.4, df = 25, $p < .001$

## Levels of Concern

The tendencies noted above carry over to levels of privacy concern.  We fielded a two-prong question. The first asked the individual whether his or her privacy concern was greater, the same, or less than five years ago; the responses are in Table 10. Answers are significantly associated with age, but the 18-24 group was not significantly different than all older respondents, or any single group.  Contributing to the significance in this table is the 65+ group, which is more concerned than the 25-34 year olds ($p < .05$).

The obvious problem with Table 10 is that there is no baseline—we don't know the level of concern at which the person began five years ago.  But we pursued the question so we could ask people whose privacy concerns increased to note "the most important reason" for the rise. The responses, in Table 11, reveal no statistically significant association with age or differences between the 18-24 year olds and the other age groups.

**Table 10 – Concern About Privacy Issues**

| Compared to five years ago, would you say you are more concerned about privacy issues on the internet, less concerned, or that you have the same level of concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *More concerned* | 55% | 54% | 44% | 59% | 55% | 60% | 67% |
| *Less concerned* | 6% | 9% | 8% | 5% | 6% | 5% | 4% |
| *Same level* | 38% | 36% | 47% | 36% | 39% | 35% | 29% |
| *Don't know/refused* | 1% | 1% | 2% | 1% | 1% | 0% | 0% |
| *Total* | 974 | 140 | 206 | 196 | 196 | 150 | 86 |

$x^2$= 26.7, df = 15,  $p < .05$

**Table 11 – Concern About Privacy Issues – Most Important Reason**

| Please tell me which one of the following is the most important reason you are more concerned about privacy issues on the internet than you were five years ago. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *You know more about privacy risks online* | 48% | 42% | 59% | 41% | 51% | 47% | 46% |
| *You have more to lose if your privacy were violated* | 30% | 32% | 23% | 29% | 29% | 32% | 39% |
| *You have had an experience that has changed your mind about privacy* | 17% | 22% | 13% | 23% | 15% | 17% | 12% |
| *Some other reason?* | 3% | 0% | 4% | 6% | 3% | 2% | 4% |
| *Don't know/refused* | 2% | 4% | 0% | 2% | 2% | 2% | 0% |
| *Total* | 532[16] | 74 | 90 | 115 | 107 | 89 | 57 |

$x^2$= 23.0, df = 20, $p = .29$ : Differences not significant

Penalties for Information Misuse

One way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them. We asked respondents one question related to the monetary penalties a firm should pay and another regarding what should happen to executives involved in illegal privacy breaches.  As seen in Tables 12 and 13, the two tendencies we have seen throughout can be found here. Table 12 shows a clear majority of 18-24 year olds selecting the highest dollar amount of punishment offered (more than $2,500), though a t-test demonstrates that they were

---

[16] N is small because only people who answered "more concerned" in the previous question were asked this question.

significantly less likely to choose that amount than the rest of the population ($p < .001$), and more likely to select $1,000 ($p < .05$).

In Table 13, around half of the sample chose the harshest penalties for the companies or individuals—being put out of business and facing jail time, while a third or more thought the company should fund efforts to protect privacy. Though answers to this question are associated with age, 18-24 year olds differed[17] significantly from all other age groups only in selecting "The company should not be punished in any of those ways" ($p < .01$).

**Table 12 – Illegal Use of Personal Information**

| If a company purchases or uses someone's personal information illegally, about how much—if anything—do you think that company should be fined? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| $100 | 2% | 3% | 3% | 1% | 1% | 1% | 2% |
| $500 | 4% | 5% | 5% | 5% | 5% | 1% | 3% |
| $1,000 | 9% | 14% | 10% | 10% | 8% | 7% | 6% |
| $2,500 | 7% | 11% | 9% | 6% | 7% | 3% | 5% |
| More than $2,500 | 69% | 54% | 63% | 68% | 76% | 79% | 77% |
| It depends | 4% | 10% | 1% | 5% | 3% | 5% | 2% |
| Don't know/refused | 4% | 3% | 8% | 5% | 1% | 5% | 5% |
| Total | 979[18] | 141 | 207 | 196 | 196 | 152 | 87 |

$x^2$= 70.8, df = 35, $p < .001$

**Table 13 – Punishing Companies for Illegal Uses of Information**

| Beyond a fine, companies that use a person's information illegally might be punished in other ways. Which ONE of the following ways to punish companies do you think is most important? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| The company should be put out of business | 18% | 16% | 19% | 18% | 14% | 20% | 22% |
| The company should fund efforts to help people protect privacy | 38% | 33% | 46% | 33% | 43% | 36% | 31% |
| Executives who are responsible should face jail time | 35% | 40% | 29% | 40% | 33% | 34% | 40% |
| The company should not be punished in any of those ways | 3% | 7% | 2% | 5% | 2% | 2% | 2% |
| It depends | 2% | 0% | 2% | 2% | 2% | 3% | 2% |
| Don't know/refused | 4% | 4% | 3% | 3% | 7% | 5% | 2% |
| Total | 973 | 139 | 206 | 197 | 195 | 151 | 85 |

$x^2$= 39.0, df = 25, $p < .05$

---

[17] 18-24 year olds have a higher percentage choosing the no penalty option.

[18] The slightly inconsistent N is caused by rounding errors as explained in the methods section.

Privacy Knowledge

Do the similarities between young adults and other age groups carry over to knowledge of existing privacy laws?  In order to explore this question, we gave the respondents a set of true/false statements to evaluate and answer. (See Table 14.) All of the answers are false. Consistently answering *true* reflects a belief that the law protects an individual's online and offline privacy more than it does in these common circumstances. We read the statements in separate clusters relating to online and offline privacy; within these clusters, we read the statements in random order.  To simplify presentation of the findings, we created a composite index tallying the number correct for each age group.

### Table 14 – Online and Offline Privacy Questions

| Online Questions | Answer |
|---|---|
| If a website has a privacy policy, it means that the site cannot share information about you with other companies, unless you give the website your permission. | False |
| If a website has a privacy policy, it means that the site cannot give your address and purchase history to the government. | False |
| If a website has a privacy policy, it means that the website must delete information it has about you, such as name and address, if you request them to do so. | False |
| If a website violates its privacy policy, it means that you have the right to sue the website for violating it. | False |
| If a company wants to follow your internet use across multiple sites on the internet, it must first obtain your permission. | False |
| **Offline Questions** | **Answer** |
| When you subscribe to a newspaper or magazine by mail or phone, the publisher is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you order a pizza by phone for home delivery, the pizza company is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you enter a sweepstakes contest, the sweepstakes company is not allowed to sell your address or phone number to other companies without your permission. | False |
| When you give your phone number to a store cashier, the store is not allowed to sell your address or phone number to other companies without your permission. | False |

As Table 15 indicates, the savvy that many attribute to younger individuals about the online environment doesn't appear to translate to privacy knowledge. The entire population of adult Americans exhibits a high level of online-privacy illiteracy; 75 percent answered only two or fewer questions correctly, with 30 percent getting none right.  But the youngest adults perform the worst on these measures: 88 percent answered

only two or fewer correctly, and 42 percent could answer none correctly.  A t-test shows that the difference between the average number correct for 18-24 year olds and the other adults—1.12 correct compared to 1.61 for the others—is statistically significant ($p <$ .001).  When focusing particularly on how these differences play out between young adults and the particular groups, a Scheffe test reveals that the 18-24 year olds were more likely to get none correct than the 25-34 and 35-44 year olds ($p <$ .05 in both cases). Young adults were also less likely to get 3-4 correct than the 35-44 and 55-64 groups ($p <$ .05 in both cases).  In all of these statistically significant cases, a substantially larger percentage of young adults know less about online privacy regulations.

When it came to our offline privacy knowledge questions, the differences between young adults and the other age groups were even more pronounced.  Eighty-eight percent of 18-24 year olds answered two or fewer of our offline questions correctly, compared to 74 percent overall.  A t-test showed that 18-24 year olds only answered 0.9 correctly compared to 1.8 for the other groups ($p <$ .001).  Moreover, Scheffe tests note statistical significance compared to each of the other groups.  Young adults were more likely to answer no questions correctly than any other age group; conversely, they were less likely to answer 3-4 questions correctly than any other age group.

Getting these questions right is important because it indicates whether the respondents know that privacy laws protect them in common commercial transactions. We found that while young adults tend to be similar to older adults in attitudes, practices, and policy preferences regarding information privacy, they are quite more likely than older adults to be wrong in judging whether the legal environment protects them.

**Table 15 - Online Privacy Knowledge Questions (5 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct | 5 Correct |
|---|---|---|---|---|
| 18-24 (N=139) | 42% | 46% | 11% | 1% |
| 25-34 (N=206) | 25% | 58% | 16% | 2% |
| 35-44 (N=197) | 24% | 38% | 30% | 8% |
| 45-54  (N=196) | 26% | 48% | 24% | 3% |
| 55-64  (N=150) | 39% | 32% | 28% | 1% |
| 65 and Older (N=86) | 31% | 43% | 24% | 1% |
| Overall (N=974) | 30% | 45% | 22% | 3% |

$x^2$ = 73.1, df = 15, $p < .001$

**Table 16 - Offline Privacy Knowledge Questions (4 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct |
|---|---|---|---|
| 18-24 (N=139) | 50% | 38% | 12% |
| 25-34 (N=206) | 34% | 37% | 29% |
| 35-44 (N=197) | 24% | 33% | 43% |
| 45-54  (N=196) | 26% | 41% | 34% |
| 55-64  (N=150) | 26% | 32% | 42% |
| 65 and Older (N=86) | 27% | 37% | 36% |
| Overall (N=974) | 27% | 35% | 38% |

$x^2$= 69.9, df = 20, $p < .001$

## Conclusion

In policy circles, it has become almost a cliché to claim that young people do not care about privacy. Certainly there are many troubling anecdotes surrounding young individuals' use of the internet, and of social networking sites in particular.  Nevertheless, we found that in large proportions young adults do care about privacy. The data show that they and older adults are more alike on many privacy topics than they are different. We suggest, then, that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

Public policy agendas should therefore not start with the proposition that young adults do not care about privacy and thus do not need regulations and other safeguards. Rather, policy discussions should acknowledge that the current business environment along with other factors sometimes encourages young adults to release personal data in order to enjoy social inclusion even while in their most rational moments they may espouse more conservative norms. Education may be useful. Although many young adults are exposed to educational programs about the internet, the focus of these programs is on personal safety from online predators and cyberbullying with little emphasis on information security and privacy.[19] Young adults certainly are different from older adults when it comes to knowledge of privacy law.  They are more likely to believe that the law protects them both online and off. This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

But education alone is probably not enough for young adults to reach aspirational levels of privacy.  They likely need multiple forms of help from various quarters of society, including perhaps the regulatory arena, to cope with the complex online currents that aim to contradict their best privacy instincts.

---

[19] "Enhancing Child Safety and Online Technologies: Final Report of the Internet Safety Technical Task Force." The Berkman Center for Internet & Society, December 31, 2008. Available at: http://cyber.law.harvard.edu/pubrelease/isttf/

# EXHIBIT 25

S. Hrg. 105–1069

# S. 2326, CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

# HEARING

BEFORE THE

## SUBCOMMITTEE ON COMMUNICATIONS

OF THE

# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

SEPTEMBER 23, 1998

Printed for the use of the Committee on Commerce, Science, and Transportation





U. S. DEPOSITORY

OCT 2 4 2000

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2000

59–873 CC

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402

Generated on 2018-11-19 19:33 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

3

children. Fortunately in this case, the Federal Trade Commission stepped in and GeoCities agreed to comply with a consent order to stop these deceptive practices. This consent order was the first of its kind and I applaud the vision and hard work of the FTC in helping to protect citizens' privacy in the online world. The Subcommittee is very fortunate to have Chairman Pitofsky of the FTC testify today and I look forward to his comments.

I also look forward to the comments of the witnesses on the Children's Online Privacy Protection Act, which is co-sponsored by Senator McCain and Senator Bryan. I understand that the bill drew heavily from the recommendations and findings of the FTC's June report on Internet privacy, which found that 89 percent of children's websites collected personal information. The report also found that only 10 percent of the sites provide for some form of parental control over the collection and use of the information. Clearly this situation cannot be allowed to continue.

The McCain-Bryan bill requires the FTC to come up with rules that would provide notice of its personal information collection and use practices and obtain parental consent for the collection of personal information from children. While I have some minor technical concerns about a couple of the bill's provisions, I am sure they can be worked out and I look forward to eventually co-sponsoring the legislation.

I commend Sen. McCain and Sen. Bryan for their hard work on this critical issue. While the remaining legislative days available are few, I will work with the Chairman of the Full Committee, Sen. Bryan, and others to move the bill to markup and passage by the full Senate as quickly as possible.

I look forward to the testimony of the witnesses. Thank you.

### STATEMENT OF HON. RICHARD H. BRYAN, U.S. SENATOR FROM NEVADA

Senator BRYAN. Mr. Chairman, let me preface my comments by thanking you. Had you not agreed to convene this hearing as promptly as you have, I think the chances of this legislation being processed in this session would have been greatly diminished. Your leadership as the chairman of the subcommittee and your responsiveness to our request indicates that working with you and other members of this committee I believe, we can process legislation. I want to thank you for your leadership and for your efforts to work with us on this piece of legislation.

The Internet offers families unlimited opportunities to explore and enjoy new worlds of information. The Internet is quickly becoming a major force in the lives of our children, as it moves swiftly into our homes and classrooms around the country. Indeed, proficiency with the Internet will be a necessary skill required to succeed in the 21st Century.

According to the 1998 American Internet User Survey, there are currently 6 million children 12 and under that use the Internet, and that number is likely to grow to 15 million by the turn of the century. Children are by their very nature honest and trusting, and when approached on the Internet by their favorite cartoon characters, or offered a chance to win a prize, or to participate in some kind of a contest, children will freely provide very personal and private information.

Children of the ages of 12 and under are not likely to have the judgment to know what is appropriate. I know when my own children were 9 or 10 years of age, if they were given an opportunity to participate in some kind of contest, I am sure that they would have been willing to freely disclose any information about my credit card they happened to know, because they would have enjoyed the opportunity to participate in these games, which are fun and enjoyable for youngsters.

Technology has made the collection and dissemination of information that is collected about each of us easier than ever before.

Generated on 2018-11-19 19:32 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

4

Besides readily available public record information, more and more companies are compiling data on what groceries we buy, what movies we rent, what magazines we read, and what we purchase with our credit cards.

There is a growing concern about the privacy of our medical records and the release of personal financial data. Indeed, today our personal privacy is threatened because (1) information about us has market value to those who wish to sell us goods and services, and (2) the ease with which this information can be gathered and disseminated has been vastly enhanced because of the technology of our time.

As the chairman was kind to acknowledge, almost 2 years ago Senator McCain and I asked the Federal Trade Commission to conduct a study of online privacy issues after it came to our attention that certain companies were giving out social security numbers over the Internet.

The FTC has looked into a number of privacy areas, and this summer released a report that makes the case for legislative action in the area of protecting children's privacy.

As the FTC will testify this morning, while 90 percent of the commercial Web sites targeting children they surveyed collected personal information from these children, only 1 percent actually got parental consent before collecting this personal information.

This situation is deplorable, in my judgment. Children 12 and under are not fully capable of understanding the consequences of giving out personal information online. Children do not oftentimes understand or comprehend the potential risk posed to their public posting of personal information that may lead to both online or other types of contact by strangers.

And the sad part is that our children often understand the Internet and know how to navigate it far better than do our parents. Parents do not always have the knowledge, the ability, or the opportunity to monitor their children's online activities, and that is why Web site operators should get parental consent prior to soliciting personal information.

The legislation that Senator McCain and I have introduced will give parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent.

The Center for Media Education and the Center for Democracy and Technology should be commended for the excellent work that they have done in addressing privacy issues. Additionally, industry has created the Online Privacy Alliance and the Children's Advertising Review Unit, and come up with self-regulatory guidelines that show us that they are taking this issue seriously, and I would like to acknowledge and express my appreciation for the willingness of the privacy groups in the industry to work on this in passing this important legislation.

Earlier this year, I held seminars in Nevada, the southern part of our State in Las Vegas, and the northern part of our State in Reno, before a group of community leaders and State and local PTA presidents to discuss online privacy issues. These seminars were very informative, and really were eye-openers for parents.

Generated on 2018-11-19 19:32 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

5

Most of these parents were pretty sophisticated. We had the FBI and the FTC. The FBI pointed out the risks that are involved in terms of your child's safety by providing information when requested as to where your child goes to school, what hours he or she may be alone after school.

Now, admittedly some of this information would have great market value to legitimate commercial enterprises, but one of the lessons we were reminded of constantly by the FBI in their presentation is that you never know who you are talking to or with on the Internet. You may think that you are talking to another youngster who has the same interests that your child may have, but in point of fact you never know that.

The FBI has a very impressive program in which they are involved in identifying sexual predators and pedophiles who may use this information and who would prey on our youngsters.

So there is a personal safety issue involved as well.

There is also the privacy issue that we have talked about. The Internet provides a tremendous educational and cultural opportunity for our children, but Linda Hooper, one of the FBI agents who made the presentation, made an analogy that traveling on the Internet is like visiting a major city.

There are places that you would want your children to go and to see, the great historical areas of interest, the great museums, but just like traveling to a major city there are places that you would not want your child to go unaccompanied, or without the consent or permission of his or her parents.

And so, too, the Internet has the same caution. Interactive online communications provide tremendous opportunities for the children of the 21st Century, but at the same time it presents unique challenges for protecting the privacy of young children and their families.

And Mr. Chairman, I look forward to working with you and processing this piece of legislation and, again, let me thank you for your leadership and your responsiveness in calling this timely hearing.

Senator BURNS. Thank you, Senator Bryan.

I would like to call Mr. Robert Pitofsky, chairman of the Federal Trade Commission here in Washington, DC, and we welcome you this morning, and if you could come to the table and give us your insight on this, I want to join Senator Bryan in congratulating you in the work that you have done in this area, because it concerns all of us here on Capitol Hill, so we congratulate you. Thank you for coming this morning.

## STATEMENT OF ROBERT PITOFSKY, CHAIRMAN, FEDERAL TRADE COMMISSION

Mr. PITOFSKY. Thank you very much, Mr. Chairman, Senator Bryan. I am delighted to appear here today to testify in support of S. 2326, the Children's Online Privacy Protection Act of 1998.

The legislation would establish basic fair information practices protection for children, the youngest and most vulnerable of online consumers. The commission believes this legislation is important and necessary.


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

# EXHIBIT 26





## Journal of Marketing Communications

ISSN: 1352-7266 (Print) 1466-4445 (Online) Journal homepage: http://www.tandfonline.com/loi/rjmc20

# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

Kristien Daems, Patrick De Pelsmacker & Ingrid Moons

**To cite this article:** Kristien Daems, Patrick De Pelsmacker & Ingrid Moons (2017): Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors, Journal of Marketing Communications, DOI: 10.1080/13527266.2017.1409250

**To link to this article:** https://doi.org/10.1080/13527266.2017.1409250

Published online: 04 Dec 2017.

Submit your article to this journal

Article views: 177

View Crossmark data

JOURNAL OF MARKETING COMMUNICATIONS, 2017
https://doi.org/10.1080/13527266.2017.1409250





# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

Kristien Daems[a], Patrick De Pelsmacker[a] and Ingrid Moons[a,b]

[a]Faculty of Applied Economics, Marketing Department, University of Antwerp, Antwerp, Belgium; [b]Faculty of Design Sciences, University of Antwerp, Antwerp, Belgium

**ABSTRACT**

Although they are key stakeholders, advertisers' views on the usage of novel (integrated and/or interactive) advertising toward minors has remained largely unexplored in academic research. This study aims to fill this gap by examining advertising professionals' opinions about the ethical appropriateness of using novel advertising formats aimed at children and teenagers, how to advance advertising literacy in minors, and their views of practices that are potentially privacy-invading, by means of both a quantitative online survey and qualitative in-depth interviews with Belgian advertising professionals. Results show that advertisers perceive that from 12 years onward, minors are capable to understand novel advertising formats and it is ethically justified to use them. Remarkably, advertisers would inform minors already from the age of 10 years onward about the commercial intention behind new advertising formats. Advertisers have strict opinions about collecting information online from minors. They advocate a combination of laws and self-regulation and governmental and educational campaigns to raise awareness and develop advertising literacy.

**ARTICLE HISTORY**
Received 1 August 2017
Accepted 21 November 2017

**KEYWORDS**
Advertising professionals; children; ethical appropriateness; novel advertising formats; teenagers; (self-)regulation

## Introduction

In the advertising world, (self-)regulation, guidelines, and codes exist with respect to advertising aimed at minors. Examples of self-regulation initiatives are the ICC code of Advertising and Marketing Communication practice, the EU Pledge, and the CARU guidelines (EU Pledge 2017; ICC 2017; The Childrens' Advertising Review Unit 2009). However, despite these initiatives to protect minors against potentially misleading and deceptive advertising, there still exists a lack of regulation on novel (online) integrated and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). Additionally, online advertising practices are often used to collect and use personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013), and are therefore potentially privacy-invading.

Consequently, the use of novel advertising formats raises questions about their ethical appropriateness, and about how advertising literacy should be improved, especially with children and teenagers (Eagle and Dahl 2015; Moses and Baldwin 2005; Nebenzhal and Jaffe 1998). Research on new advertising formats aimed at children and teenagers from an

**CONTACT** Kristien Daems ✉ Kristien.daems@uantwerpen.be

© 2017 Informa UK Limited, trading as Taylor & Francis Group

advertiser perspective is lacking. Moreover, advertising professionals' view on advertising aimed at minors has received scant attention in academic literature and is limited to traditional advertising (Clarke and Gardner 2005; Geraci 2004; Gray 2005; Grimm 2004; Martínez 2016).

The present study contributes to developing insights into how Belgian advertising professionals perceive several aspects of the ethical ramifications of using novel advertising formats to target children and teenagers. The study can inform the advertising profession and public policy about these perceptions and be a starting point to influence or change them.

## Children's and teenagers' understanding of advertising

From an early age onward, children are confronted with advertising practices, while a majority of them is unconscious about the commercial and persuasive intent behind them (Crane and Kazmi 2010). In order to be able to cope in a correct way with promotional efforts, the development of advertising literacy is of crucial importance. *Advertising literacy* is the knowledge about advertising, the ability to recognize advertising techniques, and the capability to understand the persuasive intentions behind them (John 1999; Rozendaal, Buijzen, and Valkenburg 2011). Identifying and understanding advertising depends on the ability to distinguish advertising from program- or entertainment context (Moses and Baldwin 2005). The ability to do so depends on factors such as the subtlety of the persuasive message, the similarity between the commercial and entertaining message and the presence of a cue or separator to announce the advertising message (Shiying et al. 2014).

The Persuasion Knowledge Model (PKM) (Friestad and Wright 1994) describes how people identify and process advertising and which knowledge and experience an individual needs to cope with persuasive attempts: topic knowledge (knowledge about the topic of the message, e.g., product), agent knowledge (knowledge about the advertiser behind the persuasive attempt), and persuasion knowledge (knowledge about advertising formats and persuasive tactics) (Wright, Friestad, and Boush 2005). The cognitive skills and experience to acquire this knowledge develop through childhood and adolescence (John 1999; Moses and Baldwin 2005; Wright, Friestad, and Boush 2005). Compared to adults, children and teenagers have limited cognitive skills, less advertising experience, and less developed advertising knowledge. This makes them less able to process advertising in a conscious manner and more vulnerable for and at a greater risk of being misled by persuasive communication (Kunkel et al. 2004; Moses and Baldwin 2005; Rozendaal, Buijzen, and Valkenburg 2010). As a consequence, it is more difficult for minors to recognize and understand different advertising formats and advertisers' intentions and activate their persuasion knowledge and advertising literacy (John 1999; Kunkel et al. 2004; Terlutter and Capella 2013). According to John (1999) consumer socialization of children is a sequence of three different stages (perceptual, analytical, and reflective) through which children develop from preschool (3 years old) until adolescence (16 years old). From the analytical stage (7–11 years) onward children are able to analyze stimuli (e.g., an advertisement) on multiple dimensions. Only from the reflective stage (11–17 years) onward children or teenagers have the ability to fully understand advertising and advertisers' persuasive attempts as their social and information processing skills are further developed.

## Changing advertising practices

Nowadays, children and teenagers grow up in a – predominantly online – media environment (websites, social media, games, mobile platforms, etc.) in which they encounter new integrated and/or interactive advertising formats on a regular basis (Blades et al. 2014; Bucy, Kim, and Park 2011; Rideout 2014). In integrated formats, the lines between advertising and other informative or entertaining media content have become increasingly blurred (Blades et al. 2014; Kunkel et al. 2004; Moore 2004; Terlutter and Capella 2013). An example of this integration in traditional media is brand placement, the paid inclusion of brand identifiers in media content (television programs, movies) (Gupta and Lord 1998; Karrh 1998).

Besides, novel advertising formats persuade children and teenagers in an implicit manner by means of subtle affective associations (Nairn and Fine 2008). Interactive advertising formats give the receivers the opportunity to interact with the message and are often perceived as fun and enjoyable (Hudders, Cauberghe, and Panic 2016; Mallinckrodt and Mizerski 2007). Advergames are a typical example of online, interactive advertising formats aimed at children and teenagers. Advergames embed specific brand or product-related items (e.g., logos, brand names, brand mascots) in a game (Mallinckrodt and Mizerski 2007). This can lead to a circumventing of minor's persuasion knowledge activation (Owen et al. 2013; Panic, Cauberghe, and De Pelsmacker 2013). In a highly entertaining environment especially children may not be able to identify the commercial intention and lack the ability to activate and retrieve their persuasion knowledge (Waiguny, Nelson, and Terlutter 2012). It is harder to identify these (online) advertising formats as advertising and more difficult to understand their persuasive intent than it is for prominent (online) formats such as banner ads (Tutaj and van Reijmersdal 2012).

Online (integrated) advertising practices are also often used to collect personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013) and are, therefore, liable to practices that are privacy-invading and that inappropriately use personal data the media user is not always aware of, for instance, by having minors first subscribe to a newsletter or submit personal information before they can participate in a contest or play a game. Here again, based on children's limited cognitive skills, it can be expected that children are less likely than adults to take the privacy risks involved into account (Steeves 2006).

Using integrated and/or interactive advertising formats, is often considered as inherently unethical, since they may hamper the activation of persuasion knowledge (Nairn and Fine 2008; Owen et al. 2013), and raise questions about when and how they can be used, and how advertising literacy should be improved (Eagle and Dahl 2015; Nebenzhal and Jaffe 1998; Palmer 2005). This is especially relevant when these formats are targeted at minors. John's analysis about minors' advertising literacy dates back to 1999 and the PKM (Friestad and Wright 1994) was developed based on insights from traditional advertising (Rozendaal, Buijzen, and Valkenburg (2010). However, current advertising is no longer dominated by traditional mass media advertising, but by integrated and interactive advertising formats (Kunkel et al. 2004). Consequently, recognizing commercial messages as advertising, understanding the commercial and persuasive intention behind integrated and online advertising, and the activation of persuasion knowledge is even more challenging for children and teenagers than before (Moses and Baldwin 2005). As a result, there may be an increased need to protect them and educate them about advertising to develop their advertising literacy (Crane and Kazmi 2010).

## Existing (self-)regulation and guidelines

Both governmental institutions and the advertising industry have formulated principles regarding advertising aimed at minors. The ICC Code provides guidelines about ethical and responsible advertising directed at children for self-regulated organizations (ICC 2017). The Children's Advertising Review Unit is a self-regulated initiative in the United States which implies standards (CARU guidelines) regarding the ethicality of advertising aimed at children (Ji and Laczniak 2007; The Childrens' Advertising Review Unit 2009). In Belgium, the Belgian Pledge (derived from a similar initiative at European level, the EU Pledge) is a voluntary, joint initiative between the Union of Belgian Advertisers (UBA), FEVIA (Federation of food industry in Belgium), and COMEOS (representative for Belgian commerce and services) in which their members commit to not target advertising toward children under the age of 12 for food and beverages which do not meet the nutritional standards (so called HFSS products) or not to target products at children under the age of 12, regardless of the product (The Belgian Pledge 2017). In June 2017, the Belgian Pledge was updated and additional integrated and interactive (online) media channels (beyond television and print advertising) were add to the range of the Belgian Pledge (FEVIA 2017).

However, despite the existing (self-)regulation, codes, and guidelines, there still is a lack of regulation on novel, integrated, and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). The specific characteristics of these formats warrant up-to-date legislation and/or self-regulation. Advertising professionals are key stakeholders in this debate. Their fundamental understanding of the ethical ramifications of the use of novel advertising formats toward minors and their willingness to take them into account in developing advertising campaigns is crucial.

## Advertising professionals' opinions regarding advertising aimed at minors: research questions

Advertising professionals' view on the ethical acceptability of advertising and advertising formats has received scant attention in academic research. Apart from Harris Interactive's study (Geraci 2004; Grimm 2004) and Martínez (2016) study, to the best of our knowledge, there are no published studies on advertisers' opinions regarding advertising practices aimed at children and teenagers, let alone their view with respect to new advertising formats. However, advertising professionals are the main decision-makers with respect to the target groups, formats, and stimuli used in their campaigns. Besides commercial concerns, one might expect that ethical considerations also play a role in these decisions. Consequently, developing insights into advertising professionals' opinions about the ethical appropriateness of novel advertising formats aimed at children and teenagers, how minors should be informed and how their advertising literacy should be improved, and how they could be protected by (self-)regulation, is important. The current study aims at exploring the practice and perception of advertising professionals regarding these issues, and aims to answer the following research questions:

(1)  Which new advertising formats are mostly used toward children and teenagers?
(2)  According to advertising professionals, from which age onward

    (a)  do minors understand the commercial intention behind new advertising formats,

(b)  is the usage of these new advertising formats ethically acceptable,

(c)  should minors be made aware of the commercial intent of these marketing communication techniques?

(3)  What are the characteristics of an ethical data collection and data protection policy aimed at minors?

(4)  How should advertising toward children and teenagers be regulated and how should advertising literacy be developed?

## Method

The study uses a mixed method approach by means of both a quantitative online survey and follow-up qualitative interviews.

### Online survey

#### Research population and sample

The research population is staff of Belgian advertisers and Belgian advertising agencies. The sampling frames for the online survey were the membership list of the UBA and a list of employees of advertising agencies retrieved from the website of the Association of Communication Companies (ACC). In total, 2614 advertisers from 245 different companies and 160 advertising professionals working in 79 advertising agencies were invited by email to participate to an online survey. The survey consisted of forced response questions (except for the question were the respondents could leave their email address to participate in the follow-up study). As a result the respondents could not skip questions they did not wanted to answer. However, the respondents could stop and leave the survey any time. Each respondent received the questions of the survey in the same order. Only the order of the vignettes was randomized across respondents. As a result the questions at the beginning of the survey were answered by more respondents compared to questions at the end of the survey. One hundred and sixty-one respondents started the survey. Seventy-one of them only partially completed it, because they dropped out after the introductory questions (44), after the vignettes (18), or after part of the last sections (9) of the questionnaire. Ninety respondents completed the full survey. The analyses were carried out on the number of respondents who answered the question analyzed.

#### Questionnaire and measures

In the current study, a minor is defined as an individual between 6 and 18 years old. This group is divided into two subgroups, namely children (between 6 and 12 years old) and teenagers (between 13 and 18 years old).

After a number of introductory questions, nine vignettes were presented in randomized order. Vignettes are descriptions of concrete situations or scenarios presented to the respondents to reflect upon or give their opinion about (Mortelmans 2007). The nine vignettes describe new integrated and/or interactive advertising formats used to target minors in both offline and online environments without mentioning the specific name or advertising format they refer to: product placement on television (PP), in-game advertising (IGA), advergames, applications, video advertising, merchandising, online behavioral advertising (OBA),

search engine marketing, and location-based services (LBS). These advertising formats are prominent examples of novel advertising formats. They were most often mentioned in exploratory interviews with advertisers and advertising agencies as formats that are used toward minors. Merchandising is the only traditional advertising format and was chosen because it was often mentioned as a very prominent technique when targeting children. The vignettes can be found in Appendix 1. One hundred and seventeen respondents answered all three questions for each of the nine vignettes.

By means of a slider ranging from 6 to 18 years old, for each vignette the respondents answered two questions:

(1) from which age onward are minors capable of understanding the persuasive nature of the advertising technique described in the vignette?
(2) from which age onward is the type of advertising ethically acceptable to use?

If respondents held the opinion that minors were not capable of understanding the advertising format, or that the usage of an advertising format was not ethically acceptable toward minors, they could indicate this answer option and they did not have to indicate an age on the slider. Only when a respondent indicated an age to the second question, they had to answer a third question:

(3) from which age onward minors need to be notified about the commercial intent of the advertising format described in the vignette?

For this question, they could also indicate that minors do not have to be warned about the commercial intent of the advertising format, and thus they did not have to indicate an age. These questions were based on the Harris Interactive study (Geraci 2004; Grimm 2004).

In the second section, respondents were asked how advertising to minors should be regulated, and through which organizations (governmental or educational) advertising literacy in minors should be improved. Ninety-nine respondents answered the questions in this survey block. The following five questions were presented (five-point Likert scale ranging from totally disagree to totally agree):

- Commercial communication with regard to children/teenagers should be regulated…:
  - …exclusively through self-regulation.
  - …exclusively through legislation.
  - …through a combination of legislation and self-regulation.
- The government should strive for awareness building in order to promote advertising literacy among children/teenagers.
- The educational system has a duty to promote advertising literacy among children/teenagers.

In the third section, respondents were asked about the verification rules in ethical minors' protection (yes/no answer option) (97 respondents answered this question):

- A proper data-protection policy on a social media platform that is accessible to children/teenagers…
  - provides verification of the ages of children.
  - allows verification of the status of the parent or legal guardian.
  - provides clear information concerning the use of cookies and the possibility of disabling them.

Respondent's opinion about the usage of advertising formats to collect personal data was asked by means of four questions (five-point Likert scale ranging from totally disagree to totally agree) (95 respondents answered these questions):

- Children/teenagers should not be allowed to register with a brand website or mobile platform without permission from a parent or legal guardian.
- The collection of personal information from children/teenagers should be prohibited.
- Personal information from children/teenagers should not be collected, processed, or used without permission from their parents or legal guardians.
- It is important for parents or legal guardians to be notified of the processing of personal information from their children /teenagers.

Additionally, two questions were asked concerning collection of personal data from minors (95 respondents answered these questions):

- The collection of personal information from children/teenagers…
  - is an ethically acceptable strategy.
  - is a strategy for which it is important to receive permission from parents or legal guardians.

The questions concerning privacy-policy, data collection, and protection were based on a report from the Federal Trade Commission (2012) and on the rules about (verifiable) parental consent and online privacy from the US' COPPA (Children's Online Privacy Protection Act's 1998).

The fourth section of the survey asked advertisers who target minors which forms of advertising they use toward children and/or teenagers. Respondents had to answer these questions only for the target group (children and/or teenagers) toward whom they target advertising. Ninety-four respondents answered this question.

The survey ended with demographic questions: the industry of the company the respondent works in, in which department the respondent works, level of education, age, and gender. If respondents were willing to participate in a follow-up in-depth interview they could leave their email address.

### *Qualitative follow-up study*

As a follow-up to the survey, 10 semi-structured in-depth interviews with advertising professionals were held (hereafter referred to as 'the interviewees'). Of these 10 interviewees, three were advertisers out of a list of 23 who completed the survey and were willing to participate in a follow-up interview. The other seven interviewees did not participate in the survey. The latter were selected from a list obtained from the Belgian Union of Advertisers with 27 companies that advertise to either children or teenagers. The interviews took place in a face-to-face setting and took about 45 min to one hour. The purpose of this qualitative follow-up study was to corroborate, nuance, interpret, and enrich the insights from the survey. The interviews covered the same topics as the survey. For each topic, the interviewees were asked to voice their opinion, were confronted with the results from the survey, and were probed to comment on them and to explain their agreement and/or nuances. The mix of both interviewees that did participate in the survey and those that did not participate in the survey was useful to have the interviewees reflected upon their own perceptions if they

participated in the survey, or to have the interviewees reflect upon the perceptions of other advertisers if they did not participated in the survey. All interviews were recorded and transcribed afterward to facilitate the analysis with the NVivo software program.

## Results

The results from both the quantitative and qualitative study are reported together for each research question.

### Sample characteristics

One hundred and sixty-one respondents started the survey and 90 respondents (85 advertising professionals and 5 advertising agency professionals, 54 females, $M_{age}$ = 41.5, 70 respondents educated at master's level) fully completed it. Both groups were taken together in the analysis. The financial industry (14.13%), the food industry (11.96%), and government (11.96%) are most represented. Most advertisers work in a marketing (50%) or a communication department (30.2%). The five participating advertising agency professionals work for more than 10 industries.

### Advertising formats used toward minors

The majority (61.7%) of the respondents only target adults (older than 18 years). 38.8% (36) professionals work for a company that advertises to minors. Six of these 36 advertising professionals only target children and 12 of them only advertise to teenagers. Half of the advertisers who target minors (18) focus on both children and teenagers. So, overall, 24 target children and 30 advertise to teenagers. The advertising formats used by advertisers who target children or teenagers are given in absolute numbers in Figure 1.

The most often used advertising formats toward children are contests, branded websites, premiums (a gift in exchange for the purchase of the product (Rideout 2014), and advergames. Contests, banners, and branded websites are the most often used advertising formats toward teenagers. OBA and location-based services are the least used advertising formats toward both children and teenagers.

### Vignettes

The results for the responses to the vignettes are divided into three sections: the understanding of advertising formats, ethical acceptability of advertising formats, and the need to inform minors about the commercial intentions of advertising formats. For each section, by means of independent sample t-tests, it was analyzed whether significant differences exist between the opinion of advertisers who target children and/or teenagers and advertisers who only target adults.

### Understanding advertising formats

According to the respondents, the average age at which minors can understand the different advertising formats is around 12–13 years (Table 1). Compared to the other formats, the



**Figure 1.** Advertising formats used toward children and teenagers.

**Table 1.** Average age whereupon minors understand different advertising formats.

| Advertising formats | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: 'Minors not able to understand the advertising format' |
|---|---|---|---|---|
| Merchandising | 12.74 | 2.58 | 118 | 6 |
| Applications | 12.40 | 2.54 | 115 | 8 |
| Product Placement (PP) | 13.03 | 2.75 | 114 | 12 |
| In-game Advertising (IGA) | 12.86 | 2.69 | 113 | 10 |
| Search Engine Marketing (SEM) | 12.26 | 2.59 | 121 | 5 |
| Location-Based Services (LBS) | 13.25 | 2.68 | 116 | 7 |
| Online Behavioral Advertising (OBA) | 12.72 | 2.59 | 121 | 6 |
| Advergames | 12.13 | 2.61 | 124 | 5 |
| Video advertising | 14.06 | 2.73 | 95 | 28 |

average age for location-based services, product placement and video advertising is slightly higher (13–14 years), with video advertising being the format with the highest average age indicated. The last column of the table indicates that IGA, product placement and especially video advertising are considered the most difficult formats to understand since for these formats it was indicated most often that minors are not able to understand them. For none of the nine vignettes an acceptable age under 12 years was reported.

Almost all interviewees agree that 12 years as an average age to understand these different advertising formats is plausible. The interviewees refer to research that takes 12 years as a threshold for advertising regulations (World Federation of Advertisers 2007) (quote 1).

*Quote 1:* In our company we adhere to the principle that we do not advertise towards children below the age of 12. There are good reasons for making this distinction. Academic research shows that children from the age of 12 onwards can interpret and judge advertising.

Table 2 shows that for merchandising, applications, and OBA, significant differences between respondents who advertise toward minors and advertisers who only advertise toward adults were found. Advertisers who also target minors hold the opinion that, on average, minors can understand merchandising, application, and OBA from an earlier age onward (12 years), compared to advertisers who only target adults (13 years).

### Ethical acceptability of advertising formats

On average, advertising formats are perceived as ethical when targeted at minors from the age of 12–13 years onward (Table 3). OBA, location-based services, and applications are perceived as ethically acceptable to use toward minors from an older age onward (13–14 years). The majority of the interviewees agrees with this opinion. These opinions correspond with the overall perception of advertising professionals that advertising aimed at teenagers is not a problem, whereas it is with children. The results are also in correspondence with 'The Belgian Pledge' and the 'CARU guidelines' (Ji and Laczniak 2007; The Belgian Pledge 2017; The Childrens' Advertising Review Unit 2009).

Significant differences in the opinions of advertisers who only target adults and those who target minors were only found for applications. The average age whereupon applications are considered as being ethically acceptable to use toward minors by advertisers who target toward minors is 12–13 years. Advertisers who only target adults indicate a significantly older average age, namely 14 years.

### Informing minors about the commercial intent of advertising formats

The average age from which minors should be informed about the commercial intent of advertising formats indicated is around 9–10 years (Table 4). The age is lower than the average age of 12 years to understand different advertising formats and to use the different formats in an ethical way. Some advertisers indicate that it is not necessary to inform minors about the commercial intent of advertising. This is especially the case for IGA, advergames, video advertising, and product placement.

Some interviewees would not inform children early on, whereas others hold the opinion that children have to be informed from an even earlier age onward (e.g., 6 years). Quotes 2 and 3 illustrate these mixed opinions.

**Table 2.** Understanding advertising formats – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P |
|---|---|---|---|---|---|
| Merchandising | Minors | 35 | 12.00 | 2.62 | .013 |
| | Adults | 54 | 13.31 | 2.24 | |
| Applications | Minors | 35 | 11.42 | 2.69 | .004 |
| | Adults | 54 | 13.04 | 2.32 | |
| Online Behavioral Advertising (OBA) | Minors | 35 | 11.97 | 2.53 | .035 |
| | Adults | 54 | 13.14 | 2.52 | |

**Table 3.** Average age whereupon the use of different advertising formats toward minors is considered as ethically acceptable.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: *'advertising format morally/ethically not acceptable'* |
|---|---|---|---|---|
| Merchandising | 12.62 | 3.36 | 115 | 9 |
| Applications | 13.44 | 2.91 | 111 | 12 |
| Product Placement (PP) | 12.85 | 3.36 | 114 | 12 |
| In-game Advertising (IGA) | 12.85 | 3.66 | 108 | 15 |
| Search Engine Marketing (SEM) | 12.76 | 3.33 | 119 | 7 |
| Location-Based Services (LBS) | 14.73 | 2.94 | 102 | 21 |
| Online Behavioral Advertising (OBA) | 13.52 | 3.30 | 116 | 11 |
| Advergames | 12.48 | 3.32 | 123 | 6 |
| Video advertising | 12.32 | 3.89 | 97 | 26 |

**Table 4.** Average age whereupon minors should be informed about the commercial intent of advertising formats.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N = Advertisers who indicated: *'No need to inform about commercial intent'.* |
|---|---|---|---|---|
| Merchandising | 9.88 | 3.37 | 105 | 7 |
| Applications | 9.82 | 3.29 | 110 | 1 |
| Product Placement (PP) | 9.9 | 3.25 | 101 | 10 |
| In-game Advertising (IGA) | 10.52 | 3.61 | 93 | 14 |
| Search Engine Marketing (SEM) | 9.92 | 3.18 | 110 | 8 |
| Location-Based Services (LBS) | 10.68 | 3.36 | 98 | 3 |
| Online Behavioral Advertising (OBA) | 10.43 | 3.39 | 107 | 8 |
| Advergames | 9.86 | 3.28 | 109 | 12 |
| Video advertising | 10.15 | 3.58 | 85 | 12 |

*Quote 2*: The ages indicated are quite old. I personally think that children can be gradually informed from an earlier age on, let's say six years. The explanation given to a 6-year old cannot be the same as the one given to a 9-year old or 12-year old child. (…) I think there are sufficient courses to integrate advertising education in school. Especially since advertising has become more complex. Additionally, parents do not always understand these advertising types themselves.

*Quote 3:* It is important to take into account the ability of children to understand the different advertising formats before informing them about it. Otherwise, it would work contradictory. I would say up to eight years old it has to be the parent who explains advertising formats.

Compared to advertisers who only target advertising toward adults, advertisers who target minors hold the opinion that, on average, it is desirable to inform minors about the commercial content from a younger age onward. This is especially the case for novel, integrated advertising formats which are more difficult to recognize (product placement, IGA, and video advertising) (Table 5).

### *Ethical data collection and data protection policy*

According to the vast majority of the respondents, a proper data collection and protection policy should provide verification of the age of the children (93.8%) or teenagers (88.7%),

**Table 5.** Information about commercial content – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P* |
|---|---|---|---|---|---|
| Product Placement | Minors | 33 | 9.06 | 2.65 | .012** |
| | Adults | 47 | 10.81 | 3.45 | |
| Video advertising | Minors | 24 | 8.79 | 3.17 | .052* |
| | Adults | 43 | 10.47 | 3.40 | |
| In-game advertising (IGA) | Minors | 31 | 8.97 | 2.93 | .011** |
| | Adults | 48 | 11.00 | 3.62 | |

$*p \leq .10; ** p \leq .050$.

allow verification of the status of the children's (80.4%) or teenagers' (71.1%) parents or legal guardians, and should provide clear information concerning the use of cookies and the possibility of disabling them to children (97.9%) and teenagers (95.9%). A substantial majority of the respondents (79%) agrees that the collection of personal information of children should be prohibited. Half of the advertisers (56.8%) agrees with this statement if teenagers are concerned. One in four (25.2%) disagrees if teenagers are the target group and 10.5% disagrees if children are the target group. If children (teenagers) are considered as a target group 71.5% (55.8%) agrees and 18.9% (25.3%) disagrees.

A majority (74.7%) of the advertisers agrees that children should not be allowed to register on brand websites or mobile platforms without permission of their parents or legal guardians (11.6% disagrees). If teenagers are considered as a target group the results are mixed (41.1% disagrees and 33.7% agrees). Advertisers think that it is important to notify parents or legal guardians if personal information from their children (87.4%) and teenagers (76.8%) is processed. If children are a target group, collection of personal data is perceived as unethical by a majority of the advertising professionals (84.2%). The results for teenagers are mixed (42.1% agrees, 57.9% disagrees). The majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%).

### Regulation and awareness building

The vast majority of advertising professionals do not agree with the statement that advertising toward children (76.7%) and teenagers (69.7%) should be regulated exclusively by means of self-regulation, or exclusively by means of legislation (children:62.6%; teenagers: 69.7%). The majority of the advertising professionals agree that advertising toward minors should be regulated by a combination of self-regulation and legislation for both children (77.8%) and teenagers (72.7%). The opinions of the interviewees with respect to the regulation of commercial communication toward minors are mixed. Quotes 4 and 5 illustrate both opinions.

*Quote 4:* With self-regulation you have certain mechanisms at work which work good. I think this type of regulation is the most efficient one. It is impossible to have all rules made by the legislator. In my opinion you have a stronger case if companies are willing to impose certain restrictions upon themselves and have these restrictions monitored by an independent institution. Regulation exclusively through legislation requires that the government has to invest in monitoring, because making laws without any type of monitoring does not makes sense. Therefore I think it is much more efficient to work with self-regulation. This requires a certain level of governmental confidence in companies. I do think however that companies take their responsibility seriously.

*Quote 5:* Legislation should set certain rules, and self-regulation can go further. Regulation exclusively through self-regulation, especially if it is not monitored, does not make a lot of sense.

Most advertisers agree with the statement that the government should strive for awareness building to promote advertising literacy among children and teenagers (both 66.7%) as with the statement that it is the educational system's duty to promote advertising literacy among children (76.8%) and teenagers (73.8%).

## Discussion

### Main findings

In general, all advertising professionals acknowledge that children are a vulnerable advertising target group. Teenagers are considered to be mature enough to identify advertising and to understand the commercial intention behind advertising formats. This finding is in line with John (1999) who noted that from the analytical stage in consumer socialization onward (age 11–12), teenagers have the skills to identify and understand traditional advertising. Protecting minors from persuasive communication is, therefore, more important for children (6–12 years) than for teenagers (Eagle, Bulmer, and De Bruin 2003). The results from the current study show that advertising professionals hold more or less the same perception for integrated and interactive advertising formats as for traditional ones. This is remarkable since their characteristics make it harder to identify them as advertising and recognize their persuasive intent.

Contests, brand websites, and premium offers are the most often used advertising formats toward children. Contests, banners, and branded websites are used mostly toward teenagers.

Advertisers consider minors capable of understanding novel advertising formats on average from 12 years onward. In the study of Harris Interactive (Geraci 2004; Grimm 2004) the average age whereupon minors were considered to view advertising critically was nine years. However, this study does not provide a clear definition of which type of advertising was studied. Martínez (2016) found that advertisers perceive children capable of identifying and understanding the intent of advertising at 10–12 years of age.

Novel advertising formats are considered ethically acceptable to use toward minors from the age of 12–13 years onward. These results are substantially different from Harris Interactive's study (Geraci 2004; Grimm 2004) in which marketers state that it is appropriate to target advertising to children at age seven. Advertising professionals in our study indicate that the average age to inform minors about the commercial intentions of novel advertising formats age is around 9–10 years. This is remarkable since the average age whereupon advertising is considered as ethical as well as the age whereupon minors are considered to be capable to understand the different advertising formats is 12–13 years. It appears that advertisers would inform minors about advertising even before they consider minors to be able to understand how novel advertising formats work. This is somewhat counterintuitive, since one would expect that it is only meaningful to inform or explain something to an individual, when this individual can comprehend what is explained. In the current study, formats for which it was indicated that it is not necessary to inform minors about the commercial intention are IGA, advergames, and video advertising. These results are also remarkable because these advertising formats are characterized by their integrated nature, which makes it more

difficult to recognize these formats as advertising. One would expect that especially for these integrated, implicit advertising formats it is necessary to disclose the commercial intent to minors.

The majority of the advertisers agrees that a proper policy should provide a verification of the ages of children, allows verification of the status of the parent or legal guardian and provides clear information concerning the use of cookies and the possibility of disabling them. According to the majority of advertising professionals, parents should give their permission for the data collection of both their children and teenagers.

A combination of both legislation and self-regulation to regulate advertising aimed at minors is preferred by the respondents, and governments and schools have a responsibility to make children advertising literate.

### Theoretical implications

The results of our study show that advertisers' perceptions are still based on old theories about the different stages of consumer socialization in childhood (John 1999) and models about children's cognitive development (e.g., the PKM (Friestad and Wright 1994) and that they still adhere to the principles in these models and theories that are based on traditional media. However, contemporary advertising formats as the ones explored in the current study differ from these traditional media because of their integrated and/or interactive characteristics. However, these characteristics of novel advertising formats do not seem to be taken into account when it comes to the usage and ethical acceptability of these formats when targeted at children and teenagers. As such, traditional models still function as standards for today's advertisers' perceptions, despite the fact that the way minors encounter advertising has changed a lot over the last decades and it is questionable whether these theories and models still apply to the use of contemporary advertising formats.

It appears that advertisers are satisfied with just complying with the existing ethical guidelines and rules (e.g., it is allowed to advertise to children from the age of 12 onward) and that they are not questioning whether they should take the lead themselves in updating the ethical guidelines or applying stricter ones. As such they apply the 'ethics code' view in ethical decision-making: they adhere to the law and to standards in ethical guidelines (De Pelsmacker, Geuens, and Van den Bergh 2017; Pickton and Broderick 2005). Nevertheless, given the vulnerability of minors, adhering to the 'consumer sovereignty' principle (taking the vulnerability, decision-making process and the available information to the consumer into account) or to the 'caveat venditor' principle (doing everything in the best interest of the consumers) might be more appropriate.

Moreover, it is even possible that the advertisers who participated in this study are more engaged with the subject of ethical advertising aimed at children and teenagers and are more ethically concerned than advertisers who did not participate.

### Managerial and public policy implications

The results of the current study can inform advertising professionals and public policy. Generally speaking, advertisers seem to be well aware of the vulnerability of especially young children when it comes to coping with (novel) advertising formats. The majority holds the opinion that children do not have a good understanding of new advertising formats, that

ethical concerns when advertising toward especially young minors should be taken into account, and, overwhelmingly, that especially children (not so much teenagers) should be protected against the inappropriate collection and use of personal data. Apparently, they are well aware of the measures that are taken to protect minors (for instance especially in case of unhealthy products) and to develop their advertising literacy, and they acknowledge to support them. This provides a solid basis for further developing these initiatives. Especially the educational system has a role to play, since advertisers hold the opinion that advertising literacy in children should be developed early on in primary school. Children's persuasion knowledge can be enhanced by teaching programs that focus on advertising literacy education and that learn how minors should reflect critically about advertising messages (Nelson 2016).

However, important improvements can still be made. In our sample, 24 respondents indicate that they target children, and half of both the respondents and the interviewees find this appropriate. This goes against (self-)regulatory measures in the Belgian Pledge and CARU guidelines. Advertising professional associations and the government could and should make more efforts to make professionals aware of these rules. Twenty to 25% of the respondents find it appropriate to collect personal information about children younger than 12, and to allow children to register on online platforms without parental consent. This is also an area for further improvement.

Integrated and/or online advertising formats are, on average, perceived by advertising professionals as ethically appropriate to use toward minors from the age of 12–13 years onward. However, for professionals who are currently advertising toward minors, this age is significantly lower. Public policy and advertising associations have to remain vigilant as to the ethical values of companies that market products targeted at children.

Importantly, in their appreciation of appropriateness to advertise (differently) to children and teenagers, advertising professionals seem to be largely inspired by their experience and appreciation of traditional advertising, and by the rules and regulations that are now in place. They implicitly assume that the implications of advertising today do not differ from the situation in the past when only traditional advertising formats were used. They do not seem to realize that novel integrated and interactive formats that develop brand commitment in a different way than before may constitute different challenges than traditional advertising with respect to how children and teenagers understand and process them, and what this entails with respect to the development of advertising literacy and ethical considerations with respect to these novel formats. This constitutes a major challenge for advertising organizations and public policy. Due to the specific nature of these novel advertising formats, there is an urgent necessity to revise what 'ethical advertising' aimed at minors mean and to protect minors against the implicit influence of these novel formats. This is a task for both public policy and the advertising industry.

## Limitations

The response rate of the survey was relatively low (90 out of 2614 fully completed and 161 partly completed the survey). This is common in on online surveys (Sheehan 2002) and if the subject of the survey is a rather sensitive topic, as is the case with the topic of the current study, it can be expected that this will affect the response rate negatively (Fan and Yan 2010). Nevertheless, due to the possibility of non-response bias, one should be careful with broad

generalizations of the study results. Moreover, the advertising professionals completed the survey voluntarily. This might have resulted in reaching only those advertisers who have a particular interest into the subject of advertising literacy of minors. The selection of respondents for the in-depth interviews partly compensated for this by also interviewing advertising professionals who did not participate in the survey.

Besides differences between children and teenagers, with regard to cognitive development, there might also be differences within these age categories. Future research could make this more fine-grained distinction.

Due to the limited information available in the description of the vignettes it is likely that certain situational factors which could have had an influence on the respondents' answers were not provided. However, the in-depth interviews provided a somewhat more nuanced and deeper insight into these situational factors.

The researchers tried to control for socially desirable answers by making the survey anonymous. Nevertheless, a certain degree of social desirability bias cannot be excluded.

## Acknowledgments

This study was conducted as a part of the AdLit interdisciplinary research project and funded by Vlaio (Flemish agency for innovation and entrepreneurship).

## Disclosure statement

No potential conflict of interest was reported by the authors.

## Funding

This work was supported by Agentschap Innoveren en Ondernemen [grant number 130008].

## Notes on contributors

*Kristien Daems* is a PhD student at the marketing department at the faculty of applied economics at the University of Antwerp. Her research focuses on children's and teenagers' advertising literacy.

*Patrick De Pelsmacker* is a professor of marketing at the faculty of applied economics at the University of Antwerp. His research focuses upon marketing communication effectiveness, new advertising media and formats, ethical consumer behavior, and social marketing.

*Ingrid Moons* is an assistant professor of marketing and consumer research at the faculty of applied economics and the faculty of design sciences at the University of Antwerp. Her research is situated in the domain of processes underlying the adoption of new products and services. Co-creation leading to innovation is one of the focal points in her research.

## References

Blades, Mark, Caroline Oates, Fran Blumberg, and Barrie Gunter. 2014. *Advertising to Children: New Directions, New Media*. Basingstoke: Palgrave Macmillan.

Bright, Laura F., and Terry Daugherty. 2012. "Does Customization Impact Advertising Effectiveness? An Exploratory Study of Consumer Perceptions of Advertising in Customized Online Environments." *Journal of Marketing Communications* 18 (1): 19–37. doi:10.1080/13527266.2011.620767.

Bucy, Erik Page, Sojung Claire Kim, and Miyeong Cecilia Park. 2011. "Host Selling in Cyberspace: Product Personalities and Character Advertising on Popular Children's Websites." *New Media & Society* 13 (8): 1245–1264.

Calvert, S. L. 2008. "Children as Consumers: Advertising and Marketing." *The Future of Children* 18 (1): 205–234. doi:10.1353/foc.0.0001.

Children's Online Privacy Protection Act. 1998. "Children's Online Privacy Protection Rule (COPPA)." https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/childrens-online-privacy-protection-rule.

Clarke, Barbie, and Catherine Gardner. 2005. "Concerned Children's Advertisers Leads the Way." *Young Consumers* 6 (4): 24–28.

Crane, Andrew, and Bahar Ali Kazmi. 2010. "Business and Children: Mapping Impacts, Managing Responsibilities." *Journal of Business Ethics* 91 (4): 567–586.

De Pelsmacker, Patrick, Maggie Geuens, and Joeri Van den Bergh. 2017. *Marketing Communications: A European Perspective*. 6th ed. Harlow: Pearson education.

Eagle, Lynne, Sandy Bulmer, and Anne De Bruin. 2003. "Marketing Communications Implications of Children's New Electronic Media Use: A Survey of Parental Opinions and Perceptions." *Journal of Marketing Communications* 9 (3): 129–146.

Eagle, Lynne, and Stephan Dahl. 2015. "Product Placement in Old and New Media: Examining the Evidence for Concern." *Journal of Business Ethics*: 1–14.

EU Pledge. 2017. "About the EU Pledge." EU-pledge. Accessed July 17. http://www.eu-pledge.eu/content/about-eu-pledge

Fan, Weimiao, and Zheng Yan. 2010. "Factors Affecting Response Rates of the Web Survey: A Systematic Review." *Computers in Human Behavior* 26 (2): 132–139.

Federal Trade Commission. 2012. "Mobile Apps for Kids; Current Privacy Disclosures Are Disappointing." FTC Staff Report http://www.ftc.gov/reports/mobile-apps-kids-current-privacy-disclosures-are-disappointing.

FEVIA. 2017. *Food Indusrty Reinforced the Engagement on the Topic of Responsible Child Advertising* [Voedingssector versterkt engagement rond verantwoorde kinderreclame]. Press release FEVIA, June 26th. Accessed June 26. http://www.fevia.be/nl/pers/voedingssector-versterkt-engagement-rond-verantwoorde-kinderreclame.

Friestad, M., and P. Wright. 1994. "The Persuasion Knowledge Model: How People Cope with Persuasuion Attempts." *Journal of Consumer Research* 21 (1): 1–31.

Füg, Oliver C. 2008. "Save the Children: The Protection of Minors in the Information Society and the Audiovisual Media Services Directive." *Journal of Consumer Policy* 31 (1): 45–61.

Geraci, John C. 2004. "What Do Youth Marketers Think about Selling to Kids?" *Young Consumers* 5 (3): 11–17.

Gray, Oliver. 2005. "Responsible Advertising in Europe." *Young Consumers* 6 (4): 19–23.

Grimm, M. 2004. "Is Marketing to Kids Ethical?" *Brandweek* 45 (14): 44–48.

Gupta, Pola B., and Kenneth R. Lord. 1998. "Product Placement in Movies: The Effect of Prominence and Mode on Audience Recall." *Journal of Current Issues & Research in Advertising* 20 (1): 47–59.

Hudders, Liselot, Veroline Cauberghe, and Katarina Panic. 2016. "How Advertising Literacy Training Affect Children's Responses to Television Commercials versus Advergames." *International Journal of Advertising* 35 (6): 909–931. doi:10.1080/02650487.2015.1090045.

ICC. 2017. "Marketing and Advertising to Children." Accessed July 12. https://iccwbo.org/global-issues-trends/responsible-business/marketing-advertising/marketing-and-advertising-to-children/

Ji, Mindy F., and Russell N. Laczniak. 2007. "Advertisers' Implementation of CARU Guidelines for Advertising Targeted at Children." *Journal of Current Issues & Research in Advertising* 29 (2): 27–38.

John, Deborah Roedder. 1999. "Consumer Socialization of Children: A Retrospective Look at Twenty-Five Years of Research." *Journal of Consumer Research* 26 (3): 183–213. doi:10.1086/209559.

Karrh, James A. 1998. "Brand Placement: A Review." *Journal of Current Issues & Research in Advertising* 20 (2): 31–49.

Kunkel, Dale, Brian L. Wilcox, Joanne Cantor, Peter Dowrick, Susan Linn, and Edward Palmer. 2004. "Report of the APA Task Force on Advertising and Children." http://www.apa.org/pubs/info/reports/advertising-children.aspx.

Mallinckrodt, Victoria, and Dick Mizerski. 2007. "The Effects of Playing an Advergame on Young Children's Perceptions, Preferences, and Requests." *Journal of Advertising* 36 (2): 87–100.

Martínez, Carolina. 2016. "'They Are Totally Unfiltered' Constructions of the Child Audience among Swedish Advertising Producers." *Television & New Media* 17 (7): 612–628.

McStay, Andrew. 2012. "I Consent: An Analysis of the Cookie Directive and Its Implications for UK Behavioral Advertising." *New Media & Society* 15 (4): 596–611.

Moore, Elizabeth S. 2004. "Children and the Changing World of Advertising." *Journal of Business Ethics* 52 (2): 161–167. doi:10.1023/B:BUSI.0000035907.66617.f5.

Mortelmans, D. 2007. *Handboek Kwalitatieve Onderzoeksmethoden* [Handbook Qualitative Research Methods]. Leuven: Acco.

Moses, Louis J., and Dare A. Baldwin. 2005. "What Can the Study of Cognitive Development Reveal about Children's Ability to Appreciate and Cope with Advertising?" *Journal of Public Policy & Marketing* 24 (2): 186–201.

Nairn, A., and C. Fine. 2008. "Who's Messing with My Mind? The Implications of Dual-Process Models for the Ethics of Advertising to Children." *International Journal of Advertising* 27 (3): 447–470.

Nebenzhal, Israel D., and Eugene D. Jaffe. 1998. "Ethical Dimensioins of Advertising Executions." *Journal of Business Ethics* 17 (7): 805–815.

Nelson, Michelle R. 2016. "Developing Persuasion Knowledge by Teaching Advertising Literacy in Primary School." *Journal of Advertising* 45 (2): 169–182. doi:10.1080/00913367.2015.1107871.

Owen, Laura, Charlie Lewis, Susan Auty, and Moniek Buijzen. 2013. "Is Children's Understanding of Nontraditional Advertising Comparable to their Understanding of Television Advertising?." *Journal of Public Policy & Marketing* 32 (2): 195–206.

Palmer, Daniel E. 2005. "Pop-Ups, Cookies, and Spam: Toward a Deeper Analysis of the Ethical Significance of Internet Marketing Practices." *Journal of Business Ethics* 58 (1): 271–280.

Panic, Katarina, Verolien Cauberghe, and Patrick De Pelsmacker. 2013. "Comparing TV Ads and Advergames Targeting Children: The Impact of Persuasion Knowledge on Behavioral Responses." *Journal of Advertising* 42 (2–3): 264–273.

Pickton, David, and Amanda Broderick. 2005. *Integrated Marketing Communications*. 2nd ed. Harlow: Pearson Education.

Rideout, Victoria. 2014. "Advertising to Children and Teens: Current Practices. A Common Sense Media Research Brief." https://www.commonsensemedia.org/research/advertising-to-children-and-teens-current-practices.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2010. "Comparing Children's and Adults' Cognitive Advertising Competences in the Netherlands." *Journal of Children and Media* 4 (1): 77–89. doi:10.1080/17482790903407333.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2011. "Children's Understanding of Advertisers' Persuasive Tactics." *International Journal of Advertising* 30 (1): 329–350.

Sheehan, Kim Bartel. 2002. "Online Research Methodology: Reflections and Speculations." *Journal of Interactive Advertising* 3 (1): 56–61.

Shiying, Li, Megan Pickering, Ali Moondore, Mark Blades, and Caroline Oates. 2014. "Young Children's Ability to Identify Advertisements on Television, Web Pages and Search Engine Web Pages." In *Advertsing to Children, New Directions, New Media*, edited by M. Blades, C. Oates, F. Blumberg, and B. Gunter, 199–218. London: Palgrave Macmillan.

Steeves, Valerie. 2006. "It's Not Child's Play: The Online Invasion of Children's Privacy." *University of Ottawa Law and Technology Journal* 3 (1): 169–188.

TaylorWessing. 2013. "Advertising across Different Media – A Guide to the Regulatory Playing Field in the UK." Accessed July 13. https://www.taylorwessing.com/download/article_advertising_different_media.html#.WWeBElGkKpo

Terlutter, Ralf, and Michael L. Capella. 2013. "The Gamification of Advertising; Analysis and Reserach Directions of in-Game Advertising, Advergames, and Advertising in Social Network Games." *Journal of Advertising* 42 (2–3): 95–112.

The Belgian Pledge. 2017. "Responsible Advertising and Marketing towards Children." Accessed July 12. https://www.belgianpledge.be/nl/engagementen


The Childrens' Advertising Review Unit. 2009. "Self-Regulatory Program for Children's Advertising." www.caru.org/guidelines/guidelines.pdf.

Tutaj, Karolina, and Eva A. van Reijmersdal. 2012. "Effects of Online Advertising Format and Persuasion Knowledge on Audience Reactions." *Journal of Marketing Communications* 18 (1): 5–18.

Waiguny, Martin K. J., Michelle R. Nelson, and Ralf Terlutter. 2012. "Entertainment Matters! the Relationship between Challenge and Persuasiveness of an Advergame for Children." *Journal of Marketing Communications* 18 (1): 69–89.

World Federation of Advertisers. 2007. "Food and Beverage Advertising to Children: When is a Child a Child?" www.wfanet.org/pdf/.../when_is_a_child_a_child.pdf.

Wright, P., M. Friestad, and D. M. Boush. 2005. "The Development of Marketplace Persuasion Knowledge in Children, Adolescents, and Young Adults." *Journal of Public Policy & Marketing* 24 (2): 222–233.

## Appendix 1.  Overview of advertising formats in vignettes.

| | |
|---|---|
| Product Placement (PP) on television | In a television series, a particular brand of soft drink is consumed often, and the logo is brought into focus. The brand has paid for the soft drink to be used in the television series |
| In-game advertising (IGA) | In a popular racing game, players can choose from several existing brands of cars, and billboards advertising these car brands appear along the roadside. The car brands have paid the developers of the game to have their brands used in the racing game |
| Search Engine Marketing (SEM) | Lucas would like to know more about the rules of tennis. To this end, he types 'tennis' as a search term in Google. A large number of advertisements for sports brands related to the search term appear in a sidebar next to the actual results |
| Location-Based Services (LBS) | Marie goes shopping with some of her friends during the school holiday. As they approach a popular chain store, she receives a text message on her mobile telephone containing a promotional code for a chain store |
| Online Behavioral Advertising (OBA) | Tom is searching the internet for camping equipment for his youth movement's annual camp. When he then looks through Facebook, the NewsFeed contains advertisements related to camping equipment |
| Advergames | To promote the newest product in its line, a brand has developed a game that can be played on the brand's website. While playing this game, the game elements are related to the product and the brand, and players attempt to capture as many brand logos as they can |
| Video advertising | A video on YouTube shows a child and a father singing the soundtrack of the latest Disney movie together. Disney paid the child's father to post the video online for the purpose of advertising. The Disney logo does not appear anywhere in the music clip, and there is no statement that the video is part of an advertising campaign |
| Advertising in Applications | Lori has her own tablet. Every day, she plays a music quiz that is installed as an application on her tablet. The music quiz application was a free download, with advertising appearing between the questions. A large amount of the advertising consists of ads for the latest CD from her favorite group |
| Merchandising of popular figures in a virtual world | Sam has installed an application from a media company on his parents' tablet. The application is a virtual world in which he comes into contact with various media figures and in which he and his friends try to complete challenges in this virtual world successfully. A great deal of merchandising is associated with these media figures. For example, the media figures also appear in television programs, they are present in amusement parks and they are portrayed on many products for children and teenagers |

# EXHIBIT 27

# Self-Regulatory Program for Children's Advertising

Children's Advertising Review Unit
Administered by the Council of Better Business Bureaus
Policies and Procedures set by the Advertising Self-Regulatory Council (ASRC), a service of the advertising industry and Council of Better Business Bureaus, 112 Madison Avenue, New York, NY 10016

The Children's Advertising Review Unit
Self-Regulatory Program for Children's Advertising

Index

I. INTRODUCTION                                                              3

A. Overview of the Self-Regulatory Program                                   3

B. CARU's Role                                                               3

C. Boards and Advisory Bodies                                               3

D. Procedures and Review Process                                            4


II. The Self-Regulatory Program For Children's Advertising                   4

A. Scope                                                                     4

B. Definitions                                                              5

C. Core Principles                                                          5

D. Guidelines                                                               6

1. An Overview                                                              6

2. Part I:  General Guidelines                                              6

(a) Deception                                                               6

(b) Product Presentations and Claims                                        7

(c) Material Disclosures and Disclaimers                                    8

(d) Endorsements                                                            9

(e) Blurring of Advertising and Editorial/Program Content                   9

(f) Premiums, Kids' Clubs, Sweepstakes and Contests                        10

(g) Online Sales                                                           12

(h) Sales Pressure                                                         12

(i) Unsafe and Inappropriate Advertising to Children                       13


3. Part II: Guidelines for Online Privacy Protection                       14

(a) Data Collection                                                        15

(b) Age-Screening/Hyperlinks                                               18

## I.   INTRODUCTION

### A. Overview of the Self-Regulatory Program

In 1974, the National Advertising Review Council (NARC) established the Children's Advertising Review Unit (CARU) as a self-regulatory program to promote responsible children's advertising. CARU is administered by the Council of Better Business Bureaus (CBBB) and funded by members of the children's advertising industry.

CARU's self-regulatory program sets high standards for the industry to assure that advertising directed to children is not deceptive, unfair or inappropriate for its intended audience. The standards take into account the special vulnerabilities of children, e.g., their inexperience, immaturity, susceptibility to being misled or unduly influenced, and their lack of cognitive skills needed to evaluate the credibility of advertising.

CARU's standards are embodied in principles and guidelines that were first adopted by CARU in 1975 and have been periodically revised to address changes in the marketing and media landscapes. For example, in 1996, CARU added a new section to the guidelines to address concerns about online data collection practices and updated this section again in 2014 to reflect amendments to the Children's Online Privacy Protection Act (COPPA).

### B. CARU's Role

CARU monitors and reviews advertising, websites and online services directed to children, initiates and receives complaints about advertising and online privacy practices, and determines whether such practices violate the program's standards. When it finds violations, it seeks changes through the voluntary cooperation of advertisers and website or online service operators. CARU also offers a general advisory service for advertisers and agencies, provides informational material for children, parents and educators, and encourages advertisers to develop and promote the dissemination of educational messages to children consistent with the Children's Television Act of 1990.

### C. Boards and Advisory Bodies

Policy for CARU's self-regulatory program is set by the Board of Directors of ASRC, a strategic alliance of the advertising industry and the CBBB. The Board is composed of key executives from the CBBB, the American Association of Advertising Agencies, the American Advertising Federation, the Association of National Advertisers, the Direct Marketing Association, the Electronic Retailing Association and the Interactive Advertising Bureau.

CARU's Academic/Expert Advisory Board includes leading experts in education, communication, child development, child mental health, marketing and nutrition. These

advisors provide CARU with guidance on child psychology and behavioral issues, market trends and research, and other issues as they relate to advertising and marketing to children. Members of the Advisory Board also consult with CARU on individual cases and participate in the review and revision of the principles and guidelines of the self-regulatory program.

The CARU Supporters' Council, composed of representatives of the companies that support the children's advertising industry's self-regulatory system, provides CARU with advice on trends and developments in children's advertising and media and participates in the review and revision of the principles and guidelines of the self-regulatory program.

### D. Procedures and Review Process

The procedures governing the review and resolution of cases, including the opportunity for appellate review by the National Advertising Review Board, are set forth in *The Advertising Industry's Process of Voluntary Self-Regulation*, which can be found at *http://www.asrcreviews.org/asrc-procedures/*. Under the procedures, at least ten times a year, the CBBB publishes Case Reports that include CARU's final case decisions, an Activity Report summarizing actions other than formal case decisions, and guidance based on prior published decisions. CARU's Case Reports can be found at *http://www.asrcreviews.org/category/caru/.*

## II. THE SELF-REGULATORY PROGRAM FOR CHILDREN'S ADVERTISING

### A. Scope

The principles and guidelines of the program apply to:

1. National advertising primarily directed to children under 12 years of age in any medium. Such advertising will be determined by an analysis of factors, no single one of which will necessarily be controlling, including: (a) whether the content of the media in which the advertisement appears is intended for children under 12, (considering the content's subject matter, format, projected audience demographics, and extent to which other advertising in that content is intended for children under 12); (b) whether the advertisement appears during, or just before or after, a television program aired during what is generally understood to be children's programming, considering the time of day during which the advertisement appears and the media outlet; (c) whether the advertisement appears during, or just before or after, a television program which is counted towards the broadcaster's or cablecaster's Children's Television Act obligations; and (d) whether, based on available information (including the subject matter and format of the advertisement), the advertiser intended to direct the advertisement primarily to children under 12.

2.    Online data collection and other privacy-related practices by website or online service operators that target children under 13 years of age or that have actual knowledge that a visitor is a child under 13 years of age.

**B.    Definitions**

1.    "National advertising" shall include any paid commercial message, in any medium (including labeling), if: (a) it has the purpose of inducing a sale or other commercial transaction or persuading the audience of the value or usefulness of a company, product or service; (b) it is disseminated nationally or to a substantial portion of the United States, or is test market advertising prepared for national campaigns; and (c) the content is controlled by the advertiser.

2.    "Advertiser" shall mean any person or other legal entity that engages in "national advertising," and includes, under Part II of the Guidelines, those who operate a commercial website or an online service.

**C.    Core Principles**

The following Core Principles apply to all practices covered by the self-regulatory program.

1.    Advertisers have special responsibilities when advertising to children or collecting data from children online. They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed. They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

2.    Advertising should be neither deceptive nor unfair, as these terms are applied under the Federal Trade Commission Act, to the children to whom it is directed.

3.    Advertisers should have adequate substantiation for objective advertising claims, as those claims are reasonably interpreted by the children to whom they are directed.

4.    Advertising should not stimulate children's unreasonable expectations about product quality or performance.

5.    Products and content inappropriate for children should not be advertised directly to them.

5

6. Advertisers should avoid social stereotyping and appeals to prejudice, and are encouraged to incorporate minority and other groups in advertisements and to present positive role models whenever possible.

7. Advertisers are encouraged to capitalize on the potential of advertising to serve an educational role and influence positive personal qualities and behaviors in children, e.g., being honest and respectful of others, taking safety precautions, engaging in physical activity.

8. Although there are many influences that affect a child's personal and social development, it remains the prime responsibility of the parents to provide guidance for children.  Advertisers should contribute to this parent-child relationship in a constructive manner.

**D.    Guidelines**

**1.    An Overview**

The Core Principles are broad in scope and reflect the belief that responsible advertising comes in many forms and that diversity should be encouraged. They aim to cover the myriad advertising practices in today's marketplace, as well as those that may emerge as technologies and advertising practices evolve. The Guidelines below are designed to provide additional guidance to assist advertisers in applying these broad principles to their child-directed advertising and to help them deal sensitively and honestly with children.

The Guidelines are not intended to be exhaustive. With respect to advertising practices that are not specifically addressed, CARU will apply the above Core Principles in evaluating the practices.

Part I of the Guidelines offers general guidance on deception and other marketing practices that are inappropriate when directed to children, and encourages certain practices. Part II addresses online data collection and other privacy-related practices that pose special concerns for children and require more specific guidance.

**2.    Part I: General Guidelines**

**(a)    Deception**

To assure that advertising directed to children is not deceptive:

1.  The "net impression" of the entire advertisement, considering, among other things, the express and implied claims, any material omissions, and the overall format, must not be misleading to the children to whom it is directed.

2.  Whether an advertisement leaves a misleading impression should be determined by assessing how reasonable children in the intended audience would interpret the message, taking into account their level of experience, sophistication, and maturity; limits on their cognitive abilities; and their ability to evaluate the advertising claims.

### (b)   Product Presentations and Claims

To avoid deceptive and/or inappropriate advertising to children involving product presentations and claims:

1.  Copy, sound and visual presentations should not mislead children about product or performance characteristics. Such characteristics may include, but are not limited to, speed, method of operation, color, sound, durability, nutritional benefits and similar characteristics.

2.  The presentation should not mislead children about benefits from use of the product. Such benefits may include, but are not limited to, the acquisition of strength, status, popularity, growth, proficiency and intelligence.

3.  Claims should not unduly exploit a child's imagination. While fantasy, using techniques such as animation and computer-generated imagery, is appropriate for both younger and older children, it should not create unattainable performance expectations nor exploit the younger child's difficulty in distinguishing between the real and the fanciful.

4.  Advertisements should demonstrate the performance and use of a product in a way that can be duplicated by a child for whom the product is intended.

5.  The advertisement should not mislead children about what is included in the initial purchase.

6.  Advertising that compares the advertised product to another product should be based on real product attributes and be understandable to the child audience.

7.  The amount of product featured should not be excessive or more than would be reasonable to acquire, use or consume by a person in the situation depicted. For example, if an advertisement depicts food being consumed by a person in the advertisement, or suggests that the food will be consumed, the quantity of food shown should not exceed the labeled serving size on the Nutrition Facts panel; where no

such serving size is applicable, the quantity of food shown should not exceed a single serving size that would be appropriate for consumption by a person of the age depicted.

8. Advertising of food products should encourage responsible use of the product with a view toward healthy development of the child. For example, advertising of food products should not discourage or disparage healthy lifestyle choices or the consumption of fruits or vegetables, or other foods recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid, as applicable to children under 12.

9. Advertisements for food products should clearly depict or describe the appropriate role of the product within the framework of the eating occasion depicted.

   a. Advertisements representing a mealtime should depict the food product within the framework of a nutritionally balanced meal.[1]

   b. Snack foods should be clearly depicted as such, and not as substitutes for meals.

   **(c)   Material Disclosures and Disclaimers**

1. All disclosures and disclaimers material to children should be understandable to the children in the intended audience, taking into account their limited vocabularies and level of language skills. For young audiences, simple words should be chosen, *e.g.*, "You have to put it together." Since children rely more on information presented in pictures than in words, demonstrative disclosures are encouraged.

2. These disclosures should be conspicuous in the advertising format and media used, e.g., online, advertisers should make disclosures clear and proximate to, and in the same format (i.e., audio or graphic) as, the claims to which they are related; in television, advertisers should use audio disclosures, unless disclosures in other formats are likely to be seen and understood by the intended audience.

3. Circumstances where material disclosures are needed include, but are not limited to, the following:

---

[1] While there may be a number of acceptable ways to depict a nutritionally balanced meal for children, each depiction should contain at least three of the five major food groups, preferably including those food groups recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid (i.e., fruits, vegetables, fat-free or low-fat milk and milk products and whole grains). The food included in the meal should reflect reasonable portion sizes and types of foods appropriate for children in the meal setting depicted. For example, a reasonable depiction of carrots may contain an appropriate side-dish portion for a child, rather than one or two condiment-size sticks. If the meal includes a caloric beverage, the beverage should be one that is appropriate in a nutritionally balanced meal taking into account the beverage's nutritional attributes and its calories within the context of the meal depicted.

    a.   Advertising for unassembled products should clearly indicate they need to be put together to be used properly.

    b.   If any item essential to use of the product is not included, such as batteries, this fact should be disclosed clearly.

    c.   Advertisers should clearly disclose information about products purchased separately, such as accessories or individual items in a collection.

    d.   If television advertising to children involves the use of a toll-free telephone number, it must be clearly stated, in both audio and video disclosures, that the child must get an adult's permission to call. In print or online advertising, this disclosure must be clearly and prominently displayed.

4.   Advertisers that create or sponsor an area in cyberspace, either through an online service or a website, must prominently identify the name of the sponsoring company and/or brand in that area. This could be done by using wording such as "Sponsored by _____."

5.   If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers) this fact should be clearly disclosed on the packaging.

### (d)   Endorsements

1.   Advertisers should recognize that the mere appearance of a celebrity or authority figure with a product can significantly alter a child's perception of the product. Advertisers may use such personalities as product endorsers, presenters, or testifiers, but they must take great care to avoid creating any false impression that the use of the product enhanced the celebrity's or authority figure's performance.

2.   All personal endorsements should reflect the actual experiences and beliefs of the endorser.

3.   An endorser who is represented, either directly or indirectly, as an expert must possess qualifications appropriate to the particular expertise depicted in the endorsement.

### (e)   Blurring of Advertising and Editorial/Program Content

1.   Advertisers should recognize that children may have difficulty distinguishing between program/editorial content and advertising, e.g., when program/editorial characters make advertising presentations or when an advertisement appears to be content to the intended audience.

9

2.  Advertising should not be presented in a manner that blurs the distinction between advertising and program/editorial content in ways that would be misleading to children.[2]

3.  Prohibited practices in television advertising

    a.  Program personalities, live or animated, should not be used to advertise products, premiums or services in or adjacent to a television program primarily directed to children under 12 years of age in which the same personality or character appears.

    b.  Products derived from or associated with a television program primarily directed to children under 12 years of age should not be advertised during or adjacent to that program.

4.  In media other than television, a character or personality associated with the editorial/content of the media should not be used to sell products, premiums or services in close proximity to the program/editorial content, unless the advertiser makes it clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.[3]

5.  On websites or online services directed to children, if an advertiser integrates an advertisement into the content of a game or activity, then the advertiser should make clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.

6.  If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers), the advertising itself should be separated from the program and clearly designated as advertising.

   **(f)     Premiums, Kids' Clubs, Sweepstakes and Contests**

1.  Advertisers should recognize that their use of premiums, kids' clubs, contests and sweepstakes has the potential to enhance the appeal of their products to children.

2.  Advertisers should take special care in using these kinds of promotions to guard against exploiting children's immaturity.

    i.  <u>Premiums</u>

---

[2] This provision does not apply to the mere presence of a product or character in program/editorial content.
[3] This provision does not apply to the mere presence of a character or personality in program/editorial content.

    a.  Since children have difficulty distinguishing product from premium, advertising that contains a premium message should focus the child's attention primarily on the product and make the premium message clearly secondary.

    b.  Conditions of a premium offer should be stated simply and clearly.

ii.  <u>Kids' Clubs</u>

    a.  Advertising should not mislead children into thinking they are joining a club when they are merely making a purchase or receiving a premium.

    b.  Before an advertiser uses the word "club," certain minimum requirements should be met. These are:

        1.  Interactivity - The child should perform some act demonstrating an intent to join the club, and receive something in return. Merely watching a television program or eating in a particular restaurant, for example, does not constitute membership in a club.

        2.  Continuity - There should be an ongoing relationship between the club and the child member, e.g., a regular newsletter or activities scheduled over a period of time.

        3.  Exclusivity - The activities or benefits derived from membership in the club should be exclusive to its members, and not merely the result of purchasing a particular product.

    c.  Additional requirements applying to kids' clubs online are covered in Part II of the Guidelines.

iii.  <u>Sweepstakes and Contests</u>

    a.  Advertisers should recognize that children may have unrealistic expectations about the chances of winning a sweepstakes or contest or inflated expectations of the prize(s) to be won.

    b.  The prize(s) should be clearly depicted.

    c.  The free means of entry should be clearly disclosed.

    d.  The likelihood of winning should be clearly disclosed in language readily understandable to the child audience. Disclosures such as, "Many will enter, a few will win." should be used, where appropriate.

e.   All prizes should be appropriate to the child audience.

f.   Online contests or sweepstakes should not require the child to provide more information than is reasonably necessary.  Any information collection must meet the requirements of the Data Collection section of the Guidelines and the federal Children's Online Privacy Protection Act (COPPA).

**(g)   Online Sales**

1.   Advertisers who sell products and services to children online should clearly indicate to the children when they are being targeted for a sale.

2.   If an advertiser offers the opportunity to purchase any product or service, either through the use of a "click here to order" button or other on-screen means, the ordering instructions must clearly and prominently state that a child must have a parent's permission to order.

3.   Online advertisers must make reasonable efforts, in light of all available technologies, to provide the person responsible for paying for such products and services the means to exercise control over the transaction.[4]

4.   If no reasonable means is provided to avoid unauthorized purchases by children online, the advertiser should enable the person responsible for payment to cancel the order and receive full credit without incurring any charges.

**(h) Sales Pressure**

1.   Advertising should not urge children to ask parents or others to buy products. It should not suggest that a parent or adult who purchases a product or service for a child is better, more intelligent or more generous than one who does not.

2.   Advertisers should avoid using sales pressure in advertising to children, e.g., creating a sense of urgency by using words such as 'buy it now.'

3.   Advertisements should not convey to children that possession of a product will result in greater acceptance by peers or that lack of a product will result in less acceptance by peers.

---

[4] Requiring the use of a credit card in connection with a transaction is a reasonable effort to provide the person responsible for payment with control over the transaction. This is consistent with COPPA regulations. See 16 CFR § 312.5.

4.  Advertisements should not imply that purchase or use of a product will confer upon the user the prestige, skills or other special qualities of characters appearing in advertising.

5.  Advertisements should not minimize the price of goods and services with words such as, "only," "just," or "bargain price" that children do not understand to be exaggeration or "puffing."

**(i) Unsafe and Inappropriate Advertising to Children**

1.  Safety

    a.  Advertisers should take into account that children are prone to exploration, imitation, and experimentation and may imitate product demonstrations or other activities depicted in advertisements without regard to risk.

    b.  Advertisers should not advertise products directly to children that pose safety risks to them, i.e., drugs and dietary supplements, alcohol, products labeled, 'Keep out of the reach of children;' nor should advertisers targeting children display or knowingly link to pages of websites or online services that advertise such products.

    c.  Advertisements for children's products should show them being used by children in the appropriate age range. For instance, young children should not be shown playing with toys safe only for older children.

    d.  Advertisements should not portray adults or children in unsafe situations or in acts harmful to themselves or others. For example, when activities (such as bicycle riding or skateboarding) are shown, proper precautions and safety equipment should be depicted; when an activity would be unsafe without adult supervision, supervision should be depicted.

    e.  Advertisers should be aware that many childhood injuries occur from the misuse of common household products and should avoid demonstrations that may encourage inappropriate use of such products by children.

2.  Inappropriate Advertising

a.   Advertisers should take care to ensure that only age-appropriate videos, films and interactive software are advertised to children, and if an industry rating system applies to the product, the rating label is prominently displayed.[5]

b.   Advertising should not portray or encourage behavior inappropriate for children (e.g., violence or sexuality) or include material that could unduly frighten or provoke anxiety in children; nor should advertisers targeting children display or knowingly link to pages of a website or online service that portray such behaviors or materials.

**3.        Part II: Guidelines for Online Privacy Protection**

This Part addresses concerns about the collection of personal data from children and other privacy-related practices on the Internet.  Its provisions are consistent with the Children's Online Privacy Protection Act of 1998 (COPPA) and the FTC's implementing Rule, which protect children under the age of 13, and will be interpreted consistently with those rules.

Online data collection from children poses special concerns. The medium offers unique opportunities to interact with children and to gather information for marketing purposes. Young children however, may not understand the nature of the information being sought or its intended uses, and the medium makes it easy to collect such data directly and passively from children without the supervision or permission of their parents or guardians. The collection of personal information from children,[6] as defined in Data Collection below, therefore triggers special privacy and security concerns.

The guidelines below address those concerns by providing guidance on specific issues involving online data collection and other privacy-related practices by operators of a website or other online service that 1) targets children under 13 years of age (based on the criteria set forth in the definition of website or online services directed to children in Section 312.2 of the COPPA Rule); 2) has actual knowledge that it is collecting or maintaining personal information from a child under 13 years of age; or 3) has actual knowledge that it is collecting personal information directly from users of another website or online service directed to children.[7]

---

[5] Violations of this guideline may be brought to the attention of the relevant rating entity.
[6] The definitions of "collection," "operator" and "personal information" in the Children's Online Privacy Protection Rule apply whenever these terms are used in the Online Privacy Protection Guidelines. See 16 CFR § 312.2.
[7] This category of companies might include operators of plug-ins or third party advertising networks who are notified by an operator of the child-directed nature of the operator's website.  CARU considers these to be "Pass-through operators" since they become "operators" of a child-directed website or online service only by virtue of actual knowledge.

        **(a)**    **Data Collection**

1. *Personal information* is defined under COPPA as individually identifiable information about an individual collected online, including: first and last name; home or physical address; online contact information, such as email addresses, or other identifiers that allow direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, or a video chat user identifier; a screen or user name where it functions in the same manner as online contact information; a phone number; a Social Security number; a persistent identifier that can be used to recognize a user over time and across different websites and online services, e.g., a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier; a photo, video or audio file where such files contain a child's image or voice; geolocation information sufficient to identify street name and  name of a city or town; or information  concerning the child or the parents of that child and combines with information contained in this definition.

2. In collecting[8] information from children under 13 years of age, operators should adhere to the following guidelines: Operators must clearly disclose to website or online service users its information collection and tracking practices, information uses, and the means for correcting or removing the information. These disclosures should be prominent and readily accessible before information is collected. For instance, on a website or online service where there is passive tracking, the notice should be on the page where the child enters the site.  A heading such as "Privacy," "Our Privacy Policy," or similar designation is acceptable if it allows an adult to click on the heading to obtain additional information on the site or service's practices concerning information collection, tracking and uses.

3. Operators should disclose, in language easily understood by a child, (a) why the information is being collected (*e.g.*, "We'll use your name and email to enter you in this contest and also add it to our mailing list") and (b) whether the information is intended to be shared, sold or distributed outside of the collecting company.

4. Operators should disclose passive means of collecting information from children (*e.g.,* navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

---

[8] Collects or collection means the gathering of any personal information from a child by any means, including but not limited to:
(a) Requesting, prompting, or encouraging a child to submit personal information online; (b) Enabling a child to make personal information publicly available in identifiable form. An operator shall not be considered to have collected personal information under this paragraph if it takes reasonable measures to delete all or virtually all personal information from a child's postings before they are made public and also to delete such information from its records; or (c) Passive tracking of a child online.

5. Operators must obtain "verifiable parental consent"[9] before they collect personal information (such as email addresses, screen names associated with other personal information, phone numbers, addresses or photographs) that will be publicly posted, thereby enabling others to communicate directly with the child online or offline, or when the child will be otherwise able to communicate directly with others.

6. For activities that involve public posting, operators should encourage children not to use their full names or screen names that correspond with their email address, but choose an alias (*e.g.,* "Bookworm," "Skater," etc.) or use first name, nickname, initials, etc.

7. Operators should not require a child to disclose more personal information than is reasonably necessary to participate in the online activity (*e.g.*, play a game, enter a contest, etc.).

8. Operators must obtain "verifiable parental consent" before they collect, use or disclose personal information to third parties,[10] except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.[11]

9. When an operator collects personal information only for its internal use and there is no disclosure of the information to a third party, the company may obtain parental consent through the use of email, coupled with some additional steps to provide assurance that the person providing the consent is the parent.

---

[9] The definition of "verifiable parental consent" in the Children's Online Privacy Protection Rule applies. See 16 CFR § 312.5.

[10] Third party means any person who is not:
(a) An operator with respect to the collection or maintenance of personal information on the website or online service; or
(b) A person who provides support for the internal operations of the website or online service and who does not use or disclose information protected under this part for any other purpose.

[11] Support for the internal operations of the website or online service means those activities necessary to:
(a)  maintain or analyze the functioning of the website or online service;
(b) perform network communications;
(c)  authenticate users of, or personalize the content on, the website or online service;
(d) serve contextual advertising on the website or online service or cap the frequency of advertising;
(e)  protect the security or integrity of the user, website, or online service;
(f)  ensure legal or regulatory compliance; or
(g)  fulfill a request of a child as permitted by these guidelines;

so long as the information collected for the activities listed in paragraphs (a)-(g) is not used or disclosed to contact a specific individual, including through behavioral advertising, to amass a profile on a specific individual, or for any other purpose.  Support for the internal operations also includes, e.g.: intellectual property protection, payment and delivery functions, spam protection, optimization, statistical reporting, or de-bugging.  See 78 Fed. Reg. 3981(January 17, 2013).

10.   Exceptions to prior parental consent:

(a) Where the sole purpose of collecting the name or online contact information of the parent is to provide notice and obtain parental consent;

(b) Where the purpose of collecting a parent's online contact information is to provide voluntary notice to, and subsequently update the parent about, the child's participation in a website or online services that does not otherwise collect, use or disclose children's personal information;

(c) Where the sole purpose of collecting online contact information from a child is to respond directly on a one-time basis to a specific request from the child and the information is not used to re-contact the child or any other purpose, is not disclosed, and is deleted by the operator from its records promptly after responding to the child's request;

(d)Where an operator collects and retains online contact information to be able to respond directly more than once to a child's specific request (such as an email newsletter or contest) but will not use the information for any other purpose, the operator must directly notify the parent of the nature and intended uses of the information collected, and permit access to the information sufficient to allow a parent to remove or correct the information;

(e) Where the purpose of collecting a child's and a parent's name and online contact information is to protect the safety of a child, and where such information is not used or disclosed for any purpose unrelated to the child's safety;

(f) Where the purpose of collecting a child's name and online contact information is to:
   (i) protect the security of integrity of its website or online service;
   (ii) take precautions against liability;
   (iii) respond to judicial process;
   (iv) to the extent permitted under other provisions of law, to provide information to law enforcement agencies or for an investigation on a matter related to public safety; where such information is not used for any other purpose;

(g) Where an operator collects a persistent identifier and no other personal information and such identifier is used for the sole purpose of providing support for the internal operations of the website or online service;

(h) Where an operator covered under paragraph two (2) of the definition of website or online service directed to children in §312.2 of the COPPA Rule collects a persistent identifier and no other personal information from a user who affirmatively interacts with the operator and whose previous registration with that operator indicates that such user is not a child.

11.   To respect the privacy of parents, operators should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

12.   If an operator communicates with a child by email, there should be an opportunity with each mailing for the child or parent to choose by return email or hyperlink to discontinue

receiving mailings.

**( b )   Age-Screening/Hyperlinks**

1.  A website or online service that is directed to children under the criteria set forth in the definition of websites or online services directed to children in Section 312.2 (a) of the COPPA Rule, but that does not target children as its primary audience, shall not be deemed directed to children if it: i) does not collect personal information from any visitor prior to collecting age information; and (ii) prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provision of the COPPA Rule.

2.  Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

3.  Age-screening mechanisms should be used in conjunction with technology, *e.g.,* a session cookie, to help prevent underage children from going back and changing their age to circumvent age-screening.

4.  A website or online service shall not be deemed directed to children solely because it refers or links to a commercial website or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.   Similarly, a website directed to children shall not be deemed in violation of these Guidelines by linking to a general audience website.

Copyright 1975, 2003, 2006, 2009 and 2014 Council of Better Business Bureaus, Inc. The name Children's Advertising Review Unit is a registered service mark of the Council of Better Business Bureaus, Inc.

# EXHIBIT 28

Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission | Federal Trade Commission

Case 5:18-cv-05062-EJD    Document 47-3    Filed 11/19/18    Page 108 of 148



Contact | Stay Connected | Privacy Policy | FTC en español

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

ABOUT THE FTC | NEWS & EVENTS | ENFORCEMENT | POLICY | TIPS & ADVICE | I WOULD LIKE TO...

Home » News & Events » Press Releases » Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission

# Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission

## Company Will Pay $950,000 For Tracking Children Without Parental Consent

SHARE THIS PAGE

FOR RELEASE

June 22, 2016

**TAGS:** Children's Online Privacy Protection Act (COPPA) | Technology | Mobile | Bureau of Consumer Protection | Consumer Protection | Privacy and Security | Children's Privacy | Consumer Privacy

Singapore-based mobile advertising company InMobi will pay $950,000 in civil penalties and implement a comprehensive privacy program to settle Federal Trade Commission charges it deceptively tracked the locations of hundreds of millions of consumers – including children – without their knowledge or consent to serve them geo-targeted advertising.

The FTC alleges that InMobi misrepresented that its advertising software would only track consumers' locations when they opted in and in a manner consistent with their device's privacy settings. According to the complaint, InMobi was actually tracking consumers' locations whether or not the apps using InMobi's software asked for consumers' permission to do so, and even when consumers had denied



## Related Cases

InMobi Pte Ltd.

## For Consumers

Blog: Has your cell phone fallen for a smooth operator?

Understanding Mobile Apps

## For Businesses

Blog: Track or treat? InMobi's location tracking ignored consumers' privacy settings

Consumer Privacy

Children's Privacy

## Media Resources

Our Media Resources library provides one-stop collections of materials on numerous issues in which the FTC has been actively engaged. These

Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission | Federal Trade Commission

Case 5:18-cv-05062-EJD   Document 47-3   Filed 11/19/18   Page 109 of 148

permission to access their location information.

The FTC alleges that InMobi, whose advertising network has reached more than one billion devices worldwide through thousands of popular apps, offers multiple forms of location-based advertising to its customers, including the ability to serve ads to consumers based on their current locations, locations they visit at certain times, and on their location over time.

"InMobi tracked the locations of hundreds of millions of consumers, including children, without their consent, in many cases totally ignoring consumers' express privacy preferences," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "This settlement ensures that InMobi will honor consumers' privacy choices in the future, and will be held accountable for keeping their privacy promises."

The complaint alleges that inMobi created a database built on information collected from consumers who allowed the company access to their geolocation information, combining that data with the wireless networks they were near to document the physical location of wireless networks themselves. InMobi then would use that database to infer the physical location of consumers based on the networks they were near, even when consumers had turned off location collection on their device.

The FTC alleges that InMobi also violated the Children's Online Privacy Protection Act (COPPA) by collecting this information from apps that were clearly directed at children, in spite of promising that it did not do so. The complaint noted that InMobi's software tracked location in thousands of child-directed apps with hundreds of millions of users without following the steps required by COPPA to get a parent or guardian's consent to collect and use a child's personal information.

Under the terms of its settlement with the FTC, InMobi is subject to a $4 million civil penalty, which is suspended to $950,000 based on the company's financial condition. In addition, the company will be required to delete all information it collected from children, and will be prohibited from further violations of COPPA.

In addition, InMobi will be prohibited from collecting consumers' location information without their affirmative express consent for it to be collected, and will be required to honor consumers' location privacy settings. The company will also be required to delete the location information of consumers it collected without their consent and will be prohibited from further misrepresenting its privacy practices. The settlement also will require InMobi to institute a comprehensive privacy program that will be independently audited every two years for the next 20 years.

The Commission vote to authorize the staff to refer the complaint to the U.S. Department of Justice and to approve the proposed stipulated order was 3-0. The DOJ filed the complaint and proposed stipulated order on behalf of the Commission in U.S. District Court for the Northern District of California.

**NOTE:** The Commission authorizes the filing of a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. Stipulated orders have the

pages are especially useful for members of the media.

Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission | Federal Trade Commission

Case 5:18-cv-05062-EJD   Document 47-3   Filed 11/19/18   Page 110 of 148

force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about consumer topics and file a consumer complaint online or by calling 1-877-FTC-HELP (382-4357).  Like the FTC on Facebook, follow us on Twitter, read our blogs and subscribe to press releases for the latest FTC news and resources.

## CONTACT INFORMATION

**MEDIA CONTACT:**
Jay Mayfield
*Office of Public Affairs*
202-326-2181

**STAFF CONTACT:**
Nithan Sannappa
*Bureau of Consumer Protection*
202-326-3185

Jacqueline Connor
*Bureau of Consumer Protection*
202-326-2844

**ABOUT THE FTC**

What We Do

Our History

Commissioners

Bureaus & Offices

Biographies

Budgets

Performance

Office of Inspector General

FOIA

Careers at the FTC

**NEWS & EVENTS**

Press Releases

Commission Actions

Media Resources

Events Calendar

Speeches

Audio/Video

Social Media

Blogs

Contests

**ENFORCEMENT**

Cases and Proceedings

Premerger Notification Program

Merger Review

Anticompetitive Practices

Rules

Statutes

Consumer Sentinel Network

Criminal Liaison Unit

**POLICY**

Advocacy

Advisory Opinions

Cooperation Agreements

Federal Register Notices

Reports

Studies

Testimony

Public Comments

Policy Statements

International

Hearings on Competition & Consumer Protection

**FEDERAL TRADE COMMISSION**

Headquarters:
600 Pennsylvania Avenue, NW
Washington, DC 20580
Contact Us

Stay Connected with the FTC

Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission | Federal Trade Commission

Case 5:18-cv-05062-EJD    Document 47-3    Filed 11/19/18    Page 111 of 148

**TIPS & ADVICE**

For Consumers

For Military Consumers

Business Center

Competition Guidance

**I WOULD LIKE TO...**

Submit a Consumer Complaint to the FTC

Apply for a Refund in an FTC Case

Report Identity Theft

List a Number on the National Do Not Call Registry

Get a Free Copy of My Credit Report

File a Comment

Report An Antitrust Violation

File Documents in Adjudicative Proceedings

**SITE INFORMATION**

Privacy Policy

Website Policy

No FEAR Act

USA.gov

Accessibility

Digital Government Strategy

Open Government

# EXHIBIT 29

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>    v.<br><br>InMobi Pte Ltd., a private limited company,<br><br>        Defendant. | Case No.: 3:16-cv-3474<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND CIVIL PENALTY JUDGMENT** |

       Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("Commission"), filed its Complaint for Permanent Injunction, Civil Penalties, and Other Relief ("Complaint"), in this matter, pursuant to Sections 13(b), and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 56(a)(1), the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6502(c) and 6505(d), and the Commission's Children's Online Privacy Protection Rule ("COPPA Rule"), 16 C.F.R. Part 312.  Defendant has waived service of the summons and the Complaint.  The parties have been represented by the attorneys whose names appear hereafter.  Plaintiff and Defendant stipulate to the entry of this Stipulated Order for Permanent Injunction and Civil Penalty Judgment ("Order") to resolve all matters in dispute in this action between them.

       THEREFORE, IT IS ORDERED as follows:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendant participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the tracking of consumers' locations without providing notice or receiving consent, and regardless of the consumers' preferences, and

1  in the collection of personal information from children in connection with operating a Web site or

2  online service.  The Complaint further charges that Defendant violated the COPPA Rule by

3  failing to provide notice to parents of its information practices, and to obtain verifiable parental

4  consent prior to collecting, using, or disclosing personal information from children.

5  3.      Defendant neither admits nor denies any of the allegations in the Complaint, except as

6  specifically stated in this Order.  Only for purposes of this action, Defendant admits the facts

7  necessary to establish jurisdiction.

8  4.      Defendant waives any claim that they may have under the Equal Access to Justice Act, 28

9  U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree

10  to bear its own costs and attorney fees.

11  5.      Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the

12  validity of this Order.

13                                              **DEFINITIONS**

14           For the purpose of this Order, the following definitions apply:

15  A.      "Child" means an individual under the age of 13.

16  B.      "Collects" or "collection" means, for the purposes of Parts I and II of this Order only, the

17          gathering of any personal information from a child by any means, including but not

18          limited to:

19           1.      Requesting, prompting, or encouraging a child to submit personal information

20                   online;

21           2.      Enabling a child to make personal information publicly available in identifiable

22                   form; or

23           3.      Passive tracking of a child online.

24  C.      "Covered information" means information from or about an individual consumer

25          including, but not limited to:

26           1.      Personal information; and

27           2.      Location information.

28  D.      "Defendant" means InMobi Pte Ltd., and its subsidiaries and divisions in the United

STIPULATED ORDER                              2                      Case No. 3:16-cv-3474

States, and successors and assigns.

E.    "Delete" means, for purposes of Parts I and II of this Order only, to remove personal information such that it is not maintained in retrievable form and cannot be retrieved in the normal course of business.

F.    "Disclose or disclosure" means, with respect to personal information:

    1.    The release of personal information collected by an operator from a child in identifiable form for any purpose, except where an operator provides such information to a person who provides support for the internal operations of the Web site or online service; and

    2.    Making personal information collected by an operator from a child publicly available in identifiable form by any means, including but not limited to a public posting through the Internet, or through a personal home page or screen posted on a Web site or online service; a pen pal service; an electronic mail service; a message board; or a chat room.

    a.  For purposes of this definition:

      i.  "release of personal information" means the sharing, selling, renting, or transfer of personal information to any third party; and

      ii.  "support for the internal operations of the Web site or online service" means those activities necessary to:

        A.  maintain or analyze the functioning of the Web site or online service;

        B.  perform network communications;

        C.  authenticate users of, or personalize the content on, the Web site or online service;

        D.  serve contextual advertising on the Web site or online service or cap the frequency of advertising;

        E.  protect the security or integrity of the user, Web site, or online service;

           F.         ensure legal or regulatory compliance; or

           G.        fulfill a request of a child, *so long as* the information collected for the activities listed in paragraphs (i) through (vii) of this definition is not used or disclosed to contact a specific individual, including through behavioral advertising, to amass a profile on a specific individual, or for any other purpose.

G.     "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire, radio, or other methods of transmission.

H.     "Location information" means:

    1.     Information about a consumer's location that is collected through an application programming interface; or

    2.     Information about a consumer's location that is inferred from any other data collected through an application programming interface, including but not limited to Basic Service Set Identifiers (BSSIDs), with the limited exception of Internet Protocol (IP) addresses used to infer location at no greater accuracy than city-level.

I.     "Obtaining verifiable consent" means making any reasonable effort (taking into consideration available technology) to ensure that before personal information is collected from a child, a parent of the child:

    1.     Receives notice of the operator's personal information collection, use, and disclosure practices; and

    2.     Authorizes any collection, use, and/or disclosure of the personal information.

J.     "Online contact information" means an e-mail address or any other substantially similar identifier that permits direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, or a

1    video chat user identifier.

2    K.    "Operator" means any person who operates a Web site located on the Internet or an online

3          service and who collects or maintains personal information from or about the users of or

4          visitors to such Web site or online service, or on whose behalf such information is

5          collected or maintained, or offers products or services for sale through that Web site or

6          online service, where such Web site or online service is operated for commercial purposes

7          involving commerce among the several States, or with one or more foreign nations; in any

8          territory of the United States or in the District of Columbia, or between any such territory

9          and another such territory or any State or foreign nation; or between the District of

10         Columbia and any State, territory, or foreign nation.

11   L.    "Parent" includes a legal guardian.

12   M.    "Person" means any individual, partnership, corporation, trust, estate, cooperative,

13         association, or other entity.

14   N.    "Personal information" means individually identifiable information about an individual

15         collected online, including:

16         1.    A first and last name;

17         2.    A home or other physical address including street name and name of a city or

18               town;

19         3.    Online contact information;

20         4.    A screen or user name where it functions in the same manner as online contact

21               information;

22         5.    A telephone number;

23         6.    A Social Security number;

24         7.    A persistent identifier that can be used to recognize a user over time and across

25               different Web sites or online services.  Such persistent identifier includes, but is

26               not limited to, a customer number held in a cookie, an Internet Protocol (IP)

27               address, a processor or device serial number, or a unique device identifier.

28         8.    A photograph, video, or audio file where such file contains a child's image or

STIPULATED ORDER                          5                      Case No. 3:16-cv-3474

voice;

9.     Geolocation information sufficient to identify street name and name of a city or town; or

10.     Information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition.

O.     "Software development kit" shall mean the code necessary to integrate Defendant's advertisements in an application, Web site, or other online service.

P.     "Third party" means any person who is not:

1.     An operator with respect to the collection or maintenance of personal information on the Web site or online service; or

2.     A person who provides support for the internal operations of the Web site or online service and who does not use or disclose information protected under 16 C.F.R. Part 312 for any other purpose.

Q.     "Web site or online service directed to children" means a commercial Web site or online service, or portion thereof, that is targeted to children.

1.     In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

2.     A Web site or online service shall be deemed directed to children when it has actual knowledge that it is collecting personal information directly from users of

STIPULATED ORDER        6        Case No. 3:16-cv-3474

another Web site or online service directed to children.

3.   A Web site or online service that is directed to children under the criteria set forth in paragraph (1) of this definition, but that does not target children as its primary audience, shall not be deemed directed to children if it:

a.   Does not collect personal information from any visitor prior to collecting age information; and

b.   Prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provisions of 16 C.F.R. Part 312.

4.   A Web site or online service shall not be deemed directed to children solely because it refers or links to a commercial Web site or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.

## ORDER

## I.    INJUNCTION CONCERNING COLLECTION OF PERSONAL INFORMATION FROM CHILDREN

IT IS ORDERED that Defendant and Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with being an operator of any Web site or online service directed to children or of any Web site or online service with actual knowledge that it is collecting or maintaining personal information from a child, are hereby permanently restrained and enjoined from violating the Children's Online Privacy Protection Rule, 16 C.F.R. Part 312, including, but not limited to:

A.    failing to make reasonable efforts, taking into account available technology, to ensure that a parent of a child receives direct notice of Defendant's practices with regard to the collection, use, or disclosure of personal information from children, including notice of any material change in the collection, use, or disclosure practices to which the parent has previously consented;

B.     failing to post a prominent and clearly labeled link to an online notice of its information practices with regard to children, if any, on the home or landing page or screen of its Web site or online service, *and* at each area of the Web site or online service where personal information is collected from children; and

C.     failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented.

A copy of the Children's Online Privacy Protection Rule, 16 C.F.R. Part 312, is attached hereto as Appendix A.

## II.     INJUNCTION CONCERNING DELETION OF CHILDREN'S PERSONAL INFORMATION

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from:

A.     disclosing, using, or benefitting from personal information collected from children which Defendant obtained prior to entry of this Order; and

B.     failing to destroy personal information collected from children that is in their possession, custody, or control within ten (10) days after entry of this Order. *Provided, however*, that such personal information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## III.     MONETARY JUDGMENT FOR CIVIL PENALTY

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of four million dollars ($4,000,000) is entered in favor of Plaintiff against Defendant as a civil penalty.

B.     Defendant is ordered to pay to Plaintiff, by making payment to the Treasurer of the United States, three hundred thousand dollars ($300,000),  within seven (7) days of entry of this Order, followed by  payment of six hundred fifty thousand dollars  ($650,000) in two (2) equal installments of three hundred twenty five thousand dollars ($325,000), plus interest computed

1   from the date of entry of this Order, due within six (6) months and twelve (12) months,

2   respectively, of the date of entry of this Order.  Defendant shall make all payments required by

3   this paragraph by electronic fund transfer in accordance with instructions previously provided by

4   a representative of Plaintiff.  Upon such payments, the remainder of the judgment is suspended,

5   subject to the Subparts below.

6   C.      The Commission's and Plaintiff's agreement to this suspension of part of the judgment is

7   expressly premised upon the truthfulness, accuracy, and completeness of Defendant's sworn

8   financial statement and related documents (collectively, "financial representations") submitted to

9   the Commission, namely: the Financial Statement of Defendant signed by Abhay Singhal on

10  March 28, 2016, including the attachments.

11  D.      The suspension of the judgment will be lifted as to Defendant if, upon motion by the

12  Commission or Plaintiff, the Court finds that Defendant failed to disclose any material asset,

13  materially misstated the value of any asset, or made any other material misstatement or omission

14  in the financial representations identified above.

15  E.      If the suspension of the judgment is lifted, the judgment becomes immediately due as to

16  Defendant in the amount specified in Subpart A above which the parties stipulate only for

17  purposes of this Part represents the amount of the civil penalty for the violations alleged in the

18  Complaint, less any payment previously made pursuant to this Part, plus interest computed from

19  the date of entry of this Order.

20              **IV.      ADDITIONAL MONETARY PROVISIONS**

21  A.      Defendant relinquishes dominion and all legal and equitable right, title, and interest in all

22  assets transferred pursuant to this Order and may not seek the return of any assets.

23  B.      The facts alleged in the Complaint will be taken as true, without further proof, in any

24  subsequent civil litigation by or on behalf of the Commission, including in a proceeding to

25  enforce its rights to any payment or monetary judgment pursuant to this Order.

26  C.      Defendant acknowledges that its Taxpayer Identification Number, which Defendant must

27  submit to the Commission, may be used for collecting and reporting on any delinquent amount

28  arising out of this Order, in accordance with 31 U.S.C. § 7701.

STIPULATED ORDER                          9                      Case No. 3:16-cv-3474

## V.     INJUNCTION REGARDING MISREPRESENTING PRACTICES RELATING TO INFORMATION PRIVACY

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting in any manner, expressly or by implication, the extent to which they maintain and protect the privacy, confidentiality, security, or integrity of covered information, including but not limited to:

A.     Defendant's practices with respect to personal information collected from children, including Defendant's collection, use, disclosure, and deletion practices;

B.     the extent to which Defendant collects or infers consumers' location information; or

C.     the extent to which Defendant obtains consumers' consent for the collection of covered information, including opt-in consent.

## VI.     INJUNCTION REGARDING CONSENT FOR COLLECTION OR INFERENCE OF LOCATION INFORMATION

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from collecting or inferring location information without first confirming that:

A.     the consumer has provided affirmative express consent for the collection of location information to the application, Web site, or other online service that has integrated Defendant's software development kit;

B.     the consumer has not expressed, through any operating system, device, browser, or application permission or setting, that the consumer does not consent to, or revokes consent to, the collection of location information; and

C.     the consumer has not expressed, through any operating system, device, browser, or application permission or setting, that the consumer's consent to the collection of location

1  information is limited to a level of accuracy that is less precise than the location information that

2  is to be collected or inferred by Defendant.

3  **VII.    INJUNCTION REGARDING DELETION OF LOCATION INFORMATION**

4  IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees,

5  and attorneys, and all other persons in active concert or participation with any of them, who

6  receive actual notice of this Order, are permanently restrained and enjoined from:

7  A.    disclosing, using, or benefitting from location information that was collected or inferred

8  prior to entry of this Order without meeting the requirements of Part VI of this Order; and

9  B.    failing to destroy location information that was collected or inferred prior to entry of this

10  Order without meeting the requirements of Part VI of this Order that is in their possession,

11  custody, or control within ten (10) days after entry of this Order.  *Provided, however*, that such

12  location information need not be disposed of, and may be disclosed, to the extent requested by a

13  government agency or required by law, regulation, or court order.

14  **VIII.    COMPREHENSIVE PRIVACY PROGRAM REQUIREMENT**

15  IT IS FURTHER ORDERED that Defendant, whether acting directly or indirectly, in

16  connection with the advertising, marketing, promotion, offering for sale, or sale of any product or

17  service, in or affecting commerce, shall, no later than the date of service of this Order, establish

18  and implement, and thereafter maintain, a comprehensive privacy program that is reasonably

19  designed to: (1) address privacy risks related to the development and management of new and

20  existing products and services and (2) protect the privacy and confidentiality of covered

21  information.  Such program, the content and implementation of which must be fully documented

22  in writing, shall contain privacy controls and procedures appropriate to Defendant's size and

23  complexity, the nature and scope of Defendant's activities, and the sensitivity of the covered

24  information, including:

25  A.    the designation of an employee or employees to coordinate and be responsible for the

26  privacy program;

27  B.    the identification of reasonably foreseeable, material risks, both internal and external, that

28  could result in the Defendant's unauthorized collection, use, or disclosure of covered information,

1  and assessment of the sufficiency of any safeguards in place to control these risks.  At a

2  minimum, this privacy risk assessment should include consideration of risks in each area of

3  relevant operation, including, but not limited to: (1) employee training and management,

4  including training on the requirements of this Order; and (2) product design, development, and

5  research;

6  C.      the design and implementation of reasonable privacy controls and procedures to address

7  the risks identified through the privacy risk assessment, and regular testing or monitoring of the

8  effectiveness of those privacy controls and procedures;

9  D.      the development and use of reasonable steps to select and retain service providers capable

10  of appropriately protecting the privacy of covered information they receive from Defendant, and

11  requiring service providers by contract to implement and maintain appropriate privacy

12  protections; and

13  E.      the evaluation and adjustment of Defendant's privacy program in light of the results of the

14  testing and monitoring required by Subpart C, any material changes to Defendant's operations or

15  business arrangements, or any other circumstances that Defendant knows or has reason to know

16  may have a material impact on the effectiveness of its privacy program.

## IX.    PRIVACY PROGRAM ASSESSMENT REQUIREMENT

18          IT IS FURTHER ORDERED that, in connection with its compliance with Part VIII of this

19  Order, Defendant shall obtain initial and biennial assessments and reports ("Assessments") from a

20  qualified, objective, independent third-party professional, who uses procedures and standards

21  generally accepted in the profession.  The reporting period for the Assessments shall cover: (1)

22  the first year after service of the Order for the initial Assessment; and (2) each two (2) year period

23  thereafter for twenty (20) years after service of the order for biennial Assessments.

24  A.      Each Assessment shall:

25          1.      set forth the specific privacy controls that Defendant has implemented and

26                  maintained during the reporting period;

27          2.      explain how such privacy controls are appropriate to Defendant's size and

28                  complexity, the nature and scope of Defendant's activities, and the sensitivity of

the covered information collected from or about consumers;

3.      explain how the privacy controls that have been implemented meet or exceed the protections required by Part VIII of this Order; and

4.      certify that Defendant's privacy program is operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the program has so operated throughout the reporting period.

B.      Each Assessment shall be prepared and completed within sixty (60) days after the end of the reporting period to which the Assessment applies by a person that has a minimum of three (3) years of experience in the field of privacy and data protection.  All persons conducting such Assessments and preparing such reports shall be approved by the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington D.C. 20580, in his or her sole discretion.

C.      Defendant shall provide the initial Assessment by overnight courier (not the U.S. Postal Service) to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington D.C. 20580, or by email to Debrief@ftc.gov, within ten (10) days after the Assessment has been prepared.  All subsequent biennial Assessments shall be retained by Defendant until the Order is terminated and provided to the Associate Director for Enforcement within ten (10) days of request.  The subject line must begin: United States v. InMobi Pte Ltd.

## X.      ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendant obtain acknowledgments of receipt of this Order:

A.      Defendant, within seven (7) days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For twenty (20) years after entry of this Order, Defendant must deliver a copy of this Order to:  (1) all principals, officers, and directors, and managers of Defendant and of its subsidiaries and divisions in the United States; (2) all employees, agents, and representatives having responsibilities relating to the collection, retention, storage, or security of covered

information and all employees, agents, and representatives having responsibilities related to the operation of any website or online service subject to this Order; and (3) any business entity resulting from any change in structure as set forth in the Part titled Compliance Reporting. Delivery must occur within seven (7) days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which Defendant delivers a copy of this Order, Defendant must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## XI.    COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendant make timely submissions to the Commission:

A.      One hundred eighty (180) days after entry of this Order, Defendant must submit a compliance report, sworn under penalty of perjury.  In such report, Defendant must:

1.      identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission and Plaintiff may use to communicate with Defendant;

2.      identify all of Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3.      describe the activities of each such business, including the goods and services offered, the means of advertising, marketing, and sales;

4.      describe in detail whether and how Defendant is in compliance with each Part of this Order;

5.      provide a copy of each different version of any privacy notice posted on each Web site or online service operated by Defendant or otherwise communicated to parents of children from whom Defendant collects personal information;

6.      provide a statement setting forth in detail any methods used to obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children or the methods used to avoid collecting, using, and/or disclosing personal information

from children;

      7.    provide a statement setting forth in detail the means provided for parents to review any personal information collected from their children and to refuse to permit its further use or maintenance;

      8.    provide a statement setting forth in detail why each type of information collected from a child is reasonably necessary for the provision of the particular related activity;

      9.    provide a statement setting forth in detail the procedures used to protect the confidentiality, security, and integrity of personal information collected from children; and

      10.    provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.    For twenty (20) years after entry of this Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in: (a) any designated point of contact; or (b) the structure of Defendant or any entity that Defendant has any ownership interest in or control directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.    Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within fourteen (14) days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.

The subject line must begin:  United States v. InMobi Pte Ltd.

## XII.   RECORDKEEPING

IT IS FURTHER ORDERED that Defendant must create certain records for twenty (20) years after entry of the Order, and retain each such record for five (5) years.  Specifically, Defendant must create and retain the following records:

A.      all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission;

B.      copies of all consumer complaints relating to Defendant's collection of covered information or personal information, and any response; and

C.      a copy of each materially different version of any software development kit Defendant makes available to developers, and any associated documentation or instructions.

## XIII.   COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendant's compliance with this Order:

A.      Within fourteen (14) days of receipt of a written request from a representative of the Commission or Plaintiff, Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission and Plaintiff are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.      For matters concerning this Order, the Commission and Plaintiff are authorized to communicate directly with Defendant.  Defendant must permit representatives of the Commission and Plaintiff to interview any employee or other person affiliated with Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.      The Commission and Plaintiff may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendant or any individual or entity affiliated with Defendant, without the necessity of identification or prior

notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57(b)-1.

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED** this ___ day of _____, 2016.

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

**SO STIPULATED AND AGREED**

**FOR PLAINTIFF UNITED STATES OF AMERICA**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

JONATHAN F. OLIN
Deputy Assistant Attorney General

MICHAEL S. BLUME
Director
Consumer Protection Branch

ANDREW E. CLARK
Assistant Director

/s/ Jacqueline Blaesi-Freed
JACQUELINE BLAESI-FREED
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-2809
jacqueline.m.blaesi-freed@usdoj.gov

FOR THE FEDERAL TRADE COMMISSION

MANEESHA MITHAL
Associate Director
Division of Privacy and Identity Protection

MARK EICHORN
Assistant Director
Division of Privacy and Identity Protection

NITHAN SANNAPPA
Attorney
Division of Privacy and Identity Protection
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-3185 (voice)
(202) 326-3062 (fax)

JACQUELINE CONNOR
Attorney
Division of Privacy and Identity Protection
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
(202) 326-2844 (voice)
(202) 326-3062 (fax)

1    **FOR DEFENDANT:**

2

3

4                                          Date: 4/7/16
     _____
5    TYLER NEWBY
     FENWICK AND WEST LLP
6    555 California Street, 12th Floor
     San Francisco, CA 94104
7    Tel: (415) 875-2495
     *Counsel for InMobi Pte Ltd.*
8

9    **DEFENDANT:**

10

11

12                                         Date: APRIL 7, 2016
     _____
     NAVEEN TEWARI
13   *As Chief Executive Officer of InMobi Pte Ltd.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     STIPULATED ORDER                    20              Case No. 3:16-cv-3474

# EXHIBIT 30

# How to view your location history in Google Maps



androidcentral.com/how-view-your-location-history-google-maps

July 20, 2018

What's on your timeline? See where you've traveled with Google Maps.

Harish Jonnalagadda

20 Jul 2018



Google Maps has a nifty Timeline feature that lets you browse the places you've visited along with the routes traveled. The feature was overhauled in 2015, and Google has added the ability to collate images you've taken at a particular location, allowing you to get a better overview of your travels.

It certainly comes in handy if you're looking to see all the images you took at a particular location, or if you're trying to get a highlight of your weekly or monthly activity.

- How to view your location history in Google Maps
- How to disable location tracking

1. Launch **Google Maps**.
2. Tap the **more button** (three horizontal lines) on the top left corner.
3. Tap **your timeline**.
4. Tap the **calendar icon** to view a particular day.



5. Swipe left or right to **switch months**.
6. Tap a **date** to view your **location history**. You'll see the route traveled, along with the duration and length of the overall journey.



## How to disable location tracking

Timeline is certainly a useful feature if you're interested in looking at your previous travel data, but it also comes off as creepy (Google tracks *everything*). Fortunately, you can easily turn off location tracking in Maps.

1. Tap the **more button** (three horizontal lines) on the top left corner.
2. Tap **Settings**.
3. Tap **Personal content**.



4. Tap the field that says **Location History is on** under **Location Settings**.
5. Tap the **switch** next to each device for which you'd like to disable location tracking.



There's also the option to pause tracking for your account as a whole. To do so, toggle **Location History** to off, and select **OK** in the dialog box that follows.

That's all there is to it! I like the timeline feature as it gives me a detailed look at where I've been over the course of the month (and how much time I wasted being stuck in traffic).

What are your thoughts on the location history feature? Like it? Feel like it's an intrusion of your privacy? Sound off in the comments below.

**Updated July 2018:** This article was updated with the latest steps on how to view your location history within Google Maps.

# EXHIBIT 31

# The Google tracking feature you didn't know you'd switched on

**S** nakedsecurity.sophos.com/2017/10/03/the-google-tracking-feature-you-didnt-know-youd-switched-

October 3, 2017

03 Oct 2017



## Post navigation

Previous: How a Twitter troll was slain

Next: Google is making encryption mandatory for sites on 45 Top-Level Domains

by Matt Boddy

It's National Cybersecurity Awareness Month (NCSAM) and this week's theme is simple steps to online safety. Here's a simple step for you: see if you have Google's Your Timeline turned on and, if you do, switch it off.

## Google's Your Timeline

Using GPS, Wi-Fi and cell tower data, Google's Your Timeline can paint a very accurate picture of your daily life. If you've got it switched on, it stores every step you take and everywhere you go.

And the thing is, lots of people seem to have it switched on without even realising, including me, and my favourite hats come in tinfoil.

1/6

I was surprised it had slipped past me so I started asking other people if they had it switched on too. More often than not, without making a conscious decision to let Google follow them around, they had.

In the end I decided to ask 20 people at random and write down the answers. The result of my short, non-scientific survey? 95% of the people I asked – a mixture of people in technical and non-technical roles – had location history, or its slightly less obnoxious iPhone equivalent Frequent Locations (Significant Locations in iOS 11), turned on, tracking their every step, without realising.

Check for yourself. On Android it's under Settings > Location > Google Location History.

DEEP LEARNING FOR DEEPER CYBERSECURITY

Watch Video

## It's your Timeline (and Google's)

So what exactly is Google Timeline? Google says: "Your timeline in Google Maps helps you find the places you've been and the routes you've travelled. Your timeline is private, so only you can see it."

Only you. And Google.

Google's reasoning for the timeline feature is that, if you want to remember the name of that bar or café you visited yesterday, last week, last month, last year… you can simply visit Your Timeline. The technology behind this is impressive, but the privacy and security implications are, for some, quite terrifying.

Where you go says everything about you: where you live, where you work, where you hang out, the places you visit, how often and at what time. If you're a frequent visitor to your local hospital's cancer clinic, Google knows. If you're having an affair, it's in there. If you're a courier moving large amounts of cash, that data is being shared over the internet and stored in a data centre somewhere. If you're in the military or the police it knows where you're stationed and, if you're moving, your direction of travel.

Even if the data were stored anonymously (and it isn't clear if it is or not) that would be cold comfort. Anonymous data has a way of being less anonymous than you think, and the more anonymous data you have, the easier it is to unmask the individuals involved.

## So what does Google know?

To discover what Google Timeline knows about me, and you, I removed my tinfoil hat and opted to let it store my location history again.

Here's a journey from Oxford to London by car (indicated by the dark blue line) that's been accurately tracked to the point of tagging me at a service station I visited en-route.



Once in densely populated South London, using the telephone masts, local Wi-Fi and my phone's GPS, Your Timeline accurately plotted my movements. The colour of the tracking goes from dark blue to light blue as I change speed from driving to walking.



After accurately tracking my taxi journey into Clapham, Google Timeline then has a go at tagging me in a restaurant, Café Sol. Google will use this data to add to publicly available information such as "Popular Times", shown for Café Sol below:



Google provides the following statement in its support documentation on the anonymity of this data:

> To determine popular times and visit duration, Google uses aggregated and anonymised data from users who have opted in to Google Location History.

My memories of the evening are mildly hazy, but Google Timeline can tell me exactly what I did and where I went.

I'm not too bothered about Google using my boozy night for helpful data research, but it isn't about one night. It's about every day and every night and the pattern of my daily life. It's about all this data being stored and accessible by… I don't know who, now and in the future.

Google will store this data for years, as you can see in my screenshot below.



So how did I, and almost all the people I asked at random, end up with Location History turned on?

The option appears when you set up Google Now. For me that happened after a factory reset. When you're busy clicking 'next', 'next', 'finish' and don't have two hours to spend reading everything on screen, it's easy to miss:



My tinfoil hat is back on now.

On Android 7 it was as simple as going to Settings > Location (under personal) > Google Location History and selecting 'off'. For comprehensive details on switching off and deleting your location history, go to Google's Manage or delete your Location History page.

Apple iPhones have a similar feature hidden deep within their settings. Go to Privacy > Location Services >System Services > Frequent Locations.

GZJ KDKV'54''""

# How to Disable Google Location History

wikihow.com/Disable-Google-Location-History

Tech Team
Verified

When you use some Google products like Google Search and Google Maps, Google collects your location information. This allows Google to better provide you with the most relevant search results based on your location and more personalized features in Google applications.

## Steps



1. **Go to Google Activity controls page.** Open myaccount.google.com/activitycontrols in your browser and sign in with your Google account.

1/4



2. **Navigate to "<u>Location History</u>" section.** You can see it under the **Web & App Activity** segment.



3. **Turn off the Location History.** Toggle off



the blue switch, right across **Location History.** Then a pop-up box will appear there.

2/4



4. **Confirm your changes.** Just click on the **PAUSE** button at bottom of the pop-up box.



5. **Done.** Note that this setting doesn't delete your previous location history. but you can delete your private location history data from <u>Google maps timeline settings</u>.

## Community Q&A

Search

<u>Add New Question</u>

Ask a Question

200 characters left

Include your email address to get a message when this question is answered.

Submit

- Already answered
- Not a question
- Bad question
- Other

## Tips

- In an Android phone, go to **Settings> Location> Google Location History** and turn of the Google Location History.
- Disabling Location History doesn't turn off Location Reporting or location services for your device.

## Warnings

Pausing Google Location History doesn't delete any previous activity.

## Sources and Citations

- https://support.google.com/accounts/answer/3118687
- https://myaccount.google.com/