## INDEX OF EXHIBITS TO CONSOLIDATED CLASS ACTION COMPLAINT

### CASE NO. 5:18-CV-05062-EJD

| No. | Description |
|-----|-------------|
| **1.** | Transcript of United States House of Representatives Judiciary Committee, *Transparency and Accountability: Examining Google and its Data Collection, use and Filtering Practices*, 2018 WLNR 38379064 (December 11, 2018). |
| **2.** | Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not*, The Associated Press (August 13, 2018), available at https://www.apnews.com/828aefab64d4411bac257a07c1af0ecb. |
| **3.** | Transcript of United States Senate Judiciary Committee, *GDPR & California Consumer Privacy Act: Opt-Ins, Consumer Control, and the Impact on Competition and Innovation* (March 12, 2019), available at https://www.wilmerhale.com/-/media/07d7aaf693584896bd01b8e84849e3c4.pdf?la=en&hash=DFEADCEC7602E878AFBE0B5CB1E69B70F0A7FD51. |
| **4.** | Archived Web Capture (https://archive.org/web/) dated August 16, 2018 of URL https://support.google.com/accounts/answer/3118687?hl=en; *Manage or delete your Location History*, available at https://web.archive.org/web/20180816004907/https://support.google.com/accounts/answer/3118687?hl=en. |
| **5.** | Google, *Google Terms of Service* last modified October 25, 2017, available at https://policies.google.com/terms?hl=en-US. |
| **6.** | Pew Research Center, *Mobile Fact Sheet* (February 5, 2018), available at http://www.pewinternet.org/fact-sheet/mobile/. |
| **7.** | Excerpts (pp. 1-2, 11, 14, 104-105) of David George et al., *Global Mobile Trends 2017*, GSMA Intelligence (September 2017), available at https://www.gsmaintelligence.com/research/2017/09/global-mobile-trends-2017/639/. |
| **8.** | James Vincent, *99.6 percent of new smartphones run Android or iOS*, The Verge (February 16, 2017), available at https://www.theverge.com/2017/2/16/14634656/android-ios-market-share-blackberry-2016. |
| **9.** | Google, *Google Privacy Policy* last modified January 22, 2019, available at https://policies.google.com/privacy?hl=en-US. |

INDEX OF EXHIBITS FOR PLAINTIFFS'
CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:18-CV-05062-EJD

1686405.3

| No. | Description |
|-----|-------------|
| **10.** | Archived Web Capture (https://archive.org/web/) dated July 30, 2018 of URL https://support.google.com/accounts/answer/4388034; *Location history for iPhone & iPad*, available at https://web.archive.org/web/20180730190907/https://support.google.com/accounts/answer/4388034. |
| **11.** | Google, *Google Privacy Policy* last modified December 18, 2017, available at https://policies.google.com/privacy/archive/20171218?hl=en-US. |
| **12.** | Google, *Google Privacy Policy* last modified December 18, 2017, *"may collect and process information about your actual location"* hyperlink contents, available at https://policies.google.com/privacy/example/may-collect-and-process-information?hl=en. |
| **13.** | Forbrukerrådet (Norwegian Consumer Council), *Every Step You Take, How deceptive design lets Google track users 24/7* (November 27, 2018), available at https://fil.forbrukerradet.no/wp-content/uploads/2018/11/27-11-18-every-step-you-take.pdf. |
| **14.** | Douglas C. Schmidt, *Google Data Collection*, Digital Content Next (August 15, 2018), available at https://digitalcontentnext.org/wp-content/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf. |
| **15.** | Alma Whitten, *Updating our privacy policies and terms of service*, Google Official Blog (January 24, 2012), available at https://googleblog.blogspot.com/2012/01/updating-our-privacy-policies-and-terms.html. |
| **16.** | Eyder Peralta, *Google's New Privacy Policy Will Allow Tracking Across Services*, NPR (January 25, 2012), available at https://www.npr.org/sections/thetwo-way/2012/01/25/145830858/googles-new-privacy-policy-will-allow-tracking-across-services. |
| **17.** | Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to the Public*, The Wall Street Journal (October 8, 2018), available at https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194?mod=e2tw. |
| **18.** | Bill Chappell, *Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed*, NPR (December 11, 2018), available at https://www.npr.org/2018/12/11/675529798/with-52-5-million-users-data-exposed-on-google-google-quickens-shutdown. |

INDEX OF EXHIBITS FOR PLAINTIFFS'
CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:18-CV-05062-EJD

| No. | Description |
|-----|-------------|
| 19. | Mike Chu, *New magical blue circle on your map*, Google Mobile Blog (November 28, 2007), available at http://googlemobile.blogspot.com/2007/11/new-magical-blue-circle-on-your-map.html. |
| 20. | Charles Mendis, *Locate your friends in real time with Google Latitude,* Google Mobile Blog (February 4, 2009), available at http://googlemobile.blogspot.com/2009/02/locate-your-friends-in-real-time-with.html. |
| 21. | Vic Gundotra, *See where your friends are with Google Latitude,* Google Official Blog (February 4, 2009), available at https://googleblog.blogspot.com/2009/02/see-where-your-friends-are-with-google.html. |
| 22. | Chris Lambert, *Google Latitude, now with Location History & Alerts,* Google Mobile Blog (November 10, 2009), available at http://googlemobile.blogspot.com/2009/11/google-latitude-now-with-location.html. |
| 23. | Screenshots demonstrating process for disabling Web & App Activity location storage; Exhibit prepared by Plaintiffs' counsel (August 17, 2018). |
| 24. | Emily Dreyfuss, *How to Stop Google From Tracking Your Location*, Wired (August 13, 2018), available at https://www.wired.com/story/google-location-tracking-turn-off/. |
| 25. | Associated Press, *Google found to track the location of users who have opted out*, NBC News (August 13, 2018), available at https://www.nbcnews.com/tech/tech-news/google-tracks-your-movements-it-or-not-n900106. |
| 26. | Google Account Help, *Manage Your Location History*, available at https://support.google.com/accounts/answer/3118687 (printed on April 27, 2019; last visited April 29, 2019). |
| 27. | Archived Web Capture (https://archive.org/web/) dated November 3, 2018 of URL https://myaccount.google.com/intro/activitycontrols?hl=en-US; *Activity Controls,* available at https://web.archive.org/web/20181103224740/https://myaccount.google.com/intro/activitycontrols. |

INDEX OF EXHIBITS FOR PLAINTIFFS'
CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:18-CV-05062-EJD

| No. | Description |
|---|---|
| 28. | Archived Web Captures (https://archive.org/web/) dated October 8, 2016 and May 18, 2018 of URL https://myaccount.google.com/intro/activitycontrols?hl=en-US; *Activity Controls*, available at https://web.archive.org/web/20161008213925/https://myaccount.google.com/intro/activitycontrols and https://web.archive.org/web/20180518184409/https://myaccount.google.com/intro/activitycontrols, respectively. |
| 29. | Screenshots from Archived Web Captures (https://archive.org/web/) of URL https://support.google.com/websearch/answer/54068 Google Search Help, *See & control your search activity* dated November 19, 2018, available at https://web.archive.org/web/20181119040025/https://support.google.com/websearch/answer/54068, demonstrating accessibility of information on page. Exhibit prepared by Plaintiffs' counsel (April 29, 2019). |
| 30. | Archived Web Capture (https://archive.org/web/) dated August 18, 2018 of URL https://support.google.com/accounts/answer/3118687; *Manage or delete your Location History*, available at http://web.archive.org/web/20180818160356/https://support.google.com/accounts/answer/3118687. |
| 31. | Archived Web Capture (https://archive.org/web/) dated August 16, 2018 of URL https://support.google.com/accounts/answer/3467281; *Turn location on or off for your Android device*, available at http://web.archive.org/web/20180729212714/https://support.google.com/accounts/answer/3467281. |
| 32. | Archived Web Capture (https://archive.org/web/) dated July 29, 2018 of URL https://support.google.com/android/answer/6179507; *Manage location settings for Android apps*, available at https://web.archive.org/web/20180729104542/https://support.google.com/accounts/answer/6179507?hl=en. |
| 33. | CNIL, *The CNIL's Restricted Committee Imposes a Financial Penalty of 50 Million Euros against Google LLC* (January 21, 2019), available at https://www.cnil.fr/en/cnils-restricted-committee-imposes-financial-penalty-50-million-euros-against-google-llc. |
| 34. | Lee Rainie and Kathryn Zickuhr, *Americans' Views on Mobile Etiquette*, Pew Research Center (August 26, 2015), available at http://www.pewinternet.org/2015/08/26/chapter-1-always-on-connectivity/. |

INDEX OF EXHIBITS FOR PLAINTIFFS'
CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:18-CV-05062-EJD

| No. | Description |
|---|---|
| 35. | Press Release, *Consumer groups across Europe file complaints against Google for breach of GDPR* (November 27, 2018), available at https://www.beuc.eu/publications/consumer-groups-across-europe-file-complaints-against-google-breach-gdpr/html. |
| 36. | Datainspektionen, *Request for Reply and Further Clarification to Google LLC* (January 18, 2019), available at https://www.datainspektionen.se/globalassets/dokument/ovrigt/google---request-for-reply-and-further-clarification---skrivelse-till-tillsynsobjekt.pdf. |
| 37. | Janene Pieters, *Dutch Petition against Google's Location Tracking Gets 50,000 Signatures*, Nltimes.nl (January 22, 2019), available at https://nltimes.nl/2019/01/22/dutch-petition-googles-location-tracking-gets-50000-signatures. |
| 38. | Written Testimony of Keith Enright, Google Chief Privacy Officer, United States Senate Committee on Commerce, Science, and Transportation, *Hearing on Examining Safeguards for Consumer Data Privacy*, (September 26, 2018), available at https://www.commerce.senate.gov/public/_cache/files/5d32673e-d11d-4ee1-a7f3-8b03e407128d/5D20DB4443BCCDA548DD5577BB28F01D.09-24-18enright-testimony.pdf. |
| 39. | Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance,* Pew Research Center (May 20, 2015), available at http://www.pewinternet.org/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/. |
| 40. | Lee Rainie et. al., *Anonymity, Privacy, and Security Online,* Pew Research Center (September 5, 2013), available at http://www.pewinternet.org/2013/09/05/anonymity-privacy-and-security-online/. |
| 41. | Chris Jay Hoofnagle or et. al., *How Different are Young Adults from Older Adults When it Comes to Information Privacy Attitudes and Policies?*, University of Pennsylvania Scholarly Commons (April 14, 2010), available at https://repository.upenn.edu/asc_papers/399/. |
| 42. | *S. 2326: Children's Online Privacy Protection Act of 1998*, Hearing before Senate Subcommittee on Communications, Statement of Sen. Bryan, S. Hrg. 105-1069, at 4 (Sept. 23, 1998). |
| 43. | Kristien Daems, et al., *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. Marketing Comms. 8 (2017). |

| No. | Description |
|-----|-------------|
| **44.** | Children's Advertising Review Unit, *Self-Regulatory Program for Children's Advertising* (2014), *available at* http://www.asrcreviews.org/wp-content/uploads/2012/04/Self-Regulatory-Program-for-Childrens-Advertising-Revised-2014-.pdf. |
| **45.** | Center for Digital Democracy, *New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act (COPPA): Majority express concerns about new marketing and data-collection practices* (December 6, 2012), available at https://www.democraticmedia.org/content/new-survey-reveals-strong-support-updating-childrens-online-privacy-protection-act-coppa. |
| **46.** | *Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission*, Federal Trade Commission, (June 22, 2016), available at https://www.ftc.gov/news-events/press-releases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked. |
| **47.** | Stipulated Order for Permanent Injunction and Civil Penalty Judgment, *United States of America v. InMobi Pte, Ltd.*, Case No. 3:16-cv-3474 (N.D. Cal. [June 22, 2016]) (Dkt. No. 2-1), available at https://www.ftc.gov/system/files/documents/cases/160622inmobistip.pdf. |
| **48.** | Harish Jonnalagadda, *How to view your location history in Google Maps*, Android Central (July 20, 2018), available at https://www.androidcentral.com/how-view-your-location-history-google-maps. |
| **49.** | Matt Boddy, *The Google tracking feature you didn't know you'd switched on*, Naked Security by Sophos (October 3, 2017), available at https://nakedsecurity.sophos.com/2017/10/03/the-google-tracking-feature-you-didnt-know-youd-switched-on/. |
| **50.** | WikiHow, *How to Disable Google Location History*, available at https://www.wikihow.com/Disable-Google-Location-History (printed on November 19, 2018). |
| **51.** | Letter from Greg Walden, United States House of Representatives Committee on Energy and Commerce to Sundar Pinchai, Google LLC Chief Executive Office (April 23, 2019), available at https://republicans-energycommerce.house.gov/wp-content/uploads/2019/04/4.23.19-Letter-to-Google-on-Sensorvault.pdf. |

# EXHIBIT 1

**News**Room

12/11/18 Fed. News Serv. Transcripts (Pg. Unavail. Online)
2018 WLNR 38379064

Federal News Service Transcripts
Copyright (c) 2018 Bloomberg Government

December 11, 2018

House Judiciary Committee hearing on Transparency and Accountability:
Examining Google and its Data Collection, Use and Filtering Practices

Subject: Google's Data Collection Practices Participants: Rep. Robert W. Goodlatte, R-Va., Chairman; Rep. Lamar Smith, R-Texas; Rep. Jim Sensenbrenner, R-Wis.; Rep. Darrell Issa, R-Calif.; Rep. Steve King, R-Iowa; Rep. Louie Gohmert, R-Texas; Rep. Jim Jordan, R-Ohio; Rep. Ted Poe, R-Texas; Rep. Steve Chabot, R-Ohio; Rep. Tom Marino, R-Pa.; Rep. Trey Gowdy, R-S.C.; Rep. Raul R. Labrador, R-Idaho; Rep. Doug Collins, R-Ga.; Rep. Mike Bishop, R-Mich.; Rep. Ken Buck, R-Colo.; Rep. John Ratcliffe, R-Texas; Rep. Mike Johnson, R-La.; Rep. Martha Roby, R-Ala.; Rep. Andy Biggs, R-Ariz.; Rep. Matt Gaetz, R-Fla.; Rep. Karen Handel, R-Ga.; Rep. John Rutherford, R-Fla.; Rep. Keith Rothfus, R-Pa.; Rep. Jerrold Nadler, D-N.Y., Ranking Member; Rep. Zoe Lofgren, D-Calif.; Rep. Sheila Jackson Lee, D-Texas; Rep. Steve Cohen, D-Tenn.; Rep. Hank Johnson, D-Ga.; Rep. Ted Deutch, D-Fla.; Rep. Luis V. Gutierrez, D-Ill.; Rep. Karen Bass, D-Calif.; Rep. Cedric L. Richmond, D-La.; Rep. Hakeem Jeffries, D-N.Y.; Rep. David Cicilline, D-R.I.; Rep. Pramila Jayapal, D-Wash.; Rep. Ted Lieu, D-Calif.; Rep. Jamie Raskin, D-Md.; Rep. Eric Swalwell, D-Calif.; Rep. Brad Schneider, D-Ill.; Rep. Val B. Demings, D-Fla. Witnesses: Rep. Kevin McCarthy, R-Calif., House Majority Leader; Google CEO Sundar Pichai Location: 2141 Rayburn House Office Building Time: 10:00:00 Date: 2018-12-11

GOODLATTE: Good morning. The Judiciary Committee will come to order. And, without objection, the chair is authorized to declare recess of the committee at anytime. We welcome everyone to this morning's hearing on Transparency and Accountability: Examining Google and its data Collection, Use, and Filtering practices.

Before I recognize myself and the Ranking Member for opening statements, I'd like to recognize our first witness, the Majority Leader Kevin McCarthy of California for his statement. Welcome.

MCCARTHY: Well, thank you, Mr. Goodlatte -- Chairman Goodlatte, for working with me to organize this hearing. I want to thank Sundar Pichai for testifying on Capitol Hill. We appreciate and note your willingness to travel here and answer our questions, first in a private setting in September, and now in a public setting.

Google is one of the most valuable companies in America because of what it does. Google's search engine organizes the entire internet, and by extension almost all the information in the world.

This is hardly an exaggeration. Here is a statistic you will hear a lot today, but it bears repeating. According to the Wall Street Journal 90 percent of all internet searches go through Google. That is power. And it comes with responsibility.

Mr. Pichai, it is -- it was necessary to convene this hearing because of the widening gap of distrust between technology companies and the American people. For our country and economy to grow stronger, the American must be able to have trust in the great companies of the 21st century.

We can alleviate some of their concerns today with transparency and candor. I hope we can begin to restore trust in the technology companies that shape our world, but we need answers.

We need to know, first, that Google is committed to the free market ideals of competition and entrepreneurship that launched its revolutionary products to begin with. Second, we need to be sure that any political bias within Google's workforce does not creep into its search products.

Third, we need to know that Google is living up to the America's belief in free expression, and human rights when it deals with foreign governments. Now, a word on the last subject, right now Google reportedly is developing a censored search engine with the Chinese Communist Party.

It is also developing next generation technology on Chinese soil and in conjunction with Chinese national champions like Tencent, technology that the administration considers a national priority.

Now, this news raises a troubling possibility. That Google is being used to strengthen China's system of surveillance, repression, and control. Right this very second China's authoritarian system detains more than a million religious minorities in reeducation camps.

Mr. Pichai, I urge you to reflect on that fact, and on the promise your company made when it pulled out of the China market in 2010. And I applauded you for that move in 2010.MCCARTHY: Back then, Google promised it would not censor its search results in China, or compromise its commitment to a free and open internet. Now, in light of these recent events, I think the American people deserve to know if something changed and if so, what?

All these topics -- competition, censorship, bias, and others point to one fundamental question that demands the nation's attention: Are America's technology companies serving as instruments of freedom or instruments of control? Are they fulfilling the promise of the digital age? Are they advancing the cause of self-government or are they serving of instruments of manipulation, used by powerful interests and foreign governments to rob the people of their power agency and indignity?

I believe we need to grapple with these questions together as a nation because a free world depends on a free Internet. We need to know that Google is on the side of the free world and that it will provide its services free of anticompetitive behavior, political bias and censorship.

I want to thank you again for being here and answering these questions. I look forward to listening to the answers with a very open mind and I yield back.

GOODLATTE: I would now like to invite Mr. Pichai to take his seat at the witness table.

Without objection, the Chair now recognizes the Ranking Member Mr. Nadler for a point of personal privilege to recognize a member of his staff -- a very distinguished member of his staff.

NADLER: Thank you Mr. Chairman.

Mr. Chairman, I want to take a moment to recognize Danielle Brown, whose last working day for the committee is tomorrow. Danielle has served on the Judiciary Committee Democratic staff for more than a decade in a variety of roles,

beginning as staff assist and then going to counsel parliamentarian, chief legislative counsel, and most recently deputy chief counsel.

Danielle has been essential to the operations of this committee and she has been involved in nearly every important piece of committee business over the last decade.

Her interest and expertise range from protecting vulnerable immigrants to ensuring reproductive freedom and preserving vital consumer protections. She is leaving us now, unfortunately, to become general counsel and parliamentarian of the Ways and Means Committee. Our loss is surely their gain.

I wish you well. I appreciate a wise counsel. I thank her for all her years of service to this committee and I hope the committee will join me in thanking her for her years of service to this committee.

GOODLATTE: Would the gentleman yield?

(APPLAUSE)

NADLER: I will yield to the Chairman.

GOODLATTE: I thank the gentleman for yielding.

I would like to join him in thanking Danielle for her service to this committee. She has worked with members on both sides of the aisle. She has worked with the majority staff, very productively, very cooperatively on a great many issues that have made this committee not only more productive but also operating in a fashion that has resulted in a number of bills getting from this committee all the way to the president's desk, whether that president be Barack Obama or Donald Trump.

That's an accomplishment that this entire committee should be proud of and Danielle should be proud that she has played an important part in doing that.

I thank you.(APPLAUSE)

GOODLATTE: I now recognize myself for an opening statement.

In the United States, Google operates the preeminent Internet search engine, the leading e-mail service provider and the android operating system which runs most of it smart -- most of the smart phones in the United States. When a consumer performs an internet search, sends an e-mail, or uses his or her smartphone, Google collects information on that person. In fact, almost every minute of every day, the Android operating system sends information about the exact location, temperature, barometric pressure, and speed of movement of every phone that runs on the Android operating system.

With Americans carrying their smartphones all day, every day, Google is able to collect an amount of information about its users that would even make the NSA blush. Of course, when users click through the terms of service for these services, they do consent to such collection. I think it is fair to say that most Americans have no idea the sheer volume of detailed information that is collected.

Today I hope to get answers on the extent of data collection and use by Google. In addition, decades ago, Congress passed the Communications Decency Act, including Section 230 of that act, which allows service providers to remove lewd, lascivious, excessively violent, or otherwise objectionable content from their platforms. This law allows service providers to remove illegal materials including child pornography and content that is illegal under our intellectual property laws.

While meant to allow them to block illegal, obscene, and harmful materials, there is some discretion that service providers, by necessity, must use to make decisions about what content is harmful or objectionable. Given Google's ubiquity in the search market, Google is often consumers' first and last stop when searching for information on the internet. As such, this committee is very interested in how Google makes decisions about what constitutes objectionable content that justifies filtering and who at Google makes these decisions.

Given the revelation that top executives at Google have discussed how the results of the 2016 elections do comply (ph) with Google's values, these questions have become all the more important. While it is true that Google is not a government entity, and so it does not have to comply with the first amendment, the American people deserve to know what types of information they are not getting when they perform searches on the internet.

The market works best when information about products and services is readily available. And so today, on behalf of this committee and the American consumer, I hope to get answers from Mr. Pichai regarding who at Google makes the judgment calls on whether to filter or block objectionable content, and what metrics Google uses to make those decisions.

I want to thank Google's CEO for his willingness to testify today and to answer these and other questions. With respect to search results, algorithmic screening is the primary means through which Google sorts data and information.

Google's search algorithm, for example, calculates what is presented to a user based on the variables the user inputs into the search bar. At its best, Google's algorithm reaches the best answer in the least amount of time while providing choices to the user by ranking pages most relevant to the search inquiry. Of course, by ranking pages, Google search always favors one page over another. This kind of bias appears harmless.

After all, the point of a search is to discriminate among multiple relevant sources to find the best answer. This process, however, turns much more sinister with allegations that Google manipulates its algorithm to favor the political party it likes, the ideas that it likes, or the products that it likes. There are numerous allegations in the news that Google employees have thought about doing this, talked about doing this, and have done it.

The dangerous implications to a fair democratic process cannot be understated. One study performed by psychologist Robert Epstein has revealed that internet search rankings have a significant impact on consumer choices, namely because users trust and choose higher-ranked results more than lower-ranked results. After performing five relevant double-blind, randomized, controlled experiments, using a total of 4,556 undecided voters representing diverse demographic characteristics of the voting populations of the United States and India, the study revealed that biased search rankings can shift the voting preferences of undecided voters by 20 percent or more.

The shift can be much higher in some democratic groups and search ranking bias can be masked so that people show no awareness of the manipulation. The potential for this kind of bias is clearly problematic and is further compounded by the fact that Google every day collects mountains of information about its users while they are actively engaged with a Google product or even when they are not.

According to a study conducted by Vanderbilt University, a dormant, stationary Android phone, with Chrome active in the background, communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour. The collection of location data may be obvious to most users but they are often unaware of the many sensors that the Android platform supports, including an accelerometer, a barometer, and a photometer. These -- photometer -- these sensors, in addition to the cameras and microphone on a mobile device, can collate into a very accurate picture of where a user is, what they are doing, and who else is there.

The shocking amount of information that Google collects via its phones was recently featured on Good Morning America, in which a reporter using an Android phone with no SIM card, that wasn't connected to the internet, discovered that the phone collected the device's movement, even identifying the mode of transportation, such as the subway or even a bicycle, and at times taking 10 sensor readings per minute.

Moreover, Google's practice of reinforcing its dominance, in light of allegations of self-serving bias, creates little choice for consumers across the spectrum of internet-based products or services. Given that Google's ads show up on non-Google websites and Google search engine is being used as the default search tool on other products such as the Apple phone, it is almost impossible to avoid Google altogether.

Google, in many things -- Google is many things. It's one of the largest data collectors ever seen in human history. It's an advertiser that can get the right product to the right customer at precisely the right time. Google is also an internet giant, directing over 3.5 billion searches per day. With this massive authority, however, comes the potential for far-reaching abuse. The mere suspicion that Google manipulates its products and features for self-serving or even political purposes raises serious concerns about its business practices, its impact on free speech and our democratic process, and Americans' trust that the information gathered about them in their day-to-day lives is done with their knowledge and is not being used against them.GOODLATTE: My hope is that through our inquiries today we will ensure more transparency and accountability going forward.

Last, despite the nature and scope of today's hearing, Google is still the story of the American Dream.

The company was started by two individuals in a garage and grew to be one of the most successful companies in the world. Two decades ago, we could not fathom instantaneous access to more information than that which is contained in all the encyclopedias in the world. Now, we take that for granted because of the innovative services Google provides.

With that I want to again thank our witness for his presence here today. I look forward to your testimony.

It's now my pleasure to recognize ranking member of the committee, the gentleman from New York, Mr. Nadler for his opening statement.

NADLER: Thank you Mr. Chairman. Mr. Chairman, our society has become increasingly reliant on social media and other online platforms to obtain, create, share and sort information. This information helps us make decisions ranging in importance from where to make dinner reservations to which candidate to vote for in the presidential election.

The public's increasing use of these platforms has generated many positive benefits for society. That is -- it has also given rise to some troubling trends. Google is among the dominant firms in this field. As such, given the public's widespread use in reliance on its products and services, there are legitimate questions regarding the company's policies and practices, including with respect to content moderation in the protection of user privacy.

But before we delve into these questions I must first dispense with a completely illegitimate issue which is the fantasy dreamed up by some conservatives that Google and other online platforms have an anti-conservative bias.

As I have said repeatedly, no credible evidence supports this right-wing conspiracy theory. I have little doubt that my Republican colleagues will spend much of their time presenting a laundry list of anecdotes and out of context statements made by Google employees as supposed evidence of anti-conservative bias but none of that will actually make it true. But this fact-free propaganda does help generate the mistrust that Majority Leader referred to a few moments ago.

And even if Google were deliberately discriminating against conservative viewpoints just as "Fox News" and Sinclair Broadcasting and conservative talk radio hosts like Rush Limbaugh discriminate against liberal points of view, that would be its right as a private company to do so, not to be questioned by government.

During the Reagan Administration, about 35 years ago, the Federal Communications Commissioners appointed by Ronald Reagan abolished what we used to have for the Fairness Doctrine, which placed an obligation on broadcasters who use the public airwaves to be fair to different points of view.

This question might be relevant if the Republican members wanted to bring back the Fairness Doctrine and expand its scope to social media companies. I doubt we will see any interest in doing so but we should not let the delusions of the far right distract us from the real issues that should be the focus of today's hearing. For example, we should examine what Google is doing to stop hostile foreign powers from using its platform to spread false information in order to harm our political discourse.

It has been more than two years since the 2016 election yet this committee has not held a single hearing focused on Russia's campaign to manipulate online platforms to undermine American democracy despite the fact that it is the consensus view of our intelligence agencies that Russia engaged in a massive disinformation campaign to influence the 2016 election.

I hope that Mr. Pichai can tell us what actions Google has taken to counter this unprecedented attack and what gaps remain in its defense without being so specific as to give a -- a guidance to foreign powers. This may help Congress determine what more can be done to further insulate our democratic processes from foreign interference. We should also examine how Google enforces community standards that prohibit racist or bigoted threats and other inappropriate conduct.

While internet platforms that produce many societal benefits, they've also provided a new tool for those seeking to stoke racial and ethnic hatred. The presence of hateful conduct and content on these platforms has made all the more alarming by the recent rise in hate-motivated violence. According to statistics recently released by the FBI, reported incidents of hate crimes rose by 17 percent last year compared to 2016, marking the third consecutive year that such reports have increased.

The horrible massacre at the Tree of Life Synagogue in Pittsburgh, the recent murder of an African-American couple in the Kentucky grocery store, the killing of an Indian engineer last year in Kansas are sadly not isolated outbursts of violence, but the most salient examples of a troubling trend.

We should consider to what extent Google and other online platforms may have been used to foment and to disseminate such hatred and how these platforms can play a constructive role in combating its spread. As a dominant player in this field, Google possesses significant market power. It is also useful to examine its policies and practices to ensure that other companies are able to compete in open and fair marketplace.

There are also concerns about the prevalence of pirated material available on Google and other Internet platforms at the expense of legitimate content. Finally, it is important to know what Google is doing to protect his user's data privacy and data security. The "Wall Street Journal" recently reported that Google discovered last March that a bug in its social media platform Google+ had exposed the private profile data of up to 500,000 users to third-party developers but opted not to disclose the issue publicly, not even to those who may be affected at the time.

And just yesterday, the company announced that it had discovered another Google+ bug that may have exposed the private profile data of millions of users. While Google has so far found no evidence that developers have in fact abused these bugs or that any user profile data has been misused in any way, incidents like this still raise legitimate questions

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

about what types of data exposure the company is obligated to disclose publicly. It also raises questions about how much control users you have over their own data and how such control should be regulated.

I am also disturbed by recent reports that Google is developing a search engine for the Chinese mainland market. According to these reports, the search engine would not only accommodate Chinese government censors, it might allow the Chinese government to track individuals by linking search terms to the user's mobile phone number.

Unfortunately, in this our fourth hearing devoted to entirely fictitious allegations of conservative -- of anti-conservative bias of internet companies, we will waste more time and more taxpayer money and elevating well-worn right-wing conspiracy theories instead of concentrating the substantive questions and issues that should be the focus of our hearings. Our committee can and must and will do better. I yield back the balance of my time.

GOODLATTE: Thank you, Mr. Nadler. We welcome our distinguished witness and if you would please rise, I will begin by swearing you in. Please raise your right hand.

Do you swear that the testimony that you are about to give shall be the truth, the whole truth and nothing but the truth so help you God?

Thank you. Let the record show that the witness answered in the affirmative.

Our only witness today is Mr. Sundar Pichai. Pichai is the Chief Executive Officer of Google.

Your written statement will be entered into the record in its entirety, and we ask that you summarize your testimony in five minutes. To help you stay within that time, there's a timing light on your table. When the light switches from green to yellow you have one minute to conclude your testimony. When the light turns red it signals your five minutes have expired.

Mr. Pichai you are very welcome and you may begin.PICHAI: Chairman Goodlatte, Ranking Member Nadler, distinguished members of the committee, thank you for the opportunity to be here today.

I joined Google 15 years ago, and have been privileged to serve as CEO for the past three years, but my love for information and technology began long before that.

It's been 25 years since I made the U.S. my home. Growing up in India, I have distinct memories of when my family got its first phone and its first television. Each new technology made a profound difference in our lives. Getting the phone meant I could call ahead to the hospital to check that the blood results were in instead of taking a two-hour trip there. And the television -- well, it only had one channel, but I couldn't have been more thrilled by its arrival.

Those experiences made me a technology optimist, and I remain one today, not only because I believe in technology, but because I believe in people and their ability to use technology to improve their lives. I'm incredibly proud of what Google does to empower people around the world, especially here in the U.S. I'd like to take a moment to share a bit of background on that.

Twenty years ago, two students, one from Michigan and one from Maryland, came together at Stanford with a big idea: to provide users with access to the world's information. That mission still drives everything we do, whether that's saving you a few minutes on your morning commute, or helping doctors disrupt (ph) disease and save lives.

Today, Google is more than a search engine. We are a global company that's committed to building products for everyone. That means working with many industries, from education and health care to manufacturing and

entertainment. Even as we expand into new markets, we never forget our American roots. It's no coincidence that a company dedicated to free flow of information was founded right here in the U.S.

As an American company, we cherish the values and freedoms that have allowed us to grow and serve so many users, and I'm proud to say we do, and we will continue to work with the government to keep our country safe and secure.

Over the years, our footprint has expanded far beyond California to states such as Texas, Virginia, Oklahoma and Alabama. Today in the U.S., we are growing faster outside of the Bay Area than within it. I've had that great opportunity to travel across the country and see all the places that are -- that are powering our digital economy, from Clarksville to Pittsburgh to San Diego, where we recently launched a partnership with the USO to help veterans and military families.

Along the way, I've met many people who depend on Google to learn new skills, find jobs or new businesses. Over the past year, we have supported more than 1.5 million American businesses, and over the past three years, we have made better (ph) contributions of $150 billion to the U.S. economy, added more than 24,000 employees and paid over $42 billion to our U.S. partners across Search, YouTube and Android. These investments strengthen our communities and support thousands of American jobs.

They also allow us to provide great services to our users to help them through the day. It's an honor to play this role in people's lives, and it's one we know comes with great responsibility. Protecting the privacy and security of our users has long been an essential part of our mission. We have invested an enormous amount of work over the years to bring choice, transparency and control to our users. These values are built into every product we make.

We recognize the important role of governments, including this committee, in setting rules for the development and use of technology. To that end, we support federal privacy legislation and proposed a legislative framework for privacy earlier this year.

Users look -- look to us to provide accurate, trusted information, and we work hard to ensure the integrity of our products. We have put a number of checks and balances in place to ensure they continue to live up to our standards.

I lead this company without political bias, and work to ensure that our products continue to operate that way. To do otherwise would be against our core principles and our business interests.

We are a company that provides platforms for diverse perspectives and opinions, and there is no shortage of them amongst our employees. Some Googleists are former servicemen and -women who have risked much in defense of their country. Some are civil libertarians who fiercely defend freedom of expression. Some are parents who worry about the role technology plays in our households. Some, like me, are immigrants who are profoundly grateful to the freedoms and opportunities it offers, and some of us are many of these things.

Let me close by saying that leading Google has been the greatest professional honor of my life. It's a challenging moment for our industry, but I'm privileged to be here. I greatly appreciate you letting me share the story of Google and our work to build products worthy of the trust users place in us.

Thank you for the opportunity, and I look forward to answering your questions.

GOODLATTE: Thank you.

We'll now proceed under the five-minute rule with questions, and I'll begin by recognizing myself.

Mr. Pichai, is it true that the Android operating system sends Google information every few minutes, detailing the exact location of a smart phone within a few feet, the speed of movement of the phone, the altitude of the phone, sufficient to determine what floor of a building the phone is on, the temperature surrounding the phone and other readings? And if so, with Americans carrying their phone with them virtually at all times, doesn't the collection of this volume of detailed information really mean that Google is compiling information about virtually every movement an individual with a smart phone is making, every hour of every day?

PICHAI: Mr. Chairman, thank you for the question. Today, for any service we provide our users, we go to great lengths to protect their privacy, and we give them transparency, choice and control.

Android is a powerful platform, and -- and provides smart phone for over two billion people. And as part of that, it depends on the applications users choose to use. If you're using a fitness application which is detecting the number of steps you walk, you expect it to send that information. But it's a choice users make. We make it clear, and -- and it depends on the use cases.

GOODLATTE: So the -- the answer to my question, my first question is yes. Is that correct? That the information that I cited is gathered by Google?

PICHAI: It -- if -- if the -- for Google services, you have a choice of what information is collected, and we make it transparent -- transparent.

GOODLATTE: I understand. There are -- there are uses that consumers make use of. I use it to keep track of the number of steps I walk. I understand that service that one of your competitors provides, so I -- I understand that purpose. But do you think the average consumer understands that Google will collect this volume of detailed information when they click through the terms of service agreements in order to use the Android operating system?

PICHAI: It's really important for us that, you know, that average users are able to understand it. This is why we do something called privacy checkup.

GOODLATTE: Do you think average users read the terms of service and the updates that are very frequently sent to us?PICHAI: Beyond the terms of service, we actually offer -- we remind users to do a privacy checkup, and we make it very obvious every month. In -- in fact, in the last 28 days, 160 million users went to -- went to their "My Account" settings, where they can clearly see what information we have -- we actually give, you know, show it back to them, and we give clear toggles by category where they can decide whether that information is collected, stole, or more importantly, if they decide to stop using it, we work hard to make it possible for users to take their data with them if they choose to use another service.

GOODLATTE: Let me switch to the issue of Section 230 of the Communications Decency Act. You heard me say in my opening statement that this provides broad liability protections for you and other technology companies for good faith restrictions that, when Google thinks something is obscene, lewd, lascivious, filthy, excessively violent, harassing or otherwise objectionable.

On the other hand, objectionable material, by whatever standard applied, likely elicits the most engagement from users on your site. And for Google, increased engagement potentially means increased revenue.

However, it is important for Google to make very clear where it draws the line and I don't believe Google has done its best to make that clear. So what I would ask is the following, would Google or YouTube be willing to make changes in support of a healthier civic dialogue if doing so meant a drop in user engagement metrics?

PICHAI: Absolutely, Mr. Chairman. We have a long track record of -- we have always focused on long-term goals towards user satisfaction. We focus on their knowledge, happiness, success and -- and -- and that's what we work hard to create.

It is important to us that platforms like YouTube are viable over the long run, it's in our natural incentive to do so. YouTube is a place where users, advertisers and content creators who make their livelihoods use the platform, and so we want to make this work in a sustainable way.

GOODLATTE: When it comes to political advertising, as you know, some of your competitors in other advertising media are required by law to offer the same rate -- the lowest rate, as a matter of fact, to all political candidates.

So for example, that's true in television and radio. Would Google -- should competing political candidates be charged the same effective ad rates to reach prospective voters?

PICHAI: Our advertising products are built without any bias and that -- and the rates are comparative, set by a light auction process. So depending on the key words for which you are bidding for, depending on the demand that is in the auction, the prices are automatically calculated.

So, you know, the system decides that based on...

GOODLATTE: I understand they're automatically calculated, but two competing political candidates targeting the same audience see different ad rates, and if yes, could that disparity be substantial?

PICHAI: There wouldn't be a difference based on, you know, any political reasons, unless there are key words which are of particular interest in the market to command such (ph). So it's essentially a supply and demand equilibrium.

It can lead to differences in rates, but it will vary from time to time.

GOODLATTE: Can those rates be very substantial in difference?

PICHAI: There could be occasions where yes, there could be a difference in rates, yes. I haven't looked at the specifics of it, yes.

GOODLATTE: So the result is different than in other markets like television or radio where every candidate is entitled to the lowest rate that that television station or radio station offers to any political candidate for office?

PICHAI: We -- you know, there could be variations based on the time of the day, the keywords you're choosing to go for, you know, the geographies you are advertising in, but it's decided by the system and it is a process that we have done for over 20 years.

And let me assure you, anything to do with our civic process, we make sure we do in a non-partisan way and it's really important for us.

GOODLATTE: Thank you. The Chair recognizes the gentleman from New York, Mr. Nadler, for five minutes.

NADLER: Thank you. Mr. Pichai, according to media reports, Google found evidence that -- well, let me go to the other one first. Google found a bug in its Google Plus social media platform that could have potentially exposed the private data of up to half a million users without the consent of third-party developers.

Google, however, did not disclose this bug until months later after it was revealed by a report in the Wall Street Journal. Yesterday, as I mentioned before, they found -- you announced another bug. What legal obligations is the company under to disclose data exposures that do not involve sensitive financial information but still involve private personal data like a user's name, age, e-mail address or phone number?

PICHAI: Congressman, we take privacy seriously. The bugs you mentioned are bugs. We -- we found them by either doing an audit or, you know, using our automated testing systems. Whenever we find any bugs, we follow, you know -- it gets escalated to our Privacy and Data Protection Office and we comply with...

NADLER: All right, I'm -- I'm not criticizing what you do, I'm asking what legal obligation is the company under to disclose such -- such data exposures that don't involve financial information but still involve other personal information?

PICHAI: It depends on the situation. We follow the requirements and it -- it -- and in that case, in the first case, typically we look at the legal requirements but we go above and beyond to make sure we do the right thing for our users.

In the first case, both -- there was no evidence data was misused and we conduct security ...

NADLER: I understand all of that, but my question is what legal obligations are there?

PICHAI: You know today, right now, if you found a bug, you know, and you've ascertained -- once you've done the investigation and you've ascertained the users who are eligible for notification, my understanding is you have 72 hours and we both notify users as well as the regulators in that time frame.

NADLER: OK, thank you. Now, according to media reports, Google found evidence that Russian agents spent thousands of dollars to purchase ads on its advertising platforms that span multiple Google products as part of the agents -- the Russian agent's campaign to interfere in the election two years ago.

Additionally, Juniper Downs, head of Global Policy for YouTube, testified in July that YouTube had identified and shut down multiple -- and shut down multiple channels containing thousands of videos associated with the Russian misinformation campaign.

Does Google now know the full extent to which its online platforms were exploited by Russian actors in the election two years ago?

PICHAI: We have -- you know we undertook a very thorough investigation, and in 2016, we -- we now know that there were two main ad accounts linked to Russia, which -- which you know, advertised on Google for about $4,700 in advertising.

We also found other limited ...

NADLER: Total of $4,700?

PICHAI: That's right, which was, you know -- no amount is OK here, but we found limited activity, improper activity. We learned a lot from that and we have, you know, dramatically increased the protections we have around our election offerings.

Leading up to the current elections, we did -- we again found limited activity, both from the Internet Research Agency in Russia, as well as accounts linked to Iran.

NADLER: And what -- what specific steps have you taken, including during the recent 2018 elections, to protect against further interference by Russia or other hostile foreign powers?PICHAI: We have undertaken a significant review of how ads are bought. You know, we look for the origin of these accounts. We share and collaborate with law enforcement, other technology companies and we essentially are investing a lot of effort and oversight in this area.

NADLER: Looking ahead to the next Congress, I assume we can have your assurances that Google will work with this committee as we examine the issue of how to better secure our elections from future foreign interference?

PICHAI: Congressman, protecting our elections is foundational to our democracy and you have my full commitment that we'll do that.

NADLER: OK, my last question because we -- time is running out, what are you doing -- what is Google doing to combat the spread of white supremacy and right-wing extremism across YouTube?

PICHAI: Congressman, YouTube is an important platform. We do want to allow for diverse perspectives and opinions but we have rules of the road. We have clear content policies and we have policies against many categories and we are transparent about these policies. And when we find violations on our policies, we do remove those videos and handle content...

NADLER: When you find violations, you what?

PICHAI: Of our policy. For example, we have policies against hate speech and we clearly define them. And if we find any violations there, we do take down the -- take down content.

NADLER: When you take down the content, do you note who -- who put it up so you can flag future content from the same sources?

PICHAI: We -- we look at it on a video-by-video basis. To the extent there are repeat offenses from the same account, we do take into account and we notify the content creator and we follow up accordingly.

NADLER: Thank you very much, I yield back.

GOODLATTE: Chair recognizes the gentleman from Texas, Mr. Smith, for five minutes.

SMITH: Thank you, Mr. Chairman. Mr. Chairman, Google has revolutionized the world, though not entirely in the way I expected. Americans deserve the facts, objectively reported. The muting of conservative voices by internet platforms has intensified, especially during the presidency of Donald Trump. More than 90 percent of all internet searches take place on Google or its subsidiary, YouTube, and they are curating what we see.

Google has long faced criticism for manipulating search results to censor conservatives. Conservative individuals and organizations have had their pro-Trump content tagged as hate speech or had their content reduced in search results. And enforcement of immigration laws has been tagged as hate speech as well. Such actions pose a grave threat to our democratic form of government.

PJ Media found that 96 percent of search results for Trump were from liberal media outlets. In fact, not a single right-leaning site appeared on the first page of search results. This doesn't happen by accident but is baked into the algorithms. Those who write the algorithms get the results they must want, and apparently management allows it. Dr. Robert Epstein, a Harvard-trained psychologist, authored a study recently that showed Google's bias likely swung 2.6 million votes to Hillary Clinton in the 2016 election.

Google could well elect the next president with dire implications for our democracy. This should be of real concern to all but the most politically partisan. Those at the top set the tone. It will require a herculean effort by the chief executive and senior management to change the political bias now programmed into the company's culture. And Mr. Pichai, let me ask my first question about those examples of political bias that I just mentioned and you're going to hear others too.SMITH: In your opening statement, you mentioned your desire to provide information that was without political bias. Clearly that's not working, so what are you going to do to improve that situation?

PICHAI: Congressman, thanks for the question.

If I may, some of the studies you mention, we have investigated those. There -- there are other studies which have looked at that. We have found issues with the methodology and the sample size, and so on.

But let me step back and say: Providing users with high-quality, accurate and trusted information is sacrosanct to us. It's what our principles are, and our business interests, our natural, long-term incentives are aligned with that. We want to serve users everywhere, and we need to earn their trust in doing so.

SMITH: So -- so what actions are you going to take to try to counter the political bias in some of those examples that I just gave? I mean, they're irrefutable. So it -- it occurs, you have to take some responsibility for that bias. What do you intend to do about it?

PICHAI: Congressman, with respect, but after sustained (ph) study, we reinvestigated (ph). We -- we don't agree with the methodology. Happy to follow up with your office, and give our findings on the -- on the study.

When we look at it, we evaluate our studies to -- evaluate our search results. Today, we use a very robust methodology and we have been doing this for 20 years. Making sure the results are accurate is what we need to do well, and we work hard to do that.

SMITH: What does methodology have to do with the fact that 96 percent of the references to Trump are from liberal media?

PICHAI: There are always studies, you know, which can show one -- one set of data and arrive at conclusions. But we have looked at results on our top news category. We find that we have a wide variety of sources, including sources from the left and sources from the right.

And we are committed to making sure there's diverse perspectives.

SMITH: By the way, the study that I referred to was done by a self-proclaimed Democrat who voted for Hillary Clinton and said he regretted to find what he found. But he felt it was irrefutable, and no one has been able to disprove him.

Let me go to another question. And that is, clearly there may be a difference of opinion as to the degree or amount of political bias -- would you agree to allow an independent entity to study your search results for political bias?

I know you've -- have individuals studying that now, but you appointed them. Would you allow a third-party independent outside organization to study your search results and cooperate with them to determine the degree, if any, of political bias?

PICHAI: Congressman, if I may make two points. One is, today, there have been independent third-party studies looking at search results. The economists...

SMITH: But -- but you chose those third parties. I'm talking about someone truly independent.

PICHAI: We didn't choose those third parties. I mean, they completed those studies.

The second is, we are transparent as to how we evaluate search. We publish our rater (ph) guidelines. We publish it externally. And raters evaluate it. And that's how we -- you know, we are trying hard to understand what users want, and -- and this is something important to us, to get right.

I'm happy to follow up and explain the methodology and the studies which have been done by independent third parties.

SMITH: OK. To my knowledge, again, you have picked those third parties and I'd like to have someone truly independent study those results, number one.

Number two, also to my knowledge, you never sanctioned any employee for any type of -- for manipulating the search results whatsoever. Is that the case?

GOODLATTE: The time of the gentleman has expired, but Mr. Pichai will be allowed to answer the question.

PICHAI: Very quickly. It's not possible for an individual employee or groups of employees to manipulate our search results. You know, we have a robust framework, including many steps in the process. And...

SMITH: Well my time is up. Let me just say, I disagree. I think humans can manipulate the process. It is a human process at its base.

Thank you, Mr. Chairman. Yield back.

GOODLATTE: The chair recognizes the gentlewoman from California, Ms. Lofgren, for five minutes.

LOFGREN: Thank you, Mr. Chairman.

And thank you for being here, Mr. Pichai. Google is located in Santa Clara County, my home. And I've got to say that, you know, in contrast to the recent Amazon effort for a headquarters, they are proposing -- Google is proposing to establish a facility in downtown San Jose, and they didn't ask for any tax subsidies. In fact, they're purchasing the land and paying the city gobs of money.

I'm going to be parochial and ask a question because I think most people in -- in San Jose are excited by the proposal, but there's anxiety about the impact on housing, and whether Google intends to be a partner with the city of San Jose to make sure that we accommodate the housing that will be necessary for the 20,000 additional employees that are proposed in San Jose.

PICHAI: Sorry, I missed the last part of your question?

LOFGREN: Whether you would be a partner with the city in helping to provide additional housing to accommodate these employees.

PICHAI: Congresswoman, it's an important question. We deeply care about the community where we -- where we work, as part of this effort. We have done wide outreach. And we are -- we have committed to making sure there is affordable housing at varying affordable levels...

LOFGREN: Very good.

PICHAI: ... as -- as part of -- as part of the development. We are already...

LOFGREN: Thank you so much.

PICHAI: ... in touch with city leaders there.

LOFGREN: Thank you so much. You know, there are so many questions and we're not going to be able to deal with them all today. I'm hoping in the next Congress, we will be able to visit with you and other tech companies, to go through issues of privacy, data localization and its relationship to human rights.

Competition policies, the issue of takedown requests by authoritarian regimes, encryption policy and what's going on in Australia, filtering and confirmation bias and its impact on society generally, both culturally and politically. But we can't do that in the five minutes we have here today.

So I would just like to revisit some of the questions that have already been asked. The chairman asked about location policies in your Android system, and you pointed to various apps that might provide information.

Let's say I got an Android phone. And unlike most people, I don't have a single app on that phone. What information would be collected?

PICHAI: Congresswoman, there is -- there is a device-specific location setting, which -- which you can turn on or off. And...

LOFGREN: Let's say I turn it off.

PICHAI: Turn it off, there is no location information sent from that device.

LOFGREN: OK.

PICHAI: But this is a complex area. There are times. For example, your I.P. address may include some location information.

LOFGREN: Correct.

PICHAI: That's an area we are committed to doing more to make it easier.

LOFGREN: Now, manipulation of search results. I think it's important to talk about how search works. Right now, if you Google the word "idiot" under images, a picture of Donald Trump comes up. I just did that. How would that happen? How does search work so that that would occur?

PICHAI: We provide search rate (ph) --for any time you type in a keyword. We -- as Google, we have crawled -- we have gone out and crawled and stored copies of billions of their pages in our index. And we take the keyword, and match it against web pages and rank them, based on over 200 signals.

Things like relevance, freshness, popularity, how other people are using it. And -- and based on that, you know, at any given time, we try to rank and find the best results for that query.PICHAI: And then we evaluate them with external

raters to make sure that -- and they evaluate it to objective guidelines. And -- and that's how we make sure the process is working...

(CROSSTALK)

LOFGREN: So it's not some little man sitting behind the curtain figuring out what we're going to show the user. It's basically a compilation of what users are generating, and trying to sort through that information?

PICHAI: Last year we sold over 3 trillion searches. And just as a fact, every single day 15 percent of the searches Google sees, we have never seen them before. So -- so this is working at scale. And, you know, we don't manually intervene on any particular search result.

LOFGREN: I would just like to note, from time to time, my colleagues on the other side of the aisle complain that they hear an individual engineer appears to be a Democrat. And I'd just like to put this in context. In Santa Clara County, Donald Trump, in the 2016 election, got 20 percent of the vote. That's how much of the vote he got.

So it's not a surprise that the engineers who live in Santa Clara County would reflect that general political outcome. That has nothing to do with the algorithms and the, really, automated process that is the search engine that serves us. You know, if we didn't have Google, we wouldn't be able to find any information in -- in the efficient way that we do.

I look forward next year to working with you on some of the very serious questions that we face. It's pretty obvious that bias against conservative voices is not one of them. Thank you very much. My time is expired, Mister...

GOODLATTE: The chair recognizes the gentleman from Ohio, Mr. Chabot, for five minutes.

CHABOT: Thank you, Mr. Chairman.

And, Mr. Pichai, let me start out with something real quickly. We have heard several times this morning the mention that 90 percent of the time that a person, he or she, does an Internet search that it's through Google. Would you basically agree that that's -- that's true?

PICHAI: More than ever, there are many ways users access information. Just to give an example, if you're trying to shop; if you're trying to buy something, more than 50 percent of product searches originate with Amazon in the U.S. today. If you're looking for information on news, today you can get it from more sources than ever before.

CHABOT: Do you dispute, then, the 90 percent number?

PICHAI: You know, our internal -- I mean, it's tough for us to assess the numbers. There are external studies which have shown different numbers, including lower numbers than that.

CHABOT: OK. OK. Now, you've heard the allegation this morning -- I know you dispute it -- but you've heard the allegation that there's a bias in favor of liberal or progressive points of view and against more conservative point -- you've heard that this morning already. Is that correct?

PICHAI: Yes, I...

CHABOT: OK. Let me tell you now about a firsthand experience that I've had. I do a weekly blog. I've been doing it for the better part of nine years now. And a while back, Republicans in the House passed legislation to repeal and replace Obamacare. Our bill was called the American Health Care Act, or the AHCA. When I was writing my blog about that,

I Googled "American Health Care Act" and virtually every article was an attack on our bill, article after article alleging that our bill would result in millions and millions of people losing the great care that they were supposedly getting under Obamacare.

I would argue that was completely false. But it wasn't until you got to the third or fourth page of search results before you found anything remotely positive about our bill.

Let me give you a second example. The Republican tax cut bill was passed about a year ago -- the Tax Cuts and Jobs Act -- same story, article after article attacking the Republican tax cut plan, alleging the tax cuts only went to the rich, when in actuality about 85 percent of taxpayers got their taxes cut, including millions and millions of middle-class taxpayers.

And once again, to find any article that had anything remotely good to say about our plan, you had to go deep into the -- into the search results. Now, I know Google's attitude, "The algorithm made us do it." But I don't know that I buy that.

How do you explain this apparent bias on Google's part against conservative points of view, against conservative policies? Is it just the algorithm or is there more happening there?

PICHAI: Congressman, I understand the frustration of seeing negative news, and, you know, I see it on me. On Google, there are times you can search on Google and, page after page, there's negative news, which we reflect.

But what -- what is important here is we use the robust methodology to reflect what is being said about any given topic at any particular time. And we try to do it objectively, using a set of rubrics. It is in our interest to make sure we reflect what's happening out there in the best objective manner possible. I can commit to you and I can assure you we do it without regards to political ideology. Our algorithms have no notion of political sentiment in it.

CHABOT: I guess -- not -- I'm going to run out of time here. I apologize for interrupting. But -- and I -- and I sincerely believe that you believe what you're saying here. But you've got almost 90,000 employees. Somebody out there is doing something that just isn't working, if you're looking for unbiased results.

And I have seen this firsthand, time after time. I just mentioned two of the most obvious ones that people would remember, "Yeah, those bills, heard about those."

So I have seen it -- if what I have described, and some others -- I'm sure you're going to hear other examples -- if it is happening, do you see how conservatives believe that your company is, kind of, putting their thumb on this scale, so to speak, that you're, in effect, picking winners and losers in political discourse out there in America today and therefore actually affecting elections?

And do you see why conservatives would be concerned about this and why we're asking these kinds of questions today?

There's a lot of people that think what I'm saying here is happening. And I think it's happening. So I've only got about 20 seconds to go, but I'll give it over to you (ph).

PICHAI: Congressman, it's important to me that I understand these concerns. This is why I have been trying to reach out and meet people. We have done outreach. We want to explain how these things work. We are happy to look at independent studies. It's important to us to demonstrate that our products work without any bias. And we build our products in a neutral way. And I'm happy to follow up and look forward to, you know, getting a chance to explain it better.

CHABOT: Thank you very much. And I appreciate your willingness to follow up, because there's, I think, a lot of people that have a lot of questions. And I know I'm already out of time. But let me also thank Google for one thing, and I happen to be chair of the House Small Business Committee. And your company has worked with an awful lot of small businesses all across the country and you created a lot of jobs. And I commend you for that.

I yield back.

GOODLATTE: The chair recognizes the gentleman from -- sorry -- the gentlewoman from Texas, Ms. Jackson Lee, for five minutes.

JACKSON LEE: Good morning, Mr. Pichai. I'm right here. It's a pleasure to have you here this morning.

I'm going to try and answer very -- or offer to you questions initially that require just a yes or no answer, if you would. Does Google choose conservative voices over liberal voices?

PICHAI: We approach our work without any political bias. We build it in a neutral way.

JACKSON LEE: The answer is no, or -- yes or no?PICHAI: No, Congresswoman.

JACKSON LEE: If hate speech provokes violence, is that the definition -- other aspects that you consider, that you would take it down? I know there are other aspects, but typically encouraging violence. Does that get taken down?

PICHAI: In primary purpose of inciting violence is what we construe as hate speech, yes Congresswoman.

JACKSON LEE: And it would be taken down?

PICHAI: Yes, we would remove.

JACKSON LEE: I want to just take note of the fact that I look forward to best practices when we start the 116th Congress in terms of having more hearings. My view is that this committee has washed its hands clean of engaging in meaningful oversight of technology platform efforts to sift through content being sowed by hostile foreign actors, actors claiming to heighten social division at the peril of democracy.

I won't ask a question on that, but I will make mention of the universal Declaration of Human Rights' Article 12, which says no one should be subjected to arbitrary interference with privacy, and has been noted that Google does engage in reviewing e-mails.

Would you commit to adhering to Article 12 of the Declaration of Human Rights as it relates to protecting the privacy of individual e-mails?

PICHAI: You know, we think privacy is an important individual right, it's an important human right and -- and we are committed to upholding that and happy to engage in any discussions with respect to that.

JACKSON LEE: I'd like to do so. We know that building the U.S. economy through innovation is very important. I would like to know whether or not you would be open to Google involving the AI economy to non-traditional areas of socioeconomic groups.

Data shows the impact of not having that access. Would you be welcome or would you welcome invitations to those communities to do more than what has been done?

PICHAI: Definitely, absolutely, yes.

JACKSON LEE: You received a letter from the Senate a few weeks ago regarding illegal drug sales. It's quite extensive, and my question is have you made any efforts to deal with the facilitating of sale of counterfeit, substandard and falsified medicines sold through illegal online pharmacies?

PICHAI: Congressman, there's a national crisis. We have undertaken a lot of work in this area. We -- we just recently rolled out the participated in national Take-Back Day. In Google Maps, we showed drop-off locations.

We work with law enforcement here and just last week, we received a cooperative citizenship award from Partnership for Drug Free America, and we are very committed to doing more work in this area.

JACKSON LEE: We applauded you in 2010 when Google took a very powerful stand of principle and democratic values over profits and came out of China. I am concerned that you are now going back into China and upholding the Dragonfly procedures, which would help sensor Chinese persons seeking a lifeline of democracy and freedom.

How can you do that and what are you doing to minimize or to indicate that this is not best practices?

PICHAI: Congresswoman, as I said, right now we have no plans to launch in China. We have -- we don't have a search product there. Our -- our core mission is to provide users access to information, and getting access to information is an important human right, so we are always compelled across the world to try hard to provide that information.

And -- but right now, there are no plans to launch search in China. I'm committed to being fully transparent, including with policy makers, to the extent that we ever develop plans to do that.

JACKSON LEE: I would like to pursue that with you and I thank you for that. I think that was an important statement. My community is diverse. As you well may have heard, the Congressional Black Caucus has been working extensively with Google and other search engines to recognize there are not enough individuals of diversity and African Americans.

My district has a huge number of musicians, artists and creators from all areas of entertainment. I'd be interested in what efforts are being taken by Google's platform, YouTube, to promote diversity and inclusion with the employees, what are the demographics of YouTube's U.S. employees and also, how is YouTube currently distributing resources to U.S. diversity?

But the focus is on diversity, what are you doing? YouTube is a great message and there is a whole population growing of diverse persons, including African Americans.

PICHAI: Diversity is an area where we are very committed to. YouTube, as you highlighted, is a platform where as we reach out to content creators, we want to ensure that there is diverse perspectives and we do reach out to minority communities and we engage with them to make sure they have a voice on the platform.

It is something we are committed to doing. As a company, we are -- we've been undertaking a lot of work. We were one of the first to publish a transparency report, we publish our representation numbers externally.

There is a lot more work left to do, we acknowledge that, but it's an area I know we are engaged with the Congressional Black Caucus and we are committed to doing more.

JACKSON LEE: Let me invite you to Texas and the 18th Congressional District on these very important issues and I'd like to work with Google as we go forward on some of the many issues that I have raised here today.

PICHAI: It would be a pleasure to do that.

JACKSON LEE: I thank you very much. Mr. Chairman, I'd like to put into the record a letter from Epic.org dated December 10th, 2018, ask unanimous consent, Mr. Chairman?

GOODLATTE: Without objection.

JACKSON LEE: And let me thank the witness for his testimony. Thank you also for your work.

GOODLATTE: The Chair thanks the gentlewoman and recognizes the gentleman from California, Mr. Issa, for five minutes.

ISSA: Thank you Mr. Chairman. Mr. Pichai, I would like to follow up on some of the gentlemen that came before me on this side of the dais who talked about the -- the bias and -- and I know that the gentlelady from Texas and some of the others said there is no bias, but I'd like to -- to pick up where Sheila Jackson Lee just left off, because I think it's important.

She used numbers and out -- outcome that she either has or believes exists to say that you have to do better in the minority community. Do you agree with that?

PICHAI: As a company, we are committed to making sure...

ISSA: No, no, but statistically, the outcome that she measures is how she asks you to do better, because your outcome is insufficient relative to the size of her community. Do you agree with that?

PICHAI: You know, I interpret it as we today don't have enough representation internally.

ISSA: Very good, you got her point. Now, here is the point that I think we're giving. If you measure the outcome such as some of those that were just listed by the gentlemen from Texas and Ohio, what you find is that there is an appearance of bias, including, quite frankly, the outcome of search engines, even the question of whether if I pay for advertising and my Democratic opponent pays for advertising, the -- if the characteristic of what we happen to search for somehow is more extensive if you're trying to get conservative than Republican, those are outcome events.

Will you commit to look in the case of political -- potential political bias, in all aspects of your very large company, to look at the outcome, measure the outcome, and see if in fact there is evidence of bias using that, and then work backwards to see if some of that can be evened to what would appropriately be the outcome?

Do you see my point there?PICHAI: Congressman, I understand. We don't want any -- while I'm confident we don't approach our work -- work with any political bias, I think it's important to me that we always look at outcomes and we assess to make sure there's no evidence of bias...

ISSA: And the reason I give you this point, for most of my adult life, there have been laws on the book to stop the events that Ms. Jackson Lee speaks of. We have had laws to protect minority communities. We have had laws to protect against segregation and bias. And yet, there are measurements that are still being used, including, quite frankly, we create districts that are dedicated to minorities in this country under federal orders because of a history or a measurement of outcome.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

And I would ask you to -- to seriously come back, commit to measure, and when you find an outcome that is inconsistent with that which would be ordinarily predictable -- I mean, we are two parties relatively tied in the outcome of elections on a global -- on a national basis. If that outcome doesn't come out similar, then in fact, you have the evidence to work backwards and see if, in fact, policies can be found which are causing that artificially, and which, by the way, might include an overzealous liberal crowd that simply spends more time trashing Republicans than vice versa. That might be what you find, but unless you look at the outcome, you're always going to say, "Well, we seem to be fair," but the outcome measured by my colleagues will, in fact, not work out.

PICHAI: Congressman, I -- I think it's a valid point. I appreciate it. I'm happy to engage more and follow up on it.

ISSA: Thank you. I want to get through just two more quick things.

In your opening statement and in the questions you've asked, you have talked about turning off location and other data collection. And there were two things that I'm concerned about. Can you commit, as you go through generation 15, 16, 17 of your software, to improve the dashboard -- the transparency in the tools available to teach people how to protect their privacy, how to offload data, how to, in fact, turn off things they may not want to have in order to gain privacy?

PICHAI: It's an area we want to do better. You know, I want to acknowledge as -- as the company has grown a lot, you know, there is -- there is complexity, and you know, it's something I do think we can do better. You know, more than other -- we do, today, show clear dashboards of the data and give controls, but we want to simplify it, make it easier for average users to navigate these settings, and -- and it's something we are working on.

ISSA: And I will tell you, each time I try to turn it on and off, refreshing my memory is a pain, because there is no simple place to go to find out how to do it. But the reality is, I agree that you do have a dashboard. Most don't.

I ask unanimous consent now that a -- an article from the Wall Street Journal on October 8 of 2018 be placed on the record.

GOODLATTE: Without objection.

ISSA: And in that article, it talks about that the user data be -- breach, and it also makes us aware that there's a memorandum at Google, and that memorandum has been requested by multiple members of Congress, including Senator Thune. Would you commit to provide that memorandum to Congress, so that we can know more about the internal workings related to this breach?

PICHAI: You know, I'm happy to have my office follow up on it. I'm not fully aware of all the specifics there, but definitely, I commit to following up with your office on it.

ISSA: Thank you.

Thank you, Mr. Chairman. Yield back.

GOODLATTE: Chair thanks the gentleman, and recognizes the gentleman from Tennessee, Mr. Cohen, for five minutes.COHEN: Thank you, Mr. Chair.

Howdy. First, I'd like to follow up on what Mr. Issa was talking about.

I use your apparatus often, or your -- your search engine, and I don't understand all of the different ways that you can -- can turn off the locations. That -- there's so many different things. Have you considered having an online school that

people could go to with a Google rep, and you could kind of log in and kind of ask questions, or have Google -- and -- and not like Comcast, where you get put on hold for 30 minutes, and then find somebody who you can't understand. Something easy, to talk to somebody and say, "How do I do this or that?"

PICHAI: Congressman, we are constantly looking for better ways to do it. One of the areas is giving online tutorials. And we haven't specifically looked at an option like that. I'm happy to take that feedback.

Today, we do remind people of privacy checkups and we walk them through a flow. Around 20 million people come to it every day. And so we do...

COHEN: That's online, though?

PICHAI: That's online. But it...

COHEN: But you don't have individuals?

COHEN: I find it's a lot easier to talk to somebody and go, "This is what I want." Because the other thing is frustrating. But if you could look into that, I think it would help.

Privacy is something I think many people -- and -- and myself included -- are interested in. Sometimes it's difficult to use the -- the device to get that.

PICHAI: Definitely.

COHEN: You said that you can turn off your location history, but that still you I.P. address will track your information. Is that correct?

PICHAI: All I mean, not just common to Google. Many internet companies do collect -- and sometimes store -- I.P. information for security reasons. For example, we need to know the language in which we serve your search results.

There may be some location information, you know, in there. Location turns out to be in the fabric of how people use internet today. I do think it's important, there is legislation in this area. As a company, we want to try and simplify things, and be state-of-the-art. But it is a complex area. We realize we need to do better, and we are working on it.

COHEN: A question about Russia. In recent months, authoritarian regimes, most prominently Vladimir Putin's regime, Russia -- which seems to have first place there, they're the Heisman winner of that -- have used bots to manipulate YouTube's algorithms into restricting the accessibility of online content from democratic and human rights...

GOODLATTE: Would the gentleman suspend?

COHEN: Sure.

GOODLATTE: The -- the individual who has...

COHEN: Stop the clock.

GOODLATTE: ... provided us with a poster will remove that immediately from the room. For the...

UNKNOWN: Could we have the doors closed? Could we have the doors closed?

GOODLATTE: Capitol police will escort the gentleman out of the building.

COHEN: Got to come to USC football game and shiver them (ph).

GOODLATTE: Absolutely.

COHEN: Thanks.

GOODLATTE: The gentleman is recognized.

COHEN: And I get 20 more seconds, right?

GOODLATTE: Yes, without objection.

COHEN: All right. So in recent months, authoritarian regimes, most prominently Vladimir Putin's regime in Russia, have used bots to manipulate YouTube's algorithms into restricting the accessibility of online content from democratic and human rights activists, by piling up tens of thousands of artificial dislikes to their videos.

I'm aware human rights activists have met with representatives from Google to discuss this problem and find a way of amending the algorithms to prevent this abuse by authoritarian regimes, but so far no systemic solution has been found.

YouTube is the main platform for Democratic and human rights activists in authoritarian countries, where the mainstream media are controlled by the governments. This results in YouTube algorithms, as they currently operate, putting up barriers to the distribution of such content. What is YouTube and Google currently doing to address this problem?

PICHAI: Congressman, both YouTube and Google are freely (ph) committed to freedom of expression. We do want to be a platform by which people can get their messages out, and -- and we work hard to do that.

And, you know, I'm not sure of all the specifics in that particular case, but happy to follow up. But in general, we work hard. We operate around the world. Part of the reason we do it is so that we can be a platform by which people can get their messages out, and -- including human rights activists.

COHEN: There is -- there are ways that bots could influence the algorithm by going in and disliking or whatever. That's not right?

PICHAI: Throughout our systems we deal with, you know, spam, bots and -- bots of many, many kinds. It's what we worked hard, over 20 years, to make sure we can counter. We have several measures in place. We direct (ph) these activities, and we respond strongly.COHEN: All right. To follow up on this, should I -- I heard on television this morning, MSNBC said that you have almost 200 lobbyists. And it's amazing that they all look like Ed Ahn (ph). But -- but should I just talk to one of the Ed Ahns (ph) and ask him to get with you on this issue?

PICHAI: We'll definitely have our office follow up on that.

COHEN: Thank you, sir. And by the way, as far as -- MSNBC would be a news -- I mean, if you're on MSNBC wouldn't that be in your news?

PICHAI: Is MSNBC a news provider? Is that...

COHEN: Yes.

PICHAI: ... your question? Yes.

COHEN: So, if you put -- like, I put my name in here, Rep. Steve Cohen. I punch news, this weekend I was on MSNBC four times, and yet the first thing that comes up is the Daily Caller. Not exactly a liberal, but I guess a well known group. Then Roll Call, then Breitbart News, then the Memphis Business Journal, then Breitbart News, then Breitbart.

So, it looks like you are overly using conservative news organizations on your news. And I'd like you to look into overuse of conservative news organizations to put on liberal people's news -- on Google. And if you'd let me know about that, I'd appreciate it.

PICHAI: Yes. We do get content across both sides of the aisle. You know (ph), I can -- I can assure you we do this in a neutral way. And we do this based on the specific keyword. What we are able to assess as the most relevant information.

COHEN: I'm sure you try to. But it's hard for me to fathom being on MSNBC for like eight minutes each show, four times. And there's -- there's more content on Breitbart news than MSNBC. That might say something about -- well, I'm not going to say that. It's scary. Thank you, sir.

GOODLATTE: The Chair recognizes the gentleman from Ohio, Mr. Jordan, for five minutes.

JORDAN: Thank you, Mr. Chairman. Mr. Pichai, in your opening statement you said, "I lead this company without political bias, and work to ensure that our products operate that way." Eliana Murillo is Google's head of multicultural marketing. Does Ms. Murillo do good work?

PICHAI: I'm not directly familiar with her work, but she's an employee of Google. And, you know, we are proud of our employees.

JORDAN: Well, you praised her work the day after the 2016 election. In a four-page e-mail she wrote about her work with the Latino vote. She said, "Even Sundar gave our effort a shout-out." Is she referring to you there?

PICHAI: She was referring to my communication around translation for a different related effort.

JORDAN: OK. Well, I'm going to look at two other sentences she had in that long e-mail, again, recapping her work in the 2016 election with the Latino vote. She said this, "We push to get out the Latino vote with our features." A few lines down in her e-mail she qualified that sentence.

And she said, "We push to get out the Latino vote with our features in key states." And she specifically cites the states Florida and Nevada. Near the end of her e-mail in a similar sentence she says, "We supported partners like Voto Latino to pay for rides to the polls in key states", with me?

I want to, kind of, analyze those two sentences. "We push to get out the Latino with our features in key states. We supported partners like Voto Latino to pay for rides to the polls in key states." Is it fair to say the "we" in both sentences, Mr. Pichai, refers to Google?

PICHAI: Congressman, we -- we -- we are very concerned whenever there are allegations like that. We -- we -- our team looked (ph) into it.

JORDAN: I'm not asking you that question. I'm asking you, is it fair to say the we in both sentences refers to the company Google?

PICHAI: As Google, we wouldn't participate in any partisan efforts around any civic process. So, I don't ...

JORDAN: OK.

PICHAI: ... I don't think so.

JORDAN: So, this is -- so, "we" pushed and "we" supported partners like Voto Latino to pay for rides in (ph) polls in key states. And we push to get out the Latino vote during the 2016 election.

And how were they getting that done? They were getting that done by -- according to Ms. Murillo, your Head of Multicultural Marketing, by altering your features, or configuring your features in such a way, and for paying for rides for people to get to the polls. Is that an accurate reading of those? That -- that's all I'm asking. Is that -- is that fair to say, what those sentences are talking about?

PICHAI: I haven't heard of all the specifics. But we did look into it. We found no evidence that there were any activity like from Google to a certain (ph) organization.

JORDAN: So, she's not telling the truth?

PICHAI: For sure. We didn't find any supporting evidence of any such activity.

JORDAN: She said she paid for rides to the polls, and they configured their features in such a way to get out the Latino vote. And look -- look, I actually think that's all OK, right? I think that -- that's just a good corporate citizen encouraging voter participation, encouraging people to participate in our election process.

I think, so far those sentences are just fine. But then, there's three words at the end of each sentence that do cause me real concern. And those three words are, "We push to get out the Latino vote with our features in key states."

Now, suddenly it gets political. "We supported partners like Voto Latino to pay for rides to the polls in key states." Now, that makes everything different. So, I've got really just one question for you. Why? Why -- why -- why did Google configure its features and pay for rides to the polls to get out the Latino vote only in key states?

PICHAI: Congressman, sincerely, we found no evidence to substantiate those claims. The only effort we do around elections...

JORDAN: So, your head of multicultural marketing, who you praised her work in this e-mail, gave her a shout-out, was lying when she said you were trying to get out the Latino vote in key states?

PICHAI: We -- today in the U.S. around elections, we make it -- and this is what users look to us for. Where to register to vote, where to find your nearest polling place, what are the hours they are open. And we do -- we do those things ...

JORDAN: That's not what I'm asking.

PICHAI: ... effectively.

JORDAN: I appreciate that, Mr. Pichai. And I already -- I already said that's just -- that's being a good corporate citizen. What I'm asking is, why did you only do it in key states?

PICHAI: We didn't do any such activity as Google on any of these key states. I mean, there are employees. I think they are part...

JORDAN: Did -- did you push to get out the Latino vote in all states?

PICHAI: As Google, we don't have goals around pushing out to get any particular segment. We don't participate in partisan activities. We engage with both campaigns. We support and sponsor debates across both sides of the aisle. And we provide users with information to get the election (ph).

JORDAN: Your head of multicultural marketing said you were pushing to get out the Latino vote, paying for rides to the poll -- to the polls for the Latino vote only in key states. And you're saying that's not accurate.

PICHAI: Yes, that's right. We haven't found any evidence to substantiate any...

(CROSSTALK)

JORDAN: So, she just made it up out of thin air the day after the election, and wrote this e-mail to your top executives. And it's not true?

PICHAI: Congress, happy to follow-up. But I think the employees today do their own activities.

JORDAN: I don't want the follow-up. I want the real answers right here in this committee.

PICHAI: As I said earlier, we have looked into it. We didn't find...

(CROSSTALK)

JORDAN: Did you push to get out the key vote in, I would say, the two most populous states for Latinos would be California and Texas. Did you push to get out the Latino vote, and pay for people to go to the polls in California and Texas?

PICHAI: We as a company didn't take (ph) any effort to push out votes for any particular demographic. That would be against our principles. We participate in the civic process in a nonpartisan way. And we think it's really important we do it that way.

JORDAN: Well, I just think it's interesting. Mr. Chairman, I know I'm over time, but I think it's interesting that their head of multicultural marketing writes an e-mail the day after the election where she talks about 71 percent of the Latino votes voted for Hillary, but that wasn't enough. And she talks about paying for rides to the polls in key states for Latino votes, to get out the Latino vote in key states. And the head of the company says that's not accurate.GOODLATTE: The time of the gentleman has expired. The witness may answer the question.

PICHAI: Chairman, I think it's important for us, and we are happy to follow-up with the congressman there. And we haven't found any events to substantiate those allegations, but...

(UNKNOWN): I would say yes.

JORDAN: Does Ms. Murillo still work for the company?

PICHAI: It's...

GOODLATTE: The time...

PICHAI: It's my understanding she does, yes sir.

(UNKNOWN): There you go.

GOODLATTE: The Chair recognizes the gentleman from Georgia, Mr. Johnson, for five minutes.

JOHNSON: Thank you. Mr. -- Mr. Pichai, have you ever heard talk of this e-mail that you -- you were just asked about by your head of multicultural marketing?

PICHAI: Not at that time, but later, you know, when -- when there was concerns expressed around it, I was made aware of that.

JOHNSON: Is it -- is it truth that she sent that e-mail or could that be fake news?

(LAUGHTER)

PICHAI: My -- my understanding is that there were e-mails that were sent like the congressman referred to.

(UNKNOWN): Well, that gets a straight answer.

JOHNSON: But is your testimony today that Google did not configure its features to get out the Latino vote in key states?

PICHAI: We don't build partisan features or features with any goals around affecting elections in those ways. We mainly focus our efforts on helping people register to vote and are -- you know, we -- we reach users across the United States, so anytime we do these efforts, informing people where to vote, these are used in a very distributed way widely across the entire country.

JOHNSON: All right, thank you, sir. And Google's collection and use of consumers data and its record of protecting consumers and their data are appropriate areas of congressional oversight, but sadly this committee has neglected consumer protection as an area of oversight, choosing instead to squander their oversight responsibility and use its power so as to bully Google and other technology companies into minimizing negative news and comments about Republicans and most importantly the Trump administration.

Yesterday, Google disclosed that private profiled data of over 52 million users may have been exposed. I understand that you're phasing out the Google Plus platform, but many Americans trust your e-mail platform and countless other products with their personal information.

And you admit that you collect private data for use in advertising. How can we be assured, considering this new breach, that the personally identifiable information of consumers is safe with you?

PICHAI: Congressman, it's an important question. This is why we undertake all of these efforts, we do all the important products like Gmail. The reasons -- you know, building software inevitably has bugs associated as part of the process.

We actually undertake a lot of efforts to find bugs and so we find it, we root it out and we fix it and that's how we constantly make our systems better. And you know, and the biggest data risk (ph) we normally -- you know, we see for our users is around security, that, you know, their account gets hacked or something.

That's why we work hard -- Gmail is an area where we have invested a lot. We have an advanced protection program, I would embrace members of the Congress to sign up for it if you're using Gmail. It -- it allows a second layer of protection to your account, which makes it, you know, much, much harder to get your account, you know, misappropriated in any way.JOHNSON: All right, thank you.

Yesterday, the New York Times published an in-depth investigation of your location tracking applications that sell purportedly identified -- or excuse me, personally identified data.

Google has said that it doesn't sell data, but as a corporation deeply involved in the business of consumer data use in advertising, your company benefits from applications that track consumer locations. How do you differentiate what Google does with geolocation on data from companies with applications that track and sell the data?

PICHAI: As a company, we do not sell user data. That would be against our principles and how we -- how...

JOHNSON: Well, how do you differentiate what you do with the geolocation data from companies that do sell the data? How do you -- how do you differentiate what you do with that data versus what these applications that do track and sell the data do?

PICHAI: An important source of differentiation. We do not and would never sell user data. We do give consumers preferences about how their data is used for advertising. Most of our user experience are --we make our advertising relevant based on the key words you type, and that's where we get most of our information. We -- you can just type in "Control your ad settings" into Google and you can actually change the use of your personal data for advertising as well. We allow that as an option for our users.

JOHNSON: But as my time expires, let me ask you, do you believe Google has done enough to be transparent in its data-collecting policies?

PICHAI: You know, we -- we always think there is more to do. It's an area which is going to be an ongoing area of effort for us. But we have invested a lot over the years and we do make it very transparent and we encourage users to go check it out. And in fact, every day, 20 million users go and check it. And over the last month, around 170 million users did check it.

But we are going to continue and invest more in this area.

JOHNSON: Thank you. I yield back.

PICHAI: The chair recognizes the gentleman from Texas, Mr. Poe, for five minutes.

POE: Thank you, Mr. Chairman.

I'm over here on this side. I have an iPhone and if I move from here and go over there and sit with my Democrat friends, which will make them real nervous...

(LAUGHTER)

... does Google track my movement? Does Google, through this phone, know that I have moved here and moved over to the left? It's either yes or no?

PICHAI: Not by default. There may be a Google service which you have opted in to use, and if...

POE: So Google knows that I am moving over there? It's not a trick question. You know, you make $100 million a year. You ought to be able to answer that question. Does Google know through this phone that I am moving over there and sitting next to Mr. Johnson -- which would make him real nervous. It's his question. It's yes or no?

PICHAI: I wouldn't be able to answer without looking at...

POE: You can't say yes or no?

PICHAI: Without knowing more details, sir.

POE: If I walk over there and sit next to Mr. Johnson and carry my phone, does Google know that I was sitting here and then I moved over there?

(UNKNOWN): You're welcome any time, Judge.

(LAUGHTER)

POE: Yes or no?

PICHAI: I genuinely don't know without knowing what...

(CROSSTALK)

POE: I'm shocked you don't know. I think Google obviously does.

Are you familiar with the general data protection regulation by the European Union?

PICHAI: I'm very familiar. We worked over 18 months on it.

POE: And the European Union is protecting the right of privacy of the people in Europe. We don't have such a law in the United States, do we?

PICHAI: Congressman, we have supported and...

POE: We do not have such a law in the United States, do we?

PICHAI: We don't have a comprehensive user data privacy legislation (inaudible)...

(CROSSTALK)

POE: Are you familiar with House Resolution 1039?

It's a resolution that I've introduced that would basically adopt some of the European practices in America and give consumers in the United States the right of privacy. Are you familiar with that legislation?

PICHAI: No, but I'm...

POE: I'll give you a copy before you leave.

It's ironic to me that the United States, supposed to be the country in the world that protects the privacy of individuals more than anybody else, we are playing second fiddle to the Europeans. They protect the privacy of their folks more than we do. I think the United States, Congress, needs to move in a direction to -- to allow citizens to opt in to the dissemination of their information rather than opt out, which seems to be the current law.

As Mr. Cohen has stated, I think most Americans don't know all the things that this phone can do. And one thing that it can do is disseminate information, really, that we are unaware of, to all different people out there. The United States should change the rules and make it so that we as consumers opt in. Otherwise that information is not disseminated. That is just -- just my opinion.

What does Google view as objectionable?

PICHAI: I think there are, if you're referring to our content policies, we do -- we do publish -- there are areas, for example, categories for YouTube like violent extremism, pornography, child safety, fraudulent activity. So we define categories.

POE: What are extreme political views? You -- you find those objectionable? I'm not saying you shouldn't. I'm just saying, what are those extreme political views?

PICHAI: We don't -- we think it's important -- Google and YouTube are platforms which are -- which support freedom...

POE: So what are those extreme political views that you find objectionable?

PICHAI: We don't define any political views as objectionable.

POE: So you let all political views come on, even objectionable political views?

PICHAI: We have areas which we have defined as -- as not allowed on our platforms. For example, on YouTube, there are clear definitions around hate speech, but it's defined as speech which has the primary goal of inciting hatred or violence towards groups of people.

POE: You would agree that hate speech has many different definitions depending on who is doing the defining, wouldn't you agree?

PICHAI: We -- we understand it's a subjective area. It could be open to interpretation. But we define it and we publish our definition of it. And we...

POE: Do you believe that Google, as has been brought out here in some questions, is biased?

PICHAI: Congressman, it's really important to me that we approach our work in an unbiased...

POE: Do you believe that Google is biased? It's either yes or no.

PICHAI: No, not in our approach.

POE: Now, it is a private company, is it not?

PICHAI: Yes, it is.

POE: It's not the government. Google is not the government, is it?

PICHAI: Not the last I checked, no.

POE: You want the government to regulate Google?

PICHAI: Today we are subject to a lot of regulation, across many different agencies.

POE: But you're not subject to the definition of what bias is by the government coming in and saying Google cannot be biased and we the government are going to decide what's biased and what's not biased. You're not subject to that philosophy, are you?

PICHAI: Not today.

POE: I hope we don't get to that point, where government tries to come in and regulate what bias is and -- because it is -- this is an independent, free company. I think that is, you know, Google may have -- to me, it's just a part of doing business like any other media outlet. They can say what they want.

I've gone over time, Mr. Chairman. I have some other questions I'd like to submit for the record.JOHNSON: Well, Mr. Chairman, if I might, the gentleman is certainly welcome to join me on this aisle and switch parties at any time.

(LAUGHTER)

GOODLATTE: Getting a little late in his career to do that.

POE: That's right.

(LAUGHTER)

GOODLATTE: I will just respond to the gentleman from Texas and say that we will be submitting questions in writing to you Mr. Pichai including the ones from the gentleman from Texas and we would ask that you would answer them promptly.

PICHAI: I would be very happy to.

GOODLATTE: Thank you very much. The Chair now recognizes the gentleman from Florida, Mr. Deutch for five minutes.

DEUTCH: Thank you Mr. Chairman. Mr. Pichai, I believe that the platforms can and should do a better job preventing people from using services to engage in illegal activity. Tim Cook recently said platforms and algorithms that promise to improve our lives can actually magnify our worst human tendencies. Some of your peers are publicly reckoning with the ways their companies are not mutual platforms and are accountable for the content on the services.

In congressional testimony Mark Zuckerberg said his company is responsible for the content on its platform in a "Washington Post" interview, Uber CEO Dara Khosrowshahi said we have to stand for the content of our platforms. We can't just say we're platform and our job is done.

Mr. Pichai, will you, in front of our committee this morning join your peers and affirm that Google is accountable for the content on your platforms?

PICHAI: Well we are -- we have a commitment to our users to provide accurate and trustworthy information -- high quality information and we work hard to uphold those commitments.

DEUTCH: I'll take that as a yes. I want to return to the privacy discussion that's going on and I, Mr. Pichai, went to the -- to do a privacy check at a lower city hearing. You're right. It's quite good but I want to talk about what it does and what it doesn't do and perhaps you can help me work through this a bit.

On my settings now on Google and my location history is paused and my device information is paused. My voice and audio activity are paused. My YouTube watch history is paused; that's probably a good thing, and my YouTube search history is paused. That said, it doesn't mean you're not collecting data on me does it?

PICHAI: I think if you -- for those categories if your forcibly stop collecting...

DEUTCH: I understand but overall, it doesn't mean that you're not -- you stopped collecting data. You're still collecting data on search. You're still collecting data in ways that can help advertising and help provide the services that you provide. I appreciate that. My question is this, I wanted to focus also on the "New York Times" article about what they refer to as the mobile location industry. And -- and I understand the way that data is collected when you talk on your website about -- about searching Google and getting directions for maps, watching videos on YouTube, you collect data to make services work better. I understand that.

But data is also collected to use in advertising and according to the "New York Times" story to hot market sales of location-targeted advertising, reaching an estimated $21 billion this year. It talks about your company and Facebook dominating the mobile ad market that also lead in location-based advertising and it says that Google also receives precise location information from apps that use its ad services.

Can you explain that to me? Is -- is the "New York Times" saying that if there is any company that uses your ad services and given the dominant place that you play in -- in advertising that would be, I would imagine most. If there is any company that uses your advertising, then that data that they collect would also be available to you and ultimately the data they collect on me is the question I'm asking?

PICHAI: So we as a company and we have commitments to you. We view data as belonging to users. We are stewards of that so we don't transmit personal data to advertisers if I understand...

DEUTCH: I understand that. I'm asking about -- I'm asking about the data that companies -- because the "New York Times" said that -- that Google receives precise location information from apps that use its ad services. My question is do you receive information? Is the "New York Times" right? Do you receive information about the locations that I travel from companies who use your advertising service?

PICHAI: I just want to make sure I understand the specifics but there may be information so for example if you're providing an ad and let's say it's for a restaurant. We would normally do it in a location near you so that it's relevant for you. You have an option to turn the setting off. But if it is, since we are providing that information we would be aware of it. It's not coming from the company to us but...

DEUTCH: But, no -- no but that's what I want to understand. If -- if the ad -- if a company uses your advertising, does their location sharing get to you and here's why let me just because I don't have a lot of time. The "Times" talks about that information isn't tied to someone's name or phone number. Your personal information as you define it seems to be name, email address and billing information.

The question a lot of us have Mr. Pichai, I think you can sense is that while that may be personal information and you treat that -- and you treat that the way we would expect, that there is a lot of information about where we go and where we are at any moment that can, as the "Times" points out allow someone with access to the raw data including employees or clients to identify a person without their consent by following someone then pinpointing a phone that regularly spend time at that person's home address. Can you use the locations that people go to identify -- to back into who a person is? You wouldn't do it but could someone else do that same thing?

PICHAI: We wouldn't do that without explicit user consent to answer your question, I'm happy to follow up. I want to make sure I understand the specific question. I think on a high level I would say location is turning out to be an important area. As the concert (ph) privacy legislation, I will -- I think it's important we give location protection for our users. As a company, we want to lead the way and we are ...

DEUTCH: Mr. Pichai, and I have to yield back. I just have one last question Mr. Chairman.

GOODLATTE: The time of the gentleman has expired. The Chair recognizes the gentleman from Pennsylvania, Mr. Marino.

REP TOM MARINO, (R)PENNSYLVANIA: Thank you Chairman and thank you for being here, all of you. Let me start out by saying that Sir, you and the officer of your company, I think particularly you as you are at the helm have a tremendous responsibility -- responsibility toward your employees, responsibility toward your stockholders to company providing jobs and we thank you for providing jobs. I think you also have a much more awesome responsibility to the American people to make sure that you educate accurately to make sure that you stay in the middle of the road because I learned this over the years as a prosecutor and then more so as a member of Congress.

There is a lot of people who believe everything is put out by anyone. We're a 10 second society now and we can't hold conversations, we can only read 10 or 12 words and that's supposedly the gospel. You have a responsibility see that the truth is out there and I will hold you to doing that. I don't believe in government taking control or defining as my friend the judge says what is right and what is wrong, I for one, the less federal government in my life, the better. So I am depending on you and companies like your company to help us along the lines because if the federal government does ever step in to regulate, you're not going to like it. And that said, I have a concern concerning China. In 2010, Google left the Chinese marketplace due to concerns over hack -- hacking attacks, censorship, and how the Chinese government was possibly gaining access to data.

I'm interested in what has changed since 2010 and how working with the Chinese government to censor research (ph) results are part of Google's core values. Do you understand my question?

PICHAI: Congressman, we -- right now, there are no plans for us to launch a search product in China. We are, in general, always looking to see how best, it's part of our core mission and our principles to try hard to provide users with information. We always have evidence based on every country we have operated in, us reaching out and giving users more information has a very positive impact and we feel that calling.

But right now there are no plans to launch in China. The extent that we ever approach a decision like that, I will be fully transparent, including with policymakers here and engage in consult widely.

MARINO: Am I then to understand that there's -- you have no plans to enter into any agreements with China concerning Google, how it's used in China?

PICHAI: We currently do not have a search product there ...

MARINO: Do you plan on having a search product there?

PICHAI: Right now, there are no plans to launch a search product in China.

MARINO: Let me ask it this way; if, in the future, you decide to do that, what information would you share with the Chinese concerning other users, other countries?

PICHAI: Any time we look to operate in a country, we would -- we would look at what the conditions are to operate. There are times in the past we have debated the conditions to operate and we explore a wide range of possibilities. Currently, it is an effort only internally for us. We are not doing this in China. And so, you know, but I'm happy to consult back and I'll be transparent there should we plan something there.

MARINO: I'm sure you are aware that right now there are thousands, maybe hundreds of thousands of people that the Chinese government has on computers trying to hack in the U.S. and any other countries. Same thing taking place to a lesser degree in Russia simply because of the population. What -- what can Google do to help curtail that if not eliminate countries from hacking into other countries?

PICHAI: As a company, we have faced significant attacks before. Protecting the security of our users is what really keeps me up at night and it's something we invest a lot over the years. We work with law enforcement because we rely on their intelligence to help us assess threats. But it's a comprehensive effort and it's something we take seriously.

MARINO: Thank you, I yield back. But remember the responsibility that I think you have.

GOODLATTE: Chair recognizes the gentlewoman from California, Ms. Bass, for five minutes.

BASS: Thank you, Mr. Chair, and thank you for coming today. I wanted to follow up on some questions that were asked of you earlier, specifically the use of bots by authoritarian regimes and also the use of troll farms by Russia, and wanted to know if you could be more specific in terms of how Google is going to respond. In other words, will you expand your staff or modify the algorithms in an effort to identify and eradicate the online trolls.

And then, in terms of the flooding that takes place with bots, what specifically will you do to address this?

PICHAI: This is something we actually face across the set of products we do today. Be it our ad systems, be it our search products people are trying to spam, and be it YouTube and so on. So in general, we have built systems over the years to detect anomalous traffic patterns and mitigate that. And we also learn, we collaborate with others. Law enforcement has been very helpful to us in this regard.

BASS: So if the -- so if the example of the -- of the bots where you have -- I mean, I saw one example where there was, one day, 125 dislikes and the next day there were 84,000. How do you respond in a situation like that where it's obviously -- it's done purposefully?

PICHAI: So when we see view count manipulation, manipulation of likes, dislikes, and either we get reports or we detect in our systems spikes in those activities which make it clear that it's not humans doing it, we detect it, we treat it as spam or abuse of our systems ...

BASS: You have staff dedicated to looking at that?

PICHAI: We have both. We have our algorithms, AI systems and manual reviewers and we are staffing up our manual reviewers significantly over the past couple of years. And so we do it comprehensively across all those things.

BASS: So anticipating what took place in 2016 happening again, and this is specifically regarding what Russia did to foment racial tensions in the United States and wanting to know how you are responding to that, where they called for fake protests, either to get African-Americans to turn out to protest something that was fake, or to have white supremacists be ginned up to attack communities of color, so specifically what is Google doing to respond to that?

PICHAI: We mainly saw, with respect to Russia, limited improper activity on our ad platforms. But in general, we are not a social networking company across the products we do. It's an area we haven't done well as a company. So we typically aren't connecting groups of people and that's not how Google mainly works today. And so we haven't seen that kind of activities on our platforms.

But we are vigilant and, you know -- and happy to share any findings which come through as we look into it more.

BASS: So I also wanted to ask you a couple of questions about online creators of color. Where mainstream media outlets often fail to cater to communities of color with relatable content or resolve lingering issues of underrepresentation or misrepresentation, communities of color have sought out digital mediums to tell their stories. And in some cases, this has been very successful and its led to larger networks recognizing the talent.

And in other cases, it's given a platform to voices that would otherwise be silent. So I wanted to know what policies Google might be developing to put in place to ensure that the voice of online creators can expand.

PICHAI: YouTube has a lot of community outreach programs. We partner with other organizations who do important work in this area. But today, you know, when we look -- look at YouTube, you do see a platform with very diverse set of perspectives and opinions. It's partly the strength of the platform and the reach it provides to voices and ...

BASS: Could I get the information about your outreach, specifically who you do outreach to? That would be very helpful if I could get that ...

PICHAI: I'd be very happy to do that.

BASS: And I yield back my time to Representative Deutch.

DEUTCH: Thanks -- I thank from California. Mr. Pichai, I just wanted to finish up. Again, appreciate you being here, and I wanted to follow up on something that the chairman started our hearing with, and that was a question about information collected by Google. I think the report that he referred to talked about information collected specifically on Android phones, even if those -- even if those phones aren't on Wi-Fi or -- or the cell service isn't on. Is that something that happens?

PICHAI: Congressman, it's not clear to me how something, when there is no connectivity, would happen, but, you know -- so we haven't -- I...

DEUTCH: I'm sorry.

PICHAI: (inaudible) we haven't been able to substantiate those specific findings.

DEUTCH: You're looking into those findings, though?

PICHAI: The scenario where we are -- you know, our goal is to -- you know, we're trying to help users with the information they want. Today there are many cases -- users give us feedback. Part of what we are trying to do is they want us to be location-aware when they...

DEUTCH: No, I understand, but -- so you're not aware of data being collected while the phone is not connected to either a cell service or a Wi-Fi?

PICHAI: Yeah, there may be specific instances. For example, GPS may be working and so -- you know, it depends on the specifics, but in general, no.

DEUTCH: And so, finally, the question is, if that information is, if that's possible; if you learn that it is happening -- and I would love you to share that with us -- if you learn that's happening and the information, then, when the customer turns on his or her cell service, if that information is then sent back to your company on their data plan?

A lot of people obviously have limited data plans. When you look at this, if you could also look at whether, when the information is sent back, to the extent it's happening, that it might cause some people to go over their limits, thereby costing them more on their monthly bill? That would be helpful information as well.

PICHAI: That's good feedback. We will.

DEUTCH: OK. Thank you, Mr. Pichai.

Thank you, Mr. Chairman.

GOODLATTE: The chair recognizes the gentleman from Georgia, Mr. Collins, for 5 minutes.

COLLINS: Thank you, Mr. Chairman.

And thank you, Mr. Pichai, for being here. Look, there is an understanding -- I think it's come across from everyone here, and it's a saying that I've, sort of, lived by most of my adult life, and I think most people get. Perception is reality. Now, you can disagree with the perception; you can disagree with the reality, but at a certain point in time, as you've even heard from many of the folks discussing on both sides of the aisle today, there are several perceptions that are going on, on what's being stored, what's not being stored, and how that is -- or how that data and that privacy issue -- and also the effects or the outcomes of the searches are made.

Now, one of the issues, not just Google itself but also YouTube, there is another issue that I will not touch today but probably will do some questions on, is the issue of content and the issue of how that is stolen in many cases and how that could be worked on. Those are issues we'll deal with in another setting. We've talked about this.

But I want to go through several questions, because it's been discussed a lot about what you collect and what you don't collect. So the next few questions will be yes-no questions. They're not -- I'm not trying to trick you here. It's simply what do you collect and how do you collect it, OK?

In dealing with Google, do you or do you not collect identifiers like name, age and address, yes or no?

PICHAI: If you're creating an account, yes, and using an account, yes.

COLLINS: Specific search histories when a person types something into a search bar?

PICHAI: If you have search history turned on, yes.

COLLINS: Device identifiers like IP address or IMEI?

PICHAI: Depending on the situation, we could be collecting it, yes.

COLLINS: GPS signals, Wi-Fi signals, Bluetooth, beacons?

PICHAI: You know, it would -- it would depending on specifics, so -- but there may be situations, yes.

COLLINS: GPS, yes?

PICHAI: Yes, if you have location...

COLLINS: The voice in conversations when using Google Voice products?

PICHAI: We give an option to turn on and off and...

COLLINS: But if a person didn't know it, voice in conversations when using Google Voice products? Yes?

PICHAI: We only record when they initiate it with "OK, Google," and then say the terms after.

COLLINS: Contents of e-mails and in Google Documents?

PICHAI: We store the data, but we don't read or look at your Gmail or...

COLLINS: But you have access to them?

PICHAI: As a company, we have access to them, yes.

COLLINS: So you could?

Saying you don't -- or, I'm not asking do you or don't you. I'm saying you could, though; there is a possibility?

PICHAI: We have clear, established policies on how we would view that data.

COLLINS: And your privacy policy, speaking of that, has changed 28 times, including eight times since January 2016. So I think the policies, you know -- and this is why I'm asking these questions.

Is there any type of -- any type or origin of data which Google would refuse to collect that is not already prohibited by laws like COPPA or HIPAA?

PICHAI: There are many categories of information today. You know, we are particular about anything to do with health data...

COLLINS: Those are covered under those. Anything that you would not collect outside of the two that I named which are generally accepted as things you cannot collect?

PICHAI: There are many things we -- we don't collect. For example, we don't collect -- you could have a product like Google Home. We won't collect conversations unless you specifically ask us to. So you ask a question. And so we definitely are very careful and minimize the data we need to provide a service back to our users.

COLLINS: I'm glad you mentioned data minimization. We'll get to that in just a second. How long do you keep the data that you have captured?

PICHAI: Today we give you the choice of whether you want to store the data or not, but if you store the data, from the time you turn it on, we store it for you.

COLLINS: OK, well, let me a question here. For all of this that's been discussed, age identifiers, search histories, all these things, and for the -- how many would you say -- let me just -- you've made an interesting question. How many people actually understand that they can actually cut this off?

PICHAI: You know, we remind people, and every day 20 million people come and make changes in these settings. So we see robust activity.

COLLINS: But when you control 95 percent of searches, you control this in a very large way. I would say the vast majority, not the most sophisticated, not the ones in a certain age demographic, are not as familiar with this as, say, some who work in the industry or at least around the industry. Would that not be a fair statement?

PICHAI: If you could repeat that, Congressman? Sorry, I'm...

COLLINS: I'll get back to it.

Earlier it was said that identifiers such as age, name and address are treated differently. If that is true, how are you treating them differently and is the same data collection process still done?

How is it treated differently than, maybe, some of these others that we have spoken of, I think, from Mr. Deutch's discussions, such as locators and things like that?

PICHAI: I mean, we offer different controls for that. So, for example, for location, we give specific controls for your voice -- voice activity. We give specific controls. We are trying to meet users' expectations. And so, for example, some people may want their search history to be available, but they don't want YouTube history to be recorded. So we give that choice to our users.

COLLINS: One of the general dynamics of most of this -- in this tech industry and those who collect data is data minimalization. You brought it up just a few minutes ago. The issue that I have, and it was in March of this year, a security breach searcher actually downloaded his, quote, "Googled takeout." This is probably there. It was 5.5 gigabyte. This is not a -- just a few names and addresses and where you went.

Why, number one, does Google need all this information? We can answer that in the fact that 85 percent -- 86 percent of your revenue comes from advertising, so we know you manipulate the data in some ways. However, can you explain what you do to minimize this data, which is generally an accepted standard of practice among those who collect data?

PICHAI: You know, our goal is -- you know, but we are (inaudible). For example, if we are providing you a service like Gmail, which we have done for 15 years, that data, we need to store it for our users, so they expect us to. So we are trying hard to match users' expectations. We don't need -- you know, our data for advertising, as I said earlier, most of it comes from just the key words you type. And so, you know, we need minimal data to do advertising. We give you options to turn ad personalization off. We store most of the data. We do it today to help give users the experience they want, and that's what we are trying to do.

COLLINS: I'm going to go back to where I started. Perception is reality. The amount of data being collected here, the how it is being used, how you monetize the one ad, basically the flow of information that you have and the monitorization of that is a concern.

I think the perception of how it is used and from what side of the aisle is something that this committee, I think, will take up and continue to process.

But I think when most people deal with this -- what I said earlier -- I'm not sure that in the broad scope of things, simply clicking yes, especially in a society today in which some of these things, and especially that was talked about mobile, which we've not delved into even further, is going to open up a much larger situation in which is not just simply monetizing data, it's actually using information that can be then used by either law enforcement or others in legal proceedings that can then be used against them that they're not going to understand exactly what is going on.

With that, my time has expired and I'll yield.

GOODLATTE: The Chair thanks the gentleman. The Chair now recognizes the gentleman from Rhode Island, Mr. Cicilline, for five minutes.

CICILLINE: Thank you Mr. Chairman, thank you Mr. Pichai for being here. In 2006, Internet pioneer Vint Cerf testified on behalf of Google that the open Internet was designed so that no sensible gatekeeper could exert its control to discriminate against rivals, consumers or other businesses.

Since then, it's become increasingly clear that this virtuous cycle of innovation is fundamentally threatened by the dominance of a few powerful companies.

Tim Berners, who is leading inventor of the World Wide Web, made this point clear in an open letter earlier this year, where he warned that the open Internet has been compressed under the weight of a few dominant platforms that have the ability to harm competition and control which ideas and opinions are seen and shared online.

Along with 83 percent of Americans, I strongly support an open, decentralized Internet that is free of powerful gatekeepers with the ability to discriminate against rivals, threaten innovation or harm consumers. With that in mind, I'm deeply concerned by reports of Google's discriminatory conduct in the market for Internet search.

According to findings by the European Commission, Google has harmed the competitive process by favoring its own products and services over rivals, by de-prioritizing or delisting competitors content. So my first question, Mr. Pichai, is as a proponent of Internet openness, will Google commit to ending the discrimination against rivals and other businesses through Google's products?

PICHAI: Congressman, with respect, you know, I disagree with that characterization. We provide users with the best experience they are looking for, the most relevant information, and that's our true north and that's how we approach our products.

CICILLINE: But -- but does that include the use of discriminatory practices? Is that part of your business model?

PICHAI: Definitely not, and in the European Commission, we are appealing that decision. But when they looked at shopping as a category, they excluded Amazon as a potential entrant in this space. So the specifics matter here.

We are interested in providing users with the best information they are looking for, be it from another company and be it from a competitor, that -- that's what we are interested in doing.

CICILLINE: Well I strongly believe in structural anti-trust enforcement. I also plan to work with the Federal Trade Commission to develop a legislation to address this type of discriminatory conduct online. Will Google commit to working together with Congress on legislative proposals designed to ensure that online firms with significant market power are not able to harm the competitive process that do (ph) discriminatory conduct?

PICHAI: You know, we're happy to engage constructively on -- on legislation around any of these areas.

CICILLINE: Thank you. I -- I'd like to now -- to turn to the question of China. Mr. Pichai, the operating environment in China has deteriorated with respect to surveillance, censorship and the like since Google made its first decision in 2010 to leave.

In September, I sent you a letter, along with 15 other colleagues, raising serious concerns about reports that Google is planning to re-enter the Chinese market with an app-based search engine that would likely have to comply with strict censorship and surveillance requirements imposed by the Chinese government.

Since then, a widespread course of opposition to such a move has emerged, including from lawmakers, leading human rights activists and a group of Google's own employees.

The -- the environment has deteriorated, your launching an app in that environment would seem to be completely inconsistent with Google's recently launched AI principles, which say you will not design or deploy technologies who use, and I quote, "purpose contravenes widely accepted principles of international law and human rights."

It's hard for me to imagine you could operate in the Chinese market under the current government framework and maintain a commitment to universal values such as freedom of expression and personal privacy. So I want to ask very specifically, are any employees currently having product meetings on this -- on this Chinese project, and if not, when do those end?

PICHAI: We have undertaken an internal effort, but right now there are no plans to launch a search service in China, as I said earlier.

CICILLINE: Are there any current discussions with any member of the Chinese government on launching this app?

PICHAI: Currently, we are not in discussions around launching a search product in China.

CICILLINE: Are there any current discussions with members of the Chinese government about this?

PICHAI: We -- in this effort currently is an internal effort and, you know, I'm happy to, you know, consult -- as part of transparent direction (ph) we take steps towards launching a product in China.

CICILLINE: And who at -- at Google is leading the Dragonfly effort?

PICHAI: It's -- you know, our -- our efforts around building search, you know it's -- it's undertaken by our search teams but these are distributed efforts. It's a limited effort internally, currently.

CICILLINE: Will you, Mr. Pichai, rule out launching a tool for surveillance and censorship in China while you are CEO of Google?

PICHAI: Congressman, I -- I commit to engaging, one of the things which is important to us as a company.

We have a stated mission of providing users with information, and so we always -- we think it's in our duty to explore possibilities to give users access to information, and you know, I have that commitment, but you know, as I said earlier on this, we would be very thoughtful and -- and we will engage widely as we make progress.

CICILLINE: Well I appreciate that, and let me be clear, this goes beyond Google and frankly beyond China. At a moment -- moment of rising authoritarianism around the world, when more leaders are using surveillance, censorship and oppression against their own people, we're in a moment that we must re-assert American moral leadership.

And I think it's important that -- because other countries will look at that relationship. And Mr. Chairman, with that I would ask unanimous consent to submit for the record 15 -- I have a letter of 15 colleagues and I sent to Mr. Pichai, his response, and a letter from more than 50 human and civil rights organizations, opposing the launch of a censored Google search engine for the Chinese market.

And I would just note Mr. Chairman that in the submission of this for unanimous consent, the NGO letter reports that, and I quote, "the Chinese government is actively promoting its model of pervasive digital censorship and surveillance around the world. Many governments look to China's example and of major industry leaders acquiescence to such demands will likely cause many other regimes to follow China's lead, provoking a race to the bottom in standards. It would also undermine efforts by Google and other companies to resist government surveillance requests in order to protect users privacy and securing, emboldening state, intelligence and security agencies to demanding greater access to user data."

So the implications, Mr. Chairman ...

(CROSSTALK)

... and I ask that they be made part of the record.

GOODLATTE: Without objection, so ordered. The Chair now recognizes the gentleman from Florida, Mr. Gaetz.

GAETZ: Thank you Mr. Chairman. Have you ever launched an investigation into whether political bias is impacting the consumer experience?

PICHAI: Congressman, we -- we do. It collects (inaudible) concerns, we look into them and you know, it's ...

GAETZ: So have you -- have you expressly launched an investigation into political bias of your employees?

PICHAI: On our employees, you said?

GAETZ: Yes.

PICHAI: You know, to -- to the extent that we always take a -- we take any allegations around (ph) code (ph) of conduct across every issue seriously, and we look into them.

GAETZ: You said to me yesterday that in -- as it relates (ph) to political bias, you haven't launched those investigations because there are so many redundancies and there is so much peer review that that would not be possible. Is that still your testimony today?

PICHAI: Congressman, it's -- it's the way our processes work, if you need to make a change in our algorithms, there are several steps in the process, including launch committees and -- and user testing and our rater (ph) evaluations.

(CROSSTALK)

GAETZ: But your company, your employees can get together and chat in groups, right? Google groups?

PICHAI: Yes, they can.

GAETZ: One of those groups is the Civil Rights group, right?

PICHAI: We have many employee resource groups on which they can participate in conversations, yes.

GAETZ: Have you ever looked into the conversation into the Resist (ph) group?

PICHAI: Congressman, no.

GAETZ: Is it -- does that strike -- is that a surprise to you, that there's a Resist (ph) group?

PICHAI: I'm not aware whether such a group exists or not.

GAETZ: If there was a Resist (ph) group, would that be the type of thing that you would want to look into?

PICHAI: You know, we have clear policies around how our products are built. And...

GAETZ: No but if there's a resist -- you know that the Resist movement is a movement built to resist the agenda of President Trump. There's a Resist group within your company where groups of employees, not one, are getting together within that group to engage in discourse on company time, with company infrastructure. Does that strike you as the type of thing you would want to investigate?

PICHAI: Congressman, I'm not aware of any such group. None like that has been brought to my attention and, you know, I'm happy to follow up and understand the concern better.

GAETZ: Yeah. Mr. Chairman, I seek unanimous consent to enter into the record the document from what purports to be Google employee Myles (ph) Lorentz (ph), which is opposed to the Google group, Resist?

GOODLATTE: Without objections, order (ph).

GAETZ: I'm also reading, now, from the discussion that occurred over Breitbart and Google Ads, and -- and IÕm quoting from one of your employees who purportedly posted, "Anyone want to hold their nose and look through Breitbart.com for hate speech?" Why would someone need to hold their nose to do that work?

PICHAI: Congressman, today, we have -- we have 90,000 employees and they -- the communicate in forums. As a company, we have allowed freedom of expression. And we don't stand or condone, you know, comments expressed in these things.

We are very clear about our policies as to how we build our products. And -- and, you know, we serve our publishers that way.

GAETZ: Well, if -- if you haven't launched an investigation into any of your employees because it would take a group of employees to engage in improper conduct, and if those groups of employees are engaging in discussion on your platform, and if one of those platform groups is Resist.

And if on that Resist movement -- site or any other sites in your platform, there's discussion of suppressing conservative speech, why would that not be something that you would launch an internal investigation and publish the reports, sanction those employees that may or may not be engaged in improper conduct to that we can all have greater comfort in the -- in the user experience?

PICHAI: Congressman, first of all, I want to assure you. We have checks and balances so that, employees and the (ph) -- not just on this issue, across any issue. We protect the sanctity of our systems, of our product development process. And we will do that.

GAETZ: How can I have confidence that you're protecting the sanctity of your system when you don't even know that your employees are getting together on your own company's infrastructure to talk about political activity?

PICHAI: In general, we always assume -- our systems are designed -- we assume there could be bad intent. So we have designed, from first principles. Because, you know, for security reasons, both externally and internally, at any given moment we -- we assume that somebody may be acting in bad faith. And -- and that's how we have designed our systems, with all the protections in place. We need to do that for our security of our systems, and it's a first principles approach.

GAETZ: So if you assumption is that people can act in bad faith, why then have you not launched an investigation into the communications that seem to indicate a desire to suppress conservative political movements and conservative voices?

PICHAI: If there are allegations around, you know, discussions which are specific with the intent of manipulating our products, we would conduct an investigation.

GAETZ: OK. Well, that's good to hear. The Wall Street Journal reported that your workers were discussion tweaking search terms to frame the discussion over the travel ban. Did you perform an investigation into that allegation?

PICHAI: We looked into it. There was no attempt at, you know, anything to influence our products. There are, at times, during important news events -- important, for example during events like hurricanes, et cetera -- we have a set of tools, crisis response tools.

During the travel ban, even the Department of Homeland Security was looking to put out information because there was some confusion around the event. So there was some discussion around things like that, too...

(CROSSTALK)

GAETZ: Well, I -- I would strongly suggest that one of the crisis response tools that you use is an investigation into the discourse of your employees on resisting the Trump presidency, resisting the Trump agenda and then smothering some of the conservative outlets that seek to amplify that content.

I yield back, Mr. Chair.

GOODLATTE: The gentleman yields back.

The chair now recognizes the gentleman from California, Mr. Swalwell.

SWALWELL: Thank you, Mr. Chairman.

Welcome, Mr. Pichai. I represent a congressional district in the San Francisco Bay Area, where a number of my constituents work at Google. And was hoping we can dive into some concerns that I hear from them. But also, that I hear from constituents who just -- just have concerns about privacy.

Does the United States need a national privacy law?

PICHAI: Congressman, I -- I'm of the view, given how important privacy is, that we are better off with a -- in more of a single overarching...

(CROSSTALK)

(UNKNOWN): Excuse me, would you mind moving the microphone in front of your mouth so we can hear you better? Thank you.

PICHAI: Thank you. I'm of the opinion that we are better off with -- with more of an overarching -- in (ph) our data production framework, which -- for (ph) users. And I think that would be good to do.

SWALWELL: And -- and you know, in Europe just last year, they implemented the General Data Protection Regulation, known as GDPR, and the goals were for consumers to know, to understand and consent. And would you agree that if there was a framework in the United States to have a national privacy law, that would be the, you know, critical framework to have? Know, understand and consent?

PICHAI: You know, we've had quite a bit of experience, now, working with GDPR and we have done it for many, many months. And, you know, I think there are -- you know, I think it's well-thought-out, crafted piece of legislation.

I do think there is some value for companies to have consistent global regulations. I think it's also important for users as they navigate services globally. And so I do see value in aligning where we can.

SWALWELL: Mr. Pichai, as part of Russia's attack on our democracy in 2016, it used ads on your platform, on Facebook's platform, on Twitter's platform. And money was provided in rubles, and from Russia addresses. What has Google done to make sure this doesn't happen again?

And just last week, Secretary Mattis confirmed that Russia continued its attack on our democracy in the most recent midterm elections.

Case 5:18-cv-05062-EJD   Document 80-1   Filed 04/29/19   Page 52 of 538

PICHAI: Congressman, as I said earlier, it's an area where we invest a lot. We -- we did see limited improper activity. and, you know, obviously we learned from that. We've been very transparent with our findings, leading (ph) up, over the past couple of years. Any time we have found other activity, you know, which is material, we disclose it.

And we are constantly evolving the practices we do. But, you know, I do say our efforts have been pretty successful so far. Google has evolved through both our election cycles. But it's an area where it's never enough, and you know, so you're constantly (inaudible) you (ph) learned (ph) and doing more.

SWALWELL: And Mr. Pichai, I don't think anyone disagrees that seeing an answer on a results page for certain queries can be useful. For example, if I type in, you know, "what is 25 times 15" and Google spits out "375", that's useful. But today, you know, if my wife was to search for a pediatrician in Dublin, California, instead of being matched with the most relevant information from across the web, according to Google's algorithms, my wife or any mom would see a map that is powered by Google's ecosystem of local reviews. And in response to claims that Google has put its own results ahead of its competitors when its page rank algorithm believes the competitor should be ranked higher, Google has told certain international enforcers that local search results come from a specialized index which is distinct from its organic web index.

And I was hoping today you could clarify for me, is it technically possible for Google to compare local business content it collects against that of content collected by third-party services, using a page rank like quality score?

PICHAI: You know, we -- we employ a wide variety of signals. We are interested in providing users -- we respond to user feedback. So as a user, you could be on a mobile phone with very limited connectivity. You could be a busy parent on your way, and you're checking for some information, maybe trying to find a doctor because your kid is sick. And so we are looking to see how we can get that information to you as quickly as possible.

That's the use case which drives our product development, and -- and if that information is best available from another company, we make it available. There are times we are able to provide that information because we have better information. And so we are constantly looking, and -- and -- and we do that to the best of our ability.

SWALWELL: Thank you. I yield back.

GOODLATTE: Gentleman yields back. At this time, the chair recognizes the gentleman from Louisiana, Mr. Johnson.

JOHNSON: Thank you, Mr. Chairman.

Mr. Pichai, we want to thank you for appearing today, and for taking the time to answer and -- and meet with us individually, answer our questions. I think you and I both agree it's important for your company, and for the people for us to have this public hearing, and to get all this information on the record, so to speak.

So as we discussed in my office yesterday, my conservative colleagues and I are fierce advocates of limited government, and we're also committed guardians of free speech and the free marketplace of ideas. We do not want to impose burdensome government regulations on your industry. However, we do believe we have an affirmative duty to ensure that the engine that processes as much, as we've said today, 90 percent of all Internet searches is never used to unfairly censor conservative viewpoints or suppress political views. Your challenge today and in the days ahead is to convince the members of this body that Google and your industry peers will implement your own sufficient safeguards and solutions to this problem, so that the government doesn't have to intervene.

Here -- here's a question: In -- in previous hearings and discussions, Google has described the Trusted Flagger program as a source for recommending content be removed from your platform. Recently, Google released a transparency report on

content removal, which revealed that out of the 7.7 million automated flagging removals from your platform YouTube, around 70 percent of that content was removed before it had received any views from the public.

Here's the question: How does Google ensure that content removed in the automated process is not merely because of philosophical or political differences?

PICHAI: Congressman, it's an important question. As you said, YouTube is committed to being a platform for freedom of expression, and you know, we -- we go to great lengths to do that. We only handle videos in -- in the areas of clearly-defined policies we have. We do have automated systems, but you know, we assess it. We later spot check it to make sure the system is working as intended. We respond to feedback. As content creators, you can appeal if you think something was removed erroneously. But it's really important to us that we -- we -- we provide a platform for freedom of expression, but enforce the rules of the road on areas where we have said and -- but we are very transparent about the areas and the clear policies with which we do those things.

JOHNSON: You've spoken a lot today about objectivity. That's the goal. We applaud and appreciate that.

As you know, Alphabet's incubator Jigsaw has introduced Perspective. It's a tool that uses machine learning to filter online discussions for, quote, "toxicity", unquote. This, to me, raises issues of how Google's parent company is using machine learning to filter speech that is viewed as unproductive, such as ad hominem attacks or offensive language or -- or the like. When creating a tool like Perspective, what steps has Google taken to protect conservative viewpoints from being considered toxic by subjective reviewers as the program progresses?

PICHAI: Congressman, Perspective provided by one of our sister organizations, Jigsaw, it's a platform for publishers to use. So the publishers get to define what they want acceptable or not, and -- and -- and then that's what the tool, you know, provides for them. But I think your point is valid. I mean, we -- we don't want to be in the -- in the position of just editorializing publisher content, and we are just providing a tool for publishers to better drive the content on their platforms.

JOHNSON: You mentioned the appeals process of the content provider as their material flag. How quick does that appeals process work? In other words, what's the review period?

PICHAI: I think it -- it varies. We prioritize areas which are sensitive. For example, areas like terrorism is something we prioritize very significantly, and higher up in the queue. But we are ramping up our resources, and our goal is to do it as soon as possible. But you know, sometimes it can be a matter of hours. If it's areas around copyright, we have implemented content I.D. We have a system by which we can automatically detect and respond right away back to copyright owners. So it's a -- it's a constant work in progress.

JOHNSON: In -- in the committee's last hearing with Google's Ms. Juniper Downs, we discussed this. I raised the case of the Alliance Defending Freedom's content being removed after being reported by a trusted flagger on YouTube. The -- the flagging organization with a sub -- was the Southern Poverty Law Center, which has kind of an infamous reputation for being, I would say, a radical left organization that opposes conservative viewpoints. What criteria does Google use when granting trusted flagger status to third parties, such as the SPLC?

PICHAI: You know, today, we -- I first want to clarify one thing. Our trusted flaggers don't remove content. They can flag content for us to review, and -- and we review flagged content. It's mostly used by law enforcement, many -- many nonprofit agencies in -- in areas, important areas like child safety, terrorism, and so on.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Southern Poverty Law Center is a trusted flagger. People can register. Last we checked, they've never flagged a -- a single video on our platform. We have reached out to a wide variety of organizations, including conservative organizations. We will be happy to take your suggestions to add, you know, organizations as trusted flaggers.

JOHNSON: Appreciate that. We need a little objectivity in the reviewers.

And I yield back.

GOODLATTE: Gentleman's time has expired. The chair now recognizes the gentleman from California, Mr. Lieu.

LIEU: Thank you, Mr. Chair.

This is now the fourth hearing in a series of ridiculous hearings on a (sic) free speech of Internet companies. A significant portion of this hearing was a waste of time because the First Amendment protects private individuals' and corporations' free speech rights.

Now, there are things that Google does unrelated to speech that I disagree with, but when it comes to search algorithms, your prioritization, what videos you want to show, the First Amendment protects you. So I'm going to ask you a series of questions. Some of them are fairly basic, and I apologize, but I feel like I have to educate some of my colleagues on how the U.S. Constitution works, and feel free to answer yes or no.

So my first question is, we here on the Judiciary Committee or the government -- and Google is a corporation, correct? Yes or no.

PICHAI: Yes.

LIEU: All right. The First Amendment limits what government can do in regulating the content of speech. It does not limit Google, but Google does have to follow corporate laws and other laws, and under those laws, you and your Board of Directors, have a fiduciary duty to your shareholders, correct?

PICHAI: Yes.

LIEU: And one of the ways that Google generates a profit is when consumers use your search engine, they watch videos, some of them click on ads, they use your applications. Isn't that one way you generate profit?

PICHAI: That's one of the business models we ...

LIEU: And if consumers were not getting the search results they wanted or not -- not getting the videos they wanted to see, they might start moving to your competitors. Isn't that right?

PICHAI: Every Monday when I run my management meetings, yes, we worry about -- users have a lot of choices, so we work hard to earn their trust every week.

LIEU: And -- so let's say you figure out that the number one thing users want to see are dog and cat videos. Under the U.S. Constitution, you have the absolute right to promote dog and cat videos -- I'm not saying you -- you do that, but you do have the right to do that if you wanted to, isn't that correct?

PICHAI: Congressman, I'm not the expert on First Amendment, but generally I think that's right.

LIEU: I thank you. So last week when I got notice we were going to have another one of these hearings, I did a search on Google. I searched for Congressman Steve Scalise, he is a Republican, and I hit the news tab and the first four article that come up were generally pretty positive.

The first one is from Town Hall, a generally conservative publication, about his book, Back In The Game. Second article was also about his book, Back In The Game. Third is about him talking about election results. Fourth is from Fox, another positive article about his book, Back In The Game.

You don't have a group of people at Google there, sitting there thinking hey, we like Steve Scalise, so we're going to generate positive articles on these search results. That's not what's happening, right?

PICHAI: I'm very glad to see Steve Scalise fully recovered back (ph), but we don't -- we don't you know, deal with individual queries and you know, every retaining (ph) viewpoint, and so these other ...

LIEU: In fact, no query in your programming code does Congressman Steve Scalise even show up, isn't that right?

PICHAI: Yes, that's right.

LIEU: OK. Now I'm going to do a real-time Google search for a very similar term. I'm going to change one word, so I'm going to search for Congressman Steve King, I'm going to hit the news tab. The first article that pops up is from ABC News.

It says Steve King's racist immigration talk prompts calls for congressional censure. That's a negative article, but you don't have a group of people at Google sitting there thinking and trying to modify search results every time Steve King comes up, a negative article appears. That's not what's happening, right?

PICHAI: We always operate for any inquiry with the same set of principles. We are trying to reflect what is currently -- you know, that is newsworthy, what is currently being discussed about that -- that -- that phrase.

LIEU: Thank you. So let me just conclude here by stating the obvious. If you want positive search results, do positive things. If you don't want negative search results, don't do negative things. And to some of my colleagues across the aisle, if you're getting bad press articles and bad search results, don't blame Google or Facebook or Twitter, consider blaming yourself. I yield back.

GOODLATTE: The gentleman's time has expired. The Chair now recognizes the gentleman from Arizona, Mr. Biggs.

BIGGS: Thank you Mr. Chairman, thanks for being here Mr. Pichai. I -- I don't disagree with -- with one point made by the last interrogator -- questioner, let's call him questioner, that's easier to say -- in the sense that I think you have a First Amendment right to do what you guys want to do.

So you're a private company, there's very few constraints on the First Amendment -- although there are lots of constraints ultimately when we start looking at it, everything from libel to slander to threatening, intimidating to yelling fire in the crowd.

There's -- we have constraints on First Amendment speech, but you have seemed, as we've gone through here today, to say that Google doesn't have bias. You yourself have said you personally don't have bias or animus and you also tried to implement policies to prevent bias and animus, as well. Isn't that true?

PICHAI: Yeah, I -- I -- I -- we work hard to build our products in a neutral way and I'm committed to doing it that way.BIGGS: Right, and in some respects, we haven't heard much discussion about the human intersection with the creation or manipulation or editing of algorithms, but there is human interaction with the -- humans create the algorithms and you might have some artificial intelligence that -- that might do some additional information as it goes.

But originally, the creativity comes from the humans, right?

PICHAI: Yeah, that's right.

BIGGS: Well how can we be assured that foreign adversaries will not use your platform against Americans or American national interests?

PICHAI: You know, we -- we always worry about that -- that as a tech factor, and this is why we make sure, you know, that the best way we do it, when we are building our products, we don't rely on, you know, one person or groups of people to be able to do it.

We follow a set of robust processes, including tests and validation both from users -- we get feedback from users and we use raters (ph) externally to evaluate, and we do this -- for example, our search raters (ph) in the U.S. are there in all the 50 states of the U.S.

We geographically distribute them so that we really get the perspectives of everyone around the country.

BIGGS: Well that -- that doesn't really get to the answering my question of -- of security assurance. And so I -- I guess if manipulation of your information systems was not possible or effective, we would -- we would -- we would not be seeing so many countries investing in the capability of manipulation, whether it's Russians or Chinese or Iranians or others that are, you know, attempting to manipulate your system.

PICHAI: Well there may be -- there may be attempts to use our products and services -- so for example, because we provide advertising products, you know somebody -- and what we saw in the 2016 election was, you know, limited activity but it's improper -- two accounts related to Russia, you know, advertised using our platforms.

BIGGS: At a total of 4,700 bucks, I think you said?

PICHAI: Yeah. So that's an example of, you know, the kind of tech we see and it's something that we are looking hard to mitigate and avoid.

BIGGS: So I -- I -- I guess I would say that it looks like you guys have a policy of do no evil, right? Is that fair to say you ...

PICHAI: It's not an official policy, but you know, it's -- it's a statement that's being (ph) communicated by us internally.

BIGGS: And -- and other -- people have brought up the -- the -- the work that you may or may not be doing in China and I want a clarification of that. Are you in -- looking to expand in China and cooperate with the Chinese government on a platform release in China?

PICHAI: The question is about search. Right now, we have no plans to launch search in China. We have always over the years explored how best we can continue to serve users in China, but that's what we're doing.

BIGGS: Are you doing anything with the data share with the Chinese government?

PICHAI: Today, we don't operate our services which -- which involve user data like Google Search or G-Mail in China, so no.

BIGGS: So you're telling me nothing at all then with China?

PICHAI: We do provide, you know, for example, Android, which is an operating system. We work with partners around the world and -- and there are (inaudible) manufacturers around the world, including in China.

BIGGS: So -- so you're -- manufacturers, but beyond manufacturers, any -- any other platform use?

PICHAI: We don't have any special agreements on user data today ...

BIGGS: With the Chinese government?

PICHAI: That's right.

BIGGS: OK. Do you share the data that you collect on civilians with the United States federal government?

PICHAI: We comply with valid law enforcement requests and, you know, and we -- with due process, we comply with valid law enforcement...

(CROSSTALK)

BIGGS: What's the extent of that?

PICHAI: You know, we publish a transparency report in which we give insights into the law enforcement requests we have gotten, and our -- you know, and our compliance there.

BIGGS: The last question I have, and real quickly. In May 2016, Google banned all ads by payday lenders even though it (ph) had (ph) invested in LendUp, which is effectively a payday lender.

And it -- it banned ads by -- by competitors. Is that a normal practice?

PICHAI: Congressman, we -- we undertook ad policies in that particular area because we saw evidence of misuse, and we had gotten a lot of feedback and that's what we reacted to.

BIGGS: Did you -- did you ban your own LendUp app (ph)?

PICHAI: I don't think Google is involved -- I think one of our sister companies is a -- you know, has -- has an investment in...

BIGGS: In LendUp?

PICHAI: Yeah. I think that's my understanding.

GOODLATTE: The gentleman's time...

(CROSSTALK)

BIGGS: Was it banned?

GOODLATTE: The gentleman's time has expired.

PICHAI: I can follow up. I'm not aware of the specifics. Happy to follow.

BIGGS: Thank you.

GOODLATTE: Time (ph) has expired.

The -- the gentleman from Maryland, Mr. Raskin, is recognized.

RASKIN: Thank you, Mr. Chair.

Welcome, and thank you for your testimony today. Do you know what Frazzledrip (ph) is?

PICHAI: I'm not aware of the specifics about it. I heard some references about it from our -- from our team over the past 24 hours.

RASKIN: I just learned about it in The Washington Post this morning. There's an article with this headline, "A Platform for Free Speech That Extremists Routinely Exploit." And in it, the article explains that the recommendation engine for YouTube, which -- which is owned by Google, correct?

PICHAI: Yes.

RASKIN: The recommendation engine for YouTube recently suggested videos claiming that politicians, celebrities and other lead figures were sexually abusing or consuming the remains of children, often in satanic rituals, according to watchdog group Algo (ph) Transparency.

The claims echo, and often cite, the discredited Pizzagate conspiracy, which two years ago, led to a man firing shots into a northwest Washington, D.C. pizzeria, in search of children he believed were being held as sex slaves by Democratic Party leaders.

One recent variation on the theory, which began spreading on YouTube this spring, claimed that Democrat Hillary Clinton and her longtime aide, Huma Abedin, had sexually assaulted a girl and drank her blood, a conspiracy theory its proponents dubbed "Frazzledrip" (ph).

Now, the article goes on to describe how this Frazzledrip conspiracy is all over YouTube. And some of the Frazzledrip clips purport to show grainy images of Clinton and Abedin committing crimes, and speak of invoking the death penalty.

One video, which has been viewed 77,000 times and remains online today, has a voiceover that says, "Will these children become the dessert at the conclusion of the meal?"

So -- and this is just one example that they use, of extreme right and paranoid conspiracy groups using YouTube as a place to trade their videos and to promote propaganda.

What is your company policy on that? And are you trying to deal with it?

PICHAI: You know, we are -- we are constantly undertaking efforts to deal with misinformation. But, you know, we have clearly stated policies. And we have made lots of progress in many of the areas where, you know, over the past year -- so for example, in areas like terrorism, child safety and so on.

We are looking -- looking to do more. You know, this was a recent thing, but I'm committed to following up on it, and -- and making sure we are evaluating these against our policies.

RASKIN: Yes.

PICHAI: But it's an area we acknowledge, there's more work to be done. And, you know. And we'll definitely continue doing that.

RASKIN: One of the videos discussed included images of a body on a table before restrained children, and of Hillary Clinton with a bloodied mouth and fangs, claiming that she and Abedin drank the blood of their victim. That was removed, but then another consisting of an exact copy of the video remained online, or apparently remains online.

So -- I mean, is your basic position that this is something you want to try to do something about, but basically there's just an avalanche of such material, and there's really nothing that can be done and it should be "buyer beware," or "consumer beware" when you go on YouTube?

PICHAI: You know, we do grapple with difficult issues, maybe we have to look at it on a video-by-video basis. And we have clearly stated policies. So we would need to evaluate the (ph) video, the specific video...

RASKIN: Yeah.

PICHAI: ... violates any of our policies. And we do strive to do it for the volume of content we do get and...

RASKIN: Yeah.

PICHAI: ... around 400 hours of video every minute. But it's our responsibility, I think, to make sure. You know, YouTube's a platform for freedom of expression. But it's responsible and (ph) contributes positively to society.

RASKIN: Some of my colleagues are upset about negative references to Donald Trump, not Hillary Clinton or not Barack Obama. And obviously, you know, one potential strategy today is to try to heckle you into somehow playing favorites with Donald Trump and Republicans.

I think that that would be a silly and ridiculous takeaway from this. On the other hand, there is material which is a true public danger. You know, you've got a right to have whatever politics you have.

I mean, we could -- we could subpoena Fox News and bring them in here and beat them up about how 90 percent of the references on Fox News to Barack Obama or Hillary Clinton are negative. But they've got that right under the First Amendment. You've got a right under the First Amendment, to have whatever political views you've got.

But I think the point at which it becomes a matter of serious public interest is when your communications vehicle is being used to promote propaganda that leads to violent events, like the guy showing up in the Pizzagate conspiracy case.

And so I guess my question is, are you taking that threat seriously?

(CROSSTALK)

GOODLATTE: The gentleman's time has expired, but you can answer the question.

PICHAI: Thank you. We have very clear policies against hate speech, things which could incite harm or hatred or violence. And, you know, that's an area where we are clearly taking a lot of action.

But I -- I want to acknowledge there is more work -- more work to be done. And you know, with our growth, comes more responsibility. And we are committed to doing better as we invest more in this area.

RASKIN: Thank you, Mr. Chair.

GOODLATTE: Thank you.

The Chair now recognizes the gentlelady from Georgia, Ms. Handel.

HANDEL: Thank you, Mr. Chairman.

Thank you very much for being here, Mr. Pichai. For years, a Federal Trade Commission, on a bipartisan basis, has affirmed that precise geolocation information is considered highly, highly sensitive. And that consumers must opt in to that. Do you agree with that?

PICHAI: Yes, I agree with that.

HANDEL: Do you think there's other information, privacy information, of consumers that should also be required to have opt-in versus opt-out?

PICHAI: In general, I think a framework for privacy in which users have a sense of transparency, control and choice, and have clear understanding of the tradeoffs they need to make, I think is very good for consumers and we would support that.

HANDEL: And speaking of privacy and transparency, I'm trying to understand the difference between a paying customer for the Google Suite (ph) versus the free Gmail. So when it comes to data collection, are the criteria and the rules the same if you're on Google Suite (ph) versus Gmail?

PICHAI: Gmail's -- Google Suite is a -- a broader suite of products than Gmail alone. You know, we have very specific policies around Gmail in general.

PICHAI: We don't -- as a company we don't read your Gmail unless we have express consent from you, for example, to investigate security or abuse related to an account.

On G Suite, we provide G Suite across many instances. We have clear policies against (inaudible). We don't use...

HANDEL: All right. But what I'm asking is, are the policies different?

PICHAI: We don't distinguish between -- so, for example, today we provide G Suite for free to many educational institutions. We don't use that data for -- from within G Suite for advertising.

HANDEL: But you collect it?

PICHAI: Well, we store -- you know, G Suite involves user documents, be it documents or Gmail. So we store it for the user so that they can access it.

HANDEL: And no one in your company has access to it?

PICHAI: People...

HANDEL: Or they do have access?

PICHAI: We have policies that they cannot access it unless they have specific consent from the user for a specific situation.

HANDEL: OK. What would be one of those reasons?

PICHAI: For example, you may want to investigate fraudulent activity related to your account, and, you know, we may ask for your permission to do that. There may be a valid law enforcement requirement which we have to comply with.

HANDEL: All right. I want to go back to Google Takeout, which my colleague from Georgia asked about earlier. I would say that the average person probably has never heard of Google Takeout until recently. So when did it become available?

PICHAI: We -- we started this effort, you know, (inaudible) as early as over 10 years ago, and we started building for many of our products. We started an office in Chicago with the express goal of providing users with these takeout capabilities. I think we were quite unique in starting to work on that as a company, but there is more effort we plan to do there.

HANDEL: Who has access to it?

PICHAI: Well, this is for users. So, for example, if you decide to, you know, stop your Gmail account and go with another e-mail provider, being able to take your Gmail data with you, and that's what it's designed for. Takeout is for users, yeah.

HANDEL: And -- but no one from within Google or any other place can come into Google Takeout and get your information?

PICHAI: No. It's expressly designed for consumers to take their data with them.

HANDEL: I understand what it's designed for. I'm asking who, practically, can get access to it?

PICHAI: You know, we have very strict limitations on access to sensitive...

HANDEL: Oh, so it's more than just, if I were going to Google Takeout for Karen Handel, I'm not the only person who has access to my Google Takeout?

PICHAI: No, you are the only person who can take out your data, but I'm just saying, you asked about internal systems. We have clear policies. Employees can't go looking at user data, unless there is -- there are a narrow set of circumstances, which mean, well, either consent from the user or legal situations, et cetera.

HANDEL: All right. Is it free?

PICHAI: Yes, Takeout...

(CROSSTALK)

HANDEL: ... your data?

PICHAI: Yes, it is free.

HANDEL: So when a person takes their data out or they want to go through and clean up privacy and they delete, is it really deleted or is it just hidden?

PICHAI: If -- depending on the service, if you're terminating your account and you delete the data, it will take some time, and we communicate that, to propagate through our systems and get removed, but we follow through on that.

HANDEL: But it's deleted; it's not just hidden from sight?

PICHAI: It's deleted. That's right.

HANDEL: OK. One last question. You said that your company embarked on an initiative to register people to vote. How did you do that and who did you target and in what states?

PICHAI: All we -- you know, so, for example, during registration windows, we -- we highlight; we give people information about where to register. We do these things representatively across -- for all our users across the U.S. And all indications are that the participation is uniformly high across our user base. So, you know, we do this with the express goal of...

HANDEL: But how did you do it? Did you send out links? Did you send out voter registration forms to people?

GOODLATTE: The gentlelady's time has expired, but you can answer the question.

HANDEL: Thank you.

PICHAI: For example, on the Google homepage, we may say, "Check where your polling place is." And as a user, you can click on it and we give you the location of your closest polling locations and the opening times available to you." That's an example.

HANDEL: I'll be following up on that. Thank you, Mr. Chairman. I yield.

GOODLATTE: The chair now recognizes the gentlelady from Washington state, Ms. Jayapal.

JAYAPAL: Thank you, Mr. Chairman.

And thank you, Mr. Pichai, for coming to testify before us. I, for one, am thrilled that you as a company encourage people to vote. I think we should all do that. I'd love to see election day as a holiday.

I've been deeply concerned for some time about employers mandating forced arbitration rather than allowing for people to pursue justice. And forcing people into arbitration when they've already experienced a violation of their basic rights, I think, is a deep injustice, and it subjects people who have already been victimized to further victimization. And we've seen research that shows that it discourages people from coming forward to report abuses to begin with.

There are very successful companies in your field, including companies like Salesforce, that have thrived while forgoing forced arbitration contracts and clauses. And I think that we can all agree that the argument that eliminating forced arbitration threatens innovation should be dismissed out of hand.

Eliminating forced arbitration has been a shared priority by my colleagues on this committee, as evidenced by the fact that our ranking member, Jerry Nadler, as well as Hank Johnson, David Cicilline and I have all introduced legislation to end the practice. And I was very heartened to see that Google ended forced arbitration, but only in the context of sexual harassment.

And so I hope you agree with me that upholding people's fundamental right to safety in the workplace and freedom from discrimination, whether it's based on gender or sexual orientation or race or religion or any other metric, really benefits all of us. And so I wanted to point out that it's particularly critical for companies like Google to take that moral leadership in this space, since there are limitations for affected people to pursue system-wide change through tools like class action lawsuits.

And I recognize that this is not exclusive to Google and that it extends to many, many other employers, but since you're here before the committee today, which has jurisdiction over this issue, I want to ask you if you will voluntarily commit to expanding the policy of ending forced arbitration for any violation of a person's rights, not just around sexual harassment but really for all of your employers and your contractors?

PICHAI: Congresswoman, thanks for the question. It's an important area. One thing, if I could clarify, today our arbitration agreements don't require any confidentiality provisions. That's how we have done it. But -- but, as you mentioned, for sexual harassment, we agreed that it should be up to the employees, and we gave them a choice.

We are definitely looking into this further. It's an area where I've gotten feedback personally from our employees, so we are definitely reviewing what we could do and, you know, I'm looking forward to consulting and happy to think about more -- more changes here.

JAYAPAL: Well, we'd love to work with you on that. I think that this, really, for people who are listening to this hearing that may not understand this, basically, when you sign a contract, as we saw with sexual harassment, you -- some employees don't even know what they're signing away, but they're signing away their ability to actually pursue claims in the justice system by going to forced arbitration.

And so I think that this is very, very important. I think your point about confidentiality is important, but that's not the issue here. That is about transparency. But it's not about the basic right of somebody to seek access to due process and to justice in the courts.

So what stage are you at in advancing the issue of ending forced arbitration, both on the sexual harassment side, but also in terms of the process for looking at it more broadly?

How do we -- how do we have a timeline? How do we engage with you to make sure that you endorse our legislation as we move forward in the next Congress?

PICHAI: We already, you know, we have -- we've already enacted the changes for forced arbitration, for giving arbitration as an option for employees for sexual harassment. We are definitely reviewing what more we could do in this area. I'm definitely happy to have my office follow up...

JAYAPAL: Great.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

PICHAI: ... as they're thinking about it to get -- get your thoughts on it, and we are definitely committed to looking into this more, and making changes.

JAYAPAL: Thank you.

The other issue I wanted to just raise in my last minute is moderating hate speech. And this has come up in a number of different ways, and we appreciate the work that you have done, particularly with YouTube. I know we had Alex Jones in the room earlier. But I think, you know, promoting conspiracy theories that are patently false and result in real harm is a problem. Do you agree with the U.N. high commissioner for human rights assessment that social media played a role, for example, in perpetuating -- perpetuating genocide against the Rohingya? And what is Google's responsibility to moderate hate speech on -- on your platforms?

PICHAI: We feel a tremendous sense of responsibility to moderate hate speech. You know, defined -- we have defined hate speech clearly as inciting violence or hatred towards groups of people. It's absolutely something which I think we need to take a very strict line on, and -- and we have stated our policies clearly, and we are working hard to make our enforcement better, and -- and we have gotten a lot better, and -- but it's not enough, and so we're committed to doing more here.

JAYAPAL: Well, we really look forward to working with you on that.

And before I yield back, Mr. Chairman, let me just take a point of personal privilege to say I was born in the same state as you in India, and I'm excited to see you leading a company, and continuing to show that immigrants to this country contribute great value, in spite of some of the rhetoric we hear. Thank you, Mr. Pichai.

I yield back.

GOODLATTE: Gentleman's lady -- gentlelady's time has expired. The now -- chair recognizes the gentleman from Pennsylvania, Mr. Rothfus.

ROTHFUS: Thank you, Mr. Chairman.

Mr. Pichai, thank you for being here. I appreciated the reference to Pittsburgh in your opening testimony. Great to have you in a -- part of our community there.

Your company really should be held out as a success story of America's free enterprise system. Google has very powerful products and services. There is a saying that goes, with -- with great power comes great responsibility, and I think you realize that.

I want to talk a little bit about these allegations of bias that been out there. You know, I've seen the media reports about a few Google engineers lamenting the 2016 election results. Then they discussed potentially manipulating search results that would favor some political viewpoints in the future. On a hypothetical level, those Google engineers believe that they have the power to influence an election. Do you think Google's products and services are powerful enough that they can sway public opinion to tilt an -- an election if the company wanted to? Are your products that powerful?

PICHAI: Congressman, today we see users get information from a wide variety of sources, and while Google is a big player in search, search is just one of the ways in which people get information. They get it from social networking sites...

ROTHFUS: Do you -- do you think that your products are that powerful?

PICHAI: That's not the way I think about it when we are building -- building the products. You know, we constantly worry the areas where we are not doing well, and we are looking to do better. We definitely see a lot of innovation not just from within the U.S., but globally, around the world. And -- and we do realize we are a large company, and with that comes scrutiny, and we -- we think it's important to engage on that.

ROTHFUS: Now, you've testified about Google and its algorithms working on a non- -- in a nine -- non-partisan way, and that you're confident that Google does not approach work with any political bias. Zoe Lofgren highlighted the -- the vote in -- in Santa Clara County. Does Google do anything to ensure ideological diversity among its employees and decision-makers?

PICHAI: Congressman, we've -- you know, I've communicated clearly to the company that, you know, we need to welcome viewpoints from across all sides. As a company, we are -- we're -- you're right. We are definitely based in Northern California, and clearly, you know, there -- there is a leaning there.

But last year was the first year we grew faster outside of California than within California. We also have -- have employees globally, and I do see a wide variety of opinions expressed (inaudible)

ROTHFUS: When -- when Mr. Johnson asked a question about the -- the Trusted Flagger program, you said, "for us to review." Who's the "us"? Who's doing the -- who's doing that review?

PICHAI: We review things both with a combination of our automated systems, as well as manual reviewers. These are people who are part of...

ROTHFUS: And -- and how many people is that? How -- how many -- is that a committee? Is it...

PICHAI: You know, in 20 -- we have committed to scale up our manual reviewers to over 10,000 people, and we are well -- well underway to do that. And so this is thousands of people working 24/7 globally across, looking at content based on our policies.

ROTHFUS: Google has described it -- its ethic with these pithy, great statements: Don't be evil. Do the right thing. I'd like to discuss these ideals in relation to reports that Google -- that we've been talking about with China.

The strict authoritarianism that Chinese government rules its people has caused concern around the globe for generations. I vividly recall their early days of June, 1989 in Tiananmen Square. Now we do reports (ph), recent reports about crackdowns on Muslims, on Christians, on Falun Gong, mass incarcerations and human rights abuses against people of faith in China should be a major concern for everyone around the world, including your company. Did Google design a prototype for a search engine that could be used in China to censor content?

PICHAI: Congressman, we have undertaken an internal effort.

ROTHFUS: Did they -- did you create a prototype? That there was a report in The Intercept that says a prototype for the censored search engine was designed. (inaudible) Were they wrong (ph)?

(CROSSTALK)

PICHAI: We have -- we have explored what search could look like if it -- if it were to be launched in a country like China, and that's what we explored, and -- and that...

ROTHFUS: How -- how many months was that project ongoing?

PICHAI: We've had the project underway for a while, and there have been other projects which we have undertaken for a while, and we've never launched them, too. So it could be a constantly exploring (inaudible)

ROTHFUS: How many -- how many people were working on it?

PICHAI: The estimates in (inaudible) -- sorry, the number of engineers on the project have varied over time. At one...

ROTHFUS: Ten?

PICHAI: At one point, we've had over 100 people working on it. That's my understanding.

ROTHFUS: I just want to echo what my colleague, Ms. Jayapal, had -- had said. You know, I'm glad that you're here at the committee, but I'm -- I'm glad you're here in our country. You are the success story, and I can just think of you sitting as a teenager in India, thinking that this was probably never even on your -- your radar. But you came to this country because this country had that promise out there, and I want to thank you for being here today, and encourage you to continue collaborating with this committee. Thank you.

GOODLATTE: The gentleman's time has expired. The chair now recognizes the gentlelady from Florida, Ms. Demings.

DEMINGS: Thank you so much, Mr. Chairman and Mr. Pichai. I'm here. Thank you so much for being here and enduring all that we have heard and seen today.

As you know, Google certainly has significant influence over the dissemination of information to the American people. You have the ability to mold and shape how we think, the decisions we make, what we buy. But let me just remind you and others that America, with all of its greatness, has enough problems and we have to make sure that the gift of Google is used -- the service that you provide is a responsible one.

In your own statement, you said that the American people have the ability to use technology to improve their lives. So that tells me Google helps to solve problems, not create problems. My concerns specifically centers around the protection of the consumers, because Google certainly would not be anything without the consumers.

So the protection of the data, their information, the level of service that you provide -- and I know we've talked a lot today about data collection and how it's used and if the settings are in place, then it's not collected. So let me just understand, really starting with the Chairman's questions, which I thought was a good opening for us.

If a consumer tells you not to collect their data, then you do not collect the data. Is that correct?

PICHAI: That -- that's right.

DEMINGS: OK, and how does Google -- or does Google allow advertisers to target ads based on sensitive factors like race, ethnicity, religious affiliation?

PICHAI: Currently we don't have those -- the ones you mentioned as factors in our advertising product.

DEMINGS: OK, and what is your policy regarding predatory advertisements?

PICHAI: You know, we -- we have strict policies against, and you know, we -- we are able to respond to concerns there. We have undertaken significant changes to when (ph) we find predatory practices on our platforms.

So it's an area we are committed to doing better.

DEMINGS: And since we do represent everybody for communities as well as affluent communities, how do you make sure that the information that is received in at-risk communities protects the consumer, if you will? How they're treated the same in terms of affluent versus poor communities, how do you make sure that they are?

PICHAI: We do engage with community organizations. We do, you know -- our teams do wide outreach, and to the extent there are specific concerns, which you know, there -- there is an obvious abuse of our product or platform which affects, you know, communities disparately, we do follow up and engage and take action.

DEMINGS: And how do you do that again, please?

PICHAI: So for example, you know, if there is a specific category of a product where, you know, we -- we get clear feedback the availability of the product has a disparate effect on some minority communities, we do engage and we understand and, you know, make changes in our products and policies.

DEMINGS: So you do get feedback, so do you initiate or do any checking or is -- does that information have to come back to you or are you proactive in terms of looking for those types of vulnerabilities?

PICHAI: We do both and you know -- but I do think there's more we can do in being proactive and it's something I'm happy to follow up and understand better, but you know it is an area we are committed to doing well.

DEMINGS: You talked quite a bit about working more with law enforcement. I believe you said that maybe four, five times. I'd like to hear more about some of the things that you do with law enforcement to protect the consumers, as well, and protect our electoral process and other things that we should care about.

PICHAI: You do -- we do this across a wide variety of areas. So for example, when there were concerns expressed about election interference, it's an area where we look to law enforcement for guidance. Areas like child safety is an area where we actively collaborate with law enforcement agencies.

So fraud, malware, and you know, depending on the area we engage in, we support them through efforts they are trying to do. The opioid crisis is a good example of an area where we are doing a lot of work with law enforcement.

DEMINGS: What do you think is the main area where Google could improve to better help the consumer?

PICHAI: I always ...

DEMINGS: To protect the consumer?

PICHAI: I always think -- you know, privacy is an area where we think is sacrosanct (ph) and we have done a lot for users over the years, but it's an area where expectations are constantly evolving and we are, as a company, needing to evolve and adapt to it.

And so it's an area we are committed to doing better, but it's an area I want to acknowledge that there's more to do and it's never done and -- and something we are committed to doing better.

DEMINGS: Again, thank you Mr. Chairman, I yield back.

GOODLATTE: The gentlelady yields back, the Chair now recognizes the gentleman from Texas, Mr. Gohmert, for five minutes.

GOHMERT: Mr. Pichai, appreciate your being here and I think most all of us agree on both sides, we applaud great work. For example, Steven Spielberg, despite politics, he's provided my family a lot of enjoyment and entertainment.

You and your colleagues at Google have created an extraordinary vehicle for searching out things. It's fantastic, and as Mr. Lieu, my friend across the aisle was pointing out, you know, you've got government that's not supposed to interfere in peoples civil rights, and then you've got a company, a corporation like Google.

My problem is when the government gives its immunity from lawsuits over to a private corporation that's -- the head of that corporation doesn't even realize that there is political bias run amok in his company, and that's the problem.

I don't want to see you over-regulated, I don't want to see you regulated. I want to see others come up with brilliant ways, as you, Mr. Brin and others did, to create something that makes life easier. But, a good example, you have a trusted flagger you'd indicated called the Southern Poverty Law Center.

The Southern Poverty Law Center really has stirred up more -- stirred up more hate than about any other group I know. They stirred up one guy to the point that he went to the Family Research Council and I know those people and they're Christians and they believe and I believe that Christianity is really more based on love than about any other religion in history.

God so loved the world, he sent his son, his son so loved the world, he gave his life, and yet they stirred up hate against the family research center, and a guy goes in shooting.

You have -- let's see, June 18th of this year, Southern Poverty Law Center announced it had reached a settlement with Maajid Nawaz and his organization Kilbum for falsely labeling them as an anti-Muslim hate group.

They were wrong. Now, you considered them a trusted flagger, yet they keep creating problems for people that are not haters. And in fact, they had to -- excuse me, they had to pay out $3.375 million. My problem is when you put your moniker on them of trusted flagger, why aren't you paying $3.375 to Mr. Maajid Nawaz? That's my problem. You trust people that have stirred up a lot of hate, and another good example -- and you don't -- you're so surrounded by liberality that hates conservatism, hates people that really love our Constitution and the freedoms it's afforded people like you that you don't even recognize it.

It -- it's like a blind man not even knowing what light looks like because you're surrounded by darkness. But if you looked -- let's see, a good example. After President Trump won, your co-founder Mr. Brin said quote, "most people here are pretty upset and pretty sad."

Now a lot of us have seen the video, we saw how upset the top people at Google were and for you to come in here and say there is no political bias in Google tells us you either are being dishonest, and I don't want to think that, or you don't have a clue how politically biased Google is.

Now another example is Wikipedia. We do a search and what comes up as -- right there as the knowledge panel on the right? And we -- hopefully we'll have a -- a screenshot of that. We get Wikipedia -- my Chief of Staff went on, she told me, every night for two weeks and put proper, honest information in with proper annotations and Wikipedia's liberal editors around the world would knock it out every day, instead put up a bunch of garbage like Mark Levin has now been facing.

Yet to you, they get a trusted spot and when Wikipedia slanders or libels someone and you're the one that has trusted them above any other entity, you ought to be liable.

You ought to be liable when the SPOC is liable, you ought to be liable when Wikipedia demeans and uses their political bias and I hope and encourage you to look around and notice you've run off conservatives, you embrace liberals and it's time Google was actually not immune so that people can hold you accountable and get a little better objectivity.

I see my time's run out, I yield back.

GOODLATTE: (Inaudible) Chair now recognize (inaudible).

KING: Thank you Mr. Chairman. I appreciate your testimony here today and I -- a number of these questions flow over to me, even though I may be repeating some of this. But I'm still not clear on how many staff and who it is that established as the parameters by which the algorithms are written.

Can you tell me about how many staff that is and -- and how that works?

PICHAI: Congressman, today it's -- it's our search team, which -- which works on the core -- core of our (ph) search teams. And it's, you know, a little over a thousand people I think, you know I'm happy to elaborate more, but it's -- it's thousands of people.

KING: That's -- that's close enough conceptually. And when you hire them, are they people hired, coming in from the outside or are they brought up from internally? What's the typical path to this roughly 1,000 person search team?

PICHAI: It's a combination of both, but senior most engineers on our search team typically tend to have been in the company for a very long time.

KING: And so most of the time, you will know them from having worked with them. Do you then -- do you go into their social media to try to determine what they might be doing on social media?

PICHAI: Normally we don't -- as a company, we have allowed people to express themselves, but we -- we make it clear that how we build our products is done with great car, in part (ph) focused on getting users the information they are looking for.

KING: But -- but these are -- this (ph) is a team of roughly a thousand. They're the people that write the parameters by which those who write the algorithms, write the algorithms.

PICHAI: That's roughly correct, yeah.

KING: Uh-huh. And so there isn't really any -- any look at what their private lives are, even when they're out (ph) with (ph) their public social media is not examined by the company. And does anyone outside of Google know who these thousand people are?

PICHAI: We don't -- we don't examine their personal activities. And, you know, there are some senior people are -- you know, who participate in conferences and meetings outside, and they are known to the outside community.

KING: And we're watching people whose social media has knocked them out of some pretty high positions in life. Almost every week, there's one or more whose social media -- this week, a couple of them that I can think of just in the last 24, 48 hours.

But I'm going to make this point. And I -- and I believe I've made it with a number of the -- of the internet companies that have been sitting here at this table in the past.

Where (ph) we're at with the (ph) situation here is that there's a very strong conviction on this side of the aisle, that the algorithms are written with a -- with a bias against conservatives. The people on the other side don't agree with that because, of course, it benefits them.

And -- but what we don't know are, who are these thousand people? And we don't know what their social media looks like. But we do know that the people that come from that county are about 80 percent supporters of Hillary Clinton, if I listened to the gentlelady from California correctly. And so that would be a built-in bias, if I know people from California and know their politics from California, and I think I do.

So we've got, at least theoretically, a built-in bias that's here. It's not being examined. You're (ph) not examining the social media. How would you expect that you could get to an objective result which -- you said that, you know, "We build our products in a neutral way," but that doesn't mean that your product comes out neutral.

So how would you expect to get to an unbiased result with a built-in formula that I've described, that I don't think you object to or disagree with?

PICHAI: Congressman, it's an important question but the way we rank our assessments (ph) is essentially based on user feedback, and that's what drives the iterative loop in our -- in what we put in. So...

(CROSSTALK)

KING: I do understand how it's prioritized that way, and I watch what's going on. But I made this point, that if we don't know who the thousand are and we can't look at their social media, and we can't see the algorithms to understand the results of the work they're doing behind closed doors.

And yet the public believes that it's an open forum where there's an -- a balanced exchange of open access for information, and of course it's not. And so I have said we either need to know who they are and look at their social media. And if that doesn't solve this problem, next step them is publish the algorithms.

If that doesn't happen, then the next step on the line is Section 230. The amendments to Section 230. And the step on the line beyond that is a Teddy Roosevelt step.

Now, I'm with Mr. Gohmert. I don't want to regulate anything. But neither do I want to see a society that's so polarized and so divided and so loaded (ph) that the will of the American people can't be expressed in the ballot box. That looks like either where we are, or the direction we're going.

I would just finish it with this. I have a 7-year-old granddaughter who picked up her phone before the election and she's playing a little game, kind of game a kid would play. And up on there pops a picture of her grandfather.

I'm not going to say into the record what the kind of language was used around that picture of her grandfather. But I'd ask you, how does that show up on a 7-year-old's iPhone who's playing a kids' game?

PICHAI: Congressman, iPhone is made by a different company. And so, you know, I mean...

(CROSSTALK)

KING: It might have been an android. It was a hand-me-down of some kind.

PICHAI: I guess, I'm happy to follow up when I understand the specifics. There may be an application which was being used, which had a notification but I am happy to understand it better and clarify it for you.

KING: OK. I thank you for your testimony and I yield back the balance of my time. I appreciate it.

JACKSON LEE: Mr. Chairman. Mr. Chairman.

GOODLATTE: What purpose does the gentlewoman from Texas seek recognition?

JACKSON LEE: To place three questions on the record Mr. Chairman.

GOODLATTE: We've already indicated we'll take all questions submitted in writing and ask him to answer them.

JACKSON LEE: Then I'd appreciate it if I can hear these three.

GOODLATTE: All right, gentlewoman, without objection, the gentlewoman is recognized.

JACKSON LEE: Thank you for the courtesies. I thank you for the courtesy of the gentlelady from Alabama. I think it's her time next. There have been several points made and obviously algorithm has been mentioned over and over again.

Three questions, one the explaining how algorithm may play into someone's oppression that conservatives over liberal. I think you are very clear on that that is not the case. In addition, your clarification on China and engaging in any activities to censor those individuals and number three the algorithms again about your products may be proprietary, I may be a priority over others in any explanation as to how that is in fact, if you represented to be not true or how that might be perceived that happens, your products, Google products over others and how algorithms may play a part into that.

GOODLATTE: And the gentlewoman will submit those in writing to us so we can submit them to Mr. Pichai.

JACKSON LEE: Thank you and I thank the gentleman and I thank you for yielding. Thank you very much.

GOODLATTE: Thank you. The Chair recognized the gentleman from Florida, Mr. Rutherford for five minutes.

RUTHERFORD: Thank you Mr. Chairman. Mr. Pichai, thank you very much for your testimony today. I'm going to go back to the privacy policy and talk about some of those issues because I think it's very important for the American public. You mentioned the transparency in your policy but when -- I know your policy is 20 pages long, changes multiple times a year. I have to ask a couple questions about the policy because I quite frankly don't understand all of it and that is the -- the policy states that Google's data collection applies when quote, "you use Google service."

And so most consumers would think that means Google Search or Google Maps. My question is does the policy apply when a consumer contacts a doubleclick cookie? Are you then -- are they then under that policy or not?

PICHAI: Today our product that called Google Ad Manager and in general when users interact with our services, we need their consent and by law we need to apply our privacy policy so we can offer them the full production suite cam(ph) and -- and fulfill our obligations. So as part of that, I think if you're interacting with our ad services, we do get the consent for your privacy policy.

RUTHERFORD: So that is written in the policy and they have -- OK. And then -- and then secondly, if the consumer does not have a Google account, they land on a webpage that has Google adware again is that consumer using a Google service under the privacy policy?

PICHAI: My understanding would be yes if they're (inaudible). You know they may be both subject to the privacy policy of the publisher or the application they're using asked(ph) for us to add platforms that work on that product.

RUTHERFORD: And then third and finally, your privacy policy says you collect voice and audio information when you use audio features. However, does this mean Google assistant is recording our voices and conversations? How -- how about when just using Google voice or -- or is that actually being recorded?

PICHAI: Today if you invoke Google voice by either using the microphone or you say okay Google and issue a command. We treat it like a search query, and record the activity. But we have a separate setting in which as a user you can choose whether you want these stored or not and so we give users the choice and option.

RUTHERFORD: Yes, when it gets to transparency. I think when you realize you have these active -- -when I'm clicking and giving that information and agreeing to it, I think people understand that information is going out and they're giving that information but it's these passive collection points like android and chrome where they're picking up that information and the user -- I'm not sure the user actually knows that and so you know one of my questions is we're agreeing to privacy policy but we don't really know what information we're giving up because it -- there are other groups that you are contracting with -- android and Chrome who are collecting passive information. How -- how do you address that and how do you make that transparent for the consumer?

PICHAI: (inaudible) privacy policy alone is not enough. This is why the prompt and give privacy checkups.

RUTHERFORD: Right. Right. So let -- let me stop you there and ask you then. Is it possible for -- for Google to send me a printout of all the information that they have collected on me within the last month, where I've been, where I've clicked, where -- is all that information. You have all that information, it could be provided to me right?

PICHAI: We -- we do make it available to you very easily. We want -- we are concerned about the security of the data so we don't casually get it out.

RUTHERFORD: So I would ask if -- because I'm running out of time, but instead of -- instead of me as a consumer or anyone as a consumer giving you the -- the privacy right up front. Why don't you be more honest with me? Tell me exactly what information has been collected, what information you want to share and then allow me to decide how much of that information I would like to share as a consumer?

PICHAI: Congressman I agree with that sentiment. In fact what we precisely do is actually very transparent and like we make it very easy. You go to your account settings. We clearly tell the categories and you can click and see the information we have. You can turn it on or off. But we want to do better and...

RUTHERFORD: There are areas where information is being collected, even if I have -- have the particular sites turned off, there's still information being collected through some of these other passive systems that you've contracted with. Correct?

PICHAI: We are pretty explicit about data which we collect and we give protections for you to turn them on or off. And even when you use a product lie Chrome or G-Mail or Google Home. We are very clear about the data we collect and we reflect it back to the user, the way (ph) that we have on them. And -- and we try to be transparent.

RUTHERFORD: I can just say, I'm -- my time's out, but I would tell you this. I would much rather be giving permission after I know what information I'm -- I'm giving up. So thank you very much again, and I appreciate your time.

I yield back, Mr. Chairman.

GOODLATTE: The Chair thanks the gentleman.

Recognizes the gentlewoman from Alabama, Ms. Roby, for five minutes.

ROBY: Thank you, Mr. Chairman.

Thank you. I'm just going to build upon what my colleague was just talking about, and use a (ph) specific example. In June of 2016, Google changed its privacy policy to allow for combining the DoubleClick cookie with information with, quote, "personal identifiable information."

Before this change, the cookies that tracked people across the web were not melded with other consumer information Google got from searches or Android phone use. And it's my understanding that when Google purchased DoubleClick, representations were made that Google would keep the data separate.

The point here, as you've heard from many people's concerns (ph) today, about the consumer and what the consumer knows. And I understand there's a personal responsibility as a consumer, to do my part to try to understand that. But it's also very complicated stuff.

And so I want to point to something positive that Google is doing. In March, you had the Online Safety Roadshow that came through Alabama's 2nd Congressional District, to a middle school, Girard Middle School in Dothan.

You're -- you're being a corporate citizen by trying to teach our young people how to be smart and safe on the internet. And as a mom of a 13-year-old girl, I appreciate that very much.

I think that is truly, truly a good example of what it means to be a corporate citizen, that these young people can have the world in their hands in recognizing that all the positive things that can come from it, there are some dangers as well.

I would just say, I think what we would all benefit from is -- is understanding as a corporate citizen, what are you doing to educate the consumer about the privacy policy? You've heard many of my colleagues point to the fact that you have this 20-page privacy policy, but it changes multiple times during the year. Or there's representations that are made in 2016 about DoubleClick, that change.

And so most of us don't have a -- a way to understand this and a way to know that the data that's being collected on us, exactly how it's being used.

So I applaud you for the work that you're doing to educate our young people, but I would just ask if you could provide us -- you said, you used the words, "evolve and adapt," when it comes to the policy. But what are you doing to specifically, to help educate your consumers on how they can be aware of when they click "accept" on the privacy policy, that they have a better understanding of how their data is going to be used?

PICHAI: Congresswoman, it's a good question. And for example, we are sending e-mail reminders for certain types of data that's being collected, and asking you to go review your settings. And that's an example of the kind of evolution we are doing, and we are implementing.

We are looking at combining settings where we can, so that it's easier for users. So we want to minimize the number of controls, but we want to match it with -- users have complex expectations, too. For example, they want some of their devices to be private, but they are OK with some of their other devices being able to be used where location is out (ph) there (ph), et cetera.

So we are trying to match users' expectations. Users do tell us when they search for weather or restaurants, they want restaurants near their location and not somewhere else. And -- and as you can imagine, if someone from Alabama is searching, they want information relevant to them.

So that's what we are trying to meet. But I agree with you, that we need to simplify this even more.

And there's more work to do, and it's a constant effort we are undertaking. As I look into 2019, we'll be doing more changes to make things work better. And I'll take this feedback into account.

ROBY: Well, and then just one (inaudible) legislative assistant was showing me in the privacy policy, where it's redlined to show the -- what the change was.

But it's not pointed out to -- that I'm aware of, it's not pointed out to the consumer when the policy is updated for whatever reason, what the exact change is. You have to go search for it and find it yourself.

And so if I've got that correct, you -- correct me if I'm wrong -- but my understanding is, you would have to scroll through the entire privacy policy to see where the changes were made. Is that correct?

PICHAI: I'm happy to follow up on that. I -- you know, I do think there are times (ph) we've pointed out, that there are updates in a blog post or something, and we make it clear what the changes are. But happy to follow up and get the specifics...

ROBY: I just think the more you could streamline to the consumer, how their personal information will be used, is being used, without the consumer having -- I mean, again, there's personal responsibility there as well.

But I just think you're doing some good things in terms of educating folks about -- particularly with Online Safety Roadshow, I think that you could take some of the work you're doing there and, hearing our concerns here today, look for ways that you could better educate the consumer, moving forward.

Thank you, I yield back.

GOODLATTE: Thank you very much.

Mr. Pichai, a couple of quick follow-ups here. I don't think anybody asked who makes the judgment calls regarding content moderation at Google.

PICHAI: Chairman, it depends on the area. So for example if it's YouTube, we have, you know, very clear teams which are responsible for YouTube content policies, and...

(CROSSTALK)

GOODLATTE: Are they identified? Is it possible for a customer to write to them and say, "Hey, here's -- here's a concern I have"?

PICHAI: We give clear channels for content creators to -- you know, to raise concerns back, and we have clear avenues. And -- and we also have had people who are responsible for these platforms, including content moderation, up (ph) here (ph).

You know, and -- and I think they've consulted (ph) widely (ph) here, too.

GOODLATTE: I have a question about pre-loaded apps. Do you have agreements with the companies that -- I mean, Amazon might have an app that they put on your platform. Do you have a data-sharing agreement with them? Do they get the information, and you get the information that's generated by their app as well? How does that work?

PICHAI: We don't have any special agreements with respect to user data, as part of pre-loading any application.

GOODLATTE: So if another -- somebody puts an app on your platform, they do it with your permission. Is that correct?

PICHAI: Not necessarily. You know, so for example, our device manufacturer can pre-load applications on -- on Android. And you know, it's up to them and the app they will offer, to do so.

GOODLATTE: All right. Do -- if they operate on your operating system, do you get the information as well as the app owner?

PICHAI: Of -- of information about what's happening within their application?

GOODLATTE: Right.

PICHAI: Unless -- there may be specific cases where the user has given us diagnostic information, so the answer would depend on the context. But in general, no. I mean, the relationship is between the user and the app developer.

GOODLATTE: You get an app that gathers information on a specific thing, that's not also coming to Google as well as to the -- the developer of the app?

PICHAI: In a general sense, no.

GOODLATTE: All right. And then finally -- and this you can -- you can write to us, a written answer because it's a very lengthy answer, I believe. But I'm interested in knowing -- I know you've had a lot of difficulties in Europe of late. And I'm interested in knowing how your policy in Europe differs from your policy in the United States.

PICHAI: I'm happy to have it -- I mean, I think it's a pretty extensive topic. I'm happy to have follow-up on that -- that area, back -- back to your office.

GOODLATTE: OK. Yes, we would appreciate that. We'll give you some written questions that other members have provided. We'll have some more of our own, and we would ask that you respond to those promptly.

PICHAI: Definitely will.

GOODLATTE: Thank you. Well, you've gone for about three and a half hours. And about what we predicted, isn't it, yesterday when we talked? So we thank you very much for your participation today. This concludes today's hearing.

And without objection, all members will have five legislative days to submit written questions for the witness, or additional materials for the record. And with that, this hearing is adjourned.

END

(C) Copyright 2018. Provided under license from Bloomberg Government. All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content. Bloomberg Government Support: 1-877-498-3587 www.bgov.com THIS IS A RUSH TRANSCRIPT. -------------------------

---- Index References ----

Company: ALPHABET INC; AMAZON COM INC; APPLE INC; BREITBART NEWS NETWORK LLC; CHEM RESIST GROUP LTD; CLONE ALGO TECHNOLOGIES INC; COMCAST CORP; GOOGLE LLC; LendUp; NASMEDIA CO LTD; SOUTHERN POVERTY LAW CENTER INC THE; SALESFORCE COM INC; SINCLAIR BROADCAST GROUP INC; TENCENT HOLDINGS LTD; UBER TECHNOLOGIES INC; YOUTUBE LLC; MID SOUTH COMMUNICATIONS INC; PJ MEDIA LTD

News Subject: (Emerging Market Countries (1EM65); European Union (1EU94); World Organizations (1IN77))

Industry: (Consumer Electronics (1CO61); Consumer Products & Services (1CO62); Electronics (1EL16); I.T. (1IT96); Internet (1IN27); Internet Software (1IN50); Internet Technology (1IN39); Mobile Phones & Pagers (1WI07); PC O/S Platforms (1PC73); Palmtop Computing (1PA77); Press Releases (1PR19); Search Engines (1SE87); Software (1SO30); Software O/S Platforms (1SO68); Software Products (1SO56); Telecom Consumer Equipment (1TE03))

Region: (Alabama (1AL90); Americas (1AM92); Asia (1AS61); California (1CA98); Central America (1CE62); China (1CH15); District of Columbia (1DI60); Eastern Asia (1EA61); Eastern Europe (1EA48); Europe (1EU83); Far East (1FA27); Florida (1FL79); India (1IN24); Indian Subcontinent (1IN32); Latin America (1LA15); Maryland (1MA47); Michigan (1MI45); North America (1NO39); Ohio (1OH35); Pennsylvania (1PE71); Southern Asia (1SO52); Tennessee (1TE37); Texas (1TE14); U.S. Mid-Atlantic Region (1MI18); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88); U.S. Southwest Region (1SO89); U.S. West Region (1WE46); USA (1US73))

Language: EN

Other Indexing: (MSNBC; Memphis Business Journal; PJ MEDIA; Wall Street Journal; daily caller) (Lamar Smith; Louie Gohmert; John Ratcliffe; Zoe Lofgren; Jerrold Nadler; Keith Rothfus; Robert Goodlatte; Hakeem Jeffries; Ronald Reagan; Thune; Karen Bass; Hank Johnson; Brad Schneider; Ken Buck; Cedric Richmond; Martha Roby; Ted Poe; Raul Labrador; Mike Bishop; Luis Gutierrez; Pramila Jayapal; Barack Obama; Robert Epstein; Jim Jordan; So I've; Tom Marino; Jamie Raskin; Eliana Murillo; B. Demings; Trey Gowdy; Eric Swalwell; Steve Cohen; Chair; John Rutherford; Karen Handel; David Cicilline; Sundar Pichai; Sundar Pichai; Doug Collins; Vladimir Putin; Juniper Downs; Donald John Trump; Donald Trump; Kevin J. McCarthy; Kevin McCarthy; Sheila Jackson Lee; Steve King; Ted Lieu; Darrell Issa; Mike Johnson; Danielle Brown; Jim Sensenbrenner; Andy Biggs; Matt Gaetz; Ted Deutch; Hillary Clinton; Steve Chabot; Lamar Smith; Louie Gohmert; John Ratcliffe; Myles Lorentz; Zoe Lofgren; Alex Jones; Jerrold Nadler; Keith Rothfus; Tim Cook; Robert Goodlatte; Hakeem Jeffries; Karen Bass; Dara Khosrowshahi; Dara Khosrowshahi; Hank Johnson; Huma Abedin; Brad Schneider; Ken Buck; Cedric Richmond; Martha Roby; Ted Poe; Raul Labrador; Mike Bishop; Tim Berners; Luis Gutierrez; Pramila Jayapal; Barack Obama; Jim Jordan; Steve Scalise; Tom Marino; Jamie Raskin; B. Demings; Trey Gowdy; Eric Swalwell; Well; Steve Cohen; Chair; John Rutherford; Karen Handel; David Cicilline; Sundar Pichai; Sundar Pichai; Doug Collins; Juniper Downs; Jerry Nadler; Donald Trump; Kevin J. McCarthy; Kevin McCarthy; Sheila Jackson Lee; Mark Zuckerberg; Steve King; Ted Lieu; Darrell Issa; Mike Johnson; Jim Sensenbrenner; Andy Biggs; Matt Gaetz; Ted Deutch; Hillary Clinton; Steve Chabot; Lamar Smith; Louie Gohmert; Eric Swalwell; Roosevelt; John Ratcliffe; Steve Cohen; Zoe Lofgren; John R. Rutherford; John Rutherford;

Trump; Jerrold Nadler; Karen Handel; David Cicilline; Keith Rothfus; Sundar Pichai; Sundar Pichai; Robert Goodlatte; Hakeem Jeffries; Doug Collins; Steven Spielberg; Karen Bass; Hank Johnson; Brin; Brad Schneider; Ken Buck; Cedric Richmond; Kevin J. McCarthy; Kevin McCarthy; Sheila Jackson Lee; Martha Roby; Ted Poe; Raul Labrador; Mark Levin; Steve King; Maajid Nawaz; Mike Bishop; Ted Lieu; Luis Gutierrez; Pramila Jayapal; Darrell Issa; Mike Johnson; Jim Jordan; Jim Sensenbrenner; Andy Biggs; Matt Gaetz; Tom Marino; Ted Deutch; Jamie Raskin; Hillary Clinton; Steve Chabot; B. Demings; Trey Gowdy)

Keywords: Newsmakers; HearingsKeywords:

Word Count: 35686

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.



# EXHIBIT 2

# AP Exclusive: Google tracks your movements, like it or not

**AP** **apnews.com**/828aefab64d4411bac257a07c1af0ecb

By RYAN NAKASHIMA                                                                                    August 13, 2018

Click to copyhttps://apnews.com/828aefab64d4411bac257a07c1af0ecb

Click to copyhttps://apnews.com/828aefab64d4411bac257a07c1af0ecb

1 of 7

SAN FRANCISCO (AP) — Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to.

An Associated Press investigation found that many Google services on Android devices and iPhones store your location data even if you've used a privacy setting that says it will prevent Google from doing so.

Computer-science researchers at Princeton confirmed these findings at the AP's request.

For the most part, Google is upfront about asking permission to use your location information. An app like Google Maps will remind you to allow access to location if you use it for navigating. If you agree to let it record your location over time, Google Maps will display that history for you in a "timeline" that maps out your daily movements.

Storing your minute-by-minute travels carries privacy risks and has been used by police to determine the location of suspects — such as a warrant that police in Raleigh, North Carolina, last year to find devices near a murder scene. So the company lets you "pause" a setting called Location History.

Google says that will prevent the company from remembering where you've been. Google's support page on the subject states: "You can turn off Location History at any time. With Location History off, the places you go are no longer stored."

That isn't true. Even with Location History paused, some Google apps automatically store time-stamped location data without asking. (It's possible, although laborious, to delete it .)

For example, Google stores a snapshot of where you are when you merely open its Maps app. Automatic daily weather updates on Android phones pinpoint roughly where you are. And some searches that have nothing to do with location, like "chocolate chip cookies," or "kids science kits," pinpoint your precise latitude and longitude — accurate to the square foot — and save it to your Google account.

The privacy issue affects some two billion users of devices that run Google's Android operating software and hundreds of millions of worldwide iPhone users who rely on Google for maps or search.

Storing location data in violation of a user's preferences is wrong, said Jonathan Mayer, a Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau. A researcher from Mayer's lab confirmed the AP's findings on multiple Android devices; the AP conducted its own tests on several iPhones that found the same behavior.

"If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off," Mayer said. "That seems like a pretty straightforward position to have."

Google says it is being perfectly clear.

"There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."

Google's explanation did not convince several lawmakers.

Sen. Mark Warner of Virginia told the AP it is "frustratingly common" for technology companies "to have corporate practices that diverge wildly from the totally reasonable expectations of their users," and urged policies that would give users more control of their data. Rep. Frank Pallone of New Jersey called for "comprehensive consumer privacy and data security legislation" in the wake of the AP report.

To stop Google from saving these location markers, the company says, users can turn off another setting, one that does not specifically reference location information. Called "Web and App Activity" and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.

When paused, it will prevent activity on any device from being saved to your account. But leaving "Web & App Activity" on and turning "Location History" off only prevents Google from adding your movements to the "timeline," its visualization of your daily travels. It does not stop Google's collection of other location markers.

You can delete these location markers by hand, but it's a painstaking process since you have to select them individually, unless you want to delete all of your stored activity.

You can see the stored location markers on a page in your Google account at myactivity.google.com, although they're typically scattered under several different headers, many of which are unrelated to location.

To demonstrate how powerful these other markers can be, the AP created a visual map of the movements of Princeton postdoctoral researcher Gunes Acar, who carried an Android phone with Location history off, and shared a record of his Google account.

The map includes Acar's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, The AP didn't plot the most telling and frequent marker — his home address.

Huge tech companies are under increasing scrutiny over their data practices, following a series of privacy scandals at Facebook and new data-privacy rules recently adopted by the European Union. Last year, the business news site Quartz found that Google was tracking Android users by collecting the addresses of nearby cellphone towers even if all location services were off. Google changed the practice and insisted it never recorded the data anyway.

Critics say Google's insistence on tracking its users' locations stems from its drive to boost advertising revenue.

"They build advertising information out of data," said Peter Lenz, the senior geospatial analyst at Dstillery, a rival advertising technology company. "More data for them presumably means more profit."

The AP learned of the issue from K. Shankari, a graduate researcher at UC Berkeley who studies the commuting patterns of volunteers in order to help urban planners. She noticed that her Android phone prompted her to rate a shopping trip to Kohl's, even though she had turned Location History off.

"So how did Google Maps know where I was?" she asked in a  blog post .

The AP wasn't able to recreate Shankari's experience exactly. But its attempts to do so revealed Google's tracking. The findings disturbed her.

"I am not opposed to background location tracking in principle," she said. "It just really bothers me that it is not explicitly stated."

Google offers a more accurate description of how Location History actually works in a place you'd only see if you turn it off — a popup that appears when you "pause" Location History on your . There the company notes that "some location data may be saved as part of your activity on other Google services, like Search and Maps."

Google offers additional information in a popup that appears if you re-activate the "Web & App Activity" setting — an uncommon action for many users, since this setting is on by default. That popup states that, when active, the setting "saves the things you do on Google sites, apps, and services ... and associated information, like location."

Warnings when you're about to turn Location History off via Android and iPhone device settings are more difficult to interpret. On Android, the popup explains that "places you go with your devices will stop being added to your Location History map." On the iPhone, it simply reads, "None of your Google apps will be able to store location data in Location History."

The iPhone text is technically true if potentially misleading. With Location History off, Google Maps and other apps store your whereabouts in a section of your account called "My Activity," not "Location History."

Since 2014, Google has let advertisers track the effectiveness of online ads at driving foot traffic , a feature that Google has said relies on user location histories.

The company is pushing further into such location-aware tracking to drive ad revenue, which rose 20 percent last year to $95.4 billion. At a Google Marketing Live summit in July, Google executives unveiled a new tool called "local campaigns" that dynamically uses ads to boost in-person store visits. It says it can measure how well a campaign drove foot traffic with data pulled from Google users' location histories.

Google also says location records stored in My Activity are used to target ads. Ad buyers can target ads to specific locations — say, a mile radius around a particular landmark — and typically have to pay more to reach this narrower audience.

While disabling "Web & App Activity" will stop Google from storing location markers, it also prevents Google from storing information generated by searches and other activity. That can limit the effectiveness of the Google Assistant, the company's digital concierge.

Sean O'Brien, a Yale Privacy Lab researcher with whom the AP shared its findings, said it is "disingenuous" for Google to continuously record these locations even when users disable Location History. "To me, it's something people should know," he said.

___

AP Interactive: https://interactives.ap.org/google-location-tracking/

___

Associated Press writers Alan Fram and Mary Clare Jalonick in Washington and Jonathan Drew in Raleigh, North Carolina, contributed to this report.

All contents © copyright 2019 The Associated Press. All rights reserved.



# 'Location history' off?
# Google's still tracking you

An AP investigation found that Google saves your location history even if you've paused "Location History" on mobile devices. This map shows where Princeton privacy researcher Gunes Acar travelled over several days, from data saved to his Google account despite "Location History" being off.







# EXHIBIT 3

Mar 14 2019 11:08:07

TRANSCRIPT

March 12, 2019

COMMITTEE HEARING

SEN. LINDSEY GRAHAM, R-S.C.

WASHINGTON, DC

SENATE JUDICIARY COMMITTEE HEARING ON GDPR & CALIFORNIA CONSUMER

PRIVACY ACT: OPT-INS, CONSUMER CONTROL, AND THE IMPACT ON

COMPETITION AND INNOVATION

Bloomberg Government

Support: 1-877-498-3587

www.bgov.com

Copyright 2019. Provided under license from Bloomberg Government. All materials herein are protected by United States copyright law

and/or license from Bloomberg Government, and may not be

reproduced, distributed, transmitted, displayed, published or

broadcast without the prior written permission of

Bloomberg Government.

You may not alter or remove any trademark, copyright or other

notice from copies of the content.

SENATE JUDICIARY COMMITTEE HEARING ON GDPR & CALIFORNIA

CONSUMER PRIVACY ACT: OPT-INS, CONSUMER CONTROL, AND THE IMPACT

ON COMPETITION AND INNOVATION

MARCH 12, 2019

SPEAKERS:

SEN. LINDSEY GRAHAM, R-S.C., CHAIRMAN

SEN. CHARLES E. GRASSLEY, R-IOWA

SEN. JOHN CORNYN, R-TEXAS

SEN. MIKE LEE, R-UTAH

SEN. TED CRUZ, R-TEXAS

SEN. THOM TILLIS, R-N.C.

SEN. BEN SASSE, R-NEB.

SEN. MICHAEL D. CRAPO, R-IDAHO

SEN. JOHN KENNEDY, R-LA.

SEN. JOSH HAWLEY, R-MO.

SEN. JONI ERNST, R-IOWA

SEN. MARSHA BLACKBURN, R-TENN.

SEN. DIANNE FEINSTEIN, D-CALIF., RANKING MEMBER

SEN. PATRICK J. LEAHY, D-VT.

SEN. RICHARD J. DURBIN, D-ILL.

SEN. SHELDON WHITEHOUSE, D-R.I.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. CHRIS COONS, D-DEL.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. MAZIE K. HIRONO, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. KAMALA HARRIS, D-CALIF.

WITNESSES:

WILL DEVRIES, SENIOR PRIVACY COUNSEL FOR GOOGLE, INC., MOUNTAIN

VIEW, CALIF.

ALASTAIR MACTAGGART, CHAIRMAN OF CALIFORNIANS FOR CONSUMER

PRIVACY, SACRAMENTO, CALIF.

DAVID HOFFMAN, DIRECTOR OF SECURITY POLICY AND GLOBAL PRIVACY

OFFICER FOR INTEL, SANTA CLARA, CALIF.

GABRIEL WEINBERG, CEO AND FOUNDER OF DUCKDUCKGO, PAOLI, PA.

TOM LEE, POLICY LEAD FOR MAPBOX, WASHINGTON, D.C.

ROSLYN LAYTON, VISITING SCHOLAR AT THE AMERICAN ENTERPRISE

INSTITUTE, WASHINGTON, D.C.

MICHELLE RICHARDSON, DIRECTOR OF THE PRIVACY AND DATA PROJECT

AT THE CENTER FOR DEMOCRACY AND TECHNOLOGY, WASHINGTON, D.C.

AND JANE BAMBAUER, PROFESSOR OF LAW IN THE UNIVERSITY OF

ARIZONA JAMES E. ROGERS COLLEGE OF LAW, TUCSON, ARIZ., TESTIFY

GRAHAM: The hearing will come to order.

So, about a year ago we had a joint committee hearing with the Commerce Committee with Facebook CEO Mark Zuckerberg to try to find out what role Congress should play, if any, dealing with privacy issues around social media companies and outlets.

And as you fast forward, Europe has acted and we're here to learn what Europe did and see if it's working, helping or hurting. I think the acronym is CDPR (sic). California is about to pass a law that goes into effect in January, we're trying to learn from our friends in California about their approach to this problem.

To the Commerce Committee, I realize this is your primary jurisdiction, but I'd like to work with the Commerce Committee, we had a joint hearing for a reason because there are some crossover jurisdictions. But the content part seems to be mostly us. How you protect the platforms seems to be mostly us. Most of the privacy issues I think are in Commerce, some in Judiciary.

But the big picture for me is I want to make sure consumers understand what's happening when they sign up, that they're basically monetizing you. That's how they make money. If they don't charge a fee, all your interactions on social media is used by the media companies to sell advertising.

And we just want to make sure that people understand what they're signing up for and how far this goes, and what's too far. And I don't have any of the answers by any means, but I certainly believe the problem is real.

On the content side, many of you are having to make decisions about what to put up, what to take down. What's hate speech, what's not? What's too provocative with absolutely no guidance from your government?

2

And you're neutral platforms, nobody's holding you responsible for what you put up. Nobody's holding you responsible for what you fail to take down. But that's a big advantage in the law. If you have a newspaper, a TV show, a TV station, you can be regulated and you can be sued.

I don't want to destroy the goose that laid the golden egg in terms of innovation. I think all these social media outlets have enriched our lives, but there's a downside and potentially a dark side when they can be manipulated by foreign powers, terrorist organizations in a fashion to cause harm here at home.

We have a very talented committee of Republicans and Democrats, and this is one area I think there's a lot of bipartisan desire to learn more and to do something constructive.

So with that, I will turn it over to Senator Feinstein for any statement she would like to make.

FEINSTEIN: Thank you so much, Mr. Chairman.

I want to be clear, I think protecting individual privacy is critical, and we must do all we can to give people control over their data. The two laws that we're reviewing today are the European Union's General Data Protection Regulation and California's Consumer Privacy Act. Our goal in this hearing should be to understand what impact these laws are having and how well they're protecting our consumers.

It's useful to remember, I think, what has brought us to this point. In the past few years, hundreds of millions of consumers have had their sensitive, personal data stolen as a result of data breaches. The Equifax breach in 2018 compromised data for 146 million individuals. The Yahoo breach in 2014 and the Marriott Starwood breach in 2018 each affected half a billion people worldwide.

Consumers are now just becoming aware how insecure our personal information is with the expansion of smart phones, online services, and even appliances in our homes and offices that we regularly use.

For example, programs on smartphones can use geographic information to figure out where we are at any given moment and then sell it to nearby retailers and restaurants vying for businesses that want to promote coupons and discounts to entice individuals to buy from them. This can be a good thing if it's done with the approval of the consumer.

Last year, the New York Times revealed that there is now a thermometer to collect fever and symptom information from families and then sell that user data, and it was sold to Clorox. Clorox identified which zip codes were showing increases in fevers and directed more ads for products like disinfecting wipes to those areas.

While this kind of targeting may have had a benefit for consumers, it also has very serious implications for personal privacy, especially when the data involves medical information. The reason this was in the news at all is that it crosses a murky line on how we reasonably expect online services to use very sensitive information that we entrust to them.

I represent the State of California, birthplace to some of the most innovative companies in the world at the heart of the internet revolution. California though is also home to some of the most heavily criticized companies for their collection of personal data, and as a result California is home to the strongest state privacy law in the nation. In fact, one of our panelists -- where are you, Alastair MacTaggart -- seated before us today assisted with the drafting of this law.

Europe's law went into effect last year impacting virtually every company of any size operating in Europe. Companies are also gearing up to comply with California's law which will go into effect next year, and that must happen. There has been some push back against these laws with companies saying the requirements are too cumbersome to comply with, and the penalties too stiff for even unintentional violations.

In addition, some complain that the opt-in consent requirements in the European law result in confusion to consumers. Others have complained that California's law is too narrow, and does not go far enough to limit abuses by companies that collect data from the consumer directly.

Let me say again, it's my belief that individuals should have as much control as possible over their personal data. I commend the California law for protecting most California residents. But I also believe affirmative opt-in consent should be the standard, and that's a position I have taken for years. Not opt-out.

Companies should also be required to protect their company's -- their customer's personal data with a heightened degree of care, and should be held responsible should that data directly or through cyber breach end up in the wrong hands.

I will not support any federal privacy bill that weakened the California standard. I also believe that any federal legislation should include data breach notification requirements. I have had legislation on this issue, Mr. Chairman, going back to 2003.

GRAHAM: Wow.

FEINSTEIN: And get it through, and that's notifying people...

GRAHAM: Terrible.

FEINSTEIN: ... when their data is breached.

3

You're right, it is terrible.

Consumer data privacy is a fundamental issues facing all of us. I welcome the discussion from our panelists to hear about their views on the pros and cons of these laws.

And Mr. Chairman, I want thank you for this hearing and have the Judiciary Committee begin to hear more about this important topic. You know, as all of the high-tech spreads, the protection for people's rights increases, and medical data protection I think heads the list. So thank you very much.

GRAHAM: Thank you, Senator Feinstein.

Would you please rise and raise your right hand? Do you solemnly swear that the testimony you're about to give this committee is the truth, the whole truth and nothing but the truth so help you God. All right.

We have Mr. Will DeVries, is that right? How do you say it?

DEVRIES: DeVries, Senator.

GRAHAM: DeVries, OK. He's the senior privacy counsel for

Google. Alastair MacTaggart, chairman of Californians for Consumer Privacy. David Hoffman, director of security policy and global privacy officer, Intel. Gabriel Weinberg, is that right? CEO and founder of DuckDuck Company. Tom Lee, policy lead, Mapbox, Inc., Washington, D.C. You've all lived distinguished lives and I could have (ph) gone on longer, but that's enough. All right.

DEVRIES: Chairman Graham, Ranking Member Feinstein, members of

the committee, thank you for inviting me to your -- to appear before you this morning. My name is Will DeVries. I'm a senior privacy counsel at Google. I've worked at the intersection of privacy, technology and the law for 15 years including teaching privacy law at the George Washington University of Law School. At Google I advise on global data protection compliance and product development.

Google's approach to privacy and data protection stems directly from our founding mission, to organize the world's information and make it universally accessible and useful. A key part of fulfilling that mission is building products for everyone regardless of their economic circumstances. And to this end, many of our products are free with -- with advertising as our main source of revenue.

These products and services provide tremendous value to users and businesses across the globe, but if our users don't trust us, they won't use our products. Protecting the privacy and security of our users isn't just a compliance strategy or a slogan. It is vital to our business.

Google aims to continually improve our approach to privacy and enhance the transparency and control and security that we build into our products. We have many years of practical experience building systems that apply our privacy principles in the U.S. and around the world, and there is more momentum for and consensus around creating a federal privacy law than at any time I've seen in my career in privacy.

Google welcomes this and reaffirms our longstanding support for a smart, strong, comprehensive privacy legislation.

Legislation would codify important individual rights and help promote and sustain U.S. global leadership around the free and open internet including promoting cross-border data flow and compatible pro-privacy and pro-innovation rules in other countries.

We believe there are a number of key components that Congress should consider as it drafts comprehensive privacy legislation. At its core, legislation should be risk and outcomes based, consistent, adaptable, and work for all types and sizes of entities. It should apply to all businesses and organizations that process personal information, and all data that can be used to identify an individual.

I want to briefly cover five key aspects of comprehensive privacy legislation. These aren't the only things that would go in a comprehensive bill, but in the interest of time I'll focus on these.

The law should require responsibility and reasonable data collection in use. We think that businesses and organizations should protect against potential risks and balance the legitimate interests of their -- of the organization processing the data against the impact of the processing on the rights and interests of the individual.

The law should require transparency. As a baseline companies and organizations should provide notice about the types of personal information they collect, why they collect it, how they use it and disclose it, and particularly when it's used to make decisions about an individual. And there should be incentives to go beyond the privacy policy and actively inform users about data use in the context of the services themselves.

The law should require choice and control. People have different preferences about how they want their information to be used, and preferences can vary over time. Federal privacy law should require

4

businesses and organizations to provide appropriate mechanisms for individual control including the opportunity to object to data processing where feasible in the context of the service.

The law should require portability. In addition to rights like access, correction and deletion, privacy laws should also ensure that individuals where practical can download and export their personal information. This not only empowers individuals, it also keeps the market innovative, competitive and open to new entrants.

Lastly, the law should require accountability. A privacy regulatory framework should have strong enforcement and prioritize outcomes over process. The law should encourage diverse and innovative approaches to compliance and to privacy protections.

To give detail to our call for comprehensive privacy law, we recently published a framework for data protection regulation, and provided additional detail and comments with -- to the Department of Commerce, both of which I've included in my written submissions.

We also encourage a review of the numerous established privacy principles and frameworks which have much to offer such as the Fair Information Practice principles, the OECD privacy principles, the APEC privacy framework and the European GDPR to understand what's working, what can be improved and how to support international interoperability for U.S. companies that operate abroad.

In conclusion we believe the continued success of services that collect or use personal information depends on individual's trust, that their information will be protected. We look forward to constructively engaging with Congress and other stakeholders as you consider privacy legislation that will continue to build and maintain that trust.

Thank you again for the opportunity to share our perspective and experience, and I welcome your questions.

MACTAGGART: Chairman Graham, Ranking Member Feinstein, and

distinguished members of the committee, thank you for inviting me to come testify before you today. It is an honor and a privilege.

I come to you as the person who created and sponsored a ballot measure in California last year which resulted in the passage of the California Consumer Privacy Act, or CCPA. I also come to you as the father of three little children concerned about the world they're growing up in where potentially every step and test they take will be tracked and sold to hundreds of companies they've never heard of.

And finally, I come to you as a business person. I believe that our freedom depends on our prosperity, and I would never have undertaken this journey if I didn't believe it would increase business competition which I think is good for consumers and commerce.

So CCPA has three main components, three legs of the stool as it were, and they are, one, we get to find out what information corporations have collected about us. Two, we can tell those companies to stop selling our information. And three, companies have to keep our data safe.

Now CCPA builds on some of the best work done by some of the best minds at the intersection of computer science and privacy. For example, we borrowed heavily from something called Do Not Track which is an almost decade-long effort that began in 2009, and Do -- Do not Track was meant to give consumers a way to stop their browsing history -- their browsing being tracked. And while it worked technically, ultimately, it failed because it was voluntary.

So CCPA creates a similar provision to Do Not Track and gives consumers the ability to require businesses not to sell their personal information, and it does so in user friendly fashion, that doesn't take much work from consumers. So I think this spells the end of large data-mining companies tracking you pervasively across the web.

So this means that CCPA will help increase competition. How? Well, currently over 90 percent of new growth in digital ad revenue is being captured by two companies.

Smaller businesses that create content are being devastated. Why? Well, the huge platforms learn about us by tracking us on basically every site we ever visit, whether we're logged into them or not, whether we even have an account with them or not. And then they wait to show us ads on their own sites diverting ad revenues to where they make the most money.

So let me repeat that. They let independent sites do much of the work of creating content, and then while tracking us, they learn what we're interested in and then they use that knowledge to advertise to us on their own sites.

Now, that makes a ton of sense from their point of view, but you only have to look at the state of the nation's news businesses to see where this trend is going and to know that the ability to stop this third-party tracking, this pervasive tracking is going to benefit competition.

Now speaking of advertising, it's important to state that CCPA permits advertising. We didn't want to stop the engine that powers the internet. But we put limits on ads. So no longer will every ad you see, whether you click on it or not mean your personal information has just been sold or disclosed to thousands of companies you've never heard of.

5

Now how about GDPR? Well, unlike GDPR, CCPA only covers big businesses and data brokers. Unlike GDPR's opt-in approach, CCPA is opt-out which we feel both makes for a better user experience and we think it improves privacy. There's no click fatigue from the incessant popups, and more importantly, there's no take-it-or-leave-it approach requiring consumers to consent in order to use the service.

In summary, CCPA is balanced legislation and gives consumers a meaningful control over what happens to their personal information. That's why the data miners are asking this committee for preemption because they're concerned about a threat to their business dominance.

In closing, let me remind you that every day huge corporations are tracking us across our digital footprint. Their algorithms classing us -- classing us as whether we're considering divorce, about to get pregnant, or a persuadable and gullible voter. Every mouse click and search goes into a digital file that dwarfs what any intelligence agency has ever known about its citizens in history.

Now I understand this committee is considering national legislation, but I urge you not to undo CCPA's protections which now cover one in every eight Americans. Almost 630,000 registered voters signed the petition which never polled below 80 percent. And the law passed out of both houses of the California legislature unanimously.

That's right, not a single Republican or Democrat voted against it and why is that? It's because privacy is not partisan.

So thank you for your time, I feel sure that as dedicated public servants you share my desire to give Americans the ability to take meaningful control over their and their children's personal private information.

HOFFMAN: Good morning Chairman Graham, Ranking Member Feinstein


and members of the committee, thank you for the opportunity to testify today. I'm pleased to address the committee on the need to put in place a national privacy law that protects people more and better than GDPR and CCPA.

Intel's bringing artificial intelligent technology to market to provide individual and societal benefits. The U.S. needs a law allowing for access to data to enable innovative companies large and small to develop artificial intelligence products and services.

GDPR and CCPA have substantial negative impacts to innovation and competition, and a new model is needed. In short, we need a uniquely American law that is stronger and better than GDPR and CCPA.

A recent television news report interviewed a woman named Donna, a survivor of domestic violence whose identity they protected for her safety. Donna had recently discovered her name and address on a data broker's site. Donna told the news team if you have someone who's tried to kill you, for them to be able to just type in your name and any known address that you've stayed at can pop it, it's scary because now they know ways to start trying to find you.

Victims of domestic violence are not the only ones at risk. Data broker lists include police officer home addresses, contact information for rape survivors, information on seniors who suffer from dementia, and specific categories allowing for racial and ethnic discrimination.

None of these people chose to place their names and contact information on these lists. They likely don't even know that those lists exist. The current environment makes clear that the notice and choose method of privacy protection only provides choices for those that want to profit off the pain of Americans. Data brokers are selling the safety of the American people online for $9.99 and lower.

The American people insist that this must change. Following the European Union's General Data Protection Regulation, Californians started the ballot initiative that turned into the California Consumer Privacy Act of 2018. Now there are 94 other state privacy laws at some point in the process of discussion and introduction.

Unfortunately, GDPR and these state laws are both unlikely to adequately protection Donna while they also risk the promise for social improvement and economic progress from new technologies like artificial intelligence.

These laws wrongly assume that individuals can exercise consent over how their data will be used. The data broker lists I mentioned largely draw from public records or information scraped from websites and social media applications. Laws focusing on collection of data directly from individuals are already outdated and will become even more so as improved analytics are used on data available from data brokers or on the internet.

These notice and choice laws create barriers to innovation and competition. The patchwork of state legislation will create significant new barriers to the innovative use of data. Only large law firms benefit from this patchwork because businesses of all sizes will need lawyers to determine how to offer products and services nationwide. These legal costs will slow small, innovative data-oriented startups.

A new model of privacy protection that does not rely primarily on consent is needed. For 50 years Intel's relied upon two things for our success. First, innovative companies that develop new products and services using our technology. And second, individuals having trust and confidence in their use of their products and services.

The current data broker environment and the resulting legislative patchwork puts both of those elements at risk. Data brokers are poisoning the well of trust out of which real technology companies like Intel and our customers must drink. For that reason, Intel created a model for privacy legislation and we ask that Congress use it to do three things.

First, provide meaningful protections instead of the false promise of control. Second, prohibit unaccountable data sharing with third-party companies. And finally, empower and fully resource the Federal Trade Commission.

In conclusion, a law based on Intel's model will provide the protections people erroneously believe are provided by GDPR and CCPA without the negative impacts to competition and innovation. Intel's proposal provides strong protections and robust enforcement while still allowing for the innovative use of data to allow artificial intelligence and other technologies to fulfill their promise.

I encourage you to use our framework to put in place a law that will optimize for the ethical and innovative use of data and will protect Donna. We stand ready to support the committee's effort to advance legislation. Thank you.

WEINBERG: Chairman Graham, Ranking Member Feinstein, and

members of the committee, thank you for inviting me here today. I'm here to explain that privacy legislation like GDPR and CCPA is not only pro-consumer but can be pro-business and even pro-advertising.

DuckDuckGo's primary service is a search engine alternative to Google that allows you to search the web without being tracked. We're the fourth largest in the U.S. and we do about a billion searches a month. We also offer an alternative to Google Chrome which is a mobile privacy browser.

Now I founded DuckDuckGo in 2008 pretty far outside Silicon Valley in Valley Forge, Pennsylvania. And we now have, I'm proud to say, a distributed workforce across ten states and ten other countries and D.C.

We're here today because the American people are pretty much tired of being tracked online everywhere they go. They're tired of the invasive ads, data breaches, discrimination and manipulation. I'm sure everyone here has had the same shared experience of searching for something and then have that thing haunt you around the internet, especially on apps that you visit.

Well, DuckDuckGo is here to help -- help you avoid those types of scenarios. In particular, every time you search on DuckDuckGo, it's like the first time you've ever been there. We don't even have a concept of a search history. We also offer privacy protection beyond the search box, so when you go and visit web pages, there's all these hidden trackers kind of lurking behind the scenes based on these invasive tracking networks. We block those hidden trackers.

Now in many ways I come to you from the future. I run a business that's already CCPA and GDPR compliant. Our privacy policy is extremely straight forward, and doesn't require any kind of law degree to decipher.

In fact, it's this simple. We do not collect personal information at all. Yet, even with this simple privacy policy, we nonetheless are able to make money through advertising which brings me to my first point, that privacy legislation is not anti-advertising. In fact, I'm proud to say we've been profitable since 2014, and although our finances are private, we are subject to the CCPA's floor or revenue restriction of $25 million.

So take DuckDuckGo as an example for adverting. When you search on DuckDuckGo, we can show you ads just based on what you searched on. So if you searched for a car, we can show you a car ad knowing nothing about you as a person. This is contextual advertising based on the search and not based on you as an individual.

And we're not alone. For example, the New York Times following GDPR changed their site in Europe to stop behavioral advertising and move back to contextual advertising based on what is in the article, and they reported an increase in revenue, not a decrease. And just last week, Business Insider reported that Washington Post was looking into something similar.

My second point is that privacy is actually good for business. Consumers are flocking to brands that they trust and respect. According to Harris Poll, data privacy is actually the most pressing issue on Americans' minds now for the second year in a row believe it or not. And we stand testament to that as a case in point because we've been growing exponentially during this time period.

My third point is that well-drafted legislation can actually spur competition and innovation in what is arguably the central market in the internet which is the digital ad market. Right now this ad market is a duopoly and it's hurting all kinds of businesses. It's hurting small businesses, venture-backed companies as well as the largest media companies.

To restore competition in this market, these data monopolies at the core need to be addressed. Now fixing that could take a bunch of forms, but here are three suggestions.

First, consumers should be given a real robust mechanism to opt-out of data tracking, especially by these companies at the center of these monopolies. Second, monopoly platforms should be prohibited from combining data across their different business units. And third, acquisitions that strengthen the data monopolies should be prohibited.

7

Our mission at DuckDuckGo is to raise the standard of trust online, that's exactly why we support strong privacy legislation. We believe the internet shouldn't feel so creepy, and getting the privacy you deserve online should be as simple as closing the blinds. I'm happy to answer any questions, and thank you again for inviting me to the hearing.

LEE: Chairman Graham, Ranking Member Feinstein, members of the

committee, thank you for the opportunity to appear before you today. My name's Tom Lee. I'm an engineer by training and I now lead policy at Mapbox. Today I'd like to talk to you about how our company approaches privacy, and how privacy reforms should approach smaller companies like ours.

We make maps, and our customers are developers. We power weather forecasts, messaging tools and major news sites. You've probably used our maps. In total we serve over 520 million monthly active users.

Our users benefit from our maps and we benefit from their use. By collecting GPS data we make those maps more accurate, we detect traffic jams, and we give better directions. We built these features, though, knowing that we had a responsibility to put user privacy first.

We work to minimize the information we collect, we anonymize what we do collect. We require our customers to let their users opt-out of collection. We encrypt the data in transit and at rest. We apply strong access and control policies, and we only use the data to make our products better. We're in the business of selling maps, not information about the individuals who use them.

Our success proves that you can build a valuable business and protect user privacy at the same time, and we're glad to see growing attention to this issue from lawmakers in this body, in state legislatures and around the world. We think it's time for some rules of the road, common sense ethical standards for anyone that asks users to trust them with their personal data.

But new regulations inevitably carry costs and risk, especially for smaller businesses like ours which aren't among the names we're all used to seeing in headlines about privacy. I'd like to highlight some issues that deserve attention as you consider how to craft reform without harming competitiveness or innovation.

First, the burden imposed by a proliferation of varying privacy standards is real. Our small but mighty legal team has to handle customer contracts, patents, employee policies, vendor agreements, scores of other issues.

Proceeding through the GDPR compliance process cost us hundreds of hours of efforts initially, and continues to introduce (ph)

initial time and complexity as we negotiate deals with customers. Startups can't afford to multiply that cost by dozens of additional jurisdictions, especially if some of those future regulatory regimes prove to be in conflict with one another.

We believe that our nation's privacy laws should be strong, and that they should be unified. We favor a single, national standard. Avoiding a patchwork of state rules will not only help smaller businesses like ours, but will give Americans assurances that don't change when they cross the state border.

Second, a jumble of state privacy laws risks creating loopholes, oversights and errors. It's easy to see why when you consider how much of our conversation on privacy is focused solely on the tech giants whose apps are used directly by billions of end users.

The California Consumer Privacy Act is a good example of a law that is very well designed, thanks to the experts brought to bear on the initial ballot measure. But still fails to completely imagine businesses like Mapbox.

For example, some of our customers run vehicle delivery fleets and they use our technology to monitor how -- monitor how efficiently those deliveries are being made. Under the CCPA, the drivers in those fleets could request data about their employers' operations, even if they've since left to work for a competitor.

Exposing trade secrets isn't what the CCPA was designed to do, and we're hopeful this problem can be fixed in rulemaking. But we worry that similar oversights will be inevitable if state laws proliferate in the absence of a clear, federal standard.

Third, poorly designed reform could entrench big business and harm smaller companies. Unlike some of our competitors, we don't own a major mobile operating system. We collect anonymized data when people use maps in our customers' applications.

The platform owners can collect data at a much lower level than this, and reform that fails to adequately protect secure and ethical data collection like ours risks creating uncertainty among our customers and a chilling effect. If that were to happen the accuracy of our maps and driving directions would suffer which would make it much harder for us to compete with those platform owners.

Finally, some well-meaning reforms could actually put users at greater risk by forcing collection of more user data. Data export and deletion requirements in particular often fail to envision businesses

like ours. We rarely have a direct relationship with end users. We don't know their names, e-mails, phone numbers or other personal details. All we collect is anonymized data and metadata like IP addresses which are inevitably part of any internet request.

But privacy reforms efforts including the CCPA and GDPR name those IP addresses as personal information, and include data export and deletion provisions that are associated with personal information.

This combination opens the possibility for requests filed by identity thieves, vandals and abusers. To reliability detect illegitimate requests, we might need to collect much more personal information about users than we do today, putting us and them at greater risk. It would be ironic if privacy reform led to more collection of personal data rather than less.

I know some of these concerns are technical and specific. I mention these details only to make a larger point. We agree that Americans deserve stronger privacy guarantees, but the details are critically important, and it'll be easy to get them wrong.

This work needs to be pursued in a unified and careful manner in a way that minimizes the opportunities for mistakes. Businesses subject to new rules will deserve detailed guidance about how to comply, and the people depending on these rules will deserve a system with the flexibility to respond to new problems in the future. We think the work of privacy reform can bring a real benefits to Americans and we're eager to do whatever we can to support it.

I thank you for the opportunity to appear before you today, and look forward to any questions you might have.

GRAHAM: Thank you, all, very much. That was very, very helpful

actually.

Mr. Weinberg, if I were using your service and ask a question who won the most major golf tournaments on the PGA and you gave me an answer, how would you make money?

WEINBERG: So, Senator, we might show an ad that was related to

golf because...

GRAHAM: Because that's what I asked about?

WEINBERG: Yeah, exactly.

GRAHAM: How much would that effect Google if you were limited

to doing it that way? How much money would you lose?

DEVRIES: Senator, most of the revenue we make on advertising

comes from search ads as you talked about, and most of that is based just on the current search query. It's -- it's not too dissimilar from what Mr. Weinberg describes.

GRAHAM: So do you agree with that, California guy?

MACTAGGART: I think contextual advertising is the business that

built Google and Facebook. I -- I -- I think it's -- I agree with Mr. Weinberg, and it -- it's -- there's nothing objectionable at all. People expect it.

GRAHAM: OK. So if I'm asking about cars, you'll show me a car

ad. If I'm asking about golf, maybe this person wants to know something about golf. This taking everything who am I, what kind of movies I like, you know, my politics, whatever, who does that, and how do they make money off of it, Mr. MacTaggart?

MACTAGGART: Well, so it's called behavioral advertising, and

they're trying to figure out everything about you so they can anticipate...

GRAHAM: Who are the companies that do that?

MACTAGGART: Oh, Google, Facebook, all the -- all the large

platforms.

GRAHAM: Well, he -- he said he didn't do that.

9

MACTAGGART: I-- I think he saying the -- what he said was the

majority of the money that they make now is...

GRAHAM: What percentage of your money is behavioral

advertising?

DEVRIES: I -- Senator, I don't have that number off hand, but I

can tell you that the -- the -- the value of behavioral advertising for those users who -- who have that setting on and who ask for that, that's a smaller percentage of our advertising revenue. I -- I don't know exactly the number.

GRAHAM: But you don't know how much it would be if it were just

-- took that off the table?

DEVRIES: No, I -- what I can tell you is that for -- for

operations like Google, most of our -- of our advertising is -- is based on the contextual information, the page you're visiting.

GRAHAM: Can you get back to me and let me know how much of it

comes from behavioral?

DEVRIES: I can follow up with you, yes. Absolutely.

GRAHAM: OK.

Mr. MacTaggart, so tell me what -- finish your thought.

MACTAGGART: Well, so CCPA explicitly would permit contextual

advertising because I -- again, people are -- are -- are not not expecting it, and I -- and we didn't want kill the engine that powers the internet. So there's nothing objectionable about that. What people find creepy is when it starts to anticipate, you know, who you are. So you're the single mother...

GRAHAM: Does it prohibit behavioral advertising?

MACTAGGART: No. What we do is we allow you to stop being --

your information being sold by these companies, and that's a way to stop these big, massive files being...

GRAHAM: When it comes to behavioral advertising, the consumer

gets a voice?

MACTAGGART: Absolutely.

GRAHAM: Mr. Hoffman, does -- does the Intel plan, how does it

work based on my question?

HOFFMAN: The -- the Intel model doesn't prohibit behavioral

advertising unless the use of behavioral advertising would create a substantial risk to the individual beyond what the individual's reasonable expectations. What -- what the Intel...

GRAHAM: Well, what is my reasonable expectation?

HOFFMAN: Well, I think your reasonable expectation is that

you're going to get the kind of advertising that's going to tell you about products and services that you're interested in, but you're not going to get advertising that's going to discriminate on -- on you based on your race, your -- your ethnicity.

GRAHAM: Would you be OK if -- if what Mr. MacTaggart said was

the law of the land, that when it came to behavioral advertising, you have to check with me?

HOFFMAN: I -- I think the biggest problem is that that puts too

big of a burden on the individual. What we need is a model that's risk based and puts the right controls on third-party transfer, the data brokers. I think that's the biggest concern we have.

GRAHAM: Or should we -- should we outlaw behavioral

advertising?

HOFFMAN: No, I think lots of behavioral advertising are things

that actually the individual would like to get.

GRAHAM: Mr. Weinberg, where's your view of all this?

WEINBERG: I think consumers need an easy mechanism to opt-out.

Mr. MacTaggart mentioned Do Not Track, I think that was a great...

GRAHAM: Do you agree with that, Mr. Hoffman?

HOFFMAN: I believe providing an opportunity to opt-out is -- is

critical, it's just the number of situations are going to be where individuals, that's too much of a burden to put on them.

GRAHAM: OK. Go ahead, Mr. Weinberg, because if you can convince

me, you can convince anybody, so I'm your perfect test case.

WEINBERG: Well, Mr. MacTaggart mentioned a decade-long effort

called Do Not Track which would enable consumers to be able to opt-out of behavioral advertising very easily.

GRAHAM: OK.

WEINBERG: By my estimations, 75 million people have it turned

on in their browser, 75 million Americans. And yet it's completely voluntary and does next to nothing.

GRAHAM: So you'd have to improve upon that, Mr. MacTaggart?

MACTAGGART: So what -- what will happen under CCPA is we've

already talked to browser companies. They'll put a setting in their browser. Once -- you set it once, and you set it and forget it. You just say indicate to everybody don't sell my information, then it's the law. It's not voluntary anymore.

GRAHAM: Right.

MACTAGGART: It's a huge impact.

GRAHAM: So my last question, how many of you believe the

federal government should preempt states in this area?

DEVRIES: Without lowering the protections that have been

established for residents in California and others, I think that a -- a federal law that sets out a comprehensive and consistent standard is the -- is the right thing for us to consider.

MACTAGGART: You know, I think the example with HIPAA, which is

the health legislation and GLBA which is the financial administration, that...

GRAHAM: Do you agree with his answer. He's saying using your

law as sort of the floor.

MACTAGGART: If it were a floor, not a ceiling, yes.

GRAHAM: Mr. Hoffman?

HOFFMAN: Yes, stronger and better law.

WEINBERG: No, not at this time. In theory, yes, but would like

to see the actual law.

GRAHAM: OK.

LEE: We think that strong reform is necessary and that

decreasing the overall regulatory burden.

GRAHAM: But making it a floor is OK with you?

LEE: Yes.

GRAHAM: Thank you.

FEINSTEIN: Thanks, Mr. Chairman.

First of all, let me just say something. I think this is the first panel in a quarter of a century that's I've been on that has complied with the time agreement. And so my congratulations...

GRAHAM: Then we're due. Then we're due.

FEINSTEIN: My congratulations to all of you. I'm still on

opt-in versus optee -- out -- opt-out. It's my understanding that all 28 of the European nations use opt-in. Why do you suppose they do opt-in?

DEVRIES: Thank you, Senator. The GDPR, it does require opt-in

for certain data processing, but not for all. And in fact, the GDPR contains an important concept called legitimate interests balancing.

So it says that if you believe as a -- as an entity that processes people's personal information that the legitimate interests that you've got in terms of what you're trying to offer to the user, the value you're trying to derive from that data balances well against the rights and interests of the user, that you can provide them a right to object, what we can an opt-out.

You could provide them that right as opposed to resorting to the express consent which is a very high-bar under the GDPR and they reserve it for that kind of processing activity that would require it.

FEINSTEIN: It -- I'll go down the line, but maybe you could

include -- I mean I'm not the most computer sophisticated person, but I like to know what I'm doing. I would like my privacy to be protected, and it seems to me that if somebody has a proposal, I should be able to say yes or no. And the way these notices go out, they're so small and such fine print that most people can't read them anyway.

So I think that the way one would know that they're protected is that they have to be able to opt-in as opposed to opt-out. And I'm really concerned about that. California's opt-out, Europe -- Europe is opt-in. So you've got an opt-in standard if you're a company that's relevant to in at least 28 countries. Can you respond to that?

MACTAGGART: Yeah, one of the issues with opt-in is once they

get your permission, it's sort of business as usual. The consumer wants to use this service. There's a real -- real risk that the consumer is going to want to use the -- the services it's heard of, but the services it hasn't heard of, it won't give them permission.

So the new startup -- first of all, Europe doesn't have a minimum threshold. We have $25 million. But it's -- there's an innovation impact on the new startup, but the other thing is, so you're going to Uber. Uber kind of does need to know your credit card information. It does need to know where you're going.

FEINSTEIN: Speak a little slower (inaudible).

MACTAGGART: Sorry. So if you're going to a -- site like Uber

where you're renting a, you know, getting a rideshare car, they do need to know where you're going. They do need your credit card information. They do need your name. So you're going to say yes because otherwise the service doesn't work. And the worry with opt-in is that this sort of a take-it-or-leave-it approach, it's -- it's either -- either opt-in or you can't use the service.

FEINSTEIN: But I could see the opt-out notice, you -- you know

you'd have to read it with a magnifying glass.

MACTAGGART: No. What we're -- what our law requires is on every

page that collects information, there's a button that says do not sell my information. You click it, and you just click it once. That's it.

And then in addition, just to make it even easier, we've already talked to the browser companies. As I was saying the browser companies will have a setting. You say I want to always not sell my information. You click that once in your browser, then every site you go to, you don't have to worry about it. It does it for you. That's the beauty of this. That's what the building (ph) of the Do Not Track is.

So you do it once, and then you have really meaningful -- something's happened in your life, you've now told all these companies don't sell my information. Whereas, in Europe, if you say, yes, you can process my information, then it's business as usual. Nothing's changed. That's the -- that's the distinction.

FEINSTEIN: Anyone else have a point of view on this? This is

sort of fundamental to me, so I appreciate it.

HOFFMAN: Absolutely. I -- I -- I think what's absolutely

critical in a model is to provide for situations where individuals can provide meaningful and practicable consent. The situation we have though, is that people don't read privacy policies now, and we're moving into an environment where there's going to be even more data collection putting the burden on the individual to have to consent to every situation where information is going to be collected from them.

And where we don't cover the fact that what is going to happen with technology is that more and more data about us is not going to be collected directly from us. It's going to be scraped from what other people put up on the internet. It's going to be taken from government records. We need protections that are going to cover that also. We can't put all of this burden on the individual.

Yes, we need to have mechanisms in whatever law there is to encourage companies and situations like Mr. MacTaggart was mentioning to ask people for their consent. But we need to cover these other situations also because that's where technology's headed. Intel's model does that by focusing on making it illegal to use data in ways that are going to harm people.

FEINSTEIN: Could they, just the two...

GRAHAM: Yes, ma'am.

FEINSTEIN: ... just quickly make a response?

WEINBERG: Yeah, quickly. As Mr. MacTaggart mentioned, a lot of

this easy opt-out is already built into the browsers. If it was mandated, then people would easily have an ability to opt-out of behavioral advertising, and then they wouldn't have to worry about reading all these policies (inaudible)...

FEINSTEIN: What happens in Europe then?

WEINBERG: In Europe, I would also hope that ultimately, they

respect Do Not Track in the browsers which is a worldwide setting.

FEINSTEIN: But now they do not? Now it's...

WEINBERG: Right -- right now hardly any company in the world

respects Do Not Track in the browser.

LEE: Echoing some of the comments you've heard, opt-in doesn't

escape the problem of mountains of fine print. We've -- we can see the implementation and what it

13

looks like when we look at sites that are compliant with GDPR. It standardizes the language to some extent, but it still put that burden of making a decision and parsing these legal agreements on each individual user.

So we think that while opt-in might be appropriate in some circumstances where there's particularly sensitive data or relationships between the entities, opt-out with rules of the road that make sense and are predictable and reliable is a better user experience and probably...

FEINSTEIN: Thank you.

LEE: ... a better way to go.

FEINSTEIN: Thank you. That's helpful.

Thank you, Mr. Chairman.

GRAHAM: Senator Hawley.

HAWLEY: Thank you, Mr. Chairman.

I'd like to start by noting that yesterday I sent a letter to the FTC Chairman Simons demanding that the FTC focus on enforcing our consumer protection laws, and with consent, Mr. Chairman, I'd like to ask that that letter be entered into the record.

GRAHAM: Without objection.

HAWLEY: Thank you very much.

I -- I'm concerned about the implicit bargain that consumers are being asked to ratify by which they get supposedly free services but actually had enormous amounts of personal data extracted from them without knowing what exactly is going on.

And, Mr. DeVries, I'd like to focus on -- begin at least with you and -- and your company, the largest arguably, the most powerful company in the world. I note in your testimony, your written testimony, you say for over 20 years now our flagship products have been free. And then you go on to say next paragraph that Google clearly explains how it makes money and clearly explains how your products use personal information.

And my question is is that really true? Are any of those statements actually true? So let's -- let's take some examples. Let's start with location tracking. Let's start with your Android phones. Do you think the average consumer would be surprised to learn that her location is recorded and sent to Google hundreds of times every day even when she is not using her phone?

DEVRIES: Thank you, Senator. I -- I do think we -- we take as

strong an effort as possible to try to explain these things clearly. I understand that it's -- it's complicated. The way a mobile phone works...

HAWLEY: But do you think that she would -- do you think she

would be surprised to learn that even when she's not using the phone, an Android phone, Google is receiving information about where she is -- for instance, it's every four minutes or 14 times an hour. Roughly 340 times during a 24 hour period. That's without using the phone. Do you think she'd be surprised to learn that?

DEVRIES: So, Senator, I -- I know that location information is

absolutely core to making a mobile phone work the way that you want it to work. It makes -- it's what makes maps work, it's what makes your phone calls be able to be routed correctly. And we have an optional service that's opt-in called location history which can collect location over time if people turn that on. I think there's more that we can do to explain location more clearly, and I've -- I've heard your concerns (inaudible)...

HAWLEY: Well, you -- you collect -- Google collects geolocation

data even if location history is turned off, correct?

DEVRIES: Yes, Senator, it can in order to operate other

services (inaudible)...

HAWLEY: Let's just -- let's just get that on the record. Google

collects geolocation history and information even if location history is turned off. Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned off -- turned off by scanning Wi-Fi networks around him throughout the day? Do you think he'd be surprised by that?

14

DEVRIES: Senator, I know that this data is used to provide

value back to the user to make their phone work...

HAWLEY: You're not really answering my questions. Do you --

you're telling me you don't think a consumer should be surprised? You think they should anticipate that? They have location services turned off.

GRAHAM (?): This is fascinating. What value are you talking about?

DEVRIES: Well, Senator, so in order to make, say, maps work, to

be able to locate you to give you directions where you go, maps needs to know where you are.

GRAHAM: The phone's off.

DEVRIES: Well, in order to be able to just perform basic

functions to keep it (inaudible)...

HAWLEY: Location services are off.

DEVRIES: I -- indeed, Senator, in order to be able to know what

-- where it is so it can route phone calls to you, so it can collect the basic information.

HAWLEY: So the consumer cannot meaningful opt-out. I mean he

has...

DEVRIES: Sir (ph)...

HAWLEY: ... gone and tried to turn location services off, he's

not using his phone. It's still communicating and sending information to you, and you're monetizing it and using it to direct ads him, correct?

DEVRIES: We are not using that information to direct ads at

him, no, sir. This is to provide value back to the user in terms of making their services operate.

HAWLEY: What -- you -- what -- wait, wait, wait. You don't use

the information? What do you do with that information?

DEVRIES: We use it to make sure that the -- the -- we

understand...

HAWLEY: It's not a monetary value to you?

DEVRIES: There is some ways that location can be used for ads,

so for instance your IP address.

HAWLEY: Well, I thought you just said it wasn't used for ads?

DEVRIES: Senator, there is -- there is -- there is the -- the

kind of geolocation that's sent from the cell tower from your GPS device that's used for purposes that are really about making the phone operate. I'm happy to explain this in more detail. I understand it's a complicated topic and we can communicate it better and (inaudible)...

HAWLEY: I -- I don't know that it is that complicated. I think

when somebody turns off their user information, their location history, they expect the location tracking to be off. But it's not in fact. They don't have a way, apparently, to turn it off.

Let's take another example. Do you think that an average consumer who's using your products fully understands that Google builds a profile about her, tracks where she goes to work? Tracks where

15

her boyfriend lives. Tracks where she goes to church. Tracks when she goes to the doctor. Do you think that an average consumer would anticipate that?

DEVRIES: Senator, I -- I know that we have a duty to

communicate this information clearly. I don't believe we track the information to that level without communicating to...

HAWLEY: Do you think you're communicating it clearly when a

consumer cannot turn off their location tracking?

DEVRIES: Senator, you can turn off location tracking. There are

aspects of location, though, that are necessary to make services work where if we turn those off, your phone wouldn't work the way you'd expect. And I know that's a complicated subject to explain, it is and we're trying hard and we are (inaudible)...

HAWLEY: No, it's actually -- it's not complicated. What's

complicated is you don't allow consumers to stop your tracking of them. You tell them that you do. You would anticipate that they do. A consumer would have a reasonable expectation based on what you've told them that they're not being tracked, but in fact you're still tracking it. You're still gathering the information, and you're still using it.

By the way, all of this is just phone. We're not even talking yet about search or -- or internet tracking. I mean, listen, my time is almost expired here. We could talk about the -- the internet tracking that Google performs. We could talk about the lack of consent.

Here is my basic concern is that Americans have not signed up for this. They think that the products that you're offering them are free. They're not free. They think that they can opt-out of the -- of the tracking that you're performing. They can't meaningfully opt-out.

It's kind of like that -- that old Eagle's song, you know, "You can check out anytime you like but you can never leave." That's kind of what it's like dealing with your company. And that's a problem for the American consumer. It's a real problem.

And for somebody who has two small kids at home, the idea that your company and others like it are sweeping up information to build a user profile on them that will track every step, every movement and monetize that, and they can't do anything about it, and I can't do anything about it. That's a big problem that this Congress needs to address.

Thank you, Mr. Chairman.

GRAHAM: Senator Durbin.

DURBIN: Senator Hawley, you should come up to Chicago, or

perhaps we should invite here a group called Adelson (ph).

About six weeks ago, I sat down and they did a presentation along the lines you just mentioned. They also track how you move from place to place. Are you walking? Are you running? Are you on a bicycle? Are you in a car? So the information that is being gathered going way beyond what anybody imagines when they carry one of these around every single day.

There's so many aspects of this that I want to get into, but the one that troubled me the most is they said the largest collector now of information, and they can hardly keep up with the volume, is a collector of information on kids, our children. So it isn't a question of opting in or opting out personally. It's how much they're collecting on our children.

And a company known as Knewton, K-N-E-W-T-O-N, is collecting students', not only their grades so they can process a -- a report card. They're collecting their homework. They're collecting the essays they turned in. They are making a file on each of our children. So when a college announces we're no longer going to use the SAT and the ACT, it's because they don't have to. They already have the information.

Listen to what Mr. Jose Ferreira, CEO of Knewton said in 2012. "You can look at some students and think, boy, that poor schmuck is really in a lot of trouble in school." They've already branded the kids. That information is there.

So the question I really raised and introduced legislation to deal with it, can kids opt-out at a later point in their life? Can they ask if all the information that's been accumulated about them before the age 13 be wiped clean? Is that a reasonable request? I ask anybody on the panel.

Mr. Hoffman?

HOFFMAN: I -- I would say, and Intel's model does this, that we

need to provide the ability for people later in to say -- to come back and say, look, not just the type of information that was collected from me, but now how analytics are applying to it to be used in ways that could harm me, this is disproportionate and I should have the ability to have that data either obscured or deleted. And that's part of the Intel model of this specific language for the bill that we proposed.

DURBIN: So here's the problem, when Mr. Zuckerberg came and

subjected himself to 42 senators asking questions, I asked him a couple questions. "What's the name of the hotel you stayed in last night?" And he said, "I really don't want to tell you." I said, "Well, tell me who you've communicated with in the last two days on your phone?" "I really don't want to tell you." So he -- he obviously valued privacy.

Then we asked him about Facebook Messenger and he said in general, that data is not going to be shared with third-parties. Mother, father, is that good enough in general that won't be shared with third parties?

So what we need to do is to basically say it definitely won't be shared with third parties, and it can be deleted by a child after they reach the age of 14 and beyond. Is there anybody here who thinks that's an unreasonable idea to protect our children from having the information about their lives become part of the public domain, or at least the domain of those who want to use it for business purposes? Any problems?

MACTAGGART: Sir, not only is not unreasonable. It's totally

reasonable. But I actually think it should be all of us. I mean all of us should have these rights. And -- and -- and until 10 years ago...

DURBIN: Whoa, whoa, whoa.

MACTAGGART: Sir (ph).

DURBIN: All of your companies should have the rights?

MACTAGGART: All Americans.

DURBIN: I see.

MACTAGGART: Sorry (ph).

DURBIN: OK.

MACTAGGART: Yeah, and -- this is a relatively recent

development, this behavioral advertising. And for -- for -- for most of, you know, ad tech's history, it's been the contextual stuff. You're -- you're reading an article on pickups, you see the ads for the Fords, and no one cares about that. This -- this ability to track you and start to kind of guess who you are and what you're going to be doing even before you know it. That's...

DURBIN: The folks at Adelson went so far as to show the aerial

photographs of their homes which could be easily determined, the information Senator Hawley asked earlier about location and such. So their homes were now in the -- in the domain of those who wanted to decide how to advertise to -- when it comes to their whereabouts.

Let me ask you about the actual disclosures online. How many of you have ever read one of those? Oh, well, you're -- going to disqualify you. I would just say that basically none of us do. And if we tried to, we couldn't understand, right? And that is where you are opting out and opting in when it comes to your personal privacy. So shouldn't the burden be on you and your companies and say we are out until you make us come in? Isn't that really (inaudible)...

MACTAGGART: Well, that's exactly why we have the opt-out which

we think is going to be automatic. Set it -- I wanted to never have to read another privacy policy in my life. I want no one to have read them. We give the same right to everybody. You click it once in your browser, you're done. Your -- your information's never sold again. That I think is a really important right to give Americans?

DURBIN: Well, I -- I hope that's the standard.

Mr. Weinberg, I went to my phone here and obviously compromised my privacy, and decided to look at DuckDuckGo and the first thing I find is -- is install your service. I have to go to Google Chrome. Aren't you sleeping with the enemy?

WEINBERG: You mean the Play Store? You have to use the app

store?

DURBIN: Yeah.

WEINBERG: Yeah, unfortunately, that's the only way to install

an app on an Android device.

DURBIN: I see.

WEINBERG: That's easy to use.

DURBIN: Well, I -- I want to tell you that your model sounds

like what I think America should look like. Thank you.

WEINBERG: Thank you, Senator.

BLACKBURN: The gentleman's time has expired.

Senator Kennedy for five minutes.

KENNEDY: Thank you, Madam Chairman.

Good morning, gentleman. I may have to interrupt you -- some of your answers. I'm not being rude. I'm just trying to get through my questions. And I would appreciate it if you'd speak English to me.

I -- I think we can all agree that the digital promised land has a few mines in it. I think we can agree that social media can now influence what we believe, how we vote, what we buy. Even how we feel.

I want to start with Mr. DeVries with -- did I say that correctly, with Google? Congratulations on your success. You're -- you're no longer a company, you're a country. How long is your -- how long is Google's user agreement? How many words?

DEVRIES: Sir, the -- our -- our terms of use, the user

agreement, I -- I don't know off hand. The privacy policy which is what I focus on...

KENNEDY: How many -- how many pages is it?

DEVRIES: Our terms of use, I don't know. It's -- it's certainly

got a lot of words in it. My privacy policy, which we work on, which describes how we use this (ph) information.

KENNEDY: I -- I looked at your user agreement. I eyeballed it.

Figuring six characters per word, it's about 3,600 words. That's about seven pages single-spaced. You could hide a dead body in there and nobody'd ever find it. How -- how many -- you -- you can track people, how many of your users read it?

DEVRIES: Sir, we have millions of users who come to our privacy

policy.

KENNEDY: Right. And how many of the read it?

DEVRIES: Well, I -- I can't say that very many, I'm sure, get

all the way through it. I know it's not the top of people's reading list. But...

KENNEDY: I mean you can -- I'm not trying to be rude, but you

can track everything else. Have you ever tracked that?

DEVRIES: We certainly try to keep track of how many visits we

get to our privacy policy. But we -- would have no way of knowing if people actually read it, and we do our best to make it comprehensive.

KENNEDY: Well, how many people -- how many people as a

percentage of your total users go and -- and click on your privacy policy or your user agreement?

18

DEVRIES: Well, we have visits to the -- the account page which

is where the privacy policy is. We actually have...

KENNEDY: Just give me a number if you could.

DEVRIES: We have 2 billion users a year (inaudible)...

KENNEDY: How many click on the user agreement? Do you know?

DEVRIES: Far less. In the millions, but far less than that.

KENNEDY: OK. Can you connect my data that Google has on me to

my name? Not do you do it. Do you have the ability to do it?

DEVRIES: Senator, if you have a Google account, it allows you

to put your name in, we would collect it there. If you don't, we cannot.

KENNEDY: Can you connect my name to my data. I'd really be

grateful if you would answer my question.

DEVRIES: Senator, if you have a Google account we can, if you

do not have a Google account, we cannot.

KENNEDY: OK. So, you can put a name to my data?

DEVRIES: Well, that's -- that's the way people use Google. They

-- they, you know, they send e-mail with Gmail, et cetera.

KENNEDY: Yeah but you -- you have the ability to put in, let's

say John Neely Kennedy, and find everything you want about me in terms of my data. What websites I go to, what ads I read, what I buy, that sort of thing?

DEVRIES: Yeah. And -- and we try to show that to you, Senator.

KENNEDY: You -- you do that?

DEVRIES: If you have a Google account, we do that. And we

provide you that information. You can see that, and you can delete it.

KENNEDY: So, you do that repeatedly? I could call you up and

say, give me all the information that you have on Thom Tillis, and I'll give you a quarter of a million dollars, you can do that?

DEVRIES: Senator, we never sell our users personal information,

we wouldn't do that.

KENNEDY: Can you do that?

DEVRIES: We would never do that. This violates our...

KENNEDY: Can you do that?

DEVRIES: Not legally, no.

KENNEDY: Could you do it, technically?

DEVRIES: Well, yes, sir.

KENNEDY: OK. I think -- I think -- well, strike that. Is there

any -- is there any type or piece of data that Google would not monetize?

DEVRIES: Oh, yes, sir. We -- we -- most of the data we collect,

we don't actually use for advertising purposes. We use it to provide the services back and try to make them better and work better for users.

KENNEDY: All right. You already have to comply with the rules

promulgated by the E.U.. Do you not?

DEVRIES: That's right. It's been like that (ph)...

KENNEDY: And by California. Do you not?

DEVRIES: The California Law has yet to go into effect but when

(inaudible)...

KENNEDY: When it does, you'll have to comply?

DEVRIES: That's right.

KENNEDY: That's a lot of people. What's the problem with just

extending that to everybody else?

DEVRIES: I'm sorry, extending? Oh, the California rules to...

KENNEDY: And the E.U. rules.

DEVRIES: Well, certainly. And we apply, aside from the rights

that only apply specifically under European standards, we apply...

KENNEDY: Would you object to just -- since you have to do it

there, just doing it for everybody?

DEVRIES: No, that's not our objection to having a lot of stuff

(ph)...

KENNEDY: Would you object?

DEVRIES: Well...

KENNEDY: Answer my question, Mr. DeVries. Would you object?

DEVRIES: We certainly would extend rights that we have to

(inaudible)...

KENNEDY: Would you object?

(UNKNOWN): (Inaudible).

DEVRIES: We would not object to offering people rights

(inaudible)...

KENNEDY: All right. Thank you -- Thank you, Mr. DeVries.

BLACKBURN: Gentleman yields back.

Mr. Coons, five minutes. Chris?

COONS: Thank you Madam Chair and Ranking Member. Thank you to

our witnesses. I think it is really important, that we have a thorough and open conversation about privacy and legislation. This is something Senator Flake and I started last year with a series of roundtables with advocates, industry representatives, folks from all over our country.

At the heart of this debate is a cost benefit analysis that I -- I think it's just not clear to most consumers. Social media users, like myself, benefit immensely from being able to use the platform, share information with friends, neighbors, family, constituents. And then social media companies like Facebook, or Google, or others benefit by using data to sell ads targeted to me based on information I share.

20

Normally, that interaction is great because I'm able to reach friends and family without paying a fee and Facebook and others are able to grow their business. But there are huge risks as has been detailed by many on the panel and by many here on the committee. Digital advertising companies might not unlawfully target individuals based on protected class such as race, and data that they generate and create around health care, or other protected proxy issues.

But the use of predictive profiles in order to target certain groups with ads for things like housing, employment, banking, and education have significant consequences that I don't believe the average American has really thought through. And the consequences of our legislating will be significant. We have to find a way to both significantly increase data privacy protection and clarity, while not destroying the opportunity for competitiveness and innovation that has led several of the largest companies in the world in this space to be American.

So, let me just first if I could to Mr. MacTaggart, do you think the average consumer, the average American consumer, appreciates how data can be utilized to affect their access to get a loan, to find a place to live, their access to higher education, the ways in which behavioral predictive advertising can really narrow their range of options?

MACTAGGART: No. I think the average person has no idea.

COONS: And do you think the FTC could employee it's unfairness

authority under Section 5 of the FTC act to address these secondary and discriminatory impacts of data collection and targeted advertising?

MACTAGGART: Sir, I'm not an FTC expert but I think there -- the

-- I think that's a -- what I've heard from those who are is that they would like more tools to be able to address this issue.

COONS: Mr. Hoffman, I think you worked at the FTC before your

current role at Intel, if I'm not mistaken.

HOFFMAN: I -- I did not. I've worked with the FTC for

(inaudible)...

COONS: With the FTC as an outside advisory, right?

HOFFMAN: That's right.

COONS: Forgive me. The FTC already has some authorities to

regulate and protect consumers privacy, but I'm concerned they're not doing enough, and they need greater resources and great authorities. Are there any recent examples you could site or would anyone else like to offer this, of the FTC utilizing its current authority under Section 5, and then what risks to consumers remain outside their authority that we should address?

HOFFMAN: I'd like to take the second half of your question, if

you don't mind, which I -- I would say first that not all industry sectors are actually governed by...

(UNKNOWN): Right.

HOFFMAN: ... the FTC which is a significant issue. The FTC

doesn't have role making authority, which we think would be absolutely critical within certain statutory guardrails so that it's narrowly prescribed. And we also think that the FTC absolutely needs civil finding authority.

COONS: Is one of the most important enforcement aspects, Mr.

MacTaggart, of CCPA the private right of action?

MACTAGGART: So, the private right of action only applies to

negligent data breach. The rest of it is enforced by the Attorney General, and we did give the Attorney General rule writing authority because precisely we thought, this is a fast-moving area, we didn't want them to have to come back to legislature every time. So, at one level, this is -- CCPA is a framework to give -- to set up a privacy regulator in the office of a Attorney General and give them the -- the ability to -- to regulate a very fast moving area of the economy.

COONS: Mr. DeVries, you just had an interesting exchange with

21

Senator Hawley. I am too am concerned about Google's data collection. There are about 2 billion mobile devices running on Android. There's cookies all over the internet, there's lots of different ways that data's collected. One way Google uses this data is to profile consumers for targeting ads. Do you have a specific profile that is identifiable for every user?

DEVRIES: No, Senator. We have a profile that could be related

to your Google account if you have a Google account. You can see that profile, you can delete it if you want to. And if you want to, even if you don't have a Google account, and you just had a -- a cookie that we might use to -- to target ads, you can opt-out of that, or you can delete your cookies.

COONS: Let me ask a different way. Is there a way, just to

rephrase this issue, is there a way to use an Android device and other Google products without having Google collect data on a consumer's interaction with that product? Because I've seen information that persuades me that's not true. That Android continues to collect data on you even with the SIM card out, even with the privacy protections all turned on.

DEVRIES: Thank you, Senator. There are ways to turn off all of

the use of your data for advertising. Some data needs to be collected to operate the service. To make sure the service is working, it's secure, and make sure and make sure your battery life is -- is healthy on your phone so it doesn't run out faster. Those kind of functions with continue. But the use of your data for advertising can be completely disabled.

COONS: Thank you. I -- I would also be interested in the

portability that Mr. Lee and Mr. DeVries raised but I note I've exceeded my time.

Thank you, Madam Chair.

BLACKBURN: Gentleman yields back. I will yield myself five

minutes for questioning. I want to see a show of hands. How many of you believe that Americans have a right to privacy when they are in the virtual space, raise your hand? All of you do?

How many of you believe that should be a protected and constitutional right? Awesome. All of you do. OK. When we're talking about privacy, and that stands to the individual, do each of you agree, that your PII is your virtual you, and you online. Raise your hands.

OK, Mr. DeVries, you're a little slow on the uptake there. Do you have a disagreement with that?

DEVRIES: No, ma'am.

BLACKBURN: OK. Who owns the virtual you?

DEVRIES: Ma'am, your personal information is your information.

That's something that's according to my beliefs.

BLACKBURN: So, you would agree that the individual owns their

virtual presence online? Is there anybody on the panel that disagrees with that? You know, I find it so amazing as we have worked on this issue through the years. The issue of privacy, of data security, of intellectual property protection, that one of the things that is fascinating, is many of the tech companies or the FANGS. They have built their net worth off of individuals information.

And, Mr. DeVries, while you say you don't sell that information -- pardon me. Going back to Senator Kennedy's remark, basically, what you have done is coalesce that information. And that tracking and then you have built the essence -- the essence of that individual online. Do you agree with that?

DEVRIES: Senator, we do try hard for the -- to in order to

provide value back to the user, to understand...

BLACKBURN: You didn't answer.

DEVRIES: Yet...

BLACKBURN: Pardon me. You...

DEVRIES: Yes, (inaudible).

BLACKBURN: You -- you're not answering the question. Let me go

to this. On a Google operating system, on the Android phones, we'll go back to Senator Hawley's question. I have seen these phones and I will -- I want you to tell me if this is correct or not.

If you take that Android mobile device, and you pull the SIM card, and that device is turned off, then when you turn that phone back on, it will download every single base station that you have passed. That the tracking is embedded in the hardware, and it is always tracking you. And there is no way for that device to not be tracking you.

And Senator Durbin even mentioned. It will tell you if you're walking, or if you're riding, if you're in a building based on the barometric pressure, it will tell you what floor you're on, and what side of the building you're on. Is that correct?

DEVRIES: Yes, Senator, I understand there's lots of

(inaudible)...

BLACKBURN: That is correct. OK. I think that's fascinating. And

see most Americans would not -- would not see that as being information that you are entitled to. Because going back to what Senator Kennedy said, then you are saying you own the virtual you. Would you not agree with that?

DEVRIES: No, Senator, that's not how I conceive of it.

BLACKBURN: You wouldn't agree with that. Then that is amazing

to me. You could know everything about somebody and everywhere they go, and you hold that information. And the individual doesn't hold it. Let's move on to what you're doing with Chromebooks, and the operating system there.

Now, the reason SAT's are not as relevant, is probably because what you all are doing when those children are doing those assignments online, you're recording all of that. Is that not correct? And then you're also looking at the sites they go to and using that to maybe not put ads back on that laptop that is in the school but selling that to advertisers of the parents that are in that community. Is that correct?

DEVRIES: No, ma'am. We do not use any of the data that we

collect via these education products that we offer...

BLACKBURN: How do you build a profile on the students?

DEVRIES: We don't try to build a profile on them.

BLACKBURN: You don't?

Mr. Hoffman, how do they build that profile on those students?

HOFFMAN: I -- I'm not an expert on their services and how --

and how their products operate.

BLACKBURN: OK. Thank you, I appreciate that. How many of you

support having congressionally passed privacy legislation? Raise your hands. All of you do. How many of you think that we should give the FTC the authority to oversee you and to put rules of the road in place, to allow people to choose to opt-in, rather than assuming it is going to be an opt-out. How many of you favor that? No one favors giving consumers the ability to opt-in?

HOFFMAN: I favor the -- the -- the ability for consumers to

provide an opt-in I just believe that the regulation needs to go behind that because it's necessarily but not sufficient.

BLACKBURN: OK. I appreciate that. My time is expired but I will

tell you. I think the reason you do not want to have opt-in, is because it would change your business model. And it would diminish your profits. Yield back.

Ms. Klobuchar, you're recognized now.

KLOBUCHAR: Thank you very much, Madam Chair. Thank you to all

of you for being here today. This is a very important matter and we actually just had recently at a hearing on this in the Commerce Committee, and there, there was a lot of tears shed about all this patch work Mr. MacTaggart of bills across the country and I made the point well, the reason this is happening is because of the companies have been lobbying against privacy legislation for years and nothing has happened in Congress.

And Senator Kennedy and I have a bill, while (ph) not perfect, it's a bipartisan bill, that it has a number of provision in there including notice of breach. But we don't have preemption in that bill. Simply because I think we should allow states to also do their own thing. But if we get a very strong bill, maybe that would look differently. But I don't -- I don't think we're there yet.

So, could you talk about the important of notice of breach and also why you think opt-out is so important.

MACTAGGART: Well, first of all I think notice of breach is --

is essential because otherwise you just would never know. And so, you know, in our law, we -- we do (inaudible) but around negligent data breach. And what we said basically is look, if you encrypt your data, if you redact the data, or if you have reasonable practices and procedures in place to protect the data, there's no liability.

Why we didn't want to have a situation where the Russian government, you know, hacks in to a company that's trying to do its best and then all of a sudden, they have a big -- big liability. But if the company doesn't encrypt, they have a problem. And then we went out -- opt-out again because I think that that's the most effective way of giving consumers the best level of privacy. I think the problem with opt-in is it gives a false sense of -- of -- of security.

KLOBUCHAR: OK. One of the things, I was in Austin this weekend,

at South by Southwest and few policy proposals were made there but I brought up this idea of kind of getting at what some of my colleagues are talking about how the individual consumer is monetized, basically. Like they are a pry (ph), they are a commodity to many companies.

And so, one idea would be for these -- you could do it with large platforms, you could it with large amounts of data, but that some kind of tax be placed on them, not on the consumer when they use that data or transfer that data and then that money could go back to the consumers or it could go back for cyber-security for our country. And could you talk about that? I know there's something similar being discussed in California.

MACTAGGART: Yeah. The governor recently mentioned the proposal

about data dividend. I think, you know, the only thing would be to say, I think transparency is the most important thing. And to feel like consumers understand, I think the -- the worst outcome is -- would be a relatively tiny amount of money going to people and then there's all this behavior that we're trying to address right now that gets (inaudible) forever.

KLOBUCHAR: Right. Well, this wouldn't be on its own. This would

be in -- if you don't have privacy legislation...

MACTAGGART: Sure.

KLOBUCHAR: ... it doesn't really matter. This would be for when

they do it, in a perfect world, where you have permission and you're doing it and then you get something out of it.

I don't know if you want to add anything, Mr. Weinberg, on this front.

WEINBERG: Not specifically. But as it relates to weakening the

data monopoly at the core of the advertising market, I think all options should be on the table.

KLOBUCHAR: Right. Thank you, that's a very nice way to put it.

Mr. DeVries, the Honest Ads Act is something that I've been fighting for more rules of the road for political advertising, which as you know, billions of dollars collecting data, selling ads, and the Honest Ads Act is a bill that actually has gained I think 12 republicans now in the house and it simply says that for ads that are political in nature, that it has a disclaimer of who's paying for them so you know who's paying for them and then it's disclosed.

And in fact, that's what you do for newspaper, TV, and radio, but we have billions of dollars spent online on political ads. Last September, Google announced its support of the bill and do you agree that we need to be consistent and will you pledge to continue to work with us to get this bill done?

DEVRIES: Thank you, Senator. And thanks for your leadership on

this. Ad labeling is not an issue I have a lot of direct knowledge on, but I understand that we're supportive of the goals to your bill and would love to work with your office on it.

KLOBUCHAR: OK. Anyone else have a comment on that because the

elections are coming up and we still have no rules of the road in place for issue ads most importantly as well as candidate ads.

MACTAGGART: Yeah, Senator, the one thing I would add here is,

you know, I -- I got concerned about this during the campaign and I had my attorney look into it and produce a memo. The real issue is not with the ads, it's with the fact that if you don't coordinate with campaign, and you don't expressly advocate for the election or -- of a senator or of a political representative, that's the first amendment right of the corporation to influence elections.

What you actually can do legally, with no disclosure, is you can up or down rank a -- a story about a politician. You can up or down rank a (inaudible)...

KLOBUCHAR: I understand all that. That is another issue but

what we have here, were ads that were bought by, in rubles...

MACTAGGART: Yup.

KLOBUCHAR: ... by Russia. We have issue ads that are meant to

disrupt that we don't even know who's paying for them and now we have some sites voluntarily archiving them and disclosing, but they're just going to gravitate to the sites that aren't. And that's just going to keep happening unless we pass some rules around.

$1.4 billion was spent online on these ads and it's going to go up to $3 to $4 billion in the 2020 election. And it's outrageous to me that we have no rules of the road in place. And I will have some questions about the FTC -- the FTC investigations that I'm supportive of on the record because I'm out of time. Thank you.

BLACKBURN: Senator Tillis, for five minutes.

TILLIS: Thank you, Chairman. Thank you all for being here. I

think that this weekend, I had a personal -- number one, I know all of the Google settings and there's not a whole lot of information you can get from me and I normally browse in incognito mode unless I want to be consulting on maybe some purchases that I'm making.

So, I thon on that we need to do is understand -- there's a lot of good that comes from these tools. It's a matter of getting it right. I saved couple hundred dollars this weekend on some things that I was buying because A.I. suggested something I wasn't thinking about.

I think DuckDuckGo may have gotten me there as well, but it gave me alternatives that made me a more informed consumer. On the one hand, it seems creepy to think that any of these platforms, not just Google, there's a number that we could list, could know that you went to the doctor.

On the other hand, if we can figure out a way to protect consumer data, it may also be a trigger to make sure that that person after they went to the doctor, got their medications and followed their prescripted (ph) course for getting well.

So, the point here is getting this right. I for one thing that there has to be preemption. Because this larger complex -- the -- the merits of California are actually seem to be accepted by most of the people on the panel but who knows what other 50 or 60 or 80 different proposals could come into play. Maybe even get to the municipal level for data privacy. That makes no sense at all when we're talking about competing in a global environment, so we've got to get it right.

Mr. DeVries, I think that -- it is DeVries, right? Yeah. I think that one of the challenges that you're going to have moving forward is having people understand the difference between Android the technology stack and Google, the service that people are using.

Because I think what you were trying to say is as an operating environment for a phone, like iOS, you have to capture certain information for the phone to operate. Or you're simply not going to be able to -- be able to determine where you are and to actually link in to the wireless network.

So, I'd work a little bit on explaining your social media platforms and distinguishing that between the underlying operating environment that operates the phone. Like iOS, like Microsoft, for goodness sake. I mean, this is not just limited to phones. Any Chrome tablet or any Microsoft tablet or any other variant for an operating environment have these tracking mechanisms that can be good and bad.

I for one worry when I hear a committee hearing like this because I think that we could have a Dodd-Frank like overreach on fixing something that needs to be fixed. Every single one of you

25

should be good stewards of customer data. When there's a breach, it's on you. It's not he consumers problem to fix your problem to the extent that your platforms were breached. Got to work through all that.

But if we're not careful, we actually have this sort of populist reaction that at the end of the day, could be the debt to the detriment of the consumer. For those of us who want to use it, for those of us who are maybe informed enough to -- to be more protective than others. But I'm not naive, I know there's probably vulnerabilities that I -- that I experience.

Mr. Weinberg, I did download DuckDuckGo while you were doing your opening comment. And I don't know if it was Google Play or you all that did -- before I got to use DuckDuckGo, the first thing I got was an advertise for creepysite.com. And I'm going to look that up too. It looks like an interesting site to protect my customer data.

But I don't know -- I mean, the fact of the matter is, you're able to access me because Google Play has a platform that you can actually distribute your product. That's why we have to understand this ecosystem is more complicated than just jumping on a populous notion that you're somehow exploiting consumer data and that you should be stopped.

Because if you get stopped, then all of a sudden you got a credit card that you need to offer Google if you want a Gmail account. I mean you've got to -- you've got to -- these platform shave to derive revenue somehow. And right now, they're free platforms that have kinks that need to be worked out, protections that need to be improved, but we need to be very careful with respect to global competition and other challenges that we have if we overact.

I do believe that we need to preempt, I do believe the California law is better than I would have expected out of California to be honest with you, from my side of the aisle. We need to look at the European model and some of the problems that it has but we need to come up with well-reasoned policies that allow -- that do not create a new barrier for entry.

If you're operating in ten states, ten countries and the District of Columbia, you may have reached the scale to where you can deal with additional regulatory complexity, I want the next DuckDuckGo to be able to get in and not be at a point to where the regulatory burdens are too great.

I'm not here to ask any of you all questions. I would tell you all I'm glad to hear that generally speaking you think preemption is necessary, we should make sure that the most innovative nation in the history of this planet continues to be that. We need to make sure that global competitors could replace you all and not necessarily be held to the same standards. The risk of breach would be great.

So, we need to get this right and we need to make sure that we understand the technology stacks and all the various layers that go into getting the policy right. Thank you all for being here, it was very informative.

BLACKBURN: Senator Hirono, five minutes.

HIRONO: Thank you very much. I think that we're at a point

where I think there's recognition that we do need privacy legislations. So, it might be (ph) we should be focusing on what type or protections we should provide to consumers.

And I think one of the critical questions is whether the privacy regime is an opt-in or an opt-out. And there is significant evidence that privacy defaults are sticky, and consumers rarely alter their default privacy settings. Would you all agree that's the case?

Yeah. Once you are in there, they forget about it. So, this is why in my view, the privacy regime should be an opt-in. Because I think most of the default settings require an -- an affirmative opting out. So, an opt-in -- to require the consumer to -- to opt-in to getting all these ads et cetera, is much more protective of the consumer. So, let's just go right down the line. Would you support privacy legislation that uses an opt-in as opposed to an opt-out requirement?

DEVRIES: No, Senator. I don't think that's the right approach

across the board. Opt in is certainly the right place for the -- the most important choices, but I wouldn't want to overwhelm users by having opt-in for everything. It would -- I worry it would cause click fatigue. People would just start agreeing to everything as opposed to...

HIRONO: No, opt -- opt-in means -- so the opt-out would be --

here, let me -- let me make myself really clear. So, a consumer automatically opt-out of getting any of the ads et cetera. So, that I think it decreases the -- the desire on the part of Google et cetera to get the kind of information about us.

So, we would automatically be opted out of all of these (inaudible) ads et cetera, and we would have to affirmatively opt-in to have your start using information about us. That's what I mean. And I would like to know from each of you whether an opt -- to affirmative require opting in to get all this -- these ads is -- is something you would support.

DEVRIES: Thank you, Senator. I -- I think we have an experiment

26

under the GDPR with that exact rule. So, we can see how that works. It's certainly something to consider, but I don't personally support it, no.

HIRONO: Well, because it would really limit the uses that you

have for the personal information that you collect.

DEVRIES: For Google personally, we rely less on personalized

ads than on the contextual ads but for many of our customers, our publishers, and app developers, this is the significant or portion (ph) or majority of the revenue is targeted ads. And so, we're concerned about the ecosystem.

HIRONO: Sure. But in terms of protecting the consumer from

being tracked, and the use of the tracking information to buy advertisers, the consumer will be much better protected by simply having opt-out as the default.

So, for example, Google controls advertising on non-Google sites. And my information is that Google controls the advertising on 75 percent of the most popular websites. Is that not true? (Inaudible).

DEVRIES: I -- I don't know the number we certainly have a lot

of customers out there, yes.

HIRONO: It's a lot. Yeah, Google makes a lot of money. In fact,

Google had over $136 billion in revenues last year. That's more than a billion dollars a week. So, let's just go down the line. Mr. MacTaggart, would you support a regime that would -- would basically require consumers to opt-in to get all this advertising?

MACTAGGART: So -- so, what as I hear you, Senator, I think

you're describing a third way. Because the -- the one in Europe is opt-in or not. And once you've opted-in the companies can sell you data, so it's kind of business as usual.

And that's my worry. Is that you opt-in and then -- and then nothing really changes. Our -- our example is opt-out. I think what you're saying is if there were a default where you could still use the service but, we're already opted-out...

HIRONO: But what I'm saying is that the default setting would

be opt-out and I as a consumer would have to actually affirmatively consciously opt-in to the use of all my data for, heaven knows what.

MACTAGGART: Yeah, but the problem there is once you opt-in to

the service then it's business as usual. We...

HIRONO: But you always -- if one opts-in you should always have

an opt-out feature. But this one has to actually -- do you get what I'm saying?

MACTAGGART: I...

HIRONO: I feel like -- the -- I think the -- the -- the --

person from DuckDuck of the, you know, what I'm talking about. So, I would say for a consumer -- consumer protection having the default as opting-out, automatically opting-out on, as the consumer opts-in is much protective of our consumer's privacy. How about you, third...

HOFFMAN: As I mentioned before in the response to the FTC

question. There's going to be situations particularly for risky uses of data where opt-in is necessary. The problem with an overall either opt-in or opt-out approach is examples like I provided in my -- my opening statement with Donna, the victim of the -- of -- domestic violence.

Police officers, elected officials; the information didn't come directly from them. If we rely just on that type of a model protection increasingly where technology is going...

HIRONO: Well, if...

HOFFMAN: ... we're not going to protect them.

HIRONO: ... I just need to -- Madam Chairman, I just need to

hear from the other two gentlemen. There may be some instances where we need to provide certain -- I don't know, we, we'll have to figure that part out.

But Mr...

WEINBERG: Weinberg.

HIRONO: ... Weinberg.

WEINBERG: Yes, Senator. We would support that. Just would like

to also point out that Americans in large numbers have found they do not track setting in their browser by about 25 percent. And so, people are trying to find these settings.

HIRONO: Yes. It's not easy either to find those settings.

Mr. Lee?

LEE: Senator, I think you're right when you say the defaults

are sticky. But I also think Mr. MacTaggart's right that moving too far opt-in would create a take it or leave it approach. People would wind up opting-in agreeing to these exact same fine print contracts that no one actually parses.

HIRONO: I know, but most people will not make the decision to

opt-in. I can pretty much tell you that.

BLACKBURN: And the lady's time has expired.

HIRONO: Thank you very much.

BLACKBURN: Senator Whitehouse, five minutes.

WHITEHOUSE: Thank you, Madam Chair. Thank you all for being

here. I am finding small companies in my home state of Rhode Island that are subject to GDPR without knowing so. Because they have in our global economy a business link with the E.U. that makes them liable.

And I think probably the majority of companies that have that liability don't even know about it. So, I agree that we need to take some step to try to bring some conformity. So that they're not walking into invert liability under GDPR standards they didn't even know they were subject to.

Has anybody looked at the privacy shield program between Switzerland and the U.S. and if you have, is that a useful model for considering legislation going forward?

DEVRIES: We comply with the privacy. We use the -- the -- the

U.S. -- both the U.S. E.U. and the U.S. Switzerland agreements to be able to transfer data lawfully. So, we are familiar. That agreement is really focused on the idea of lawful transfer of data from those countries to the U.S. for processing.

WHITEHOUSE: Yeah.

DEVRIES: So, it's not complete as a privacy regime but, it

certainly, has -- gives a lot to offer, gives us a good starting place to look at.

WHITEHOUSE: OK. Let me raise a different point. One of you

mentioned earlier that at this point these big data companies -- might have been you, Mr. Weinberg. Now how more data on individuals then any security service has in the history of humankind.

And obviously, we have considerable concerns about so-called big government having enormous amounts of information on the public and what misuse that might be put to. The problem that I see right now is that the division between private and public. Between government and particularly certain big business that engage with government in a way that they actually want to own, control, and manipulate government on their behalf.

It puts us in a position where you can easily have these data services made available to government probably through a political party rather than through the actual government agency. But nevertheless, it becomes fully operative in our political space. We saw Cambridge Analytica try to do that. Succeed at doing it, get caught and blow up.

But I think more to come behind that and, I worry about how weak our defenses are in this area. When we had the hearing with Mr. Zuckerberg of Facebook, he sat in front us and said that their policy for finding who was launching political advertising on their -- for -- medium, was that they had to disclose the corporate name of the entity that placed the advertisement.

So, as simple a device as a, phony baloney, shell corporation completely defeats Facebook's effort. And that's so bad an effort that's it's hard to believe that they're actually sincere about trying to identify who is behind political ads. Because it's really not hard to set up a regime where you have to chase it through until there's a real company that's doing real business or a real person with a real human name.

And so, I remain very suspicious of the -- this being a particularly dangerous area in which data gets deployed for political purposes through government by potentially a political party rather than the government itself. But to the same effect.

And I wonder if any of you have a particular -- yes, Mr. MacTaggart?

MACTAGGART: Well, Senator, I think as I was saying earlier. The

issue -- is one thing you're talking about is -- is a foreign entity or another entity. But think about the entities themselves. It's a first amendment right of the corporation to -- as long as you're not in direct coordination with the campaign, it's legal, there's no disclosure.

They can up or down rank a story about you and your reelection. They can show more news or less news to a swing voter in your district, in an effort to influence. It's totally legal and there's no disclosure required. That's the part that's actually -- when you look at it in terms of a democracy, I mean, it's just a bomb sitting in the heart of the democracy...

WHITEHOUSE: Yup.

MACTAGGART: ... right here. And something needs to be done...

WHITEHOUSE: Maybe (inaudible) and waiting to be -- waiting to

go off. And I -- I think it's something that we need to pay attention to in this conversation. You agree?

MACTAGGART: Completely, agree.

WHITEHOUSE: Yes. OK. My time is up. Thank you all very much.

BLACKBURN: I thank the gentlemen for finishing with five

seconds to spare there.

Senator Blumenthal, five minutes.

BLUMENTHAL: Thanks, Madam Chairwoman. In case anybody had any

doubt, privacy is all the rage, bipartisan. But as frequently, happens the devil really is in the details. And my view is first, do no harm. We have a very profoundly significant advance in California.

The GDPR represents progress and what I see is lots of good intentions invoking privacy in the name of undercutting rather than advancing what we have now through the use of preemption.

And I am helping to lead a group in the commerce committee, as you may know. Involving a bipartisan core of support for adopting a law that regards California as a floor, not a ceiling, in terms of the privacy standards for both the expectations of what the standards should be but also enforcement. And so, I really feel strongly that we should build on California and make it even stronger.

Let me congratulate you, Mr. MacTaggart on accomplishing in two years a feat that Congress has been unable to do in two decades. And a extraordinary example of citizen activism and your coalition. Persevering against very strong opposition that similarly to what is happening now on a national level expressing good intentions sought to sabotage rather than advance your success.

And in fact, every week we receive a new privacy framework from trade group. They start with preemption and they conclude with endorsing the status-quo. Preempt California. Go back to the status-quo.

So, let me ask you, how would you -- what are the most important points that you think you would apply to make California even stronger at the national level?

MACTAGGART: Well, Senator I'm pretty -- I was pretty happy with

29

the -- with the deal we struck -- we did have to give up a couple of things. We -- we gave up a whistle blower provision. Because I do think finding out what's going on in -- inside these companies is very difficult.

And but, other than that we -- we were in this extraordinary position where the consumer companies realized they were going to have to spend a lot of money that wasn't going to look good for them spending against their customers. So, I -- I -- we -- we got a deal that we really liked.

WHITEHOUSE: And -- and -- I'm glad to hear that. And look

forward to your helping us, including members of this committee, the Judiciary Committee. Because I think the input from this committee will be important to the Commerce Committee as we frame legislation, bipartisan legislation, going forward.

Is there anyone here talking about enforcement that would be opposed to strong authority both for rule making and penalty imposition by the FTC? If you're against it, raise your hand? Is there anyone -- and the record may reflect that no one raised his hand.

Is there anyone who would oppose state Attorney General enforcement of the federal law? If you're opposed to the state Attorney General enforcement, please raise your hand. Good. No -- no one has raised your hand.

Let me ask Google are you willing to commit, Mr. DeVries, support for a law at least as strong as California, and potentially with a whistle blower provision?

DEVRIES: Senator, we support the goals of the California

legislation. There's things that can be improved. We have needs and fixes to be made as everyone acknowledged. But with those fixes I think that those are important rights that we'd want to see in federal law as well.

WHITEHOUSE: Well, I'd ask you for the record to give me in

writing what you think the fixes should be?

DEVRIES: We'd be happy to communicate those. We've been working

with the Attorney General on this issue as well as members of the legislator about what some of the changes would be to bring some of the ambiguities out of the law and make the rights more clearly stated.

We think we can even do broader -- more established those rights even more broadly as we consider a federal legislation.

WHITEHOUSE: Mr. Weinberg, one last question, because my time is

almost up. Is there a potentially a business model here? That in effect, and I think you'd proven there is. Avoids tracking but, also collects any information completely anonymously. In other words, divorcing or separating the information from name and other identifying information?

WEINBERG: Yes, Senator I do. I think the devils in the details,

as you started with. And that, when you have this notion of pseudo anonymous data, it can actually be not anonymous. But if we legislate those kind of ambiguities as required, I believe that companies will innovate and figure it out like we have.

WHITEHOUSE: If -- if we legislate that separation -- like a

separation of church and state. The companies would comply, and we would change the business model. But there would still be the opportunity for profitability?

WEINBERG: Yes, Senator, I believe that's the case.

WHITEHOUSE: And you've proven it?

WEINBERG: Yes.

WHITEHOUSE: And would that change Google's business model?

WEINBERG: As, Mr. DeVries mentioned I think Google actually

makes most of its money in a way that would not change it that significantly. They make it via contextual advertising on search ads and they've have divorce themselves from the behavioral advertising.

WHITEHOUSE: Do you agree, Mr. DeVries?

DEVRIES: I think we'd want to make sure we support publishers

with advertising products. But I -- I agree otherwise with Mr. Weinberg.

WHITEHOUSE: Thank you.

BLACKBURN: Gentleman's time has expired. And that concludes our

questioning for this first panel today. We thank each of you for being here. I think that is evident to you that we are focused on doing something.

Opting-in for your PII, making that choice, having that protection opt-out for search and non-sensitive data. Those are things that you have heard discussed here today. We look forward to continuing to talk with you all and work as we develop a privacy protection legislation. Thank you all for your time. You're dismissed.

At this time, as we reset the table for our second panel, I will call them forward and introduce them as I am calling them forward.

Ms. Roslyn Layton, is a visiting scholar at the American Enterprise Institute.

Ms. Michelle Richardson, is the Director of the Privacy and Data Project at the Center for Democracy and Technology.

Professor Jane Bambauer, and I hope I am saying your name correctly, Bambauer? Excellent. Is a Professor of Law at the University of Arizona College of Law, she is also the Director of the Program on Economics and Privacy at George Mason University Antonin Scalia Law School.

I want to welcome the three of you. I will say that it is an honor for me to see before me three women leaders in technology. This is women's history month and no doubt, you all are probably making history. This is the first time we have had a panel of women here.

Before I have you stand, and we swear you in. I'd like to ask anonymous consent to include Senator Grassley's statement for the record in the record of these proceedings. Without objection, so ordered.

If each of you will stand to be sworn in. Do you affirm that the testimony that you're about to give before this committee is the truth, the whole truth, and nothing but the truth, so help you God?

Thank you, please take your seats.

And, Ms. Layton we will begin with you with your testimony.

LAYTON: Senator Blackburn, Senator Coons and members of the

committee, thank you for the opportunity to discuss the GDPR and the CCPA. It is a honor and I'm harden by your bipartisanship. This testimony reflects my research conducted at Demark Audbur University.

Additionally, I'm the mother of three Danish American children, so I have a very personal interest to investigate whether the European rules work. The academic literature shows that online trust is a function of institutions, business practices, technology, and user knowledge.

But unfortunately, the European union rejected this formula for its data protection policy. My hope is for Congress to avoid the mistakes of the GDPR and ultimately leap-frog Europe with a better framework based upon privacy enhancing technology, consumer education, and scientifically based standard setting.

Now, to analyze a policy like the GDPR, we must set aside the political pronouncements and evaluate its real-world effects. Here are ten key problems with the GDPR and if not properly addressed they will also plague the CCPA.

The first problem. The GDPR has strengthened the largest players. Since implementation, Google, Facebook and Amazon have increased their market share in the E.U.. This is a perverse outcome for a policy promised to level the playing field.

Number two, the GDPR weakens small and medium size firms. The ad-tech competitors of Google and Facebook have lost up to one-third of their market position. And venture capital for E.U. startups has declined by one-fifth.

Number three, the GDPR is expensive to implement. Dozens of Americans firms no longer serve the E.U. because of the high cost of compliance. Some $3 million for a company of 500 employees. Given that Europe is a destination of two-thirds of America's goods and services this should be seen as a -- a tariff.

Four, the GDPR silences free speech. Over 1,000 American news sites such as the venerable Los Angeles Times and the Chicago Tribune are no longer accessible in the E.U.. If this policy was

31

introduced in the United States it would violate the first amendment for the barrier its creates to expression.

Number five, the GDPR threatens innovation and research. GDPR requirements are fundamentally incompatible with big data, artificial intelligence, blockchain and machine learning.

Number six, the GDPR undermines the transparency of systems that organize the Internet. The vital information of the so-called, WHOIS protocol, the address book of the Internet, is obscured today. Law enforcement, cyber-security professionals and property rights holders can no longer access this vital information.

Number seven, the GDPR and the CCPA create risks for identity theft and online fraud, because there's no requirement for -- to authenticate users before their information requests.

Number eight, the GDPR has not created greater trust online in the E.U. After a decade of increasing regulations, including lots of opt-ins, Europeans report no greater sense of trust online. California has more privacy laws than any state, and yet, its residents do not report feeling more private or safe.

Number nine, the GDPR and the CCPA use the pretense of consumer control to increase the power of government. The discussion of consumers takes just a small part of the text of these laws, whose main goal is to empower bureaucrats. The GDPR imposes 45 specific regulations on business practices and 35 obligation on regulators. There was no rational process to test these provisions before they were enacted. California goes even further with 77 invented regulations and sweeping powers granted to the Attorney General with no accountability or transparency requirements.

Number 10, because the GDPR and the CCPA fail to meaningfully incorporate the role of innovation and education in policy, they will not increase trust online. People should not be so naive to mistake the bureaucratization of data protection as a way to create a natural right of privacy.

So, I urge this Congress to attempt to create a superior framework. This will require incentivizing the development of world-class, scientifically-proven, privacy-enhancing technologies through grants and competitions and to provide safe harbors for their research, development and practice. My testimony details ways to enable consumer education.

And finally, Congress should look at the role of scientific standard setting as described by Nobel Economist Elinor Ostrom, who advocated governance where the users set the rules and offered means of monitoring and compliance that don't bankrupt the enterprise. The E.U. should not -- the U.S. should not copy the E.U. on data protection but leap-frog it by creating better systems and policies. I thank you, and I look forward to your questions.

BLACKBURN: Thank the gentle lady.

Ms. Richardson, you're recognized.

RICHARDSON: Chairwoman Blackburn, Ranking Member Coons, thank


you for the opportunity to testify today. This Center for Democracy and Technology has supported comprehensive federal privacy legislation since our founding in 1994. And we appreciate the committee taking on this issue at a uniquely important time. Privacy and data issues are often complex and full of jargon. We want to leave you with one clear message today. Our current notice and consent model is broken.

We need Congress to think much bigger instead of keeping this model limping along. Move the privacy burden back to where it belongs; the companies who collect and use our data. We've seamlessly integrated the Internet into every aspects of our lives, and it has improved the quality of our lives in extraordinary ways.

But it has also created a world where devices and applications are constantly creating and collecting data about us. We interact with smartphones, laptops, wearables, home IoT devices, connected cars, online accounts, websites and even connected public infrastructure every day.

There is little left about our lives that is not documented in some way. But the problem goes further. Our data doesn't stay with the long list of companies we consciously choose to engage with. It's instead shared with third parties and business partners that we have no relationship with. And this includes data that is incredibly sensitive like location information, biometrics and health data.

Some argue that the solution to this problem is making privacy policies clear so consumers better understand what they're signing up for. But ultimately, there is no meaningful way for people to make informed timely decisions about the hundreds of different companies that they interact with every day.

Instead, the goal should be to define our digital civil rights. What reasonable behavior can we expect from companies that hold our data? What rights do we have that are so precious that they can't be signed away?

To that end, CDT has published model privacy legislation, and we invite members to borrow from it as they craft a comprehensive privacy bill. It's informed by GDPR and the new law in California, but we think it better reflects U.S. values and more significantly shifts the burden of data management from users to companies. It's crucial that a federal privacy law govern all entities that hold personal information and under a single regime.

We would recommend that any privacy law do four things. One, it should deter discrimination against those who use online services; two, it should limit the collection, use and sharing of sensitive information that is not necessary to offer the service user requested; three, it should require all entities to take reasonable efforts to secure personal information; and four, it should grant individuals the right to access, correct, delete, and port their information.

Importantly, all of these requirements can and should exist outside of the current notice and consent model. These are the rights that you should not be able to sign away. We also believe these requirements should apply to businesses that process personal information regardless of the business model or their size.

And if drafted properly, these sorts of requirements can actually level the playing field. As Congress tries to find a way forward that works for both industry and individuals, it should be mindful that size is not always a proxy for privacy risk and privacy harm. And we recommend Congress consider the following things.

First, from the point of view of a consumer, the privacy harm they experience has nothing to do with how many employees a company has or how much money it makes. Cambridge Analytica had only six employees when it collected information on 50 million Facebook users. And some of the most popular apps today process the information on hundreds of millions of people before they even became profitable. Creating an exception from a privacy law for entities like this just doesn't make sense.

Second, different companies choose to use data in different ways, and their obligations will be proportional to their data use. For example, your dry cleaner or a corner store may process very minimal data while some technology start-ups process much more and can impact millions of people's privacy on day one. Privacy requirements can scale according to how a company uses data.

And third, clarity is just as important as flexibility. You'll hear that small businesses -- start-ups just need flexibility, but too much flexibility leads to uncertainty. Compliance costs should go to following the rules that Congress writes, not trying to figure out what they even are. Thank you again for the opportunity to testify. We look forward to working with the committee to draft a privacy law that works for both consumers and companies.

BLACKBURN: And we thank you for the testimony.

Professor Bambauer, you're recognized.

BAMBAUER: Chair -- Chair Blackburn, Senator Coons and members

of the committee, it's an honor to be here. And I'm delighted that you're doing the hard work of crafting a strong and sensible national privacy law. It is hard work.

I've devoted my career to understanding privacy and information law, because it's an area where detached and careful research can take you to some pretty surprising places. The best interests of consumers are not always intuitive in our digital economy. So, my goal is to share some of what I know about the possible pitfalls as you move forward.

So, first of all, as you know, time is of the essence. If the -- if the California Consumer Protection Act comes into effect, we may be in for a pretty rough ride. And we can look at what's been happening in Europe to get a sense.

So, since the GDPR took effect, there's been a significant reduction in venture capital investment all across every sector in Europe. That -- that comes with millions of dollars per week of lost investment and -- and of course, lost jobs as well, and lost services to consumers. Competition has also suffered, because firms who lose the most are the younger and smaller ones.

The CCPA is a light version of the European privacy law. And it's likely to cause a similar shock here, maybe even a greater shock, because the U.S. has been the world's hub of invention for information technologies.

So, Congress should certainly take the opportunity to stake out some -- some clear rules to protect consumers, but concrete risk and harm should continue to be the touchstone rather than consumer control.

So, I know I'm going against the grain. Why is it that I'm emphasizing harm over control? Well, at bottom, the GDPR and the CCPA create a property right -- right. So, the idea is that, as a consumer, it's your data, and you're the ultimate authority about its best uses.

The property model has so dominated national tension and debate about privacy that our live debates, basically, take it for granted. We're -- we're debating over opt-ins and opt-outs, for example, and that already assumes that privacy is a species of property, and the owner should have veto power.

To be sure consumers do want this -- do want to be in control of their information, particularly when harms are hard to define and hard to anticipate. But consumer control has its own problems and unintended side effects.

So first, it's frequently going to leave the consumer under protected for reasons that Mr. Taggart (sic) said in the first panel. Because they may opt-in or fail to opt-out. Without enough information

about the pros and cons of some kind of data arrangement.

But also, it's certainly definitely going to overprotect the consumer in many cases. Ultimately, to their detriment. When distrust or transaction costs cause new services to fail even though in fact, they would be beneficial if they were given a chance.

After all, people have always tended to be wary of new information technologies. It seems to be part of our hardwiring. And so, we should just be aware of that. Opt-in rules and other legal incentives to -- sort of get consumers to guide -- to guard their privacy, rest on an assumption that unbalanced privacy is better for them.

But the empirical evidence does not really support this assumption. Studies that are able to actually take into account the real-world alternatives to a controversial data practice more often find that consumer benefit from the intrusive practices, even though they seem obnoxious. I've given a couple examples in my written testimony, but I want to elaborate on -- on digital advertising. Because that's come up so much in the first panel.

So, Senator Graham asked about googling information about golf, and then getting ads based on his -- his Google search results. It's true that Google, and other major companies would not lose much money from advertising revenue in services like that. But if you think about the dynamics of this process, it is the content markets that are going to really lose out.

So, we can look at what happened in the E.U. when their cookie law went into effect. Across the board, revenues were reduced for all -- all -- all websites. But the relative story's where things get interesting. General content -- content providers were the biggest losers whereas marginal niche content providers didn't have as much of an effect.

Also, noisy and moving ads tended to do better than ads that were -- that -- that were not noisy. So, we need to keep these types of unintended consequences in mind. So, if the CCPA is equivalent to a kind of tear down and rebuild of American privacy law, I recommend a significant renovation instead. And I've circulated a bill.

I know you've seen lots of bills recently. This one empowers the FTC to expand some of the work it's already done in -- in defining unfair and deceptive privacy related business practices in this area. But it also lets them build their expertise the consumers can't possibly develop to figure out what practices are going to be most harmful. Thank you.

BLACKBURN: And thank each of you for your testimony. And I


thank you for the written testimony. We realize a lot of work goes into that. And we appreciate that you take the time to do it when you agree to come before us. And you're exactly right this is an issue that we are intending to do something on this year. I'm going to recognize myself for five minutes. Four questions.

And, Ms. Richardson, I want to thank you for mentioning that we that -- that we should have one set of rules for the entire ecosystem with one regulator; the FTC.

RICHARDSON: Right.

BLACKBURN: And I -- I do think that type clarity sets the


ground rules for how we move forward.

Because Ms. Layton, as you mentioned with small business and how heavy-handed rules make it more difficult for small business. We want the Internet to flourish. And we're looking at 5G coming on. And we're looking at artificial intelligence and this spectrum of data that has been created over the past ten years.

But in that regard also, we want to make certain that people do have that expectation to privacy and do know who owns their information.

Professor Bambauer, I thank you for your continuum of work on this issue. We appreciate that. Talk -- go back into what you were just talking about and let's begin with preemption and why that is so important to exercise that.

Because you look at GDPR, and of course the E.U. would have preferred for us to go first in privacy legislation, I really think they would have liked for us to set the standard. And we should want to be setting these standards. But California with their law, talk a little bit about preemption and why we need to put that in place.

BAMBAUER: Yup. Well, I -- I don't -- I don't object to the idea


that we should be setting the standard I just do not think that California's law is setting the correct standard. It is -- it is putting the onus on...

BLACKBURN: I would agree with you on that. But talk a little


bit about why we need to exercise preemption, so we don't have 50 different laws.

BAMBAUER: Right. Yes. So, in an -- in a context where every

state potentially has a different privacy law, the compliance costs with be overwhelming. The likely result is, if a -- if a company at least has enough resources, it will comply with the most demanding standard and therefore we won't really have a laboratory of democracy. You know, we won't have -- we won't be experimenting in -- in different states because of the nature of the Internet, where services cross borders. We will have -- we will have a rush to the higher level of -- of regulation.

BLACKBURN: Ms. Layton, GDPR is on average $3 million compliance

costs for a firm in the E.U. with 500 employees. And when you're looking at that startups, that just have a couple of employees, talk a little bit about how those compliance cost. What that is going to do to smaller firms.

LAYTON: Well, I think we can see what's happened already. I

mean if you can go to Silicon Valley today and -- and startups are saying we're just not serving the E.U. And it's conceivable that they -- it's just that uncertainty is so high, that they don't even want to begin to do it.

That's a concern because Europe is a location for two-thirds of our digital goods and services. So, it's quite a large market.

BLACKBURN: Yeah. You touched on WHOIS.

LAYTON: Yes.

BLACKBURN: Which we -- which I think is important. But to

comply with a GDPR, and I can, they have a rule that allows registries and registrars to obscure WHOIS. You want to talk about that for a minute?

LAYTON: Yes. So -- so, WHOIS as a kind of address book of the

internet. And -- and it's interesting because the, you know, the WHOIS database is used by the -- everyone in the world. It's used by law enforcement and -- and property rights holders everywhere. But it isn't actually required that the information is obscured.

But -- but companies are -- are invoking the ability to obscure themselves so that when people need to find out who may be putting up a site with child pornography, for example, they can't find out who's doing it.

So, it is -- it's devastating, I think. And -- and so this is a case where it wasn't -- this was one of the consequences that the European policy makers didn't consider. And they wouldn't even listen to people who'd bring up these concerns. And so -- so here we are with the major cyber-security problem, law enforcement problem, protection of intellectual property...

BLACKBURN: Right. OK. Professor Bambauer, in the couple of

seconds I have left, let's go back to the -- the -- putting a data privacy regime in place and why should the FTC be the one to take the lead in that?

BAMBAUER: Well, they -- they have the expertise that they've

already been developing over the years to understand what types of services were downed ultimately to -- to a consumers benefit, and which ones don't.

So, it's quite important, you know, we are often focused on the practices that wind up potentially harming consumers. But another major, major role of a good regulator is to allow, you know, seemingly suspicious innovations to go forward if -- even though they seem on the surface to be creepy, if there's no real reason to suspect that they are going to cause harm.

BLACKBURN: My time's expired.

Senator Feinstein?

FEINSTEIN: Madam Chairman.

(UNKNOWN): (Inaudible) let Senator Coons go first?

FEINSTEIN: Senator Coons?

COONS: Thank you, Madam Chairman, and Ranking Member Feinstein,

I'll be brief. I have just two questions...

35

(UNKNOWN): Thank you, (inaudible).

COONS: ... I'd like to ask the panel. Just to continue a line

of questioning that was already under way. I agree that compliance cost has to be one of our concerns as we're trying to strike the right balance.

I'm also someone passionate about protecting intellectual property. And the Internet poses a wide range of intellectual property challenges including offers to sell counterfeit goods, widespread digital piracy. And while I support efforts to protect individual privacy, I'm concerned about reports that GDPR's make it even more difficult to identify those responsible for infringing content.

Dr. Layton, if you could just -- what safeguards do you propose for avoiding enabling illegal behavior online through increased privacy protection?

LAYTON: Well, one -- one significant example is the use of

artificial intelligence to attempt to find infringements. And under the GDPR, that itself could be illegal. So, even the ways that we would attempt to compensate for the WHOIS not being accessible, that also -- so the -- the -- the workaround would be illegal as well.

So -- so, it's just that sort of a -- of a snowballing effect that we have an original problem, and then we create a law that the cure is worse than the disease. So, it's just not wanting to go down that slippery slope.

COONS: I'll look for specific proposals. I think it is an

interesting challenge.

Ms. Richardson, you raised an excellent point that the privacy risk is not proportional to size and profitability of companies. And I'd be interested in -- in your answer and if I could Professor Bambauer's too.

What beyond increased rule making, what additional tools should we be giving the FTC in order to be more affecting in protecting data privacy? For example, when providing them with authority to oppose civil penalties for first time violations be in any way a constructive stat towards giving them more relevant authority in this space?

RICHARDSON: Absolutely. Our current system where companies get

one free bite of the apple of inappropriate behavior before they are fined is not working. And that is something that could easily be done to allow them to have original fining authority. I think they're going to need an assist from the state A.G.s. If we are talking about a system that is going to sweep in all companies who hold personal information.

It's just not going to be possible for the FTC to do that by itself. No matter how much resources we give it. But I would say also Congress just needs to give the FTC direction by putting a baseline privacy standard. Make a list of no go's, the most offensive behavior that we're seeing on the internet, so the FTC can really focus on some of the harder issues and using its rule making authority to provide detail where it is really necessary.

COON: Detail, definition. Professor Bambauer?

BAMBAUER: Yes. I -- I have to read the with (inaudible)

authority. I would hope that the FTC could define both safe harbors for -- for conduct that clearly is.

(UNKNOWN): (Inaudible).

COONS: Your microphone's not on. Thank you, Professor.

BAMBAUER: Sorry. The FTC could define safe harbors for -- to --

to find conduct that clearly is in consumer's interest. As well as I don't know what the opposite would be. Deep waters? Where, you know, conduct that clearly would violate the standard. I -- I also think that the FTC could -- could...

COONS: I think they call (inaudible).

BAMBAUER: Right. OK. Yes, that's right. They could also create

certification standards for companies to...

COONS: Right.

BAMBAUER: ... more clearly compete on privacy by signaling that

they intend to comply with -- with -- with standards that go beyond what the law would require. And civil -- I'm -- I'm not against civil penalties for first violations. I -- I -- I -- my proposal bill has -- has something for that. As long as those violations are knowing. In other words, as long as it -- it's the -- the company has a reason to understand that what they're doing violates some clear -- clear notion of privacy.

COONS: Nice quick question. Tom Lee and Will DeVries on the

previous panel talked -- did not talk directly. Both referenced portability. I only dimly grasp this, if I might Ms. Richardson, my superficial grasp of this is, there happens to be a very power social media platform, into which my family and I have invested huge amounts of photographs, and data, and memories.

If another platform came up that had stronger privacy protections that was appealing to me, I don't today have the ability, that I'm aware of, to demand of Facebook that they allow me to port to a new platform everything that I want.

So, to the question the Chair was asking previously, you know, do I really own my digital, virtual self, and how would we do that in a way that would not, as Mr. Lee raised, unintentionally then compel the new more privacy sensitive company to engage in practices in the receipt of my data that would violate their own standards. Does that make sense as a question?

RICHARDSON: Yeah. And this complicated. You're going to...

COONS: It is.

RICHARDSON: ... have to make a couple of decisions. One, just

substantively about what data you should be able to take with you but also on a technical matter how the interfaces should be working. And I think that is best kicked to NIST or another agency with that expertise.

COONS: I appreciate you raising NIST. One of my favorite

federal agencies that is completely relevant here.

Thank you very much, Madam Chair, and Senate.

BLACKBURN: It is indeed relevant, and we've worked with them

for quite a while on some of these issues.

Senator Hawley, you're recognized.

HAWLEY: Thank you very much. And thanks to the witnesses to

being here today. I -- I want to talk about property rights and particularly as it relates to data brokers. But can I just first make sure that we're all on the same page?

Do you all agree that -- that the personal information like your location, like your -- the websites you visit, like your credit card information, that that is a -- a form of property? I mean like this personal data is property. Do -- do we agree on that?

You -- you don't think so, Professor Bambauer?

BAMBAUER: No. I -- I mean, property depends on certain sets of

legal rights that rights that are -- right now, are not well defined and so it's not inevitable that -- that those will be property rights.

HAWLEY: And -- and you don't think that that should be

considered property?

BAMBAUER: No, I -- I do not. For -- no I do not. I -- I don't

think that -- so, property rights are best vested in entities and people who -- who know what is in their best interests better than any -- anyone else. They have (inaudible)...

HAWLEY: Well, that's a questions about assignment of the right.

I'm talking about the content of the right.

37

BAMBAUER: Right.

HAWLEY: You -- you don't...

BAMBAUER: So...

HAWLEY: ... you don't -- you're telling me, you don't think

that personal information isn't property at all?

BAMBAUER: Not only is it not, it under the first amendment

precedent that we have, it cannot. It cannot really have the same form of property protection that say intellectual property does.

HAWLEY: Well, form is different. I'm -- I'm just asking is

there a -- I'm intrigued for instance by the title of the -- of the paper that you submitted. You talk about privacy as not property.

BAMBAUER: Right.

HAWLEY: But that seems to be me to be slightly a category or

mistake. We're not talking about privacy as property, but what's property is the personal information and data. Those privacy protections for that property is a different question. I'm just trying to drill down; do you actually think that personal confidential information is -- is property? But -- and I hear you saying, that you do not think so.

BAMBAUER: I do not think so.

HAWLEY: Do -- do others agree or disagree with that?

LAYTON: I would just add to -- I would just add to that and I

would point you to the work of Pam Dixon, who would really call these -- they're shared property rights. And because the -- the way that the data's collected, it's so integrated within systems, and with other users, that it's hard to extricate.

And -- and that might be just one way to think about it. I -- I don't disagree with the importance of our Constitution and how we want to protect property from the perspective of the Constitution. But there is a technical complication here.

RICHARDSON: Looking (ph) at a high level, yes. We -- we think

in an ideal world.

HAWLEY: Well, it -- it seems to me that the -- certainly the

companies who collect these are the data brokers who collect information, they regard it as property, right? Because it's bought and sold, I mean, it's monetized. It seems strange to me to say that -- that this kind of information that is quite valuable, apparently, because I understand that there's a pretty robust market for this information .It's being bought and sold, right? I mean that seems to me it's a form of property.

And so, certainly the market's treating it as a form of property. So, then we -- we have a a fairly classic question that arises in our law in regular intervals which is how do we define that property, and then how do we -- where do we assign the rights, right?

I mean, to whom do we give the property right, and what are the rules for bargaining an exchange of that right. And this is a classic market definition question that -- that has come up repeatedly in our history and that brings me to the -- to the data brokers.

So, my understanding is, you correct me if I've got this wrong, but data brokers collect data from commercial governmental, other publicly available sources. This data can include information like bankruptcy information, voting and registrations, consumer purchase data, web browsing activities, warranty registration, and other details of consumers every day interactions. They put that together, build a user profile, and then they sell this data to other parties. Have I got that, basically right? Am I -- is -- is that correct?

So, my question is then, why shouldn't we give consumers some control? Why shouldn't they be assigned the property right in this data? That they can then, you know, we can -- we can set the default rules, right? About how that data is-- is transferred or how it can be alienated if you like to use the formal legal term. But why shouldn't we start by saying the -- we're going to assign this data property right to consumers. Is is -- is that -- is that wrongheaded? And if so, why? Or is that the right approach. Yeah, we can just go down the line. Go ahead, Ms. --

LAYTON: What -- I'll just say very quickly. I -- I certainly

respect the question, I thank you for thinking so deeply about it. What I would say is it's -- it's maybe not what's so important as the data, it may be the algorithm itself. It's the software that's the property that -- and my concern is the regulations that we are doing are in fact -- they're regulatory takings.

We are essentially taking -- divesting companies for their intellectual property to create an algorithm. The person's data is a separate issue which -- which I don't necessarily have the answer for you. But I think you need to distinguish between the data collected and the algorithm itself.

HAWLEY: Can -- can you just say more about the -- do say

something about the algorithm and why that might be proprietary and why and why it's so valuable to the companies that develop it.

LAYTON: Well, and -- and absolutely, I mean I think when we --

you -- saw the companies that we had today. It was their engineers, their ingenuity that created the -- they -- they put together the -- the rules or the -- the -- the decisions between how things should be related. They've written that down in a code. And that code is -- has a value, which they of course want to protect, there's no doubt about that.

HAWLEY: Yeah. Thank you.

Do you have anything to add to that, Ms. Richardson?

RICHARDSON: We don't usually use up property framework to talk

about this, but we do think your number one goal should be shifting the burden of privacy management from users back onto companies.

HAWLEY: I see my time's expired.

Thank you, Madam Chair, thanks all of you.

BLACKBURN: Thank you all.

Senator Feinstein for five minutes.

FEINSTEIN: Thank you very much, Madam Chairman. Senator Hawley,

I thought your questions were very well placed and really very good. For someone, and I'm not all that computer sophisticated, it was revolutionary because I really see the breadth and depth of what we're dealing in. And the fact of what the unknown is what the future brings.

So, let me ask this the European law, I'm fascinated about this and opt-in and opt-out. It seems to me if you have a button for opt-out, you can have a button for opt-in. But how -- how -- how would you respond to claims that the European law has been harmful for business? Please.

RICHARDSON: I -- I would point out that it's only been nine

months and there is not a lot of good data out there about how this is really affecting businesses. Either there, or here in the U.S. There are some statistics available, but they are really looking at very small snapshots of very specific things.

But there is some hope. I know Cisco recently put out a report that said that companies that are GDPR compliant are getting their products out faster. Because there are fewer questions about privacy and security. So, we're hoping that we're moving to a model where people benefit from the investment up front.

LAYTON: Senator, as a person who lives in the E.U., and

experienced that for the past decade, with increasing waits of privacy regulation, I would say it is -- it's quite demonstrably worse. Particularly as an American. If you want to read American news. You cannot access over 1,000 news sites from the European Union. You can't read what's going on in the Los Angeles Times. You just a get blank -- a -- a white page that says due to the GDPR, we're not serving content.

So, that -- it's -- it's staggering to think about what, you know, from American perspective what that would mean, if -- if we would adopt such a framework. But from the other side, the -- the opt-in kind of the way that it's experienced, every single time you go to a new website this big popup comes into your face.

And what's -- what has been shown in consistent user studies is people frequently click away. Or they do the opt-in and then they have to -- they don't read the policy, so much more data's collected had they not had an opt-in.

And this has also been shown with do not track, is that companies who will say opt-in up front, they tend to ask for more points to collect on data than had they not. So this is one of the unintended consequences. I know it sounds great on the surface, but in practice, can have a negative effect.

BAMBAUER: So, it's true that the...

FEINSTEIN: (Inaudible).

BAMBAUER: ... the GDPR has -- has obviously only been in effect

for a few months and that -- that the studies -- there are some, you know, well done studies but they are limited by -- by that fact. Europe was already starting though from a very strong privacy standpoint. And so, the fact that we're seeing so much -- so much of an effect, suggests that here in the U.S., when we move form a lower baseline to a -- to a much higher one that -- that -- that the impact may be greater.

But let me tell you about another study here in the U.S., actually, in your district. There was a study of opt-in versus opt-out for -- for lending. Because it just happened to be that counties in the bay area took different default approaches.

So, in one county, you know, they would require -- if a -- if a bank wanted to get extra data from these data aggregators, the -- the person applying for the loan would have to opt-in and in another county, similar county, they'd have to opt-out if they didn't want that data collected.

So, the result was that the counties with opt-out procedures, where for most applicants, data was automatically, you -- you know, was automatically received from data aggregators. Those applicants got better loans. The terms were better, the -- the interest rates were lower on average, and the defaults were -- were...

FEINSTEIN: Why would that be?

BAMBAUER: Why would it be? It's because loan officers are

always going to work with some information. They will definitely have income. If you also think about the distributional affects, this is important too, loan officers are always going to be making their decisions based on income.

So, we already have a class, you know, a sort of class effect. With extra information though, you can differentiate the people who may look bad by traditional members -- by -- by traditional measures, but who are actually low credit risk based on this extra sort of new information that was collected about them passively.

And -- and therefore, offer loans to -- to otherwise weak looking applicants who are not actually likely to default. And then, you know, conversely, if we're limited to just the basic information that an applicant providers, because they have, you know, failed to opt-in to extra sort of creepy sounding data practices, well, ironically, they're actually going to be disserved by that.

FEINSTEIN: But as I understand it, we're talking about all

kinds of data now, the most personal data and the most impersonal data. It seems to me, that on opt-out, the individual loses their power.

BAMBAUER: Yes.

FEINSTEIN: But in opt-in, the individual has the power to say

no, I don't want you to collect this or do that. And what I worry about, because of the sophisticated of the sector, is that it becomes so complicated, that people rebel against it. And I know when I get some of these notices, I don't know what they mean, the print is so small. The easiest way is just to avoid it.

But if I have to get something, I'm going to find a way to get it and that to me is kind of the different between opt-in and opt-out and maybe you limit the areas but I -- I think everybody would agree that an individual's personal medical data should have the highest security connected to it. And that you would want to opt-in to anything that offered the opportunity that you lose some of that security, and say no.

So, I have a very, as somebody who is sort of a -- of a generation that is not the most hip in terms of these things, I want to see that people are protected. And our privacy is protected. And I know I'm a Californian, I know the industry somewhat, and appreciate it and want to help it. But the power they have is so enormous over individuals that they know all this, and the individual knows a very little bit about how something may be used and -- you're -- you're going to, you know, face exposure that's going to identify you and that kind of thing.

When you think of what the future can bring, I would think that the United States of America in terms of the federal government, would want to protect people as much as they possibly could. I'd be interested in your comments.

BAMBAUER: So, is it OK to go over...

BLACKBURN: Time has expired. And I will -- if it is OK for us

to take their comments as a written response.

FEINSTEIN: Fine.

BLACKBURN: That would be appreciated. I -- there are no other

members waiting to ask questions, and we want to thank you all for your time being here today for your testimony. I will remind all the members of the committee that you have one week in which to submit additional questions for response. While on the Senate side, they do not put a time limit on you, for like we did when I was in the house.

Let's just do that in a very timely manner. As you can see, this is an issue that's we want to take an action on. To make certain that we find that right balance. That your PII is protected, that your non sensitive information has protections, but it properly utilized, that we exercise the data security which deals with the breaches, and the notifications there and that as we look at intellectual property protections, that we also look at prioritization.

And what is being done in the search field on prioritization. With that, we thank you all for being here.

This hearing is concluded. Adjourned.

END


Mar 14, 2019 11:08 ET .EOF

-0- Mar/14/2019 15:08 GMT

# EXHIBIT 4

# Manage or delete your Location History

web.archive.org/web/20180816004907/https://support.google.com/accounts/answer/3118687

Your Location History helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or traffic predictions for your daily commute.

You control what's saved in your Location History, and you can delete your history at any time.

**Note:** Some of these steps work only on Android 8.0 and up.  Learn how to check your Android version.
Learn what applies in Android 4.1 through 4.3 or for iPhone and iPad.

## Turn Location History on or off

You can turn off Location History at any time. With Location History off, the places you go are no longer stored. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.

You can also turn off Location services for a device. Learn how.

### Turn Location History on/off using device settings (Android 2.3 & up)

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

### Turn Location History on/off using a website

1. Go to the Activity controls section of your Google Account. You might need to sign in.
2. Turn **Location History** on or off.
3. Confirm the change. This setting will change for your Google Account and all devices associated with it.

If you use a work or school account, your administrator might turn this setting on or off for you.

## Delete Location History

You can delete all of your Location History or only parts of it. If you delete your entire history, some apps may not work correctly.

## Delete Location History using device settings (Android 2.3 & up)

**IMPORTANT**: Deleting your Location History in the Settings app is permanent. You can't reverse or undo it. Deleting your Location History may cause problems in some apps.

## Delete Location History using a website

You can delete individual locations, locations by date, or your whole location history on the Location History website.

1. Go to maps.google.com/locationhistory. You might need to sign in.
2. Pick how to delete your Location History:

**Note**: The Location History website isn't available in South Korea.

# Usage & diagnostics for Location History

When you turn on Location History, you also let your device send diagnostic information to Google about what's working and not working for Location History.

All usage and diagnostics information is used in accordance with Google's privacy policy.

## What information your device could share

Your device may send information to Google for improving Location History. For example, your device may send information when Location services aren't working properly.

Sent information could include:

- Quality and length of your connections to mobile networks, GPS, Wi-Fi networks, or Bluetooth
- State of your location settings
- Restarts and crash reports
- Apps used for turning Location History on or off
- Battery levels

## How shared information helps Google improve

Usage and diagnostics information can help improve Google apps, products, and Android devices. For example, Google can use information to improve:

- **Battery life**:
  Google can use information about what's using the most battery on your device to help reduce battery consumption for commonly used features.
- **Location accuracy**:

Google can use information from location sensors and settings to help improve location estimates for apps and services.

## Related articles

Was this article helpful?

How can we improve it?

true

# EXHIBIT 5

GOOGLE TERMS OF SERVICE

Last modified: October 25, 2017 (view archived versions)

# Welcome to Google!

Thanks for using our products and services ("Services"). The Services are provided by Google LLC ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States.

By using our Services, you are agreeing to these terms. Please read them carefully.

Our Services are very diverse, so sometimes additional terms or product requirements (including age requirements) may apply. Additional terms will be available with the relevant Services, and those additional terms become part of your agreement with us if you use those Services.

# Using our Services

You must follow any policies made available to you within the Services.

Don't misuse our Services. For example, don't interfere with our Services or try to access them using a method other than the interface and the instructions that we provide. You may use our Services only as permitted by law, including applicable export and re-export control laws and regulations. We may suspend or stop providing our Services to you if you do not comply with our terms or policies or if we are investigating suspected misconduct.

Using our Services does not give you ownership of any intellectual property rights in our Services or the content you access. You may not use content from our Services unless you obtain permission from its owner or are otherwise permitted by law. These terms do not grant you the right to use any branding or logos used in our Services. Don't remove, obscure, or alter any legal notices displayed in or along with our Services.

Our Services display some content that is not Google's. This content is the sole responsibility of the entity that makes it available. We may review content to determine whether it is illegal or violates our policies, and we may remove or refuse to display content that we reasonably believe violates our policies or the law. But that does not necessarily mean that we review content, so please don't assume that we do.

In connection with your use of the Services, we may send you service announcements, administrative messages, and other information. You may opt out of some of those communications.

Some of our Services are available on mobile devices. Do not use such Services in a way that distracts you and prevents you from obeying traffic or safety laws.

# Your Google Account

You may need a Google Account in order to use some of our Services. You may create your own Google Account, or your Google Account may be assigned to you by an administrator, such as your employer or educational institution. If you are using a Google Account assigned to you by an administrator, different or additional terms may apply and your administrator may be able to access or disable your account.

To protect your Google Account, keep your password confidential. You are responsible for the activity that happens on or through your Google Account. Try not to reuse your Google Account password on third-party applications. If you learn of any unauthorized use of your password or Google Account, follow these instructions.

# Privacy and Copyright Protection

Google's privacy policies explain how we treat your personal data and protect your privacy when you use our Services. By using our Services, you agree that Google can use such data in accordance with our privacy policies.

We respond to notices of alleged copyright infringement and terminate accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act.

We provide information to help copyright holders manage their intellectual property online. If you think somebody is violating your copyrights and want to notify us, you can find information about submitting notices and Google's policy about responding to notices in our Help Center.

# Your Content in our Services

Some of our Services allow you to upload, submit, store, send or receive content. You retain ownership of any intellectual property rights that you hold in that content. In short, what belongs to you stays yours.

When you upload, submit, store, send or receive content to or through our Services, you give Google (and those we work with) a worldwide license to use, host, store, reproduce, modify, create derivative works (such as those resulting from translations, adaptations or other changes we make so that your content works better with our Services), communicate, publish, publicly perform, publicly display and distribute such content. The rights you grant in this license are for the limited purpose of operating, promoting, and improving our Services, and to develop new ones. This license continues even if you stop using our Services (for example, for a business listing you have added to Google Maps). Some Services may offer you ways to access and remove content that has been provided to that Service. Also, in some of our Services, there are terms or settings that narrow the scope of our use of the content submitted in those Services. Make sure you have the necessary rights to grant us this license for any content that you submit to our Services.

Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection. This analysis occurs as the content is sent, received, and when it is stored.

If you have a Google Account, we may display your Profile name, Profile photo, and actions you take on Google or on third-party applications connected to your Google Account (such as +1's, reviews you write and comments you post) in our Services, including displaying in ads and other commercial contexts. We will respect the choices you make to limit sharing or visibility settings in your Google Account. For example, you can choose your settings so your name and photo do not appear in an ad.

You can find more information about how Google uses and stores content in the privacy policy or additional terms for particular Services. If you submit feedback or suggestions about our Services, we may use your feedback or suggestions without obligation to you.

## About Software in our Services

When a Service requires or includes downloadable software, this software may update automatically on your device once a new version or feature is available. Some Services may let you adjust your automatic update settings.

Google gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by Google as part of the Services. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Google, in the manner permitted by these terms. You may not copy, modify, distribute, sell, or lease any part of our Services or included software, nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit those restrictions or you have our written permission.

Open source software is important to us. Some software used in our Services may be offered under an open source license that we will make available to you. There may be provisions in the open source license that expressly override some of these terms.

## Modifying and Terminating our Services

We are constantly changing and improving our Services. We may add or remove functionalities or features, and we may suspend or stop a Service altogether.

You can stop using our Services at any time, although we'll be sorry to see you go. Google may also stop providing Services to you, or add or create new limits to our Services at any time.

We believe that you own your data and preserving your access to such data is important. If we discontinue a Service, where reasonably possible, we will give you reasonable advance notice and a chance to get information out of that Service.

## Our Warranties and Disclaimers

We provide our Services using a commercially reasonable level of skill and care and we hope that you will enjoy using them. But there are certain things that we don't promise about our Services.

OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTIONS OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES "AS IS".

SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, LIKE THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. TO THE EXTENT PERMITTED BY LAW, WE EXCLUDE ALL WARRANTIES.

## Liability for our Services

WHEN PERMITTED BY LAW, GOOGLE, AND GOOGLE'S SUPPLIERS AND DISTRIBUTORS, WILL NOT BE
RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL,
CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES.

TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE, AND ITS SUPPLIERS AND
DISTRIBUTORS, FOR ANY CLAIMS UNDER THESE TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS
LIMITED TO THE AMOUNT YOU PAID US TO USE THE SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE
SERVICES AGAIN).

IN ALL CASES, GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, WILL NOT BE LIABLE FOR ANY LOSS OR
DAMAGE THAT IS NOT REASONABLY FORESEEABLE.

# Business uses of our Services

If you are using our Services on behalf of a business, that business accepts these terms. It will hold harmless and
indemnify Google and its affiliates, officers, agents, and employees from any claim, suit or action arising from or
related to the use of the Services or violation of these terms, including any liability or expense arising from claims,
losses, damages, suits, judgments, litigation costs and attorneys' fees.

# About these Terms

We may modify these terms or any additional terms that apply to a Service to, for example, reflect changes to the
law or changes to our Services. You should look at the terms regularly. We'll post notice of modifications to these
terms on this page. We'll post notice of modified additional terms in the applicable Service. Changes will not apply
retroactively and will become effective no sooner than fourteen days after they are posted. However, changes
addressing new functions for a Service or changes made for legal reasons will be effective immediately. If you do
not agree to the modified terms for a Service, you should discontinue your use of that Service.

If there is a conflict between these terms and the additional terms, the additional terms will control for that
conflict.

These terms control the relationship between Google and you. They do not create any third party beneficiary
rights.

If you do not comply with these terms, and we don't take action right away, this doesn't mean that we are giving up
any rights that we may have (such as taking action in the future).

If it turns out that a particular term is not enforceable, this will not affect any other terms.

The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

For information about how to contact Google, please visit our contact page.

# EXHIBIT 6

# Mobile Fact Sheet

 pewinternet.org/fact-sheet/mobile/

MORE FACT SHEETS: INTERNET/BROADBAND | SOCIAL MEDIA

In contrast to the largely stationary internet of the early 2000s, Americans today are increasingly connected to the world of digital information while "on the go" via smartphones and other mobile devices. Explore the patterns and trends that have shaped the mobile revolution below.



## Mobile phone ownership over time

The vast majority of Americans – 95% – now own a cellphone of some kind. The share of Americans that own smartphones is now 77%, up from just 35% in Pew Research Center's first survey of smartphone ownership conducted in 2011.

|  | Cellphone | Smartphone |
|---|---|---|
| 10/27/2002 | 62% |  |
| 11/30/2004 | 65% |  |
| 2/9/2005 | 66% |  |
| 12/31/2005 | 67% |  |
| 3/28/2006 | 66% |  |
| 4/6/2006 | 73% |  |
| 9/5/2007 | 76% |  |
| 12/2/2007 | 75% |  |
| 1/13/2008 | 77% |  |
| 5/11/2008 | 78% |  |
| 8/10/2008 | 82% |  |
| 12/20/2008 | 84% |  |

|  | Cellphone | Smartphone |
|---|---|---|
| 1/27/2009 | 85% | |
| 4/19/2009 | 85% | |
| 9/14/2009 | 84% | |
| 12/27/2009 | 83% | |
| 1/19/2010 | 80% | |
| 5/30/2010 | 82% | |
| 9/13/2010 | 85% | |
| 11/1/2010 | 84% | |
| 11/24/2010 | 82% | |
| 11/28/2010 | 82% | |
| 12/21/2010 | 81% | |
| 3/20/2011 | 86% | |
| 5/22/2011 | 83% | 35% |
| 8/26/2011 | 84% | |
| 12/21/2011 | 87% | |
| 1/8/2012 | 88% | |
| 1/15/2012 | 87% | 39% |
| 2/19/2012 | 88% | 45% |
| 4/3/2012 | 88% | 46% |
| 8/5/2012 | 87% | 44% |
| 8/7/2012 | 89% | |
| 9/6/2012 | 85% | 45% |
| 9/23/2012 | 88% | 43% |
| 9/30/2012 | 89% | |
| 10/14/2012 | 88% | |
| 11/4/2012 | 89% | |
| 11/10/2012 | 84% | 46% |

| | Cellphone | Smartphone |
|---|---|---|
| 12/9/2012 | 87% | 45% |
| 12/16/2012 | 88% | |
| 1/6/2013 | 89% | 51% |
| 5/19/2013 | 91% | 56% |
| 7/14/2013 | 90% | 53% |
| 7/28/2013 | 91% | 53% |
| 9/16/2013 | 89% | 54% |
| 9/30/2013 | 91% | 55% |
| 10/6/2013 | 92% | 58% |
| 1/5/2014 | 92% | 55% |
| 1/12/2014 | 90% | 58% |
| 1/26/2014 | 91% | 55% |
| 2/18/2014 | 90% | |
| 4/27/2014 | 92% | |
| 9/21/2014 | 91% | |
| 12/21/2014 | 89% | 59% |
| 4/12/2015 | 92% | 67% |
| 7/12/2015 | 92% | 68% |
| 11/15/2015 | 91% | 69% |
| 4/4/2016 | 92% | 72% |
| 5/3/2016 | 92% | 70% |
| 11/6/2016 | 95% | 77% |
| 1/10/2018 | 95% | 77% |

Pew Research Center



# Who owns cellphones and smartphones

A substantial majority of Americans are cellphone owners across a wide range of demographic groups. By contrast, smartphone ownership exhibits greater variation based on age, household income and educational attainment.

% of U.S. adults who own the following devices

| | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| Total | 95% | 77% | 17% |
| Men | 95% | 80% | 16% |
| Women | 94% | 75% | 19% |
| Ages 18-29 | 100% | 94% | 6% |
| 30-49 | 98% | 89% | 9% |
| 50-64 | 94% | 73% | 21% |
| 65+ | 85% | 46% | 40% |
| White | 94% | 77% | 17% |
| Black | 98% | 75% | 23% |
| Hispanic | 97% | 77% | 20% |
| Less than high school graduate | 90% | 57% | 33% |
| High school graduate | 92% | 69% | 24% |
| Some college | 96% | 80% | 16% |
| College graduate | 97% | 91% | 6% |
| Less than $30,000 | 92% | 67% | 25% |
| $30,000-$49,999 | 98% | 82% | 15% |
| $50,000-$74,999 | 98% | 83% | 15% |
| $75,000+ | 98% | 93% | 5% |

|  | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| Urban | 96% | 83% | 13% |
| Suburban | 94% | 78% | 16% |
| Rural | 91% | 65% | 26% |

Source: Survey conducted Jan. 3-10, 2018.

Pew Research Center



## Ownership of other devices

Along with mobile phones, Americans own a range of other information devices. Nearly three quarters of U.S. adults now own desktop or laptop computers, while roughly half now own tablet computers and around one-in-five own e-reader devices.

|  | E-reader | Tablet computer | Desktop/laptop computer |
|---|---|---|---|
| 1/13/2008 |  |  | 74% |
| 4/19/2009 | 2% |  |  |
| 9/14/2009 | 3% |  |  |
| 5/30/2010 | 4% | 3% |  |
| 6/20/2010 |  |  | 78% |
| 9/13/2010 | 5% | 4% |  |
| 11/24/2010 | 6% | 5% |  |
| 5/22/2011 | 12% | 8% |  |
| 8/26/2011 | 9% | 10% |  |
| 12/21/2011 | 10% | 10% | 75% |
| 1/8/2012 | 18% | 20% |  |
| 1/15/2012 | 19% | 19% | 78% |
| 2/19/2012 | 14% | 14% |  |

| | E-reader | Tablet computer | Desktop/laptop computer |
|---|---|---|---|
| 4/3/2012 | 18% | 18% | |
| 8/5/2012 | 19% | 21% | |
| 8/7/2012 | | 25% | |
| 11/10/2012 | 19% | 24% | 77% |
| 12/16/2012 | | 29% | |
| 1/6/2013 | 26% | 31% | |
| 5/19/2013 | 24% | 34% | |
| 9/30/2013 | 24% | 34% | |
| 4/12/2015 | 19% | 45% | 73% |
| 4/4/2016 | 17% | 48% | 74% |
| 11/6/2016 | 22% | 51% | 78% |
| 1/10/2018 | | 53% | 73% |

Pew Research Center



## Smartphone dependency over time

As the adoption of traditional broadband service has slowed in recent years, a growing share of Americans now use smartphones as their primary means of online access at home. Today one-in-five American adults are "smartphone-only" internet users – meaning they own a smartphone, but do not have traditional home broadband service.

| | U.S. adults |
|---|---|
| 2013 | 8% |
| 2014 | -- |
| 2015 | 13% |
| 2016 | 12% |
| 2017 | -- |

|      | U.S. adults |
| ---- | ----------- |
| 2018 | 20%         |

Pew Research Center



## Who is smartphone dependent

Reliance on smartphones for online access is especially common among younger adults, non-whites and lower-income Americans.

- Age
- Race
- Gender
- Income
- Education
- Community

|      | 18-29 | 30-49 | 50-64 | 65+ |
| ---- | ----- | ----- | ----- | --- |
| 2013 | 12%   | 9%    | 7%    | 3%  |
| 2014 | --    | --    | --    | --  |
| 2015 | 19%   | 16%   | 11%   | 7%  |
| 2016 | 17%   | 13%   | 11%   | 7%  |
| 2017 | --    | --    | --    | --  |
| 2018 | 28%   | 24%   | 16%   | 10% |

Pew Research Center

|      | White | Black | Hispanic |
| ---- | ----- | ----- | -------- |
| 2013 | 6%    | 10%   | 16%      |
| 2014 | --    | --    | --       |
| 2015 | 10%   | 19%   | 23%      |
| 2016 | 9%    | 15%   | 23%      |

|  | White | Black | Hispanic |
|---|---|---|---|
| 2017 | -- | -- | -- |
| 2018 | 14% | 24% | 35% |

Pew Research Center

|  | Men | Women |
|---|---|---|
| 2013 | 9% | 8% |
| 2014 | -- | -- |
| 2015 | 14% | 13% |
| 2016 | 12% | 12% |
| 2017 | -- | -- |
| 2018 | 20% | 19% |

Pew Research Center

|  | Less than $30,000 | $30,000-$49,999 | $50,000-$74,999 | $75,000+ |
|---|---|---|---|---|
| 2013 | 12% | 9% | 5% | 5% |
| 2014 | -- | -- | -- | -- |
| 2015 | 20% | 15% | 10% | 6% |
| 2016 | 21% | 12% | 10% | 5% |
| 2017 | -- | -- | -- | -- |
| 2018 | 31% | 22% | 14% | 9% |

Pew Research Center

|  | Less than high school graduate | High school graduate | Some college | College graduate |
|---|---|---|---|---|
| 2013 | 14% | 11% | 8% | 4% |
| 2014 | -- | -- | -- | -- |
| 2015 | 21% | 17% | 14% | 6% |
| 2016 | 27% | 15% | 12% | 5% |
| 2017 | -- | -- | -- | -- |

| | Less than high school graduate | High school graduate | Some college | College graduate |
|---|---|---|---|---|
| 2018 | 39% | 22% | 21% | 10% |

Pew Research Center

| | Urban | Suburban | Rural |
|---|---|---|---|
| 2013 | 9% | 7% | 9% |
| 2014 | -- | -- | -- |
| 2015 | 15% | 12% | 15% |
| 2016 | 12% | 12% | 14% |
| 2017 | -- | -- | -- |
| 2018 | 22% | 17% | 17% |

Pew Research Center



## Find out more

Find more in-depth explorations of the impact of mobile adoption by following the links below.

Millennials stand out for their technology use, but older generations also embrace digital life May 2, 2018

About a quarter of U.S. adults say they are 'almost constantly' online March 14, 2018

Nearly one-in-five Americans now listen to audiobooks March 8, 2018

A third of Americans live in a household with three or more smartphones May 25, 2017

Tech Adoption Climbs Among Older Adults May 17, 2017

Digital divide persists even as lower-income Americans make gains in tech adoption March 22, 2017

All reports and blog posts related to mobile technology.

# EXHIBIT 7



# Global Mobile Trends 2017

September 2017

# Contents

**1** Key takeaways

**2** Consumers and mobile

**3** Internet unconnected – the other half

**4** Networks

**5** Financial performance

**6** Competitive landscape and cross-sector competition

**7** Regional views

Europe
North America
China
India
Asia

Latin America
Sub-Saharan Africa
Middle East and North Africa

# Two thirds of the population are connected by mobile

The 5 billion mobile subscriber milestone was reached in Q2 2017.
Barring perhaps radio, it is the most prevalent technology on earth.

A further 620 million subscribers will be added by 2020, reaching almost three quarters of the global population.

## GLOBAL MOBILE UNIQUE SUBSCRIBERS AND PENETRATION



Source: GSMA Intelligence

Unique subscribers        Market penetration



# Smartphone growth led by Asian and African markets as affordability improves

Smartphones account for over half of total connections globally.

As with subscriber growth, smartphone growth is being driven by developing markets

Five markets will account for more than 40% of the 1.6 billion new smartphone connections by 2020.

Lower cost smartphones from local manufacturers such as Huawei, Oppo, OnePlus and Xiaomi in China, Micromax in India, and now AfriOne in Nigeria, are helping to address the affordability barrier.

Source: GSMA Intelligence



**CONTRIBUTION TO SMARTPHONE GROWTH**

4.1bn — Q2 2017

India — China — Nigeria — Indonesia — Pakistan — Other

5.7bn — 2020

53% — % of total connections — 66%

 **Authors**

## Lead authors

David George
Director
dgeorge@gsma.com

Tim Hatt
Director
thatt@gsma.com

## Editors

Ed Barker
Head of Industry Strategy

Matt Bonsall
Director of Ecosystem Strategy

## Authors

Akanksha Sharma
Senior Analyst

Calum Dewar
Director, Forecasting

David Evans
Director, Product Innovation

Francesco Rizzato
Senior Analyst, Forecasting

Gu Zhang
Senior Analyst

Jan Stryjak
Lead Analyst

Kalvin Bahia
Principal Economist

Kavi Bains
Senior Analyst, Financial Modelling

Kenechi Okeleke
Lead Analyst

Matthew Iji
Manager, Core Forecasting

Maximo Corral San Martin
Senior Analyst, Forecasting

Michael Meyer
Analyst

Mike Rogers
Senior Analyst

Mike Meloán
Lead Analyst

Pablo Iacopino
Senior Manager

Robert Wyrzykowski
Analyst, Spectrum

Sylwia Kechiche
Lead Analyst, M2M

 # About



 GSMA Intelligence

The GSMA represents the interests of mobile operators worldwide, uniting nearly 800 operators with more than 300 companies in the broader mobile ecosystem, including handset and device makers, software companies, equipment providers and internet companies,

as well as organisations in adjacent industry sectors. The GSMA also produces industry-leading events such as Mobile World Congress, Mobile World Congress Shanghai, Mobile World Congress Americas and the Mobile 360 Series of conferences.

For more information, please visit the GSMA corporate website at www.gsma.com

Follow the GSMA on Twitter: @GSMA

GSMA Intelligence is the definitive source of global mobile operator data, analysis and forecasts, and publisher of authoritative industry reports and research. Our data covers every operator group, network and MVNO in every country worldwide – from Afghanistan to Zimbabwe. It is the most accurate and complete set of industry metrics available, comprising tens of millions of individual data points, updated daily. GSMA Intelligence is relied on by leading operators, vendors, regulators, financial institutions and third-party industry players, to support strategic decision-making and long-term investment planning. The data is used as an industry reference point and is frequently cited by the media and by the industry itself. Our team of analysts and experts produce regular thought-leading research reports across a range of industry topics.

www.gsmaintelligence.com

info@gsmaintelligence.com

# EXHIBIT 8

# 99.6 percent of new smartphones run Android or iOS

**theverge.com**/2017/2/16/14634656/android-ios-market-share-blackberry-2016

James Vincent

February 16, 2017



The latest smartphone figures from Gartner are out, and they paint an *extremely* familiar picture. Between them, Android and iOS accounted for 99.6 percent of all smartphone sales in the fourth quarter of 2016. This duopoly has been the norm for a while now (in the second quarter of 2015 this figure was 96.8 percent), but it's always impressive — and slightly terrifying — to see how Google and Apple continue to wring the last decimal points of market share from global smartphone users.

Of the 432 million smartphones sold in the last quarter, 352 million ran Android (81.7 percent) and 77 million ran iOS (17.9 percent). But what happened to the other players? Well, in the same quarter, Windows Phone managed to round up 0.3 percent of the market, while BlackBerry was reduced to a rounding *error*. The once-great firm sold just over 200,000 units, amounting to 0.0 percent market share.

| Operating System | 4Q16 Units | 4Q16 Market Share (%) | 4Q15 Units | 4Q15 Market Share (%) |
|---|---|---|---|---|
| Android | 352,669.9 | 81.7 | 325,394.4 | 80.7 |
| iOS | 77,038.9 | 17.9 | 71,525.9 | 17.7 |
| Windows | 1,092.2 | 0.3 | 4,395.0 | 1.1 |
| BlackBerry | 207.9 | 0.0 | 906.9 | 0.2 |
| Other OS | 530.4 | 0.1 | 887.3 | 0.2 |
| Total | 431,539.3 | 100.0 | 403,109.4 | 100.0 |

*Worldwide smartphone sales in the fourth quarter of 2016. (Thousands of units.)*
*Image: Gartner*

It's worth noting that although, in retrospect, this state of affairs seems inescapable, for years analysts were predicting otherwise. Three years ago, Gartner said that Microsoft's mobile OS would underline overtake iOS for market share in 2017, while BlackBerry would still be hanging around as a sizable (if small) player.

In this latest report, Gartner doesn't make any future predictions, but notes that the smartphone market continues to shift. In the last quarter it grew 7 percent to 432 million units sold; Samsung's sales fell for the second consecutive quarter, dropping 2.9 percent year on year; and the middle ground continues to be fought over by a number of successful Chinese brands (including Huawei, Oppo, and BBK). That's just vendors jostling for position, though, and with Google and Apple's supremely dominant market share, no one is predicting the rise of a new mobile OS for the foreseeable future.

# Next Up In Tech

# EXHIBIT 9

GOOGLE PRIVACY POLICY

# When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.

This Privacy Policy is meant to help you understand what information we collect, why we collect it, and how you can update, manage, export, and delete your information.

Effective January 22, 2019

Archived versions

---

We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:

- Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system

- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps

You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

To help explain things as clearly as possible, we've added examples, explanatory videos, and definitions for key terms. And if you have any questions about this Privacy Policy, you can contact us.

---

INFORMATION GOOGLE COLLECTS

# We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

# Things you create or provide to us

When you create a Google Account, you provide us with personal information that includes your name and a password. You can also choose to add a phone number or payment information to your account. Even if you aren't signed in to a Google Account, you might choose to provide us with information — like an email address to receive updates about our services.

We also collect the content you create, upload, or receive from others when using our services. This includes things like email you write and receive, photos and videos you save, docs and spreadsheets you create, and comments you make on YouTube videos.

# Information we collect as you use our services

## Your apps, browsers & devices

We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

## Your activity

We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for

- Videos you watch

- Views and interactions with content and ads

- Voice and audio information when you use audio features

- Purchase activity

- People with whom you communicate or share content

- Activity on third-party sites and apps that use our services

- Chrome browsing history you've synced with your Google Account

If you use our services to make and receive calls or send and receive messages, we may collect telephony log information like your phone number, calling-party number, receiving-party number, forwarding numbers, time and date of calls and messages, duration of calls, routing information, and types of calls.

You can visit your Google Account to find and manage activity information that's saved in your account.


Go to Google Account

## Your location information

We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS

- IP address

- Sensor data from your device

- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

WHY GOOGLE COLLECTS DATA

# We use data to build better services

We use the information we collect from all our services for the following purposes:

## Provide our services

We use your information to deliver our services, like processing the terms you search for in order to return results or helping you share content by suggesting recipients from your contacts.

## Maintain & improve our services

We also use your information to ensure our services are working as intended, such as tracking outages or troubleshooting issues that you report to us. And we use your information to make improvements to our services — for example, understanding which search terms are most frequently misspelled helps us improve spell-check features used across our services.

## Develop new services

We use the information we collect in existing services to help us develop new ones. For example, understanding how people organized their photos in Picasa, Google's first photos app, helped us design and launch Google Photos.

## Provide personalized services, including content and ads

We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results. For example, Security Checkup provides security tips adapted to how you use Google products. And Google Play uses information like apps you've already installed and videos you've watched on YouTube to suggest new apps you might like.

Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

- We don't show you personalized ads based on <u>sensitive categories</u>, such as race, religion, sexual orientation, or health.

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

---

 Go to Ad Settings

---

## Measure performance

We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites that use Google Analytics, Google and a Google Analytics customer <u>may link information</u> about your activity from that site with activity from other sites that use our ad services.

## Communicate with you

We use information we collect, like your email address, to interact with you directly. For example, we may send you a notification if we detect suspicious activity, like an attempt to sign in to your Google Account from an unusual location. Or we may let you know about upcoming changes or improvements to our services. And if you contact Google, we'll keep a record of your request in order to help solve any issues you might be facing.

## Protect Google, our users, and the public

We use information to help improve the <u>safety and reliability</u> of our services. This includes detecting, preventing, and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.

---

We use different technologies to process your information for these purposes. We use automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features tailored to how you use our services. And we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data. For example, Google Translate helps people communicate across languages by detecting common language patterns in phrases you ask it to translate.

We may combine the information we collect among our services and across your devices for the purposes described above. For example, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

If other users already have your email address or other information that identifies you, we may show them your publicly visible Google Account information, such as your name and photo. This helps people identify an email coming from you, for example.

We'll ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy.

YOUR PRIVACY CONTROLS

# You have choices regarding the information we collect and how it's used

This section describes key controls for managing your privacy across our services. You can also visit the Privacy Checkup, which provides an opportunity to review and adjust important privacy settings. In addition to these tools, we also offer specific privacy settings in our products — you can learn more in our Product Privacy Guide.

 Go to Privacy Checkup

# Managing, reviewing, and updating your information

When you're signed in, you can always review and update information by visiting the services you use. For example, Photos and Drive are both designed to help you manage specific types of content you've saved with Google.

We also built a place for you to review and control information saved in your Google Account. Your Google Account includes:

## Privacy controls

 **Activity Controls**

Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions.

Go to Activity Controls

 **Ad settings**

Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads. You can modify your interests, choose whether your personal information is used to make ads more relevant to you, and turn on or off certain advertising services.

Go to Ad Settings

 **About you**

Control what others see about you across Google services.

Go to About You

 **Shared endorsements**

Choose whether your name and photo appear next to your activity, like reviews and recommendations, that appear in ads.

Go to Shared Endorsements

**Information you share**

 Control whom you share information with through your account on Google+.

Go to Information You Share

## Ways to review & update your information

 **My Activity**

My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity.

Go to My Activity

 **Google Dashboard**

Google Dashboard allows you to manage information associated with specific products.

Go to Dashboard

 **Your personal information**

Manage your contact information, such as your name, email, and phone number.

Go to Personal Info

When you're signed out, you can manage information associated with your browser or device, including:

- Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.

- YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.

- Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads.

# Exporting, removing & deleting your information

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

You can also request to remove content from specific Google services based on applicable law.

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

And finally, Inactive Account Manager allows you to give someone else access to parts of your Google Account in case you're unexpectedly unable to use your account.

There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.

SHARING YOUR INFORMATION

# When you share your information

Many of our services let you share information with other people, and you have control over how you share. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

When you're signed in and interact with some Google services, like leaving comments on a YouTube video or reviewing a song in Play, your name and photo appear next to your activity. We may also display this information in ads depending on your Shared endorsements setting.

# When Google shares your information

We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

## With your consent

We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to make a reservation through a booking service, we'll get your permission before sharing your name or phone number with the restaurant. We'll ask for your explicit consent to share any sensitive personal information.

## With domain administrators

If you're a student or work for an organization that uses Google services (like G Suite), your domain administrator and resellers who manage your account will have access to your Google Account. They may be able to:

- Access and retain information stored in your account, like your email

- View statistics regarding your account, like how many apps you install

- Change your account password

- Suspend or terminate your account access

- Receive your account information in order to satisfy applicable law, regulation, legal process, or enforceable governmental request

- Restrict your ability to delete or edit your information or your privacy settings

## For external processing

We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.

## For legal reasons

We will share personal information outside of Google if we have a good-faith belief that access, use, preservation, or disclosure of the information is reasonably necessary to:

- Meet any applicable law, regulation, legal process, or enforceable governmental request. We share information about the number and type of requests we receive from governments in our Transparency Report.

- Enforce applicable Terms of Service, including investigation of potential violations.

- Detect, prevent, or otherwise address fraud, security, or technical issues.

- Protect against harm to the rights, property or safety of Google, our users, or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

If Google is involved in a merger, acquisition, or sale of assets, we'll continue to ensure the confidentiality of your personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

KEEPING YOUR INFORMATION SECURE

# We build security into our services to protect your information

All Google products are built with strong security features that continuously protect your information. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.

We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems

- We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

EXPORTING & DELETING YOUR INFORMATION

# You can export a copy of your information or delete it from your Google Account at any time

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 Export your data

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

In some cases, we retain data for limited periods when it needs to be kept for legitimate business or legal purposes. You can read about Google's data retention periods, including how long it takes us to delete your information.

We try to ensure that our services protect information from accidental or malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted from our active and backup systems.

COMPLIANCE & COOPERATION WITH REGULATORS

We regularly review this Privacy Policy and make sure that we process your information in ways that comply with it.

# Data transfers

We maintain servers around the world and your information may be processed on servers located outside of the country where you live. Data protection laws vary among countries, with some providing more protection than others. Regardless of where your information is processed, we apply the same protections described in this policy. We also comply with certain legal frameworks relating to the transfer of data, such as the EU-US and Swiss-US Privacy Shield Frameworks.

When we receive formal written complaints, we respond by contacting the person who made the complaint. We work with the appropriate regulatory authorities, including local data protection

authorities, to resolve any complaints regarding the transfer of your data that we cannot resolve with you directly.

---

ABOUT THIS POLICY

## When this policy applies

This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, Android, and services offered on third-party sites, such as advertising services. This Privacy Policy doesn't apply to services that have separate privacy policies that do not incorporate this Privacy Policy.

This Privacy Policy doesn't apply to:

- The information practices of other companies and organizations that advertise our services

- Services offered by other companies or individuals, including products or sites that may include Google services, be displayed to you in search results, or be linked from our services

## Changes to this policy

We change this Privacy Policy from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We always indicate the date the last changes were published and we offer access to archived versions for your review. If changes are significant, we'll provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes).

---

RELATED PRIVACY PRACTICES

## Specific Google services

The following privacy notices provide additional information about some Google services:

- Chrome & the Chrome Operating System

- Play Books

- Payments

- Fiber

- Google Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country)

# Other useful resources

The following links highlight useful resources for you to learn more about our practices and privacy settings.

- Your Google Account is home to many of the settings you can use to manage your account

- Privacy Checkup guides you through key privacy settings for your Google Account

- Google's safety center helps you learn more about our built-in security, privacy controls, and tools to help set digital ground rules for your family online

- Privacy & Terms provides more context regarding this Privacy Policy and our Terms of Service

- Technologies includes more information about:

  ◦ How Google uses cookies

  ◦ Technologies used for Advertising

  ◦ How Google uses pattern recognition to recognize things like faces in photos

  ◦ How Google uses information from sites or apps that use our services

---

## ads you'll find most useful

For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for "pizza." Learn more about Google ads and why you may see particular ads.

## the people who matter most to you online

For example, when you type an address in the To, Cc, or Bcc field of an email you're composing, Gmail will suggest addresses based on the people you contact most frequently.

## phone number

If you add your phone number to your account, it can be used for different purposes across Google services, depending on your settings. For example, your phone number can be used to help you access your account if you forget your password, help people find and connect with you, and make the ads you see more relevant to you. Learn more

## payment information

For example, if you add a credit card or other payment method to your Google Account, you can use it to buy things across our services, like apps in the Play Store. We may also ask for other information, like a business tax ID, to help process your payment. In some cases, we may also need to verify your identity and may ask you for information to do this.

We may also use payment information to verify that you meet age requirements, if, for example, you enter an incorrect birthday indicating you're not old enough to have a Google Account. Learn more

## devices

For example, we can use information from your devices to help you decide which device you'd like to use to install an app or view a movie you buy from Google Play. We also use this information to help protect your account.

## Android device with Google apps

Android devices with Google apps include devices sold by Google or one of our partners and include phones, cameras, vehicles, wearables, and televisions. These devices use Google Play Services and other pre-installed apps that include services like Gmail, Maps, your phone's camera and phone dialer, text-to-speech conversion, keyboard input, and security features.

## Views and interactions with content and ads

For example, we collect information about views and interactions with ads so we can provide aggregated reports to advertisers, like telling them whether we served their ad on a page and whether the ad was likely seen by a viewer. We may also measure other interactions, such as how you move your mouse over an ad or if you interact with the page on which the ad appears.

## synced with your Google Account

Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. Learn more

## services to make and receive calls or send and receive messages

Examples of these services include:

- Google Hangouts, for making domestic and international calls

- Google Voice, for making calls, sending text messages, and managing voicemail

- Google Fi, for a phone plan

## Sensor data from your device

Your device may have sensors that can be used to better understand your location and movement. For example, an accelerometer can be used to determine your speed and a gyroscope to figure out your direction of travel.

## Information about things near your device

If you use Google's Location services on Android, we can improve the performance of apps that rely on your location, like Google Maps. If you use Google's Location services, your device sends information to Google about its location, sensors (like accelerometer), and nearby cell towers and Wi-Fi access points (like MAC address and signal strength). All these things help to determine your location. You can use your device settings to enable Google Location services. Learn more

## publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's language models and build features like Google Translate.

## protect against abuse

For example, information about security threats can help us notify you if we think your account has been compromised (at which point we can help you take steps to protect your account).

## advertising and research services on their behalf

For example, advertisers may upload data from their loyalty-card programs so that they can better understand the performance of their ad campaigns. We only provide aggregated reports to advertisers that don't reveal information about individual people.

## deliver our services

Examples of how we use your information to deliver our services include:

- We use the IP address assigned to your device to send you the data you requested, such as loading a YouTube video

- We use unique identifiers stored in cookies on your device to help us authenticate you as the person who should have access to your Google Account

- Photos and videos you upload to Google Photos are used to help you create albums, animations, and other creations that you can share. Learn more

- A flight confirmation email you receive may be used to create a "check-in" button that appears in your Gmail

- When you purchase services or physical goods from us, you may provide us information like your shipping address or delivery instructions. We use this information for things like processing, fulfilling, and delivering your order, and to provide support in connection with the product or service you purchase.

## ensure our services are working as intended

For example, we continuously monitor our systems to look for problems. And if we find something wrong with a specific feature, reviewing activity information collected before the problem started allows us to fix things more quickly.

## make improvements

For example, we use cookies to analyze how people interact with our services. And that analysis can help us build better products. For example, it may help us discover that it's taking people too long to complete a certain task or that they have trouble finishing steps at all. We can then redesign that feature and improve the product for everyone.

## customized search results

For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

## personalized ads

You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads. Learn more

## sensitive categories

When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't

use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

## may link information

Google Analytics relies on first-party cookies, which means the cookies are set by the Google Analytics customer. Using our systems, data generated through Google Analytics can be linked by the Google Analytics customer and by Google to third-party cookies that are related to visits to other websites. For example, an advertiser may want to use its Google Analytics data to create more relevant ads, or to further analyze its traffic. Learn more

## safety and reliability

Some examples of how we use your information to help keep our services safe and reliable include:

- Collecting and analyzing IP addresses and cookie data to protect against automated abuse. This abuse takes many forms, such as sending spam to Gmail users, stealing money from advertisers by fraudulently clicking on ads, or censoring content by launching a Distributed Denial of Service (DDoS) attack.

- The "last account activity" feature in Gmail can help you find out if and when someone accessed your email without your knowledge. This feature shows you information about recent activity in Gmail, such as the IP addresses that accessed your mail, the associated location, and the date and time of access. Learn more

## detect abuse

When we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies, we may disable your account or take other appropriate action. In certain circumstances, we may also report the violation to appropriate authorities.

## combine the information we collect

Some examples of how we combine the information we collect include:

- When you're signed in to your Google Account and search on Google, you can see search results from the public web, along with relevant information from the content you have in other Google

products, like Gmail or Google Calendar. This can include things like the status of your upcoming flights, restaurant, and hotel reservations, or your photos. Learn more

- If you have communicated with someone via Gmail and want to add them to a Google Doc or an event in Google Calendar, Google makes it easy to do so by autocompleting their email address when you start to type in their name. This feature makes it easier to share things with people you know. Learn more

- The Google app can use data that you have stored in other Google products to show you personalized content, depending on your settings. For example, if you have searches stored in your Web & App Activity, the Google app can show you news articles and other information about your interests, like sports scores, based your activity. Learn more

- If you link your Google Account to your Google Home, you can manage your information and get things done through the Google Assistant. For example, you can add events to your Google Calendar or get your schedule for the day, ask for status updates on your upcoming flight, or send information like driving directions to your phone. Learn more

### your activity on other sites and apps

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

Learn more about how Google uses data when you use our partners' sites or apps.

### partner with Google

There are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more

### specific Google services

For example, you can delete your blog from Blogger or a Google Site you own from Google Sites. You can also delete reviews you've left on apps, games, and other content in the Play Store.

## rely on cookies to function properly

For example, we use a cookie called 'lbcs' that makes it possible for you to open many Google Docs in one browser. Blocking this cookie would prevent Google Docs from working as expected. Learn more

## legal process, or enforceable governmental request

Like other technology and communications companies, Google regularly receives requests from governments and courts around the world to disclose user data. Respect for the privacy and security of data you store with Google underpins our approach to complying with these legal requests. Our legal team reviews each and every request, regardless of type, and we frequently push back when a request appears to be overly broad or doesn't follow the correct process. Learn more in our Transparency Report.

## show trends

When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms. Learn more

## specific partners

For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. Learn more about these partners and how they use your information.

## servers around the world

For example, we operate data centers located around the world to help keep our products continuously available for users.

## third parties

For example, we process your information to report use statistics to rights holders about how their content was used in our services. We may also process your information if people search for your name and we display search results for sites containing publicly available information about you.

## appropriate safeguards

For example, we may anonymize data, or encrypt data to ensure it can't be linked to other information about you. Learn more

## ensure and improve

For example, we analyze how people interact with advertising to improve the performance of our ads.

## Customizing our services

For example, we may display a Google Doodle on the Search homepage to celebrate an event specific to your country.

## Affiliates

An affiliate is an entity that belongs to the Google group of companies, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, Google Payment Corp, and Google Dialer Inc. Learn more about the companies providing business services in the EU.

## Algorithm

A process or set of rules followed by a computer in performing problem-solving operations.

## Application data cache

An application data cache is a data repository on a device. It can, for example, enable a web application to run without an internet connection and improve the performance of the application by enabling faster loading of content.

## Browser web storage

Browser web storage enables websites to store data in a browser on a device. When used in "local storage" mode, it enables data to be stored across sessions. This makes data retrievable even after a browser has been closed and reopened. One technology that facilitates web storage is HTML 5.

## Cookies and similar technologies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Device

A device is a computer that can be used to access Google services. For example, desktop computers, tablets, smart speakers, and smartphones are all considered devices.

## Non-personally identifiable information

This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

## IP address

Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet.

## Pixel tag

A pixel tag is a type of technology placed on a website or within the body of an email for the purpose of tracking certain activity, such as views of a website or when an email is opened. Pixel tags are often used in combination with cookies.

## Personal information

This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

## Sensitive personal information

This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

## Server logs

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser.

A typical log entry for a search for "cars" looks like this:

```
123.45.67.89 - 25/Mar/2003 10:15:32 -
http://www.google.com/search?q=cars -
Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. Depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.

- `25/Mar/2003 10:15:32` is the date and time of the query.

- `http://www.google.com/search?q=cars` is the requested URL, including the search query.

- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.

- `740674ce2123a969` is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've visited Google, then it will be the unique cookie ID assigned to their device the next time they visit Google from that particular device).

## Unique identifiers

A unique identifier is a string of characters that can be used to uniquely identify a browser, app, or device. Different identifiers vary in how permanent they are, whether they can be reset by users, and how they can be accessed.

Unique identifiers can be used for various purposes, including security and fraud detection, syncing services such as your email inbox, remembering your preferences, and providing personalized advertising. For example, unique identifiers stored in cookies help sites display content in your browser in your preferred language. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. Learn more about how Google uses cookies.

On other platforms besides browsers, unique identifiers are used to recognize a specific device or app on that device. For example, a unique identifier such as the Advertising ID is used to provide relevant advertising on Android devices, and can be managed in your device's settings. Unique identifiers may also be incorporated into a device by its manufacturer (sometimes called a universally unique ID or UUID), such as the IMEI-number of a mobile phone. For example, a device's unique identifier can be used to customize our service to your device or analyze device issues related to our services.

# EXHIBIT 10

# Location history for iPhone & iPad

web.archive.org/web/20180730190907/https://support.google.com/accounts/answer/4388034

Location services make it easier to use Google products. Turning location history on for your account lets Google give you useful information, based on where you've been with the devices where you're signed in.

For example, the Google app uses your past locations to show you traffic updates for your daily commute by learning the route you take to work.

## See & manage your location history

1. Go to your Timeline.
2. At the top left, choose the time period you want to see.

Delete your location history
1. Go to your Timeline.
2. At the bottom right, tap **Settings** ⚙ ❯ **Delete all location history**.
3. Confirm that you want to delete all your location history.
4. Tap **Delete Location History**.

Turn Location History on or off
Location History stores your location data from all devices that are signed in to your Google Account.

**Note:** When you pause Location History, it doesn't delete previous activity, it only stops saving new location information.

### Using your browser

1. Go to the Location history section of your Google Account.
2. Turn **Location History** on or off.
   - **Off:** Confirm by tapping **Pause**.
   - **On:** Confirm by tapping **Turn on**.

### Using the Google app

## Common issues with location services

Availability
Location History may not be available if:

- It's not available in your region.

- You don't meet certain age restrictions.
- Your Google Account is through your work, school, or other group, and your administrator turned off your access to these features.
- You've turned off <u>Location Services</u> or <u>Background App Refresh</u>.

On Google Maps 3.2.1 and up, you can't turn on Location Reporting and History on your iPhone or iPad. If you have Location History turned on from another Google app, like the Google app, the Google Maps app can use Location History data stored in your Google account to give you better search results.

<u>Background App Refresh</u>

If you're not on the latest version of iOS, Location History could require Location Services and Background App Refresh to be on to work properly.

Location Services uses GPS, Wi-Fi hotspots, and cellular network towers to determine your location. Background App Refresh allows Location Reporting to work when you're not actively using a Google app.

Learn more about how to manage <u>Location Services</u> and <u>Background App Refresh</u>.

<u>Data use</u>

This feature can use a lot of data. Before using this feature, review your device's data plan.

Was this article helpful?

How can we improve it?

# EXHIBIT 11

PRIVACY POLICY

Last modified: December 18, 2017 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.

- How we use that information.

- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

# Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like.

We collect information in the following ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card to store with your account. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We collect information about the services that you use and how you use them, like when you watch a video on YouTube, visit a website that uses our advertising services, or view and interact with our ads and content. This information includes:

  - Device information

    We collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - Log information

    When you use our services or view content provided by Google, we automatically collect and store certain information in server logs. This includes:

    - details of how you used our service, such as your search queries.

    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.

    - Internet protocol address.

    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.

    - cookies that may uniquely identify your browser or your Google Account.

  - Location information

    When you use Google services, we may collect and process information about your actual location. We use various technologies to determine location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points and cell towers.

  - Unique application numbers

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

- **Local storage**

  We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

- **Cookies and similar technologies**

  We and our partners use various technologies to collect and store information when you visit a Google service, and this may include using cookies or similar technologies to identify your browser or device. We also use these technologies to collect and store information when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites. Our Google Analytics product helps businesses and site owners analyze the traffic to their websites and apps. When used in conjunction with our advertising services, such as those using the DoubleClick cookie, Google Analytics information is linked, by the Google Analytics customer or by Google, using Google technology, with information about visits to multiple sites.

Information we collect when you are signed in to Google, in addition to information we obtain about you from partners, may be associated with your Google Account. When information is associated with your Google Account, we treat it as personal information. For more information about how you can access, manage or delete information that is associated with your Google Account, visit the Transparency and choice section of this policy.

# How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are

represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

If you have a Google Account, we may display your Profile name, Profile photo, and actions you take on Google or on third-party applications connected to your Google Account (such as +1's, reviews you write and comments you post) in our services, including displaying in ads and other commercial contexts. We will respect the choices you make to limit sharing or visibility settings in your Google Account.

When you contact Google, we keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. One of the products we use to do this on our own services is Google Analytics. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health.

Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

# Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and update your Google activity controls to decide what types of data, such as videos you've watched on YouTube or past searches, you would like saved with your account when you use Google services. You can also visit these controls to manage whether certain activity is stored in a cookie or similar technology on your device when you use our services while signed-out of your account.

- Review and control certain types of information tied to your Google Account by using Google Dashboard.

- View and edit your preferences about the Google ads shown to you on Google and across the web, such as which categories might interest you, using Ads Settings. You can also visit that page to opt out of certain Google advertising services.

- Adjust how the Profile associated with your Google Account appears to others.

- Control who you share information with through your Google Account.

- Take information associated with your Google Account out of many of our services.

- Choose whether your Profile name and Profile photo appear in shared endorsements that appear in ads.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes.

We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

# Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for G Suite users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.

  - change your account password.

  - suspend or terminate your account access.

  - access or retain information stored as part of your account.

  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.

  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.

  - enforce applicable Terms of Service, including investigation of potential violations.

  - detect, prevent, or otherwise address fraud, security or technical issues.

  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

# Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.

- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.

- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.

- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

## When this Privacy Policy applies

Our Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, services Google provides on Android devices, and services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

## Compliance and cooperation with regulatory authorities

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks, including the EU-US and Swiss-US Privacy Shield Frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

## Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

# Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS

- Play Books

- Payments

- Fiber

- Project Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link

For more information about some of our most popular services, you can visit the Google Product Privacy Guide.


# Other useful privacy and security related materials

Further useful privacy and security related materials can be found through Google's policies and principles pages, including:

- Information about our technologies and principles, which includes, among other things, more information on

  - how Google uses cookies.

  - technologies we use for advertising.

  - how we recognize patterns like faces.

- A page that explains what data is shared with Google when you visit websites that use our advertising, analytics and social products.

- The Privacy Checkup tool, which makes it easy to review your key privacy settings.

- Google's safety center, which provides information on how to stay safe and secure online.

# EXHIBIT 12

# "may collect and process information about your actual location"

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

G **policies.google.com**/privacy/example/may-collect-and-process-information

This content is from an archived version of our Privacy Policy. See <u>here</u> for our current Privacy Policy.

## Examples

- For example, Google Maps can center the maps view on your current location.  <u>Learn more.</u> If you use Google Maps for Mobile, we use GPS, WiFi and cell tower signals to determine your location. <u>Learn more.</u>
- When you're near a bus stop or a train station, Google Now can tell you what buses or trains will arrive next.
- Location History allows Google to store a history of your location data from all devices where you are logged into your Google Account and have enabled Location Reporting. Location History and Location Reporting data may be used by any Google app or service. For example, Google Maps may use it to improve your search results based on the places that you've been. <u>Learn more.</u>

# EXHIBIT 13



# EVERY STEP
# YOU TAKE

How deceptive design lets Google track users 24/7

27.11.2018



# Table of contents

Table of contents ..................................................................................2

1    Summary ....................................................................................4

2    Introduction ...............................................................................4
2.1    Method ........................................................................................5

3    Background .................................................................................6
3.1    Business model ..........................................................................7
3.2    Market share ..............................................................................8
3.3    Android and competition ...........................................................8
3.4    Operating system functionality .................................................9
3.5    Location tracking ......................................................................10
3.6    Dark patterns and deception ...................................................12

4.    Google and location tracking ...................................................13
4.1    Location History .......................................................................13
4.2    Web & App Activity ..................................................................15
4.3    Setting up a Google Account ...................................................16
    4.3.1    Enabling Google Assistant .................................................19
    4.3.2    Starting Google apps for the first time ............................19
    4.3.3    Pausing Location History ...................................................22
4.4    Location tracking through Web & App Activity ........................23
4.5    Problematic practices ..............................................................25
    4.5.1    Hidden default settings ....................................................26
    4.5.2    Misleading and unbalanced information ...........................27
    4.5.3    Deceptive click-flow ..........................................................27
    4.5.4    Repeated nudging ..............................................................28
    4.5.5    Bundling of services and lack of granular choices..............29
    4.5.6    Permissions and always-on settings..................................30
    4.5.7    Summary of problematic practices ...................................31

5    Legal analysis ..........................................................................33
5.1    Consent ....................................................................................34
    5.1.1    Freely given .......................................................................35
    5.1.2    Specific and informed?......................................................36
    5.1.3    Unambiguous? ...................................................................37
5.2    Legitimate interests ................................................................38
    5.2.1    Transparency .....................................................................38
    5.2.2    Balancing test ...................................................................39
    5.2.2.1    Reasonable expectations .............................................40
5.3    Summary of legal analysis ......................................................42



**6     Appendix..............................................................................................43**



# 1    Summary

In this report, we look at how Google continuously tracks the location of its users through a number of different technologies. This tracking is implemented and enabled through the features "Location History" and "Web & App Activity". These settings are integrated into all Google accounts as a personalisation feature, and are also used to facilitate targeted advertising.

We argue that consumers are deceived into being tracked when they use Google services. This happens through a variety of techniques, including withholding or hiding information, deceptive design practices, and bundling of services. We argue that these practices are unethical, and that they in our opinion are in breach of European data protection legislation because they fail to fulfill the conditions for lawful data processing.

# 2    Introduction

As smartphones have become ubiquitous consumer devices, connectivity is increasingly at our fingertips at all times. Through their combination of transmitters and sensors, our phones are able to sense their environment, and pinpoint our location as we carry them around. Where we move can reveal a lot about each of us, including our religious beliefs, political leanings, and sexual orientation. It is vital that digital service providers – who are omnipresent in our lives through our smartphones – treat location data about us with care, and only collect it when strictly necessary, with our consent.

The Norwegian Consumer Council is funded by the Norwegian Government, and is an interest organisation for consumers. Part of our work is to promote consumer rights such as privacy, security and balanced contracts in digital products and services. We have published reports on how smartphone apps fail to respect consumer rights,[1] how connected devices such as toys lack basic security and privacy-protective measures,[2] and how leading digital services use unethical design choices to steer users away from privacy.[3]

---

[1] "Threats to Consumers in Mobile Apps"
https://www.forbrukerradet.no/undersokelse/2015/appfail-threats-to-consumers-in-mobile-apps/
[2] "Internet of Things" https://www.forbrukerradet.no/internet-of-things/
[3] "New analysis shows how Facebook and Google push users into sharing personal data" https://www.forbrukerradet.no/side/facebook-and-google-manipulate-users-into-sharing-personal-data/



This report is part of our work on consumer privacy and the right to make informed choices. Through demonstrating how users are deceived into making privacy-intrusive choices, we argue that agency is being taken away from the consumer for the benefit of service-providers. We therefore urge service-providers to avoid using deceptive practices that undermine consumers' rights to make free and informed choices.

In our previous report "Deceived by Design", we looked at how digital service providers use different unethical design practices – referred to as "dark patterns" – to lead users into making certain choices. As part of this work, we briefly touched upon the confusing layout of Google's Location History setting. As a continuation of this work, we now look closer at how Google tracks the location of their users.

Chapter 3 provides background on Google and the Android operating system, location tracking in general, and on the concept of dark patterns. In chapter 4, we identify some of the problematic practices that consumers are exposed to when setting up an Android device and creating a Google account. A legal analysis of Google's practices in light of the General Data Protection Regulation (GDPR) is included in chapter 5.

## 2.1   Method

In this report, we look at how several Google services collect location data from smartphone users, demonstrated through user testing. Most of the tests were performed using an Android device, with a few tests performed on an iPhone for reference. This was done through what we consider a regular user experience. When setting up a new Android device, users typically go through a process of registering and/or logging in to a Google account, and adjusting or accepting a number of settings related to data collection, such as voice data, location data, and diagnostic data. The testers documented every click and choice that appeared during the process of setting up the device, registering a new Google account, and launching the preinstalled Google apps for the first time.

The analysis and discussion throughout the report is based on European data protection legislation and ethical principles from literature on user interface



design.[4] These principles serve as benchmarks used to consider the legal and ethical aspects of the design and content of the process.

The tests in chapter 4 were performed in July 2018 using a Samsung Galaxy S7 Android device running Android version 8.0.0, which had been reset to factory settings. The results were reproduced in October 2018 on the same Samsung device, and on a Google Pixel device running Android version 9.[5] Although the settings and device setup process may vary somewhat between devices, we regard the Google account setup can to be representative of a typical user experience. The screenshots were taken in July and August 2018. A diagram that illustrates how users can turn off or avoid location tracking is included as an appendix.

Because this is an analysis of digital settings and content that may be subject to change, we cannot say with certainty that all users of these services have been presented with identical settings and design patterns during the setup process. However, our opinion is that the findings are and will continue to be relevant even if changes are made, because these examples illustrate the challenges consumers face in digital services at a given point in time.

This report was written with funding from the Norwegian Research Council through the ALerT research project[6] and the Norwegian ministry for Children and Equality. We are also thankful for invaluable help and input from the European consumer organization BEUC, the Dutch consumer organization Consumentenbond, None of Your Business (noyb), Jon Worth, Dr. Frederik Zuiderveen Borgesius, and Privacy International.

# 3    Background

The smartphone market is generally split between two operating systems (OS), Apple's iOS and Google's Android OS. Apple's iOS is used on all iPhone and iPad devices, while the majority of other smartphones and tablets run on a version

---

[4] See "Nudges for Privacy and Security", https://dl.acm.org/citation.cfm?id=3054926 and "Dark patterns and the ethics of design" https://medium.com/adventures-in-ux-design/dark-patterns-and-the-ethics-of-design-31853436176b
[5] Testers found minor differences between the Samsung Galaxy and the Pixel device, but not significant enough to change the conclusions in this report.
[6] "ALerT - Awareness Learning Tools for Data Sharing Everywhere" https://www.nr.no/en/projects/alert-awareness-learning-tools-data-sharing-everywhere



of Android. Although Apple's iOS is also popular among consumers, we have chosen mainly to focus on Google apps and Android for several reasons. These reasons are explained below, together with relevant background information.

## 3.1  Business model

Google and Apple have somewhat different business models.[7] Apple is primarily a hardware provider, with revenue coming from selling devices such as iPhones, with additional revenue coming from their App Store. Google makes a significant part of their revenue from data-driven advertising.[8]  In 2017, Google was rated the most valuable brand in the world, with a brand value of $109.5bn /€95bn.[9]

Google is a subsidiary of Alphabet Inc., and deliver a vast amount of consumer- and business-facing services. These consumer-facing services include, but are not limited to, Google Search, Google Maps, Gmail, Android, YouTube, and Google Assistant. Google also runs a large number of business facing services, including analytics and advertising services.

Google provides most of its consumer-facing services at no direct financial cost to the user. Rather than having users pay an upfront fee for using these services, Google collects data about its users and their behavior, which is monetized through advertising and other business-facing services. Through its various services, Google collects a comprehensive picture of its users, including device information, browsing history, precise geolocation, and more. On Android devices, a large amount of data is collected passively in the background without any active actions from the user.[10]

Through compiling profiles about individual users, as well as user segments or categories based on preferences or behavior, Google can offer advertisers numerous ways to reach a target audience. Advertisers can use Google's ad

---

[7] "How Do Tech Companies Make Money? Visualizing Tech Giants Business Models" https://fourweekmba.com/tech-giants-business-models/
[8] "Once again, Alphabet made a lot of money on Google advertising and this time Wall Street is thrilled" https://qz.com/970765/alphabet-goog-q1-2017-earnings/
[9] "The world's most valuable brands revealed" https://www.independent.co.uk/news/business/news/worlds-most-valuable-brands-facebook-google-apple-amazon-a7556571.html
[10] A 2018 study showed that an idle Android device communicated with Google servers more than ten times as often as an idle iOS device communicated with Apple servers. "Google Data Collection research" https://digitalcontentnext.org/blog/2018/08/21/google-data-collection-research/



services to reach particular audiences with tailored ads, often called "programmatic advertising". Continued data collection about how users respond to ads, and tracking of individual users across different devices, enables Google to offer advertising spaces that are tailored to the individual user, and that are delivered "in the right moment with the right message".[11]

## 3.2   Market share

The Android OS is by far the dominant international market player, with an estimated 85 % of the global mobile OS market share.[12] Android is used by a variety of smartphone providers, including Samsung, Huawei, Sony, and more. Users of these phones may not be aware that Android is a Google product, and therefore that they are using a Google-powered device. Apple's iOS, on the other hand, has a market share between 10 % and 15 % globally. iOS is only available on Apple products such as iPhones, meaning that users who are using iOS already have a customer relationship with Apple.

## 3.3   Android and competition

Android-users have to create a Google Account before they can access the Google Play app store, which is required to download new apps, or to receive app updates. Additionally, when setting up an Android device for the first time, users have to agree to Google's privacy policy, and terms and conditions. This entails that users have to agree to Google processing user data collected through the Android device, such as device ID, usage data, and location data.

Google provides the Android OS through an open source license, meaning that the smartphone manufacturer does not have to pay Google for using or adapting Android (to develop so-called Android forks). However, the Android license agreement for manufacturers comes with a number of caveats.

While the Android OS is distributed under an open source license, the suite of apps called Google Play Services is proprietary software.[13] In order to use the Android OS on the phones they manufacture, phone manufacturers are required to include the Google Search and Google's Chrome browser

---

[11] "Organize audience insights" https://www.thinkwithgoogle.com/marketing-resources/programmatic/organize-audience-insights-programmatic-buying/

[12] "Smartphone OS market share" https://www.idc.com/promo/smartphone-market-share/os

[13] This includes services such as Google Play, Gmail, Google Maps, and more. "Google's Iron Grip On Android" https://arstechnica.com/gadgets/2013/10/googles-iron-grip-on-android-controlling-open-source-by-any-means-necessary/



preinstalled on the phones, and use Google Search as a default search engine as a condition to use Google's proprietary apps.[14]

If, for example, Samsung were to choose not to include Google Chrome on their phones, they would be barred from including the Google Play app store. Without Google Play, users will be unable to receive app updates or install other apps on the phone without going to third party app stores.[15] Additionally, if for example Samsung were to release a phone with a competing OS on it, they would lose access to use Android on all their other phone models. In July 2018, Google was fined by EU antitrust authorities for abuse of market dominance because of these practices.[16]

## 3.4   Operating system functionality

Although many Google features and services are available also for iPhone users, the implementation is different between the two operating systems. Since iPhones do not come with any preinstalled Google apps, users have to actively download and activate any Google services they may want to use.[17] This also means that iPhone users do not need to have a Google account in order to download other apps.

Additionally, the app permission systems of Android and iOS are different. For example, both operating systems will ask users whether they want certain apps to access location data. However, on Android, allowing any particular app to access location data will allow the service to collect this information in the background, not just while the app is actively in use. On iPhones, users launching an app that requests location data are asked whether they want to give the app access to location at all times, or "only while using the app".[18] In other words, iPhone users can choose to give a map service access to location

---

[14] "EU says Google abuses its Android dominance" https://www.cnet.com/news/eu-hits-google-with-android-app-abuse-charges/
[15] "New Android OEM Licensing Terms Leak"
https://arstechnica.com/gadgets/2014/02/new-android-oem-licensing-terms-leak-open-comes-with-restrictions/
[16] "Google fined £3.8bn by EU over Android antitrust violations"
https://www.theguardian.com/business/2018/jul/18/google-faces-record-multibillion-fine-from-eu-over-android
[17] Except Google Search, which is set as the default search engine on iPhones. Google reportedly pays Apple between $9 and $12 billion for this.
http://fortune.com/2018/09/29/google-apple-safari-search-engine/
[18] "Uber users on iPhones can now block the app from always tracking their location, thanks to Apple's new iOS update" https://nordic.businessinsider.com/thanks-to-ios-11-users-can-stop-uber-from-tracking-them-24-7-2017-9



only when they are actively using the app, while on Android users have to choose between either letting the app access location services at all times, or completely block the app from accessing location.



*1 Google Maps permissions prompt. Android on the left, iPhone on the right.*

## 3.5   Location tracking

Location data can be described as a physical position point, defined by geographical coordinates. Location tracking means that the location of a person or entity is recorded over time. When aggregated, location data can also reveal broader patterns or anomalies. As we use our smartphones for an increasing number of tasks in our everyday lives, the usefulness of location tracking is obvious. Interactive real-time maps, searches that show nearby businesses, and weather services are perhaps the most obvious examples, but location tracking can also be aggregated and used for route planning, traffic management, and so on.

It is possible to infer a lot about an individual based on their location history. Studies have demonstrated that four approximate location points is often



enough to accurately identify an individual.[19] Inferences about sensitive personal data can also be made from tracking your location. For example religious views (spends time in a mosque), political stance (attended a protest march), and health related issues (visits a cancer treatment center).

Furthermore, information about your whereabouts can reveal your habits and your personality. This can be used to target advertising, or for individualised offers and services. If you frequent a pub, indicating a drinking habit, this could be valuable information for an insurance company. Similarly, someone who regularly goes for runs could be offered lowered premiums, or be targeted by advertisements for sporting equipment. Consumers may be subjected to discriminatory practices through the individualisation of messages and offers, although these forms of discrimination can be difficult to discover.[20]

Companies such as Google are not collecting location data in a vacuum. Geolocation is part of a bigger picture, and can be combined with other data such as browsing history, preferences, social networks, shopping history, and so on. For example, information about visiting a physical store can be used to measure ad effectiveness, as long as the person who saw the ad can be identified as the same person who visited the store. This practice of combining tracking data to draw new inferences is also called "closing the loop".[21]

Consumer studies have demonstrated that consumers are particularly conscious and worried about the tracking of their location. An international 2018 study that asked more than 8000 consumers about location data and privacy, showed that 75-80 % of consumers feel vulnerable when their location data is being shared.[22] Despite this general anxiety, many consumers feel powerless to limit the amounts of data being collected through their smartphones. Consumers are also generally unlikely to adjust the privacy settings of the services they use, which makes it crucial that service-providers act responsibly when it comes to the types of data they collect, when they collect it, and how they use it.

---

[19] "Study shows how easy it is to determine someone's identity with cell phone data" https://phys.org/news/2013-03-easy-identity-cell.html

[20] In 2015, researchers at Carnegie Mellon University found that Google's advertising platform was showing higher paying jobs to more men than women. "Google's algorithms advertise higher paying jobs to more men than women" https://www.theverge.com/2015/7/7/8905037/google-ad-discrimination-adfisher

[21] "New digital innovations to close the loop for advertisers" https://adwords.googleblog.com/2016/09/New-Digital-Innovations-to-Close-the-Loop-for-Advertisers.html

[22] "Privacy and Location Data: Global Consumer Study March 2018" https://www.here.com/en/node/40306



## 3.6   Dark patterns and deception

As we use digital services, we are subtly being influenced in various ways, including through the user design of the service. These can be innocuous nudges, such as giving us easy access to relevant information, but some of these practices have a more insidious motive. Through so-called "dark patterns", deceptive design practices, users are nudged toward making choices that are in favor of the service-provider, and often against their own interests.[23]

Dark patterns come in many shapes, and encapsulate many different design practices. For example, the use of color, visibility and wording may serve to steer users toward choices that benefit the service provider. This can include misrepresenting the consequences of a choice, by only focusing on certain aspects that put the service provider's preferred choice in a positive light. Similarly, information that might dissuade the user from opting in to a service can be withheld or hidden from view, giving users a skewed impression.

As many mobile phone services are used on the go, users will often take the path of least resistance in order to access a service as soon as possible. Making the least privacy friendly choice part of the natural flow of a service, can be a particularly effective dark pattern when the user is in a rush, or just wants to start using the service. For example, this can be done by using a certain click-flow,[24] then subverting the design mid-flow by switching the expected function of a button. When setting up an Android device, the "Continue" button is always a blue button placed in the right corner. However, for some steps of the process, the blue button also entails enabling extra features.[25] If users are not paying full attention every step of the way, they may end up unintentionally enabling a setting without knowing that they have done so.

Furthermore, users can be deceived by being discouraged from making an active choice, paving the way for default settings that disfavor the user. When users are asked to opt out of certain settings, rather than opting in, the service-provider could be exploiting the users' disposition to leave the default settings enabled.[26]  Similarly, continuous prompts that ask users to enable settings do

---

[23] "Dark Patterns are designed to trick you (and they're all over the Web)"
https://arstechnica.com/information-technology/2016/07/dark-patterns-are-designed-to-trick-you-and-theyre-all-over-the-web/
[24] A pattern of buttons or links that have to be clicked in order to proceed through a process.
[25] See chapter 4.5.3
[26] "Do users change their settings?" https://www.uie.com/brainsparks/2011/09/14/do-users-change-their-settings/



not respect the users' original choices, and may wear out the users and make them resign to clicking "I accept" despite originally being reluctant.

Another dark pattern entails service providers "bundling" different services that are not functionally interdependent. For example, using a map service could be made contingent on uploading your web browser history. Such bundling can make users share information that they otherwise would not, because the alternative is punishment in the form of being denied access to a service or function.

Dark patterns are often considered unethical design practices.[27] The use of deceptive design tricks to obfuscate important information, bundling, and misrepresenting what settings actually do, are also at odds with the notion of giving users agency to make informed choices. As such, dark patterns have the potential to be used in ways that circumvent laws meant to protect consumers.

## 4.    Google and location tracking

Google mainly tracks user location through two settings, Location History and Web & App Activity, which are both integrated into the Google user account.[28] These settings can be controlled through the Google account or through Android settings, and collect and combine data from other Google Services that collect user data, such as Google Maps, YouTube, Google Chrome, and Google Photos.

In this chapter, we first give a brief overview of the Location History and Web & App Activity settings. Subsequently, we look at how these settings are presented to the user in different contexts. This is followed by a discussion of the different practices that mislead users throughout the process.

## 4.1   Location History

Location History is a Google account setting that continuously logs the location of the user. According to Google, the Location History feature *"helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or*

---

[27] "Dark patterns and the ethics of design" https://medium.com/adventures-in-ux-design/dark-patterns-and-the-ethics-of-design-31853436176b
[28] The Google user account is the main hub for most Google services, and is used to log in to Android, Gmail, Search, YouTube, and much more.



*traffic predictions for your daily commute."[29]* The location data collected through Location History is derived from GPS, Wi-Fi scanning, and Bluetooth scanning, which means that Google can track a user's precise location inside buildings as well as outside.

According to the description on Google's My Account website, data collected through Location History is also used to serve targeted advertising:

> *"This data helps Google give you more personalized experiences across Google services, like a map of where you've been, tips about your commute, recommendations based on places you've visited, and useful ads, both on and off Google."[30]*



*2 Google Location History, as seen on a Google Account.*

When enabled, Location History collects a variety of user data, including mode of transportation (walking, driving, on a tram, entering a vehicle, etc.), barometric pressure (altitude), Wi-Fi information, GPS coordinates, and the battery level of your device. This data is transmitted to Google, and stored as a part of the user's Google account.

---

[29] "Google Account Help - Manage or delete your Location History"
https://support.google.com/accounts/answer/3118687?hl=en
[30] "Google Activity Controls" https://myaccount.google.com/activitycontrols



Some of the information inferred through this data collection (location, route, mode of transportation, which shop you visited at what time) is available on the user account ("Location History Timeline"), where users can look through their movement history for the period the feature has been enabled.[31] Other data, such as barometric pressure, nearby Wi-Fi hotspots and Bluetooth beacons, and battery level, is not visible to the user, but is collected passively in the background.



*3 Google Timeline on a web browser on a PC.*

According to Google, the Location History feature is voluntary, and users must opt in before the feature starts tracking user location.[32]

## 4.2   Web & App Activity

Web & App Activity is another Google account setting, which collects a variety of user data from an assortment of Google services. As shown in the screenshot below, Web & App Activity is described as *"Saves your searches, Chrome browsing history and activity from sites and apps that use Google services. This gives you better search results, suggestions and personalisation across Google services".*

Google users can look at the data collected through Web & App Activity through the "My Activity" timeline on their profile, which is logged separately from the Location History Timeline.[33] This log includes timestamped records of which

---

[31] "Google Timeline" https://www.google.com/maps/timeline?pb
[32] "Google privacy policy – How do I know if my Location History is on?" https://policies.google.com/technologies/location-data#is-on
[33] "Google – My Activity" https://myactivity.google.com/myactivity



apps they have used on their Android device. Web & App Activity can also track offline behavior, such as credit card purchases.[34] Web & App Activity is enabled by default when setting up a Google account.

Data from Web & App Activity is also used to personalise advertising. However, information about this data being used for advertising is only shown to the user in certain circumstances. In some contexts, such as when setting up a Google account, the use of this data for advertising is not mentioned, even after clicking "learn more". In a few limited contexts, such as when the setting has been actively turned off, and the user attempts to enable it again, Google informs the user about the advertising purposes.



*4 Information about Web & App Activity. During the Android setup process (left), and in the Google account (right).*

## 4.3   Setting up a Google Account

When setting up a Google account, users are asked to review a truncated version of Google's privacy policy. In addition to clicking "Create Account", users can click "More options", which reveals a number of settings that can be adjusted.

---

[34] "How to use Google privacy settings"
https://www.consumerreports.org/privacy/how-to-use-google-privacy-settings/





*5 Users have to click "More options" to adjust the Google settings.*

As the screenshot below illustrates, Location History is turned off by default when setting up the account. Note that there is no clear indication that this information is also used for advertising purposes, unless the user clicks "Learn more". Clicking "Learn more" reveals that the location data collected through Location History is used to serve "more useful ads on and off Google".[35]

---

[35] Screenshot of the whole screen and text is included in the appendix.





*6 Location History when setting up a Google account.*

After clicking "More options", it is also revealed that Web & App Activity is turned on as a default setting. The description beneath the setting says that it provides "better search results, suggestions and personalization". Note that there is no obvious indication that Web & App Activity will record location data, unless the user clicks "Learn more". Neither text mentions advertising.



*7 Web & App Activity is enabled by default.*



### 4.3.1  Enabling Google Assistant

As part of the process of setting up an Android device, users are asked to enable a service called Google Assistant. Google Assistant is a voice-activated digital assistant, meant to help users perform everyday tasks. The assistant is also an integral part of the Google Home smart speaker system, and several other products made by both Google and third parties. This means that the Google Assistant is likely to become a fixture in the everyday life of many consumers.[36]

As the screenshots below shows, enabling the Google Assistant service in the Android setup process, also entails turning on Location History. On this screen, users are only told that Location History "saves where you go with your devices". If the user clicks the inconspicuous grey arrow to the right of Location History, a more detailed description appears, including the fact that the data is used for advertising purposes.



*8 Google Assistant prompt, when setting up an Android device.*

### 4.3.2  Starting Google apps for the first time

If the user has not enabled Location History when setting up their Android device, they will be asked to enable the setting on several other occasions.[37]

---

[36]"Google Assistant" https://assistant.google.com/platforms/speakers/

[37] For this test, we only tried starting the preinstalled Google apps after a fresh Android install. We did not observe prompts to enable Location History during the startup of the Google apps YouTube, Chrome, Hangouts, and Drive.



Upon opening the Google Maps app for the first time, users are asked again to activate Location History. The pop-up says that Location History will give users "improved route recommendations, see popular times for places and save visits to your timeline". Unless the user clicks the inconspicuous arrow on the right, they will not be informed that this information is also used for marketing purposes.



*9 Location History prompt when opening Google Maps.*

Upon opening the Google Photos app and clicking the "Places" gallery button, users are also asked to turn on Location History. According to Google, enabling Location History lets the user "see photos grouped by where you've been". It does not appear to be possible to enable this particular feature without enabling Location History.





*10 Location History prompt when opening "Places" in Google Photos.*

Upon opening the Google App for the first time, users are asked once more to enable Location History. As the screenshot below shows, there is no visible information about what enabling Location History actually entails, and there is no obvious button to display more information about Location History before activating the service as a part of "personalised updates".





*11 Popup when opening Google App for the first time.*

### 4.3.3  Pausing Location History

It is possible to turn Location History on, or to pause it, in the Android location settings menu. As the screenshots below demonstrate, the information given here is somewhat truncated, but informs users that the data collected through Location History is used for ads.

Attempting to pause the service results in a warning that pausing it "limits functionality of some Google products over time". However, there is no comprehensive explanation of all services that are affected, or how their functionality will be limited.





*12 Location History in Android settings.*

It is also worth noting that there is no real option to *turn off* Location History once it has been enabled; users can only *pause* it after the Google account has been created. This raises questions about whether the user has actually withdrawn his or her consent to the use of past location data for advertising, or if pausing Location History only halts the collection of future data. The process of deleting historical location data is separate from pausing Location History, and Location History data is seemingly retained indefinitely if the user does not actively delete it.[38]

## 4.4   Location tracking through Web & App Activity

If the user has purposefully avoided enabling Location History, this does not necessarily mean that Google is not collecting the user's location. A report published by the Associated Press in August 2018 showed that Web & App Activity also reports user location data to Google, which is used for

---

[38] In March 2017, the Danish Consumer Council filed a complaint with the Danish data protection authority against Google. This complaint alleges, amongst other things, that Google retains Location History data indefinitely without a sufficient legal reason to do so. "Forbrugerrådet Tænk anmelder Google til Datatilsynet» https://taenk.dk/om-os/presserum/forbrugerraadet-taenk-anmelder-google-til-datatilsynet



personalisation purposes such as advertising.[39] As mentioned, Web & App Activity is enabled by default when setting up a Google account. Unless the user first clicks "More options", and then "Learn more", it is not clear that this setting actually collects location data.



*13 Web & App Activity when registering a Google account.*

Although most apps do not record the user's location through Web & App Activity, certain apps and services, such as Google searches and searches made through Google Maps, are logged with location data of where the user was when he or she performed the search. In other words, users who turn Location History off, but leave Web & App Activity on, will still have some of their location data collected by Google. Location data logged through Web & App Activity is not visible on the timeline map that Location History provides, but shows up if the user looks at the My Activity timeline, which is wholly separate from Location History.

---

[39] "Google tracks your movements, like it or not"
https://apnews.com/828aefab64d4411bac257a07c1af0ecb





*14 Location data recorded through Web & App Activity*

As with Location History, users who attempt to pause App & Web Activity receive a vague warning that this will limit or disable functionality. This non-extensive list includes "you may stop seeing more relevant search results or recommendations that you care about".



*15 Pausing Web & App Activity*

## 4.5   Problematic practices

As outlined above, we see a number of problematic ethical and legal issues with the ways that Google have implemented Location History and Web & App Activity into the Google account and the Android operating system, and how they present these settings to the user. In the following, we expand upon the problematic issues, followed by a legal analysis of how the issues are, in our opinion, at odds with the GDPR.



Google give a certain degree of control to the user through its account system. For example, Location History can be deleted through the Location Timeline, and can be exported through Google's "Takeout" tool.[40] However, the data extracted through Takeout seems to be more detailed than what is shown in the Location History timeline.[41]

Users that delve into the dashboard can also get a certain degree of control over what ads they see.[42] Additionally, there is a lot of different information and settings spread throughout the Google dashboard, although some of these can be difficult to find.[43]

### 4.5.1  Hidden default settings

When setting up a Google account, the actual account settings are hidden behind extra clicks. Users first have to click "More options" to see what the settings are, and whether they are enabled or disabled. Web & App Activity is enabled by default, meaning that users who did not click "More options" will not be aware that this data collection is happening.



*16 Default settings hidden behind "More options".*

Users are unlikely to diverge from default settings, either because they are in a rush to use a service, or because they trust the service-provider. In any case,

---

[40] Google Takeout https://takeout.google.com/settings/takeout
[41] This can be seen by using third party tools such as Location History Visualizer https://locationhistoryvisualizer.com/
[42] Google Ads Settings https://adssettings.google.com/
[43] In "Deceived by Design", we documented some of the hurdles of navigating through the Google account dashboard. See pp. 34-39 https://fil.forbrukerradet.no/wp-content/uploads/2018/06/2018-06-27-deceived-by-design-final.pdf



obscuring the invasive default settings is a dark pattern that dissuades users from making an active choice, and does not provide data protection by default.

### 4.5.2 Misleading and unbalanced information

Whenever the Location History and Web & App Activity settings are presented to the user, the clearly visible information is limited to a few positive examples of what the setting entails. The information that is visible often also trivializes the extent of tracking that is going on, and how it is used. For example, in all the instances where users are asked to enable Location History, the fact that this data is also used for advertising is hidden behind a grey arrow or a "Learn More"-link.



*17 Relevant information hidden behind extra clicks.*

Similarly, the fact that Web & App Activity collects location data is also always hidden behind another click, and information about this data being used for advertising is only available in some contexts. Consequently, users are not given sufficient information to make an informed choice. This appears to be cherry picking from the service-provider's side, where certain aspects that may be perceived as negative by the user are glossed over.

Even if the user clicks "Learn more", the description of both Location History and Web & App Activity still seems to mislead the user about what they are actually agreeing to. For example, Location History is often described as being a "private map", which may give the impression that the information is not used for other purposes such as advertising. Similarly, the name "Web & App Activity" obscures the fact that the setting also collects location data.

### 4.5.3 Deceptive click-flow

Although Location History technically has to be enabled before it begins collecting data, users following the click-flow when setting up an Android device are likely to unknowingly enable the setting. Google has designed the Android



setup choice-architecture in a way that facilitates enabling Location History as part of the setup process.

As shown below, throughout the setup process, the way to proceed is represented by blue buttons on the bottom right of the screen. However, if the user keeps clicking the blue buttons throughout the process, they will also enable Google Assistant, which means that Location History is also turned on. In other words, users that do not want to share their location with Google have to be very attentive in order to stop location tracking. This is a dark pattern that may end up both irritating and confusing a potentially impatient user into enabling Location History without being aware of it.



*18 Some steps from the Android setup process. Google Assistant prompt on the right. Note that this is a shortened version of the actual process.*

### 4.5.4  Repeated nudging

Users are repeatedly asked to turn on Location History, in many different contexts. On Android devices, users that do not wish to enable Location History have to decline the setting at least four times when using different services that are preinstalled on Android phones;[44] in Google Assistant, Google Maps, Google app, and Google Photos.

---

[44] Google Maps and Google Photos also ask users to enable Location History on iPhones, but since iOS has different preinstalled services, we regard the nudging as more pressing on Android devices.





*19 Prompt in Google Maps to enable Location History.*

Instead of Google taking "no" for an answer, users have to keep making the same choice repeatedly. This increases the chances that users turn on the setting, either by accident, because they are tired of being asked, or because they believe that the services will not work otherwise.

### 4.5.5  Bundling of services and lack of granular choices

Throughout the Google ecosystem of services, separate services or functionalities are integrated and co-dependent, or simply bundled together. Enabling Location History is required in order to enable other services that users may want to use, such as Google Assistant and Google Photos Places.

Having your photos grouped by location may be a useful and desirable feature for many users. However, in order to enable this feature, users must also enable Location History. There is no granularity to this choice, meaning that users that want their photos grouped by location can only receive this feature by opting in to location tracking for advertising purposes.



*20 Prompt in Google Photos to enable Location History.*

Similarly, when enabling Google Assistant as part of the Android setup process, users also have to enable Location History. Despite this, the Google Assistant



service appears to function even if the user later disables Location History, although the user is never informed about this.[45]

Conversely, there is no granularity to the actual Location History setting. Either users have to allow Google to collect their location data at all times through Location History, or they must reject the feature in its entirety, blocking off other services that have Location History bundled into them.

In other words, if the user does not allow Google to collect user location data at all times through Location History, Google appears to block off potentially useful features such as Google Assistant and photos sorted by location. This all-or-nothing choice benefits Google at the cost of failing to respect users by for example providing granular choices.

### 4.5.6  Permissions and always-on settings

When enabled, Location History is always on in the background on Android devices, regardless of whether the user is actively using a service that requires location services. In part, this seems to be because of how the Android operating system works.

Android users that want to use an app that requires location data, have a binary choice; Either they give the app permission to use location services, in which case the app can also record user location when the app is not in use. The alternative is to deny the app permission completely, which means that the app cannot use location services even when in active use.

On iPhones, on the other hand, users can choose to give an app permission to use location services only when the app is in use. The latter practice is an example of privacy-preserving technology, while Google's solution is an all-or-nothing choice that limits the users' options.

---

[45] "If you're using an Android phone, Google may be tracking every move you make" https://qz.com/1183559/if-youre-using-an-android-phone-google-may-be-tracking-every-move-you-make/





*21 Device level permissions. Android on the left, iOS on the right.*

Additionally, if the user has allowed an app to access location in the background, iOS will periodically remind the user that this is happening. This prevents the user from enabling tracking in one context for a specific reason, then forgetting to turn it off.



*22 iOS reminder that the user has given the Google app access to location, even when the app is not in use.*

### 4.5.7  Summary of problematic practices

As users rarely change their settings or break the click-flow when installing software, many are likely not to realize that they turned on Location History,[46] or that Web & App Activity is enabled. Through a variety of dark patterns, Google is getting a blanket permission constantly to collect the exact location of the user, including the latitude (e.g. floor of the building) and mode of transportation, both outside and inside, to serve targeted advertising.

Users that are setting up their Android device, and are eager to get the device up and running, are particularly susceptible to inadvertently turning on Location History, while anyone who want to use Google Assistant when setting up their

---

[46] In July 2018, Google began sending monthly emails to users with Location History movement. These emails give some aggregated information about the user's monthly travels, but do not mention any other ways that this data is being used.



Android device will end up enabling this pervasive tracking. Furthermore, if the user has kept Location History disabled despite the continued nudging, his or her location will still be shared with Google through Web & App Activity.

In our opinion, the sum of these practices is that users are deceived into enabling privacy adverse features. This deception is unethical, and fails to respect user agency. In the following chapter, the practices will be discussed in the context of European data protection legislation.



# 5    Legal analysis

In this chapter, we examine whether Google has fulfilled the legal requirements under the GDPR when using location data collected through "Location History" and "Web & App activity" for advertising purposes. For the purposes of this chapter, the terms "data subject" will be used interchangeably with "user", and "data controller" will be used to mean Google.


As demonstrated in chapter 3.5, location data is personal data – information that directly or indirectly can identify a natural person.[47] This means that Google is collecting personal data when it collects and stores information about a person's location and movement through "Location history" and "Web & App activity".


The processing of personal data is only lawful if one out of six general terms is fulfilled.[48] When considering the legal grounds for Google's processing of location data for advertising purposes, we will therefore begin with establishing what legal basis Google is using. In order to establish this, we have used Google's European privacy policy as the main source.[49]


From the privacy policy, it appears that Google is relying both on user "consent" and on "legitimate interests" when processing location data for advertising purposes.[50] It is not clear from the privacy policy which legal grounds applies to what manners of processing. This is in itself problematic, as Google has an obligation to be specific about what legal grounds it is using for particular processing of personal data.[51] Relying on legitimate interest to process data while the processing could have been based on another lawful basis, also constitutes a violation of transparency requirements.[52]

---

[47] GDPR art. 4(1)

[48] GDPR art. 6. See also GDPR recital 40.

[49] "Google privacy policy" https://policies.google.com/privacy#enforcement

[50] On the basis of Google's European privacy policy, this report will not consider other legal grounds than "consent" and "legitimate interest" in art. 6 GDPR for Google's processing of personal data through Location history and Web & App activity

[51] As a result of an investigation done by the EU Data Protection Authorities, Google was already in 2012 urged to clarify which legal basis it uses for processing of personal data. See https://www.cnil.fr/sites/default/files/typo/document/20121016-letter_google-article_29-FINAL.pdf and https://www.cnil.fr/sites/default/files/typo/document/GOOGLE_PRIVACY_POLICY_RECOMMENDATIONS-FINAL-EN.pdf

[52] GDPR art. 5(1)(a) see also https://ico.org.uk/for-organisations/guide-to-the-general-data-protection-regulation-gdpr/legitimate-interests/when-can-we-rely-on-legitimate-interests/



To be compliant with GDPR, consent has to be opt in. Because Location History is based on users opting in (off by default), we will assume that this data processing is based on consent.[53] Web & App Activity is turned on by default, and we anticipate that Google cannot rely on consent as a legal basis. The Article 29 Working party clearly state that "pre-ticked boxes or opt-out constructions that require an intervention from the data subject to prevent agreement" is invalidate consent under the GDPR.[54] Therefore, we assume that processing of location data collected through Web & App Activity is based on legitimate interests.[55]

*In the following we analyze whether the way that Google collects consent for Location History is in accordance with the requirements set forth in the GDPR. This is followed by a discussion of the legal grounds for Web & App Activity.*

## 5.1  Consent

Consent is defined in the GDPR as "any freely given, specific, informed and unambiguous indication" by a "statement" or by "clear affirmative action" from the data subject.[56] All of these conditions need to be fulfilled for consent to be considered valid. Below we will look at whether Google's use of Location History data for advertising purposes fulfills these conditions.

In Google's privacy policy, it states:

> "*We ask for your agreement to process your information for specific purposes and you have the right to withdraw your consent at any time. For example, we ask for your consent to provide you with personalized services like ads. We also ask for your consent to collect your voice and audio activity for speech recognition.*"

From this, it appears that Google is relying on consent as a legal ground for at least some of its processing of personal data, particularly for serving targeted advertising.

---

[53] GDPR art. 6 (1)(a). See also art. 5(3) of the ePrivacy Directive which requires consent to pull information from a user's device. As the ePrivacy Directive already requires consent for reading information (such as location data) from a user device, it makes most sense if the applicable legal basis under the GDPR is also consent in Location history.

[54]  Working Party 29"Guidelines on Consent under Regulation 2016/679" p. 16. http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051

[55] GDPR art. 6(1)(f)

[56] GDPR Art.4(11)



### 5.1.1  Freely given

Since, as Google argues, users have to opt in to Location History,[57] the data subject should freely have given his or her consent for processing of personal data collected through Location History. This indicates that the data subject has been provided with a real choice about whether he or she accepts Google processing such data, and that this data may be used for advertising purposes.

However, as demonstrated in chapter 4, there are significant differences in how Google collects consent for Location History between iOS-users and Android users. During the Android setup process, users are guided through a process that seems designed to make users consent to Google processing their location data, simply by following the click-flow.



This click-flow makes the user likely to enable Location History as a part of the process, without being made fully aware of what this entails. If the user was not aware what he or she consented to, it will be contestable whether consent has been freely given. Furthermore, if the user has not given consent to Location History during the setup process, Android users are nudged toward enabling the setting at several other occasions. The user may feel pressured into giving his or her consent because of this recurrent nudging.

This is problematic, considering consent should be freely given in order to be valid. "The Article 29 Working Party" have stated that consent is not freely given if there is "any element of compulsion, pressure or inability".[58] Additionally,

---

[57] "Google privacy policy" https://policies.google.com/technologies/location-data#is-on
[58] "The Article 29 Working Party" was replaced by the European Data Protection Board (EDPB) on the 25th of May 2018. This is a group consisting of EU member state data protection authorities, who provide guidelines on how to interpret EU-regulation on data protection issues.  Working Party 29"Guidelines on Consent under Regulation



users are pushed into giving consent to Location History in order to get access to Google Assistant, and to have photos sorted after location. There are also vague warnings about reduced functionality if the user disables Location History. These examples indicate that users who have been nudged into enabling Location History have not "freely given" their consent, and consequently it is not the valid consent required under the GDPR. If this is the case, the processing of this personal data may lack a valid legal basis.

### 5.1.2  Specific and informed?

In order to be considered valid, consent must be specific and informed. This means that the user must be presented with any information that is necessary to understand what he or she is consenting to, and that it should be clear what the consequences of giving consent could be.

When setting up a Google account, users are told that they can control how Google collects and uses their data. Users are also informed that they can adjust the settings and withdraw their consent. This shows that Google has provided information about rules, safeguards and rights. However, it is questionable whether the way that this information is presented is sufficient, considering users have to click "learn more" to get important information about the purposes of the processing, and the choices they have.

It is also questionable whether Google provides sufficient information about the purposes of the processing of location data. As shown in chapter 4, Google gives some information about processing personal data for advertising purposes, but only if the user clicks "learn more", and even then, this information is vague. Furthermore, phrasing such as "private map" can also mislead the user.

The relevant information regarding what Location History actually entails is hidden behind extra clicks and submenus, and the information about what the data is used for is ambiguous:

> *"Location History helps you get useful information (..) more useful ads on and off Google"*

Even if the consumer finds and reads the information under "Learn more", many users will probably not understand to what extent their location data is processed, that it is stored indefinitely, and how it is used for advertising

---

2016/679" p. 7 http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051



purposes. In particular, when using a service such as Google Assistant or photos grouped by location, it may not be obvious for the user that location data is being collected and stored, or for what purposes. This may be at odds with the notion of a "specific and informed" consent.

### 5.1.3  Unambiguous?

In order for consent to be valid, the user must have given an "unambiguous indication" through a "clear and affirmative action", that he or she consents to Google processing his or her personal data for advertising purposes through Location History.

In this context, it is worth mentioning that if Google was to base the processing of personal data in Web & App Activity on consent, and not legitimate interest (as we anticipate), consent would not be considered "unambiguous" since Web & App Activity is turned on by default. Pre-ticked boxes and "blanket acceptance of general terms and conditions cannot be seen as a clear affirmative action to consent to the use of personal data."[59]

Google claims that the user must opt in before it can process location data collected through "Location history". However, since this consent is given after the user has been exposed to dark patterns such as deceptive click-flows and hidden information, it is questionable whether the data subject has given an "unambiguous indication". Furthermore, this raises questions about whether the consent is "obvious". As demonstrated, the user may also have declined to turn on Location History several times, but will continue to be nudged toward turning it on in different contexts.

The user has to perform extra actions, such as clicking "Learn more", to get information about the purpose of the processing of the personal data. The presentation of this information is ambiguous, and consequently may not be in accordance with the requirements for an "unambiguous consent".[60]

---

[59] Working Party 29"Guidelines on Consent under Regulation 2016/679" p. 16
http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051
[60] Working Party 29"Guidelines on Consent under Regulation 2016/679" p. 17
http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051



## 5.2  Legitimate interests

Processing of personal data may in certain circumstances be based on the data controller's legitimate interests.[61]

According to Google's privacy policy:

> *"We process your information for our legitimate interests and those of third parties while applying appropriate safeguards that protect your privacy. This means that we process your information for things like: [...] Providing advertising to make many of our services freely available for users"* [62]

Since data collected through Web & App Activity is used for advertising purposes, and the setting is opt-out,  it seems reasonable to assume that Google is relying on legitimate interest as the legal grounds for processing this data.

Under the GDPR, the processing of personal data is lawful if it is "necessary for the purposes of the legitimate interests of the controller".[63] However, if a data controller (in this case Google) is relying on legitimate interests for processing personal data, this must be balanced against the interest or fundamental rights and interests of the data subject. A legitimate interest must also be "lawful", "sufficiently clearly articulated" (transparent) and "represent a real and present interest".[64]

### 5.2.1  Transparency

As demonstrated in chapter 4, the information provided about the purposes and extent of data collection through Web & App Activity is not particularly clear. The fact that location data is collected as a part of this setting is hidden behind extra clicks, and information stating that this data may be used for advertising is only available under limited circumstances. Additionally, the fact that Web & App Activity is enabled by default is hidden when setting up a Google account.

---

[61] GDPR art. 6(1)(f)

[62] "Google Privacy Policy" https://policies.google.com/privacy#enforcement

[63] GDPR Art. 6(1)(f)

[64] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 25 and p. 52 www.dataprotection.ro/servlet/ViewDocument?id=1086



Furthermore, in the limited contexts where Google actually provides information about this data being used for advertising, the description of how the data is used is ambiguous:

> *"This data helps Google give you more personalised experiences across Google services, such as faster searches, better recommendations, and useful ads, both off and on Google"*

This phrasing seems like a blanket disclaimer that permits a wide range of purposes for using data collected through Web & App Activity.

Consequently, as the purposes for the collection and use of personal data from Web & App Activity are, in our opinion, unclear, this does not seem to fulfil the requirement for legitimate interest as a legal basis.

### 5.2.2  Balancing test

In order for legitimate interest to be a valid legal ground for processing personal data, it must be considered whether Google has a legitimate interest that overrides the individual's interests, rights and/or freedoms. This balancing test must be carried out by the data controller.[65]

Several features must be taken into account when performing a balancing test: The nature of the interests of the controller, the possible prejudice suffered by the controller, the nature of the data, the status of the data subject, and the way that data is processed. Additionally, the data controller must take into account the fundamental rights and/ or interests of the data subject that could be impacted.[66]

Privacy and the right to protection of personal data is a fundamental right in the EU.[67] Therefore, there is a high barrier to set aside the individual's rights and interests in privacy matters.

As mentioned, Google states in its privacy policy that it has a legitimate interest to provide "advertising to make many of our services freely available for

---

[65] GDPR art. 6 (1)(f) GDPR and recital 47.
[66] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 55
www.dataprotection.ro/servlet/ViewDocument?id=1086
[67] Art. 8(1) of the Charter of Fundamental Rights of the European Union, art. 16(1) of the treaty on the Functioning of the European Union (TFEU), art. 1(2) and recital 1 GDPR.



users".[68] However, the extensive tracking performed through features such as Web & App Activity and Location History is very invasive, especially considering that the tracking happens regardless of user interaction, and that the collected data is retained on a seemingly indefinite basis. As a result, Web & App Activity and Location History are arguably privacy adverse. Any legitimate interest to provide advertising should therefore arguably be overridden by the data subject's fundamental right to privacy.

### 5.2.2.1  Reasonable expectations

In order for a legitimate interest to be valid, it must be considered whether the data subject had "reasonable expectations" at the time and in the context of the collection of personal data, that the personal data could be used for advertising and marketing purposes.[69] This consideration should be based on an objective perspective of what a reasonable person could expect.

It is questionable whether the users had a "reasonable expectation" to believe that Google is tracking their location for marketing purposes in the context of Web & App Activity. In many cases, Google will have been collecting this information since users created a Google account. Today, a number of consumers may be aware of such processing due to the media and consumer organisations contributing to more information and awareness of these practices. Additionally, as shown, Google provides some information to the user.

However, many consumers may not have been aware of this processing when they first created the account. In these cases, the data subject would not have had reasonable expectation for such processing of personal data at the time when Google started collecting the data. Similarly, users who (with or without intent) have enabled Location History, may not have been aware of the extent of tracking and use of the data.

One must also consider whether the context of the collection could give the data subjects reasonable expectations that their location data would be used for advertising purposes. As outlined throughout this report, the extent of the collection of personal data for advertising purposes is under-communicated and hidden in the presentation of both Location History and Web & App activity.

This indicates that many users would not have reasonable expectations about Google processing their personal data for advertising purposes. In addition,

---

[68] "Google Privacy Policy" https://policies.google.com/privacy#enforcement
[69] GDPR art. 6 (1)(f) and recital 47



since Web & App activity is turned on by default, the data subject would likely
not have seen any information about location data being collected, and could
therefore probably not have reasonable expectations for such processing, and
at such a comprehensive scale.

*The Article 29 Working Party recommend that data controllers demonstrate the reasons why they consider their own interest to override the data subject's interests and rights. This should be demonstrated in a clear and user-friendly way. The burden of proof is with the data controller.[70] In situations where the data subject does not have reasonable expectations of the processing of personal data, this will imply that the data subject's interests and rights will override the controller's interests.[71] As the report has shown, Google collects personal data passively in the background and not necessarily while using the app.[72] With this in mind, it seems that the lack of a reasonable expectation at the time of collection would tip the balancing act in favour of the interest of the data subject.*

Safeguards

The implementation of certain safeguards can modify the legal grounds for
processing personal data using legitimate interests. Such safeguards may
include functions such as opting out of the processing of personal data,
anonymisations of personal data, and particular transparency measures such as
easy to use deletion tools.

Google claims to anonymise data. However, according to recent reports, this
"anonymous data" can be easily re-identified as long as the user connects to
their Google account.[73] In this case, anonymisation is not actually effective, and
works against its purpose as a safeguard.

According to The Article 29 Working Party, "opt-in consent would almost always
be required for [...] for tracking and profiling for purposes of direct marketing,
behavioural advertisement, location-based advertising or tracking-based digital
market research".[74] This implies that Google may lack a valid legal basis to
process location data for marketing purposes through Web & App Activity.

---

[70] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of
the data controller under Article 7 of Directive 95/46/EC" p. 42
www.dataprotection.ro/servlet/ViewDocument?id=1086
[71] GDPR recital 47
[72] See this report, chapters 3.1 and 3.4.
[73] This is outlined in a 2018 report by researchers at the Vanderbilt University. "Google
Data Collection" https://digitalcontentnext.org/wp-content/uploads/2018/08/DCN-
Google-Data-Collection-Paper.pdf
[74] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of
the data controller under Article 7 of Directive 95/46/EC" p. 47
www.dataprotection.ro/servlet/ViewDocument?id=1086



***

As we have seen, users are able to opt out of Web & App Activity by pausing the setting. However, it is unlikely that many users would ever opt out of Web & App activity, since they would likely not know that the setting is turned on by default. Furthermore, regular users will be unaware that location data is collected, that this data is used for advertising, or even that Web & App Activity exists in the first place.

In our opinion, because of the high barrier to protect the individual's right and interest in privacy matters, Google's interests does not override the data subject's interests and rights in this case.

## 5.3 Summary of legal analysis

As demonstrated throughout this chapter, the ways that Google has designed its Location History and Web & App Activity settings are problematic in light of European data protection requirements. In this report we have questioned the legal basis Google has for collecting and processing this location data.

It is questionable whether users have given free, specific, informed, and unambiguous consent to the collection and use of location data through Location History. It can also be discussed whether the user can withdraw his or her consent, since there is no real option to turn off Location History, only to pause it.

Since Web & App Activity is turned on by default, the collection and use of personal data through this setting cannot be based on consent. Google claims to have a legitimate interest in serving ads based on personal data, but the fact that location data is collected, and how it is used, is not clearly expressed to the user. This calls into question whether Google's legitimate interest in serving advertising as part of its business model, overrides the data subject's fundamental right to privacy. As we have argued above, in light of how Web & App Activity is presented to users, the interests of the data subject should take precedence in this case.



# 6  Appendix





## Setting up a Google account.

The screenshots show what users are presented with when setting up an Android device. In order to see the different options, and to turn these on or off, users have to scroll through the truncated privacy policy, and click "More options".





# EXHIBIT 14

Digital Content Next





# Google Data Collection

## —NEW—

| August 2018 | |
|---|---|

digitalcontentnext.org

This research was conducted by Professor Douglas C. Schmidt, Professor of Computer Science at Vanderbilt University, and his team.  DCN is grateful to support Professor Schmidt in distributing it. We offer it to the public with the permission of Professor Schmidt.

# **Google Data Collection**

## **Professor Douglas C. Schmidt, Vanderbilt University**

## **August 15, 2018**

## I.     EXECUTIVE SUMMARY

1.      Google is the world's largest digital advertising company.[1] It also provides the #1 web browser,[2] the #1 mobile platform,[3] and the #1 search engine[4] worldwide. Google's video platform, email service, and map application have over 1 billion monthly active users each.[5] Google utilizes the tremendous reach of its products to collect detailed information about people's online and real-world behaviors, which it then uses to target them with paid advertising. Google's revenues increase significantly as the targeting technology and data are refined.

2.      Google collects user data in a variety of ways.  The most obvious are "active," with the user directly and consciously communicating information to Google, as for example by signing in to any of its widely used applications such as YouTube, Gmail, Search etc.  Less obvious ways for Google to collect data are "passive" means, whereby an application is instrumented to gather information while it's running, possibly without the user's knowledge. Google's passive data gathering methods arise from platforms (e.g. Android and Chrome), applications (e.g. Search, YouTube, Maps), publisher tools (e.g. Google Analytics, AdSense) and advertiser tools (e.g. AdMob, AdWords). The extent and magnitude of Google's passive data collection has largely been overlooked by past studies on this topic.[6]

3.      To understand what data Google collects, this study draws on four key sources:

a.      Google's My Activity[7] and Takeout[8] tools, which describe information collected during the use of Google's user-facing products;

b.      Data intercepted as it is sent to Google server domains while Google or 3rd-party products are used;

c.      Google's privacy policies (both general and product-specific); and

d.      Other 3rd-party research that has examined Google's data collection efforts.

4.      Through the combined use of above resources, this study provides a unique and comprehensive view of Google's data collection approaches and delves deeper into specific types of information it collects from users. This study highlights the following key findings:

---

[1] "Google and Facebook tighten grip on US digital ad market," *eMarketer*, Sept. 21, 2017, available at
https://www.emarketer.com/Article/Google-Facebook-Tighten-Grip-on-US-Digital-Ad-Market/1016494
[2] "Market share or leading internet browsers in the United States and worldwide as of February 2018," *Statista*, February 2018,
available at https://www.statista.com/statistics/276738/worldwide-and-us-market-share-of-leading-internet-browsers/
[3] "Global OS market share in sales to end users from 1st quarter 2009 to 2nd quarter 2017," *Statista*, August 2017, available at
https://www.statista.com/statistics/266136/global-market-share-held-by-smartphone-operating-systems/
[4] "Worldwide desktop market share of leading search engines from January 2010 to October 2017," *Statista*, Feb. 2018, available
at https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/
[5] Google 10K filings with the SEC, 2017, available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf
[6] Please see Appendix section IX.F for a list of past studies/news reports on Google data collection
[7] "My Activity," *Google*, available at https://myactivity.google.com/myactivity
[8] "Download your data," *Google*, available at https://takeout.google.com/settings/takeout?pli=1

a.   Google learns a great deal about a user's personal interests during even a single day of typical internet usage. In an example "day in the life" scenario, where a real user with a new Google account and an Android phone (with new SIM card) goes through her daily routine, Google collected data at numerous activity touchpoints, such as user location, routes taken, items purchased, and music listened to. Surprisingly, Google collected or inferred over two-thirds of the information through passive means. At the end of the day, Google identified user interests with remarkable accuracy.

b.   Android is a key enabler of data collection for Google, with over 2 billion monthly active users worldwide.[9] While the Android OS is used by Original Equipment Manufacturers (OEMs) around the world, it is tightly connected with Google's ecosystem through Google Play Services. Android helps Google collect personal user information (e.g. name, mobile phone number, birthdate, zip code, and in many cases, credit card number), activity on the mobile phone (e.g. apps used, websites visited), and location coordinates. In the background, Android frequently sends Google user location and device-related information, such as apps usage, crash reports, device configuration, backups, and various device-related identifiers.

c.   The Chrome browser helps Google collect user data from both mobile and desktop devices, with over 2 billion active installs worldwide.[10] The Chrome browser collects personal information (e.g. when a user completes online forms) and sends it to Google as part of the data synchronization process. It also tracks webpage visits and sends user location coordinates to Google.

d.   Both Android and Chrome send data to Google even in the absence of *any* user interaction. Our experiments show that a dormant, stationary Android phone (with Chrome active in the background) communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour. In fact, location information constituted 35% of all the data samples sent to Google. In contrast, a similar experiment showed that on an iOS Apple device with Safari (where neither Android nor Chrome were used), Google could not collect any appreciable data (location or otherwise) in the absence of a user interaction with the device.

e.   After a user starts interacting with an Android phone (e.g. moves around, visits webpages, uses apps), passive communications to Google server domains increase significantly, even in cases where the user did not use any prominent Google applications (i.e. no Google Search, no YouTube, no Gmail, and no Google Maps). This increase is driven largely by data activity from Google's publisher and advertiser products (e.g. Google Analytics, DoubleClick, AdWords)[11]. Such data constituted 46% of all requests

---

[9] Dave Burke, "Android: celebrating a big milestone together with you," *Google,* May 17, 2017, available at https://www.blog.google/products/android/2bn-milestone/

[10] Frederic Lardinois, "Google says there are now 2 billion active Chrome installs," *TechCrunch,* Nov. 10, 2016, available at https://techcrunch.com/2016/11/10/google-says-there-are-now-2-billion-active-chrome-installs/

[11] Google recently rebranded AdWords as "Google Ads" and DoubleClick as "Google Ad Manager"

to Google servers from the Android phone. Google collected location at a 1.4x higher rate compared to the stationary phone experiment with no user interaction. Magnitude wise, Google's servers communicated 11.6 MB of data per day (or 0.35 GB/month) with the Android device. This experiment suggests that even if a user does not interact with any key Google applications, Google is still able to collect considerable information through its advertiser and publisher products.

f.   While using an iOS device, if a user decides to forgo the use of *any* Google product (i.e. no Android, no Chrome, no Google applications), and visits only non-Google webpages, the number of times data is communicated to Google servers still remains surprisingly high. This communication is driven purely by advertiser/publisher services. The number of times such Google services are called from an iOS device is similar to an Android device. In this experiment, the total magnitude of data communicated to Google servers from an iOS device is found to be approximately half of that from the Android device.

g.   Advertising identifiers (which are purportedly "user anonymous" and collect activity data on apps and 3rd-party webpage visits) can get connected with a user's Google identity. This happens via passing of device-level identification information to Google servers by an Android device. Likewise, the DoubleClick cookie ID (which tracks a user's activity on the 3rd-party webpages) is another purportedly "user anonymous" identifier that Google can connect to a user's Google Account if a user accesses a Google application in the same browser in which a 3rd-party webpage was previously accessed. Overall, our findings indicate that Google has the ability to connect the anonymous data collected through passive means with the personal information of the user.

# Contents

I.   Executive summary ..................................................................................................................... 2

II.   A day in the life of a Google user ........................................................................................ 7

III.   Data collection through Android and Chrome platforms ................................................ 9

  A.   Personal information and activity data collection .......................................................... 10

  B.   User location data collection .............................................................................................. 11

  C.   An assessment of passive data collection by Google through Android and Chrome .............................. 13

IV.   Data collection through publisher and advertiser technologies ..................................... 15

  A.   Google Analytics and DoubleClick .................................................................................. 17

  B.   AdSense, AdWords and AdMob ....................................................................................... 18

  C.   Association of passively collected data with personal information ............................. 19

    1)   Mobile advertising identifier may get de-anonymized through data sent to Google by Android ...... 20

    2)   DoubleClick cookie ID gets connected with user's personal information on Google Account ....... 21

V.   Amount of data collected during a minimal use of Google products ........................... 23

VI.   Data collected from Google's key popular applications aimed at individuals ............. 25

  A.   Search .................................................................................................................................... 26

  B.   YouTube ................................................................................................................................ 27

  C.   Maps ....................................................................................................................................... 28

  D.   Gmail ...................................................................................................................................... 29

VII.   Products with high future potential for data aggregation ............................................ 30

  A.   Accelerated Mobile Pages (AMP) .................................................................................... 30

  B.   Google Assistant .................................................................................................................. 32

  C.   Photos .................................................................................................................................... 33

  D.   Chromebook ......................................................................................................................... 34

  E.   Google Pay ............................................................................................................................ 35

  F.   User data collected from 3rd-party data vendors ........................................................... 35

VIII.   Conclusion ............................................................................................................................... 36

IX.   Appendix ................................................................................................................................... 37

A.   Characterization of active vs passive data collection from "day in the life" of a user .............................37

B.   List of Google products ..................................................................................................................38

C.   Data collection from other prominent Google products .................................................................38

D.   Method for location traffic monitoring ...........................................................................................46

E.   Google sign in authentication sequence ..........................................................................................49

F.   Usage profile for mobile data collection experiments.....................................................................50

G.   Past articles that relate to Google's data collection practices .........................................................51

H.   Clarifications ...................................................................................................................................52

I.   About the author ..............................................................................................................................52

## II.        A DAY IN THE LIFE OF A GOOGLE USER

5.        To illustrate the multitude of touchpoints between Google and an individual, as well as the extent of information collected during these interactions, an experiment was designed where a researcher carried an Android mobile phone device[12] during a day's activities. The mobile phone was wiped by conducting a factory data reset[13] and configured as a new device to avoid prior user information associated with the device.[14] A new Google account was created (username "Jane"), so that Google had no prior knowledge of the user and had no advertising interests associated with the account. Researcher then went about a normal day using the mobile phone associated with the new Google account.

6.        The data collected by Google was checked using two tools provided by Google: My Activity[15] and Takeout.[16]  The My Activity tool shows data collected by Google from any Search-related activities, use of Google applications (e.g. YouTube video plays, Maps search, Google Assistant), visits to 3rd-party web pages (while logged in to Chrome), and clicks on advertisements. The Google Takeout tool provides a more comprehensive information about all historical user data collected via Google's applications (e.g. it contains all past email messages on Gmail, search queries, location collection, and YouTube videos watched). We synthesized the collected data and used it to depict key information collection events in the form of a "day in the life" of the user "Jane," as shown in Figure 1.

7.        In the activity shown in Figure 1, as well as throughout the rest of this document, the collected data is categorized in two broad subgroups: *active* and *passive*. Active data is defined as information directly exchanged between the user and a Google product, whereas passive data is defined as information exchanged in the background without any obvious notification to the user. An example of active data collection occurred when Jane submitted a keyword in the Search tool bar and that search query was collected by Google. An example of passive data collection occurred when Jane's location was sent to Google after she entered a search query.

---

[12] LG X Power device with Android 6.0 version installed
[13] The factory data reset deletes all login data for Google services and other accounts, system and app data and settings, all downloaded apps, digital rights management licenses, music, images, documents and backups, and other usage data from the internal storage of the device.
[14] Researchers used LG X Power device that was wiped clean to the default factory settings and given new SIM card in order to ensure that no data was stored on the phone and that phone numbers could not be linked with any past usage.
[15] "My Activity," Google, available at https://myactivity.google.com/myactivity
[16] "Download your data," Google, available at https://takeout.google.com/settings/takeout?pli=1

**Figure 1: Day in the life of Jane, highlighting touchpoints where Google collects data**



8.      Analysis of key touch points during a normal day in the life of Jane suggested that the number of "passive" data collection events outnumbered the "active" events by approximately two-to-one (a detailed breakdown of characterization of active vs passive data collected appears in Table 3 of the Appendix section IX. A).

9.      Google analyzes the collected data to assess user interests, which it then applies to target users with appropriate ads. For example, Google provides a list of interests that it has inferred from a user's activities, available via the "topics you like" section in the Google's Ad Personalization webpage.[17] Figure 2 shows such a list that Google associated with Jane's account after a day's worth of activity. In total, Google attributed 18 interests to Jane, eight of which (shown by colored borders) closely matched Jane's usage and activities.[18]

**Figure 2: Google's assessment of Jane's interest at the end of the day**



10.     Although My Activity and Takeout tools are helpful in assessing the amount of active data collected after a user interacts with Google's products, they do not paint a complete picture of the size and scale of Google's data collection. A comprehensive understanding of which requires a review of Google's product-specific privacy policies, as well as analyses of the actual data traffic passed to Google servers during the instances of a user's interaction with its services. Results derived from these resources are covered later in this report.

## III.     DATA COLLECTION THROUGH ANDROID AND CHROME PLATFORMS

---

[17] "Ads personalization," *Google*, last accessed on August 15 2018, available at https://adssettings.google.com/authenticated
[18] It's unclear as to why other interests that have no connection with Jane's activities during the day show up in this list, though perhaps Google uses historical analysis of similar interests from other users to create associated recommendations.

11.     Android and Chrome are Google's key platforms that aid in significant user data collection due to their extensive reach and frequency of usage. By January 2018, Android captured 53% of the total US mobile OS market (Apple iOS held 45%)[19] and as of May 2017 there were more than 2 billion monthly active Android devices worldwide.[20]

12.     Google's Chrome browser held more than 60% share of all internet browser usage in the world with over 1 Billion monthly active users as reported in the 2017 Q4 10K filing.[21] Both platforms facilitate the use of Google and 3rd-party content (e.g. 3rd-party websites and 3rd-party apps) and hence provide Google access to a wide range of personal, web activity, and location information.

### A.     Personal information and activity data collection

13.     To download and use apps from Google Play Store on an Android device, a user must have (or create) a Google Account, which becomes a key gateway through which Google collects personal information, including user name, email, and phone number. If a user registers for services such as Google Pay[22], Android also collects the user's credit card information, zip code, and birth date. All this information becomes part of a user's personal information associated with their Google Account.

14.     While Chrome does not mandate sharing additional personal information gathered from users, it does have the capability to capture such information. For example, Chrome collects a range of personal information via its form "autofill" feature, and such form fields typically include user name, address, phone number, login name, and passwords.[23]  Chrome stores form fill information on a user's local drive, however, if the user logs in to Chrome using Google Account and enables its "Sync" feature, this information gets sent to and stored on Google servers. Chrome could also learn about the language(s) a person speaks during their interactions with its translate feature, which is enabled by default.[24]

15.     In addition to personal data, both Chrome and Android send Google information about a user's web browsing and mobile app activities, respectively. Any webpage visit is automatically tracked and collected under

---

[19] "Subscriber share held by smartphone operating systems in the United States from 2012 to 2018," *Statista,* May 2018, available at https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/
[20] Dave Burke, "Android: celebrating a big milestone together with you," *Google,* May 17, 2017, available at https://www.blog.google/products/android/2bn-milestone/
[21] Google 10K filings with the SEC
[22] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#payments
[23] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#autofill
[24] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#translate

user credentials by Google if the user is signed in to Chrome. Chrome also collects information about a user's browsing history, passwords, website-specific permissions, cookies, download history, and add-on data.[25]

16.      Android sends periodic updates to Google servers, including device type, cell service carrier name, crash reports, and information about apps installed on the phone.[26] It also notifies Google whenever any app is accessed on the phone (e.g. Google knows when an Android user accesses their Uber app).

### B.      User location data collection

17.      Android and Chrome platforms meticulously collect user location and movement information using a variety of sources, as depicted by Figure 3. For example, a "coarse location" assessment can be done by using GPS coordinates on an Android phone or through a network's IP address on a desktop/laptop device. The user location accuracy can be improved further ("fine location") through the use of nearby cell tower IDs or via scanning the device-specific BSSIDs or basic service set identifiers, assigned to the radio chipset used in nearby Wi-Fi access points.[27]  Android phones can also use information from the Bluetooth beacons registered with Google's Proximity Beacon API.[28] These beacons not only provide user's geolocation coordinates, but could also pinpoint exact floor levels in buildings.[29]

**Figure 3: Android and Chrome use multiple ways to locate a mobile user**



---

[25] "Google Chrome Privacy Notice," *Google*, March 6, 2018, available at https://www.google.com/intl/en/chrome/browser/privacy
[26] https://policies.google.com/privacy?hl=en&gl=us#infocollect
[27] To understand how location data is sent to Google servers in more depth, our researchers analyzed the data traffic from a mobile phone from a user in motion, applying the method described in Appendix section VIII.C.
[28] "Google beacon platform, proximity beacon API," *Google,* last accessed on August 15 2018, available at https://developers.google.com/beacons/proximity/guides
[29] "Google beacon platform, proximity beacon API," *Google,* last accessed on August 15 2018, available at https://developers.google.com/beacons/proximity/guides

18.     It's hard for an Android mobile user to "opt out" of location tracking. For example, on an Android device, even if a user turns off the Wi-Fi, the device's location is still tracked via its Wi-Fi signal. To prevent such tracking, Wi-Fi scanning must be explicitly disabled in a separate user action, as shown in Figure 4.

**Figure 4: Android collects data even if Wi-Fi is turned off by user**



19.     The ubiquity of Wi-Fi hubs has made location tracking quite frequent. For example, during a short 15-minute walk around a residential neighborhood, an Android device sent nine location requests to Google. The request collectively contained ~100 unique BSSIDs of public and private Wi-Fi access points.

20.     Google can ascertain with a high degree of confidence whether a user is still, walking, running, bicycling, or riding on a train or a car.  It achieves this by tracking an Android mobile user's location coordinates at frequent time intervals in combination with the data from onboard sensors (such as an accelerometer) on mobile phones. Figure 5 shows an example of such data communicated with the Google servers while the user was walking.

**Figure 5: Snapshot from a Google user location upload**

```
"activityReadings": [
    {
        "activities": [
            {
                "confidence": 99,
                "type": "onFoot"
            },
            {
                "confidence": 99,
                "type": "walking"
            },
            {
                "confidence": 1,
                "type": "unknown"
            }
        ],
        "timestampMs": 1527095517507
    },
```

### C.     An assessment of passive data collection by Google through Android and Chrome

21.     Active data that Android or Chrome platforms collect and send to Google as a result of users' activities on these platforms can be assessed through the MyActivity and Takeout tools. Of potentially greater interest, however, is the passive data that these platforms collect, which goes beyond location data and which remains relatively unrecognized by the users. To assess the type and frequency of occurrence of such collection in greater detail an experiment was conducted that monitored traffic data sent to Google from mobile phones (both Android and iPhone) using the method discussed in Section IX.D in the Appendix. For comparison's sake, this experiment also included the analysis of data sent to Apple via an iPhone device.

22.     For simplicity, the phones were kept stationary, with no user interaction. On the Android phone a single Chrome browser session remained active in the background, whereas on the iPhone the Safari browser was used. This configuration provided an opportunity for systematic analysis of the background collection that Google performs purely through Android and Chrome, as well as collection that occurs in the absence of those (i.e. from iPhone device), without any additional collection requests generated by other products and applications (e.g. YouTube, Gmail, App usage).

23.     Figure 6 shows a summary of the results obtained from this experiment. The x-axis indicates the number of times the phones communicated with Google (or Apple) servers, whereas the y-axis indicates the phone type (Android or iPhone) and server domain type (Google or Apple) with which data packets were exchanged by the phones. The colored legend describes the broad categorization of the type of data requests identified by the domain address of the server. A complete list of domain addresses belonging within each category appears in Table 5 of Section IX.D of the Appendix.

24.     During a 24-hour time period the Android device communicated ~900 data samples to a variety of Google server endpoints. Of these, ~35% (or approximately 14/hour) were location-related. Google ad domains received only ~3% of the traffic, which is mainly due to the fact that the mobile browser was not actively used during the collection period. The remaining ~62% of communications with the Google server domains were roughly divided between requests to Google's Play App store, Android's uploads of device-related data (such as crash reports and device authorization), and other data which were predominantly in the category of Google services background calls and refreshes.

**Figure 6: Traffic data sent from idle Android and iPhone mobiles**



25.     Figure 6 shows that the iPhone device communicated with Google domains at more than an order of magnitude (~50x) lower frequency than the Android device, and that Google did not collect any user location during the 24-hour experiment timeframe via iPhone. This result highlights the fact that the Android and Chrome platforms play an important role in Google's data collection.

26.     Additionally, the iPhone device's communication with Apple's servers were 10x less frequent than the Android device's communications with Google. Location data made up a very small fraction (~1%) of the net data sent to Apple servers from the iPhone, with Apple receiving location-related communications once every day on an average.

27.     Magnitude wise, Android phones communicated 4.4 MB of data per day (~130MB per month) with Google servers, which is 6x more than what Google servers communicated through the iPhone device.

14

28.     As a reminder, this experiment was conducted using a stationary phone with no user interaction. As a user becomes mobile and starts interacting with their phone, the frequency of communications with Google's servers increases considerably. Section V of this report summarizes results from such an experiment.

## IV.     DATA COLLECTION THROUGH PUBLISHER AND ADVERTISER TECHNOLOGIES

29.     A major source for Google's user activity data collection stems from its publisher- and advertiser-focused tools, such as Google Analytics, DoubleClick, AdSense, AdWords, and AdMob. These tools have tremendous reach, e.g. over 1 million mobile apps use AdMob,[30] over 1 million advertisers use AdWords,[31] over 15 million websites use AdSense,[32] and over 30 million websites use Google Analytics.[33]

30.     During the writing of this report Google rebranded AdWords as "Google Ads" and DoubleClick as "Google Ad Manager", however there were no changes instituted in the core product functionalities including information collection by these products.[34] Therefore, for the purpose of this report the names are kept unchanged to avoid confusion that may occur with related domain names (such as doubleclick.net).

31.     There are two main groups of users of Google's publisher- and advertiser-focused tools:

   o   *Website and app publishers*, which are organizations that own websites and create mobile apps. These entities use Google's tools to (1) make money by allowing the display of ads to visitors on their websites or apps, and (2) better track and understand who is visiting their websites and using their apps. Google's tools place cookies and run scripts in the browsers of website visitors that help determine a user's identity, track their interest in content, and follow their online behavior. Google's mobile app libraries track use of apps on mobile phones.

   o   *Advertisers*, which are organizations that pay to have banner, video, or other ads delivered to users as they browse the Internet or use apps. These entities apply Google's tools to target specific profiles of people for advertisements to increase the return on their marketing investments (better targeted ads generally yield higher click-through rates and conversions). Such tools also enable advertisers to analyze their audiences and measure the efficacy of their digital advertising by tracking which ads were clicked with what frequency and by providing insight into the profiles of people who clicked on ads.

---

[30] "AdMob by Google," *Google*, last accessed on August 15 2018, available at https://www.google.com/admob/
[31] "Hear form our happy customers," *Google,* last accessed on August 15 2018, available at https://adwords.google.com/home/resources/success-stories/
[32] "Websites using Google Adsense," *BuiltWith,* last accessed on August 15 2018, available at https://trends.builtwith.com/websitelist/Google-Adsense
[33] Google Analytics usage statistics," *BuiltWith,* April 2018, available at https://trends.builtwith.com/analytics/Google-Analytics
[34] Garett Sloane, "Google to retire Doubleclick and AdWords names in a rebrand of its as business," *Ad Age,* available at http://adage.com/article/digital/google-waves-goodbye-doubleclick-ad-business-evolves/314046/

32.     Together, these tools collect information about user activities on websites and in apps, such as content visited, and ads clicked. They work in the background—largely unnoticeable by users. Figure 7 shows some of these key tools, with arrows indicating data collected from users and ads served to users.

**Figure 7: Google products aimed at publishers and advertisers**[35]



33.     The information collected by such tools includes a non-personal identifier that Google can use to send targeted advertisements without identifying the unique individual's personal information. These identifiers can be device- or session-specific, as well as permanent or semi-permanent. Table 1 lists a set of such identifiers. To provide users greater anonymity during information collection for ad targeting, Google has recently shifted towards using semi-permanent device unique identifiers (e.g. GAIDs).[36] Further sections go in detail about how these tools collect user data and the use of such identifiers during the data collection process.

**Table 1: Identifiers passed to Google**

| Identifier | Type | Description |
|---|---|---|
| GAID/IDFA | Semi-Permanent | Alphanumeric string for Android / iOS devices to allow targeted mobile ads. Resettable by users. |
| Client ID | Semi-Permanent | ID created the first time a cookie is stored on the browser. Used to link browsing sessions together. Resets when browser cookies are cleared. |
| IP address | Semi-Permanent | A unique string of number that identifies the network through which a device is accessing the Internet. |

---

[35] "Our products," *Google,* last accessed on August 15 2018, available at https://www.google.com/about/products/
[36] "Best practices for unique identifiers," *Google,* last accessed on August 15 2018, available at https://developer.android.com/training/articles/user-data-ids

| | | |
|---|---|---|
| Android device ID | Semi-Permanent | Randomly generated number when a device is first booted up. Used to identify the device. It is in the process of being phased out of advertising. Resets with a factory reset of a device. |
| Google Services Framework (GSF) | Semi-Permanent | Randomly assigned number when a user first logs into Google services on a device. Used to identify a unique device. Resets with a factory reset of a device. |
| IEMI / MEID | Permanent | Identifier used in mobile communication standards. Unique for each mobile phone. |
| MAC address | Permanent | Unique 12-character identifier for a piece of hardware (e.g. router). |
| Serial number | Permanent | Alphanumeric string used to identify a device. |

### A.    Google Analytics and DoubleClick

34.    DoubleClick and Google Analytics (GA) are Google's leading products in user behavior tracking and webpage traffic analyses on desktop and mobile devices. GA is used by ~75% of the top 100,000 most visited websites.[37] DoubleClick cookies are associated with more than 1.6 million websites.[38]

35.    GA uses short pieces of tracking code (called "page tags") embedded in a website's HTML code.[39] After a webpage loads per a user's request, the GA code calls an "analytics.js" file residing on Google's servers. This program transfers a "default" snapshot of user data at that moment, which includes visited webpage address, page title, browser information, current location (derived from IP address), and user language settings. GA scripts use cookies to track user behavior.

36.    GA script, the first time when it's run, generates and stores a browser-specific cookie on the user's computer. This cookie has a unique client identifier or Client ID (see Table 1 for details).[40] Google uses the unique identifier to link previously stored cookies that capture a user's activity on a particular domain as long as the cookie does not expire, or the user does not clear the cookies cached on their browser.[41]

37.    While a GA cookie is specific to the particular domain of the website that user visits (called a "1st-party cookie"), a DoubleClick cookie is typically associated with a common 3rd-party domain (such as

---

[37] Google Analytics usage statistics," *BuiltWith,* April 2018, available at https://trends.builtwith.com/analytics/Google-Analytics
[38] "DoubleClick market share," *Datanyze,* last accessed on August 15 2018, available at https://www.datanyze.com/market-share/ad-exchanges/doubleclick-market-share
[39] GA or other tags can also be implemented through Google Tag Manage (GTM) without changing the functionality of the page tag
[40] "Cookies and user identification," *Google,* last accessed on August 15 2018, available at https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id
[41] "Cookies and user identification," *Google,* last accessed on August 15 2018, available at https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id

doubleclick.net). Google uses such cookies to track user interaction across multiple 3rd-party websites.[42] When a user interacts with an advertisement on a website, DoubleClick's conversion tracking tools (e.g. Floodlight) places cookies on a user's computer and generates a unique client ID.[43] Thereafter, if the user visits the advertised website, the stored cookie information gets accessed by the DoubleClick server, thereby recording the visit as a valid conversion.

### B.    AdSense, AdWords and AdMob

38.    AdSense and AdWords are Google tools that serve ads on websites and in Google Search results, respectively. More than 15 million websites have AdSense installed to display sponsored ads.[44] Likewise, more than 2 million websites and apps that make up the Google Display Network (GDN) and reach over 90% of Internet users[45] display AdWords ads.

39.    AdSense collects information about whether an ad was displayed on the publisher's webpage. It also collects how the user interacted with the ad, such as clicking an ad or tracking the curser movement over an ad.[46] AdWords enables advertisers to serve search ads on Google Search, display ads on publisher pages, and overlay ads on YouTube videos. To track user click-through and conversion rates, AdWords ads place a cookie on users' browsers to identify the same user if they later visit the advertiser's website or complete a purchase.[47]

40.    While AdSense and AdWords collect data on mobile devices as well, their ability to get user information on mobile devices is limited since mobile apps do not share cookie data between them, an isolation technique known as 'sandboxing,'[48] which makes it hard for advertisers to track user behavior across mobile apps.

41.    To address this issue, Google and other companies use mobile "ad libraries" (such as AdMob) that are integrated into the apps by their developers for serving ads in mobile apps. These libraries compile and run with the apps and send to Google data that is specific to the app to which they belong, including GPS locations, device make, and device model when apps have the appropriate permissions. As observed through the data

---

[42] "DoubleClick search help," *Google,* last accessed on August 15 2018, available at https://support.google.com/ds/answer/7298761?hl=en

[43] "DoubleClick search help," *Google,* last accessed on August 15 2018, available at https://support.google.com/ds/answer/2903014?hl=en&ref_topic=6054260

[44] "Websites using Google Adsense," *BuiltWith,* last accessed on August 15 2018, available at https://trends.builtwith.com/websitelist/Google-Adsense

[45] "Google Ads Help," *Google,* last accessed on August 15 2018, available at https://support.google.com/google-ads/answer/2404191?hl=en

[46] "AdSense help, privacy and security," *Google,* last accessed on August 15 2018, available at https://support.google.com/adsense/answer/9897?hl=en

[47] "Evaluating ad performance on the Search Network," *Google,* last accessed on August 15 2018, available at https://support.google.com/adwords/answer/2404037?hl=en; "About conversion tracking," *Google,* last accessed on August 15 2018, available at https://support.google.com/adwords/answer/1722022?hl=en

[48] This approach is similar to desktops, where cookies are not shared between browsers.

traffic analyses (Figure 8), and confirmed through Google's own developer webpages,[49] such libraries can also send user-personal data, such as age and gender, to Google whenever app developers explicitly pass these values to the library.

**Figure 8: Snapshot of information sent back to Google when an application is launched**



### C.    Association of passively collected data with personal information

42.     As discussed above, Google collects data through publisher and advertiser products and associate such data with a variety of semi-permanent, anonymous identifiers. Google however, has the ability to associate these IDs with a user's personal information. This is insinuated by the statements made in Google's privacy policy, excerpts of which are shown in Figure 9. The left text box clearly states that Google may associate data from advertising services and analytics tools with a user's personal information, depending upon the user's account settings. This arrangement is enabled by default, as shown in the right text box.

**Figure 9: Google's privacy page for 3rd-party websites collection and association with personal information[5051]**



---

[49] "Google APIs for Android," *Google,* last accessed on August 15 2018, available at
https://developers.google.com/android/reference/com/google/android/gms/ads/doubleclick/PublisherAdRequest.Builder
[50] "Google privacy and terms," *Google,* last accessed on August 15 2018, available at
https://policies.google.com/privacy/example/your-activity-on-other-sites-and-apps
[51] "Google https://myaccount.google.com/activitycontrols

43.     Furthermore, an analysis of data traffic exchanged with Google servers (summarized below) identified two key examples (one on Android and the other in Chrome) that point to Google's ability to correlate anonymously collected data with users' personal information.

### 1)     Mobile advertising identifier may get de-anonymized through data sent to Google by Android

44.     Analyses of data traffic communicated between an Android phone and Google server domains suggest a possible way through which anonymous identifiers (GAID in this case) can get associated with a user's Google Account. Figure 10 describes this process through a series of three key steps.

45.     In step 1, a "checkin" data is sent to the URL *android.clients.google.com/checkin*. This particular communication provides an Android data sync to Google servers and contains Android log information (e.g. recovery log), kernel messages, crash dumps, and other device-related identifiers. A snapshot of a partially decoded checkin request sent to Google's server from Android is shown in Figure 10.

**Figure 10: Device identifiers are sent together with account information in Android check in requests**



46.     As pointed out by the labeled boxes, through the checkin process, Android sends to Google a variety of important device-related permanent identifiers, including device MAC address, IMEI /MEID, and device

serial number. Moreover, these requests also contain the Android user's Gmail ID. The data present in checkin uploads enable Google to connect a user's personal information with Android device permanent identifiers.

47.     In step 2, the reply to the checkin request comes from the Google server. This message contains a Google services framework identifier (GSF ID)[52] that is similar to the actual "Android ID"[53] (see Table 1 for descriptions).

48.     Step 3 entails another instance of communication where the same GSF ID (from step 2) is sent to Google together with the GAID. Figure 10 shows one such data transmit to *android.clients.google.com/fdfe/bulkDetails?au=1.*

49.     Through the above three data exchanges, Google receives the information needed to connect a GAID with permanent device identifiers as well as users' Google Account IDs.

50.     These intercepted data exchanges with Google servers from an Android phone show how Google can connect anonymized information collected on an Android mobile device via DoubleClick, Analytics or AdMob tools with the user's personal identity. During the 24-hour data collection from a stationary and dormant Android phone two instances of checkin communications with Google servers were observed.  Additional analysis is needed, however, to determine if such information exchange occurs with a certain periodicity or if it is triggered by specific activities on the phones.

> **2)    DoubleClick cookie ID gets connected with user's personal information on Google Account**

51.     The previous section explained how Google can de-anonymize user identity via the passive, anonymized data it collects from an Android mobile device. This section shows how such de-anonymization can also occur on a desktop/laptop device.

52.     Anonymized data on desktops/laptops is collected via cookie-based identifiers (e.g. Cookie ID), which are typically generated by Google's ad and publisher products (e.g. DoubleClick) and stored on a user's local mass storage. The experiment presented below assessed whether Google can connect such identifiers (and hence information associated with them) with a user's personal information. This experiment involved the following ordered steps:

 1. Opened a new (no saved cookies, e.g. Private or Incognito) browser session (Chrome or other),

---

[52] "Difference between Android ID and device ID," *Stack Exchange,* Dec. 2016, available at
https://android.stackexchange.com/questions/162448/difference-between-android-id-and-device-id
[53] Patrick Ahlbrecht, "What's the difference between the GSF ID and the Android ID," *Onyxbits,* March 2016, available at
https://blog.onyxbits.de/whats-the-difference-between-the-gsf-id-and-the-android-id-208/

2. Visited a 3rd-party website that used Google's DoubleClick ad network,

3. Visited the website of a widely used Google service (Gmail in this case),

4. Signed in to Gmail.

53.     After completion of step 1 and 2, as part of the page load process, the DoubleClick server received a request when the user first visited the 3rd-party website. This request was part of a series of requests comprising the DoubleClick initialization process started by the publisher website, which resulted in the Chrome browser setting a cookie for the DoubleClick domain. This cookie stayed on user's computer until it expired or until the user manually cleared cookies via the browser settings.

54.     Thereafter, in step 3, when the user visited Gmail, they are prompted to log in with their Google credentials. Google manages identity using a "single sign on (SSO)" architecture, whereby credentials are supplied to an account service (signified by *accounts.google.com*) in exchange for an "authentication token," which can then be presented to other Google services to identify the users.  In step 4, when a user accesses their Gmail account, they are effectively signing into their Google Account, which then provides Gmail with an authorization token to verify the user's identity. [54] This process is outlined by Figure 24 in Section IX.E in the Appendix.

55.     In the last step of this sign-on process, a request is sent to the DoubleClick domain. This request contains both the authentication token provided by Google and the tracking cookie set when the user visited the 3rd-party website in step 2 (this communication is shown in Figure 11).  This allows Google to connect the user's Google credentials with a DoubleClick cookie ID. Therefore, if the users do not clear browser cookies regularly, their browsing information on 3rd-party webpages that use DoubleClick services could get associated with their personal information on Google Account.

**Figure 11: Request to DoubleClick.net includes Google's authentication token and past cookies**



[54] The advantage of the extra authentication step is that the user's browser can later use the same authentication token to confirm user identity on other Google services (due to this process a sign-on in any particular Google application enables an automatic sign-on all others in the same browser session).

56.     It has thus far been established that Google collects a wide variety of user data through its publisher and advertiser tools, without a direct knowledge of the user. While such data is collected with user-anonymous identifiers, Google has the ability to connect this collected information with a user's personal credentials stored in their Google Account.

57.     It's worth pointing out that Google's passive user data collection from 3rd-party webpages cannot be prevented using popular ad blocking tools,[55] as such tools are designed primarily to prevent the occurrence of advertisements while users browse through 3rd-party webpages.[56] The next section takes a closer look at the magnitude of such data collection.

## V.     AMOUNT OF DATA COLLECTED DURING A MINIMAL USE OF GOOGLE PRODUCTS

58.     This section examines the details surrounding Google's data collection through its publisher and advertiser services. To understand such data collection, an experiment is designed which entailed a user going through her daily life using a mobile phone (akin to "day in the life" described before), while deliberately *avoiding* the use of any direct Google products (i.e. avoiding Search, Gmail, YouTube, Maps, etc.), except for the Chrome browser.

59.     To keep the experiment as realistic as possible, various consumer usage studies[57,58] were used to form a daily usage profile of a typical mobile phone user, thereafter, any direct interactions with Google's products were omitted from the profile. Section IX.F in the Appendix describes the websites and apps used in this experiment.

60.     The experiment was replicated on both Android and iOS devices and the HTTPS data sent to Google and Apple servers were monitored and analyzed using a similar method explained in previous sections. The results are summarized in Figure 12. During the 24-hour time period (which includes the night time stationary/dormant timeframe), the majority of calls from the Android phone were made to Google's location and publisher/advertisement service domains (e.g. DoubleClick, Analytics). Google collected user location in ~450 instances, which is ~1.4x times the experiment presented in Section III.C, which involved a stationary phone.

---

[55] "How many users block Google Analytics, measured in Google Analytics," *Quantable,* Dec. 2017, available at https://www.quantable.com/analytics/how-many-users-block-google-analytics/
[56] "Ad blocking: who blocks ads, why and how to win them back," *iab.,* 2016, available at https://www.iab.com/wp-content/uploads/2016/07/IAB-Ad-Blocking-2016-Who-Blocks-Ads-Why-and-How-to-Win-Them-Back.pdf
[57] The average person visited 88 webpages per day in 2010. "Nielsen provides topline U.S. web data for March 2010," *Nielsen,* April 2010, available at http://www.nielsen.com/us/en/insights/news/2010/nielsen-provides-topline-u-s-web-data-for-march-2010.html
[58] 55% of web traffic comes from mobile devices. Eric Enge, "Mobile vs desktop usage: mobile grows but desktop still a big player in 2017," *Stone Temple,* April 2017, available at https://www.stonetemple.com/mobile-vs-desktop-usage-mobile-grows-but-desktop-still-a-big-player-in-2017/

**Figure 12: Information requests from mobile devices during a day of typical use**



61.     Google servers communicated significantly lower number of times with an iPhone device compared to Android (45% less). However, the number of calls to Google's advertising domains were similar from both devices - an expected outcome since the usage of 3rd-party webpages and apps was similar on both devices. One notable difference was that the location data sent to Google from an iOS device is practically non-existent. In the absence of Android and Chrome platforms—or the use of any other Google product—Google becomes significantly limited in its ability to track the user location.

62.     The total number of calls to Apple servers from an iOS device was much lower, just 19% the number of calls to Google servers from an Android device. Moreover, there are no ad-related calls to Apple servers, which may stem from the fact that Apple's business model is not as dependent on advertising as Google's. Although Apple does obtain some user location data from iOS devices, the volume of data collected is much (16x) lower than what Google collects from Android.

63.     Magnitude wise, Android phones communicated 11.6 MB of data per day (~350 MB per month) with Google servers. On the other hand, the iPhone device communicated just half that amount. The amount of data particularly associated with Google's ad domains remained very similar across both the devices.

64.     The iPhone device communicated an order of magnitude less data to Apple servers than what the Android device exchanged with Google servers.

65.     Overall, even in the absence of user interaction with Google's most popular applications, a user of an Android phone and the Chrome browser still sends a significant amount of data to Google, the majority of which is associated with location and calls to ad server domains. Although an iPhone user is insulated from Google's location collection in this narrow experiment, Google still captures a similar amount of ad-related data.

66.     The next section describes the data collected by Google's popular applications, such as Gmail, YouTube, Maps, and Search.

## VI.   DATA COLLECTED FROM GOOGLE'S KEY POPULAR APPLICATIONS AIMED AT INDIVIDUALS

67.     Google has dozens of constantly evolving products and services (a list is available in Table 4 in Section IX.B of the Appendix). These products are often accessed through—or associated with—a Google Account, which enables Google to directly link user activity details from its application-oriented products and services to a user profile. In addition to product usage data, Google also collects device-related identifiers and location data when Google's products and services are accessed.[59]

68.     Some of Google's applications (e.g. YouTube, Search, Gmail, and Maps) are central to the basic tasks that many users conduct daily through their desktop or mobile devices. Table 2 describes the reach of these key products. This section explains how each of these prominent applications collect user information.

**Table 2: Worldwide reach of Google's top application products**

| Product | Active users |
|---------|--------------|
| Search | Greater than 1B monthly active users, 90.6% search engine market share[60] |
| YouTube | Greater than 1.8 billion logged-in monthly active users[61] |
| Maps | Greater than 1 billion monthly active users[62] |
| Gmail | 1.2 billion registered users[63] |

[59] "Google privacy and terms," *Google,* last accessed on August 15 2018, available at https://policies.google.com/privacy
[60] "Search engine market share worldwide," *StatCounter Global Stats,* April 2018, available at http://gs.statcounter.com/search-engine-market-share#monthly-201704-201804
[61] Devindra Hardawar, "YouTube gets 1.8 billion logged-in viewers monthly," *Engadget,* May 3, 2018, available at https://www.engadget.com/2018/05/03/youtube-1-8-billion-viewers/
[62] Google 10K filings with the SEC, 2017, available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf
[63] Motek Moyen, "Gmail is very popular but Google still won't fix a security vulnerability," *Seeking Alpha,* July 17, 2017, available at https://seekingalpha.com/article/4088241-gmail-popular-google-still-fix-security-vulnerability

## A.    Search

69.    Google Search is the most popular web search engine in the world,[64] with over 11 billion search queries per month in the United States alone.[65] In addition to serving ranked webpage results in response to users' general queries, Google operates other search-based tools, such as Google Finance, Flights, News, Scholar, Patents, Books, Images, Videos, and Hotels. Google uses its search products to collect data related to search queries, browsing history, and ad-click/purchase activity. For example, Google Finance collects information on the type of stocks users may be tracking, whereas Google Flights tracks users' travel bookings and search requests.

70.    Whenever Search is used, Google collects location data via various means of assessing locations on mobile or desktop devices, as discussed in previous sections. Google records all search activity a user conducts and links it back to their Google Account if the user is logged in. Figure 13 shows an example of information collected by Google about a user's keyword search and page visit.

**Figure 13: An example search data collection taken from user's My Activity page**



71.    In addition to being the default search engine on Chrome and Google devices, Google Search is also the default option on other 3rd-party browsers and applications through various distribution agreements. For example, Google recently became the default search engine on Mozilla's Firefox browser[66] in key geographic locations (including US and Canada), a position owned by Yahoo previously. Similarly, Apple switched from

---

[64] "Search engine market share worldwide," *StatCounter Global Stats,* April 2018, available at http://gs.statcounter.com/search-engine-market-share#monthly-201704-201804

[65] "Number of explicit core search queries powered by search engines in the United States as of January 2018 (in billions)," *Statista,* Feb. 2018, available at https://www.statista.com/statistics/265796/us-search-engines-ranked-by-number-of-core-searches/

[66] Denelle Dixon, "Firefox features Google as default search provider in the U.S., Canada, Hong Kong and Taiwan," *The Mozilla Blog,* Nov. 14, 2017, available at https://blog.mozilla.org/blog/2017/11/14/firefox-features-google-as-default-search-provider-in-the-u-s-canada-hong-kong-and-taiwan/

Microsoft's Bing to Google for Siri web search results on iOS and Mac devices.[67] Google has similar agreements in place with OEMs,[68] which helps reach mobile customers.

**B.      YouTube**

72.      YouTube provides users a platform for uploading and viewing video content. It has more than 180 million users in the USA alone and has the distinction of being the second-most visited website in the US,[69] ranked only behind Google Search. Among online streaming media companies, YouTube has almost 80% market share in terms of monthly user visits (as shown in Figure 14). The amount of content uploaded and viewed on YouTube is substantial; ~400 hours of video are uploaded every minute[70] and ~1 billion hours of video are watched daily on the YouTube platform.[71]



**Figure 14: Comparison of leading multimedia websites monthly visits in the United States[72]**



73.      YouTube can be accessed by users via desktops (web browser), mobile devices (app and/or web browser), and Google Home (through a paid subscription service called YouTube Red). Google collects and stores search history, watch history, playlists, subscriptions, and comments on videos. All this information is marked with a date and time stamp of when the activity took place.

---

[67] Matthew Panzarino, "Apple switches from Bing to Google for Siri web search results on iOS and Spotlight on Mac," Sept. 25, 2017, available at https://techcrunch.com/2017/09/25/apple-switches-from-bing-to-google-for-siri-web-search-results-on-ios-and-spotlight-on-mac/

[68] "Google's Android mobile application distribution agreement with OEMs leaked, reveals lots of strict conditions," *Microsoft and Technology News,* Feb. 13, 2014, available at https://mspoweruser.com/mobile-application-distribution-agreement/

[69] "Top Sites in United States," *Alexa,* available at https://www.alexa.com/topsites/countries/US

[70] "Hours of video uploaded to YouTube every minute as of July 2015," *Statista,* July 2015, available at https://www.statista.com/statistics/259477/hours-of-video-uploaded-to-youtube-every-minute/

[71] Darrell Etherington, "People now watch 1 billion hours of YouTube per day," *TeachCrunch,* Feb. 28, 2017, available at https://techcrunch.com/2017/02/28/people-now-watch-1-billion-hours-of-youtube-per-day/

[72] "Leading multimedia websites in the United States in November 2016, based on market share of visits," *Statista,* Dec. 2016, available at https://www.statista.com/statistics/266201/us-market-share-of-leading-internet-video-portals/

74.     If a user is signs into their Google Account on any Google application inside a browser (e.g. Chrome, Firefox, Safari), Google recognizes the user's identity, even if the video is accessed through a non-Google website (e.g. YouTube videos played through CNN.com). This feature allows Google to track a user's YouTube usage across multiple 3rd-party platforms. Figure 15 shows an example of YouTube data collected.

**Figure 15: An example of YouTube data collection from My Activity**



75.     Google also offers a separate YouTube product for children, known as YouTube Kids, which is intended as a "family friendly" version of YouTube with parental control features and video filters. Google collects information from YouTube Kids, including device type, operating system, unique device identifiers, log information, and details of how the service was used. Google then uses this information to deliver limited advertisements that are non-clickable, and which have restrictions on format, time length, and site-served.[73]

**C.     Maps**

76.     Maps is Google's flagship navigation app. Google Maps can ascertain user's travel routes, speed, and places that a user visits frequently (e.g. home, work, restaurants, and businesses). This information provides Google with a window into a user's interests (e.g. food and shopping preferences), movement, and behavior.

77.     Maps uses IP address, GPS, cell signal, and Wi-Fi access point data to calculate a device's location. The latter two are collected from the device through which Maps is used and sent to Google for location assessment through its Location API. This API provides rich details about a user, including geographic coordinates, whether the user is stationary or moving, speed, and probabilistic determination of user's mode of transport (e.g. bike, car, train, etc.).

---

[73] "Advertising on YouTube Kids," *Google,* last accessed on August 15 2018, available at https://support.google.com/youtube/answer/6168681?hl=en

78.     Maps stores a historical timeline of places visited by a user signed in to Maps using their Google account. Figure 16 shows an example of such a user's timeline.[74] The red dots indicate location coordinates captured by Maps while the user is on the move; the blue connecting lines are Maps projection of the actual route the user took.

**Figure 16: Example Google Maps "Timeline" from an actual user**



79.     The accuracy of location information captured by navigation applications enables Google to not only target ad audiences, but also helps deliver ads to users as they approach stores.[75] In addition, Google Maps uses this information to generate real-time traffic updates.[76]

### D.     Gmail

80.     Gmail stores all messages (sent/received), sender name, email address, and date/time of messages sent or received. Since Gmail acts as a central mail repository for many people, it can ascertain their interests by scanning email content, identifying merchant addresses through their promotional emails or sales receipts sent to emails, and learn about a user's plans (e.g. dinner reservations, doctor's appointments,). Since users may use their Gmail ID for other 3rd-party platforms (e.g. Facebook, LinkedIn), Gmail can scan any content that comes from them in the form of an email (e.g. notifications, messages).

81.     From its inception in 2004 until at least late 2017, Google may have scanned the contents of Gmail emails to improve ad targeting and search results, as well as filter spam. In the summer of 2016, Google went a step further and changed its privacy policy to enable it to combine formerly anonymous web-browsing data

---

[74] "My Activity," *Google*, available at https://myactivity.google.com/myactivity
[75] "The Home Depot earns 8X in-store ROI with mobile display ads," *Google*, Sept. 2016, available at https://www.thinkwithgoogle.com/intl/en-aunz/advertising-channels/mobile/home-depot-roi-mobile-display-ads/
[76] "Google Map's real-time traffic layer…," *Spatial Unlimited,* March 2011, available at https://shreerangpatwardhan.blogspot.com/2011/03/google-maps-real-time-traffic-layer.html

of its subsidiary DoubleClick (which serves customized ads across the Internet) with the personally-identifying data Google has through its other products, including Gmail.[77] The result was that "…the DoubleClick ads that follow people around on the web may now be customized to them based on keywords they used in their Gmail. It also meant that Google could now build a complete portrait of a user by name, based on everything they write in email, every website they visit, and the searches they conduct."[78]

82.     Toward the end of 2017, Google announced it would discontinue the practice of Gmail message-based personalization of ads.[79] Recently, however, Google clarified that it is still scanning Gmail messages for some purposes.[80]

## VII.    PRODUCTS WITH HIGH FUTURE POTENTIAL FOR DATA AGGREGATION

83.     Google has additional products that show future potential for market adoption and data collection, including AMP, Photos, Chromebook, Assistant, and Pay. Additionally, Google is able to use third party data vendors to collect user information. The following sections describe these in greater detail.

84.     There are other Google applications that may not be widely used, however for completeness, data collection through them is presented in Section VIII.B of the Appendix.

### A.    Accelerated Mobile Pages (AMP)

85.     Accelerated Mobile Pages (AMP) is an open-source initiative spearheaded by Google to enable quicker load times for websites and ads. AMP converts conventional HTML and JavaScript code into a more simplified version developed by Google[81] and caches the AMP-validated webpages in Google's network of servers for faster access.[82] AMP delivers page links through Google search results, as well as 3rd-party platforms, such as LinkedIn and Twitter. As the AMP page reports: "AMP's ecosystem includes 25 million domains, 100+ technology providers and leading platforms, that span the areas of publishing, advertising, e-commerce, local and small businesses, and more!"[83]

---

[77] Julia Angwin, "Google has quietly dropped ban on personally identifiable web tracking," *ProPublica,* Oct. 21, 2016, available at https://www.propublica.org/article/google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking
[78] Suzanne Monyak, "Google changed a major privacy policy four months ago, and no one really noticed," *Slate,* Oct. 21, 2016, available at
http://www.slate.com/blogs/future_tense/2016/10/21/google_changed_a_major_privacy_policy_and_no_one_really_noticed.html
[79] Mark Bergen, "Google will stop reading your emails for Gmail ads," *Bloomberg,* June 23, 2017, available at
https://www.bloomberg.com/news/articles/2017-06-23/google-will-stop-reading-your-emails-for-gmail-ads
[80] Ben Popken, "Google sells the future, powered by your personal data," *NBC News,* May 10, 2018, available at
https://www.nbcnews.com/tech/tech-news/google-sells-future-powered-your-personal-data-n870501
[81] "AMP HTML specification," *AMP,* last accessed on August 15 2018, available at
https://www.ampproject.org/docs/fundamentals/spec
[82] "Load AMP pages quickly with Google AMP Cache," *Google,* last accessed on August 15 2018, available at
https://developers.google.com/amp/cache
[83] "An open source effort to improve the content ecosystem for everyone," *AMP,* last accessed on August 15 2018, available at
https://www.ampproject.org/learn/overview

86.     Figure 17a describes the steps leading to the delivery of an AMP page accessed via Google Search. Please note that the provider of content through AMP does not need to provide their own a cache server, as this is something that Google provides for securing optimal delivery speeds to users. Since the AMP cache is hosted on Google servers, when an AMP link is clicked through Google Search, the domain address shows up from a Google.com domain rather than from a publisher's own domain. This is shown through snapshots taken from an example keyword search in Figure 17b.

**<u>Figure 17: Regular web page vs AMP page</u>**



87.     Users can access content from multiple publishers whose articles appear in search results while navigating the AMP carousel, all while staying within the Google domain. In effect, the AMP cache operates as a content delivery network (CDN) owned and operated by Google.

88.     By creating an open-source tool, complete with a CDN, Google has attracted a large user base for serving mobile websites and advertisements that constitute a significant amount of information (e.g. the content itself, page views, ads served, and information on whom that content is being delivered). All of this information

is available to Google by virtue of it residing on Google's CDN servers, thereby providing Google far more data than it otherwise could access.

89.     AMP is highly user-centric, i.e.  it delivers a much faster and improved browsing experience to users without the clutter of pop-ups and sidebars. Although AMP is a major shift in the way content is cached and delivered to users, Google's privacy policy associated with AMP is quite general.[84] In particular, Google is able to collect webpage usage information (e.g. server logs and IP address) from requests sent to AMP cache servers. Moreover, regular pages are converted into AMP via the use of AMP APIs.[85] Google can therefore access applications or websites ("API clients") and use any submitted information through the API in accordance with its general policies.[86]

90.     Like regular webpages, AMP webpages track usage data via Google Analytics and DoubleClick. In particular, they collect information on page data (e.g. domain, path, and page title), user data (e.g. client ID, time zone), browsing data (e.g. unique page view ID and referrer), browser info, and interaction and events data.[87] Although Google's modes of data collection have not changed with AMP, the *amount* of data collected has increased since visitors are spending 35% more time on web content that loads with Google AMP versus standard mobile pages.[88]

## B.     Google Assistant

91.     Google Assistant is a virtual personal assistant accessed through mobile phones and smart devices. It is a popular virtual assistant, alongside Apple's Siri, Amazon's Alexa, and Microsoft's Cortana.[89] Google Assistant is accessed through the home button of mobile devices with Android 6.0 or higher. It can also be accessed through a dedicated app on iOS devices[90], as well as smart speakers, such as Google Home. Google Assistant performs numerous functions, such as sending texts, looking up emails, controlling music, searching photos, getting answers to questions about the weather or traffic, and controlling smart home devices.[91]

92.     Google collects all Google Assistant queries, whether audio or typed. It also collects the location where the query occurred. Figure 18 shows the content of a query stored by Google. In addition to its use on Google's

---

[84] "AMP on Google privacy and terms," *Google,* last accessed on August 15 2018, available at https://developers.google.com/amp/cache/policies
[85] "Link to AMP content," *Google,* last accessed on August 15 2018, available at https://developers.google.com/amp/cache/use-amp-url
[86] "Google APIs terms of service," *Google,* last accessed on August 15 2018, available at https://developers.google.com/terms
[87] "Tracking accelerated mobile pages (AMP)," *Google,* last accessed on August 15 2018, available at https://support.google.com/analytics/answer/6343176?hl=en&ref_topic=7378717
[88] John Saroff, "The new speed of mobile engagement," *Chartbeat,* June 5, 2017, available at http://blog.chartbeat.com/2017/06/05/the-new-speed-of-mobile-engagement
[89] Tripp Mickle, "'I'm not sure I understand' – how Apple's Siri lost her mojo," *The Wall Street Journal,* June 7, 2017, available at https://www.wsj.com/articles/apples-siri-once-an-original-now-struggles-to-be-heard-above-the-crowd-1496849095
[90] "Google Assistant," *Google,* last accessed on August 15 2018, available at https://assistant.google.com/platforms/phones/
[91] "Google Assistant," *Google,* last accessed on August 15 2018, available at https://assistant.google.com/platforms/phones/

Home speakers, Google Assistant is enabled on various other speakers produced by 3rd-parties (e.g. Bose wireless headphones). Overall, Google Assistant is available on more than 400 million devices.[92] Google can collect data via all these devices since Assistant queries go through Google's servers.

**Figure 18: Example of detail collected from Google Assistant query**



### C. Photos

93.     Google Photos is used by more than 500 million people globally and stores more than 1.2 billion photos and videos every day.[93] Google records the time and GPS coordinates for every photo taken. Google uploads images to the Google cloud and conducts image analysis to identify a broad set of objects, such as modes of transportation, animals, logos, landmarks, text, and faces.[94] Google's face detection capabilities even enable the detection of emotional states associated with faces in photos uploaded and stored in their cloud.[95]

94.     Google Photos conducts this image analysis by default when the product is used, but will not distinguish between individual people unless the user gives the app permission.[96] If a user provides permission for Google to group similar faces together, Google identifies different people using facial recognition

[92] Scott Huffman, "New devices and more: what's in store for the Google Assistant this year." *Google,* Jan. 9, 2018, available at https://www.blog.google/products/assistant/new-devices-more-google-assistant-ces-2018
[93] Anil Sabharwal, "500 million people using Google Photos, and three new ways to share," *Google,* May 17, 2017, available at https://blog.google/products/photos/google-photos-500-million-new-sharing/
[94] "Cloud vision API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/vision/
[95] "Cloud vision API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/vision/
[96] "Find people, things, and places in your photos," *Google,* last accessed on August 15 2018, available at https://support.google.com/photos/answer/6128838?co=GENIE.Platform%3DAndroid&hl=en

technology and enables users to share photos based on its "face grouping" technology.[97,98] Examples of Google's image classification capabilities with and without face grouping permission from the user are shown in Figure 19. Google uses Photos to assemble a vast trove of identifying facial information, which has become the subject of recent lawsuits[99] by certain states.

**Figure 19: Example image recognition in Google Photos**



### D.     Chromebook

95.     Chromebook is Google's tablet computer running on the Chrome operating system (Chrome OS) which allows users to access applications on the cloud. While Chromebook holds a very small fraction of the PC market, it's growing rapidly, especially in computing devices for the K-12 category, where it held 59.8% of the market in Q2 2017.[100] Since Chromebook is accessed through a Google Account, a user is always signed on to all of Google's applications while accessing them on a Chromebook device. Chromebook's data collection is similar to the Google Chrome browser, which is covered in section II.A. Chromebooks also allow cookies from Google and 3rd-party domains to track user activity, similar to any other notebook or PC device.

96.     Many K-12 schools use Chromebooks to access Google's products via its GSuite for Education service. Google states that data collected from such use is not used for targeted advertising.[101] Students are shown ads, however, if they use additional services (such as YouTube or Blogger) on Chromebooks provided through their educational institutions.

---

[97] Anil Sabharwal, "500 million people using Google Photos, and three new ways to share," *Google,* May 17, 2017, available at https://blog.google/products/photos/google-photos-500-million-new-sharing/

[98] "Share your Google Photos library with a partner," *Google,* last accessed on August 15 2018, available at https://support.google.com/photos/answer/7378858#filterbyface

[99] Amy Korte, "Federal court in Illinois rules biometric privacy lawsuit against Google can proceed," *Illinois Privacy,* March 8, 2017, available at https://www.illinoispolicy.org/federal-court-in-illinois-rules-biometric-privacy-lawsuit-against-google-can-proceed/

[100] "Mobile PC sales in to US K-12 education starting to slow as the market looking toward replacement cycles," *Future Source Consulting,* Dec. 6, 2017, available at https://www.futuresource-consulting.com/Press-Q3-2017-Mobile-PC-Sales-in-Education-1217.html

[101] "Chromebooks privacy and security," *Google,* last accessed on August 15 2018, available at https://drive.google.com/file/d/0B__OTXR_u3RbcFB3Y01xUVhaalU/view

### E.    Google Pay

97.    Google Pay is a digital payments service that allows users to store credit card, bank account, and PayPal information to make payments in stores, on websites, or within apps using Google Chrome or a connected Android device.[102] Pay is the means by which Google collects verified user address and phone numbers, as these are associated with charge accounts. In addition to personal information, Pay also collects transaction information, such as date and amount of transaction, merchant location and description, type of payment used, descriptions of the items purchased, any photo that a user choose to associate with the transaction, names and email addresses of the seller and buyer, the user's description of the reason for transaction, and any offers associated with the transaction.[103] Google treats this information as personal information under its general privacy policy. It therefore can use this information across its products and services for enriched advertising.[104] Google's privacy settings allow for such a use of collected data by default.[105]

### F.    User data collected from 3rd-party data vendors

98.    Google collects 3rd-party data in addition to information they collect directly from their services and applications. For example, in 2014 Google announced that it would begin tracking sales in brick-and-mortar stores by buying credit and debit card transaction data. Such data covered 70% of all credit and debit transactions in the US.[106]  It contained the name of the individual, as well as the time, location, and amount of their purchase.[107]

99.    3rd-party data is also used to support Google Pay, including verification services, information arising from Google Pay transactions at merchant locations, payment methods, identity of card issuers, information regarding access to balances in the Google payment account, carrier and operator billing information, and consumer reports.[108] For sellers, Google may obtain information from credit bureaus or business information services.

100.    Although the 3rd-party user information that Google currently receives is limited in scope, it has already attracted the attention of governmental authorities. For example, the FTC announced an injunction against

---

[102] "Google Pay," *Google,* last accessed on August 15 2018, available at https://pay.google.com/about/

[103] "Google Payments privacy notice," *Google,* Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en

[104] "Google Payments privacy notice," *Google,* Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en

[105] "Google payments center," *Google,* available at
https://payments.google.com/payments/home?page=privacySettings#privacySettings:

[106] "Google plans to track credit card spending," *BBC,* May 26, 2017, available at http://www.bbc.com/news/technology-40027706

[107] Elizabeth Dwoskin and Craig Timberg, "Google now knows when its users go to the store and buy stuff," *The Washington Post,* May 23, 2017, available at https://www.washingtonpost.com/news/the-switch/wp/2017/05/23/google-now-knows-when-you-are-at-a-cash-register-and-how-much-you-are-spending/?utm_term=.281715f8e215

[108] "Google Payments privacy notice," *Google,* Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en

Google in July 2017 with respect to how Google's collection of consumer purchasing data infringes upon electronic privacy.[109] The injunction challenges Google's claim that they can protect consumer privacy throughout the process using their algorithm. Although further action has not yet occurred, the FTC injunction is an example of public concern with the amount of consumer data that Google collects.

## VIII.   CONCLUSION

101.    Google counts a large percentage of the world's population as its direct customers, with multiple products leading their markets globally and many surpassing 1 billion monthly active users. These products are able to collect user data through a variety of techniques that may not be easily graspable by a general user.  A major part of Google's data collection occurs while a user is not directly engaged with any of its products. The magnitude of such collection is significant, especially on Android mobile devices. And while such information is typically collected without identifying a unique user, Google distinctively possesses the ability to utilize data collected from other sources to de-anonymize such a collection.

---

[109] FTC Complaint, request for investigation, injunction, and other relief submitted by The Electronic Privacy Information Center, available at https://epic.org/privacy/ftc/google/EPIC-FTC-Google-Purchase-Tracking-Complaint.pdf

# IX.   APPENDIX

## A.   Characterization of active vs passive data collection from "day in the life" of a user

**Table 3: Active and passive Google data collection**

| Number | Description | Active collection | Passive collection |
|--------|-------------|-------------------|--------------------|
| 1 | Gets ready in the morning while listening to Google Play Music | • Music interests | • Morning location |
| 2 | Drops kids off at daycare before commuting to work | | • Walked to a daycare location |
| 3 | Checks the news while commuting to work on the subway | | • Traveling on the subway<br>• News pages visited |
| 4 | Searches for cold medicine while on the subway | • Records search queries | • Traveling on the subway |
| 5 | Walks from subway to work | | • Commute path to work address |
| 6 | Uses Maps to find a new lunch spot | • Destination entered into Maps | • Dining interests |
| 7 | Gets coffee from Starbucks using her Starbucks app | | • Walks to a Starbucks<br>• Opens Starbucks app |
| 8 | Schedules doctor's appointment, Google creates a Calendar event from the confirmation email | | • Event details of the doctor appointment |
| 9 | Walks to Walgreens and purchases cold medicine using Google Pay | • Purchase details | • Walks to a Walgreens |
| 10 | Takes an Uber home from work | | • Commute path to home address via car<br>• Use of Uber app |
| 11 | Looks for hotels on Expedia for a weekend trip | | • Webpage interaction via DoubleClick cookies & Google Analytics |
| 12 | Uses Google Home to play music for her kids | • Google Home search query | • Location of Google Home |

| 13 | Watches videos on YouTube | • YouTube activity |

**B.      List of Google products**

**Table 4: List of Google Products**

| Category | Products |
|---|---|
| **1. Applications** | **Watch, Listen and Play**<br>YouTube, Google Play Music, Chromecast, Google Play Movies and TV |
| | **Browser**<br>Chrome |
| | **Search**<br>Search, Finance, Flights, News, Scholar, Patents, Books, Images, Videos, Hotels |
| | **Navigation**<br>Maps, Waze |
| | **Productivity tools**<br>Drive, Docs, Sheets, Slides, Forms |
| | **Social & communications**<br>Gmail, Allo, Hangouts, Duo, Google+, Translate |
| | **Storage and organization**<br>Photos, Contacts, Calendar, Keep |
| | **Personal Assistant**<br>Google voice assistant |
| **2. Operating systems** | **Android**<br>Phones, Wear, Auto |
| | **Chrome**<br>Chromebook |
| **3. Services** | Fiber, DNS, Project Fi, Google pay |
| **4. Devices** | Home, Wi-Fi router, Chromecast, Nest, Daydream View |

**C.      Data collection from other prominent Google products**

a)      Google Play Music and Play Movies and TV

102.    Google Play Music, Play Movies and TV are on-demand services that offer streaming of music, podcasts, TV shows, and movies. These services can be thought of as the Google equivalent of Apple iTunes. Like YouTube, these services collect information about user search, bought/rent/played content, information about users' geography (through IP address), and device information.

b)    Waze

103.    Waze got acquired by Google in 2013 and operates as a Google subsidiary. In contrast to Maps, Waze is a crowd-sourced app where user-supplied data (such as GPS location coordinates, travel times, traffic info, accidents, police monitoring, blocked roads, and construction) is analyzed to provide routing and real-time travel condition updates. In addition to location information collected through the mobile device, Waze collects information about use of its services from the device Waze is installed on, including mobile device name, operating system, web page visits, information viewed on app, app content use/created, and ads viewed and clicked.

104.    Waze works like a social network and provides users the ability to befriend other users and create an online community of local drivers.[110] Users can link their phone's contact list, Facebook, or Twitter accounts, which Waze then uses to match with friends on platforms who are also using Waze's service. Overall, Waze gives Google the ability to access more real-time user data, as well as information on acquaintances that may or may not be using a Google Account.

c)    Google Docs and Drive

105.    Google's productivity tools (Docs, Sheets, Slides, Forms, and Drive – which are part of the broader "G Suite" of products) are cloud-based applications used by both individuals and enterprises. Google's G Suite privacy policies[111] prohibit Google from scanning stored data for advertising purposes on enterprise versions. In contrast, the free versions of these tools are governed by Google's general privacy policy, so Google may access the information for ad targeting.

106.    After an individual registers for a Google Account, Google provides free storage space (currently 15GB) on Google Drive to share across products including Gmail, Photos, and Docs. Google's Terms of Service indicate that Google retains the license to use the stored data in variety of ways, including reproducing,

---

[110] J.D. Biersdorfer, "Getting social with Waze," *The New York Times,* Sept. 20, 2017, available at
https://www.nytimes.com/2017/09/20/technology/personaltech/getting-social-with-waze.html
[111] "Google Cloud help, privacy," *Google,* last accessed on August 15 2018, available at
https://support.google.com/googlecloud/answer/6056650?hl=en

modifying, communicating, and publishing.[112] Although all user data stored in Google Drive is encrypted, it's not a "zero-knowledge encryption"[113] since Google manages the data encryption key.

d)     Video chat and social messaging apps

107.    Google Hangouts is a communication platform, akin to Skype, and a part of Google's G Suite cloud-connected apps. Users can start and join video conferences or group conversations from the Hangout app available on Android and iOS, through a web browser, from the Hangouts desktop app or Chrome extension, and from other Google products (e.g. Gmail and Calendar).[114] Google stores details of these exchanges (including conference call and conversation time stamps), participant information, and message content. These details are available to users and can be downloaded via the Google Takeout tool.[115] Figure 20 shows some data recorded from a Google Hangouts conversation, including participant names, participant IDs, and the contents of the conversation.

**Figure 20: Google Takeout recordings of a Google Hangouts Conversation**



108.    In addition to the enterprise-focused Hangouts, Google also offers an instant messaging app called Allo, which is available for Android and iOS or through web browsers.[116] Google records and stores all messages communicated through Allo by default (unless the user invokes incognito mode).[117]

---

[112] "Google Drive terms of service," *Google,* last accessed on August 15 2018, available at https://www.google.com/drive/terms-of-service

[113] Fergus O'Sullivan, "What exactly is zero-knowledge in the cloud and how does it work?," *Cloudwards,* June 16, 2017, available at https://www.cloudwards.net/what-exactly-is-zero-knowledge-in-the-cloud-and-how-does-it-work

[114] "GSuite learning center," *Google,* last accessed on August 15 2018, available at https://gsuite.google.com/learning-center/products/hangouts/get-started/#!/

[115] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1

[116] Sean Keach, "Google Allo just got a major upgrade – but do we really need it?," *Trusted Reviews,* Aug. 16, 2017, available at http://www.trustedreviews.com/news/google-allo-3261336

[117] Russell Brandom, "Google backs off on previously announced Allo privacy feature," *The Verge,* Sept. 21, 2016, available at https://www.theverge.com/2016/9/21/12994362/allo-privacy-message-logs-google

109.     Google offers an app called Google Duo that is a dedicated mobile video chat app. It is available both on Android and iOS, but not on desktop/laptop computers. Users can call or video chat each other and even connect with users on the Android operating system who have not downloaded the app.[118] Once installed, Google Duo has access to a user's profile data, contacts, camera, microphone, Wi-Fi connection information, and device ID and call information.[119] Google also stores the time stamps of when the apps are used and provides this info to the users via Google Takeout.

e)     Google+

110.     Google+ is a social media network launched in 2011 as a competitor to Facebook. Although Google does not release statistics on Google+'s active users, it is now primarily a place for niche communities.[120] A user can choose to follow other users, organize the users they follow into groups (e.g. best friends vs. work colleagues), start "Communities," or join existing ones (e.g. "Photography enthusiasts"). Posts from followed users and communities then appear in the user's home feed.

111.     Google Takeout shows several types of Google+ data that Google stores. Google compiles vCards from the profiles of all the people a user follows (in Takeout, this information is contained within the "Google+ Circles" folder). Google also collects in HTML format all content posted by a user, which is contained in the "Google+ Stream" folder of Takeout, as shown in Figure 21. Posted photos also are saved within Google Photos.

**Figure 21: Example of Google+ posted content saved by Google**



f)     Translate

112.     Google Translate is a free machine translation service supporting over 100 languages that is available on the web and through apps for Android and iOS. It is also integrated into Google Assistant and Google Chrome, as well as being available to 3rd-party developers through a paid API.[121] Altogether, it serves more than 500 million monthly users.[122] If users have the Google Translate app on their phone, they can use the app to

---

[118] Swapna Krishna, "Google Duo allows you to call people who don't have the app," *Engadget,* Jan. 12, 2018, available at https://www.engadget.com/2018/01/12/google-duo-call-android-users-without-app
[119] Google informs the user of this access when the user downloads the app.
[120] Karissa Bell, "Google+ isn't dead and these are the people astill using it the most," *Mashable,* Jan. 18, 2017, available at https://mashable.com/2017/01/18/who-is-using-google-plus-anyway/#_lP0PXr.eiqZ
[121] "Google Cloud, pricing," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/translate/pricing
[122] Gideon Lewis-Kraus, "The great A.I. awakening," *The New York Times,* Dec. 14, 2016, available at https://www.nytimes.com/2016/12/14/magazine/the-great-ai-awakening.html

translate languages within other apps, such as WhatsApp.[123] Although Google states that it does not track Google Translate web queries[124]—and these queries do not appear in a user's Search history or elsewhere in Google Takeout—Google's privacy policy does allow it to store them for short period of time and occasionally for longer period for debugging and other testing.[125]

g)   Calendar

113.    Google Calendar is a scheduling tool that enables users to keep track of their daily and weekly activities. It is widely used on both desktop and mobile devices, with more than 500 million downloads from the Google Play Store.[126] Personal information, such as an individual's name and contact information, is often associated with a Calendar user.

114.    By using calendars, users provide Google with details (such as the time, location, and contact information) for all participants of an event. Google states that the app has access to "read calendar events plus confidential information."[127] As part of this information collection, Google reads and stores the email addresses of all members included in a calendar event, regardless of their Google affiliation.[128] As long as one person on a calendar invitation is using Google Calendars, therefore, Google records the contact information for every other person on the invitation.

h)   Keep

115.    Google Keep is a note-taking tool that allows the user to take notes that sync between devices associated with their Google account. Keep has been downloaded more than 100 million times from the Google Play Store.[129] Google collects and stores all contents of the notes, as well as the time they were created.[130] Figure 22 shows Google Keep notes recorded by Google. Google scans and classifies the notes that are created based on their contents. Examples of classification categories are food, places, and travel.

---

[123] "Google Translate," *Google,* available at https://translate.google.com/intl/en/about
[124] "Google Translate help," *Google,* last accessed on August 15 2018, available at https://support.google.com/translate/answer/6142479?co=GENIE.Platform%3DDesktop&hl=en&oco=0
[125] "Access to the Google Cloud API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/translate/faq
[126] "Google Calendar," *Google Play Store,* last accessed on August 15 2018, available at https://play.google.com/store/apps/details?id=com.google.android.calendar
[127] "Google Calendar," *Google Play Store,* last accessed on August 15 2018, available at https://play.google.com/store/apps/details?id=com.google.android.calendar
[128] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1
[129] "Google Keep," *Google Play Store,* last accessed on August 15 2018, available at https://play.google.com/store/apps/details?id=com.google.android.keep&hl
[130] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1

**Figure 22: Example of Google Keep notes, accessed from Google take out**

```
            </style></head>
<body><div class="note"><div class="heading"><div class="meta-icons">

</div>
Apr 26, 2018, 11:06:04 AM</div>

<div class="content">Grocery list:<br>- pasta<br>- tomatoes<br>- lettuce <br>- salad
dressing <br>- salmon <br>- lemon<br>- capers <br>- Bread<br>- butter<br>- milk<br>-
eggs<br>- bacon<br>- OJ<br>- </div>

</div></body></html>
```

i)      Chromecast

116.    Like Apple TV, Google Chromecast is a device that acts as an interface to watch videos from a variety of applications (e.g. Netflix, YouTube, Hulu, Play Store), as well as to project video from smartphones and computers onto larger televisions and monitors. Every Cast device has a unique identifier that is associated with a user's Google Account during registration.

117.    Google uses Chromecast to collect system activity, crash reports, and usage data, such as details about the use of casting functionality of devices, including the apps and domains that are casted.[131] Chromecast uses Google Cast, which is a software platform that enables seamless streaming of audio/video between devices on the same network.[132] In addition to a multitude of other Google products (e.g. Google Home) that use Cast functionality, the Cast platform is also used by 3rd-party devices using "Chromecast built-in" (e.g. TVs and video gaming consoles[133]), that offer similar functionality. Google also collects usage data and crash reports from 3rd-party Cast devices.[134]

j)      Google DNS

118.    Google launched a free Domain Name System (DNS)[135] service, called Google Public DNS, in December of 2009. Google DNS is aimed at improving web browsing experience by enhancing speed, security, and accuracy.[136] In December 2014, Google Public DNS was reported to be serving 400 billion responses.[137]

119.    To detect abuse (such as DDoS attacks) and to fix problems, Google Public DNS keeps a temporary log of full IP addresses that it deletes within 24-48 hours. For longer-term efforts to debug and prevent abuse,

---

[131] "Chromecast help," *Google,* last accessed on August 15 2018, available at https://support.google.com/chromecast/answer/6076570?hl=en
[132] "Google Cast," *Google,* last accessed on August 15 2018, available at https://developers.google.com/cast
[133] "What is Google Cast and Chromecast," *Shield,* last accessed on August 15 2018, available at https://shield.nvidia.com/blog/what-is-googlecast-chromecast
[134] "Chromecast help," *Google,* last accessed on August 15 2018, available at https://support.google.com/chromecast/answer/6076570?hl=en
[135] DNS services translate domain names into IP addresses and thus are necessary to navigate the web.
[136] "Google Public DNS," *Google,* last accessed on August 15 2018, available at https://developers.google.com/speed/public-dns/faq
[137] "Google Public DNS and location-sensitive DNS responses," *Google Webmaster Central Blog,* Dec. 15, 2014, available at https://webmasters.googleblog.com/2014/12/google-public-dns-and-location.html

Google keeps non-personally-identifiable city/metro-level location information for two weeks, and randomly samples a small subset for permanent storage.[138]

<p style="text-align:center">k) <u>Google Wi-Fi router</u></p>

120. Google began rolling out a mesh Wi-Fi router, Google Wi-Fi, in December 2016. Mesh routers allow a user to extend access to a Wi-Fi network across a larger area with additional connected routers. By December of 2017, Google Wi-Fi became the best mesh Wi-Fi system in the USA according to data from the NPD Group.[139] The information it collects[140] falls into the following three categories:

- <u>Cloud services</u>, which include broadcast information from connected devices (such as a device name like "Jane's iPhone"), infer information from connected devices (such as manufacture's name like Samsung), connection status, data transfer speed and historical consumption, network settings and information about wireless environment (e.g. other routers in the area). It does collect connected device information and data usage.
- <u>Wi-Fi stats</u>, which include anonymous data usage, crash reports and device performance information.
- <u>Wi-Fi app stats</u>, which includes usage and crash reports.

121. According to Google, the Wi-Fi router does not track the websites visited or collect the content of network traffic.[141]

<p style="text-align:center">l) <u>Nest</u></p>

122. In January 2014, Google acquired Nest, which is a home automation company.[142] Nest's product line includes many smart home devices, including thermostats, cameras, doorbells, alarm systems, locks and smoke/CO detectors.[143] In addition, Nest lists more than 100 3rd-party products that can integrate with Nest, ranging from refrigerators to beds.[144]

123. Nest devices collect a variety of information, including not only users' direct adjustments to the devices, but also data on the environment within the home. For example, the Nest Learning Thermostat collects data (such as temperature, humidity, ambient light, and movement) and thus knows when people are at home and even in what rooms.[145] When a user connect 3rd-party products that integrate with Nest, Nest shares

---

[138] "Google Public DNS," *Google,* available at https://developers.google.com/speed/public-dns/privacy
[139] Jillian D'Onfro, "The surprising use case that has made Google Wifi one of the company's sleeper hits," *CNBC,* Dec. 18, 2017, available at https://www.cnbc.com/2017/12/18/google-wifi-mesh-technology-sales-stats.html
[140] "Google Wifi help," *Google,* last accessed on August 15 2018, available at https://support.google.com/wifi/answer/6246642?hl=en
[141] "Google Wifi help," *Google,* last accessed on August 15 2018, available at https://support.google.com/wifi/answer/6246642?hl=en
[142] "Google to acquire Nest," *Alphabet,* Jan. 13, 2014, available at https://abc.xyz/investor/news/releases/2014/0113.html
[143] Nest homepage, available at https://nest.com/
[144] "Works with Nest," Nest, last accessed on August 15 2018, available at https://nest.com/works-with-nest/
[145] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/

information with those parties but informs the user about what information is being shared.[146] Nest does not share data with other 3rd-parties, such as partner energy or insurance companies, without first gaining a user's consent.[147]

124.    On its website, Nest states that Nest accounts and Google accounts are not linked (unless a user chooses to integrate with Google products and services) and that Google does not sell Nest data. Recently, however, data sharing concerns have arisen from an announcement[148] by Google concerning the merger of Nest and Google hardware teams.[149] In addition, concerns have been raised in the media about the future links between Google, Nest, and 3rd-party electrical and insurance companies.[150]

<div align="center">

m)    <u>Google Fiber</u>

</div>

125.    Google Fiber is a broadband, Internet protocol (IP) TV, and Voice-Over-Internet-Protocol (VOIP) phone service connecting users via ultra-high-speed fiber-optic networks that extend all the way to their residences,[151] known as Fiber Internet, Fiber TV, and Fiber Phone, respectively. Google's efforts to deploy extensive networks of fiber optic cables were hampered by physical costs and negotiations with local municipalities. Google Fiber is therefore now expanding to new cities via Webpass (an Internet service provider acquired by Google), which delivers similarly high speeds through existing wireless and Ethernet technologies.[152]

126.    Fiber Internet collects technical information connected to a user's Google Account, but does not share account details with other Google properties without the user's additional consent.[153] Fiber Internet requires user consent before associating a user's Google Account with other information, such as sites visited or content of communications.[154]

---

[146] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/
[147] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/
[148] Rick Osterloh, "Nest to join forces with Google's hardware team," *Nest,* Feb. 7, 2018, available at https://blog.google/topics/hardware/nest-join-forces-googles-hardware-team/
[149] Leo Kelion, "Google-Nest merger raises privacy issues," *BBC,* Feb. 8, 2018, available at http://www.bbc.com/news/technology-42989073
[150] Casey Johnston, "What Google can really do with Nest, or really, Nest's data," *Ars Technica,* Jan. 15, 2014, available at https://arstechnica.com/information-technology/2014/01/what-google-can-really-do-with-nest-or-really-nests-data/
[151] Ryan Waniata, "Comcast killer: Google Fiber touches down in Austin with its new TV and internet devices," *Digital Trends,* Dec. 3, 2014, available at https://www.digitaltrends.com/home-theater/google-fiber-tv-hands-on
[152] Nick Statt, "Google Fiber-owned Webpass is bringing its wireless gigabit internet to Denver," *The Verge,* Feb. 22, 2017, available at https://www.theverge.com/2017/2/22/14703142/google-fiber-webpass-denver-expansion-gigabit-Internet and https://gizmodo.com/what-happened-to-google-fiber-1792440779
[153] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[154] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy

127.    Fiber TV collects information on programs and applications used and associates it with the user's Google Account.[155] Likewise, Fiber Phone collects usage information (e.g. logs of call history, voicemails, SMS messages, and recorded conversations) and associates it with a user's Google Account.[156] Although this information is not shared with 3rd-parties unless a user provides consent, information may be shared with 3rd-parties for external processing and for legal reasons. While Google does not explicitly mention the use of Fiber TV/phone for ad targeting, its general privacy policy does allow the use of collected personal information for targeting purposes. Moreover, Google states it will share Google Fiber user's non-personal identifiable information publicly with content providers, publishers, advertisers, and/or connected sites.[157]

### D.    Method for location traffic monitoring

128.    To capture the requests being sent to Google server domains from a mobile phone, our study employs a "man-in-the-middle" (MITM) technique using the "MITM Proxy" tool.  While previous studies that analyze similar data employed a Wi-Fi hotspot to act as an intermediary between mobile phone and Google servers, the present study uses a virtual private network (VPN) on a mobile phone to analyze data sent through Wi-Fi networks as well as the cellular network.

**Figure 23: Example VPN setup used to analyze data shared with Google**



The specific steps performed to configure and conduct the experiments are described below:

1.    The mobile devices used in the data collection experiments[158] were factory reset to ensure that no previously installed applications or adjusted settings affected traffic to and from the phone. Upon

---

[155] "Google Fiber privacy notice," *Google*, last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[156] "Google Fiber privacy notice," *Google*, last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[157] "Google Fiber privacy notice," *Google*, last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[158] Devices include an LG X Power with Android 6.0 version installed and an iPhone 5 with iOS 10.3.3 installed

reactivation, the devices were configured with the suggested default settings. The devices were then equipped with new SIM cards to obtain new cell phone numbers.

2. A VPN connection was setup with a remote proxy computer using VPN settings/functionality provided by the phone operating system. An IPsec/LT2P with a PSK authentication setup was chosen. The VPN configuration enabled the remote proxy to intercept and record the data transmitted from the mobile phones. Due to the nature of the type of signals emitted from a phone, the VPN set up is unable to intercept voice and SMS data sent from the mobile devices. However, it captured all TCP traffic to and from the device, including HTTP and HTTPS traffic.

3. HTTPS software certificates were installed on the mobile devices to enable decryption of the data traffic captured. VPN configuration allowed the routing of all HTTP and HTTPS traffic through the mitmproxy program[159] using iptables.[160] This program then performed SSL decryption using its own certificate to decrypt the traffic and dump it to HAR (HTTP Archive) files for analysis.

4. Analysis of decrypted HTTP and HTTPS traffic data mainly involved categorization of server requests into key segments using the request header info. Tables 5 and 6 detail the traffic headers that were identified as transmitting data to/from Google and Apple.

129.    In specific cases, requests to Google were further decoded to analyze the information that was passed at a more granular level. One specific request to Google that was further decoded was the "Google location API," designated by the /loc/m/api endpoint. The location specifications were reverse engineered by removing the message header and decoding the compressed protobuf message.[161] The decoded location API contained Wi-Fi and network scans that were used to determine the location of the device.

**Table 5: Notable Google server domains communicating with mobile phone devices**

| Segment | Pathway header | Description |
|---------|---------------|-------------|
| Ad domains | doubleclick.net | Sends data to and from DoubleClick |
| | google-analytics.com | Sends data to and from GA |
| | googletagmanager.com | Implements webpage tags |
| | googletagservices.com | Implements webpage tags |
| | googlesyndication.com | Retrieves and displays ads |
| | adservice.google.com | Calls the AdWords network |

---

[159] https://mitmproxy.org/
[160] "iptables(8) – Linux man page," *Die.net,* available at https://linux.die.net/man/8/iptables
[161] Additional information on the decoding method can be found here: "Reverse engineering: Google Location protobuf specifications," *Esther Codes,* accessed March 2018, available at
https://web.archive.org/web/20180213201547/https://esther.codes/reverse-engineering-google-location-gms-specification/

|  | google.com/ads/ | Ad measurement and user lists |
|---|---|---|
|  | gstatic.com | Loads ads on the page |
|  | google.com/adsense | Calls AdSense |
|  | google.com/pagead | Serves page ads |
| Location | google.com/loc/m/api | Sends back nearby network and Wi-Fi information |
|  | googleapis.com/userlocation/v1/reports | Sends back user movement information (i.e. walking, running, biking, driving, etc.) |
|  | googleapis.com/placesandroid | Matches determined location with businesses, etc. (Google Places) |
|  | maps.googleapis.com/maps | Retrieves detailed information based on a place ID or a place search |
|  | clients4.google.com/glm/mmap | Sends user's location information to retrieve map data |
| Google Play API | play.googleapis.com/log/batch | Device activity logging information |
|  | play.googleapis.com/play/log/timestamp | Updates a cookie and reports the time |
|  | play.googleapis.com/play/log?format | Play Store/Services log upload |
| Device auth. and upload | googleapis.com/batch | Device information and updates |
|  | clients4.google.com/chrome-sync | Chrome browser synchronization |
|  | googleapis.com/experimentsandconfigs | testing/experiment config download |
|  | android.clients.google.com/backup/backup | Device backup |
|  | android.clients.google.com/auth | Device authorization |
|  | android.clients.google.com/checkin | Device identifying information and activity |
|  | android.clients.google.com/ | Authentication with Google services |
| Other | cdn.ampproject.org | Retrieving data from the AMP CDN |
|  | google.com/xjs | Communication with Google Search |
|  | google.com/gen | Communications with Google Search that transmit cookie data |
|  | clients4.google.com/ukm | Chrome speed information |
|  | inbox.google.com/sync | Mail synchronization |
|  | mail.google.com/mail/ads | Mail ad refresh |
|  | google.com/complete/search | Sends character level information to enable the search autocomplete function |
|  | Googleapi.com/ | Other Google APIs include Google services (i.e. YouTube, Calendar, etc.) |

| | |
|---|---|
| Google.com/ | Other miscellaneous calls to Google's domain |

**Table 6: Notable Apple server domains communicating with mobile phone devices**

| Segment | Pathway header | Description |
|---|---|---|
| Location | geosrc=wifi,73.xxx&kb_ime=en_US&key=beagle1626&latlng=40.xxx,-74.xxx&locale=en_US | Passes location coordinates back to Apple when using the browser |
| | cl2.apple.com | Calls to the core location server |
| | gs-loc.apple.com | Apple location services |
| App store | us-east-1.blobstore.apple.com/apple | Communicates with the Apple store; includes Apple ID |
| Device auth. and upload | mesu.apple.com/assets/com_apple_MobileAsset | Details mobile configurations and settings |
| | bookmarks.icloud.com | Syncs mobile behavior with the cloud |
| | ckdatabase.icloud.com/api | Communicates device authorization tokens and syncs with iCloud |
| | keyvalueservice.icloud.com/sync | Syncs mobile device behavior |
| Other | api-glb-nyc.smoot.apple.com/ | Miscellaneous Apple APIs |
| | gsp64-ssl.ls.apple.com | Provides device information when the phone accesses websites via Safari |
| | gspe35-ssl.ls.apple.com/geo_manifest/dynamic/config?application=geod | Loads map tiles, but does not pass location information |
| | configuration.apple.com/configurations/pep/config/geo/networkDefaults | Communicates the settings of the location collection tools |

E.   **Google sign in authentication sequence**

**Figure 24: Authentication sequence**



### F.    Usage profile for mobile data collection experiments

130.    A usage profile was designed to simulate a typical user's interaction with their mobile phone throughout the course of a day. A variety of statistics that describe peoples' online behavior and mobile phone usage were integrated to create the profile, as described below.

131.    The designed profile visited 45 webpages during the course of the day based on website visit statistics from a 2010 Nielsen study, which indicates that the average person visits 88 webpages per day[162] and a 2017 Stone Temple study, which states that roughly 50-55% of webpage visits come from mobile devices.[163] The 45 webpage visits were evenly split between 5 top non-Google news and sports domains.[164] When the phone was not being used to visit webpages the browser was left running in the background of the phone. The resulting usage profile represents a conservative user as the number of webpage visits per day is likely to have increased since the 2010 Nielsen study.

132.    The usage profile also included a variety of non-Google mobile applications. Top non-Google applications were selected from the social media, shopping, travel, and health categories. These applications included Facebook, Instagram, Snapchat, Pinterest, Amazon Shopping, Walmart, Starbucks, Yelp, and Six Pack

---

[162] "Nielsen provides topline U.S. web data for March 2010," Nielsen, April 2010, available at
http://www.nielsen.com/us/en/insights/news/2010/nielsen-provides-topline-u-s-web-data-for-march-2010.html
[163] Eric Enge, "Mobile vs desktop usage: mobile grows but desktop still a big player in 2017," *Stone Temple,* April 2017, available at https://www.stonetemple.com/mobile-vs-desktop-usage-mobile-grows-but-desktop-still-a-big-player-in-2017/
[164] The domains selected were New York Time, CNN, The Guardian, ESPN, and Crickbuzz. The websites were identified by using Alexa's lists, available at https://www.alexa.com/topsites/category

in 30 Days. These apps were opened periodically throughout the day to simulate a typical user who spends approximately 2.5 hours in mobile app per day, as reported by eMarketer.[165]

### G.      Past articles that relate to Google's data collection practices

**Table 7: Summary of other Google data collection studies**

| Title | Relevant findings | Author, Date |
|-------|-------------------|--------------|
| AP Exclusive: Google tracks your movements, like it or not[166] | Google is tracking users' location even when location services are disabled | Ryan Nakashima<br>August 2018 |
| Australian regulator investigates Google data harvesting from Android phones[167] | Google "harvest" about 1GB of data from Android devices per month | Oracle<br>May 2018 |
| How to Keep Google From Owning Your Online Life[168] | It is very difficult for the average consumer to avoid Google products | WSJ, May 2018 |
| Google tracking phones even when they are disconnected?[169] | Google tracks phones even when phones are "disconnected" (no SIM cards, airplane mode, Wi-Fi off) | Fox News,<br>Feb. 2018 |
| Google collects Android users' locations even when location services are disabled[170] | Google collects Android location when location services are turned off | Quartz<br>Nov. 2017 |

---

[165] "eMarketer reveals new estimates for mobile app usage," *eMarketer,* April 2017, available at
https://www.emarketer.com/Article/eMarketer-Unveils-New-Estimates-Mobile-App-Usage/1015611
[166] Ryan Nakashima, "AP Exclusive: Google tracks your movements, like it or not," *AP*, August 13, 2018, available at
https://apnews.com/828aefab64d4411bac257a07c1af0ecb
[167] Anne Davis, "Australian regulator investigates Google data harvesting from Android phones," *The Guardian,* May 13, 2018,
available at https://www.theguardian.com/technology/2018/may/14/australian-regulator-investigates-google-data-harvesting-from-android-phones
[168] David Pierce, "How to Keep Google From Owning Your Online Life," *The Wall Street Journal,* May 8, 2018, available at
https://www.wsj.com/articles/how-to-keep-google-from-owning-your-online-life-1525795372
[169] Brett Larson, "Google tracking phones even when they are disconnected?," *Fox News,* Feb 11, 2018, available at
http://video.foxnews.com/v/5731183327001/?#sp=show-clips
[170] Keith Collins, "Google collects Android users' locations even when location services are disabled," *Quartz,* November 17, 2017,
available at https://qz.com/1131515/google-collects-android-users-locations-even-when-location-services-are-disabled/

| | | |
|---|---|---|
| Google is permanently nerfing all Home Minis because mine spied on everything I said 24/7[171] | The Google Home mini was saving recording when the device was not activated with "OK Google" *Google claims to have resolved the issue | Artem Russakovskii Oct. 2017 |
| Online Tracking: A 1-million-site Measurement and Analysis[172] | Google can track users ~80% of websites using its cookies. | Princeton University 2016 |
| Why Do Android Smartphones Guzzle the Most Data?[173] | Android devices consume more data (2.2GB/month) than other smartphones | Ericsson Dec. 2013 |
| Data leakage from Android smartphones[174] | Android passes anonymous IDs along with devices IDs such as Mac address and IMIE | Lasse Øverlier June 2012 |

## H.    Clarifications

133.    Our understanding of the data being sent to Google through its Android platform is limited to Android 6.0 version only. This study does not capture any updates/patches that may have been implemented on later versions that may affect Android's communications with the Google servers. While new versions of Android are currently present in the market, Android 6.0 is still the most widely used version.[175] Additionally, while we took utmost precaution for classifying the pathway headers by their purpose (e.g., location, ad, device upload, app store), it is possible that some headers may serve multiple purposes (e.g., ad as well as location). These aspects are not captured in our study. Consequently, the description presented for these headers may not be exhaustive with respect to the purpose they serve.

## I.    About the author

134.    Professor Douglas Schmidt is a software system expert with over 30+ years conducting, supervising, and researching the development of software for distributed middleware systems and their applications in

---

[171] Artem Russakovskii, "Google is permanently nerfing all Home Minis because mine spied on everything I said 24/7," *Android Police,* October 10, 2017, available at https://www.androidpolice.com/2017/10/10/google-nerfing-home-minis-mine-spied-everything-said-247/

[172] Englehardt, Steven, and Arvind Narayana, "Online Tracking: A 1-million-site Measurement and Analysis," *ACM CCS,* 2016, available at http://randomwalker.info/publications/OpenWPM_1_million_site_tracking_measurement.pdf

[173] Brian Chen, "Why Do Android Smartphones Guzzle the Most Data?," *The New York Times,* December 31, 2013, available at https://bits.blogs.nytimes.com/2013/12/31/why-do-android-smartphones-guzzle-the-most-data/

[174] Lasse Øverlier , "Data leakage from Android smartphones," *Norwegian Defense Research Establishment,* June 6, 2012, available at https://www.ffi.no/no/Rapporter/12-00275.pdf

[175] "Mobile & Tablet Android Version Market Share Worldwide," *statcounter,* available at http://gs.statcounter.com/android-version-market-share/mobile-tablet/worldwide

networking and security, machine learning and smart-grid, design patterns, and more. He has authored 10+ books and 600+ papers that have been collectively cited over 38,000 times. Professor Schmidt has over 30 years of experience teaching these concepts both in-classroom and online to over 200,000 students in total.

135.     Professor Schmidt has participated in 20+ prior expert engagements spanning expert report production and oral testimony both through deposition and at trial. His consulting work has ranged from patent and copyright litigation matters to advising both private and public entities on various issues relating to software infrastructure and design. He earned his PhD and MS in Computer Science from the University of California, Irvine in 1994 and 1990, respectively.

136.     Professor Schmidt is currently the Cornelius Vanderbilt Professor of Computer Science at Vanderbilt University. Prior to Vanderbilt, he held several directorial and C-level positions in both academic and industry settings including the Software Engineering Institute at Carnegie Mellon University, the Information Technology Office at the Defense Advanced Research Project Agency (DARPA),  the Federal Government, as well as several technology start-ups.

# EXHIBIT 15



# Official Blog

Insights from Googlers into our products, technology, and the Google culture

---

## Updating our privacy policies and terms of service

January 24, 2012

In just over a month we will make some changes to our privacy policies and Google Terms of Service. This stuff matters, so we wanted to explain what's changing, why and what these changes mean for users.

First, our privacy policies. Despite trimming our policies in 2010, we still have more than 70 (yes, you read right … 70) privacy documents covering all of our different products. This approach is somewhat complicated. It's also at odds with our efforts to integrate our different products more closely so that we can create a beautifully simple, intuitive user experience across Google.

So we're rolling out a new main privacy policy that covers the majority of our products and explains what information we collect, and how we use it, in a much more readable way. While we've had to keep a handful of separate privacy notices for legal and other reasons, we're consolidating more than 60 into our main Privacy Policy.

Regulators globally have been calling for shorter, simpler privacy policies—and having one policy covering many different products is now fairly standard across the web.

These changes will take effect on March 1, and we're starting to notify users today,
including via email and a notice on our homepage.



Google Privacy Policy Update

What does this mean in practice? The main change is for users with Google Accounts.
Our new Privacy Policy makes clear that, if you're signed in, we may combine
information you've provided from one service with information from other services. In
short, we'll treat you as a single user across all our products, which will mean a simpler,
more intuitive Google experience.

Our recently launched personal search feature is a good example of the cool things
Google can do when we combine information across products. Our search box now
gives you great answers not just from the web, but your personal stuff too. So if I
search for restaurants in Munich, I might see Google+ posts or photos that people have
shared with me, or that are in my albums. Today we can also do things like make it easy
for you to read a memo from Google Docs right in your Gmail, or add someone from
your Gmail contacts to a meeting in Google Calendar.

But there's so much more that Google can do to help you by sharing more of your
information with … well, you. We can make search better—figuring out what you really
mean when you type in Apple, Jaguar or Pink. We can provide more relevant ads too.

For example, it's January but maybe you're not a gym person, so fitness ads aren't that useful to you. We can provide reminders that you're going to be late for a meeting based on your location, your calendar and an understanding of what the traffic is like that day. Or ensure that our spelling suggestions, even for your friends' names, are accurate because you've typed them before. People still have to do way too much heavy lifting, and we want to do a better job of helping them out.

Second, the Google Terms of Service—terms you agree to when you use our products. As with our privacy policies, we've rewritten them so they're easier to read. We've also cut down the total number, so many of our products are now covered by our new main Google Terms of Service. Visit the Google Terms of Service page to find the revised terms.

Finally, what we're not changing. We remain committed to data liberation, so if you want to take your information elsewhere you can. We don't sell your personal information, nor do we share it externally without your permission except in very limited circumstances like a valid court order. We try hard to be transparent about the information we collect, and to give you meaningful choices about how it is used—for example our Ads Preferences Manager enables you to edit the interest categories we advertise against or turn off certain Google ads altogether. And we continue to design privacy controls, like Google+'s circles, into our products from the ground up.

We believe this new, simpler policy will make it easier for people to understand our privacy practices as well as enable Google to improve the services we offer. Whether you're a new Google user or an old hand, please do take the time to read our new privacy policy and terms, learn more about the changes we're making and understand the controls we offer.

Posted by Alma Whitten, Director of Privacy, Product and Engineering

  

Labels: privacy

# EXHIBIT 16

# Google's New Privacy Policy Will Allow Tracking Across Services

npr.org/sections/thetwo-way/2012/01/25/145830858/googles-new-privacy-policy-will-allow-tracking-across-services

Eyder Peralta

## Google's New Privacy Policy Will Allow Tracking Across Services

## Economy



Enlarge this image

A sign for Google is displayed behind the Google android robot, at the National Retail Federation in New York. **Mark Lennihan/AP hide caption**

**toggle caption**

Mark Lennihan/AP



A sign for Google is displayed behind the Google android robot, at the National Retail Federation in New York.

Mark Lennihan/AP
Yesterday afternoon Google announced it was making sweeping changes to its privacy policy beginning March 1. Users can't opt out, so Google is beginning to send notice to its users via email and even on its homepage.

The big change is that Google will now track you across its services. In other words, Google will now, for example, be able to pair information it collects on its email service with information it collects on its search service to really target its advertising. In a blog post explaining the changes, Google says it will make the experience across its suite of products "more intuitive."

But here's how Danny Sullivan, a search expert, explains it for Marketing Land:

> "It sounds like the Miranda warning so familiar to those who watch US cop shows: 'Anything you can and do will be held against you in a court of law.' On March 1, Google has a new privacy policy and terms of service that goes into effect. Anything you do on Google, under these new agreements, can and may be used to target you in a court of Google, so to speak.
>
> In many ways, this is Google growing up into the new portal it has become. Rather than people signing up for individual products, Gmail, YouTube and so on, they're now signing-up for Google — or at least a single set of terms (in most cases) for all the company's products. It's similar to how you sign-up for Facebook, rather than individual products within Facebook."

2/3

Simplifying is good, said Sullivan. But then, he adds, you start thinking about what information Google can now use. In a Gmail account, Google can use your personal details, your contact list and your actual emails.

"We're used to that being used to show us ads within Gmail," he writes. "But does this now mean that information can be used to show us ads in regular web search? Or at YouTube? Or as we surf the web?"

In its story, _The Washington Post_ answers yes to all those questions. They say this would mean that Google for example could surmise you are a basketball fan by all those YouTube videos you watch and then pair that with the Miami location you've set in Gmail. They would then serve ads for the Miami Heat.

"Google's new privacy announcement is frustrating and a little frightening," Common Sense Media chief executive James Steyer told the Post. "Even if the company believes that tracking users across all platforms improves their services, consumers should still have the option to opt out — especially the kids and teens who are avid users of YouTube, Gmail and Google Search."

While Google is not providing a way for users to opt out of its new privacy policy, this tracking only happens when you are logged in.

Still Rep. Ed Markey (D-Mass.) told _USA Today_ that the move opens questions about how much control users have over personal information. The paper adds:

> "Critics worry the tech giants will open fresh opportunities for cybercrooks to prey on users of the sites.
>
> "'Both are racing to monetize our private information and in doing so creating collateral damage,' says Alisdair Faulkner, chief product officer at security firm ThreatMetrix. 'They are essentially indexing more and more private information and, in doing so, serving it up on a platter to cybercriminals.'"

# EXHIBIT 17

# Google Exposed User Data, Feared Repercussions of Disclosing to Public

**WSJ** wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194

October 7, 2018



Google Chief Executive Sundar Pichai was briefed on a plan not to notify users of a software glitch that gave outside developers potential access to private data. Photo: David Paul Morris/Bloomberg News

By

October 8, 2018

Google exposed the private data of hundreds of thousands of users of the Google+ social network and then opted not to disclose the issue this past spring, in part because of fears that doing so would draw regulatory scrutiny and cause reputational damage, according to people briefed on the incident and documents reviewed by The Wall Street Journal.

As part of its response to the incident, the Alphabet Inc. GOOGL -2.11% unit on Monday announced a sweeping set of data privacy measures that include permanently shutting down all consumer functionality of Google+. The move effectively puts the final nail in the coffin of a product that was launched in 2011 to challenge Facebook Inc. FB -2.68% and is widely seen as one of Google's biggest failures.

A software glitch in the social site gave outside developers potential access to private Google+ profile data between 2015 and March 2018, when internal investigators discovered and fixed the issue, according to the documents and people briefed on the incident. A memo reviewed

by the Journal prepared by Google's legal and policy staff and shared with senior executives warned that disclosing the incident would likely trigger "immediate regulatory interest" and invite comparisons to <u>Facebook's leak of user information</u> to data firm Cambridge Analytica.

Chief Executive Sundar Pichai was briefed on the plan not to notify users after an internal committee had reached that decision, the people said.

The closure of Google+ is part of a broader review of privacy practices by Google that has determined the company needs tighter controls on several major products, the people said. In its announcement Monday, the company said it is curtailing the <u>access it gives outside developers</u> to user data on Android smartphones and Gmail.

## Social Bug

How a software glitch allowed app developers to potentially access Google+ user data



1

2

User A goes into privacy settings to make profile data viewable only to certain friends on Google+, including User B.

User A signs up to Google+ and fills out profile fields: name, employer, job title, gender, birth date and relationship status.

User A

Name

B

Employer

Job title

4

3

User B signs up for an app that asks the user to log in using Google+ credentials. The user gives the app permission to access profile information.

The app developer collects data on User B. Because of the software glitch, the developer can also collect User A's private profile data.

APP

User B

DATA

Log in

User B

5

Google discovered and fixed the glitch in March 2018. It found no evidence of misuse of data.

The episode involving Google+, which hasn't been previously reported, shows the company's concerted efforts to avoid public scrutiny of how it handles user information, particularly at a time when regulators and consumer privacy groups are leading a charge to hold tech giants accountable for the vast power they wield over the personal data of billions of people.

The snafu threatens to give Google a black eye on privacy after public assurances that it was less susceptible to data gaffes like those that have befallen Facebook. It may also complicate Google's attempts to stave off unfavorable regulation in Washington. Mr. Pichai recently agreed to testify before Congress in the coming weeks.

## Related Video



The Meaning of Life According to Google

Google handles 90% of the world's internet searches, and it increasingly is promoting a single answer for many questions. Even subjective or unanswerable queries sometimes get seemingly definitive answers. Here's how the algorithms are -- and aren't -- working. Video/Photo Illustration: Heather Seidel/The Wall Street Journal



"Whenever user data may have been affected, we go beyond our legal requirements and apply several criteria focused on our users in determining whether to provide notice," a Google spokesman said in a statement.

In weighing whether to disclose the incident, the company considered "whether we could accurately identify the users to inform, whether there was any evidence of misuse, and whether there were any actions a developer or user could take in response," he said. "None of these thresholds were met here."

The internal memo from legal and policy staff says the company has no evidence that any outside developers misused the data but acknowledges it has no way of knowing for sure. The profile data that was exposed included full names, email addresses, birth dates, gender, profile photos, places lived, occupation and relationship status; it didn't include phone numbers, email messages, timeline posts, direct messages or any other type of communication data, one of the people said.

## Related

- RIP Google+. We Hardly Knew Ye.
- Heard on the Street: Google Needs Political Savvy

Google makes user data available to outside developers through more than 130 different public channels known as application programming interfaces, or APIs. These tools usually require a user's permission to access any information, but they can be misused by unscrupulous actors posing as app developers to gain access to sensitive personal data.

A privacy task force formed inside Google, code named Project Strobe, has in recent months conducted a companywide audit of the company's APIs, according to the people briefed on the process. The group is made up of more than 100 engineers, product managers and lawyers, the people said.

In a blog post on Monday, Google said it plans to clamp down on the data it provides outside developers through APIs. The company will stop letting most outside developers gain access to SMS messaging data, call log data and some forms of contact data on Android phones, and Gmail will only permit a small number of developers to continue building add-ons for the email service, the company said.

Google faced pressure to rein in developer access to Gmail earlier this year, after a Wall Street Journal examination found that developers commonly use free email apps to hook users into giving up access to their inboxes without clearly stating what data they collect. In some cases, employees at these app companies have read people's actual emails to improve their software algorithms.

## Newsletter Sign-up

The coming changes are evidence of a larger rethinking of data privacy at Google, which has in the past placed relatively few restrictions on how external apps access users' data, provided those users give permission. Restricting access to APIs will hurt some developers who have been helping Google build a universe of useful apps.

The Google+ data problem, discovered as part of the Strobe audit, was the result of a flaw in an API Google created to help app developers access an array of profile and contact information about the people who sign up to use their apps, as well as the people they are connected to on Google+. When a user grants a developer permission, any of the data they entered into a Google+ profile can be collected by the developer.

In March of this year, Google discovered that Google+ also permitted developers to retrieve the data of some users who never intended to share it publicly, according to the memo and two people briefed on the matter. Because of a bug in the API, developers could collect the profile data of their users' friends even if that data was explicitly marked nonpublic in Google's privacy settings, the people said.

During a two-week period in late March, Google ran tests to determine the impact of the bug, one of the people said. It found 496,951 users who had shared private profile data with a friend could have had that data accessed by an outside developer, the person said. Some of the individuals whose data was exposed to potential misuse included paying users of G Suite, a set of productivity tools including Google Docs and Drive, the person said. G Suite customers include businesses, schools and governments.

Because the company kept a limited set of activity logs, it was unable to determine which users were affected and what types of data may potentially have been improperly collected, the two people briefed on the matter said. The bug existed since 2015, and it is unclear whether a larger number of users may have been affected over that time.

## Google Watch

A history of Google's privacy controversies

**2004: Gmail**

Gmail scanned messages and sold ads related to their content, a practice that  privacy groups said was a violation of user trust. Google responded that other email providers were already using computers to scan email to protect against spam and hackers, and that showing ads helped offset the cost of its free service. In 2014, Google stopped scanning inboxes of student, business and government users and last year said it was halting all Gmail scanning for ads.

**2010: Buzz**

Debut of Google Buzz was fumbled when the social site publicly displayed the contact lists of its users, leading to a probe by the Federal Trade Commission. Google settled with the FTC in 2011 and agreed to undergo 20 years of privacy audits by the agency. At the time of the settlement, Google said in a blog post that the Buzz launch "fell short of our usual standards for transparency and user control."

**2010: Street View**

Google said its Street View camera cars collected private data through wireless networks while driving by people's homes. Google stopped collecting Street View images in some countries as a result.

**2013: Glass**

Google Glass, a wearable computer headset with the ability to record video, was seen by some as a privacy intrusion when people began wearing them into private spaces like bathrooms. Google stopped selling the device to consumers and retooled it for professionals .

**2013: Prism**

Leaks revealed Google was part of a program called Prism , which allowed the U.S. National Security Agency to collect data on internet users. Google denied it ever gave the government direct access to its servers.

**2018: YouTube**

Privacy groups complained YouTube violated a federal law protecting children's privacy by collecting data from users under 13. The company said users under 13 aren't permitted to use YouTube. Google and the FTC have said they will evaluate the complaint.

**2018: Android**

The Associated Press found that Google collects location data of Android users even after their "location history" is turned off, a policy called misleading by privacy groups and lawmakers. Google told the AP that its descriptions of its location tools are clear.

**2018: Google+**

A software bug gave outside developers access to the private user profile data of a half-million

Google+ users, and executives decided not to inform the public, partly out of fear of regulatory scrutiny. Google officials said the incident didn't rise to the threshold of alerting users, and found no evidence any of the data were accessed..

Google believes up to 438 applications had access to the unauthorized Google+ data, the people said. Strobe investigators, after testing some of the apps and checking to see if any of the developers had previous complaints against them, determined none of the developers looked suspicious, the people said. The company's ability to determine what was done with the data was limited because the company doesn't have "audit rights" over its developers, the memo said. The company didn't call or visit with any of the developers, the people said.

The question of whether to notify users went before Google's Privacy and Data Protection Office, a council of top product executives who oversee key decisions relating to privacy, the people said.

Internal lawyers advised that Google wasn't legally required to disclose the incident to the public, the people said. Because the company didn't know what developers may have what data, the group also didn't believe notifying users would give any actionable benefit to the end users, the people said.

The memo from legal and policy staff wasn't a factor in the decision, said a person familiar with the process, but reflected internal disagreements over how to handle the matter.

The document shows Google officials felt that disclosure could have serious ramifications. Revealing the incident would likely result "in us coming into the spotlight alongside or even instead of Facebook despite having stayed under the radar throughout the Cambridge Analytica scandal," the memo said. It "almost guarantees Sundar will testify before Congress."

A range of factors go into determining whether a company must notify users of a potential data breach. There is no federal breach notification law in the U.S., so companies must navigate a patchwork of state laws with differing standards, said Al Saikali, a lawyer with Shook, Hardy & Bacon LLP. He isn't affiliated with any of the parties.

While many companies wouldn't notify users if a name and birth date were accessed, some firms would, Mr. Saikali said. Some firms notify users even when it is unclear that the data in question was accessed, he said. "Fifty percent of the cases I work on are judgment calls," he said. "Only about half the time do you get conclusive evidence that says that this bad guy did access information."

Europe's General Data Protection Regulation, which went into effect in May of this year, requires companies to notify regulators of breaches within 72 hours, under threat of a maximum fine of 2% of world-wide revenue. The information potentially leaked via Google's API would constitute personal information under GDPR, but because the problem was discovered in March, it wouldn't have been covered under the European regulation, Mr. Saikali said.

Google could also face class-action lawsuits over its decision not to disclose the incident, Mr. Saikali said. "The story here that the plaintiffs will tell is that Google knew something here and hid it. That by itself is enough to make the lawyers salivate," he said.

In its contracts with paid users of G Suite apps, Google tells customers it will notify them about any incidents involving their data "promptly and without undue delay" and will "promptly take reasonable steps to minimize harm." That requirement may not apply to Google+ profile data, however, even if it belonged to a G Suite customer.

—Newley Purnell contributed to this article.

**Write to** Douglas MacMillan at douglas.macmillan@wsj.com and Robert McMillan at Robert.Mcmillan@wsj.com

**Corrections & Amplifications**
Google, a unit of Alphabet Inc., exposed the private data of some users of its Google+ social network to outside developers, but the company said it found no evidence that developers misused data. The phrase "data breach" in a headline on an earlier version of this article could be interpreted as suggesting that data were misused. (Oct. 9, 2018)

Appeared in the October 9, 2018, print edition as 'Google Hid Data Breach for Months.'

# EXHIBIT 18

# Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed

📻📻📻 npr.org/2018/12/11/675529798/with-52-5-million-users-data-exposed-on-google-google-quickens-shutdown

Bill Chappell

**Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed**

## Technology



Enlarge this image
Google+ will shut down in April instead of August, after a new data vulnerability was found in its software. **Google+ /Screenshot by NPR hide caption**

**toggle caption**
Google+ /Screenshot by NPR



Google+ will shut down in April instead of August, after a new data vulnerability was found in its software.

Google+ /Screenshot by NPR
The Google+ social network inadvertently gave app developers access to information on some 52.5 million users — even data that users designated as private — because of a "bug" in its software, Google says. The company had already announced it was pulling the plug on the social network because of an earlier incident, and now says the shutdown will happen four months sooner.

Users' name, birth date, email address, work history and other information were exposed for nearly a week in November, Google says in a blog post about the privacy flaw.

Google announced in October that it was closing the consumer version of Google+ because of a vulnerability that left nearly 500,000 accounts exposed reportedly from 2015 to March 2018, as well as the fact that it had failed to catch on.

There was no evidence that data was misused in either incident, Google says.

"No third party compromised our systems, and we have no evidence that the app developers that inadvertently had this access for six days were aware of it or misused it in any way," Google says about the November problem.

The company adds that the November vulnerability did not expose passwords, financial information, ID numbers and other data often used for identity theft.

The flaw was in a software update to a Google+ API — or application programming interface — a widely used method for integrating users' data and profile information into apps and devices. The company says it found the problem during a routine review and fixed it. That update took place in November.

Google+ was set to be shut down in August 2019, but Google has moved up its "sunset date" to April 2019. In addition, all of the social network's APIs will be shut down "within the next 90 days," Google says.

As part of that plan, Google says it wants to give users time to move to a different platform and promises to give users "ways they can safely and securely download and migrate their data."

To some, the most surprising thing about the Google+ shutdown was the fact that the network was still up and running, after being introduced in 2011. Although the consumer version of the social network is going away, Google will continue to offer it to businesses. Both consumers and "enterprise customers" were affected by the recent privacy flaw, Google says.

For anyone who wants to leave the service early, the company has also posted a guide titled, "Delete your Google+ profile."

# EXHIBIT 19

# New magical blue circle on your map

G googlemobile.blogspot.com/2007/11/new-magical-blue-circle-on-your-map.html

Posted by Mike Chu, software engineer, Google mobile team

We've all been there: You're out and about, and you need to figure out where you are, what's around you, and how to get there. Google Maps for mobile can help you do all that, but first you have to enter in a starting point using the keypad. And let's face it -- entering things into your phone using the keypad is so 2006. While some people are lucky enough to have GPS-enabled mobile phones that provide location information for Google Maps for mobile, the vast majority of us are not. So what to do?

Starting today, we have an answer: Google Maps for mobile with My Location . My Location is a new beta technology from Google that uses cell tower identification to provide you with approximate location information, so it will work on phones without GPS. Simply fire up Google Maps for mobile, press [0], and the map will indicate your approximate location by centering on a blue circle like this:



If you do have a GPS-enabled device, My Location can actually complement it. My Location kicks in faster than GPS in most cases, so you can access your location even faster on the map. It also works reliably indoors (unlike GPS) and doesn't drain your phone battery at the rate that GPS does.

Of course, this feature is in beta, which in this case means a few different things: First, although accuracy and coverage may vary, both will improve over time as more and more people use Google Maps for mobile. Second, My Location isn't currently supported on all devices (see our Help Center for more on this); we're working on that. Third, we'd love to get your feedback on it -- feel free to leave your comments below.

To give Google Maps for mobile with My Location a try, text "MYLOCATION" to 33669, or head to on your mobile browser.

If you'd like to learn more about the My Location technology, take a look at this short video:

# EXHIBIT 20

# Locate your friends in real time with Google Latitude

G **googlemobile.blogspot.com**/2009/02/locate-your-friends-in-real-time-with.html

Way back in November 2007, we location-enabled all of our Google Maps for mobile clients to bring location awareness to the masses and improve the local search experience. Using My Location, millions of you have been able to easily find yourselves on a map at the touch of a button. But what about finding other people? Lots of you have been requesting to see where your friends are on a map, too. Well now you can with .



Latitude is a new feature of Google Maps for mobile, as well as an iGoogle gadget, that allows you to share your location with your friends and to see their approximate locations, if they choose to share them with you. You can use your Google account to sign in and easily invite friends to Latitude from your existing list of contacts or by entering their email addresses. Google Talk is integrated with Latitude, so you and your friends can update your status messages and profile photos on the go and see what everyone is up to. You can also call, SMS, IM, or email each other within the app. Check out the video below to see Latitude in action.

We've gone to great lengths to put this on as many smartphone devices as possible from day one so that most of the people you know will be able to use Latitude right away. There are two primary ways to use Latitude right now:

1. On your mobile phone: visit from your phone's mobile browser to download Google Maps for mobile with Latitude. We currently support most of the popular smartphone platforms: Android, Blackberry, Symbian S60, and Windows Mobile, and we are hoping to see Latitude on the iPhone soon. It will be available through Google Mobile App, and you'll just need to download or update the app from the App store to find Latitude in the Apps tab.

2. On your computer: go to http://google.com/latitude from your browser and add the Latitude gadget to your iGoogle homepage. What's neat is that if you've installed Google Gears or if you're using Google Chrome, you can choose to automatically share your location from your laptop or desktop computer -- no smartphone required!

Latitude gives you control over how much or little location information you want to share, and with whom. And of course Latitude is 100% opt-in. Learn more about using Latitude and its privacy features in our Help Center or check out our privacy video.

Oh, and I almost forgot to mention - it is available in 27 countries and 42 languages. See in which part of the world your friends are now!

Posted by Charles Mendis, Software Engineer, Google mobile team

# EXHIBIT 21



## Official Blog

Insights from Googlers into our products, technology, and the Google culture

# See where your friends are with Google Latitude

February 4, 2009

How often do you find yourself wondering where your friends are and what they're up to? It's a pretty central question to our daily social lives, and it's precisely the question you can now answer using Google Latitude.

Latitude is a new feature for Google Maps on your mobile device. It's also an iGoogle gadget on your computer. Once you've opted in to Latitude, you can see the approximate location of your friends and loved ones who have decided to share their location with you. So now you can do things like see if your spouse is stuck in traffic on the way home from work, notice that a buddy is in town for the weekend, or take comfort in knowing that a loved one's flight landed safely, despite bad weather.

And with Latitude, not only can you see your friends' locations on a map, but you can also be in touch directly via SMS, Google Talk, Gmail, or by updating your status message; you can even upload a new profile photo on the fly. It's a fun way to feel close to the people you care about.

Fun aside, we recognize the sensitivity of location data, so we've built fine-grained privacy controls right into the application. Everything about Latitude is opt-in. You not

only control exactly who gets to see your location, but you also decide the location that they see. For instance, let's say you are in Rome. Instead of having your approximate location detected and shared automatically, you can manually set your location for elsewhere — perhaps a visit to Niagara Falls . Since you may not want to share the same information with everyone, Latitude lets you change the settings on a friend-by-friend basis. So for each person, you can choose to share your best available location or your city-level location, or you can hide. Everything is under your control and, of course, you can sign out of Latitude at any time. Check out this video to learn more about the privacy features.

Finally, since we'd like you to be able to use Latitude with *any* of your friends, we've been working hard to make it available to as many people as possible. Today, Latitude is available in 27 countries, and we hope to add more soon.

Ready to share your location? If you have a mobile smartphone, visit google.com/latitude on your phone's web browser to download the latest version of Google Maps for mobile with Latitude. Latitude is available on Blackberry, S60, and Windows Mobile, and will be available on Android in the next few days. We expect it will be coming to the iPhone, through Google Mobile App, very soon.

No smartphone? No worries. Visit google.com/latitude on your desktop or laptop to install the Latitude iGoogle gadget and share your location right from your computer. If you have Google Gears installed in your browser (you do by default if you use Google Chrome), you can automatically share your location; otherwise, manually set your location to let your friends know where you are.

Visit the Google Mobile blog for more details, and check out the video below to see Latitude in action.



Posted by Vic Gundotra, VP Engineering, Google mobile team

  

Labels: mobile , privacy

## Links to this post

Create a Link

# EXHIBIT 22

# Google Latitude, now with Location History & Alerts

G googlemobile.blogspot.com/2009/11/google-latitude-now-with-location.html

Since the launch of Google Latitude earlier this year, we've been getting a lot of feature requests. One of the most popular ideas was for Latitude to keep track of location history, allowing you (but not your friends) to see where you've been at any point in time. Another popular idea was to notify you when you're near your Latitude friends so you can easily meet up or grab lunch. Today, we're happy to introduce both Google Location History and Google Location Alerts (beta) to let you do even more with Latitude.

Whether you're taking a road trip across the country, backpacking across Europe, or just going out for a night on the town, it's fascinating to look back at where you went, and for how long you stayed. Enable to store, view, and manage your past Latitude locations. You can visualize your history on Google Maps and Earth or play back a recent trip in order. Of course, you can always delete selected history or your entire location history at any time. While working on Location History, I found myself going back in time to discover things that would have otherwise been impossible. For example, I stopped at an awesome BBQ place on my way back from Lake Tahoe this summer, but I couldn't remember the name when my friend was asking about it a few months later. I pulled up my location history for that weekend, found where I was stationary on the drive home, and the restaurant name showed up in Google Maps: Drooling Dog Bar BQ. Check it out below:



People also want to know when their friends were nearby, but it's not always convenient to keep checking Latitude to see if a friend has recently shown up near you. After working on this for a while, we realized it wasn't as straightforward as sending a notification every time Latitude friends were near each other. Imagine that you're Latitude friends with your roommate or co-workers. It would get pretty annoying to get a text message every single time you walked in the door at home or pulled into work. To avoid this, we decided to make Location Alerts smarter by requiring that you also enable Location History. Using your past location history, Location Alerts can recognize your regular, routine locations and not create alerts when you're at places like home or work. Alerts will only be sent to you and any nearby friends when you're either at an unusual place or at a routine place at an unusual time. Keep in mind that it may take up to a week to learn your "unusual" locations and start sending alerts.

To enable these features, go to . You must first be an existing Google Latitude user; if you're not

already, sign up here. You must explicitly enable each feature, and of course, you can disable it at any time. Learn more in the Help Center about Location Alerts and Location History, suggest and vote on ideas in the Mobile Product Ideas page, or report problems in the Mobile Help Forum.Posted by Chris Lambert, Software Engineer, Google Mobile



# EXHIBIT 23

**Step 1**



**Step 2**



Step 3



# Step 4



## Step 5



Turn on additional Web & App Activity?

████████████@gmail.com

Additional Web & App Activity saves your activity from sites, apps, and devices that use Google services, including:

- activity from sites and apps that partner with Google to show ads
- Chrome history (if Chrome Sync is turned on)
- app activity, including data that apps share with Google
- Android usage & diagnostics, like battery level, how often you use your device and apps, and system errors

If you use your device without an internet connection, your data may be saved to your account once you return online.

Not all Google services save this data to your account.

This data helps Google give you more personalized experiences across Google services, like helpful app and content recommendations, and useful ads, both on and off Google.

This data may be saved and used in any Google service where you are signed in to give you more personalized experiences. You can see your data, delete it and change your settings at account.google.com.

# EXHIBIT 24

# How to Stop Google From Tracking Your Location

wired.com/story/google-location-tracking-turn-off/



*Leong Thian Fu/Getty Images*

If, like most people, you thought Google stopped tracking your location once you turned off Location History in your account settings, you were wrong. According to an AP investigation published Monday, even if you disable Location History, the search giant still tracks you every time you open Google Maps, get certain automatic weather updates, or search for things in your browser. There's a way to stop it—but it takes some digging.

The problem affects anyone with an Android phone and iPhone users running Google Maps on their devices, according to the AP report, which researchers at Princeton University verified. That's more than two billion people.

The Google support page for managing and deleting your Location History says that once you turn it off, "the places you go are no longer stored. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account." The AP's

investigation found that's not true. In fact, turning off your Location History only stops Google from creating a timeline of your location that you can view. Some apps will still track you and store time-stamped location data from your devices.

More specifically, the AP was able to track Princeton researcher Gunes Acar's home address, as well as his daily activities, using just Google Web & App activity, which he had shared with the news agency.

"If Google is representing to its users that they can turn off or pause location tracking but it's nevertheless tracking their location, that seems like textbook deception to me," says Alan Butler, senior council at the Electronic Privacy Information Center.

To *actually* turn off location tracking, Google says you have to navigate to a setting buried deep in your Google Account called Web & App Activity, which is set by default to share your information, including not just location but IP address and more. Finding that setting isn't easy. At all.

Sign in to your Google account on a browser on iOS or your desktop, or through the Android settings menu. In the browser, access your account settings by finding **Google Account** in the dropdown in the upper right-hand corner, then head to **Personal Info & Privacy**, choose **Go to My Activity**, then in the left-hand nav click **Activity Controls**. Once there you'll see the setting called **Web & App Activity**, which you can toggle off.

On your Android phone, go from **Google settings** to **Google Account**, then tap on **Data & personalization**. You'll find **Web & App Activity** there.

Google further buries the notion that **Web & App Activity** has anything to do with location. In fact, the setting sits right above the **Location History** option, suggesting at a glance that the two things are quite distinct. And Google's vanilla description of **Web & App Activity** is that it "Saves your activity on Google sites and apps to give you faster searches, better recommendations, and more personalized experiences in Maps, Search, and other Google services." From there, you have to tap **Learn more**, then scroll to **What's saved as Web & App Activity**, and tap *again* on **Info about your searches & more** before Google says anything about location whatsoever.

To stop that tracking, toggle the blue **Web & App Activity** slider to off. Google will then give you a popup warning: "Pausing Web & App Activity may limit or disable more personalized experiences across Google services. For example, you may stop seeing more relevant search results or recommendations about places you care about. Even when this setting is paused, Google may temporarily use information from recent searches in order to improve the quality of the active search session."

> 'This really reads like a classic case of an unfairly deceptive business practice. I really think that the FTC needs to investigate right away.'

Alan Butler, EPIC

Google told the AP that it provides "clear descriptions of these tools," but it takes eight taps on an Android phone—if you know exactly where you're going—to even access that description to begin with. As the AP notes, most people who explicitly turned off their Location History tracking, as WIRED and many other privacy conscious publications have advised people to do, would have assumed they had already taken all steps necessary to keep their location private.

As well they should. Google itself offers at least three support pages on location:  **Manage or delete your Location History**, **Turn location on or off for your Android device**, and **Manage location settings for Android apps**. None of these makes any mention of Web & App Activity.

In spite of this, a Google spokesperson told WIRED that "we make sure Location History users know that when they disable the product, we continue to use location to improve the Google experience when they do things like perform a Google search or use Google for driving directions." This apparently refers to a warning that appears if you turn off Location History, which says that it "does not affect other location services on your device." However, nowhere in that popup does it indicate that you can turn off other forms of location tracking by pausing Web & App Activity.

"Tracking people without their consent and without proper controls in place is creepy and wrong," wrote UC Berkeley graduate researcher K. Shankari in a blog post that first alerted the AP to the problem.

Beyond creepiness, though, Google's location-tracking may also violate the Federal Trade Commission's consumer protection statutes against deceptive privacy practices. "This really reads like a classic case of an unfairly deceptive business practice. I really think that the FTC needs to investigate right away," says Butler.

Google's Location History situation is reminiscent of Facebook's various runnings with the FTC. In 2011, the agency famously settled with Facebook over the social media giant's inability to keep privacy promises to consumers. As part of that deal, Facebook agreed to a consent decree in which it promised to reform how it tracked and shared user data. That decree has been in the news lately, after the FTC opened a new investigation this spring into whether Facebook's data sharing with Cambridge Analytica violated its 2011 settlement. The FTC has more recently penalized Uber, Vizio, the phone maker Blu, and many others for misleading customers about how their data was collected, stored, and shared.

Former FTC chief technologist Ashkan Soltani noted in  a tweet that Google's "confusing privacy dialogue" may merit a closer look from the agency.

"Google's reaction—that users can delete individual data points, or users can go deep down in settings and turn off certain web settings that appear to have nothing to do with location, therefore it should be okay, I think fundamentally misunderstands what they're dealing with," says Butler. "When you're creating a historical log of someone's movements over time, that's information that's uniquely sensitive and needs to be handled accordingly."

The revelations are likely to touch off a firestorm for Google. For now, the best thing you can do is navigate through your labyrinthine settings, and hit "pause" on something you likely thought you'd already stopped.

*Correction on 8/15/2018: An earlier version of this article misspelled K. Shankari's name.*

---

## More Great WIRED Stories

# EXHIBIT 25

# Google found to track the location of users who have opted out

nbcnews.com/tech/tech-news/google-tracks-your-movements-it-or-not-n900106

## Tech & Media

Even with Location History paused, some Google apps automatically store time-stamped location data without asking.



A mobile phone displays a user's travels in New York, on Aug. 8, 2018. Google records your movements even when you explicitly tell it not to. An Associated Press investigation shows that using Google services on Android devices and iPhones allows the search giant to record your whereabouts as you go about your day.Seth Wenig / AP

Aug. 13, 2018 / 1:44 PM GMT  / Source: Associated Press

Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to.

An Associated Press investigation found that many Google services on Android devices and iPhones store your location data even if you've used privacy settings that say they will prevent it from doing so.

Computer-science researchers at Princeton confirmed these findings at the AP's request.

For the most part, Google is upfront about asking permission to use your location information. An app like Google Maps will remind you to allow access to location if you use it for navigating. If you agree to let it record your location over time, Google Maps will display that history for you in a "timeline" that maps out your daily movements.

Storing your minute-by-minute travels carries privacy risks and has been used by police to determine the location of suspects — such as a warrant that police in Raleigh, North Carolina, served on Google last year to find devices near a murder scene. So the company will let you "pause" a setting called Location History.

Google says that will prevent the company from remembering where you've been. Google's support page on the subject states: "You can turn off Location History at any time. With Location History off, the places you go are no longer stored."

That isn't true. Even with Location History paused, some Google apps automatically store time-stamped location data without asking.

For example, Google stores a snapshot of where you are when you merely open its Maps app. Automatic daily weather updates on Android phones pinpoint roughly where you are. And some searches that have nothing to do with location, like "chocolate chip cookies," or "kids science kits," pinpoint your precise latitude and longitude — accurate to the square foot — and save it to your Google account.

The privacy issue affects some two billion users of devices that run Google's Android operating software and hundreds of millions of worldwide iPhone users who rely on Google for maps or search.

Storing location data in violation of a user's preferences is wrong, said Jonathan Mayer, a Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau. A researcher from Mayer's lab confirmed the AP's findings on multiple Android devices; the AP conducted its own tests on several iPhones that found the same behavior.

"If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off," Mayer said. "That seems like a pretty straightforward position to have."

Google says it is being perfectly clear.

"There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."

To stop Google from saving these location markers, the company says, users can turn off another setting, one that does not specifically reference location information. Called "Web and App Activity" and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.

When paused, it will prevent activity on any device from being saved to your account. But leaving "Web & App Activity" on and turning "Location History" off only prevents Google from adding your movements to the "timeline," its visualization of your daily travels. It does not stop Google's collection of other location markers.

You can delete these location markers by hand, but it's a painstaking process since you have to select them individually, unless you want to delete all of your stored activity.

You can see the stored location markers on a page in your Google account at myactivity.google.com, although they're typically scattered under several different headers, many of which are unrelated to location.

To demonstrate how powerful these other markers can be, the AP created a visual map of the movements of Princeton postdoctoral researcher Gunes Acar, who carried an Android phone with Location history off, and shared a record of his Google account.

The map includes Acar's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, The AP didn't plot the most telling and frequent marker — his home address.

Huge tech companies are under increasing scrutiny over their data practices, following a series of privacy scandals at Facebook and new data-privacy rules recently adopted by the European Union. Last year, the business news site Quartz found that Google was tracking Android users by collecting the addresses of nearby cellphone towers even if all location services were off. Google changed the practice and insisted it never recorded the data anyway.

Critics say Google's insistence on tracking its users' locations stems from its drive to boost advertising revenue.

"They build advertising information out of data," said Peter Lenz, the senior geospatial analyst at Dstillery, a rival advertising technology company. "More data for them presumably means more profit."

The AP learned of the issue from K. Shankari, a graduate researcher at UC Berkeley who studies the commuting patterns of volunteers in order to help urban planners. She noticed that her Android phone prompted her to rate a shopping trip to Kohl's, even though she had turned Location History off.

"So how did Google Maps know where I was?" she asked in a blog post .

The AP wasn't able to recreate Shankari's experience exactly. But its attempts to do so revealed Google's tracking. The findings disturbed her.

"I am not opposed to background location tracking in principle," she said. "It just really bothers me that it is not explicitly stated."

Google offers a more accurate description of how Location History actually works in a place you'd only see if you turn it off — a popup that appears when you "pause" Location History on your Google account webpage . There the company notes that "some location data may be saved as part of your activity on other Google services, like Search and Maps."

Google offers additional information in a popup that appears if you re-activate the "Web & App Activity" setting — an uncommon action for many users, since this setting is on by default. That popup states that, when active, the setting "saves the things you do on Google sites, apps, and services ... and associated information, like location."

Warnings when you're about to turn Location History off via Android and iPhone device settings are more difficult to interpret. On Android, the popup explains that "places you go with your devices will stop being added to your Location History map." On the iPhone, it simply reads, "None of your Google apps will be able to store location data in Location History."

The iPhone text is technically true if potentially misleading. With Location History off, Google Maps and other apps store your whereabouts in a section of your account called "My Activity," not "Location History."

Since 2014, Google has let advertisers track the effectiveness of online ads at driving foot traffic , a feature that Google has said relies on user location histories.

The company is pushing further into such location-aware tracking to drive ad revenue, which rose 20 percent last year to $95.4 billion. At a Google Marketing Live summit in July, Google executives unveiled a new tool called "local campaigns" that dynamically uses ads to boost in-person store visits. It says it can measure how well a campaign drove foot traffic with data pulled from Google users' location histories.

Google also says location records stored in My Activity are used to target ads. Ad buyers can target ads to specific locations — say, a mile radius around a particular landmark — and typically have to pay more to reach this narrower audience.

While disabling "Web & App Activity" will stop Google from storing location markers, it also prevents Google from storing information generated by searches and other activity. That can limit the effectiveness of the Google Assistant, the company's digital concierge.

Sean O'Brien, a Yale Privacy Lab researcher with whom the AP shared its findings, said it is "disingenuous" for Google to continuously record these locations even when users disable Location History. "To me, it's something people should know," he said.

# EXHIBIT 26

# Manage your Location History

Location History is a Google Account–level setting that saves where you go with every mobile device where:

- You're signed in to your Google Account,
- You have turned on Location History, and
- The device has Location Reporting turned on.

When you turn on Location History, you may see a number of benefits across Google products and services, including personalized maps, recommendations based on places you've visited, help finding your phone, real-time traffic updates about your commute, and more useful ads.

- Location History is turned off by default for your Google Account and can only be turned on if you opt in.
- You can pause Location History at any time in your Google Account's Activity controls    .
- You control what's saved in your Location History. You can view the places where you've been in Google Maps Timeline, and you can edit or delete information through Timeline as well.

If you have other settings like Web & App Activity turned on and you pause Location History or delete location data from Location History, you may still have location data saved in your Google Account as part of your use of other Google sites, apps, and services. For example, location data may be saved as part of activity on Search and Maps when your Web & App Activity setting is on, and included in your photos depending on your camera app settings.

**Note:** Some of these steps work only on Android 8.0 and up. Learn how to check your Android version

## Turn Location History on or off

You can turn off Location History for your account at any time. If you use a work or school account, your administrator needs to make this setting available for you. If they do so, you will be able to use Location History as any other user.

1. On your Android phone or tablet, open your device's Settings app ⚙️ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History** > **Manage setting**.
4. Change whether your account or your devices can report Location History to Google:
   - **Your account & all your devices:** At the top, turn **Use Location History** on or off.
   - **Only a certain device:** Under "This device" or "Other devices on this account," turn the device on or off.

If you're on a browser, go to the Activity controls      section of your Google Account. You might need to sign in. At the top, turn Location History on or off.

## When Location History is on

- Google only receives Location History for each device where you are signed in and you have Location Reporting turned on.
- You can change the Location Reporting setting for each device where you're signed in, and limit which devices provide location data to be included in Location History. If you want to change your Location History settings, you can choose to:
  - Report your location from only some of your devices, but not others.
  - Report your location from all your devices.
  - Turn off Location History for your Google Account. Your location won't be reported from any of your devices and you will not have new Location History recorded to your account.
- Your settings for other location services on your device, like Google Location Services and Find My Device, are not changed.

## When Location History is off

- New location information is no longer saved to your Location History.
- Previous activity is not deleted from your Location History. You can manually delete your Location History.
- Your settings for other location services on your device, like Google Location Services and Find My Device, are not changed.
- Some location data may continue to be saved in other settings, like Web & App Activity, as part of your use of other services, like Search and Maps, even after you turn off Location History.

## Delete Location History

Google Maps Timeline      provides you with an interface to manage and delete your Location History information. You can choose to delete all your history, or only parts of it. When you delete Location History information from Timeline, you won't be able to see it again.

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. At the bottom, tap **Manage Timeline**. Your device will open Google Maps 🗺.
5. Tap More ⋮ > **Settings**.
6. At the bottom, choose **Delete all Location History** or **Delete Location History range**.

If you're on a browser, go to maps.google.com/timeline      . You might need to sign in. You can delete individual locations, locations by date, or your whole location history in Timeline.

Note: Timeline is not currently available in South Korea. You can turn on or pause Location History from within your Activity Controls      and can delete your Location History data      .

## What happens after deleting Location History

- If you delete your entire Location History, some Google apps may not work the same as they did before.
- Even after you delete your Location History information, some location data may continue to be saved in other settings, like Web & App Activity, as part of your use of other services, like Search and Maps.

# Usage & diagnostics for Location History

When you turn on Location History, your device may send diagnostic information to Google about what's working and not working for Location History. If you turn Location History off, you can decide whether to share usage and diagnostics information.

All usage and diagnostics information is used in accordance with Google's privacy policy         .

---

What information your device could share

---

How shared information helps Google improve

---

## Learn more about other location settings

- Choose which apps can use your location: Learn how to manage app location settings.
- Learn how to turn your device's location on or off.
- Find your location on a map: Learn how to find & improve your location's accuracy in Google Maps.
- Manage your history of the places you've been and the routes you've traveled: Learn how to edit your timeline on Google Maps.

---

**Was this article helpful?**

Yes     No

# EXHIBIT 27

# Activity controls

🏛 **web.archive.org**/web/20181103224740/https://myaccount.google.com/intro/activitycontrols

The data saved to your account helps give you more personalized experiences across all Google services. Choose which settings you want to save data to your Google Account.

## Web & App Activity

Saves your activity on Google sites and apps to give you faster searches, better recommendations, and more personalized experiences in Maps, Search, and other Google services. <u>Learn more</u>

<u>Sign in</u>



## Location History

Saves where you go with your devices to give you personalized maps, recommendations based on places you've visited, and more. <u>Learn more</u>

<u>Sign in</u>



## Device Information

Stores info about your contacts, calendars, apps, and other device data to improve your experience across Google services. <u>Learn more</u>

<u>Sign in</u>



## Voice & Audio Activity

Records your voice and audio on Google services to improve speech recognition, like when you say "Ok Google" to do a voice search. <u>Learn more</u>

<u>Sign in</u>



## YouTube Search History

Saves your searches on YouTube to make your future searches faster and improve your recommendations. <u>Learn more</u>

<u>Sign in</u>

## YouTube Watch History

Makes it easier to find YouTube videos you've watched and improve your recommendations in YouTube and other Google services. Learn more

Sign in





# EXHIBIT 28



https://myaccount.google.com/intro/activitycontrols

Activity controls

122 captures
5 Sep 2016 - 15 Nov 2018

APR **MAY** JUL
◀ **18** ▶
2017 **2018** 2019

▼ About this capture

# Google

Sign in

← Activity controls ?

From better commute options in Maps to quicker results in Search, the data we save with your account can make Google services a lot more useful to you. Here are your controls for managing this data and editing your activity.



## Web & App Activity

Save your search activity on apps and in browsers to make searches faster and get customized experiences in Search, Maps, Now, and other Google products. Learn more

SIGN IN



## Location History

Creates a private map of where you go with your signed-in devices in order to provide improved map searches, commute routes, and more. Learn more

SIGN IN

https://myaccount.google.com/intro/activitycontrols          Go     APR  MAY  JUL

122 captures                                                      ◀  18  ▶
5 Sep 2016 - 15 Nov 2018                                        2017 2018 2019        ▼ About this capture



## Device Information

Store your contacts, calendars, apps, and other device data to improve your experience across Google.
Learn more

SIGN IN



## Voice & Audio Activity

Help recognize your voice and improve speech recognition by storing your voice and audio inputs to your account (for example, when you say "Ok Google" to do a voice search). Learn more

SIGN IN



## YouTube Search History

Store your YouTube searches to make your future searches faster and improve your recommendations.
Learn more

SIGN IN

https://myaccount.google.com/intro/activitycontrols          Go          APR  **MAY**  JUL

**122 captures**                                                          ◀  **18**  ▶
5 Sep 2016 - 15 Nov 2018                                              2017  **2018**  2019



## YouTube Watch History

Make it easier to find your recently watched videos on YouTube and improve your recommendations.
Learn more

**SIGN IN**

Google     Terms & Privacy     Help



https://myaccount.google.com/intro/activitycontrols     Go

122 captures
5 Sep 2016 - 15 Nov 2018

SEP  **OCT**  NOV
◀ **08** ▶
2015  **2016**  **2017**

About this capture

Sign in

 **Activity controls** 

From better commute options in Maps to quicker results in Search, the data we save with your account can make Google services a lot more useful to you. Here are your controls for managing this data and editing your activity.



## Web & App Activity

Save your search activity on apps and in browsers to make searches faster and get customized experiences in Search, Maps, Now, and other Google products. Learn more

SIGN IN



## Location History

Creates a private map of where you go with your signed-in devices in order to provide improved map searches, commute routes, and more. Learn more

SIGN IN



https://myaccount.google.com/intro/activitycontrols    Go    SEP  OCT  NOV

122 captures

5 Sep 2016 - 15 Nov 2018

◀ 08 ▶

2015  2016  2017

▼ About this capture

## Device Information

Store your contacts, calendars, apps, and other device data to improve your experience across Google.
Learn more

SIGN IN



## Voice & Audio Activity

Help recognize your voice and improve speech recognition by storing your voice and audio inputs to your account (for example, when you say "Ok Google" to do a voice search). Learn more

SIGN IN



## YouTube Search History

Store your YouTube searches to make your future searches faster and improve your recommendations.
Learn more

SIGN IN

https://myaccount.google.com/intro/activitycontrols    Go

SEP    OCT    NOV
◄    08    ►
2015    2016    2017

122 captures
5 Sep 2016 - 15 Nov 2018

▼ About this capture



## YouTube Watch History

Make it easier to find your recently watched videos on YouTube and improve your recommendations.
Learn more

SIGN IN

Google     Terms & Privacy     Help

# EXHIBIT 29

# See & control your search activity

If Web & App Activity is turned on, your searches and activity from other Google services are saved to your Google Account, so you may get better search results and suggestions.

You control what's saved. And you can delete your past searches and activity or turn off Web & App Activity at any time.

**Note**: If you got your Google Account through work or school, you could need to contact your administrator to turn on the Web & App Activity service for your organization.

**Computer**    Android    iPhone & iPad

## Turn Web & App Activity on or off

1. On your computer, visit the Activity controls ⬏ page. You may be asked to sign in to your Google Account.
2. Turn **Web & App Activity** on or off.
3. If you turn the switch on, you can check the box next to "Include Chrome browsing history and activity from websites and apps that use Google services."

**Note**: Some browsers and devices may have more settings that affect how this activity is saved.

## See or delete your search activity

You can find and delete your searches and browsing activity by visiting My Activity ⬏. Learn more about how to view and control activity or how to delete activity.



## How your saved activity is used

Learn more about how Google uses your saved activity ⬏ and helps keep it private.

For more information about how Google treats search queries generally, see the Privacy Policy FAQ ⬏.

## How Web & App Activity works when you're signed out

Your search and ad results may be customized using search-related activity even if you're signed out. To turn off this kind of search customization, you can search and browse privately. Learn how.

## Browser history

In the Activity controls ⬏ page, you can also check the box to "Include Chrome browsing history and activity from websites and apps that use Google services." When this box is checked, you can control whether activity from your device is saved.

Your searches and the sites you visit may also be stored in your browser or the Google Toolbar. Learn how to delete your history on Chrome, Toolbar, Safari ⬏, Internet Explorer ⬏, or Firefox ⬏.

**Was this article helpful?**    Yes    No

*After clicking through collapsed links under "What's saved as Web & App Activity":*

## What's saved as Web & App Activity

### Info about your searches & more                                        ⌃

When Web & App Activity is on, Google saves information like:

- Searches and other things you do on Google products and services, like Maps
- Your location, language, IP address, referrer, and whether you use a browser or an app
- Ads you click, or things you buy on an advertiser's site
- Information on your device like recent apps or contact names you searched for

**Note**: Activity could be saved even when you're offline.

### Info about your browsing & more                                        ⌃

Google can save information like:

- Websites and apps you use
- Your activity on websites and in apps that use Google services
- Your Chrome browsing history

To let Google save this information:

- Web & App Activity must be on.
- The box next to "Include Chrome browsing history and activity from websites and apps that use Google services" must be checked.

Your Chrome history is saved only if you're signed in to your Google Account and have Chrome Sync turned on. Learn about Chrome Sync.

**Note**: If you use a shared device or sign in with more than one account, activity might be saved to the default account on the browser or device you use.

Archived Web Capture (https://archive.org/web/) dated November 19, 2018 of URL https://support.google.com/websearch/answer/54068; *See & control your search activity*, available at https://web.archive.org/web/20181119040025/https://support.google.com/websearch/answer/54068 (emphasis added).

# EXHIBIT 30

# Manage or delete your Location History

web.archive.org/web/20180818024224/https://support.google.com/accounts/answer/3118687

Your Location History helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or traffic predictions for your daily commute.

You control what's saved in your Location History, and you can delete your history at any time.

**Note:** Some of these steps work only on Android 8.0 and up. Learn how to check your Android version.
Learn what applies in Android 4.1 through 4.3 or for iPhone and iPad.

# Turn Location History on or off

You can turn off Location History at the account level at any time.

This setting does not affect other location services on your device, like Google Location Services and Find My Device. Some location data may be saved as part of your activity on other services, like Search and Maps. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.

You can also turn off Location services for a device. Learn how.

## Turn Location History on/off using device settings (Android 2.3 & up)

1. On your Android phone or tablet, open your device's Settings app ⚙ ❯ **Google** ❯ **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

## Turn Location History on/off using a website

1. Go to the Activity controls section of your Google Account. You might need to sign in.
2. Turn **Location History** on or off.
3. Confirm the change. This setting will change for your Google Account and all devices associated with it.

If you use a work or school account, your administrator might turn this setting on or off for you.

# Delete Location History

You can delete all of your Location History or only parts of it. If you delete your entire history, some apps may not work correctly.

## Delete Location History using device settings (Android 2.3 & up)

**IMPORTANT**: Deleting your Location History in the Settings app is permanent. You can't reverse or undo it. Deleting your Location History may cause problems in some apps.

## Delete Location History using a website

You can delete individual locations, locations by date, or your whole location history on the Location History website.

1. Go to maps.google.com/locationhistory. You might need to sign in.
2. Pick how to delete your Location History:

**Note**: The Location History website isn't available in South Korea.

# Usage & diagnostics for Location History

When you turn on Location History, you also let your device send diagnostic information to Google about what's working and not working for Location History.

All usage and diagnostics information is used in accordance with Google's privacy policy.

## What information your device could share

Your device may send information to Google for improving Location History. For example, your device may send information when Location services aren't working properly.

Sent information could include:

- Quality and length of your connections to mobile networks, GPS, Wi-Fi networks, or Bluetooth
- State of your location settings
- Restarts and crash reports
- Apps used for turning Location History on or off
- Battery levels

## How shared information helps Google improve

Usage and diagnostics information can help improve Google apps, products, and Android devices. For example, Google can use information to improve:

- **Battery life**:
  Google can use information about what's using the most battery on your device to help

reduce battery consumption for commonly used features.

- **Location accuracy**:
  Google can use information from location sensors and settings to help improve location estimates for apps and services.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 31

# Turn location on or off for your Android device

web.archive.org/web/20180816040916/https://support.google.com/accounts/answer/3467281

When location is on, you can get information based on where your device has been. For example, you can get automatic commute predictions or better search results.

When an app is using your device's precise location, the top of your screen will show Location
⌖ .

**Note:** Some of these steps work only on Android 9.0 and up.  Learn how to check your Android version.

## Turn location on or off

When you have location turned on, your device uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location.

If you turn off location, it will also be turned off for all apps. Many features also won't work.

1. Open your device's Settings app.
2. Tap **Security & location** ❯ **Location**.
       **Note**: If you don't see "Security & location," tap **Location**.
3. If you see "Mode," go to the steps for  Android 8.1 and below.
4. Turn **Use location** on or off.

**Tip**: If you change your location setting often,  learn how to quickly change settings.

## Share your location for help in an emergency

To help first responders find you quickly, dial an emergency number. For example, dial:

- 911 in the US
- 112 in Europe
- 999 in some other places

Your device will send its location automatically using Android Emergency Location Service (ELS), if ELS works in your country and on your mobile network.

### How emergency location sharing works

ELS turns on only when you call or text an emergency number.

ELS finds and sends your location by turning on location and using Google's Location services during your emergency call. If needed, ELS can turn on mobile data. When you finish the call or text, your settings go back to how you had them.

## If you're using Android 8.1 & below

<u>Pick your device's location accuracy mode</u>
You can choose your location mode based on accuracy, speed, and battery use.

1. Open your device's Settings app.
2. Tap **Security & Location** ⟩ **Location**.
   > **Note**: If you don't see "Security & Location," tap **Location**.
3. Tap **Mode**. Then pick:
   - **High accuracy**: This mode uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Battery saving**: This mode uses sources that use less battery, like Wi-Fi and mobile networks. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Device only**: This mode uses only GPS. It doesn't use Google's Location services to provide location information. It can estimate your device's location more slowly and use more battery.

## Related articles

Was this article helpful?

How can we improve it?

GZJ KDKV'54''''

# Manage location settings for Android apps

web.archive.org/web/20180729104542/https://support.google.com/accounts/answer/6179507

You can let apps use your device's location to do things for you or give you information. For example, apps can use your device's location to see commute traffic or find nearby restaurants.

**Note:** Some of these steps work only on Android 8.0 and up.  Learn how to check your Android version.

## See which apps use your location

1. Open your device's Settings app ⚙ .
2. Tap **Security & Location**  ›  **Location**.
3. Under "Recent location requests," see the apps that recently checked your location. For more information about an app, like its battery or data use, tap it.

## Turn Google's Location services on or off

To help improve location for apps, Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

You can turn Google's Location services on or off at any time.

Turn on Google's Location services
1. Open your device's Settings app ⚙ .
2. Tap **Security & Location**  ›  **Location**  ›  **Mode**.
3. Choose **High accuracy** or **Battery saving**. Both modes can use Wi-Fi,  mobile networks, and sensors to determine location.

Turn off Google's Location services
1. Open your device's Settings app ⚙ .
2. Tap **Security & Location**  ›  **Location**.
3. You can turn off Google's Location services in 2 ways:
   - Tap **Mode**  ›  **Device only**. This mode uses only GPS to determine location.
   - Turn off **Location**. Turning off location for your device also turns it off for all apps. Many features will be turned off.

## If asked to change location settings

If an app must use your location, it can ask whether you want to change your location settings.

How apps ask you to change location settings

Apps ask you to change your location settings in different ways:

- **"Change location setting?"**
  The app needs your location turned on. Location services give the app data that it needs to work properly.
- **"Improve location accuracy?"**
  Location is already on, but you can turn on more settings or sensors to better determine location.
- **Location mode**
  Using a different mode would improve accuracy. For example, the app could ask you to let your device use available Wi-Fi and mobile networks to find locations. The app will choose the setting that uses the least battery.
- **Wi-Fi connection**
  Scanning for Wi-Fi networks helps find locations. The app can ask you to turn on Wi-Fi, or to let your device scan for Wi-Fi networks.
- **Google Location services**
  Let Google's Location services help apps find locations. Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 33

# The CNIL's restricted committee imposes a financial penalty of 50 Million euros against GOOGLE LLC

cnil.fr/en/cnils-restricted-committee-imposes-financial-penalty-50-million-euros-against-google-llc

On 25 and 28 May 2018, the National Data Protection Commission (CNIL) received group complaints from the associations *None Of Your Business* ("NOYB") *and La Quadrature du Net* ("LQDN"). LQDN was mandated by 10 000 people to refer the matter to the CNIL. In the two complaints, the associations reproach GOOGLE for not having a valid legal basis to process the personal data of the users of its services, particularly for ads personalization purposes.

## The handling of the complaints by the CNIL

The CNIL immediately started investigating the complaints. On 1st June 2018, in accordance with the provisions on European cooperation as defined in the General Data Protection Regulation ("GDPR"), the CNIL sent these two complaints to its European counterparts to assess if it was competent to deal with them. Indeed, the GDPR establishes a "one-stop-shop mechanism" which provides that an organization set up in the European Union shall have only one interlocutor, which is the Data Protection Authority ("DPA") of the country where its "main establishment" is located. This authority serves as "lead authority". It must therefore coordinate the cooperation between the other Data Protection Authorities before taking any decision about a cross-border processing carried out by the company.

In this case, the discussions with the other authorities, in particular with the Irish DPA, where GOOGLE's European headquarters are situated, did not allow to consider that GOOGLE had a main establishment in the European Union. Indeed, when the CNIL initiated proceedings, the Irish establishment did not have a decision-making power on the processing operations carried out in the context of the operating system Android and the services provided by GOOGLE LLC, in relation to the creation of an account during the configuration of a mobile phone.

As the "one-stop-shop mechanism" was not applicable, the CNIL was competent to take any decision regarding processing operations carried out by GOOGLE LLC, as were the other DPA. The CNIL implemented the new European Framework as interpreted by all European authorities in the European Data Protection Board's (EDPB) guidelines.

In order to deal with the complaints received, the CNIL carried out online inspections in September 2018. The aim was to verify the compliance of the processing operations implemented by GOOGLE with the French Data Protection Act and the GDPR by analysing the browsing pattern of a user and the documents he or she can have access, when creating a GOOGLE account during the configuration of a mobile equipment using Android.

## The violations observed by the restricted committee

On the basis of the inspections carried out, the CNIL's restricted committee responsible for

examining breaches of the Data Protection Act observed two types of breaches of the GDPR.

## A violation of the obligations of transparency and information:

First, the restricted committee notices that the information provided by GOOGLE is not easily accessible for users.

Indeed, the general structure of the information chosen by the company does not enable to comply with the Regulation. Essential information, such as the data processing purposes, the data storage periods or the categories of personal data used for the ads personalization, are excessively disseminated  across several documents, with buttons and links on which it is required to click to access complementary information. The relevant information is accessible after several steps only, implying sometimes up to 5 or 6 actions. For instance, this is the case when a user wants to have a complete information on his or her data collected for the personalization purposes or for the geo-tracking service.

Moreover, the restricted committee observes that some information is not always clear nor comprehensive.

Users are not able to fully understand the extent of the processing operations carried out by GOOGLE. But the processing operations are particularly massive and intrusive because of the number of services offered (about twenty), the amount and the nature of the data processed and combined. The restricted committee observes in particular that the purposes of processing are described in a too generic and vague manner, and so are the categories of data processed for these various purposes. Similarly, the information communicated is not clear enough so that the user can understand that the legal basis of processing operations for the ads personalization is the consent, and not the legitimate interest of the company. Finally, the restricted committee notices that the information about the retention period is not provided for some data.

## A violation of the obligation to have a legal basis for ads personalization processing:

The company GOOGLE states that it obtains the user's consent to process data for ads personalization purposes. However, the restricted committee considers that **the consent is not validly obtained for two reasons**.

First, the restricted committee observes that the users' consent is not sufficiently informed.

The information on processing operations for the ads personalization is diluted in several documents and does not enable the user to be aware of their extent. For example, in the section "Ads Personalization", it is not possible to be aware of the plurality of services, websites

and applications involved in these processing operations (Google search, You tube, Google home, Google maps, Playstore, Google pictures...) and therefore of the amount of data processed and combined.

Then, the restricted committee observes that the collected consent is neither "specific" nor "unambiguous".

When an account is created, the user can admittedly modify some options associated to the account by clicking on the button « More options », accessible above the button « Create Account ». It is notably possible to configure the display of personalized ads.

That does not mean that the GDPR is respected. Indeed, the user not only has to click on the button "More options" to access the configuration, but the display of the ads personalization is moreover pre-ticked. However, as provided by the GDPR, consent is "unambiguous" only with a clear affirmative action from the user (by ticking a non-pre-ticked box for instance). Finally, before creating an account, the user is asked to tick the boxes « *I agree to Google's Terms of Service*» and « *I agree to the processing of my information as described above and further explained in the Privacy Policy*» in order to create the account. Therefore, the user gives his or her consent in full, for all the processing operations purposes carried out by GOOGLE based on this consent (ads personalization, speech recognition, etc.). However, the GDPR provides that the consent is "specific" only if it is given distinctly for each purpose.

## The fine imposed by the restricted committee and its publicity

The CNIL restricted committee publicly imposes a financial penalty of 50 Million euros against GOOGLE.

This is the first time that the CNIL applies the new sanction limits provided by the GDPR. The amount decided, and the publicity of the fine, are justified by the severity of the infringements observed regarding the essential principles of the GDPR: transparency, information and consent.

Despite the measures implemented by GOOGLE (documentation and configuration tools), the infringements observed deprive the users of essential guarantees regarding processing operations that can reveal important parts of their private life since they are based on a huge amount of data, a wide variety of services and almost unlimited possible combinations. The restricted committee recalls that the extent of these processing operations in question imposes to enable the users to control their data and therefore to sufficiently inform them and allow them to validly consent.

Moreover, the violations are continuous breaches of the Regulation as they are still observed to date. It is not a one-off, time-limited, infringement.

Finally, taking into account the important place that the operating system Android has on the French market, thousands of French people create, every day, a GOOGLE account when using their smartphone. Furthermore, the restricted committee points out that the economic model of the company is partly based on the ads personalization. Therefore, it is of its utmost responsibility to comply with the obligations on the matter.

GZJ KOKV'56''''

# Americans' Views on Mobile Etiquette

**pewinternet.org**/2015/08/26/chapter-1-always-on-connectivity/

August 26, 2015



Internet & Technology

Report

August 26, 2015

# Chapter 1: Always on Connectivity

By Lee Rainie and Kathryn Zickuhr

For most Americans, the cellphone is no longer an auxiliary or supplementary device to their landline telephone. Roughly nine-in-ten Americans own a cellphone and nearly two-thirds own a smartphone. Recent research from the U.S. government shows that almost 43% of adults live in a cellphone-only household — that is, without a landline. As mobile devices become more common and essential, Americans are creating and navigating new norms around these gadgets' use in social gatherings and public spaces.

Cellphones can be a source of instant connection — and constant distraction. Many are concerned that people's attention to mobile devices in public and in social spaces prompts them to live "Alone Together," as the title of MIT professor Sherry Turkle's book puts it. Such a life, in her view, is socially stunted and damaging to communities. On the other hand, researcher Keith Hampton, who has studied how people use mobile devices in public spaces, has found evidence that cellphones are not encroaching on group social interactions, but rather are serving to fill time during periods of waiting and other interstitial moments.

These are intriguing and important issues. Norms of etiquette are not just small-scale social niceties. They affect fundamental human interactions and the character of public spaces. That is why Pew Research Center conducted a survey on the subject.

The poll found that Americans have varied and nuanced views on the new contours of civil behavior. They are sorting through the neo-etiquette of mobile life — sometimes attesting that constant connectivity brings social payoffs and other times lamenting what screen distractions do to social gatherings; sometimes appreciating the instantaneous availability of

people and information and other times feeling aggrieved when others want to take advantage of that; sometimes declaring the importance of being present with others and other times glancing at screens while in-person conversation swirls around them.

This chapter starts to explore these cross-pressures with a look at the basics of "always-on" connectivity.

## Americans' cellphones are generally with them and rarely turned off

Fully 92% of American adults own a cellphone, including the 67% who own a smartphone. As cellphones and smartphones become more widely adopted and play a larger role in people's daily communications, their owners often treat them like body appendages. Nine-in-ten cellphone owners (90%) say they "frequently" carry their phone with them, while 6% say they "occasionally" have their phones with them. Just 3% say they only "rarely" have their cellphones with them and 1% of cellphone owners say they "never" have their phone with them.

Though the vast majority of members of all age groups carry their phones with them frequently, there are still some differences by age. For instance, cellphone owners ages 30 to 49 are more likely to have their cell phone with them frequently (95%) than any other age group; cellphone owners ages 65 and older are least likely to carry their phone with them frequently (81%).



Beyond that, the majority of cell owners almost always keep their phones on. Most cell owners say they turn their phone off either rarely (45%) or never (31%). Cell owners under age 50 are most likely to say they never turn their phone off, and cell owners ages 65 and older are most likely to say they frequently do. Still, over half of these older adults still say they rarely or never turn off their phone.

Most smartphone owners say they rarely (47%) or never (36%) turn their phones off. Just 4% of smartphone owners say they turn their phones off frequently, and 14% say they turn them off occasionally. However, "feature phone" owners (those who do not own smartphones) are more likely to turn their phones off at least some of the time: 16% say they turn them off frequently and 24% say they turn them off occasionally. Still, a majority still say they turn their cellphones off either rarely (40%) or never (20%).

## A share of smartphone users say they use their phones' apps or browsers "continuously"

Those who own smartphones are more likely than other mobile phone users to have their phone with them and powered on. Some 94% of smartphone owners carry their phone with them frequently and 82% say they never or rarely turn their phones off.

In addition, most smartphone owners take advantage of other features of their device, with 59% reporting they use apps on their phones at least several times a day and 27% saying they use them "continuously."

Web browsing is somewhat less intense in usage: most smartphone owners browse the web on their phones at least several times a day, although only 14% use their phones' browser continuously (roughly half the proportion who continuously use apps).

As with many other technology-related activities, there are substantial differences between age groups. Younger smartphone owners use apps and browse the web on their phones more often than older adults. Some 43% of smartphone owners ages 18 to 29 describe their app usage as "continuous," compared with 26% of smartphone owners in the next highest age group (ages 30 to 49). Meanwhile, among older smartphone owners, just 7% use apps on a continuous basis and about half (48%) of those 65 and older say they use apps on their phones once a day or less.



**Smartphone Owners Live Always-On Lives**

*% of mobile phone owners in each group who ...*

■ Smartphone owners ■ Other cell owners

Carry phone frequently: 94, 79
Never/rarely turn phone off: 82, 60

Source: Pew Research Center American Trends Panel survey, May 30-June 30, 2014. N=3,042 cell users

**PEW RESEARCH CENTER**

# EXHIBIT 35



**(https://www.beuc.eu)**

# Consumer groups across Europe file complaints against Google for breach of GDPR

PRESS RELEASE - 27.11.2018

Today, seven consumer organisations from across Europe have announced that they will file complaints against Google with their national data protection authorities[1]. Based on new research published today by BEUC's Norwegian member Forbrukerrådet, the consumer groups, all part of the BEUC network, are referring Google to their respective national authorities for breaching the General Data Protection Regulation (GDPR) in relation to how the company tracks its users' location.



**(https://www.youtube.com/watch?v=qIq17DeAc1M&feature=youtu.be)**Location data can reveal a lot about people, including religious beliefs (going to places of worship), political leanings (going to demonstrations), health conditions (regular hospital visits) and sexual orientation (visiting certain bars). The report shows that Google collects users' location data notably through the features 'location history' and 'web & app activity', which are integrated into all Google user accounts[2]. The company uses various tricks and practices to ensure users have these features enabled and does not give them straightforward information about what this effectively entails.

These unfair practices[2] leave consumers in the dark about the use of their personal data. Additionally they do not give consumers a real choice other than providing their location data, which is then used by the company for a wide range of purposes including targeted advertising.

These practices are not compliant with the GDPR, as Google lacks a valid legal ground for processing the data in question. In particular, the report shows that users' consent provided under these circumstances is not freely given. Also, the company cannot invoke a 'legitimate interest' to collect and process location data, due to the significant and intrusive impact that this tracking has on the rights and freedoms of the individual.[3]

Monique Goyens, Director General of The European Consumer Organisation, commented:

"Google's data hunger is notorious but the scale with which it deceives its users to track and monetise their every move is breathtaking. Google is not respecting fundamental GDPR principles, such as the obligation to use data in a lawful, fair and transparent manner.

"Thanks to the GDPR, users should be in control of their personal data. Google's deceptive practices are in breach of the spirit and the letter of this regulation. We need strong, coherent, enforcement of the rules. We can't have companies pretending to comply but de facto circumventing the law.

"It can undoubtedly be useful to share your location data, for instance to find a restaurant when travelling. But the places we go to also reveal a lot about ourselves and our private life.

"The situation is more than alarming. Smartphones are being used for spying on our every move. This is not the digital society that European consumers want to live in.

"With today's action to submit complaints with data protection authorities across Europe, we want to stop consumer exploitation and force those digital giants to finally accept their responsibility."

ENDS

## Notes:

[1] *Forbrukerrådet (Norway), Consumentenbond (The Netherlands), Ekpizo (Greece), dTest (Czech Republic), Zveza Potrošnikov Slovenije (Slovenia), Federacja Konsumentów (Poland) and Sveriges Konsumenter (Sweden) will file complaints with their data protection authorities. Forbrugerrådet Tænk (Denmark) will report these practices to the Danish data protection body. vzbv from Germany is considering an action for an injunction against Google because of these practices. The Transatlantic Consumer Dialogue will bring it to the attention of the Federal Trade Commission.*

[2] *Android, Google's operating system, powers an estimated 2 billion devices worldwide (https://www.cnet.com/news/google-boasts-2-billion-active-android-devices/) making it the most-used globally. It is used by a big majority of smartphone manufacturers, such as Samsung, Huawei and Sony. Android, however, comes with numerous strings attached, including that all users of such devices de facto need to have a Google account*

[3] *Practices used by Google to nudge users into sharing location data:*

> *Deceptive click-flow: the click-flow when setting up an Android device pushes users into enabling 'Location History' without being aware of what it entails.*
> *Hidden default settings: when setting up a Google account, the 'Web & App Activity' settings are hidden behind extra clicks and enabled by default.*
> *Misleading and unbalanced information: users are not given sufficient information when presented with choices, and are misled about what data is collected and how it is used.*
> *Repeated nudging: users are repeatedly asked to turn on 'Location History' when using different Google services even if they decided against this feature when setting up their phone.*
> *Bundling of services and lack of granular choices: if the user wants features such as Google Assistant and photos sorted by location, Google turns on invasive location tracking.*

[4] *For more information please consult our FAQ (https://www.beuc.eu/documents/files/Google_complaint_geo-location_tracking_FAQ.pdf) and research (https://www.forbrukerradet.no/undersokelse/no-undersokelsekategori/every-step-you-take).*

Nov 2018   **HTML ()**   PDF   116Kb

**EN (/publications/beuc-pr-2018-011_consumer_groups_across_europe_file_complaints_against_google_for_breach_of_gdpr.pdf)**

**FR (/publications/beuc-pr-2018-011_geolocalisation_des_organisations_de_consommateurs_europeennes_poursuivent_google.pdf)**

Privacy and personal data protection (https://www.beuc.eu/digital-rights/privacy-and-personal-data-protection)

Press release (https://www.beuc.eu/press-media/press-releases?tid[]=5)

# Contact Card

## Communications Department

The European Consumer Organisation

Europäischer Verbraucherverband

Bureau Européen des Unions de Consommateurs

Rue d'Arlon, 80 Bte 1

B - 1040 Bruxelles

Tel: +32 2 789 24 01

E-mail: **communications@beuc.eu (mailto:communications@beuc.eu)**

### Director

Johannes Kleis

**(mailto: )**

# EXHIBIT 36



Google LLC
Amphitheatre Parkway,
Mountain View, CA 94043
USA

# Request for Reply and Further Clarification

## 1. Summary and Notice

*Datainspektionen*, the Swedish Data Protection Authority (DPA), has along with several other Supervisory Authorities of the European Union's General Data Protection Regulation (GDPR)[1], received complaints against *you*, Google LLC (Google), based on a report called *Every Step You Take etc.* ("the report")[2] by *Forbrukerrådet* (the Norwegian Consumer Council).

After having reviewed the complaint,[3] filed with us on the 27th of November 2018, by a representative of *Sveriges Konsumenter* (the Swedish Consumer Association) on behalf of a data subject ("the complainant"), Datainspektionen has decided to open an investigation into the matter in light of its competence under article 55.1 and 56.1 of the GDPR.

Datainspektionen, invoking its investigative powers pursuant to Article 58.1 of the GDPR, hereby order you to provide the below specified information and documents (specified in section 3) and answer the questions below (set out in section 4) **no later than on the 1st of February 2019**. You may, if you wish, submit your answer in English. Please note that Datainspektionen welcomes you to email us, but not if you are sending sensitive information. See contact details in the footer.

---

[1] Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC.
[2] Please see Appendix 1 (The Norwegian Consumer Council, the 27th of November 2018, *Every step you take - How deceptive design lets Google track users 24/7*).
[3] Please see Appendix 2.

## 2. Summary of the complaint before this Authority

In summary, the complainant holds that the way Google provides itself access to the location data of users of its mobile operative system Android by ways of its so called "Location History" and "Web & App Activity" ("the services") is in breach of the GDPR. According to the complainant, the report by *Forbrukerrådet* states that Google use deceptive design, misleading information and repeated pushing to manipulate users into allowing constant tracking of their movements. In essence, the complainant holds that the processing of location data in this way is unlawful and that Google is in violation of Articles 5, 6, 7, 12, 13 and 25 of the GDPR.

## 3. Information and documents that Google must provide

Datainspektionen order Google to submit the following.

*Information*: A summary, with regard to the period 25th of May 2018 – 27th of November 2018 ("the relevant period"), that must include a) the total number of Swedish data subjects about which you have obtained location data through the services and b) an approximation of how many data points that are gathered on average on an individual, broken down for each of the 24 hours of the day, presented in a structured and clear manner.

*Document(s)*, in the version that were in effect during the relevant period:
1. Record(s) of processing activities pursuant to Article 30 of the GDPR, limited to those relevant to your processing of the location data of the Swedish data subjects obtained through the services during the relevant period,
2. Privacy policies for the services, and
3. Data Impact Assessment(s) that you have finalised pursuant to Article 35, during or before the relevant period, limited to those relevant to your processing of the location data of the Swedish data subjects obtained through the services during the relevant period.

## 4. Questions that Google must answer

Datainspektionen request that you in general comment on the complaint and the report. Your answer should particularly clarify (in relation to the GDPR):

1. For what purpose(s) you have processed location data of the Swedish data subjects obtained through the services during the relevant period and what your legal basis (Article 6) for each type of processing was,

2. If applicable, when and how you provided the Swedish data subjects with the information regarding the processing in the previous questions (Article 12 and 13), which should include the information that was provided,

3. Whether your answers to the previous two questions is representative of how you fulfil your obligations to inform and obtain legal basis (Article 6) for the processing of location data of data subjects in general through the use of the services,

4. If the legal basis for any of the processing is consent (Article 6.1.a), an explanation and evidence that show how the conditions for consent (Article 7) have been fulfilled,

5. If the legal basis for any of the processing is legitimate interests (Article 6.1.f), an explanation of how it constitutes an appropriate legal basis with regard to the location data being processed,

6. Whether the so called "design patterns" you have allegedly used for obtaining legal basis for the processing of location data of users, as they have been described in the report (pp. 26-31), is accurate with regard to the Swedish data subjects of whom you have been processing location data obtained through the services during the relevant period, and if not, your own corrections in that regard, preferably in a visually comparable and clear material such as those in the report (e.g. p. 28),

7. If you consider your answers to the previous question compatible with the principles of lawfulness, fairness and transparency (Article 5.1.a) and data protection by design and by default (Article 25), your argument(s) for that position,

8. Any comments you would like to make, in light of your answers to the previous questions and the recommendations allegedly put forth to you within the documents referred to in the report (footnote 51, p. 33)[4],

---

[4] Which states "[a]s a result of an investigation done by the EU Data Protection Authorities, Google was already in 2012 urged to clarify which legal basis it uses for processing of

9. Whether you consider any of the location data of the Swedish data subjects that you have processed during the relevant period to be such special category data as referred to in Article 9, and if so, which legal basis you have identified for the processing of such data under Article 6 as well as Article 9,

10. What measures in general you have made to protect the location data of the Swedish data subjects pursuant to article 25 and 32, and

11. If applicable, in light of your answers to the previous questions, any changes to your practises in this regard in the period 28th of November 2018 – 18th of January 2019, that you wish to put forward.

On behalf of Datainspektionen,

Ulrika Bergström, Legal Advisor
Nazli Pirayehgar, Legal Advisor
Olle Pettersson, Legal Advisor

*Olle Pettersson, 2019-01-18   (Det här är en elektronisk signatur)*

---

personal data. See https://www.cnil.fr/sites/default/files/typo/document/20121016-letter_google-article_29-FINAL.pdf and
https://www.cnil.fr/sites/default/files/typo/document/GOOGLE_PRIVACY_POLICY-_RECOMMENDATIONS-FINAL-EN.pdf."

# EXHIBIT 37

# Dutch petition against Google's location tracking gets 50,000 signatures

nltimes.nl/2019/01/22/dutch-petition-googles-location-tracking-gets-50000-signatures

January 22, 2019



Dutch consumers' association Consumentenbond handed Google a petition against the company's location tracking with over 50 thousand signatures. This petition forms part of a joint action by seven consumer associations in Europe, Consumentenbond announced on Monday, NU.nl reports.

The organizations are protesting against the collection of location data from Android phones. According to research by Norwegian consumer organization Forbrukerradet, Google did not ask Android users for permission in the right way. Companies must explicitly request permission for the collection of location data, according to the organizations. By not doing so, Google is in violation of the General Data Protection Regulation - the European privacy law.

The consumer organizations filed a complaint with national privacy regulators regarding this matter.

In a response, Google said the company finds it important "that users understand how and why we collect data and what privacy settings there are so that they can make conscious choices". Google says it is working hard on improving its privacy settings.

GZJ KDKV'5: ''''

**Written Testimony of Keith Enright**

**Chief Privacy Officer, Google**

**United States Senate Committee on Commerce, Science, and Transportation**

**Hearing on "Examining Safeguards for Consumer Data Privacy"**

**September 26, 2018**

Chairman Thune, Ranking Member Nelson, and distinguished members of the Committee: thank you for the opportunity to appear before you this morning. I appreciate your leadership on the important issues of data privacy and security, and I welcome the opportunity to discuss Google's work in these areas.

My name is Keith Enright, and I am the Chief Privacy Officer for Google. I have worked at the intersection of technology, privacy, and the law for nearly 20 years, including as the functional privacy lead for two other companies prior to joining Google in 2011. In that time, I have been fortunate to engage with legislators, regulatory agencies, academics, and civil society to help inform and improve privacy protections for individuals around the world.

I lead Google's global privacy legal team and, together with product and engineering partners, direct our Office of Privacy and Data Protection, which is responsible for legal compliance, the application of our privacy principles, and generally meeting our users' expectations of privacy. This work is the effort of a large cross-functional team of engineers, researchers, and other experts whose principal mission is protecting the privacy of our users.

Across every single economic sector, government function, and organizational mission, data and technology are critical keys to success. With advances in artificial intelligence and machine learning, data-based research and services will continue to drive economic development and social progress in the years to come. Doctors use data to save lives; farmers rely on data to increase yields; and charities analyze data to better serve our communities. I have had the privilege of working with government agencies to better leverage data to advance their mission and provide improved care and benefits to Americans efficiently and reliably. Businesses of all types and sizes, far beyond those represented at this hearing today, collect and use data. In my previous experience, I saw first-hand the transformative efforts by traditional brick and mortar retail businesses to improve efficiency, reduce costs, and delight consumers through the innovative use of data.

At Google, we combine cutting-edge technology with data to build products and services that improve people's lives and enhance their productivity, help grow the economy,[1] improve

---

[1] Last year, Google's tools helped provide $283 billion of economic activity in the U.S. for more than 1.5 million businesses, website publishers, and nonprofits nationwide (https://economicimpact.google.com/).

accessibility[2] and make the web safer and more secure.[3] With partners, we are working to tackle big societal challenges and enable medical[4] and scientific breakthroughs.[5] These types of benefits all rely on the collection and use of data, and must come with, and not at the expense of, privacy and security.

**Privacy That Works For Everyone**

We acknowledge that we have made mistakes in the past, from which we have learned, and improved our robust privacy program.

The foundation of our business is the trust of people that use our services. To maintain user trust, we must clearly explain how our products use personal information, and to provide easy-to-find and use controls to manage privacy. We also invest in research and development of cutting-edge privacy and security engineering techniques, sharing what we learn to benefit the broader ecosystem.

Google's approach to privacy stems directly from our founding mission: to organize the world's information and make it universally accessible and useful. Providing most of our products for free is a key part of meeting that mission, and ads help us make that happen. With advertising, as with all our products, users trust us to keep their personal information confidential and under their control. We do not sell personal information. Period.

As the world becomes increasingly data-focused, there is, rightly, increased focus on the impacts on consumers and whether there should be better rules of the road for data privacy. We understand that Congress may be legislating on privacy and we support that effort.  We look forward to constructively engaging with you as your work develops.

To that end, I want to briefly cover four key issues that we believe are critical elements to this discussion: transparency, control, data portability, and security. These components are also central to Google's recently released framework for responsible data protection regulation, which I will discuss as well.

**Informing Users And Explaining Our Practices**

First, transparency is a core value of our approach to serving users. Google strives to be upfront about the data we collect, why we collect it, and how we use it. We get that privacy policies are not users' first choice in reading material, but we work to make ours clear and

---

[2] For example, we have used data analysis and machine learning to enable closed captioning on over 1 billion YouTube videos in 10 languages making them accessible to the over 300 million deaf or hard of hearing people around the world (https://youtube.googleblog.com/2017/02/one-billion-captioned-videos.html).
[3] Google Safe Browsing (https://safebrowsing.google.com) helps protect over three billion devices every day, and it is free and publicly available for developers and other companies to use.
[4] Working with physicians and other healthcare experts, we've developed  systems that can detect diabetic eye disease (https://ai.googleblog.com/2016/11/deep-learning-for-detection-of-diabetic.html) and breast cancer tumors (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html), help predict medical outcomes (https://ai.googleblog.com/2018/05/deep-learning-for-electronic-health.html), and even shed light on connections between cardiovascular disease and images of the eye (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html).
[5] We've shown machine learning can help predict molecular properties, which could aid everything from pharmaceuticals to photovoltaics to basic science (https://ai.googleblog.com/2017/04/predicting-properties-of-molecules-with.html). Another example is that Google's AI technology helped discover the first 8-planet system outside our own (https://www.blog.google/technology/ai/hunting-planets-machine-learning/).

concise. Outside experts have praised ours as best in class.[6] Just this year we updated our Privacy Policy to be easier to understand, with informative videos that explain our practices and settings. In addition to making our privacy controls easy to find in user accounts and through Google Search, we have also made them immediately accessible from the Privacy Policy so that users can make decisions about their account settings as they learn about our practices.

We also look for ways to add transparency into our products directly, so that users can understand the privacy implications of their choices  in context. For example, if you add a Google Drive file to a shared folder, we'll check to make sure you intend to share that file with everyone who has access to that folder. With Why This Ad,[7] you are able to click or tap on an icon in each ad to find out why you are seeing that particular ad and understand more about how Google's system makes these decisions. Another example is if someone wants to install a new app on their Android mobile phone, they can see the types of personal information that apps can access right on the screen before deciding whether to install it. If they change their mind or want to learn more, they can learn about the different permissions, and disable specific ones.  Finally, our Transparency Report[8] provides information to the public on how government actions can affect the free flow of information online. We are always working to expand the information we provide to users.

**Google Account Controls**

Second, with regard to user control, our privacy tools are built for everyone. Different people have different preferences about how they want their information to be used, and preferences can vary over time, so we build products and controls that do not presume all users are the same. For instance, a Search user can choose not to sign in when they search, and a Chrome user can choose to use Chrome's Incognito mode. For users who have a Google account, we put their privacy and security settings in a single place -- Google Account [9] -- so users don't have to visit several different apps or pages to see their data and set their preferences for how Google should store and use their information.

Google was one of the first companies to offer users this type of centralized dashboard[10] in 2009, and we continue to develop and improve these and other tools to make them more robust and intuitive. These efforts are working: in 2017, nearly 2 billion people visited their Google Account controls.[11]

I particularly want to call attention to our Security Checkup[12] and Privacy Checkup[13] tools, which respectively, help users identify and control the apps that have access to their Google account data, and guide users to review and change their security and privacy settings. These

---

[6] Time Magazine and the Center for Plain Language ranked Google number one among technology companies for best privacy policy (http://time.com/3986016/google-facebook-twitter-privacy-policies/).
[7] https://support.google.com/ads/answer/1634057?hl=en
[8] https://transparencyreport.google.com/?hl=en
[9] https://myaccount.google.com/intro?hl=en-US
[10] Dashboards are a recognized best practice (https://www.ivir.nl/publicaties/download/PrivacyBridgesUserControls2017.pdf).
[11] See: https://www.blog.google/technology/safety-security/improving-our-privacy-controls-new-google-dashboard/, https://www.blog.google/technology/safety-security/celebrating-my-accounts-first-birthday/, and https://googleblog.blogspot.com/2015/06/privacy-security-tools-improvements.html for more information.
[12] https://myaccount.google.com/security-checkup
[13] https://myaccount.google.com/privacycheckup?otzr=1

checkups help users make decisions about what information they are sharing, who they are sharing it with, and what to expect when they share it. It is not enough to just have these tools available: we actively encourage users to do privacy and security reviews by reminding them to use these tools through service-wide promotions and individual prompts.

Google Account is where users can:
- download a copy of their personal information;
- see or delete their Google activity, such as search queries or browsing, by date, product, or topic;
- disable personalized ads or see the information Google uses to personalize their ads; and
- locate a lost or stolen phone.

**Privacy From The Ground Up**

Protecting users is about more than just being transparent and offering control -- it requires building products that reflect our privacy commitments and principles at every stage of their development. Doing this properly requires a comprehensive data protection program that includes privacy design reviews, engineers dedicated to privacy to review code and data flows, and a system to manage and address any issues discovered before users are put at risk. Google has had such a program for over seven years, and we continue to expand and refine it.

**Data Portability**

Third, we believe data portability is a key way to drive innovation, facilitate competition, and best serve our users - that's why we have been working on it for over a decade.[14]

Google has always believed that people should use our products because they provide unique value and features. Download Your Data[15] is a practical tool that lets users backup or archive important information, organize information between multiple accounts, recover from account hijacking, and explore the data stored in their account.

Currently, users average around one million exports per month covering eight billion files. We enable export from more than 50 Google products, even offering the option to import data directly into our competitors' systems. If a user wants to try out a new product or service or even switch because they think it is better, they should be able to do so as easily as possible, not be locked into an existing service.

Portability is one way we ensure that users can trust Google with their data. This is why we led the development of the Data Transfer Project,[16] an open-source platform that enables you to move a copy of your data directly from one account to another without downloading and reuploading. For people who rely on phones and mobile networks for connectivity, this is a tremendous improvement. We're grateful for our industry partners' contributions to this project, and look forward to working with others.

---

[14] https://publicpolicy.googleblog.com/2009/09/introducing-dataliberationorg-liberate.html
[15] https://support.google.com/accounts/answer/3024190?hl=en
[16] See website (https://datatransferproject.dev/) and white paper (https://datatransferproject.dev/dtp-overview.pdf) for more information.

**Security**

Fourth, security considerations are paramount in all of these efforts. The security threat landscape that we see is increasingly complex and wide ranging. Securing the infrastructure that provides Google's services is critical in light of the growing and sophisticated nature of many threats directed at our services and users.

All Google products are built with strong security protections at their core to continuously and automatically detect threats and protect users. We devote significant resources to fortify Google's infrastructure and this includes continuous and proactive efforts to identify and block a wide range of security risks. The insights we've gained serving billions of people around the world help us stay ahead.

We have also worked to help our users improve their own cybersecurity posture. For example, we have offered two-step verification to our users since 2011,[17] and last year, we unveiled the Advanced Protection Program,[18] which provides the strongest account protection that Google offers.

Our focus on security is not limited to Google's users. We share technologies and collaborate with partners to help people stay safer whenever they are online. In 2007, we launched the first version of our Safe Browsing tool.[19] This tool helps protect users from phishing, malware, and other potential attacks by examining billions of URLs, software, and website content. We have made Safe Browsing free and publicly available to webmasters and developers so that they can protect their websites and applications from malicious actors.

Finally, it is important to note that small and midsize businesses are leveraging Google's cloud technology to protect the security and confidentiality of their business data. In the past, many such businesses managed their own online security infrastructure, putting them at a disadvantage. Now, these small and midsize businesses can avail themselves of the security expertise previously only available to the largest, most sophisticated enterprises, significantly reducing their information technology costs while vastly improving the security, confidentiality, integrity, and availability of business critical data.

**Toward A Comprehensive Baseline Privacy Framework**

Now, more than any time I've seen in my career in privacy, there is an interest in setting out baseline privacy requirements in law. We welcome this: a healthy data ecosystem requires people feel comfortable that all entities who use personal information will be held accountable for protecting it.[20]

The U.S. approach to privacy is admirable for its focus on protecting consumers while encouraging innovation and investment, but there is room for improvement. To demonstrate

---

[17] https://www.google.com/landing/2step/
[18] https://google.com/advancedprotection/
[19] https://safebrowsing.google.com/
[20] Comments filed in U.S. Department of Commerce, Docket No. 100402174-0175-01 and Docket No. 101214614−0614−01 : Information Privacy and Innovation in the Internet Economy (2010).

our commitment to the goal of comprehensive baseline privacy legislation, we recently put forward principles for a responsible data framework. The framework is based on the Fair Information Practices Principles (FIPPs), OECD Privacy Principles, Asia-Pacific Economic Cooperation (APEC) Privacy Framework, aspects of the European General Data Protection Regulation (GDPR), and our 20 years of experience offering services that depend on information, privacy protections, and user trust. It includes many of the principles I have talked about today: transparency, control, data portability, and security.

I am submitting a copy of Google's framework with my testimony. We hope it can contribute to this Committee's work.

Our framework is high-level, and of course, the manner in which general principles are implemented will matter a great deal. We urge the Committee to take into consideration the impacts on service functionality, the consumer benefits of free and low-cost products, the future of the open web and app ecosystem, the unique compliance needs of new entrants and small businesses, and competitive market dynamics.

**Conclusion**

Privacy and security work is never finished. Our work will continue, and we stand ready to do our part in building a better ecosystem for everyone. Sound practices and smart regulations can help, particularly when they are applied across the board to those making decisions regarding the collection and use of personal data. We share your goals of ensuring consumers are protected and businesses have an opportunity to innovate and grow.

Thank you again for the opportunity to tell you about our continued efforts in this space. We look forward to continuing to work with Congress on these important issues. I welcome any questions you might have.

# EXHIBIT 39

# Americans' Attitudes About Privacy, Security and Surveillance

---

**pewinternet.org**/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/

May 20, 2015



Internet & Technology

Report

May 20, 2015

By Mary Madden and Lee Rainie

The cascade of reports following the June 2013 government surveillance revelations by NSA contractor Edward Snowden have brought new attention to debates about how best to preserve Americans' privacy in the digital age. At the same time, the public has been awash with news stories detailing security breaches at major retailers, health insurance companies and financial institutions. These events – and the doubts they inspired – have contributed to a cloud of personal "data insecurity" that now looms over many Americans' daily decisions and activities. Some find these developments deeply troubling and want limits put in place, while others do not feel these issues affect them personally. Others believe that widespread monitoring can bring some societal benefits in safety and security or that innocent people should have "nothing to hide."

Americans' views about privacy and surveillance are relevant to policymaking on these matters. Key legal decisions about the legitimacy of surveillance or tracking programs have hinged on the question of whether Americans think it is reasonable in certain situations to assume that they will be under observation, or if they expect that their activities will not be monitored. A federal appeals court recently ruled that a National Security Agency program that collects Americans' phone records is illegal. In striking down the program, Judge Gerald Lynch wrote: "Such expansive development of government repositories of formerly private records would be an unprecedented contraction of the privacy expectations of all Americans. Perhaps such a contraction is required by national security needs in the face of the dangers of contemporary domestic and international terrorism. But we would expect such a momentous decision to be preceded by substantial debate, and expressed in unmistakable language."

Two new Pew Research Center surveys explore these issues and place them in the wider context of the tracking and profiling that occurs in commercial arenas. The surveys find that Americans feel privacy is important in their daily lives in a number of essential ways. Yet, they have a pervasive sense that they are under surveillance when in public and very few feel they have a great deal of control over the data that is collected about them and how it is used. Adding to earlier Pew Research reports that have documented low levels of trust in sectors that Americans associate with data collection and monitoring, the new findings show Americans also have exceedingly low levels of confidence in the privacy and security of the records that are maintained by a variety of institutions in the digital age.

While some Americans have taken modest steps to stem the tide of data collection, few have adopted advanced privacy-enhancing measures. However, majorities of Americans expect that a wide array of organizations should have limits on the length of time that they can retain records of their activities and communications. At the same time, Americans continue to express the belief that there should be greater limits on government surveillance programs. Additionally, they say it is important to preserve the ability to be anonymous for certain online activities.

## Most Americans hold strong views about the importance of privacy in their everyday lives.

The majority of Americans believe it is important – often "very important" – that they be able to maintain privacy and confidentiality in commonplace activities of their lives. Most strikingly, these views are especially pronounced when it comes to knowing what information about them is being collected and who is doing the collecting. These feelings also extend to their wishes that they be able to maintain privacy in their homes, at work, during social gatherings, at times when they want to be alone and when they are moving around in public.

When they are asked to think about all of their daily interactions – both online and offline – and the extent to which certain privacy-related values are important to them, clear majorities say these dimensions are at least "somewhat important" and many express the view that these aspects of personal information control are "very important."

Survey results from early 2015 show:

- 93% of adults say that being in control of *who* can get information about them is important; 74% feel this is "very important," while 19% say it is "somewhat important."
- 90% say that controlling *what* information is collected about them is important—65% think it is "very important" and 25% say it is "somewhat important."

At the same time, Americans also value having the ability to share confidential matters with another trusted person. Nine-in-ten (93%) adults say this ability is important to them, with 72% saying it is "very important" and 21% saying it is "somewhat important."

## Permission and publicness are key features that influence views on surveillance.

Americans say they do not wish to be observed without their approval; 88% say it is important that they not have someone watch or listen to them without their permission (67% feel this is "very important" and 20% say it is "somewhat important").

However, far fewer (63%) feel it is important to be able to "go around in public without always being identified." Only 34% believe being able to go unnoticed in public is "very important" and 29% say it is "somewhat important" to them. In both cases, all adults, regardless of age or gender, express comparable views.



**Americans Hold Strong Views About Privacy in Everyday Life**

*In response to the following question: "Privacy means different things to different people today. In thinking about all of your daily interactions – both online and offline – please tell me how important each of the following are to you . . ."*

*% of adults who say ...*

| | Very important | Somewhat important | Not very important | Not at all important | Don't know | NET Important | NET Not Important |
|---|---|---|---|---|---|---|---|
| Being in control of who can get info about you | 74% | 19% | 3 | 1 | 1 | **93%** | 4 |
| Being able to share confidential matters with someone you trust | 72 | 21 | 2 | 1 | 1 | **93** | 4 |
| Not having someone watch you or listen to you without your permission | 67 | 20 | 8 | 1 | 2 | **88** | 9 |
| Controlling what information is collected about you | 65 | 25 | 5 | 1 | 1 | **90** | 6 |
| Not being disturbed at home | 56 | 29 | 9 | 2 | 2 | **85** | 11 |
| Being able to have times when you are completely alone, away from anyone else | 55 | 30 | 9 | 2 | 2 | **85** | 10 |
| Having individuals in social/work situations not ask you things that are highly personal | 44 | 36 | 13 | 2 | 4 | **79** | 15 |
| Being able to go around in public without always being identified | 34 | 29 | 25 | 6 | 4 | **63** | 31 |
| Not being monitored at work | 28 | 28 | 22 | 6 | 15 | **56** | 27 |

Source: Pew Research Center's Privacy Panel Survey #4, Jan. 27, 2015-Feb. 16, 2015 (N=461). Refused responses not shown.

**PEW RESEARCH CENTER**

The findings above come from a survey conducted Jan. 27 to Feb. 16, 2015, among 461 adults on the GfK Knowledge Panel. It has a margin of error of plus or minus 5.8 percentage points. The findings cited below in the Summary section come from a separate survey of 498 adults on the same Knowledge Panel; that survey was conducted between Aug. 5 and Sept. 2, 2014, and has a margin of error of plus or minus 5.6 percentage points.

## Americans have little confidence that their data will remain private and secure.

For all of the 11 entities we asked about in the fall 2014 survey – from government agencies to credit card companies to social media sites – only small minorities say they are "very confident" the records maintained by these organizations will remain private and secure.

- Just 6% of adults say they are "very confident" that **government agencies** can keep their

records private and secure, while another 25% say they are "somewhat confident."

- Only 6% of respondents say they are "very confident" that **landline telephone companies** will be able to protect their data and 25% say they are "somewhat confident" that the records of their activities will remain private and secure.
- **Credit card companies** appear to instill a marginally higher level of confidence; 9% say they are "very confident" and 29% say they are "somewhat confident" their data will stay private and secure.



**Few Express Confidence That Their Records Will Remain Private and Secure**

*% of adults who say they are ... that the records of their activity maintained by various companies and organizations will remain private and secure*

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498). Refused responses not shown.

PEW RESEARCH CENTER

Online service providers are among the least trusted entities when it comes to keeping information private and secure. When asked about search engine providers, online video sites, social media sites and online advertisers, the majority felt "not too confident" or "not at all confident" that these entities could protect their data:

- 76% of adults say they are "not too confident" or "not at all confident" that records of their activity maintained by the **online advertisers** who place ads on the websites they visit will remain private and secure.
- 69% of adults say they are not confident that records of their activity maintained by the **social media sites** they use will remain private and secure.

4/9

- 66% of adults say they are not confident that records of their activity maintained by **search engine providers** will remain private and secure.
- 66% say they are not confident that records of their activity collected by the **online video sites** they use will remain private and secure.

## Few feel they have "a lot" of control over how much information is collected about them in daily life and how it is used.

When asked how much control they feel they have over how much information is collected about them and how it is used in their everyday lives, only a small minority of Americans say they have "a lot" of control over their personal data collection and its use.

When thinking about a range of activities that might take place on a typical day, 9% say they feel they have "a lot" of control over how much information is collected about them and how it is used, while 38% say they have "some control." Another 37% feel they have "not much control," and 13% feel they personally have "no control at all" over the way their data is gathered and used.

## A very small number say they have changed their behavior to avoid being tracked recently, but many were already engaged in more common or less technical privacy-enhancing measures.

At the time of the mid-2014 survey, the vast majority of respondents – 91% – had not made any changes to their internet or cellphone use to avoid having their activities tracked or noticed. Only 7% reported that they had made these kinds of changes in "recent months."

At the same time, a much larger group had engaged in some everyday obfuscation tactics and privacy-enhancing measures. These activities were not necessarily in direct response to news of government monitoring programs, but, rather, represent a set of measures that respondents may have engaged in out of broader concerns about their personal info. Some of the more common activities include:

- Clearing cookies or browser history (59% have done this).
- Refusing to provide information about themselves that wasn't relevant to a transaction (57% have done this).
- Using a temporary username or email address (25% have done this).
- Giving inaccurate or misleading information about themselves (24% have done this).
- Deciding not to use a website because they asked for a real name (23% have done this).

## Advanced measures, such as the use of proxy servers and encryption are less common.

This survey included somewhat more expansive questions about advanced privacy-enhancing measures such as the use of proxy servers, virtual private networks and encryption across a variety of communications channels, following up on findings reported earlier this year. However, even with comparatively broader language, just one-in-ten Americans said they had adopted these more sophisticated steps to shield their information:

- 10% of adults say they have encrypted their phone calls, text messages or email.
- 9% say they have used a service that allows them to browse the Web anonymously, such as a proxy server, Tor software, or a virtual personal network.

## Most want limits on the length of time that records of their activity can be retained.

There is wide variation across the length of time that respondents feel is reasonable for businesses and other organizations to store their data. Additionally, there is considerable variance on their views depending on the kind of organization that retains the records of the activity. In general, and even though it may be necessary to provide certain functionality, people are less comfortable with online service providers – such as search engine providers and social media sites – storing records and archives of their activity.

- 50% of adults think that **online advertisers** who place ads on the websites they visit should not save records or archives of their activity for any length of time.
- 44% feel that the **online video sites** they use shouldn't retain records of their activity.
- 40% think that their **search engine** provider shouldn't retain information about their activity.
- 40% think that **social media sites** they use shouldn't save data about their activity.

At the other end of the spectrum, the vast majority of adults are comfortable with the idea that credit card companies might retain records or archives of their activity. Just 13% think that credit card companies "shouldn't save any information."

## Those who have greater awareness of the government monitoring programs are more likely to believe that certain records should not be saved for any length of time.



**Those Who Have Heard "a Lot" About Government Surveillance Hold Stronger Views About Certain Data Retention Limits**

*% of U.S. adults who say the following organizations <u>should not save any information</u> about their activity*

■ Heard "a little" about gov't surveillance   ■ Heard "a lot" about gov't surveillance

| | | |
|---|---|---|
| Your email provider | 30 | 43 |
| Your search engine provider | 38 | 54 |
| Social media sites you use | 35 | 55 |

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498).

**PEW RESEARCH CENTER**

Those who have had the most exposure to information about the government surveillance programs also have some of the strongest views about data retention limits for certain kinds of organizations. These differences are particularly notable when considering social media sites. Among those who have heard "a lot" about the government collecting communications data as part of anti-terrorism efforts, 55% say that the social media sites they use should not save any information regarding their activity, compared with 35% of those who have heard "a little" about the government monitoring programs.

## 65% of American adults believe there are not adequate limits on the telephone and internet data that the government collects.

When asked to think about the data the government collects as part of anti-terrorism efforts, 65% of Americans say there are not adequate limits on "what telephone and internet data the government can collect." Just 31% say they believe that there are adequate limits on the kinds of data gathered for these programs. The majority view that there are not sufficient limits on what data the government gathers is consistent across all demographic groups. Those who are more aware of the government surveillance efforts are considerably more likely to believe there are not adequate safeguards in place; 74% of those who have heard "a lot" about the programs say that there are not adequate limits, compared with 62% who have heard only "a little" about the monitoring programs.

## 55% of Americans support the idea of online anonymity for certain activities, but many are undecided on the issue.

In the current survey, the majority of adults (55%) said that people should have the ability to

use the internet completely anonymously for certain kinds of online activities. Another 16% do not think people should be able to remain anonymous when they are online; 27% said they don't know.

Men are more likely than women to think people should be able to engage in certain online activities anonymously (61% vs. 49%), but support for internet anonymity does not vary by age. Education is a predictor, but income is not; adults with at least some college education are significantly more likely than those who have not attended college to believe that people should have the ability to use the internet anonymously (66% vs. 40%).

## Even as they expect online anonymity, most assume that motivated people and organizations could uncover private details.

Many believe they are particularly vulnerable to people or organizations who have a motive to learn private details about their past. When considering how difficult it would be for a *motivated* person or organization to learn private details about their past that they would prefer to keep private, 64% of adults said it would be "not too" or "not at all" difficult for a motivated person or organization to uncover that sensitive information. Just 20% felt it would be "very" or "somewhat" difficult.

Men and women report similar responses, but those ages 50 and older (76%) are significantly more likely to believe it would be "not too" or "not at all difficult" when compared with those under the age of 50 (54%). Similarly, those with a college degree are more likely than those who have not attended college to feel more exposed (70% vs. 58%).

## More about these surveys

The majority of the analysis in this report is based on a Pew Research Center survey conducted between Aug. 5, 2014, and Sept. 2, 2014, among a sample of 498 adults ages 18 or older. The survey was conducted by the GfK Group using KnowledgePanel, its nationally representative online research panel. GfK selected a representative sample of 1,537 English-speaking panelists to invite to join the subpanel and take the first survey in January 2014. Of the 935 panelists who responded to the invitation (60.8%), 607 agreed to join the subpanel and subsequently completed the first survey (64.9%), the results of which were reported in November 2014. This group has agreed to take four online surveys about "current issues, some of which relate to technology" over the course of a year and possibly participate in one or more 45- to 60-minute online focus group chat sessions. For the second survey whose results are reported here, 498 of the original 607 panelists participated. A random subset of the subpanel is occasionally invited to participate in online focus groups. For this report, a total of 26 panelists participated in one of three online focus groups conducted during December 2014. Sampling error for the total sample of 498 respondents is plus or minus 5.6 percentage points at the 95% level of confidence.

An additional survey related to Americans' views about the importance of privacy was conducted between Jan. 27 and Feb. 16, 2015, among a sample of 461 adults ages 18 or older. The sample was drawn from the same 607 adults who agreed to participate in the

subpanel on privacy. It has a margin of error of plus or minus 5.8 percentage points.

For more information on the Privacy Panel, please see the Methods section at the end of this report.

## Acknowledgements

The authors would like to acknowledge the generous contributions of the various outside reviewers who offered their insights at various stages of this project. In particular, we would like to thank Tiffany Barrett, danah boyd, Mary Culnan and all of the attendees of the Future of Privacy Forum Research Seminar Series, Urs Gasser, Chris Hoofnagle, Michael Kaiser, Kirsten Martin and Bruce Schneier. In addition, the authors are grateful for the ongoing editorial, methodological and production-related support provided by the staff of the Pew Research Center.

While we greatly appreciate all of these contributions, the authors alone bear responsibility for the presentation of these findings, as well as any omissions or errors.

GZJ KDKV'62''''

# Anonymity, Privacy, and Security Online

pewinternet.org/2013/09/05/anonymity-privacy-and-security-online

September 5, 2013



<u>Report</u>

September 5, 2013

By <u>Lee Rainie</u>, <u>Sara Kiesler</u>, <u>Ruogu Kang</u> and <u>Mary Madden</u>

## Anonymity online

Most internet users would like to be anonymous online at least occasionally, but many think it is not possible to be completely anonymous online. New findings in a national survey show:

- 86% of internet users have taken steps online to remove or mask their digital footprints—ranging from clearing cookies to encrypting their email, from avoiding using their name to using virtual networks that mask their internet protocol (IP) address.
- 55% of internet users have taken steps to avoid observation by specific people, organizations, or the government

Still, 59% of internet users do not believe it is possible to be completely anonymous online, while 37% of them believe it is possible.

A section of the survey looking at various security-related issues finds that notable numbers of internet users say they have experienced problems because others stole their personal information or otherwise took advantage of their visibility online—including hijacked email and social media accounts, stolen information such as Social Security numbers or credit card information, stalking or harassment, loss of reputation, or victimization by scammers.

- 21% of internet users have had an email or social networking account compromised or taken over by someone else without permission.
- 13% of internet users have experienced trouble in a relationship between them and a family member or a friend because of something the user posted online.
- 12% of internet users have been stalked or harassed online.
- 11% of internet users have had important personal information stolen such as their Social Security Number, credit card, or bank account information.
- 6% of internet users have been the victim of an online scam and lost money.
- 6% of internet users have had their reputation damaged because of something that

happened online.

- 4% of internet users have been led into physical danger because of something that happened online.
- 1% of internet users have lost a job opportunity or educational opportunity because of something they posted online or someone posted about them.

Some 68% of internet users believe current laws are not good enough in protecting people's privacy online and 24% believe current laws provide reasonable protections.

Most internet users know that key pieces of personal information about them are available online—such as photos and videos of them, their email addresses, birth dates, phone numbers, home addresses, and the groups to which they belong. And growing numbers of internet users (50%) say they are worried about the amount of personal information about them that is online —a figure that has jumped from 33% who expressed such worry in 2009.

People would like control over their information, saying in many cases it is very important to them that only they or the people they authorize should be given access to such things as the content of their emails, the people to whom they are sending emails, the place where they are when they are online, and the content of the files they download.

**About this survey**

This survey by the Pew Research Center's Internet Project was underwritten by Carnegie Mellon University. The findings in this report are based on data from telephone interviews conducted by Princeton Survey Research Associates International from July 11-14, among a sample of 1,002 adults ages 18 and older.  Telephone interviews were conducted in English by landline and cell phone. For results based on the total sample, one can say with 95% confidence that the error attributable to sampling is plus or minus 3.4 percentage points and for the results from 792 internet and smartphone users in the sample, the margin of error is 3.8 percentage points.  More information is available in the Methods section at the end of this report.

## A closer look at key findings

**86% of internet users have tried to use the internet in ways to minimize the visibility of their digital footprints**

The chart below shows the variety of ways that internet users have tried to avoid being observed online.



### The strategies people use to be less visible online
*% of adult internet users who say they have done these things online*

| Strategy | Percentage |
|---|---|
| Cleared cookies and browser history | 64% |
| Deleted / edited something you posted in past | 41% |
| Set your browser to disable or turn off cookies | 41% |
| Not used website because it asked for your real name | 36% |
| Used temporary username / email address | 26% |
| Post comments without revealing who you are | 25% |
| Asked someone to remove something posted about you | 21% |
| Tried to mask your identity | 18% |
| Used a public computer to browse anonymously | 18% |
| Used fake name / untraceable username | 18% |
| Encrypted your communications | 14% |
| Used service that allows you to browse the web anonymously | 14% |
| Given inaccurate info about yourself | 13% |

**Source:** Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**55% of internet users have taken steps to hide from specific people or organizations**

Beyond their general hope that they can go online anonymously, the majority of internet users have tried to avoid observation by other people, groups, companies, and government agencies. Hackers, criminals and advertisers are at the top of the list of groups people wish to avoid.



### Who users try to avoid
*% of adult internet users who say they have used the internet in ways to avoid being observed or seen by ...*

Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**Users report that a wide range of their personal information is available online, but feel strongly about controlling who has access to certain kinds of behavioral data and communications content.**

Users know that there is a considerable amount of personal information about them available online. Among the list of items queried, photos were the most commonly reported content posted online; 66% of internet users reported that an image of them was available online. And half (50%) say that their birth date is available.



## Personal information online
*% of adult internet users who say this information about them is available online*

| | |
|---|---|
| A photo of you | 66% |
| Your birth date | 50% |
| Your email address | 46% |
| Your employer / company you work for | 44% |
| Things you've written using your name | 38% |
| Your home address | 30% |
| Which groups / orgs you belong to | 29% |
| Your cell number | 24% |
| Your home phone number | 21% |
| Video of you | 21% |
| Your political party / affiliation | 20% |

**Source:** Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

Another set of questions focused on the kinds of "data exhaust" that is generated as a result of everyday forms of online communications, web surfing and application use. Respondents were asked how much they cared "that only you and those you authorize should have access" to certain kinds of behavioral data and communications content and there was notable variance in the answers. The content of email messages and the people with whom one communicates via email are considerably more sensitive pieces of information when compared with other online activities and associated data trails.

## How much do you care that only you and those you authorize should have access to this information?

*% of adult internet users who say it is important—or not—to them to control these types of information*



Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

# EXHIBIT 41



University of Pennsylvania
**ScholarlyCommons**

Departmental Papers (ASC)                                    Annenberg School for Communication

4-14-2010

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

Chris Jay Hoofnagle

Jennifer King

Su Li

Joseph Turow
*University of Pennsylvania*, jturow@asc.upenn.edu

Follow this and additional works at: http://repository.upenn.edu/asc_papers

Part of the Communication Technology and New Media Commons, Consumer Protection Law Commons, Privacy Law Commons, and the Public Relations and Advertising Commons

Recommended Citation
Hoofnagle, C., King, J., Li, S., & Turow, J. (2010). How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?. Retrieved from http://repository.upenn.edu/asc_papers/399

Electronic copy available at: http://ssrn.com/abstract=1589864

This paper is posted at ScholarlyCommons. http://repository.upenn.edu/asc_papers/399
For more information, please contact libraryrepository@pobox.upenn.edu.

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

**Abstract**

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are." Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults. This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In this telephonic (wireline and wireless) survey of internet using Americans (N=1000), we found that large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. Where there were differences, over half of the young adult-respondents did answer in the direction of older adults. There clearly is social significance in that large numbers of young adults agree with older Americans on issues of information privacy.

A gap in privacy knowledge provides one explanation for the apparent license with which the young behave online. 42 percent of young Americans answered all of our five online privacy questions incorrectly. 88 percent answered only two or fewer correctly. The problem is even more pronounced when presented with offline privacy issues – post hoc analysis showed that young Americans were more likely to answer no questions correctly than any other age group.

We conclude then that that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

**Keywords**
behavioral advertising, online advertising, privacy, transparency, consumer protection, social networking, age, young

**Disciplines**
Communication | Communication Technology and New Media | Consumer Protection Law | Privacy Law | Public Relations and Advertising

**Comments**
Electronic copy available at: http://ssrn.com/abstract=1589864

Cookie:TShram@google.com/mobile
Cookie:TShram@www.msnbc.msn.com/id/23565
Cookie:TShram@tvguide.com/PartnerGrid
Cookie:TShram@www.de
Cookie:TShram@voip.fabphone.co.uk/voip/promo
Cookie:TShram@www.co
Cookie:TShram@w
Cookie:TShram@www.ebay.com/rtm/main
Cookie:TShram@stat.upe.c
Cookie:TShram@www.comcastsupport.com/sdcookie:TShram@user
Cookie:TShram@bing.com/search
Cookie:TS
Cookie:TShram@onlinestores.metaservices.microsoft.com/swervices/witching
Cookie:
Cookie:TShram@www.google
Cookie:TShram@ytsa.net/tase
Cookie:TShram@community.adobe.com/help/api/thumbs
Cookie:TShram@google.com/verify
Cookie:TShram@google.ca/verify
Cookie:TShram@www.microsoft.com/windows.mobile
SNID
27=1JR2BZwybn9ozsGG7nzQprKfpqOX_Ai6QDcxTmOf4Q=SSDlBYXE3on3iWwc
google.com/verify
9728
2320728704
30067751
406026352
30030938
*
ach-search
UjiezX7sFgNwJhrie19zsC69Vu8=
community.adobe.com/help/api/v1/thumbs/
1536
2784647552
30759988
3564042032
30025733
*
sik_client_guid
47aeeb428-73bc-ada9-bb60-728dc6567a7
www.comcastsupport.com/sdcxuser/rrn/
1088
284664448
30089887
2560430544
30016461
*
SynZCSI
K_25_503=10036:80001
tvguide.com/PartnerGrid

# HOW DIFFERENT ARE YOUNG ADULTS FROM OLDER ADULTS WHEN IT COMES TO INFORMATION PRIVACY ATTITUDES & POLICIES?

## APRIL 14, 2010

"WE SUGGEST…THAT YOUNG-ADULT AMERICANS HAVE AN ASPIRATION FOR INCREASED PRIVACY EVEN WHILE THEY PARTICIPATE IN AN ONLINE REALITY THAT IS OPTIMIZED TO INCREASE THEIR REVELATION OF PERSONAL DATA." (SEE PAGE 20)

**Chris Hoofnagle**
UC Berkeley School of Law, Berkeley Center for Law and Technology

**Jennifer King**
UC Berkeley School of Information

**Su Li**
UC Berkeley School of Law, Center for the Study of Law and Society

**Joseph Turow**
Annenberg School for Communication, University of Pennsylvania

Electronic copy available at: http://ssrn.com/abstract=1589864

**Chris Jay Hoofnagle**, J.D., is director of the Berkeley Center for Law & Technology's information privacy programs and senior fellow to the Samuelson Law, Technology & Public Policy Clinic. He is an expert in information privacy law. Hoofnagle co-chairs the annual Privacy Law Scholars Conference. He is licensed to practice law in California and Washington, DC.

**Jennifer King**, MIMS, is a Ph.D. candidate at the UC Berkeley School of Information. Most recently she was a researcher at the Samuelson Law, Technology, and Public Policy Clinic at UC Berkeley's School of Law.  Her research areas include information privacy and security, usability and human-computer interaction, video surveillance and other sensor networks. With Chris Hoofnagle, King has published three reports exploring Californians' privacy attitudes, available at SSRN.com.

**Su Li**, Ph.D., recently joined Berkeley Law as its new Statistician in Empirical Legal Studies.  Her research interests include gender and social inequality, economic sociology, social network analysis, and the sociology of education.  Li received her Ph.D. in Sociology and a Master's in Mathematical Models for Social Science at Northwestern University. An expert in quantitative methodology, Li was Assistant Professor of Sociology at Wichita State University before joining Berkeley Law.

**Joseph Turow**, Ph.D., is Robert Lewis Shayon Professor of Communication at the Annenberg School for Communication, University of Pennsylvania. Among his several books are *Niche Envy: Marketing Discrimination in the Digital Age* (MIT Press, 2006) and *Breaking Up America: Advertisers and the New Media World* (U of Chicago Press, 1997). Since 1999 he has conducted national telephone surveys that have moved forward public discourse on digital media, marketing, and privacy. Several can be found at the Annenberg Public Policy Center website, APPCPenn.org.

This survey was supported by the Rose Foundation for Communities and the Environment, Tim Little, Executive Director, under grant 025629-003, Chris Jay Hoofnagle, Principal Investigator; and by The Annenberg School for Communication— Michael Delli Carpini, Dean.

Electronic copy available at: http://ssrn.com/abstract=1589864

## Overview

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are."[1] Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults.[2] This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In July 2009, we commissioned a nationally representative telephone survey (landline and cellular) of Americans in order to understand the public's views of both online and offline privacy issues. Our first report from this effort, *Americans Reject Tailored Advertising and Three Activities that Enable It*,[3] released in October 2009, investigated Americans' comprehension of online tailored advertising and related privacy concerns. In this report, we compare young adults and older adults with respect to attitudes toward online privacy protection, whether they carry out certain privacy-protecting behaviors, their public policy preferences regarding privacy, and their knowledge of information privacy law that might affect them in their everyday lives. We found that expressed attitudes towards privacy by American young adults (aged 18-24) are not nearly as different from those of older adults as many suggest. With important exceptions, large percentages of young adults are in harmony with older Americans when it comes to sensitivity about online privacy and policy suggestions. For example, a large majority of young adults:

---

[1] Ariel Maislos, chief executive of Pudding Media, quoted in Louise Story, *Company Will Monitor Phone Calls to Tailor Ads,* New York Times, Sept. 24, 2007, available at: http://www.nytimes.com/2007/09/24/business/media/24adcol.html.

[2] Marwick, A., Murgia-Díaz, D., and Palfrey, J. (2010). Youth, Privacy and Reputation Literature Review. Berkman Center for Internet and Society, Harvard University.

[3] Joseph Turow et al., *Americans Reject Tailored Advertising and Three Activities that Enable It*, SSRN ELIBRARY (2009), http://ssrn.com/paper=1478214.

- Has refused to give information to a business in cases where they felt it was too personal or not necessary;
- Believes anyone who uploads a photo of them to the internet should get their permission first, even if taken in public;
- Believes there should be a law that gives people the right to know all the information websites know about them; and
- Believes there should be a law that requires websites to delete all stored information about an individual.

In view of these findings, why would so many young adults act in social networks and elsewhere online in ways that would seem to offer quite private information to all comers?  A number of answers present themselves, including suggestions that people 24 years and younger approach cost-benefit analyses related to risk differently than do individuals older than 24.  An important part of the picture, though, must surely be our finding that higher proportions of 18-24 year olds believe incorrectly that the law protects their privacy online and offline more than it actually does.  This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

## Background

Popular writings and comments suggest that America's youngest adults do not care about information privacy, particularly online. As evidence, many point to younger internet users' adoption and prolific use of blogs, social network sites, posting of photos, and general documenting and (over)sharing of their life's details online, from the mundane to the intimate, for all the world to consume.  "Young adults**,"** exhorted one newspaper article to that segment of its readers, "you might regret that scandalous Facebook posting as you get older."[4]  More broadly, Robert Iger, CEO of Disney, recently commented categorically that "kids don't care" about privacy issues, contending that complaints generally came from much older consumers.  Indeed, he said that when

---

[4] Roger [no surname], "There is No Privacy," *Virginia Pilot*, April 4, 2009, p. B9.

he talked to his adult children about their online privacy concerns "they can't figure out what I'm talking about."[5]

Iger is not alone in making claims about differences between young people—even college students—and older members of the population when it comes to giving out personal information online.  Anecdotes abound detailing how college-age students post photos of themselves unclothed and/or drunken, for the entire world—including potential employers—to see.  It is not a leap to argue that these actions are hard-wired into young people.  One psychological study found that adolescents (aged 13-16) and what they termed "youths" (those aged 18-22) are "more inclined toward risky behavior and risky decision making than are 'adults' (those older than 24 years) and that peer influence plays an important role in explaining risky behavior during adolescence."  Their finding was more pronounced among adolescents than among the youths, but differences between youths and adults were striking in willingness to take risks—particularly when group behavior was involved.[6]   Although the authors do not mention social media, the findings are clearly relevant to these situations. There the benefits of looking cool to peers may outweigh concerns about negative consequences, especially if those potential consequences are not likely to happen immediately. A related explanation for risky privacy behavior on social-networking sites is that they encourage users to disclose more and more information over time.

Young people's use of social media does not in itself mean that they find privacy irrelevant.[7]  Indeed, the Pew Internet & American Life Project found in 2007 that teenagers used a variety of techniques to obscure their real location or personal details on social networking sites.[8]  That study fits with the findings of other researchers, who have

---

[5]  Gina Keating, "Disney CEO Bullish on Direct Marketing to Consumers," Reuters, July 23, 2009, http://www.reuters.com/article/idUSTRE56M0ZY20090723?pageNumber=2&virtualBrandChannel=0

[6]  Margo Gardner and Laurence Steinberg, "Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study," *Developmental Psychology* 41:4, 625-635.  No one 23 or 24 years of age was in the sample.

[7]  Raynes-Goldie, Kate. "Aliases, creeping, and wall cleaning: Understanding privacy in the age of Facebook" *First Monday* [Online], Volume 15 Number 1 (2 January 2010); Lenhart, Amanda and Madden, Mary. "Teens, Privacy, and Online Social Networks." Pew Internet & American Life Project, April 18. 2007. Available at: http://www.pewinternet.org/Reports/2007/Teens-Privacy-and-Online-Social-Networks.aspx; and more generally danah boyd's excellent bibliography of Social Networking Studies at: http://www.danah.org/researchBibs/sns.html.

[8]  Lenhart and Madden, *Id.*

urged the importance of reframing the issue to ask *what dimensions* of privacy younger adults care about.[9]  While differences between young adults and those older than they may be important, other more subtle commonalities may be ignored. In recent years older age groups have rushed to social networking in large numbers with discussions of personal issues and details. A common anecdotal observation is that young adults and adolescents are more likely than their elders to post racy photos or document episodes of untoward behavior.   If research shows this distinction is accurate, the question nevertheless remains whether the same, higher, or lower percentages of Americans over 24 years old reveal more subtle but important private information about themselves that might lead to embarrassing and unfortunate incidents, such as identity theft.

In spite of vigorous social concerns and discussions, there does not appear to be research that shows definitively that young adults are fundamentally different from older Americans when it comes to privacy attitudes. Moreover, comparisons of what people of different ages do online must be placed within a context of how they understand the norms and laws of privacy in their society.  What, if anything, have they done to protect their privacy? What do they believe about privacy norms when presented with the opportunity to think rationally about them?  And what protections do they believe laws afford them when they do present themselves in various online environments?   The extent to which Americans of different ages have similar or different answers to these questions will suggest whether they converge on similar policy approaches despite seemingly different decisions in the heat of online activities. That is the topic we chose for this study.

In our earlier report on tailored advertising we compared age groups' responses to three questions that asked, "Please tell me whether or not you want websites you visit to show you *ads* [another question substituted *discounts* and a third *news*] that are tailored to your interests."   We found that while young adults' concerns were lower compared to other age categories, substantial proportions nevertheless said they did not want tailoring of ads, discounts, and news (55%, 37%, and 54% respectively).  Moreover, the percentages saying no rose to very high levels when the young adults were told that the information required to tailor advertisements would come from following them on the

---

[9] See Raynes-Goldie (2010).

website they were visiting (67% said no), on other websites they have visited (86% said no) and what they do offline—for example, in stores (90% said no).[10] The findings led us to believe that these tendencies might apply to young adults' approaches to privacy in general.  We hypothesized a dual dynamic:  A smaller percentage of young adults than older adults would evidence privacy concerns, but that percentage would still be large, typically exceeding 50% of young adults.  We did find this dynamic at work. But we also noted that differences in privacy attitudes and practices between young adults and older ones were at times so small as to not be statistically significant.

## Methods

In 2009, we commissioned a survey on behalf of the Berkeley Center for Law and Technology at the University of California, Berkeley School of Law in order to gauge the American public's attitudes towards and knowledge of the rules and practices surrounding the collection and use of personal information.   In this report, we present a summary of our findings for a subset of our survey questions.[11] These questions were part of a survey of Americans' opinions about and understanding of a variety of online and offline privacy issues. We cast our population net broadly. We included people in our study if they were 18 years or older said yes to one of the following questions: "Do you go on online or use the internet, at least occasionally?" and "Do you send or receive email, at least occasionally?"

The survey was conducted from June 18 to July 2, 2009 by Princeton Survey Research Associates International. PSRA conducted telephone interviews with a nationally representative, English-speaking sample of 1,000 American adults living in the continental United States. A combination of landline (n=725) and wireless (n=275) random digit dial (RDD) samples was used to represent all adults in the continental United States who have access to either a landline or cellular telephone. The interviews averaged 20 minutes. Based on a seven callback procedure and using the American Association of Public Opinion research (AAPOR) RR3 method, a standard for this type of survey, the overall response rates were a typical 18 percent for the landline sample and

---

[10] *Id.* at Fn. 3.

[11] *Id.*

22 percent for the cellular sample. Statistical results are weighted to correct known demographic discrepancies.[12] The margin of sampling error for the complete set of weighted data is ±3.6 percent at the 95 percent confidence level. The margin of error is higher for smaller subgroups within the sample.

Table 1 presents the characteristics of the sample. For this report, we created cross-tabulations of a subset of our survey questions to compare responses across typical age categories (18-24, 25-34, 35-44, 45-54, 55-64, and 65+). Because some people didn't reveal their age, the total for this study's sample is 975 individuals. We considered chi-square values for each table significant at the level of $p < .05$. When the chi-square tests were significant, we used two sample t-tests to discover whether there are statistically significant differences between the 18-24 year olds and all the older adults (i.e. 18-24 compared to 25-65+). We also used Scheffe post-hoc tests to examine if any two age groups are significantly different from each other (e.g. 18-24 vs. 25-34 or 18-24 vs. 35-44) on each possible answer to the question being asked in the tables. For both t-tests and Scheffe tests[13] we considered significance to be at the level of $p < .05$.

All tables presented in this paper are based on the weighted sample of the data,

---

[12] A two-stage procedure was used to weight this dual-frame sample. A first-stage weight was applied to account for the overlapping sample frames. The first stage weight balanced the phone use distribution of the entire sample to match population parameters. The phone use parameter was derived from an analysis of the most recently available National Health Interview Survey (NHIS) data along with data from recent dual-frame surveys. (See Blumberg SJ, Luke JV, "Wireless substitution: Early release of estimates from the National Health Interview Survey, July-December, 2008." National Center for Health Statistics. May 2009.) This adjustment ensures that the dual- users are appropriately divided between the landline and cell sample frames.

The second stage of weighting balanced the total sample demographics to population parameters. The total sample was balanced to match national population parameters for sex, age, education, race, Hispanic origin, region (U.S. Census definitions), population density, and telephone usage. The basic weighting parameters came from a special analysis of the Census Bureau's 2008 Annual Social and Economic Supplement (ASEC) that included all households in the continental United States. The population density parameter was derived from Census 2000 data. The telephone usage parameter came from the analysis of NHIS data.

We conducted all analyses in this report using SPSS on a weighted random sample. Due to the unique way that SPSS handles weight, we applied the standardized weight in all analyses so that the sample was corrected by population proportion but not by population size. That is, the sample size was not inflated to the original population size in our analysis. Using the standardized weight prevents the risk of unduly reducing standard errors in significance tests and thereby prevents the risk of having type I errors in the analysis.

[13] Since Tables 15 and 16 involve indexed variables, on top of the tests on the comparisons of percentages we conducted additional t-tests and Scheffe tests to compare the means of the created indexed variables. See text for details.

with a valid sample size of 975. However, applying weights causes rounding errors in cross-tabulations, which is the reason that the Ns in all tables, except for Table 11, appear as a number other than 975.

**Table 1:  Characteristics of U.S. Adults in Sample (N=1,000)\***

|  | % |
|---|---|
| **Sex** | |
| Male | 48 |
| Female | 52 |
| **Age** | |
| 18-24 | 14 |
| 25-34 | 21 |
| 35-44 | 20 |
| 45-54 | 19 |
| 55-64 | 15 |
| 65+ | 8 |
| Refused | 3 |
| **Race** | |
| White | 78 |
| Black or African American | 9 |
| Asian or Pacific Islander | 4 |
| American Indian or Alaskan Native | 1 |
| Mixed Race | 2 |
| Other/Don't Know/Refused | 6 |
| **Hispanic or Latino Background?** | |
| Yes | 11 |
| No | 88 |
| Don't Know/Refused | 1 |
| **Household Income** | |
| Under $30,000 | 21 |
| $30,000 to under $50,000 | 19 |
| $50,000 to under $75,000 | 17 |
| $75,000 and Over | 33 |
| Don't Know/Refused | 10 |
| **Region of the Country** | |
| Northeast | 19 |
| Midwest | 22 |
| South | 33 |
| West | 26 |

\*When the numbers don't add to 100% it is because of a rounding error.

## Findings

The following tables will elaborate on a basic theme:  Large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. For most of the questions we asked, there is a statistically significant difference between the youngest adults and older age categories. However, even in these cases over half of the young adult-respondents did answer in the direction of older adults.  There clearly is *social significance* in that large numbers of young adults—in some cases, 80-90 percent—agree with older Americans on issues of information privacy.

## Table 2 – Refused to Provide Information

| Have you ever refused to give information to a business or a company because you thought it was not really necessary or was too personal? | Total | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 88% | 82% | 84% | 91% | 93% | 92% | 85% |
| *No, have not* | 11% | 18% | 13% | 9% | 7% | 7% | 14% |
| *Don't know/refused* | 1% | 0% | 3% | 0% | 0% | 1% | 1% |
| *Total* | 974 | 139 | 206 | 197 | 195 | 151 | 86 |

$x^2$= 34.158, df = 10, $p$ < .001

## Table 3 – Uploading Where I am Recognizable

| Generally speaking, anyone who uploads a photo or video of me to the internet where I am clearly recognizable should first get my permission. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Strongly agree or Agree* | 86% | 84% | 81% | 86% | 90% | 91% | 88% |
| *Strongly disagree or Disagree* | 13% | 16% | 18% | 13% | 9% | 9% | 8% |
| *Don't know/refused* | 1% | 0% | 2% | 1% | 1% | 0% | 3% |
| *Total* | 973 | 140 | 206 | 197 | 195 | 150 | 85 |

$x^2$= 22.8, df = 10, $p$ < .05; Differences are significant but not related to young adults vs. older adults.   See text.

**Table 4 – Right To Know**

| Do you think there should be a law that gives people the right to know everything that a website knows about them, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 68% | 62% | 68% | 73% | 71% | 64% | 69% |
| *No, law is not necessary* | 30% | 35% | 31% | 24% | 28% | 31% | 30% |
| *Don't know/refused* | 2% | 3% | 2% | 3% | 1% | 5% | 1% |
| *Total* | 976 | 141 | 206 | 197 | 196 | 150 | 86 |

$x^2$= 12.3, df = 10, $p$ = .27 : Differences not significant

**Table 5 – Right To Delete**

| Do you think there should be a law that requires websites and advertising companies to delete all stored information about an individual, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 92% | 88% | 91% | 90% | 94% | 94% | 90% |
| *No, law is not necessary* | 8% | 11% | 7% | 10% | 5% | 5% | 9% |
| *Don't know/refused* | 1% | 1% | 1% | 0% | 1% | 1% | 1% |
| *Total* | 975 | 139 | 207 | 197 | 195 | 150 | 87 |

$x^2$= 10.6, df = 10, $p$ = .39 : Differences not significant

These dynamics are visible quite clearly in Tables Two through Five, which report on Americans' sensitivity regarding privacy issues. Large proportions of all age groups have refused to provide information to a business for privacy reasons.  They agree or agree strongly with the norm that a person should get permission before posting a photo of someone who is clearly recognizable to the internet, even if that photo was taken in public.  They agree that there should be a law that gives people the right to know "everything that a website knows about them."  And they agree that there should be a law that requires websites and advertising companies to delete "all stored information" about an individual.  In the case of the first issue (see Table Two), a statistically significant lower proportion of 18-24 year olds agrees with these positions, but this proportion of young adults agreeing or agreeing strongly was nevertheless over 80%.[14]  With respect to

---

[14] In Table 2, when comparing the 18-24 year olds to the rest of the sample, the differences in the percentages between the two groups are statistically significant at .05 level according to a two-sample t-test.  Interestingly, the Scheffe tests of differences between 18-24 year olds and each of the other groups show no significance at .05 level.  With respect to Table 3, although answers to this question are

the other three issues (see Tables Three through Five), the differences between the 18-24 year olds and the other adults are not statistically significant: both young and old alike are in agreement.

Privacy Practices

We also sought to determine whether young adults were different from other adult categories when it came to common privacy-related practices—whether they read privacy policies, how frequently they erase their browser cookies, whether or not they had ever changed their mind about an online purchase because of a privacy or security concern, and how frequently they check their credit report. In the case of reading privacy policies, there are no statistical differences among age groups. As Table 6 shows, about half the adult population, including young adults, says it reads policies often or sometimes. When it comes to erasing cookies (Table 7), 58% of young adults say they erase cookies often or sometimes. Statistical tests beyond the chi-square also indicate that age differences are essentially not statistically significant. The t-test tells us that the only statistically significant finding involves the higher proportion of 18-24 year olds answering "hardly ever" compared to the rest of adults. The Scheffe test finds no significance at all between the answers of young adults and the other age groups when it comes to erasing cookies.

About half of young adults have changed their mind about a purchase because of some privacy concern. Post hoc comparisons of the data in Table 8 show no significant difference between young adults and the rest of the population.

We did find a difference regarding checking credit reports. A substantially lower percentage of 18-24 year olds does that, with statistically significant differences from the other age groups centering on their answers of "about once a year," and "less often than once a year." Young adults have a significantly higher proportion of people who answered "never" than the other age groups.[15] This distinction between young adults and the others is understandable because credit reports become relevant to older adults, as they buy homes and use credit cards that are not cosigned by their parents.

significantly related to age, neither Scheffe tests nor t-tests show clear patterns of significance between young adults and the rest of the sample or between the youngest adults and each of the older groups.

[15] The comparison between the 18-24 year olds and the rest of the sample was statistically significant at .05 level according a two sample t-test.

**Table 6 – Reading Privacy Policies**

| Do you read the privacy policies of websites … | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 14% | 14% | 12% | 16% | 15% | 14% | 15% |
| *Sometimes* | 36% | 37% | 32% | 40% | 34% | 39% | 36% |
| *Hardly ever* | 32% | 31% | 32% | 28% | 37% | 32% | 27% |
| *Never* | 18% | 16% | 24% | 16% | 13% | 14% | 22% |
| *Don't know/refused* | 1% | 1% | 0% | 1% | 0% | 1% | 0% |
| *Total* | 974 | 141 | 207 | 196 | 195 | 149 | 86 |

$x^2$= 21.9, df = 20, $p$ = .349 : Differences not significant

**Table 7 – Erasing Cookies**

| When using the internet, do you erase your cookies . . . | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 39% | 33% | 36% | 51% | 40% | 39% | 33% |
| *Sometimes* | 24% | 25% | 31% | 19% | 20% | 28% | 16% |
| *Hardly ever* | 17% | 25% | 12% | 18% | 20% | 13% | 13% |
| *Never* | 12% | 14% | 14% | 7% | 12% | 13% | 17% |
| *Not familiar with cookies* | 6% | 4% | 3% | 3% | 5% | 7% | 17% |
| *Don't know/refused* | 3% | 0% | 4% | 3% | 4% | 1% | 5% |
| *Total* | 974 | 139 | 206 | 196 | 195 | 150 | 88 |

$x^2$= 73.7, df = 25, $p$ < .001

**Table 8 – Changing Mind About Purchase**

| Have you ever changed your mind about buying something online because of a privacy or security concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 56% | 49% | 55% | 66% | 58% | 56% | 41% |
| *No, have not* | 38% | 44% | 39% | 29% | 38% | 39% | 47% |
| *Does not shop online* | 6% | 7% | 6% | 5% | 4% | 5% | 12% |
| *Don't know/refused* | 0% | 0% | 0% | 1% | 1% | 1% | 0% |
| *Total* | 974 | 140 | 207 | 196 | 196 | 150 | 85 |

$x^2$= 27.7, df = 15, $p$ < .05

**Table 9 – Checked Credit Report**

| In general, how often do you check your credit report? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *At least once a month* | 10% | 14% | 9% | 12% | 5% | 9% | 9% |
| *Every few months (quarterly)* | 18% | 13% | 19% | 17% | 17% | 22% | 17% |
| *About once a year* | 34% | 16% | 40% | 39% | 40% | 33% | 31% |
| *Less often than once a year* | 18% | 5% | 17% | 24% | 21% | 21% | 20% |
| *Never* | 19% | 48% | 14% | 8% | 17% | 15% | 21% |
| *Don't know/refused* | 1% | 4% | 1% | 1% | 1% | 1% | 1% |
| *Total* | 972 | 139 | 206 | 197 | 194 | 150 | 86 |

$x^2$= 144.4, df = 25, $p < .001$

Levels of Concern

The tendencies noted above carry over to levels of privacy concern.  We fielded a two-prong question. The first asked the individual whether his or her privacy concern was greater, the same, or less than five years ago; the responses are in Table 10. Answers are significantly associated with age, but the 18-24 group was not significantly different than all older respondents, or any single group.  Contributing to the significance in this table is the 65+ group, which is more concerned than the 25-34 year olds ($p < .05$).

The obvious problem with Table 10 is that there is no baseline—we don't know the level of concern at which the person began five years ago.  But we pursued the question so we could ask people whose privacy concerns increased to note "the most important reason" for the rise. The responses, in Table 11, reveal no statistically significant association with age or differences between the 18-24 year olds and the other age groups.

**Table 10 – Concern About Privacy Issues**

| Compared to five years ago, would you say you are more concerned about privacy issues on the internet, less concerned, or that you have the same level of concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *More concerned* | 55% | 54% | 44% | 59% | 55% | 60% | 67% |
| *Less concerned* | 6% | 9% | 8% | 5% | 6% | 5% | 4% |
| *Same level* | 38% | 36% | 47% | 36% | 39% | 35% | 29% |
| *Don't know/refused* | 1% | 1% | 2% | 1% | 1% | 0% | 0% |
| *Total* | 974 | 140 | 206 | 196 | 196 | 150 | 86 |

$x^2$= 26.7, df = 15,  $p < .05$

**Table 11 – Concern About Privacy Issues – Most Important Reason**

| Please tell me which one of the following is the most important reason you are more concerned about privacy issues on the internet than you were five years ago. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *You know more about privacy risks online* | 48% | 42% | 59% | 41% | 51% | 47% | 46% |
| *You have more to lose if your privacy were violated* | 30% | 32% | 23% | 29% | 29% | 32% | 39% |
| *You have had an experience that has changed your mind about privacy* | 17% | 22% | 13% | 23% | 15% | 17% | 12% |
| *Some other reason?* | 3% | 0% | 4% | 6% | 3% | 2% | 4% |
| *Don't know/refused* | 2% | 4% | 0% | 2% | 2% | 2% | 0% |
| *Total* | 532[16] | 74 | 90 | 115 | 107 | 89 | 57 |

$x^2$= 23.0, df = 20, $p = .29$ : Differences not significant

Penalties for Information Misuse

One way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them. We asked respondents one question related to the monetary penalties a firm should pay and another regarding what should happen to executives involved in illegal privacy breaches.  As seen in Tables 12 and 13, the two tendencies we have seen throughout can be found here. Table 12 shows a clear majority of 18-24 year olds selecting the highest dollar amount of punishment offered (more than $2,500), though a t-test demonstrates that they were

---

[16] N is small because only people who answered "more concerned" in the previous question were asked this question.

significantly less likely to choose that amount than the rest of the population ($p < .001$), and more likely to select \$1,000 ($p < .05$).

In Table 13, around half of the sample chose the harshest penalties for the companies or individuals—being put out of business and facing jail time, while a third or more thought the company should fund efforts to protect privacy. Though answers to this question are associated with age, 18-24 year olds differed[17] significantly from all other age groups only in selecting "The company should not be punished in any of those ways" ($p < .01$).

**Table 12 – Illegal Use of Personal Information**

| If a company purchases or uses someone's personal information illegally, about how much—if anything—do you think that company should be fined? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *\$100* | 2% | 3% | 3% | 1% | 1% | 1% | 2% |
| *\$500* | 4% | 5% | 5% | 5% | 5% | 1% | 3% |
| *\$1,000* | 9% | 14% | 10% | 10% | 8% | 7% | 6% |
| *\$2,500* | 7% | 11% | 9% | 6% | 7% | 3% | 5% |
| *More than \$2,500* | 69% | 54% | 63% | 68% | 76% | 79% | 77% |
| *It depends* | 4% | 10% | 1% | 5% | 3% | 5% | 2% |
| *Don't know/refused* | 4% | 3% | 8% | 5% | 1% | 5% | 5% |
| *Total* | 979[18] | 141 | 207 | 196 | 196 | 152 | 87 |

$x^2 = 70.8$, df = 35, $p < .001$

**Table 13 – Punishing Companies for Illegal Uses of Information**

| Beyond a fine, companies that use a person's information illegally might be punished in other ways. Which ONE of the following ways to punish companies do you think is most important? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *The company should be put out of business* | 18% | 16% | 19% | 18% | 14% | 20% | 22% |
| *The company should fund efforts to help people protect privacy* | 38% | 33% | 46% | 33% | 43% | 36% | 31% |
| *Executives who are responsible should face jail time* | 35% | 40% | 29% | 40% | 33% | 34% | 40% |
| *The company should not be punished in any of those ways* | 3% | 7% | 2% | 5% | 2% | 2% | 2% |
| *It depends* | 2% | 0% | 2% | 2% | 2% | 3% | 2% |
| *Don't know/refused* | 4% | 4% | 3% | 3% | 7% | 5% | 2% |
| *Total* | 973 | 139 | 206 | 197 | 195 | 151 | 85 |

$x^2 = 39.0$, df = 25, $p < .05$

---

[17] 18-24 year olds have a higher percentage choosing the no penalty option.

[18] The slightly inconsistent N is caused by rounding errors as explained in the methods section.

Privacy Knowledge

Do the similarities between young adults and other age groups carry over to knowledge of existing privacy laws?  In order to explore this question, we gave the respondents a set of true/false statements to evaluate and answer. (See Table 14.) All of the answers are false. Consistently answering *true* reflects a belief that the law protects an individual's online and offline privacy more than it does in these common circumstances. We read the statements in separate clusters relating to online and offline privacy; within these clusters, we read the statements in random order.  To simplify presentation of the findings, we created a composite index tallying the number correct for each age group.

**Table 14 – Online and Offline Privacy Questions**

| Online Questions | Answer |
|---|---|
| If a website has a privacy policy, it means that the site cannot share information about you with other companies, unless you give the website your permission. | False |
| If a website has a privacy policy, it means that the site cannot give your address and purchase history to the government. | False |
| If a website has a privacy policy, it means that the website must delete information it has about you, such as name and address, if you request them to do so. | False |
| If a website violates its privacy policy, it means that you have the right to sue the website for violating it. | False |
| If a company wants to follow your internet use across multiple sites on the internet, it must first obtain your permission. | False |
| **Offline Questions** | **Answer** |
| When you subscribe to a newspaper or magazine by mail or phone, the publisher is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you order a pizza by phone for home delivery, the pizza company is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you enter a sweepstakes contest, the sweepstakes company is not allowed to sell your address or phone number to other companies without your permission. | False |
| When you give your phone number to a store cashier, the store is not allowed to sell your address or phone number to other companies without your permission. | False |

As Table 15 indicates, the savvy that many attribute to younger individuals about the online environment doesn't appear to translate to privacy knowledge. The entire population of adult Americans exhibits a high level of online-privacy illiteracy; 75 percent answered only two or fewer questions correctly, with 30 percent getting none right.  But the youngest adults perform the worst on these measures: 88 percent answered

only two or fewer correctly, and 42 percent could answer none correctly.  A t-test shows that the difference between the average number correct for 18-24 year olds and the other adults—1.12 correct compared to 1.61 for the others—is statistically significant ($p < .001$).  When focusing particularly on how these differences play out between young adults and the particular groups, a Scheffe test reveals that the 18-24 year olds were more likely to get none correct than the 25-34 and 35-44 year olds ($p < .05$ in both cases).  Young adults were also less likely to get 3-4 correct than the 35-44 and 55-64 groups ($p < .05$ in both cases).  In all of these statistically significant cases, a substantially larger percentage of young adults know less about online privacy regulations.

When it came to our offline privacy knowledge questions, the differences between young adults and the other age groups were even more pronounced.  Eighty-eight percent of 18-24 year olds answered two or fewer of our offline questions correctly, compared to 74 percent overall.  A t-test showed that 18-24 year olds only answered 0.9 correctly compared to 1.8 for the other groups ($p < .001$).  Moreover, Scheffe tests note statistical significance compared to each of the other groups.  Young adults were more likely to answer no questions correctly than any other age group; conversely, they were less likely to answer 3-4 questions correctly than any other age group.

Getting these questions right is important because it indicates whether the respondents know that privacy laws protect them in common commercial transactions.  We found that while young adults tend to be similar to older adults in attitudes, practices, and policy preferences regarding information privacy, they are quite more likely than older adults to be wrong in judging whether the legal environment protects them.

**Table 15 - Online Privacy Knowledge Questions (5 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct | 5 Correct |
|---|---|---|---|---|
| 18-24 (N=139) | 42% | 46% | 11% | 1% |
| 25-34 (N=206) | 25% | 58% | 16% | 2% |
| 35-44 (N=197) | 24% | 38% | 30% | 8% |
| 45-54 (N=196) | 26% | 48% | 24% | 3% |
| 55-64 (N=150) | 39% | 32% | 28% | 1% |
| 65 and Older (N=86) | 31% | 43% | 24% | 1% |
| Overall (N=974) | 30% | 45% | 22% | 3% |

$x^2$ = 73.1, df = 15, $p$ < .001

**Table 16 - Offline Privacy Knowledge Questions (4 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct |
|---|---|---|---|
| 18-24 (N=139) | 50% | 38% | 12% |
| 25-34 (N=206) | 34% | 37% | 29% |
| 35-44 (N=197) | 24% | 33% | 43% |
| 45-54 (N=196) | 26% | 41% | 34% |
| 55-64 (N=150) | 26% | 32% | 42% |
| 65 and Older (N=86) | 27% | 37% | 36% |
| Overall (N=974) | 27% | 35% | 38% |

$x^2$ = 69.9, df = 20, $p$ < .001

## Conclusion

In policy circles, it has become almost a cliché to claim that young people do not care about privacy. Certainly there are many troubling anecdotes surrounding young individuals' use of the internet, and of social networking sites in particular. Nevertheless, we found that in large proportions young adults do care about privacy. The data show that they and older adults are more alike on many privacy topics than they are different. We suggest, then, that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

Public policy agendas should therefore not start with the proposition that young adults do not care about privacy and thus do not need regulations and other safeguards. Rather, policy discussions should acknowledge that the current business environment along with other factors sometimes encourages young adults to release personal data in order to enjoy social inclusion even while in their most rational moments they may espouse more conservative norms. Education may be useful. Although many young adults are exposed to educational programs about the internet, the focus of these programs is on personal safety from online predators and cyberbullying with little emphasis on information security and privacy.[19] Young adults certainly are different from older adults when it comes to knowledge of privacy law. They are more likely to believe that the law protects them both online and off. This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

But education alone is probably not enough for young adults to reach aspirational levels of privacy. They likely need multiple forms of help from various quarters of society, including perhaps the regulatory arena, to cope with the complex online currents that aim to contradict their best privacy instincts.

---

[19] "Enhancing Child Safety and Online Technologies: Final Report of the Internet Safety Technical Task Force." The Berkman Center for Internet & Society, December 31, 2008. Available at: http://cyber.law.harvard.edu/pubrelease/isttf/

**GZJ KDKV'64''''**

S. Hrg. 105–1069

# S. 2326, CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

# HEARING

BEFORE THE

## SUBCOMMITTEE ON COMMUNICATIONS

OF THE

# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

SEPTEMBER 23, 1998

Printed for the use of the Committee on Commerce, Science, and Transportation





U. S. DEPOSITORY

OCT 2 4 2000

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2000

59–873 CC

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402



Original from
UNIVERSITY OF CALIFORNIA

3

children. Fortunately in this case, the Federal Trade Commission stepped in and GeoCities agreed to comply with a consent order to stop these deceptive practices. This consent order was the first of its kind and I applaud the vision and hard work of the FTC in helping to protect citizens' privacy in the online world. The Subcommittee is very fortunate to have Chairman Pitofsky of the FTC testify today and I look forward to his comments.

I also look forward to the comments of the witnesses on the Children's Online Privacy Protection Act, which is co-sponsored by Senator McCain and Senator Bryan. I understand that the bill drew heavily from the recommendations and findings of the FTC's June report on Internet privacy, which found that 89 percent of children's websites collected personal information. The report also found that only 10 percent of the sites provide for some form of parental control over the collection and use of the information. Clearly this situation cannot be allowed to continue.

The McCain-Bryan bill requires the FTC to come up with rules that would provide notice of its personal information collection and use practices and obtain parental consent for the collection of personal information from children. While I have some minor technical concerns about a couple of the bill's provisions, I am sure they can be worked out and I look forward to eventually co-sponsoring the legislation.

I commend Sen. McCain and Sen. Bryan for their hard work on this critical issue. While the remaining legislative days available are few, I will work with the Chairman of the Full Committee, Sen. Bryan, and others to move the bill to markup and passage by the full Senate as quickly as possible.

I look forward to the testimony of the witnesses. Thank you.

### STATEMENT OF HON. RICHARD H. BRYAN, U.S. SENATOR FROM NEVADA

Senator BRYAN. Mr. Chairman, let me preface my comments by thanking you. Had you not agreed to convene this hearing as promptly as you have, I think the chances of this legislation being processed in this session would have been greatly diminished. Your leadership as the chairman of the subcommittee and your responsiveness to our request indicates that working with you and other members of this committee I believe, we can process legislation. I want to thank you for your leadership and for your efforts to work with us on this piece of legislation.

The Internet offers families unlimited opportunities to explore and enjoy new worlds of information. The Internet is quickly becoming a major force in the lives of our children, as it moves swiftly into our homes and classrooms around the country. Indeed, proficiency with the Internet will be a necessary skill required to succeed in the 21st Century.

According to the 1998 American Internet User Survey, there are currently 6 million children 12 and under that use the Internet, and that number is likely to grow to 15 million by the turn of the century. Children are by their very nature honest and trusting, and when approached on the Internet by their favorite cartoon characters, or offered a chance to win a prize, or to participate in some kind of a contest, children will freely provide very personal and private information.

Children of the ages of 12 and under are not likely to have the judgment to know what is appropriate. I know when my own children were 9 or 10 years of age, if they were given an opportunity to participate in some kind of contest, I am sure that they would have been willing to freely disclose any information about my credit card they happened to know, because they would have enjoyed the opportunity to participate in these games, which are fun and enjoyable for youngsters.

Technology has made the collection and dissemination of information that is collected about each of us easier than ever before.

Generated on 2018-11-19 19:32 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

 Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

4

Besides readily available public record information, more and more companies are compiling data on what groceries we buy, what movies we rent, what magazines we read, and what we purchase with our credit cards.

There is a growing concern about the privacy of our medical records and the release of personal financial data. Indeed, today our personal privacy is threatened because (1) information about us has market value to those who wish to sell us goods and services, and (2) the ease with which this information can be gathered and disseminated has been vastly enhanced because of the technology of our time.

As the chairman was kind to acknowledge, almost 2 years ago Senator McCain and I asked the Federal Trade Commission to conduct a study of online privacy issues after it came to our attention that certain companies were giving out social security numbers over the Internet.

The FTC has looked into a number of privacy areas, and this summer released a report that makes the case for legislative action in the area of protecting children's privacy.

As the FTC will testify this morning, while 90 percent of the commercial Web sites targeting children they surveyed collected personal information from these children, only 1 percent actually got parental consent before collecting this personal information.

This situation is deplorable, in my judgment. Children 12 and under are not fully capable of understanding the consequences of giving out personal information online. Children do not oftentimes understand or comprehend the potential risk posed to their public posting of personal information that may lead to both online or other types of contact by strangers.

And the sad part is that our children often understand the Internet and know how to navigate it far better than do our parents. Parents do not always have the knowledge, the ability, or the opportunity to monitor their children's online activities, and that is why Web site operators should get parental consent prior to soliciting personal information.

The legislation that Senator McCain and I have introduced will give parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent.

The Center for Media Education and the Center for Democracy and Technology should be commended for the excellent work that they have done in addressing privacy issues. Additionally, industry has created the Online Privacy Alliance and the Children's Advertising Review Unit, and come up with self-regulatory guidelines that show us that they are taking this issue seriously, and I would like to acknowledge and express my appreciation for the willingness of the privacy groups in the industry to work on this in passing this important legislation.

Earlier this year, I held seminars in Nevada, the southern part of our State in Las Vegas, and the northern part of our State in Reno, before a group of community leaders and State and local PTA presidents to discuss online privacy issues. These seminars were very informative, and really were eye-openers for parents.

Generated on 2018-11-19 19:32 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
UNIVERSITY OF CALIFORNIA

5

Most of these parents were pretty sophisticated. We had the FBI and the FTC. The FBI pointed out the risks that are involved in terms of your child's safety by providing information when requested as to where your child goes to school, what hours he or she may be alone after school.

Now, admittedly some of this information would have great market value to legitimate commercial enterprises, but one of the lessons we were reminded of constantly by the FBI in their presentation is that you never know who you are talking to or with on the Internet. You may think that you are talking to another youngster who has the same interests that your child may have, but in point of fact you never know that.

The FBI has a very impressive program in which they are involved in identifying sexual predators and pedophiles who may use this information and who would prey on our youngsters.

So there is a personal safety issue involved as well.

There is also the privacy issue that we have talked about. The Internet provides a tremendous educational and cultural opportunity for our children, but Linda Hooper, one of the FBI agents who made the presentation, made an analogy that traveling on the Internet is like visiting a major city.

There are places that you would want your children to go and to see, the great historical areas of interest, the great museums, but just like traveling to a major city there are places that you would not want your child to go unaccompanied, or without the consent or permission of his or her parents.

And so, too, the Internet has the same caution. Interactive online communications provide tremendous opportunities for the children of the 21st Century, but at the same time it presents unique challenges for protecting the privacy of young children and their families.

And Mr. Chairman, I look forward to working with you and processing this piece of legislation and, again, let me thank you for your leadership and your responsiveness in calling this timely hearing.

Senator BURNS. Thank you, Senator Bryan.

I would like to call Mr. Robert Pitofsky, chairman of the Federal Trade Commission here in Washington, DC, and we welcome you this morning, and if you could come to the table and give us your insight on this, I want to join Senator Bryan in congratulating you in the work that you have done in this area, because it concerns all of us here on Capitol Hill, so we congratulate you. Thank you for coming this morning.

## STATEMENT OF ROBERT PITOFSKY, CHAIRMAN, FEDERAL TRADE COMMISSION

Mr. PITOFSKY. Thank you very much, Mr. Chairman, Senator Bryan. I am delighted to appear here today to testify in support of S. 2326, the Children's Online Privacy Protection Act of 1998.

The legislation would establish basic fair information practices protection for children, the youngest and most vulnerable of online consumers. The commission believes this legislation is important and necessary.


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

# EXHIBIT 43





*Journal of Marketing Communications*

ISSN: 1352-7266 (Print) 1466-4445 (Online) Journal homepage: http://www.tandfonline.com/loi/rjmc20

# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

**Kristien Daems, Patrick De Pelsmacker & Ingrid Moons**

**To cite this article:** Kristien Daems, Patrick De Pelsmacker & Ingrid Moons (2017): Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors, Journal of Marketing Communications, DOI: 10.1080/13527266.2017.1409250

**To link to this article:** https://doi.org/10.1080/13527266.2017.1409250

⊞ Published online: 04 Dec 2017.

✎ Submit your article to this journal ⬀

⊪ Article views: 177

⬤ View Crossmark data⬀

JOURNAL OF MARKETING COMMUNICATIONS, 2017
https://doi.org/10.1080/13527266.2017.1409250





# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

Kristien Daems[a], Patrick De Pelsmacker[a] and Ingrid Moons[a,b]

[a]Faculty of Applied Economics, Marketing Department, University of Antwerp, Antwerp, Belgium; [b]Faculty of Design Sciences, University of Antwerp, Antwerp, Belgium

**ABSTRACT**

Although they are key stakeholders, advertisers' views on the usage of novel (integrated and/or interactive) advertising toward minors has remained largely unexplored in academic research. This study aims to fill this gap by examining advertising professionals' opinions about the ethical appropriateness of using novel advertising formats aimed at children and teenagers, how to advance advertising literacy in minors, and their views of practices that are potentially privacy-invading, by means of both a quantitative online survey and qualitative in-depth interviews with Belgian advertising professionals. Results show that advertisers perceive that from 12 years onward, minors are capable to understand novel advertising formats and it is ethically justified to use them. Remarkably, advertisers would inform minors already from the age of 10 years onward about the commercial intention behind new advertising formats. Advertisers have strict opinions about collecting information online from minors. They advocate a combination of laws and self-regulation and governmental and educational campaigns to raise awareness and develop advertising literacy.

**ARTICLE HISTORY**
Received 1 August 2017
Accepted 21 November 2017

**KEYWORDS**
Advertising professionals; children; ethical appropriateness; novel advertising formats; teenagers; (self-)regulation

## Introduction

In the advertising world, (self-)regulation, guidelines, and codes exist with respect to advertising aimed at minors. Examples of self-regulation initiatives are the ICC code of Advertising and Marketing Communication practice, the EU Pledge, and the CARU guidelines (EU Pledge 2017; ICC 2017; The Childrens' Advertising Review Unit 2009). However, despite these initiatives to protect minors against potentially misleading and deceptive advertising, there still exists a lack of regulation on novel (online) integrated and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). Additionally, online advertising practices are often used to collect and use personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013), and are therefore potentially privacy-invading.

Consequently, the use of novel advertising formats raises questions about their ethical appropriateness, and about how advertising literacy should be improved, especially with children and teenagers (Eagle and Dahl 2015; Moses and Baldwin 2005; Nebenzhal and Jaffe 1998). Research on new advertising formats aimed at children and teenagers from an

**CONTACT** Kristien Daems ✉ Kristien.daems@uantwerpen.be

© 2017 Informa UK Limited, trading as Taylor & Francis Group

advertiser perspective is lacking. Moreover, advertising professionals' view on advertising aimed at minors has received scant attention in academic literature and is limited to traditional advertising (Clarke and Gardner 2005; Geraci 2004; Gray 2005; Grimm 2004; Martínez 2016).

The present study contributes to developing insights into how Belgian advertising professionals perceive several aspects of the ethical ramifications of using novel advertising formats to target children and teenagers. The study can inform the advertising profession and public policy about these perceptions and be a starting point to influence or change them.

## Children's and teenagers' understanding of advertising

From an early age onward, children are confronted with advertising practices, while a majority of them is unconscious about the commercial and persuasive intent behind them (Crane and Kazmi 2010). In order to be able to cope in a correct way with promotional efforts, the development of advertising literacy is of crucial importance. *Advertising literacy* is the knowledge about advertising, the ability to recognize advertising techniques, and the capability to understand the persuasive intentions behind them (John 1999; Rozendaal, Buijzen, and Valkenburg 2011). Identifying and understanding advertising depends on the ability to distinguish advertising from program- or entertainment context (Moses and Baldwin 2005). The ability to do so depends on factors such as the subtlety of the persuasive message, the similarity between the commercial and entertaining message and the presence of a cue or separator to announce the advertising message (Shiying et al. 2014).

The Persuasion Knowledge Model (PKM) (Friestad and Wright 1994) describes how people identify and process advertising and which knowledge and experience an individual needs to cope with persuasive attempts: topic knowledge (knowledge about the topic of the message, e.g., product), agent knowledge (knowledge about the advertiser behind the persuasive attempt), and persuasion knowledge (knowledge about advertising formats and persuasive tactics) (Wright, Friestad, and Boush 2005). The cognitive skills and experience to acquire this knowledge develop through childhood and adolescence (John 1999; Moses and Baldwin 2005; Wright, Friestad, and Boush 2005). Compared to adults, children and teenagers have limited cognitive skills, less advertising experience, and less developed advertising knowledge. This makes them less able to process advertising in a conscious manner and more vulnerable for and at a greater risk of being misled by persuasive communication (Kunkel et al. 2004; Moses and Baldwin 2005; Rozendaal, Buijzen, and Valkenburg 2010). As a consequence, it is more difficult for minors to recognize and understand different advertising formats and advertisers' intentions and activate their persuasion knowledge and advertising literacy (John 1999; Kunkel et al. 2004; Terlutter and Capella 2013). According to John (1999) consumer socialization of children is a sequence of three different stages (perceptual, analytical, and reflective) through which children develop from preschool (3 years old) until adolescence (16 years old). From the analytical stage (7–11 years) onward children are able to analyze stimuli (e.g., an advertisement) on multiple dimensions. Only from the reflective stage (11–17 years) onward children or teenagers have the ability to fully understand advertising and advertisers' persuasive attempts as their social and information processing skills are further developed.

## Changing advertising practices

Nowadays, children and teenagers grow up in a – predominantly online – media environment (websites, social media, games, mobile platforms, etc.) in which they encounter new integrated and/or interactive advertising formats on a regular basis (Blades et al. 2014; Bucy, Kim, and Park 2011; Rideout 2014). In integrated formats, the lines between advertising and other informative or entertaining media content have become increasingly blurred (Blades et al. 2014; Kunkel et al. 2004; Moore 2004; Terlutter and Capella 2013). An example of this integration in traditional media is brand placement, the paid inclusion of brand identifiers in media content (television programs, movies) (Gupta and Lord 1998; Karrh 1998).

Besides, novel advertising formats persuade children and teenagers in an implicit manner by means of subtle affective associations (Nairn and Fine 2008). Interactive advertising formats give the receivers the opportunity to interact with the message and are often perceived as fun and enjoyable (Hudders, Cauberghe, and Panic 2016; Mallinckrodt and Mizerski 2007). Advergames are a typical example of online, interactive advertising formats aimed at children and teenagers. Advergames embed specific brand or product-related items (e.g., logos, brand names, brand mascots) in a game (Mallinckrodt and Mizerski 2007). This can lead to a circumventing of minor's persuasion knowledge activation (Owen et al. 2013; Panic, Cauberghe, and De Pelsmacker 2013). In a highly entertaining environment especially children may not be able to identify the commercial intention and lack the ability to activate and retrieve their persuasion knowledge (Waiguny, Nelson, and Terlutter 2012). It is harder to identify these (online) advertising formats as advertising and more difficult to understand their persuasive intent than it is for prominent (online) formats such as banner ads (Tutaj and van Reijmersdal 2012).

Online (integrated) advertising practices are also often used to collect personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013) and are, therefore, liable to practices that are privacy-invading and that inappropriately use personal data the media user is not always aware of, for instance, by having minors first subscribe to a newsletter or submit personal information before they can participate in a contest or play a game. Here again, based on children's limited cognitive skills, it can be expected that children are less likely than adults to take the privacy risks involved into account (Steeves 2006).

Using integrated and/or interactive advertising formats, is often considered as inherently unethical, since they may hamper the activation of persuasion knowledge (Nairn and Fine 2008; Owen et al. 2013), and raise questions about when and how they can be used, and how advertising literacy should be improved (Eagle and Dahl 2015; Nebenzhal and Jaffe 1998; Palmer 2005). This is especially relevant when these formats are targeted at minors. John's analysis about minors' advertising literacy dates back to 1999 and the PKM (Friestad and Wright 1994) was developed based on insights from traditional advertising (Rozendaal, Buijzen, and Valkenburg (2010). However, current advertising is no longer dominated by traditional mass media advertising, but by integrated and interactive advertising formats (Kunkel et al. 2004). Consequently, recognizing commercial messages as advertising, understanding the commercial and persuasive intention behind integrated and online advertising, and the activation of persuasion knowledge is even more challenging for children and teenagers than before (Moses and Baldwin 2005). As a result, there may be an increased need to protect them and educate them about advertising to develop their advertising literacy (Crane and Kazmi 2010).

## Existing (self-)regulation and guidelines

Both governmental institutions and the advertising industry have formulated principles regarding advertising aimed at minors. The ICC Code provides guidelines about ethical and responsible advertising directed at children for self-regulated organizations (ICC 2017). The Children's Advertising Review Unit is a self-regulated initiative in the United States which implies standards (CARU guidelines) regarding the ethicality of advertising aimed at children (Ji and Laczniak 2007; The Childrens' Advertising Review Unit 2009). In Belgium, the Belgian Pledge (derived from a similar initiative at European level, the EU Pledge) is a voluntary, joint initiative between the Union of Belgian Advertisers (UBA), FEVIA (Federation of food industry in Belgium), and COMEOS (representative for Belgian commerce and services) in which their members commit to not target advertising toward children under the age of 12 for food and beverages which do not meet the nutritional standards (so called HFSS products) or not to target products at children under the age of 12, regardless of the product (The Belgian Pledge 2017). In June 2017, the Belgian Pledge was updated and additional integrated and interactive (online) media channels (beyond television and print advertising) were add to the range of the Belgian Pledge (FEVIA 2017).

However, despite the existing (self-)regulation, codes, and guidelines, there still is a lack of regulation on novel, integrated, and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). The specific characteristics of these formats warrant up-to-date legislation and/or self-regulation. Advertising professionals are key stakeholders in this debate. Their fundamental understanding of the ethical ramifications of the use of novel advertising formats toward minors and their willingness to take them into account in developing advertising campaigns is crucial.

## Advertising professionals' opinions regarding advertising aimed at minors: research questions

Advertising professionals' view on the ethical acceptability of advertising and advertising formats has received scant attention in academic research. Apart from Harris Interactive's study (Geraci 2004; Grimm 2004) and Martínez (2016) study, to the best of our knowledge, there are no published studies on advertisers' opinions regarding advertising practices aimed at children and teenagers, let alone their view with respect to new advertising formats. However, advertising professionals are the main decision-makers with respect to the target groups, formats, and stimuli used in their campaigns. Besides commercial concerns, one might expect that ethical considerations also play a role in these decisions. Consequently, developing insights into advertising professionals' opinions about the ethical appropriateness of novel advertising formats aimed at children and teenagers, how minors should be informed and how their advertising literacy should be improved, and how they could be protected by (self-)regulation, is important. The current study aims at exploring the practice and perception of advertising professionals regarding these issues, and aims to answer the following research questions:

(1) Which new advertising formats are mostly used toward children and teenagers?
(2) According to advertising professionals, from which age onward

   (a) do minors understand the commercial intention behind new advertising formats,

    (b)  is the usage of these new advertising formats ethically acceptable,

    (c)  should minors be made aware of the commercial intent of these marketing communication techniques?

(3)  What are the characteristics of an ethical data collection and data protection policy aimed at minors?

(4)  How should advertising toward children and teenagers be regulated and how should advertising literacy be developed?

## Method

The study uses a mixed method approach by means of both a quantitative online survey and follow-up qualitative interviews.

### Online survey

#### Research population and sample

The research population is staff of Belgian advertisers and Belgian advertising agencies. The sampling frames for the online survey were the membership list of the UBA and a list of employees of advertising agencies retrieved from the website of the Association of Communication Companies (ACC). In total, 2614 advertisers from 245 different companies and 160 advertising professionals working in 79 advertising agencies were invited by email to participate to an online survey. The survey consisted of forced response questions (except for the question were the respondents could leave their email address to participate in the follow-up study). As a result the respondents could not skip questions they did not wanted to answer. However, the respondents could stop and leave the survey any time. Each respondent received the questions of the survey in the same order. Only the order of the vignettes was randomized across respondents. As a result the questions at the beginning of the survey were answered by more respondents compared to questions at the end of the survey. One hundred and sixty-one respondents started the survey. Seventy-one of them only partially completed it, because they dropped out after the introductory questions (44), after the vignettes (18), or after part of the last sections (9) of the questionnaire. Ninety respondents completed the full survey. The analyses were carried out on the number of respondents who answered the question analyzed.

#### Questionnaire and measures

In the current study, a minor is defined as an individual between 6 and 18 years old. This group is divided into two subgroups, namely children (between 6 and 12 years old) and teenagers (between 13 and 18 years old).

    After a number of introductory questions, nine vignettes were presented in randomized order. Vignettes are descriptions of concrete situations or scenarios presented to the respondents to reflect upon or give their opinion about (Mortelmans 2007). The nine vignettes describe new integrated and/or interactive advertising formats used to target minors in both offline and online environments without mentioning the specific name or advertising format they refer to: product placement on television (PP), in-game advertising (IGA), advergames, applications, video advertising, merchandising, online behavioral advertising (OBA),

search engine marketing, and location-based services (LBS). These advertising formats are prominent examples of novel advertising formats. They were most often mentioned in exploratory interviews with advertisers and advertising agencies as formats that are used toward minors. Merchandising is the only traditional advertising format and was chosen because it was often mentioned as a very prominent technique when targeting children. The vignettes can be found in Appendix 1. One hundred and seventeen respondents answered all three questions for each of the nine vignettes.

By means of a slider ranging from 6 to 18 years old, for each vignette the respondents answered two questions:

(1) from which age onward are minors capable of understanding the persuasive nature of the advertising technique described in the vignette?
(2) from which age onward is the type of advertising ethically acceptable to use?

If respondents held the opinion that minors were not capable of understanding the advertising format, or that the usage of an advertising format was not ethically acceptable toward minors, they could indicate this answer option and they did not have to indicate an age on the slider. Only when a respondent indicated an age to the second question, they had to answer a third question:

(3) from which age onward minors need to be notified about the commercial intent of the advertising format described in the vignette?

For this question, they could also indicate that minors do not have to be warned about the commercial intent of the advertising format, and thus they did not have to indicate an age. These questions were based on the Harris Interactive study (Geraci 2004; Grimm 2004).

In the second section, respondents were asked how advertising to minors should be regulated, and through which organizations (governmental or educational) advertising literacy in minors should be improved. Ninety-nine respondents answered the questions in this survey block. The following five questions were presented (five-point Likert scale ranging from totally disagree to totally agree):

- Commercial communication with regard to children/teenagers should be regulated…:
  - …exclusively through self-regulation.
  - …exclusively through legislation.
  - …through a combination of legislation and self-regulation.
- The government should strive for awareness building in order to promote advertising literacy among children/teenagers.
- The educational system has a duty to promote advertising literacy among children/teenagers.

In the third section, respondents were asked about the verification rules in ethical minors' protection (yes/no answer option) (97 respondents answered this question):

- A proper data-protection policy on a social media platform that is accessible to children/teenagers…
  - provides verification of the ages of children.
  - allows verification of the status of the parent or legal guardian.
  - provides clear information concerning the use of cookies and the possibility of disabling them.

Respondent's opinion about the usage of advertising formats to collect personal data was asked by means of four questions (five-point Likert scale ranging from totally disagree to totally agree) (95 respondents answered these questions):

- Children/teenagers should not be allowed to register with a brand website or mobile platform without permission from a parent or legal guardian.
- The collection of personal information from children/teenagers should be prohibited.
- Personal information from children/teenagers should not be collected, processed, or used without permission from their parents or legal guardians.
- It is important for parents or legal guardians to be notified of the processing of personal information from their children /teenagers.

Additionally, two questions were asked concerning collection of personal data from minors (95 respondents answered these questions):

- The collection of personal information from children/teenagers…
  - is an ethically acceptable strategy.
  - is a strategy for which it is important to receive permission from parents or legal guardians.

The questions concerning privacy-policy, data collection, and protection were based on a report from the Federal Trade Commission (2012) and on the rules about (verifiable) parental consent and online privacy from the US' COPPA (Children's Online Privacy Protection Act's 1998).

The fourth section of the survey asked advertisers who target minors which forms of advertising they use toward children and/or teenagers. Respondents had to answer these questions only for the target group (children and/or teenagers) toward whom they target advertising. Ninety-four respondents answered this question.

The survey ended with demographic questions: the industry of the company the respondent works in, in which department the respondent works, level of education, age, and gender. If respondents were willing to participate in a follow-up in-depth interview they could leave their email address.

### Qualitative follow-up study

As a follow-up to the survey, 10 semi-structured in-depth interviews with advertising professionals were held (hereafter referred to as 'the interviewees'). Of these 10 interviewees, three were advertisers out of a list of 23 who completed the survey and were willing to participate in a follow-up interview. The other seven interviewees did not participate in the survey. The latter were selected from a list obtained from the Belgian Union of Advertisers with 27 companies that advertise to either children or teenagers. The interviews took place in a face-to-face setting and took about 45 min to one hour. The purpose of this qualitative follow-up study was to corroborate, nuance, interpret, and enrich the insights from the survey. The interviews covered the same topics as the survey. For each topic, the interviewees were asked to voice their opinion, were confronted with the results from the survey, and were probed to comment on them and to explain their agreement and/or nuances. The mix of both interviewees that did participate in the survey and those that did not participate in the survey was useful to have the interviewees reflected upon their own perceptions if they

participated in the survey, or to have the interviewees reflect upon the perceptions of other advertisers if they did not participated in the survey. All interviews were recorded and transcribed afterward to facilitate the analysis with the NVivo software program.

## Results

The results from both the quantitative and qualitative study are reported together for each research question.

### Sample characteristics

One hundred and sixty-one respondents started the survey and 90 respondents (85 advertising professionals and 5 advertising agency professionals, 54 females, $M_{age}$ = 41.5, 70 respondents educated at master's level) fully completed it. Both groups were taken together in the analysis. The financial industry (14.13%), the food industry (11.96%), and government (11.96%) are most represented. Most advertisers work in a marketing (50%) or a communication department (30.2%). The five participating advertising agency professionals work for more than 10 industries.

### Advertising formats used toward minors

The majority (61.7%) of the respondents only target adults (older than 18 years). 38.8% (36) professionals work for a company that advertises to minors. Six of these 36 advertising professionals only target children and 12 of them only advertise to teenagers. Half of the advertisers who target minors (18) focus on both children and teenagers. So, overall, 24 target children and 30 advertise to teenagers. The advertising formats used by advertisers who target children or teenagers are given in absolute numbers in Figure 1.

The most often used advertising formats toward children are contests, branded websites, premiums (a gift in exchange for the purchase of the product (Rideout 2014), and advergames. Contests, banners, and branded websites are the most often used advertising formats toward teenagers. OBA and location-based services are the least used advertising formats toward both children and teenagers.

## Vignettes

The results for the responses to the vignettes are divided into three sections: the understanding of advertising formats, ethical acceptability of advertising formats, and the need to inform minors about the commercial intentions of advertising formats. For each section, by means of independent sample t-tests, it was analyzed whether significant differences exist between the opinion of advertisers who target children and/or teenagers and advertisers who only target adults.

### Understanding advertising formats

According to the respondents, the average age at which minors can understand the different advertising formats is around 12–13 years (Table 1). Compared to the other formats, the





**Figure 1.** Advertising formats used toward children and teenagers.

**Table 1.** Average age whereupon minors understand different advertising formats.

| Advertising formats | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: 'Minors not able to understand the advertising format' |
|---|---|---|---|---|
| Merchandising | 12.74 | 2.58 | 118 | 6 |
| Applications | 12.40 | 2.54 | 115 | 8 |
| Product Placement (PP) | 13.03 | 2.75 | 114 | 12 |
| In-game Advertising (IGA) | 12.86 | 2.69 | 113 | 10 |
| Search Engine Marketing (SEM) | 12.26 | 2.59 | 121 | 5 |
| Location-Based Services (LBS) | 13.25 | 2.68 | 116 | 7 |
| Online Behavioral Advertising (OBA) | 12.72 | 2.59 | 121 | 6 |
| Advergames | 12.13 | 2.61 | 124 | 5 |
| Video advertising | 14.06 | 2.73 | 95 | 28 |

average age for location-based services, product placement and video advertising is slightly higher (13–14 years), with video advertising being the format with the highest average age indicated. The last column of the table indicates that IGA, product placement and especially video advertising are considered the most difficult formats to understand since for these formats it was indicated most often that minors are not able to understand them. For none of the nine vignettes an acceptable age under 12 years was reported.

Almost all interviewees agree that 12 years as an average age to understand these different advertising formats is plausible. The interviewees refer to research that takes 12 years as a threshold for advertising regulations (World Federation of Advertisers 2007) (quote 1).

*Quote 1:* In our company we adhere to the principle that we do not advertise towards children below the age of 12. There are good reasons for making this distinction. Academic research shows that children from the age of 12 onwards can interpret and judge advertising.

Table 2 shows that for merchandising, applications, and OBA, significant differences between respondents who advertise toward minors and advertisers who only advertise toward adults were found. Advertisers who also target minors hold the opinion that, on average, minors can understand merchandising, application, and OBA from an earlier age onward (12 years), compared to advertisers who only target adults (13 years).

### Ethical acceptability of advertising formats

On average, advertising formats are perceived as ethical when targeted at minors from the age of 12–13 years onward (Table 3). OBA, location-based services, and applications are perceived as ethically acceptable to use toward minors from an older age onward (13–14 years). The majority of the interviewees agrees with this opinion. These opinions correspond with the overall perception of advertising professionals that advertising aimed at teenagers is not a problem, whereas it is with children. The results are also in correspondence with 'The Belgian Pledge' and the 'CARU guidelines' (Ji and Laczniak 2007; The Belgian Pledge 2017; The Childrens' Advertising Review Unit 2009).

Significant differences in the opinions of advertisers who only target adults and those who target minors were only found for applications. The average age whereupon applications are considered as being ethically acceptable to use toward minors by advertisers who target toward minors is 12–13 years. Advertisers who only target adults indicate a significantly older average age, namely 14 years.

### Informing minors about the commercial intent of advertising formats

The average age from which minors should be informed about the commercial intent of advertising formats indicated is around 9–10 years (Table 4). The age is lower than the average age of 12 years to understand different advertising formats and to use the different formats in an ethical way. Some advertisers indicate that it is not necessary to inform minors about the commercial intent of advertising. This is especially the case for IGA, advergames, video advertising, and product placement.

Some interviewees would not inform children early on, whereas others hold the opinion that children have to be informed from an even earlier age onward (e.g., 6 years). Quotes 2 and 3 illustrate these mixed opinions.

**Table 2.** Understanding advertising formats – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P |
|---|---|---|---|---|---|
| Merchandising | Minors | 35 | 12.00 | 2.62 | .013 |
| | Adults | 54 | 13.31 | 2.24 | |
| Applications | Minors | 35 | 11.42 | 2.69 | .004 |
| | Adults | 54 | 13.04 | 2.32 | |
| Online Behavioral Advertising (OBA) | Minors | 35 | 11.97 | 2.53 | .035 |
| | Adults | 54 | 13.14 | 2.52 | |

**Table 3.** Average age whereupon the use of different advertising formats toward minors is considered as ethically acceptable.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: *'advertising format morally/ethically not acceptable'* |
|---|---|---|---|---|
| Merchandising | 12.62 | 3.36 | 115 | 9 |
| Applications | 13.44 | 2.91 | 111 | 12 |
| Product Placement (PP) | 12.85 | 3.36 | 114 | 12 |
| In-game Advertising (IGA) | 12.85 | 3.66 | 108 | 15 |
| Search Engine Marketing (SEM) | 12.76 | 3.33 | 119 | 7 |
| Location-Based Services (LBS) | 14.73 | 2.94 | 102 | 21 |
| Online Behavioral Advertising (OBA) | 13.52 | 3.30 | 116 | 11 |
| Advergames | 12.48 | 3.32 | 123 | 6 |
| Video advertising | 12.32 | 3.89 | 97 | 26 |

**Table 4.** Average age whereupon minors should be informed about the commercial intent of advertising formats.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N = Advertisers who indicated: *'No need to inform about commercial intent'.* |
|---|---|---|---|---|
| Merchandising | 9.88 | 3.37 | 105 | 7 |
| Applications | 9.82 | 3.29 | 110 | 1 |
| Product Placement (PP) | 9.9 | 3.25 | 101 | 10 |
| In-game Advertising (IGA) | 10.52 | 3.61 | 93 | 14 |
| Search Engine Marketing (SEM) | 9.92 | 3.18 | 110 | 8 |
| Location-Based Services (LBS) | 10.68 | 3.36 | 98 | 3 |
| Online Behavioral Advertising (OBA) | 10.43 | 3.39 | 107 | 8 |
| Advergames | 9.86 | 3.28 | 109 | 12 |
| Video advertising | 10.15 | 3.58 | 85 | 12 |

*Quote 2*: The ages indicated are quite old. I personally think that children can be gradually informed from an earlier age on, let's say six years. The explanation given to a 6-year old cannot be the same as the one given to a 9-year old or 12-year old child. (…) I think there are sufficient courses to integrate advertising education in school. Especially since advertising has become more complex. Additionally, parents do not always understand these advertising types themselves.

*Quote 3:* It is important to take into account the ability of children to understand the different advertising formats before informing them about it. Otherwise, it would work contradictory. I would say up to eight years old it has to be the parent who explains advertising formats.

Compared to advertisers who only target advertising toward adults, advertisers who target minors hold the opinion that, on average, it is desirable to inform minors about the commercial content from a younger age onward. This is especially the case for novel, integrated advertising formats which are more difficult to recognize (product placement, IGA, and video advertising) (Table 5).

### Ethical data collection and data protection policy

According to the vast majority of the respondents, a proper data collection and protection policy should provide verification of the age of the children (93.8%) or teenagers (88.7%),

**Table 5.** Information about commercial content – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P* |
|---|---|---|---|---|---|
| Product Placement | Minors | 33 | 9.06 | 2.65 | .012** |
| | Adults | 47 | 10.81 | 3.45 | |
| Video advertising | Minors | 24 | 8.79 | 3.17 | .052* |
| | Adults | 43 | 10.47 | 3.40 | |
| In-game advertising (IGA) | Minors | 31 | 8.97 | 2.93 | .011** |
| | Adults | 48 | 11.00 | 3.62 | |

*$p \le .10$; ** $p \le .050$.

allow verification of the status of the children's (80.4%) or teenagers' (71.1%) parents or legal guardians, and should provide clear information concerning the use of cookies and the possibility of disabling them to children (97.9%) and teenagers (95.9%). A substantial majority of the respondents (79%) agrees that the collection of personal information of children should be prohibited. Half of the advertisers (56.8%) agrees with this statement if teenagers are concerned. One in four (25.2%) disagrees if teenagers are the target group and 10.5% disagrees if children are the target group. If children (teenagers) are considered as a target group 71.5% (55.8%) agrees and 18.9% (25.3%) disagrees.

A majority (74.7%) of the advertisers agrees that children should not be allowed to register on brand websites or mobile platforms without permission of their parents or legal guardians (11.6% disagrees). If teenagers are considered as a target group the results are mixed (41.1% disagrees and 33.7% agrees). Advertisers think that it is important to notify parents or legal guardians if personal information from their children (87.4%) and teenagers (76.8%) is processed. If children are a target group, collection of personal data is perceived as unethical by a majority of the advertising professionals (84.2%). The results for teenagers are mixed (42.1% agrees, 57.9% disagrees). The majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%).

### Regulation and awareness building

The vast majority of advertising professionals do not agree with the statement that advertising toward children (76.7%) and teenagers (69.7%) should be regulated exclusively by means of self-regulation, or exclusively by means of legislation (children:62.6%; teenagers: 69.7%). The majority of the advertising professionals agree that advertising toward minors should be regulated by a combination of self-regulation and legislation for both children (77.8%) and teenagers (72.7%). The opinions of the interviewees with respect to the regulation of commercial communication toward minors are mixed. Quotes 4 and 5 illustrate both opinions.

*Quote 4:* With self-regulation you have certain mechanisms at work which work good. I think this type of regulation is the most efficient one. It is impossible to have all rules made by the legislator. In my opinion you have a stronger case if companies are willing to impose certain restrictions upon themselves and have these restrictions monitored by an independent institution. Regulation exclusively through legislation requires that the government has to invest in monitoring, because making laws without any type of monitoring does not makes sense. Therefore I think it is much more efficient to work with self-regulation. This requires a certain level of governmental confidence in companies. I do think however that companies take their responsibility seriously.

*Quote 5:* Legislation should set certain rules, and self-regulation can go further. Regulation exclusively through self-regulation, especially if it is not monitored, does not make a lot of sense.

Most advertisers agree with the statement that the government should strive for awareness building to promote advertising literacy among children and teenagers (both 66.7%) as with the statement that it is the educational system's duty to promote advertising literacy among children (76.8%) and teenagers (73.8%).

## Discussion

### *Main findings*

In general, all advertising professionals acknowledge that children are a vulnerable advertising target group. Teenagers are considered to be mature enough to identify advertising and to understand the commercial intention behind advertising formats. This finding is in line with John (1999) who noted that from the analytical stage in consumer socialization onward (age 11–12), teenagers have the skills to identify and understand traditional advertising. Protecting minors from persuasive communication is, therefore, more important for children (6–12 years) than for teenagers (Eagle, Bulmer, and De Bruin 2003). The results from the current study show that advertising professionals hold more or less the same perception for integrated and interactive advertising formats as for traditional ones. This is remarkable since their characteristics make it harder to identify them as advertising and recognize their persuasive intent.

Contests, brand websites, and premium offers are the most often used advertising formats toward children. Contests, banners, and branded websites are used mostly toward teenagers.

Advertisers consider minors capable of understanding novel advertising formats on average from 12 years onward. In the study of Harris Interactive (Geraci 2004; Grimm 2004) the average age whereupon minors were considered to view advertising critically was nine years. However, this study does not provide a clear definition of which type of advertising was studied. Martínez (2016) found that advertisers perceive children capable of identifying and understanding the intent of advertising at 10–12 years of age.

Novel advertising formats are considered ethically acceptable to use toward minors from the age of 12–13 years onward. These results are substantially different from Harris Interactive's study (Geraci 2004; Grimm 2004) in which marketers state that it is appropriate to target advertising to children at age seven. Advertising professionals in our study indicate that the average age to inform minors about the commercial intentions of novel advertising formats age is around 9–10 years. This is remarkable since the average age whereupon advertising is considered as ethical as well as the age whereupon minors are considered to be capable to understand the different advertising formats is 12–13 years. It appears that advertisers would inform minors about advertising even before they consider minors to be able to understand how novel advertising formats work. This is somewhat counterintuitive, since one would expect that it is only meaningful to inform or explain something to an individual, when this individual can comprehend what is explained. In the current study, formats for which it was indicated that it is not necessary to inform minors about the commercial intention are IGA, advergames, and video advertising. These results are also remarkable because these advertising formats are characterized by their integrated nature, which makes it more

difficult to recognize these formats as advertising. One would expect that especially for these integrated, implicit advertising formats it is necessary to disclose the commercial intent to minors.

The majority of the advertisers agrees that a proper policy should provide a verification of the ages of children, allows verification of the status of the parent or legal guardian and provides clear information concerning the use of cookies and the possibility of disabling them. According to the majority of advertising professionals, parents should give their permission for the data collection of both their children and teenagers.

A combination of both legislation and self-regulation to regulate advertising aimed at minors is preferred by the respondents, and governments and schools have a responsibility to make children advertising literate.

### Theoretical implications

The results of our study show that advertisers' perceptions are still based on old theories about the different stages of consumer socialization in childhood (John 1999) and models about children's cognitive development (e.g., the PKM (Friestad and Wright 1994) and that they still adhere to the principles in these models and theories that are based on traditional media. However, contemporary advertising formats as the ones explored in the current study differ from these traditional media because of their integrated and/or interactive characteristics. However, these characteristics of novel advertising formats do not seem to be taken into account when it comes to the usage and ethical acceptability of these formats when targeted at children and teenagers. As such, traditional models still function as standards for today's advertisers' perceptions, despite the fact that the way minors encounter advertising has changed a lot over the last decades and it is questionable whether these theories and models still apply to the use of contemporary advertising formats.

It appears that advertisers are satisfied with just complying with the existing ethical guidelines and rules (e.g., it is allowed to advertise to children from the age of 12 onward) and that they are not questioning whether they should take the lead themselves in updating the ethical guidelines or applying stricter ones. As such they apply the 'ethics code' view in ethical decision-making: they adhere to the law and to standards in ethical guidelines (De Pelsmacker, Geuens, and Van den Bergh 2017; Pickton and Broderick 2005). Nevertheless, given the vulnerability of minors, adhering to the 'consumer sovereignty' principle (taking the vulnerability, decision-making process and the available information to the consumer into account) or to the 'caveat venditor' principle (doing everything in the best interest of the consumers) might be more appropriate.

Moreover, it is even possible that the advertisers who participated in this study are more engaged with the subject of ethical advertising aimed at children and teenagers and are more ethically concerned than advertisers who did not participate.

### Managerial and public policy implications

The results of the current study can inform advertising professionals and public policy. Generally speaking, advertisers seem to be well aware of the vulnerability of especially young children when it comes to coping with (novel) advertising formats. The majority holds the opinion that children do not have a good understanding of new advertising formats, that

ethical concerns when advertising toward especially young minors should be taken into account, and, overwhelmingly, that especially children (not so much teenagers) should be protected against the inappropriate collection and use of personal data. Apparently, they are well aware of the measures that are taken to protect minors (for instance especially in case of unhealthy products) and to develop their advertising literacy, and they acknowledge to support them. This provides a solid basis for further developing these initiatives. Especially the educational system has a role to play, since advertisers hold the opinion that advertising literacy in children should be developed early on in primary school. Children's persuasion knowledge can be enhanced by teaching programs that focus on advertising literacy education and that learn how minors should reflect critically about advertising messages (Nelson 2016).

However, important improvements can still be made. In our sample, 24 respondents indicate that they target children, and half of both the respondents and the interviewees find this appropriate. This goes against (self-)regulatory measures in the Belgian Pledge and CARU guidelines. Advertising professional associations and the government could and should make more efforts to make professionals aware of these rules. Twenty to 25% of the respondents find it appropriate to collect personal information about children younger than 12, and to allow children to register on online platforms without parental consent. This is also an area for further improvement.

Integrated and/or online advertising formats are, on average, perceived by advertising professionals as ethically appropriate to use toward minors from the age of 12–13 years onward. However, for professionals who are currently advertising toward minors, this age is significantly lower. Public policy and advertising associations have to remain vigilant as to the ethical values of companies that market products targeted at children.

Importantly, in their appreciation of appropriateness to advertise (differently) to children and teenagers, advertising professionals seem to be largely inspired by their experience and appreciation of traditional advertising, and by the rules and regulations that are now in place. They implicitly assume that the implications of advertising today do not differ from the situation in the past when only traditional advertising formats were used. They do not seem to realize that novel integrated and interactive formats that develop brand commitment in a different way than before may constitute different challenges than traditional advertising with respect to how children and teenagers understand and process them, and what this entails with respect to the development of advertising literacy and ethical considerations with respect to these novel formats. This constitutes a major challenge for advertising organizations and public policy. Due to the specific nature of these novel advertising formats, there is an urgent necessity to revise what 'ethical advertising' aimed at minors mean and to protect minors against the implicit influence of these novel formats. This is a task for both public policy and the advertising industry.

## Limitations

The response rate of the survey was relatively low (90 out of 2614 fully completed and 161 partly completed the survey). This is common in on online surveys (Sheehan 2002) and if the subject of the survey is a rather sensitive topic, as is the case with the topic of the current study, it can be expected that this will affect the response rate negatively (Fan and Yan 2010). Nevertheless, due to the possibility of non-response bias, one should be careful with broad

generalizations of the study results. Moreover, the advertising professionals completed the survey voluntarily. This might have resulted in reaching only those advertisers who have a particular interest into the subject of advertising literacy of minors. The selection of respondents for the in-depth interviews partly compensated for this by also interviewing advertising professionals who did not participate in the survey.

Besides differences between children and teenagers, with regard to cognitive development, there might also be differences within these age categories. Future research could make this more fine-grained distinction.

Due to the limited information available in the description of the vignettes it is likely that certain situational factors which could have had an influence on the respondents' answers were not provided. However, the in-depth interviews provided a somewhat more nuanced and deeper insight into these situational factors.

The researchers tried to control for socially desirable answers by making the survey anonymous. Nevertheless, a certain degree of social desirability bias cannot be excluded.

## Acknowledgments

This study was conducted as a part of the AdLit interdisciplinary research project and funded by Vlaio (Flemish agency for innovation and entrepreneurship).

## Disclosure statement

No potential conflict of interest was reported by the authors.

## Funding

This work was supported by Agentschap Innoveren en Ondernemen [grant number 130008].

## Notes on contributors

*Kristien Daems* is a PhD student at the marketing department at the faculty of applied economics at the University of Antwerp. Her research focuses on children's and teenagers' advertising literacy.

*Patrick De Pelsmacker* is a professor of marketing at the faculty of applied economics at the University of Antwerp. His research focuses upon marketing communication effectiveness, new advertising media and formats, ethical consumer behavior, and social marketing.

*Ingrid Moons* is an assistant professor of marketing and consumer research at the faculty of applied economics and the faculty of design sciences at the University of Antwerp. Her research is situated in the domain of processes underlying the adoption of new products and services. Co-creation leading to innovation is one of the focal points in her research.

## References

Blades, Mark, Caroline Oates, Fran Blumberg, and Barrie Gunter. 2014. *Advertising to Children: New Directions, New Media*. Basingstoke: Palgrave Macmillan.

Bright, Laura F., and Terry Daugherty. 2012. "Does Customization Impact Advertising Effectiveness? An Exploratory Study of Consumer Perceptions of Advertising in Customized Online Environments." *Journal of Marketing Communications* 18 (1): 19–37. doi:10.1080/13527266.2011.620767.

Bucy, Erik Page, Sojung Claire Kim, and Miyeong Cecilia Park. 2011. "Host Selling in Cyberspace: Product Personalities and Character Advertising on Popular Children's Websites." *New Media & Society* 13 (8): 1245–1264.

Calvert, S. L. 2008. "Children as Consumers: Advertising and Marketing." *The Future of Children* 18 (1): 205–234. doi:10.1353/foc.0.0001.

Children's Online Privacy Protection Act. 1998. "Children's Online Privacy Protection Rule (COPPA)." https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/childrens-online-privacy-protection-rule.

Clarke, Barbie, and Catherine Gardner. 2005. "Concerned Children's Advertisers Leads the Way." *Young Consumers* 6 (4): 24–28.

Crane, Andrew, and Bahar Ali Kazmi. 2010. "Business and Children: Mapping Impacts, Managing Responsibilities." *Journal of Business Ethics* 91 (4): 567–586.

De Pelsmacker, Patrick, Maggie Geuens, and Joeri Van den Bergh. 2017. *Marketing Communications: A European Perspective*. 6th ed. Harlow: Pearson education.

Eagle, Lynne, Sandy Bulmer, and Anne De Bruin. 2003. "Marketing Communications Implications of Children's New Electronic Media Use: A Survey of Parental Opinions and Perceptions." *Journal of Marketing Communications* 9 (3): 129–146.

Eagle, Lynne, and Stephan Dahl. 2015. "Product Placement in Old and New Media: Examining the Evidence for Concern." *Journal of Business Ethics*: 1–14.

EU Pledge. 2017. "About the EU Pledge." EU-pledge. Accessed July 17. http://www.eu-pledge.eu/content/about-eu-pledge

Fan, Weimiao, and Zheng Yan. 2010. "Factors Affecting Response Rates of the Web Survey: A Systematic Review." *Computers in Human Behavior* 26 (2): 132–139.

Federal Trade Commission. 2012. "Mobile Apps for Kids; Current Privacy Disclosures Are Disappointing." FTC Staff Report http://www.ftc.gov/reports/mobile-apps-kids-current-privacy-disclosures-are-disappointing.

FEVIA. 2017. *Food Indusrty Reinforced the Engagement on the Topic of Responsible Child Advertising* [Voedingssector versterkt engagement rond verantwoorde kinderreclame]. Press release FEVIA, June 26th. Accessed June 26. http://www.fevia.be/nl/pers/voedingssector-versterkt-engagement-rond-verantwoorde-kinderreclame.

Friestad, M., and P. Wright. 1994. "The Persuasion Knowledge Model: How People Cope with Persuasuion Attempts." *Journal of Consumer Research* 21 (1): 1–31.

Füg, Oliver C. 2008. "Save the Children: The Protection of Minors in the Information Society and the Audiovisual Media Services Directive." *Journal of Consumer Policy* 31 (1): 45–61.

Geraci, John C. 2004. "What Do Youth Marketers Think about Selling to Kids?" *Young Consumers* 5 (3): 11–17.

Gray, Oliver. 2005. "Responsible Advertising in Europe." *Young Consumers* 6 (4): 19–23.

Grimm, M. 2004. "Is Marketing to Kids Ethical?" *Brandweek* 45 (14): 44–48.

Gupta, Pola B., and Kenneth R. Lord. 1998. "Product Placement in Movies: The Effect of Prominence and Mode on Audience Recall." *Journal of Current Issues & Research in Advertising* 20 (1): 47–59.

Hudders, Liselot, Veroline Cauberghe, and Katarina Panic. 2016. "How Advertising Literacy Training Affect Children's Responses to Television Commercials versus Advergames." *International Journal of Advertising* 35 (6): 909–931. doi:10.1080/02650487.2015.1090045.

ICC. 2017. "Marketing and Advertising to Children." Accessed July 12. https://iccwbo.org/global-issues-trends/responsible-business/marketing-advertising-and-advertising-to-children/

Ji, Mindy F., and Russell N. Laczniak. 2007. "Advertisers' Implementation of CARU Guidelines for Advertising Targeted at Children." *Journal of Current Issues & Research in Advertising* 29 (2): 27–38.

John, Deborah Roedder. 1999. "Consumer Socialization of Children: A Retrospective Look at Twenty-Five Years of Research." *Journal of Consumer Research* 26 (3): 183–213. doi:10.1086/209559.

Karrh, James A. 1998. "Brand Placement: A Review." *Journal of Current Issues & Research in Advertising* 20 (2): 31–49.

Kunkel, Dale, Brian L. Wilcox, Joanne Cantor, Peter Dowrick, Susan Linn, and Edward Palmer. 2004. "Report of the APA Task Force on Advertising and Children." http://www.apa.org/pubs/info/reports/advertising-children.aspx.

Mallinckrodt, Victoria, and Dick Mizerski. 2007. "The Effects of Playing an Advergame on Young Children's Perceptions, Preferences, and Requests." *Journal of Advertising* 36 (2): 87–100.

Martínez, Carolina. 2016. "'They Are Totally Unfiltered' Constructions of the Child Audience among Swedish Advertising Producers." *Television & New Media* 17 (7): 612–628.

McStay, Andrew. 2012. "I Consent: An Analysis of the Cookie Directive and Its Implications for UK Behavioral Advertising." *New Media & Society* 15 (4): 596–611.

Moore, Elizabeth S. 2004. "Children and the Changing World of Advertising." *Journal of Business Ethics* 52 (2): 161–167. doi:10.1023/B:BUSI.0000035907.66617.f5.

Mortelmans, D. 2007. *Handboek Kwalitatieve Onderzoeksmethoden* [Handbook Qualitative Research Methods]. Leuven: Acco.

Moses, Louis J., and Dare A. Baldwin. 2005. "What Can the Study of Cognitive Development Reveal about Children's Ability to Appreciate and Cope with Advertising?" *Journal of Public Policy & Marketing* 24 (2): 186–201.

Nairn, A., and C. Fine. 2008. "Who's Messing with My Mind? The Implications of Dual-Process Models for the Ethics of Advertising to Children." *International Journal of Advertising* 27 (3): 447–470.

Nebenzhal, Israel D., and Eugene D. Jaffe. 1998. "Ethical Dimensioins of Advertising Executions." *Journal of Business Ethics* 17 (7): 805–815.

Nelson, Michelle R. 2016. "Developing Persuasion Knowledge by Teaching Advertising Literacy in Primary School." *Journal of Advertising* 45 (2): 169–182. doi:10.1080/00913367.2015.1107871.

Owen, Laura, Charlie Lewis, Susan Auty, and Moniek Buijzen. 2013. "Is Children's Understanding of Nontraditional Advertising Comparable to their Understanding of Television Advertising?." *Journal of Public Policy & Marketing* 32 (2): 195–206.

Palmer, Daniel E. 2005. "Pop-Ups, Cookies, and Spam: Toward a Deeper Analysis of the Ethical Significance of Internet Marketing Practices." *Journal of Business Ethics* 58 (1): 271–280.

Panic, Katarina, Verolien Cauberghe, and Patrick De Pelsmacker. 2013. "Comparing TV Ads and Advergames Targeting Children: The Impact of Persuasion Knowledge on Behavioral Responses." *Journal of Advertising* 42 (2–3): 264–273.

Pickton, David, and Amanda Broderick. 2005. *Integrated Marketing Communications*. 2nd ed. Harlow: Pearson Education.

Rideout, Victoria. 2014. "Advertising to Children and Teens: Current Practices. A Common Sense Media Research Brief." https://www.commonsensemedia.org/research/advertising-to-children-and-teens-current-practices.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2010. "Comparing Children's and Adults' Cognitive Advertising Competences in the Netherlands." *Journal of Children and Media* 4 (1): 77–89. doi:10.1080/17482790903407333.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2011. "Children's Understanding of Advertisers' Persuasive Tactics." *International Journal of Advertising* 30 (2): 329–350.

Sheehan, Kim Bartel. 2002. "Online Research Methodology: Reflections and Speculations." *Journal of Interactive Advertising* 3 (1): 56–61.

Shiying, Li, Megan Pickering, Ali Moondore, Mark Blades, and Caroline Oates. 2014. "Young Children's Ability to Identify Advertisements on Television, Web Pages and Search Engine Web Pages." In *Advertsing to Children, New Directions, New Media*, edited by M. Blades, C. Oates, F. Blumberg, and B. Gunter, 199–218. London: Palgrave Macmillan.

Steeves, Valerie. 2006. "It's Not Child's Play: The Online Invasion of Children's Privacy." *University of Ottawa Law and Technology Journal* 3 (1): 169–188.

TaylorWessing. 2013. "Advertising across Different Media – A Guide to the Regulatory Playing Field in the UK." Accessed July 13. https://www.taylorwessing.com/download/article_advertising_different_media.html#.WWeBEIGkKpo

Terlutter, Ralf, and Michael L. Capella. 2013. "The Gamification of Advertising; Analysis and Reserach Directions of in-Game Advertising, Advergames, and Advertising in Social Network Games." *Journal of Advertising* 42 (2–3): 95–112.

The Belgian Pledge. 2017. "Responsible Advertising and Marketing towards Children." Accessed July 12. https://www.belgianpledge.be/nl/engagementen

The Childrens' Advertising Review Unit. 2009. "Self-Regulatory Program for Children's Advertising." www.caru.org/guidelines/guidelines.pdf.

Tutaj, Karolina, and Eva A. van Reijmersdal. 2012. "Effects of Online Advertising Format and Persuasion Knowledge on Audience Reactions." *Journal of Marketing Communications* 18 (1): 5–18.

Waiguny, Martin K. J., Michelle R. Nelson, and Ralf Terlutter. 2012. "Entertainment Matters! the Relationship between Challenge and Persuasiveness of an Advergame for Children." *Journal of Marketing Communications* 18 (1): 69–89.

World Federation of Advertisers. 2007. "Food and Beverage Advertising to Children: When is a Child a Child?" www.wfanet.org/pdf/.../when_is_a_child_a_child.pdf.

Wright, P., M. Friestad, and D. M. Boush. 2005. "The Development of Marketplace Persuasion Knowledge in Children, Adolescents, and Young Adults." *Journal of Public Policy & Marketing* 24 (2): 222–233.

## Appendix 1.  Overview of advertising formats in vignettes.

| | |
|---|---|
| Product Placement (PP) on television | In a television series, a particular brand of soft drink is consumed often, and the logo is brought into focus. The brand has paid for the soft drink to be used in the television series |
| In-game advertising (IGA) | In a popular racing game, players can choose from several existing brands of cars, and billboards advertising these car brands appear along the roadside. The car brands have paid the developers of the game to have their brands used in the racing game |
| Search Engine Marketing (SEM) | Lucas would like to know more about the rules of tennis. To this end, he types 'tennis' as a search term in Google. A large number of advertisements for sports brands related to the search term appear in a sidebar next to the actual results |
| Location-Based Services (LBS) | Marie goes shopping with some of her friends during the school holiday. As they approach a popular chain store, she receives a text message on her mobile telephone containing a promotional code for a chain store |
| Online Behavioral Advertising (OBA) | Tom is searching the internet for camping equipment for his youth movement's annual camp. When he then looks through Facebook, the NewsFeed contains advertisements related to camping equipment |
| Advergames | To promote the newest product in its line, a brand has developed a game that can be played on the brand's website. While playing this game, the game elements are related to the product and the brand, and players attempt to capture as many brand logos as they can |
| Video advertising | A video on YouTube shows a child and a father singing the soundtrack of the latest Disney movie together. Disney paid the child's father to post the video online for the purpose of advertising. The Disney logo does not appear anywhere in the music clip, and there is no statement that the video is part of an advertising campaign |
| Advertising in Applications | Lori has her own tablet. Every day, she plays a music quiz that is installed as an application on her tablet. The music quiz application was a free download, with advertising appearing between the questions. A large amount of the advertising consists of ads for the latest CD from her favorite group |
| Merchandising of popular figures in a virtual world | Sam has installed an application from a media company on his parents' tablet. The application is a virtual world in which he comes into contact with various media figures and in which he and his friends try to complete challenges in this virtual world successfully. A great deal of merchandising is associated with these media figures. For example, the media figures also appear in television programs, they are present in amusement parks and they are portrayed on many products for children and teenagers |

**GZJ KDKV'66''''**

# Self-Regulatory Program for Children's Advertising

Children's Advertising Review Unit
Administered by the Council of Better Business Bureaus
Policies and Procedures set by the Advertising Self-Regulatory Council (ASRC), a service of the advertising industry and Council of Better Business Bureaus, 112 Madison Avenue, New York, NY 10016

The Children's Advertising Review Unit
Self-Regulatory Program for Children's Advertising

Index

I. INTRODUCTION                                                                                          3

A. Overview of the Self-Regulatory Program                                              3

B. CARU's Role                                                                                        3

C. Boards and Advisory Bodies                                                               3

D. Procedures and Review Process                                                          4


II. The Self-Regulatory Program For Children's Advertising                     4

A. Scope                                                                                                  4

B. Definitions                                                                                          5

C. Core Principles                                                                                   5

D. Guidelines                                                                                          6

1. An Overview                                                                                        6

2. Part I:  General Guidelines                                                                  6

(a) Deception                                                                                           6

(b) Product Presentations and Claims                                                      7

(c) Material Disclosures and Disclaimers                                                 8

(d) Endorsements                                                                                    9

(e) Blurring of Advertising and Editorial/Program Content                        9

(f) Premiums, Kids' Clubs, Sweepstakes and Contests                          10

(g) Online Sales                                                                                      12

(h) Sales Pressure                                                                                  12

(i) Unsafe and Inappropriate Advertising to Children                              13


3. Part II: Guidelines for Online Privacy Protection                               14

(a) Data Collection                                                                                 15

(b) Age-Screening/Hyperlinks                                                                18

# I.      INTRODUCTION

## A. Overview of the Self-Regulatory Program

In 1974, the National Advertising Review Council (NARC) established the Children's Advertising Review Unit (CARU) as a self-regulatory program to promote responsible children's advertising. CARU is administered by the Council of Better Business Bureaus (CBBB) and funded by members of the children's advertising industry.

CARU's self-regulatory program sets high standards for the industry to assure that advertising directed to children is not deceptive, unfair or inappropriate for its intended audience. The standards take into account the special vulnerabilities of children, e.g., their inexperience, immaturity, susceptibility to being misled or unduly influenced, and their lack of cognitive skills needed to evaluate the credibility of advertising.

CARU's standards are embodied in principles and guidelines that were first adopted by CARU in 1975 and have been periodically revised to address changes in the marketing and media landscapes. For example, in 1996, CARU added a new section to the guidelines to address concerns about online data collection practices and updated this section again in 2014 to reflect amendments to the Children's Online Privacy Protection Act (COPPA).

## B. CARU's Role

CARU monitors and reviews advertising, websites and online services directed to children, initiates and receives complaints about advertising and online privacy practices, and determines whether such practices violate the program's standards. When it finds violations, it seeks changes through the voluntary cooperation of advertisers and website or online service operators. CARU also offers a general advisory service for advertisers and agencies, provides informational material for children, parents and educators, and encourages advertisers to develop and promote the dissemination of educational messages to children consistent with the Children's Television Act of 1990.

## C. Boards and Advisory Bodies

Policy for CARU's self-regulatory program is set by the Board of Directors of ASRC, a strategic alliance of the advertising industry and the CBBB. The Board is composed of key executives from the CBBB, the American Association of Advertising Agencies, the American Advertising Federation, the Association of National Advertisers, the Direct Marketing Association, the Electronic Retailing Association and the Interactive Advertising Bureau.

CARU's Academic/Expert Advisory Board includes leading experts in education, communication, child development, child mental health, marketing and nutrition. These

advisors provide CARU with guidance on child psychology and behavioral issues, market trends and research, and other issues as they relate to advertising and marketing to children. Members of the Advisory Board also consult with CARU on individual cases and participate in the review and revision of the principles and guidelines of the self-regulatory program.

The CARU Supporters' Council, composed of representatives of the companies that support the children's advertising industry's self-regulatory system, provides CARU with advice on trends and developments in children's advertising and media and participates in the review and revision of the principles and guidelines of the self-regulatory program.

### D. Procedures and Review Process

The procedures governing the review and resolution of cases, including the opportunity for appellate review by the National Advertising Review Board, are set forth in The Advertising Industry's Process of Voluntary Self-Regulation, which can be found at *http://www.asrcreviews.org/asrc-procedures/*. Under the procedures, at least ten times a year, the CBBB publishes Case Reports that include CARU's final case decisions, an Activity Report summarizing actions other than formal case decisions, and guidance based on prior published decisions. CARU's Case Reports can be found at *http://www.asrcreviews.org/category/caru/.*

## II.    THE SELF-REGULATORY PROGRAM FOR CHILDREN'S ADVERTISING

### A.    Scope

The principles and guidelines of the program apply to:

1.    National advertising primarily directed to children under 12 years of age in any medium. Such advertising will be determined by an analysis of factors, no single one of which will necessarily be controlling, including: (a) whether the content of the media in which the advertisement appears is intended for children under 12, (considering the content's subject matter, format, projected audience demographics, and extent to which other advertising in that content is intended for children under 12); (b) whether the advertisement appears during, or just before or after, a television program aired during what is generally understood to be children's programming, considering the time of day during which the advertisement appears and the media outlet; (c) whether the advertisement appears during, or just before or after, a television program which is counted towards the broadcaster's or cablecaster's Children's Television Act obligations; and (d) whether, based on available information (including the subject matter and format of the advertisement), the advertiser intended to direct the advertisement primarily to children under 12.

2.   Online data collection and other privacy-related practices by website or online service operators that target children under 13 years of age or that have actual knowledge that a visitor is a child under 13 years of age.

**B.   Definitions**

1.   "National advertising" shall include any paid commercial message, in any medium (including labeling), if: (a) it has the purpose of inducing a sale or other commercial transaction or persuading the audience of the value or usefulness of a company, product or service; (b) it is disseminated nationally or to a substantial portion of the United States, or is test market advertising prepared for national campaigns; and (c) the content is controlled by the advertiser.

2.   "Advertiser" shall mean any person or other legal entity that engages in "national advertising," and includes, under Part II of the Guidelines, those who operate a commercial website or an online service.

**C.   Core Principles**

The following Core Principles apply to all practices covered by the self-regulatory program.

1.   Advertisers have special responsibilities when advertising to children or collecting data from children online. They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed. They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

2.   Advertising should be neither deceptive nor unfair, as these terms are applied under the Federal Trade Commission Act, to the children to whom it is directed.

3.   Advertisers should have adequate substantiation for objective advertising claims, as those claims are reasonably interpreted by the children to whom they are directed.

4.   Advertising should not stimulate children's unreasonable expectations about product quality or performance.

5.   Products and content inappropriate for children should not be advertised directly to them.

5

6. Advertisers should avoid social stereotyping and appeals to prejudice, and are encouraged to incorporate minority and other groups in advertisements and to present positive role models whenever possible.

7. Advertisers are encouraged to capitalize on the potential of advertising to serve an educational role and influence positive personal qualities and behaviors in children, e.g., being honest and respectful of others, taking safety precautions, engaging in physical activity.

8. Although there are many influences that affect a child's personal and social development, it remains the prime responsibility of the parents to provide guidance for children.  Advertisers should contribute to this parent-child relationship in a constructive manner.

**D.   Guidelines**

**1.   An Overview**

The Core Principles are broad in scope and reflect the belief that responsible advertising comes in many forms and that diversity should be encouraged. They aim to cover the myriad advertising practices in today's marketplace, as well as those that may emerge as technologies and advertising practices evolve. The Guidelines below are designed to provide additional guidance to assist advertisers in applying these broad principles to their child-directed advertising and to help them deal sensitively and honestly with children.

The Guidelines are not intended to be exhaustive. With respect to advertising practices that are not specifically addressed, CARU will apply the above Core Principles in evaluating the practices.

Part I of the Guidelines offers general guidance on deception and other marketing practices that are inappropriate when directed to children, and encourages certain practices. Part II addresses online data collection and other privacy-related practices that pose special concerns for children and require more specific guidance.

**2.   Part I: General Guidelines**

**(a)   Deception**

To assure that advertising directed to children is not deceptive:

6

1. The "net impression" of the entire advertisement, considering, among other things, the express and implied claims, any material omissions, and the overall format, must not be misleading to the children to whom it is directed.

2. Whether an advertisement leaves a misleading impression should be determined by assessing how reasonable children in the intended audience would interpret the message, taking into account their level of experience, sophistication, and maturity; limits on their cognitive abilities; and their ability to evaluate the advertising claims.

**(b)   Product Presentations and Claims**

To avoid deceptive and/or inappropriate advertising to children involving product presentations and claims:

1. Copy, sound and visual presentations should not mislead children about product or performance characteristics. Such characteristics may include, but are not limited to, speed, method of operation, color, sound, durability, nutritional benefits and similar characteristics.

2. The presentation should not mislead children about benefits from use of the product. Such benefits may include, but are not limited to, the acquisition of strength, status, popularity, growth, proficiency and intelligence.

3. Claims should not unduly exploit a child's imagination. While fantasy, using techniques such as animation and computer-generated imagery, is appropriate for both younger and older children, it should not create unattainable performance expectations nor exploit the younger child's difficulty in distinguishing between the real and the fanciful.

4. Advertisements should demonstrate the performance and use of a product in a way that can be duplicated by a child for whom the product is intended.

5. The advertisement should not mislead children about what is included in the initial purchase.

6. Advertising that compares the advertised product to another product should be based on real product attributes and be understandable to the child audience.

7. The amount of product featured should not be excessive or more than would be reasonable to acquire, use or consume by a person in the situation depicted. For example, if an advertisement depicts food being consumed by a person in the advertisement, or suggests that the food will be consumed, the quantity of food shown should not exceed the labeled serving size on the Nutrition Facts panel; where no

such serving size is applicable, the quantity of food shown should not exceed a single serving size that would be appropriate for consumption by a person of the age depicted.

8. Advertising of food products should encourage responsible use of the product with a view toward healthy development of the child. For example, advertising of food products should not discourage or disparage healthy lifestyle choices or the consumption of fruits or vegetables, or other foods recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid, as applicable to children under 12.

9. Advertisements for food products should clearly depict or describe the appropriate role of the product within the framework of the eating occasion depicted.

   a. Advertisements representing a mealtime should depict the food product within the framework of a nutritionally balanced meal.[1]

   b. Snack foods should be clearly depicted as such, and not as substitutes for meals.

   **(c)    Material Disclosures and Disclaimers**

1. All disclosures and disclaimers material to children should be understandable to the children in the intended audience, taking into account their limited vocabularies and level of language skills. For young audiences, simple words should be chosen, *e.g.*, "You have to put it together." Since children rely more on information presented in pictures than in words, demonstrative disclosures are encouraged.

2. These disclosures should be conspicuous in the advertising format and media used, e.g., online, advertisers should make disclosures clear and proximate to, and in the same format (i.e., audio or graphic) as, the claims to which they are related; in television, advertisers should use audio disclosures, unless disclosures in other formats are likely to be seen and understood by the intended audience.

3. Circumstances where material disclosures are needed include, but are not limited to, the following:

---

[1] While there may be a number of acceptable ways to depict a nutritionally balanced meal for children, each depiction should contain at least three of the five major food groups, preferably including those food groups recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid (i.e., fruits, vegetables, fat-free or low-fat milk and milk products and whole grains). The food included in the meal should reflect reasonable portion sizes and types of foods appropriate for children in the meal setting depicted. For example, a reasonable depiction of carrots may contain an appropriate side-dish portion for a child, rather than one or two condiment-size sticks. If the meal includes a caloric beverage, the beverage should be one that is appropriate in a nutritionally balanced meal taking into account the beverage's nutritional attributes and its calories within the context of the meal depicted.

a. Advertising for unassembled products should clearly indicate they need to be put together to be used properly.

b. If any item essential to use of the product is not included, such as batteries, this fact should be disclosed clearly.

c. Advertisers should clearly disclose information about products purchased separately, such as accessories or individual items in a collection.

d. If television advertising to children involves the use of a toll-free telephone number, it must be clearly stated, in both audio and video disclosures, that the child must get an adult's permission to call. In print or online advertising, this disclosure must be clearly and prominently displayed.

4. Advertisers that create or sponsor an area in cyberspace, either through an online service or a website, must prominently identify the name of the sponsoring company and/or brand in that area. This could be done by using wording such as "Sponsored by _____."

5. If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers) this fact should be clearly disclosed on the packaging.

**(d)   Endorsements**

1. Advertisers should recognize that the mere appearance of a celebrity or authority figure with a product can significantly alter a child's perception of the product. Advertisers may use such personalities as product endorsers, presenters, or testifiers, but they must take great care to avoid creating any false impression that the use of the product enhanced the celebrity's or authority figure's performance.

2. All personal endorsements should reflect the actual experiences and beliefs of the endorser.

3. An endorser who is represented, either directly or indirectly, as an expert must possess qualifications appropriate to the particular expertise depicted in the endorsement.

**(e)   Blurring of Advertising and Editorial/Program Content**

1. Advertisers should recognize that children may have difficulty distinguishing between program/editorial content and advertising, e.g., when program/editorial characters make advertising presentations or when an advertisement appears to be content to the intended audience.

2. Advertising should not be presented in a manner that blurs the distinction between advertising and program/editorial content in ways that would be misleading to children.[2]

3. Prohibited practices in television advertising

    a. Program personalities, live or animated, should not be used to advertise products, premiums or services in or adjacent to a television program primarily directed to children under 12 years of age in which the same personality or character appears.

    b. Products derived from or associated with a television program primarily directed to children under 12 years of age should not be advertised during or adjacent to that program.

4. In media other than television, a character or personality associated with the editorial/content of the media should not be used to sell products, premiums or services in close proximity to the program/editorial content, unless the advertiser makes it clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.[3]

5. On websites or online services directed to children, if an advertiser integrates an advertisement into the content of a game or activity, then the advertiser should make clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.

6. If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers), the advertising itself should be separated from the program and clearly designated as advertising.

    **(f)    Premiums, Kids' Clubs, Sweepstakes and Contests**

1. Advertisers should recognize that their use of premiums, kids' clubs, contests and sweepstakes has the potential to enhance the appeal of their products to children.

2. Advertisers should take special care in using these kinds of promotions to guard against exploiting children's immaturity.

    i.   <u>Premiums</u>

---

[2] This provision does not apply to the mere presence of a product or character in program/editorial content.
[3] This provision does not apply to the mere presence of a character or personality in program/editorial content.

a. Since children have difficulty distinguishing product from premium, advertising that contains a premium message should focus the child's attention primarily on the product and make the premium message clearly secondary.

b. Conditions of a premium offer should be stated simply and clearly.

ii. <u>Kids' Clubs</u>

a. Advertising should not mislead children into thinking they are joining a club when they are merely making a purchase or receiving a premium.

b. Before an advertiser uses the word "club," certain minimum requirements should be met. These are:

1. Interactivity - The child should perform some act demonstrating an intent to join the club, and receive something in return. Merely watching a television program or eating in a particular restaurant, for example, does not constitute membership in a club.

2. Continuity - There should be an ongoing relationship between the club and the child member, e.g., a regular newsletter or activities scheduled over a period of time.

3. Exclusivity - The activities or benefits derived from membership in the club should be exclusive to its members, and not merely the result of purchasing a particular product.

c. Additional requirements applying to kids' clubs online are covered in Part II of the Guidelines.

iii. <u>Sweepstakes and Contests</u>

a. Advertisers should recognize that children may have unrealistic expectations about the chances of winning a sweepstakes or contest or inflated expectations of the prize(s) to be won.

b. The prize(s) should be clearly depicted.

c. The free means of entry should be clearly disclosed.

d. The likelihood of winning should be clearly disclosed in language readily understandable to the child audience. Disclosures such as, "Many will enter, a few will win." should be used, where appropriate.

11

e.  All prizes should be appropriate to the child audience.

f.  Online contests or sweepstakes should not require the child to provide more information than is reasonably necessary.  Any information collection must meet the requirements of the Data Collection section of the Guidelines and the federal Children's Online Privacy Protection Act (COPPA).

**(g)   Online Sales**

1.  Advertisers who sell products and services to children online should clearly indicate to the children when they are being targeted for a sale.

2.  If an advertiser offers the opportunity to purchase any product or service, either through the use of a "click here to order" button or other on-screen means, the ordering instructions must clearly and prominently state that a child must have a parent's permission to order.

3.  Online advertisers must make reasonable efforts, in light of all available technologies, to provide the person responsible for paying for such products and services the means to exercise control over the transaction.[4]

4.  If no reasonable means is provided to avoid unauthorized purchases by children online, the advertiser should enable the person responsible for payment to cancel the order and receive full credit without incurring any charges.

**(h) Sales Pressure**

1.  Advertising should not urge children to ask parents or others to buy products. It should not suggest that a parent or adult who purchases a product or service for a child is better, more intelligent or more generous than one who does not.

2.  Advertisers should avoid using sales pressure in advertising to children, e.g., creating a sense of urgency by using words such as 'buy it now.'

3.  Advertisements should not convey to children that possession of a product will result in greater acceptance by peers or that lack of a product will result in less acceptance by peers.

---

[4] Requiring the use of a credit card in connection with a transaction is a reasonable effort to provide the person responsible for payment with control over the transaction. This is consistent with COPPA regulations. See 16 CFR § 312.5.

4. Advertisements should not imply that purchase or use of a product will confer upon the user the prestige, skills or other special qualities of characters appearing in advertising.

5. Advertisements should not minimize the price of goods and services with words such as, "only," "just," or "bargain price" that children do not understand to be exaggeration or "puffing."

**(i) Unsafe and Inappropriate Advertising to Children**

1. Safety

    a. Advertisers should take into account that children are prone to exploration, imitation, and experimentation and may imitate product demonstrations or other activities depicted in advertisements without regard to risk.

    b. Advertisers should not advertise products directly to children that pose safety risks to them, i.e., drugs and dietary supplements, alcohol, products labeled, 'Keep out of the reach of children;' nor should advertisers targeting children display or knowingly link to pages of websites or online services that advertise such products.

    c. Advertisements for children's products should show them being used by children in the appropriate age range. For instance, young children should not be shown playing with toys safe only for older children.

    d. Advertisements should not portray adults or children in unsafe situations or in acts harmful to themselves or others. For example, when activities (such as bicycle riding or skateboarding) are shown, proper precautions and safety equipment should be depicted; when an activity would be unsafe without adult supervision, supervision should be depicted.

    e. Advertisers should be aware that many childhood injuries occur from the misuse of common household products and should avoid demonstrations that may encourage inappropriate use of such products by children.

2. Inappropriate Advertising

13

    a.   Advertisers should take care to ensure that only age-appropriate videos, films and interactive software are advertised to children, and if an industry rating system applies to the product, the rating label is prominently displayed.[5]

    b.   Advertising should not portray or encourage behavior inappropriate for children (e.g., violence or sexuality) or include material that could unduly frighten or provoke anxiety in children; nor should advertisers targeting children display or knowingly link to pages of a website or online service that portray such behaviors or materials.

**3.**        **Part II: Guidelines for Online Privacy Protection**

This Part addresses concerns about the collection of personal data from children and other privacy-related practices on the Internet.  Its provisions are consistent with the Children's Online Privacy Protection Act of 1998 (COPPA) and the FTC's implementing Rule, which protect children under the age of 13, and will be interpreted consistently with those rules.

Online data collection from children poses special concerns. The medium offers unique opportunities to interact with children and to gather information for marketing purposes. Young children however, may not understand the nature of the information being sought or its intended uses, and the medium makes it easy to collect such data directly and passively from children without the supervision or permission of their parents or guardians. The collection of personal information from children,[6] as defined in Data Collection below, therefore triggers special privacy and security concerns.

The guidelines below address those concerns by providing guidance on specific issues involving online data collection and other privacy-related practices by operators of a website or other online service that 1) targets children under 13 years of age (based on the criteria set forth in the definition of website or online services directed to children in Section 312.2 of the COPPA Rule); 2) has actual knowledge that it is collecting or maintaining personal information from a child under 13 years of age; or 3) has actual knowledge that it is collecting personal information directly from users of another website or online service directed to children.[7]

---

[5] Violations of this guideline may be brought to the attention of the relevant rating entity.
[6] The definitions of "collection," "operator" and "personal information" in the Children's Online Privacy Protection Rule apply whenever these terms are used in the Online Privacy Protection Guidelines. See 16 CFR § 312.2.
[7] This category of companies might include operators of plug-ins or third party advertising networks who are notified by an operator of the child-directed nature of the operator's website.  CARU considers these to be "Pass-through operators" since they become "operators" of a child-directed website or online service only by virtue of actual knowledge.

### (a)   Data Collection

1.  *Personal information* is defined under COPPA as individually identifiable information about an individual collected online, including: first and last name; home or physical address; online contact information, such as email addresses, or other identifiers that allow direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, or a video chat user identifier; a screen or user name where it functions in the same manner as online contact information; a phone number; a Social Security number; a persistent identifier that can be used to recognize a user over time and across different websites and online services, e.g., a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier; a photo, video or audio file where such files contain a child's image or voice; geolocation information sufficient to identify street name and  name of a city or town; or information  concerning the child or the parents of that child and combines with information contained in this definition.

2.  In collecting[8] information from children under 13 years of age, operators should adhere to the following guidelines: Operators must clearly disclose to website or online service users its information collection and tracking practices, information uses, and the means for correcting or removing the information. These disclosures should be prominent and readily accessible before information is collected. For instance, on a website or online service where there is passive tracking, the notice should be on the page where the child enters the site.  A heading such as "Privacy," "Our Privacy Policy," or similar designation is acceptable if it allows an adult to click on the heading to obtain additional information on the site or service's practices concerning information collection, tracking and uses.

3.  Operators should disclose, in language easily understood by a child, (a) why the information is being collected (*e.g.*, "We'll use your name and email to enter you in this contest and also add it to our mailing list") and (b) whether the information is intended to be shared, sold or distributed outside of the collecting company.

4.  Operators should disclose passive means of collecting information from children (*e.g.,* navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

---

[8] Collects or collection means the gathering of any personal information from a child by any means, including but not limited to:
(a) Requesting, prompting, or encouraging a child to submit personal information online; (b) Enabling a child to make personal information publicly available in identifiable form. An operator shall not be considered to have collected personal information under this paragraph if it takes reasonable measures to delete all or virtually all personal information from a child's postings before they are made public and also to delete such information from its records; or (c) Passive tracking of a child online.

5. Operators must obtain "verifiable parental consent"[9] before they collect personal information (such as email addresses, screen names associated with other personal information, phone numbers, addresses or photographs) that will be publicly posted, thereby enabling others to communicate directly with the child online or offline, or when the child will be otherwise able to communicate directly with others.

6. For activities that involve public posting, operators should encourage children not to use their full names or screen names that correspond with their email address, but choose an alias (*e.g.,* "Bookworm," "Skater," etc.) or use first name, nickname, initials, etc.

7. Operators should not require a child to disclose more personal information than is reasonably necessary to participate in the online activity (*e.g.*, play a game, enter a contest, etc.).

8. Operators must obtain "verifiable parental consent" before they collect, use or disclose personal information to third parties,[10] except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.[11]

9. When an operator collects personal information only for its internal use and there is no disclosure of the information to a third party, the company may obtain parental consent through the use of email, coupled with some additional steps to provide assurance that the person providing the consent is the parent.

---

[9] The definition of "verifiable parental consent" in the Children's Online Privacy Protection Rule applies. See 16 CFR § 312.5.

[10] Third party means any person who is not:
(a) An operator with respect to the collection or maintenance of personal information on the website or online service; or
(b) A person who provides support for the internal operations of the website or online service and who does not use or disclose information protected under this part for any other purpose.

[11] Support for the internal operations of the website or online service means those activities necessary to:
(a)  maintain or analyze the functioning of the website or online service;
(b) perform network communications;
(c)  authenticate users of, or personalize the content on, the website or online service;
(d) serve contextual advertising on the website or online service or cap the frequency of advertising;
(e)  protect the security or integrity of the user, website, or online service;
(f)  ensure legal or regulatory compliance; or
(g)  fulfill a request of a child as permitted by these guidelines;

so long as the information collected for the activities listed in paragraphs (a)-(g) is not used or disclosed to contact a specific individual, including through behavioral advertising, to amass a profile on a specific individual, or for any other purpose.  Support for the internal operations also includes, e.g.: intellectual property protection, payment and delivery functions, spam protection, optimization, statistical reporting, or de-bugging.  See 78 Fed. Reg. 3981(January 17, 2013).

10. Exceptions to prior parental consent:

(a) Where the sole purpose of collecting the name or online contact information of the parent is to provide notice and obtain parental consent;

(b) Where the purpose of collecting a parent's online contact information is to provide voluntary notice to, and subsequently update the parent about, the child's participation in a website or online services that does not otherwise collect, use or disclose children's personal information;

(c) Where the sole purpose of collecting online contact information from a child is to respond directly on a one-time basis to a specific request from the child and the information is not used to re-contact the child or any other purpose, is not disclosed, and is deleted by the operator from its records promptly after responding to the child's request;

(d) Where an operator collects and retains online contact information to be able to respond directly more than once to a child's specific request (such as an email newsletter or contest) but will not use the information for any other purpose, the operator must directly notify the parent of the nature and intended uses of the information collected, and permit access to the information sufficient to allow a parent to remove or correct the information;

(e) Where the purpose of collecting a child's and a parent's name and online contact information is to protect the safety of a child, and where such information is not used or disclosed for any purpose unrelated to the child's safety;

(f) Where the purpose of collecting a child's name and online contact information is to:

   (i) protect the security of integrity of its website or online service;

   (ii) take precautions against liability;

   (iii) respond to judicial process;

   (iv) to the extent permitted under other provisions of law, to provide information to law enforcement agencies or for an investigation on a matter related to public safety; where such information is not used for any other purpose;

(g) Where an operator collects a persistent identifier and no other personal information and such identifier is used for the sole purpose of providing support for the internal operations of the website or online service;

(h) Where an operator covered under paragraph two (2) of the definition of website or online service directed to children in §312.2 of the COPPA Rule collects a persistent identifier and no other personal information from a user who affirmatively interacts with the operator and whose previous registration with that operator indicates that such user is not a child.

11. To respect the privacy of parents, operators should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

12. If an operator communicates with a child by email, there should be an opportunity with each mailing for the child or parent to choose by return email or hyperlink to discontinue

receiving mailings.

### ( b )  Age-Screening/Hyperlinks

1. A website or online service that is directed to children under the criteria set forth in the definition of websites or online services directed to children in Section 312.2 (a) of the COPPA Rule, but that does not target children as its primary audience, shall not be deemed directed to children if it: i) does not collect personal information from any visitor prior to collecting age information; and (ii) prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provision of the COPPA Rule.

2. Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

3. Age-screening mechanisms should be used in conjunction with technology, *e.g.,* a session cookie, to help prevent underage children from going back and changing their age to circumvent age-screening.

4. A website or online service shall not be deemed directed to children solely because it refers or links to a commercial website or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.   Similarly, a website directed to children shall not be deemed in violation of these Guidelines by linking to a general audience website.

Copyright 1975, 2003, 2006, 2009 and 2014 Council of Better Business Bureaus, Inc. The name Children's Advertising Review Unit is a registered service mark of the Council of Better Business Bureaus, Inc.

# EXHIBIT 45

# New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act (COPPA): Majority express concerns about new marketing and data-collection practices

democraticmedia.org/content/new-survey-reveals-strong-support-updating-childrens-online-privacy-protection-act-coppa

By: Jeff Chester | Dec 6 2012

**FOR IMMEDIATE RELEASE**
**Dec. 6, 2012**

### New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act

*Majority express concerns about new marketing and data-collection practices such as behavioral profiling and mobile tracking*

**WASHINGTON, DC and SAN FRANCISCO** – Two leading nonprofit groups, the Center for Digital Democracy and Common Sense Media, today released the results of a new survey on public attitudes about children's online privacy. The study — conducted over a two-week period in November by Princeton Research Associates International (PSRAI) — polled more than 2,000 adults and found overwhelming support for the Children's Online Privacy Protection Act (COPPA), the law that requires parental consent before websites can collect personal information from children under the age of 13. The findings revealed strong support not only for the basic principles of the law, but also for several key proposed changes in the rules that would address a range of online business practices — including mobile marketing and behavioral profiling — that have emerged since the COPPA took effect more than a decade ago. The Federal Trade Commission is expected to announce a number of updates to the COPPA regulations in the coming weeks.

The majority of respondents in the survey (90%) expressed support for COPPA's basic requirement that online companies seeking to collect personal information from young children must first obtain permission from parents. In addition, the survey found significantly high levels of support for safeguards to protect children from many of the data collection and marketing practices that are frequently used to target them in today's digital media environment.

Respondents expressed disapproval of a number of techniques increasingly employed by many child-directed websites — 80% of adults were opposed to allowing advertisers to collect and use information about a child's activities online, even in cases where advertisers do not know the actual name and address of a child.

The survey also found that both parents and nonparents largely agree on many points:

91% of both parents and adults believe it is not okay for advertisers to collect information about a child's location from that child's mobile phone. 94% of parents and 91% of adults agree that advertisers should receive the parent's permission before putting tracking software on a child's computer.96% of parents and 94% of adults expressed disapproval when asked if it is "okay OK for a website to ask children for personal information about their friends." 91% of parents said they strongly disagree with the idea, as did 86% of adults.
Congress passed COPPA in 1998 with bipartisan support. The law established a set of safeguards for website operators targeting children under 13, and ensured that parents would play the key decision-making role in determining whether and how their children's personal information would be used in the online environment. The law was purposely designed to respond to changing technologies and business practices, and requires the Federal Trade Commission to conduct periodic reviews. A coalition of child advocacy, consumer, public health, and privacy groups has called on the FTC to update its COPPA rules to cover many of the techniques that marketers are using today, which include: collecting geolocation information from a child's mobile phone; targeting children and their friends through social networks and interactive games; and employing cookies, plug-ins, and other software to track young peoples' online behaviors. The FTC proposed changes to the rules last year, and has sought comments from a wide range of industry and public interest groups, but has yet to release its revised regulations.

"It is clear from these findings that the public supports strong action by the FTC to address the disturbing and widespread practices that threaten the privacy and safety of our nation's children," said Kathryn C. Montgomery, Ph.D, professor of communication at American University and one of the leaders of the campaign to pass COPPA during the 1990s. "Children should be able to reap the benefits of this new participatory media culture without being subjected to techniques that take advantage of their developmental vulnerabilities. We must ensure that the COPPA rules are updated effectively so that the generation of young people growing up online today will be treated fairly in the growing digital marketplace."

"The results of this poll should be a wake-up call to the industry that parents understand what's at stake for their kids in a digital world, and want the power to protect their children to remain in their hands," said James P. Steyer, CEO and founder, Common Sense Media. "The industry argues that updates to COPPA will stifle innovation and cost jobs, when in fact, they should respect the role of parents and use it build consumer trust. The FTC's recommended updates to COPPA represent the most important regulation of the past 10 years when it comes to protecting our kids' privacy. They will help ensure that parents have better information and tools, and that parents -- not third-party ad networks and data brokers -- get to decide when their children's personal information can -- and can't -- be collected, shared, and sold."

Additional information about the survey, including a summary of findings, full tables, and an infographic can be found at www.democraticmedia.org and www.commonsense.org/COPPA. To download the summary of findings directly, and a new Infographic on "Big Data, Little Kids," see attached.

**About Center for Digital Democracy**

The Center for Digital Democracy (CDD) is recognized as one of the leading consumer protection and privacy organizations in the United States. Since its founding in 2001 (and prior to that through its predecessor organization, the Center for Media Education), CDD has been at the forefront of research, public education, and advocacy on protecting consumers in the digital age. Its impact has been highly significant, fostering widespread debate, educating a spectrum of stakeholders, and creating a legacy of government and self-regulatory safeguards across a variety of Internet and digital media platforms. CDD's public education programs are focused on informing consumers, policy makers, and the press about contemporary digital marketing issues, including its impact on public health, children and youth, and financial services. For more information, visit www.democraticmedia.org.

**About Common Sense Media**

Common Sense Media is dedicated to improving the lives of kids and families by providing the trustworthy information, education, and independent voice they need to thrive in a world of media and technology. We exist because our kids are growing up in a culture that profoundly impacts their physical, social, and emotional well-being. We provide families with the advice and media reviews they need in order to make the best choices for their children. Through our education programs and policy efforts, Common Sense Media empowers parents, educators, and young people to become knowledgeable and responsible digital citizens. For more information, go to: www.commonsense.org.

GZJ KDKV'68''''

# Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission

FTC **ftc.gov/**news-events/press-releases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked

June 22, 2016

Singapore-based mobile advertising company InMobi will pay $950,000 in civil penalties and implement a comprehensive privacy program to settle Federal Trade Commission charges it deceptively tracked the locations of hundreds of millions of consumers – including children – without their knowledge or consent to serve them geo-targeted advertising.

The FTC alleges that InMobi mispresentedthat its advertising software would only track consumers' locations when they opted in and in a manner consistent with their device's privacy settings. According to the complaint, InMobi was actually tracking consumers' locations whether or not the apps using InMobi's software asked for consumers' permission to do so, and even when consumers had denied permission to access their location information.

The FTC alleges that InMobi, whose advertising network has reached more than one billion devices worldwide through thousands of popular apps, offers multiple forms of location-based advertising to its customers, including the ability to serve ads to consumers based on their current locations, locations they visit at certain times, and on their location over time.

"InMobi tracked the locations of hundreds of millions of consumers, including children, without their consent, in many cases totally ignoring consumers' express privacy preferences," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "This settlement ensures that InMobi will honor consumers' privacy choices in the future, and will be held accountable for keeping their privacy promises."

The complaint alleges that inMobi created a database built on information collected from consumers who allowed the company access to their geolocation information, combining that data with the wireless networks they were near to document the physical location of wireless networks themselves. InMobi then would use that database to infer the physical location of consumers based on the networks they were near, even when consumers had turned off location collection on their device.

The FTC alleges that InMobi also violated the Children's Online Privacy Protection Act (COPPA) by collecting this information from apps that were clearly directed at children, in spite of promising that it did not do so. The complaint noted that InMobi's software tracked location in thousands of child-directed apps with hundreds of millions of users without following the steps required by COPPA to get a parent or guardian's consent to collect and use a child's personal information.

Under the terms of its settlement with the FTC, InMobi is subject to a $4 million civil penalty, which is suspended to $950,000 based on the company's financial condition. In addition, the company will be required to delete all information it collected from children, and will be

prohibited from further violations of COPPA.

In addition, InMobi will be prohibited from collecting consumers' location information without their affirmative express consent for it to be collected, and will be required to honor consumers' location privacy settings. The company will also be required to delete the location information of consumers it collected without their consent and will be prohibited from further misrepresenting its privacy practices. The settlement also will require InMobi to institute a comprehensive privacy program that will be independently audited every two years for the next 20 years.

The Commission vote to authorize the staff to refer the complaint to the U.S. Department of Justice and to approve the proposed stipulated order was 3-0. The DOJ filed the complaint and proposed stipulated order on behalf of the Commission in U.S. District Court for the Northern District of California**.**

**NOTE:** The Commission authorizes the filing of a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. Stipulated orders have the force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about consumer topics and file a consumer complaint online or by calling 1-877-FTC-HELP (382-4357).  Like the FTC on , follow us on , read our blogs and subscribe to press releases for the latest FTC news and resources.

# EXHIBIT 47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>     v.<br><br>InMobi Pte Ltd., a private limited company,<br><br>            Defendant. | Case No.: 3:16-cv-3474<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND CIVIL PENALTY JUDGMENT** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("Commission"), filed its Complaint for Permanent Injunction, Civil Penalties, and Other Relief ("Complaint"), in this matter, pursuant to Sections 13(b), and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 56(a)(1), the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6502(c) and 6505(d), and the Commission's Children's Online Privacy Protection Rule ("COPPA Rule"), 16 C.F.R. Part 312.  Defendant has waived service of the summons and the Complaint.  The parties have been represented by the attorneys whose names appear hereafter.  Plaintiff and Defendant stipulate to the entry of this Stipulated Order for Permanent Injunction and Civil Penalty Judgment ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendant participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the tracking of consumers' locations without providing notice or receiving consent, and regardless of the consumers' preferences, and

1  in the collection of personal information from children in connection with operating a Web site or

2  online service.  The Complaint further charges that Defendant violated the COPPA Rule by

3  failing to provide notice to parents of its information practices, and to obtain verifiable parental

4  consent prior to collecting, using, or disclosing personal information from children.

5  3.      Defendant neither admits nor denies any of the allegations in the Complaint, except as

6  specifically stated in this Order.  Only for purposes of this action, Defendant admits the facts

7  necessary to establish jurisdiction.

8  4.      Defendant waives any claim that they may have under the Equal Access to Justice Act, 28

9  U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree

10  to bear its own costs and attorney fees.

11  5.      Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the

12  validity of this Order.

## DEFINITIONS

14      For the purpose of this Order, the following definitions apply:

15  A.      "Child" means an individual under the age of 13.

16  B.      "Collects" or "collection" means, for the purposes of Parts I and II of this Order only, the

17  gathering of any personal information from a child by any means, including but not

18  limited to:

19      1.      Requesting, prompting, or encouraging a child to submit personal information

20          online;

21      2.      Enabling a child to make personal information publicly available in identifiable

22          form; or

23      3.      Passive tracking of a child online.

24  C.      "Covered information" means information from or about an individual consumer

25  including, but not limited to:

26      1.      Personal information; and

27      2.      Location information.

28  D.      "Defendant" means InMobi Pte Ltd., and its subsidiaries and divisions in the United

States, and successors and assigns.

E.   "Delete" means, for purposes of Parts I and II of this Order only, to remove personal

    information such that it is not maintained in retrievable form and cannot be retrieved in

    the normal course of business.

F.   "Disclose or disclosure" means, with respect to personal information:

    1.   The release of personal information collected by an operator from a child in

        identifiable form for any purpose, except where an operator provides such

        information to a person who provides support for the internal operations of the

        Web site or online service; and

    2.   Making personal information collected by an operator from a child publicly

        available in identifiable form by any means, including but not limited to a public

        posting through the Internet, or through a personal home page or screen posted on

        a Web site or online service; a pen pal service; an electronic mail service; a

        message board; or a chat room.

        a.   For purposes of this definition:

            i.   "release of personal information" means the sharing, selling, renting, or

               transfer of personal information to any third party; and

            ii.   "support for the internal operations of the Web site or online service"

               means those activities necessary to:

               A.   maintain or analyze the functioning of the Web site or online

                   service;

               B.   perform network communications;

               C.   authenticate users of, or personalize the content on, the Web site or

                   online service;

               D.   serve contextual advertising on the Web site or online service or

                   cap the frequency of advertising;

               E.   protect the security or integrity of the user, Web site, or online

                   service;

F.     ensure legal or regulatory compliance; or

G.     fulfill a request of a child, *so long as* the information collected for the activities listed in paragraphs (i) through (vii) of this definition is not used or disclosed to contact a specific individual, including through behavioral advertising, to amass a profile on a specific individual, or for any other purpose.

G.     "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire, radio, or other methods of transmission.

H.     "Location information" means:

1.     Information about a consumer's location that is collected through an application programming interface; or

2.     Information about a consumer's location that is inferred from any other data collected through an application programming interface, including but not limited to Basic Service Set Identifiers (BSSIDs), with the limited exception of Internet Protocol (IP) addresses used to infer location at no greater accuracy than city-level.

I.     "Obtaining verifiable consent" means making any reasonable effort (taking into consideration available technology) to ensure that before personal information is collected from a child, a parent of the child:

1.     Receives notice of the operator's personal information collection, use, and disclosure practices; and

2.     Authorizes any collection, use, and/or disclosure of the personal information.

J.     "Online contact information" means an e-mail address or any other substantially similar identifier that permits direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, or a

video chat user identifier.

K.  "Operator" means any person who operates a Web site located on the Internet or an online service and who collects or maintains personal information from or about the users of or visitors to such Web site or online service, or on whose behalf such information is collected or maintained, or offers products or services for sale through that Web site or online service, where such Web site or online service is operated for commercial purposes involving commerce among the several States, or with one or more foreign nations; in any territory of the United States or in the District of Columbia, or between any such territory and another such territory or any State or foreign nation; or between the District of Columbia and any State, territory, or foreign nation.

L.  "Parent" includes a legal guardian.

M.  "Person" means any individual, partnership, corporation, trust, estate, cooperative, association, or other entity.

N.  "Personal information" means individually identifiable information about an individual collected online, including:

1.  A first and last name;

2.  A home or other physical address including street name and name of a city or town;

3.  Online contact information;

4.  A screen or user name where it functions in the same manner as online contact information;

5.  A telephone number;

6.  A Social Security number;

7.  A persistent identifier that can be used to recognize a user over time and across different Web sites or online services.  Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or a unique device identifier.

8.  A photograph, video, or audio file where such file contains a child's image or

voice;

9. Geolocation information sufficient to identify street name and name of a city or town; or

10. Information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition.

O. "Software development kit" shall mean the code necessary to integrate Defendant's advertisements in an application, Web site, or other online service.

P. "Third party" means any person who is not:

1. An operator with respect to the collection or maintenance of personal information on the Web site or online service; or

2. A person who provides support for the internal operations of the Web site or online service and who does not use or disclose information protected under 16 C.F.R. Part 312 for any other purpose.

Q. "Web site or online service directed to children" means a commercial Web site or online service, or portion thereof, that is targeted to children.

1. In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

2. A Web site or online service shall be deemed directed to children when it has actual knowledge that it is collecting personal information directly from users of

another Web site or online service directed to children.

3.    A Web site or online service that is directed to children under the criteria set forth in paragraph (1) of this definition, but that does not target children as its primary audience, shall not be deemed directed to children if it:

    a.  Does not collect personal information from any visitor prior to collecting age information; and

    b.  Prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provisions of 16 C.F.R. Part 312.

4.    A Web site or online service shall not be deemed directed to children solely because it refers or links to a commercial Web site or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.

## ORDER

## I.    INJUNCTION CONCERNING COLLECTION OF PERSONAL INFORMATION FROM CHILDREN

IT IS ORDERED that Defendant and Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with being an operator of any Web site or online service directed to children or of any Web site or online service with actual knowledge that it is collecting or maintaining personal information from a child, are hereby permanently restrained and enjoined from violating the Children's Online Privacy Protection Rule, 16 C.F.R. Part 312, including, but not limited to:

A.    failing to make reasonable efforts, taking into account available technology, to ensure that a parent of a child receives direct notice of Defendant's practices with regard to the collection, use, or disclosure of personal information from children, including notice of any material change in the collection, use, or disclosure practices to which the parent has previously consented;

B.      failing to post a prominent and clearly labeled link to an online notice of its information practices with regard to children, if any, on the home or landing page or screen of its Web site or online service, *and* at each area of the Web site or online service where personal information is collected from children; and

C.      failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented.

A copy of the Children's Online Privacy Protection Rule, 16 C.F.R. Part 312, is attached hereto as Appendix A.

## II.      INJUNCTION CONCERNING DELETION OF CHILDREN'S PERSONAL INFORMATION

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from:

A.      disclosing, using, or benefitting from personal information collected from children which Defendant obtained prior to entry of this Order; and

B.      failing to destroy personal information collected from children that is in their possession, custody, or control within ten (10) days after entry of this Order. *Provided, however*, that such personal information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## III.      MONETARY JUDGMENT FOR CIVIL PENALTY

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of four million dollars ($4,000,000) is entered in favor of Plaintiff against Defendant as a civil penalty.

B.      Defendant is ordered to pay to Plaintiff, by making payment to the Treasurer of the United States, three hundred thousand dollars ($300,000), within seven (7) days of entry of this Order, followed by payment of six hundred fifty thousand dollars ($650,000) in two (2) equal installments of three hundred twenty five thousand dollars ($325,000), plus interest computed

from the date of entry of this Order, due within six (6) months and twelve (12) months, respectively, of the date of entry of this Order. Defendant shall make all payments required by this paragraph by electronic fund transfer in accordance with instructions previously provided by a representative of Plaintiff. Upon such payments, the remainder of the judgment is suspended, subject to the Subparts below.

C. The Commission's and Plaintiff's agreement to this suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Defendant's sworn financial statement and related documents (collectively, "financial representations") submitted to the Commission, namely: the Financial Statement of Defendant signed by Abhay Singhal on March 28, 2016, including the attachments.

D. The suspension of the judgment will be lifted as to Defendant if, upon motion by the Commission or Plaintiff, the Court finds that Defendant failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

E. If the suspension of the judgment is lifted, the judgment becomes immediately due as to Defendant in the amount specified in Subpart A above which the parties stipulate only for purposes of this Part represents the amount of the civil penalty for the violations alleged in the Complaint, less any payment previously made pursuant to this Part, plus interest computed from the date of entry of this Order.

## IV.   ADDITIONAL MONETARY PROVISIONS

A. Defendant relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B. The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order.

C. Defendant acknowledges that its Taxpayer Identification Number, which Defendant must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

## V. INJUNCTION REGARDING MISREPRESENTING PRACTICES RELATING TO INFORMATION PRIVACY

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from misrepresenting in any manner, expressly or by implication, the extent to which they maintain and protect the privacy, confidentiality, security, or integrity of covered information, including but not limited to:

A.     Defendant's practices with respect to personal information collected from children, including Defendant's collection, use, disclosure, and deletion practices;

B.     the extent to which Defendant collects or infers consumers' location information; or

C.     the extent to which Defendant obtains consumers' consent for the collection of covered information, including opt-in consent.

## VI. INJUNCTION REGARDING CONSENT FOR COLLECTION OR INFERENCE OF LOCATION INFORMATION

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from collecting or inferring location information without first confirming that:

A.     the consumer has provided affirmative express consent for the collection of location information to the application, Web site, or other online service that has integrated Defendant's software development kit;

B.     the consumer has not expressed, through any operating system, device, browser, or application permission or setting, that the consumer does not consent to, or revokes consent to, the collection of location information; and

C.     the consumer has not expressed, through any operating system, device, browser, or application permission or setting, that the consumer's consent to the collection of location

1  information is limited to a level of accuracy that is less precise than the location information that

2  is to be collected or inferred by Defendant.

3      **VII.  INJUNCTION REGARDING DELETION OF LOCATION INFORMATION**

4      IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees,

5  and attorneys, and all other persons in active concert or participation with any of them, who

6  receive actual notice of this Order, are permanently restrained and enjoined from:

7  A.  disclosing, using, or benefitting from location information that was collected or inferred

8  prior to entry of this Order without meeting the requirements of Part VI of this Order; and

9  B.  failing to destroy location information that was collected or inferred prior to entry of this

10  Order without meeting the requirements of Part VI of this Order that is in their possession,

11  custody, or control within ten (10) days after entry of this Order.  *Provided, however*, that such

12  location information need not be disposed of, and may be disclosed, to the extent requested by a

13  government agency or required by law, regulation, or court order.

14      **VIII.  COMPREHENSIVE PRIVACY PROGRAM REQUIREMENT**

15      IT IS FURTHER ORDERED that Defendant, whether acting directly or indirectly, in

16  connection with the advertising, marketing, promotion, offering for sale, or sale of any product or

17  service, in or affecting commerce, shall, no later than the date of service of this Order, establish

18  and implement, and thereafter maintain, a comprehensive privacy program that is reasonably

19  designed to: (1) address privacy risks related to the development and management of new and

20  existing products and services and (2) protect the privacy and confidentiality of covered

21  information.  Such program, the content and implementation of which must be fully documented

22  in writing, shall contain privacy controls and procedures appropriate to Defendant's size and

23  complexity, the nature and scope of Defendant's activities, and the sensitivity of the covered

24  information, including:

25  A.  the designation of an employee or employees to coordinate and be responsible for the

26  privacy program;

27  B.  the identification of reasonably foreseeable, material risks, both internal and external, that

28  could result in the Defendant's unauthorized collection, use, or disclosure of covered information,

and assessment of the sufficiency of any safeguards in place to control these risks. At a

minimum, this privacy risk assessment should include consideration of risks in each area of

relevant operation, including, but not limited to: (1) employee training and management,

including training on the requirements of this Order; and (2) product design, development, and

research;

C.     the design and implementation of reasonable privacy controls and procedures to address

the risks identified through the privacy risk assessment, and regular testing or monitoring of the

effectiveness of those privacy controls and procedures;

D.     the development and use of reasonable steps to select and retain service providers capable

of appropriately protecting the privacy of covered information they receive from Defendant, and

requiring service providers by contract to implement and maintain appropriate privacy

protections; and

E.     the evaluation and adjustment of Defendant's privacy program in light of the results of the

testing and monitoring required by Subpart C, any material changes to Defendant's operations or

business arrangements, or any other circumstances that Defendant knows or has reason to know

may have a material impact on the effectiveness of its privacy program.

## IX.     PRIVACY PROGRAM ASSESSMENT REQUIREMENT

IT IS FURTHER ORDERED that, in connection with its compliance with Part VIII of this

Order, Defendant shall obtain initial and biennial assessments and reports ("Assessments") from a

qualified, objective, independent third-party professional, who uses procedures and standards

generally accepted in the profession. The reporting period for the Assessments shall cover: (1)

the first year after service of the Order for the initial Assessment; and (2) each two (2) year period

thereafter for twenty (20) years after service of the order for biennial Assessments.

A.     Each Assessment shall:

1.     set forth the specific privacy controls that Defendant has implemented and

maintained during the reporting period;

2.     explain how such privacy controls are appropriate to Defendant's size and

complexity, the nature and scope of Defendant's activities, and the sensitivity of

the covered information collected from or about consumers;

3.  explain how the privacy controls that have been implemented meet or exceed the protections required by Part VIII of this Order; and

4.  certify that Defendant's privacy program is operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the program has so operated throughout the reporting period.

B.  Each Assessment shall be prepared and completed within sixty (60) days after the end of the reporting period to which the Assessment applies by a person that has a minimum of three (3) years of experience in the field of privacy and data protection. All persons conducting such Assessments and preparing such reports shall be approved by the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington D.C. 20580, in his or her sole discretion.

C.  Defendant shall provide the initial Assessment by overnight courier (not the U.S. Postal Service) to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington D.C. 20580, or by email to Debrief@ftc.gov, within ten (10) days after the Assessment has been prepared. All subsequent biennial Assessments shall be retained by Defendant until the Order is terminated and provided to the Associate Director for Enforcement within ten (10) days of request. The subject line must begin: United States v. InMobi Pte Ltd.

# X.   ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendant obtain acknowledgments of receipt of this Order:

A.  Defendant, within seven (7) days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.  For twenty (20) years after entry of this Order, Defendant must deliver a copy of this Order to: (1) all principals, officers, and directors, and managers of Defendant and of its subsidiaries and divisions in the United States; (2) all employees, agents, and representatives having responsibilities relating to the collection, retention, storage, or security of covered

information and all employees, agents, and representatives having responsibilities related to the operation of any website or online service subject to this Order; and (3) any business entity resulting from any change in structure as set forth in the Part titled Compliance Reporting. Delivery must occur within seven (7) days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which Defendant delivers a copy of this Order, Defendant must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## XI.    COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendant make timely submissions to the Commission:

A.      One hundred eighty (180) days after entry of this Order, Defendant must submit a compliance report, sworn under penalty of perjury. In such report, Defendant must:

1.      identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission and Plaintiff may use to communicate with Defendant;

2.      identify all of Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3.      describe the activities of each such business, including the goods and services offered, the means of advertising, marketing, and sales;

4.      describe in detail whether and how Defendant is in compliance with each Part of this Order;

5.      provide a copy of each different version of any privacy notice posted on each Web site or online service operated by Defendant or otherwise communicated to parents of children from whom Defendant collects personal information;

6.      provide a statement setting forth in detail any methods used to obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children or the methods used to avoid collecting, using, and/or disclosing personal information

STIPULATED ORDER                              14                        Case No. 3:16-cv-3474

from children;

      7.     provide a statement setting forth in detail the means provided for parents to review any personal information collected from their children and to refuse to permit its further use or maintenance;

      8.     provide a statement setting forth in detail why each type of information collected from a child is reasonably necessary for the provision of the particular related activity;

      9.     provide a statement setting forth in detail the procedures used to protect the confidentiality, security, and integrity of personal information collected from children; and

      10.    provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.     For twenty (20) years after entry of this Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in: (a) any designated point of contact; or (b) the structure of Defendant or any entity that Defendant has any ownership interest in or control directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.     Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within fourteen (14) days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.

The subject line must begin:  United States v. InMobi Pte Ltd.

## XII.   RECORDKEEPING

IT IS FURTHER ORDERED that Defendant must create certain records for twenty (20) years after entry of the Order, and retain each such record for five (5) years.  Specifically, Defendant must create and retain the following records:

A.      all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission;

B.      copies of all consumer complaints relating to Defendant's collection of covered information or personal information, and any response; and

C.      a copy of each materially different version of any software development kit Defendant makes available to developers, and any associated documentation or instructions.

## XIII.   COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendant's compliance with this Order:

A.      Within fourteen (14) days of receipt of a written request from a representative of the Commission or Plaintiff, Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission and Plaintiff are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.      For matters concerning this Order, the Commission and Plaintiff are authorized to communicate directly with Defendant.  Defendant must permit representatives of the Commission and Plaintiff to interview any employee or other person affiliated with Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.      The Commission and Plaintiff may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendant or any individual or entity affiliated with Defendant, without the necessity of identification or prior

1   notice.  Nothing in this Order limits the Commission's lawful use of compulsory process,

2   pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57(b)-1.

**XIV.   RETENTION OF JURISDICTION**

4       IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

5   purposes of construction, modification, and enforcement of this Order.

7   **SO ORDERED** this ___ day of _____, 2016.

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

1    **SO STIPULATED AND AGREED**

2    **FOR PLAINTIFF UNITED STATES OF AMERICA**

3

4    BENJAMIN C. MIZER
     Principal Deputy Assistant Attorney General
5    Civil Division

6    JONATHAN F. OLIN
7    Deputy Assistant Attorney General

8    MICHAEL S. BLUME
     Director
9    Consumer Protection Branch

10   ANDREW E. CLARK
11   Assistant Director

12

     /s/ Jacqueline Blaesi-Freed
13   JACQUELINE BLAESI-FREED
     Trial Attorney
14   Consumer Protection Branch
     U.S. Department of Justice
15   P.O. Box 386
     Washington, DC  20044
16   (202) 353-2809
17   jacqueline.m.blaesi-freed@usdoj.gov

18

19

20

21

22

23

24

25

26

27

28

1   FOR THE FEDERAL TRADE COMMISSION

2

3

4   MANEESHA MITHAL
    Associate Director
5   Division of Privacy and Identity Protection

6

7

8   MARK EICHORN
    Assistant Director
9   Division of Privacy and Identity Protection

10

11

12  NITHAN SANNAPPA
    Attorney
13  Division of Privacy and Identity Protection
    Federal Trade Commission
14  600 Pennsylvania Avenue, N.W.
    Washington, DC 20580
15  (202) 326-3185 (voice)
    (202) 326-3062 (fax)

16

17

18  JACQUELINE CONNOR
    Attorney
19  Division of Privacy and Identity Protection
    Federal Trade Commission
20  600 Pennsylvania Avenue, N.W.
    (202) 326-2844 (voice)
21  (202) 326-3062 (fax)

22

23

24

25

26

27

28

**FOR DEFENDANT:**

_____ Date: 4/7/16

TYLER NEWBY
FENWICK AND WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2495
*Counsel for InMobi Pte Ltd.*

**DEFENDANT:**

_____ Date: APRIL 7, 2016

NAVEEN TEWARI
*As Chief Executive Officer of InMobi Pte Ltd.*

GZJ KDKV'6: ''''

# How to view your location history in Google Maps



androidcentral.com/how-view-your-location-history-google-maps

July 20, 2018

What's on your timeline? See where you've traveled with Google Maps.

Harish Jonnalagadda

20 Jul 2018



Google Maps has a nifty Timeline feature that lets you browse the places you've visited along with the routes traveled. The feature was overhauled in 2015, and Google has added the ability to collate images you've taken at a particular location, allowing you to get a better overview of your travels.

It certainly comes in handy if you're looking to see all the images you took at a particular location, or if you're trying to get a highlight of your weekly or monthly activity.

- How to view your location history in Google Maps
- How to disable location tracking

1. Launch **Google Maps**.
2. Tap the **more button** (three horizontal lines) on the top left corner.
3. Tap **your timeline**.
4. Tap the **calendar icon** to view a particular day.



5. Swipe left or right to **switch months**.
6. Tap a **date** to view your **location history**. You'll see the route traveled, along with the duration and length of the overall journey.



# How to disable location tracking

Timeline is certainly a useful feature if you're interested in looking at your previous travel data, but it also comes off as creepy (Google tracks *everything*). Fortunately, you can easily turn off location tracking in Maps.

1. Tap the **more button** (three horizontal lines) on the top left corner.
2. Tap **Settings**.
3. Tap **Personal content**.



4. Tap the field that says **Location History is on** under **Location Settings**.
5. Tap the **switch** next to each device for which you'd like to disable location tracking.



There's also the option to pause tracking for your account as a whole. To do so, toggle **Location History** to off, and select **OK** in the dialog box that follows.

That's all there is to it! I like the timeline feature as it gives me a detailed look at where I've been over the course of the month (and how much time I wasted being stuck in traffic).

What are your thoughts on the location history feature? Like it? Feel like it's an intrusion of your privacy? Sound off in the comments below.

**Updated July 2018:** This article was updated with the latest steps on how to view your location history within Google Maps.

# EXHIBIT 49

# The Google tracking feature you didn't know you'd switched on

🔵 nakedsecurity.sophos.com/2017/10/03/the-google-tracking-feature-you-didnt-know-youd-switched-

October 3, 2017

03 Oct 2017



## Post navigation

Previous: How a Twitter troll was slain

Next: Google is making encryption mandatory for sites on 45 Top-Level Domains

by Matt Boddy

It's National Cybersecurity Awareness Month (NCSAM) and this week's theme is simple steps to online safety. Here's a simple step for you: see if you have Google's Your Timeline turned on and, if you do, switch it off.

## Google's Your Timeline

Using GPS, Wi-Fi and cell tower data, Google's Your Timeline can paint a very accurate picture of your daily life. If you've got it switched on, it stores every step you take and everywhere you go.

And the thing is, lots of people seem to have it switched on without even realising, including me, and my favourite hats come in tinfoil.

1/6

I was surprised it had slipped past me so I started asking other people if they had it switched on too. More often than not, without making a conscious decision to let Google follow them around, they had.

In the end I decided to ask 20 people at random and write down the answers. The result of my short, non-scientific survey? 95% of the people I asked – a mixture of people in technical and non-technical roles – had location history, or its slightly less obnoxious iPhone equivalent Frequent Locations (Significant Locations in iOS 11), turned on, tracking their every step, without realising.

Check for yourself. On Android it's under Settings > Location > Google Location History.

DEEP LEARNING FOR DEEPER CYBERSECURITY

Watch Video

# It's your Timeline (and Google's)

So what exactly is Google Timeline? Google says: "Your timeline in Google Maps helps you find the places you've been and the routes you've travelled. Your timeline is private, so only you can see it."

Only you. And Google.

Google's reasoning for the timeline feature is that, if you want to remember the name of that bar or café you visited yesterday, last week, last month, last year… you can simply visit Your Timeline. The technology behind this is impressive, but the privacy and security implications are, for some, quite terrifying.

Where you go says everything about you: where you live, where you work, where you hang out, the places you visit, how often and at what time. If you're a frequent visitor to your local hospital's cancer clinic, Google knows. If you're having an affair, it's in there. If you're a courier moving large amounts of cash, that data is being shared over the internet and stored in a data centre somewhere. If you're in the military or the police it knows where you're stationed and, if you're moving, your direction of travel.

Even if the data were stored anonymously (and it isn't clear if it is or not) that would be cold comfort. Anonymous data has a way of being less anonymous than you think, and the more anonymous data you have, the easier it is to unmask the individuals involved.

# So what does Google know?

To discover what Google Timeline knows about me, and you, I removed my tinfoil hat and opted to let it store my location history again.

Here's a journey from Oxford to London by car (indicated by the dark blue line) that's been accurately tracked to the point of tagging me at a service station I visited en-route.



Once in densely populated South London, using the telephone masts, local Wi-Fi and my phone's GPS, Your Timeline accurately plotted my movements. The colour of the tracking goes from dark blue to light blue as I change speed from driving to walking.

After accurately tracking my taxi journey into Clapham, Google Timeline then has a go at tagging me in a restaurant, Café Sol. Google will use this data to add to publicly available information such as "Popular Times", shown for Café Sol below:



Google provides the following statement in its support documentation on the anonymity of this data:

> To determine popular times and visit duration, Google uses aggregated and anonymised data from users who have opted in to Google Location History.

My memories of the evening are mildly hazy, but Google Timeline can tell me exactly what I did and where I went.

I'm not too bothered about Google using my boozy night for helpful data research, but it isn't about one night. It's about every day and every night and the pattern of my daily life. It's about all this data being stored and accessible by… I don't know who, now and in the future.

Google will store this data for years, as you can see in my screenshot below.



So how did I, and almost all the people I asked at random, end up with Location History turned on?

The option appears when you set up Google Now. For me that happened after a factory reset. When you're busy clicking 'next', 'next', 'finish' and don't have two hours to spend reading everything on screen, it's easy to miss:



My tinfoil hat is back on now.

On Android 7 it was as simple as going to Settings > Location (under personal) > Google Location History and selecting 'off'. For comprehensive details on switching off and deleting your location history, go to Google's <u>Manage or delete your Location History</u> page.

Apple iPhones have a similar feature hidden deep within their settings. Go to Privacy > Location Services >System Services > Frequent Locations.

# GZJ KDKV"72""

# How to Disable Google Location History

**wikihow.com**/Disable-Google-Location-History

Tech Team
Verified

When you use some Google products like Google Search and Google Maps, Google collects your location information. This allows Google to better provide you with the most relevant search results based on your location and more personalized features in Google applications.

## Steps



1. **Go to Google Activity controls page.** Open myaccount.google.com/activitycontrols in your browser and sign in with your Google account.



2. **Navigate to "Location History" section.** You can see it under the **Web & App Activity** segment.



3. **Turn off the Location History.** Toggle off



the blue switch, right across **Location History.** Then a pop-up box will appear there.



4. **Confirm your changes.** Just click on the **PAUSE** button at bottom of the pop-up box.



5. **Done.** Note that this setting doesn't delete your previous location history. but you can delete your private location history data from Google maps timeline settings.

## Community Q&A

Search

Add New Question

Ask a Question

200 characters left

Include your email address to get a message when this question is answered.

Submit

- Already answered
- Not a question
- Bad question
- Other

## Tips

- In an Android phone, go to **Settings> Location> Google Location History** and turn of the Google Location History.
- Disabling Location History doesn't turn off Location Reporting or location services for your device.

## Warnings

Pausing Google Location History doesn't delete any previous activity.

## Sources and Citations

- https://support.google.com/accounts/answer/3118687
- https://myaccount.google.com/

# EXHIBIT 51

FRANK PALLONE, JR., NEW JERSEY

CHAIRMAN

GREG WALDEN, OREGON

RANKING MEMBER

ONE HUNDRED SIXTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

April 23, 2019

Mr. Sundar Pichai
Chief Executive Officer
Google
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Pichai:

We are writing in response to concerning reports about a massive database of precise location information on hundreds of millions of consumers known inside Google as "Sensorvault."[1]  According to recent reports, Google tracks and stores precise location information on a huge volume of consumers, including practically every consumer with an Android mobile device, in some cases storing information dating back to 2009.[2]

The potential ramifications for consumer privacy are far reaching and concerning when examining the purposes for the Sensorvault database and how precise location information could be shared with third parties.

First, according to the reports, Google collects precise location information in numerous ways including from the location history function on Android phones, Google searches, and Google apps that have location enabled.[3]  Second, precise location information is reportedly collected even when people are not making calls or using apps, which enables Google to track the "whole pattern of life" of an individual.[4]  Finally, Google reportedly never destroys any of the precise location information it captures in the Sensorvault database, and has therefore

---

[1] *Tracking Phones, Google Is a Dragnet for the Police*, New York Times (Apr. 13, 2019).

[2] *Google's Sensorvault Is a Boon for Law Enforcement. This Is How It Works*, New York Times (Apr. 13, 2019).

[3] *Id.*

[4] *See* note 1.

Mr. Sundar Pichai
April 23, 2019
Page 2

compiled an extraordinarily detailed picture of the movements and whereabouts of a vast number of consumers stretching back more than a decade.[5]

As part of the Committee's ongoing commitment to protect the privacy of the American people and to understand the benefits and risks of various data collection and use practices, we would like to know the purposes for which Google maintains the Sensorvault database and the extent to which Google shares precise location information from this database with third parties. To that end, please provide answers to the following questions by May 7, 2019:

1. What information does Google store in the Sensorvault database and for what purposes does Google use this information? Please describe each use in detail. If the types of information in the database or the purposes for which such information is used have changed over time, explain any such changes in chronological order.

2. Please describe which affiliates/subsidiaries of Alphabet have access to or use the data or analytics derived from the data in the Sensorvault database.

3. Does Google maintain other databases of precise location information? If so, how does the Sensorvault database differ from other such databases and how is the data from such databases used?

4. Who is able to access the information in the Sensorvault database? Include in your response both the number of Google employees with access to the Sensorvault database and the roles and responsibilities of any persons with access.

5. What are the sources from which Google collects the information maintained in the Sensorvault database and any other database identified in response to question 3? Specifically, describe any Google services, mobile applications, devices, or any other means through which Google obtains the information.

   a. If consumers are required to "opt in" to the collection of precise location information, describe with specificity how consumers "opt in" to the service, and the notice provided to such consumers about the purposes for which Google collects the information. If any such "opt in" has changed over time, describe those changes.

   b. If consumers may "opt out" of the collection of precise location information, describe with specificity how consumers "opt out" and the notice provided to such consumers about the purposes for which Google collects the information. If any such "opt out" has changed over time, describe those changes.

6. To the extent that a consumer has requested that precise location data not be shared with Google, through opt-outs or other mechanisms, do Android phones continue to collect

---

[5] *Id.*

Mr. Sundar Pichai
April 23, 2019
Page 3

precise location data on the device or store such precise location information on the device?  If so, to the extent that the consumer subsequently allows location data to be shared with Google, is that formerly stored precise location information transmitted to Google?  Under what other circumstances would the device continue to transmit precise location information to Google when a consumer has requested that precise location information not be shared with Google?

7.  How accurate is the precise location information stored in the Sensorvault database?  Include in your response both the accuracy of the precise location information and the accuracy of attributing such information to a single individual.

8.  What controls, if any, does Google provide to consumers to limit or revoke Google's access to the information stored in the Sensorvault database?  Does Google provide consumers a means to delete data stored in Sensorvault? If so, describe in detail how consumers may do so.

9.  What is Google's retention policy with respect to precise location information stored in the Sensorvault database?  For what purpose(s) does Google maintain precise location information going back to 2009?

10. Does Google share, sell, license, or otherwise disclose precise location information (including deidentified data) from the Sensorvault database with any third parties other than law enforcement?  If so, identify the types of businesses receiving such information and the purpose for disclosing any such information.  If the data is deidentified, provide a description of how it is deidentified.

Mr. Sundar Pichai
April 23, 2019
Page 4

    In addition to providing the written responses requested, please make arrangements to provide Committee staff with a briefing on these topics to occur no later than May 10, 2019. Thank you for your attention.  If you have any questions, please contact Lisa Goldman of the Majority Staff at (202) 225-2927 and Melissa Froelich of the Minority Staff at (202)-226-3641.

                Sincerely,

Frank Pallone, Jr.
Chairman

Greg Walden
Ranking Member

Jan Schakowsky
Chair
Subcommittee on Consumer
   Protection and Commerce

Cathy McMorris Rodgers
Ranking Member
Subcommittee on Consumer
   Protection and Commerce