# EXHIBIT 2

# AP Exclusive: Google tracks your movements, like it or not

**AP** **apnews.com**/828aefab64d4411bac257a07c1af0ecb

By RYAN NAKASHIMA                                                                      August 13, 2018

Click to copyhttps://apnews.com/828aefab64d4411bac257a07c1af0ecb

Click to copyhttps://apnews.com/828aefab64d4411bac257a07c1af0ecb

1 of 7

SAN FRANCISCO (AP) — Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to.

An Associated Press investigation found that many Google services on Android devices and iPhones store your location data even if you've used a privacy setting that says it will prevent Google from doing so.

Computer-science researchers at Princeton confirmed these findings at the AP's request.

For the most part, Google is upfront about asking permission to use your location information. An app like Google Maps will remind you to allow access to location if you use it for navigating. If you agree to let it record your location over time, Google Maps will display that history for you in a "timeline" that maps out your daily movements.

Storing your minute-by-minute travels carries privacy risks and has been used by police to determine the location of suspects — such as a warrant that police in Raleigh, North Carolina, last year to find devices near a murder scene. So the company lets you "pause" a setting called Location History.

Google says that will prevent the company from remembering where you've been. Google's support page on the subject states: "You can turn off Location History at any time. With Location History off, the places you go are no longer stored."

That isn't true. Even with Location History paused, some Google apps automatically store time-stamped location data without asking. (It's possible, although laborious, to delete it .)

For example, Google stores a snapshot of where you are when you merely open its Maps app. Automatic daily weather updates on Android phones pinpoint roughly where you are. And some searches that have nothing to do with location, like "chocolate chip cookies," or "kids science kits," pinpoint your precise latitude and longitude — accurate to the square foot — and save it to your Google account.

The privacy issue affects some two billion users of devices that run Google's Android operating software and hundreds of millions of worldwide iPhone users who rely on Google for maps or search.

Storing location data in violation of a user's preferences is wrong, said Jonathan Mayer, a Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau. A researcher from Mayer's lab confirmed the AP's findings on multiple Android devices; the AP conducted its own tests on several iPhones that found the same behavior.

"If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off," Mayer said. "That seems like a pretty straightforward position to have."

Google says it is being perfectly clear.

"There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."

Google's explanation did not convince several lawmakers.

Sen. Mark Warner of Virginia told the AP it is "frustratingly common" for technology companies "to have corporate practices that diverge wildly from the totally reasonable expectations of their users," and urged policies that would give users more control of their data. Rep. Frank Pallone of New Jersey called for "comprehensive consumer privacy and data security legislation" in the wake of the AP report.

To stop Google from saving these location markers, the company says, users can turn off another setting, one that does not specifically reference location information. Called "Web and App Activity" and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.

When paused, it will prevent activity on any device from being saved to your account. But leaving "Web & App Activity" on and turning "Location History" off only prevents Google from adding your movements to the "timeline," its visualization of your daily travels. It does not stop Google's collection of other location markers.

You can delete these location markers by hand, but it's a painstaking process since you have to select them individually, unless you want to delete all of your stored activity.

You can see the stored location markers on a page in your Google account at myactivity.google.com, although they're typically scattered under several different headers, many of which are unrelated to location.

To demonstrate how powerful these other markers can be, the AP created a visual map of the movements of Princeton postdoctoral researcher Gunes Acar, who carried an Android phone with Location history off, and shared a record of his Google account.

The map includes Acar's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, The AP didn't plot the most telling and frequent marker — his home address.

Huge tech companies are under increasing scrutiny over their data practices, following a series of privacy scandals at Facebook and new data-privacy rules recently adopted by the European Union. Last year, the business news site Quartz found that Google was tracking Android users by collecting the addresses of nearby cellphone towers even if all location services were off. Google changed the practice and insisted it never recorded the data anyway.

Critics say Google's insistence on tracking its users' locations stems from its drive to boost advertising revenue.

"They build advertising information out of data," said Peter Lenz, the senior geospatial analyst at Dstillery, a rival advertising technology company. "More data for them presumably means more profit."

The AP learned of the issue from K. Shankari, a graduate researcher at UC Berkeley who studies the commuting patterns of volunteers in order to help urban planners. She noticed that her Android phone prompted her to rate a shopping trip to Kohl's, even though she had turned Location History off.

"So how did Google Maps know where I was?" she asked in a blog post .

The AP wasn't able to recreate Shankari's experience exactly. But its attempts to do so revealed Google's tracking. The findings disturbed her.

"I am not opposed to background location tracking in principle," she said. "It just really bothers me that it is not explicitly stated."

Google offers a more accurate description of how Location History actually works in a place you'd only see if you turn it off — a popup that appears when you "pause" Location History on your . There the company notes that "some location data may be saved as part of your activity on other Google services, like Search and Maps."

Google offers additional information in a popup that appears if you re-activate the "Web & App Activity" setting — an uncommon action for many users, since this setting is on by default. That popup states that, when active, the setting "saves the things you do on Google sites, apps, and services ... and associated information, like location."

Warnings when you're about to turn Location History off via Android and iPhone device settings are more difficult to interpret. On Android, the popup explains that "places you go with your devices will stop being added to your Location History map." On the iPhone, it simply reads, "None of your Google apps will be able to store location data in Location History."

The iPhone text is technically true if potentially misleading. With Location History off, Google Maps and other apps store your whereabouts in a section of your account called "My Activity," not "Location History."

Since 2014, Google has let advertisers track the effectiveness of online ads at driving foot traffic , a feature that Google has said relies on user location histories.

The company is pushing further into such location-aware tracking to drive ad revenue, which rose 20 percent last year to $95.4 billion. At a Google Marketing Live summit in July, Google executives unveiled a new tool called "local campaigns" that dynamically uses ads to boost in-person store visits. It says it can measure how well a campaign drove foot traffic with data pulled from Google users' location histories.

Google also says location records stored in My Activity are used to target ads. Ad buyers can target ads to specific locations — say, a mile radius around a particular landmark — and typically have to pay more to reach this narrower audience.

While disabling "Web & App Activity" will stop Google from storing location markers, it also prevents Google from storing information generated by searches and other activity. That can limit the effectiveness of the Google Assistant, the company's digital concierge.

Sean O'Brien, a Yale Privacy Lab researcher with whom the AP shared its findings, said it is "disingenuous" for Google to continuously record these locations even when users disable Location History. "To me, it's something people should know," he said.

———

AP Interactive: https://interactives.ap.org/google-location-tracking/

———

Associated Press writers Alan Fram and Mary Clare Jalonick in Washington and Jonathan Drew in Raleigh, North Carolina, contributed to this report.

All contents © copyright 2019 The Associated Press. All rights reserved.



# 'Location history' off?
# Google's still tracking you

An AP investigation found that Google saves your location history even if you've paused "Location History" on mobile devices. This map shows where Princeton privacy researcher Gunes Acar travelled over several days, from data saved to his Google account despite "Location History" being off.







# EXHIBIT 3

Mar 14 2019 11:08:07

TRANSCRIPT

March 12, 2019

COMMITTEE HEARING

SEN. LINDSEY GRAHAM, R-S.C.

WASHINGTON, DC

SENATE JUDICIARY COMMITTEE HEARING ON GDPR & CALIFORNIA CONSUMER

PRIVACY ACT: OPT-INS, CONSUMER CONTROL, AND THE IMPACT ON

COMPETITION AND INNOVATION

Bloomberg Government

Support: 1-877-498-3587

www.bgov.com

Copyright 2019. Provided under license from Bloomberg Government. All materials herein are protected by United States copyright law

and/or license from Bloomberg Government, and may not be

reproduced, distributed, transmitted, displayed, published or

broadcast without the prior written permission of

Bloomberg Government.

You may not alter or remove any trademark, copyright or other

notice from copies of the content.

SENATE JUDICIARY COMMITTEE HEARING ON GDPR & CALIFORNIA

CONSUMER PRIVACY ACT: OPT-INS, CONSUMER CONTROL, AND THE IMPACT

ON COMPETITION AND INNOVATION

MARCH 12, 2019

SPEAKERS:

SEN. LINDSEY GRAHAM, R-S.C., CHAIRMAN

SEN. CHARLES E. GRASSLEY, R-IOWA

SEN. JOHN CORNYN, R-TEXAS

SEN. MIKE LEE, R-UTAH

SEN. TED CRUZ, R-TEXAS

SEN. THOM TILLIS, R-N.C.

SEN. BEN SASSE, R-NEB.

SEN. MICHAEL D. CRAPO, R-IDAHO

SEN. JOHN KENNEDY, R-LA.

SEN. JOSH HAWLEY, R-MO.

SEN. JONI ERNST, R-IOWA

SEN. MARSHA BLACKBURN, R-TENN.

SEN. DIANNE FEINSTEIN, D-CALIF., RANKING MEMBER

SEN. PATRICK J. LEAHY, D-VT.

SEN. RICHARD J. DURBIN, D-ILL.

SEN. SHELDON WHITEHOUSE, D-R.I.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. CHRIS COONS, D-DEL.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. MAZIE K. HIRONO, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. KAMALA HARRIS, D-CALIF.

WITNESSES:

WILL DEVRIES, SENIOR PRIVACY COUNSEL FOR GOOGLE, INC., MOUNTAIN

VIEW, CALIF.

ALASTAIR MACTAGGART, CHAIRMAN OF CALIFORNIANS FOR CONSUMER

PRIVACY, SACRAMENTO, CALIF.

DAVID HOFFMAN, DIRECTOR OF SECURITY POLICY AND GLOBAL PRIVACY

OFFICER FOR INTEL, SANTA CLARA, CALIF.

GABRIEL WEINBERG, CEO AND FOUNDER OF DUCKDUCKGO, PAOLI, PA.

TOM LEE, POLICY LEAD FOR MAPBOX, WASHINGTON, D.C.

ROSLYN LAYTON, VISITING SCHOLAR AT THE AMERICAN ENTERPRISE

INSTITUTE, WASHINGTON, D.C.

MICHELLE RICHARDSON, DIRECTOR OF THE PRIVACY AND DATA PROJECT

AT THE CENTER FOR DEMOCRACY AND TECHNOLOGY, WASHINGTON, D.C.

AND JANE BAMBAUER, PROFESSOR OF LAW IN THE UNIVERSITY OF

ARIZONA JAMES E. ROGERS COLLEGE OF LAW, TUCSON, ARIZ., TESTIFY

GRAHAM: The hearing will come to order.

So, about a year ago we had a joint committee hearing with the Commerce Committee with Facebook CEO Mark Zuckerberg to try to find out what role Congress should play, if any, dealing with privacy issues around social media companies and outlets.

And as you fast forward, Europe has acted and we're here to learn what Europe did and see if it's working, helping or hurting. I think the acronym is CDPR (sic). California is about to pass a law that goes into effect in January, we're trying to learn from our friends in California about their approach to this problem.

To the Commerce Committee, I realize this is your primary jurisdiction, but I'd like to work with the Commerce Committee, we had a joint hearing for a reason because there are some crossover jurisdictions. But the content part seems to be mostly us. How you protect the platforms seems to be mostly us. Most of the privacy issues I think are in Commerce, some in Judiciary.

But the big picture for me is I want to make sure consumers understand what's happening when they sign up, that they're basically monetizing you. That's how they make money. If they don't charge a fee, all your interactions on social media is used by the media companies to sell advertising.

And we just want to make sure that people understand what they're signing up for and how far this goes, and what's too far. And I don't have any of the answers by any means, but I certainly believe the problem is real.

On the content side, many of you are having to make decisions about what to put up, what to take down. What's hate speech, what's not? What's too provocative with absolutely no guidance from your government?

2

And you're neutral platforms, nobody's holding you responsible for what you put up. Nobody's holding you responsible for what you fail to take down. But that's a big advantage in the law. If you have a newspaper, a TV show, a TV station, you can be regulated and you can be sued.

I don't want to destroy the goose that laid the golden egg in terms of innovation. I think all these social media outlets have enriched our lives, but there's a downside and potentially a dark side when they can be manipulated by foreign powers, terrorist organizations in a fashion to cause harm here at home.

We have a very talented committee of Republicans and Democrats, and this is one area I think there's a lot of bipartisan desire to learn more and to do something constructive.

So with that, I will turn it over to Senator Feinstein for any statement she would like to make.

FEINSTEIN: Thank you so much, Mr. Chairman.

I want to be clear, I think protecting individual privacy is critical, and we must do all we can to give people control over their data. The two laws that we're reviewing today are the European Union's General Data Protection Regulation and California's Consumer Privacy Act. Our goal in this hearing should be to understand what impact these laws are having and how well they're protecting our consumers.

It's useful to remember, I think, what has brought us to this point. In the past few years, hundreds of millions of consumers have had their sensitive, personal data stolen as a result of data breaches. The Equifax breach in 2018 compromised data for 146 million individuals. The Yahoo breach in 2014 and the Marriott Starwood breach in 2018 each affected half a billion people worldwide.

Consumers are now just becoming aware how insecure our personal information is with the expansion of smart phones, online services, and even appliances in our homes and offices that we regularly use.

For example, programs on smartphones can use geographic information to figure out where we are at any given moment and then sell it to nearby retailers and restaurants vying for businesses that want to promote coupons and discounts to entice individuals to buy from them. This can be a good thing if it's done with the approval of the consumer.

Last year, the New York Times revealed that there is now a thermometer to collect fever and symptom information from families and then sell that user data, and it was sold to Clorox. Clorox identified which zip codes were showing increases in fevers and directed more ads for products like disinfecting wipes to those areas.

While this kind of targeting may have had a benefit for consumers, it also has very serious implications for personal privacy, especially when the data involves medical information. The reason this was in the news at all is that it crosses a murky line on how we reasonably expect online services to use very sensitive information that we entrust to them.

I represent the State of California, birthplace to some of the most innovative companies in the world at the heart of the internet revolution. California though is also home to some of the most heavily criticized companies for their collection of personal data, and as a result California is home to the strongest state privacy law in the nation. In fact, one of our panelists -- where are you, Alastair MacTaggart -- seated before us today assisted with the drafting of this law.

Europe's law went into effect last year impacting virtually every company of any size operating in Europe. Companies are also gearing up to comply with California's law which will go into effect next year, and that must happen. There has been some push back against these laws with companies saying the requirements are too cumbersome to comply with, and the penalties too stiff for even unintentional violations.

In addition, some complain that the opt-in consent requirements in the European law result in confusion to consumers. Others have complained that California's law is too narrow, and does not go far enough to limit abuses by companies that collect data from the consumer directly.

Let me say again, it's my belief that individuals should have as much control as possible over their personal data. I commend the California law for protecting most California residents. But I also believe affirmative opt-in consent should be the standard, and that's a position I have taken for years. Not opt-out.

Companies should also be required to protect their company's -- their customer's personal data with a heightened degree of care, and should be held responsible should that data directly or through cyber breach end up in the wrong hands.

I will not support any federal privacy bill that weakened the California standard. I also believe that any federal legislation should include data breach notification requirements. I have had legislation on this issue, Mr. Chairman, going back to 2003.

GRAHAM: Wow.

FEINSTEIN: And get it through, and that's notifying people...

GRAHAM: Terrible.

FEINSTEIN: ... when their data is breached.

where you're renting a, you know, getting a rideshare car, they do need to know where you're going. They do need your credit card information. They do need your name. So you're going to say yes because otherwise the service doesn't work. And the worry with opt-in is that this sort of a take-it-or-leave-it approach, it's -- it's either -- either opt-in or you can't use the service.

FEINSTEIN: But I could see the opt-out notice, you -- you know

you'd have to read it with a magnifying glass.

MACTAGGART: No. What we're -- what our law requires is on every

page that collects information, there's a button that says do not sell my information. You click it, and you just click it once. That's it.

And then in addition, just to make it even easier, we've already talked to the browser companies. As I was saying the browser companies will have a setting. You say I want to always not sell my information. You click that once in your browser, then every site you go to, you don't have to worry about it. It does it for you. That's the beauty of this. That's what the building (ph) of the Do Not Track is.

So you do it once, and then you have really meaningful -- something's happened in your life, you've now told all these companies don't sell my information. Whereas, in Europe, if you say, yes, you can process my information, then it's business as usual. Nothing's changed. That's the -- that's the distinction.

FEINSTEIN: Anyone else have a point of view on this? This is

sort of fundamental to me, so I appreciate it.

HOFFMAN: Absolutely. I -- I -- I think what's absolutely

critical in a model is to provide for situations where individuals can provide meaningful and practicable consent. The situation we have though, is that people don't read privacy policies now, and we're moving into an environment where there's going to be even more data collection putting the burden on the individual to have to consent to every situation where information is going to be collected from them.

And where we don't cover the fact that what is going to happen with technology is that more and more data about us is not going to be collected directly from us. It's going to be scraped from what other people put up on the internet. It's going to be taken from government records. We need protections that are going to cover that also. We can't put all of this burden on the individual.

Yes, we need to have mechanisms in whatever law there is to encourage companies and situations like Mr. MacTaggart was mentioning to ask people for their consent. But we need to cover these other situations also because that's where technology's headed. Intel's model does that by focusing on making it illegal to use data in ways that are going to harm people.

FEINSTEIN: Could they, just the two...

GRAHAM: Yes, ma'am.

FEINSTEIN: ... just quickly make a response?

WEINBERG: Yeah, quickly. As Mr. MacTaggart mentioned, a lot of

this easy opt-out is already built into the browsers. If it was mandated, then people would easily have an ability to opt-out of behavioral advertising, and then they wouldn't have to worry about reading all these policies (inaudible)...

FEINSTEIN: What happens in Europe then?

WEINBERG: In Europe, I would also hope that ultimately, they

respect Do Not Track in the browsers which is a worldwide setting.

FEINSTEIN: But now they do not? Now it's...

WEINBERG: Right -- right now hardly any company in the world

respects Do Not Track in the browser.

LEE: Echoing some of the comments you've heard, opt-in doesn't

escape the problem of mountains of fine print. We've -- we can see the implementation and what it

13

looks like when we look at sites that are compliant with GDPR. It standardizes the language to some extent, but it still put that burden of making a decision and parsing these legal agreements on each individual user.

So we think that while opt-in might be appropriate in some circumstances where there's particularly sensitive data or relationships between the entities, opt-out with rules of the road that make sense and are predictable and reliable is a better user experience and probably...

FEINSTEIN: Thank you.

LEE: ... a better way to go.

FEINSTEIN: Thank you. That's helpful.

Thank you, Mr. Chairman.

GRAHAM: Senator Hawley.

HAWLEY: Thank you, Mr. Chairman.

I'd like to start by noting that yesterday I sent a letter to the FTC Chairman Simons demanding that the FTC focus on enforcing our consumer protection laws, and with consent, Mr. Chairman, I'd like to ask that that letter be entered into the record.

GRAHAM: Without objection.

HAWLEY: Thank you very much.

I -- I'm concerned about the implicit bargain that consumers are being asked to ratify by which they get supposedly free services but actually had enormous amounts of personal data extracted from them without knowing what exactly is going on.

And, Mr. DeVries, I'd like to focus on -- begin at least with you and -- and your company, the largest arguably, the most powerful company in the world. I note in your testimony, your written testimony, you say for over 20 years now our flagship products have been free. And then you go on to say next paragraph that Google clearly explains how it makes money and clearly explains how your products use personal information.

And my question is is that really true? Are any of those statements actually true? So let's -- let's take some examples. Let's start with location tracking. Let's start with your Android phones. Do you think the average consumer would be surprised to learn that her location is recorded and sent to Google hundreds of times every day even when she is not using her phone?

DEVRIES: Thank you, Senator. I -- I do think we -- we take as

strong an effort as possible to try to explain these things clearly. I understand that it's -- it's complicated. The way a mobile phone works...

HAWLEY: But do you think that she would -- do you think she

would be surprised to learn that even when she's not using the phone, an Android phone, Google is receiving information about where she is -- for instance, it's every four minutes or 14 times an hour. Roughly 340 times during a 24 hour period. That's without using the phone. Do you think she'd be surprised to learn that?

DEVRIES: So, Senator, I -- I know that location information is

absolutely core to making a mobile phone work the way that you want it to work. It makes -- it's what makes maps work, it's what makes your phone calls be able to be routed correctly. And we have an optional service that's opt-in called location history which can collect location over time if people turn that on. I think there's more that we can do to explain location more clearly, and I've -- I've heard your concerns (inaudible)...

HAWLEY: Well, you -- you collect -- Google collects geolocation

data even if location history is turned off, correct?

DEVRIES: Yes, Senator, it can in order to operate other

services (inaudible)...

HAWLEY: Let's just -- let's just get that on the record. Google

collects geolocation history and information even if location history is turned off. Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned off -- turned off by scanning Wi-Fi networks around him throughout the day? Do you think he'd be surprised by that?

DEVRIES: Senator, I know that this data is used to provide

value back to the user to make their phone work...

HAWLEY: You're not really answering my questions. Do you --

you're telling me you don't think a consumer should be surprised? You think they should anticipate that? They have location services turned off.

GRAHAM (?): This is fascinating. What value are you talking about?

DEVRIES: Well, Senator, so in order to make, say, maps work, to

be able to locate you to give you directions where you go, maps needs to know where you are.

GRAHAM: The phone's off.

DEVRIES: Well, in order to be able to just perform basic

functions to keep it (inaudible)...

HAWLEY: Location services are off.

DEVRIES: I -- indeed, Senator, in order to be able to know what

-- where it is so it can route phone calls to you, so it can collect the basic information.

HAWLEY: So the consumer cannot meaningful opt-out. I mean he

has...

DEVRIES: Sir (ph)...

HAWLEY: ... gone and tried to turn location services off, he's

not using his phone. It's still communicating and sending information to you, and you're monetizing it and using it to direct ads him, correct?

DEVRIES: We are not using that information to direct ads at

him, no, sir. This is to provide value back to the user in terms of making their services operate.

HAWLEY: What -- you -- what -- wait, wait, wait. You don't use

the information? What do you do with that information?

DEVRIES: We use it to make sure that the -- the -- we

understand...

HAWLEY: It's not a monetary value to you?

DEVRIES: There is some ways that location can be used for ads,

so for instance your IP address.

HAWLEY: Well, I thought you just said it wasn't used for ads?

DEVRIES: Senator, there is -- there is -- there is the -- the

kind of geolocation that's sent from the cell tower from your GPS device that's used for purposes that are really about making the phone operate. I'm happy to explain this in more detail. I understand it's a complicated topic and we can communicate it better and (inaudible)...

HAWLEY: I -- I don't know that it is that complicated. I think

when somebody turns off their user information, their location history, they expect the location tracking to be off. But it's not in fact. They don't have a way, apparently, to turn it off.

Let's take another example. Do you think that an average consumer who's using your products fully understands that Google builds a profile about her, tracks where she goes to work? Tracks where

15

her boyfriend lives. Tracks where she goes to church. Tracks when she goes to the doctor. Do you think that an average consumer would anticipate that?

DEVRIES: Senator, I -- I know that we have a duty to

communicate this information clearly. I don't believe we track the information to that level without communicating to...

HAWLEY: Do you think you're communicating it clearly when a

consumer cannot turn off their location tracking?

DEVRIES: Senator, you can turn off location tracking. There are

aspects of location, though, that are necessary to make services work where if we turn those off, your phone wouldn't work the way you'd expect. And I know that's a complicated subject to explain, it is and we're trying hard and we are (inaudible)...

HAWLEY: No, it's actually -- it's not complicated. What's

complicated is you don't allow consumers to stop your tracking of them. You tell them that you do. You would anticipate that they do. A consumer would have a reasonable expectation based on what you've told them that they're not being tracked, but in fact you're still tracking it. You're still gathering the information, and you're still using it.

By the way, all of this is just phone. We're not even talking yet about search or -- or internet tracking. I mean, listen, my time is almost expired here. We could talk about the -- the internet tracking that Google performs. We could talk about the lack of consent.

Here is my basic concern is that Americans have not signed up for this. They think that the products that you're offering them are free. They're not free. They think that they can opt-out of the -- of the tracking that you're performing. They can't meaningfully opt-out.

It's kind of like that -- that old Eagle's song, you know, "You can check out anytime you like but you can never leave." That's kind of what it's like dealing with your company. And that's a problem for the American consumer. It's a real problem.

And for somebody who has two small kids at home, the idea that your company and others like it are sweeping up information to build a user profile on them that will track every step, every movement and monetize that, and they can't do anything about it, and I can't do anything about it. That's a big problem that this Congress needs to address.

Thank you, Mr. Chairman.

GRAHAM: Senator Durbin.

DURBIN: Senator Hawley, you should come up to Chicago, or

perhaps we should invite here a group called Adelson (ph).

About six weeks ago, I sat down and they did a presentation along the lines you just mentioned. They also track how you move from place to place. Are you walking? Are you running? Are you on a bicycle? Are you in a car? So the information that is being gathered going way beyond what anybody imagines when they carry one of these around every single day.

There's so many aspects of this that I want to get into, but the one that troubled me the most is they said the largest collector now of information, and they can hardly keep up with the volume, is a collector of information on kids, our children. So it isn't a question of opting in or opting out personally. It's how much they're collecting on our children.

And a company known as Knewton, K-N-E-W-T-O-N, is collecting students', not only their grades so they can process a -- a report card. They're collecting their homework. They're collecting the essays they turned in. They are making a file on each of our children. So when a college announces we're no longer going to use the SAT and the ACT, it's because they don't have to. They already have the information.

Listen to what Mr. Jose Ferreira, CEO of Knewton said in 2012. "You can look at some students and think, boy, that poor schmuck is really in a lot of trouble in school." They've already branded the kids. That information is there.

So the question I really raised and introduced legislation to deal with it, can kids opt-out at a later point in their life? Can they ask if all the information that's been accumulated about them before the age 13 be wiped clean? Is that a reasonable request? I ask anybody on the panel.

Mr. Hoffman?

HOFFMAN: I -- I would say, and Intel's model does this, that we

# EXHIBIT 4

**News**Room

12/11/18 Fed. News Serv. Transcripts (Pg. Unavail. Online)
2018 WLNR 38379064

Federal News Service Transcripts
Copyright (c) 2018 Bloomberg Government

December 11, 2018

House Judiciary Committee hearing on Transparency and Accountability:
Examining Google and its Data Collection, Use and Filtering Practices

Subject: Google's Data Collection Practices Participants: Rep. Robert W. Goodlatte, R-Va., Chairman; Rep. Lamar Smith, R-Texas; Rep. Jim Sensenbrenner, R-Wis.; Rep. Darrell Issa, R-Calif.; Rep. Steve King, R-Iowa; Rep. Louie Gohmert, R-Texas; Rep. Jim Jordan, R-Ohio; Rep. Ted Poe, R-Texas; Rep. Steve Chabot, R-Ohio; Rep. Tom Marino, R-Pa.; Rep. Trey Gowdy, R-S.C.; Rep. Raul R. Labrador, R-Idaho; Rep. Doug Collins, R-Ga.; Rep. Mike Bishop, R-Mich.; Rep. Ken Buck, R-Colo.; Rep. John Ratcliffe, R-Texas; Rep. Mike Johnson, R-La.; Rep. Martha Roby, R-Ala.; Rep. Andy Biggs, R-Ariz.; Rep. Matt Gaetz, R-Fla.; Rep. Karen Handel, R-Ga.; Rep. John Rutherford, R-Fla.; Rep. Keith Rothfus, R-Pa.; Rep. Jerrold Nadler, D-N.Y., Ranking Member; Rep. Zoe Lofgren, D-Calif.; Rep. Sheila Jackson Lee, D-Texas; Rep. Steve Cohen, D-Tenn.; Rep. Hank Johnson, D-Ga.; Rep. Ted Deutch, D-Fla.; Rep. Luis V. Gutierrez, D-Ill.; Rep. Karen Bass, D-Calif.; Rep. Cedric L. Richmond, D-La.; Rep. Hakeem Jeffries, D-N.Y.; Rep. David Cicilline, D-R.I.; Rep. Pramila Jayapal, D-Wash.; Rep. Ted Lieu, D-Calif.; Rep. Jamie Raskin, D-Md.; Rep. Eric Swalwell, D-Calif.; Rep. Brad Schneider, D-Ill.; Rep. Val B. Demings, D-Fla. Witnesses: Rep. Kevin McCarthy, R-Calif., House Majority Leader; Google CEO Sundar Pichai Location: 2141 Rayburn House Office Building Time: 10:00:00 Date: 2018-12-11

GOODLATTE: Good morning. The Judiciary Committee will come to order. And, without objection, the chair is authorized to declare recess of the committee at anytime. We welcome everyone to this morning's hearing on Transparency and Accountability: Examining Google and its data Collection, Use, and Filtering practices.

Before I recognize myself and the Ranking Member for opening statements, I'd like to recognize our first witness, the Majority Leader Kevin McCarthy of California for his statement. Welcome.

MCCARTHY: Well, thank you, Mr. Goodlatte -- Chairman Goodlatte, for working with me to organize this hearing. I want to thank Sundar Pichai for testifying on Capitol Hill. We appreciate and note your willingness to travel here and answer our questions, first in a private setting in September, and now in a public setting.

Google is one of the most valuable companies in America because of what it does. Google's search engine organizes the entire internet, and by extension almost all the information in the world.

This is hardly an exaggeration. Here is a statistic you will hear a lot today, but it bears repeating. According to the Wall Street Journal 90 percent of all internet searches go through Google. That is power. And it comes with responsibility.

Mr. Pichai, it is -- it was necessary to convene this hearing because of the widening gap of distrust between technology companies and the American people. For our country and economy to grow stronger, the American must be able to have trust in the great companies of the 21st century.

We can alleviate some of their concerns today with transparency and candor. I hope we can begin to restore trust in the technology companies that shape our world, but we need answers.

We need to know, first, that Google is committed to the free market ideals of competition and entrepreneurship that launched its revolutionary products to begin with. Second, we need to be sure that any political bias within Google's workforce does not creep into its search products.

Third, we need to know that Google is living up to the America's belief in free expression, and human rights when it deals with foreign governments. Now, a word on the last subject, right now Google reportedly is developing a censored search engine with the Chinese Communist Party.

It is also developing next generation technology on Chinese soil and in conjunction with Chinese national champions like Tencent, technology that the administration considers a national priority.

Now, this news raises a troubling possibility. That Google is being used to strengthen China's system of surveillance, repression, and control. Right this very second China's authoritarian system detains more than a million religious minorities in reeducation camps.

Mr. Pichai, I urge you to reflect on that fact, and on the promise your company made when it pulled out of the China market in 2010. And I applauded you for that move in 2010.MCCARTHY: Back then, Google promised it would not censor its search results in China, or compromise its commitment to a free and open internet. Now, in light of these recent events, I think the American people deserve to know if something changed and if so, what?

All these topics -- competition, censorship, bias, and others point to one fundamental question that demands the nation's attention: Are America's technology companies serving as instruments of freedom or instruments of control? Are they fulfilling the promise of the digital age? Are they advancing the cause of self-government or are they serving of instruments of manipulation, used by powerful interests and foreign governments to rob the people of their power agency and indignity?

I believe we need to grapple with these questions together as a nation because a free world depends on a free Internet. We need to know that Google is on the side of the free world and that it will provide its services free of anticompetitive behavior, political bias and censorship.

I want to thank you again for being here and answering these questions. I look forward to listening to the answers with a very open mind and I yield back.

GOODLATTE: I would now like to invite Mr. Pichai to take his seat at the witness table.

Without objection, the Chair now recognizes the Ranking Member Mr. Nadler for a point of personal privilege to recognize a member of his staff -- a very distinguished member of his staff.

NADLER: Thank you Mr. Chairman.

Mr. Chairman, I want to take a moment to recognize Danielle Brown, whose last working day for the committee is tomorrow. Danielle has served on the Judiciary Committee Democratic staff for more than a decade in a variety of roles,

beginning as staff assist and then going to counsel parliamentarian, chief legislative counsel, and most recently deputy chief counsel.

Danielle has been essential to the operations of this committee and she has been involved in nearly every important piece of committee business over the last decade.

Her interest and expertise range from protecting vulnerable immigrants to ensuring reproductive freedom and preserving vital consumer protections. She is leaving us now, unfortunately, to become general counsel and parliamentarian of the Ways and Means Committee. Our loss is surely their gain.

I wish you well. I appreciate a wise counsel. I thank her for all her years of service to this committee and I hope the committee will join me in thanking her for her years of service to this committee.

GOODLATTE: Would the gentleman yield?

(APPLAUSE)

NADLER: I will yield to the Chairman.

GOODLATTE: I thank the gentleman for yielding.

I would like to join him in thanking Danielle for her service to this committee. She has worked with members on both sides of the aisle. She has worked with the majority staff, very productively, very cooperatively on a great many issues that have made this committee not only more productive but also operating in a fashion that has resulted in a number of bills getting from this committee all the way to the president's desk, whether that president be Barack Obama or Donald Trump.

That's an accomplishment that this entire committee should be proud of and Danielle should be proud that she has played an important part in doing that.

I thank you.(APPLAUSE)

GOODLATTE: I now recognize myself for an opening statement.

In the United States, Google operates the preeminent Internet search engine, the leading e-mail service provider and the android operating system which runs most of it smart -- most of the smart phones in the United States. When a consumer performs an internet search, sends an e-mail, or uses his or her smartphone, Google collects information on that person. In fact, almost every minute of every day, the Android operating system sends information about the exact location, temperature, barometric pressure, and speed of movement of every phone that runs on the Android operating system.

With Americans carrying their smartphones all day, every day, Google is able to collect an amount of information about its users that would even make the NSA blush. Of course, when users click through the terms of service for these services, they do consent to such collection. I think it is fair to say that most Americans have no idea the sheer volume of detailed information that is collected.

Today I hope to get answers on the extent of data collection and use by Google. In addition, decades ago, Congress passed the Communications Decency Act, including Section 230 of that act, which allows service providers to remove lewd, lascivious, excessively violent, or otherwise objectionable content from their platforms. This law allows service providers to remove illegal materials including child pornography and content that is illegal under our intellectual property laws.

While meant to allow them to block illegal, obscene, and harmful materials, there is some discretion that service providers, by necessity, must use to make decisions about what content is harmful or objectionable. Given Google's ubiquity in the search market, Google is often consumers' first and last stop when searching for information on the internet. As such, this committee is very interested in how Google makes decisions about what constitutes objectionable content that justifies filtering and who at Google makes these decisions.

Given the revelation that top executives at Google have discussed how the results of the 2016 elections do comply (ph) with Google's values, these questions have become all the more important. While it is true that Google is not a government entity, and so it does not have to comply with the first amendment, the American people deserve to know what types of information they are not getting when they perform searches on the internet.

The market works best when information about products and services is readily available. And so today, on behalf of this committee and the American consumer, I hope to get answers from Mr. Pichai regarding who at Google makes the judgment calls on whether to filter or block objectionable content, and what metrics Google uses to make those decisions.

I want to thank Google's CEO for his willingness to testify today and to answer these and other questions. With respect to search results, algorithmic screening is the primary means through which Google sorts data and information.

Google's search algorithm, for example, calculates what is presented to a user based on the variables the user inputs into the search bar. At its best, Google's algorithm reaches the best answer in the least amount of time while providing choices to the user by ranking pages most relevant to the search inquiry. Of course, by ranking pages, Google search always favors one page over another. This kind of bias appears harmless.

After all, the point of a search is to discriminate among multiple relevant sources to find the best answer. This process, however, turns much more sinister with allegations that Google manipulates its algorithm to favor the political party it likes, the ideas that it likes, or the products that it likes. There are numerous allegations in the news that Google employees have thought about doing this, talked about doing this, and have done it.

The dangerous implications to a fair democratic process cannot be understated. One study performed by psychologist Robert Epstein has revealed that internet search rankings have a significant impact on consumer choices, namely because users trust and choose higher-ranked results more than lower-ranked results. After performing five relevant double-blind, randomized, controlled experiments, using a total of 4,556 undecided voters representing diverse demographic characteristics of the voting populations of the United States and India, the study revealed that biased search rankings can shift the voting preferences of undecided voters by 20 percent or more.

The shift can be much higher in some democratic groups and search ranking bias can be masked so that people show no awareness of the manipulation. The potential for this kind of bias is clearly problematic and is further compounded by the fact that Google every day collects mountains of information about its users while they are actively engaged with a Google product or even when they are not.

According to a study conducted by Vanderbilt University, a dormant, stationary Android phone, with Chrome active in the background, communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour. The collection of location data may be obvious to most users but they are often unaware of the many sensors that the Android platform supports, including an accelerometer, a barometer, and a photometer. These -- photometer -- these sensors, in addition to the cameras and microphone on a mobile device, can collate into a very accurate picture of where a user is, what they are doing, and who else is there.

GOODLATTE: The gentleman's time has expired, but you can answer the question.

PICHAI: Thank you. We have very clear policies against hate speech, things which could incite harm or hatred or violence. And, you know, that's an area where we are clearly taking a lot of action.

But I -- I want to acknowledge there is more work -- more work to be done. And you know, with our growth, comes more responsibility. And we are committed to doing better as we invest more in this area.

RASKIN: Thank you, Mr. Chair.

GOODLATTE: Thank you.

The Chair now recognizes the gentlelady from Georgia, Ms. Handel.

HANDEL: Thank you, Mr. Chairman.

Thank you very much for being here, Mr. Pichai. For years, a Federal Trade Commission, on a bipartisan basis, has affirmed that precise geolocation information is considered highly, highly sensitive. And that consumers must opt in to that. Do you agree with that?

PICHAI: Yes, I agree with that.

HANDEL: Do you think there's other information, privacy information, of consumers that should also be required to have opt-in versus opt-out?

PICHAI: In general, I think a framework for privacy in which users have a sense of transparency, control and choice, and have clear understanding of the tradeoffs they need to make, I think is very good for consumers and we would support that.

HANDEL: And speaking of privacy and transparency, I'm trying to understand the difference between a paying customer for the Google Suite (ph) versus the free Gmail. So when it comes to data collection, are the criteria and the rules the same if you're on Google Suite (ph) versus Gmail?

PICHAI: Gmail's -- Google Suite is a -- a broader suite of products than Gmail alone. You know, we have very specific policies around Gmail in general.

PICHAI: We don't -- as a company we don't read your Gmail unless we have express consent from you, for example, to investigate security or abuse related to an account.

On G Suite, we provide G Suite across many instances. We have clear policies against (inaudible). We don't use...

HANDEL: All right. But what I'm asking is, are the policies different?

PICHAI: We don't distinguish between -- so, for example, today we provide G Suite for free to many educational institutions. We don't use that data for -- from within G Suite for advertising.

HANDEL: But you collect it?

# EXHIBIT 5

GOOGLE TERMS OF SERVICE

Effective March 31, 2020

Archived versions

## What's covered in these terms

We know it's tempting to skip these Terms of Service, but it's important to establish what you can expect from us as you use Google services, and what we expect from you.

These Terms of Service reflect the way Google's business works, the laws that apply to our company, and certain things we've always believed to be true. As a result, these Terms of Service help define Google's relationship with you as you interact with our services. For example, these terms include the following topic headings:

- What you can expect from us, which describes how we provide and develop our services

- What we expect from you, which establishes certain rules for using our services

- Content in Google services, which describes the intellectual property rights to the content you find in our services — whether that content belongs to you, Google, or others

- In case of problems or disagreements, which describes other legal rights you have, and what to expect in case someone violates these terms

Understanding these terms is important because, by using our services, you're agreeing to these terms.

Besides these terms, we also publish a Privacy Policy. Although it's not part of these terms, we encourage you to read it to better understand how you can update, manage, export, and delete your information.

## Service provider

Google services are provided by, and you're contracting with:

Google LLC

organized under the laws of the State of Delaware, USA, and operating under the laws of the USA

1600 Amphitheatre Parkway

Mountain View, California 94043

USA

## Age requirements

If you're under the age required to manage your own Google Account, you must have your parent or legal guardian's permission to use a Google Account. Please have your parent or legal guardian read these terms with you.

If you're a parent or legal guardian, and you allow your child to use the services, then these terms apply to you and you're responsible for your child's activity on the services.

Some Google services have additional age requirements as described in their service-specific additional terms and policies.

## Your relationship with Google

These terms help define the relationship between you and Google. Broadly speaking, we give you permission to use our services if you agree to follow these terms, which reflect how Google's business works and how we earn money. When we speak of "Google," "we," "us," and "our," we mean Google LLC and its affiliates.

## What you can expect from us

### Provide a broad range of useful services

We provide a broad range of services that are subject to these terms, including:

- apps and sites (like Search and Maps)

- platforms (like Google Play)

- integrated services (like Maps embedded in other companies' apps or sites)

- devices (like Google Home)

Our services are designed to work together, making it easier for you to move from one activity to the next. For example, Maps can remind you to leave for an appointment that appears in your Google Calendar.

## Improve Google services

We're constantly developing new technologies and features to improve our services. For example, we invest in artificial intelligence that uses machine learning to detect and block spam and malware, and to provide you with innovative features, like simultaneous translations. As part of this continual improvement, we sometimes add or remove features and functionalities, increase or decrease limits to our services, and start offering new services or stop offering old ones.

If we make material changes that negatively impact your use of our services or if we stop offering a service, we'll provide you with reasonable advance notice and an opportunity to export your content from your Google Account using Google Takeout, except in urgent situations such as preventing abuse, responding to legal requirements, or addressing security and operability issues.

# What we expect from you

## Follow these terms and service-specific additional terms

The permission we give you to use our services continues as long as you meet your responsibilities in:

- **these terms**

- **service-specific additional terms**, which could, for example, include things like additional age requirements

We also make various policies, help centers, and other resources available to you to answer common questions and to set expectations about using our services. These resources include our Privacy Policy, Copyright Help Center, Safety Center, and other pages accessible from our policies site.

Although we give you permission to use our services, we retain any intellectual property rights we have in the services.


## Respect others

Many of our services allow you to interact with others. We want to maintain a respectful environment for everyone, which means you must follow these basic rules of conduct:

• comply with applicable laws, including export control, sanctions, and human trafficking laws

• respect the rights of others, including privacy and intellectual property rights

• don't abuse or harm others or yourself (or threaten or encourage such abuse or harm) — for example, by misleading, defrauding, defaming, bullying, harassing, or stalking others

• don't abuse, harm, interfere with, or disrupt the services

Our service-specific additional terms and policies provide additional details about appropriate conduct that everyone using those services must follow. If you find that others aren't following these rules, many of our services allow you to report abuse. If we act on a report of abuse, we also provide a fair process as described in the Taking action in case of problems section.


## Permission to use your content

Some of our services are designed to let you upload, submit, store, send, receive, or share your content. You have no obligation to provide any content to our services and you're free to choose the content that you want to provide. If you choose to upload or share content, please make sure you have the necessary rights to do so and that the content is lawful.

## License

Your content remains yours, which means that you retain any intellectual property rights that you have in your content. For example, you have intellectual property rights in the creative content you make, such as reviews you write. Or you may have the right to share someone else's creative content if they've given you their permission.

We need your permission if your intellectual property rights restrict our use of your content. You provide Google with that permission through this license.

## What's covered

This license covers your content if that content is protected by intellectual property rights.

## What's not covered

- This license doesn't affect your privacy rights — it's only about your intellectual property rights

- This license doesn't cover these types of content:

  - publicly-available factual information that you provide, such as corrections to the address of a local business. That information doesn't require a license because it's considered common knowledge that everyone's free to use.

  - feedback that you offer, such as suggestions to improve our services. Feedback is covered in the Service-related communications section below.

## Scope

This license is:

- worldwide, which means it's valid anywhere in the world

- non-exclusive, which means you can license your content to others

- royalty-free, which means there are no fees for this license

## Rights

This license allows Google to:

- host, reproduce, distribute, communicate, and use your content — for example, to save your content on our systems and make it accessible from anywhere you go

- publish, publicly perform, or publicly display your content, if you've made it visible to others

- modify and create derivative works based on your content, such as reformatting or translating it

- sublicense these rights to:

  - other users to allow the services to work as designed, such as enabling you to share photos with people you choose

  - our contractors who've signed agreements with us that are consistent with these terms, only for the limited purposes described in the Purpose section below

## Purpose

This license is for the limited purpose of:

- **operating and improving the services**, which means allowing the services to work as designed and creating new features and functionalities. This includes using automated systems and algorithms to analyze your content:

  - for spam, malware, and illegal content

  - to recognize patterns in data, such as determining when to suggest a new album in Google Photos to keep related photos together

  - to customize our services for you, such as providing recommendations and personalized search results, content, and ads (which you can change or turn off in Ads Settings)

  This analysis occurs as the content is sent, received, and when it is stored.

- **using content you've shared publicly to promote the services**. For example, to promote a Google app, we might quote a review you wrote. Or to promote Google Play, we might show a screenshot of the app you offer in the Play Store.

- **developing new technologies and services** for Google consistent with these terms

## Duration

This license lasts for as long as your content is protected by intellectual property rights.

If you remove from our services any content that's covered by this license, then our systems will stop making that content publicly available in a reasonable amount of time. There are two exceptions:

- If you already shared your content with others before removing it. For example, if you shared a photo with a friend who then made a copy of it, or shared it again, then that photo may continue to appear in your friend's Google Account even after you remove it from your Google Account.

- If you make your content available through other companies' services, it's possible that search engines, including Google Search, will continue to find and display your content as part of their search results.

# Using Google services

## Your Google Account

If you meet these age requirements you can create a Google Account for your convenience. Some services require that you have a Google Account in order to work — for example, to use Gmail, you need a Google Account so that you have a place to send and receive your email.

You're responsible for what you do with your Google Account, including taking reasonable steps to keep your Google Account secure, and we encourage you to regularly use the Security Checkup.

## Using Google services on behalf of an organization

Many organizations, such as businesses, non-profits, and schools, take advantage of our services. To use our services on behalf of an organization:

- an authorized representative of that organization must agree to these terms

- your organization's administrator may assign a Google Account to you. That administrator might require you to follow additional rules and may be able to access or disable your Google Account.

## Service-related communications

To provide you with our services, we sometimes send you service announcements and other information. To learn more about how we communicate with you, see Google's Privacy Policy.

If you choose to give us feedback, such as suggestions to improve our services, we may act on your feedback without obligation to you.

---

# Content in Google services

## Your content

Some of our services give you the opportunity to make your content publicly available — for example, you might post a product or restaurant review that you wrote, or you might upload a blog post that you created.

- See the Permission to use your content section for more about your rights in your content, and how your content is used in our services

- See the Removing your content section to learn why and how we might remove user-generated content from our services

If you think someone is infringing your intellectual property rights, you can send us notice of the infringement and we'll take appropriate action. For example, we suspend or close the Google Accounts of repeat copyright infringers as described in our Copyright Help Center.

## Google content

Some of our services include content that belongs to Google — for example, many of the visual illustrations you see in Google Maps. You may use Google's content as allowed by these terms and any service-specific additional terms, but we retain any intellectual property rights that we have in our content. Don't remove, obscure, or alter any of our branding, logos, or legal notices. If you want to use our branding or logos, please see the Google Brand Permissions page.

## Other content

Finally, some of our services give you access to content that belongs to other people or organizations — for example, a store owner's description of their own business, or a newspaper article displayed in Google News. You may not use this content without that person or organization's permission, or as otherwise allowed by law. The views expressed in other people or organizations' content are theirs, and don't necessarily reflect Google's views.

---

# Software in Google services

Some of our services include downloadable software. We give you permission to use that software as part of the services.

The license we give you is:

• worldwide, which means it's valid anywhere in the world

• non-exclusive, which means that we can license the software to others

• royalty-free, which means there are no fees for this license

• personal, which means it doesn't extend to anyone else

• non-assignable, which means you're not allowed to assign the license to anyone else

Some of our services include software that's offered under open source license terms that we make available to you. Sometimes there are provisions in the open source license that explicitly override parts of these terms, so please be sure to read those licenses.

You may not copy, modify, distribute, sell, or lease any part of our services or software. Also, you may not reverse engineer or attempt to extract any of our source code unless you have our written permission or applicable law lets you do so.

When a service requires or includes downloadable software, that software sometimes updates automatically on your device once a new version or feature is available. Some services let you adjust your automatic update settings.

# In case of problems or disagreements

By law, you have the right to (1) a certain quality of service, and (2) ways to fix problems if things go wrong. These terms don't limit or take away any of those rights. For example, if you're a consumer, then you continue to enjoy all legal rights granted to consumers under applicable law.

## Warranty

We provide our services using reasonable skill and care. If we don't meet the quality level described in this warranty, you agree to tell us and we'll work with you to try to resolve the issue.

## Disclaimers

The only commitments we make about our services (including the content in the services, the specific functions of our services, or their reliability, availability, or ability to meet your needs) are (1) described in the Warranty section, (2) stated in the service-specific additional terms, or (3) provided under applicable laws. We don't make any other commitments about our services.

And unless required by law, we don't provide implied warranties, such as the implied warranties of merchantability, fitness for a particular purpose, and non-infringement.

## Liabilities

### For all users

These terms only limit our responsibilities as allowed by applicable law. Specifically, these terms don't limit Google's liability for death or personal injury, fraud, fraudulent misrepresentation, gross negligence, or willful misconduct.

Other than the rights and responsibilities described in this section (In case of problems or disagreements), Google won't be responsible for any other losses, unless they're caused by our breach of these terms or service-specific additional terms.

For business users and organizations only

If you're a business user or organization, then to the extent allowed by applicable law:

- You'll indemnify Google and its directors, officers, employees, and contractors for any third-party legal proceedings (including actions by government authorities) arising out of or relating to your unlawful use of the services or violation of these terms or service-specific additional terms. This indemnity covers any liability or expense arising from claims, losses, damages, judgments, fines, litigation costs, and legal fees.

- Google won't be responsible for the following liabilities:

  - loss of profits, revenues, business opportunities, goodwill, or anticipated savings

  - indirect or consequential loss

  - punitive damages

- Google's total liability arising out of or relating to these terms is limited to the greater of (1) US$500 or (2) 125% of the fees that you paid to use the relevant services in the 12 months before the breach

If you're legally exempt from certain responsibilities, including indemnification, then those responsibilities don't apply to you under these terms. For example, the United Nations enjoys certain immunities from legal obligations and these terms don't override those immunities.

## Taking action in case of problems

Before taking action as described below, we'll provide you with advance notice when reasonably possible, describe the reason for our action, and give you an opportunity to fix the problem, unless we reasonably believe that doing so would:

- cause harm or liability to a user, third party, or Google

- violate the law or a legal enforcement authority's order

- compromise an investigation

- compromise the operation, integrity, or security of our services

## Removing your content

If we reasonably believe that any of your content (1) breaches these terms, service-specific additional terms or policies, (2) violates applicable law, or (3) could harm our users, third parties, or Google, then we reserve the right to take down some or all of that content in accordance with applicable law. Examples include child pornography, content that facilitates human trafficking or harassment, and content that infringes someone else's intellectual property rights.

## Suspending or terminating your access to Google services

Google reserves the right to suspend or terminate your access to the services or delete your Google Account if any of these things happen:

- you materially or repeatedly breach these terms, service-specific additional terms or policies

- we're required to do so to comply with a legal requirement or a court order

- we reasonably believe that your conduct causes harm or liability to a user, third party, or Google — for example, by hacking, phishing, harassing, spamming, misleading others, or scraping content that doesn't belong to you

If you believe your Google Account has been suspended or terminated in error, you can appeal.

Of course, you're always free to stop using our services at any time. If you do stop using a service, we'd appreciate knowing why so that we can continue improving our services.

## Settling disputes, governing law, and courts

For information about how to contact Google, please visit our contact page.

California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

To the extent that applicable local law prevents certain disputes from being resolved in a California court, then you can file those disputes in your local courts. Likewise, if applicable local law prevents

your local court from applying California law to resolve these disputes, then these disputes will be governed by the applicable local laws of your country, state, or other place of residence.

## About these terms

By law, you have certain rights that can't be limited by a contract like these terms of service. These terms are in no way intended to restrict those rights.

These terms describe the relationship between you and Google. They don't create any legal rights for other people or organizations, even if others benefit from that relationship under these terms.

We want to make these terms easy to understand, so we've used examples from our services. But not all services mentioned may be available in your country.

If these terms conflict with the service-specific additional terms, the additional terms will govern for that service.

If it turns out that a particular term is not valid or enforceable, this will not affect any other terms.

If you don't follow these terms or the service-specific additional terms, and we don't take action right away, that doesn't mean we're giving up any rights that we may have, such as taking action in the future.

We may update these terms and service-specific additional terms (1) to reflect changes in our services or how we do business — for example, when we add new services, features, technologies, pricing, or benefits (or remove old ones), (2) for legal, regulatory, or security reasons, or (3) to prevent abuse or harm.

If we materially change these terms or service-specific additional terms, we'll provide you with reasonable advance notice and the opportunity to review the changes, except (1) when we launch a new service or feature, or (2) in urgent situations, such as preventing ongoing abuse or responding to legal requirements. If you don't agree to the new terms, you should remove your content and stop using the services. You can also end your relationship with us at any time by closing your Google Account.

DEFINITIONS

## affiliate

An entity that belongs to the Google group of companies, which means Google LLC and its subsidiaries, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, and Google Dialer Inc.

## business user

An individual or entity who is not a consumer (see consumer).

## consumer

An individual who uses Google services for personal, non-commercial purposes outside of their trade, business, craft, or profession. (See business user)

## copyright

A legal right that allows the creator of an original work (such as a blog post, photo, or video) to decide if and how that original work may be used by others.

## disclaimer

A statement that limits someone's legal responsibilities.

## EU Platform-to-Business Regulation

The Regulation (EU) 2019/1150 on promoting fairness and transparency for business users of online intermediation services.

## indemnify or indemnity

An individual or organization's contractual obligation to compensate the losses suffered by another individual or organization from legal proceedings such as lawsuits.

## intellectual property rights (IP rights)

Rights over the creations of a person's mind, such as inventions (patent rights); literary and artistic works (copyright); designs (design rights); and symbols, names, and images used in commerce (trademarks). IP rights may belong to you, another individual, or an organization.

## liability

Losses from any type of legal claim, whether the claim is based on a contract, tort (including negligence), or other reason, and whether or not those losses could have been reasonably anticipated or foreseen.

## organization

A legal entity (such as a corporation, non-profit, or school) and not an individual person.

## services

Google services that are subject to these terms are the products and services listed at https://policies.google.com/terms/service-specific, including:

- Google apps and sites (like Search and Maps)

- platforms (like Google Play)

- integrated services (like Maps embedded in other companies' apps or sites)

- devices (like Google Home)

## trademark

Symbols, names, and images used in commerce that are capable of distinguishing the goods or services of one individual or organization from those of another.

## warranty

An assurance that a product or service will perform to a certain standard.

## your content

Things that you write, upload, submit, store, send, receive, or share with Google using our services, such as:

- Docs, Sheets, and Slides you create

- blog posts you upload through Blogger

- reviews you submit through Maps

- videos you store in Drive

- emails you send and receive through Gmail

- pictures you share with friends through Photos

- travel itineraries that you share with Google

# EXHIBIT 6

**GOOGLE TERMS OF SERVICE**

Last modified: October 25, 2017 (view archived versions)

# Welcome to Google!

Thanks for using our products and services ("Services"). The Services are provided by Google LLC ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States.

By using our Services, you are agreeing to these terms. Please read them carefully.

Our Services are very diverse, so sometimes additional terms or product requirements (including age requirements) may apply. Additional terms will be available with the relevant Services, and those additional terms become part of your agreement with us if you use those Services.

# Using our Services

You must follow any policies made available to you within the Services.

Don't misuse our Services. For example, don't interfere with our Services or try to access them using a method other than the interface and the instructions that we provide. You may use our Services only as permitted by law, including applicable export and re-export control laws and regulations. We may suspend or stop providing our Services to you if you do not comply with our terms or policies or if we are investigating suspected misconduct.

Using our Services does not give you ownership of any intellectual property rights in our Services or the content you access. You may not use content from our Services unless you obtain permission from its owner or are otherwise permitted by law. These terms do not grant you the right to use any branding or logos used in our Services. Don't remove, obscure, or alter any legal notices displayed in or along with our Services.

Our Services display some content that is not Google's. This content is the sole responsibility of the entity that makes it available. We may review content to determine whether it is illegal or violates our policies, and we may remove or refuse to display content that we reasonably believe violates our policies or the law. But that does not necessarily mean that we review content, so please don't assume that we do.

In connection with your use of the Services, we may send you service announcements, administrative messages, and other information. You may opt out of some of those communications.

Some of our Services are available on mobile devices. Do not use such Services in a way that distracts you and prevents you from obeying traffic or safety laws.

## Your Google Account

You may need a Google Account in order to use some of our Services. You may create your own Google Account, or your Google Account may be assigned to you by an administrator, such as your employer or educational institution. If you are using a Google Account assigned to you by an administrator, different or additional terms may apply and your administrator may be able to access or disable your account.

To protect your Google Account, keep your password confidential. You are responsible for the activity that happens on or through your Google Account. Try not to reuse your Google Account password on third-party applications. If you learn of any unauthorized use of your password or Google Account, follow these instructions.

## Privacy and Copyright Protection

Google's privacy policies explain how we treat your personal data and protect your privacy when you use our Services. By using our Services, you agree that Google can use such data in accordance with our privacy policies.

We respond to notices of alleged copyright infringement and terminate accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act.

We provide information to help copyright holders manage their intellectual property online. If you think somebody is violating your copyrights and want to notify us, you can find information about submitting notices and Google's policy about responding to notices in our Help Center.

## Your Content in our Services

Some of our Services allow you to upload, submit, store, send or receive content. You retain ownership of any intellectual property rights that you hold in that content. In short, what belongs to you stays yours.

When you upload, submit, store, send or receive content to or through our Services, you give Google (and those we work with) a worldwide license to use, host, store, reproduce, modify, create derivative works (such as those resulting from translations, adaptations or other changes we make so that your content works better with our Services), communicate, publish, publicly perform, publicly display and distribute such content. The rights you grant in this license are for the limited purpose of operating, promoting, and improving our Services, and to develop new ones. This license continues even if you stop using our Services (for example, for a business listing you have added to Google Maps). Some Services may offer you ways to access and remove content that has been provided to that Service. Also, in some of our Services, there are terms or settings that narrow the scope of our use of the content submitted in those Services. Make sure you have the necessary rights to grant us this license for any content that you submit to our Services.

Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection. This analysis occurs as the content is sent, received, and when it is stored.

If you have a Google Account, we may display your Profile name, Profile photo, and actions you take on Google or on third-party applications connected to your Google Account (such as +1's, reviews you write and comments you post) in our Services, including displaying in ads and other commercial contexts. We will respect the choices you make to limit sharing or visibility settings in your Google Account. For example, you can choose your settings so your name and photo do not appear in an ad.

You can find more information about how Google uses and stores content in the privacy policy or additional terms for particular Services. If you submit feedback or suggestions about our Services, we may use your feedback or suggestions without obligation to you.

## About Software in our Services

When a Service requires or includes downloadable software, this software may update automatically on your device once a new version or feature is available. Some Services may let you adjust your automatic update settings.

Google gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by Google as part of the Services. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Google, in the manner permitted by these terms. You may not copy, modify, distribute, sell, or lease any part of our Services or included software, nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit those restrictions or you have our written permission.

Open source software is important to us. Some software used in our Services may be offered under an open source license that we will make available to you. There may be provisions in the open source license that expressly override some of these terms.

## Modifying and Terminating our Services

We are constantly changing and improving our Services. We may add or remove functionalities or features, and we may suspend or stop a Service altogether.

You can stop using our Services at any time, although we'll be sorry to see you go. Google may also stop providing Services to you, or add or create new limits to our Services at any time.

We believe that you own your data and preserving your access to such data is important. If we discontinue a Service, where reasonably possible, we will give you reasonable advance notice and a chance to get information out of that Service.

## Our Warranties and Disclaimers

We provide our Services using a commercially reasonable level of skill and care and we hope that you will enjoy using them. But there are certain things that we don't promise about our Services.

OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTIONS OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES "AS IS".

SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, LIKE THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. TO THE EXTENT PERMITTED BY LAW, WE EXCLUDE ALL WARRANTIES.

## Liability for our Services

WHEN PERMITTED BY LAW, GOOGLE, AND GOOGLE'S SUPPLIERS AND DISTRIBUTORS, WILL NOT BE
RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL LOSSES OR INDIRECT, SPECIAL,
CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES.

TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE, AND ITS SUPPLIERS AND
DISTRIBUTORS, FOR ANY CLAIMS UNDER THESE TERMS, INCLUDING FOR ANY IMPLIED WARRANTIES, IS
LIMITED TO THE AMOUNT YOU PAID US TO USE THE SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE
SERVICES AGAIN).

IN ALL CASES, GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, WILL NOT BE LIABLE FOR ANY LOSS OR
DAMAGE THAT IS NOT REASONABLY FORESEEABLE.

# Business uses of our Services

If you are using our Services on behalf of a business, that business accepts these terms. It will hold harmless and
indemnify Google and its affiliates, officers, agents, and employees from any claim, suit or action arising from or
related to the use of the Services or violation of these terms, including any liability or expense arising from claims,
losses, damages, suits, judgments, litigation costs and attorneys' fees.

# About these Terms

We may modify these terms or any additional terms that apply to a Service to, for example, reflect changes to the
law or changes to our Services. You should look at the terms regularly. We'll post notice of modifications to these
terms on this page. We'll post notice of modified additional terms in the applicable Service. Changes will not apply
retroactively and will become effective no sooner than fourteen days after they are posted. However, changes
addressing new functions for a Service or changes made for legal reasons will be effective immediately. If you do
not agree to the modified terms for a Service, you should discontinue your use of that Service.

If there is a conflict between these terms and the additional terms, the additional terms will control for that
conflict.

These terms control the relationship between Google and you. They do not create any third party beneficiary
rights.

If you do not comply with these terms, and we don't take action right away, this doesn't mean that we are giving up
any rights that we may have (such as taking action in the future).

If it turns out that a particular term is not enforceable, this will not affect any other terms.

The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

For information about how to contact Google, please visit our contact page.

# EXHIBIT 7

# Mobile Fact Sheet

 **pewinternet.org**/fact-sheet/mobile/

MORE FACT SHEETS: <u>INTERNET/BROADBAND</u> | <u>SOCIAL MEDIA</u>

In contrast to the largely stationary internet of the early 2000s, Americans today are increasingly connected to the world of digital information while "on the go" via smartphones and other mobile devices. Explore the patterns and trends that have shaped the mobile revolution below.



## Mobile phone ownership over time

The vast majority of Americans – 95% – now own a cellphone of some kind. The share of Americans that own smartphones is now 77%, up from just 35% in Pew Research Center's first survey of smartphone ownership conducted in 2011.

|            | Cellphone | Smartphone |
|------------|-----------|------------|
| 10/27/2002 | 62%       |            |
| 11/30/2004 | 65%       |            |
| 2/9/2005   | 66%       |            |
| 12/31/2005 | 67%       |            |
| 3/28/2006  | 66%       |            |
| 4/6/2006   | 73%       |            |
| 9/5/2007   | 76%       |            |
| 12/2/2007  | 75%       |            |
| 1/13/2008  | 77%       |            |
| 5/11/2008  | 78%       |            |
| 8/10/2008  | 82%       |            |
| 12/20/2008 | 84%       |            |

| | Cellphone | Smartphone |
|---|---|---|
| 1/27/2009 | 85% | |
| 4/19/2009 | 85% | |
| 9/14/2009 | 84% | |
| 12/27/2009 | 83% | |
| 1/19/2010 | 80% | |
| 5/30/2010 | 82% | |
| 9/13/2010 | 85% | |
| 11/1/2010 | 84% | |
| 11/24/2010 | 82% | |
| 11/28/2010 | 82% | |
| 12/21/2010 | 81% | |
| 3/20/2011 | 86% | |
| 5/22/2011 | 83% | 35% |
| 8/26/2011 | 84% | |
| 12/21/2011 | 87% | |
| 1/8/2012 | 88% | |
| 1/15/2012 | 87% | 39% |
| 2/19/2012 | 88% | 45% |
| 4/3/2012 | 88% | 46% |
| 8/5/2012 | 87% | 44% |
| 8/7/2012 | 89% | |
| 9/6/2012 | 85% | 45% |
| 9/23/2012 | 88% | 43% |
| 9/30/2012 | 89% | |
| 10/14/2012 | 88% | |
| 11/4/2012 | 89% | |
| 11/10/2012 | 84% | 46% |

|            | Cellphone | Smartphone |
|------------|-----------|------------|
| 12/9/2012  | 87%       | 45%        |
| 12/16/2012 | 88%       |            |
| 1/6/2013   | 89%       | 51%        |
| 5/19/2013  | 91%       | 56%        |
| 7/14/2013  | 90%       | 53%        |
| 7/28/2013  | 91%       | 53%        |
| 9/16/2013  | 89%       | 54%        |
| 9/30/2013  | 91%       | 55%        |
| 10/6/2013  | 92%       | 58%        |
| 1/5/2014   | 92%       | 55%        |
| 1/12/2014  | 90%       | 58%        |
| 1/26/2014  | 91%       | 55%        |
| 2/18/2014  | 90%       |            |
| 4/27/2014  | 92%       |            |
| 9/21/2014  | 91%       |            |
| 12/21/2014 | 89%       | 59%        |
| 4/12/2015  | 92%       | 67%        |
| 7/12/2015  | 92%       | 68%        |
| 11/15/2015 | 91%       | 69%        |
| 4/4/2016   | 92%       | 72%        |
| 5/3/2016   | 92%       | 70%        |
| 11/6/2016  | 95%       | 77%        |
| 1/10/2018  | 95%       | 77%        |

Pew Research Center



## Who owns cellphones and smartphones

A substantial majority of Americans are cellphone owners across a wide range of demographic groups. By contrast, smartphone ownership exhibits greater variation based on age, household income and educational attainment.

% of U.S. adults who own the following devices

| | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| Total | 95% | 77% | 17% |
| Men | 95% | 80% | 16% |
| Women | 94% | 75% | 19% |
| Ages 18-29 | 100% | 94% | 6% |
| 30-49 | 98% | 89% | 9% |
| 50-64 | 94% | 73% | 21% |
| 65+ | 85% | 46% | 40% |
| White | 94% | 77% | 17% |
| Black | 98% | 75% | 23% |
| Hispanic | 97% | 77% | 20% |
| Less than high school graduate | 90% | 57% | 33% |
| High school graduate | 92% | 69% | 24% |
| Some college | 96% | 80% | 16% |
| College graduate | 97% | 91% | 6% |
| Less than $30,000 | 92% | 67% | 25% |
| $30,000-$49,999 | 98% | 82% | 15% |
| $50,000-$74,999 | 98% | 83% | 15% |
| $75,000+ | 98% | 93% | 5% |

|  | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| Urban | 96% | 83% | 13% |
| Suburban | 94% | 78% | 16% |
| Rural | 91% | 65% | 26% |

Source: Survey conducted Jan. 3-10, 2018.

Pew Research Center



## Ownership of other devices

Along with mobile phones, Americans own a range of other information devices. Nearly three quarters of U.S. adults now own desktop or laptop computers, while roughly half now own tablet computers and around one-in-five own e-reader devices.

|  | E-reader | Tablet computer | Desktop/laptop computer |
|---|---|---|---|
| 1/13/2008 |  |  | 74% |
| 4/19/2009 | 2% |  |  |
| 9/14/2009 | 3% |  |  |
| 5/30/2010 | 4% | 3% |  |
| 6/20/2010 |  |  | 78% |
| 9/13/2010 | 5% | 4% |  |
| 11/24/2010 | 6% | 5% |  |
| 5/22/2011 | 12% | 8% |  |
| 8/26/2011 | 9% | 10% |  |
| 12/21/2011 | 10% | 10% | 75% |
| 1/8/2012 | 18% | 20% |  |
| 1/15/2012 | 19% | 19% | 78% |
| 2/19/2012 | 14% | 14% |  |

| | E-reader | Tablet computer | Desktop/laptop computer |
|---|---|---|---|
| 4/3/2012 | 18% | 18% | |
| 8/5/2012 | 19% | 21% | |
| 8/7/2012 | | 25% | |
| 11/10/2012 | 19% | 24% | 77% |
| 12/16/2012 | | 29% | |
| 1/6/2013 | 26% | 31% | |
| 5/19/2013 | 24% | 34% | |
| 9/30/2013 | 24% | 34% | |
| 4/12/2015 | 19% | 45% | 73% |
| 4/4/2016 | 17% | 48% | 74% |
| 11/6/2016 | 22% | 51% | 78% |
| 1/10/2018 | | 53% | 73% |

Pew Research Center



## Smartphone dependency over time

As the adoption of traditional broadband service has slowed in recent years, a growing share of Americans now use smartphones as their primary means of online access at home. Today one-in-five American adults are "smartphone-only" internet users – meaning they own a smartphone, but do not have traditional home broadband service.

| | U.S. adults |
|---|---|
| 2013 | 8% |
| 2014 | -- |
| 2015 | 13% |
| 2016 | 12% |
| 2017 | -- |

| | U.S. adults |
| --- | --- |
| 2018 | 20% |

Pew Research Center



## Who is smartphone dependent

Reliance on smartphones for online access is especially common among younger adults, non-whites and lower-income Americans.

- Age
- Race
- Gender
- Income
- Education
- Community

| | 18-29 | 30-49 | 50-64 | 65+ |
| --- | --- | --- | --- | --- |
| 2013 | 12% | 9% | 7% | 3% |
| 2014 | -- | -- | -- | -- |
| 2015 | 19% | 16% | 11% | 7% |
| 2016 | 17% | 13% | 11% | 7% |
| 2017 | -- | -- | -- | -- |
| 2018 | 28% | 24% | 16% | 10% |

Pew Research Center

| | White | Black | Hispanic |
| --- | --- | --- | --- |
| 2013 | 6% | 10% | 16% |
| 2014 | -- | -- | -- |
| 2015 | 10% | 19% | 23% |
| 2016 | 9% | 15% | 23% |

|      | White | Black | Hispanic |
|------|-------|-------|----------|
| 2017 | --    | --    | --       |
| 2018 | 14%   | 24%   | 35%      |

Pew Research Center

|      | Men | Women |
|------|-----|-------|
| 2013 | 9%  | 8%    |
| 2014 | --  | --    |
| 2015 | 14% | 13%   |
| 2016 | 12% | 12%   |
| 2017 | --  | --    |
| 2018 | 20% | 19%   |

Pew Research Center

|      | Less than $30,000 | $30,000-$49,999 | $50,000-$74,999 | $75,000+ |
|------|-------------------|-----------------|-----------------|----------|
| 2013 | 12%               | 9%              | 5%              | 5%       |
| 2014 | --                | --              | --              | --       |
| 2015 | 20%               | 15%             | 10%             | 6%       |
| 2016 | 21%               | 12%             | 10%             | 5%       |
| 2017 | --                | --              | --              | --       |
| 2018 | 31%               | 22%             | 14%             | 9%       |

Pew Research Center

|      | Less than high school graduate | High school graduate | Some college | College graduate |
|------|--------------------------------|----------------------|--------------|------------------|
| 2013 | 14%                            | 11%                  | 8%           | 4%               |
| 2014 | --                             | --                   | --           | --               |
| 2015 | 21%                            | 17%                  | 14%          | 6%               |
| 2016 | 27%                            | 15%                  | 12%          | 5%               |
| 2017 | --                             | --                   | --           | --               |

| | Less than high school graduate | High school graduate | Some college | College graduate |
|---|---|---|---|---|
| 2018 | 39% | 22% | 21% | 10% |

Pew Research Center

| | Urban | Suburban | Rural |
|---|---|---|---|
| 2013 | 9% | 7% | 9% |
| 2014 | -- | -- | -- |
| 2015 | 15% | 12% | 15% |
| 2016 | 12% | 12% | 14% |
| 2017 | -- | -- | -- |
| 2018 | 22% | 17% | 17% |

Pew Research Center



## Find out more

Find more in-depth explorations of the impact of mobile adoption by following the links below.

Millennials stand out for their technology use, but older generations also embrace digital life
May 2, 2018
About a quarter of U.S. adults say they are 'almost constantly' online March 14, 2018
Nearly one-in-five Americans now listen to audiobooks March 8, 2018
A third of Americans live in a household with three or more smartphones May 25, 2017
Tech Adoption Climbs Among Older Adults May 17, 2017
Digital divide persists even as lower-income Americans make gains in tech adoption March 22, 2017

All reports and blog posts related to mobile technology.

# EXHIBIT 8



# Global Mobile Trends 2017

September 2017

# Contents

**1** Key takeaways

**2** Consumers and mobile

**3** Internet unconnected – the other half

**4** Networks

**5** Financial performance

**6** Competitive landscape and cross-sector competition

**7** Regional views

Europe
North America
China
India
Asia

Latin America
Sub-Saharan Africa
Middle East and North Africa

# Two thirds of the population are connected by mobile

The 5 billion mobile subscriber milestone was reached in Q2 2017.
Barring perhaps radio, it is the most prevalent technology on earth.

A further 620 million subscribers will be added by 2020, reaching almost three quarters of the global population.

**GLOBAL MOBILE UNIQUE SUBSCRIBERS AND PENETRATION**



Source: GSMA Intelligence

Unique subscribers    Market penetration



# Smartphone growth led by Asian and African markets as affordability improves

Smartphones account for over half of total connections globally.

As with subscriber growth, smartphone growth is being driven by developing markets

Five markets will account for more than 40% of the 1.6 billion new smartphone connections by 2020.

Lower cost smartphones from local manufacturers such as Huawei, Oppo, OnePlus and Xiaomi in China, Micromax in India, and now AfriOne in Nigeria, are helping to address the affordability barrier.

Source: GSMA Intelligence



**CONTRIBUTION TO SMARTPHONE GROWTH**

4.1bn

5.7bn

Q2 2017 · India · China · Nigeria · Indonesia · Pakistan · Other · 2020

53% —— % of total connections —— 66%

 Authors

## Lead authors

David George
Director
dgeorge@gsma.com

Tim Hatt
Director
thatt@gsma.com

## Editors

Ed Barker
Head of Industry Strategy

Matt Bonsall
Director of Ecosystem Strategy

## Authors

Akanksha Sharma
Senior Analyst

Calum Dewar
Director, Forecasting

David Evans
Director, Product Innovation

Francesco Rizzato
Senior Analyst, Forecasting

Gu Zhang
Senior Analyst

Jan Stryjak
Lead Analyst

Kalvin Bahia
Principal Economist

Kavi Bains
Senior Analyst, Financial Modelling

Kenechi Okeleke
Lead Analyst

Matthew Iji
Manager, Core Forecasting

Maximo Corral San Martin
Senior Analyst, Forecasting

Michael Meyer
Analyst

Mike Rogers
Senior Analyst

Mike Meloán
Lead Analyst

Pablo Iacopino
Senior Manager

Robert Wyrzykowski
Analyst, Spectrum

Sylwia Kechiche
Lead Analyst, M2M

 # About



 GSMA Intelligence

The GSMA represents the interests of mobile operators worldwide, uniting nearly 800 operators with more than 300 companies in the broader mobile ecosystem, including handset and device makers, software companies, equipment providers and internet companies,

as well as organisations in adjacent industry sectors. The GSMA also produces industry-leading events such as Mobile World Congress, Mobile World Congress Shanghai, Mobile World Congress Americas and the Mobile 360 Series of conferences.

For more information, please visit the GSMA corporate website at www.gsma.com

Follow the GSMA on Twitter: @GSMA

GSMA Intelligence is the definitive source of global mobile operator data, analysis and forecasts, and publisher of authoritative industry reports and research. Our data covers every operator group, network and MVNO in every country worldwide – from Afghanistan to Zimbabwe. It is the most accurate and complete set of industry metrics available, comprising tens of millions of individual data points, updated daily. GSMA Intelligence is relied on by leading operators, vendors, regulators, financial institutions and third-party industry players, to support strategic decision-making and long-term investment planning. The data is used as an industry reference point and is frequently cited by the media and by the industry itself. Our team of analysts and experts produce regular thought-leading research reports across a range of industry topics.

www.gsmaintelligence.com

info@gsmaintelligence.com

# EXHIBIT 9

# 99.6 percent of new smartphones run Android or iOS

**theverge.com**/2017/2/16/14634656/android-ios-market-share-blackberry-2016

James Vincent                                                            February 16, 2017



The latest smartphone figures from Gartner are out, and they paint an *extremely* familiar picture. Between them, Android and iOS accounted for 99.6 percent of all smartphone sales in the fourth quarter of 2016. This duopoly has been the norm for a while now (in the second quarter of 2015 this figure was 96.8 percent), but it's always impressive — and slightly terrifying — to see how Google and Apple continue to wring the last decimal points of market share from global smartphone users.

Of the 432 million smartphones sold in the last quarter, 352 million ran Android (81.7 percent) and 77 million ran iOS (17.9 percent). But what happened to the other players? Well, in the same quarter, Windows Phone managed to round up 0.3 percent of the market, while BlackBerry was reduced to a rounding *error*. The once-great firm sold just over 200,000 units, amounting to 0.0 percent market share.

| Operating System | 4Q16 Units | 4Q16 Market Share (%) | 4Q15 Units | 4Q15 Market Share (%) |
|---|---|---|---|---|
| Android | 352,669.9 | 81.7 | 325,394.4 | 80.7 |
| iOS | 77,038.9 | 17.9 | 71,525.9 | 17.7 |
| Windows | 1,092.2 | 0.3 | 4,395.0 | 1.1 |
| BlackBerry | 207.9 | 0.0 | 906.9 | 0.2 |
| Other OS | 530.4 | 0.1 | 887.3 | 0.2 |
| Total | 431,539.3 | 100.0 | 403,109.4 | 100.0 |

*Worldwide smartphone sales in the fourth quarter of 2016. (Thousands of units.)*
*Image: Gartner*

It's worth noting that although, in retrospect, this state of affairs seems inescapable, for years analysts were predicting otherwise. Three years ago, Gartner said that Microsoft's mobile OS would <u>overtake iOS for market share in 2017</u>, while BlackBerry would still be hanging around as a sizable (if small) player.

In this latest report, Gartner doesn't make any future predictions, but notes that the smartphone market continues to shift. In the last quarter it grew 7 percent to 432 million units sold; Samsung's sales fell for the second consecutive quarter, dropping 2.9 percent year on year; and the middle ground continues to be fought over by a number of successful Chinese brands (including Huawei, Oppo, and BBK). That's just vendors jostling for position, though, and with Google and Apple's supremely dominant market share, no one is predicting the rise of a new mobile OS for the foreseeable future.

## Next Up In Tech

# EXHIBIT 10

GOOGLE PRIVACY POLICY

# When you use our services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control.

This Privacy Policy is meant to help you understand what information we collect, why we collect it, and how you can update, manage, export, and delete your information.

Effective July 1, 2020

Archived versions

---

We build a range of services that help millions of people daily to explore and interact with the world in new ways. Our services include:

- Google apps, sites, and devices, like Search, YouTube, and Google Home

- Platforms like the Chrome browser and Android operating system

- Products that are integrated into third-party apps and sites, like ads and embedded Google Maps

You can use our services in a variety of ways to manage your privacy. For example, you can sign up for a Google Account if you want to create and manage content like emails and photos, or see more relevant search results. And you can use many Google services when you're signed out or without creating an account at all, like searching on Google or watching YouTube videos. You can also choose to browse the web privately using Chrome in Incognito mode. And across our services, you can adjust your privacy settings to control what we collect and how your information is used.

To help explain things as clearly as possible, we've added examples, explanatory videos, and definitions for key terms. And if you have any questions about this Privacy Policy, you can contact us.

---

INFORMATION GOOGLE COLLECTS

# We want you to understand the types of information we collect as you use our services

We collect information to provide better services to all our users — from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like. The information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls.

When you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This helps us do things like maintain your language preferences across browsing sessions.

When you're signed in, we also collect information that we store with your Google Account, which we treat as personal information.

## Things you create or provide to us

When you create a Google Account, you provide us with personal information that includes your name and a password. You can also choose to add a phone number or payment information to your account. Even if you aren't signed in to a Google Account, you might choose to provide us with information — like an email address to receive updates about our services.

We also collect the content you create, upload, or receive from others when using our services. This includes things like email you write and receive, photos and videos you save, docs and spreadsheets you create, and comments you make on YouTube videos.

## Information we collect as you use our services

### Your apps, browsers & devices

We collect information about the apps, browsers, and devices you use to access Google services, which helps us provide features like automatic product updates and dimming your screen if your battery runs low.

The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

We collect this information when a Google service on your device contacts our servers — for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

## Your activity

We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include:

- Terms you search for

- Videos you watch

- Views and interactions with content and ads

- Voice and audio information when you use audio features

- Purchase activity

- People with whom you communicate or share content

- Activity on third-party sites and apps that use our services

- Chrome browsing history you've synced with your Google Account

If you use our services to make and receive calls or send and receive messages, we may collect telephony log information like your phone number, calling-party number, receiving-party number, forwarding numbers, time and date of calls and messages, duration of calls, routing information, and types of calls.

You can visit your Google Account to find and manage activity information that's saved in your account.

 Go to Google Account

## Your location information

We collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you.

Your location can be determined with varying degrees of accuracy by:

- GPS

- IP address

- Sensor data from your device

- Information about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices

The types of location data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app. You can also turn on Location History if you want to create a private map of where you go with your signed-in devices.

In some circumstances, Google also collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.

We use various technologies to collect and store information, including cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs.

WHY GOOGLE COLLECTS DATA

# We use data to build better services

We use the information we collect from all our services for the following purposes:

## Provide our services

We use your information to deliver our services, like processing the terms you search for in order to return results or helping you share content by suggesting recipients from your contacts.

## Maintain & improve our services

We also use your information to ensure our services are working as intended, such as tracking outages or troubleshooting issues that you report to us. And we use your information to make improvements to our services — for example, understanding which search terms are most frequently misspelled helps us improve spell-check features used across our services.

## Develop new services

We use the information we collect in existing services to help us develop new ones. For example, understanding how people organized their photos in Picasa, Google's first photos app, helped us design and launch Google Photos.

## Provide personalized services, including content and ads

We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results. For example, Security Checkup provides security tips adapted to how you use Google products. And Google Play uses information like apps you've already installed and videos you've watched on YouTube to suggest new apps you might like.

Depending on your settings, we may also show you personalized ads based on your interests. For example, if you search for "mountain bikes," you may see an ad for sports equipment when you're browsing a site that shows ads served by Google. You can control what information we use to show you ads by visiting your ad settings.

- We don't show you personalized ads based on sensitive categories, such as race, religion, sexual orientation, or health.

- We don't share information that personally identifies you with advertisers, such as your name or email, unless you ask us to. For example, if you see an ad for a nearby flower shop and select the "tap to call" button, we'll connect your call and may share your phone number with the flower shop.

 Go to Ad Settings

## Measure performance

We use data for analytics and measurement to understand how our services are used. For example, we analyze data about your visits to our sites to do things like optimize product design. And we also use data about the ads you interact with to help advertisers understand the performance of their ad campaigns. We use a variety of tools to do this, including Google Analytics. When you visit sites that use Google Analytics, Google and a Google Analytics customer may link information about your activity from that site with activity from other sites that use our ad services.

## Communicate with you

We use information we collect, like your email address, to interact with you directly. For example, we may send you a notification if we detect suspicious activity, like an attempt to sign in to your Google Account from an unusual location. Or we may let you know about upcoming changes or improvements to our services. And if you contact Google, we'll keep a record of your request in order to help solve any issues you might be facing.

## Protect Google, our users, and the public

We use information to help improve the safety and reliability of our services. This includes detecting, preventing, and responding to fraud, abuse, security risks, and technical issues that could harm Google, our users, or the public.

We use different technologies to process your information for these purposes. We use automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features tailored to how you use our services. And we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data. For example, Google Translate helps people communicate across languages by detecting common language patterns in phrases you ask it to translate.

We may combine the information we collect among our services and across your devices for the purposes described above. For example, if you watch videos of guitar players on YouTube, you might see an ad for guitar lessons on a site that uses our ad products. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

If other users already have your email address or other information that identifies you, we may show them your publicly visible Google Account information, such as your name and photo. This helps people identify an email coming from you, for example.

We'll ask for your consent before using your information for a purpose that isn't covered in this Privacy Policy.

---

YOUR PRIVACY CONTROLS

## You have choices regarding the information we collect and how it's used

This section describes key controls for managing your privacy across our services. You can also visit the Privacy Checkup, which provides an opportunity to review and adjust important privacy settings. In addition to these tools, we also offer specific privacy settings in our products — you can learn more in our Product Privacy Guide.

---

 Go to Privacy Checkup

---

## Managing, reviewing, and updating your information

When you're signed in, you can always review and update information by visiting the services you use. For example, Photos and Drive are both designed to help you manage specific types of content you've saved with Google.

We also built a place for you to review and control information saved in your Google Account. Your Google Account includes:

## Privacy controls



### Activity Controls

Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions.

Go to Activity Controls

---



### Ad settings

Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads. You can modify your interests, choose whether your personal information is used to make ads more relevant to you, and turn on or off certain advertising services.

Go to Ad Settings

---



### About you

Control what others see about you across Google services.

Go to About You

---



### Shared endorsements

Choose whether your name and photo appear next to your activity, like reviews and recommendations, that appear in ads.

Go to Shared Endorsements

---

### Information you share

 If you're a G Suite user, control whom you share information with through your account on Google+.

Go to Information You Share

## Ways to review & update your information

 **My Activity**

My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity.

Go to My Activity

 **Google Dashboard**

Google Dashboard allows you to manage information associated with specific products.

Go to Dashboard

 **Your personal information**

Manage your contact information, such as your name, email, and phone number.

Go to Personal Info

When you're signed out, you can manage information associated with your browser or device, including:

- Signed-out search personalization: Choose whether your search activity is used to offer you more relevant results and recommendations.

- YouTube settings: Pause and delete your YouTube Search History and your YouTube Watch History.

- Ad Settings: Manage your preferences about the ads shown to you on Google and on sites and apps that partner with Google to show ads.

# Exporting, removing & deleting your information

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

You can also request to remove content from specific Google services based on applicable law.

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

And finally, Inactive Account Manager allows you to give someone else access to parts of your Google Account in case you're unexpectedly unable to use your account.

There are other ways to control the information Google collects whether or not you're signed in to a Google Account, including:

- Browser settings: For example, you can configure your browser to indicate when Google has set a cookie in your browser. You can also configure your browser to block all cookies from a specific domain or all domains. But remember that our services rely on cookies to function properly, for things like remembering your language preferences.

- Device-level settings: Your device may have controls that determine what information we collect. For example, you can modify location settings on your Android device.

---

SHARING YOUR INFORMATION

# When you share your information

Many of our services let you share information with other people, and you have control over how you share. For example, you can share videos on YouTube publicly or you can decide to keep your videos private. Remember, when you share information publicly, your content may become accessible through search engines, including Google Search.

When you're signed in and interact with some Google services, like leaving comments on a YouTube video or reviewing an app in Play, your name and photo appear next to your activity. We may also display this information in ads depending on your Shared endorsements setting.

# When Google shares your information

We do not share your personal information with companies, organizations, or individuals outside of Google except in the following cases:

## With your consent

We'll share personal information outside of Google when we have your consent. For example, if you use Google Home to make a reservation through a booking service, we'll get your permission before sharing your name or phone number with the restaurant. We'll ask for your explicit consent to share any sensitive personal information.

## With domain administrators

If you're a student or work for an organization that uses Google services (like G Suite), your domain administrator and resellers who manage your account will have access to your Google Account. They may be able to:

- Access and retain information stored in your account, like your email

- View statistics regarding your account, like how many apps you install

- Change your account password

- Suspend or terminate your account access

- Receive your account information in order to satisfy applicable law, regulation, legal process, or enforceable governmental request

- Restrict your ability to delete or edit your information or your privacy settings

## For external processing

We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.

## For legal reasons

We will share personal information outside of Google if we have a good-faith belief that access, use, preservation, or disclosure of the information is reasonably necessary to:

- Meet any applicable law, regulation, legal process, or enforceable governmental request. We share information about the number and type of requests we receive from governments in our Transparency Report.

- Enforce applicable Terms of Service, including investigation of potential violations.

- Detect, prevent, or otherwise address fraud, security, or technical issues.

- Protect against harm to the rights, property or safety of Google, our users, or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners — like publishers, advertisers, developers, or rights holders. For example, we share information publicly to show trends about the general use of our services. We also allow specific partners to collect information from your browser or device for advertising and measurement purposes using their own cookies or similar technologies.

If Google is involved in a merger, acquisition, or sale of assets, we'll continue to ensure the confidentiality of your personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

KEEPING YOUR INFORMATION SECURE

## We build security into our services to protect your information

All Google products are built with strong security features that continuously protect your information. The insights we gain from maintaining our services help us detect and automatically block security threats from ever reaching you. And if we do detect something risky that we think you should know about, we'll notify you and help guide you through steps to stay better protected.

We work hard to protect you and Google from unauthorized access, alteration, disclosure, or destruction of information we hold, including:

- We use encryption to keep your data private while in transit

- We offer a range of security features, like Safe Browsing, Security Checkup, and 2 Step Verification to help you protect your account

- We review our information collection, storage, and processing practices, including physical security measures, to prevent unauthorized access to our systems

- We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it. Anyone with this access is subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

EXPORTING & DELETING YOUR INFORMATION

## You can export a copy of your information or delete it from your Google Account at any time

You can export a copy of content in your Google Account if you want to back it up or use it with a service outside of Google.

 **Export your data**

To delete your information, you can:

- Delete your content from specific Google services

- Search for and then delete specific items from your account using My Activity

- Delete specific Google products, including your information associated with those products

- Delete your entire Google Account

 **Delete your information**

RETAINING YOUR INFORMATION

We retain the data we collect for different periods of time depending on what it is, how we use it, and how you configure your settings:

- Some data you can delete whenever you like, such as the content you create or upload. You can also delete activity information saved in your account, or choose to have it deleted automatically after a set period of time.

- Other data is deleted or anonymized automatically after a set period of time, such as advertising data in server logs.

- We keep some data until you delete your Google Account, such as information about how often you use our services.

- And some data we retain for longer periods of time when necessary for legitimate business or legal purposes, such as security, fraud and abuse prevention, or financial record-keeping.

When you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our servers or retained only in anonymized form. We try to ensure that our services protect information from accidental or malicious deletion. Because of this, there may be delays between when you delete something and when copies are deleted from our active and backup systems.

You can read more about Google's data retention periods, including how long it takes us to delete your information.

---

COMPLIANCE & COOPERATION WITH REGULATORS

We regularly review this Privacy Policy and make sure that we process your information in ways that comply with it.

# Data transfers

We maintain servers around the world and your information may be processed on servers located outside of the country where you live. Data protection laws vary among countries, with some providing more protection than others. Regardless of where your information is processed, we apply the same protections described in this policy. We also comply with certain legal frameworks relating to the transfer of data, such as the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks.

When we receive formal written complaints, we respond by contacting the person who made the complaint. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of your data that we cannot resolve with you directly.

# California requirements

The California Consumer Privacy Act (CCPA) requires specific disclosures for California residents.

This Privacy Policy is designed to help you understand how Google handles your information:

- We explain the categories of information Google collects and the sources of that information in Information Google collects.

- We explain how Google uses information in Why Google collects data.

- We explain when Google may share information in Sharing your information. Google does not sell your personal information.

The CCPA also provides the right to request information about how Google collects, uses, and discloses your personal information. And it gives you the right to access your information and request that Google delete that information. Finally, the CCPA provides the right to not be discriminated against for exercising your privacy rights.

We describe the choices you have to manage your privacy and data across Google's services in Your privacy controls. You can exercise your rights by using these controls, which allow you to access, review, update and delete your information, as well as export and download a copy of it. When you use them, we'll validate your request by verifying that you're signed in to your Google Account. If you have questions or requests related to your rights under the CCPA, you (or your authorized agent) can also contact Google.

The CCPA requires a description of data practices using specific categories. This table uses these categories to organize the information in this Privacy Policy.

## Categories of personal information we collect

**Identifiers** such as your name, phone number, and address, as well as unique identifiers tied to the browser, application, or device you're using.

**Demographic information**, such as your age, gender and language.

**Commercial information** such as your payment information and a history of purchases you make on Google's services.

**Biometric information** if you choose to provide it, such as fingerprints in Google's product development studies.

**Internet, network, and other activity information** such as your search terms; views and interactions with content and ads; Chrome browsing history you've synced with your Google Account; information about the interaction of your apps, browsers, and devices with our services (like IP address, crash reports, and system activity); and activity on third-party sites and apps that use our services. You can review and control activity data stored in your Google Account in My Activity.

**Geolocation data**, such as may be determined by GPS, IP address, and other data from sensors on or around your device, depending in part on your device and account settings. Learn more about Google's use of location information.

**Audio, electronic, visual and similar information**, such as voice and audio information when you use audio features.

**Professional, employment, and education information**, such as information you provide or that is maintained through a G Suite account by an organization at which you study or work.

**Other information you create or provide**, such as the content you create, upload, or receive (like photos and videos or emails, docs and spreadsheets). Google Dashboard allows you to manage information associated with specific products.

**Inferences** drawn from the above, like your ads interest categories.

## Business purposes for which information may be used or disclosed

**Protecting against security threats, abuse, and illegal activity**: Google uses and may disclose information to detect, prevent and respond to security incidents, and for protecting against other malicious, deceptive, fraudulent, or illegal activity. For example, to protect our services, Google may receive or disclose information about IP addresses that malicious actors have compromised.

**Auditing and measurement**: Google uses information for analytics and measurement to understand how our services are used, as well as to fulfill obligations to our partners like publishers, advertisers, developers, or rights holders. We may disclose non-personally identifiable information publicly and with these partners, including for auditing purposes.

**Maintaining our services**: Google uses information to ensure our services are working as intended, such as tracking outages or troubleshooting bugs and other issues that you report to us.

**Research and development**: Google uses information to improve our services and to develop new products, features and technologies that benefit our users and the public. For example, we use publicly available information to help train Google's language models and build features like Google Translate.

**Use of service providers**: Google shares information with service providers to perform services on our behalf, in compliance with our Privacy Policy and other appropriate confidentiality and security measures. For example, we may rely on service providers to help provide customer support.

**Advertising**: Google processes information, including online identifiers and information about your

interactions with advertisements, to provide advertising. This keeps Google's services and many of
the websites and services you use free of charge. You can control what information we use to show
you ads by visiting your ad settings.

**Legal reasons**: Google also uses information to satisfy applicable laws or regulations, and discloses
information in response to legal process or enforceable government requests, including to law
enforcement. We provide information about the number and type of requests we receive from
governments in our Transparency Report.

## Parties with whom information may be shared

**Other people with whom you choose to share your information**, like docs or photos, and videos or
comments on YouTube.

**Third parties to whom you consent to sharing your information,** such as services that integrate
with Google's services. You can review and manage third party apps and sites with access to data in
your Google Account.

**Service providers**, trusted businesses or persons that process information on Google's behalf,
based on our instructions and in compliance with our Privacy Policy and any other appropriate
confidentiality and security measures.

**Domain administrators**, if you work or study at an organization that uses Google services like G
Suite.

**Law enforcement or other third parties**, for the legal reasons described in Sharing your information.

ABOUT THIS POLICY

# When this policy applies

This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including
YouTube, Android, and services offered on third-party sites, such as advertising services. This
Privacy Policy doesn't apply to services that have separate privacy policies that do not incorporate
this Privacy Policy.

This Privacy Policy doesn't apply to:

- The information practices of other companies and organizations that advertise our services

- Services offered by other companies or individuals, including products or sites that may include Google services, be displayed to you in search results, or be linked from our services

## Changes to this policy

We change this Privacy Policy from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We always indicate the date the last changes were published and we offer access to archived versions for your review. If changes are significant, we'll provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes).

RELATED PRIVACY PRACTICES

## Specific Google services

The following privacy notices provide additional information about some Google services:

- Chrome & the Chrome Operating System

- Play Books

- Payments

- Fiber

- Google Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country)

- Voice and Audio Collection from Children's Features on the Google Assistant

# Other useful resources

The following links highlight useful resources for you to learn more about our practices and privacy settings.

- Your Google Account is home to many of the settings you can use to manage your account

- Privacy Checkup guides you through key privacy settings for your Google Account

- Google's safety center helps you learn more about our built-in security, privacy controls, and tools to help set digital ground rules for your family online

- Privacy & Terms provides more context regarding this Privacy Policy and our Terms of Service

- Technologies includes more information about:

    - How Google uses cookies

    - Technologies used for Advertising

    - How Google uses pattern recognition to recognize things like faces in photos

    - How Google uses information from sites or apps that use our services

---

# Key terms

## Affiliates

An affiliate is an entity that belongs to the Google group of companies, including the following companies that provide consumer services in the EU: Google Ireland Limited, Google Commerce Ltd, Google Payment Corp, and Google Dialer Inc. Learn more about the companies providing business services in the EU.

## Algorithm

A process or set of rules followed by a computer in performing problem-solving operations.

## Application data cache

An application data cache is a data repository on a device. It can, for example, enable a web application to run without an internet connection and improve the performance of the application by enabling faster loading of content.

## Browser web storage

Browser web storage enables websites to store data in a browser on a device. When used in "local storage" mode, it enables data to be stored across sessions. This makes data retrievable even after a browser has been closed and reopened. One technology that facilitates web storage is HTML 5.

## Cookies

A cookie is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the site again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies. Learn more about how Google uses cookies and how Google uses data, including cookies, when you use our partners' sites or apps.

## Device

A device is a computer that can be used to access Google services. For example, desktop computers, tablets, smart speakers, and smartphones are all considered devices.

## Google Account

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address, and a password). This account information is used to authenticate you when you access Google services and protect your account from unauthorized access by others. You can edit or delete your account at any time through your Google Account settings.

## IP address

Every device connected to the Internet is assigned a number known as an Internet protocol (IP) address. These numbers are usually assigned in geographic blocks. An IP address can often be used to identify the location from which a device is connecting to the Internet.

## Non-personally identifiable information

This is information that is recorded about users so that it no longer reflects or references an individually-identifiable user.

## Personal information

This is information that you provide to us which personally identifies you, such as your name, email address, or billing information, or other data that can be reasonably linked to such information by Google, such as information we associate with your Google Account.

## Pixel tag

A pixel tag is a type of technology placed on a website or within the body of an email for the purpose of tracking certain activity, such as views of a website or when an email is opened. Pixel tags are often used in combination with cookies.

## Referrer URL

A Referrer URL (Uniform Resource Locator) is information transmitted to a destination webpage by a web browser, typically when you click a link to that page. The Referrer URL contains the URL of the last webpage the browser visited.

## Sensitive personal information

This is a particular category of personal information relating to topics such as confidential medical facts, racial or ethnic origins, political or religious beliefs, or sexuality.

## Server logs

Like most websites, our servers automatically record the page requests made when you visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser.

A typical log entry for a search for "cars" looks like this:

```
123.45.67.89 - 25/Mar/2003 10:15:32 -
http://www.google.com/search?q=cars -
Firefox 1.0.7; Windows NT 5.1 -
740674ce2123e969
```

- `123.45.67.89` is the Internet Protocol address assigned to the user by the user's ISP. Depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet.

- `25/Mar/2003 10:15:32` is the date and time of the query.

- `http://www.google.com/search?q=cars` is the requested URL, including the search query.

- `Firefox 1.0.7; Windows NT 5.1` is the browser and operating system being used.

- `740674ce2123a969` is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time they've visited Google, then it will be the unique cookie ID assigned to their device the next time they visit Google from that particular device).

## Unique identifiers

A unique identifier is a string of characters that can be used to uniquely identify a browser, app, or device. Different identifiers vary in how permanent they are, whether they can be reset by users, and how they can be accessed.

Unique identifiers can be used for various purposes, including security and fraud detection, syncing services such as your email inbox, remembering your preferences, and providing personalized advertising. For example, unique identifiers stored in cookies help sites display content in your browser in your preferred language. You can configure your browser to refuse all cookies or to indicate when a cookie is being sent. Learn more about how Google uses cookies.

On other platforms besides browsers, unique identifiers are used to recognize a specific device or app on that device. For example, a unique identifier such as the Advertising ID is used to provide relevant advertising on Android devices, and can be managed in your device's settings. Unique identifiers may also be incorporated into a device by its manufacturer (sometimes called a universally unique ID or UUID), such as the IMEI-number of a mobile phone. For example, a device's unique identifier can be used to customize our service to your device or analyze device issues related to our services.

# Additional Context

## ads you'll find most useful

For example, if you watch videos about baking on YouTube, you may see more ads that relate to baking as you browse the web. We also may use your IP address to determine your approximate location, so that we can serve you ads for a nearby pizza delivery service if you search for "pizza." Learn more about Google ads and why you may see particular ads.

## advertising and research services on their behalf

For example, advertisers may upload data from their loyalty-card programs so that they can better understand the performance of their ad campaigns. We only provide aggregated reports to advertisers that don't reveal information about individual people.

## Android device with Google apps

Android devices with Google apps include devices sold by Google or one of our partners and include phones, cameras, vehicles, wearables, and televisions. These devices use Google Play Services and other pre-installed apps that include services like Gmail, Maps, your phone's camera and phone dialer, text-to-speech conversion, keyboard input, and security features.

## combine the information we collect

Some examples of how we combine the information we collect include:

- When you're signed in to your Google Account and search on Google, you can see search results from the public web, along with relevant information from the content you have in other Google products, like Gmail or Google Calendar. This can include things like the status of your upcoming flights, restaurant, and hotel reservations, or your photos. Learn more

- If you have communicated with someone via Gmail and want to add them to a Google Doc or an event in Google Calendar, Google makes it easy to do so by autocompleting their email address when you start to type in their name. This feature makes it easier to share things with people you know. Learn more

- The Google app can use data that you have stored in other Google products to show you personalized content, depending on your settings. For example, if you have searches stored in your Web & App Activity, the Google app can show you news articles and other information about your interests, like sports scores, based your activity. Learn more

- If you link your Google Account to your Google Home, you can manage your information and get things done through the Google Assistant. For example, you can add events to your Google Calendar or get your schedule for the day, ask for status updates on your upcoming flight, or send information like driving directions to your phone. Learn more

## customized search results

For example, when you're signed in to your Google Account and have the Web & App Activity control enabled, you can get more relevant search results that are based on your previous searches and activity from other Google services. You can learn more here. You may also get customized search results even when you're signed out. If you don't want this level of search customization, you can search and browse privately or turn off signed-out search personalization.

## deliver our services

Examples of how we use your information to deliver our services include:

- We use the IP address assigned to your device to send you the data you requested, such as loading a YouTube video

- We use unique identifiers stored in cookies on your device to help us authenticate you as the person who should have access to your Google Account

- Photos and videos you upload to Google Photos are used to help you create albums, animations, and other creations that you can share. Learn more

- A flight confirmation email you receive may be used to create a "check-in" button that appears in your Gmail

- When you purchase services or physical goods from us, you may provide us information like your shipping address or delivery instructions. We use this information for things like processing, fulfilling, and delivering your order, and to provide support in connection with the product or service you purchase.

## detect abuse

When we detect spam, malware, illegal content, and other forms of abuse on our systems in violation of our policies, we may disable your account or take other appropriate action. In certain circumstances, we may also report the violation to appropriate authorities.

## devices

For example, we can use information from your devices to help you decide which device you'd like to use to install an app or view a movie you buy from Google Play. We also use this information to help protect your account.

## ensure and improve

For example, we analyze how people interact with advertising to improve the performance of our ads.

## ensure our services are working as intended

For example, we continuously monitor our systems to look for problems. And if we find something wrong with a specific feature, reviewing activity information collected before the problem started allows us to fix things more quickly.

## Information about things near your device

If you use Google's Location services on Android, we can improve the performance of apps that rely on your location, like Google Maps. If you use Google's Location services, your device sends information to Google about its location, sensors (like accelerometer), and nearby cell towers and Wi-

Fi access points (like MAC address and signal strength). All these things help to determine your location. You can use your device settings to enable Google Location services. Learn more

## legal process, or enforceable governmental request

Like other technology and communications companies, Google regularly receives requests from governments and courts around the world to disclose user data. Respect for the privacy and security of data you store with Google underpins our approach to complying with these legal requests. Our legal team reviews each and every request, regardless of type, and we frequently push back when a request appears to be overly broad or doesn't follow the correct process. Learn more in our Transparency Report.

## make improvements

For example, we use cookies to analyze how people interact with our services. And that analysis can help us build better products. For example, it may help us discover that it's taking people too long to complete a certain task or that they have trouble finishing steps at all. We can then redesign that feature and improve the product for everyone.

## may link information

Google Analytics relies on first-party cookies, which means the cookies are set by the Google Analytics customer. Using our systems, data generated through Google Analytics can be linked by the Google Analytics customer and by Google to third-party cookies that are related to visits to other websites. For example, an advertiser may want to use its Google Analytics data to create more relevant ads, or to further analyze its traffic. Learn more

## partner with Google

There are over 2 million non-Google websites and apps that partner with Google to show ads. Learn more

## payment information

For example, if you add a credit card or other payment method to your Google Account, you can use it to buy things across our services, like apps in the Play Store. We may also ask for other information,

like a business tax ID, to help process your payment. In some cases, we may also need to verify your identity and may ask you for information to do this.

We may also use payment information to verify that you meet age requirements, if, for example, you enter an incorrect birthday indicating you're not old enough to have a Google Account. Learn more

## personalized ads

You may also see personalized ads based on information from the advertiser. If you shopped on an advertiser's website, for example, they can use that visit information to show you ads. Learn more

## phone number

If you add your phone number to your account, it can be used for different purposes across Google services, depending on your settings. For example, your phone number can be used to help you access your account if you forget your password, help people find and connect with you, and make the ads you see more relevant to you. Learn more

## protect against abuse

For example, information about security threats can help us notify you if we think your account has been compromised (at which point we can help you take steps to protect your account).

## publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's language models and build features like Google Translate.

## rely on cookies to function properly

For example, we use a cookie called 'lbcs' that makes it possible for you to open many Google Docs in one browser. Blocking this cookie would prevent Google Docs from working as expected. Learn more

## safety and reliability

Some examples of how we use your information to help keep our services safe and reliable include:

- Collecting and analyzing IP addresses and cookie data to protect against automated abuse. This abuse takes many forms, such as sending spam to Gmail users, stealing money from advertisers by fraudulently clicking on ads, or censoring content by launching a Distributed Denial of Service (DDoS) attack.

- The "last account activity" feature in Gmail can help you find out if and when someone accessed your email without your knowledge. This feature shows you information about recent activity in Gmail, such as the IP addresses that accessed your mail, the associated location, and the date and time of access. Learn more

## sensitive categories

When showing you personalized ads, we use topics that we think might be of interest to you based on your activity. For example, you may see ads for things like "Cooking and Recipes" or "Air Travel." We don't use topics or show personalized ads based on sensitive categories like race, religion, sexual orientation, or health. And we require the same from advertisers that use our services.

## Sensor data from your device

Your device may have sensors that can be used to better understand your location and movement. For example, an accelerometer can be used to determine your speed and a gyroscope to figure out your direction of travel.

## servers around the world

For example, we operate data centers located around the world to help keep our products continuously available for users.

## services to make and receive calls or send and receive messages

Examples of these services include:

- Google Hangouts, for making domestic and international calls

- Google Voice, for making calls, sending text messages, and managing voicemail

- Google Fi, for a phone plan

## show trends

When lots of people start searching for something, it can provide useful information about particular trends at that time. Google Trends samples Google web searches to estimate the popularity of searches over a certain period of time and shares those results publicly in aggregated terms. Learn more

## specific Google services

For example, you can delete your blog from Blogger or a Google Site you own from Google Sites. You can also delete reviews you've left on apps, games, and other content in the Play Store.

## specific partners

For example, we allow YouTube creators and advertisers to work with measurement companies to learn about the audience of their YouTube videos or ads, using cookies or similar technologies. Another example is merchants on our shopping pages, who use cookies to understand how many different people see their product listings. Learn more about these partners and how they use your information.

## synced with your Google Account

Your Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account. Learn more

## the people who matter most to you online

For example, when you type an address in the To, Cc, or Bcc field of an email you're composing, Gmail will suggest addresses based on the people you contact most frequently.

## third parties

For example, we process your information to report use statistics to rights holders about how their content was used in our services. We may also process your information if people search for your name and we display search results for sites containing publicly available information about you.

## Views and interactions with content and ads

For example, we collect information about views and interactions with ads so we can provide aggregated reports to advertisers, like telling them whether we served their ad on a page and whether the ad was likely seen by a viewer. We may also measure other interactions, such as how you move your mouse over an ad or if you interact with the page on which the ad appears.

## your activity on other sites and apps

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

Learn more about how Google uses data when you use our partners' sites or apps.

# EXHIBIT 11

# Manage or delete your Location History

web.archive.org/web/20180816004907/https://support.google.com/accounts/answer/3118687

Your Location History helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or traffic predictions for your daily commute.

You control what's saved in your Location History, and you can delete your history at any time.

**Note:** Some of these steps work only on Android 8.0 and up.  Learn how to check your Android version.
Learn what applies in Android 4.1 through 4.3 or for iPhone and iPad.

## Turn Location History on or off

You can turn off Location History at any time. With Location History off, the places you go are no longer stored. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.

You can also turn off Location services for a device.  Learn how.

### Turn Location History on/off using device settings (Android 2.3 & up)

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

### Turn Location History on/off using a website

1. Go to the Activity controls section of your Google Account. You might need to sign in.
2. Turn **Location History** on or off.
3. Confirm the change. This setting will change for your Google Account and all devices associated with it.

If you use a work or school account, your administrator might turn this setting on or off for you.

## Delete Location History

You can delete all of your Location History or only parts of it. If you delete your entire history, some apps may not work correctly.

## Delete Location History using device settings (Android 2.3 & up)

**IMPORTANT**: Deleting your Location History in the Settings app is permanent. You can't reverse or undo it. Deleting your Location History may cause problems in some apps.

## Delete Location History using a website

You can delete individual locations, locations by date, or your whole location history on the Location History website.

1. Go to maps.google.com/locationhistory. You might need to sign in.
2. Pick how to delete your Location History:

**Note**: The Location History website isn't available in South Korea.

# Usage & diagnostics for Location History

When you turn on Location History, you also let your device send diagnostic information to Google about what's working and not working for Location History.

All usage and diagnostics information is used in accordance with Google's privacy policy.

## What information your device could share

Your device may send information to Google for improving Location History. For example, your device may send information when Location services aren't working properly.

Sent information could include:

- Quality and length of your connections to mobile networks, GPS, Wi-Fi networks, or Bluetooth
- State of your location settings
- Restarts and crash reports
- Apps used for turning Location History on or off
- Battery levels

## How shared information helps Google improve

Usage and diagnostics information can help improve Google apps, products, and Android devices. For example, Google can use information to improve:

- **Battery life**:
  Google can use information about what's using the most battery on your device to help reduce battery consumption for commonly used features.
- **Location accuracy**:

Google can use information from location sensors and settings to help improve location estimates for apps and services.

## Related articles

Was this article helpful?

How can we improve it?

true

# EXHIBIT 12

# Location history for iPhone & iPad

web.archive.org/web/20180730190907/https://support.google.com/accounts/answer/4388034

Location services make it easier to use Google products. Turning location history on for your account lets Google give you useful information, based on where you've been with the devices where you're signed in.

For example, the Google app uses your past locations to show you traffic updates for your daily commute by learning the route you take to work.

## See & manage your location history

1. Go to your Timeline.
2. At the top left, choose the time period you want to see.

Delete your location history
1. Go to your Timeline.
2. At the bottom right, tap **Settings** ⚙ ﹀ **Delete all location history**.
3. Confirm that you want to delete all your location history.
4. Tap **Delete Location History**.

Turn Location History on or off
Location History stores your location data from all devices that are signed in to your Google Account.

**Note:** When you pause Location History, it doesn't delete previous activity, it only stops saving new location information.

### Using your browser

1. Go to the Location history section of your Google Account.
2. Turn **Location History** on or off.
   - **Off:** Confirm by tapping **Pause**.
   - **On:** Confirm by tapping **Turn on**.

### Using the Google app

## Common issues with location services

Availability
Location History may not be available if:

- It's not available in your region.

- You don't meet certain age restrictions.
- Your Google Account is through your work, school, or other group, and your administrator turned off your access to these features.
- You've turned off Location Services or Background App Refresh.

On Google Maps 3.2.1 and up, you can't turn on Location Reporting and History on your iPhone or iPad. If you have Location History turned on from another Google app, like the Google app, the Google Maps app can use Location History data stored in your Google account to give you better search results.

Background App Refresh
If you're not on the latest version of iOS, Location History could require Location Services and Background App Refresh to be on to work properly.

Location Services uses GPS, Wi-Fi hotspots, and cellular network towers to determine your location. Background App Refresh allows Location Reporting to work when you're not actively using a Google app.

Learn more about how to manage Location Services and Background App Refresh.

Data use
This feature can use a lot of data. Before using this feature, review your device's data plan.

Was this article helpful?

How can we improve it?

# EXHIBIT 13

PRIVACY POLICY

Last modified: December 18, 2017 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

•   What information we collect and why we collect it.

•   How we use that information.

•   The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

# Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful, the people who matter most to you online, or which YouTube videos you might like.

We collect information in the following ways:

•   **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card to store with your account. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We collect information about the services that you use and how you use them, like when you watch a video on YouTube, visit a website that uses our advertising services, or view and interact with our ads and content. This information includes:

  ○ Device information

  We collect device-specific information (such as your hardware model, operating system version, unique identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  ○ **Log information**

  When you use our services or view content provided by Google, we automatically collect and store certain information in server logs. This includes:

  ▪ details of how you used our service, such as your search queries.

  ▪ telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.

  ▪ Internet protocol address.

  ▪ device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.

  ▪ cookies that may uniquely identify your browser or your Google Account.

  ○ **Location information**

  When you use Google services, we may collect and process information about your actual location. We use various technologies to determine location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points and cell towers.

  ○ **Unique application numbers**

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

- **Local storage**

  We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

- **Cookies and similar technologies**

  We and our partners use various technologies to collect and store information when you visit a Google service, and this may include using cookies or similar technologies to identify your browser or device. We also use these technologies to collect and store information when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites. Our Google Analytics product helps businesses and site owners analyze the traffic to their websites and apps. When used in conjunction with our advertising services, such as those using the DoubleClick cookie, Google Analytics information is linked, by the Google Analytics customer or by Google, using Google technology, with information about visits to multiple sites.

Information we collect when you are signed in to Google, in addition to information we obtain about you from partners, may be associated with your Google Account. When information is associated with your Google Account, we treat it as personal information. For more information about how you can access, manage or delete information that is associated with your Google Account, visit the Transparency and choice section of this policy.

# How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are

represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

If you have a Google Account, we may display your Profile name, Profile photo, and actions you take on Google or on third-party applications connected to your Google Account (such as +1's, reviews you write and comments you post) in our services, including displaying in ads and other commercial contexts. We will respect the choices you make to limit sharing or visibility settings in your Google Account.

When you contact Google, we keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. One of the products we use to do this on our own services is Google Analytics. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate an identifier from cookies or similar technologies with sensitive categories, such as those based on race, religion, sexual orientation or health.

Our automated systems analyze your content (including emails) to provide you personally relevant product features, such as customized search results, tailored advertising, and spam and malware detection.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. Depending on your account settings, your activity on other sites and apps may be associated with your personal information in order to improve Google's services and the ads delivered by Google.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

# Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and update your Google activity controls to decide what types of data, such as videos you've watched on YouTube or past searches, you would like saved with your account when you use Google services. You can also visit these controls to manage whether certain activity is stored in a cookie or similar technology on your device when you use our services while signed-out of your account.

- Review and control certain types of information tied to your Google Account by using Google Dashboard.

- View and edit your preferences about the Google ads shown to you on Google and across the web, such as which categories might interest you, using Ads Settings. You can also visit that page to opt out of certain Google advertising services.

- Adjust how the Profile associated with your Google Account appears to others.

- Control who you share information with through your Google Account.

- Take information associated with your Google Account out of many of our services.

- Choose whether your Profile name and Profile photo appear in shared endorsements that appear in ads.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes.

We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

# Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for G Suite users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.

  - change your account password.

  - suspend or terminate your account access.

  - access or retain information stored as part of your account.

  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.

  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  ○ meet any applicable law, regulation, legal process or enforceable governmental request.

  ○ enforce applicable Terms of Service, including investigation of potential violations.

  ○ detect, prevent, or otherwise address fraud, security or technical issues.

  ○ protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

# Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.

- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.

- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.

- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

# When this Privacy Policy applies

Our Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, services Google provides on Android devices, and services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

# Compliance and cooperation with regulatory authorities

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks, including the EU-US and Swiss-US Privacy Shield Frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

# Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

# Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS

- Play Books

- Payments

- Fiber

- Project Fi

- G Suite for Education

- YouTube Kids

- Google Accounts Managed with Family Link

For more information about some of our most popular services, you can visit the Google Product Privacy Guide.

# Other useful privacy and security related materials

Further useful privacy and security related materials can be found through Google's policies and principles pages, including:

- Information about our technologies and principles, which includes, among other things, more information on

  - how Google uses cookies.

  - technologies we use for advertising.

  - how we recognize patterns like faces.

- A page that explains what data is shared with Google when you visit websites that use our advertising, analytics and social products.

• The Privacy Checkup tool, which makes it easy to review your key privacy settings.

• Google's safety center, which provides information on how to stay safe and secure online.

# EXHIBIT 14

# How Google Uses Wi-Fi Networks to Figure Out Your Exact Location

slate.com/technology/2018/06/how-google-uses-wi-fi-networks-to-figure-out-your-exact-location.html

June 20, 2018

## A Google Home security issue underscores how much Google knows about you.

By Christina Bonnington

June 20, 2018 10:30 AM

Photo illustration by Slate. Photos by Thinkstock, Google.

Future Tense is a partnership of Slate, New America, and Arizona State University that examines emerging technologies, public policy, and society.



Google is in the process of fixing an unnerving security bug in its Google Home and Chromecast devices—one in which a malicious website could potentially learn your exact location. While the bug itself is cause for concern, it's worth understanding precisely how Google can triangulate your location via mapped wireless networks, an ability that may surprise some device owners.

Security investigator Brian Krebs reported Monday that Craig Young, a researcher with security firm TripWire, discovered a security vulnerability in Google Home and Chromecast products that stems from poor authentication protocols. With a simple script, a website could collect precise location data on Chromecast and Google Home device owners.

An attack would work like this: A site—which could merely be an advertisement on a page—would request a list of nearby wireless networks from the Google device on your Wi-Fi network. Google Home and Chromecast devices don't currently have any authentication protocols in place for this kind of request, so any site could ask for this information—one that is legitimately trying to use your location to provide a service, like an accurate weather forecast, or one that intends to use this information against you. The site would then send the list to Google's geolocation look-up services to pinpoint your location. This process

would take about a minute to complete. From there, a malicious actor could use your location information to better target phishing attacks or scams, like those fake IRS warnings. It could also lend credence, Young said, to extortion or blackmail campaigns.

Google originally called this geolocation issue an "intended behavior," but it has since agreed to fix the flaw. A patch should arrive in mid-July.

Young's advice: Whenever possible, keep your connected home products on a separate network from other smartphones or computers—the devices you use to browse the internet and download data. This minimizes the chances that a malicious website will gain access to that network's details and your personal information. (He offers details on how to set that up here.)

It's common for websites to track the IP addresses of their visitors, which offer only general insight into a user's location—IP addresses may map to a location several miles away from your actual physical address. But Google doesn't merely collect IP-address data to estimate a user's location. Instead, Google retains a detailed map of known Wi-Fi networks and access points. By knowing the exact location of these networks, and your proximity to them, its location services can gauge your location with roughly 30 feet of accuracy.

Google has been using this technique to figure out your location for years. It's far more accurate than relying on satellite-based GPS technology, which can be affected by tall buildings or cloud cover as your device's signal bounces between Earth and space. Wi-Fi has very little interference (as long as you don't live in an old house with chicken wire in the walls) and Wi-Fi networks of homes and businesses tend to be stationary, which means they're reliable locationwise.

In your own home, Google can identify your location thanks to the handshake between your router's Wi-Fi name or MAC address and an Android device. Any time a GPS-enabled Android device picks up your router's broadcast signal, it can pinpoint its location and relay that information to Google's location servers. Other than stopping your router from broadcasting its unique ID—which would mean manually connecting to your network each time you want to get on Wi-Fi at home—there's no way to prevent this from happening.

For the most part, this Wi-Fi–based location mapping is useful: This is how Google can so quickly and accurately pinpoint your exact location on a map. If you're walking through a densely populated, high rise–filled downtown, this Wi-Fi network–based mapping technique can mean the difference between your little blue dot showing up where you actually are or a block or two away. It's also how apps like Google Maps and Waze can continue to work well even if you have your GPS switched off. However, that information in the wrong hands is a serious privacy concern. In the case of Google Home and Chromecast units, Young's demo of the attack is so accurate that he can tell "roughly how far apart his device in the kitchen is from another device in the basement."

Young's demo—and the revelation that your exact home location could be shared with third parties via your Google Home or Chromecast—is unsettling, but Google is working on a fix, so the hole should be patched in a matter of weeks. It does, however, act as a timely reminder of the security risks smart home products can introduce to your home network. Amazon and Google, the leaders in the smart-speaker space, have so far been <u>quick to react to potential threats</u> to their products, something that's not true of all "<u>internet of things</u>" product makers. As long as that pattern continues, device owners should be in good shape —but if you want to ensure connected home safety, put those devices on a separate wireless network.

# EXHIBIT 15

## "may collect and process information about your actual location"

G **policies.google.com**/privacy/example/may-collect-and-process-information

This content is from an archived version of our Privacy Policy. See here for our current Privacy Policy.

## Examples

- For example, Google Maps can center the maps view on your current location. Learn more. If you use Google Maps for Mobile, we use GPS, WiFi and cell tower signals to determine your location. Learn more.
- When you're near a bus stop or a train station, Google Now can tell you what buses or trains will arrive next.
- Location History allows Google to store a history of your location data from all devices where you are logged into your Google Account and have enabled Location Reporting. Location History and Location Reporting data may be used by any Google app or service. For example, Google Maps may use it to improve your search results based on the places that you've been. Learn more.

# EXHIBIT 16



# EVERY STEP
# YOU TAKE

How deceptive design lets Google track users 24/7

27.11.2018



# Table of contents

Table of contents ...................................................................................... 2

1    Summary ............................................................................................ 4

2    Introduction ...................................................................................... 4
2.1    Method.............................................................................................5

3    Background ...................................................................................... 6
3.1    Business model .................................................................................7
3.2    Market share .....................................................................................8
3.3    Android and competition ..................................................................8
3.4    Operating system functionality.........................................................9
3.5    Location tracking .............................................................................10
3.6    Dark patterns and deception ..........................................................12

4.    Google and location tracking .................................................... 13
4.1    Location History ..............................................................................13
4.2    Web & App Activity .........................................................................15
4.3    Setting up a Google Account...........................................................16
        4.3.1    Enabling Google Assistant ..................................................19
        4.3.2    Starting Google apps for the first time ...............................19
        4.3.3    Pausing Location History ....................................................22
4.4    Location tracking through Web & App Activity ...............................23
4.5    Problematic practices.....................................................................25
        4.5.1    Hidden default settings .......................................................26
        4.5.2    Misleading and unbalanced information .............................27
        4.5.3    Deceptive click-flow ...........................................................27
        4.5.4    Repeated nudging ..............................................................28
        4.5.5    Bundling of services and lack of granular choices..............29
        4.5.6    Permissions and always-on settings...................................30
        4.5.7    Summary of problematic practices .....................................31

5    Legal analysis .............................................................................. 33
5.1    Consent ...........................................................................................34
        5.1.1    Freely given ........................................................................35
        5.1.2    Specific and informed?.......................................................36
        5.1.3    Unambiguous? ....................................................................37
5.2    Legitimate interests.........................................................................38
        5.2.1    Transparency.......................................................................38
        5.2.2    Balancing test ......................................................................39
        5.2.2.1    Reasonable expectations .........................................40
5.3    Summary of legal analysis ...............................................................42



**6      Appendix................................................................................ 43**



# 1    Summary

In this report, we look at how Google continuously tracks the location of its users through a number of different technologies. This tracking is implemented and enabled through the features "Location History" and "Web & App Activity". These settings are integrated into all Google accounts as a personalisation feature, and are also used to facilitate targeted advertising.

We argue that consumers are deceived into being tracked when they use Google services. This happens through a variety of techniques, including withholding or hiding information, deceptive design practices, and bundling of services. We argue that these practices are unethical, and that they in our opinion are in breach of European data protection legislation because they fail to fulfill the conditions for lawful data processing.

# 2    Introduction

As smartphones have become ubiquitous consumer devices, connectivity is increasingly at our fingertips at all times. Through their combination of transmitters and sensors, our phones are able to sense their environment, and pinpoint our location as we carry them around. Where we move can reveal a lot about each of us, including our religious beliefs, political leanings, and sexual orientation. It is vital that digital service providers – who are omnipresent in our lives through our smartphones – treat location data about us with care, and only collect it when strictly necessary, with our consent.

The Norwegian Consumer Council is funded by the Norwegian Government, and is an interest organisation for consumers. Part of our work is to promote consumer rights such as privacy, security and balanced contracts in digital products and services. We have published reports on how smartphone apps fail to respect consumer rights,[1] how connected devices such as toys lack basic security and privacy-protective measures,[2] and how leading digital services use unethical design choices to steer users away from privacy.[3]

---

[1] "Threats to Consumers in Mobile Apps"
https://www.forbrukerradet.no/undersokelse/2015/appfail-threats-to-consumers-in-mobile-apps/
[2] "Internet of Things" https://www.forbrukerradet.no/internet-of-things/
[3] "New analysis shows how Facebook and Google push users into sharing personal data" https://www.forbrukerradet.no/side/facebook-and-google-manipulate-users-into-sharing-personal-data/



This report is part of our work on consumer privacy and the right to make informed choices. Through demonstrating how users are deceived into making privacy-intrusive choices, we argue that agency is being taken away from the consumer for the benefit of service-providers. We therefore urge service-providers to avoid using deceptive practices that undermine consumers' rights to make free and informed choices.

In our previous report "Deceived by Design", we looked at how digital service providers use different unethical design practices – referred to as "dark patterns" – to lead users into making certain choices. As part of this work, we briefly touched upon the confusing layout of Google's Location History setting. As a continuation of this work, we now look closer at how Google tracks the location of their users.

Chapter 3 provides background on Google and the Android operating system, location tracking in general, and on the concept of dark patterns. In chapter 4, we identify some of the problematic practices that consumers are exposed to when setting up an Android device and creating a Google account. A legal analysis of Google's practices in light of the General Data Protection Regulation (GDPR) is included in chapter 5.

## 2.1   Method

In this report, we look at how several Google services collect location data from smartphone users, demonstrated through user testing. Most of the tests were performed using an Android device, with a few tests performed on an iPhone for reference. This was done through what we consider a regular user experience. When setting up a new Android device, users typically go through a process of registering and/or logging in to a Google account, and adjusting or accepting a number of settings related to data collection, such as voice data, location data, and diagnostic data. The testers documented every click and choice that appeared during the process of setting up the device, registering a new Google account, and launching the preinstalled Google apps for the first time.

The analysis and discussion throughout the report is based on European data protection legislation and ethical principles from literature on user interface



design.[4] These principles serve as benchmarks used to consider the legal and ethical aspects of the design and content of the process.

The tests in chapter 4 were performed in July 2018 using a Samsung Galaxy S7 Android device running Android version 8.0.0, which had been reset to factory settings. The results were reproduced in October 2018 on the same Samsung device, and on a Google Pixel device running Android version 9.[5] Although the settings and device setup process may vary somewhat between devices, we regard the Google account setup can to be representative of a typical user experience. The screenshots were taken in July and August 2018. A diagram that illustrates how users can turn off or avoid location tracking is included as an appendix.

Because this is an analysis of digital settings and content that may be subject to change, we cannot say with certainty that all users of these services have been presented with identical settings and design patterns during the setup process. However, our opinion is that the findings are and will continue to be relevant even if changes are made, because these examples illustrate the challenges consumers face in digital services at a given point in time.

This report was written with funding from the Norwegian Research Council through the ALerT research project[6] and the Norwegian ministry for Children and Equality. We are also thankful for invaluable help and input from the European consumer organization BEUC, the Dutch consumer organization Consumentenbond, None of Your Business (noyb), Jon Worth, Dr. Frederik Zuiderveen Borgesius, and Privacy International.

# 3    Background

The smartphone market is generally split between two operating systems (OS), Apple's iOS and Google's Android OS. Apple's iOS is used on all iPhone and iPad devices, while the majority of other smartphones and tablets run on a version

---

[4] See "Nudges for Privacy and Security", https://dl.acm.org/citation.cfm?id=3054926 and "Dark patterns and the ethics of design" https://medium.com/adventures-in-ux-design/dark-patterns-and-the-ethics-of-design-31853436176b
[5] Testers found minor differences between the Samsung Galaxy and the Pixel device, but not significant enough to change the conclusions in this report.
[6] "ALerT - Awareness Learning Tools for Data Sharing Everywhere" https://www.nr.no/en/projects/alert-awareness-learning-tools-data-sharing-everywhere



of Android. Although Apple's iOS is also popular among consumers, we have chosen mainly to focus on Google apps and Android for several reasons. These reasons are explained below, together with relevant background information.

## 3.1   Business model

Google and Apple have somewhat different business models.[7] Apple is primarily a hardware provider, with revenue coming from selling devices such as iPhones, with additional revenue coming from their App Store. Google makes a significant part of their revenue from data-driven advertising.[8]  In 2017, Google was rated the most valuable brand in the world, with a brand value of $109.5bn /€95bn.[9]

Google is a subsidiary of Alphabet Inc., and deliver a vast amount of consumer- and business-facing services. These consumer-facing services include, but are not limited to, Google Search, Google Maps, Gmail, Android, YouTube, and Google Assistant. Google also runs a large number of business facing services, including analytics and advertising services.

Google provides most of its consumer-facing services at no direct financial cost to the user. Rather than having users pay an upfront fee for using these services, Google collects data about its users and their behavior, which is monetized through advertising and other business-facing services. Through its various services, Google collects a comprehensive picture of its users, including device information, browsing history, precise geolocation, and more. On Android devices, a large amount of data is collected passively in the background without any active actions from the user.[10]

Through compiling profiles about individual users, as well as user segments or categories based on preferences or behavior, Google can offer advertisers numerous ways to reach a target audience. Advertisers can use Google's ad

---

[7] "How Do Tech Companies Make Money? Visualizing Tech Giants Business Models" https://fourweekmba.com/tech-giants-business-models/
[8] "Once again, Alphabet made a lot of money on Google advertising and this time Wall Street is thrilled" https://qz.com/970765/alphabet-goog-q1-2017-earnings/
[9] "The world's most valuable brands revealed" https://www.independent.co.uk/news/business/news/worlds-most-valuable-brands-facebook-google-apple-amazon-a7556571.html
[10] A 2018 study showed that an idle Android device communicated with Google servers more than ten times as often as an idle iOS device communicated with Apple servers. "Google Data Collection research" https://digitalcontentnext.org/blog/2018/08/21/google-data-collection-research/



services to reach particular audiences with tailored ads, often called "programmatic advertising". Continued data collection about how users respond to ads, and tracking of individual users across different devices, enables Google to offer advertising spaces that are tailored to the individual user, and that are delivered "in the right moment with the right message".[11]

## 3.2   Market share

The Android OS is by far the dominant international market player, with an estimated 85 % of the global mobile OS market share.[12] Android is used by a variety of smartphone providers, including Samsung, Huawei, Sony, and more. Users of these phones may not be aware that Android is a Google product, and therefore that they are using a Google-powered device. Apple's iOS, on the other hand, has a market share between 10 % and 15 % globally. iOS is only available on Apple products such as iPhones, meaning that users who are using iOS already have a customer relationship with Apple.

## 3.3   Android and competition

Android-users have to create a Google Account before they can access the Google Play app store, which is required to download new apps, or to receive app updates. Additionally, when setting up an Android device for the first time, users have to agree to Google's privacy policy, and terms and conditions. This entails that users have to agree to Google processing user data collected through the Android device, such as device ID, usage data, and location data.

Google provides the Android OS through an open source license, meaning that the smartphone manufacturer does not have to pay Google for using or adapting Android (to develop so-called Android forks). However, the Android license agreement for manufacturers comes with a number of caveats.

While the Android OS is distributed under an open source license, the suite of apps called Google Play Services is proprietary software.[13] In order to use the Android OS on the phones they manufacture, phone manufacturers are required to include the Google Search and Google's Chrome browser

---

[11] "Organize audience insights" https://www.thinkwithgoogle.com/marketing-resources/programmatic/organize-audience-insights-programmatic-buying/

[12] "Smartphone OS market share" https://www.idc.com/promo/smartphone-market-share/os

[13] This includes services such as Google Play, Gmail, Google Maps, and more. "Google's Iron Grip On Android" https://arstechnica.com/gadgets/2013/10/googles-iron-grip-on-android-controlling-open-source-by-any-means-necessary/



preinstalled on the phones, and use Google Search as a default search engine as a condition to use Google's proprietary apps.[14]

If, for example, Samsung were to choose not to include Google Chrome on their phones, they would be barred from including the Google Play app store. Without Google Play, users will be unable to receive app updates or install other apps on the phone without going to third party app stores.[15] Additionally, if for example Samsung were to release a phone with a competing OS on it, they would lose access to use Android on all their other phone models. In July 2018, Google was fined by EU antitrust authorities for abuse of market dominance because of these practices.[16]

## 3.4  Operating system functionality

Although many Google features and services are available also for iPhone users, the implementation is different between the two operating systems. Since iPhones do not come with any preinstalled Google apps, users have to actively download and activate any Google services they may want to use.[17] This also means that iPhone users do not need to have a Google account in order to download other apps.

Additionally, the app permission systems of Android and iOS are different. For example, both operating systems will ask users whether they want certain apps to access location data. However, on Android, allowing any particular app to access location data will allow the service to collect this information in the background, not just while the app is actively in use. On iPhones, users launching an app that requests location data are asked whether they want to give the app access to location at all times, or "only while using the app".[18] In other words, iPhone users can choose to give a map service access to location

---

[14] "EU says Google abuses its Android dominance" https://www.cnet.com/news/eu-hits-google-with-android-app-abuse-charges/
[15] "New Android OEM Licensing Terms Leak"
https://arstechnica.com/gadgets/2014/02/new-android-oem-licensing-terms-leak-open-comes-with-restrictions/
[16] "Google fined £3.8bn by EU over Android antitrust violations"
https://www.theguardian.com/business/2018/jul/18/google-faces-record-multibillion-fine-from-eu-over-android
[17] Except Google Search, which is set as the default search engine on iPhones. Google reportedly pays Apple between $9 and $12 billion for this.
http://fortune.com/2018/09/29/google-apple-safari-search-engine/
[18] "Uber users on iPhones can now block the app from always tracking their location, thanks to Apple's new iOS update" https://nordic.businessinsider.com/thanks-to-ios-11-users-can-stop-uber-from-tracking-them-24-7-2017-9



only when they are actively using the app, while on Android users have to choose between either letting the app access location services at all times, or completely block the app from accessing location.



*1 Google Maps permissions prompt. Android on the left, iPhone on the right.*

## 3.5   Location tracking

Location data can be described as a physical position point, defined by geographical coordinates. Location tracking means that the location of a person or entity is recorded over time. When aggregated, location data can also reveal broader patterns or anomalies. As we use our smartphones for an increasing number of tasks in our everyday lives, the usefulness of location tracking is obvious. Interactive real-time maps, searches that show nearby businesses, and weather services are perhaps the most obvious examples, but location tracking can also be aggregated and used for route planning, traffic management, and so on.

It is possible to infer a lot about an individual based on their location history. Studies have demonstrated that four approximate location points is often



enough to accurately identify an individual.[19] Inferences about sensitive personal data can also be made from tracking your location. For example religious views (spends time in a mosque), political stance (attended a protest march), and health related issues (visits a cancer treatment center).

Furthermore, information about your whereabouts can reveal your habits and your personality. This can be used to target advertising, or for individualised offers and services. If you frequent a pub, indicating a drinking habit, this could be valuable information for an insurance company. Similarly, someone who regularly goes for runs could be offered lowered premiums, or be targeted by advertisements for sporting equipment. Consumers may be subjected to discriminatory practices through the individualisation of messages and offers, although these forms of discrimination can be difficult to discover.[20]

Companies such as Google are not collecting location data in a vacuum. Geolocation is part of a bigger picture, and can be combined with other data such as browsing history, preferences, social networks, shopping history, and so on. For example, information about visiting a physical store can be used to measure ad effectiveness, as long as the person who saw the ad can be identified as the same person who visited the store. This practice of combining tracking data to draw new inferences is also called "closing the loop".[21]

Consumer studies have demonstrated that consumers are particularly conscious and worried about the tracking of their location. An international 2018 study that asked more than 8000 consumers about location data and privacy, showed that 75-80 % of consumers feel vulnerable when their location data is being shared.[22] Despite this general anxiety, many consumers feel powerless to limit the amounts of data being collected through their smartphones. Consumers are also generally unlikely to adjust the privacy settings of the services they use, which makes it crucial that service-providers act responsibly when it comes to the types of data they collect, when they collect it, and how they use it.

---

[19] "Study shows how easy it is to determine someone's identity with cell phone data"
https://phys.org/news/2013-03-easy-identity-cell.html
[20] In 2015, researchers at Carnegie Mellon University found that Google's advertising platform was showing higher paying jobs to more men than women. "Google's algorithms advertise higher paying jobs to more men than women"
https://www.theverge.com/2015/7/7/8905037/google-ad-discrimination-adfisher
[21] "New digital innovations to close the loop for advertisers"
https://adwords.googleblog.com/2016/09/New-Digital-Innovations-to-Close-the-Loop-for-Advertisers.html
[22] "Privacy and Location Data: Global Consumer Study March 2018"
https://www.here.com/en/node/40306



## 3.6   Dark patterns and deception

As we use digital services, we are subtly being influenced in various ways, including through the user design of the service. These can be innocuous nudges, such as giving us easy access to relevant information, but some of these practices have a more insidious motive. Through so-called "dark patterns", deceptive design practices, users are nudged toward making choices that are in favor of the service-provider, and often against their own interests.[23]

Dark patterns come in many shapes, and encapsulate many different design practices. For example, the use of color, visibility and wording may serve to steer users toward choices that benefit the service provider. This can include misrepresenting the consequences of a choice, by only focusing on certain aspects that put the service provider's preferred choice in a positive light. Similarly, information that might dissuade the user from opting in to a service can be withheld or hidden from view, giving users a skewed impression.

As many mobile phone services are used on the go, users will often take the path of least resistance in order to access a service as soon as possible. Making the least privacy friendly choice part of the natural flow of a service, can be a particularly effective dark pattern when the user is in a rush, or just wants to start using the service. For example, this can be done by using a certain click-flow,[24] then subverting the design mid-flow by switching the expected function of a button. When setting up an Android device, the "Continue" button is always a blue button placed in the right corner. However, for some steps of the process, the blue button also entails enabling extra features.[25] If users are not paying full attention every step of the way, they may end up unintentionally enabling a setting without knowing that they have done so.

Furthermore, users can be deceived by being discouraged from making an active choice, paving the way for default settings that disfavor the user. When users are asked to opt out of certain settings, rather than opting in, the service-provider could be exploiting the users' disposition to leave the default settings enabled.[26]  Similarly, continuous prompts that ask users to enable settings do

---

[23] "Dark Patterns are designed to trick you (and they're all over the Web)" https://arstechnica.com/information-technology/2016/07/dark-patterns-are-designed-to-trick-you-and-theyre-all-over-the-web/
[24] A pattern of buttons or links that have to be clicked in order to proceed through a process.
[25] See chapter 4.5.3
[26] "Do users change their settings?" https://www.uie.com/brainsparks/2011/09/14/do-users-change-their-settings/



not respect the users' original choices, and may wear out the users and make them resign to clicking "I accept" despite originally being reluctant.

Another dark pattern entails service providers "bundling" different services that are not functionally interdependent. For example, using a map service could be made contingent on uploading your web browser history. Such bundling can make users share information that they otherwise would not, because the alternative is punishment in the form of being denied access to a service or function.

Dark patterns are often considered unethical design practices.[27] The use of deceptive design tricks to obfuscate important information, bundling, and misrepresenting what settings actually do, are also at odds with the notion of giving users agency to make informed choices. As such, dark patterns have the potential to be used in ways that circumvent laws meant to protect consumers.

# 4.    Google and location tracking

Google mainly tracks user location through two settings, Location History and Web & App Activity, which are both integrated into the Google user account.[28] These settings can be controlled through the Google account or through Android settings, and collect and combine data from other Google Services that collect user data, such as Google Maps, YouTube, Google Chrome, and Google Photos.

In this chapter, we first give a brief overview of the Location History and Web & App Activity settings. Subsequently, we look at how these settings are presented to the user in different contexts. This is followed by a discussion of the different practices that mislead users throughout the process.

## 4.1   Location History

Location History is a Google account setting that continuously logs the location of the user. According to Google, the Location History feature *"helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or*

---

[27] "Dark patterns and the ethics of design" https://medium.com/adventures-in-ux-design/dark-patterns-and-the-ethics-of-design-31853436176b
[28] The Google user account is the main hub for most Google services, and is used to log in to Android, Gmail, Search, YouTube, and much more.



*traffic predictions for your daily commute."[29]* The location data collected through Location History is derived from GPS, Wi-Fi scanning, and Bluetooth scanning, which means that Google can track a user's precise location inside buildings as well as outside.

According to the description on Google's My Account website, data collected through Location History is also used to serve targeted advertising:

> *"This data helps Google give you more personalized experiences across Google services, like a map of where you've been, tips about your commute, recommendations based on places you've visited, and useful ads, both on and off Google."[30]*



*2 Google Location History, as seen on a Google Account.*

When enabled, Location History collects a variety of user data, including mode of transportation (walking, driving, on a tram, entering a vehicle, etc.), barometric pressure (altitude), Wi-Fi information, GPS coordinates, and the battery level of your device. This data is transmitted to Google, and stored as a part of the user's Google account.

---

[29] "Google Account Help - Manage or delete your Location History" https://support.google.com/accounts/answer/3118687?hl=en
[30] "Google Activity Controls" https://myaccount.google.com/activitycontrols



Some of the information inferred through this data collection (location, route, mode of transportation, which shop you visited at what time) is available on the user account ("Location History Timeline"), where users can look through their movement history for the period the feature has been enabled.[31] Other data, such as barometric pressure, nearby Wi-Fi hotspots and Bluetooth beacons, and battery level, is not visible to the user, but is collected passively in the background.



*3 Google Timeline on a web browser on a PC.*

According to Google, the Location History feature is voluntary, and users must opt in before the feature starts tracking user location.[32]

## 4.2   Web & App Activity

Web & App Activity is another Google account setting, which collects a variety of user data from an assortment of Google services. As shown in the screenshot below, Web & App Activity is described as *"Saves your searches, Chrome browsing history and activity from sites and apps that use Google services. This gives you better search results, suggestions and personalisation across Google services".*

Google users can look at the data collected through Web & App Activity through the "My Activity" timeline on their profile, which is logged separately from the Location History Timeline.[33] This log includes timestamped records of which

---

[31] "Google Timeline" https://www.google.com/maps/timeline?pb
[32] "Google privacy policy – How do I know if my Location History is on?" https://policies.google.com/technologies/location-data#is-on
[33] "Google – My Activity" https://myactivity.google.com/myactivity



apps they have used on their Android device. Web & App Activity can also track offline behavior, such as credit card purchases.[34] Web & App Activity is enabled by default when setting up a Google account.

Data from Web & App Activity is also used to personalise advertising. However, information about this data being used for advertising is only shown to the user in certain circumstances. In some contexts, such as when setting up a Google account, the use of this data for advertising is not mentioned, even after clicking "learn more". In a few limited contexts, such as when the setting has been actively turned off, and the user attempts to enable it again, Google informs the user about the advertising purposes.



*4 Information about Web & App Activity. During the Android setup process (left), and in the Google account (right).*

## 4.3   Setting up a Google Account

When setting up a Google account, users are asked to review a truncated version of Google's privacy policy. In addition to clicking "Create Account", users can click "More options", which reveals a number of settings that can be adjusted.

---

[34] "How to use Google privacy settings"
https://www.consumerreports.org/privacy/how-to-use-google-privacy-settings/





*5 Users have to click "More options" to adjust the Google settings.*

As the screenshot below illustrates, Location History is turned off by default when setting up the account. Note that there is no clear indication that this information is also used for advertising purposes, unless the user clicks "Learn more". Clicking "Learn more" reveals that the location data collected through Location History is used to serve "more useful ads on and off Google".[35]

---

[35] Screenshot of the whole screen and text is included in the appendix.





*6 Location History when setting up a Google account.*

After clicking "More options", it is also revealed that Web & App Activity is turned on as a default setting. The description beneath the setting says that it provides "better search results, suggestions and personalization". Note that there is no obvious indication that Web & App Activity will record location data, unless the user clicks "Learn more". Neither text mentions advertising.



*7 Web & App Activity is enabled by default.*



### 4.3.1 Enabling Google Assistant

As part of the process of setting up an Android device, users are asked to enable a service called Google Assistant. Google Assistant is a voice-activated digital assistant, meant to help users perform everyday tasks. The assistant is also an integral part of the Google Home smart speaker system, and several other products made by both Google and third parties. This means that the Google Assistant is likely to become a fixture in the everyday life of many consumers.[36]

As the screenshots below shows, enabling the Google Assistant service in the Android setup process, also entails turning on Location History. On this screen, users are only told that Location History "saves where you go with your devices". If the user clicks the inconspicuous grey arrow to the right of Location History, a more detailed description appears, including the fact that the data is used for advertising purposes.



*8 Google Assistant prompt, when setting up an Android device.*

### 4.3.2 Starting Google apps for the first time

If the user has not enabled Location History when setting up their Android device, they will be asked to enable the setting on several other occasions.[37]

---

[36]"Google Assistant" https://assistant.google.com/platforms/speakers/

[37] For this test, we only tried starting the preinstalled Google apps after a fresh Android install. We did not observe prompts to enable Location History during the startup of the Google apps YouTube, Chrome, Hangouts, and Drive.



Upon opening the Google Maps app for the first time, users are asked again to activate Location History. The pop-up says that Location History will give users "improved route recommendations, see popular times for places and save visits to your timeline". Unless the user clicks the inconspicuous arrow on the right, they will not be informed that this information is also used for marketing purposes.



*9 Location History prompt when opening Google Maps.*

Upon opening the Google Photos app and clicking the "Places" gallery button, users are also asked to turn on Location History. According to Google, enabling Location History lets the user "see photos grouped by where you've been". It does not appear to be possible to enable this particular feature without enabling Location History.





*10 Location History prompt when opening "Places" in Google Photos.*

Upon opening the Google App for the first time, users are asked once more to enable Location History. As the screenshot below shows, there is no visible information about what enabling Location History actually entails, and there is no obvious button to display more information about Location History before activating the service as a part of "personalised updates".





*11 Popup when opening Google App for the first time.*

### 4.3.3  Pausing Location History

It is possible to turn Location History on, or to pause it, in the Android location settings menu. As the screenshots below demonstrate, the information given here is somewhat truncated, but informs users that the data collected through Location History is used for ads.

Attempting to pause the service results in a warning that pausing it "limits functionality of some Google products over time". However, there is no comprehensive explanation of all services that are affected, or how their functionality will be limited.





*12 Location History in Android settings.*

It is also worth noting that there is no real option to *turn off* Location History once it has been enabled; users can only *pause* it after the Google account has been created. This raises questions about whether the user has actually withdrawn his or her consent to the use of past location data for advertising, or if pausing Location History only halts the collection of future data. The process of deleting historical location data is separate from pausing Location History, and Location History data is seemingly retained indefinitely if the user does not actively delete it.[38]

## 4.4   Location tracking through Web & App Activity

If the user has purposefully avoided enabling Location History, this does not necessarily mean that Google is not collecting the user's location. A report published by the Associated Press in August 2018 showed that Web & App Activity also reports user location data to Google, which is used for

---

[38] In March 2017, the Danish Consumer Council filed a complaint with the Danish data protection authority against Google. This complaint alleges, amongst other things, that Google retains Location History data indefinitely without a sufficient legal reason to do so. "Forbrugerrådet Tænk anmelder Google til Datatilsynet» https://taenk.dk/om-os/presserum/forbrugerraadet-taenk-anmelder-google-til-datatilsynet



personalisation purposes such as advertising.[39] As mentioned, Web & App Activity is enabled by default when setting up a Google account. Unless the user first clicks "More options", and then "Learn more", it is not clear that this setting actually collects location data.



*13 Web & App Activity when registering a Google account.*

Although most apps do not record the user's location through Web & App Activity, certain apps and services, such as Google searches and searches made through Google Maps, are logged with location data of where the user was when he or she performed the search. In other words, users who turn Location History off, but leave Web & App Activity on, will still have some of their location data collected by Google. Location data logged through Web & App Activity is not visible on the timeline map that Location History provides, but shows up if the user looks at the My Activity timeline, which is wholly separate from Location History.

---

[39] "Google tracks your movements, like it or not"
https://apnews.com/828aefab64d4411bac257a07c1af0ecb





*14 Location data recorded through Web & App Activity*

As with Location History, users who attempt to pause App & Web Activity receive a vague warning that this will limit or disable functionality. This non-extensive list includes "you may stop seeing more relevant search results or recommendations that you care about".



*15 Pausing Web & App Activity*

## 4.5   Problematic practices

As outlined above, we see a number of problematic ethical and legal issues with the ways that Google have implemented Location History and Web & App Activity into the Google account and the Android operating system, and how they present these settings to the user. In the following, we expand upon the problematic issues, followed by a legal analysis of how the issues are, in our opinion, at odds with the GDPR.



Google give a certain degree of control to the user through its account system. For example, Location History can be deleted through the Location Timeline, and can be exported through Google's "Takeout" tool.[40] However, the data extracted through Takeout seems to be more detailed than what is shown in the Location History timeline.[41]

Users that delve into the dashboard can also get a certain degree of control over what ads they see.[42] Additionally, there is a lot of different information and settings spread throughout the Google dashboard, although some of these can be difficult to find.[43]

### 4.5.1  Hidden default settings

When setting up a Google account, the actual account settings are hidden behind extra clicks. Users first have to click "More options" to see what the settings are, and whether they are enabled or disabled. Web & App Activity is enabled by default, meaning that users who did not click "More options" will not be aware that this data collection is happening.



*16 Default settings hidden behind "More options".*

Users are unlikely to diverge from default settings, either because they are in a rush to use a service, or because they trust the service-provider. In any case,

---

[40] Google Takeout https://takeout.google.com/settings/takeout

[41] This can be seen by using third party tools such as Location History Visualizer https://locationhistoryvisualizer.com/

[42] Google Ads Settings https://adssettings.google.com/

[43] In "Deceived by Design", we documented some of the hurdles of navigating through the Google account dashboard. See pp. 34-39 https://fil.forbrukerradet.no/wp-content/uploads/2018/06/2018-06-27-deceived-by-design-final.pdf



obscuring the invasive default settings is a dark pattern that dissuades users from making an active choice, and does not provide data protection by default.

### 4.5.2  Misleading and unbalanced information

Whenever the Location History and Web & App Activity settings are presented to the user, the clearly visible information is limited to a few positive examples of what the setting entails. The information that is visible often also trivializes the extent of tracking that is going on, and how it is used. For example, in all the instances where users are asked to enable Location History, the fact that this data is also used for advertising is hidden behind a grey arrow or a "Learn More"-link.



*17 Relevant information hidden behind extra clicks.*

Similarly, the fact that Web & App Activity collects location data is also always hidden behind another click, and information about this data being used for advertising is only available in some contexts. Consequently, users are not given sufficient information to make an informed choice. This appears to be cherry picking from the service-provider's side, where certain aspects that may be perceived as negative by the user are glossed over.

Even if the user clicks "Learn more", the description of both Location History and Web & App Activity still seems to mislead the user about what they are actually agreeing to. For example, Location History is often described as being a "private map", which may give the impression that the information is not used for other purposes such as advertising. Similarly, the name "Web & App Activity" obscures the fact that the setting also collects location data.

### 4.5.3  Deceptive click-flow

Although Location History technically has to be enabled before it begins collecting data, users following the click-flow when setting up an Android device are likely to unknowingly enable the setting. Google has designed the Android



setup choice-architecture in a way that facilitates enabling Location History as part of the setup process.

As shown below, throughout the setup process, the way to proceed is represented by blue buttons on the bottom right of the screen. However, if the user keeps clicking the blue buttons throughout the process, they will also enable Google Assistant, which means that Location History is also turned on. In other words, users that do not want to share their location with Google have to be very attentive in order to stop location tracking. This is a dark pattern that may end up both irritating and confusing a potentially impatient user into enabling Location History without being aware of it.



*18 Some steps from the Android setup process. Google Assistant prompt on the right. Note that this is a shortened version of the actual process.*

### 4.5.4 Repeated nudging

Users are repeatedly asked to turn on Location History, in many different contexts. On Android devices, users that do not wish to enable Location History have to decline the setting at least four times when using different services that are preinstalled on Android phones;[44] in Google Assistant, Google Maps, Google app, and Google Photos.

---

[44] Google Maps and Google Photos also ask users to enable Location History on iPhones, but since iOS has different preinstalled services, we regard the nudging as more pressing on Android devices.





*19 Prompt in Google Maps to enable Location History.*

Instead of Google taking "no" for an answer, users have to keep making the same choice repeatedly. This increases the chances that users turn on the setting, either by accident, because they are tired of being asked, or because they believe that the services will not work otherwise.

### 4.5.5  Bundling of services and lack of granular choices

Throughout the Google ecosystem of services, separate services or functionalities are integrated and co-dependent, or simply bundled together. Enabling Location History is required in order to enable other services that users may want to use, such as Google Assistant and Google Photos Places.

Having your photos grouped by location may be a useful and desirable feature for many users. However, in order to enable this feature, users must also enable Location History. There is no granularity to this choice, meaning that users that want their photos grouped by location can only receive this feature by opting in to location tracking for advertising purposes.



*20 Prompt in Google Photos to enable Location History.*

Similarly, when enabling Google Assistant as part of the Android setup process, users also have to enable Location History. Despite this, the Google Assistant



service appears to function even if the user later disables Location History, although the user is never informed about this.[45]

Conversely, there is no granularity to the actual Location History setting. Either users have to allow Google to collect their location data at all times through Location History, or they must reject the feature in its entirety, blocking off other services that have Location History bundled into them.

In other words, if the user does not allow Google to collect user location data at all times through Location History, Google appears to block off potentially useful features such as Google Assistant and photos sorted by location. This all-or-nothing choice benefits Google at the cost of failing to respect users by for example providing granular choices.

### 4.5.6  Permissions and always-on settings

When enabled, Location History is always on in the background on Android devices, regardless of whether the user is actively using a service that requires location services. In part, this seems to be because of how the Android operating system works.

Android users that want to use an app that requires location data, have a binary choice; Either they give the app permission to use location services, in which case the app can also record user location when the app is not in use. The alternative is to deny the app permission completely, which means that the app cannot use location services even when in active use.

On iPhones, on the other hand, users can choose to give an app permission to use location services only when the app is in use. The latter practice is an example of privacy-preserving technology, while Google's solution is an all-or-nothing choice that limits the users' options.

---

[45] "If you're using an Android phone, Google may be tracking every move you make"
https://qz.com/1183559/if-youre-using-an-android-phone-google-may-be-tracking-every-move-you-make/





*21 Device level permissions. Android on the left, iOS on the right.*

Additionally, if the user has allowed an app to access location in the background, iOS will periodically remind the user that this is happening. This prevents the user from enabling tracking in one context for a specific reason, then forgetting to turn it off.



*22 iOS reminder that the user has given the Google app access to location, even when the app is not in use.*

### 4.5.7  Summary of problematic practices

As users rarely change their settings or break the click-flow when installing software, many are likely not to realize that they turned on Location History,[46] or that Web & App Activity is enabled. Through a variety of dark patterns, Google is getting a blanket permission constantly to collect the exact location of the user, including the latitude (e.g. floor of the building) and mode of transportation, both outside and inside, to serve targeted advertising.

Users that are setting up their Android device, and are eager to get the device up and running, are particularly susceptible to inadvertently turning on Location History, while anyone who want to use Google Assistant when setting up their

---

[46] In July 2018, Google began sending monthly emails to users with Location History movement. These emails give some aggregated information about the user's monthly travels, but do not mention any other ways that this data is being used.



Android device will end up enabling this pervasive tracking. Furthermore, if the user has kept Location History disabled despite the continued nudging, his or her location will still be shared with Google through Web & App Activity.

In our opinion, the sum of these practices is that users are deceived into enabling privacy adverse features. This deception is unethical, and fails to respect user agency. In the following chapter, the practices will be discussed in the context of European data protection legislation.



# 5    Legal analysis

In this chapter, we examine whether Google has fulfilled the legal requirements under the GDPR when using location data collected through "Location History" and "Web & App activity" for advertising purposes. For the purposes of this chapter, the terms "data subject" will be used interchangeably with "user", and "data controller" will be used to mean Google.

As demonstrated in chapter 3.5, location data is personal data – information that directly or indirectly can identify a natural person.[47] This means that Google is collecting personal data when it collects and stores information about a person's location and movement through "Location history" and "Web & App activity".

The processing of personal data is only lawful if one out of six general terms is fulfilled.[48] When considering the legal grounds for Google's processing of location data for advertising purposes, we will therefore begin with establishing what legal basis Google is using. In order to establish this, we have used Google's European privacy policy as the main source.[49]

From the privacy policy, it appears that Google is relying both on user "consent" and on "legitimate interests" when processing location data for advertising purposes.[50] It is not clear from the privacy policy which legal grounds applies to what manners of processing. This is in itself problematic, as Google has an obligation to be specific about what legal grounds it is using for particular processing of personal data.[51] Relying on legitimate interest to process data while the processing could have been based on another lawful basis, also constitutes a violation of transparency requirements.[52]

---

[47] GDPR art. 4(1)

[48] GDPR art. 6. See also GDPR recital 40.

[49] "Google privacy policy" https://policies.google.com/privacy#enforcement

[50] On the basis of Google's European privacy policy, this report will not consider other legal grounds than "consent" and "legitimate interest" in art. 6 GDPR for Google's processing of personal data through Location history and Web & App activity

[51] As a result of an investigation done by the EU Data Protection Authorities, Google was already in 2012 urged to clarify which legal basis it uses for processing of personal data. See https://www.cnil.fr/sites/default/files/typo/document/20121016-letter_google-article_29-FINAL.pdf and https://www.cnil.fr/sites/default/files/typo/document/GOOGLE_PRIVACY_POLICY_RECOMMENDATIONS-FINAL-EN.pdf

[52] GDPR art. 5(1)(a) see also https://ico.org.uk/for-organisations/guide-to-the-general-data-protection-regulation-gdpr/legitimate-interests/when-can-we-rely-on-legitimate-interests/



To be compliant with GDPR, consent has to be opt in. Because Location History is based on users opting in (off by default), we will assume that this data processing is based on consent.[53] Web & App Activity is turned on by default, and we anticipate that Google cannot rely on consent as a legal basis. The Article 29 Working party clearly state that "pre-ticked boxes or opt-out constructions that require an intervention from the data subject to prevent agreement" is invalidate consent under the GDPR.[54] Therefore, we assume that processing of location data collected through Web & App Activity is based on legitimate interests.[55]

*In the following we analyze whether the way that Google collects consent for Location History is in accordance with the requirements set forth in the GDPR. This is followed by a discussion of the legal grounds for Web & App Activity.*

## 5.1   Consent

Consent is defined in the GDPR as "any freely given, specific, informed and unambiguous indication" by a "statement" or by "clear affirmative action" from the data subject.[56] All of these conditions need to be fulfilled for consent to be considered valid. Below we will look at whether Google's use of Location History data for advertising purposes fulfills these conditions.

In Google's privacy policy, it states:

> "*We ask for your agreement to process your information for specific purposes and you have the right to withdraw your consent at any time. For example, we ask for your consent to provide you with personalized services like ads. We also ask for your consent to collect your voice and audio activity for speech recognition.*"

From this, it appears that Google is relying on consent as a legal ground for at least some of its processing of personal data, particularly for serving targeted advertising.

---

[53] GDPR art. 6 (1)(a). See also art. 5(3) of the ePrivacy Directive which requires consent to pull information from a user's device. As the ePrivacy Directive already requires consent for reading information (such as location data) from a user device, it makes most sense if the applicable legal basis under the GDPR is also consent in Location history.

[54]  Working Party 29"Guidelines on Consent under Regulation 2016/679" p. 16. http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051

[55] GDPR art. 6(1)(f)

[56] GDPR Art.4(11)



### 5.1.1 Freely given

Since, as Google argues, users have to opt in to Location History,[57] the data subject should freely have given his or her consent for processing of personal data collected through Location History. This indicates that the data subject has been provided with a real choice about whether he or she accepts Google processing such data, and that this data may be used for advertising purposes.

However, as demonstrated in chapter 4, there are significant differences in how Google collects consent for Location History between iOS-users and Android users. During the Android setup process, users are guided through a process that seems designed to make users consent to Google processing their location data, simply by following the click-flow.



This click-flow makes the user likely to enable Location History as a part of the process, without being made fully aware of what this entails. If the user was not aware what he or she consented to, it will be contestable whether consent has been freely given. Furthermore, if the user has not given consent to Location History during the setup process, Android users are nudged toward enabling the setting at several other occasions. The user may feel pressured into giving his or her consent because of this recurrent nudging.

This is problematic, considering consent should be freely given in order to be valid. "The Article 29 Working Party" have stated that consent is not freely given if there is "any element of compulsion, pressure or inability".[58] Additionally,

---

[57] "Google privacy policy" https://policies.google.com/technologies/location-data#is-on

[58] "The Article 29 Working Party" was replaced by the European Data Protection Board (EDPB) on the 25th of May 2018. This is a group consisting of EU member state data protection authorities, who provide guidelines on how to interpret EU-regulation on data protection issues.  Working Party 29"Guidelines on Consent under Regulation



users are pushed into giving consent to Location History in order to get access to Google Assistant, and to have photos sorted after location. There are also vague warnings about reduced functionality if the user disables Location History. These examples indicate that users who have been nudged into enabling Location History have not "freely given" their consent, and consequently it is not the valid consent required under the GDPR. If this is the case, the processing of this personal data may lack a valid legal basis.

### 5.1.2  Specific and informed?

In order to be considered valid, consent must be specific and informed. This means that the user must be presented with any information that is necessary to understand what he or she is consenting to, and that it should be clear what the consequences of giving consent could be.

When setting up a Google account, users are told that they can control how Google collects and uses their data. Users are also informed that they can adjust the settings and withdraw their consent. This shows that Google has provided information about rules, safeguards and rights. However, it is questionable whether the way that this information is presented is sufficient, considering users have to click "learn more" to get important information about the purposes of the processing, and the choices they have.

It is also questionable whether Google provides sufficient information about the purposes of the processing of location data. As shown in chapter 4, Google gives some information about processing personal data for advertising purposes, but only if the user clicks "learn more", and even then, this information is vague. Furthermore, phrasing such as "private map" can also mislead the user.

The relevant information regarding what Location History actually entails is hidden behind extra clicks and submenus, and the information about what the data is used for is ambiguous:

> *"Location History helps you get useful information (..) more useful ads on and off Google"*

Even if the consumer finds and reads the information under "Learn more", many users will probably not understand to what extent their location data is processed, that it is stored indefinitely, and how it is used for advertising

---

2016/679" p. 7 http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051



purposes. In particular, when using a service such as Google Assistant or photos grouped by location, it may not be obvious for the user that location data is being collected and stored, or for what purposes. This may be at odds with the notion of a "specific and informed" consent.

### 5.1.3  Unambiguous?

In order for consent to be valid, the user must have given an "unambiguous indication" through a "clear and affirmative action", that he or she consents to Google processing his or her personal data for advertising purposes through Location History.

In this context, it is worth mentioning that if Google was to base the processing of personal data in Web & App Activity on consent, and not legitimate interest (as we anticipate), consent would not be considered "unambiguous" since Web & App Activity is turned on by default. Pre-ticked boxes and "blanket acceptance of general terms and conditions cannot be seen as a clear affirmative action to consent to the use of personal data."[59]

Google claims that the user must opt in before it can process location data collected through "Location history". However, since this consent is given after the user has been exposed to dark patterns such as deceptive click-flows and hidden information, it is questionable whether the data subject has given an "unambiguous indication". Furthermore, this raises questions about whether the consent is "obvious". As demonstrated, the user may also have declined to turn on Location History several times, but will continue to be nudged toward turning it on in different contexts.

The user has to perform extra actions, such as clicking "Learn more", to get information about the purpose of the processing of the personal data. The presentation of this information is ambiguous, and consequently may not be in accordance with the requirements for an "unambiguous consent".[60]

---

[59] Working Party 29 "Guidelines on Consent under Regulation 2016/679" p. 16
http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051
[60] Working Party 29 "Guidelines on Consent under Regulation 2016/679" p. 17
http://ec.europa.eu/newsroom/article29/item-detail.cfm?item_id=623051



## 5.2   Legitimate interests

Processing of personal data may in certain circumstances be based on the data controller's legitimate interests.[61]

According to Google's privacy policy:

> *"We process your information for our legitimate interests and those of third parties while applying appropriate safeguards that protect your privacy. This means that we process your information for things like: [...] Providing advertising to make many of our services freely available for users"* [62]

Since data collected through Web & App Activity is used for advertising purposes, and the setting is opt-out,  it seems reasonable to assume that Google is relying on legitimate interest as the legal grounds for processing this data.

Under the GDPR, the processing of personal data is lawful if it is "necessary for the purposes of the legitimate interests of the controller".[63] However, if a data controller (in this case Google) is relying on legitimate interests for processing personal data, this must be balanced against the interest or fundamental rights and interests of the data subject. A legitimate interest must also be "lawful", "sufficiently clearly articulated" (transparent) and "represent a real and present interest".[64]

### 5.2.1  Transparency

As demonstrated in chapter 4, the information provided about the purposes and extent of data collection through Web & App Activity is not particularly clear. The fact that location data is collected as a part of this setting is hidden behind extra clicks, and information stating that this data may be used for advertising is only available under limited circumstances. Additionally, the fact that Web & App Activity is enabled by default is hidden when setting up a Google account.

---

[61] GDPR art. 6(1)(f)

[62] "Google Privacy Policy" https://policies.google.com/privacy#enforcement

[63] GDPR Art. 6(1)(f)

[64] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 25 and p. 52 www.dataprotection.ro/servlet/ViewDocument?id=1086



Furthermore, in the limited contexts where Google actually provides information about this data being used for advertising, the description of how the data is used is ambiguous:

> *"This data helps Google give you more personalised experiences across Google services, such as faster searches, better recommendations, and useful ads, both off and on Google"*

This phrasing seems like a blanket disclaimer that permits a wide range of purposes for using data collected through Web & App Activity.

Consequently, as the purposes for the collection and use of personal data from Web & App Activity are, in our opinion, unclear, this does not seem to fulfil the requirement for legitimate interest as a legal basis.

### 5.2.2  Balancing test

In order for legitimate interest to be a valid legal ground for processing personal data, it must be considered whether Google has a legitimate interest that overrides the individual's interests, rights and/or freedoms. This balancing test must be carried out by the data controller.[65]

Several features must be taken into account when performing a balancing test: The nature of the interests of the controller, the possible prejudice suffered by the controller, the nature of the data, the status of the data subject, and the way that data is processed. Additionally, the data controller must take into account the fundamental rights and/ or interests of the data subject that could be impacted.[66]

Privacy and the right to protection of personal data is a fundamental right in the EU.[67] Therefore, there is a high barrier to set aside the individual's rights and interests in privacy matters.

As mentioned, Google states in its privacy policy that it has a legitimate interest to provide "advertising to make many of our services freely available for

---

[65] GDPR art. 6 (1)(f) GDPR and recital 47.
[66] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 55
www.dataprotection.ro/servlet/ViewDocument?id=1086
[67] Art. 8(1) of the Charter of Fundamental Rights of the European Union, art. 16(1) of the treaty on the Functioning of the European Union (TFEU), art. 1(2) and recital 1 GDPR.



users".[68] However, the extensive tracking performed through features such as Web & App Activity and Location History is very invasive, especially considering that the tracking happens regardless of user interaction, and that the collected data is retained on a seemingly indefinite basis. As a result, Web & App Activity and Location History are arguably privacy adverse. Any legitimate interest to provide advertising should therefore arguably be overridden by the data subject's fundamental right to privacy.

### 5.2.2.1 Reasonable expectations

In order for a legitimate interest to be valid, it must be considered whether the data subject had "reasonable expectations" at the time and in the context of the collection of personal data, that the personal data could be used for advertising and marketing purposes.[69] This consideration should be based on an objective perspective of what a reasonable person could expect.

It is questionable whether the users had a "reasonable expectation" to believe that Google is tracking their location for marketing purposes in the context of Web & App Activity. In many cases, Google will have been collecting this information since users created a Google account. Today, a number of consumers may be aware of such processing due to the media and consumer organisations contributing to more information and awareness of these practices. Additionally, as shown, Google provides some information to the user.

However, many consumers may not have been aware of this processing when they first created the account. In these cases, the data subject would not have had reasonable expectation for such processing of personal data at the time when Google started collecting the data. Similarly, users who (with or without intent) have enabled Location History, may not have been aware of the extent of tracking and use of the data.

One must also consider whether the context of the collection could give the data subjects reasonable expectations that their location data would be used for advertising purposes. As outlined throughout this report, the extent of the collection of personal data for advertising purposes is under-communicated and hidden in the presentation of both Location History and Web & App activity.

This indicates that many users would not have reasonable expectations about Google processing their personal data for advertising purposes. In addition,

---

[68] "Google Privacy Policy" https://policies.google.com/privacy#enforcement
[69] GDPR art. 6 (1)(f) and recital 47



since Web & App activity is turned on by default, the data subject would likely not have seen any information about location data being collected, and could therefore probably not have reasonable expectations for such processing, and at such a comprehensive scale.

*The Article 29 Working Party recommend that data controllers demonstrate the reasons why they consider their own interest to override the data subject's interests and rights. This should be demonstrated in a clear and user-friendly way. The burden of proof is with the data controller.[70] In situations where the data subject does not have reasonable expectations of the processing of personal data, this will imply that the data subject's interests and rights will override the controller's interests.[71] As the report has shown, Google collects personal data passively in the background and not necessarily while using the app.[72] With this in mind, it seems that the lack of a reasonable expectation at the time of collection would tip the balancing act in favour of the interest of the data subject.*

Safeguards

The implementation of certain safeguards can modify the legal grounds for processing personal data using legitimate interests. Such safeguards may include functions such as opting out of the processing of personal data, anonymisations of personal data, and particular transparency measures such as easy to use deletion tools.

Google claims to anonymise data. However, according to recent reports, this "anonymous data" can be easily re-identified as long as the user connects to their Google account.[73] In this case, anonymisation is not actually effective, and works against its purpose as a safeguard.

According to The Article 29 Working Party, "opt-in consent would almost always be required for [...] for tracking and profiling for purposes of direct marketing, behavioural advertisement, location-based advertising or tracking-based digital market research".[74] This implies that Google may lack a valid legal basis to process location data for marketing purposes through Web & App Activity.

---

[70] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 42 www.dataprotection.ro/servlet/ViewDocument?id=1086

[71] GDPR recital 47

[72] See this report, chapters 3.1 and 3.4.

[73] This is outlined in a 2018 report by researchers at the Vanderbilt University. "Google Data Collection" https://digitalcontentnext.org/wp-content/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf

[74] Article 29 Working Party "Opinion 06/2014 on the notion of legitimate interests of the data controller under Article 7 of Directive 95/46/EC" p. 47 www.dataprotection.ro/servlet/ViewDocument?id=1086



***

As we have seen, users are able to opt out of Web & App Activity by pausing the setting. However, it is unlikely that many users would ever opt out of Web & App activity, since they would likely not know that the setting is turned on by default. Furthermore, regular users will be unaware that location data is collected, that this data is used for advertising, or even that Web & App Activity exists in the first place.

In our opinion, because of the high barrier to protect the individual's right and interest in privacy matters, Google's interests does not override the data subject's interests and rights in this case.

## 5.3 Summary of legal analysis

As demonstrated throughout this chapter, the ways that Google has designed its Location History and Web & App Activity settings are problematic in light of European data protection requirements. In this report we have questioned the legal basis Google has for collecting and processing this location data.

It is questionable whether users have given free, specific, informed, and unambiguous consent to the collection and use of location data through Location History. It can also be discussed whether the user can withdraw his or her consent, since there is no real option to turn off Location History, only to pause it.

Since Web & App Activity is turned on by default, the collection and use of personal data through this setting cannot be based on consent. Google claims to have a legitimate interest in serving ads based on personal data, but the fact that location data is collected, and how it is used, is not clearly expressed to the user. This calls into question whether Google's legitimate interest in serving advertising as part of its business model, overrides the data subject's fundamental right to privacy. As we have argued above, in light of how Web & App Activity is presented to users, the interests of the data subject should take precedence in this case.



# 6  Appendix





# Setting up a Google account.

The screenshots show what users are presented with when setting up an Android device. In order to see the different options, and to turn these on or off, users have to scroll through the truncated privacy policy, and click "More options".





# EXHIBIT 17

'Nine in ten' Android apps send data to Google

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**tr** **techradar.com**/news/nine-in-ten-android-apps-send-data-to-google

Steve McCaskill



A new <u>study</u> has revealed that 90 per cent of all Android applications share personal data to Google, raising questions about the volume of information collected by ad-supported software and the ability for tech giants to create profiles of individuals.

Researchers at Oxford University looked at almost one million Android apps available on the Google Play store and found the median app shared user data with ten third parties and a fifth shared it with more than 20.

Read more: Antivirus Free - Virus Cleaner

The researchers told the Financial Times that the popularity of 'freemium' applications supported by advertising and the rise of vast advertising networks meant that many people, and often app developers themselves, are unaware of the scale of this data harvesting.

## Mobile app data sharing

This information could involve details used to serve personalised advertising, such as age, gender and location, while many applications allow users to login using their Google or Facebook account.

Through these chains, much of this data ended up at major technology companies like Google, Facebook, Twitter, Microsoft and Amazon. Although much of this data is anonymised, it does raise concerns about what any third party may be able to discover or infer.

Google told the newspaper that it disputed the researcher's methodologies, arguing that some of the sharing was an app reporting crash statistics and analytics. The researchers responded by saying many of these rights went beyond such use cases.

For European users, the findings raise the issue of how these applications comply with GDPR and how the data is shared beyond the EU, which forbids the transfer of citizen data to counties deemed not to have privacy safeguards equivalent to those in Europe. Although data can be shared with the US thanks to Privacy Shield, this is not true of China.

## Mobile operator view

Mobile operators will also have a keen eye on the findings. Operators have long-complained about having to compete with over-the-top (OTT) platforms that profit from mobile networks without contributing to the cost of construction and maintenance and whose applications actually bypass telco services.

They have also argued that OTT players are not subject to the same level of regulation as telcos, which is why GDPR has been welcomed within the industry and why many oppose net neutrality legislation.

The counter-argument is that operators have access to a level of data that OTT players do not – such as the ability to see cell data, browsing habits and billing information. But if major tech companies have access to such huge amounts of data, then what advantage is there?

Here are the best mobile deals for October 2018

# EXHIBIT 18

Digital Content Next





# Google Data Collection

## —NEW—

**August 2018**

digitalcontentnext.org

This research was conducted by Professor Douglas C. Schmidt, Professor of Computer Science at Vanderbilt University, and his team.  DCN is grateful to support Professor Schmidt in distributing it. We offer it to the public with the permission of Professor Schmidt.

# __Google Data Collection__

## Professor Douglas C. Schmidt, Vanderbilt University

## August 15, 2018

## I.   EXECUTIVE SUMMARY

1.      Google is the world's largest digital advertising company.[1] It also provides the #1 web browser,[2] the #1 mobile platform,[3] and the #1 search engine[4] worldwide. Google's video platform, email service, and map application have over 1 billion monthly active users each.[5] Google utilizes the tremendous reach of its products to collect detailed information about people's online and real-world behaviors, which it then uses to target them with paid advertising. Google's revenues increase significantly as the targeting technology and data are refined.

2.      Google collects user data in a variety of ways.  The most obvious are "active," with the user directly and consciously communicating information to Google, as for example by signing in to any of its widely used applications such as YouTube, Gmail, Search etc.  Less obvious ways for Google to collect data are "passive" means, whereby an application is instrumented to gather information while it's running, possibly without the user's knowledge. Google's passive data gathering methods arise from platforms (e.g. Android and Chrome), applications (e.g. Search, YouTube, Maps), publisher tools (e.g. Google Analytics, AdSense) and advertiser tools (e.g. AdMob, AdWords). The extent and magnitude of Google's passive data collection has largely been overlooked by past studies on this topic.[6]

3.      To understand what data Google collects, this study draws on four key sources:

    a.   Google's My Activity[7] and Takeout[8] tools, which describe information collected during the use of Google's user-facing products;

    b.   Data intercepted as it is sent to Google server domains while Google or 3rd-party products are used;

    c.   Google's privacy policies (both general and product-specific); and

    d.   Other 3rd-party research that has examined Google's data collection efforts.

4.      Through the combined use of above resources, this study provides a unique and comprehensive view of Google's data collection approaches and delves deeper into specific types of information it collects from users. This study highlights the following key findings:

---

[1] "Google and Facebook tighten grip on US digital ad market," *eMarketer*, Sept. 21, 2017, available at
https://www.emarketer.com/Article/Google-Facebook-Tighten-Grip-on-US-Digital-Ad-Market/1016494
[2] "Market share or leading internet browsers in the United States and worldwide as of February 2018," *Statista,* February 2018, available at https://www.statista.com/statistics/276738/worldwide-and-us-market-share-of-leading-internet-browsers/
[3] "Global OS market share in sales to end users from 1st quarter 2009 to 2nd quarter 2017," *Statista*, August 2017, available at https://www.statista.com/statistics/266136/global-market-share-held-by-smartphone-operating-systems/
[4] "Worldwide desktop market share of leading search engines from January 2010 to October 2017," *Statista*, Feb. 2018, available at https://www.statista.com/statistics/216573/worldwide-market-share-of-search-engines/
[5] Google 10K filings with the SEC, 2017, available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf
[6] Please see Appendix section IX.F for a list of past studies/news reports on Google data collection
[7] "My Activity," *Google*, available at https://myactivity.google.com/myactivity
[8] "Download your data," *Google*, available at https://takeout.google.com/settings/takeout?pli=1

2

a. Google learns a great deal about a user's personal interests during even a single day of typical internet usage. In an example "day in the life" scenario, where a real user with a new Google account and an Android phone (with new SIM card) goes through her daily routine, Google collected data at numerous activity touchpoints, such as user location, routes taken, items purchased, and music listened to. Surprisingly, Google collected or inferred over two-thirds of the information through passive means. At the end of the day, Google identified user interests with remarkable accuracy.

b. Android is a key enabler of data collection for Google, with over 2 billion monthly active users worldwide.[9] While the Android OS is used by Original Equipment Manufacturers (OEMs) around the world, it is tightly connected with Google's ecosystem through Google Play Services. Android helps Google collect personal user information (e.g. name, mobile phone number, birthdate, zip code, and in many cases, credit card number), activity on the mobile phone (e.g. apps used, websites visited), and location coordinates. In the background, Android frequently sends Google user location and device-related information, such as apps usage, crash reports, device configuration, backups, and various device-related identifiers.

c. The Chrome browser helps Google collect user data from both mobile and desktop devices, with over 2 billion active installs worldwide.[10] The Chrome browser collects personal information (e.g. when a user completes online forms) and sends it to Google as part of the data synchronization process. It also tracks webpage visits and sends user location coordinates to Google.

d. Both Android and Chrome send data to Google even in the absence of *any* user interaction. Our experiments show that a dormant, stationary Android phone (with Chrome active in the background) communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour. In fact, location information constituted 35% of all the data samples sent to Google. In contrast, a similar experiment showed that on an iOS Apple device with Safari (where neither Android nor Chrome were used), Google could not collect any appreciable data (location or otherwise) in the absence of a user interaction with the device.

e. After a user starts interacting with an Android phone (e.g. moves around, visits webpages, uses apps), passive communications to Google server domains increase significantly, even in cases where the user did not use any prominent Google applications (i.e. no Google Search, no YouTube, no Gmail, and no Google Maps). This increase is driven largely by data activity from Google's publisher and advertiser products (e.g. Google Analytics, DoubleClick, AdWords)[11]. Such data constituted 46% of all requests

[9] Dave Burke, "Android: celebrating a big milestone together with you," *Google,* May 17, 2017, available at https://www.blog.google/products/android/2bn-milestone/
[10] Frederic Lardinois, "Google says there are now 2 billion active Chrome installs," *TechCrunch,* Nov. 10, 2016, available at https://techcrunch.com/2016/11/10/google-says-there-are-now-2-billion-active-chrome-installs/
[11] Google recently rebranded AdWords as "Google Ads" and DoubleClick as "Google Ad Manager"

to Google servers from the Android phone. Google collected location at a 1.4x higher rate compared to the stationary phone experiment with no user interaction. Magnitude wise, Google's servers communicated 11.6 MB of data per day (or 0.35 GB/month) with the Android device. This experiment suggests that even if a user does not interact with any key Google applications, Google is still able to collect considerable information through its advertiser and publisher products.

f.   While using an iOS device, if a user decides to forgo the use of *any* Google product (i.e. no Android, no Chrome, no Google applications), and visits only non-Google webpages, the number of times data is communicated to Google servers still remains surprisingly high. This communication is driven purely by advertiser/publisher services. The number of times such Google services are called from an iOS device is similar to an Android device. In this experiment, the total magnitude of data communicated to Google servers from an iOS device is found to be approximately half of that from the Android device.

g.   Advertising identifiers (which are purportedly "user anonymous" and collect activity data on apps and 3rd-party webpage visits) can get connected with a user's Google identity. This happens via passing of device-level identification information to Google servers by an Android device. Likewise, the DoubleClick cookie ID (which tracks a user's activity on the 3rd-party webpages) is another purportedly "user anonymous" identifier that Google can connect to a user's Google Account if a user accesses a Google application in the same browser in which a 3rd-party webpage was previously accessed. Overall, our findings indicate that Google has the ability to connect the anonymous data collected through passive means with the personal information of the user.

# Contents

I.   Executive summary ..................................................................................................................2

II.   A day in the life of a Google user ............................................................................................7

III.   Data collection through Android and Chrome platforms .........................................................9

   A.   Personal information and activity data collection ..............................................................10

   B.   User location data collection ..............................................................................................11

   C.   An assessment of passive data collection by Google through Android and Chrome...........13

IV.   Data collection through publisher and advertiser technologies...............................................15

   A.   Google Analytics and DoubleClick ....................................................................................17

   B.   AdSense, AdWords and AdMob ........................................................................................18

   C.   Association of passively collected data with personal information ......................................19

      1)   Mobile advertising identifier may get de-anonymized through data sent to Google by Android......20

      2)   DoubleClick cookie ID gets connected with user's personal information on Google Account .......21

V.   Amount of data collected during a minimal use of Google products .........................................23

VI.   Data collected from Google's key popular applications aimed at individuals .............................25

   A.   Search ................................................................................................................................26

   B.   YouTube ............................................................................................................................27

   C.   Maps ..................................................................................................................................28

   D.   Gmail.................................................................................................................................29

VII.   Products with high future potential for data aggregation ........................................................30

   A.   Accelerated Mobile Pages (AMP) ......................................................................................30

   B.   Google Assistant ...............................................................................................................32

   C.   Photos ...............................................................................................................................33

   D.   Chromebook .....................................................................................................................34

   E.   Google Pay ........................................................................................................................35

   F.   User data collected from 3rd-party data vendors................................................................35

VIII.   Conclusion ............................................................................................................................36

IX.   Appendix ...............................................................................................................................37

A.    Characterization of active vs passive data collection from "day in the life" of a user ...........................37

B.    List of Google products ...............................................................................................................38

C.    Data collection from other prominent Google products ...............................................................38

D.    Method for location traffic monitoring .........................................................................................46

E.    Google sign in authentication sequence .......................................................................................49

F.    Usage profile for mobile data collection experiments ...................................................................50

G.    Past articles that relate to Google's data collection practices .......................................................51

H.    Clarifications ..............................................................................................................................52

I.    About the author ........................................................................................................................52

## II.      A DAY IN THE LIFE OF A GOOGLE USER

5.      To illustrate the multitude of touchpoints between Google and an individual, as well as the extent of information collected during these interactions, an experiment was designed where a researcher carried an Android mobile phone device[12] during a day's activities. The mobile phone was wiped by conducting a factory data reset[13] and configured as a new device to avoid prior user information associated with the device.[14] A new Google account was created (username "Jane"), so that Google had no prior knowledge of the user and had no advertising interests associated with the account. Researcher then went about a normal day using the mobile phone associated with the new Google account.

6.      The data collected by Google was checked using two tools provided by Google: My Activity[15] and Takeout.[16]  The My Activity tool shows data collected by Google from any Search-related activities, use of Google applications (e.g. YouTube video plays, Maps search, Google Assistant), visits to 3rd-party web pages (while logged in to Chrome), and clicks on advertisements. The Google Takeout tool provides a more comprehensive information about all historical user data collected via Google's applications (e.g. it contains all past email messages on Gmail, search queries, location collection, and YouTube videos watched). We synthesized the collected data and used it to depict key information collection events in the form of a "day in the life" of the user "Jane," as shown in Figure 1.

7.      In the activity shown in Figure 1, as well as throughout the rest of this document, the collected data is categorized in two broad subgroups: *active* and *passive*. Active data is defined as information directly exchanged between the user and a Google product, whereas passive data is defined as information exchanged in the background without any obvious notification to the user. An example of active data collection occurred when Jane submitted a keyword in the Search tool bar and that search query was collected by Google. An example of passive data collection occurred when Jane's location was sent to Google after she entered a search query.

---

[12] LG X Power device with Android 6.0 version installed
[13] The factory data reset deletes all login data for Google services and other accounts, system and app data and settings, all downloaded apps, digital rights management licenses, music, images, documents and backups, and other usage data from the internal storage of the device.
[14] Researchers used LG X Power device that was wiped clean to the default factory settings and given new SIM card in order to ensure that no data was stored on the phone and that phone numbers could not be linked with any past usage.
[15] "My Activity," Google, available at https://myactivity.google.com/myactivity
[16] "Download your data," Google, available at https://takeout.google.com/settings/takeout?pli=1

**Figure 1: Day in the life of Jane, highlighting touchpoints where Google collects data**



## A DAY IN THE LIFE OF A TYPICAL GOOGLE USER

8

8.     Analysis of key touch points during a normal day in the life of Jane suggested that the number of "passive" data collection events outnumbered the "active" events by approximately two-to-one (a detailed breakdown of characterization of active vs passive data collected appears in Table 3 of the Appendix section IX. A).

9.     Google analyzes the collected data to assess user interests, which it then applies to target users with appropriate ads. For example, Google provides a list of interests that it has inferred from a user's activities, available via the "topics you like" section in the Google's Ad Personalization webpage.[17] Figure 2 shows such a list that Google associated with Jane's account after a day's worth of activity. In total, Google attributed 18 interests to Jane, eight of which (shown by colored borders) closely matched Jane's usage and activities.[18]

**Figure 2: Google's assessment of Jane's interest at the end of the day**



Interests inferred by Google

| Action & Platform Games | Books & Literature | Business & Industrial |
|---|---|---|
| Computer & Video Games | Computers & Electronics | Education |
| Games | Home & Garden | Mobile & Wireless |
| Movies | Music & Audio | News |
| Online Communities | Parenting | Science |
| Sports Games | TV & Video | TV Comedies |

10.     Although My Activity and Takeout tools are helpful in assessing the amount of active data collected after a user interacts with Google's products, they do not paint a complete picture of the size and scale of Google's data collection. A comprehensive understanding of which requires a review of Google's product-specific privacy policies, as well as analyses of the actual data traffic passed to Google servers during the instances of a user's interaction with its services. Results derived from these resources are covered later in this report.

## III.     DATA COLLECTION THROUGH ANDROID AND CHROME PLATFORMS

---

[17] "Ads personalization," *Google*, last accessed on August 15 2018, available at https://adssettings.google.com/authenticated
[18] It's unclear as to why other interests that have no connection with Jane's activities during the day show up in this list, though perhaps Google uses historical analysis of similar interests from other users to create associated recommendations.

11.     Android and Chrome are Google's key platforms that aid in significant user data collection due to their extensive reach and frequency of usage. By January 2018, Android captured 53% of the total US mobile OS market (Apple iOS held 45%)[19] and as of May 2017 there were more than 2 billion monthly active Android devices worldwide.[20]

12.     Google's Chrome browser held more than 60% share of all internet browser usage in the world with over 1 Billion monthly active users as reported in the 2017 Q4 10K filing.[21] Both platforms facilitate the use of Google and 3rd-party content (e.g. 3rd-party websites and 3rd-party apps) and hence provide Google access to a wide range of personal, web activity, and location information.

### A.     Personal information and activity data collection

13.     To download and use apps from Google Play Store on an Android device, a user must have (or create) a Google Account, which becomes a key gateway through which Google collects personal information, including user name, email, and phone number. If a user registers for services such as Google Pay[22], Android also collects the user's credit card information, zip code, and birth date. All this information becomes part of a user's personal information associated with their Google Account.

14.     While Chrome does not mandate sharing additional personal information gathered from users, it does have the capability to capture such information. For example, Chrome collects a range of personal information via its form "autofill" feature, and such form fields typically include user name, address, phone number, login name, and passwords.[23]  Chrome stores form fill information on a user's local drive, however, if the user logs in to Chrome using Google Account and enables its "Sync" feature, this information gets sent to and stored on Google servers. Chrome could also learn about the language(s) a person speaks during their interactions with its translate feature, which is enabled by default.[24]

15.     In addition to personal data, both Chrome and Android send Google information about a user's web browsing and mobile app activities, respectively. Any webpage visit is automatically tracked and collected under

---

[19] "Subscriber share held by smartphone operating systems in the United States from 2012 to 2018," *Statista,* May 2018, available at https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/
[20] Dave Burke, "Android: celebrating a big milestone together with you," *Google,* May 17, 2017, available at https://www.blog.google/products/android/2bn-milestone/
[21] Google 10K filings with the SEC
[22] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#payments
[23] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#autofill
[24] "Google Chrome privacy whitepaper," *Google,* March 6, 2018, available at https://www.google.com/chrome/privacy/whitepaper.html#translate

user credentials by Google if the user is signed in to Chrome. Chrome also collects information about a user's browsing history, passwords, website-specific permissions, cookies, download history, and add-on data.[25]

16.     Android sends periodic updates to Google servers, including device type, cell service carrier name, crash reports, and information about apps installed on the phone.[26] It also notifies Google whenever any app is accessed on the phone (e.g. Google knows when an Android user accesses their Uber app).

### B.      User location data collection

17.     Android and Chrome platforms meticulously collect user location and movement information using a variety of sources, as depicted by Figure 3. For example, a "coarse location" assessment can be done by using GPS coordinates on an Android phone or through a network's IP address on a desktop/laptop device. The user location accuracy can be improved further ("fine location") through the use of nearby cell tower IDs or via scanning the device-specific BSSIDs or basic service set identifiers, assigned to the radio chipset used in nearby Wi-Fi access points.[27]  Android phones can also use information from the Bluetooth beacons registered with Google's Proximity Beacon API.[28] These beacons not only provide user's geolocation coordinates, but could also pinpoint exact floor levels in buildings.[29]

**Figure 3: Android and Chrome use multiple ways to locate a mobile user**



[25] "Google Chrome Privacy Notice," *Google*, March 6, 2018, available at https://www.google.com/intl/en/chrome/browser/privacy
[26] https://policies.google.com/privacy?hl=en&gl=us#infocollect
[27] To understand how location data is sent to Google servers in more depth, our researchers analyzed the data traffic from a mobile phone from a user in motion, applying the method described in Appendix section VIII.C.
[28] "Google beacon platform, proximity beacon API," *Google,* last accessed on August 15 2018, available at https://developers.google.com/beacons/proximity/guides
[29] "Google beacon platform, proximity beacon API," *Google,* last accessed on August 15 2018, available at https://developers.google.com/beacons/proximity/guides

18.     It's hard for an Android mobile user to "opt out" of location tracking. For example, on an Android device, even if a user turns off the Wi-Fi, the device's location is still tracked via its Wi-Fi signal. To prevent such tracking, Wi-Fi scanning must be explicitly disabled in a separate user action, as shown in Figure 4.

**Figure 4: Android collects data even if Wi-Fi is turned off by user**



19.     The ubiquity of Wi-Fi hubs has made location tracking quite frequent. For example, during a short 15-minute walk around a residential neighborhood, an Android device sent nine location requests to Google. The request collectively contained ~100 unique BSSIDs of public and private Wi-Fi access points.

20.     Google can ascertain with a high degree of confidence whether a user is still, walking, running, bicycling, or riding on a train or a car.  It achieves this by tracking an Android mobile user's location coordinates at frequent time intervals in combination with the data from onboard sensors (such as an accelerometer) on mobile phones. Figure 5 shows an example of such data communicated with the Google servers while the user was walking.

**Figure 5: Snapshot from a Google user location upload**

```
"activityReadings": [
    {
        "activities": [
            {
                "confidence": 99,
                "type": "onFoot"
            },
            {
                "confidence": 99,
                "type": "walking"
            },
            {
                "confidence": 1,
                "type": "unknown"
            }
        ],
        "timestampMs": 1527095517507
    },
```

### C.    An assessment of passive data collection by Google through Android and Chrome

21.    Active data that Android or Chrome platforms collect and send to Google as a result of users' activities on these platforms can be assessed through the MyActivity and Takeout tools. Of potentially greater interest, however, is the passive data that these platforms collect, which goes beyond location data and which remains relatively unrecognized by the users. To assess the type and frequency of occurrence of such collection in greater detail an experiment was conducted that monitored traffic data sent to Google from mobile phones (both Android and iPhone) using the method discussed in Section IX.D in the Appendix. For comparison's sake, this experiment also included the analysis of data sent to Apple via an iPhone device.

22.    For simplicity, the phones were kept stationary, with no user interaction. On the Android phone a single Chrome browser session remained active in the background, whereas on the iPhone the Safari browser was used. This configuration provided an opportunity for systematic analysis of the background collection that Google performs purely through Android and Chrome, as well as collection that occurs in the absence of those (i.e. from iPhone device), without any additional collection requests generated by other products and applications (e.g. YouTube, Gmail, App usage).

23.    Figure 6 shows a summary of the results obtained from this experiment. The x-axis indicates the number of times the phones communicated with Google (or Apple) servers, whereas the y-axis indicates the phone type (Android or iPhone) and server domain type (Google or Apple) with which data packets were exchanged by the phones. The colored legend describes the broad categorization of the type of data requests identified by the domain address of the server. A complete list of domain addresses belonging within each category appears in Table 5 of Section IX.D of the Appendix.

13

24.     During a 24-hour time period the Android device communicated ~900 data samples to a variety of Google server endpoints. Of these, ~35% (or approximately 14/hour) were location-related. Google ad domains received only ~3% of the traffic, which is mainly due to the fact that the mobile browser was not actively used during the collection period. The remaining ~62% of communications with the Google server domains were roughly divided between requests to Google's Play App store, Android's uploads of device-related data (such as crash reports and device authorization), and other data which were predominantly in the category of Google services background calls and refreshes.

**Figure 6: Traffic data sent from idle Android and iPhone mobiles**



25.     Figure 6 shows that the iPhone device communicated with Google domains at more than an order of magnitude (~50x) lower frequency than the Android device, and that Google did not collect any user location during the 24-hour experiment timeframe via iPhone. This result highlights the fact that the Android and Chrome platforms play an important role in Google's data collection.

26.     Additionally, the iPhone device's communication with Apple's servers were 10x less frequent than the Android device's communications with Google. Location data made up a very small fraction (~1%) of the net data sent to Apple servers from the iPhone, with Apple receiving location-related communications once every day on an average.

27.     Magnitude wise, Android phones communicated 4.4 MB of data per day (~130MB per month) with Google servers, which is 6x more than what Google servers communicated through the iPhone device.

14

28.     As a reminder, this experiment was conducted using a stationary phone with no user interaction.  As a user becomes mobile and starts interacting with their phone, the frequency of communications with Google's servers increases considerably. Section V of this report summarizes results from such an experiment.

## IV.   DATA COLLECTION THROUGH PUBLISHER AND ADVERTISER TECHNOLOGIES

29.     A major source for Google's user activity data collection stems from its publisher- and advertiser-focused tools, such as Google Analytics, DoubleClick, AdSense, AdWords, and AdMob. These tools have tremendous reach, e.g. over 1 million mobile apps use AdMob,[30] over 1 million advertisers use AdWords,[31] over 15 million websites use AdSense,[32] and over 30 million websites use Google Analytics.[33]

30.     During the writing of this report Google rebranded AdWords as "Google Ads" and DoubleClick as "Google Ad Manager", however there were no changes instituted in the core product functionalities including information collection by these products.[34] Therefore, for the purpose of this report the names are kept unchanged to avoid confusion that may occur with related domain names (such as doubleclick.net).

31.     There are two main groups of users of Google's publisher- and advertiser-focused tools:

    o   *Website and app publishers*, which are organizations that own websites and create mobile apps. These entities use Google's tools to (1) make money by allowing the display of ads to visitors on their websites or apps, and (2) better track and understand who is visiting their websites and using their apps. Google's tools place cookies and run scripts in the browsers of website visitors that help determine a user's identity, track their interest in content, and follow their online behavior. Google's mobile app libraries track use of apps on mobile phones.

    o   *Advertisers*, which are organizations that pay to have banner, video, or other ads delivered to users as they browse the Internet or use apps. These entities apply Google's tools to target specific profiles of people for advertisements to increase the return on their marketing investments (better targeted ads generally yield higher click-through rates and conversions). Such tools also enable advertisers to analyze their audiences and measure the efficacy of their digital advertising by tracking which ads were clicked with what frequency and by providing insight into the profiles of people who clicked on ads.

---

[30] "AdMob by Google," *Google*, last accessed on August 15 2018, available at https://www.google.com/admob/
[31] "Hear form our happy customers," *Google*, last accessed on August 15 2018, available at https://adwords.google.com/home/resources/success-stories/
[32] "Websites using Google Adsense," *BuiltWith,* last accessed on August 15 2018, available at https://trends.builtwith.com/websitelist/Google-Adsense
[33] Google Analytics usage statistics," *BuiltWith*, April 2018, available at https://trends.builtwith.com/analytics/Google-Analytics
[34] Garett Sloane, "Google to retire Doubleclick and AdWords names in a rebrand of its as business," *Ad Age,* available at http://adage.com/article/digital/google-waves-goodbye-doubleclick-ad-business-evolves/314046/

32.     Together, these tools collect information about user activities on websites and in apps, such as content visited, and ads clicked. They work in the background—largely unnoticeable by users. Figure 7 shows some of these key tools, with arrows indicating data collected from users and ads served to users.

**Figure 7: Google products aimed at publishers and advertisers[35]**



33.     The information collected by such tools includes a non-personal identifier that Google can use to send targeted advertisements without identifying the unique individual's personal information. These identifiers can be device- or session-specific, as well as permanent or semi-permanent. Table 1 lists a set of such identifiers. To provide users greater anonymity during information collection for ad targeting, Google has recently shifted towards using semi-permanent device unique identifiers (e.g. GAIDs).[36] Further sections go in detail about how these tools collect user data and the use of such identifiers during the data collection process.

**Table 1: Identifiers passed to Google**

| Identifier | Type | Description |
|---|---|---|
| GAID/IDFA | Semi-Permanent | Alphanumeric string for Android / iOS devices to allow targeted mobile ads. Resettable by users. |
| Client ID | Semi-Permanent | ID created the first time a cookie is stored on the browser. Used to link browsing sessions together. Resets when browser cookies are cleared. |
| IP address | Semi-Permanent | A unique string of number that identifies the network through which a device is accessing the Internet. |

---

[35] "Our products," *Google,* last accessed on August 15 2018, available at https://www.google.com/about/products/
[36] "Best practices for unique identifiers," *Google,* last accessed on August 15 2018, available at https://developer.android.com/training/articles/user-data-ids

| Android device ID | Semi-Permanent | Randomly generated number when a device is first booted up. Used to identify the device. It is in the process of being phased out of advertising. Resets with a factory reset of a device. |
|---|---|---|
| Google Services Framework (GSF) | Semi-Permanent | Randomly assigned number when a user first logs into Google services on a device. Used to identify a unique device. Resets with a factory reset of a device. |
| IEMI / MEID | Permanent | Identifier used in mobile communication standards. Unique for each mobile phone. |
| MAC address | Permanent | Unique 12-character identifier for a piece of hardware (e.g. router). |
| Serial number | Permanent | Alphanumeric string used to identify a device. |

A.     Google Analytics and DoubleClick

34.     DoubleClick and Google Analytics (GA) are Google's leading products in user behavior tracking and webpage traffic analyses on desktop and mobile devices. GA is used by ~75% of the top 100,000 most visited websites.[37] DoubleClick cookies are associated with more than 1.6 million websites.[38]

35.     GA uses short pieces of tracking code (called "page tags") embedded in a website's HTML code.[39] After a webpage loads per a user's request, the GA code calls an "analytics.js" file residing on Google's servers. This program transfers a "default" snapshot of user data at that moment, which includes visited webpage address, page title, browser information, current location (derived from IP address), and user language settings. GA scripts use cookies to track user behavior.

36.     GA script, the first time when it's run, generates and stores a browser-specific cookie on the user's computer. This cookie has a unique client identifier or Client ID (see Table 1 for details).[40] Google uses the unique identifier to link previously stored cookies that capture a user's activity on a particular domain as long as the cookie does not expire, or the user does not clear the cookies cached on their browser.[41]

37.     While a GA cookie is specific to the particular domain of the website that user visits (called a "1st-party cookie"), a DoubleClick cookie is typically associated with a common 3rd-party domain (such as

---

[37] Google Analytics usage statistics," *BuiltWith,* April 2018, available at https://trends.builtwith.com/analytics/Google-Analytics
[38] "DoubleClick market share," *Datanyze,* last accessed on August 15 2018, available at https://www.datanyze.com/market-share/ad-exchanges/doubleclick-market-share
[39] GA or other tags can also be implemented through Google Tag Manage (GTM) without changing the functionality of the page tag
[40] "Cookies and user identification," *Google,* last accessed on August 15 2018, available at
https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id
[41] "Cookies and user identification," *Google,* last accessed on August 15 2018, available at
https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id

doubleclick.net). Google uses such cookies to track user interaction across multiple 3rd-party websites.[42] When a user interacts with an advertisement on a website, DoubleClick's conversion tracking tools (e.g. Floodlight) places cookies on a user's computer and generates a unique client ID.[43] Thereafter, if the user visits the advertised website, the stored cookie information gets accessed by the DoubleClick server, thereby recording the visit as a valid conversion.

## B. AdSense, AdWords and AdMob

38.     AdSense and AdWords are Google tools that serve ads on websites and in Google Search results, respectively. More than 15 million websites have AdSense installed to display sponsored ads.[44] Likewise, more than 2 million websites and apps that make up the Google Display Network (GDN) and reach over 90% of Internet users[45] display AdWords ads.

39.     AdSense collects information about whether an ad was displayed on the publisher's webpage. It also collects how the user interacted with the ad, such as clicking an ad or tracking the curser movement over an ad.[46] AdWords enables advertisers to serve search ads on Google Search, display ads on publisher pages, and overlay ads on YouTube videos. To track user click-through and conversion rates, AdWords ads place a cookie on users' browsers to identify the same user if they later visit the advertiser's website or complete a purchase.[47]

40.     While AdSense and AdWords collect data on mobile devices as well, their ability to get user information on mobile devices is limited since mobile apps do not share cookie data between them, an isolation technique known as 'sandboxing,'[48] which makes it hard for advertisers to track user behavior across mobile apps.

41.     To address this issue, Google and other companies use mobile "ad libraries" (such as AdMob) that are integrated into the apps by their developers for serving ads in mobile apps. These libraries compile and run with the apps and send to Google data that is specific to the app to which they belong, including GPS locations, device make, and device model when apps have the appropriate permissions. As observed through the data

---

[42] "DoubleClick search help," *Google,* last accessed on August 15 2018, available at
https://support.google.com/ds/answer/7298761?hl=en
[43] "DoubleClick search help," *Google,* last accessed on August 15 2018, available at
https://support.google.com/ds/answer/2903014?hl=en&ref_topic=6054260
[44] "Websites using Google Adsense," *BuiltWith,* last accessed on August 15 2018, available at
https://trends.builtwith.com/websitelist/Google-Adsense
[45] "Google Ads Help," *Google,* last accessed on August 15 2018, available at https://support.google.com/google-ads/answer/2404191?hl=en
[46] "AdSense help, privacy and security," *Google,* last accessed on August 15 2018, available at
https://support.google.com/adsense/answer/9897?hl=en
[47] "Evaluating ad performance on the Search Network," *Google,* last accessed on August 15 2018, available at
https://support.google.com/adwords/answer/2404037?hl=en; "About conversion tracking," *Google,* last accessed on August 15 2018, available at https://support.google.com/adwords/answer/1722022?hl=en
[48] This approach is similar to desktops, where cookies are not shared between browsers.

traffic analyses (Figure 8), and confirmed through Google's own developer webpages,[49] such libraries can also send user-personal data, such as age and gender, to Google whenever app developers explicitly pass these values to the library.

**Figure 8: Snapshot of information sent back to Google when an application is launched**



### C.    Association of passively collected data with personal information

42.    As discussed above, Google collects data through publisher and advertiser products and associate such data with a variety of semi-permanent, anonymous identifiers. Google however, has the ability to associate these IDs with a user's personal information. This is insinuated by the statements made in Google's privacy policy, excerpts of which are shown in Figure 9. The left text box clearly states that Google may associate data from advertising services and analytics tools with a user's personal information, depending upon the user's account settings. This arrangement is enabled by default, as shown in the right text box.

**Figure 9: Google's privacy page for 3rd-party websites collection and association with personal information[50][51]**



---

[49] "Google APIs for Android," *Google*, last accessed on August 15 2018, available at
https://developers.google.com/android/reference/com/google/android/gms/ads/doubleclick/PublisherAdRequest.Builder
[50] "Google privacy and terms," *Google*, last accessed on August 15 2018, available at
https://policies.google.com/privacy/example/your-activity-on-other-sites-and-apps
[51] "Google https://myaccount.google.com/activitycontrols

43.     Furthermore, an analysis of data traffic exchanged with Google servers (summarized below) identified two key examples (one on Android and the other in Chrome) that point to Google's ability to correlate anonymously collected data with users' personal information.

### 1)     Mobile advertising identifier may get de-anonymized through data sent to Google by Android

44.     Analyses of data traffic communicated between an Android phone and Google server domains suggest a possible way through which anonymous identifiers (GAID in this case) can get associated with a user's Google Account. Figure 10 describes this process through a series of three key steps.

45.     In step 1, a "checkin" data is sent to the URL *android.clients.google.com/checkin*. This particular communication provides an Android data sync to Google servers and contains Android log information (e.g. recovery log), kernel messages, crash dumps, and other device-related identifiers. A snapshot of a partially decoded checkin request sent to Google's server from Android is shown in Figure 10.

**Figure 10: Device identifiers are sent together with account information in Android check in requests**



46.     As pointed out by the labeled boxes, through the checkin process, Android sends to Google a variety of important device-related permanent identifiers, including device MAC address, IMEI /MEID, and device

serial number. Moreover, these requests also contain the Android user's Gmail ID. The data present in checkin uploads enable Google to connect a user's personal information with Android device permanent identifiers.

47.     In step 2, the reply to the checkin request comes from the Google server. This message contains a Google services framework identifier (GSF ID)[52] that is similar to the actual "Android ID"[53] (see Table 1 for descriptions).

48.     Step 3 entails another instance of communication where the same GSF ID (from step 2) is sent to Google together with the GAID. Figure 10 shows one such data transmit to *android.clients.google.com/fdfe/bulkDetails?au=1.*

49.     Through the above three data exchanges, Google receives the information needed to connect a GAID with permanent device identifiers as well as users' Google Account IDs.

50.     These intercepted data exchanges with Google servers from an Android phone show how Google can connect anonymized information collected on an Android mobile device via DoubleClick, Analytics or AdMob tools with the user's personal identity. During the 24-hour data collection from a stationary and dormant Android phone two instances of checkin communications with Google servers were observed.  Additional analysis is needed, however, to determine if such information exchange occurs with a certain periodicity or if it is triggered by specific activities on the phones.

        **2)      DoubleClick cookie ID gets connected with user's personal information on Google Account**

51.     The previous section explained how Google can de-anonymize user identity via the passive, anonymized data it collects from an Android mobile device. This section shows how such de-anonymization can also occur on a desktop/laptop device.

52.     Anonymized data on desktops/laptops is collected via cookie-based identifiers (e.g. Cookie ID), which are typically generated by Google's ad and publisher products (e.g. DoubleClick) and stored on a user's local mass storage. The experiment presented below assessed whether Google can connect such identifiers (and hence information associated with them) with a user's personal information. This experiment involved the following ordered steps:

      1. Opened a new (no saved cookies, e.g. Private or Incognito) browser session (Chrome or other),

---

[52] "Difference between Android ID and device ID," *Stack Exchange,* Dec. 2016, available at
https://android.stackexchange.com/questions/162448/difference-between-android-id-and-device-id
[53] Patrick Ahlbrecht, "What's the difference between the GSF ID and the Android ID," *Onyxbits,* March 2016, available at
https://blog.onyxbits.de/whats-the-difference-between-the-gsf-id-and-the-android-id-208/

2. Visited a 3rd-party website that used Google's DoubleClick ad network,

3. Visited the website of a widely used Google service (Gmail in this case),

4. Signed in to Gmail.

53.     After completion of step 1 and 2, as part of the page load process, the DoubleClick server received a request when the user first visited the 3rd-party website. This request was part of a series of requests comprising the DoubleClick initialization process started by the publisher website, which resulted in the Chrome browser setting a cookie for the DoubleClick domain. This cookie stayed on user's computer until it expired or until the user manually cleared cookies via the browser settings.

54.     Thereafter, in step 3, when the user visited Gmail, they are prompted to log in with their Google credentials. Google manages identity using a "single sign on (SSO)" architecture, whereby credentials are supplied to an account service (signified by *accounts.google.com*) in exchange for an "authentication token," which can then be presented to other Google services to identify the users.  In step 4, when a user accesses their Gmail account, they are effectively signing into their Google Account, which then provides Gmail with an authorization token to verify the user's identity. [54] This process is outlined by Figure 24 in Section IX.E in the Appendix.

55.     In the last step of this sign-on process, a request is sent to the DoubleClick domain. This request contains both the authentication token provided by Google and the tracking cookie set when the user visited the 3rd-party website in step 2 (this communication is shown in Figure 11).  This allows Google to connect the user's Google credentials with a DoubleClick cookie ID. Therefore, if the users do not clear browser cookies regularly, their browsing information on 3rd-party webpages that use DoubleClick services could get associated with their personal information on Google Account.

**Figure 11: Request to DoubleClick.net includes Google's authentication token and past cookies**



---

[54] The advantage of the extra authentication step is that the user's browser can later use the same authentication token to confirm user identity on other Google services (due to this process a sign-on in any particular Google application enables an automatic sign-on all others in the same browser session).

22

56.    It has thus far been established that Google collects a wide variety of user data through its publisher and advertiser tools, without a direct knowledge of the user. While such data is collected with user-anonymous identifiers, Google has the ability to connect this collected information with a user's personal credentials stored in their Google Account.

57.    It's worth pointing out that Google's passive user data collection from 3rd-party webpages cannot be prevented using popular ad blocking tools,[55] as such tools are designed primarily to prevent the occurrence of advertisements while users browse through 3rd-party webpages.[56] The next section takes a closer look at the magnitude of such data collection.

## V.    AMOUNT OF DATA COLLECTED DURING A MINIMAL USE OF GOOGLE PRODUCTS

58.    This section examines the details surrounding Google's data collection through its publisher and advertiser services. To understand such data collection, an experiment is designed which entailed a user going through her daily life using a mobile phone (akin to "day in the life" described before), while deliberately *avoiding* the use of any direct Google products (i.e. avoiding Search, Gmail, YouTube, Maps, etc.), except for the Chrome browser.

59.    To keep the experiment as realistic as possible, various consumer usage studies[57,58] were used to form a daily usage profile of a typical mobile phone user, thereafter, any direct interactions with Google's products were omitted from the profile. Section IX.F in the Appendix describes the websites and apps used in this experiment.

60.    The experiment was replicated on both Android and iOS devices and the HTTPS data sent to Google and Apple servers were monitored and analyzed using a similar method explained in previous sections. The results are summarized in Figure 12. During the 24-hour time period (which includes the night time stationary/dormant timeframe), the majority of calls from the Android phone were made to Google's location and publisher/advertisement service domains (e.g. DoubleClick, Analytics). Google collected user location in ~450 instances, which is ~1.4x times the experiment presented in Section III.C, which involved a stationary phone.

---

[55] "How many users block Google Analytics, measured in Google Analytics," *Quantable,* Dec. 2017, available at https://www.quantable.com/analytics/how-many-users-block-google-analytics/
[56] "Ad blocking: who blocks ads, why and how to win them back," *iab.,* 2016, available at https://www.iab.com/wp-content/uploads/2016/07/IAB-Ad-Blocking-2016-Who-Blocks-Ads-Why-and-How-to-Win-Them-Back.pdf
[57] The average person visited 88 webpages per day in 2010. "Nielsen provides topline U.S. web data for March 2010," *Nielsen,* April 2010, available at http://www.nielsen.com/us/en/insights/news/2010/nielsen-provides-topline-u-s-web-data-for-march-2010.html
[58] 55% of web traffic comes from mobile devices. Eric Enge, "Mobile vs desktop usage: mobile grows but desktop still a big player in 2017," *Stone Temple,* April 2017, available at https://www.stonetemple.com/mobile-vs-desktop-usage-mobile-grows-but-desktop-still-a-big-player-in-2017/

**Figure 12: Information requests from mobile devices during a day of typical use**



61.     Google servers communicated significantly lower number of times with an iPhone device compared to Android (45% less). However, the number of calls to Google's advertising domains were similar from both devices - an expected outcome since the usage of 3rd-party webpages and apps was similar on both devices. One notable difference was that the location data sent to Google from an iOS device is practically non-existent. In the absence of Android and Chrome platforms—or the use of any other Google product—Google becomes significantly limited in its ability to track the user location.

62.     The total number of calls to Apple servers from an iOS device was much lower, just 19% the number of calls to Google servers from an Android device. Moreover, there are no ad-related calls to Apple servers, which may stem from the fact that Apple's business model is not as dependent on advertising as Google's. Although Apple does obtain some user location data from iOS devices, the volume of data collected is much (16x) lower than what Google collects from Android.

63.     Magnitude wise, Android phones communicated 11.6 MB of data per day (~350 MB per month) with Google servers. On the other hand, the iPhone device communicated just half that amount. The amount of data particularly associated with Google's ad domains remained very similar across both the devices.

64.     The iPhone device communicated an order of magnitude less data to Apple servers than what the Android device exchanged with Google servers.

65.     Overall, even in the absence of user interaction with Google's most popular applications, a user of an Android phone and the Chrome browser still sends a significant amount of data to Google, the majority of which is associated with location and calls to ad server domains. Although an iPhone user is insulated from Google's location collection in this narrow experiment, Google still captures a similar amount of ad-related data.

66.     The next section describes the data collected by Google's popular applications, such as Gmail, YouTube, Maps, and Search.

## VI.   DATA COLLECTED FROM GOOGLE'S KEY POPULAR APPLICATIONS AIMED AT INDIVIDUALS

67.     Google has dozens of constantly evolving products and services (a list is available in Table 4 in Section IX.B of the Appendix). These products are often accessed through—or associated with—a Google Account, which enables Google to directly link user activity details from its application-oriented products and services to a user profile. In addition to product usage data, Google also collects device-related identifiers and location data when Google's products and services are accessed.[59]

68.     Some of Google's applications (e.g. YouTube, Search, Gmail, and Maps) are central to the basic tasks that many users conduct daily through their desktop or mobile devices. Table 2 describes the reach of these key products. This section explains how each of these prominent applications collect user information.

**Table 2: Worldwide reach of Google's top application products**

| Product | Active users |
| --- | --- |
| Search | Greater than 1B monthly active users, 90.6% search engine market share[60] |
| YouTube | Greater than 1.8 billion logged-in monthly active users[61] |
| Maps | Greater than 1 billion monthly active users[62] |
| Gmail | 1.2 billion registered users[63] |

[59] "Google privacy and terms," *Google,* last accessed on August 15 2018, available at https://policies.google.com/privacy
[60] "Search engine market share worldwide," *StatCounter Global Stats,* April 2018, available at http://gs.statcounter.com/search-engine-market-share#monthly-201704-201804
[61] Devindra Hardawar, "YouTube gets 1.8 billion logged-in viewers monthly," *Engadget,* May 3, 2018, available at https://www.engadget.com/2018/05/03/youtube-1-8-billion-viewers/
[62] Google 10K filings with the SEC, 2017, available at https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf
[63] Motek Moyen, "Gmail is very popular but Google still won't fix a security vulnerability," *Seeking Alpha,* July 17, 2017, available at https://seekingalpha.com/article/4088241-gmail-popular-google-still-fix-security-vulnerability

## A.    Search

69.    Google Search is the most popular web search engine in the world,[64] with over 11 billion search queries per month in the United States alone.[65] In addition to serving ranked webpage results in response to users' general queries, Google operates other search-based tools, such as Google Finance, Flights, News, Scholar, Patents, Books, Images, Videos, and Hotels. Google uses its search products to collect data related to search queries, browsing history, and ad-click/purchase activity. For example, Google Finance collects information on the type of stocks users may be tracking, whereas Google Flights tracks users' travel bookings and search requests.

70.    Whenever Search is used, Google collects location data via various means of assessing locations on mobile or desktop devices, as discussed in previous sections. Google records all search activity a user conducts and links it back to their Google Account if the user is logged in. Figure 13 shows an example of information collected by Google about a user's keyword search and page visit.

**Figure 13: An example search data collection taken from user's My Activity page**



71.    In addition to being the default search engine on Chrome and Google devices, Google Search is also the default option on other 3rd-party browsers and applications through various distribution agreements. For example, Google recently became the default search engine on Mozilla's Firefox browser[66] in key geographic locations (including US and Canada), a position owned by Yahoo previously. Similarly, Apple switched from

---

[64] "Search engine market share worldwide," *StatCounter Global Stats,* April 2018, available at http://gs.statcounter.com/search-engine-market-share#monthly-201704-201804

[65] "Number of explicit core search queries powered by search engines in the United States as of January 2018 (in billions)," *Statista,* Feb. 2018, available at https://www.statista.com/statistics/265796/us-search-engines-ranked-by-number-of-core-searches/

[66] Denelle Dixon, "Firefox features Google as default search provider in the U.S., Canada, Hong Kong and Taiwan," *The Mozilla Blog,* Nov. 14, 2017, available at https://blog.mozilla.org/blog/2017/11/14/firefox-features-google-as-default-search-provider-in-the-u-s-canada-hong-kong-and-taiwan/

Microsoft's Bing to Google for Siri web search results on iOS and Mac devices.[67] Google has similar agreements in place with OEMs,[68] which helps reach mobile customers.

### B.    YouTube

72.    YouTube provides users a platform for uploading and viewing video content. It has more than 180 million users in the USA alone and has the distinction of being the second-most visited website in the US,[69] ranked only behind Google Search. Among online streaming media companies, YouTube has almost 80% market share in terms of monthly user visits (as shown in Figure 14). The amount of content uploaded and viewed on YouTube is substantial; ~400 hours of video are uploaded every minute[70] and ~1 billion hours of video are watched daily on the YouTube platform.[71]

**Figure 14: Comparison of leading multimedia websites monthly visits in the United States[72]**



73.    YouTube can be accessed by users via desktops (web browser), mobile devices (app and/or web browser), and Google Home (through a paid subscription service called YouTube Red). Google collects and stores search history, watch history, playlists, subscriptions, and comments on videos. All this information is marked with a date and time stamp of when the activity took place.

---

[67] Matthew Panzarino, "Apple switches from Bing to Google for Siri web search results on iOS and Spotlight on Mac," Sept. 25, 2017, available at https://techcrunch.com/2017/09/25/apple-switches-from-bing-to-google-for-siri-web-search-results-on-ios-and-spotlight-on-mac/

[68] "Google's Android mobile application distribution agreement with OEMs leaked, reveals lots of strict conditions," *Microsoft and Technology News,* Feb. 13, 2014, available at https://mspoweruser.com/mobile-application-distribution-agreement/

[69] "Top Sites in United States," *Alexa,* available at https://www.alexa.com/topsites/countries/US

[70] "Hours of video uploaded to YouTube every minute as of July 2015," *Statista,* July 2015, available at https://www.statista.com/statistics/259477/hours-of-video-uploaded-to-youtube-every-minute/

[71] Darrell Etherington, "People now watch 1 billion hours of YouTube per day," *TechCrunch,* Feb. 28, 2017, available at https://techcrunch.com/2017/02/28/people-now-watch-1-billion-hours-of-youtube-per-day/

[72] "Leading multimedia websites in the United States in November 2016, based on market share of visits," *Statista,* Dec. 2016, available at https://www.statista.com/statistics/266201/us-market-share-of-leading-internet-video-portals/

74.     If a user is signs into their Google Account on any Google application inside a browser (e.g. Chrome, Firefox, Safari), Google recognizes the user's identity, even if the video is accessed through a non-Google website (e.g. YouTube videos played through CNN.com). This feature allows Google to track a user's YouTube usage across multiple 3rd-party platforms. Figure 15 shows an example of YouTube data collected.

**Figure 15: An example of YouTube data collection from My Activity**



75.     Google also offers a separate YouTube product for children, known as YouTube Kids, which is intended as a "family friendly" version of YouTube with parental control features and video filters. Google collects information from YouTube Kids, including device type, operating system, unique device identifiers, log information, and details of how the service was used. Google then uses this information to deliver limited advertisements that are non-clickable, and which have restrictions on format, time length, and site-served.[73]

        **C.      Maps**

76.     Maps is Google's flagship navigation app. Google Maps can ascertain user's travel routes, speed, and places that a user visits frequently (e.g. home, work, restaurants, and businesses). This information provides Google with a window into a user's interests (e.g. food and shopping preferences), movement, and behavior.

77.     Maps uses IP address, GPS, cell signal, and Wi-Fi access point data to calculate a device's location. The latter two are collected from the device through which Maps is used and sent to Google for location assessment through its Location API. This API provides rich details about a user, including geographic coordinates, whether the user is stationary or moving, speed, and probabilistic determination of user's mode of transport (e.g. bike, car, train, etc.).

---

[73] "Advertising on YouTube Kids," *Google,* last accessed on August 15 2018, available at
https://support.google.com/youtube/answer/6168681?hl=en

78.     Maps stores a historical timeline of places visited by a user signed in to Maps using their Google account. Figure 16 shows an example of such a user's timeline.[74] The red dots indicate location coordinates captured by Maps while the user is on the move; the blue connecting lines are Maps projection of the actual route the user took.

**Figure 16: Example Google Maps "Timeline" from an actual user**



79.     The accuracy of location information captured by navigation applications enables Google to not only target ad audiences, but also helps deliver ads to users as they approach stores.[75] In addition, Google Maps uses this information to generate real-time traffic updates.[76]

### D.     Gmail

80.     Gmail stores all messages (sent/received), sender name, email address, and date/time of messages sent or received. Since Gmail acts as a central mail repository for many people, it can ascertain their interests by scanning email content, identifying merchant addresses through their promotional emails or sales receipts sent to emails, and learn about a user's plans (e.g. dinner reservations, doctor's appointments,). Since users may use their Gmail ID for other 3rd-party platforms (e.g. Facebook, LinkedIn), Gmail can scan any content that comes from them in the form of an email (e.g. notifications, messages).

81.     From its inception in 2004 until at least late 2017, Google may have scanned the contents of Gmail emails to improve ad targeting and search results, as well as filter spam. In the summer of 2016, Google went a step further and changed its privacy policy to enable it to combine formerly anonymous web-browsing data

---

[74] "My Activity," *Google*, available at https://myactivity.google.com/myactivity
[75] "The Home Depot earns 8X in-store ROI with mobile display ads," *Google*, Sept. 2016, available at
https://www.thinkwithgoogle.com/intl/en-aunz/advertising-channels/mobile/home-depot-roi-mobile-display-ads/
[76] "Google Map's real-time traffic layer…," *Spatial Unlimited*, March 2011, available at
https://shreerangpatwardhan.blogspot.com/2011/03/google-maps-real-time-traffic-layer.html

of its subsidiary DoubleClick (which serves customized ads across the Internet) with the personally-identifying data Google has through its other products, including Gmail.[77] The result was that "…the DoubleClick ads that follow people around on the web may now be customized to them based on keywords they used in their Gmail. It also meant that Google could now build a complete portrait of a user by name, based on everything they write in email, every website they visit, and the searches they conduct."[78]

82.     Toward the end of 2017, Google announced it would discontinue the practice of Gmail message-based personalization of ads.[79] Recently, however, Google clarified that it is still scanning Gmail messages for some purposes.[80]

## VII.     PRODUCTS WITH HIGH FUTURE POTENTIAL FOR DATA AGGREGATION

83.     Google has additional products that show future potential for market adoption and data collection, including AMP, Photos, Chromebook, Assistant, and Pay. Additionally, Google is able to use third party data vendors to collect user information. The following sections describe these in greater detail.

84.     There are other Google applications that may not be widely used, however for completeness, data collection through them is presented in Section VIII.B of the Appendix.

### A.     Accelerated Mobile Pages (AMP)

85.     Accelerated Mobile Pages (AMP) is an open-source initiative spearheaded by Google to enable quicker load times for websites and ads. AMP converts conventional HTML and JavaScript code into a more simplified version developed by Google[81] and caches the AMP-validated webpages in Google's network of servers for faster access.[82] AMP delivers page links through Google search results, as well as 3rd-party platforms, such as LinkedIn and Twitter. As the AMP page reports: "AMP's ecosystem includes 25 million domains, 100+ technology providers and leading platforms, that span the areas of publishing, advertising, e-commerce, local and small businesses, and more!"[83]

---

[77] Julia Angwin, "Google has quietly dropped ban on personally identifiable web tracking," *ProPublica,* Oct. 21, 2016, available at https://www.propublica.org/article/google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking
[78] Suzanne Monyak, "Google changed a major privacy policy four months ago, and no one really noticed," *Slate,* Oct. 21, 2016, available at
http://www.slate.com/blogs/future_tense/2016/10/21/google_changed_a_major_privacy_policy_and_no_one_really_noticed.html
[79] Mark Bergen, "Google will stop reading your emails for Gmail ads," *Bloomberg,* June 23, 2017, available at https://www.bloomberg.com/news/articles/2017-06-23/google-will-stop-reading-your-emails-for-gmail-ads
[80] Ben Popken, "Google sells the future, powered by your personal data," *NBC News,* May 10, 2018, available at https://www.nbcnews.com/tech/tech-news/google-sells-future-powered-your-personal-data-n870501
[81] "AMP HTML specification," *AMP,* last accessed on August 15 2018, available at https://www.ampproject.org/docs/fundamentals/spec
[82] "Load AMP pages quickly with Google AMP Cache," *Google,* last accessed on August 15 2018, available at https://developers.google.com/amp/cache
[83] "An open source effort to improve the content ecosystem for everyone," *AMP*, last accessed on August 15 2018, available at https://www.ampproject.org/learn/overview

86.     Figure 17a describes the steps leading to the delivery of an AMP page accessed via Google Search. Please note that the provider of content through AMP does not need to provide their own a cache server, as this is something that Google provides for securing optimal delivery speeds to users. Since the AMP cache is hosted on Google servers, when an AMP link is clicked through Google Search, the domain address shows up from a Google.com domain rather than from a publisher's own domain. This is shown through snapshots taken from an example keyword search in Figure 17b.

**Figure 17: Regular web page vs AMP page**



87.     Users can access content from multiple publishers whose articles appear in search results while navigating the AMP carousel, all while staying within the Google domain. In effect, the AMP cache operates as a content delivery network (CDN) owned and operated by Google.

88.     By creating an open-source tool, complete with a CDN, Google has attracted a large user base for serving mobile websites and advertisements that constitute a significant amount of information (e.g. the content itself, page views, ads served, and information on whom that content is being delivered). All of this information

is available to Google by virtue of it residing on Google's CDN servers, thereby providing Google far more data than it otherwise could access.

89.     AMP is highly user-centric, i.e.  it delivers a much faster and improved browsing experience to users without the clutter of pop-ups and sidebars. Although AMP is a major shift in the way content is cached and delivered to users, Google's privacy policy associated with AMP is quite general.[84] In particular, Google is able to collect webpage usage information (e.g. server logs and IP address) from requests sent to AMP cache servers. Moreover, regular pages are converted into AMP via the use of AMP APIs.[85] Google can therefore access applications or websites ("API clients") and use any submitted information through the API in accordance with its general policies.[86]

90.     Like regular webpages, AMP webpages track usage data via Google Analytics and DoubleClick. In particular, they collect information on page data (e.g. domain, path, and page title), user data (e.g. client ID, time zone), browsing data (e.g. unique page view ID and referrer), browser info, and interaction and events data.[87] Although Google's modes of data collection have not changed with AMP, the *amount* of data collected has increased since visitors are spending 35% more time on web content that loads with Google AMP versus standard mobile pages.[88]

## B.     Google Assistant

91.     Google Assistant is a virtual personal assistant accessed through mobile phones and smart devices. It is a popular virtual assistant, alongside Apple's Siri, Amazon's Alexa, and Microsoft's Cortana.[89] Google Assistant is accessed through the home button of mobile devices with Android 6.0 or higher. It can also be accessed through a dedicated app on iOS devices[90], as well as smart speakers, such as Google Home. Google Assistant performs numerous functions, such as sending texts, looking up emails, controlling music, searching photos, getting answers to questions about the weather or traffic, and controlling smart home devices.[91]

92.     Google collects all Google Assistant queries, whether audio or typed. It also collects the location where the query occurred. Figure 18 shows the content of a query stored by Google. In addition to its use on Google's

---

[84] "AMP on Google privacy and terms," *Google,* last accessed on August 15 2018, available at https://developers.google.com/amp/cache/policies

[85] "Link to AMP content," *Google,* last accessed on August 15 2018, available at https://developers.google.com/amp/cache/use-amp-url

[86] "Google APIs terms of service," *Google,* last accessed on August 15 2018, available at https://developers.google.com/terms

[87] "Tracking accelerated mobile pages (AMP)," *Google,* last accessed on August 15 2018, available at https://support.google.com/analytics/answer/6343176?hl=en&ref_topic=7378717

[88] John Saroff, "The new speed of mobile engagement," *Chartbeat,* June 5, 2017, available at http://blog.chartbeat.com/2017/06/05/the-new-speed-of-mobile-engagement

[89] Tripp Mickle, "'I'm not sure I understand' – how Apple's Siri lost her mojo," *The Wall Street Journal,* June 7, 2017, available at https://www.wsj.com/articles/apples-siri-once-an-original-now-struggles-to-be-heard-above-the-crowd-1496849095

[90] "Google Assistant," *Google,* last accessed on August 15 2018, available at https://assistant.google.com/platforms/phones/

[91] "Google Assistant," *Google,* last accessed on August 15 2018, available at https://assistant.google.com/platforms/phones/

Home speakers, Google Assistant is enabled on various other speakers produced by 3rd-parties (e.g. Bose wireless headphones). Overall, Google Assistant is available on more than 400 million devices.[92] Google can collect data via all these devices since Assistant queries go through Google's servers.

**Figure 18: Example of detail collected from Google Assistant query**



C.      **Photos**

93.      Google Photos is used by more than 500 million people globally and stores more than 1.2 billion photos and videos every day.[93] Google records the time and GPS coordinates for every photo taken. Google uploads images to the Google cloud and conducts image analysis to identify a broad set of objects, such as modes of transportation, animals, logos, landmarks, text, and faces.[94] Google's face detection capabilities even enable the detection of emotional states associated with faces in photos uploaded and stored in their cloud.[95]

94.      Google Photos conducts this image analysis by default when the product is used, but will not distinguish between individual people unless the user gives the app permission.[96] If a user provides permission for Google to group similar faces together, Google identifies different people using facial recognition

[92] Scott Huffman, "New devices and more: what's in store for the Google Assistant this year." *Google,* Jan. 9, 2018, available at https://www.blog.google/products/assistant/new-devices-more-google-assistant-ces-2018
[93] Anil Sabharwal, "500 million people using Google Photos, and three new ways to share," *Google,* May 17, 2017, available at https://blog.google/products/photos/google-photos-500-million-new-sharing/
[94] "Cloud vision API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/vision/
[95] "Cloud vision API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/vision/
[96] "Find people, things, and places in your photos," *Google,* last accessed on August 15 2018, available at https://support.google.com/photos/answer/6128838?co=GENIE.Platform%3DAndroid&hl=en

technology and enables users to share photos based on its "face grouping" technology.[97,98] Examples of Google's image classification capabilities with and without face grouping permission from the user are shown in Figure 19. Google uses Photos to assemble a vast trove of identifying facial information, which has become the subject of recent lawsuits[99] by certain states.

**Figure 19: Example image recognition in Google Photos**



D. **Chromebook**

95.     Chromebook is Google's tablet computer running on the Chrome operating system (Chrome OS) which allows users to access applications on the cloud. While Chromebook holds a very small fraction of the PC market, it's growing rapidly, especially in computing devices for the K-12 category, where it held 59.8% of the market in Q2 2017.[100] Since Chromebook is accessed through a Google Account, a user is always signed on to all of Google's applications while accessing them on a Chromebook device. Chromebook's data collection is similar to the Google Chrome browser, which is covered in section II.A. Chromebooks also allow cookies from Google and 3rd-party domains to track user activity, similar to any other notebook or PC device.

96.     Many K-12 schools use Chromebooks to access Google's products via its GSuite for Education service. Google states that data collected from such use is not used for targeted advertising.[101] Students are shown ads, however, if they use additional services (such as YouTube or Blogger) on Chromebooks provided through their educational institutions.

---

[97] Anil Sabharwal, "500 million people using Google Photos, and three new ways to share," *Google,* May 17, 2017, available at https://blog.google/products/photos/google-photos-500-million-new-sharing/
[98] "Share your Google Photos library with a partner," *Google,* last accessed on August 15 2018, available at https://support.google.com/photos/answer/7378858#filterbyface
[99] Amy Korte, "Federal court in Illinois rules biometric privacy lawsuit against Google can proceed," *Illinois Privacy,* March 8, 2017, available at https://www.illinoispolicy.org/federal-court-in-illinois-rules-biometric-privacy-lawsuit-against-google-can-proceed/
[100] "Mobile PC sales in to US K-12 education starting to slow as the market looking toward replacement cycles," *Future Source Consulting,* Dec. 6, 2017, available at https://www.futuresource-consulting.com/Press-Q3-2017-Mobile-PC-Sales-in-Education-1217.html
[101] "Chromebooks privacy and security," *Google,* last accessed on August 15 2018, available at https://drive.google.com/file/d/0B__OTXR_u3RbcFB3Y01xUVhaalU/view

### E.      Google Pay

97.      Google Pay is a digital payments service that allows users to store credit card, bank account, and PayPal information to make payments in stores, on websites, or within apps using Google Chrome or a connected Android device.[102] Pay is the means by which Google collects verified user address and phone numbers, as these are associated with charge accounts. In addition to personal information, Pay also collects transaction information, such as date and amount of transaction, merchant location and description, type of payment used, descriptions of the items purchased, any photo that a user choose to associate with the transaction, names and email addresses of the seller and buyer, the user's description of the reason for transaction, and any offers associated with the transaction.[103] Google treats this information as personal information under its general privacy policy. It therefore can use this information across its products and services for enriched advertising.[104] Google's privacy settings allow for such a use of collected data by default.[105]

### F.      User data collected from 3rd-party data vendors

98.      Google collects 3rd-party data in addition to information they collect directly from their services and applications. For example, in 2014 Google announced that it would begin tracking sales in brick-and-mortar stores by buying credit and debit card transaction data. Such data covered 70% of all credit and debit transactions in the US.[106]  It contained the name of the individual, as well as the time, location, and amount of their purchase.[107]

99.      3rd-party data is also used to support Google Pay, including verification services, information arising from Google Pay transactions at merchant locations, payment methods, identity of card issuers, information regarding access to balances in the Google payment account, carrier and operator billing information, and consumer reports.[108] For sellers, Google may obtain information from credit bureaus or business information services.

100.      Although the 3rd-party user information that Google currently receives is limited in scope, it has already attracted the attention of governmental authorities. For example, the FTC announced an injunction against

---

[102] "Google Pay," *Google,* last accessed on August 15 2018, available at https://pay.google.com/about/
[103] "Google Payments privacy notice," *Google*, Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en
[104] "Google Payments privacy notice," *Google*, Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en
[105] "Google payments center," *Google,* available at https://payments.google.com/payments/home?page=privacySettings#privacySettings:
[106] "Google plans to track credit card spending," *BBC,* May 26, 2017, available at http://www.bbc.com/news/technology-40027706
[107] Elizabeth Dwoskin and Craig Timberg, "Google now knows when its users go to the store and buy stuff," *The Washington Post,* May 23, 2017, available at https://www.washingtonpost.com/news/the-switch/wp/2017/05/23/google-now-knows-when-you-are-at-a-cash-register-and-how-much-you-are-spending/?utm_term=.281715f8e215
[108] "Google Payments privacy notice," *Google*, Dec. 14, 2017, available at https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldo=0&ldt=privacynotice&ldl=en

Google in July 2017 with respect to how Google's collection of consumer purchasing data infringes upon electronic privacy.[109] The injunction challenges Google's claim that they can protect consumer privacy throughout the process using their algorithm. Although further action has not yet occurred, the FTC injunction is an example of public concern with the amount of consumer data that Google collects.

## VIII.   CONCLUSION

101.     Google counts a large percentage of the world's population as its direct customers, with multiple products leading their markets globally and many surpassing 1 billion monthly active users. These products are able to collect user data through a variety of techniques that may not be easily graspable by a general user.  A major part of Google's data collection occurs while a user is not directly engaged with any of its products. The magnitude of such collection is significant, especially on Android mobile devices. And while such information is typically collected without identifying a unique user, Google distinctively possesses the ability to utilize data collected from other sources to de-anonymize such a collection.

---

[109] FTC Complaint, request for investigation, injunction, and other relief submitted by The Electronic Privacy Information Center, available at https://epic.org/privacy/ftc/google/EPIC-FTC-Google-Purchase-Tracking-Complaint.pdf

## IX.    APPENDIX

### A.    Characterization of active vs passive data collection from "day in the life" of a user

Table 3: Active and passive Google data collection

| Number | Description | Active collection | Passive collection |
|--------|-------------|-------------------|--------------------|
| 1 | Gets ready in the morning while listening to Google Play Music | • Music interests | • Morning location |
| 2 | Drops kids off at daycare before commuting to work | | • Walked to a daycare location |
| 3 | Checks the news while commuting to work on the subway | | • Traveling on the subway<br>• News pages visited |
| 4 | Searches for cold medicine while on the subway | • Records search queries | • Traveling on the subway |
| 5 | Walks from subway to work | | • Commute path to work address |
| 6 | Uses Maps to find a new lunch spot | • Destination entered into Maps | • Dining interests |
| 7 | Gets coffee from Starbucks using her Starbucks app | | • Walks to a Starbucks<br>• Opens Starbucks app |
| 8 | Schedules doctor's appointment, Google creates a Calendar event from the confirmation email | | • Event details of the doctor appointment |
| 9 | Walks to Walgreens and purchases cold medicine using Google Pay | • Purchase details | • Walks to a Walgreens |
| 10 | Takes an Uber home from work | | • Commute path to home address via car<br>• Use of Uber app |
| 11 | Looks for hotels on Expedia for a weekend trip | | • Webpage interaction via DoubleClick cookies & Google Analytics |
| 12 | Uses Google Home to play music for her kids | • Google Home search query | • Location of Google Home |

| | |
|---|---|
| **13** Watches videos on YouTube | • YouTube activity |

**B.** **List of Google products**

**Table 4: List of Google Products**

| Category | Products |
|---|---|
| **1. Applications** | **Watch, Listen and Play**<br>YouTube, Google Play Music, Chromecast, Google Play Movies and TV |
| | **Browser**<br>Chrome |
| | **Search**<br>Search, Finance, Flights, News, Scholar, Patents, Books, Images, Videos, Hotels |
| | **Navigation**<br>Maps, Waze |
| | **Productivity tools**<br>Drive, Docs, Sheets, Slides, Forms |
| | **Social & communications**<br>Gmail, Allo, Hangouts, Duo, Google+, Translate |
| | **Storage and organization**<br>Photos, Contacts, Calendar, Keep |
| | **Personal Assistant**<br>Google voice assistant |
| **2. Operating systems** | **Android**<br>Phones, Wear, Auto |
| | **Chrome**<br>Chromebook |
| **3. Services** | Fiber, DNS, Project Fi, Google pay |
| **4. Devices** | Home, Wi-Fi router, Chromecast, Nest, Daydream View |

**C.** **Data collection from other prominent Google products**

a) Google Play Music and Play Movies and TV

38

102.     Google Play Music, Play Movies and TV are on-demand services that offer streaming of music, podcasts, TV shows, and movies. These services can be thought of as the Google equivalent of Apple iTunes. Like YouTube, these services collect information about user search, bought/rent/played content, information about users' geography (through IP address), and device information.

b)     <u>Waze</u>

103.     Waze got acquired by Google in 2013 and operates as a Google subsidiary. In contrast to Maps, Waze is a crowd-sourced app where user-supplied data (such as GPS location coordinates, travel times, traffic info, accidents, police monitoring, blocked roads, and construction) is analyzed to provide routing and real-time travel condition updates. In addition to location information collected through the mobile device, Waze collects information about use of its services from the device Waze is installed on, including mobile device name, operating system, web page visits, information viewed on app, app content use/created, and ads viewed and clicked.

104.     Waze works like a social network and provides users the ability to befriend other users and create an online community of local drivers.[110] Users can link their phone's contact list, Facebook, or Twitter accounts, which Waze then uses to match with friends on platforms who are also using Waze's service. Overall, Waze gives Google the ability to access more real-time user data, as well as information on acquaintances that may or may not be using a Google Account.

c)     <u>Google Docs and Drive</u>

105.     Google's productivity tools (Docs, Sheets, Slides, Forms, and Drive – which are part of the broader "G Suite" of products) are cloud-based applications used by both individuals and enterprises. Google's G Suite privacy policies[111] prohibit Google from scanning stored data for advertising purposes on enterprise versions. In contrast, the free versions of these tools are governed by Google's general privacy policy, so Google may access the information for ad targeting.

106.     After an individual registers for a Google Account, Google provides free storage space (currently 15GB) on Google Drive to share across products including Gmail, Photos, and Docs. Google's Terms of Service indicate that Google retains the license to use the stored data in variety of ways, including reproducing,

---

[110] J.D. Biersdorfer, "Getting social with Waze," *The New York Times,* Sept. 20, 2017, available at
https://www.nytimes.com/2017/09/20/technology/personaltech/getting-social-with-waze.html
[111] "Google Cloud help, privacy," *Google,* last accessed on August 15 2018, available at
https://support.google.com/googlecloud/answer/6056650?hl=en

modifying, communicating, and publishing.[112] Although all user data stored in Google Drive is encrypted, it's not a "zero-knowledge encryption"[113] since Google manages the data encryption key.

<div align="center">d)    <u>Video chat and social messaging apps</u></div>

107.    Google Hangouts is a communication platform, akin to Skype, and a part of Google's G Suite cloud-connected apps. Users can start and join video conferences or group conversations from the Hangout app available on Android and iOS, through a web browser, from the Hangouts desktop app or Chrome extension, and from other Google products (e.g. Gmail and Calendar).[114] Google stores details of these exchanges (including conference call and conversation time stamps), participant information, and message content. These details are available to users and can be downloaded via the Google Takeout tool.[115] Figure 20 shows some data recorded from a Google Hangouts conversation, including participant names, participant IDs, and the contents of the conversation.

**Figure 20: Google Takeout recordings of a Google Hangouts Conversation**



108.    In addition to the enterprise-focused Hangouts, Google also offers an instant messaging app called Allo, which is available for Android and iOS or through web browsers.[116] Google records and stores all messages communicated through Allo by default (unless the user invokes incognito mode).[117]

---

[112] "Google Drive terms of service," *Google,* last accessed on August 15 2018, available at https://www.google.com/drive/terms-of-service

[113] Fergus O'Sullivan, "What exactly is zero-knowledge in the cloud and how does it work?," *Cloudwards,* June 16, 2017, available at https://www.cloudwards.net/what-exactly-is-zero-knowledge-in-the-cloud-and-how-does-it-work

[114] "GSuite learning center," *Google,* last accessed on August 15 2018, available at https://gsuite.google.com/learning-center/products/hangouts/get-started/#!/

[115] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1

[116] Sean Keach, "Google Allo just got a major upgrade – but do we really need it?," *Trusted Reviews,* Aug. 16, 2017, available at http://www.trustedreviews.com/news/google-allo-3261336

[117] Russell Brandom, "Google backs off on previously announced Allo privacy feature," *The Verge,* Sept. 21, 2016, available at https://www.theverge.com/2016/9/21/12994362/allo-privacy-message-logs-google

109.     Google offers an app called Google Duo that is a dedicated mobile video chat app. It is available both on Android and iOS, but not on desktop/laptop computers. Users can call or video chat each other and even connect with users on the Android operating system who have not downloaded the app.[118] Once installed, Google Duo has access to a user's profile data, contacts, camera, microphone, Wi-Fi connection information, and device ID and call information.[119] Google also stores the time stamps of when the apps are used and provides this info to the users via Google Takeout.

e)     Google+

110.     Google+ is a social media network launched in 2011 as a competitor to Facebook. Although Google does not release statistics on Google+'s active users, it is now primarily a place for niche communities.[120] A user can choose to follow other users, organize the users they follow into groups (e.g. best friends vs. work colleagues), start "Communities," or join existing ones (e.g. "Photography enthusiasts"). Posts from followed users and communities then appear in the user's home feed.

111.     Google Takeout shows several types of Google+ data that Google stores. Google compiles vCards from the profiles of all the people a user follows (in Takeout, this information is contained within the "Google+ Circles" folder). Google also collects in HTML format all content posted by a user, which is contained in the "Google+ Stream" folder of Takeout, as shown in Figure 21. Posted photos also are saved within Google Photos.

**Figure 21: Example of Google+ posted content saved by Google**



f)     Translate

112.     Google Translate is a free machine translation service supporting over 100 languages that is available on the web and through apps for Android and iOS. It is also integrated into Google Assistant and Google Chrome, as well as being available to 3rd-party developers through a paid API.[121] Altogether, it serves more than 500 million monthly users.[122] If users have the Google Translate app on their phone, they can use the app to

---

[118] Swapna Krishna, "Google Duo allows you to call people who don't have the app," *Engadget,* Jan. 12, 2018, available at https://www.engadget.com/2018/01/12/google-duo-call-android-users-without-app
[119] Google informs the user of this access when the user downloads the app.
[120] Karissa Bell, "Google+ isn't dead and these are the people astill using it the most," *Mashable,* Jan. 18, 2017, available at https://mashable.com/2017/01/18/who-is-using-google-plus-anyway/#_lP0PXr.eiqZ
[121] "Google Cloud, pricing," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/translate/pricing
[122] Gideon Lewis-Kraus, "The great A.I. awakening," *The New York Times,* Dec. 14, 2016, available at https://www.nytimes.com/2016/12/14/magazine/the-great-ai-awakening.html

translate languages within other apps, such as WhatsApp.[123] Although Google states that it does not track Google Translate web queries[124]—and these queries do not appear in a user's Search history or elsewhere in Google Takeout—Google's privacy policy does allow it to store them for short period of time and occasionally for longer period for debugging and other testing.[125]

g)     Calendar

113.     Google Calendar is a scheduling tool that enables users to keep track of their daily and weekly activities. It is widely used on both desktop and mobile devices, with more than 500 million downloads from the Google Play Store.[126] Personal information, such as an individual's name and contact information, is often associated with a Calendar user.

114.     By using calendars, users provide Google with details (such as the time, location, and contact information) for all participants of an event. Google states that the app has access to "read calendar events plus confidential information."[127] As part of this information collection, Google reads and stores the email addresses of all members included in a calendar event, regardless of their Google affiliation.[128] As long as one person on a calendar invitation is using Google Calendars, therefore, Google records the contact information for every other person on the invitation.

h)     Keep

115.     Google Keep is a note-taking tool that allows the user to take notes that sync between devices associated with their Google account. Keep has been downloaded more than 100 million times from the Google Play Store.[129] Google collects and stores all contents of the notes, as well as the time they were created.[130] Figure 22 shows Google Keep notes recorded by Google. Google scans and classifies the notes that are created based on their contents. Examples of classification categories are food, places, and travel.

---

[123] "Google Translate," *Google,* available at https://translate.google.com/intl/en/about
[124] "Google Translate help," *Google,* last accessed on August 15 2018, available at
https://support.google.com/translate/answer/6142479?co=GENIE.Platform%3DDesktop&hl=en&oco=0
[125] "Access to the Google Cloud API," *Google,* last accessed on August 15 2018, available at https://cloud.google.com/translate/faq
[126] "Google Calendar," *Google Play Store,* last accessed on August 15 2018, available at
https://play.google.com/store/apps/details?id=com.google.android.calendar
[127] "Google Calendar," *Google Play Store,* last accessed on August 15 2018, available at
https://play.google.com/store/apps/details?id=com.google.android.calendar
[128] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1
[129] "Google Keep," *Google Play Store,* last accessed on August 15 2018, available at
https://play.google.com/store/apps/details?id=com.google.android.keep&hl
[130] "Download your data," *Google,* available at https://takeout.google.com/settings/takeout?pli=1

**Figure 22: Example of Google Keep notes, accessed from Google take out**

```
        </style></head>
<body><div class="note"><div class="heading"><div class="meta-icons">

</div>
Apr 26, 2018, 11:06:04 AM</div>

<div class="content">Grocery list:<br>- pasta<br>- tomatoes<br>- lettuce <br>- salad
dressing <br>- salmon <br>- lemon<br>- capers <br>- Bread<br>- butter<br>- milk<br>-
eggs<br>- bacon<br>- OJ<br>- </div>

</div></body></html>
```

        i)        Chromecast

116.    Like Apple TV, Google Chromecast is a device that acts as an interface to watch videos from a variety of applications (e.g. Netflix, YouTube, Hulu, Play Store), as well as to project video from smartphones and computers onto larger televisions and monitors. Every Cast device has a unique identifier that is associated with a user's Google Account during registration.

117.    Google uses Chromecast to collect system activity, crash reports, and usage data, such as details about the use of casting functionality of devices, including the apps and domains that are casted.[131] Chromecast uses Google Cast, which is a software platform that enables seamless streaming of audio/video between devices on the same network.[132] In addition to a multitude of other Google products (e.g. Google Home) that use Cast functionality, the Cast platform is also used by 3rd-party devices using "Chromecast built-in" (e.g. TVs and video gaming consoles[133]), that offer similar functionality. Google also collects usage data and crash reports from 3rd-party Cast devices.[134]

        j)        Google DNS

118.    Google launched a free Domain Name System (DNS)[135] service, called Google Public DNS, in December of 2009. Google DNS is aimed at improving web browsing experience by enhancing speed, security, and accuracy.[136] In December 2014, Google Public DNS was reported to be serving 400 billion responses.[137]

119.    To detect abuse (such as DDoS attacks) and to fix problems, Google Public DNS keeps a temporary log of full IP addresses that it deletes within 24-48 hours. For longer-term efforts to debug and prevent abuse,

---

[131] "Chromecast help," *Google,* last accessed on August 15 2018, available at
https://support.google.com/chromecast/answer/6076570?hl=en
[132] "Google Cast," *Google,* last accessed on August 15 2018, available at https://developers.google.com/cast
[133] "What is Google Cast and Chromecast," *Shield,* last accessed on August 15 2018, available at https://shield.nvidia.com/blog/what-is-googlecast-chromecast
[134] "Chromecast help," *Google,* last accessed on August 15 2018, available at
https://support.google.com/chromecast/answer/6076570?hl=en
[135] DNS services translate domain names into IP addresses and thus are necessary to navigate the web.
[136] "Google Public DNS," *Google,* last accessed on August 15 2018, available at https://developers.google.com/speed/public-dns/faq
[137] "Google Public DNS and location-sensitive DNS responses," *Google Webmaster Central Blog,* Dec. 15, 2014, available at https://webmasters.googleblog.com/2014/12/google-public-dns-and-location.html

Google keeps non-personally-identifiable city/metro-level location information for two weeks, and randomly samples a small subset for permanent storage.[138]

k)      Google Wi-Fi router

120.    Google began rolling out a mesh Wi-Fi router, Google Wi-Fi, in December 2016. Mesh routers allow a user to extend access to a Wi-Fi network across a larger area with additional connected routers. By December of 2017, Google Wi-Fi became the best mesh Wi-Fi system in the USA according to data from the NPD Group.[139] The information it collects[140] falls into the following three categories:

- ▪ Cloud services, which include broadcast information from connected devices (such as a device name like "Jane's iPhone"), infer information from connected devices (such as manufacture's name like Samsung), connection status, data transfer speed and historical consumption, network settings and information about wireless environment (e.g. other routers in the area). It does collect connected device information and data usage.

- ▪ Wi-Fi stats, which include anonymous data usage, crash reports and device performance information.

- ▪ Wi-Fi app stats, which includes usage and crash reports.

121.    According to Google, the Wi-Fi router does not track the websites visited or collect the content of network traffic.[141]

l)      Nest

122.    In January 2014, Google acquired Nest, which is a home automation company.[142] Nest's product line includes many smart home devices, including thermostats, cameras, doorbells, alarm systems, locks and smoke/CO detectors.[143] In addition, Nest lists more than 100 3rd-party products that can integrate with Nest, ranging from refrigerators to beds.[144]

123.    Nest devices collect a variety of information, including not only users' direct adjustments to the devices, but also data on the environment within the home. For example, the Nest Learning Thermostat collects data (such as temperature, humidity, ambient light, and movement) and thus knows when people are at home and even in what rooms.[145] When a user connect 3rd-party products that integrate with Nest, Nest shares

---

[138] "Google Public DNS," *Google,* available at https://developers.google.com/speed/public-dns/privacy
[139] Jillian D'Onfro, "The surprising use case that has made Google Wifi one of the company's sleeper hits," *CNBC,* Dec. 18, 2017, available at https://www.cnbc.com/2017/12/18/google-wifi-mesh-technology-sales-stats.html
[140] "Google Wifi help," *Google,* last accessed on August 15 2018, available at https://support.google.com/wifi/answer/6246642?hl=en
[141] "Google Wifi help," *Google,* last accessed on August 15 2018, available at https://support.google.com/wifi/answer/6246642?hl=en
[142] "Google to acquire Nest," *Alphabet,* Jan. 13, 2014, available at https://abc.xyz/investor/news/releases/2014/0113.html
[143] Nest homepage, available at https://nest.com/
[144] "Works with Nest," Nest, last accessed on August 15 2018, available at https://nest.com/works-with-nest/
[145] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/

information with those parties but informs the user about what information is being shared.[146] Nest does not share data with other 3rd-parties, such as partner energy or insurance companies, without first gaining a user's consent.[147]

124.      On its website, Nest states that Nest accounts and Google accounts are not linked (unless a user chooses to integrate with Google products and services) and that Google does not sell Nest data. Recently, however, data sharing concerns have arisen from an announcement[148] by Google concerning the merger of Nest and Google hardware teams.[149] In addition, concerns have been raised in the media about the future links between Google, Nest, and 3rd-party electrical and insurance companies.[150]

<center>m)      Google Fiber</center>

125.      Google Fiber is a broadband, Internet protocol (IP) TV, and Voice-Over-Internet-Protocol (VOIP) phone service connecting users via ultra-high-speed fiber-optic networks that extend all the way to their residences,[151] known as Fiber Internet, Fiber TV, and Fiber Phone, respectively. Google's efforts to deploy extensive networks of fiber optic cables were hampered by physical costs and negotiations with local municipalities. Google Fiber is therefore now expanding to new cities via Webpass (an Internet service provider acquired by Google), which delivers similarly high speeds through existing wireless and Ethernet technologies.[152]

126.      Fiber Internet collects technical information connected to a user's Google Account, but does not share account details with other Google properties without the user's additional consent.[153] Fiber Internet requires user consent before associating a user's Google Account with other information, such as sites visited or content of communications.[154]

---

[146] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/
[147] "Privacy statement for Nest products and services," *Nest,* last accessed on August 15 2018, available at https://nest.com/legal/privacy-statement-for-nest-products-and-services/
[148] Rick Osterloh, "Nest to join forces with Google's hardware team," *Nest,* Feb. 7, 2018, available at https://blog.google/topics/hardware/nest-join-forces-googles-hardware-team/
[149] Leo Kelion, "Google-Nest merger raises privacy issues," *BBC,* Feb. 8, 2018, available at http://www.bbc.com/news/technology-42989073
[150] Casey Johnston, "What Google can really do with Nest, or really, Nest's data," *Ars Technica,* Jan. 15, 2014, available at https://arstechnica.com/information-technology/2014/01/what-google-can-really-do-with-nest-or-really-nests-data/
[151] Ryan Waniata, "Comcast killer: Google Fiber touches down in Austin with its new TV and internet devices," *Digital Trends,* Dec. 3, 2014, available at https://www.digitaltrends.com/home-theater/google-fiber-tv-hands-on
[152] Nick Statt, "Google Fiber-owned Webpass is bringing its wireless gigabit internet to Denver," *The Verge,* Feb. 22, 2017, available at https://www.theverge.com/2017/2/22/14703142/google-fiber-webpass-denver-expansion-gigabit-Internet and https://gizmodo.com/what-happened-to-google-fiber-1792440779
[153] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[154] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy

127.     Fiber TV collects information on programs and applications used and associates it with the user's Google Account.[155] Likewise, Fiber Phone collects usage information (e.g. logs of call history, voicemails, SMS messages, and recorded conversations) and associates it with a user's Google Account.[156] Although this information is not shared with 3rd-parties unless a user provides consent, information may be shared with 3rd-parties for external processing and for legal reasons. While Google does not explicitly mention the use of Fiber TV/phone for ad targeting, its general privacy policy does allow the use of collected personal information for targeting purposes. Moreover, Google states it will share Google Fiber user's non-personal identifiable information publicly with content providers, publishers, advertisers, and/or connected sites.[157]

### D.     Method for location traffic monitoring

128.     To capture the requests being sent to Google server domains from a mobile phone, our study employs a "man-in-the-middle" (MITM) technique using the "MITM Proxy" tool.  While previous studies that analyze similar data employed a Wi-Fi hotspot to act as an intermediary between mobile phone and Google servers, the present study uses a virtual private network (VPN) on a mobile phone to analyze data sent through Wi-Fi networks as well as the cellular network.

**Figure 23: Example VPN setup used to analyze data shared with Google**



The specific steps performed to configure and conduct the experiments are described below:

1.     The mobile devices used in the data collection experiments[158] were factory reset to ensure that no previously installed applications or adjusted settings affected traffic to and from the phone. Upon

---

[155] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[156] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[157] "Google Fiber privacy notice," *Google,* last accessed on August 15 2018, available at https://fiber.google.com/legal/privacy
[158] Devices include an LG X Power with Android 6.0 version installed and an iPhone 5 with iOS 10.3.3 installed

reactivation, the devices were configured with the suggested default settings. The devices were then equipped with new SIM cards to obtain new cell phone numbers.

2.  A VPN connection was setup with a remote proxy computer using VPN settings/functionality provided by the phone operating system. An IPsec/LT2P with a PSK authentication setup was chosen. The VPN configuration enabled the remote proxy to intercept and record the data transmitted from the mobile phones. Due to the nature of the type of signals emitted from a phone, the VPN set up is unable to intercept voice and SMS data sent from the mobile devices. However, it captured all TCP traffic to and from the device, including HTTP and HTTPS traffic.

3.  HTTPS software certificates were installed on the mobile devices to enable decryption of the data traffic captured. VPN configuration allowed the routing of all HTTP and HTTPS traffic through the mitmproxy program[159] using iptables.[160] This program then performed SSL decryption using its own certificate to decrypt the traffic and dump it to HAR (HTTP Archive) files for analysis.

4.  Analysis of decrypted HTTP and HTTPS traffic data mainly involved categorization of server requests into key segments using the request header info. Tables 5 and 6 detail the traffic headers that were identified as transmitting data to/from Google and Apple.

129.   In specific cases, requests to Google were further decoded to analyze the information that was passed at a more granular level. One specific request to Google that was further decoded was the "Google location API," designated by the /loc/m/api endpoint. The location specifications were reverse engineered by removing the message header and decoding the compressed protobuf message.[161] The decoded location API contained Wi-Fi and network scans that were used to determine the location of the device.

**Table 5: Notable Google server domains communicating with mobile phone devices**

| Segment | Pathway header | Description |
| --- | --- | --- |
| Ad domains | doubleclick.net | Sends data to and from DoubleClick |
| | google-analytics.com | Sends data to and from GA |
| | googletagmanager.com | Implements webpage tags |
| | googletagservices.com | Implements webpage tags |
| | googlesyndication.com | Retrieves and displays ads |
| | adservice.google.com | Calls the AdWords network |

---

[159] https://mitmproxy.org/

[160] "iptables(8) – Linux man page," *Die.net,* available at https://linux.die.net/man/8/iptables

[161] Additional information on the decoding method can be found here: "Reverse engineering: Google Location protobuf specifications," *Esther Codes,* accessed March 2018, available at https://web.archive.org/web/20180213201547/https://esther.codes/reverse-engineering-google-location-gms-specification/

|  | google.com/ads/ | Ad measurement and user lists |
|---|---|---|
|  | gstatic.com | Loads ads on the page |
|  | google.com/adsense | Calls AdSense |
|  | google.com/pagead | Serves page ads |
| Location | google.com/loc/m/api | Sends back nearby network and Wi-Fi information |
|  | googleapis.com/userlocation/v1/reports | Sends back user movement information (i.e. walking, running, biking, driving, etc.) |
|  | googleapis.com/placesandroid | Matches determined location with businesses, etc. (Google Places) |
|  | maps.googleapis.com/maps | Retrieves detailed information based on a place ID or a place search |
|  | clients4.google.com/glm/mmap | Sends user's location information to retrieve map data |
| Google Play API | play.googleapis.com/log/batch | Device activity logging information |
|  | play.googleapis.com/play/log/timestamp | Updates a cookie and reports the time |
|  | play.googleapis.com/play/log?format | Play Store/Services log upload |
| Device auth. and upload | googleapis.com/batch | Device information and updates |
|  | clients4.google.com/chrome-sync | Chrome browser synchronization |
|  | googleapis.com/experimentsandconfigs | testing/experiment config download |
|  | android.clients.google.com/backup/backup | Device backup |
|  | android.clients.google.com/auth | Device authorization |
|  | android.clients.google.com/checkin | Device identifying information and activity |
|  | android.clients.google.com/ | Authentication with Google services |
| Other | cdn.ampproject.org | Retrieving data from the AMP CDN |
|  | google.com/xjs | Communication with Google Search |
|  | google.com/gen | Communications with Google Search that transmit cookie data |
|  | clients4.google.com/ukm | Chrome speed information |
|  | inbox.google.com/sync | Mail synchronization |
|  | mail.google.com/mail/ads | Mail ad refresh |
|  | google.com/complete/search | Sends character level information to enable the search autocomplete function |
|  | Googleapi.com/ | Other Google APIs include Google services (i.e. YouTube, Calendar, etc.) |

48

| | Google.com/ | Other miscellaneous calls to Google's domain |
|---|---|---|

**Table 6: Notable Apple server domains communicating with mobile phone devices**

| Segment | Pathway header | Description |
|---|---|---|
| Location | geosrc=wifi,73.xxx&kb_ime=en_US&key=beagle1626&latlng=40.xxx,-74.xxx&locale=en_US | Passes location coordinates back to Apple when using the browser |
| | cl2.apple.com | Calls to the core location server |
| | gs-loc.apple.com | Apple location services |
| App store | us-east-1.blobstore.apple.com/apple | Communicates with the Apple store; includes Apple ID |
| Device auth. and upload | mesu.apple.com/assets/com_apple_MobileAsset | Details mobile configurations and settings |
| | bookmarks.icloud.com | Syncs mobile behavior with the cloud |
| | ckdatabase.icloud.com/api | Communicates device authorization tokens and syncs with iCloud |
| | keyvalueservice.icloud.com/sync | Syncs mobile device behavior |
| Other | api-glb-nyc.smoot.apple.com/ | Miscellaneous Apple APIs |
| | gsp64-ssl.ls.apple.com | Provides device information when the phone accesses websites via Safari |
| | gspe35-ssl.ls.apple.com/geo_manifest/dynamic/config?application=geod | Loads map tiles, but does not pass location information |
| | configuration.apple.com/configurations/pep/config/geo/networkDefaults | Communicates the settings of the location collection tools |

E.    **Google sign in authentication sequence**

**Figure 24: Authentication sequence**



### F.    Usage profile for mobile data collection experiments

130.    A usage profile was designed to simulate a typical user's interaction with their mobile phone throughout the course of a day. A variety of statistics that describe peoples' online behavior and mobile phone usage were integrated to create the profile, as described below.

131.    The designed profile visited 45 webpages during the course of the day based on website visit statistics from a 2010 Nielsen study, which indicates that the average person visits 88 webpages per day[162] and a 2017 Stone Temple study, which states that roughly 50-55% of webpage visits come from mobile devices.[163] The 45 webpage visits were evenly split between 5 top non-Google news and sports domains.[164] When the phone was not being used to visit webpages the browser was left running in the background of the phone. The resulting usage profile represents a conservative user as the number of webpage visits per day is likely to have increased since the 2010 Nielsen study.

132.     The usage profile also included a variety of non-Google mobile applications. Top non-Google applications were selected from the social media, shopping, travel, and health categories. These applications included Facebook, Instagram, Snapchat, Pinterest, Amazon Shopping, Walmart, Starbucks, Yelp, and Six Pack

---

[162] "Nielsen provides topline U.S. web data for March 2010," Nielsen, April 2010, available at
http://www.nielsen.com/us/en/insights/news/2010/nielsen-provides-topline-u-s-web-data-for-march-2010.html
[163] Eric Enge, "Mobile vs desktop usage: mobile grows but desktop still a big player in 2017," *Stone Temple,* April 2017, available at
https://www.stonetemple.com/mobile-vs-desktop-usage-mobile-grows-but-desktop-still-a-big-player-in-2017/
[164] The domains selected were New York Time, CNN, The Guardian, ESPN, and Crickbuzz. The websites were identified by using Alexa's lists, available at https://www.alexa.com/topsites/category

in 30 Days. These apps were opened periodically throughout the day to simulate a typical user who spends approximately 2.5 hours in mobile app per day, as reported by eMarketer.[165]

### G.    Past articles that relate to Google's data collection practices

**Table 7: Summary of other Google data collection studies**

| Title | Relevant findings | Author, Date |
|---|---|---|
| AP Exclusive: Google tracks your movements, like it or not[166] | Google is tracking users' location even when location services are disabled | Ryan Nakashima August 2018 |
| Australian regulator investigates Google data harvesting from Android phones[167] | Google "harvest" about 1GB of data from Android devices per month | Oracle May 2018 |
| How to Keep Google From Owning Your Online Life[168] | It is very difficult for the average consumer to avoid Google products | WSJ, May 2018 |
| Google tracking phones even when they are disconnected?[169] | Google tracks phones even when phones are "disconnected" (no SIM cards, airplane mode, Wi-Fi off) | Fox News, Feb. 2018 |
| Google collects Android users' locations even when location services are disabled[170] | Google collects Android location when location services are turned off | Quartz Nov. 2017 |

---

[165] "eMarketer reveals new estimates for mobile app usage," *eMarketer,* April 2017, available at
https://www.emarketer.com/Article/eMarketer-Unveils-New-Estimates-Mobile-App-Usage/1015611
[166] Ryan Nakashima, "AP Exclusive: Google tracks your movements, like it or not," *AP*, August 13, 2018, available at https://apnews.com/828aefab64d4411bac257a07c1af0ecb
[167] Anne Davis, "Australian regulator investigates Google data harvesting from Android phones," *The Guardian,* May 13, 2018, available at https://www.theguardian.com/technology/2018/may/14/australian-regulator-investigates-google-data-harvesting-from-android-phones
[168] David Pierce, "How to Keep Google From Owning Your Online Life," *The Wall Street Journal,* May 8, 2018, available at https://www.wsj.com/articles/how-to-keep-google-from-owning-your-online-life-1525795372
[169] Brett Larson, "Google tracking phones even when they are disconnected?," *Fox News,* Feb 11, 2018, available at http://video.foxnews.com/v/5731183327001/?#sp=show-clips
[170] Keith Collins, "Google collects Android users' locations even when location services are disabled," *Quartz,* November 17, 2017, available at https://qz.com/1131515/google-collects-android-users-locations-even-when-location-services-are-disabled/

| | | |
|---|---|---|
| Google is permanently nerfing all Home Minis because mine spied on everything I said 24/7[171] | The Google Home mini was saving recording when the device was not activated with "OK Google" *Google claims to have resolved the issue | Artem Russakovskii Oct. 2017 |
| Online Tracking: A 1-million-site Measurement and Analysis[172] | Google can track users ~80% of websites using its cookies. | Princeton University 2016 |
| Why Do Android Smartphones Guzzle the Most Data?[173] | Android devices consume more data (2.2GB/month) than other smartphones | Ericsson Dec. 2013 |
| Data leakage from Android smartphones[174] | Android passes anonymous IDs along with devices IDs such as Mac address and IMIE | Lasse Øverlier June 2012 |

## H.    Clarifications

133.    Our understanding of the data being sent to Google through its Android platform is limited to Android 6.0 version only. This study does not capture any updates/patches that may have been implemented on later versions that may affect Android's communications with the Google servers. While new versions of Android are currently present in the market, Android 6.0 is still the most widely used version.[175] Additionally, while we took utmost precaution for classifying the pathway headers by their purpose (e.g., location, ad, device upload, app store), it is possible that some headers may serve multiple purposes (e.g., ad as well as location). These aspects are not captured in our study. Consequently, the description presented for these headers may not be exhaustive with respect to the purpose they serve.

## I.    About the author

134.    Professor Douglas Schmidt is a software system expert with over 30+ years conducting, supervising, and researching the development of software for distributed middleware systems and their applications in

---

[171] Artem Russakovskii, "Google is permanently nerfing all Home Minis because mine spied on everything I said 24/7," *Android Police,* October 10, 2017, available at https://www.androidpolice.com/2017/10/10/google-nerfing-home-minis-mine-spied-everything-said-247/

[172] Englehardt, Steven, and Arvind Narayana, "Online Tracking: A 1-million-site Measurement and Analysis," *ACM CCS,* 2016, available at http://randomwalker.info/publications/OpenWPM_1_million_site_tracking_measurement.pdf

[173] Brian Chen, "Why Do Android Smartphones Guzzle the Most Data?," *The New York Times,* December 31, 2013, available at https://bits.blogs.nytimes.com/2013/12/31/why-do-android-smartphones-guzzle-the-most-data/

[174] Lasse Øverlier , "Data leakage from Android smartphones," *Norwegian Defense Research Establishment,* June 6, 2012, available at https://www.ffi.no/no/Rapporter/12-00275.pdf

[175] "Mobile & Tablet Android Version Market Share Worldwide," *statcounte*r, available at http://gs.statcounter.com/android-version-market-share/mobile-tablet/worldwide

networking and security, machine learning and smart-grid, design patterns, and more. He has authored 10+ books and 600+ papers that have been collectively cited over 38,000 times. Professor Schmidt has over 30 years of experience teaching these concepts both in-classroom and online to over 200,000 students in total.

135.    Professor Schmidt has participated in 20+ prior expert engagements spanning expert report production and oral testimony both through deposition and at trial. His consulting work has ranged from patent and copyright litigation matters to advising both private and public entities on various issues relating to software infrastructure and design. He earned his PhD and MS in Computer Science from the University of California, Irvine in 1994 and 1990, respectively.

136.    Professor Schmidt is currently the Cornelius Vanderbilt Professor of Computer Science at Vanderbilt University. Prior to Vanderbilt, he held several directorial and C-level positions in both academic and industry settings including the Software Engineering Institute at Carnegie Mellon University, the Information Technology Office at the Defense Advanced Research Project Agency (DARPA),  the Federal Government, as well as several technology start-ups.

# EXHIBIT 19

nature    scientific reports    articles    article

# SCIENTIFIC REPORTS

Search        E-alert        Submit        Login

Help us understand how you use our websites. Take part in our 30 minute study now.

Open Access | Published: 25 March 2013

# Unique in the Crowd: The privacy bounds of human mobility

Yves-Alexandre de Montjoye, César A. Hidalgo, Michel Verleysen & Vincent D. Blondel

*Scientific Reports* **3**, Article number: 1376 (2013)

**25k** Accesses | **507** Citations | **1982** Altmetric | Metrics

## Abstract

We study fifteen months of human mobility data for one and a half million individuals and find that human mobility traces are highly unique. In fact, in a dataset where the location of an individual is specified hourly and with a spatial resolution equal to that given by the carrier's antennas, four spatio-temporal points are enough to uniquely identify 95% of the individuals. We coarsen the data spatially and temporally to find a formula for the uniqueness of human mobility traces given their resolution and the available outside information. This formula shows that the uniqueness of mobility traces decays approximately as the 1/10 power of their resolution. Hence, even coarse datasets provide little

anonymity. These findings represent fundamental constraints to an individual's privacy and have important implications for the design of frameworks and institutions dedicated to protect the privacy of individuals.

Download PDF

## Introduction

Derived from the Latin Privatus, meaning "withdraw from public life," the notion of privacy has been foundational to the development of our diverse societies, forming the basis for individuals' rights such as free speech and religious freedom[1]. Despite its importance, privacy has mainly relied on informal protection mechanisms. For instance, tracking individuals' movements has been historically difficult, making them de-facto private. For centuries, information technologies have challenged these informal protection mechanisms. In 1086, William I of England commissioned the creation of the Doomsday book, a written record of major property holdings in England containing individual information collected for tax and draft purposes[2]. In the late 19th century, de-facto privacy was similarly threatened by photographs and yellow journalism. This resulted in one of the first publications advocating privacy in the U.S. in which Samuel

**Affiliations**

1. Massachusetts Institute of Technology, Media Lab, 20 Ames Street, Cambridge, MA 02139, USA

   Yves-Alexandre de Montjoye & César A. Hidalgo

2. Université catholique de Louvain, Institute for Information and Communication Technologies, Electronics and Applied Mathematics, Avenue Georges Lemaître 4, B-1348, Louvain-la-Neuve, Belgium

   Yves-Alexandre de Montjoye, Michel Verleysen & Vincent D. Blondel

3. Harvard University, Center for International Development, 79 JFK Street, Cambridge, MA 02138, USA

   César A. Hidalgo

4. Instituto de Sistemas Complejos de Valparaíso, Paseo 21 de Mayo, Valparaíso, Chile

   César A. Hidalgo

5. Massachusetts Institute of Technology, Laboratory for Information and Decision Systems, 77 Massachusetts Avenue, Cambridge, MA 02139, USA

   Vincent D. Blondel

**Contributions**

Y.-A. de M. designed and performed experiments, analyzed data and wrote the paper; C.A.H. designed experiments, developed analytic tools and wrote the paper; M.V. and V.D.B. designed experiments and wrote the paper.

## Ethics declarations

**Competing interests**

The authors declare no competing financial interests.

## Electronic supplementary material

**Supplementary InformationOnline Support Material for: Unique in the Crowd: The privacy bounds of human mobility**

## Rights and permissions

This work is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License. To view a copy of this license, visit http://creativecommons.org/licenses/by-nc-nd/3.0/

Reprints and Permissions

## About this article

**Cite this article**

de Montjoye, Y., Hidalgo, C., Verleysen, M. *et al.*
Unique in the Crowd: The privacy bounds of human
mobility. *Sci Rep* **3,** 1376 (2013).
https://doi.org/10.1038/srep01376

Received01 October 2012Accepted04 February 2013

Published25 March 2013

DOIhttps://doi.org/10.1038/srep01376

**Share this article**

Anyone you share the following link with will be able
to read this content:

Get shareable link

Provided by the Springer Nature SharedIt content-
sharing initiative

**Subjects**

Applied mathematics • Applied physics • Computational
science • Statistics

# Further reading

# EXHIBIT 20

# MIT News
#### ON CAMPUS AND AROUND THE WORLD



MIT researchers find that the growing practice of compiling massive datasets about people's movement patterns for urban planning and development research may, in fact, put people's private data at risk — even if that data is anonymized.

# The privacy risks of compiling mobility data

## Merging different types of location-stamped data can make it easier to discern users' identities, even when the data is anonymized.

**Rob Matheson | MIT News Office**
**December 7, 2018**

A new study by MIT researchers finds that the growing practice of compiling massive, anonymized datasets about people's movement patterns is a double-edged sword: While it can provide deep insights into human behavior for research, it could also put people's private data at risk.

Companies, researchers, and other entities are beginning to collect, store, and process anonymized data that contains "location stamps" (geographical coordinates and time stamps) of users. Data can be grabbed from mobile phone records, credit card transactions, public transportation smart cards, Twitter accounts, and mobile apps. Merging those datasets could provide rich information about how humans travel, for instance, to optimize transportation and urban planning, among other things.

But with big data come big privacy issues: Location stamps are extremely specific to individuals and can be used for nefarious purposes. Recent research has shown that, given only a few randomly selected points in mobility datasets, someone could identify and learn sensitive information about individuals. With merged mobility datasets, this becomes even easier: An agent could potentially match users trajectories in anonymized data from one dataset, with deanonymized data in another, to unmask the anonymized data.

### PRESS MENTIONS

MIT researchers have found that it's easy to reidentify anonymized data compiled in massive datasets, reports Kelsey Campbell-Dollaghan for *Fast Company*. The findings show that urban planners, tech companies and designers, "who stand to learn so much from these big urban datasets," need to be careful about whether all that data could be combined to deanonymize it."

**FAST COMPANY**

A new study by MIT researchers provides evidence that compiling massive anonymized datasets of people's movement patterns can put their private data at risk, reports the Xinhua news agency. The researchers found "data containing 'location stamps' – information with geographical coordinates and time stamps – could be used to easily track the mobility trajectories of how people live and work."



In a paper published today in *IEEE Transactions on Big Data*, the MIT researchers show how this can happen in the first-ever analysis of so-called user "matchability" in two large-scale datasets from Singapore, one from a mobile network operator and one from a local transportation system.

The researchers use a statistical model that tracks location stamps of users in both datasets and provides a probability that data points in both sets come from the same person. In experiments, the researchers found the model could match around 17 percent of individuals in one week's worth of data, and more than 55 percent of individuals after one month of collected data. The work demonstrates an efficient, scalable way to match mobility trajectories in datasets, which can be a boon for research. But, the researchers warn, such processes can increase the possibility of deanonymizing real user data.

"As researchers, we believe that working with large-scale datasets can allow discovering unprecedented insights about human society and mobility, allowing us to plan cities better. Nevertheless, it is important to show that identification is possible, so people can be aware of potential risks of sharing mobility data," says Daniel Kondor, a postdoc in the Future Urban Mobility Group at the Singapore-MIT Alliance for Research and Technology.

"In publishing the results — and, in particular, the consequences of deanonymizing data — we felt a bit like 'white hat' or 'ethical' hackers," adds co-author Carlo Ratti, a professor of the practice in MIT's Department of Urban Studies and Planning and director of MIT's Senseable City Lab. "We felt that it was important to warn people about these new possibilities [of data merging] and [to consider] how we might regulate it."

The co-authors of the study are Behrooz Hashemian, a postdoc at the Senseable City Lab, and Yves-Alexandre de Montjoye of the Department of Computing and Data Science Institute of Imperial College London.

### Eliminating false positives

To understand how matching location stamps and potential deanonymization works, consider this scenario: "I was at Sentosa Island in Singapore two days ago, came to the Dubai airport yesterday, and am on Jumeirah Beach in Dubai today. It's highly unlikely another person's trajectory looks exactly the same. In short, if someone has my anonymized credit card information, and perhaps my open location data from Twitter, they could then deanonymize my credit card data," Ratti says.

Similar models exist to evaluate deanonymization in data. But those use computationally intensive approaches for re-identification, meaning to merge anonymous data with public data to identify specific individuals. These models have only worked on limited datasets. The MIT researchers instead used a simpler statistical approach — measuring the probability of false positives — to efficiently predict matchability among scores of users in massive datasets.

In their work, the researchers compiled two anonymized "low-density" datasets — a few records per day — about mobile phone use and personal transportation in Singapore, recorded over one week in 2011. The mobile data came from a large mobile network operator and comprised timestamps and geographic coordinates in more than 485 million records from over 2 million users. The transportation data contained over 70 million records with timestamps for individuals moving through the city.

## RELATED

Paper: "Towards matching user mobility traces in large-scale datasets"

Future Urban Mobility Group

Senseable City Lab

Singapore-MIT Alliance for Research and Technology

Department of Urban Studies and Planning

School of Architecture and Planning

## ARCHIVES



Holding law-enforcement accountable for electronic surveillance



Private browsing gets more private



A future of shared mobility



Privacy challenges

The probability that a given user has records in both datasets will increase along with the size of the merged datasets, but so will the probability of false positives. The researchers' model selects a user from one dataset and finds a user from the other dataset with a high number of matching location stamps. Simply put, as the number of matching points increases, the probability of a false-positive match decreases. After matching a certain number of points along a trajectory, the model rules out the possibility of the match being a false positive.

Focusing on typical users, they estimated a matchability success rate of 17 percent over a week of compiled data, and about 55 percent for four weeks. That estimate jumps to about 95 percent with data compiled over 11 weeks.

The researchers also estimated how much activity is needed to match most users over a week. Looking at users with between 30 and 49 personal transportation records, and around 1,000 mobile records, they estimated more than 90 percent success with a week of compiled data. Additionally, by combining the two datasets with GPS traces — regularly collected actively and passively by smartphone apps — the researchers estimated they could match 95 percent of individual trajectories, using less than one week of data.

**Better privacy**

With their study, the researchers hope to increase public awareness and promote tighter regulations for sharing consumer data. "All data with location stamps (which is most of today's collected data) is potentially very sensitive and we should all make more informed decisions on who we share it with," Ratti says. "We need to keep thinking about the challenges in processing large-scale data, about individuals, and the right way to provide adequate guarantees to preserve privacy."

To that end, Ratti, Kondor, and other researchers have been working extensively on the ethical and moral issues of big data. In 2013, the Senseable City Lab at MIT launched an initiative called "Engaging Data," which involves leaders from government, privacy rights groups, academia, and business, who study how mobility data can and should be used by today's data-collecting firms.

"The world today is awash with big data," Kondor says. "In 2015, mankind produced as much information as was created in all previous years of human civilization. Although data means a better knowledge of the urban environment, currently much of this wealth of information is held by just a few companies and public institutions that know a lot about us, while we know so little about them. We need to take care to avoid data monopolies and misuse."

---

Topics:    **Research    Privacy    Computer science and technology**

**Mobile devices    Data    Technology and society**

**Urban studies and planning    School of Architecture and Planning**

About This Website

This Website is maintained by the MIT News Office, part of the Office of Communications.

MIT News Office • Building 11-400
Massachusetts Institute of Technology • Cambridge, MA 02139-4307

# EXHIBIT 21



## Official Blog

Insights from Googlers into our products, technology, and the Google culture

---

# Updating our privacy policies and terms of service

January 24, 2012

In just over a month we will make some changes to our privacy policies and Google Terms of Service. This stuff matters, so we wanted to explain what's changing, why and what these changes mean for users.

First, our privacy policies. Despite trimming our policies in 2010, we still have more than 70 (yes, you read right … 70) privacy documents covering all of our different products. This approach is somewhat complicated. It's also at odds with our efforts to integrate our different products more closely so that we can create a beautifully simple, intuitive user experience across Google.

So we're rolling out a new main privacy policy that covers the majority of our products and explains what information we collect, and how we use it, in a much more readable way. While we've had to keep a handful of separate privacy notices for legal and other reasons, we're consolidating more than 60 into our main Privacy Policy.

Regulators globally have been calling for shorter, simpler privacy policies—and having one policy covering many different products is now fairly standard across the web.

These changes will take effect on March 1, and we're starting to notify users today,
including via email and a notice on our homepage.



What does this mean in practice? The main change is for users with Google Accounts.
Our new Privacy Policy makes clear that, if you're signed in, we may combine
information you've provided from one service with information from other services. In
short, we'll treat you as a single user across all our products, which will mean a simpler,
more intuitive Google experience.

Our recently launched personal search feature is a good example of the cool things
Google can do when we combine information across products. Our search box now
gives you great answers not just from the web, but your personal stuff too. So if I
search for restaurants in Munich, I might see Google+ posts or photos that people have
shared with me, or that are in my albums. Today we can also do things like make it easy
for you to read a memo from Google Docs right in your Gmail, or add someone from
your Gmail contacts to a meeting in Google Calendar.

But there's so much more that Google can do to help you by sharing more of your
information with … well, you. We can make search better—figuring out what you really
mean when you type in Apple, Jaguar or Pink. We can provide more relevant ads too.

For example, it's January but maybe you're not a gym person, so fitness ads aren't that useful to you. We can provide reminders that you're going to be late for a meeting based on your location, your calendar and an understanding of what the traffic is like that day. Or ensure that our spelling suggestions, even for your friends' names, are accurate because you've typed them before. People still have to do way too much heavy lifting, and we want to do a better job of helping them out.

Second, the Google Terms of Service—terms you agree to when you use our products. As with our privacy policies, we've rewritten them so they're easier to read. We've also cut down the total number, so many of our products are now covered by our new main Google Terms of Service. Visit the Google Terms of Service page to find the revised terms.

Finally, what we're not changing. We remain committed to data liberation, so if you want to take your information elsewhere you can. We don't sell your personal information, nor do we share it externally without your permission except in very limited circumstances like a valid court order. We try hard to be transparent about the information we collect, and to give you meaningful choices about how it is used—for example our Ads Preferences Manager enables you to edit the interest categories we advertise against or turn off certain Google ads altogether. And we continue to design privacy controls, like Google+'s circles, into our products from the ground up.

We believe this new, simpler policy will make it easier for people to understand our privacy practices as well as enable Google to improve the services we offer. Whether you're a new Google user or an old hand, please do take the time to read our new privacy policy and terms, learn more about the changes we're making and understand the controls we offer.

Posted by Alma Whitten, Director of Privacy, Product and Engineering

  

Labels: privacy

# EXHIBIT 22

# Where Even the Children Are Being Tracked

nytimes.com/interactive/2019/12/21/opinion/pasadena-smartphone-spying.html

Charlie Warzel                                                                    December 21, 2019

**On Nov. 19, 2016,** kids in tow, Margie Homer drove from her home. She pulled into the lot of the Pasadena Waldorf School in Altadena, Calif., at 10:26 a.m. It was a gorgeous, clear morning, and she and hundreds of others walked among the bales of hay and suits of armor decorating the grounds for the annual holiday Elves' Faire. At 12:49 p.m. she pulled out of the lot, heading back down East Mariposa Street the way she came.

All afternoon the city hummed in every direction. Across town, K. was en route to a lunch at Din Tai Fung, a Taiwanese restaurant in Arcadia where he'd arrive at 1:34 p.m. for a 54-minute lunch. M. stopped at Pasadena City College briefly, then made a trip to Home Depot. Others, like C. and J., went to church. There were evening errands: After a day with family, A. popped into a CVS at 6:57 p.m. C. took an evening trip to Costco. T. made a stop at AutoZone in Rosemead. Hundreds more shopped, ate, walked in the park, visited doctors' offices and coffee shops, and a few checked into hotels at odd hours.

The only thing out of the ordinary for the good people of Pasadena, Calif., about this particular Saturday is that three years later and 3,000 miles away in a newsroom, Times Opinion watched their every move unfold all over again. Minute by minute and inch by inch.

We pieced together some stories from Pasadena over a period of several months. Our eye in the sky wasn't a network of traffic cams or satellites but data exhaust spewing from smartphone apps buried in the pockets and purses of unsuspecting Americans.

Connecting location pings across Pasadena, Calif., revealed skeins of activity.

The Times Privacy Project was given access to a data set with more than 50 billion location "pings" from the phones of more than 12 million Americans across several major cities. Each piece of information came down to a set of coordinates in time. The result is a tapestry of movement laid across a city grid — like the computer game SimCity, only real.

This granular location data — the kind that is collected by hundreds of mobile apps and then shared with dozens of location data brokers — may seem like a catalog of the mundane. But the aggregate is closer to total surveillance — an exact record of the rhythms of a living, breathing community.

Freaked Out?
3 Steps to <u>Protect Your Phone</u>

Modern data surveillance relies on the ease of gathering but also the capacity to analyze giant sets of numbers. Run a set of numbers through a computer and the data becomes far more personal and invasive. Data points become a diary. A cluster of pings inside a secure facility reveals clues to the secretive role of an aerospace engineer. Visits to places of worship, trips to Planned Parenthood, a late-night visit to a bail bondsman — all collected in perpetuity and logged forever to be analyzed, traded and monetized. Each mark of latitude and longitude tells the story of the triumphs and tribulations of a life.

Americans would never consent to a government directive that all citizens carry a device that broadcast, in real time, their physical location and archived that information in repositories that could be shared among powerful, faceless institutions. Instead, Americans have been lulled into doing it voluntarily by misleading companies.

If a mobile phone is turned on, chances are its location is collected in a spreadsheet somewhere. What does it feel like to see that archive? We went to Pasadena to find out.

A home in Pasadena, Calif.

**Take away the temperate,** cloudless days, the 90,000-plus people who pack the Rose Bowl at the start of each year and the imposing presence of the San Gabriel Mountains to the north, and Pasadena could be anywhere. Which is, in part, why we chose Pasadena. The data doesn't discriminate — it's collected from every town and city in America. Situated 11 miles northeast of downtown Los Angeles and in the county of the same name, Pasadena is both of the city and not. Hollywood celebrities live there, but mostly to escape the crush of the Greater Los Angeles sprawl.

The city changes by the block. Palm-tree-lined streets with manicured lawns give way to suburban sprawl, drive-through liquor stores and laundromats. There are wildfires and gentrification. NASA and Caltech map the depths of the universe from here, while the public school district tries to provide a soft landing for a large influx of foster children.

Dan Paige, a Los Angeles County sheriff's deputy, has to look after all of it. As a member of the city's Homeless Outreach, Search and Rescue, and the Community Emergency Response Team, he's accustomed to being the person doing the tracking. But without his knowledge a series of apps on his phone had been silently, scrupulously relaying his location. When we emailed to say we were in town and had a map of his movements, Mr. Paige agreed to meet. He didn't bother providing the station's address. "Hopefully with that data you have, you can track my exact location," he wrote.

A number of apps on Dan Paige's phone tracked his movements without his knowledge.

Mr. Paige took over managing the Sheriff's Station social media accounts in 2012, and so he carries two phones and an iPad most of the time. In a dimly lit room where we met, he drummed his fingers on his county-issue iPhone 6 and let out a resigned laugh as we showed him a detailed map of his movements over a few months: shuttling to the dry cleaners, then to lunch downtown followed by a stop at Search and Rescue headquarters and finally to a E.M.T. training at a Glendale community college. When we showed him the thick red lines drawing a direct route from the police station to his home, he winced.

"It is a little surprising," he confessed. As a law enforcement officer, he was concerned about possible threats against him and his family. In his line of work, any record of his home, as well as of the stores and restaurants he frequents, is a vulnerability.

Mr. Paige is not a stranger to technology and privacy. He meticulously strips photos of their metadata before posting them to the sheriff's department's Twitter or Facebook accounts. He checks his permissions and helps educate fellow officers. But though he turns location services off on most of his apps, he's aware that it takes only one slip-up to transmit his exact coordinates — like everyone, he's only as secure as the weakest link in his chain of downloaded apps. "Whenever you agree to an app, there's those eight pages of two-point font to read and, yeah, I'm guilty of not reading — just hit 'accept' and roll the dice," he said.

As they go about their daily lives, many Pasadena residents we spoke with, like the rest of us, frequent locations whose populations for one reason or another could be vulnerable — because they attend mosques or synagogues or work at secure facilities, like NASA's Jet Propulsion Laboratory. We plucked one scientist at the lab out of the data, and when we tracked him down in real life and explained how we did it, he was alarmed. "Somebody who might want to get some information from [the lab] for instance, they might target me," the scientist told us. "This will be a treasure trove for any spying agency, I would presume." He asked that we preserve his anonymity in this story.

Smartphone apps buried in the pockets of unsuspecting Americans track movements everywhere, from motels to workplaces to homes to gas stations.

For Mr. Paige, seeing his location map laid out before him crystallized the risks to the community he has sworn to protect. He mused about the judges he knew in town, the prosecutors, the Hollywood celebrities and even the clergy whom someone might want to target. "If you were to compile a list of all the people that you feel could be vulnerable, it would probably be quite a few groups," he told us.

All of it seemed, to him, more than a little out of control. "You have that feeling of it being out of your hands," he said.

**Among the most sensitive** and vulnerable populations under Mr. Paige's guard is the student body at John Muir High, a labyrinth of classrooms tucked against the San Fernando Freeway. When we arrived, the din from a nearby on-ramp was drowned out by the Muir drumline, which was putting the finishing touches on a routine for the playoff football game against Chaffey High School that evening. The principal, Lawton Gray, was presiding over it all, wearing a Mustangs T-shirt for the occasion.

At Muir, 79 percent of the students are listed by the Pasadena school district as "socioeconomically disadvantaged," and Dr. Gray, who is fiercely protective of the kids, has no shortage of concerns. He does home visits to help students who are struggling with their school work or their family lives.

We went into the school, sat down with Dr. Gray at a table in his office and pulled up the dataset for John Muir High — roughly 80 cellphones pinging across a six-month period. His eyes widened and he put his elbows on the table for a closer look at the laptop screen. "Wait, they're tracking individual cell phones? Oh, that's scary," he said. His eyes intensely scanned the screen. At first, he wasn't sure what was in front of him. He stopped on a particular clustering of pings, peppered across Muir High School and the surrounding area. "Wait. This isn't just everybody? This is for one person?" Yes, we told him. His voice went hushed. "Oh, shit."

After a minute, he exhaled, and referred to a certain movie from 20 years ago that we also find ourselves thinking a lot about these days. "This is almost like 'Enemy of the State,'" he said.

Lawton Gray, a high school principal, was startled to learn that people in his school were being tracked.

His thoughts went to the kids he knew who were having trouble with an abusive parent. "I just think about those families," he said, letting out a short, exasperated sigh. "If there's child abuse or there's something going on and this parent has access to find out where this

kid is even though they're not supposed to. That's what bothers me the most. Because I do know those situations."

Many parents probably aren't aware of this, but there are only weak rules and regulations prohibiting the location tracking of minors. Many terms-of-service agreements for apps prohibit people younger than 13 from creating accounts, but it's really up to the kids and their families to enforce such rules. And with technology now everywhere in the classroom — much of it, like laptops, provided by some school districts — parents may not be aware how connected their children really are.

Dr. Gray zoomed out to see one device — very likely carried by a Muir student — and its lengthy data trail, a tangle of lines traversing the greater Los Angeles area. "There are no valid reasons that someone can tell me right now as to why they need to collect this data for people that are under 18 years old," he said.


John Muir High School in Pasadena. Currently there are only weak rules and regulations prohibiting the location tracking of minors.

Paging through an entire city's location data is disorienting. Initially, there's the surprise at the ease of pulling needles out of the digital haystack. Draw a box around any given location, isolate a date or time and voilà — the bird's-eye details of a life sprawl out before you. The first thing to notice is the granularity — precise movements, sometimes down to the inch. The precision is what feels most unnerving. Watching employees move from the cafeteria to their office and then idling in the parking lot feels less like a justifiable marketing insight than it does a pillar of the panopticon.

At the spreadsheet level, the notion of location tracking is abstract, almost a thought experiment. Corporations, hungry for Big Data, view mapping every move as an aggregation. But as you drive through Pasadena's quiet sun-drenched streets, the surveillance becomes real. From this vantage, a location data map of Pasadena — or any town — takes on a darker quality. Each device and its pings are a detailed diary of a given day and also a dossier: intelligence collected on neighbors, parishioners or a fellow traveler in the produce section of the grocery store. Sanctified spaces like synagogues, churches and mosques are transformed from sacred gathering places into revealing data points. But such data are a blunt instrument, an inference or educated guess as to one's identity. Show up someplace once and you're forever associated with it in a database someplace, context be damned. We saw single visits to spaces where patrons probably thought their trip was lost to time and masked in the cover of night: a stroll into the Church of Scientology storefront, a late-night stop at a massage parlor. Now, forever, those visits are recorded in a database and often tied directly to a home address, viewable by anyone with access.

The collective nature of privacy has even made its way to local law enforcement. "It's a concern for everybody," John Perez, Pasadena's chief of police, told us. He suggested a leak of such data could even turn neighbors against one another. "It's going to start destroying relationships with families and people. At the end of the day, we're going to be destroyed by it — and can we put it back together?"

Americans don't have the vocabulary to adequately describe the experience and pervasiveness of digital surveillance. When we showed up on doorsteps, laptop in hand to inform people that their movements had been captured, sold and eventually supplied to us, many didn't know what to make of it. Shocked? In theory, yes. And yet many also assumed they'd signed their data away long ago. Upset? Sometimes. They felt violated, but what could they really do about it? They were, when we visited them, alive and well, so how bad could it be? Many tried to describe a feeling but were unable to find the right words.

"I definitely don't like it," Linda Keavy, a schoolteacher, told us as she stood on her doorstep one Sunday afternoon. "I don't know why they need that. And I don't know, I kind of get frustrated in that everything is about someone making money off of everything."

"As sad as it is, it's kind of expected, I think," said Luis Chavez, an emergency-room technician. "I'm sure a lot of people don't know that, they're just downloading some candy app, they have no idea." Mr. Chavez traced his data path and rattled off explanations for the pings. A trip to see a cousin. Commutes to the hospital. A few trips to the Subaru dealership where he bought his car.

Luis Chavez's data recorded his trips to work and to see family.

Mr. Chavez, like others we spoke to, seemed mostly unconcerned about himself but worried more about others, like the patients who come into his emergency room and might be anxious about their privacy, which in theory is protected by the Health Insurance Portability and Accountability Act. When we asked him what he'd say to companies that collected the information, he was at a loss for words. "I'm just wondering, where does it go? It's too late to reclaim it now — it's just permanently out there. I don't know what I'd say."

When confronted with their digital trail, people can get defensive. On doorsteps across Pasadena, people assured us they'd already taken steps to protect themselves. They'd heard about Facebook's Cambridge Analytica scandal, and they notice when they're followed around the internet with targeted ads. They weren't surprised, but many couldn't suppress a sheepishness when we explained that we'd been looking at them, as if they'd done something wrong or been exposed for sloppy digital hygiene. Despite our assurances that there's little way to escape at least some location tracking, many seemed to blame themselves for getting caught up in a dataset they had no idea existed.

**Some people we identified** just shrugged off the news. They saw themselves as unimportant, and so they thought there was little risk anyone would ever go to the trouble of de-anonymizing their location data and using it against them. Some simply couldn't imagine harm coming from such information, even when the data exposed the most personal corners of their lives.

Like most digitally savvy folks, Ed Honowitz, a former small-business owner, figured that precious pieces of his data were ricocheting around unknown servers. He told us that while the location map trail in our dataset was alarming to see, he wasn't quite surprised. "It's not like 'Oh my God, I had no idea this existed.'"

One man we identified in the data — M. — was so concerned about his privacy that he insisted we not identify him by name and meet him not at his house, which is in a gated community, but at his place of worship. Of all the data trails we tracked in the region, his told the most poignant story. It showed a series of visits to a hospital by two phones, one of which eventually disappeared from the data. The pings chronicled the progression of an illness that eventually claimed the life of M.'s wife.

He squinted at the information spread out on the laptop before him. The movements of his late wife were cherished memories for him. Did it seem wrong that they could also be corporate intelligence to a marketer? M. just shrugged. The trials of her illness, as painful and private as they were at the time, were summed up in a public obituary. Ultimately, he argued, the data was already out in the world. It had already traveled so far. So what if it was now staring back at him through the screen?

Robert Howell, a professor of philosophy at Southern Methodist University, has identified what he calls the Peeping Tom Effect to express the indifference many people feel toward data surveillance. He says we have a visceral reaction only "when we think about living, breathing agents observing our private lives." It just doesn't feel like such a personal violation when "corporations are collecting the same information and storing it on their computers."

This psychological bias in favor of faceless surveillance may explain why Amazon's Alexa smart speaker faced such a backlash after reports revealed that Amazon hired thousands of people to listen to the recordings. Few people had seemed bothered that Amazon could store conversations for eternity and using them for targeted advertising or other profitable ends. That feeling curdled only when Alexa users learned that real people were listening in.

It's also possible that many people just feel as if they never had that much privacy to begin with, even before the era of mobile phones and ubiquitous corporate surveillance. Some security and privacy researchers, like Munish Walther-Puri, argue this is the reason average citizens are resigned to invasive practices like location tracking: "What is the value of privacy if you never felt like you had it to begin with?"

And yet the data is ours. It comes from the phones we bought, on mobile networks we pay to use. It chronicles our movements and our lives. It may be used to manipulate our behavior by nudging us toward a particular purchase or political candidate. It may be leaked or hacked or bought or sold to bad actors and abused. If that happens, we, not the corporations who hold our data, will suffer personal consequences.

Data is collected from every town and city in America, including Pasadena.

**Sitting at her kitchen table,** Margie Homer couldn't stop following her past self. "That was a birthday party," she said hovering a cursor over the details of a Saturday afternoon nearly three years ago. Her two cats nuzzled at our feet as she leaned in toward our laptop. "That's the cafeteria, and that's the building that I primarily work in." She was gesturing toward a sprawling complex of buildings that make up NASA's Jet Propulsion Laboratory, a secure facility roughly the size of a university where Dr. Homer, a chemist, works on projects for space stations.

Dr. Homer is no Luddite. At J.P.L., she's surrounded by state-of-the-art technology and an army of number crunchers and data miners. Privacy warnings have rubbed off on her — enough that she has resisted the constant pleas of her pre-teenage kids for a smartphone. Aside from the occasional tracking mandated by her favorite guilty pleasure, "Pokémon Go," Dr. Homer assumed she'd been a good steward of her location data.

She grabbed her Android off the table and started sifting through her apps, starting with those whose location permissions were set to "allowed all the time."

Margie Homer felt betrayed by the apps tracking her movements.

CVS. Google Maps. Google search. Google V.R. services, which Dr. Homer didn't recall giving location permissions. Google Wifi and Chrome. Ikea. Amazon. AMC. Theaters. Pokémon Go. She paused on an app from her school district that she hadn't realized had been hoovering up location data. "This is the problem with putting all this technology into people's hands when they don't really understand what's going on," she said. "I'm not stupid. In a sense, I saw it coming. People talk about it at work all the time. But it's a completely different thing when someone shows you a map."

Dr. Homer was outraged and frustrated. Scrolling through visits to friends and family, she worried that maybe her data might somehow reveal the information of those closest to her. She remembered political protests she attended — was her phone betraying activists around her? Staring at the data, it became easy to see what people frequently

misunderstand: Privacy isn't just an individual matter. It's a collective concern. Dr. Homer's location wasn't just hers but was also intertwined with that of every person she'd encountered.

Consent is murky. Technically, each ping is collected legally, with the express consent of the device holder; apps can't collect GPS data unless you allow them to via a pop-up screen. But of the dozens of Pasadena residents we spoke with — even those unfazed by the detail of the data — none felt as though they'd consented to this level of collection. "Undoubtedly the whole industry benefits from the passivity of people, just not caring that much about what happens, or understanding, or worrying about it," said Mr. Honowitz, the former small-business owner we surprised with his data on his front porch.

"If these companies actually walked us through their terms of service on these apps in a meaningful way, people would say: 'This is insane. I don't want to give you the right to do this,'" said Patrick Cahalan, a Pasadena School Board member.

Collecting every scrap of our lives via smartphones is framed as a trade-off. If companies know where you are, they can serve you better information, like a personalized ad or a list of coffee shops near you. Pooling the data is even more useful. Companies can see trends, like traffic patterns, which may result in a faster commute. That's a persuasive argument.

Location tracking has always been an abstract idea. Consumers could never see behind the scenes and into the data.

What happens when Americans parse the information companies actually collect on them? They begin to evaluate the true cost of their digital conveniences. For Dr. Homer the cost was this: the location of her home, her parents' house, her office, the site of a date and even her kids' favorite stalls at an annual holiday carnival. And while she's not entirely sure which app or apps was the culprit, she thinks it's entirely possible she traded it all for a few coupons for a reduced price on soup, the benefit she received for giving location permission to a hastily downloaded app.

Dr. Homer is lucky. What separates her from the tens of millions of us who've traded our information is that she has seen the full exchange of values. Unlike the rest of us, she knows, down to the data point, the cost of her services rendered. Is it really worth it? That's a question not just people in Pasadena, but all of us, need to ask ourselves.

Charlie Warzel (charlie.warzel@nytimes.com) is a writer at large for Opinion. Stuart A. Thompson (stuart.thompson@nytimes.com) is a writer and editor in the Opinion section.

Lora Kelley and Ben Smithgall contributed research. Additional production by Jessia Ma and Gus Wezerek.

# EXHIBIT 23

# How to Track President Trump

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**nytimes.com**/interactive/2019/12/20/opinion/location-data-national-security.html

**If you own a mobile phone,** its every move is logged and tracked by dozens of companies. No one is beyond the reach of this constant digital surveillance. Not even the president of the United States.

The Times Privacy Project obtained a dataset with more than 50 billion location pings from the phones of more than 12 million people in this country. It was a random sample from 2016 and 2017, but it took only minutes — with assistance from publicly available information — for us to deanonymize location data and track the whereabouts of President Trump.

A single dot appeared on the screen, representing the precise location of someone in President Trump's entourage at 7:10 a.m. It lingered around the grounds of the president's Mar-a-Lago Club in Palm Beach, Fla., where the president was staying, for about an hour.

Then it was on the move.

The dot traveled to the Trump National Golf Club in Jupiter, about 30 minutes north of the hotel, pinging again at 9:24 a.m. just outside the compound. The president was there to play golf with Prime Minister Shinzo Abe of Japan.

There the dot stayed until at least 1:12 p.m., when it moved to the Trump International Golf Club in West Palm Beach, where the world leaders enjoyed a private lunch.

By 5:08 p.m., the phone was back at Mar-a-Lago.

The president had what he called a working dinner with Mr. Abe that night.

**The device's owner** was easy to trace, revealing the outline of the person's work and life. The same phone pinged a dozen times at the nearby Secret Service field office and events with elected officials. From computer screens more than 1,000 miles away, we could watch the person travel from exclusive areas at Palm Beach International Airport to Mar-a-Lago.

The meticulous movements — down to a few feet — of the president's entourage were recorded by a smartphone we believe belonged to a Secret Service agent, whose home was also clearly identifiable in the data. Connecting the home to public deeds revealed the person's name, along with the name of the person's spouse, exposing even more details about both families. We could also see other stops this person made, apparently more connected with his private life than his public duties. The Secret Service declined to comment on our findings or describe its policies regarding location data.

The vulnerability of the person we tracked in Mr. Trump's entourage is one that many if not all of us share: the apps (weather services, maps, perhaps even something as mundane as a coupon saver) collecting and sharing his location on his phone.

Americans have grown <u>eerily accustomed</u> to <u>being tracked throughout their digital lives</u>. But it's far from their fault. It's a result of a system in which data surveillance practices are hidden from consumers and in which much of the collection of information is done without the full knowledge of the device holders.

For the nation's security agencies, however, privacy is critical to the safety of military, defense and security operations across the country and abroad. If threats to that privacy have seemed abstract in the past, the trove of location data we have analyzed has brought them into sharp relief. Military and intelligence officials have long been concerned about how their movements could be exposed; now every move is. As a senior Defense Department official told Times Opinion, even the Pentagon has told employees to expect that their privacy is compromised:

"We want our people to understand: They should make no assumptions about anonymity. You are not anonymous on this planet at this point in our existence. Everyone is trackable, traceable, discoverable to some degree."

We were able to track smartphones in nearly every major government building and facility in Washington. We could follow them back to homes and, ultimately, their owners' true identities. Even a prominent senator's national security adviser — someone for whom privacy and security are core to their every working day — was identified and tracked in the data.

**While the Constitution prevents companies** from sharing location data with the government without a warrant, there are no federal protections limiting how they use or share it privately. No such protections are currently being debated before Congress — even though we found that we could track people through Congress's own halls as easily as any place else.

When we reached out to some lawmakers to show what we found, the outrage proved bipartisan.

"This is terrifying," said Senator Josh Hawley, Republican of Missouri, who has called for the federal government take a tougher stance with tech companies. "It is terrifying not just because of the major national security implications, what Beijing could get ahold of. But it also raises personal privacy concerns for individuals and families. These companies are tracking our kids."

"Tech companies are profiting by spying on Americans — trampling on the right to privacy and risking our national security," Senator Elizabeth Warren, a Democrat running for

president, told us. "They are throwing around their power to undermine our democracy with zero consequences. This report is another alarming case for why we need to break up big tech, adopt serious privacy regulations and hold top executives of these companies personally responsible."

Agencies can limit how their employees use location-sharing apps and services, but that doesn't mean those guidelines will be strictly enforced — or extended to personal devices.

But no matter how comprehensive an organization's policies and regulations are, getting everyone to follow them is nearly impossible as many of these apps' surveillance practices are not visible to consumers.

"The human being is the weak link," said Martijn Rasser, a former Central Intelligence Agency officer who is now a senior fellow in the technology and national security program at the Center for a New American Security. "It's really difficult to enforce a lot of these rules and regulations. Sometimes, all it takes is one person to violate the rules to completely negate the purpose of having those rules in the first place."

Despite the sensitivity of this information, it is put to everyday use. Packaged with millions of other data points, location information is turned into marketing analysis and sold to financial institutions, real estate investors, advertising companies and others. Companies say they vet partners carefully and tend to work with larger players that have a clear business case for receiving the data.

Like all data, the vast location files are vulnerable to hacks, leaks or sale at any point along that process. The data we reviewed was provided to Times Opinion by sources who asked to remain anonymous because they were not authorized to share it and could face severe penalties for doing so.

Multiple experts with ties to the United States' national security agencies warned in interviews that foreign actors like Russia, North Korea, China and other adversaries may be working to steal, buy or otherwise obtain this kind of data. Only months ago, hackers working for the Chinese government allegedly targeted location data for people moving throughout Asia by breaking into telecom networks, according to a report by Reuters.

"People literally go to work every day, sit down at a desk, check the sports, send an email or two to their girlfriend and then start looking for databases they can steal," said James Dempsey, the executive director of the Berkeley Center for Law and Technology. "They just do that 9 to 5, every day."

The American government may conduct similar intelligence operations against its adversaries, experts said, though under stricter legal frameworks.

Using the data, we identified people in positions of power by following smartphone pings as they moved around the White House, Capitol Hill, the Supreme Court and other government facilities. In many cases, the data trails led back to the smartphone users' homes. In this series, we did not name any of the identified people without their permission. And the data below has been obscured to protect device owners.

**Connecting a ping to a person** was as easy as combining home and work locations with public information. A seemingly random set of movements turned into a clear individual pattern after we added just one other piece of information.

Plenty of corroborating information is already floating around dark corners of the web, given the frequent high-profile data breaches of the past decade. Consider what China already knows: In 2015, a federal database containing the personal information of more than four million people with security clearances was stolen by Chinese hackers presumed to be state actors.

"From those very detailed documents, they may gather a good deal of information about a person," said David S. Kris, a co-founder of the consulting firm Culper Partners and former assistant attorney general for the national security division of the Department of Justice. Mr. Kris said he was also included in the data that was hacked. "The more you can combine location-based data into a mosaic with other information, the more likely you are to gain real insight into an adversary."

Location data potentially gives any enemy an opening for attack. Russians, whose intelligence apparatus has worked for decades to disrupt American democracy, could simply leak location information to embarrass the government, the legal system or particular officials.

"Think about Russia's efforts to undermine public trust and confidence in our democratic institutions," Suzanne Spaulding, senior adviser at the Center for Strategic and International Studies and a former under secretary at the Department of Homeland Security, told us. "Think about all of the ways they could use location data to do that. Think about tracking judges everywhere they went and how you could use that to undermine confidence in our courts and our justice system."

After Ms. Spaulding raised the danger of tracking judges, we checked the data file for courthouse employees. In minutes, we found dozens of potential targets by watching smartphones sharing their precise locations inside Washington courthouses. One person whose movements we traced has a role in the technology division, which controls servers containing data for the Supreme Court.

For people with political power, knowing those locations could put their safety — and our national security — at risk. Experts told Times Opinion that foreign governments could use the data to monitor sensitive sites and identify people with access to them, and their associates.

"Not everybody in the department has a national security position, not everybody has access to classified or higher-level stuff," the senior Defense official said. "But everyone in the department is of some interest or value to a lot of adversaries just by virtue of being a member of the Defense Department, just by working at the Pentagon."

**The possibilities for blackmail are endless.** Once stolen, details on sexual interests and extramarital affairs can provide opportunities for extortion. Targets could be coerced in ways large and small, compelled to make decisions or take actions for a foreign government. Or the locations themselves could provide valuable intelligence about security practices, contacts, schedules and the identities of people in prominent and sensitive posts, with access to state secrets or critical infrastructure.

With no training and far more limited technical tools than those of a state intelligence service, we were able to use the location data — date, time and length of stay — to make basic inferences. By determining whether two people were in the same place at the same time, it was easy to zero in on spouses, co-workers or friends. Cataloguing their movements revealed even more associations, creating the map of a robust social network that would be nearly impossible to determine through traditional surveillance. In cases where it was difficult to identify an individual, associations offered more clues about workplaces and interests.

In one case, it proved difficult to confirm the identity of a man listed in public records who had a common name. Examining his associations revealed that he met multiple times with someone carrying another phone that was being tracked. That person was, we soon learned, his brother. That piece of information doubled the pool of digital breadcrumbs to follow, ultimately helping confirm both of their identities.

Now consider elections. Bad actors could monitor candidates and elected leaders for intelligence that could be leaked or used to blackmail them. There are also no regulations limiting how long location data can be stored. Data swept up today may prove valuable in the future, as everyday citizens rise to positions of authority and influence only to have their precise movements from years gone by reviewed for damaging insights.

Defense contractors and employees at secure locations like power plants are all at risk.

We found smartphone pings at all of these sorts of sites. In one case, someone who spent their weekdays at the Pentagon visited a mental health and substance abuse facility multiple times.

Even just commuting to work can be risky for people in prominent positions. "The easiest way to figure out how to get to you is know you always have the same routine," said Mr. Rasser, the former Central Intelligence Agency officer. He said he mixes up his own routine, partly because the C.I.A. emphasized such methods when he joined.

The threats will only grow as more data is collected and shared. More apps will enter the marketplace using tracking technology. And companies are becoming more sophisticated at collecting location data, adding signals from Wi-Fi networks and Bluetooth beacons. They also often rely on one-time consent or disclosures that don't explicitly state what's collected or shared.

Experts emphasized how location data has joined many other kinds of sensitive information in the espionage toolkit, showing how intelligence agencies must continually adapt to the digital age.

"We need to learn to operate with fewer secrets," Ms. Spaulding said.

Even areas once thought to be secure showed up in the data. Personal phones aren't generally allowed inside the C.I.A. or the National Security Agency. But while no pings registered inside the C.I.A. headquarters, we found thousands of pings in the parking lots outside, with trails that led to the homes of likely employees.

Similarly, there were no blackout areas in many sensitive government buildings. We observed thousands of pings inside the Pentagon, on military bases, in F.B.I. headquarters and in Secret Service facilities across the country. (Intelligence facilities also have secure areas where certain electronic devices aren't permitted.)

The risks posed by location-tracking remain largely unaddressed by the government. Beginning last year, the Department of Defense prohibited geolocation features and functionality from being used by its workers on devices in "operational areas" like foreign military bases. For all other locations, the department said it would consider the risks and issue specific recommendations to personnel.

For now, the department does not issue guidance to employees about downloading specific apps, including those that might share location data with third parties. "Instead, we focused on certain core characteristics of the geolocation functionality and identified what risks those characteristics posed," a department spokesman, Lt. Col. Uriah L. Orland, said in an email.

Agencies with a need for heightened security are left in a vulnerable position. Phones are ubiquitous, and so long as granular location tracking remains legal, even the Defense Department must play along. "We cannot stop our workforce of 3.6 million people from living their everyday lives," a senior department official told us.

We haven't identified any serving elected representatives in our data, but we found a former House representative and dozens of prominent public officials, including chiefs of staff, security officials and subcommittee staff members.

Given their proximity to public figures with public schedules and their presence at training sites and field offices, Secret Service agents were particularly easy to identify. With little difficulty, we were able to track a Secret Service agent who spent most of his daytime hours in the West Wing of the White House. He also joined President Trump at the National Cathedral the day after the inauguration.

**While the data reviewed** by Times Opinion is from three years ago, similar information is being collected daily and often resold to third parties, meaning anyone with current access to such data could feasibly, in near real time, track people within arm's reach of the president or other powerful figures.

"If you want to take action against someone, you have to find them first," said Mr. Kris, the former Department of Justice official. "I'm wary of breathless, pearl-clutching, speculative, sensationalistic counterintelligence concerns. This doesn't strike me as falling into that category. I think there is a legitimate concern here."

Leaked location data may open the door to other cyber vulnerabilities. Foreign actors could learn movement details and infer meeting locations, which could be used to conduct a type of scam where targets receive fake emails — posing as a friend you just met with or a business you just visited — including a phony link meant to steal your password or install malware.

"Location tracking data of individuals can be used to facilitate reconnaissance, recruitment, social engineering, extortion and in worst-case scenarios, things like kidnapping and assassination," warned Kelli Vanderlee, manager of intelligence analysis at the cybersecurity company FireEye.

Those are not theoretical threats. The phone of the Washington Post journalist Jamal Khashoggi, who was assassinated in 2018, was allegedly compromised, possibly allowing his location data to be used to follow him.

Last year, Strava, a company that makes a fitness app, released a global map showing 700 million activities that clearly revealed American military bases abroad. The Department of Defense issued its recent guidance after discovering the problem. The data reviewed by Times Opinion revealed several points on domestic military bases as well, showing how some of the nation's most secure armed sites can be exposed.

"An adversary can still glean a lot from your whereabouts on the base itself," said Mr. Rasser, the former C.I.A. officer. "If you're always at a certain part of the base, at a certain time, you can start piecing together what the function of that corner of the base could be

based on the person's job duties."

Using base locations as a guide, Times Opinion accurately surmised the job title of a commander in the U.S. Air Force Reserve. He regularly traveled to the Pentagon and visited Joint Base Andrews, perhaps best known as the home of the president's airliner, Air Force One.

It's not necessary for someone to visit sensitive locations to be open to scrutiny or criticism. Location data could become a powerful political tool, exposing the private lives of wealthy elites who prefer to adopt a more egalitarian persona. It is not difficult to imagine efforts to undermine a political campaign by exposing travels through private airports or visits to expensive restaurants and luxurious spas.

The sources who provided the trove of location information to Times Opinion did so to press for regulation and increased scrutiny of the location data market. Some solutions exist that could help improve privacy while ensuring businesses can still perform some of the analysis they do today, like limiting the ability to identify individual paths, changing how long the information is stored and limiting how it's sold.

So far, Washington has done virtually nothing to address the threats, and location data companies have every reason to keep refining their tracking, sucking up more data and selling it to the highest bidders.

Stuart A. Thompson (stuart.thompson@nytimes.com) is a writer and editor in the Opinion section. Charlie Warzel (charlie.warzel@nytimes.com) is a writer at large for Opinion. Alex Kingsbury contributed reporting. Lora Kelley, Ben Smithgall and Vanessa Swales contributed research. Graphics by Stuart A. Thompson. Additional production by Jessia Ma and Gus Wezerek. Note: Visualizations have been adjusted to protect device owners.

*Like other media companies, The Times collects data on its visitors when they read stories like this one. For more detail please see our privacy policy and our publisher's description of The Times's practices and continued steps to increase transparency and protections.*

# EXHIBIT 24

# New magical blue circle on your map

G **googlemobile.blogspot.com**/2007/11/new-magical-blue-circle-on-your-map.html

Posted by Mike Chu, software engineer, Google mobile team

We've all been there: You're out and about, and you need to figure out where you are, what's around you, and how to get there. Google Maps for mobile can help you do all that, but first you have to enter in a starting point using the keypad. And let's face it -- entering things into your phone using the keypad is so 2006. While some people are lucky enough to have GPS-enabled mobile phones that provide location information for Google Maps for mobile, the vast majority of us are not. So what to do?

Starting today, we have an answer: Google Maps for mobile with <u>My Location</u> . My Location is a new beta technology from Google that uses cell tower identification to provide you with approximate location information, so it will work on phones without GPS. Simply fire up Google Maps for mobile, press [0], and the map will indicate your approximate location by centering on a blue circle like this:



If you do have a GPS-enabled device, My Location can actually complement it. My Location kicks in faster than GPS in most cases, so you can access your location even faster on the map. It also works reliably indoors (unlike GPS) and doesn't drain your phone battery at the rate that GPS does.

Of course, this feature is in beta, which in this case means a few different things: First, although accuracy and coverage may vary, both will improve over time as more and more people use Google Maps for mobile. Second, My Location isn't currently supported on all devices (see our <u>Help Center</u> for more on this); we're working on that. Third, we'd love to get your feedback on it - - feel free to leave your comments below.

To give Google Maps for mobile with My Location a try, text "MYLOCATION" to 33669, or head to on your mobile browser.

If you'd like to learn more about the My Location technology, take a look at this short video:

# EXHIBIT 25

# Locate your friends in real time with Google Latitude

G googlemobile.blogspot.com/2009/02/locate-your-friends-in-real-time-with.html

Way back in November 2007, we location-enabled all of our
Google Maps for mobile clients to bring location awareness to
the masses and improve the local search experience. Using My
Location, millions of you have been able to easily find yourselves
on a map at the touch of a button. But what about finding other
people? Lots of you have been requesting to see where your
friends are on a map, too. Well now you can with  .



Latitude is a new feature of Google Maps for mobile, as well as
an iGoogle gadget, that allows you to share your location with
your friends and to see their approximate locations, if they choose to share them with you. You
can use your Google account to sign in and easily invite friends to Latitude from your existing
list of contacts or by entering their email addresses. Google Talk is integrated with Latitude, so
you and your friends can update your status messages and profile photos on the go and see
what everyone is up to. You can also call, SMS, IM, or email each other within the app. Check out
the video below to see Latitude in action.

We've gone to great lengths to put this on as many smartphone devices as possible from day
one so that most of the people you know will be able to use Latitude right away. There are two
primary ways to use Latitude right now:

1. On your mobile phone: visit from your phone's mobile browser to download Google Maps
   for mobile with Latitude. We currently support most of the popular smartphone platforms:
   Android, Blackberry, Symbian S60, and Windows Mobile, and we are hoping to see
   Latitude on the iPhone soon. It will be available through Google Mobile App, and you'll just
   need to download or update the app from the App store to find Latitude in the Apps tab.
2. On your computer: go to http://google.com/latitude from your browser and add the
   Latitude gadget to your iGoogle homepage. What's neat is that if you've installed Google
   Gears or if you're using Google Chrome, you can choose to automatically share your
   location from your laptop or desktop computer -- no smartphone required!

Latitude gives you control over how much or little location information you want to share, and
with whom. And of course Latitude is 100% opt-in. Learn more about using Latitude and its
privacy features in our Help Center or check out our privacy video.

Oh, and I almost forgot to mention - it is available in 27 countries and 42 languages. See in
which part of the world your friends are now!

Posted by Charles Mendis, Software Engineer, Google mobile team

1/1

# EXHIBIT 26



# Official Blog

Insights from Googlers into our products,
technology, and the Google culture

## See where your friends are with Google Latitude

February 4, 2009

How often do you find yourself wondering where your friends are and what they're up
to? It's a pretty central question to our daily social lives, and it's precisely the question
you can now answer using Google Latitude.

Latitude is a new feature for Google Maps on your mobile device. It's also an iGoogle
gadget on your computer. Once you've opted in to Latitude, you can see the
approximate location of your friends and loved ones who have decided to share their
location with you. So now you can do things like see if your spouse is stuck in traffic on
the way home from work, notice that a buddy is in town for the weekend, or take
comfort in knowing that a loved one's flight landed safely, despite bad weather.

And with Latitude, not only can you see your friends' locations on a map, but you can
also be in touch directly via SMS, Google Talk, Gmail, or by updating your status
message; you can even upload a new profile photo on the fly. It's a fun way to feel close
to the people you care about.

Fun aside, we recognize the sensitivity of location data, so we've built fine-grained
privacy controls right into the application. Everything about Latitude is opt-in. You not

only control exactly who gets to see your location, but you also decide the location that they see. For instance, let's say you are in Rome. Instead of having your approximate location detected and shared automatically, you can manually set your location for elsewhere — perhaps a visit to Niagara Falls . Since you may not want to share the same information with everyone, Latitude lets you change the settings on a friend-by-friend basis. So for each person, you can choose to share your best available location or your city-level location, or you can hide. Everything is under your control and, of course, you can sign out of Latitude at any time. Check out this video to learn more about the privacy features.

Finally, since we'd like you to be able to use Latitude with *any* of your friends, we've been working hard to make it available to as many people as possible. Today, Latitude is available in 27 countries, and we hope to add more soon.

Ready to share your location? If you have a mobile smartphone, visit google.com/latitude on your phone's web browser to download the latest version of Google Maps for mobile with Latitude. Latitude is available on Blackberry, S60, and Windows Mobile, and will be available on Android in the next few days. We expect it will be coming to the iPhone, through Google Mobile App, very soon.

No smartphone? No worries. Visit google.com/latitude on your desktop or laptop to install the Latitude iGoogle gadget and share your location right from your computer. If you have Google Gears installed in your browser (you do by default if you use Google Chrome), you can automatically share your location; otherwise, manually set your location to let your friends know where you are.

Visit the Google Mobile blog for more details, and check out the video below to see Latitude in action.



Posted by Vic Gundotra, VP Engineering, Google mobile team

  

Labels: mobile , privacy

**Links to this post**

Create a Link



Google

Google  ·  Privacy  ·  Terms

# EXHIBIT 27

# Google Latitude, now with Location History & Alerts

G googlemobile.blogspot.com/2009/11/google-latitude-now-with-location.html

Since the launch of Google Latitude earlier this year, we've been getting a lot of feature requests. One of the most popular ideas was for Latitude to keep track of location history, allowing you (but not your friends) to see where you've been at any point in time. Another popular idea was to notify you when you're near your Latitude friends so you can easily meet up or grab lunch. Today, we're happy to introduce both Google Location History and Google Location Alerts (beta) to let you do even more with Latitude.

Whether you're taking a road trip across the country, backpacking across Europe, or just going out for a night on the town, it's fascinating to look back at where you went, and for how long you stayed. Enable to store, view, and manage your past Latitude locations. You can visualize your history on Google Maps and Earth or play back a recent trip in order. Of course, you can always delete selected history or your entire location history at any time. While working on Location History, I found myself going back in time to discover things that would have otherwise been impossible. For example, I stopped at an awesome BBQ place on my way back from Lake Tahoe this summer, but I couldn't remember the name when my friend was asking about it a few months later. I pulled up my location history for that weekend, found where I was stationary on the drive home, and the restaurant name showed up in Google Maps: Drooling Dog Bar BQ. Check it out below:



People also want to know when their friends were nearby, but it's not always convenient to keep checking Latitude to see if a friend has recently shown up near you. After working on this for a while, we realized it wasn't as straightforward as sending a notification every time Latitude friends were near each other. Imagine that you're Latitude friends with your roommate or co-workers. It would get pretty annoying to get a text message every single time you walked in the door at home or pulled into work. To avoid this, we decided to make Location Alerts smarter by requiring that you also enable Location History. Using your past location history, Location Alerts can recognize your regular, routine locations and not create alerts when you're at places like home or work. Alerts will only be sent to you and any nearby friends when you're either at an unusual place or at a routine place at an unusual time. Keep in mind that it may take up to a week to learn your "unusual" locations and start sending alerts.

To enable these features, go to . You must first be an existing Google Latitude user; if you're not

already, <u>sign up here</u>. You must explicitly enable each feature, and of course, you can disable it at any time. Learn more in the Help Center about <u>Location Alerts</u> and <u>Location History</u>, suggest and vote on ideas in the <u>Mobile Product Ideas</u> page, or report problems in the <u>Mobile Help Forum</u>.Posted by Chris Lambert, Software Engineer, Google Mobile



# EXHIBIT 28

**Step 1**



**Step 2**



## Step 3





# Step 4



## Step 5



Turn on additional Web & App Activity?

███████@gmail.com

Additional Web & App Activity saves your activity from sites, apps, and devices that use Google services, including:

- activity from sites and apps that partner with Google to show ads
- Chrome history (if Chrome Sync is turned on)
- app activity, including data that apps share with Google
- Android usage & diagnostics, like battery level, how often you use your device and apps, and system errors

If you use your device without an internet connection, your data may be saved to your account once you return online.

Not all Google services save this data to your account.

This data helps Google give you more personalized experiences across Google services, like helpful app and content recommendations, and useful ads, both on and off Google.

This data may be saved and used in any Google service where you are signed in to give you more personalized experiences. You can see your data, delete it and change your settings at account.google.com.

# EXHIBIT 29

# How to Stop Google From Tracking Your Location

wired.com/story/google-location-tracking-turn-off/



*Leong Thian Fu/Getty Images*

If, like most people, you thought Google stopped tracking your location once you turned off Location History in your account settings, you were wrong. According to an AP investigation published Monday, even if you disable Location History, the search giant still tracks you every time you open Google Maps, get certain automatic weather updates, or search for things in your browser. There's a way to stop it—but it takes some digging.

The problem affects anyone with an Android phone and iPhone users running Google Maps on their devices, according to the AP report, which researchers at Princeton University verified. That's more than two billion people.

The Google support page for managing and deleting your Location History says that once you turn it off, "the places you go are no longer stored. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account." The AP's

investigation found that's not true. In fact, turning off your Location History only stops Google from creating a timeline of your location that you can view. Some apps will still track you and store time-stamped location data from your devices.

More specifically, the AP was able to track Princeton researcher Gunes Acar's home address, as well as his daily activities, using just Google Web & App activity, which he had shared with the news agency.

"If Google is representing to its users that they can turn off or pause location tracking but it's nevertheless tracking their location, that seems like textbook deception to me," says Alan Butler, senior council at the Electronic Privacy Information Center.

To *actually* turn off location tracking, Google says you have to navigate to a setting buried deep in your Google Account called Web & App Activity, which is set by default to share your information, including not just location but IP address and more. Finding that setting isn't easy. At all.

Sign in to your Google account on a browser on iOS or your desktop, or through the Android settings menu. In the browser, access your account settings by finding **Google Account** in the dropdown in the upper right-hand corner, then head to **Personal Info & Privacy**, choose **Go to My Activity**, then in the left-hand nav click  **Activity Controls**. Once there you'll see the setting called **Web & App Activity**, which you can toggle off.

On your Android phone, go from **Google settings** to **Google Account**, then tap on **Data & personalization**. You'll find  **Web & App Activity** there.

Google further buries the notion that **Web & App Activity** has anything to do with location. In fact, the setting sits right above the **Location History** option, suggesting at a glance that the two things are quite distinct. And Google's vanilla description of **Web & App Activity** is that it "Saves your activity on Google sites and apps to give you faster searches, better recommendations, and more personalized experiences in Maps, Search, and other Google services." From there, you have to tap **Learn more**, then scroll to **What's saved as Web & App Activity**, and tap *again* on **Info about your searches & more** before Google says anything about location whatsoever.

To stop that tracking, toggle the blue **Web & App Activity** slider to off. Google will then give you a popup warning: "Pausing Web & App Activity may limit or disable more personalized experiences across Google services. For example, you may stop seeing more relevant search results or recommendations about places you care about. Even when this setting is paused, Google may temporarily use information from recent searches in order to improve the quality of the active search session."

> 'This really reads like a classic case of an unfairly deceptive business practice. I really think that the FTC needs to investigate right away.'

Alan Butler, EPIC

Google told the AP that it provides "clear descriptions of these tools," but it takes eight taps on an Android phone—if you know exactly where you're going—to even access that description to begin with. As the AP notes, most people who explicitly turned off their Location History tracking, as WIRED and many other privacy conscious publications have advised people to do, would have assumed they had already taken all steps necessary to keep their location private.

As well they should. Google itself offers at least three support pages on location:  **Manage or delete your Location History**, **Turn location on or off for your Android device**, and **Manage location settings for Android apps**. None of these makes any mention of Web & App Activity.

In spite of this, a Google spokesperson told WIRED that "we make sure Location History users know that when they disable the product, we continue to use location to improve the Google experience when they do things like perform a Google search or use Google for driving directions." This apparently refers to a warning that appears if you turn off Location History, which says that it "does not affect other location services on your device." However, nowhere in that popup does it indicate that you can turn off other forms of location tracking by pausing Web & App Activity.

"Tracking people without their consent and without proper controls in place is creepy and wrong," wrote UC Berkeley graduate researcher K. Shankari in a blog post that first alerted the AP to the problem.

Beyond creepiness, though, Google's location-tracking may also violate the Federal Trade Commission's consumer protection statutes against deceptive privacy practices. "This really reads like a classic case of an unfairly deceptive business practice. I really think that the FTC needs to investigate right away," says Butler.

Google's Location History situation is reminiscent of Facebook's various runnings with the FTC. In 2011, the agency famously settled with Facebook over the social media giant's inability to keep privacy promises to consumers. As part of that deal, Facebook agreed to a consent decree in which it promised to reform how it tracked and shared user data. That decree has been in the news lately, after the FTC opened a new investigation this spring into whether Facebook's data sharing with Cambridge Analytica violated its 2011 settlement. The FTC has more recently penalized Uber, Vizio, the phone maker Blu, and many others for misleading customers about how their data was collected, stored, and shared.

Former FTC chief technologist Ashkan Soltani noted in  a tweet that Google's "confusing privacy dialogue" may merit a closer look from the agency.

"Google's reaction—that users can delete individual data points, or users can go deep down in settings and turn off certain web settings that appear to have nothing to do with location, therefore it should be okay, I think fundamentally misunderstands what they're dealing with," says Butler. "When you're creating a historical log of someone's movements over time, that's information that's uniquely sensitive and needs to be handled accordingly."

The revelations are likely to touch off a firestorm for Google. For now, the best thing you can do is navigate through your labyrinthine settings, and hit "pause" on something you likely thought you'd already stopped.

*Correction on 8/15/2018: An earlier version of this article misspelled K. Shankari's name.*

## More Great WIRED Stories

# EXHIBIT 30

# Google found to track the location of users who have opted out

nbcnews.com/tech/tech-news/google-tracks-your-movements-it-or-not-n900106

## Tech & Media

Even with Location History paused, some Google apps automatically store time-stamped location data without asking.



A mobile phone displays a user's travels in New York, on Aug. 8, 2018. Google records your movements even when you explicitly tell it not to. An Associated Press investigation shows that using Google services on Android devices and iPhones allows the search giant to record your whereabouts as you go about your day.Seth Wenig / AP

Aug. 13, 2018 / 1:44 PM GMT  / Source: Associated Press

Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to.

An Associated Press investigation found that many Google services on Android devices and iPhones store your location data even if you've used privacy settings that say they will prevent it from doing so.

Computer-science researchers at Princeton confirmed these findings at the AP's request.

For the most part, Google is upfront about asking permission to use your location information. An app like Google Maps will remind you to allow access to location if you use it for navigating. If you agree to let it record your location over time, Google Maps will display that history for you in a "timeline" that maps out your daily movements.

Storing your minute-by-minute travels carries privacy risks and has been used by police to determine the location of suspects — such as a warrant that police in Raleigh, North Carolina, served on Google last year to find devices near a murder scene. So the company will let you "pause" a setting called Location History.

Google says that will prevent the company from remembering where you've been. Google's support page on the subject states: "You can turn off Location History at any time. With Location History off, the places you go are no longer stored."

That isn't true. Even with Location History paused, some Google apps automatically store time-stamped location data without asking.

For example, Google stores a snapshot of where you are when you merely open its Maps app. Automatic daily weather updates on Android phones pinpoint roughly where you are. And some searches that have nothing to do with location, like "chocolate chip cookies," or "kids science kits," pinpoint your precise latitude and longitude — accurate to the square foot — and save it to your Google account.

The privacy issue affects some two billion users of devices that run Google's Android operating software and hundreds of millions of worldwide iPhone users who rely on Google for maps or search.

Storing location data in violation of a user's preferences is wrong, said Jonathan Mayer, a Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau. A researcher from Mayer's lab confirmed the AP's findings on multiple Android devices; the AP conducted its own tests on several iPhones that found the same behavior.

"If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off," Mayer said. "That seems like a pretty straightforward position to have."

Google says it is being perfectly clear.

"There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."

To stop Google from saving these location markers, the company says, users can turn off another setting, one that does not specifically reference location information. Called "Web and App Activity" and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.

When paused, it will prevent activity on any device from being saved to your account. But leaving "Web & App Activity" on and turning "Location History" off only prevents Google from adding your movements to the "timeline," its visualization of your daily travels. It does not stop Google's collection of other location markers.

You can delete these location markers by hand, but it's a painstaking process since you have to select them individually, unless you want to delete all of your stored activity.

You can see the stored location markers on a page in your Google account at myactivity.google.com, although they're typically scattered under several different headers, many of which are unrelated to location.

To demonstrate how powerful these other markers can be, the AP created a visual map of the movements of Princeton postdoctoral researcher Gunes Acar, who carried an Android phone with Location history off, and shared a record of his Google account.

The map includes Acar's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, The AP didn't plot the most telling and frequent marker — his home address.

---

Huge tech companies are under increasing scrutiny over their data practices, following a series of privacy scandals at Facebook and new data-privacy rules recently adopted by the European Union. Last year, the business news site Quartz found that Google was tracking Android users by collecting the addresses of nearby cellphone towers even if all location services were off. Google changed the practice and insisted it never recorded the data anyway.

Critics say Google's insistence on tracking its users' locations stems from its drive to boost advertising revenue.

"They build advertising information out of data," said Peter Lenz, the senior geospatial analyst at Dstillery, a rival advertising technology company. "More data for them presumably means more profit."

The AP learned of the issue from K. Shankari, a graduate researcher at UC Berkeley who studies the commuting patterns of volunteers in order to help urban planners. She noticed that her Android phone prompted her to rate a shopping trip to Kohl's, even though she had turned Location History off.

"So how did Google Maps know where I was?" she asked in a blog post .

The AP wasn't able to recreate Shankari's experience exactly. But its attempts to do so revealed Google's tracking. The findings disturbed her.

"I am not opposed to background location tracking in principle," she said. "It just really bothers me that it is not explicitly stated."

Google offers a more accurate description of how Location History actually works in a place you'd only see if you turn it off — a popup that appears when you "pause" Location History on your Google account webpage . There the company notes that "some location data may be saved as part of your activity on other Google services, like Search and Maps."

Google offers additional information in a popup that appears if you re-activate the "Web & App Activity" setting — an uncommon action for many users, since this setting is on by default. That popup states that, when active, the setting "saves the things you do on Google sites, apps, and services ... and associated information, like location."

Warnings when you're about to turn Location History off via Android and iPhone device settings are more difficult to interpret. On Android, the popup explains that "places you go with your devices will stop being added to your Location History map." On the iPhone, it simply reads, "None of your Google apps will be able to store location data in Location History."

The iPhone text is technically true if potentially misleading. With Location History off, Google Maps and other apps store your whereabouts in a section of your account called "My Activity," not "Location History."

Since 2014, Google has let advertisers track the effectiveness of online ads at driving foot traffic , a feature that Google has said relies on user location histories.

The company is pushing further into such location-aware tracking to drive ad revenue, which rose 20 percent last year to $95.4 billion. At a Google Marketing Live summit in July, Google executives unveiled a new tool called "local campaigns" that dynamically uses ads to boost in-person store visits. It says it can measure how well a campaign drove foot traffic with data pulled from Google users' location histories.

Google also says location records stored in My Activity are used to target ads. Ad buyers can target ads to specific locations — say, a mile radius around a particular landmark — and typically have to pay more to reach this narrower audience.

While disabling "Web & App Activity" will stop Google from storing location markers, it also prevents Google from storing information generated by searches and other activity. That can limit the effectiveness of the Google Assistant, the company's digital concierge.

Sean O'Brien, a Yale Privacy Lab researcher with whom the AP shared its findings, said it is "disingenuous" for Google to continuously record these locations even when users disable Location History. "To me, it's something people should know," he said.

# EXHIBIT 31

# Manage your Location History

Location History is a Google Account–level setting that saves where you go with every mobile device where:

- You're signed in to your Google Account,
- You have turned on Location History, and
- The device has Location Reporting turned on.

When you turn on Location History, you may see a number of benefits across Google products and services, including personalized maps, recommendations based on places you've visited, help finding your phone, real-time traffic updates about your commute, and more useful ads.

- Location History is turned off by default for your Google Account and can only be turned on if you opt in.
- You can pause Location History at any time in your Google Account's Activity controls .
- You control what's saved in your Location History. You can view the places where you've been in Google Maps Timeline, and you can edit or delete information through Timeline as well.

If you have other settings like Web & App Activity turned on and you pause Location History or delete location data from Location History, you may still have location data saved in your Google Account as part of your use of other Google sites, apps, and services. For example, location data may be saved as part of activity on Search and Maps when your Web & App Activity setting is on, and included in your photos depending on your camera app settings.

**Note:** Some of these steps work only on Android 8.0 and up. Learn how to check your Android version.

## Turn Location History on or off

You can turn off Location History for your account at any time. If you use a work or school account, your administrator needs to make this setting available for you. If they do so, you will be able to use Location History as any other user.

1. On your Android phone or tablet, open your device's Settings app ⚙️ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History** > **Manage setting**.
4. Change whether your account or your devices can report Location History to Google:
   - **Your account & all your devices:** At the top, turn **Use Location History** on or off.
   - **Only a certain device:** Under "This device" or "Other devices on this account," turn the device on or off.

If you're on a browser, go to the Activity controls section of your Google Account. You might need to sign in. At the top, turn Location History on or off.

## When Location History is on

- Google only receives Location History for each device where you are signed in and you have Location Reporting turned on.
- You can change the Location Reporting setting for each device where you're signed in, and limit which devices provide location data to be included in Location History. If you want to change your Location History settings, you can choose to:
  - Report your location from only some of your devices, but not others.
  - Report your location from all your devices.
  - Turn off Location History for your Google Account. Your location won't be reported from any of your devices and you will not have new Location History recorded to your account.
- Your settings for other location services on your device, like Google Location Services and Find My Device, are not changed.

## When Location History is off

- New location information is no longer saved to your Location History.
- Previous activity is not deleted from your Location History. You can manually delete your Location History.
- Your settings for other location services on your device, like Google Location Services and Find My Device, are not changed.
- Some location data may continue to be saved in other settings, like Web & App Activity, as part of your use of other services, like Search and Maps, even after you turn off Location History.

## Delete Location History

Google Maps Timeline provides you with an interface to manage and delete your Location History information. You can choose to delete all your history, or only parts of it. When you delete Location History information from Timeline, you won't be able to see it again.

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. At the bottom, tap **Manage Timeline**. Your device will open Google Maps 🗺️.
5. Tap More ⋮ > **Settings**.
6. At the bottom, choose **Delete all Location History** or **Delete Location History range**.

If you're on a browser, go to maps.google.com/timeline. You might need to sign in. You can delete individual locations, locations by date, or your whole location history in Timeline.

Note: Timeline is not currently available in South Korea. You can turn on or pause Location History from within your Activity Controls and can delete your Location History data.

## What happens after deleting Location History

- If you delete your entire Location History, some Google apps may not work the same as they did before.
- Even after you delete your Location History information, some location data may continue to be saved in other settings, like Web & App Activity, as part of your use of other services, like Search and Maps.

# Usage & diagnostics for Location History

When you turn on Location History, your device may send diagnostic information to Google about what's working and not working for Location History. If you turn Location History off, you can decide whether to share usage and diagnostics information.

All usage and diagnostics information is used in accordance with Google's privacy policy .

What information your device could share

How shared information helps Google improve

## Learn more about other location settings

- Choose which apps can use your location: Learn how to manage app location settings.
- Learn how to turn your device's location on or off.
- Find your location on a map: Learn how to find & improve your location's accuracy in Google Maps.
- Manage your history of the places you've been and the routes you've traveled: Learn how to edit your timeline on Google Maps.

Was this article helpful?

Yes     No

# EXHIBIT 32



COPY

MAY 2 7 2020

CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

**MARK BRNOVICH**
**ATTORNEY GENERAL**
Firm State Bar No. 14000

Joseph A. Kanefield (State Bar No. 15838)
Brunn W. Roysden III (State Bar No. 28698)
Oramel H. Skinner (State Bar No. 032891)
Michael S. Catlett (State Bar No. 025238)
Christopher Sloot (State Bar No. 034196)
  *Assistant Attorneys General*
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone:  (602) 542-8958
Beau.Roysden@azag.gov
O.H.Skinner@azag.gov
Michael.Catlett@azag.gov
Christopher.Sloot@azag.gov
ACL@azag.gov

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*
*State of Arizona ex rel. Mark Brnovich,*
*Attorney General*

## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA, *ex rel.* MARK BRNOVICH, Attorney General, | Case No: CV 2020-006219 |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |
| v. | Assigned to the Hon: _____ |
| GOOGLE LLC, a Delaware limited liability company, | (Non-classified; Consumer Fraud) |
| Defendant. | REQUEST ASSIGNMENT TO COMPLEX COURT |
|  | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

*Page*

I.  INTRODUCTION ................................................................. 1

II. PARTIES, JURISDICTION, AND VENUE ............................ 5

   A.  Plaintiff ................................................................. 5

   B.  Defendant ................................................................ 5

   C.  Jurisdiction and Venue............................................ 5

III. FACTUAL ALLEGATIONS ..................................................... 6

   A.  Google Engages in Acts and Practices In Connection With the Sale and Advertisement of Merchandise In And Affecting The State of Arizona ........................... 6

   B.  Overview of Google's Many Location-Related Settings................................. 10

   C.  Google Admits Its Location-Related Settings Are a ▆▆▆▆ ▆▆ ............... 12

      1.  Google Misleads and Deceives Users Through Its Location History and Web & App Activity Settings. ............................... 14

      2.  ▆▆▆▆▆▆▆ WiFi Scanning and WiFi Connectivity Settings................................. 19

   D.  Google Uses Its Users' Locations Even When Users Turn Off the Relevant Permissions ............................ 21

      1.  ▆▆▆▆▆▆▆ ▆▆▆▆ ............................ 21

      2.  ▆▆▆▆▆▆▆ ▆▆▆▆ ............................ 24

      3.  ▆▆▆▆▆▆▆ ▆▆▆▆ ............................ 26

   E.  Google Automatically Changes the State of Permissions Without Notifying Users........ 27

   F.  Google Changes the Android User Interface to Increase Location ▆▆▆▆ at the Expense of User Choice and Consent ................................. 29

-i-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1

## TABLE OF CONTENTS (*cont.*)

2

3      G.     Google Misleads and Deceives Users Regarding Its Deletion of Their Location

4             Information ............................................................................................... 33

5      H.     Google Has Engaged In Willful Violations Of The Arizona Consumer Fraud Act ......... 34

6  IV.   ARIZONA'S INVESTIGATION INTO GOOGLE'S  UNFAIR AND DECEPTIVE ACTS

7      AND PRACTICES ....................................................................................... 36

8  V.    CLAIM FOR RELIEF .................................................................................... 41

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1      Plaintiff State of Arizona *ex rel.* Mark Brnovich, Attorney General, for its Complaint against

2  Defendant Google LLC ("Google"), alleges as follows:

3  <center>**I.    INTRODUCTION**</center>

4      1.    This case concerns Google's widespread and systemic use of deceptive and unfair

5  business practices to obtain information about the location of its users, including its users in Arizona,

6  which Google then exploits to power its lucrative advertising business.

7      2.    The average consumer likely associates Google with its popular products and services

8  including Google Search, Google Maps, the Google Chrome browser, YouTube, and Android, but these

9  products and services are not Google's principal business.

10      3.    From a revenue perspective, Google's principal business is selling advertisements and

11  displaying them to the users of Google's products and services.

12      4.    This reality is reflected by Google's financials. In 2019, for example, over 80% of

13  Google's massive revenues—$135 billion out of $161 billion total—were generated by advertising.

14      5.    Google's advertising revenues are driven by the company's collection of detailed

15  information about its users, including information about where those users are located. Location

16  information allows Google to enable advertisers to target users in a specific geographic location, and it

17  also allows Google to validate the effectiveness of ads by reporting to advertisers how often online ad

18  clicks are converted into real-world store visits.

19      6.    Given the lucrative nature of Google's advertising business, which depends on having

20  detailed location information about its users, Google goes to great lengths to collect its users' location

21  information. Indeed, according to Harvard Professor Shoshana Zuboff, "Google's proprietary methods

22  enable it to surveil, capture, expand, construct and claim behavioral" data, "including data that users

23  intentionally choose not to share." *See* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM 80

24  (2019). In this regard, individual users of Google products and services are the targets of a sweeping

25  surveillance apparatus designed to collect their behavioral data *en masse*, including data pertaining to

26  user location. *Id.* at 8–10.

27

28

<center>-1-</center>

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

7.      The tactics Google deploys to surveil its users' locations—including users in Arizona—include willfully deceptive and unfair acts and practices within the meaning of the Arizona Consumer Fraud Act.

8.      One aspect of Google's deceptive conduct came into public view with the August 2018 publication of an Associated Press article entitled, "Google tracks your movements, like it or not." The article discusses Google's Location History service, which enables users to view where they have been. Google provided users the ability to disable Location History. At the same time, Google told users that "with Location History off, the places you go are no longer stored." But the AP article revealed that this statement was blatantly false—even with Location History off, Google would surreptitiously collect location information through other settings such as Web & App Activity and use that information to sell ads.

9.      Arizona's investigation has revealed that Google's deceptive and unfair conduct extends well beyond its false Location History disclosure. Indeed, such acts and practices pervade Google's seemingly relentless drive to (i) collect as much user location information as possible and (ii) make it exceedingly hard for users to understand what is going on with their location information, let alone opt-out of this morass. This is demonstrated by the following examples:

   a.  As described in the AP article, with Location History off, Google continues to collect location information through Web & App Activity—a title that reveals nothing about the setting's connection to harvesting location data. Through Web & App Activity, Google logs information relating to a user's activity on Google websites and apps, such as conducting a search on Google Search. A critical component of this information from Google's perspective is a user's location. Nevertheless, until early-to mid-2018, Google's disclosures during account creation made no mention of the fact that location information was collected through Web & App Activity, which is defaulted to "on." And even today the title itself is misleading by failing to disclose any connection to location.

   b.  Devices running the Android operating system have a device-level location setting. Google tells users that "the types of data we collect depend in part on your device and

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

account settings. For example, you can turn your Android device's location on or off using the device's settings app." A reasonable conclusion from this disclosure is that "off means off"—*i.e.*, that Google simply will not collect and exploit user location information when a device's location setting is turned off. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████.

c.  ████████████████████████████████████████████████

████████████. There are two relevant settings—WiFi scanning and WiFi connectivity. Only the WiFi scanning setting is presented within location settings, which would lead a reasonable user to believe that turning it off would result in Google no longer discerning a user's location through WiFi scans. ████████████████████████

████████████████████████████████████████████████

████████████.

d.  In recent versions of Android, individual Google apps ask for the user's permission to use their location data. A reasonable inference is that, if the user denies this app-level permission to an app, that app will not be able to use the user's location. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

e.  The ████████████████ deception also manifests in ads personalization. As explained above, Google serves personalized ads to its users based in part on information Google has about a user's location. Google purports, however, to allow users to opt out of ads personalization by turning off a setting of that name ("GAP"). ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Moreover, Google

2 has a *second* ads service ("DoubleClick") through which it serves ads on third-party

3 websites. The setting that controls DoubleClick's service of location-based ads is in a

4 completely separate user interface from the GAP setting. ▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮.

12    f.   Users are more likely to disable their device's location setting if they are readily

13       offered such a setting. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮.

20    10.   Users, including in Arizona, have come to rely on Google's products and services on a

21 daily basis. At the same time, through these deceptive and unfair acts and practices, Google makes it

22 impractical if not impossible for users to meaningfully opt-out of Google's collection of location

23 information, should the users seek to do so.

24    11.   Google has engaged in these deceptive and unfair acts and practices with the purpose of

25 enhancing its ability to collect and profit from user location information. And profited it has, to the tune

26 of over $134 billion in advertising revenue in 2019 alone. On information and belief, hundreds of

27 millions of dollars of these advertising revenues were generated from ads presented to millions of users

28 in the State of Arizona.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1   12.   Arizona brings this action to put a stop to Google's deceptive and unfair acts and

2   practices; force Google to disgorge all profits, gains, gross receipts, and other benefits obtained for the

3   period of time when it engaged in any unlawful practice; recover restitution for Arizona consumers; and

4   impose civil penalties for Google's willful violations of the Arizona Consumer Fraud Act.

5                        **II.     PARTIES, JURISDICTION, AND VENUE**

6   **A.     Plaintiff**

7   13.   Plaintiff is the State of Arizona, *ex rel.* Mark Brnovich, Attorney General ("Arizona").

8   The Attorney General is authorized to bring this action in the name of the State under A.R.S. § 44-1521

9   *et seq.*

10  **B.     Defendant**

11  14.   Google LLC is a Delaware limited liability company with its principal place of business

12  at 1600 Amphitheatre Parkway, Mountain View, California.

13  15.   Google is a technology company that specializes in Internet-related products and

14  services, which include online advertising technologies, search, cloud computing, and other software

15  and hardware.

16  16.   Google markets and advertises its products and services throughout the United States,

17  and on information and belief the number of Google's Arizona users is in the millions.

18  17.   Google touts that "[i]n 2019, [it] helped provide $6.22 billion of economic activity for

19  28,900 Arizona businesses, publishers, nonprofits, creators, and developers."[1]

20  18.   At all relevant times Google acted with the knowledge and understanding that the

21  activities described in this Complaint would affect users of Google's products and services throughout

22  the United States, including in the State of Arizona.

23  **C.     Jurisdiction and Venue**

24  19.   This Court has subject-matter jurisdiction over this matter, including under Article VI,

25  Section 14 of the Arizona Constitution.

26

27

28

---

[1] https://economicimpact.google.com/state/az/.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

20.     This Court may enter appropriate orders both prior to and following a determination of liability pursuant to the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

21.     Venue is proper in Maricopa County pursuant to A.R.S. § 12-401.

### III.     FACTUAL ALLEGATIONS

**A.     Google Engages in Acts and Practices In Connection With the Sale and Advertisement of Merchandise In And Affecting The State of Arizona**

22.     Google's deceptive and unfair acts and practices alleged herein are in connection with the sale or advertisement of merchandise for several reasons, including the following:

a.  Google sells its own Android devices to consumers in Arizona, and those devices both run Google's proprietary forks of the Android operating system and come preloaded with several Google apps. As part of activating and setting up their phones after purchasing them for consideration, consumers purportedly "consent" to the settings described herein that result in Google's collection of location data. Google's acts, practices, representations, and omissions regarding those settings, including during setup, are thus in connection with the sale of Google's Android phones.

b.  Google creates both software that is part of the Android operating system (*i.e.*, proprietary forks) and also Google apps that it causes to be included on Android devices sold by other manufacturers to consumers in Arizona. As part of activating and setting up those devices after purchasing them for consideration, consumers purportedly "consent" to the settings described herein and Google's collection of location data. Google's acts, practices, representations, and omissions regarding those settings are thus in connection with the sale of certain third-party Android phones.

c.  Google advertises the devices and software described in (a) and (b), *supra*, to consumers. Google also advertises software that runs on other operating systems (*e.g.*, iOS). Google's acts, practices, representations, and omissions when advertising devices and software are thus in connection with the advertisement of merchandise.

d.  Google sells ad placements (*i.e.*, "merchandise") to third parties for consideration (Google's principal business), which advertisements are powered by the fruits of the

-6-

1    deceptive and unfair acts and practices alleged herein relating to collection of user

2    location data. Google's acts, practices, representations, and omissions when selling ad

3    placements to purchasers of such ad placements are thus in connection with the sale

4    of merchandise.

5       e.  Google markets (*i.e.*, advertises) its ad business to potential and actual buyers of its

6    advertisements. Google's acts, practices, representations, and omissions when

7    marketing its ad business to potential buyers of ads are thus in connection with the

8    advertisement of merchandise.

9       f.  Google's unfair and deceptive acts and practices lead to targeted advertisements to

10    Arizona consumers based on user location data, and Google also tracks "conversions"

11    of such ads to physical store visits. Google's acts, practices, representations, and

12    omissions when serving advertisements to consumers on behalf of the third parties

13    who have purchased such ads, and tracking conversions from such ads, are thus in

14    connection with the advertisement and sale of merchandise by those third parties.

15      23.  Google's own "device" offerings include smartphones in the Google Pixel and Google

16    Nexus families of phones. For example, Google has sold and/or advertised the following devices:

17    •   Google Pixel family

18        o   Pixel C (released 2015)

19        o   Pixelbook (released 2017)

20        o   Pixel Slate (released 2018)

21        o   Pixel 1 (released 2016)

22        o   Pixel 2 (released 2017)

23        o   Pixel 3 (released 2018)

24        o   Pixel 4 (released 2019)

25    •   Google Nexus family

26        o   Nexus One (released January 2010)

27        o   Nexus S (released December 2010)

28        o   Galaxy Nexus (released November 2011)

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1        o      Nexus 4 (released November 2012)

2        o      Nexus 5 (released November 2013)

3        o      Nexus 6 (released November 2014)

4        o      Nexus 5X (released October 2015)

5        o      Nexus 6P (released September 2015)

6        24.     On information and belief, Google, through agreements with third-party manufacturers

7 such as Samsung and carriers such as Verizon, causes its Android software and apps to be pre-installed

8 on phones and devices that are sold to consumers in Arizona, and which consumers "consent" to as part

9 of the setup process after buying such phones and devices.

10      25.     Google also sells, advertises and/or otherwise offers for consideration various software

11 services to Arizona consumers, either directly or indirectly. For example, Google's software offerings

12 include the Android operating system ("Android"), Google-authored apps ("Google apps"), Google

13 Accounts, and Google web browsers, such as Chrome. In its privacy policy, Google defines its services

14 as including (i) "Google apps, sites, and devices, like Search, YouTube, and Google Home," (ii)

15 "Platforms like the Chrome browser and Android operating system," and (iii) "Products that are

16 integrated into third-party apps and sites, like ads and embedded Google Maps." Ex. 72 (GOOG-GLAZ-

17 00000715) at 715.

18      26.     In consideration for use of Google's software products and devices, Google collects, *inter*

19 *alia,* "information about your location when you use our services, which helps us offer features like

20 driving directions for your weekend getaway or showtimes for movies playing near you." *Id.* at 718.

21 Google tells consumers it must collect this data "to deliver our services," "ensure our services are

22 working as intended," "develop new services," and "show you personalized ads." *Id.* at 719. ████

23 ████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████. 3/6/2020 ████ EUO Tr. at 368:1–369:17; *see also id.* at 370:4–

26 24 (████████████████████████████████████████████████

27 ████████████); 2/28/2020 ████ EUO Tr. at 327:17–18 (████████████████

28 ████████████).

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

27.     Google also collects users' location data from its Android operating system. Google's Android is a popular smartphone operating system in the United States. Beyond smartphones, Android also runs on various other types of devices, such as tablets, televisions, home appliances, and fitness trackers. Android is also the operating system that is installed on all of Google's own smartphone devices.

28.     Android is technically an open-source software, meaning that anyone can take the Android source code, modify it in any way, and install it on a compatible device. Such modifications are called "forks" of Android.

29.     While third-party smartphone manufacturers ("OEMs") are technically free to pre-install any Android fork on their phones, ███████████████████████████████████████ ███████████. 2/28/2020 ████ EUO Tr. at 448:9–17.

30.     Google causes its preferred versions of Android to be pre-installed on many smartphones, and forbids OEMs from pre-installing any Google apps (such as Search or Maps) on other versions of Android. Google has a large incentive to do this: its own version of Android contains Google Mobile Services ("GMS"), █████████████████████████████████████████ ███████████████████████████████████████ ████████████. 2/28/2020 ████ EUO Tr. at 444:8–445:9; *see also* Ex. 201 (GOOG-GLAZ-00149241) (███████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████).

31.     The location data that Google collects—from any source—adds an enormous amount of value to Google's advertising offerings. As explained above, Google is primarily an advertising

---

[2] GMS ██████████████████████████████████ 9/25/2019 ████ EUO Tr. at 139:1–6. That collection includes ████████████ ██████████████████ *Id.* at 138:4–10; *see also* https://www.android.com/gms/ (GMS is "a collection of Google applications and APIs that help support functionality across devices. These apps work together seamlessly to ensure your device provides a great user experience right out of the box.").

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1   company—in 2019, Google made $161 billion in revenue, of which $135 billion (84%) came from
2   advertising.

3       32.     For instance, one of Google's advertising offerings is called Store Visits. With this
4   product, Google is able to inform its advertisers how effective their ads are by informing them when
5   viewing an ad online drives a physical store visit. Google is only able to do this by collecting massive
6   amounts of user location data.

7   **B.      Overview of Google's Many Location-Related Settings**

8       33.     As explained further below, Google's products and services include a web of interrelated
9   settings that relate to Google's collection of a user's location-related information. These settings,
10  individually and collectively, are in many cases deceptive, and their use by Google to collect users'
11  location data is unfair and deceptive.

12      34.     The settings fall into three categories: (i) account-level, (ii) device-level, and (iii) app-
13  level. In many instances, these settings are defaulted to enable collection of user location data, unless the
14  user affirmatively disables the settings. In many instances, the settings can conflict with one another, but
15  Google collects user location data regardless. In many instances, locating and/or understanding the
16  appropriate setting is extraordinarily difficult and confusing.

17      35.     Device-level settings are those that are specific to a given hardware device, like a
18  smartphone or tablet. A user may have a single Google Account that is used on multiple devices. For
19  example, a device-level location setting may be turned off for that user's Pixel phone, but turned on for
20  the user's tablet.

21      36.     Account-level settings are those that apply to a user's entire Google Account and are
22  propagated to all devices associated with that Google Account.

23      37.     App-level settings are settings specific to a particular app. An app-level setting can relate
24  to a Google app, such as Google Maps. An app-level setting can also apply to third-party apps that are
25  installed on an Android device.

26      38.     Although these various settings have changed over time (including recently), the
27  following table includes some of the relevant settings today:

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

| Setting Name | Category | Description |
|---|---|---|
| Device Location (or Location Master) | Device-level setting | This setting is the main location setting on a device and controls whether a device's location setting is on. When it is on, GPS is used to obtain a user's location. |
| Google Location Accuracy (formerly known as Google Location Services) ("GLA") | Device-level setting | GLA is a network-based location service that uses signals other than GPS to obtain a user's location. Specifically, GLA obtains location from WiFi, cellular networks and a variety of sensors (█████████████████████ ███████). |
| Usage & Diagnostics | Device-level setting | When turned on, this setting purportedly helps Google improve the Android operating system ("OS"). It collects the user's IP addresses, which can be used to infer location. |
| WiFi Scanning | Device-level setting | This setting allows apps and services to be able to obtain WiFi scans even when the WiFi setting is off. ███████ ████████████████████████████████████████ ███████ |
| Bluetooth Scanning | Device-level setting | This setting allows apps and services to be able to obtain Bluetooth scans even when the Bluetooth setting is off. ████████████████████████████████████████████ ███████ |
| App-level location permission | App-level setting | When on, this setting gives an app permission to access the location of the corresponding device's location. |
| Location History ("LH") | Account-level setting | When on, this setting allows Google to build a comprehensive list of everywhere the user goes with their devices that also have Location Reporting (explained below) turned on, even when the user is not using a Google service. LH also powers a product called Timeline, which is a user-facing product in which users can view and delete the places they have been. |
| Location Reporting | Device-level setting | This is a sub-setting of LH. When on, it enables the device to report location via Google's Location History setting. |
| Web & App Activity ("WAA") | Account-level setting | When this setting is on, Google saves a user's Google activity. For example, when a user uses Google Search or Google Maps to search for "restaurants near me," Google collects the search term as well as information about that activity, such as a user's location and IP address. WAA also powers a product called My Activity, which is a user-facing product in which users can view and delete their WAA. |
| Supplemental Web & App Activity ("sWAA") | Device- and account-level setting | This is a sub-setting to WAA. When it is on, it allows a user's Chrome history and activity from websites and apps that use Google services to be collected. |
| Google Location Sharing | Account-level setting | This setting allows a Google Account holder to share his real-time location with others. |

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

| Setting Name | Category | Description |
|---|---|---|
| Google Ad Personalization ("GAP") | Account-level setting | When off, this setting purports to prevent Google from targeting a user with ads based on the user's location. |

*See, e.g.*, Ex. 202 (Google's Consolidated Final Responses to the First, Second, and Third CIDs ("Google's Responses to CIDs 1–3")) at 17–20 (4/17/2019 response to DFI 7 from the First CID); Ex. 203 (GOOG-GLAZ-00076994) at 7000–002; 9/25/2019 ▆▆▆ EUO Tr. at 83:11–89:14.

39.    Location History in particular is central to Google's revenue stream. Among other things,

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆ Ex. 204 (GOOG-GLAZ-00085882) at 882.

40.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.*

41.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆ *Id.*

**C.    Google Admits Its Location-Related Settings Are a** ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

42.    The array of location-related settings described above misleads and deceives users of Google's products into believing that they are not sharing location information when they actually are. Their use by Google also constitutes unfair acts and practices.

43.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆. Ex. 56 (GOOG-GLAZ-00002914) (▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆); Ex. 205 (GOOG-GLAZ-00055259) at

259 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).

44.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

- ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆ Ex. 206 (GOOG-GLAZ-00055452) at 452.

- ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆ Ex. 207 (GOOG-GLAZ-00077898) at 899.

-12-

- [redacted] Ex. 208 (GOOG-GLAZ-00055552) at 553.
- [redacted] Ex. 209 (GOOG-GLAZ-00057477) at 477.
- [redacted] Ex. 210 (GOOG-GLAZ-00057940) at 940.
- [redacted] 9/25/2019 [redacted] EUO Tr. at 275:9–277:6.
- [redacted] Ex. 211 (GOOG-GLAZ-00017790) at 790–91.
- [redacted] Ex. 212 (GOOG-GLAZ-00161717) at 717.
- [redacted] Ex. 213 (GOOG-GLAZ-00028891) at 896–97.
- [redacted] Ex. 214 (GOOG-GLAZ-00101814) at 14.
- [redacted] Ex. 215 (GOOG-GLAZ-00163209) at 213.

45. [redacted]. *See, e.g.*, Ex. 43 (GOOG-GLAZ-00031017) at 019–23 ([redacted] (9/25/2019 [redacted] EUO Tr. at 49:17–50), [redacted]).

46.     Though Google has published a variety of documentation for users, ███████████. *See* Ex. 216 (GOOG-GLAZ-00078009) at 037 (███████████████████████████████████████████████████████████████), 059 (███████████████████████████████████████████████████); Ex. 214 (GOOG-GLAZ-00101814) at 814 (███████████████████████████████████).

47.     The result of this complex web of settings and purported "consents" ██████████████████████████████████ (Ex. 209 (GOOG-GLAZ-00057477) at 478) that misleads users into handing over their location data to Google.

48.     Thus, though Google claims to have obtained consent to collect and store its users' data, that consent is based on a misleading user interface, as well as other unfair and deceptive acts and practices.

49.     ███████████████████████████████████████. *See* Ex. 217 (GOOG-GLAZ-00046967) at 968 (██████████████████████████████████). ████████████████████████████████. *E.g.*, Ex. 218 (GOOG-GLAZ-00114667) at 667–68 (██████████████████████████████████████).

1.      **Google Misleads and Deceives Users Through Its Location History and Web & App Activity Settings**

50.     While Google obtains its users' location information through numerous settings and products, two of the primary settings through which Google misleads, deceives, and conceals material facts from users are Location History and Web & App Activity.

-14-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

51.     On August 13, 2018, the AP published an exclusive report titled "Google tracks your movements, like it or not" that publicly exposed this deception.[3] The article explained how Google "records your movements even when you explicitly tell it not to."

52.     Until the AP article was published, Google represented on its public help page regarding Location History that "You can turn off Location History at any time. With Location History off, the places you go are no longer stored." Ex. 8 (old Google help page titled "Manage or delete your Location History"); *see also* 7/11/2019 ██████ EUO Tr. at 29:10–31:2.

53.     But that was not true. Even with Location History off, Google still collected and stored location data via (at least) its Web & App Activity setting. Thus, for example, a user who had Location History off and looked up the weather where he lived or searched the web with Google's Search app would still unknowingly send Google his location.

54.     ███████████████████████████████████████ ████████████████████████████████. Ex. 20 (GOOG-GLAZ-00001521) at 523; Ex. 23 (GOOG-GLAZ-00001371) at 373. ██████████████████████████████ ██████████████████████████████. Ex. 20 (GOOG-GLAZ-00001521) at 523.

55.     ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████. Ex. 219 (GOOG-GLAZ-00001422).

56.     ██████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████ ███████████████. 3/6/2020 ██████ EUO Tr. at 176:10–178:11.

_____

[3] https://apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracks-your-movements,-like-it-or-not.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

57. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████.

Ex. 24 (GOOG-GLAZ-00001458) at 464–65. ██████

████████████████████████████████████

██████████████. *Id.* at 466.

58.     After the AP story was published, Google updated its help page to remove the disclosure "With Location History off, the places you go are no longer stored." Ex. 11 (GOOG-GLAZ-00000927). In other words, Google attempted to "fix" this particular deception only when it was caught.

59. ████████████████████████████████

█████████. 7/11/2019 ██████ EUO Tr. at 139:13–17 (███████

████████████████████████████████████

███████████). Indeed, ██████████████

██████████████████ Ex. 220 (GOOG-GLAZ-00057237) at 238; *see also* Ex. 221 (GOOG-GLAZ-00146003) at 007 (████████████████████

████████████); Ex. 213 (GOOG-GLAZ-00028891) at 894–95 (██████

████████████████████████████████████

████████████████████████████████

██████████████████).

60. ████████████████████████████████

██████. Ex. 222 (GOOG-GLAZ-00069965) at 965 (████████████

██████).

61. ████████████████████████████████

████████:

- ████████████████████████████████

████████████████████████████████

████████████████████████ Ex. 19 (GOOG-GLAZ-00001288) at 289.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1   •   ████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████. *Id.* at 290.

4   •   ████████████████████████████████████████████████

5   █████████████████████████████████████████████ Ex. 223 (GOOG-

6   GLAZ-00057861) at 861.

7   •   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████ Ex. 224 (GOOG-

11  GLAZ-00149867) at 868.

12  •   ████████████████████████████████████████████████████

13  *Id.* at 867.

14  •   ██████████████████████████████████████████████████████

15  ████████ Ex. 18 (GOOG-GLAZ-00001266) at 270.

16  •   ████████████████████████████████████████████████

17  █████████████████████████████████████████ Ex. 20 (GOOG-

18  GLAZ-00001521) at 523.

19      62.     Completely independent of its connection to Location History, Web & App Activity itself

20  is another source of deceptive and unfair acts and practices and unlawful concealment by Google. Until

21  around early- to mid-2018, Google's disclosures during account creation made no mention of the fact

22  that location information was collected via WAA, which is defaulted to "on." 7/12/2019 ██████ EUO

23  Tr. at 175:7–15, 374:1–13.

24      63.     Even after Google changed this policy, users had to click on a "Learn More" link to view

25  that disclosure until late 2018, when Google finally disclosed that WAA may include location data

26  collection without users having to click on "Learn More." *Id.* at 376:15–3. Thus, users who had set up an

27  account prior to 2018 would never receive a disclosure that WAA collects location data when setting up

28  their account on a new device. *Id.* at 381:16–23. The same was true after account setup if a user wanted

-17-

to enable a Google product that required WAA to be "on": the WAA disclosure made no mention of location collection. Ex. 225 (GOOG-GLAZ-00101684) at 684 (███████████████████████ ██████████████████████████████████).

64.     Additionally, until Android Q, an Android user could not directly access the WAA settings on his phone. 7/12/2019 ███████ EUO Tr. at 164:16–166:19.[4] Instead, a user would have to navigate to the device's settings, then to a Google link which took the user to his Google Account, then navigate down to WAA. *Id.*

65.     ████████████████████████████████████████████ ███████████████████████████████████. Ex. 226 (GOOG-GLAZ-00107030) at 030 (███████████████████████████████████████████████████████).[5]

66.     ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████. 7/12/2019 ███████ EUO Tr. at 182:23–194:12. ████████████████████████████████████████████████████████████ ██████. *Id.* ████████████████████████████████████████████. *See id.* at 183:24–184:10; Ex. 227 (GOOG-GLAZ-00084080) at 1 (████████████████████ █████████████).

67.     ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████ Ex. 228 (GOOG-GLAZ-00106193) at 194.

68.     ████████████████████████████████████████████ ████████████████████████████████████████████ 7/12/2019 ███████ EUO Tr. at 195:11–

---

[4] At least prior to Android Q, the same was true of the Location History setting. *See* 7/12/2019 ████████ EUO Tr. at 165:13–166:4, 170:6–171:1. Android Q, also known as Android 10, was released on September 3, 2019. *See* https://www.theverge.com/2019/9/3/20842507/google-android-10-q-pixel-release-download-availability.

[5] ████████████████████████████████████████████████████████████ ████████████ 7/12/2019 ███████ EUO Tr. at 69:15–18.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1    205:22; Ex. 202 (Google's Responses to CIDs 1–3) at 92–95 (9/4/2019 response to DFI 23 from the

2    Third CID) (███████████████████████████████████████████████████████

3    ████████████). ████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████.

6          69.    ████████████████████████████████████████████████████████

7    ████. Ex. 229 (GOOG-GLAZ-00077413) at 413 (███████████████████████████

8    ████████████████████████████). ██████████████████████████████████████

9    ███████████████████████████████████████████████ *Id.* ████████████████

10   ██████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████. 2/27/2020 ██████ EUO Tr. at

13   52:22–58:13.[6] ███████████████████████████████████████████████████

14   ██████████████████████████████. *Id.* at 55:3–13. ██████████████████████

15   ████████████████████. *Id.* at 58:14–59:2.

16        70.    ████████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████.

19        **2.    ██████████████████████████████████████████████████ WiFi**

20        **Scanning and WiFi Connectivity Settings**

21        71.    One of Google's location settings is WiFi Scanning. WiFi Scanning and WiFi

22   connectivity are independent settings, and both can be switched off. 9/25/2019 █████ EUO Tr. at 90:2–7.

23   Whereas the WiFi connectivity setting ███████████████████████████████████████

24

25

26   [6] ██████████████████████████████████████████████████████████████████

27   ██████ 2/27/2020 █████ EUO Tr. at 57:20–58:13. ████████████████████████████

28   ██████████████████████. *Id.* at 157:10–20.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1 ███████████████████████████████████████████████████████████████[7]

2 *Id.* at 117:4–118:5.

3       72.     Google's written disclosures at most suggest to users only that WiFi Scanning (as

4 opposed to WiFi connectivity) is related to location data. Ex. 230 (GOOG-GLAZ-00001105) at 106

5 ("To help apps get better location info, you can let your device scan for nearby Wi-Fi access points . . .

6 Tap Advanced > Scanning . . . Turn Wi-Fi scanning . . . on or off"). ██████████████████████

7 ██████████████████████████████████████████████████████.

8       73.     The user interface for the WiFi Scanning setting is housed within location settings, while

9 the WiFi connectivity setting itself is separate.[8] This leads users to believe that the two functions

10 (scanning and connectivity) are separate, and that if they disable the WiFi Scanning permission on their

11 device, Google no longer collects, uses, or stores location information derived from WiFi scans.

12       74.     ███████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████. 9/25/2019 ████ EUO Tr. at 88:23–89:10. If WiFi Scanning is *off*, ████

15 ████████████████████████████████████████████████████████████

16 █████████████████████████████████████████. *Id.* at 91:2–7. Further, as

17 of at least November 1, 2017, ██████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 █████████████████████████ Ex. 43 (GOOG-GLAZ-00031017) at 022.

20       75.     Thus, despite the user attempting to prevent the reporting of WiFi-based location data—

21 and despite the user affirmatively turning the Location Master off—███████████████████████

22 ████████████████████████.

23

24

25 ───────────────

   [7] ██████████████████████████████████████████████████████████

26 ███████████████████ Ex. 231 (GOOG-GLAZ-00109617) at 617. █████████████████

27 ████████████████████████████████████████ *Id.*

   [8] Depending on the OEM and build of Android, the path can look like Settings > Privacy and safety >

28 Location > Improve accuracy > WiFi scanning. *See* https://www.solveyourtech.com/turn-off-wifi-bluetooth-scanning-location-accuracy-android-marshmallow/.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

76.     In short, the separation of the WiFi Scanning and WiFi connectivity settings misleads users into providing location data to Google even if they do not want to. Google's disclosures suggest disabling "WiFi Scanning" will prevent Google from scanning nearby WiFi access points. ████████

████████████████████████████████████████████████████

████████████████ .

77.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *See* Ex. 43 (GOOG-GLAZ-00031017) at 020–21. ████████

████████████████████████ *Id.* at 021.[9] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id.* at 021–22.[10]

78.     In addition to deceiving consumers through the WiFi setting described above, ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████. *Id.* at 021.

**D.     Google Uses Its Users' Locations Even When Users Turn Off the Relevant Permissions**

1.     ████████████████████████████████████████████

████████

79.     In more recent versions of Android, individual apps ask for the user's permission to use location data, and users can change this permission through their settings. This permissions structure is called a "run-time" permission model; before this model, Google used an "install-time" model that

---

[9] Android P became publicly available on August 6, 2018. https://www.theverge.com/circuitbreaker/2018/8/6/17656294/essential-phone-android-9-pie-update-now-available.

[10] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1  sought a user's permission only when the app was installed for the first time. 9/25/2019 ▬▬ EUO Tr. at

2  163:3–12, 215:3–216:7. Run-time permissions were introduced with Android Marshmallow. *Id.*[11]

3        80.    Thus, under the run-time model, Google represents to its users that a given app would not

4  be able to obtain a user's location if the user denies app-level location permissions. Ex. 232 (GOOG-

5  GLAZ-00027697) at 700 (███████████████████████████████████████████████████

6  ███████████████████████████████████); Ex. 233 (GOOG-GLAZ-00000381) at 381

7  (public-facing help page explaining that users "can control which apps can see and use your phone's

8  location. For example, you could let Google Maps use your phone's location to give you driving

9  directions, but not share the location with a game or social media app.").

10        81.    ███████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████. Ex. 45 (GOOG-GLAZ-00005829) at 829–

13  32 (███████████████████████████████████████████████████████████

14  █████████████████████████████); Ex. 234 (GOOG-GLAZ-00060013) at 013

15  (███████████████████████████████████████████████████████); Ex. 114

16  (GOOG-GLAZ-00198467) at 469 (███████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ███████████████████████████████████);[12] Ex. 235 (GOOG-GLAZ-00150448) at

19  449 (███████████████████████████████████); Ex. 236 (GOOG-GLAZ-00027379) at

20  379–83 (███████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ███████████████████); Ex. 237 (GOOG-GLAZ-00096366) at 378 (███████████████

23  ████████████████████████████████████████████████████████████).

24

25  _____

26  [11] Android Marshmallow was publicly released in October 2015.
    https://www.theverge.com/2015/10/5/9454437/android-6-0-marshmallow-now-available.

27  [12] ██████████████████████████████████████████████████████████
    ████████████████████████████ *See* 2/27/2020 ▬▬ EUO Tr.

28  at 117:1–3, 119:17–19. ███████████████████████████████████████████████
    ████████. *See id.* at 98:19–99:4.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1    82. ████████████████████████████████████████████████

2    ████████████████████████████. Ex. 45 (GOOG-GLAZ-00005829) at 829. In technical terms, ████████

3    ████████████████████████████████████████████████████████████████

4    ████████████████████ (Ex. 238 (GOOG-GLAZ-00027688) at 689)—████████████████

5    ████████████████████ Ex. 232 (GOOG-GLAZ-00027697) at 697; *see also* Ex. 214 (GOOG-

6    GLAZ-00101814) at 814 (████████████████████████████████████████████

7    ████████████████████████).

8    83. ████████████████████████████████████████████████

9    ████████████████████████████. Ex. 45 (GOOG-GLAZ-00005829) at 829 (████████████

10   ████████████████████████████).

11   84. ████████████████████████████████████████████████

12   ████████████████████. *See* Ex. 47 (GOOG-GLAZ-00033771) at 772 (████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████). ████████████████████████████████

16   ████████████████████████████████████.

17   85. ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████. Ex. 235 (GOOG-GLAZ-00150448) at 452

20   (████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████).

23   86. ████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████. *Id.* at 450 (████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████).

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

87. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 239 (GOOG-GLAZ-00037593) at 640. And Google consistently makes representations that location data is collected and stored only when the respective settings are turned on. *E.g.*, Ex. 8 at 1 ("With Location History off, the places you go are no longer stored"); Ex. 72 (GOOG-GLAZ-00000715) at 718 ("The types of data we collect depend in part on your device and account settings. For example, you can turn your Android device's location on or off using the device's settings app").

88.     Thus, a reasonable belief for users is that, when they turn their device's Location Master off, Google no longer collects, stores, or uses any location information. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 240 (GOOG-GLAZ-00157550) at 550; *see also* Ex. 69 (GOOG-GLAZ-00096793) at 807 (▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

89. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 5/8/2020 ▮▮▮▮▮▮

EUO Tr. at 271:23–272:1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); 5/21/2020 ▮▮▮▮▮ Rough EUO Tr. at 98:4–

6 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

90. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 241 (GOOG-GLAZ-00097091) at 092.

91. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1　████████████████████████████████████

2　█████████████████████████████████████████

3　█████████████████████████████████████

4　█████████████████████████████████████████

5　██████████████████. *See id.*; *see also* Ex. 242 (GOOG-GLAZ-00101518) at 518 (█

6　█████████████████████████████████████████

7　█████████████████████████████████████████

8　█████████████████████████████████████).

9　　92. ███████████████████████████████

10　███████████████████████████ Ex. 243 (GOOG-GLAZ-00111292) at

11　320.

12　　93. ████████████████████████████████

13　█████████████████████████████████████

14　(Ex. 84 (GOOG-GLAZ-00079712) at 712 (██████████████████

15　████████████))████████████████████

16　█████████████████████████████████████████

17　█████████████████████████████████████

18　███████████████████████████████████████ 3/6/2020

19　████ EUO Tr. at 378:14–379:6.

20　　94. ███████████████████████████████

21　█████████████████████████████████████████

22　███████████████████████████████████

23　█████████████████████████████████████████

24　████████████████████████████████████

25　█████████████████████████████████████████

26　████ Ex. 244 (GOOG-GLAZ-00031991) at 991. ██████████████

27　█████████████████████████████████████████.

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

95. ██████████████████████████████████████████████

██████████████████████████████████████████████████ .

3.  ██████████████████████████████████████████████

██████████████████████

96.  Google's culpable conduct is not limited solely to collecting location data in a misleading

and deceiving way; it also uses location data for ads in ways that mislead and deceive users, including

those in Arizona.

97.  Google serves ads to its users based in part on location data retrieved from, among other

settings, Location History and Web & App Activity. 9/25/2019 ████ EUO Tr. at 222:10–25. Google

purports to allow users to opt-out of this advertisement personalization; in order to do so, Google

provides an account-level toggle in a user's Google Account under "Data & Personalization." Ex. 245

(GOOG-GLAZ-00000415) at 415 ("You can change where you see personalized ads or stop Google

from using your activity to personalize ads.").

98.  Such a toggle implies that the user has control over whether Google will serve ads based

on the user's location. But █████████████████████████████████████████████████████████

████████████████████████████████ Ex. 70 (GOOG-GLAZ-00085629) at 636.

99.  ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ .

5/21/2020 ████ Rough EUO Tr. at 114:9–115:11. ██████████████████████████

████████████████████████████████████████████████ . *Id.* at 84:14–19.

100.  ████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ . *See* 2/27/2020 ████ EUO Tr. at 172:2–15; 2/28/2020 ████ EUO Tr. 318:24–

319:7.

101.  ████████████████████████████████████████████████████

███████████████████████████████████ . 2/27/2020 ████ EUO Tr. at 163:6–16, 167:8–

22. ██████████████████████████████████████████████████████

███████ . *Id.*

-26-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

102. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████. 2/27/2020 ████ EUO Tr. at 172:2–15 (██████████
████████████████████████████████).

103. ████████████████████████████████████████
██████████████████████████. 2/27/2020 █████ EUO Tr. at
189:18–190:17.

104. ████████████████████████████████████
███████████████████. Ex. 70 (GOOG-GLAZ-00085629) at 638 (██████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████).

**E.      Google Automatically Changes the State of Permissions Without Notifying Users**

105.    Presumably, the entire point of including various toggles and consents on devices and
accounts is to give the user control over the state of their device and/or account. However, Google has
pushed a variety of updates that automatically change the user's location settings and defaults without
informing the user, much less seeking or obtaining consent.

106.    For example, in August 2016, █████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████. Ex. 79 (GOOG-GLAZ-00057389) at 389; *see also* Ex. 246 (GOOG-GLAZ-00058103) at
104 (███████████████████████████████████████████
████████████████████████████████████████████████
██████████).[13] ████████████████████████████████████

---

[13] As described above, sWAA is a setting, housed within WAA as a checkbox, that collects data from
████████████████████████████████████████████████ in WAA. Ex.
203 (GOOG-GLAZ-00076994) at 7002. This supplemental setting is itself misleading for users. *See* Ex.

1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

3 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 79 (GOOG-GLAZ-00057389)

5 at 389.

6     107.   In another example, in around 2017, ▇▇▇▇▇▇▇▇▇▇▇

7 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

8 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9 ▇▇▇▇▇▇▇▇▇▇▇. Ex. 78 (GOOG-GLAZ-00070610) at 610. ▇▇▇▇▇▇

10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

13 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.*; *see also* Ex. 248 (GOOG-GLAZ-00070491)

15 at 491 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

17     108.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

19 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. 3/6/2020 ▇▇▇ EUO Tr. at 286:19–287:24,

20 290:14–291:24.

21     109.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

23 Ex. 249 (GOOG-GLAZ-00125482) at 490 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25 ▇▇▇▇▇▇▇▇▇▇); Ex. 250 (GOOG-GLAZ-00065187) at 192 (▇▇▇▇

26 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27 _____

28 247 (GOOG-GLAZ-00126368) at 384 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1  ██████████████████████████████████████████████); Ex. 251

2  (GOOG-GLAZ-00127414) at 414–16 (████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████).

5  **F.   Google Changes the Android User Interface to Increase Location ████████ at the**

6  **Expense of User Choice and Consent**

7  110.  ██████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ███████████████████████████████████████.

11  111.  ██████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████. Ex. 51 (GOOG-GLAZ-00026768) at 769–72 (███████████

16  ████████████████████).

17  112.  ██████████████████████████████████████████

18  ████████████████████████████████ 9/25/2019 ████ EUO Tr. at 199:4–6.

19  ████████████████████████████████████████████████████

20  ████████████████████████████. Ex. 51 (GOOG-GLAZ-00026768) at 770. ███

21  ████████████████████████████████████████████████████

22  ████████████████████████████████. *Id.* at 769–77.[14]

23  113.  One change to the Android UI was a change to the Quick Settings ("QS") panel on

24  Android KitKat. The QS panel becomes visible when a user pulls down from the top of the screen at

25  almost any point on an Android device. 9/25/2019 ████ EUO Tr. at 202:15–22. The panel includes

26  toggles for various popularly used settings, such as WiFi. The QS panel previously included a toggle for

27

28  [14] Android KitKat was publicly released on October 31, 2013. *See* https://googleblog.blogspot.com/2013/10/android-for-all-and-new-nexus-5.html.

-29-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

the Location Master; ███████████████████████████████████████████

████████████████████ Ex. 51 (GOOG-GLAZ-00026768) at 772; Ex. 71 (GOOG-
GLAZ-00027187) at 196 (████████████████████████████████████████
████████).

114.   ███████████████████████████████████████████████

████████████████████████████. Ex. 51 (GOOG-GLAZ-00026768) at
768–72.

████████████████████████████████████████. Ex. 61 (GOOG-GLAZ-
00026360) at 360. ████████████

████████. *Id.* at 361 (████████████████████████

████████████████████████████████).[15]

115.   ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. *See* Ex. 52 (GOOG-
GLAZ-00005425) at 428; *see also* Ex. 252 (GOOG-GLAZ-00028327) at 327 (████████

████████████████).

116.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████. Ex. 52 (GOOG-GLAZ-
00005425) at 429.

███.

117.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████. Ex. 51 (GOOG-GLAZ-00026768) at 785; *see also*
9/25/2019 █████ EUO Tr. at 238:10–239:3; Ex. 253 (GOOG-GLAZ-00028014) at 014–25 (████

---
[15] ██████████████████████████████████████████████████████
████████████████████.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1

2 ▮▮▮▮▮▮▮▮▮▮▮▮).

3      118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 254 (GOOG-GLAZ-00115868) at 868 (sheet1, cell

6 G14). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7

8 ▮▮▮▮▮▮▮▮▮▮▮. Ex. 53 (GOOG-GLAZ-00026843) at 850. ▮▮▮▮

9

10

11 ▮▮▮▮▮▮▮▮▮▮. *Id.* at 847–50.

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.*

13 at 846–47.

14      119. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15

16 ▮▮▮▮▮▮▮▮▮▮▮. Ex. 255 (GOOG-GLAZ-00027518) at 518; Ex. 256

17 (GOOG-GLAZ-00029585) at 615.

18      120. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex.

20 257 (GOOG-GLAZ-00032539) at 539.

21      121. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex.

23 52 (GOOG-GLAZ-00005425) at 431. ▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 426. ▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

27 *Id.* at 426. ▮▮▮▮▮▮▮▮▮▮

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

2　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. *Id.* at 425.

3　　122.　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

4　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. *See, e.g.*, Ex.

5　53 (GOOG-GLAZ-00026843) at 844 (▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

6　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋).

7　　123.　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

8　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

9　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

10　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

11　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

12　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

13　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.

14　　124.　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

15　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. Ex. 254 (GOOG-GLAZ-00115868) at

16　868 (sheet1, rows 12–14). ▋▋▋▋▋▋▋▋

17　▋▋▋▋▋▋▋▋. *See* Ex. 61 (GOOG-GLAZ-00026360) at 361 (▋▋▋▋▋▋▋▋▋

18　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

19　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

20　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋) (emphasis in original).

21　　125.　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

22　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

23　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

24　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. Ex. 256 (GOOG-GLAZ-00029585) at 595.

25　　126.　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

26　▋▋▋▋▋. *Id.*▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

27　▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋:

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

*Id.*

127. ███████████████████████████████████████████████████████

███████████████████████. *Id.*

128. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████.

**G.    Google Misleads and Deceives Users Regarding Its Deletion of Their Location Information**

129.    Google admits that, until at least as late as 2015, ████████████████

█████████████████████████████ Ex. 214 (GOOG-GLAZ-00101814) at 814. ████████

███████████████████████████████████████████████████████████████

███████████. In particular, Google now represents that users are able to delete the location data that

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1  it has collected and stored. Ex. 36 (GOOG-GLAZ-00000001) at 001–02 ("We'll keep this data in your

2  Google Account until you choose to remove it," "[w]hen you delete data in your Google account, we

3  immediately start the process of removing it from the product and our systems"); *see also* Ex. 202

4  (Google's Responses to CIDs 1–3) at 79–80 (9/47/2019 response to DFI 10 from the Third CID) (▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

7       130.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8  ▮▮▮▮▮▮▮▮▮▮▮.

9       131.   While that by itself is misleading and deceptive, what is worse is that Google's user-

10  facing interface displays data being deleted immediately—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 59

11  (GOOG-GLAZ-00031110) at 124 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). ▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮. Ex. 258 (GOOG-GLAZ-00065293) at 295 (▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮) (emphasis in original).

18  **H.   Google Has Engaged In Willful Violations Of The Arizona Consumer Fraud Act**

19       132.   Google's many violations of the Arizona Consumer fraud act were willful, *i.e.* it knew or

20  should have known its conduct was of the nature prohibited by the Arizona Consumer Fraud Act.

21       133.   Google willfully misleads and deceives users into enabling collection of their location

22  data and using and storing their location data in ways users do not know or understand. Google also

23  willfully engages in unfair acts and practices, including through the conduct described above.

24       134.   Some of this evidence was described above, and more is set forth here and below:

25     •   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮ Ex. 209 (GOOG-GLAZ-00057477) at 477–78.

- ███████████████████████████████ Ex. 259 (GOOG-GLAZ-00078007) at 807.
- ███████████████████████████████████████████████
███████████████████████████████████████████
████ Ex. 216 (GOOG-GLAZ-00078009) at 018.
- ███████████████████████████████████████████████
███████████████████████████████████████████. Ex.
260 (GOOG-GLAZ-00057339) at 340.
- ███████████████████████████████████████████████
██████████████████ Ex. 270 (GOOG-GLAZ-00055829) at 851.
- ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
██████████████ Ex. 261 (GOOG-GLAZ-00099239) at 239.
- ███████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████ Ex. 262 (GOOG-GLAZ-
00117506) at 506.

135. ███████████████████████████████. Ex. 263 (GOOG-GLAZ-
00100799) at 800 (███████████████████████████████████████████
█████████████████████████████████████████████
█████).

136. ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████. Ex. 260 (GOOG-GLAZ-00057339) at 339.
██████████████████████████████████:

- ███████████████████████████. *Id.* at 339 (███████████████
███████████████████████████████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1    ████████████████████); Ex. 264 (GOOG-GLAZ-00048459) at 478

2    (███████████████████████████████████████████).

3    •    ████████████. *Id.*; Ex. 265 (GOOG-GLAZ-00078761) at 761

4    (███████████████████); Ex. 266 (GOOG-GLAZ-

5    00151516) at 517 (████████████████████████████████████

6    ███████████████████).

7    •    ████████████████████████. Ex. 23 (GOOG-GLAZ-

8    00001371) at 373 (████████████████████████████████

9    ██████████████); Ex. 267 (GOOG-GLAZ-00035559) at 559 (███████

10   █████████████████); Ex. 268 (GOOG-GLAZ-00078652) at 52

11   (████████████████████████).

12   •    ██████████████████████████████████. Ex.

13   47 (GOOG-GLAZ-00033771) at 72 (███████████████████).

14   •    ████████████. Ex. 269 (GOOG-GLAZ-00073037) at 037–43 (████████

15   ████████████████████████████████████████████

16   ████).

17   •    █████████████. Ex. 266 (GOOG-GLAZ-00151516) at 517.

18              IV.    **ARIZONA'S INVESTIGATION INTO GOOGLE'S**

19                 **UNFAIR AND DECEPTIVE ACTS AND PRACTICES**

20          137.    The Arizona Attorney General's Office ("AGO") first became aware of Google's

21   potential violations of the Arizona Consumer Fraud Act in connection with the collection of user

22   location data after the Associated Press published the article entitled, "Google tracks your movements,

23   like it or not."

24          138.    ██████████████████████████████████

25   ████████████████████████████████.

26          139.    ███████████████████████████████.

27          140.    █████████████████████████████████████

28   █████████████████████████████████████████████

-36-

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

6    141.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. 3/6/2020

16 ▓▓▓ EUO Tr. at 67:20–70:11. ▓▓▓▓▓▓▓▓▓▓

17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.*

18 at 71:7–17.

19    142.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

23 2/28/2020 ▓▓▓▓ EUO Tr. at 448:9–17; 9/25/2019 ▓▓▓ EUO Tr. at 139:1–140:21. ▓▓▓

24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

25 2/28/2020 ▓▓▓▓ EUO Tr. at 444:8–445:17, 448:9–17; *see also* 9/25/2019 ▓▓▓ EUO Tr. at 64:6–13.

26    143.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

27 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

28 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



1　████████████████████████████████████████████████████

2　████████████████████████████████████████████████████

3　███. 3/6/2020 ██████ EUO Tr. at 122:6–124:2.

4　　144. ███████████████████████████████████████████

5　████████████████████████████████████████████████

6　████████████████████████████████████████████████████

7　Ex. 202 (Google's Response to CIDs 1–3) at 51 (5/30/2019 response to RFP 19 from the First CID). ██

8　████████████████████████████████████████████████

9　████████████████████████████████████████████████████

10　████████████████████████████████████████████████

11　████████████████████████████████████████████████

12　5/21/2020 ████████ Rough EUO Tr. at 84:15–19.

13　　145. ███████████████████████████████████████████

14　████████████████████████████████████████████████████

15　████████████████████████████████████████████████████

16　██████████████████████████████████████████

17　████████████████████████████████████████████████████

18　██████████████████████████████████████████

19　███████████████.

20　　146. ███████████████████████████████████████████

21　████████████████████████████████████████████████████

22　████████████████████████████████████████████████████

23　████████████████████████████████████████████████████

24　████████████████████████████████████████████████████

25　███████████████.

26　　147. ███████████████████████████████████████████

27　████████████████████████████████████████████████████

28　████████████████████████████████████████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1

2

3 . *See* 5/8/2020

4 EUO Tr. at 167:19–169:25; 3/6/2020 EUO Tr. at 398:18–401:17. Location History and

5 Web & App Activity are user-facing settings.

6

7 .

8 148.

9

10 .

11 149.

12

13

14

15 .

16 150.

17

18

19

20

21

22 2/27/2020 EUO Tr. at 59:17–61:15, 115:4–17, 124:17–125:5, 144:15–19, 194:17–

23 195:2; 2/28/2020 EUO Tr. at 447:15–22, 448:18–449:19, 450:2–451:10, 458:24–459:5.

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



1 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2 ▬▬▬.[16] 2/27/2020 ▬▬▬ EUO Tr. at 34:1–35:7, 115:18–23.

3      151. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

4 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

5 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

6 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

7 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ 2/27/2020 ▬▬ EUO Tr. at

8 115:18–23; 5/8/2020 ▬▬▬ EUO Tr. at 115:11–17. ▬▬▬▬▬

9 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

10 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

12 ▬▬▬▬▬▬▬. 2/27/2020 ▬▬▬ EUO Tr. at 125:2–12. ▬▬▬▬

13 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. 5/8/2020 ▬▬▬ EUO Tr. at 61:7–18,

14 102:17–103:6.

15      152. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17 ▬▬▬▬▬. *E.g.*, 5/8/2020 ▬▬▬▬ EUO Tr. at 57:9–12, 59:25–60:17, 61:3–62:4, 79:10–80:12,

18 115:15–20; *see also id.* at 111:22–24 (▬▬▬▬▬▬▬▬▬▬▬▬▬

19 ▬▬▬▬▬▬▬▬▬).

20      153. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

21 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

24

25 _____

26 [16] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

27 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

28 5/8/2020 ▬▬▬▬ EUO Tr. at 28:4–21, 59:18–60:17, 61:3–6, 64:24–65:7, 70:16–71:6, 72:16–74:8, 106:6–19.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1

2

3

154.

4

5

6

7      155.   In short, the AGO's pre-suit investigation has been prejudiced by Google's uncooperative

8    conduct, delay tactics, and general failure to comply with the AGO's discovery demands. Even so, the

9    AGO's investigation to date has uncovered and confirmed the wrongdoing alleged herein.

## V.    CLAIM FOR RELIEF

## ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1521, *et seq.*)

12     156.   Arizona realleges and incorporates by reference all prior paragraphs as though fully set

13   forth herein.

14     157.   The Arizona Consumer Fraud Act provides that "[t]he act, use or employment by any

15   person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise,

16   misrepresentation, or concealment, suppression or omission of any material fact with intent that others

17   rely upon such concealment, suppression or omission, in connection with the sale or advertisement of

18   any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is

19   declared to be an unlawful practice." A.R.S. § 44-1522(A).

20     158.   Google is a "person" within the meaning of A.R.S. § 44-1521(6).

21     159.   The Google products and services described in this Complaint, including but not limited

22   to Google apps, sites, and devices, Google Accounts, Google ads, and platforms like Google Chrome

23   and Android, are "merchandise" within the meaning of A.R.S. § 44-1521(5).

24     160.   Google has systematically engaged in activities with a tendency or capacity to deceive

25   consumers. Google engaged in unlawful practices by employing deception, deceptive or unfair practices,

26   false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material

27   facts with intent that others rely upon such concealment, suppression or omission, in connection with the

28   sale and advertisement of Google products and services.

-41-

161.    In particular, and as described above, Google's unlawful practices, in violation of the Arizona Consumer Fraud Act, include the following:

    a.  Engaging in deceptive and unfair acts and practices by making the deceptive misrepresentation and false promise that "[w]ith Location History off, the places you go are no longer stored," when in fact Google continued to collect and store user location information even with Location History turned off.

    b.  Concealing, suppressing, or omitting the material fact that Google continued to collect and store user location information even with Location History turned off.

    c.  Concealing, suppressing, or omitting during account creation the material fact that location information was collected through Web & App Activity—which defaulted to "on."

    d.  Engaging in deceptive and unfair acts and practices by making the deceptive misrepresentation and false promise that users "can turn [their] Android device's location on or off using the device's settings app" despite the fact that ███████ ███████████████████████████████████████████████████████ ██████████.

    e.  Concealing, suppressing, or omitting the material fact that ███████████ ████████████████████████████████████████████████████.

    f.  Engaging in deceptive and unfair acts and practices by ██████████████ ███████████████████████████████████████████████████ ████████████████████████████.

    g.  Concealing, suppressing, or omitting the material fact that ███████████ ██████████████████████████████████████████████████████ ████████████████████████████.

    h.  Engaging in deceptive and unfair acts and practices by knowingly maintaining a misleading and diverse array of settings related to location tracking that makes it difficult if not impossible to understand the conditions in which Google will collect location data.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

i.  Concealing, suppressing, or omitting the material facts about the conditions in which Google will collect location data.

j.  Engaging in deceptive and unfair acts and practices by ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████.

k.  Concealing, suppressing, or omitting the material fact that location settings were on.

l.  Engaging in deceptive and unfair acts and practices by ██████████████

██████████████████████████████████████████████

██████████████████████████.

m.  Concealing, suppressing, or omitting the material fact that ████████████

██████████████████████████████████████████████

██████████████████████████.

n.  Engaging in deceptive and unfair acts and practices by knowingly maintaining a confusing and misleading presentation of the WiFi scanning and WiFi connectivity settings that ████████████████████████████████

████████████████████████.

o.  Concealing, suppressing, or omitting the material fact that ████████████

████████████████████████.

p.  Engaging in deceptive and unfair acts and practices by continuing to present location-based advertisements to users ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████.

q.  Concealing, suppressing, or omitting the material fact that ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████.

-43-

    r. Engaging in deceptive and unfair acts and practices by ███████████

████████████████████████████████████████████████

███████████████████████████.

    s. Concealing, suppressing, or omitting the material fact that ████████

███████████████████████████████████████████.

162. With respect to its concealment, suppression, and omission of material facts described above, Google intends that users rely on the concealment, suppression, or omission.

163. Consumers in Arizona have in fact been the subject of deception, deceptive/unfair acts/practices, false pretense and promises, misrepresentations, and concealment, suppression, or omission of material facts described above.

164. Google's purpose in engaging in these unlawful practices is simple: increasing revenue and profit. Google generates over one hundred billion dollars of revenue and tens of billions of dollars of profit every year from advertising, including, on information and belief, hundreds of millions of dollars from ads shown to users in Arizona. These advertising profits are driven in large part by Google's ability to collect and store its users' location data, which enables Google to sell advertisers on the ability to target ads to users in particular locations. It also enables Google to track "conversions" of ad clicks to store visits. Google therefore goes to great lengths to collect location information from its users, including by engaging in the unlawful activities alleged in this Complaint. Those unlawful activities were done in connection with the sale or advertisement of merchandise within the meaning of A.R.S. § 44-1522(A).

165. While engaging in the unlawful acts and practices alleged in this Complaint, Google has at all times acted "willfully" as defined by A.R.S. § 44-1531: Google knew or should have known that its conduct was of the nature prohibited by the Arizona Consumer Fraud Act.

166. Google's violations present a continuing harm and the unlawful acts and practices complained of here affect the public interest.

167. Google's actions to date have failed to fully address the misleading and deceptive nature of its business activities and the company continues to engage in acts prohibited by the Arizona Consumer Fraud Act.

**PRAYER FOR RELIEF**

WHEREFORE, Arizona respectfully requests that the Court enter Judgment against Google as follows:

A.     Order Google to disgorge all profits, gains, gross receipts, and other benefits obtained by means of any unlawful practice as alleged herein, pursuant to A.R.S. §44-1528(A)(3);

B.     Order Google to pay full restitution to consumers, pursuant to A.R.S. §44-1528(A)(2);

C.     Order Google to pay Arizona a civil penalty of not more than $10,000 for each willful violation of the Arizona Consumer Fraud Act, pursuant to A.R.S. § 44-1531;

D.     Enter an injunction against Google, permanently prohibiting it from continuing the unlawful acts and practices alleged in this Complaint or doing any acts in furtherance of such unlawful acts of practices, pursuant to A.R.S. § 44-1528(A)(1);

E.     Order Google to pay Arizona its costs of investigation and prosecution of this matter, including its reasonable attorneys' fees, pursuant to A.R.S. § 44-1534; and

F.     Award Arizona such further relief as the Court deems just and proper under the circumstances.

Dated: May 27, 2020

MARK BRNOVICH
ATTORNEY GENERAL
By: */s/ Brunn W. Roysden III*
Joseph A. Kanefield
Brunn W. Roysden III
Oramel H. Skinner
Michael S. Catlett
Christopher Sloot
   *Assistant Attorneys General*

Guy Ruttenberg (CA Bar No. 207937)
(*pro hac vice* application forthcoming)
Michael Eshaghian (CA Bar No. 300869)
(*pro hac vice* application forthcoming)
RUTTENBERG IP LAW, A PROFESSIONAL
CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, California 90067
Telephone: (310) 627-2270
guy@ruttenbergiplaw.com
mike@ruttenbergiplaw.com

David H. Thompson (DC Bar No. 450503)
(*pro hac vice* application forthcoming)
Peter A. Patterson (DC Bar No. 998668)
(*pro hac vice* application forthcoming)
COOPER & KIRK PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com
ppaterson@cooperkirk.com

*Attorneys for Plaintiff State of Arizona ex rel. Mark Brnovich, Attorney General*

-45-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

# EXHIBIT 33

# Activity controls

🏛 **web.archive.org**/web/20181103224740/https://myaccount.google.com/intro/activitycontrols

The data saved to your account helps give you more personalized experiences across all Google services. Choose which settings you want to save data to your Google Account.

## Web & App Activity

Saves your activity on Google sites and apps to give you faster searches, better recommendations, and more personalized experiences in Maps, Search, and other Google services. Learn more

Sign in



## Location History

Saves where you go with your devices to give you personalized maps, recommendations based on places you've visited, and more. Learn more

Sign in

## Device Information

Stores info about your contacts, calendars, apps, and other device data to improve your experience across Google services. Learn more

Sign in



## Voice & Audio Activity

Records your voice and audio on Google services to improve speech recognition, like when you say "Ok Google" to do a voice search. Learn more

Sign in

## YouTube Search History

Saves your searches on YouTube to make your future searches faster and improve your recommendations. Learn more

Sign in

## YouTube Watch History




1/2

Makes it easier to find YouTube videos you've watched and improve your recommendations in YouTube and other Google services. Learn more

Sign in





# EXHIBIT 34



https://myaccount.google.com/intro/activitycontrols    Go

122 captures
5 Sep 2016 - 15 Nov 2018

APR    MAY    JUL
◀  18  ▶
2017  2018  2019

About this capture

# Google

Sign in

← Activity controls    ?

From better commute options in Maps to quicker results in Search, the data we save with your account can make Google services a lot more useful to you. Here are your controls for managing this data and editing your activity.



## Web & App Activity

Save your search activity on apps and in browsers to make searches faster and get customized experiences in Search, Maps, Now, and other Google products. Learn more

SIGN IN



## Location History

Creates a private map of where you go with your signed-in devices in order to provide improved map searches, commute routes, and more. Learn more

SIGN IN



## Device Information

Store your contacts, calendars, apps, and other device data to improve your experience across Google.
Learn more

SIGN IN



## Voice & Audio Activity

Help recognize your voice and improve speech recognition by storing your voice and audio inputs to your account (for example, when you say "Ok Google" to do a voice search). Learn more

SIGN IN



## YouTube Search History

Store your YouTube searches to make your future searches faster and improve your recommendations.
Learn more

SIGN IN

https://myaccount.google.com/intro/activitycontrols   Go

122 captures

5 Sep 2016 - 15 Nov 2018

APR  MAY  JUL

◀ 18 ▶

2017  2018  2019

▼ About this capture



## YouTube Watch History

Make it easier to find your recently watched videos on YouTube and improve your recommendations.

Learn more

**SIGN IN**

Google    Terms & Privacy    Help



https://myaccount.google.com/intro/activitycontrols

122 captures
5 Sep 2016 - 15 Nov 2018

SEP   OCT   NOV
◀  08  ▶
2015  2016  2017

About this capture

Sign in

 ## Activity controls 

From better commute options in Maps to quicker results in Search, the data we save with your account can make Google services a lot more useful to you. Here are your controls for managing this data and editing your activity.



## Web & App Activity

Save your search activity on apps and in browsers to make searches faster and get customized experiences in Search, Maps, Now, and other Google products. Learn more

SIGN IN



## Location History

Creates a private map of where you go with your signed-in devices in order to provide improved map searches, commute routes, and more. Learn more

SIGN IN



https://myaccount.google.com/intro/activitycontrols    Go

122 captures
5 Sep 2016 - 15 Nov 2018

SEP   OCT   NOV
◀   08   ▶
2015   2016   2017

▼ About this capture

## Device Information

Store your contacts, calendars, apps, and other device data to improve your experience across Google.
Learn more

SIGN IN



## Voice & Audio Activity

Help recognize your voice and improve speech recognition by storing your voice and audio inputs to your account (for example, when you say "Ok Google" to do a voice search). Learn more

SIGN IN



## YouTube Search History

Store your YouTube searches to make your future searches faster and improve your recommendations.
Learn more

SIGN IN



https://myaccount.google.com/intro/activitycontrols    Go

SEP **OCT** NOV

◀ **08** ▶

2015 **2016** **2017**

122 captures
5 Sep 2016 - 15 Nov 2018

activity controls

▼ About this capture

## YouTube Watch History

Make it easier to find your recently watched videos on YouTube and improve your recommendations.

Learn more

**SIGN IN**

Google    Terms & Privacy    Help

# EXHIBIT 35

# See & control your search activity

If Web & App Activity is turned on, your searches and activity from other Google services are saved to your Google Account, so you may get better search results and suggestions.

You control what's saved. And you can delete your past searches and activity or turn off Web & App Activity at any time.

**Note**: If you got your Google Account through work or school, you could need to contact your administrator to turn on the Web & App Activity service for your organization.

**Computer**   Android   iPhone & iPad

## Turn Web & App Activity on or off

1. On your computer, visit the Activity controls ⎋ page. You may be asked to sign in to your Google Account.
2. Turn **Web & App Activity** on or off.
3. If you turn the switch on, you can check the box next to "Include Chrome browsing history and activity from websites and apps that use Google services."

**Note**: Some browsers and devices may have more settings that affect how this activity is saved.

## See or delete your search activity

You can find and delete your searches and browsing activity by visiting My Activity ⎋. Learn more about how to view and control activity or how to delete activity.



## How your saved activity is used

Learn more about how Google uses your saved activity ⎋ and helps keep it private.

For more information about how Google treats search queries generally, see the Privacy Policy FAQ ⎋.

## How Web & App Activity works when you're signed out

Your search and ad results may be customized using search-related activity even if you're signed out. To turn off this kind of search customization, you can search and browse privately. Learn how.

## Browser history

In the Activity controls ⎋ page, you can also check the box to "Include Chrome browsing history and activity from websites and apps that use Google services." When this box is checked, you can control whether activity from your device is saved.

Your searches and the sites you visit may also be stored in your browser or the Google Toolbar. Learn how to delete your history on Chrome, Toolbar, Safari ⎋, Internet Explorer ⎋, or Firefox ⎋.

Was this article helpful?    Yes    No

*After clicking through collapsed links under "What's saved as Web & App Activity":*



Archived Web Capture (https://archive.org/web/) dated November 19, 2018 of URL
https://support.google.com/websearch/answer/54068; *See & control your search activity*, available at
https://web.archive.org/web/20181119040025/https://support.google.com/websearch/answer/54068
(emphasis added).

# EXHIBIT 36

# Manage or delete your Location History

web.archive.org/web/20180818024224/https://support.google.com/accounts/answer/3118687

Your Location History helps you get better results and recommendations on Google products. For example, you can see recommendations based on places you've visited with signed-in devices, or traffic predictions for your daily commute.

You control what's saved in your Location History, and you can delete your history at any time.

**Note:** Some of these steps work only on Android 8.0 and up.  Learn how to check your Android version.

Learn what applies  in Android 4.1 through 4.3  or  for iPhone and iPad .

## Turn Location History on or off

You can turn off Location History at the account level at any time.

This setting does not affect other location services on your device, like Google Location Services and Find My Device. Some location data may be saved as part of your activity on other services, like Search and Maps. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.

You can also turn off Location services for a device.  Learn how.

### Turn Location History on/off using device settings (Android 2.3 & up)

1. On your Android phone or tablet, open your device's Settings app ⚙️ ❯ **Google** ❯ **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

### Turn Location History on/off using a website

1. Go to the  Activity controls  section of your Google Account. You might need to sign in.
2. Turn **Location History** on or off.
3. Confirm the change. This setting will change for your Google Account and all devices associated with it.

If you use a work or school account, your administrator might turn this setting on or off for you.

# Delete Location History

You can delete all of your Location History or only parts of it. If you delete your entire history, some apps may not work correctly.

## Delete Location History using device settings (Android 2.3 & up)

**IMPORTANT**: Deleting your Location History in the Settings app is permanent. You can't reverse or undo it. Deleting your Location History may cause problems in some apps.

## Delete Location History using a website

You can delete individual locations, locations by date, or your whole location history on the Location History website.

1. Go to maps.google.com/locationhistory. You might need to sign in.
2. Pick how to delete your Location History:

**Note**: The Location History website isn't available in South Korea.

# Usage & diagnostics for Location History

When you turn on Location History, you also let your device send diagnostic information to Google about what's working and not working for Location History.

All usage and diagnostics information is used in accordance with Google's privacy policy.

## What information your device could share

Your device may send information to Google for improving Location History. For example, your device may send information when Location services aren't working properly.

Sent information could include:

- Quality and length of your connections to mobile networks, GPS, Wi-Fi networks, or Bluetooth
- State of your location settings
- Restarts and crash reports
- Apps used for turning Location History on or off
- Battery levels

## How shared information helps Google improve

Usage and diagnostics information can help improve Google apps, products, and Android devices. For example, Google can use information to improve:

- **Battery life**:
  Google can use information about what's using the most battery on your device to help

reduce battery consumption for commonly used features.

- **Location accuracy**:
  Google can use information from location sensors and settings to help improve location estimates for apps and services.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 37

# Turn location on or off for your Android device

web.archive.org/web/20180816040916/https://support.google.com/accounts/answer/3467281

When location is on, you can get information based on where your device has been. For example, you can get automatic commute predictions or better search results.

When an app is using your device's precise location, the top of your screen will show Location .

**Note:** Some of these steps work only on Android 9.0 and up.  Learn how to check your Android version.

## Turn location on or off

When you have location turned on, your device uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location.

If you turn off location, it will also be turned off for all apps. Many features also won't work.

1. Open your device's Settings app.
2. Tap **Security & location**  ›  **Location**.
      **Note**: If you don't see "Security & location," tap **Location**.
3. If you see "Mode," go to the steps for  Android 8.1 and below.
4. Turn **Use location** on or off.

**Tip**: If you change your location setting often,  learn how to quickly change settings.

## Share your location for help in an emergency

To help first responders find you quickly, dial an emergency number. For example, dial:

- 911 in the US
- 112 in Europe
- 999 in some other places

Your device will send its location automatically using Android Emergency Location Service (ELS), if ELS works in your country and on your mobile network.

### How emergency location sharing works

ELS turns on only when you call or text an emergency number.

ELS finds and sends your location by turning on location and using Google's Location services during your emergency call. If needed, ELS can turn on mobile data. When you finish the call or text, your settings go back to how you had them.

## If you're using Android 8.1 & below

Pick your device's location accuracy mode
You can choose your location mode based on accuracy, speed, and battery use.

1. Open your device's Settings app.
2. Tap **Security & Location** ❯ **Location**.
   **Note**: If you don't see "Security & Location," tap **Location**.
3. Tap **Mode**. Then pick:
   - **High accuracy**: This mode uses GPS, Wi-Fi, mobile networks, and sensors to get the most accurate location. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Battery saving**: This mode uses sources that use less battery, like Wi-Fi and mobile networks. It uses Google's Location services to help estimate your device's location faster and more accurately.
   - **Device only**: This mode uses only GPS. It doesn't use Google's Location services to provide location information. It can estimate your device's location more slowly and use more battery.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 38

# Manage location settings for Android apps

web.archive.org/web/20180729104542/https://support.google.com/accounts/answer/6179507

You can let apps use your device's location to do things for you or give you information. For example, apps can use your device's location to see commute traffic or find nearby restaurants.

**Note:** Some of these steps work only on Android 8.0 and up. <u>Learn how to check your Android version</u>.

## See which apps use your location

1. Open your device's Settings app ⚙ .
2. Tap **Security & Location** ❯ **Location**.
3. Under "Recent location requests," see the apps that recently checked your location. For more information about an app, like its battery or data use, tap it.

## Turn Google's Location services on or off

To help improve location for apps, Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

You can turn Google's Location services on or off at any time.

<u>Turn on Google's Location services</u>
1. Open your device's Settings app ⚙ .
2. Tap **Security & Location** ❯ **Location** ❯ **Mode**.
3. Choose **High accuracy** or **Battery saving**. Both modes can use Wi-Fi, mobile networks, and sensors to determine location.

<u>Turn off Google's Location services</u>
1. Open your device's Settings app ⚙ .
2. Tap **Security & Location** ❯ **Location**.
3. You can turn off Google's Location services in 2 ways:
   - Tap **Mode** ❯ **Device only**. This mode uses only GPS to determine location.
   - Turn off **Location**. Turning off location for your device also turns it off for all apps. Many features will be turned off.

## If asked to change location settings

If an app must use your location, it can ask whether you want to change your location settings.

How apps ask you to change location settings

Apps ask you to change your location settings in different ways:

- **"Change location setting?"**
  The app needs your location turned on. Location services give the app data that it needs to work properly.
- **"Improve location accuracy?"**
  Location is already on, but you can turn on more settings or sensors to better determine location.
- **Location mode**
  Using a different mode would improve accuracy. For example, the app could ask you to let your device use available Wi-Fi and mobile networks to find locations. The app will choose the setting that uses the least battery.
- **Wi-Fi connection**
  Scanning for Wi-Fi networks helps find locations. The app can ask you to turn on Wi-Fi, or to let your device scan for Wi-Fi networks.
- **Google Location services**
  Let Google's Location services help apps find locations. Google's Location services can collect location data from time to time. It uses this data in an anonymized manner to improve location accuracy and location-based services. To estimate location, it uses sources like Wi-Fi, mobile networks, and sensors.

## Related articles

Was this article helpful?

How can we improve it?

# EXHIBIT 39

# Create your first ad in just a few steps

------------------------------------------------------------------------

**ads.google.com**/home/how-it-works/

Google Ads makes it easy to show the world what's unique about your business, so you can reach customers searching for what you offer.

Step 1

## Tell us your goal

We'll tailor your ad based on the results you want. And, no matter which advertising goal you choose, Google Ads can help you across the board:

- Get more calls to your business
- Increase visits to your store
- Drive people to your website

step 2

## Decide where to advertise

Go global, or stay local. You decide where you'd like to show your ads, and we'll get them in front of the right people.

Step 3

## Create your message

Highlight what's best about your business in 3 short sentences to get customers excited. Or create compelling banner ads by adding images.

Step 4

## Set your budget cap

You'll never pay more than the monthly cap you set, and you can adjust or pause anytime. Plus, we'll show you estimated results for your budget.

Step 5

## Go live

------------------------------------------------------------------------

We'll display your ads when people search for products or services like yours. Your ads can appear on Google Search and Maps, and across our network of partner sites.

You'll pay for results, like when people click your ad to call your business, visit your website, or get directions to your store.

## Google helps improve your ads over time

We know you want to focus on what's most important—running your business. So our smart technology will help find ways to improve your ads and get you better results.

Plus, we'll provide reports, insights, and ongoing tips, so you can track your progress and make your ads even more successful.

# EXHIBIT 40

# About advanced location options

Location targeting based on household income is being automatically migrated from location targeting into demographic targeting. To make household income targeting changes or see your reports, go to the Demographics section of your Google Ads account.

Location options let you include or exclude people based on:

- where they're likely to be located
- the places they've shown interest in

By default, location targeting includes both physical locations and locations of interest, but advanced advertisers can use these options to limit their targeting to a subset of these categories. This article goes over the advanced options for location targeting and location exclusion. Note that advanced location options only apply to ads on the Search and Display Networks.

## Compare location targeting options

By default, you'll be able to reach people who are likely to be located, or who are regularly located in your targeted areas, as well as those who show interest in your targeted geographic areas. People can show interest through terms used in their searches, if they were recently in a location, or through content they view related to the location (such as pages or sites).

Areas that people show interest in are also known as locations of interest, which we identify regardless of the Google search domain the person searches on. Find out more about how we determine geographic location and locations of interest.

You can have the option to switch to a different way of targeting. Let's take a look at our available targeting options.

### Reach people in, or who show interest in, your targeted locations

This default and recommended option lets you reach people who are likely to be located, or who are regularly located in your targeted location, as well as people who have shown interest in your targeted location.

Most campaigns will see a decrease in impressions when switching from the default targeting option. We suggest that you change your targeting option only if you want to refine your campaign's traffic.

### Reach people in or who are regularly in your targeted locations

This option lets you show your ads to people who are likely to be located, or who are regularly located in your target area. This does not include people who searched for your target locations but whose physical location was outside the target location at the time of searching.

### Reach people who are searching for your targeted locations

This option lets you show your ads to anyone who searches on Google for your targeted location. If a person doesn't specify a location in their search, then the system uses their physical location for targeting.

# Compare location exclusion options

By default, you'll exclude people located in your excluded locations.

You have the option to change your default setting to exclude people who are located in, or who show interest in, your excluded locations. Let's take a look at our available exclusion options, and examine how they work with some example campaigns.

## Don't show ads to people within your excluded locations

This option keeps your ads from appearing to people who are likely to be located in the areas you've excluded. People who are outside these areas may still see your ads.

## Don't show ads to people in, or who show interest in, your excluded locations

With this option, we won't show your ads to people who are likely to be located in your excluded location OR who showed interest in your excluded location.

## Related links

- Target ads to geographic locations
- Exclude ads from geographic locations
- Refine your location targeting

---

Was this helpful?

Yes    No

---

Need more help?
Try these next steps:

**Ask the Help Community**
Get answers from community experts

# EXHIBIT 41

# About targeting geographic locations

Target your ads to people in—or who've shown interest in—geographic locations relevant to where you do business. You can select whether you'd like your ad to appear for someone's physical location, locations of interest, or both. Location targeting can help you make sure your ads are relevant to the people who see them—which can help boost your campaign's value.

## Where your users are located or regularly located (*physical location*)

The Google Ads system uses a number of factors to determine someone's physical location and whether to show your ad. When possible, we determine physical location based on someone's computer or mobile device location, or other methods.

- **IP address:**

  Location is typically based on the Internet Protocol (IP) address, which is a unique number assigned by Internet Service Providers to each computer connected to the Internet.

  If a device is connected to a Wi-Fi network, we may detect the Wi-Fi network's IP address to determine physical location. If a mobile device is connected to a mobile carrier's proxy server, we may use the carrier IP to determine the device's location.

- **Device location:**

  Depending on a user's location settings, we may be able to use a precise location for advertising, based on one of these sources of location data:

  - **GPS**: Accuracy varies depending on GPS signal and connection.
  - **Wi-Fi**: Accuracy should be similar to the access range of a typical Wi-Fi router.
  - **Bluetooth**: If Bluetooth and/or Bluetooth scanning are enabled on a device, a publicly broadcast Bluetooth signal can provide an accurate indication of location
  - **Google's cell ID (cell tower) location database**: Used in the absence of Wi-Fi or GPS. Accuracy is dependent on how many cell towers are located within an area and available data, and some devices don't support cell ID location.

## Locations your users showed interest in (*location of interest*)

If the Google Ads system detects geographic areas that someone is interested in, we may show appropriate ads targeted to that area or surrounding areas (known as "location of interest").

Some of the ways that we might detect a location of interest are based on:

- Terms used in searches that indicate a location.
- Past searches that indicated a location of interest.
- A **perso**n's past physical locations.
- The content and context of a website where an ad is displayed. Keep in mind that the mention of a location on a page doesn't always indicate an interest in that location.

- Searches on Google Maps or Google Maps for Mobile.
- If someone sets a custom location for Google search results     .

On the Google Display Network, we may infer a location associated with a page or site when we believe it will be useful for targeting your ads. A location mentioned on a page may not always indicate interest in that location. For example, someone who is reading news about San Francisco isn't necessarily interested in ads for San Francisco florists. Similarly, we might infer an interest in a location, even if that location isn't specifically mentioned on a page, but the context of the entire site indicates an interest in that place.

Location of interest isn't restricted to a **perso**n's country, or the Google search domain the **perso**n is searching on. For example, if someone in Paris, France searches for *Los Angeles taxi* on google.fr (France), we'll still identify Los Angeles as a location they're interested in.

## Advanced location options

The default advanced location option in Google Ads will use both physical location and / or location of interest to determine where ads can appear. You can update your advanced location options at any time.

## Related areas

When you target an area, we may also show your ad to customers in nearby, closely related areas that normally couldn't be targeted because of low population, insufficient data about the geographic area, or because that level of targeting isn't available. For example, if you target the city of Portland, we may also show your ads to people in nearby suburbs of Portland.

## Related articles

- About advanced location options
- Refine your location targeting
- Measure your geographic performance

Was this helpful?

Yes       No

Need more help?
Try these next steps:

# EXHIBIT 42

# The CNIL's restricted committee imposes a financial penalty of 50 Million euros against GOOGLE LLC

cnil.fr/en/cnils-restricted-committee-imposes-financial-penalty-50-million-euros-against-google-llc

On 25 and 28 May 2018, the National Data Protection Commission (CNIL) received group complaints from the associations *None Of Your Business* ("NOYB") *and La Quadrature du Net* ("LQDN"). LQDN was mandated by 10 000 people to refer the matter to the CNIL. In the two complaints, the associations reproach GOOGLE for not having a valid legal basis to process the personal data of the users of its services, particularly for ads personalization purposes.

## The handling of the complaints by the CNIL

The CNIL immediately started investigating the complaints. On 1st June 2018, in accordance with the provisions on European cooperation as defined in the General Data Protection Regulation ("GDPR"), the CNIL sent these two complaints to its European counterparts to assess if it was competent to deal with them. Indeed, the GDPR establishes a "one-stop-shop mechanism" which provides that an organization set up in the European Union shall have only one interlocutor, which is the Data Protection Authority ("DPA") of the country where its "main establishment" is located. This authority serves as "lead authority". It must therefore coordinate the cooperation between the other Data Protection Authorities before taking any decision about a cross-border processing carried out by the company.

In this case, the discussions with the other authorities, in particular with the Irish DPA, where GOOGLE's European headquarters are situated, did not allow to consider that GOOGLE had a main establishment in the European Union. Indeed, when the CNIL initiated proceedings, the Irish establishment did not have a decision-making power on the processing operations carried out in the context of the operating system Android and the services provided by GOOGLE LLC, in relation to the creation of an account during the configuration of a mobile phone.

As the "one-stop-shop mechanism" was not applicable, the CNIL was competent to take any decision regarding processing operations carried out by GOOGLE LLC, as were the other DPA. The CNIL implemented the new European Framework as interpreted by all European authorities in the European Data Protection Board's (EDPB) guidelines.

In order to deal with the complaints received, the CNIL carried out online inspections in September 2018. The aim was to verify the compliance of the processing operations implemented by GOOGLE with the French Data Protection Act and the GDPR by analysing the browsing pattern of a user and the documents he or she can have access, when creating a GOOGLE account during the configuration of a mobile equipment using Android.

## The violations observed by the restricted committee

On the basis of the inspections carried out, the CNIL's restricted committee responsible for

examining breaches of the Data Protection Act observed two types of breaches of the GDPR.

## A violation of the obligations of transparency and information:

First, the restricted committee notices that the information provided by GOOGLE is not easily accessible for users.

Indeed, the general structure of the information chosen by the company does not enable to comply with the Regulation. Essential information, such as the data processing purposes, the data storage periods or the categories of personal data used for the ads personalization, are excessively disseminated  across several documents, with buttons and links on which it is required to click to access complementary information. The relevant information is accessible after several steps only, implying sometimes up to 5 or 6 actions. For instance, this is the case when a user wants to have a complete information on his or her data collected for the personalization purposes or for the geo-tracking service.

Moreover, the restricted committee observes that some information is not always clear nor comprehensive.

Users are not able to fully understand the extent of the processing operations carried out by GOOGLE. But the processing operations are particularly massive and intrusive because of the number of services offered (about twenty), the amount and the nature of the data processed and combined. The restricted committee observes in particular that the purposes of processing are described in a too generic and vague manner, and so are the categories of data processed for these various purposes. Similarly, the information communicated is not clear enough so that the user can understand that the legal basis of processing operations for the ads personalization is the consent, and not the legitimate interest of the company. Finally, the restricted committee notices that the information about the retention period is not provided for some data.

## A violation of the obligation to have a legal basis for ads personalization processing:

The company GOOGLE states that it obtains the user's consent to process data for ads personalization purposes. However, the restricted committee considers that **the consent is not validly obtained for two reasons**.

First, the restricted committee observes that the users' consent is not sufficiently informed.

The information on processing operations for the ads personalization is diluted in several documents and does not enable the user to be aware of their extent. For example, in the section "Ads Personalization", it is not possible to be aware of the plurality of services, websites

and applications involved in these processing operations (Google search, You tube, Google home, Google maps, Playstore, Google pictures...) and therefore of the amount of data processed and combined.

Then, the restricted committee observes that the collected consent is neither "specific" nor "unambiguous".

When an account is created, the user can admittedly modify some options associated to the account by clicking on the button « More options », accessible above the button « Create Account ». It is notably possible to configure the display of personalized ads.

That does not mean that the GDPR is respected. Indeed, the user not only has to click on the button "More options" to access the configuration, but the display of the ads personalization is moreover pre-ticked. However, as provided by the GDPR, consent is "unambiguous" only with a clear affirmative action from the user (by ticking a non-pre-ticked box for instance). Finally, before creating an account, the user is asked to tick the boxes « *I agree to Google's Terms of Service*» and « *I agree to the processing of my information as described above and further explained in the Privacy Policy*» in order to create the account. Therefore, the user gives his or her consent in full, for all the processing operations purposes carried out by GOOGLE based on this consent (ads personalization, speech recognition, etc.). However, the GDPR provides that the consent is "specific" only if it is given distinctly for each purpose.

## The fine imposed by the restricted committee and its publicity

The CNIL restricted committee publicly imposes a financial penalty of 50 Million euros against GOOGLE.

This is the first time that the CNIL applies the new sanction limits provided by the GDPR. The amount decided, and the publicity of the fine, are justified by the severity of the infringements observed regarding the essential principles of the GDPR: transparency, information and consent.

Despite the measures implemented by GOOGLE (documentation and configuration tools), the infringements observed deprive the users of essential guarantees regarding processing operations that can reveal important parts of their private life since they are based on a huge amount of data, a wide variety of services and almost unlimited possible combinations. The restricted committee recalls that the extent of these processing operations in question imposes to enable the users to control their data and therefore to sufficiently inform them and allow them to validly consent.

Moreover, the violations are continuous breaches of the Regulation as they are still observed to date. It is not a one-off, time-limited, infringement.

Finally, taking into account the important place that the operating system Android has on the French market, thousands of French people create, every day, a GOOGLE account when using their smartphone. Furthermore, the restricted committee points out that the economic model of the company is partly based on the ads personalization. Therefore, it is of its utmost responsibility to comply with the obligations on the matter.

# EXHIBIT 43

# Americans' Views on Mobile Etiquette

pewinternet.org/2015/08/26/chapter-1-always-on-connectivity/

August 26, 2015



Internet & Technology

Report

August 26, 2015

## Chapter 1: Always on Connectivity

By Lee Rainie and Kathryn Zickuhr

For most Americans, the cellphone is no longer an auxiliary or supplementary device to their landline telephone. Roughly nine-in-ten Americans own a cellphone and nearly two-thirds own a smartphone. Recent research from the U.S. government shows that almost 43% of adults live in a cellphone-only household — that is, without a landline. As mobile devices become more common and essential, Americans are creating and navigating new norms around these gadgets' use in social gatherings and public spaces.

Cellphones can be a source of instant connection — and constant distraction. Many are concerned that people's attention to mobile devices in public and in social spaces prompts them to live "Alone Together," as the title of MIT professor Sherry Turkle's book puts it. Such a life, in her view, is socially stunted and damaging to communities. On the other hand, researcher Keith Hampton, who has studied how people use mobile devices in public spaces, has found evidence that cellphones are not encroaching on group social interactions, but rather are serving to fill time during periods of waiting and other interstitial moments.

These are intriguing and important issues. Norms of etiquette are not just small-scale social niceties. They affect fundamental human interactions and the character of public spaces. That is why Pew Research Center conducted a survey on the subject.

The poll found that Americans have varied and nuanced views on the new contours of civil behavior. They are sorting through the neo-etiquette of mobile life — sometimes attesting that constant connectivity brings social payoffs and other times lamenting what screen distractions do to social gatherings; sometimes appreciating the instantaneous availability of

people and information and other times feeling aggrieved when others want to take advantage of that; sometimes declaring the importance of being present with others and other times glancing at screens while in-person conversation swirls around them.

This chapter starts to explore these cross-pressures with a look at the basics of "always-on" connectivity.

## Americans' cellphones are generally with them and rarely turned off

Fully 92% of American adults own a cellphone, including the 67% who own a smartphone. As cellphones and smartphones become more widely adopted and play a larger role in people's daily communications, their owners often treat them like body appendages. Nine-in-ten cellphone owners (90%) say they "frequently" carry their phone with them, while 6% say they "occasionally" have their phones with them. Just 3% say they only "rarely" have their cellphones with them and 1% of cellphone owners say they "never" have their phone with them.

Though the vast majority of members of all age groups carry their phones with them frequently, there are still some differences by age. For instance, cellphone owners ages 30 to 49 are more likely to have their cell phone with them frequently (95%) than any other age group; cellphone owners ages 65 and older are least likely to carry their phone with them frequently (81%).



**Cell Owners Under 50 Rarely Turn Their Phones Off**

*% of cell owners in each age bracket who say they turn off their phone ...*

| | Frequently | Occasionally | Rarely | Never |
|---|---|---|---|---|
| All adults | 7 | 17 | 45 | 31 |
| 18-29 | 3 | 14 | 48 | 35 |
| 30-49 | 4 | 13 | 43 | 39 |
| 50-64 | 9 | 19 | 45 | 26 |
| 65+ | 17 | 24 | 42 | 17 |

Source: Pew Research Center American Trends Panel survey, May 30-June 30, 2014.
N=3,042 cell users

**PEW RESEARCH CENTER**

Beyond that, the majority of cell owners almost always keep their phones on. Most cell owners say they turn their phone off either rarely (45%) or never (31%). Cell owners under age 50 are most likely to say they never turn their phone off, and cell owners ages 65 and older are most likely to say they frequently do. Still, over half of these older adults still say they rarely or never turn off their phone.

Most smartphone owners say they rarely (47%) or never (36%) turn their phones off. Just 4% of smartphone owners say they turn their phones off frequently, and 14% say they turn them off occasionally. However, "feature phone" owners (those who do not own smartphones) are more likely to turn their phones off at least some of the time: 16% say they turn them off frequently and 24% say they turn them off occasionally. Still, a majority still say they turn their cellphones off either rarely (40%) or never (20%).

## A share of smartphone users say they use their phones' apps or browsers "continuously"

Those who own smartphones are more likely than other mobile phone users to have their phone with them and powered on. Some 94% of smartphone owners carry their phone with them frequently and 82% say they never or rarely turn their phones off.

In addition, most smartphone owners take advantage of other features of their device, with 59% reporting they use apps on their phones at least several times a day and 27% saying they use them "continuously."

Web browsing is somewhat less intense in usage: most smartphone owners browse the web on their phones at least several times a day, although only 14% use their phones' browser continuously (roughly half the proportion who continuously use apps).

As with many other technology-related activities, there are substantial differences between age groups. Younger smartphone owners use apps and browse the web on their phones more often than older adults. Some 43% of smartphone owners ages 18 to 29 describe their app usage as "continuous," compared with 26% of smartphone owners in the next highest age group (ages 30 to 49). Meanwhile, among older smartphone owners, just 7% use apps on a continuous basis and about half (48%) of those 65 and older say they use apps on their phones once a day or less.



**Smartphone Owners Live Always-On Lives**

*% of mobile phone owners in each group who ...*

Source: Pew Research Center American Trends Panel survey, May 30-June 30, 2014. N=3,042 cell users

**PEW RESEARCH CENTER**

# EXHIBIT 44

# Opinion | Twelve Million Phones, One Dataset, Zero Privacy - The New York Times

nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html

These are the actual locations
for millions of Americans. At the New York Stock Exchange ...

... in the beachfront neighborhoods
of Los Angeles ...

... in secure facilities like
the Pentagon ...

... at the White House ...

... and at Mar-a-Lago, President
Trump's Palm Beach resort.

One nation, tracked

An investigation into the smartphone tracking industry from Times Opinion

**Every minute of every day,** everywhere on the planet, dozens of companies — largely unregulated, little scrutinized — are logging the movements of tens of millions of people with mobile phones and storing the information in gigantic data files. The Times Privacy Project obtained one such file, by far the largest and most sensitive ever to be reviewed by journalists. It holds more than 50 billion location pings from the phones of more than 12 million Americans as they moved through several major cities, including Washington, New York, San Francisco and Los Angeles.

Each piece of information in this file represents the precise location of a single smartphone over a period of several months in 2016 and 2017. The data was provided to Times Opinion by sources who asked to remain anonymous because they were not authorized to share it and could face severe penalties for doing so. The sources of the information said they had grown alarmed about how it might be abused and urgently wanted to inform the public and lawmakers.

*[Related: How to Track President Trump — Read more about the national security risks found in the data.]*

After spending months sifting through the data, tracking the movements of people across the country and speaking with dozens of data companies, technologists, lawyers and academics who study this field, we feel the same sense of alarm. In the cities that the data file covers, it tracks people from nearly every neighborhood and block, whether they live in mobile homes in Alexandria, Va., or luxury towers in Manhattan.

One search turned up more than a dozen people visiting the Playboy Mansion, some overnight. Without much effort we spotted visitors to the estates of Johnny Depp, Tiger Woods and Arnold Schwarzenegger, connecting the devices' owners to the residences indefinitely.

If you lived in one of the cities the dataset covers and use apps that share your location — anything from weather apps to local news apps to coupon savers — you could be in there, too.

If you could see the full trove, you might never use your phone the same way again.

A typical day at Grand Central Terminal
in New York City

Satellite imagery: Microsoft

**The data reviewed by Times Opinion** didn't come from a telecom or giant tech company, nor did it come from a governmental surveillance operation. It originated from a location data company, one of dozens quietly collecting precise movements using software slipped onto mobile phone apps. You've probably never heard of most of the companies — and yet to anyone who has access to this data, your life is an open book. They can see the places you go every moment of the day, whom you meet with or spend the night with, where you pray, whether you visit a methadone clinic, a psychiatrist's office or a massage parlor.

The Times and other news organizations have reported on smartphone tracking in the past. But never with a data set so large. Even still, this file represents just a small slice of what's collected and sold every day by the location tracking industry — surveillance so omnipresent in our digital lives that it now seems impossible for anyone to avoid.

Freaked Out?
3 Steps to Protect Your Phone

It doesn't take much imagination to conjure the powers such always-on surveillance can provide an authoritarian regime like China's. Within America's own representative democracy, citizens would surely rise up in outrage if the government attempted to mandate that every person above the age of 12 carry a tracking device that revealed their location 24 hours a day. Yet, in the decade since Apple's App Store was created, Americans

have, app by app, consented to just such a system run by private companies. Now, as the decade ends, tens of millions of Americans, including many children, find themselves carrying spies in their pockets during the day and leaving them beside their beds at night — even though the corporations that control their data are far less accountable than the government would be.

[Related: _Where Even the Children Are Being Tracked_ — _We followed every move of people in one city. Then we went to tell them._]

"The seduction of these consumer products is so powerful that it blinds us to the possibility that there is another way to get the benefits of the technology without the invasion of privacy. But there is," said William Staples, founding director of the Surveillance Studies Research Center at the University of Kansas. "All the companies collecting this location information act as what I have called Tiny Brothers, using a variety of data sponges to engage in everyday surveillance."

In this and subsequent articles we'll reveal what we've found and why it has so shaken us. We'll ask you to consider the national security risks the existence of this kind of data creates and the specter of what such precise, always-on human tracking might mean in the hands of corporations and the government. We'll also look at legal and ethical justifications that companies rely on to collect our precise locations and the deceptive techniques they use to lull us into sharing it.

Today, it's perfectly legal to collect and sell all this information. In the United States, as in most of the world, no federal law limits what has become a vast and lucrative trade in human tracking. Only internal company policies and the decency of individual employees prevent those with access to the data from, say, stalking an estranged spouse or selling the evening commute of an intelligence officer to a hostile foreign power.

Companies say the data is shared only with vetted partners. As a society, we're choosing simply to take their word for that, displaying a blithe faith in corporate beneficence that we don't extend to far less intrusive yet more heavily regulated industries. Even if these companies are acting with the soundest moral code imaginable, there's ultimately no foolproof way they can secure the data from falling into the hands of a foreign security service. Closer to home, on a smaller yet no less troubling scale, there are often few protections to stop an individual analyst with access to such data from tracking an ex-lover or a victim of abuse.

## A DIARY OF YOUR EVERY MOVEMENT

**The companies that collect** all this information on your movements justify their business on the basis of three claims: People consent to be tracked, the data is anonymous and the data is secure.

None of those claims hold up, based on the file we've obtained and our review of company practices.

Yes, the location data contains billions of data points with no identifiable information like names or email addresses. But it's child's play to connect real names to the dots that appear on the maps.

Here's what that looks like.

The data included more
than 10,000 smartphones tracked
in Central Park.

Here is one smartphone, isolated
from the crowd.

Here are all pings from
that smartphone over the period covered by the data.

Connecting those pings reveals a diary of the person's life.

Note: Driving path is inferred. Data has been additionally obscured. Satellite imagery: Maxar Technologies, New York G.I.S., U.S.D.A. Farm Service Agency, Imagery, Landsat/Copernicus and Sanborn.

**In most cases,** ascertaining a home location and an office location was enough to identify a person. Consider your daily commute: Would any other smartphone travel directly between your house and your office every day?

Describing location data as anonymous is "a completely false claim" that has been debunked in multiple studies, Paul Ohm, a law professor and privacy researcher at the Georgetown University Law Center, told us. "Really precise, longitudinal geolocation information is absolutely impossible to anonymize."

"D.N.A.," he added, "is probably the only thing that's harder to anonymize than precise geolocation information."

*[Work in the location tracking industry? Seen an abuse of data? We want to hear from you. Using a non-work phone or computer, contact us on a secure line at 440-295-5934, @charliewarzel on Wire or email Charlie Warzel and Stuart A. Thompson directly.]*

Yet companies continue to claim that the data are anonymous. In marketing materials and at trade conferences, anonymity is a major selling point — key to allaying concerns over such invasive monitoring.

To evaluate the companies' claims, we turned most of our attention to identifying people in positions of power. With the help of publicly available information, like home addresses, we easily identified and then tracked scores of notables. We followed military officials with security clearances as they drove home at night. We tracked law enforcement officers as they took their kids to school. We watched high-powered lawyers (and their guests) as they traveled from private jets to vacation properties. We did not name any of the people we identified without their permission.

The data set is large enough that it surely points to scandal and crime but our purpose wasn't to dig up dirt. We wanted to document the risk of underregulated surveillance.

Watching dots move across a map sometimes revealed hints of faltering marriages, evidence of drug addiction, records of visits to psychological facilities.

Connecting a sanitized ping to an actual human in time and place could feel like reading someone else's diary.

In one case, we identified Mary Millben, a singer based in Virginia who has performed for three presidents, including President Trump. She was invited to the service at the Washington National Cathedral the morning after the president's inauguration. That's where we first found her.



Mary Millben has performed for three presidents during her singing career. Getty Images

She remembers how, surrounded by dignitaries and the first family, she was moved by the music echoing through the recesses of the cathedral while members of both parties joined together in prayer. All the while, the apps on her phone were also monitoring the moment, recording her position and the length of her stay in meticulous detail. For the advertisers who might buy access to the data, the intimate prayer service could well supply some profitable marketing insights.

"To know that you have a list of places I have been, and my phone is connected to that, that's scary," Ms. Millben told us. "What's the business of a company benefiting off of knowing where I am? That seems a little dangerous to me."

Like many people we identified in the data, Ms. Millben said she was careful about limiting how she shared her location. Yet like many of them, she also couldn't name the app that might have collected it. Our privacy is only as secure as the least secure app on our device.

"That makes me uncomfortable," she said. "I'm sure that makes every other person uncomfortable, to know that companies can have free rein to take your data, locations, whatever else they're using. It is disturbing."

*[Related: <u>What's the Worst That Could Happen With My Phone Data?</u> — Our journalists answers your questions about their investigation into how companies track smartphone users.]*

The inauguration weekend yielded a trove of personal stories and experiences: elite attendees at presidential ceremonies, religious observers at church services, supporters assembling across the National Mall — all surveilled and recorded permanently in rigorous detail.

Protesters were tracked just as rigorously. After the pings of Trump supporters, basking in victory, vanished from the National Mall on Friday evening, they were replaced hours later by those of participants in the Women's March, as a crowd of nearly half a million descended on the capital. Examining just a photo from the event, you might be hard-pressed to tie a face to a name. But in our data, pings at the protest connected to clear trails through the data, documenting the lives of protesters in the months before and after the protest, including where they lived and worked.

We spotted a senior official at the Department of Defense walking through the Women's March, beginning on the National Mall and moving past the Smithsonian National Museum of American History that afternoon. His wife was also on the mall that day, something we discovered after tracking him to his home in Virginia. Her phone was also beaming out location data, along with the phones of several neighbors.

Senior Defense Department official and his wife identified at the Women's March

Note: Animated movement of the person's location is inferred. Satellite imagery: Microsoft and DigitalGlobe.

The official's data trail also led to a high school, homes of friends, a visit to Joint Base Andrews, workdays spent in the Pentagon and a ceremony at Joint Base Myer-Henderson Hall with President Barack Obama in 2017 (nearly a dozen more phones were tracked there, too).

Inauguration Day weekend was marked by other protests — and riots. Hundreds of protesters, some in black hoods and masks, gathered north of the National Mall that Friday, eventually setting fire to a limousine near Franklin Square. The data documented those rioters, too. Filtering the data to that precise time and location led us to the doorsteps of some who were there. Police were present as well, many with faces obscured by riot gear. The data led us to the homes of at least two police officers who had been at the scene.

As revealing as our searches of Washington were, we were relying on just one slice of data, sourced from one company, focused on one city, covering less than one year. Location data companies collect orders of magnitude more information every day than the totality of what Times Opinion received.

Data firms also typically draw on other sources of information that we didn't use. We lacked the mobile advertising IDs or other identifiers that advertisers often combine with demographic information like home ZIP codes, age, gender, even phone numbers and emails to create detailed audience profiles used in targeted advertising. When datasets are combined, privacy risks can be amplified. Whatever protections existed in the location dataset can crumble with the addition of only one or two other sources.

There are dozens of companies profiting off such data daily across the world — by collecting it directly from smartphones, creating new technology to better capture the data or creating audience profiles for targeted advertising.

The full collection of companies can feel dizzying, as it's constantly changing and seems impossible to pin down. Many use technical and nuanced language that may be confusing to average smartphone users.

While many of them have been involved in the business of tracking us for years, the companies themselves are unfamiliar to most Americans. (Companies can work with data derived from GPS sensors, Bluetooth beacons and other sources. Not all companies in the location data business collect, buy, sell or work with granular location data.)

  

  





 

  



A Selection of Companies Working

the Location Data Business



A Selection of Companies Working

in the Location Data Business

Sources: MightySignal, LUMA Partners and AppFigures.

Location data companies generally downplay the risks of collecting such revealing information at scale. Many also say they're not very concerned about potential regulation or software updates that could make it more difficult to collect location data.

"No, it doesn't really keep us up at night," Brian Czarny, chief marketing officer at Factual, one such company, said. He added that Factual does not resell detailed data like the information we reviewed. "We don't feel like anybody should be doing that because it's a risk to the whole business," he said.

In absence of a federal privacy law, the industry has largely relied on self-regulation. Several industry groups offer ethical guidelines meant to govern it. Factual joined the Mobile Marketing Association, along with many other data location and marketing

companies, in drafting a pledge intended to improve its self-regulation. The pledge is slated to be released next year.

States are starting to respond with their own laws. The California Consumer Protection Act goes into effect next year and adds new protections for residents there, like allowing them to ask companies to delete their data or prevent its sale. But aside from a few new requirements, the law could leave the industry largely unencumbered.

"If a private company is legally collecting location data, they're free to spread it or share it however they want," said Calli Schroeder, a lawyer for the privacy and data protection company VeraSafe.

The companies are required to disclose very little about their data collection. By law, companies need only describe their practices in their privacy policies, which tend to be <u>dense legal documents</u> that few people read and even fewer can truly understand.

Beverly Hills, Calif.

Satellite imagery: Microsoft, Vexcel and DigitalGlobe

## EVERYTHING CAN BE HACKED

**Does it really matter** that your information isn't actually anonymous? Location data companies argue that your data is safe — that it poses no real risk because it's stored on guarded servers. This assurance has been undermined by the parade of publicly reported data breaches — to say nothing of breaches that don't make headlines. In truth, sensitive information can be easily transferred or leaked, as evidenced by this very story.

We're constantly shedding data, for example, by surfing the internet or making credit card purchases. But location data is different. Our precise locations are used fleetingly in the moment for a targeted ad or notification, but then repurposed indefinitely for much more profitable ends, like tying your purchases to <u>billboard ads</u> you drove past on the freeway. Many apps that use your location, like weather services, work perfectly well without your precise location — but collecting your location feeds a lucrative secondary business of analyzing, licensing and transferring that information to third parties.

The data contains simple information like date, latitude and longitude, making it easy to inspect, download and transfer. Note: Values are randomized to protect sources and device owners.

For many Americans, the only real risk they face from having their information exposed would be embarrassment or inconvenience. But for others, like survivors of abuse, the risks could be substantial. And who can say what practices or relationships any given individual

might want to keep private, to withhold from friends, family, employers or the government? We found hundreds of pings in mosques and churches, abortion clinics, queer spaces and other sensitive areas.

In one case, we observed a change in the regular movements of a Microsoft engineer. He made a visit one Tuesday afternoon to the main Seattle campus of a Microsoft competitor, Amazon. The following month, he started a new job at Amazon. It took minutes to identify him as Ben Broili, a manager now for Amazon Prime Air, a drone delivery service.

"I can't say I'm surprised," Mr. Broili told us in early December. "But knowing that you all can get ahold of it and comb through and place me to see where I work and live — that's weird." That we could so easily discern that Mr. Broili was out on a job interview raises some obvious questions, like: Could the internal location surveillance of executives and employees become standard corporate practice?



Ben Broili's interview at Amazon was captured in the data.  Grant Hindsley for The New York Times

Mr. Broili wasn't worried about apps cataloguing his every move, but he said he felt unsure about whether the tradeoff between the services offered by the apps and the sacrifice of privacy was worth it. "It's an awful lot of data," he said. "And I really still don't understand how it's being used. I'd have to see how the other companies were weaponizing or monetizing it to make that call."

If this kind of location data makes it easy to keep tabs on employees, it makes it just as simple to stalk celebrities. Their private conduct — even in the dead of night, in residences and far from paparazzi — could come under even closer scrutiny.

Reporters hoping to evade other forms of surveillance by meeting in person with a source might want to rethink that practice. Every major newsroom covered by the data contained dozens of pings; we easily traced one Washington Post journalist through Arlington, Va.

In other cases, there were detours to hotels and late-night visits to the homes of prominent people. One person, plucked from the data in Los Angeles nearly at random, was found traveling to and from roadside motels multiple times, for visits of only a few hours each time.

While these pointillist pings don't in themselves reveal a complete picture, a lot can be gleaned by examining the date, time and length of time at each point.

Large data companies like Foursquare — perhaps the most familiar name in the location data business — say they don't sell detailed location data like the kind reviewed for this story but rather use it to inform analysis, such as measuring whether you entered a store after seeing an ad on your mobile phone.

But a number of companies do sell the detailed data. Buyers are typically data brokers and advertising companies. But some of them have little to do with consumer advertising, including financial institutions, geospatial analysis companies and real estate investment firms that can process and analyze such large quantities of information. They might pay more than $1 million for a tranche of data, according to a former location data company employee who agreed to speak anonymously.

Location data is also collected and shared alongside a mobile advertising ID, a supposedly anonymous identifier about 30 digits long that allows advertisers and other businesses to tie activity together across apps. The ID is also used to combine location trails with other information like your name, home address, email, phone number or even an identifier tied to your Wi-Fi network.

The data can change hands in almost real time, so fast that your location could be transferred from your smartphone to the app's servers and exported to third parties in milliseconds. This is how, for example, you might see an ad for a new car some time after walking through a dealership.

That data can then be resold, copied, pirated and abused. There's no way you can ever retrieve it.

Location data is about far more than consumers seeing a few more relevant ads. This information provides critical intelligence for big businesses. The Weather Channel app's parent company, for example, analyzed users' location data for hedge funds, according to a lawsuit filed in Los Angeles this year that was triggered by Times reporting. And Foursquare received much attention in 2016 after using its data trove to predict that after an E. coli crisis, Chipotle's sales would drop by 30 percent in the coming months. Its same-store sales ultimately fell 29.7 percent.

Much of the concern over location data has focused on telecom giants like Verizon and AT&T, which have been selling location data to third parties for years. Last year, Motherboard, Vice's technology website, found that once the data was sold, it was being shared to help bounty hunters find specific cellphones in real time. The resulting scandal forced the telecom giants to pledge they would stop selling location movements to data brokers.

Yet no law prohibits them from doing so.

Location data is transmitted from your phone via software development kits, or S.D.Ks. as they're known in the trade. The kits are small programs that can be used to build features within an app. They make it easy for app developers to simply include location-tracking features, a useful component of services like weather apps. Because they're so useful and easy to use, S.D.K.s are embedded in thousands of apps. Facebook, Google and Amazon, for example, have extremely popular S.D.K.s that allow smaller apps to connect to bigger companies' ad platforms or help provide web traffic analytics or payment infrastructure.

But they could also sit on an app and collect location data while providing no real service back to the app. Location companies may pay the apps to be included — collecting valuable data that can be monetized.

"If you have an S.D.K. that's frequently collecting location data, it is more than likely being resold across the industry," said Nick Hall, chief executive of the data marketplace company VenPath.

Downtown San Francisco

Satellite imagery: Microsoft, DigitalGlobe, Vexcel Imaging, Distribution Airbus

## THE 'HOLY GRAIL' FOR MARKETERS

**If this information is so sensitive,** why is it collected in the first place?

For brands, following someone's precise movements is key to understanding the "customer journey" — every step of the process from seeing an ad to buying a product. It's the Holy Grail of advertising, one marketer said, the complete picture that connects all of our interests and online activity with our real-world actions.

Once they have the complete customer journey, companies know a lot about what we want, what we buy and what made us buy it. Other groups have begun to find ways to use it too. Political campaigns could analyze the interests and demographics of rally attendees and use that information to shape their messages to try to manipulate particular groups. Governments around the world could have a new tool to identify protestors.

Pointillist location data also has some clear benefits to society. Researchers can use the raw data to provide key insights for transportation studies and government planners. The City Council of Portland, Ore., unanimously approved a deal to study traffic and transit by monitoring millions of cellphones. Unicef announced a plan to use aggregated mobile location data to study epidemics, natural disasters and demographics.

For individual consumers, the value of constant tracking is less tangible. And the lack of transparency from the advertising and tech industries raises still more concerns.

Does a coupon app need to sell second-by-second location data to other companies to be profitable? Does that really justify allowing companies to track millions and potentially expose our private lives?

Data companies say users consent to tracking when they agree to share their location. But those consent screens rarely make clear how the data is being packaged and sold. If companies were clearer about what they were doing with the data, would anyone agree to share it?

What about data collected years ago, before hacks and leaks made privacy a forefront issue? Should it still be used, or should it be deleted for good?

If it's possible that data stored securely today can easily be hacked, leaked or stolen, is this kind of data worth that risk?

Is all of this surveillance and risk worth it merely so that we can be served slightly more relevant ads? Or so that hedge fund managers can get richer?

The companies profiting from our every move can't be expected to voluntarily limit their practices. Congress has to step in to protect Americans' needs as consumers and rights as citizens.

Until then, one thing is certain: We are living in the world's most advanced surveillance system. This system wasn't created deliberately. It was built through the interplay of technological advance and the profit motive. It was built to make money. The greatest trick technology companies ever played was persuading society to surveil itself.

Stuart A. Thompson (stuart.thompson@nytimes.com) is a writer and editor in the Opinion section. Charlie Warzel (charlie.warzel@nytimes.com) is a writer at large for Opinion.

Lora Kelley, Ben Smithgall, Vanessa Swales and Susan Beachy contributed research. Alex Kingsbury contributed reporting. Graphics by Stuart A. Thompson. Additional production by Jessia Ma and Gus Wezerek. Note: Visualizations have been adjusted to protect device owners.

Opening satellite imagery: Microsoft (New York Stock Exchange); Imagery (Pentagon, Los Angeles); Google and DigitalGlobe (White House); Microsoft and DigitalGlobe (Washington, D.C.); Imagery and Maxar Technologies (Mar-a-Lago).

*Like other media companies, The Times collects data on its visitors when they read stories like this one. For more detail please see our privacy policy and our publisher's description of The Times's practices and continued steps to increase transparency and protections.*

# EXHIBIT 45

# azcentral.

---

**CONSUMERS**

# Arizona attorney general sues Google, alleges the tech giant fraudulently collects users' location data

**Ryan Randazzo** Arizona Republic

Published 5:30 p.m. MT May 27, 2020 | Updated 6:43 p.m. MT May 27, 2020

Arizona Attorney General Mark Brnovich filed a lawsuit Wednesday claiming that Google fraudulently tracks users' locations to sell more advertising and even deceives people to think the location tracking is turned off when it's not.

The suit is potentially worth hundreds of millions of dollars.

The case, filed in Maricopa County Superior Court, seeks to force Google to "disgorge" all profits it has earned by fraudulently tracking user location, pay restitution, and pay a civil penalty of up to $10,000 for each time it violated fraud statutes.

"Google makes it impractical if not impossible for users to meaningfully opt-out of Google's collection of location information, should the users seek to do so," the complaint states.

"The tactics Google deploys to surveil its users' locations — including users in Arizona — include willfully deceptive and unfair acts and practices within the meaning of the Arizona Consumer Fraud Act."

Google responded Wednesday by saying it gives users control over location data.

"The Attorney General and the contingency fee lawyers filing this lawsuit appear to have mischaracterized our services," Google spokesman Jose Castaneda said. "We have always built privacy features into our products and provided robust controls for location data. We look forward to setting the record straight."

Brnovich said his office began investigating the issue after a 2018 Associated Press article revealed that Google continues to track users' locations through web and app activity even when those users turn off the location history settings on smartphones and tablets.

Google's parent company, Alphabet Inc. of Mountain View, California, reported that in 2019 Google advertising brought in $134.8 billion in revenue or about 83% of the company's total revenue stream.

"Hundreds of millions of dollars of these advertising revenues were generated from ads presented to millions of users in the state of Arizona," the complaint states.

The lawsuit asserts that collecting location data is key to effective advertising at the company.

"Given the lucrative nature of Google's advertising business, the company goes to great lengths to collect users' location, including through presenting users with a misleading mess of settings, some of which seemingly have nothing to do with the collection of location information," Brnovich's office said in a press release announcing the lawsuit.

Several pages of the 48-page complaint and 140 pages of exhibits are redacted from public view.

Brnovich's office explained that the redactions are testimony provided by Google employees given under oath and internal documents obtained during the investigation and that Google has asserted the information is confidential.

"The State will be seeking to make more information public consistent with applicable court rules," Brnovich's office said.

*Reach reporter Ryan Randazzo at ryan.randazzo@arizonarepublic.com or 602-444-4331. Follow him on Twitter @UtilityReporter.*

Subscribe to azcentral.com today.

# EXHIBIT 46

- [Securities](#)
- Rankings
- [Data-Driven Lawyers](#)
- [Regional Powerhouses](#)
- [Law360's MVPs](#)
- [Glass Ceiling Report](#)
- [Global 20](#)
- [Law360 400](#)
- [Diversity Snapshot](#)
- [Practice Groups of the Year](#)
- [Rising Stars](#)
- [Titans of the Plaintiffs Bar](#)
- Site Menu
- [Join the Law360 team](#)
- [Search legal jobs](#)
- [Learn more about Law360](#)
- [Read testimonials](#)
- [Contact Law360](#)
- [Sign up for our newsletters](#)
- [Site Map](#)
- [Help](#)

We use cookies to help provide and enhance our service and tailor content. [Disable them / read more](#). By continuing or closing this message you agree to the use of cookies. [close](#)



Make sure you don't miss any Law360 breaking news.

[Download our plug-in for Chrome to get customizable, real-time news alerts](#)

# Senate Bill Would Curtail Data Use, Create New Privacy Cop

*By [Allison Grande](#)*

Share us on: By [Allison Grande](#)

Law360 (June 18, 2020, 8:50 PM EDT) -- A Senate Democrat is taking the latest crack at enacting federal privacy legislation, introducing a proposal Thursday that would limit companies' ability to use and share consumers' personal data, ban the use of facial recognition technology, create a new independent privacy regulator and subject corporate executives to potential criminal liability.

Calling the need for federal data privacy legislation "long overdue," Sen. Sherrod Brown, an Ohio Democrat and ranking member of the Senate Committee on Banking, Housing and Urban Affairs, said he set out to develop the Data Accountability and Transparency Act of 2020 to give consumers the power to hold both corporations and the government responsible for how they collect and protect personal information.

Rather than relying on the current "ineffective" consent-based privacy framework that requires consumers to agree to notices and privacy policies that are often confusing or complex in order to use online services, Brown's proposal would instead institute a general ban on collecting, using or sharing personal data except for certain permissible purposes, including providing a requested good or service, detecting and responding to security incidents, and employment, according to the lawmaker.

Similar to California's landmark Consumer Privacy Act, which took effect in January and is the first privacy legislation of its kind in the U.S., the Senate proposal would also require companies to disclose to consumers what data they've collected, the reason for collection and how long they plan on retaining it; ensure that consumers have the ability to correct any inaccurate or incomplete information; and implement and maintain reasonable security procedures to protect personal data. Individuals would also have the right to challenge the reason for collection and request a human review of any automated decisions, Brown said.

The Senate bill additionally proposes creating a new, independent agency that would be charged with protecting individuals' privacy and would contain a dedicated Office of Civil Rights to protect individuals from discrimination. The agency would be given rulemaking, supervisory and enforcement authority, along with the ability to issue civil penalties for violations of the new law, according to Brown.

Consumers would be allowed to bring private lawsuits to recover statutory damages of between $100 and $1,000 per violation, and state attorneys general would similarly be empowered to enforce the proposed law, which as currently drafted wouldn't preempt more protective state laws, Brown added.

"We need legislation now more than ever that empowers Americans to control their personal information," Brown said in a statement Thursday. "No person should have to worry about being spied on, just like no one should worry about their information being bought and sold or stolen. My proposal would change the fundamental framework of privacy in this country."

Unlike other privacy proposals that have been floated in Congress in recent years, Brown's proposal goes beyond the objective of protecting consumers' personal data from misuse and disclosure to cover a broader range of potentially concerning data uses.

Under his proposal, the use of facial recognition technology would be generally outlawed, and companies would be barred from using personal data to discriminate in housing, employment, credit, insurance and public accommodations.

Additionally, companies would need to establish comprehensive privacy and data security policies and submit an annual report to the new privacy agency established by the proposed law describing their data collection, use and sharing policies and identifying each service provider with which they share personal data, Brown noted.

CEOs would be required to certify compliance with the law, and both they and boards of directors would be on the hook for civil and criminal penalties — including fines and imprisonment of up to five years — for knowingly and intentionally violating the proposed law's mandates, according to Brown.

The lawmaker said he worked with a diverse group of privacy experts as well as civil rights and consumer organizations to draft the proposed legislation. Several of these groups and individuals —  including the Electronic Privacy Information Center, U.S. PIRG, Free Press Action and the Center for Digital Democracy — released statements Thursday backing the proposal.

"Companies should only use and share personal data to deliver the services and products we ask for," said Justin Brookman, director for consumer privacy and technology policy at Consumer Reports. "This bill sets aside the old opt-in vs. opt-out debate and instead simply conforms data processing to consumer expectations. This innovative approach should inform all data privacy discussions going forward."

Brown's draft legislation marks the latest attempt by federal lawmakers to come up with federal privacy rules

that would head off a patchwork of state laws that is expected to spring up in the coming years on the heels of California enacting its groundbreaking privacy statute.

The Republican chair and Democratic ranking member of the influential Senate Commerce Committee advanced dueling privacy proposals last year. But while both bills aim to give consumers more control over their personal data, they diverged on the hot-button issues of whether the laws should preempt more stringent state protections or contain a private right of action that would allow consumers to sue companies for alleged violations.

Several congressional Democrats, including Sen. Kirsten Gillibrand of New York and Reps. Anna Eshoo and Zoe Lofgren of California, have separately called for the creation of an independent federal privacy agency to overtake the Federal Trade Commission and seize sole responsibility for creating and enforcing data protection rules.

Senators on both sides of the aisle have also recently floated legislation to deal with the narrower issue of how companies like Google and Apple are using personal data to help track and contain the spread of COVID-19.

A Republican-backed measure announced in April would seek to hold companies liable for misusing consumers' health, geolocation and other personal information to fight the pandemic, while a bipartisan proposal that emerged earlier this month would limit how apps used to trace the spread of the virus can scoop up users' data and require that individuals be able to consent to their information being collected and delete that data later.

--Editing by Bruce Goldman.

*For a reprint of this article, please contact reprints@law360.com.*

View comments

---

## Related Articles

Sens. Float Privacy Bill To Protect Data In COVID-19 Era

---

Wash. Could Be Next To Enact Consumer Data Privacy Law

---

Senate Democrats Unveil Sweeping Privacy Bill Framework

---

Washington State Privacy Bill Likely Won't Pass This Year

---

Will New Congress Pass A National Data Protection Law?

## Attached Documents

- Draft Bill

## Useful Tools & Links

- Add to Briefcase
- Save to PDF & Print

# EXHIBIT 47



Menu

(/searchpage)

(https://www.beuc.eu)

# Consumer groups across Europe file complaints against Google for breach of GDPR

**PRESS RELEASE - 27.11.2018**

Today, seven consumer organisations from across Europe have announced that they will file complaints against Google with their national data protection authorities[1]. Based on new research published today by BEUC's Norwegian member Forbrukerrådet, the consumer groups, all part of the BEUC network, are referring Google to their respective national authorities for breaching the General Data Protection Regulation (GDPR) in relation to how the company tracks its users' location.



**(https://www.youtube.com/watch?v=qIq17DeAc1M&feature=youtu.be)**Location data can reveal a lot about people, including religious beliefs (going to places of worship), political leanings (going to demonstrations), health conditions (regular hospital visits) and sexual orientation (visiting certain bars). The report shows that Google collects users' location data notably through the features 'location history' and 'web & app activity', which are integrated into all Google user accounts[2]. The company uses various tricks and practices to ensure users have these features enabled and does not give them straightforward information about what this effectively entails.

These unfair practices[2] leave consumers in the dark about the use of their personal data. Additionally they do not give consumers a real choice other than providing their location data, which is then used by the company for a wide range of purposes including targeted advertising.

These practices are not compliant with the GDPR, as Google lacks a valid legal ground for processing the data in question. In particular, the report shows that users' consent provided under these circumstances is not freely given. Also, the company cannot invoke a 'legitimate interest' to collect and process location data, due to the significant and intrusive impact that this tracking has on the rights and freedoms of the individual.[3]

Monique Goyens, Director General of The European Consumer Organisation, commented:

"Google's data hunger is notorious but the scale with which it deceives its users to track and monetise their every move is breathtaking. Google is not respecting fundamental GDPR principles, such as the obligation to use data in a lawful, fair and transparent manner.

"Thanks to the GDPR, users should be in control of their personal data. Google's deceptive practices are in breach of the spirit and the letter of this regulation. We need strong, coherent, enforcement of the rules. We can't have companies pretending to comply but de facto circumventing the law.

"It can undoubtedly be useful to share your location data, for instance to find a restaurant when travelling. But the places we go to also reveal a lot about ourselves and our private life.

"The situation is more than alarming. Smartphones are being used for spying on our every move. This is not the digital society that European consumers want to live in.

"With today's action to submit complaints with data protection authorities across Europe, we want to stop consumer exploitation and force those digital giants to finally accept their responsibility."

ENDS

## Notes:

[1] *Forbrukerrådet (Norway), Consumentenbond (The Netherlands), Ekpizo (Greece), dTest (Czech Republic), Zveza Potrošnikov Slovenije (Slovenia), Federacja Konsumentów (Poland) and Sveriges Konsumenter (Sweden) will file complaints with their data protection authorities. Forbrugerrådet Tænk (Denmark) will report these practices to the Danish data protection body. vzbv from Germany is considering an action for an injunction against Google because of these practices. The Transatlantic Consumer Dialogue will bring it to the attention of the Federal Trade Commission.*

[2] *Android, Google's operating system, powers an estimated 2 billion devices worldwide (https://www.cnet.com/news/google-boasts-2-billion-active-android-devices/) making it the most-used globally. It is used by a big majority of smartphone manufacturers, such as Samsung, Huawei and Sony. Android, however, comes with numerous strings attached, including that all users of such devices de facto need to have a Google account*

[3] *Practices used by Google to nudge users into sharing location data:*

*Deceptive click-flow: the click-flow when setting up an Android device pushes users into enabling 'Location History' without being aware of what it entails.*

*Hidden default settings: when setting up a Google account, the 'Web & App Activity' settings are hidden behind extra clicks and enabled by default.*

*Misleading and unbalanced information: users are not given sufficient information when presented with choices, and are misled about what data is collected and how it is used.*

*Repeated nudging: users are repeatedly asked to turn on 'Location History' when using different Google services even if they decided against this feature when setting up their phone.*

*Bundling of services and lack of granular choices: if the user wants features such as Google Assistant and photos sorted by location, Google turns on invasive location tracking.*

[4] *For more information please consult our FAQ (https://www.beuc.eu/documents/files/Google_complaint_geo-location_tracking_FAQ.pdf) and research (https://www.forbrukerradet.no/undersokelse/no-undersokelsekategori/every-step-you-take).*

# EXHIBIT 48


Datainspektionen

**Skrivelse**          **Diarienr**                    1 (4)
2019-01-18          DI-2019-740

Google LLC
Amphitheatre Parkway,
Mountain View, CA 94043
USA

# Request for Reply and Further Clarification

## 1. Summary and Notice

*Datainspektionen*, the Swedish Data Protection Authority (DPA), has along
with several other Supervisory Authorities of the European Union's General
Data Protection Regulation (GDPR)[1], received complaints against *you*,
Google LLC (Google), based on a report called *Every Step You Take etc.* ("the
report")[2] by *Forbrukerrådet* (the Norwegian Consumer Council).

After having reviewed the complaint,[3] filed with us on the 27th of November
2018, by a representative of *Sveriges Konsumenter* (the Swedish Consumer
Association) on behalf of a data subject ("the complainant"),
Datainspektionen has decided to open an investigation into the matter in
light of its competence under article 55.1 and 56.1 of the GDPR.

Datainspektionen, invoking its investigative powers pursuant to Article 58.1
of the GDPR, hereby order you to provide the below specified information
and documents (specified in section 3) and answer the questions below (set
out in section 4) **no later than on the 1st of February 2019**. You may, if you
wish, submit your answer in English. Please note that Datainspektionen
welcomes you to email us, but not if you are sending sensitive information.
See contact details in the footer.

---

[1] Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016
on the protection of natural persons with regard to the processing of personal data and on
the free movement of such data, and repealing Directive 95/46/EC.
[2] Please see Appendix 1 (The Norwegian Consumer Council, the 27th of November 2018,
*Every step you take - How deceptive design lets Google track users 24/7*).
[3] Please see Appendix 2.

## 2. Summary of the complaint before this Authority

In summary, the complainant holds that the way Google provides itself access to the location data of users of its mobile operative system Android by ways of its so called "Location History" and "Web & App Activity" ("the services") is in breach of the GDPR. According to the complainant, the report by *Forbrukerrådet* states that Google use deceptive design, misleading information and repeated pushing to manipulate users into allowing constant tracking of their movements. In essence, the complainant holds that the processing of location data in this way is unlawful and that Google is in violation of Articles 5, 6, 7, 12, 13 and 25 of the GDPR.

## 3. Information and documents that Google must provide

Datainspektionen order Google to submit the following.

*Information*: A summary, with regard to the period 25th of May 2018 – 27th of November 2018 ("the relevant period"), that must include a) the total number of Swedish data subjects about which you have obtained location data through the services and b) an approximation of how many data points that are gathered on average on an individual, broken down for each of the 24 hours of the day, presented in a structured and clear manner.

*Document(s)*, in the version that were in effect during the relevant period:
1. Record(s) of processing activities pursuant to Article 30 of the GDPR, limited to those relevant to your processing of the location data of the Swedish data subjects obtained through the services during the relevant period,
2. Privacy policies for the services, and
3. Data Impact Assessment(s) that you have finalised pursuant to Article 35, during or before the relevant period, limited to those relevant to your processing of the location data of the Swedish data subjects obtained through the services during the relevant period.

## 4. Questions that Google must answer

Datainspektionen request that you in general comment on the complaint and the report. Your answer should particularly clarify (in relation to the GDPR):

1.  For what purpose(s) you have processed location data of the Swedish data subjects obtained through the services during the relevant period and what your legal basis (Article 6) for each type of processing was,

2.  If applicable, when and how you provided the Swedish data subjects with the information regarding the processing in the previous questions (Article 12 and 13), which should include the information that was provided,

3.  Whether your answers to the previous two questions is representative of how you fulfil your obligations to inform and obtain legal basis (Article 6) for the processing of location data of data subjects in general through the use of the services,

4.  If the legal basis for any of the processing is consent (Article 6.1.a), an explanation and evidence that show how the conditions for consent (Article 7) have been fulfilled,

5.  If the legal basis for any of the processing is legitimate interests (Article 6.1.f), an explanation of how it constitutes an appropriate legal basis with regard to the location data being processed,

6.  Whether the so called "design patterns" you have allegedly used for obtaining legal basis for the processing of location data of users, as they have been described in the report (pp. 26-31), is accurate with regard to the Swedish data subjects of whom you have been processing location data obtained through the services during the relevant period, and if not, your own corrections in that regard, preferably in a visually comparable and clear material such as those in the report (e.g. p. 28),

7.  If you consider your answers to the previous question compatible with the principles of lawfulness, fairness and transparency (Article 5.1.a) and data protection by design and by default (Article 25), your argument(s) for that position,

8.  Any comments you would like to make, in light of your answers to the previous questions and the recommendations allegedly put forth to you within the documents referred to in the report (footnote 51, p. 33)[4],

---

[4] Which states "[a]s a result of an investigation done by the EU Data Protection Authorities, Google was already in 2012 urged to clarify which legal basis it uses for processing of

9.  Whether you consider any of the location data of the Swedish data subjects that you have processed during the relevant period to be such special category data as referred to in Article 9, and if so, which legal basis you have identified for the processing of such data under Article 6 as well as Article 9,

10.  What measures in general you have made to protect the location data of the Swedish data subjects pursuant to article 25 and 32, and

11.  If applicable, in light of your answers to the previous questions, any changes to your practises in this regard in the period 28th of November 2018 – 18th of January 2019, that you wish to put forward.

On behalf of Datainspektionen,

Ulrika Bergström, Legal Advisor
Nazli Pirayehgar, Legal Advisor
Olle Pettersson, Legal Advisor

*Olle Pettersson, 2019-01-18   (Det här är en elektronisk signatur)*

---

personal data. See https://www.cnil.fr/sites/default/files/typo/document/20121016-letter_google-article_29-FINAL.pdf and
https://www.cnil.fr/sites/default/files/typo/document/GOOGLE_PRIVACY_POLICY-_RECOMMENDATIONS-FINAL-EN.pdf."

# EXHIBIT 49

# Dutch petition against Google's location tracking gets 50,000 signatures

**nltimes.nl**/2019/01/22/dutch-petition-googles-location-tracking-gets-50000-signatures

January 22, 2019



Dutch consumers' association Consumentenbond handed Google a petition against the company's location tracking with over 50 thousand signatures. This petition forms part of a joint action by seven consumer associations in Europe, Consumentenbond announced on Monday, NU.nl reports.

The organizations are protesting against the collection of location data from Android phones. According to research by Norwegian consumer organization Forbrukerradet, Google did not ask Android users for permission in the right way. Companies must explicitly request permission for the collection of location data, according to the organizations. By not doing so, Google is in violation of the General Data Protection Regulation - the European privacy law.

The consumer organizations filed a complaint with national privacy regulators regarding this matter.

In a response, Google said the company finds it important "that users understand how and why we collect data and what privacy settings there are so that they can make conscious choices". Google says it is working hard on improving its privacy settings.

# EXHIBIT 50

# Google to Face Court on Claims It Misled Australians on Personal Data

WSJ **wsj.com**/articles/google-to-face-court-on-claims-it-misled-australians-on-personal-data-11572337382

By Rachel Pannett                                                                October 29, 2019



An Australian regulator alleges Google failed to tell users they had to switch off two account settings, not just one, if they didn't want the company to keep their personal information.

Photo: david gray/Reuters

- Save
- Print
- Text

SYDNEY— Alphabet Inc.'s GOOG 0.65% Google is being taken to court by an Australian regulator that alleges the internet giant misled customers about how it collected and used personal location data.

Google said it intends to defend itself against the claims, filed by Australia's competition watchdog on Tuesday. The regulator alleges Google failed to tell users of its Android mobile phones and tablets that they had to switch off two account settings—not just one—if

they didn't want the company to keep their personal information.

"We are taking court action against Google because we allege that as a result of these on-screen representations, Google has collected, kept and used highly sensitive and valuable personal information about consumers' location without them making an informed choice," Australian Competition and Consumer Commission Chairman Rod Sims said in a statement.

The lawsuit comes as <u>Facebook</u> Inc. and Google face the prospect of having <u>their secretive algorithms policed</u> by a beefed-up watchdog in Australia, under proposed changes designed to limit the power that tech giants wield over news and advertising markets.

Those proposals stem from a year-and-a-half investigation by the national competition regulator, at the direction of the Australian government, into the impact such companies have had on the country.

In its report, released in July, the regulator recommended strengthening privacy safeguards with steep penalties of up to 10% of annual domestic turnover for the misuse of data. Its recommendations are being considered by the Australian government.

Why You Can't Win at Privacy Whac-A-Mole
You may also like
Up Next



0:00 / 4:27



Why You Can't Win at Privacy Whac-A-Mole
Despite new initiatives from Google and Facebook, messing with privacy controls is like playing a carnival game. Knock out one way for advertisers to track you, and they quickly find another way to do it. WSJ's Joanna Stern heads to Coney Island to explain. Photo: Kenny Wassus

In the U.S., Facebook was fined $5 billion in July by the Federal Trade Commission after it found the company had repeatedly used deceptive disclosures and account settings to lure users into sharing personal information, undermining their actual privacy preferences.

The Australian regulator's case against Google focuses on two Google Account settings: one labeled 'Location History,' and another labeled 'Web & App Activity.' It alleges that Google misled consumers from January 2017 to late 2018 by staying silent about the fact that both settings had to be switched off to stop the company collecting data.

It also alleges that from about mid-2018 until late 2018, Google further misled consumers by saying that the only way they could prevent Google from collecting, keeping and using their location data was to stop using certain Google services, including Google Search and Google Maps.

A Google spokeswoman said the company is reviewing details of the allegations. "We continue to engage with the ACCC and intend to defend this matter," she said.

The regulator is seeking penalties, declarations and orders requiring the publication of corrective notices and the establishment of a compliance program from Google.

**Write to** Rachel Pannett at rachel.pannett@wsj.com

# EXHIBIT 51

# Data Protection Commission launches Statutory Inquiry into Google's processing of location data and transparency surrounding that processing

dataprotection.ie/en/data-protection-commission-launches-statutory-inquiry-googles-processing-location-data-and

04th February 2020

The Data Protection Commission, in its role as Lead Supervisory Authority for Google, has received a number of complaints from various Consumer Organisations across the EU, in which concerns were raised with regard to Google's processing of location data. The issues raised within the concerns relate to the legality of Google's processing of location data and the transparency surrounding that processing. As such the DPC has commenced an own-volition Statutory Inquiry, with respect to Google Ireland Limited, pursuant to Section 110 of the Data Protection 2018 and in accordance with the co-operation mechanism outlined under Article 60 of the GDPR. The Inquiry will set out to establish whether Google has a valid legal basis for processing the location data of its users and whether it meets its obligations as a data controller with regard to transparency.

# EXHIBIT 52

**Written Testimony of Keith Enright**

**Chief Privacy Officer, Google**

**United States Senate Committee on Commerce, Science, and Transportation**

**Hearing on "Examining Safeguards for Consumer Data Privacy"**

**September 26, 2018**

Chairman Thune, Ranking Member Nelson, and distinguished members of the Committee: thank you for the opportunity to appear before you this morning. I appreciate your leadership on the important issues of data privacy and security, and I welcome the opportunity to discuss Google's work in these areas.

My name is Keith Enright, and I am the Chief Privacy Officer for Google. I have worked at the intersection of technology, privacy, and the law for nearly 20 years, including as the functional privacy lead for two other companies prior to joining Google in 2011. In that time, I have been fortunate to engage with legislators, regulatory agencies, academics, and civil society to help inform and improve privacy protections for individuals around the world.

I lead Google's global privacy legal team and, together with product and engineering partners, direct our Office of Privacy and Data Protection, which is responsible for legal compliance, the application of our privacy principles, and generally meeting our users' expectations of privacy. This work is the effort of a large cross-functional team of engineers, researchers, and other experts whose principal mission is protecting the privacy of our users.

Across every single economic sector, government function, and organizational mission, data and technology are critical keys to success. With advances in artificial intelligence and machine learning, data-based research and services will continue to drive economic development and social progress in the years to come. Doctors use data to save lives; farmers rely on data to increase yields; and charities analyze data to better serve our communities. I have had the privilege of working with government agencies to better leverage data to advance their mission and provide improved care and benefits to Americans efficiently and reliably. Businesses of all types and sizes, far beyond those represented at this hearing today, collect and use data. In my previous experience, I saw first-hand the transformative efforts by traditional brick and mortar retail businesses to improve efficiency, reduce costs, and delight consumers through the innovative use of data.

At Google, we combine cutting-edge technology with data to build products and services that improve people's lives and enhance their productivity, help grow the economy,[1] improve

---

[1] Last year, Google's tools helped provide $283 billion of economic activity in the U.S. for more than 1.5 million businesses, website publishers, and nonprofits nationwide (https://economicimpact.google.com/).

accessibility[2] and make the web safer and more secure.[3] With partners, we are working to tackle big societal challenges and enable medical[4] and scientific breakthroughs.[5] These types of benefits all rely on the collection and use of data, and must come with, and not at the expense of, privacy and security.

**Privacy That Works For Everyone**

We acknowledge that we have made mistakes in the past, from which we have learned, and improved our robust privacy program.

The foundation of our business is the trust of people that use our services. To maintain user trust, we must clearly explain how our products use personal information, and to provide easy-to-find and use controls to manage privacy. We also invest in research and development of cutting-edge privacy and security engineering techniques, sharing what we learn to benefit the broader ecosystem.

Google's approach to privacy stems directly from our founding mission: to organize the world's information and make it universally accessible and useful. Providing most of our products for free is a key part of meeting that mission, and ads help us make that happen. With advertising, as with all our products, users trust us to keep their personal information confidential and under their control. We do not sell personal information. Period.

As the world becomes increasingly data-focused, there is, rightly, increased focus on the impacts on consumers and whether there should be better rules of the road for data privacy. We understand that Congress may be legislating on privacy and we support that effort.  We look forward to constructively engaging with you as your work develops.

To that end, I want to briefly cover four key issues that we believe are critical elements to this discussion: transparency, control, data portability, and security. These components are also central to Google's recently released framework for responsible data protection regulation, which I will discuss as well.

**Informing Users And Explaining Our Practices**

First, transparency is a core value of our approach to serving users. Google strives to be upfront about the data we collect, why we collect it, and how we use it. We get that privacy policies are not users' first choice in reading material, but we work to make ours clear and

---

[2] For example, we have used data analysis and machine learning to enable closed captioning on over 1 billion YouTube videos in 10 languages making them accessible to the over 300 million deaf or hard of hearing people around the world (https://youtube.googleblog.com/2017/02/one-billion-captioned-videos.html).
[3] Google Safe Browsing (https://safebrowsing.google.com) helps protect over three billion devices every day, and it is free and publicly available for developers and other companies to use.
[4] Working with physicians and other healthcare experts, we've developed  systems that can detect diabetic eye disease (https://ai.googleblog.com/2016/11/deep-learning-for-detection-of-diabetic.html) and breast cancer tumors (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html), help predict medical outcomes (https://ai.googleblog.com/2018/05/deep-learning-for-electronic-health.html), and even shed light on connections between cardiovascular disease and images of the eye (https://ai.googleblog.com/2018/02/assessing-cardiovascular-risk-factors.html).
[5] We've shown machine learning can help predict molecular properties, which could aid everything from pharmaceuticals to photovoltaics to basic science (https://ai.googleblog.com/2017/04/predicting-properties-of-molecules-with.html). Another example is that Google's AI technology helped discover the first 8-planet system outside our own (https://www.blog.google/technology/ai/hunting-planets-machine-learning/).

concise. Outside experts have praised ours as best in class.[6] Just this year we updated our Privacy Policy to be easier to understand, with informative videos that explain our practices and settings. In addition to making our privacy controls easy to find in user accounts and through Google Search, we have also made them immediately accessible from the Privacy Policy so that users can make decisions about their account settings as they learn about our practices.

We also look for ways to add transparency into our products directly, so that users can understand the privacy implications of their choices in context. For example, if you add a Google Drive file to a shared folder, we'll check to make sure you intend to share that file with everyone who has access to that folder. With Why This Ad,[7] you are able to click or tap on an icon in each ad to find out why you are seeing that particular ad and understand more about how Google's system makes these decisions. Another example is if someone wants to install a new app on their Android mobile phone, they can see the types of personal information that apps can access right on the screen before deciding whether to install it. If they change their mind or want to learn more, they can learn about the different permissions, and disable specific ones. Finally, our Transparency Report[8] provides information to the public on how government actions can affect the free flow of information online. We are always working to expand the information we provide to users.

**Google Account Controls**

Second, with regard to user control, our privacy tools are built for everyone. Different people have different preferences about how they want their information to be used, and preferences can vary over time, so we build products and controls that do not presume all users are the same. For instance, a Search user can choose not to sign in when they search, and a Chrome user can choose to use Chrome's Incognito mode. For users who have a Google account, we put their privacy and security settings in a single place -- Google Account [9] -- so users don't have to visit several different apps or pages to see their data and set their preferences for how Google should store and use their information.

Google was one of the first companies to offer users this type of centralized dashboard[10] in 2009, and we continue to develop and improve these and other tools to make them more robust and intuitive. These efforts are working: in 2017, nearly 2 billion people visited their Google Account controls.[11]

I particularly want to call attention to our Security Checkup[12] and Privacy Checkup[13] tools, which respectively, help users identify and control the apps that have access to their Google account data, and guide users to review and change their security and privacy settings. These

---

[6] Time Magazine and the Center for Plain Language ranked Google number one among technology companies for best privacy policy (http://time.com/3986016/google-facebook-twitter-privacy-policies/).
[7] https://support.google.com/ads/answer/1634057?hl=en
[8] https://transparencyreport.google.com/?hl=en
[9] https://myaccount.google.com/intro?hl=en-US
[10] Dashboards are a recognized best practice (https://www.ivir.nl/publicaties/download/PrivacyBridgesUserControls2017.pdf).
[11] See: https://www.blog.google/technology/safety-security/improving-our-privacy-controls-new-google-dashboard/, https://www.blog.google/technology/safety-security/celebrating-my-accounts-first-birthday/, and https://googleblog.blogspot.com/2015/06/privacy-security-tools-improvements.html for more information.
[12] https://myaccount.google.com/security-checkup
[13] https://myaccount.google.com/privacycheckup?otzr=1

checkups help users make decisions about what information they are sharing, who they are sharing it with, and what to expect when they share it. It is not enough to just have these tools available: we actively encourage users to do privacy and security reviews by reminding them to use these tools through service-wide promotions and individual prompts.

Google Account is where users can:
- download a copy of their personal information;
- see or delete their Google activity, such as search queries or browsing, by date, product, or topic;
- disable personalized ads or see the information Google uses to personalize their ads; and
- locate a lost or stolen phone.

**Privacy From The Ground Up**

Protecting users is about more than just being transparent and offering control -- it requires building products that reflect our privacy commitments and principles at every stage of their development. Doing this properly requires a comprehensive data protection program that includes privacy design reviews, engineers dedicated to privacy to review code and data flows, and a system to manage and address any issues discovered before users are put at risk. Google has had such a program for over seven years, and we continue to expand and refine it.

**Data Portability**

Third, we believe data portability is a key way to drive innovation, facilitate competition, and best serve our users - that's why we have been working on it for over a decade.[14]

Google has always believed that people should use our products because they provide unique value and features. Download Your Data[15] is a practical tool that lets users backup or archive important information, organize information between multiple accounts, recover from account hijacking, and explore the data stored in their account.

Currently, users average around one million exports per month covering eight billion files. We enable export from more than 50 Google products, even offering the option to import data directly into our competitors' systems. If a user wants to try out a new product or service or even switch because they think it is better, they should be able to do so as easily as possible, not be locked into an existing service.

Portability is one way we ensure that users can trust Google with their data. This is why we led the development of the Data Transfer Project,[16] an open-source platform that enables you to move a copy of your data directly from one account to another without downloading and reuploading. For people who rely on phones and mobile networks for connectivity, this is a tremendous improvement. We're grateful for our industry partners' contributions to this project, and look forward to working with others.

---

[14] https://publicpolicy.googleblog.com/2009/09/introducing-dataliberationorg-liberate.html
[15] https://support.google.com/accounts/answer/3024190?hl=en
[16] See website (https://datatransferproject.dev/) and white paper (https://datatransferproject.dev/dtp-overview.pdf) for more information.

**Security**

Fourth, security considerations are paramount in all of these efforts. The security threat landscape that we see is increasingly complex and wide ranging. Securing the infrastructure that provides Google's services is critical in light of the growing and sophisticated nature of many threats directed at our services and users.

All Google products are built with strong security protections at their core to continuously and automatically detect threats and protect users. We devote significant resources to fortify Google's infrastructure and this includes continuous and proactive efforts to identify and block a wide range of security risks. The insights we've gained serving billions of people around the world help us stay ahead.

We have also worked to help our users improve their own cybersecurity posture. For example, we have offered two-step verification to our users since 2011,[17] and last year, we unveiled the Advanced Protection Program,[18] which provides the strongest account protection that Google offers.

Our focus on security is not limited to Google's users. We share technologies and collaborate with partners to help people stay safer whenever they are online. In 2007, we launched the first version of our Safe Browsing tool.[19] This tool helps protect users from phishing, malware, and other potential attacks by examining billions of URLs, software, and website content. We have made Safe Browsing free and publicly available to webmasters and developers so that they can protect their websites and applications from malicious actors.

Finally, it is important to note that small and midsize businesses are leveraging Google's cloud technology to protect the security and confidentiality of their business data. In the past, many such businesses managed their own online security infrastructure, putting them at a disadvantage. Now, these small and midsize businesses can avail themselves of the security expertise previously only available to the largest, most sophisticated enterprises, significantly reducing their information technology costs while vastly improving the security, confidentiality, integrity, and availability of business critical data.

**Toward A Comprehensive Baseline Privacy Framework**

Now, more than any time I've seen in my career in privacy, there is an interest in setting out baseline privacy requirements in law. We welcome this: a healthy data ecosystem requires people feel comfortable that all entities who use personal information will be held accountable for protecting it.[20]

The U.S. approach to privacy is admirable for its focus on protecting consumers while encouraging innovation and investment, but there is room for improvement. To demonstrate

---

[17] https://www.google.com/landing/2step/
[18] https://google.com/advancedprotection/
[19] https://safebrowsing.google.com/
[20] Comments filed in U.S. Department of Commerce, Docket No. 100402174-0175-01 and Docket No. 101214614−0614−01 : Information Privacy and Innovation in the Internet Economy (2010).

our commitment to the goal of comprehensive baseline privacy legislation, we recently put forward principles for a responsible data framework. The framework is based on the Fair Information Practices Principles (FIPPs), OECD Privacy Principles, Asia-Pacific Economic Cooperation (APEC) Privacy Framework, aspects of the European General Data Protection Regulation (GDPR), and our 20 years of experience offering services that depend on information, privacy protections, and user trust. It includes many of the principles I have talked about today: transparency, control, data portability, and security.

I am submitting a copy of Google's framework with my testimony. We hope it can contribute to this Committee's work.

Our framework is high-level, and of course, the manner in which general principles are implemented will matter a great deal. We urge the Committee to take into consideration the impacts on service functionality, the consumer benefits of free and low-cost products, the future of the open web and app ecosystem, the unique compliance needs of new entrants and small businesses, and competitive market dynamics.

**Conclusion**

Privacy and security work is never finished. Our work will continue, and we stand ready to do our part in building a better ecosystem for everyone. Sound practices and smart regulations can help, particularly when they are applied across the board to those making decisions regarding the collection and use of personal data. We share your goals of ensuring consumers are protected and businesses have an opportunity to innovate and grow.

Thank you again for the opportunity to tell you about our continued efforts in this space. We look forward to continuing to work with Congress on these important issues. I welcome any questions you might have.

# EXHIBIT 53

# Americans' Attitudes About Privacy, Security and Surveillance

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

pewinternet.org/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/

May 20, 2015



Internet & Technology

Report

May 20, 2015

By Mary Madden and Lee Rainie

The cascade of reports following the June 2013 government surveillance revelations by NSA contractor Edward Snowden have brought new attention to debates about how best to preserve Americans' privacy in the digital age. At the same time, the public has been awash with news stories detailing security breaches at major retailers, health insurance companies and financial institutions. These events – and the doubts they inspired – have contributed to a cloud of personal "data insecurity" that now looms over many Americans' daily decisions and activities. Some find these developments deeply troubling and want limits put in place, while others do not feel these issues affect them personally. Others believe that widespread monitoring can bring some societal benefits in safety and security or that innocent people should have "nothing to hide."

Americans' views about privacy and surveillance are relevant to policymaking on these matters. Key legal decisions about the legitimacy of surveillance or tracking programs have hinged on the question of whether Americans think it is reasonable in certain situations to assume that they will be under observation, or if they expect that their activities will not be monitored. A federal appeals court recently ruled that a National Security Agency program that collects Americans' phone records is illegal. In striking down the program, Judge Gerald Lynch wrote: "Such expansive development of government repositories of formerly private records would be an unprecedented contraction of the privacy expectations of all Americans. Perhaps such a contraction is required by national security needs in the face of the dangers of contemporary domestic and international terrorism. But we would expect such a momentous decision to be preceded by substantial debate, and expressed in unmistakable language."

Two new Pew Research Center surveys explore these issues and place them in the wider context of the tracking and profiling that occurs in commercial arenas. The surveys find that Americans feel privacy is important in their daily lives in a number of essential ways. Yet, they have a pervasive sense that they are under surveillance when in public and very few feel they have a great deal of control over the data that is collected about them and how it is used. Adding to earlier Pew Research reports that have documented low levels of trust in sectors that Americans associate with data collection and monitoring, the new findings show Americans also have exceedingly low levels of confidence in the privacy and security of the records that are maintained by a variety of institutions in the digital age.

While some Americans have taken modest steps to stem the tide of data collection, few have adopted advanced privacy-enhancing measures. However, majorities of Americans expect that a wide array of organizations should have limits on the length of time that they can retain records of their activities and communications. At the same time, Americans continue to express the belief that there should be greater limits on government surveillance programs. Additionally, they say it is important to preserve the ability to be anonymous for certain online activities.

## Most Americans hold strong views about the importance of privacy in their everyday lives.

The majority of Americans believe it is important – often "very important" – that they be able to maintain privacy and confidentiality in commonplace activities of their lives. Most strikingly, these views are especially pronounced when it comes to knowing what information about them is being collected and who is doing the collecting. These feelings also extend to their wishes that they be able to maintain privacy in their homes, at work, during social gatherings, at times when they want to be alone and when they are moving around in public.

When they are asked to think about all of their daily interactions – both online and offline – and the extent to which certain privacy-related values are important to them, clear majorities say these dimensions are at least "somewhat important" and many express the view that these aspects of personal information control are "very important."

Survey results from early 2015 show:

- 93% of adults say that being in control of *who* can get information about them is important; 74% feel this is "very important," while 19% say it is "somewhat important."
- 90% say that controlling *what* information is collected about them is important—65% think it is "very important" and 25% say it is "somewhat important."

At the same time, Americans also value having the ability to share confidential matters with another trusted person. Nine-in-ten (93%) adults say this ability is important to them, with 72% saying it is "very important" and 21% saying it is "somewhat important."

## Permission and publicness are key features that influence views on surveillance.

Americans say they do not wish to be observed without their approval; 88% say it is important that they not have someone watch or listen to them without their permission (67% feel this is "very important" and 20% say it is "somewhat important").

However, far fewer (63%) feel it is important to be able to "go around in public without always being identified." Only 34% believe being able to go unnoticed in public is "very important" and 29% say it is "somewhat important" to them. In both cases, all adults, regardless of age or gender, express comparable views.



**Americans Hold Strong Views About Privacy in Everyday Life**

*In response to the following question: "Privacy means different things to different people today. In thinking about all of your daily interactions – both online and offline – please tell me how important each of the following are to you . . ."*

*% of adults who say ...*

| | Very important | Somewhat important | Not very important | Not at all important | Don't know | NET Important | NET Not Important |
|---|---|---|---|---|---|---|---|
| Being in control of who can get info about you | 74% | | 19% | 3 | 11 | **93%** | 4% |
| Being able to share confidential matters with someone you trust | 72 | | 21 | 2 | 11 | **93** | 4 |
| Not having someone watch you or listen to you without your permission | 67 | | 20 | 8 | 12 | **88** | 9 |
| Controlling what information is collected about you | 65 | | 25 | 5 | 11 | **90** | 6 |
| Not being disturbed at home | 56 | | 29 | 9 | 22 | **85** | 11 |
| Being able to have times when you are completely alone, away from anyone else | 55 | | 30 | 9 | 22 | **85** | 10 |
| Having individuals in social/work situations not ask you things that are highly personal | 44 | | 36 | 13 | 2 4 | **79** | 15 |
| Being able to go around in public without always being identified | 34 | 29 | | 25 | 6 4 | **63** | 31 |
| Not being monitored at work | 28 | 28 | | 22 | 6 | 15 | **56** | 27 |

Source: Pew Research Center's Privacy Panel Survey #4, Jan. 27, 2015-Feb. 16, 2015 (N=461). Refused responses not shown.

**PEW RESEARCH CENTER**

The findings above come from a survey conducted Jan. 27 to Feb. 16, 2015, among 461 adults on the GfK Knowledge Panel. It has a margin of error of plus or minus 5.8 percentage points. The findings cited below in the Summary section come from a separate survey of 498 adults on the same Knowledge Panel; that survey was conducted between Aug. 5 and Sept. 2, 2014, and has a margin of error of plus or minus 5.6 percentage points.

## Americans have little confidence that their data will remain private and secure.

For all of the 11 entities we asked about in the fall 2014 survey – from government agencies to credit card companies to social media sites – only small minorities say they are "very confident" the records maintained by these organizations will remain private and secure.

- Just 6% of adults say they are "very confident" that **government agencies** can keep their

records private and secure, while another 25% say they are "somewhat confident."

- Only 6% of respondents say they are "very confident" that **landline telephone companies** will be able to protect their data and 25% say they are "somewhat confident" that the records of their activities will remain private and secure.
- **Credit card companies** appear to instill a marginally higher level of confidence; 9% say they are "very confident" and 29% say they are "somewhat confident" their data will stay private and secure.



**Few Express Confidence That Their Records Will Remain Private and Secure**

*% of adults who say they are ... that the records of their activity maintained by various companies and organizations will remain private and secure*

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498). Refused responses not shown.

**PEW RESEARCH CENTER**

Online service providers are among the least trusted entities when it comes to keeping information private and secure. When asked about search engine providers, online video sites, social media sites and online advertisers, the majority felt "not too confident" or "not at all confident" that these entities could protect their data:

- 76% of adults say they are "not too confident" or "not at all confident" that records of their activity maintained by the **online advertisers** who place ads on the websites they visit will remain private and secure.
- 69% of adults say they are not confident that records of their activity maintained by the **social media sites** they use will remain private and secure.

- 66% of adults say they are not confident that records of their activity maintained by **search engine providers** will remain private and secure.
- 66% say they are not confident that records of their activity collected by the **online video sites** they use will remain private and secure.

## Few feel they have "a lot" of control over how much information is collected about them in daily life and how it is used.

When asked how much control they feel they have over how much information is collected about them and how it is used in their everyday lives, only a small minority of Americans say they have "a lot" of control over their personal data collection and its use.

When thinking about a range of activities that might take place on a typical day, 9% say they feel they have "a lot" of control over how much information is collected about them and how it is used, while 38% say they have "some control." Another 37% feel they have "not much control," and 13% feel they personally have "no control at all" over the way their data is gathered and used.

## A very small number say they have changed their behavior to avoid being tracked recently, but many were already engaged in more common or less technical privacy-enhancing measures.

At the time of the mid-2014 survey, the vast majority of respondents – 91% – had not made any changes to their internet or cellphone use to avoid having their activities tracked or noticed. Only 7% reported that they had made these kinds of changes in "recent months."

At the same time, a much larger group had engaged in some everyday obfuscation tactics and privacy-enhancing measures. These activities were not necessarily in direct response to news of government monitoring programs, but, rather, represent a set of measures that respondents may have engaged in out of broader concerns about their personal info. Some of the more common activities include:

- Clearing cookies or browser history (59% have done this).
- Refusing to provide information about themselves that wasn't relevant to a transaction (57% have done this).
- Using a temporary username or email address (25% have done this).
- Giving inaccurate or misleading information about themselves (24% have done this).
- Deciding not to use a website because they asked for a real name (23% have done this).

## Advanced measures, such as the use of proxy servers and encryption are less common.

This survey included somewhat more expansive questions about advanced privacy-enhancing measures such as the use of proxy servers, virtual private networks and encryption across a variety of communications channels, following up on findings reported earlier this year. However, even with comparatively broader language, just one-in-ten Americans said they had adopted these more sophisticated steps to shield their information:

- 10% of adults say they have encrypted their phone calls, text messages or email.
- 9% say they have used a service that allows them to browse the Web anonymously, such as a proxy server, Tor software, or a virtual personal network.

## Most want limits on the length of time that records of their activity can be retained.

There is wide variation across the length of time that respondents feel is reasonable for businesses and other organizations to store their data. Additionally, there is considerable variance on their views depending on the kind of organization that retains the records of the activity. In general, and even though it may be necessary to provide certain functionality, people are less comfortable with online service providers – such as search engine providers and social media sites – storing records and archives of their activity.

- 50% of adults think that **online advertisers** who place ads on the websites they visit should not save records or archives of their activity for any length of time.
- 44% feel that the **online video sites** they use shouldn't retain records of their activity.
- 40% think that their **search engine** provider shouldn't retain information about their activity.
- 40% think that **social media sites** they use shouldn't save data about their activity.

At the other end of the spectrum, the vast majority of adults are comfortable with the idea that credit card companies might retain records or archives of their activity. Just 13% think that credit card companies "shouldn't save any information."

## Those who have greater awareness of the government monitoring programs are more likely to believe that certain records should not be saved for any length of time.



### Those Who Have Heard "a Lot" About Government Surveillance Hold Stronger Views About Certain Data Retention Limits

*% of U.S. adults who say the following organizations <u>should not save any information</u> about their activity*

■ Heard "a little" about gov't surveillance  ■ Heard "a lot" about gov't surveillance

| Your email provider | 30 / 43 |
| Your search engine provider | 38 / 54 |
| Social media sites you use | 35 / 55 |

Source: Pew Research Center's Privacy Panel Survey #2, Aug. 5, 2014-Sept. 2, 2014 (N=498).

**PEW RESEARCH CENTER**

Those who have had the most exposure to information about the government surveillance programs also have some of the strongest views about data retention limits for certain kinds of organizations. These differences are particularly notable when considering social media sites. Among those who have heard "a lot" about the government collecting communications data as part of anti-terrorism efforts, 55% say that the social media sites they use should not save any information regarding their activity, compared with 35% of those who have heard "a little" about the government monitoring programs.

## 65% of American adults believe there are not adequate limits on the telephone and internet data that the government collects.

When asked to think about the data the government collects as part of anti-terrorism efforts, 65% of Americans say there are not adequate limits on "what telephone and internet data the government can collect."  Just 31% say they believe that there are adequate limits on the kinds of data gathered for these programs. The majority view that there are not sufficient limits on what data the government gathers is consistent across all demographic groups. Those who are more aware of the government surveillance efforts are considerably more likely to believe there are not adequate safeguards in place; 74% of those who have heard "a lot" about the programs say that there are not adequate limits, compared with 62% who have heard only "a little" about the monitoring programs.

## 55% of Americans support the idea of online anonymity for certain activities, but many are undecided on the issue.

In the current survey, the majority of adults (55%) said that people should have the ability to

use the internet completely anonymously for certain kinds of online activities. Another 16% do not think people should be able to remain anonymous when they are online; 27% said they don't know.

Men are more likely than women to think people should be able to engage in certain online activities anonymously (61% vs. 49%), but support for internet anonymity does not vary by age. Education is a predictor, but income is not; adults with at least some college education are significantly more likely than those who have not attended college to believe that people should have the ability to use the internet anonymously (66% vs. 40%).

## Even as they expect online anonymity, most assume that motivated people and organizations could uncover private details.

Many believe they are particularly vulnerable to people or organizations who have a motive to learn private details about their past. When considering how difficult it would be for a *motivated* person or organization to learn private details about their past that they would prefer to keep private, 64% of adults said it would be "not too" or "not at all" difficult for a motivated person or organization to uncover that sensitive information. Just 20% felt it would be "very" or "somewhat" difficult.

Men and women report similar responses, but those ages 50 and older (76%) are significantly more likely to believe it would be "not too" or "not at all difficult" when compared with those under the age of 50 (54%). Similarly, those with a college degree are more likely than those who have not attended college to feel more exposed (70% vs. 58%).

## More about these surveys

The majority of the analysis in this report is based on a Pew Research Center survey conducted between Aug. 5, 2014, and Sept. 2, 2014, among a sample of 498 adults ages 18 or older. The survey was conducted by the GfK Group using KnowledgePanel, its nationally representative online research panel. GfK selected a representative sample of 1,537 English-speaking panelists to invite to join the subpanel and take the first survey in January 2014. Of the 935 panelists who responded to the invitation (60.8%), 607 agreed to join the subpanel and subsequently completed the first survey (64.9%), the results of which were reported in November 2014. This group has agreed to take four online surveys about "current issues, some of which relate to technology" over the course of a year and possibly participate in one or more 45- to 60-minute online focus group chat sessions. For the second survey whose results are reported here, 498 of the original 607 panelists participated. A random subset of the subpanel is occasionally invited to participate in online focus groups. For this report, a total of 26 panelists participated in one of three online focus groups conducted during December 2014. Sampling error for the total sample of 498 respondents is plus or minus 5.6 percentage points at the 95% level of confidence.

An additional survey related to Americans' views about the importance of privacy was conducted between Jan. 27 and Feb. 16, 2015, among a sample of 461 adults ages 18 or older. The sample was drawn from the same 607 adults who agreed to participate in the

subpanel on privacy. It has a margin of error of plus or minus 5.8 percentage points.

For more information on the Privacy Panel, please see the Methods section at the end of this report.

## Acknowledgements

The authors would like to acknowledge the generous contributions of the various outside reviewers who offered their insights at various stages of this project. In particular, we would like to thank Tiffany Barrett, danah boyd, Mary Culnan and all of the attendees of the Future of Privacy Forum Research Seminar Series, Urs Gasser, Chris Hoofnagle, Michael Kaiser, Kirsten Martin and Bruce Schneier. In addition, the authors are grateful for the ongoing editorial, methodological and production-related support provided by the staff of the Pew Research Center.

While we greatly appreciate all of these contributions, the authors alone bear responsibility for the presentation of these findings, as well as any omissions or errors.

# EXHIBIT 54

# Anonymity, Privacy, and Security Online

pewinternet.org/2013/09/05/anonymity-privacy-and-security-online

September 5, 2013



Report

September 5, 2013

By Lee Rainie, Sara Kiesler, Ruogu Kang and Mary Madden

## Anonymity online

Most internet users would like to be anonymous online at least occasionally, but many think it is not possible to be completely anonymous online. New findings in a national survey show:

- 86% of internet users have taken steps online to remove or mask their digital footprints—ranging from clearing cookies to encrypting their email, from avoiding using their name to using virtual networks that mask their internet protocol (IP) address.
- 55% of internet users have taken steps to avoid observation by specific people, organizations, or the government

Still, 59% of internet users do not believe it is possible to be completely anonymous online, while 37% of them believe it is possible.

A section of the survey looking at various security-related issues finds that notable numbers of internet users say they have experienced problems because others stole their personal information or otherwise took advantage of their visibility online—including hijacked email and social media accounts, stolen information such as Social Security numbers or credit card information, stalking or harassment, loss of reputation, or victimization by scammers.

- 21% of internet users have had an email or social networking account compromised or taken over by someone else without permission.
- 13% of internet users have experienced trouble in a relationship between them and a family member or a friend because of something the user posted online.
- 12% of internet users have been stalked or harassed online.
- 11% of internet users have had important personal information stolen such as their Social Security Number, credit card, or bank account information.
- 6% of internet users have been the victim of an online scam and lost money.
- 6% of internet users have had their reputation damaged because of something that

happened online.

- 4% of internet users have been led into physical danger because of something that happened online.
- 1% of internet users have lost a job opportunity or educational opportunity because of something they posted online or someone posted about them.

Some 68% of internet users believe current laws are not good enough in protecting people's privacy online and 24% believe current laws provide reasonable protections.

Most internet users know that key pieces of personal information about them are available online—such as photos and videos of them, their email addresses, birth dates, phone numbers, home addresses, and the groups to which they belong. And growing numbers of internet users (50%) say they are worried about the amount of personal information about them that is online —a figure that has jumped from 33% who expressed such worry in 2009.

People would like control over their information, saying in many cases it is very important to them that only they or the people they authorize should be given access to such things as the content of their emails, the people to whom they are sending emails, the place where they are when they are online, and the content of the files they download.

**About this survey**

This survey by the Pew Research Center's Internet Project was underwritten by Carnegie Mellon University. The findings in this report are based on data from telephone interviews conducted by Princeton Survey Research Associates International from July 11-14, among a sample of 1,002 adults ages 18 and older.  Telephone interviews were conducted in English by landline and cell phone. For results based on the total sample, one can say with 95% confidence that the error attributable to sampling is plus or minus 3.4 percentage points and for the results from 792 internet and smartphone users in the sample, the margin of error is 3.8 percentage points.  More information is available in the Methods section at the end of this report.

## A closer look at key findings

**86% of internet users have tried to use the internet in ways to minimize the visibility of their digital footprints**

The chart below shows the variety of ways that internet users have tried to avoid being observed online.



## The strategies people use to be less visible online
*% of adult internet users who say they have done these things online*

| Strategy | % |
|---|---|
| Cleared cookies and browser history | 64% |
| Deleted / edited something you posted in past | 41% |
| Set your browser to disable or turn off cookies | 41% |
| Not used website because it asked for your real name | 36% |
| Used temporary username / email address | 26% |
| Post comments without revealing who you are | 25% |
| Asked someone to remove something posted about you | 21% |
| Tried to mask your identity | 18% |
| Used a public computer to browse anonymously | 18% |
| Used fake name / untraceable username | 18% |
| Encrypted your communications | 14% |
| Used service that allows you to browse the web anonymously | 14% |
| Given inaccurate info about yourself | 13% |

**Source:** Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**55% of internet users have taken steps to hide from specific people or organizations**

Beyond their general hope that they can go online anonymously, the majority of internet users have tried to avoid observation by other people, groups, companies, and government agencies. Hackers, criminals and advertisers are at the top of the list of groups people wish to avoid.



## Who users try to avoid

*% of adult internet users who say they have used the internet in ways to avoid being observed or seen by ...*

Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

**Users report that a wide range of their personal information is available online, but feel strongly about controlling who has access to certain kinds of behavioral data and communications content.**

Users know that there is a considerable amount of personal information about them available online. Among the list of items queried, photos were the most commonly reported content posted online; 66% of internet users reported that an image of them was available online. And half (50%) say that their birth date is available.

## Personal information online
*% of adult internet users who say this information about them is available online*



Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

Another set of questions focused on the kinds of "data exhaust" that is generated as a result of everyday forms of online communications, web surfing and application use. Respondents were asked how much they cared "that only you and those you authorize should have access" to certain kinds of behavioral data and communications content and there was notable variance in the answers. The content of email messages and the people with whom one communicates via email are considerably more sensitive pieces of information when compared with other online activities and associated data trails.

## How much do you care that only you and those you authorize should have access to this information?

*% of adult internet users who say it is important—or not—to them to control these types of information*



Source: Pew Research Center's Internet & American Life Project Omnibus Survey, conducted July 11-14, 2013, on landline and cell phones. N=792 for internet users and smartphone owners. Interviews were conducted in English on landline and cell phones. The margin of error on the sample is +/- 3.8 percentage points.

# EXHIBIT 55



**University of Pennsylvania**
**ScholarlyCommons**

Departmental Papers (ASC)                                    Annenberg School for Communication

4-14-2010

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

Chris Jay Hoofnagle

Jennifer King

Su Li

Joseph Turow
*University of Pennsylvania*, jturow@asc.upenn.edu

Follow this and additional works at: http://repository.upenn.edu/asc_papers

Part of the Communication Technology and New Media Commons, Consumer Protection Law Commons, Privacy Law Commons, and the Public Relations and Advertising Commons

Recommended Citation
Hoofnagle, C., King, J., Li, S., & Turow, J. (2010). How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?. Retrieved from http://repository.upenn.edu/asc_papers/399

Electronic copy available at: http://ssrn.com/abstract=1589864

This paper is posted at ScholarlyCommons. http://repository.upenn.edu/asc_papers/399
For more information, please contact libraryrepository@pobox.upenn.edu.

# How Different are Young Adults From Older Adults When it Comes to Information Privacy Attitudes & Policies?

**Abstract**

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are." Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults. This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In this telephonic (wireline and wireless) survey of internet using Americans (N=1000), we found that large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. Where there were differences, over half of the young adult-respondents did answer in the direction of older adults. There clearly is social significance in that large numbers of young adults agree with older Americans on issues of information privacy.

A gap in privacy knowledge provides one explanation for the apparent license with which the young behave online. 42 percent of young Americans answered all of our five online privacy questions incorrectly. 88 percent answered only two or fewer correctly. The problem is even more pronounced when presented with offline privacy issues – post hoc analysis showed that young Americans were more likely to answer no questions correctly than any other age group.

We conclude then that that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

**Keywords**
behavioral advertising, online advertising, privacy, transparency, consumer protection, social networking, age, young

**Disciplines**
Communication | Communication Technology and New Media | Consumer Protection Law | Privacy Law | Public Relations and Advertising

**Comments**
Electronic copy available at: http://ssrn.com/abstract=1589864

Cookie:TShram@google.com/mobile
Cookie:TShram@www.msnbc.msn.com/12345
Cookie:TShram@tvguide.com/PartnerGrid
Cookie:TShram@www.dell.com/rtm/2
Cookie:TShram@voip.fabphone.co.uk/voip/promo
Cookie:TShram@www.comcastsupport.com/publication
Cookie:TShram@www.comcastsupport.com/sdcxuser/rrn
Cookie:TShram@www.ebay.com/rtm/main
Cookie:TShram@stat.upe.com
Cookie:TShram@www.comcastsupport.com/sdcookie:TShram@user
Cookie:TShram@bing.com/search
Cookie:TShram@ytsa.net/tase
Cookie:TShram@onlinestores.metaservices.microsoft.com/swervices/witching
Cookie:TShram@ytsa.net/tase
Cookie:TShram@www.google.com/
Cookie:TShram@ytsa.net/tase
Cookie:TShram@community.adobe.com/help/api/thumbs
Cookie:TShram@google.com/verify
Cookie:TShram@google.ca/verify
Cookie:TShram@www.microsoft.com/windows.mobile
SNID
27=1JR2BZwybn9ozsGG7nzQprKfpqOX_Ai6QDcxTmOf4Q=SSDlBYXE3on3iWwc
google.com/verify
9728
2320728704
30067751
406026352
30030938
*
ach-search
UjiezX7sFgNwJhrie19zsC69Vu8=
community.adobe.com/help/api/v1/thumbs/
1536
2784647552
30759988
3564042032
30025733
*
sik_client_guid
47aeeb428-73bc-ada9-bb60-728dc6367a7
www.comcastsupport.com/sdcxuser/rrn/
1088
284664448
30089887
2560430544
30016461
*
SynZCSI
K_25_503=10036:80001
tvguide.com/PartnerGrid

# HOW DIFFERENT ARE YOUNG ADULTS FROM OLDER ADULTS WHEN IT COMES TO INFORMATION PRIVACY ATTITUDES & POLICIES?

## APRIL 14, 2010

"We suggest...that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data." (SEE PAGE 20)

**Chris Hoofnagle**
UC Berkeley School of Law, Berkeley Center for Law and Technology

**Jennifer King**
UC Berkeley School of Information

**Su Li**
UC Berkeley School of Law, Center for the Study of Law and Society

**Joseph Turow**
Annenberg School for Communication, University of Pennsylvania

**Chris Jay Hoofnagle**, J.D., is director of the Berkeley Center for Law & Technology's information privacy programs and senior fellow to the Samuelson Law, Technology & Public Policy Clinic. He is an expert in information privacy law. Hoofnagle co-chairs the annual Privacy Law Scholars Conference. He is licensed to practice law in California and Washington, DC.

**Jennifer King**, MIMS, is a Ph.D. candidate at the UC Berkeley School of Information. Most recently she was a researcher at the Samuelson Law, Technology, and Public Policy Clinic at UC Berkeley's School of Law.  Her research areas include information privacy and security, usability and human-computer interaction, video surveillance and other sensor networks. With Chris Hoofnagle, King has published three reports exploring Californians' privacy attitudes, available at SSRN.com.

**Su Li**, Ph.D., recently joined Berkeley Law as its new Statistician in Empirical Legal Studies.  Her research interests include gender and social inequality, economic sociology, social network analysis, and the sociology of education.  Li received her Ph.D. in Sociology and a Master's in Mathematical Models for Social Science at Northwestern University. An expert in quantitative methodology, Li was Assistant Professor of Sociology at Wichita State University before joining Berkeley Law.

**Joseph Turow**, Ph.D., is Robert Lewis Shayon Professor of Communication at the Annenberg School for Communication, University of Pennsylvania. Among his several books are *Niche Envy: Marketing Discrimination in the Digital Age* (MIT Press, 2006) and *Breaking Up America: Advertisers and the New Media World* (U of Chicago Press, 1997). Since 1999 he has conducted national telephone surveys that have moved forward public discourse on digital media, marketing, and privacy. Several can be found at the Annenberg Public Policy Center website, APPCPenn.org.

This survey was supported by the Rose Foundation for Communities and the Environment, Tim Little, Executive Director, under grant 025629-003, Chris Jay Hoofnagle, Principal Investigator; and by The Annenberg School for Communication—Michael Delli Carpini, Dean.

Electronic copy available at: http://ssrn.com/abstract=1589864

## Overview

Media reports teem with stories of young people posting salacious photos online, writing about alcohol-fueled misdeeds on social networking sites, and publicizing other ill-considered escapades that may haunt them in the future. These anecdotes are interpreted as representing a generation-wide shift in attitude toward information privacy. Many commentators therefore claim that young people "are less concerned with maintaining privacy than older people are."[1] Surprisingly, though, few empirical investigations have explored the privacy attitudes of young adults.[2] This report is among the first quantitative studies evaluating young adults' attitudes. It demonstrates that the picture is more nuanced than portrayed in the popular media.

In July 2009, we commissioned a nationally representative telephone survey (landline and cellular) of Americans in order to understand the public's views of both online and offline privacy issues. Our first report from this effort, *Americans Reject Tailored Advertising and Three Activities that Enable It*,[3] released in October 2009, investigated Americans' comprehension of online tailored advertising and related privacy concerns. In this report, we compare young adults and older adults with respect to attitudes toward online privacy protection, whether they carry out certain privacy-protecting behaviors, their public policy preferences regarding privacy, and their knowledge of information privacy law that might affect them in their everyday lives. We found that expressed attitudes towards privacy by American young adults (aged 18-24) are not nearly as different from those of older adults as many suggest. With important exceptions, large percentages of young adults are in harmony with older Americans when it comes to sensitivity about online privacy and policy suggestions. For example, a large majority of young adults:

---

[1] Ariel Maislos, chief executive of Pudding Media, quoted in Louise Story, *Company Will Monitor Phone Calls to Tailor Ads,* New York Times, Sept. 24, 2007, available at: http://www.nytimes.com/2007/09/24/business/media/24adcol.html.

[2] Marwick, A., Murgia-Díaz, D., and Palfrey, J. (2010). Youth, Privacy and Reputation Literature Review. Berkman Center for Internet and Society, Harvard University.

[3] Joseph Turow et al., *Americans Reject Tailored Advertising and Three Activities that Enable It*, SSRN ELIBRARY (2009), http://ssrn.com/paper=1478214.

- Has refused to give information to a business in cases where they felt it was too personal or not necessary;
- Believes anyone who uploads a photo of them to the internet should get their permission first, even if taken in public;
- Believes there should be a law that gives people the right to know all the information websites know about them; and
- Believes there should be a law that requires websites to delete all stored information about an individual.

In view of these findings, why would so many young adults act in social networks and elsewhere online in ways that would seem to offer quite private information to all comers?  A number of answers present themselves, including suggestions that people 24 years and younger approach cost-benefit analyses related to risk differently than do individuals older than 24.  An important part of the picture, though, must surely be our finding that higher proportions of 18-24 year olds believe incorrectly that the law protects their privacy online and offline more than it actually does.  This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

## Background

Popular writings and comments suggest that America's youngest adults do not care about information privacy, particularly online. As evidence, many point to younger internet users' adoption and prolific use of blogs, social network sites, posting of photos, and general documenting and (over)sharing of their life's details online, from the mundane to the intimate, for all the world to consume.  "Young adults**,"** exhorted one newspaper article to that segment of its readers, "you might regret that scandalous Facebook posting as you get older."[4]  More broadly, Robert Iger, CEO of Disney, recently commented categorically that "kids don't care" about privacy issues, contending that complaints generally came from much older consumers.  Indeed, he said that when

---

[4] Roger [no surname], "There is No Privacy," *Virginia Pilot*, April 4, 2009, p. B9.

he talked to his adult children about their online privacy concerns "they can't figure out what I'm talking about."[5]

Iger is not alone in making claims about differences between young people—even college students—and older members of the population when it comes to giving out personal information online.  Anecdotes abound detailing how college-age students post photos of themselves unclothed and/or drunken, for the entire world—including potential employers—to see.  It is not a leap to argue that these actions are hard-wired into young people.  One psychological study found that adolescents (aged 13-16) and what they termed "youths" (those aged 18-22) are "more inclined toward risky behavior and risky decision making than are 'adults' (those older than 24 years) and that peer influence plays an important role in explaining risky behavior during adolescence."  Their finding was more pronounced among adolescents than among the youths, but differences between youths and adults were striking in willingness to take risks—particularly when group behavior was involved.[6]   Although the authors do not mention social media, the findings are clearly relevant to these situations. There the benefits of looking cool to peers may outweigh concerns about negative consequences, especially if those potential consequences are not likely to happen immediately. A related explanation for risky privacy behavior on social-networking sites is that they encourage users to disclose more and more information over time.

Young people's use of social media does not in itself mean that they find privacy irrelevant.[7]   Indeed, the Pew Internet & American Life Project found in 2007 that teenagers used a variety of techniques to obscure their real location or personal details on social networking sites.[8]   That study fits with the findings of other researchers, who have

---

[5] Gina Keating, "Disney CEO Bullish on Direct Marketing to Consumers," Reuters, July 23, 2009, http://www.reuters.com/article/idUSTRE56M0ZY20090723?pageNumber=2&virtualBrandChannel=0

[6] Margo Gardner and Laurence Steinberg, "Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study," *Developmental Psychology* 41:4, 625-635.  No one 23 or 24 years of age was in the sample.

[7] Raynes-Goldie, Kate. "Aliases, creeping, and wall cleaning: Understanding privacy in the age of Facebook" *First Monday* [Online], Volume 15 Number 1 (2 January 2010); Lenhart, Amanda and Madden, Mary. "Teens, Privacy, and Online Social Networks." Pew Internet & American Life Project, April 18. 2007. Available at: http://www.pewinternet.org/Reports/2007/Teens-Privacy-and-Online-Social-Networks.aspx; and more generally danah boyd's excellent bibliography of Social Networking Studies at: http://www.danah.org/researchBibs/sns.html.

[8] Lenhart and Madden, *Id*.

urged the importance of reframing the issue to ask *what dimensions* of privacy younger adults care about.[9]   While differences between young adults and those older than they may be important, other more subtle commonalities may be ignored. In recent years older age groups have rushed to social networking in large numbers with discussions of personal issues and details. A common anecdotal observation is that young adults and adolescents are more likely than their elders to post racy photos or document episodes of untoward behavior.   If research shows this distinction is accurate, the question nevertheless remains whether the same, higher, or lower percentages of Americans over 24 years old reveal more subtle but important private information about themselves that might lead to embarrassing and unfortunate incidents, such as identity theft.

In spite of vigorous social concerns and discussions, there does not appear to be research that shows definitively that young adults are fundamentally different from older Americans when it comes to privacy attitudes. Moreover, comparisons of what people of different ages do online must be placed within a context of how they understand the norms and laws of privacy in their society.  What, if anything, have they done to protect their privacy? What do they believe about privacy norms when presented with the opportunity to think rationally about them?  And what protections do they believe laws afford them when they do present themselves in various online environments?   The extent to which Americans of different ages have similar or different answers to these questions will suggest whether they converge on similar policy approaches despite seemingly different decisions in the heat of online activities. That is the topic we chose for this study.

In our earlier report on tailored advertising we compared age groups' responses to three questions that asked, "Please tell me whether or not you want websites you visit to show you *ads* [another question substituted *discounts* and a third *news*] that are tailored to your interests."   We found that while young adults' concerns were lower compared to other age categories, substantial proportions nevertheless said they did not want tailoring of ads, discounts, and news (55%, 37%, and 54% respectively).  Moreover, the percentages saying no rose to very high levels when the young adults were told that the information required to tailor advertisements would come from following them on the

---

[9] See Raynes-Goldie (2010).

website they were visiting (67% said no), on other websites they have visited (86% said no) and what they do offline—for example, in stores (90% said no).[10] The findings led us to believe that these tendencies might apply to young adults' approaches to privacy in general.  We hypothesized a dual dynamic:  A smaller percentage of young adults than older adults would evidence privacy concerns, but that percentage would still be large, typically exceeding 50% of young adults.  We did find this dynamic at work. But we also noted that differences in privacy attitudes and practices between young adults and older ones were at times so small as to not be statistically significant.

## Methods

In 2009, we commissioned a survey on behalf of the Berkeley Center for Law and Technology at the University of California, Berkeley School of Law in order to gauge the American public's attitudes towards and knowledge of the rules and practices surrounding the collection and use of personal information.   In this report, we present a summary of our findings for a subset of our survey questions.[11] These questions were part of a survey of Americans' opinions about and understanding of a variety of online and offline privacy issues. We cast our population net broadly. We included people in our study if they were 18 years or older said yes to one of the following questions: "Do you go on online or use the internet, at least occasionally?" and "Do you send or receive email, at least occasionally?"

The survey was conducted from June 18 to July 2, 2009 by Princeton Survey Research Associates International. PSRA conducted telephone interviews with a nationally representative, English-speaking sample of 1,000 American adults living in the continental United States. A combination of landline (n=725) and wireless (n=275) random digit dial (RDD) samples was used to represent all adults in the continental United States who have access to either a landline or cellular telephone. The interviews averaged 20 minutes. Based on a seven callback procedure and using the American Association of Public Opinion research (AAPOR) RR3 method, a standard for this type of survey, the overall response rates were a typical 18 percent for the landline sample and

---

[10] *Id*. at Fn. 3.

[11] *Id*.

22 percent for the cellular sample. Statistical results are weighted to correct known demographic discrepancies.[12] The margin of sampling error for the complete set of weighted data is ±3.6 percent at the 95 percent confidence level. The margin of error is higher for smaller subgroups within the sample.

Table 1 presents the characteristics of the sample. For this report, we created cross-tabulations of a subset of our survey questions to compare responses across typical age categories (18-24, 25-34, 35-44, 45-54, 55-64, and 65+). Because some people didn't reveal their age, the total for this study's sample is 975 individuals. We considered chi-square values for each table significant at the level of $p < .05$. When the chi-square tests were significant, we used two sample t-tests to discover whether there are statistically significant differences between the 18-24 year olds and all the older adults (i.e. 18-24 compared to 25-65+).  We also used Scheffe post-hoc tests to examine if any two age groups are significantly different from each other (e.g. 18-24 vs. 25-34 or 18-24 vs. 35-44) on each possible answer to the question being asked in the tables.  For both t-tests and Scheffe tests[13] we considered significance to be at the level of $p < .05$.

All tables presented in this paper are based on the weighted sample of the data,

---

[12] A two-stage procedure was used to weight this dual-frame sample. A first-stage weight was applied to account for the overlapping sample frames. The first stage weight balanced the phone use distribution of the entire sample to match population parameters. The phone use parameter was derived from an analysis of the most recently available National Health Interview Survey (NHIS) data along with data from recent dual-frame surveys. (See Blumberg SJ, Luke JV, "Wireless substitution: Early release of estimates from the National Health Interview Survey, July-December, 2008." National Center for Health Statistics. May 2009.) This adjustment ensures that the dual- users are appropriately divided between the landline and cell sample frames.

The second stage of weighting balanced the total sample demographics to population parameters. The total sample was balanced to match national population parameters for sex, age, education, race, Hispanic origin, region (U.S. Census definitions), population density, and telephone usage. The basic weighting parameters came from a special analysis of the Census Bureau's 2008 Annual Social and Economic Supplement (ASEC) that included all households in the continental United States. The population density parameter was derived from Census 2000 data. The telephone usage parameter came from the analysis of NHIS data.

We conducted all analyses in this report using SPSS on a weighted random sample.  Due to the unique way that SPSS handles weight, we applied the standardized weight in all analyses so that the sample was corrected by population proportion but not by population size.  That is, the sample size was not inflated to the original population size in our analysis. Using the standardized weight prevents the risk of unduly reducing standard errors in significance tests and thereby prevents the risk of having type I errors in the analysis.

[13] Since Tables 15 and 16 involve indexed variables, on top of the tests on the comparisons of percentages we conducted additional t-tests and Scheffe tests to compare the means of the created indexed variables. See text for details.

with a valid sample size of 975. However, applying weights causes rounding errors in cross-tabulations, which is the reason that the Ns in all tables, except for Table 11, appear as a number other than 975.

**Table 1:  Characteristics of U.S. Adults in Sample (N=1,000)\***

|  | % |
|---|---|
| **Sex** | |
| Male | 48 |
| Female | 52 |
| **Age** | |
| 18-24 | 14 |
| 25-34 | 21 |
| 35-44 | 20 |
| 45-54 | 19 |
| 55-64 | 15 |
| 65+ | 8 |
| Refused | 3 |
| **Race** | |
| White | 78 |
| Black or African American | 9 |
| Asian or Pacific Islander | 4 |
| American Indian or Alaskan Native | 1 |
| Mixed Race | 2 |
| Other/Don't Know/Refused | 6 |
| **Hispanic or Latino Background?** | |
| Yes | 11 |
| No | 88 |
| Don't Know/Refused | 1 |
| **Household Income** | |
| Under $30,000 | 21 |
| $30,000 to under $50,000 | 19 |
| $50,000 to under $75,000 | 17 |
| $75,000 and Over | 33 |
| Don't Know/Refused | 10 |
| **Region of the Country** | |
| Northeast | 19 |
| Midwest | 22 |
| South | 33 |
| West | 26 |

\*When the numbers don't add to 100% it is because of a rounding error.

## Findings

The following tables will elaborate on a basic theme:  Large percentages of young adults (those 18-24 years) are in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions. In several cases, there are no statistically significant differences between young adults and older age categories on these topics. For most of the questions we asked, there is a statistically significant difference between the youngest adults and older age categories. However, even in these cases over half of the young adult-respondents did answer in the direction of older adults.  There clearly is *social significance* in that large numbers of young adults—in some cases, 80-90 percent—agree with older Americans on issues of information privacy.

### Table 2 – Refused to Provide Information

| Have you ever refused to give information to a business or a company because you thought it was not really necessary or was too personal? | Total | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 88% | 82% | 84% | 91% | 93% | 92% | 85% |
| *No, have not* | 11% | 18% | 13% | 9% | 7% | 7% | 14% |
| *Don't know/refused* | 1% | 0% | 3% | 0% | 0% | 1% | 1% |
| *Total* | 974 | 139 | 206 | 197 | 195 | 151 | 86 |

$x^2$= 34.158, df = 10, $p$ < .001

### Table 3 – Uploading Where I am Recognizable

| Generally speaking, anyone who uploads a photo or video of me to the internet where I am clearly recognizable should first get my permission. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Strongly agree or Agree* | 86% | 84% | 81% | 86% | 90% | 91% | 88% |
| *Strongly disagree or Disagree* | 13% | 16% | 18% | 13% | 9% | 9% | 8% |
| *Don't know/refused* | 1% | 0% | 2% | 1% | 1% | 0% | 3% |
| *Total* | 973 | 140 | 206 | 197 | 195 | 150 | 85 |

$x^2$= 22.8, df = 10, $p$ < .05; Differences are significant but not related to young adults vs. older adults.   See text.

**Table 4 – Right To Know**

| Do you think there should be a law that gives people the right to know everything that a website knows about them, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 68% | 62% | 68% | 73% | 71% | 64% | 69% |
| *No, law is not necessary* | 30% | 35% | 31% | 24% | 28% | 31% | 30% |
| *Don't know/refused* | 2% | 3% | 2% | 3% | 1% | 5% | 1% |
| *Total* | 976 | 141 | 206 | 197 | 196 | 150 | 86 |

$x^2$= 12.3, df = 10, $p$ = .27 : Differences not significant

**Table 5 – Right To Delete**

| Do you think there should be a law that requires websites and advertising companies to delete all stored information about an individual, or do you feel such a law is not necessary? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, should be a law* | 92% | 88% | 91% | 90% | 94% | 94% | 90% |
| *No, law is not necessary* | 8% | 11% | 7% | 10% | 5% | 5% | 9% |
| *Don't know/refused* | 1% | 1% | 1% | 0% | 1% | 1% | 1% |
| *Total* | 975 | 139 | 207 | 197 | 195 | 150 | 87 |

$x^2$= 10.6, df = 10, $p$ = .39 : Differences not significant

These dynamics are visible quite clearly in Tables Two through Five, which report on Americans' sensitivity regarding privacy issues. Large proportions of all age groups have refused to provide information to a business for privacy reasons. They agree or agree strongly with the norm that a person should get permission before posting a photo of someone who is clearly recognizable to the internet, even if that photo was taken in public. They agree that there should be a law that gives people the right to know "everything that a website knows about them." And they agree that there should be a law that requires websites and advertising companies to delete "all stored information" about an individual. In the case of the first issue (see Table Two), a statistically significant lower proportion of 18-24 year olds agrees with these positions, but this proportion of young adults agreeing or agreeing strongly was nevertheless over 80%.[14] With respect to

---

[14] In Table 2, when comparing the 18-24 year olds to the rest of the sample, the differences in the percentages between the two groups are statistically significant at .05 level according to a two-sample t-test. Interestingly, the Scheffe tests of differences between 18-24 year olds and each of the other groups show no significance at .05 level. With respect to Table 3, although answers to this question are

the other three issues (see Tables Three through Five), the differences between the 18-24 year olds and the other adults are not statistically significant: both young and old alike are in agreement.

Privacy Practices

We also sought to determine whether young adults were different from other adult categories when it came to common privacy-related practices—whether they read privacy policies, how frequently they erase their browser cookies, whether or not they had ever changed their mind about an online purchase because of a privacy or security concern, and how frequently they check their credit report. In the case of reading privacy policies, there are no statistical differences among age groups. As Table 6 shows, about half the adult population, including young adults, says it reads policies often or sometimes. When it comes to erasing cookies (Table 7), 58% of young adults say they erase cookies often or sometimes. Statistical tests beyond the chi-square also indicate that age differences are essentially not statistically significant. The t-test tells us that the only statistically significant finding involves the higher proportion of 18-24 year olds answering "hardly ever" compared to the rest of adults. The Scheffe test finds no significance at all between the answers of young adults and the other age groups when it comes to erasing cookies.

About half of young adults have changed their mind about a purchase because of some privacy concern. Post hoc comparisons of the data in Table 8 show no significant difference between young adults and the rest of the population.

We did find a difference regarding checking credit reports. A substantially lower percentage of 18-24 year olds does that, with statistically significant differences from the other age groups centering on their answers of "about once a year," and "less often than once a year." Young adults have a significantly higher proportion of people who answered "never" than the other age groups.[15] This distinction between young adults and the others is understandable because credit reports become relevant to older adults, as they buy homes and use credit cards that are not cosigned by their parents.

significantly related to age, neither Scheffe tests nor t-tests show clear patterns of significance between young adults and the rest of the sample or between the youngest adults and each of the older groups.
[15] The comparison between the 18-24 year olds and the rest of the sample was statistically significant at .05 level according a two sample t-test.

**Table 6 – Reading Privacy Policies**

| Do you read the privacy policies of websites ... | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 14% | 14% | 12% | 16% | 15% | 14% | 15% |
| *Sometimes* | 36% | 37% | 32% | 40% | 34% | 39% | 36% |
| *Hardly ever* | 32% | 31% | 32% | 28% | 37% | 32% | 27% |
| *Never* | 18% | 16% | 24% | 16% | 13% | 14% | 22% |
| *Don't know/refused* | 1% | 1% | 0% | 1% | 0% | 1% | 0% |
| *Total* | 974 | 141 | 207 | 196 | 195 | 149 | 86 |

$x^2$= 21.9, df = 20, $p$ = .349 : Differences not significant

**Table 7 – Erasing Cookies**

| When using the internet, do you erase your cookies . . . | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Often* | 39% | 33% | 36% | 51% | 40% | 39% | 33% |
| *Sometimes* | 24% | 25% | 31% | 19% | 20% | 28% | 16% |
| *Hardly ever* | 17% | 25% | 12% | 18% | 20% | 13% | 13% |
| *Never* | 12% | 14% | 14% | 7% | 12% | 13% | 17% |
| *Not familiar with cookies* | 6% | 4% | 3% | 3% | 5% | 7% | 17% |
| *Don't know/refused* | 3% | 0% | 4% | 3% | 4% | 1% | 5% |
| *Total* | 974 | 139 | 206 | 196 | 195 | 150 | 88 |

$x^2$= 73.7, df = 25, $p$ < .001

**Table 8 – Changing Mind About Purchase**

| Have you ever changed your mind about buying something online because of a privacy or security concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *Yes, have* | 56% | 49% | 55% | 66% | 58% | 56% | 41% |
| *No, have not* | 38% | 44% | 39% | 29% | 38% | 39% | 47% |
| *Does not shop online* | 6% | 7% | 6% | 5% | 4% | 5% | 12% |
| *Don't know/refused* | 0% | 0% | 0% | 1% | 1% | 1% | 0% |
| *Total* | 974 | 140 | 207 | 196 | 196 | 150 | 85 |

$x^2$= 27.7, df = 15, $p$ < .05

**Table 9 – Checked Credit Report**

| In general, how often do you check your credit report? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *At least once a month* | 10% | 14% | 9% | 12% | 5% | 9% | 9% |
| *Every few months (quarterly)* | 18% | 13% | 19% | 17% | 17% | 22% | 17% |
| *About once a year* | 34% | 16% | 40% | 39% | 40% | 33% | 31% |
| *Less often than once a year* | 18% | 5% | 17% | 24% | 21% | 21% | 20% |
| *Never* | 19% | 48% | 14% | 8% | 17% | 15% | 21% |
| *Don't know/refused* | 1% | 4% | 1% | 1% | 1% | 1% | 1% |
| *Total* | 972 | 139 | 206 | 197 | 194 | 150 | 86 |

$x^2$= 144.4, df = 25, $p < .001$

## Levels of Concern

The tendencies noted above carry over to levels of privacy concern.  We fielded a two-prong question. The first asked the individual whether his or her privacy concern was greater, the same, or less than five years ago; the responses are in Table 10. Answers are significantly associated with age, but the 18-24 group was not significantly different than all older respondents, or any single group.  Contributing to the significance in this table is the 65+ group, which is more concerned than the 25-34 year olds ($p < .05$).

The obvious problem with Table 10 is that there is no baseline—we don't know the level of concern at which the person began five years ago.  But we pursued the question so we could ask people whose privacy concerns increased to note "the most important reason" for the rise. The responses, in Table 11, reveal no statistically significant association with age or differences between the 18-24 year olds and the other age groups.

**Table 10 – Concern About Privacy Issues**

| Compared to five years ago, would you say you are more concerned about privacy issues on the internet, less concerned, or that you have the same level of concern? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *More concerned* | 55% | 54% | 44% | 59% | 55% | 60% | 67% |
| *Less concerned* | 6% | 9% | 8% | 5% | 6% | 5% | 4% |
| *Same level* | 38% | 36% | 47% | 36% | 39% | 35% | 29% |
| *Don't know/refused* | 1% | 1% | 2% | 1% | 1% | 0% | 0% |
| *Total* | 974 | 140 | 206 | 196 | 196 | 150 | 86 |

$x^2$= 26.7, df = 15,  $p < .05$

**Table 11 – Concern About Privacy Issues – Most Important Reason**

| Please tell me which one of the following is the most important reason you are more concerned about privacy issues on the internet than you were five years ago. | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *You know more about privacy risks online* | 48% | 42% | 59% | 41% | 51% | 47% | 46% |
| *You have more to lose if your privacy were violated* | 30% | 32% | 23% | 29% | 29% | 32% | 39% |
| *You have had an experience that has changed your mind about privacy* | 17% | 22% | 13% | 23% | 15% | 17% | 12% |
| *Some other reason?* | 3% | 0% | 4% | 6% | 3% | 2% | 4% |
| *Don't know/refused* | 2% | 4% | 0% | 2% | 2% | 2% | 0% |
| *Total* | 532[16] | 74 | 90 | 115 | 107 | 89 | 57 |

$x^2$= 23.0, df = 20, $p = .29$ : Differences not significant

Penalties for Information Misuse

One way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them. We asked respondents one question related to the monetary penalties a firm should pay and another regarding what should happen to executives involved in illegal privacy breaches.  As seen in Tables 12 and 13, the two tendencies we have seen throughout can be found here. Table 12 shows a clear majority of 18-24 year olds selecting the highest dollar amount of punishment offered (more than $2,500), though a t-test demonstrates that they were

---

[16] N is small because only people who answered "more concerned" in the previous question were asked this question.

significantly less likely to choose that amount than the rest of the population ($p < .001$), and more likely to select $1,000 ($p < .05$).

In Table 13, around half of the sample chose the harshest penalties for the companies or individuals—being put out of business and facing jail time, while a third or more thought the company should fund efforts to protect privacy. Though answers to this question are associated with age, 18-24 year olds differed[17] significantly from all other age groups only in selecting "The company should not be punished in any of those ways" ($p < .01$).

**Table 12 – Illegal Use of Personal Information**

| If a company purchases or uses someone's personal information illegally, about how much—if anything—do you think that company should be fined? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *$100* | 2% | 3% | 3% | 1% | 1% | 1% | 2% |
| *$500* | 4% | 5% | 5% | 5% | 5% | 1% | 3% |
| *$1,000* | 9% | 14% | 10% | 10% | 8% | 7% | 6% |
| *$2,500* | 7% | 11% | 9% | 6% | 7% | 3% | 5% |
| *More than $2,500* | 69% | 54% | 63% | 68% | 76% | 79% | 77% |
| *It depends* | 4% | 10% | 1% | 5% | 3% | 5% | 2% |
| *Don't know/refused* | 4% | 3% | 8% | 5% | 1% | 5% | 5% |
| *Total* | 979[18] | 141 | 207 | 196 | 196 | 152 | 87 |

$x^2$= 70.8, df = 35, $p < .001$

**Table 13 – Punishing Companies for Illegal Uses of Information**

| Beyond a fine, companies that use a person's information illegally might be punished in other ways. Which ONE of the following ways to punish companies do you think is most important? | Overall | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 + |
|---|---|---|---|---|---|---|---|
| *The company should be put out of business* | 18% | 16% | 19% | 18% | 14% | 20% | 22% |
| *The company should fund efforts to help people protect privacy* | 38% | 33% | 46% | 33% | 43% | 36% | 31% |
| *Executives who are responsible should face jail time* | 35% | 40% | 29% | 40% | 33% | 34% | 40% |
| *The company should not be punished in any of those ways* | 3% | 7% | 2% | 5% | 2% | 2% | 2% |
| *It depends* | 2% | 0% | 2% | 2% | 2% | 3% | 2% |
| *Don't know/refused* | 4% | 4% | 3% | 3% | 7% | 5% | 2% |
| *Total* | 973 | 139 | 206 | 197 | 195 | 151 | 85 |

$x^2$= 39.0, df = 25, $p < .05$

---

[17] 18-24 year olds have a higher percentage choosing the no penalty option.

[18] The slightly inconsistent N is caused by rounding errors as explained in the methods section.

Privacy Knowledge

Do the similarities between young adults and other age groups carry over to knowledge of existing privacy laws?  In order to explore this question, we gave the respondents a set of true/false statements to evaluate and answer. (See Table 14.) All of the answers are false. Consistently answering *true* reflects a belief that the law protects an individual's online and offline privacy more than it does in these common circumstances. We read the statements in separate clusters relating to online and offline privacy; within these clusters, we read the statements in random order.  To simplify presentation of the findings, we created a composite index tallying the number correct for each age group.

**Table 14 – Online and Offline Privacy Questions**

| Online Questions | Answer |
|---|---|
| If a website has a privacy policy, it means that the site cannot share information about you with other companies, unless you give the website your permission. | False |
| If a website has a privacy policy, it means that the site cannot give your address and purchase history to the government. | False |
| If a website has a privacy policy, it means that the website must delete information it has about you, such as name and address, if you request them to do so. | False |
| If a website violates its privacy policy, it means that you have the right to sue the website for violating it. | False |
| If a company wants to follow your internet use across multiple sites on the internet, it must first obtain your permission. | False |
| **Offline Questions** | **Answer** |
| When you subscribe to a newspaper or magazine by mail or phone, the publisher is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you order a pizza by phone for home delivery, the pizza company is not allowed to sell your address and phone number to other companies without your permission. | False |
| When you enter a sweepstakes contest, the sweepstakes company is not allowed to sell your address or phone number to other companies without your permission. | False |
| When you give your phone number to a store cashier, the store is not allowed to sell your address or phone number to other companies without your permission. | False |

As Table 15 indicates, the savvy that many attribute to younger individuals about the online environment doesn't appear to translate to privacy knowledge. The entire population of adult Americans exhibits a high level of online-privacy illiteracy; 75 percent answered only two or fewer questions correctly, with 30 percent getting none right.  But the youngest adults perform the worst on these measures: 88 percent answered

only two or fewer correctly, and 42 percent could answer none correctly.  A t-test shows that the difference between the average number correct for 18-24 year olds and the other adults—1.12 correct compared to 1.61 for the others—is statistically significant ($p <$ .001).  When focusing particularly on how these differences play out between young adults and the particular groups, a Scheffe test reveals that the 18-24 year olds were more likely to get none correct than the 25-34 and 35-44 year olds ($p <$ .05 in both cases).  Young adults were also less likely to get 3-4 correct than the 35-44 and 55-64 groups ($p <$ .05 in both cases).  In all of these statistically significant cases, a substantially larger percentage of young adults know less about online privacy regulations.

　　When it came to our offline privacy knowledge questions, the differences between young adults and the other age groups were even more pronounced.  Eighty-eight percent of 18-24 year olds answered two or fewer of our offline questions correctly, compared to 74 percent overall.  A t-test showed that 18-24 year olds only answered 0.9 correctly compared to 1.8 for the other groups ($p <$ .001).  Moreover, Scheffe tests note statistical significance compared to each of the other groups.  Young adults were more likely to answer no questions correctly than any other age group; conversely, they were less likely to answer 3-4 questions correctly than any other age group.

　　Getting these questions right is important because it indicates whether the respondents know that privacy laws protect them in common commercial transactions.  We found that while young adults tend to be similar to older adults in attitudes, practices, and policy preferences regarding information privacy, they are quite more likely than older adults to be wrong in judging whether the legal environment protects them.

**Table 15 - Online Privacy Knowledge Questions (5 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct | 5 Correct |
|---|---|---|---|---|
| 18-24 (N=139) | 42% | 46% | 11% | 1% |
| 25-34 (N=206) | 25% | 58% | 16% | 2% |
| 35-44 (N=197) | 24% | 38% | 30% | 8% |
| 45-54  (N=196) | 26% | 48% | 24% | 3% |
| 55-64  (N=150) | 39% | 32% | 28% | 1% |
| 65 and Older (N=86) | 31% | 43% | 24% | 1% |
| Overall (N=974) | 30% | 45% | 22% | 3% |

$x^2$ = 73.1, df = 15, $p$ < .001

**Table 16 - Offline Privacy Knowledge Questions (4 total)**

| Age Range | 0 Correct | 1-2 Correct | 3-4 Correct |
|---|---|---|---|
| 18-24 (N=139) | 50% | 38% | 12% |
| 25-34 (N=206) | 34% | 37% | 29% |
| 35-44 (N=197) | 24% | 33% | 43% |
| 45-54  (N=196) | 26% | 41% | 34% |
| 55-64  (N=150) | 26% | 32% | 42% |
| 65 and Older (N=86) | 27% | 37% | 36% |
| Overall (N=974) | 27% | 35% | 38% |

$x^2$= 69.9, df = 20, $p$ < .001

## Conclusion

In policy circles, it has become almost a cliché to claim that young people do not care about privacy. Certainly there are many troubling anecdotes surrounding young individuals' use of the internet, and of social networking sites in particular. Nevertheless, we found that in large proportions young adults do care about privacy. The data show that they and older adults are more alike on many privacy topics than they are different. We suggest, then, that young-adult Americans have an aspiration for increased privacy even while they participate in an online reality that is optimized to increase their revelation of personal data.

Public policy agendas should therefore not start with the proposition that young adults do not care about privacy and thus do not need regulations and other safeguards. Rather, policy discussions should acknowledge that the current business environment along with other factors sometimes encourages young adults to release personal data in order to enjoy social inclusion even while in their most rational moments they may espouse more conservative norms. Education may be useful. Although many young adults are exposed to educational programs about the internet, the focus of these programs is on personal safety from online predators and cyberbullying with little emphasis on information security and privacy.[19] Young adults certainly are different from older adults when it comes to knowledge of privacy law. They are more likely to believe that the law protects them both online and off. This lack of knowledge in a tempting environment, rather than a cavalier lack of concern regarding privacy, may be an important reason large numbers of them engage with the digital world in a seemingly unconcerned manner.

But education alone is probably not enough for young adults to reach aspirational levels of privacy. They likely need multiple forms of help from various quarters of society, including perhaps the regulatory arena, to cope with the complex online currents that aim to contradict their best privacy instincts.

---

[19] "Enhancing Child Safety and Online Technologies: Final Report of the Internet Safety Technical Task Force." The Berkman Center for Internet & Society, December 31, 2008. Available at: http://cyber.law.harvard.edu/pubrelease/isttf/

# EXHIBIT 56

S. Hrg. 105–1069

# S. 2326, CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

# HEARING

BEFORE THE

## SUBCOMMITTEE ON COMMUNICATIONS

OF THE

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

SEPTEMBER 23, 1998

Printed for the use of the Committee on Commerce, Science, and Transportation





U. S. DEPOSITORY

OCT 2 4 2000

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2000

59–873 CC

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402

Generated on 2018-11-19 19:33 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF CALIFORNIA

3

children. Fortunately in this case, the Federal Trade Commission stepped in and GeoCities agreed to comply with a consent order to stop these deceptive practices. This consent order was the first of its kind and I applaud the vision and hard work of the FTC in helping to protect citizens' privacy in the online world. The Subcommittee is very fortunate to have Chairman Pitofsky of the FTC testify today and I look forward to his comments.

I also look forward to the comments of the witnesses on the Children's Online Privacy Protection Act, which is co-sponsored by Senator McCain and Senator Bryan. I understand that the bill drew heavily from the recommendations and findings of the FTC's June report on Internet privacy, which found that 89 percent of children's websites collected personal information. The report also found that only 10 percent of the sites provide for some form of parental control over the collection and use of the information. Clearly this situation cannot be allowed to continue.

The McCain-Bryan bill requires the FTC to come up with rules that would provide notice of its personal information collection and use practices and obtain parental consent for the collection of personal information from children. While I have some minor technical concerns about a couple of the bill's provisions, I am sure they can be worked out and I look forward to eventually co-sponsoring the legislation.

I commend Sen. McCain and Sen. Bryan for their hard work on this critical issue. While the remaining legislative days available are few, I will work with the Chairman of the Full Committee, Sen. Bryan, and others to move the bill to markup and passage by the full Senate as quickly as possible.

I look forward to the testimony of the witnesses. Thank you.

### STATEMENT OF HON. RICHARD H. BRYAN, U.S. SENATOR FROM NEVADA

Senator BRYAN. Mr. Chairman, let me preface my comments by thanking you. Had you not agreed to convene this hearing as promptly as you have, I think the chances of this legislation being processed in this session would have been greatly diminished. Your leadership as the chairman of the subcommittee and your responsiveness to our request indicates that working with you and other members of this committee I believe, we can process legislation. I want to thank you for your leadership and for your efforts to work with us on this piece of legislation.

The Internet offers families unlimited opportunities to explore and enjoy new worlds of information. The Internet is quickly becoming a major force in the lives of our children, as it moves swiftly into our homes and classrooms around the country. Indeed, proficiency with the Internet will be a necessary skill required to succeed in the 21st Century.

According to the 1998 American Internet User Survey, there are currently 6 million children 12 and under that use the Internet, and that number is likely to grow to 15 million by the turn of the century. Children are by their very nature honest and trusting, and when approached on the Internet by their favorite cartoon characters, or offered a chance to win a prize, or to participate in some kind of a contest, children will freely provide very personal and private information.

Children of the ages of 12 and under are not likely to have the judgment to know what is appropriate. I know when my own children were 9 or 10 years of age, if they were given an opportunity to participate in some kind of contest, I am sure that they would have been willing to freely disclose any information about my credit card they happened to know, because they would have enjoyed the opportunity to participate in these games, which are fun and enjoyable for youngsters.

Technology has made the collection and dissemination of information that is collected about each of us easier than ever before.


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Generated on 2018-11-19 19:32 GMT / http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

4

Besides readily available public record information, more and more companies are compiling data on what groceries we buy, what movies we rent, what magazines we read, and what we purchase with our credit cards.

There is a growing concern about the privacy of our medical records and the release of personal financial data. Indeed, today our personal privacy is threatened because (1) information about us has market value to those who wish to sell us goods and services, and (2) the ease with which this information can be gathered and disseminated has been vastly enhanced because of the technology of our time.

As the chairman was kind to acknowledge, almost 2 years ago Senator McCain and I asked the Federal Trade Commission to conduct a study of online privacy issues after it came to our attention that certain companies were giving out social security numbers over the Internet.

The FTC has looked into a number of privacy areas, and this summer released a report that makes the case for legislative action in the area of protecting children's privacy.

As the FTC will testify this morning, while 90 percent of the commercial Web sites targeting children they surveyed collected personal information from these children, only 1 percent actually got parental consent before collecting this personal information.

This situation is deplorable, in my judgment. Children 12 and under are not fully capable of understanding the consequences of giving out personal information online. Children do not oftentimes understand or comprehend the potential risk posed to their public posting of personal information that may lead to both online or other types of contact by strangers.

And the sad part is that our children often understand the Internet and know how to navigate it far better than do our parents. Parents do not always have the knowledge, the ability, or the opportunity to monitor their children's online activities, and that is why Web site operators should get parental consent prior to soliciting personal information.

The legislation that Senator McCain and I have introduced will give parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent.

The Center for Media Education and the Center for Democracy and Technology should be commended for the excellent work that they have done in addressing privacy issues. Additionally, industry has created the Online Privacy Alliance and the Children's Advertising Review Unit, and come up with self-regulatory guidelines that show us that they are taking this issue seriously, and I would like to acknowledge and express my appreciation for the willingness of the privacy groups in the industry to work on this in passing this important legislation.

Earlier this year, I held seminars in Nevada, the southern part of our State in Las Vegas, and the northern part of our State in Reno, before a group of community leaders and State and local PTA presidents to discuss online privacy issues. These seminars were very informative, and really were eye-openers for parents.


Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Generated on 2018-11-19 19:32 GMT  /  http://hdl.handle.net/2027/uc1.b5182874
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

5

Most of these parents were pretty sophisticated. We had the FBI and the FTC. The FBI pointed out the risks that are involved in terms of your child's safety by providing information when requested as to where your child goes to school, what hours he or she may be alone after school.

Now, admittedly some of this information would have great market value to legitimate commercial enterprises, but one of the lessons we were reminded of constantly by the FBI in their presentation is that you never know who you are talking to or with on the Internet. You may think that you are talking to another youngster who has the same interests that your child may have, but in point of fact you never know that.

The FBI has a very impressive program in which they are involved in identifying sexual predators and pedophiles who may use this information and who would prey on our youngsters.

So there is a personal safety issue involved as well.

There is also the privacy issue that we have talked about. The Internet provides a tremendous educational and cultural opportunity for our children, but Linda Hooper, one of the FBI agents who made the presentation, made an analogy that traveling on the Internet is like visiting a major city.

There are places that you would want your children to go and to see, the great historical areas of interest, the great museums, but just like traveling to a major city there are places that you would not want your child to go unaccompanied, or without the consent or permission of his or her parents.

And so, too, the Internet has the same caution. Interactive online communications provide tremendous opportunities for the children of the 21st Century, but at the same time it presents unique challenges for protecting the privacy of young children and their families.

And Mr. Chairman, I look forward to working with you and processing this piece of legislation and, again, let me thank you for your leadership and your responsiveness in calling this timely hearing.

Senator BURNS. Thank you, Senator Bryan.

I would like to call Mr. Robert Pitofsky, chairman of the Federal Trade Commission here in Washington, DC, and we welcome you this morning, and if you could come to the table and give us your insight on this, I want to join Senator Bryan in congratulating you in the work that you have done in this area, because it concerns all of us here on Capitol Hill, so we congratulate you. Thank you for coming this morning.

## STATEMENT OF ROBERT PITOFSKY, CHAIRMAN, FEDERAL TRADE COMMISSION

Mr. PITOFSKY. Thank you very much, Mr. Chairman, Senator Bryan. I am delighted to appear here today to testify in support of S. 2326, the Children's Online Privacy Protection Act of 1998.

The legislation would establish basic fair information practices protection for children, the youngest and most vulnerable of online consumers. The commission believes this legislation is important and necessary.

Digitized by 

# EXHIBIT 57





## Journal of Marketing Communications

ISSN: 1352-7266 (Print) 1466-4445 (Online) Journal homepage: http://www.tandfonline.com/loi/rjmc20

# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

Kristien Daems, Patrick De Pelsmacker & Ingrid Moons

**To cite this article:** Kristien Daems, Patrick De Pelsmacker & Ingrid Moons (2017): Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors, Journal of Marketing Communications, DOI: 10.1080/13527266.2017.1409250

**To link to this article:** https://doi.org/10.1080/13527266.2017.1409250

Published online: 04 Dec 2017.

Submit your article to this journal ↗

Article views: 177

View Crossmark data ↗

JOURNAL OF MARKETING COMMUNICATIONS, 2017
https://doi.org/10.1080/13527266.2017.1409250





# Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors

Kristien Daems[a], Patrick De Pelsmacker[a] and Ingrid Moons[a,b]

[a]Faculty of Applied Economics, Marketing Department, University of Antwerp, Antwerp, Belgium; [b]Faculty of Design Sciences, University of Antwerp, Antwerp, Belgium

### ABSTRACT

Although they are key stakeholders, advertisers' views on the usage of novel (integrated and/or interactive) advertising toward minors has remained largely unexplored in academic research. This study aims to fill this gap by examining advertising professionals' opinions about the ethical appropriateness of using novel advertising formats aimed at children and teenagers, how to advance advertising literacy in minors, and their views of practices that are potentially privacy-invading, by means of both a quantitative online survey and qualitative in-depth interviews with Belgian advertising professionals. Results show that advertisers perceive that from 12 years onward, minors are capable to understand novel advertising formats and it is ethically justified to use them. Remarkably, advertisers would inform minors already from the age of 10 years onward about the commercial intention behind new advertising formats. Advertisers have strict opinions about collecting information online from minors. They advocate a combination of laws and self-regulation and governmental and educational campaigns to raise awareness and develop advertising literacy.

### ARTICLE HISTORY
Received 1 August 2017
Accepted 21 November 2017

### KEYWORDS
Advertising professionals; children; ethical appropriateness; novel advertising formats; teenagers; (self-)regulation

## Introduction

In the advertising world, (self-)regulation, guidelines, and codes exist with respect to advertising aimed at minors. Examples of self-regulation initiatives are the ICC code of Advertising and Marketing Communication practice, the EU Pledge, and the CARU guidelines (EU Pledge 2017; ICC 2017; The Childrens' Advertising Review Unit 2009). However, despite these initiatives to protect minors against potentially misleading and deceptive advertising, there still exists a lack of regulation on novel (online) integrated and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). Additionally, online advertising practices are often used to collect and use personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013), and are therefore potentially privacy-invading.

Consequently, the use of novel advertising formats raises questions about their ethical appropriateness, and about how advertising literacy should be improved, especially with children and teenagers (Eagle and Dahl 2015; Moses and Baldwin 2005; Nebenzhal and Jaffe 1998). Research on new advertising formats aimed at children and teenagers from an

---

**CONTACT**  Kristien Daems  ✉ Kristien.daems@uantwerpen.be

© 2017 Informa UK Limited, trading as Taylor & Francis Group

advertiser perspective is lacking. Moreover, advertising professionals' view on advertising aimed at minors has received scant attention in academic literature and is limited to traditional advertising (Clarke and Gardner 2005; Geraci 2004; Gray 2005; Grimm 2004; Martínez 2016).

The present study contributes to developing insights into how Belgian advertising professionals perceive several aspects of the ethical ramifications of using novel advertising formats to target children and teenagers. The study can inform the advertising profession and public policy about these perceptions and be a starting point to influence or change them.

## Children's and teenagers' understanding of advertising

From an early age onward, children are confronted with advertising practices, while a majority of them is unconscious about the commercial and persuasive intent behind them (Crane and Kazmi 2010). In order to be able to cope in a correct way with promotional efforts, the development of advertising literacy is of crucial importance. *Advertising literacy* is the knowledge about advertising, the ability to recognize advertising techniques, and the capability to understand the persuasive intentions behind them (John 1999; Rozendaal, Buijzen, and Valkenburg 2011). Identifying and understanding advertising depends on the ability to distinguish advertising from program- or entertainment context (Moses and Baldwin 2005). The ability to do so depends on factors such as the subtlety of the persuasive message, the similarity between the commercial and entertaining message and the presence of a cue or separator to announce the advertising message (Shiying et al. 2014).

The Persuasion Knowledge Model (PKM) (Friestad and Wright 1994) describes how people identify and process advertising and which knowledge and experience an individual needs to cope with persuasive attempts: topic knowledge (knowledge about the topic of the message, e.g., product), agent knowledge (knowledge about the advertiser behind the persuasive attempt), and persuasion knowledge (knowledge about advertising formats and persuasive tactics) (Wright, Friestad, and Boush 2005). The cognitive skills and experience to acquire this knowledge develop through childhood and adolescence (John 1999; Moses and Baldwin 2005; Wright, Friestad, and Boush 2005). Compared to adults, children and teenagers have limited cognitive skills, less advertising experience, and less developed advertising knowledge. This makes them less able to process advertising in a conscious manner and more vulnerable for and at a greater risk of being misled by persuasive communication (Kunkel et al. 2004; Moses and Baldwin 2005; Rozendaal, Buijzen, and Valkenburg 2010). As a consequence, it is more difficult for minors to recognize and understand different advertising formats and advertisers' intentions and activate their persuasion knowledge and advertising literacy (John 1999; Kunkel et al. 2004; Terlutter and Capella 2013). According to John (1999) consumer socialization of children is a sequence of three different stages (perceptual, analytical, and reflective) through which children develop from preschool (3 years old) until adolescence (16 years old). From the analytical stage (7–11 years) onward children are able to analyze stimuli (e.g., an advertisement) on multiple dimensions. Only from the reflective stage (11–17 years) onward children or teenagers have the ability to fully understand advertising and advertisers' persuasive attempts as their social and information processing skills are further developed.

## Changing advertising practices

Nowadays, children and teenagers grow up in a – predominantly online – media environment (websites, social media, games, mobile platforms, etc.) in which they encounter new integrated and/or interactive advertising formats on a regular basis (Blades et al. 2014; Bucy, Kim, and Park 2011; Rideout 2014). In integrated formats, the lines between advertising and other informative or entertaining media content have become increasingly blurred (Blades et al. 2014; Kunkel et al. 2004; Moore 2004; Terlutter and Capella 2013). An example of this integration in traditional media is brand placement, the paid inclusion of brand identifiers in media content (television programs, movies) (Gupta and Lord 1998; Karrh 1998).

Besides, novel advertising formats persuade children and teenagers in an implicit manner by means of subtle affective associations (Nairn and Fine 2008). Interactive advertising formats give the receivers the opportunity to interact with the message and are often perceived as fun and enjoyable (Hudders, Cauberghe, and Panic 2016; Mallinckrodt and Mizerski 2007). Advergames are a typical example of online, interactive advertising formats aimed at children and teenagers. Advergames embed specific brand or product-related items (e.g., logos, brand names, brand mascots) in a game (Mallinckrodt and Mizerski 2007). This can lead to a circumventing of minor's persuasion knowledge activation (Owen et al. 2013; Panic, Cauberghe, and De Pelsmacker 2013). In a highly entertaining environment especially children may not be able to identify the commercial intention and lack the ability to activate and retrieve their persuasion knowledge (Waiguny, Nelson, and Terlutter 2012). It is harder to identify these (online) advertising formats as advertising and more difficult to understand their persuasive intent than it is for prominent (online) formats such as banner ads (Tutaj and van Reijmersdal 2012).

Online (integrated) advertising practices are also often used to collect personal data (Bright and Daugherty 2012; McStay 2012; Terlutter and Capella 2013) and are, therefore, liable to practices that are privacy-invading and that inappropriately use personal data the media user is not always aware of, for instance, by having minors first subscribe to a newsletter or submit personal information before they can participate in a contest or play a game. Here again, based on children's limited cognitive skills, it can be expected that children are less likely than adults to take the privacy risks involved into account (Steeves 2006).

Using integrated and/or interactive advertising formats, is often considered as inherently unethical, since they may hamper the activation of persuasion knowledge (Nairn and Fine 2008; Owen et al. 2013), and raise questions about when and how they can be used, and how advertising literacy should be improved (Eagle and Dahl 2015; Nebenzhal and Jaffe 1998; Palmer 2005). This is especially relevant when these formats are targeted at minors. John's analysis about minors' advertising literacy dates back to 1999 and the PKM (Friestad and Wright 1994) was developed based on insights from traditional advertising (Rozendaal, Buijzen, and Valkenburg (2010). However, current advertising is no longer dominated by traditional mass media advertising, but by integrated and interactive advertising formats (Kunkel et al. 2004). Consequently, recognizing commercial messages as advertising, understanding the commercial and persuasive intention behind integrated and online advertising, and the activation of persuasion knowledge is even more challenging for children and teenagers than before (Moses and Baldwin 2005). As a result, there may be an increased need to protect them and educate them about advertising to develop their advertising literacy (Crane and Kazmi 2010).

## Existing (self-)regulation and guidelines

Both governmental institutions and the advertising industry have formulated principles regarding advertising aimed at minors. The ICC Code provides guidelines about ethical and responsible advertising directed at children for self-regulated organizations (ICC 2017). The Children's Advertising Review Unit is a self-regulated initiative in the United States which implies standards (CARU guidelines) regarding the ethicality of advertising aimed at children (Ji and Laczniak 2007; The Childrens' Advertising Review Unit 2009). In Belgium, the Belgian Pledge (derived from a similar initiative at European level, the EU Pledge) is a voluntary, joint initiative between the Union of Belgian Advertisers (UBA), FEVIA (Federation of food industry in Belgium), and COMEOS (representative for Belgian commerce and services) in which their members commit to not target advertising toward children under the age of 12 for food and beverages which do not meet the nutritional standards (so called HFSS products) or not to target products at children under the age of 12, regardless of the product (The Belgian Pledge 2017). In June 2017, the Belgian Pledge was updated and additional integrated and interactive (online) media channels (beyond television and print advertising) were add to the range of the Belgian Pledge (FEVIA 2017).

However, despite the existing (self-)regulation, codes, and guidelines, there still is a lack of regulation on novel, integrated, and/or interactive advertising formats (Calvert 2008; Füg 2008; TaylorWessing 2013). The specific characteristics of these formats warrant up-to-date legislation and/or self-regulation. Advertising professionals are key stakeholders in this debate. Their fundamental understanding of the ethical ramifications of the use of novel advertising formats toward minors and their willingness to take them into account in developing advertising campaigns is crucial.

## Advertising professionals' opinions regarding advertising aimed at minors: research questions

Advertising professionals' view on the ethical acceptability of advertising and advertising formats has received scant attention in academic research. Apart from Harris Interactive's study (Geraci 2004; Grimm 2004) and Martínez (2016) study, to the best of our knowledge, there are no published studies on advertisers' opinions regarding advertising practices aimed at children and teenagers, let alone their view with respect to new advertising formats. However, advertising professionals are the main decision-makers with respect to the target groups, formats, and stimuli used in their campaigns. Besides commercial concerns, one might expect that ethical considerations also play a role in these decisions. Consequently, developing insights into advertising professionals' opinions about the ethical appropriateness of novel advertising formats aimed at children and teenagers, how minors should be informed and how their advertising literacy should be improved, and how they could be protected by (self-)regulation, is important. The current study aims at exploring the practice and perception of advertising professionals regarding these issues, and aims to answer the following research questions:

(1)  Which new advertising formats are mostly used toward children and teenagers?
(2)  According to advertising professionals, from which age onward

    (a)  do minors understand the commercial intention behind new advertising formats,

> (b)  is the usage of these new advertising formats ethically acceptable,
> (c)  should minors be made aware of the commercial intent of these marketing com-
>      munication techniques?
>
> (3)  What are the characteristics of an ethical data collection and data protection policy
>      aimed at minors?
> (4)  How should advertising toward children and teenagers be regulated and how should
>      advertising literacy be developed?

## Method

The study uses a mixed method approach by means of both a quantitative online survey
and follow-up qualitative interviews.

### *Online survey*

### *Research population and sample*

The research population is staff of Belgian advertisers and Belgian advertising agencies. The
sampling frames for the online survey were the membership list of the UBA and a list of
employees of advertising agencies retrieved from the website of the Association of
Communication Companies (ACC). In total, 2614 advertisers from 245 different companies
and 160 advertising professionals working in 79 advertising agencies were invited by email
to participate to an online survey. The survey consisted of forced response questions (except
for the question were the respondents could leave their email address to participate in the
follow-up study). As a result the respondents could not skip questions they did not wanted
to answer. However, the respondents could stop and leave the survey any time. Each respond-
ent received the questions of the survey in the same order. Only the order of the vignettes
was randomized across respondents. As a result the questions at the beginning of the survey
were answered by more respondents compared to questions at the end of the survey. One
hundred and sixty-one respondents started the survey. Seventy-one of them only partially
completed it, because they dropped out after the introductory questions (44), after the
vignettes (18), or after part of the last sections (9) of the questionnaire. Ninety respondents
completed the full survey. The analyses were carried out on the number of respondents who
answered the question analyzed.

### *Questionnaire and measures*

In the current study, a minor is defined as an individual between 6 and 18 years old. This
group is divided into two subgroups, namely children (between 6 and 12 years old) and
teenagers (between 13 and 18 years old).

   After a number of introductory questions, nine vignettes were presented in randomized
order. Vignettes are descriptions of concrete situations or scenarios presented to the respond-
ents to reflect upon or give their opinion about (Mortelmans 2007). The nine vignettes
describe new integrated and/or interactive advertising formats used to target minors in
both offline and online environments without mentioning the specific name or advertising
format they refer to: product placement on television (PP), in-game advertising (IGA), adver-
games, applications, video advertising, merchandising, online behavioral advertising (OBA),

search engine marketing, and location-based services (LBS). These advertising formats are prominent examples of novel advertising formats. They were most often mentioned in exploratory interviews with advertisers and advertising agencies as formats that are used toward minors. Merchandising is the only traditional advertising format and was chosen because it was often mentioned as a very prominent technique when targeting children. The vignettes can be found in Appendix 1. One hundred and seventeen respondents answered all three questions for each of the nine vignettes.

By means of a slider ranging from 6 to 18 years old, for each vignette the respondents answered two questions:

(1) from which age onward are minors capable of understanding the persuasive nature of the advertising technique described in the vignette?
(2) from which age onward is the type of advertising ethically acceptable to use?

If respondents held the opinion that minors were not capable of understanding the advertising format, or that the usage of an advertising format was not ethically acceptable toward minors, they could indicate this answer option and they did not have to indicate an age on the slider. Only when a respondent indicated an age to the second question, they had to answer a third question:

(3) from which age onward minors need to be notified about the commercial intent of the advertising format described in the vignette?

For this question, they could also indicate that minors do not have to be warned about the commercial intent of the advertising format, and thus they did not have to indicate an age. These questions were based on the Harris Interactive study (Geraci 2004; Grimm 2004).

In the second section, respondents were asked how advertising to minors should be regulated, and through which organizations (governmental or educational) advertising literacy in minors should be improved. Ninety-nine respondents answered the questions in this survey block. The following five questions were presented (five-point Likert scale ranging from totally disagree to totally agree):

- Commercial communication with regard to children/teenagers should be regulated…:
  - …exclusively through self-regulation.
  - …exclusively through legislation.
  - …through a combination of legislation and self-regulation.
- The government should strive for awareness building in order to promote advertising literacy among children/teenagers.
- The educational system has a duty to promote advertising literacy among children/teenagers.

In the third section, respondents were asked about the verification rules in ethical minors' protection (yes/no answer option) (97 respondents answered this question):

- A proper data-protection policy on a social media platform that is accessible to children/teenagers…
  - provides verification of the ages of children.
  - allows verification of the status of the parent or legal guardian.
  - provides clear information concerning the use of cookies and the possibility of disabling them.

Respondent's opinion about the usage of advertising formats to collect personal data was asked by means of four questions (five-point Likert scale ranging from totally disagree to totally agree) (95 respondents answered these questions):

- Children/teenagers should not be allowed to register with a brand website or mobile platform without permission from a parent or legal guardian.
- The collection of personal information from children/teenagers should be prohibited.
- Personal information from children/teenagers should not be collected, processed, or used without permission from their parents or legal guardians.
- It is important for parents or legal guardians to be notified of the processing of personal information from their children /teenagers.

Additionally, two questions were asked concerning collection of personal data from minors (95 respondents answered these questions):

- The collection of personal information from children/teenagers…
  - is an ethically acceptable strategy.
  - is a strategy for which it is important to receive permission from parents or legal guardians.

The questions concerning privacy-policy, data collection, and protection were based on a report from the Federal Trade Commission (2012) and on the rules about (verifiable) parental consent and online privacy from the US' COPPA (Children's Online Privacy Protection Act's 1998).

The fourth section of the survey asked advertisers who target minors which forms of advertising they use toward children and/or teenagers. Respondents had to answer these questions only for the target group (children and/or teenagers) toward whom they target advertising. Ninety-four respondents answered this question.

The survey ended with demographic questions: the industry of the company the respondent works in, in which department the respondent works, level of education, age, and gender. If respondents were willing to participate in a follow-up in-depth interview they could leave their email address.

### Qualitative follow-up study

As a follow-up to the survey, 10 semi-structured in-depth interviews with advertising professionals were held (hereafter referred to as 'the interviewees'). Of these 10 interviewees, three were advertisers out of a list of 23 who completed the survey and were willing to participate in a follow-up interview. The other seven interviewees did not participate in the survey. The latter were selected from a list obtained from the Belgian Union of Advertisers with 27 companies that advertise to either children or teenagers. The interviews took place in a face-to-face setting and took about 45 min to one hour. The purpose of this qualitative follow-up study was to corroborate, nuance, interpret, and enrich the insights from the survey. The interviews covered the same topics as the survey. For each topic, the interviewees were asked to voice their opinion, were confronted with the results from the survey, and were probed to comment on them and to explain their agreement and/or nuances. The mix of both interviewees that did participate in the survey and those that did not participate in the survey was useful to have the interviewees reflected upon their own perceptions if they

participated in the survey, or to have the interviewees reflect upon the perceptions of other advertisers if they did not participated in the survey. All interviews were recorded and transcribed afterward to facilitate the analysis with the NVivo software program.

## Results

The results from both the quantitative and qualitative study are reported together for each research question.

### Sample characteristics

One hundred and sixty-one respondents started the survey and 90 respondents (85 advertising professionals and 5 advertising agency professionals, 54 females, $M_{age} = 41.5$, 70 respondents educated at master's level) fully completed it. Both groups were taken together in the analysis. The financial industry (14.13%), the food industry (11.96%), and government (11.96%) are most represented. Most advertisers work in a marketing (50%) or a communication department (30.2%). The five participating advertising agency professionals work for more than 10 industries.

### Advertising formats used toward minors

The majority (61.7%) of the respondents only target adults (older than 18 years). 38.8% (36) professionals work for a company that advertises to minors. Six of these 36 advertising professionals only target children and 12 of them only advertise to teenagers. Half of the advertisers who target minors (18) focus on both children and teenagers. So, overall, 24 target children and 30 advertise to teenagers. The advertising formats used by advertisers who target children or teenagers are given in absolute numbers in Figure 1.

   The most often used advertising formats toward children are contests, branded websites, premiums (a gift in exchange for the purchase of the product (Rideout 2014), and advergames. Contests, banners, and branded websites are the most often used advertising formats toward teenagers. OBA and location-based services are the least used advertising formats toward both children and teenagers.

## Vignettes

The results for the responses to the vignettes are divided into three sections: the understanding of advertising formats, ethical acceptability of advertising formats, and the need to inform minors about the commercial intentions of advertising formats. For each section, by means of independent sample t-tests, it was analyzed whether significant differences exist between the opinion of advertisers who target children and/or teenagers and advertisers who only target adults.

### Understanding advertising formats

According to the respondents, the average age at which minors can understand the different advertising formats is around 12–13 years (Table 1). Compared to the other formats, the




**Figure 1.** Advertising formats used toward children and teenagers.

**Table 1.** Average age whereupon minors understand different advertising formats.

| Advertising formats | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: 'Minors not able to understand the advertising format' |
|---|---|---|---|---|
| Merchandising | 12.74 | 2.58 | 118 | 6 |
| Applications | 12.40 | 2.54 | 115 | 8 |
| Product Placement (PP) | 13.03 | 2.75 | 114 | 12 |
| In-game Advertising (IGA) | 12.86 | 2.69 | 113 | 10 |
| Search Engine Marketing (SEM) | 12.26 | 2.59 | 121 | 5 |
| Location-Based Services (LBS) | 13.25 | 2.68 | 116 | 7 |
| Online Behavioral Advertising (OBA) | 12.72 | 2.59 | 121 | 6 |
| Advergames | 12.13 | 2.61 | 124 | 5 |
| Video advertising | 14.06 | 2.73 | 95 | 28 |

average age for location-based services, product placement and video advertising is slightly higher (13–14 years), with video advertising being the format with the highest average age indicated. The last column of the table indicates that IGA, product placement and especially video advertising are considered the most difficult formats to understand since for these formats it was indicated most often that minors are not able to understand them. For none of the nine vignettes an acceptable age under 12 years was reported.

Almost all interviewees agree that 12 years as an average age to understand these different advertising formats is plausible. The interviewees refer to research that takes 12 years as a threshold for advertising regulations (World Federation of Advertisers 2007) (quote 1).

*Quote 1:* In our company we adhere to the principle that we do not advertise towards children below the age of 12. There are good reasons for making this distinction. Academic research shows that children from the age of 12 onwards can interpret and judge advertising.

Table 2 shows that for merchandising, applications, and OBA, significant differences between respondents who advertise toward minors and advertisers who only advertise toward adults were found. Advertisers who also target minors hold the opinion that, on average, minors can understand merchandising, application, and OBA from an earlier age onward (12 years), compared to advertisers who only target adults (13 years).

### *Ethical acceptability of advertising formats*

On average, advertising formats are perceived as ethical when targeted at minors from the age of 12–13 years onward (Table 3). OBA, location-based services, and applications are perceived as ethically acceptable to use toward minors from an older age onward (13–14 years). The majority of the interviewees agrees with this opinion. These opinions correspond with the overall perception of advertising professionals that advertising aimed at teenagers is not a problem, whereas it is with children. The results are also in correspondence with 'The Belgian Pledge' and the 'CARU guidelines' (Ji and Laczniak 2007; The Belgian Pledge 2017; The Childrens' Advertising Review Unit 2009).

Significant differences in the opinions of advertisers who only target adults and those who target minors were only found for applications. The average age whereupon applications are considered as being ethically acceptable to use toward minors by advertisers who target toward minors is 12–13 years. Advertisers who only target adults indicate a significantly older average age, namely 14 years.

### *Informing minors about the commercial intent of advertising formats*

The average age from which minors should be informed about the commercial intent of advertising formats indicated is around 9–10 years (Table 4). The age is lower than the average age of 12 years to understand different advertising formats and to use the different formats in an ethical way. Some advertisers indicate that it is not necessary to inform minors about the commercial intent of advertising. This is especially the case for IGA, advergames, video advertising, and product placement.

Some interviewees would not inform children early on, whereas others hold the opinion that children have to be informed from an even earlier age onward (e.g., 6 years). Quotes 2 and 3 illustrate these mixed opinions.

**Table 2.** Understanding advertising formats – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P |
|---|---|---|---|---|---|
| Merchandising | Minors | 35 | 12.00 | 2.62 | .013 |
| | Adults | 54 | 13.31 | 2.24 | |
| Applications | Minors | 35 | 11.42 | 2.69 | .004 |
| | Adults | 54 | 13.04 | 2.32 | |
| Online Behavioral Advertising (OBA) | Minors | 35 | 11.97 | 2.53 | .035 |
| | Adults | 54 | 13.14 | 2.52 | |

**Table 3.** Average age whereupon the use of different advertising formats toward minors is considered as ethically acceptable.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N= Advertisers who indicated: *'advertising format morally/ethically not acceptable'* |
|---|---|---|---|---|
| Merchandising | 12.62 | 3.36 | 115 | 9 |
| Applications | 13.44 | 2.91 | 111 | 12 |
| Product Placement (PP) | 12.85 | 3.36 | 114 | 12 |
| In-game Advertising (IGA) | 12.85 | 3.66 | 108 | 15 |
| Search Engine Marketing (SEM) | 12.76 | 3.33 | 119 | 7 |
| Location-Based Services (LBS) | 14.73 | 2.94 | 102 | 21 |
| Online Behavioral Advertising (OBA) | 13.52 | 3.30 | 116 | 11 |
| Advergames | 12.48 | 3.32 | 123 | 6 |
| Video advertising | 12.32 | 3.89 | 97 | 26 |

**Table 4.** Average age whereupon minors should be informed about the commercial intent of advertising formats.

| Advertising format | Mean age | SD | N= Advertisers who indicated an age | N = Advertisers who indicated: *'No need to inform about commercial intent'*. |
|---|---|---|---|---|
| Merchandising | 9.88 | 3.37 | 105 | 7 |
| Applications | 9.82 | 3.29 | 110 | 1 |
| Product Placement (PP) | 9.9 | 3.25 | 101 | 10 |
| In-game Advertising (IGA) | 10.52 | 3.61 | 93 | 14 |
| Search Engine Marketing (SEM) | 9.92 | 3.18 | 110 | 8 |
| Location-Based Services (LBS) | 10.68 | 3.36 | 98 | 3 |
| Online Behavioral Advertising (OBA) | 10.43 | 3.39 | 107 | 8 |
| Advergames | 9.86 | 3.28 | 109 | 12 |
| Video advertising | 10.15 | 3.58 | 85 | 12 |

*Quote 2*: The ages indicated are quite old. I personally think that children can be gradually informed from an earlier age on, let's say six years. The explanation given to a 6-year old cannot be the same as the one given to a 9-year old or 12-year old child. (…) I think there are sufficient courses to integrate advertising education in school. Especially since advertising has become more complex. Additionally, parents do not always understand these advertising types themselves.

*Quote 3:* It is important to take into account the ability of children to understand the different advertising formats before informing them about it. Otherwise, it would work contradictory. I would say up to eight years old it has to be the parent who explains advertising formats.

Compared to advertisers who only target advertising toward adults, advertisers who target minors hold the opinion that, on average, it is desirable to inform minors about the commercial content from a younger age onward. This is especially the case for novel, integrated advertising formats which are more difficult to recognize (product placement, IGA, and video advertising) (Table 5).

### *Ethical data collection and data protection policy*

According to the vast majority of the respondents, a proper data collection and protection policy should provide verification of the age of the children (93.8%) or teenagers (88.7%),

**Table 5.** Information about commercial content – significant differences between respondents who do and do not advertise to minors.

| Format | Advertiser group | N | Mean | SD | P* |
|---|---|---|---|---|---|
| Product Placement | Minors | 33 | 9.06 | 2.65 | .012** |
| | Adults | 47 | 10.81 | 3.45 | |
| Video advertising | Minors | 24 | 8.79 | 3.17 | .052* |
| | Adults | 43 | 10.47 | 3.40 | |
| In-game advertising (IGA) | Minors | 31 | 8.97 | 2.93 | .011** |
| | Adults | 48 | 11.00 | 3.62 | |

*$p \leq .10$; ** $p \leq .050$.

allow verification of the status of the children's (80.4%) or teenagers' (71.1%) parents or legal guardians, and should provide clear information concerning the use of cookies and the possibility of disabling them to children (97.9%) and teenagers (95.9%). A substantial majority of the respondents (79%) agrees that the collection of personal information of children should be prohibited. Half of the advertisers (56.8%) agrees with this statement if teenagers are concerned. One in four (25.2%) disagrees if teenagers are the target group and 10.5% disagrees if children are the target group. If children (teenagers) are considered as a target group 71.5% (55.8%) agrees and 18.9% (25.3%) disagrees.

A majority (74.7%) of the advertisers agrees that children should not be allowed to register on brand websites or mobile platforms without permission of their parents or legal guardians (11.6% disagrees). If teenagers are considered as a target group the results are mixed (41.1% disagrees and 33.7% agrees). Advertisers think that it is important to notify parents or legal guardians if personal information from their children (87.4%) and teenagers (76.8%) is processed. If children are a target group, collection of personal data is perceived as unethical by a majority of the advertising professionals (84.2%). The results for teenagers are mixed (42.1% agrees, 57.9% disagrees). The majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%).

### Regulation and awareness building

The vast majority of advertising professionals do not agree with the statement that advertising toward children (76.7%) and teenagers (69.7%) should be regulated exclusively by means of self-regulation, or exclusively by means of legislation (children:62.6%; teenagers: 69.7%). The majority of the advertising professionals agree that advertising toward minors should be regulated by a combination of self-regulation and legislation for both children (77.8%) and teenagers (72.7%). The opinions of the interviewees with respect to the regulation of commercial communication toward minors are mixed. Quotes 4 and 5 illustrate both opinions.

*Quote 4:* With self-regulation you have certain mechanisms at work which work good. I think this type of regulation is the most efficient one. It is impossible to have all rules made by the legislator. In my opinion you have a stronger case if companies are willing to impose certain restrictions upon themselves and have these restrictions monitored by an independent institution. Regulation exclusively through legislation requires that the government has to invest in monitoring, because making laws without any type of monitoring does not makes sense. Therefore I think it is much more efficient to work with self-regulation. This requires a certain level of governmental confidence in companies. I do think however that companies take their responsibility seriously.

*Quote 5:* Legislation should set certain rules, and self-regulation can go further. Regulation exclusively through self-regulation, especially if it is not monitored, does not make a lot of sense.

Most advertisers agree with the statement that the government should strive for awareness building to promote advertising literacy among children and teenagers (both 66.7%) as with the statement that it is the educational system's duty to promote advertising literacy among children (76.8%) and teenagers (73.8%).

## Discussion

### *Main findings*

In general, all advertising professionals acknowledge that children are a vulnerable advertising target group. Teenagers are considered to be mature enough to identify advertising and to understand the commercial intention behind advertising formats. This finding is in line with John (1999) who noted that from the analytical stage in consumer socialization onward (age 11–12), teenagers have the skills to identify and understand traditional advertising. Protecting minors from persuasive communication is, therefore, more important for children (6–12 years) than for teenagers (Eagle, Bulmer, and De Bruin 2003). The results from the current study show that advertising professionals hold more or less the same perception for integrated and interactive advertising formats as for traditional ones. This is remarkable since their characteristics make it harder to identify them as advertising and recognize their persuasive intent.

Contests, brand websites, and premium offers are the most often used advertising formats toward children. Contests, banners, and branded websites are used mostly toward teenagers.

Advertisers consider minors capable of understanding novel advertising formats on average from 12 years onward. In the study of Harris Interactive (Geraci 2004; Grimm 2004) the average age whereupon minors were considered to view advertising critically was nine years. However, this study does not provide a clear definition of which type of advertising was studied. Martínez (2016) found that advertisers perceive children capable of identifying and understanding the intent of advertising at 10–12 years of age.

Novel advertising formats are considered ethically acceptable to use toward minors from the age of 12–13 years onward. These results are substantially different from Harris Interactive's study (Geraci 2004; Grimm 2004) in which marketers state that it is appropriate to target advertising to children at age seven. Advertising professionals in our study indicate that the average age to inform minors about the commercial intentions of novel advertising formats age is around 9–10 years. This is remarkable since the average age whereupon advertising is considered as ethical as well as the age whereupon minors are considered to be capable to understand the different advertising formats is 12–13 years. It appears that advertisers would inform minors about advertising even before they consider minors to be able to understand how novel advertising formats work. This is somewhat counterintuitive, since one would expect that it is only meaningful to inform or explain something to an individual, when this individual can comprehend what is explained. In the current study, formats for which it was indicated that it is not necessary to inform minors about the commercial intention are IGA, advergames, and video advertising. These results are also remarkable because these advertising formats are characterized by their integrated nature, which makes it more

difficult to recognize these formats as advertising. One would expect that especially for these integrated, implicit advertising formats it is necessary to disclose the commercial intent to minors.

The majority of the advertisers agrees that a proper policy should provide a verification of the ages of children, allows verification of the status of the parent or legal guardian and provides clear information concerning the use of cookies and the possibility of disabling them. According to the majority of advertising professionals, parents should give their permission for the data collection of both their children and teenagers.

A combination of both legislation and self-regulation to regulate advertising aimed at minors is preferred by the respondents, and governments and schools have a responsibility to make children advertising literate.

### *Theoretical implications*

The results of our study show that advertisers' perceptions are still based on old theories about the different stages of consumer socialization in childhood (John 1999) and models about children's cognitive development (e.g., the PKM (Friestad and Wright 1994) and that they still adhere to the principles in these models and theories that are based on traditional media. However, contemporary advertising formats as the ones explored in the current study differ from these traditional media because of their integrated and/or interactive characteristics. However, these characteristics of novel advertising formats do not seem to be taken into account when it comes to the usage and ethical acceptability of these formats when targeted at children and teenagers. As such, traditional models still function as standards for today's advertisers' perceptions, despite the fact that the way minors encounter advertising has changed a lot over the last decades and it is questionable whether these theories and models still apply to the use of contemporary advertising formats.

It appears that advertisers are satisfied with just complying with the existing ethical guidelines and rules (e.g., it is allowed to advertise to children from the age of 12 onward) and that they are not questioning whether they should take the lead themselves in updating the ethical guidelines or applying stricter ones. As such they apply the 'ethics code' view in ethical decision-making: they adhere to the law and to standards in ethical guidelines (De Pelsmacker, Geuens, and Van den Bergh 2017; Pickton and Broderick 2005). Nevertheless, given the vulnerability of minors, adhering to the 'consumer sovereignty' principle (taking the vulnerability, decision-making process and the available information to the consumer into account) or to the 'caveat venditor' principle (doing everything in the best interest of the consumers) might be more appropriate.

Moreover, it is even possible that the advertisers who participated in this study are more engaged with the subject of ethical advertising aimed at children and teenagers and are more ethically concerned than advertisers who did not participate.

### *Managerial and public policy implications*

The results of the current study can inform advertising professionals and public policy. Generally speaking, advertisers seem to be well aware of the vulnerability of especially young children when it comes to coping with (novel) advertising formats. The majority holds the opinion that children do not have a good understanding of new advertising formats, that

ethical concerns when advertising toward especially young minors should be taken into account, and, overwhelmingly, that especially children (not so much teenagers) should be protected against the inappropriate collection and use of personal data. Apparently, they are well aware of the measures that are taken to protect minors (for instance especially in case of unhealthy products) and to develop their advertising literacy, and they acknowledge to support them. This provides a solid basis for further developing these initiatives. Especially the educational system has a role to play, since advertisers hold the opinion that advertising literacy in children should be developed early on in primary school. Children's persuasion knowledge can be enhanced by teaching programs that focus on advertising literacy education and that learn how minors should reflect critically about advertising messages (Nelson 2016).

However, important improvements can still be made. In our sample, 24 respondents indicate that they target children, and half of both the respondents and the interviewees find this appropriate. This goes against (self-)regulatory measures in the Belgian Pledge and CARU guidelines. Advertising professional associations and the government could and should make more efforts to make professionals aware of these rules. Twenty to 25% of the respondents find it appropriate to collect personal information about children younger than 12, and to allow children to register on online platforms without parental consent. This is also an area for further improvement.

Integrated and/or online advertising formats are, on average, perceived by advertising professionals as ethically appropriate to use toward minors from the age of 12–13 years onward. However, for professionals who are currently advertising toward minors, this age is significantly lower. Public policy and advertising associations have to remain vigilant as to the ethical values of companies that market products targeted at children.

Importantly, in their appreciation of appropriateness to advertise (differently) to children and teenagers, advertising professionals seem to be largely inspired by their experience and appreciation of traditional advertising, and by the rules and regulations that are now in place. They implicitly assume that the implications of advertising today do not differ from the situation in the past when only traditional advertising formats were used. They do not seem to realize that novel integrated and interactive formats that develop brand commitment in a different way than before may constitute different challenges than traditional advertising with respect to how children and teenagers understand and process them, and what this entails with respect to the development of advertising literacy and ethical considerations with respect to these novel formats. This constitutes a major challenge for advertising organizations and public policy. Due to the specific nature of these novel advertising formats, there is an urgent necessity to revise what 'ethical advertising' aimed at minors mean and to protect minors against the implicit influence of these novel formats. This is a task for both public policy and the advertising industry.

## Limitations

The response rate of the survey was relatively low (90 out of 2614 fully completed and 161 partly completed the survey). This is common in on online surveys (Sheehan 2002) and if the subject of the survey is a rather sensitive topic, as is the case with the topic of the current study, it can be expected that this will affect the response rate negatively (Fan and Yan 2010). Nevertheless, due to the possibility of non-response bias, one should be careful with broad

generalizations of the study results. Moreover, the advertising professionals completed the survey voluntarily. This might have resulted in reaching only those advertisers who have a particular interest into the subject of advertising literacy of minors. The selection of respondents for the in-depth interviews partly compensated for this by also interviewing advertising professionals who did not participate in the survey.

Besides differences between children and teenagers, with regard to cognitive development, there might also be differences within these age categories. Future research could make this more fine-grained distinction.

Due to the limited information available in the description of the vignettes it is likely that certain situational factors which could have had an influence on the respondents' answers were not provided. However, the in-depth interviews provided a somewhat more nuanced and deeper insight into these situational factors.

The researchers tried to control for socially desirable answers by making the survey anonymous. Nevertheless, a certain degree of social desirability bias cannot be excluded.

## Acknowledgments

This study was conducted as a part of the AdLit interdisciplinary research project and funded by Vlaio (Flemish agency for innovation and entrepreneurship).

## Disclosure statement

No potential conflict of interest was reported by the authors.

## Funding

This work was supported by Agentschap Innoveren en Ondernemen [grant number 130008].

## Notes on contributors

*Kristien Daems* is a PhD student at the marketing department at the faculty of applied economics at the University of Antwerp. Her research focuses on children's and teenagers' advertising literacy.

*Patrick De Pelsmacker* is a professor of marketing at the faculty of applied economics at the University of Antwerp. His research focuses upon marketing communication effectiveness, new advertising media and formats, ethical consumer behavior, and social marketing.

*Ingrid Moons* is an assistant professor of marketing and consumer research at the faculty of applied economics and the faculty of design sciences at the University of Antwerp. Her research is situated in the domain of processes underlying the adoption of new products and services. Co-creation leading to innovation is one of the focal points in her research.

## References

Blades, Mark, Caroline Oates, Fran Blumberg, and Barrie Gunter. 2014. *Advertising to Children: New Directions, New Media*. Basingstoke: Palgrave Macmillan.
Bright, Laura F., and Terry Daugherty. 2012. "Does Customization Impact Advertising Effectiveness? An Exploratory Study of Consumer Perceptions of Advertising in Customized Online Environments." *Journal of Marketing Communications* 18 (1): 19–37. doi:10.1080/13527266.2011.620767.

Bucy, Erik Page, Sojung Claire Kim, and Miyeong Cecilia Park. 2011. "Host Selling in Cyberspace: Product Personalities and Character Advertising on Popular Children's Websites." New Media & Society 13 (8): 1245–1264.

Calvert, S. L. 2008. "Children as Consumers: Advertising and Marketing." The Future of Children 18 (1): 205–234. doi:10.1353/foc.0.0001.

Children's Online Privacy Protection Act. 1998. "Children's Online Privacy Protection Rule (COPPA)." https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/childrens-online-privacy-protection-rule.

Clarke, Barbie, and Catherine Gardner. 2005. "Concerned Children's Advertisers Leads the Way." Young Consumers 6 (4): 24–28.

Crane, Andrew, and Bahar Ali Kazmi. 2010. "Business and Children: Mapping Impacts, Managing Responsibilities." Journal of Business Ethics 91 (4): 567–586.

De Pelsmacker, Patrick, Maggie Geuens, and Joeri Van den Bergh. 2017. Marketing Communications: A European Perspective. 6th ed. Harlow: Pearson education.

Eagle, Lynne, Sandy Bulmer, and Anne De Bruin. 2003. "Marketing Communications Implications of Children's New Electronic Media Use: A Survey of Parental Opinions and Perceptions." Journal of Marketing Communications 9 (3): 129–146.

Eagle, Lynne, and Stephan Dahl. 2015. "Product Placement in Old and New Media: Examining the Evidence for Concern." Journal of Business Ethics: 1–14.

EU Pledge. 2017. "About the EU Pledge." EU-pledge. Accessed July 17. http://www.eu-pledge.eu/content/about-eu-pledge

Fan, Weimiao, and Zheng Yan. 2010. "Factors Affecting Response Rates of the Web Survey: A Systematic Review." Computers in Human Behavior 26 (2): 132–139.

Federal Trade Commission. 2012. "Mobile Apps for Kids; Current Privacy Disclosures Are Disappointing." FTC Staff Report http://www.ftc.gov/reports/mobile-apps-kids-current-privacy-disclosures-are-disappointing.

FEVIA. 2017. Food Indusrty Reinforced the Engagement on the Topic of Responsible Child Advertising [Voedingssector versterkt engagement rond verantwoorde kinderreclame]. Press release FEVIA, June 26th. Accessed June 26. http://www.fevia.be/nl/pers/voedingssector-versterkt-engagement-rond-verantwoorde-kinderreclame.

Friestad, M., and P. Wright. 1994. "The Persuasion Knowledge Model: How People Cope with Persuasuion Attempts." Journal of Consumer Research 21 (1): 1–31.

Füg, Oliver C. 2008. "Save the Children: The Protection of Minors in the Information Society and the Audiovisual Media Services Directive." Journal of Consumer Policy 31 (1): 45–61.

Geraci, John C. 2004. "What Do Youth Marketers Think about Selling to Kids?" Young Consumers 5 (3): 11–17.

Gray, Oliver. 2005. "Responsible Advertising in Europe." Young Consumers 6 (4): 19–23.

Grimm, M. 2004. "Is Marketing to Kids Ethical?" Brandweek 45 (14): 44–48.

Gupta, Pola B., and Kenneth R. Lord. 1998. "Product Placement in Movies: The Effect of Prominence and Mode on Audience Recall." Journal of Current Issues & Research in Advertising 20 (1): 47–59.

Hudders, Liselot, Veroline Cauberghe, and Katarina Panic. 2016. "How Advertising Literacy Training Affect Children's Responses to Television Commercials versus Advergames." International Journal of Advertising 35 (6): 909–931. doi:10.1080/02650487.2015.1090045.

ICC. 2017. "Marketing and Advertising to Children." Accessed July 12. https://iccwbo.org/global-issues-trends/responsible-business/marketing-advertising/marketing-and-advertising-to-children/

Ji, Mindy F., and Russell N. Laczniak. 2007. "Advertisers' Implementation of CARU Guidelines for Advertising Targeted at Children." Journal of Current Issues & Research in Advertising 29 (2): 27–38.

John, Deborah Roedder. 1999. "Consumer Socialization of Children: A Retrospective Look at Twenty-Five Years of Research." Journal of Consumer Research 26 (3): 183–213. doi:10.1086/209559.

Karrh, James A. 1998. "Brand Placement: A Review." Journal of Current Issues & Research in Advertising 20 (2): 31–49.

Kunkel, Dale, Brian L. Wilcox, Joanne Cantor, Peter Dowrick, Susan Linn, and Edward Palmer. 2004. "Report of the APA Task Force on Advertising and Children." http://www.apa.org/pubs/info/reports/advertising-children.aspx.

Mallinckrodt, Victoria, and Dick Mizerski. 2007. "The Effects of Playing an Advergame on Young Children's Perceptions, Preferences, and Requests." *Journal of Advertising* 36 (2): 87–100.

Martínez, Carolina. 2016. "'They Are Totally Unfiltered' Constructions of the Child Audience among Swedish Advertising Producers." *Television & New Media* 17 (7): 612–628.

McStay, Andrew. 2012. "I Consent: An Analysis of the Cookie Directive and Its Implications for UK Behavioral Advertising." *New Media & Society* 15 (4): 596–611.

Moore, Elizabeth S. 2004. "Children and the Changing World of Advertising." *Journal of Business Ethics* 52 (2): 161–167. doi:10.1023/B:BUSI.0000035907.66617.f5.

Mortelmans, D. 2007. *Handboek Kwalitatieve Onderzoeksmethoden* [Handbook Qualitative Research Methods]. Leuven: Acco.

Moses, Louis J., and Dare A. Baldwin. 2005. "What Can the Study of Cognitive Development Reveal about Children's Ability to Appreciate and Cope with Advertising?" *Journal of Public Policy & Marketing* 24 (2): 186–201.

Nairn, A., and C. Fine. 2008. "Who's Messing with My Mind? The Implications of Dual-Process Models for the Ethics of Advertising to Children." *International Journal of Advertising* 27 (3): 447–470.

Nebenzhal, Israel D., and Eugene D. Jaffe. 1998. "Ethical Dimensioins of Advertising Executions." *Journal of Business Ethics* 17 (7): 805–815.

Nelson, Michelle R. 2016. "Developing Persuasion Knowledge by Teaching Advertising Literacy in Primary School." *Journal of Advertising* 45 (2): 169–182. doi:10.1080/00913367.2015.1107871.

Owen, Laura, Charlie Lewis, Susan Auty, and Moniek Buijzen. 2013. "Is Children's Understanding of Nontraditional Advertising Comparable to their Understanding of Television Advertising?." *Journal of Public Policy & Marketing* 32 (2): 195–206.

Palmer, Daniel E. 2005. "Pop-Ups, Cookies, and Spam: Toward a Deeper Analysis of the Ethical Significance of Internet Marketing Practices." *Journal of Business Ethics* 58 (1): 271–280.

Panic, Katarina, Verolien Cauberghe, and Patrick De Pelsmacker. 2013. "Comparing TV Ads and Advergames Targeting Children: The Impact of Persuasion Knowledge on Behavioral Responses." *Journal of Advertising* 42 (2–3): 264–273.

Pickton, David, and Amanda Broderick. 2005. *Integrated Marketing Communications*. 2nd ed. Harlow: Pearson Education.

Rideout, Victoria. 2014. "Advertising to Children and Teens: Current Practices. A Common Sense Media Research Brief." https://www.commonsensemedia.org/research/advertising-to-children-and-teens-current-practices.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2010. "Comparing Children's and Adults' Cognitive Advertising Competences in the Netherlands." *Journal of Children and Media* 4 (1): 77–89. doi:10.1080/17482790903407333.

Rozendaal, Esther, Moniek Buijzen, and Patti Valkenburg. 2011. "Children's Understanding of Advertisers' Persuasive Tactics." *International Journal of Advertising* 30 (1): 329–350.

Sheehan, Kim Bartel. 2002. "Online Research Methodology: Reflections and Speculations." *Journal of Interactive Advertising* 3 (1): 56–61.

Shiying, Li, Megan Pickering, Ali Moondore, Mark Blades, and Caroline Oates. 2014. "Young Children's Ability to Identify Advertisements on Television, Web Pages and Search Engine Web Pages." In *Advertsing to Children, New Directions, New Media*, edited by M. Blades, C. Oates, F. Blumberg, and B. Gunter, 199–218. London: Palgrave Macmillan.

Steeves, Valerie. 2006. "It's Not Child's Play: The Online Invasion of Children's Privacy." *University of Ottawa Law and Technology Journal* 3 (1): 169–188.

TaylorWessing. 2013. "Advertising across Different Media – A Guide to the Regulatory Playing Field in the UK." Accessed July 13. https://www.taylorwessing.com/download/article_advertising_different_media.html#.WWeBEIGkKpo

Terlutter, Ralf, and Michael L. Capella. 2013. "The Gamification of Advertising; Analysis and Reserach Directions of in-Game Advertising, Advergames, and Advertising in Social Network Games." *Journal of Advertising* 42 (2–3): 95–112.

The Belgian Pledge. 2017. "Responsible Advertising and Marketing towards Children." Accessed July 12. https://www.belgianpledge.be/nl/engagementen

The Childrens' Advertising Review Unit. 2009. "Self-Regulatory Program for Children's Advertising." www.caru.org/guidelines/guidelines.pdf.

Tutaj, Karolina, and Eva A. van Reijmersdal. 2012. "Effects of Online Advertising Format and Persuasion Knowledge on Audience Reactions." *Journal of Marketing Communications* 18 (1): 5–18.

Waiguny, Martin K. J., Michelle R. Nelson, and Ralf Terlutter. 2012. "Entertainment Matters! the Relationship between Challenge and Persuasiveness of an Advergame for Children." *Journal of Marketing Communications* 18 (1): 69–89.

World Federation of Advertisers. 2007. "Food and Beverage Advertising to Children: When is a Child a Child?" www.wfanet.org/pdf/.../when_is_a_child_a_child.pdf.

Wright, P., M. Friestad, and D. M. Boush. 2005. "The Development of Marketplace Persuasion Knowledge in Children, Adolescents, and Young Adults." *Journal of Public Policy & Marketing* 24 (2): 222–233.

## Appendix 1.  Overview of advertising formats in vignettes.

| | |
|---|---|
| Product Placement (PP) on television | In a television series, a particular brand of soft drink is consumed often, and the logo is brought into focus. The brand has paid for the soft drink to be used in the television series |
| In-game advertising (IGA) | In a popular racing game, players can choose from several existing brands of cars, and billboards advertising these car brands appear along the roadside. The car brands have paid the developers of the game to have their brands used in the racing game |
| Search Engine Marketing (SEM) | Lucas would like to know more about the rules of tennis. To this end, he types 'tennis' as a search term in Google. A large number of advertisements for sports brands related to the search term appear in a sidebar next to the actual results |
| Location-Based Services (LBS) | Marie goes shopping with some of her friends during the school holiday. As they approach a popular chain store, she receives a text message on her mobile telephone containing a promotional code for a chain store |
| Online Behavioral Advertising (OBA) | Tom is searching the internet for camping equipment for his youth movement's annual camp. When he then looks through Facebook, the NewsFeed contains advertisements related to camping equipment |
| Advergames | To promote the newest product in its line, a brand has developed a game that can be played on the brand's website. While playing this game, the game elements are related to the product and the brand, and players attempt to capture as many brand logos as they can |
| Video advertising | A video on YouTube shows a child and a father singing the soundtrack of the latest Disney movie together. Disney paid the child's father to post the video online for the purpose of advertising. The Disney logo does not appear anywhere in the music clip, and there is no statement that the video is part of an advertising campaign |
| Advertising in Applications | Lori has her own tablet. Every day, she plays a music quiz that is installed as an application on her tablet. The music quiz application was a free download, with advertising appearing between the questions. A large amount of the advertising consists of ads for the latest CD from her favorite group |
| Merchandising of popular figures in a virtual world | Sam has installed an application from a media company on his parents' tablet. The application is a virtual world in which he comes into contact with various media figures and in which he and his friends try to complete challenges in this virtual world successfully. A great deal of merchandising is associated with these media figures. For example, the media figures also appear in television programs, they are present in amusement parks and they are portrayed on many products for children and teenagers |

# EXHIBIT 58

# Self-Regulatory Program for Children's Advertising

Children's Advertising Review Unit
Administered by the Council of Better Business Bureaus
Policies and Procedures set by the Advertising Self-Regulatory Council (ASRC), a service of the advertising industry and Council of Better Business Bureaus, 112 Madison Avenue, New York, NY 10016

The Children's Advertising Review Unit
Self-Regulatory Program for Children's Advertising

Index

I. INTRODUCTION                                                         3

A. Overview of the Self-Regulatory Program                              3

B. CARU's Role                                                          3

C. Boards and Advisory Bodies                                          3

D. Procedures and Review Process                                       4


II. The Self-Regulatory Program For Children's Advertising              4

A. Scope                                                               4

B. Definitions                                                         5

C. Core Principles                                                     5

D. Guidelines                                                          6

1. An Overview                                                         6

2. Part I:  General Guidelines                                         6

(a) Deception                                                          6

(b) Product Presentations and Claims                                   7

(c) Material Disclosures and Disclaimers                               8

(d) Endorsements                                                       9

(e) Blurring of Advertising and Editorial/Program Content              9

(f) Premiums, Kids' Clubs, Sweepstakes and Contests                   10

(g) Online Sales                                                       12

(h) Sales Pressure                                                     12

(i) Unsafe and Inappropriate Advertising to Children                   13


3. Part II: Guidelines for Online Privacy Protection                   14

(a) Data Collection                                                    15

(b) Age-Screening/Hyperlinks                                           18

I.      **INTRODUCTION**

### A. Overview of the Self-Regulatory Program

In 1974, the National Advertising Review Council (NARC) established the Children's Advertising Review Unit (CARU) as a self-regulatory program to promote responsible children's advertising. CARU is administered by the Council of Better Business Bureaus (CBBB) and funded by members of the children's advertising industry.

CARU's self-regulatory program sets high standards for the industry to assure that advertising directed to children is not deceptive, unfair or inappropriate for its intended audience. The standards take into account the special vulnerabilities of children, e.g., their inexperience, immaturity, susceptibility to being misled or unduly influenced, and their lack of cognitive skills needed to evaluate the credibility of advertising.

CARU's standards are embodied in principles and guidelines that were first adopted by CARU in 1975 and have been periodically revised to address changes in the marketing and media landscapes. For example, in 1996, CARU added a new section to the guidelines to address concerns about online data collection practices and updated this section again in 2014 to reflect amendments to the Children's Online Privacy Protection Act (COPPA).

### B. CARU's Role

CARU monitors and reviews advertising, websites and online services directed to children, initiates and receives complaints about advertising and online privacy practices, and determines whether such practices violate the program's standards. When it finds violations, it seeks changes through the voluntary cooperation of advertisers and website or online service operators. CARU also offers a general advisory service for advertisers and agencies, provides informational material for children, parents and educators, and encourages advertisers to develop and promote the dissemination of educational messages to children consistent with the Children's Television Act of 1990.

### C. Boards and Advisory Bodies

Policy for CARU's self-regulatory program is set by the Board of Directors of ASRC, a strategic alliance of the advertising industry and the CBBB. The Board is composed of key executives from the CBBB, the American Association of Advertising Agencies, the American Advertising Federation, the Association of National Advertisers, the Direct Marketing Association, the Electronic Retailing Association and the Interactive Advertising Bureau.

CARU's Academic/Expert Advisory Board includes leading experts in education, communication, child development, child mental health, marketing and nutrition. These

3

advisors provide CARU with guidance on child psychology and behavioral issues, market trends and research, and other issues as they relate to advertising and marketing to children. Members of the Advisory Board also consult with CARU on individual cases and participate in the review and revision of the principles and guidelines of the self-regulatory program.

The CARU Supporters' Council, composed of representatives of the companies that support the children's advertising industry's self-regulatory system, provides CARU with advice on trends and developments in children's advertising and media and participates in the review and revision of the principles and guidelines of the self-regulatory program.

### D. Procedures and Review Process

The procedures governing the review and resolution of cases, including the opportunity for appellate review by the National Advertising Review Board, are set forth in The Advertising Industry's Process of Voluntary Self-Regulation, which can be found at *http://www.asrcreviews.org/asrc-procedures/*. Under the procedures, at least ten times a year, the CBBB publishes Case Reports that include CARU's final case decisions, an Activity Report summarizing actions other than formal case decisions, and guidance based on prior published decisions. CARU's Case Reports can be found at *http://www.asrcreviews.org/category/caru/.*

## II.   THE SELF-REGULATORY PROGRAM FOR CHILDREN'S ADVERTISING

### A.   Scope

The principles and guidelines of the program apply to:

1.   National advertising primarily directed to children under 12 years of age in any medium. Such advertising will be determined by an analysis of factors, no single one of which will necessarily be controlling, including: (a) whether the content of the media in which the advertisement appears is intended for children under 12, (considering the content's subject matter, format, projected audience demographics, and extent to which other advertising in that content is intended for children under 12); (b) whether the advertisement appears during, or just before or after, a television program aired during what is generally understood to be children's programming, considering the time of day during which the advertisement appears and the media outlet; (c) whether the advertisement appears during, or just before or after, a television program which is counted towards the broadcaster's or cablecaster's Children's Television Act obligations; and (d) whether, based on available information (including the subject matter and format of the advertisement), the advertiser intended to direct the advertisement primarily to children under 12.

2.      Online data collection and other privacy-related practices by website or online service operators that target children under 13 years of age or that have actual knowledge that a visitor is a child under 13 years of age.

## B.    Definitions

1.  "National advertising" shall include any paid commercial message, in any medium (including labeling), if: (a) it has the purpose of inducing a sale or other commercial transaction or persuading the audience of the value or usefulness of a company, product or service; (b) it is disseminated nationally or to a substantial portion of the United States, or is test market advertising prepared for national campaigns; and (c) the content is controlled by the advertiser.

2.  "Advertiser" shall mean any person or other legal entity that engages in "national advertising," and includes, under Part II of the Guidelines, those who operate a commercial website or an online service.

## C.    Core Principles

The following Core Principles apply to all practices covered by the self-regulatory program.

1.  Advertisers have special responsibilities when advertising to children or collecting data from children online. They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed. They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

2.  Advertising should be neither deceptive nor unfair, as these terms are applied under the Federal Trade Commission Act, to the children to whom it is directed.

3.  Advertisers should have adequate substantiation for objective advertising claims, as those claims are reasonably interpreted by the children to whom they are directed.

4.  Advertising should not stimulate children's unreasonable expectations about product quality or performance.

5.  Products and content inappropriate for children should not be advertised directly to them.

6. Advertisers should avoid social stereotyping and appeals to prejudice, and are encouraged to incorporate minority and other groups in advertisements and to present positive role models whenever possible.

7. Advertisers are encouraged to capitalize on the potential of advertising to serve an educational role and influence positive personal qualities and behaviors in children, e.g., being honest and respectful of others, taking safety precautions, engaging in physical activity.

8. Although there are many influences that affect a child's personal and social development, it remains the prime responsibility of the parents to provide guidance for children. Advertisers should contribute to this parent-child relationship in a constructive manner.

**D.    Guidelines**

**1.    An Overview**

The Core Principles are broad in scope and reflect the belief that responsible advertising comes in many forms and that diversity should be encouraged. They aim to cover the myriad advertising practices in today's marketplace, as well as those that may emerge as technologies and advertising practices evolve. The Guidelines below are designed to provide additional guidance to assist advertisers in applying these broad principles to their child-directed advertising and to help them deal sensitively and honestly with children.

The Guidelines are not intended to be exhaustive. With respect to advertising practices that are not specifically addressed, CARU will apply the above Core Principles in evaluating the practices.

Part I of the Guidelines offers general guidance on deception and other marketing practices that are inappropriate when directed to children, and encourages certain practices. Part II addresses online data collection and other privacy-related practices that pose special concerns for children and require more specific guidance.

**2.    Part I: General Guidelines**

**(a)    Deception**

To assure that advertising directed to children is not deceptive:

1. The "net impression" of the entire advertisement, considering, among other things, the express and implied claims, any material omissions, and the overall format, must not be misleading to the children to whom it is directed.

2. Whether an advertisement leaves a misleading impression should be determined by assessing how reasonable children in the intended audience would interpret the message, taking into account their level of experience, sophistication, and maturity; limits on their cognitive abilities; and their ability to evaluate the advertising claims.

   **(b)   Product Presentations and Claims**

To avoid deceptive and/or inappropriate advertising to children involving product presentations and claims:

1. Copy, sound and visual presentations should not mislead children about product or performance characteristics. Such characteristics may include, but are not limited to, speed, method of operation, color, sound, durability, nutritional benefits and similar characteristics.

2. The presentation should not mislead children about benefits from use of the product. Such benefits may include, but are not limited to, the acquisition of strength, status, popularity, growth, proficiency and intelligence.

3. Claims should not unduly exploit a child's imagination. While fantasy, using techniques such as animation and computer-generated imagery, is appropriate for both younger and older children, it should not create unattainable performance expectations nor exploit the younger child's difficulty in distinguishing between the real and the fanciful.

4. Advertisements should demonstrate the performance and use of a product in a way that can be duplicated by a child for whom the product is intended.

5. The advertisement should not mislead children about what is included in the initial purchase.

6. Advertising that compares the advertised product to another product should be based on real product attributes and be understandable to the child audience.

7. The amount of product featured should not be excessive or more than would be reasonable to acquire, use or consume by a person in the situation depicted. For example, if an advertisement depicts food being consumed by a person in the advertisement, or suggests that the food will be consumed, the quantity of food shown should not exceed the labeled serving size on the Nutrition Facts panel; where no

such serving size is applicable, the quantity of food shown should not exceed a single serving size that would be appropriate for consumption by a person of the age depicted.

8. Advertising of food products should encourage responsible use of the product with a view toward healthy development of the child. For example, advertising of food products should not discourage or disparage healthy lifestyle choices or the consumption of fruits or vegetables, or other foods recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid, as applicable to children under 12.

9. Advertisements for food products should clearly depict or describe the appropriate role of the product within the framework of the eating occasion depicted.

  a. Advertisements representing a mealtime should depict the food product within the framework of a nutritionally balanced meal.[1]

  b. Snack foods should be clearly depicted as such, and not as substitutes for meals.

### (c)   Material Disclosures and Disclaimers

1. All disclosures and disclaimers material to children should be understandable to the children in the intended audience, taking into account their limited vocabularies and level of language skills. For young audiences, simple words should be chosen, *e.g.*, "You have to put it together." Since children rely more on information presented in pictures than in words, demonstrative disclosures are encouraged.

2. These disclosures should be conspicuous in the advertising format and media used, e.g., online, advertisers should make disclosures clear and proximate to, and in the same format (i.e., audio or graphic) as, the claims to which they are related; in television, advertisers should use audio disclosures, unless disclosures in other formats are likely to be seen and understood by the intended audience.

3. Circumstances where material disclosures are needed include, but are not limited to, the following:

---

[1] While there may be a number of acceptable ways to depict a nutritionally balanced meal for children, each depiction should contain at least three of the five major food groups, preferably including those food groups recommended for increased consumption by current USDA Dietary Guidelines for Americans and My Pyramid (i.e., fruits, vegetables, fat-free or low-fat milk and milk products and whole grains). The food included in the meal should reflect reasonable portion sizes and types of foods appropriate for children in the meal setting depicted. For example, a reasonable depiction of carrots may contain an appropriate side-dish portion for a child, rather than one or two condiment-size sticks. If the meal includes a caloric beverage, the beverage should be one that is appropriate in a nutritionally balanced meal taking into account the beverage's nutritional attributes and its calories within the context of the meal depicted.

a.  Advertising for unassembled products should clearly indicate they need to be put together to be used properly.

b.  If any item essential to use of the product is not included, such as batteries, this fact should be disclosed clearly.

c.  Advertisers should clearly disclose information about products purchased separately, such as accessories or individual items in a collection.

d.  If television advertising to children involves the use of a toll-free telephone number, it must be clearly stated, in both audio and video disclosures, that the child must get an adult's permission to call. In print or online advertising, this disclosure must be clearly and prominently displayed.

4.  Advertisers that create or sponsor an area in cyberspace, either through an online service or a website, must prominently identify the name of the sponsoring company and/or brand in that area. This could be done by using wording such as "Sponsored by _____."

5.  If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers) this fact should be clearly disclosed on the packaging.

### (d)  Endorsements

1.  Advertisers should recognize that the mere appearance of a celebrity or authority figure with a product can significantly alter a child's perception of the product. Advertisers may use such personalities as product endorsers, presenters, or testifiers, but they must take great care to avoid creating any false impression that the use of the product enhanced the celebrity's or authority figure's performance.

2.  All personal endorsements should reflect the actual experiences and beliefs of the endorser.

3.  An endorser who is represented, either directly or indirectly, as an expert must possess qualifications appropriate to the particular expertise depicted in the endorsement.

### (e)  Blurring of Advertising and Editorial/Program Content

1.  Advertisers should recognize that children may have difficulty distinguishing between program/editorial content and advertising, e.g., when program/editorial characters make advertising presentations or when an advertisement appears to be content to the intended audience.

9

2.  Advertising should not be presented in a manner that blurs the distinction between advertising and program/editorial content in ways that would be misleading to children.[2]

3.  Prohibited practices in television advertising

    a.  Program personalities, live or animated, should not be used to advertise products, premiums or services in or adjacent to a television program primarily directed to children under 12 years of age in which the same personality or character appears.

    b.  Products derived from or associated with a television program primarily directed to children under 12 years of age should not be advertised during or adjacent to that program.

4.  In media other than television, a character or personality associated with the editorial/content of the media should not be used to sell products, premiums or services in close proximity to the program/editorial content, unless the advertiser makes it clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.[3]

5.  On websites or online services directed to children, if an advertiser integrates an advertisement into the content of a game or activity, then the advertiser should make clear, in a manner that will be easily understood by the intended audience, that it is an advertisement.

6.  If videotapes, CD-ROMS, DVDs or software marketed to children contain advertising or promotions (e.g., trailers), the advertising itself should be separated from the program and clearly designated as advertising.

    **(f)    Premiums, Kids' Clubs, Sweepstakes and Contests**

1.  Advertisers should recognize that their use of premiums, kids' clubs, contests and sweepstakes has the potential to enhance the appeal of their products to children.

2.  Advertisers should take special care in using these kinds of promotions to guard against exploiting children's immaturity.

    i.  <u>Premiums</u>

---

[2] This provision does not apply to the mere presence of a product or character in program/editorial content.
[3] This provision does not apply to the mere presence of a character or personality in program/editorial content.

a. Since children have difficulty distinguishing product from premium, advertising that contains a premium message should focus the child's attention primarily on the product and make the premium message clearly secondary.

b. Conditions of a premium offer should be stated simply and clearly.

ii. <u>Kids' Clubs</u>

a. Advertising should not mislead children into thinking they are joining a club when they are merely making a purchase or receiving a premium.

b. Before an advertiser uses the word "club," certain minimum requirements should be met. These are:

1. Interactivity - The child should perform some act demonstrating an intent to join the club, and receive something in return. Merely watching a television program or eating in a particular restaurant, for example, does not constitute membership in a club.

2. Continuity - There should be an ongoing relationship between the club and the child member, e.g., a regular newsletter or activities scheduled over a period of time.

3. Exclusivity - The activities or benefits derived from membership in the club should be exclusive to its members, and not merely the result of purchasing a particular product.

c. Additional requirements applying to kids' clubs online are covered in Part II of the Guidelines.

iii. <u>Sweepstakes and Contests</u>

a. Advertisers should recognize that children may have unrealistic expectations about the chances of winning a sweepstakes or contest or inflated expectations of the prize(s) to be won.

b. The prize(s) should be clearly depicted.

c. The free means of entry should be clearly disclosed.

d. The likelihood of winning should be clearly disclosed in language readily understandable to the child audience. Disclosures such as, "Many will enter, a few will win." should be used, where appropriate.

e.   All prizes should be appropriate to the child audience.

f.   Online contests or sweepstakes should not require the child to provide more information than is reasonably necessary.  Any information collection must meet the requirements of the Data Collection section of the Guidelines and the federal Children's Online Privacy Protection Act (COPPA).

**(g)   Online Sales**

1.   Advertisers who sell products and services to children online should clearly indicate to the children when they are being targeted for a sale.

2.   If an advertiser offers the opportunity to purchase any product or service, either through the use of a "click here to order" button or other on-screen means, the ordering instructions must clearly and prominently state that a child must have a parent's permission to order.

3.   Online advertisers must make reasonable efforts, in light of all available technologies, to provide the person responsible for paying for such products and services the means to exercise control over the transaction.[4]

4.   If no reasonable means is provided to avoid unauthorized purchases by children online, the advertiser should enable the person responsible for payment to cancel the order and receive full credit without incurring any charges.

**(h) Sales Pressure**

1.   Advertising should not urge children to ask parents or others to buy products. It should not suggest that a parent or adult who purchases a product or service for a child is better, more intelligent or more generous than one who does not.

2.   Advertisers should avoid using sales pressure in advertising to children, e.g., creating a sense of urgency by using words such as 'buy it now.'

3.   Advertisements should not convey to children that possession of a product will result in greater acceptance by peers or that lack of a product will result in less acceptance by peers.

---

[4] Requiring the use of a credit card in connection with a transaction is a reasonable effort to provide the person responsible for payment with control over the transaction. This is consistent with COPPA regulations. See 16 CFR § 312.5.

4. Advertisements should not imply that purchase or use of a product will confer upon the user the prestige, skills or other special qualities of characters appearing in advertising.

5. Advertisements should not minimize the price of goods and services with words such as, "only," "just," or "bargain price" that children do not understand to be exaggeration or "puffing."

**(i) Unsafe and Inappropriate Advertising to Children**

1. Safety

   a. Advertisers should take into account that children are prone to exploration, imitation, and experimentation and may imitate product demonstrations or other activities depicted in advertisements without regard to risk.

   b. Advertisers should not advertise products directly to children that pose safety risks to them, i.e., drugs and dietary supplements, alcohol, products labeled, 'Keep out of the reach of children;' nor should advertisers targeting children display or knowingly link to pages of websites or online services that advertise such products.

   c. Advertisements for children's products should show them being used by children in the appropriate age range. For instance, young children should not be shown playing with toys safe only for older children.

   d. Advertisements should not portray adults or children in unsafe situations or in acts harmful to themselves or others. For example, when activities (such as bicycle riding or skateboarding) are shown, proper precautions and safety equipment should be depicted; when an activity would be unsafe without adult supervision, supervision should be depicted.

   e. Advertisers should be aware that many childhood injuries occur from the misuse of common household products and should avoid demonstrations that may encourage inappropriate use of such products by children.

2. Inappropriate Advertising

    a. Advertisers should take care to ensure that only age-appropriate videos, films and interactive software are advertised to children, and if an industry rating system applies to the product, the rating label is prominently displayed.[5]

    b. Advertising should not portray or encourage behavior inappropriate for children (e.g., violence or sexuality) or include material that could unduly frighten or provoke anxiety in children; nor should advertisers targeting children display or knowingly link to pages of a website or online service that portray such behaviors or materials.

### 3.   Part II: Guidelines for Online Privacy Protection

This Part addresses concerns about the collection of personal data from children and other privacy-related practices on the Internet.  Its provisions are consistent with the Children's Online Privacy Protection Act of 1998 (COPPA) and the FTC's implementing Rule, which protect children under the age of 13, and will be interpreted consistently with those rules.

Online data collection from children poses special concerns. The medium offers unique opportunities to interact with children and to gather information for marketing purposes. Young children however, may not understand the nature of the information being sought or its intended uses, and the medium makes it easy to collect such data directly and passively from children without the supervision or permission of their parents or guardians. The collection of personal information from children,[6] as defined in Data Collection below, therefore triggers special privacy and security concerns.

The guidelines below address those concerns by providing guidance on specific issues involving online data collection and other privacy-related practices by operators of a website or other online service that 1) targets children under 13 years of age (based on the criteria set forth in the definition of website or online services directed to children in Section 312.2 of the COPPA Rule); 2) has actual knowledge that it is collecting or maintaining personal information from a child under 13 years of age; or 3) has actual knowledge that it is collecting personal information directly from users of another website or online service directed to children.[7]

---

[5] Violations of this guideline may be brought to the attention of the relevant rating entity.

[6] The definitions of "collection," "operator" and "personal information" in the Children's Online Privacy Protection Rule apply whenever these terms are used in the Online Privacy Protection Guidelines. See 16 CFR § 312.2.

[7] This category of companies might include operators of plug-ins or third party advertising networks who are notified by an operator of the child-directed nature of the operator's website.  CARU considers these to be "Pass-through operators" since they become "operators" of a child-directed website or online service only by virtue of actual knowledge.

   (a)  **Data Collection**

1. *Personal information* is defined under COPPA as individually identifiable information about an individual collected online, including: first and last name; home or physical address; online contact information, such as email addresses, or other identifiers that allow direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, or a video chat user identifier; a screen or user name where it functions in the same manner as online contact information; a phone number; a Social Security number; a persistent identifier that can be used to recognize a user over time and across different websites and online services, e.g., a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier; a photo, video or audio file where such files contain a child's image or voice; geolocation information sufficient to identify street name and  name of a city or town; or information  concerning the child or the parents of that child and combines with information contained in this definition.

2. In collecting[8] information from children under 13 years of age, operators should adhere to the following guidelines: Operators must clearly disclose to website or online service users its information collection and tracking practices, information uses, and the means for correcting or removing the information. These disclosures should be prominent and readily accessible before information is collected. For instance, on a website or online service where there is passive tracking, the notice should be on the page where the child enters the site.  A heading such as "Privacy," "Our Privacy Policy," or similar designation is acceptable if it allows an adult to click on the heading to obtain additional information on the site or service's practices concerning information collection, tracking and uses.

3. Operators should disclose, in language easily understood by a child, (a) why the information is being collected (*e.g*., "We'll use your name and email to enter you in this contest and also add it to our mailing list") and (b) whether the information is intended to be shared, sold or distributed outside of the collecting company.

4. Operators should disclose passive means of collecting information from children (*e.g.,* navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

---

[8] Collects or collection means the gathering of any personal information from a child by any means, including but not limited to:
(a) Requesting, prompting, or encouraging a child to submit personal information online; (b) Enabling a child to make personal information publicly available in identifiable form. An operator shall not be considered to have collected personal information under this paragraph if it takes reasonable measures to delete all or virtually all personal information from a child's postings before they are made public and also to delete such information from its records; or (c) Passive tracking of a child online.

5. Operators must obtain "verifiable parental consent"[9] before they collect personal information (such as email addresses, screen names associated with other personal information, phone numbers, addresses or photographs) that will be publicly posted, thereby enabling others to communicate directly with the child online or offline, or when the child will be otherwise able to communicate directly with others.

6. For activities that involve public posting, operators should encourage children not to use their full names or screen names that correspond with their email address, but choose an alias (*e.g.,* "Bookworm," "Skater," etc.) or use first name, nickname, initials, etc.

7. Operators should not require a child to disclose more personal information than is reasonably necessary to participate in the online activity (*e.g.*, play a game, enter a contest, etc.).

8. Operators must obtain "verifiable parental consent" before they collect, use or disclose personal information to third parties,[10] except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.[11]

9. When an operator collects personal information only for its internal use and there is no disclosure of the information to a third party, the company may obtain parental consent through the use of email, coupled with some additional steps to provide assurance that the person providing the consent is the parent.

---

[9] The definition of "verifiable parental consent" in the Children's Online Privacy Protection Rule applies. See 16 CFR § 312.5.

[10] Third party means any person who is not:
(a) An operator with respect to the collection or maintenance of personal information on the website or online service; or
(b) A person who provides support for the internal operations of the website or online service and who does not use or disclose information protected under this part for any other purpose.

[11] Support for the internal operations of the website or online service means those activities necessary to:
(a)  maintain or analyze the functioning of the website or online service;
(b) perform network communications;
(c)  authenticate users of, or personalize the content on, the website or online service;
(d) serve contextual advertising on the website or online service or cap the frequency of advertising;
(e)  protect the security or integrity of the user, website, or online service;
(f)  ensure legal or regulatory compliance; or
(g)  fulfill a request of a child as permitted by these guidelines;

so long as the information collected for the activities listed in paragraphs (a)-(g) is not used or disclosed to contact a specific individual, including through behavioral advertising, to amass a profile on a specific individual, or for any other purpose.  Support for the internal operations also includes, e.g.: intellectual property protection, payment and delivery functions, spam protection, optimization, statistical reporting, or de-bugging.  See 78 Fed. Reg. 3981(January 17, 2013).

10. Exceptions to prior parental consent:

(a) Where the sole purpose of collecting the name or online contact information of the parent is to provide notice and obtain parental consent;

(b) Where the purpose of collecting a parent's online contact information is to provide voluntary notice to, and subsequently update the parent about, the child's participation in a website or online services that does not otherwise collect, use or disclose children's personal information;

(c) Where the sole purpose of collecting online contact information from a child is to respond directly on a one-time basis to a specific request from the child and the information is not used to re-contact the child or any other purpose, is not disclosed, and is deleted by the operator from its records promptly after responding to the child's request;

(d) Where an operator collects and retains online contact information to be able to respond directly more than once to a child's specific request (such as an email newsletter or contest) but will not use the information for any other purpose, the operator must directly notify the parent of the nature and intended uses of the information collected, and permit access to the information sufficient to allow a parent to remove or correct the information;

(e) Where the purpose of collecting a child's and a parent's name and online contact information is to protect the safety of a child, and where such information is not used or disclosed for any purpose unrelated to the child's safety;

(f) Where the purpose of collecting a child's name and online contact information is to:

(i) protect the security of integrity of its website or online service;

(ii) take precautions against liability;

(iii) respond to judicial process;

(iv) to the extent permitted under other provisions of law, to provide information to law enforcement agencies or for an investigation on a matter related to public safety; where such information is not used for any other purpose;

(g) Where an operator collects a persistent identifier and no other personal information and such identifier is used for the sole purpose of providing support for the internal operations of the website or online service;

(h) Where an operator covered under paragraph two (2) of the definition of website or online service directed to children in §312.2 of the COPPA Rule collects a persistent identifier and no other personal information from a user who affirmatively interacts with the operator and whose previous registration with that operator indicates that such user is not a child.

11. To respect the privacy of parents, operators should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

12. If an operator communicates with a child by email, there should be an opportunity with each mailing for the child or parent to choose by return email or hyperlink to discontinue

receiving mailings.

    **( b )   Age-Screening/Hyperlinks**

1. A website or online service that is directed to children under the criteria set forth in the definition of websites or online services directed to children in Section 312.2 (a) of the COPPA Rule, but that does not target children as its primary audience, shall not be deemed directed to children if it: i) does not collect personal information from any visitor prior to collecting age information; and (ii) prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provision of the COPPA Rule.

2. Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

3. Age-screening mechanisms should be used in conjunction with technology, *e.g.,* a session cookie, to help prevent underage children from going back and changing their age to circumvent age-screening.

4. A website or online service shall not be deemed directed to children solely because it refers or links to a commercial website or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.   Similarly, a website directed to children shall not be deemed in violation of these Guidelines by linking to a general audience website.

Copyright 1975, 2003, 2006, 2009 and 2014 Council of Better Business Bureaus, Inc. The name Children's Advertising Review Unit is a registered service mark of the Council of Better Business Bureaus, Inc.

# EXHIBIT 59

# New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act (COPPA): Majority express concerns about new marketing and data-collection practices

democraticmedia.org/content/new-survey-reveals-strong-support-updating-childrens-online-privacy-protection-act-coppa

By: Jeff Chester | Dec 6 2012

**FOR IMMEDIATE RELEASE**
**Dec. 6, 2012**

### New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act

*Majority express concerns about new marketing and data-collection practices such as behavioral profiling and mobile tracking*

**WASHINGTON, DC and SAN FRANCISCO** – Two leading nonprofit groups, the Center for Digital Democracy and Common Sense Media, today released the results of a new survey on public attitudes about children's online privacy. The study — conducted over a two-week period in November by Princeton Research Associates International (PSRAI) — polled more than 2,000 adults and found overwhelming support for the Children's Online Privacy Protection Act (COPPA), the law that requires parental consent before websites can collect personal information from children under the age of 13. The findings revealed strong support not only for the basic principles of the law, but also for several key proposed changes in the rules that would address a range of online business practices — including mobile marketing and behavioral profiling — that have emerged since the COPPA took effect more than a decade ago. The Federal Trade Commission is expected to announce a number of updates to the COPPA regulations in the coming weeks.

The majority of respondents in the survey (90%) expressed support for COPPA's basic requirement that online companies seeking to collect personal information from young children must first obtain permission from parents. In addition, the survey found significantly high levels of support for safeguards to protect children from many of the data collection and marketing practices that are frequently used to target them in today's digital media environment.

Respondents expressed disapproval of a number of techniques increasingly employed by many child-directed websites — 80% of adults were opposed to allowing advertisers to collect and use information about a child's activities online, even in cases where advertisers do not know the actual name and address of a child.

The survey also found that both parents and nonparents largely agree on many points:

91% of both parents and adults believe it is not okay for advertisers to collect information about a child's location from that child's mobile phone. 94% of parents and 91% of adults agree that advertisers should receive the parent's permission before putting tracking software on a child's computer.96% of parents and 94% of adults expressed disapproval when asked if it is "okay OK for a website to ask children for personal information about their friends." 91% of parents said they strongly disagree with the idea, as did 86% of adults.

Congress passed COPPA in 1998 with bipartisan support. The law established a set of safeguards for website operators targeting children under 13, and ensured that parents would play the key decision-making role in determining whether and how their children's personal information would be used in the online environment. The law was purposely designed to respond to changing technologies and business practices, and requires the Federal Trade Commission to conduct periodic reviews. A coalition of child advocacy, consumer, public health, and privacy groups has called on the FTC to update its COPPA rules to cover many of the techniques that marketers are using today, which include: collecting geolocation information from a child's mobile phone; targeting children and their friends through social networks and interactive games; and employing cookies, plug-ins, and other software to track young peoples' online behaviors. The FTC proposed changes to the rules last year, and has sought comments from a wide range of industry and public interest groups, but has yet to release its revised regulations.

"It is clear from these findings that the public supports strong action by the FTC to address the disturbing and widespread practices that threaten the privacy and safety of our nation's children," said Kathryn C. Montgomery, Ph.D, professor of communication at American University and one of the leaders of the campaign to pass COPPA during the 1990s. "Children should be able to reap the benefits of this new participatory media culture without being subjected to techniques that take advantage of their developmental vulnerabilities. We must ensure that the COPPA rules are updated effectively so that the generation of young people growing up online today will be treated fairly in the growing digital marketplace."

"The results of this poll should be a wake-up call to the industry that parents understand what's at stake for their kids in a digital world, and want the power to protect their children to remain in their hands," said James P. Steyer, CEO and founder, Common Sense Media. "The industry argues that updates to COPPA will stifle innovation and cost jobs, when in fact, they should respect the role of parents and use it build consumer trust. The FTC's recommended updates to COPPA represent the most important regulation of the past 10 years when it comes to protecting our kids' privacy. They will help ensure that parents have better information and tools, and that parents -- not third-party ad networks and data brokers -- get to decide when their children's personal information can -- and can't -- be collected, shared, and sold."

Additional information about the survey, including a summary of findings, full tables, and an infographic can be found at www.democraticmedia.org and www.commonsense.org/COPPA. To download the summary of findings directly, and a new Infographic on "Big Data, Little Kids," see attached.

**About Center for Digital Democracy**

The Center for Digital Democracy (CDD) is recognized as one of the leading consumer protection and privacy organizations in the United States. Since its founding in 2001 (and prior to that through its predecessor organization, the Center for Media Education), CDD has been at the forefront of research, public education, and advocacy on protecting consumers in the digital age. Its impact has been highly significant, fostering widespread debate, educating a spectrum of stakeholders, and creating a legacy of government and self-regulatory safeguards across a variety of Internet and digital media platforms. CDD's public education programs are focused on informing consumers, policy makers, and the press about contemporary digital marketing issues, including its impact on public health, children and youth, and financial services. For more information, visit www.democraticmedia.org.

**About Common Sense Media**

Common Sense Media is dedicated to improving the lives of kids and families by providing the trustworthy information, education, and independent voice they need to thrive in a world of media and technology. We exist because our kids are growing up in a culture that profoundly impacts their physical, social, and emotional well-being. We provide families with the advice and media reviews they need in order to make the best choices for their children. Through our education programs and policy efforts, Common Sense Media empowers parents, educators, and young people to become knowledgeable and responsible digital citizens. For more information, go to: www.commonsense.org.

# EXHIBIT 60

# Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission

FTC **ftc.gov/**news-events/press-releases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked

June 22, 2016

Singapore-based mobile advertising company InMobi will pay $950,000 in civil penalties and implement a comprehensive privacy program to settle Federal Trade Commission charges it deceptively tracked the locations of hundreds of millions of consumers – including children – without their knowledge or consent to serve them geo-targeted advertising.

The FTC alleges that InMobi mispresentedthat its advertising software would only track consumers' locations when they opted in and in a manner consistent with their device's privacy settings. According to the complaint, InMobi was actually tracking consumers' locations whether or not the apps using InMobi's software asked for consumers' permission to do so, and even when consumers had denied permission to access their location information.

The FTC alleges that InMobi, whose advertising network has reached more than one billion devices worldwide through thousands of popular apps, offers multiple forms of location-based advertising to its customers, including the ability to serve ads to consumers based on their current locations, locations they visit at certain times, and on their location over time.

"InMobi tracked the locations of hundreds of millions of consumers, including children, without their consent, in many cases totally ignoring consumers' express privacy preferences," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "This settlement ensures that InMobi will honor consumers' privacy choices in the future, and will be held accountable for keeping their privacy promises."

The complaint alleges that inMobi created a database built on information collected from consumers who allowed the company access to their geolocation information, combining that data with the wireless networks they were near to document the physical location of wireless networks themselves. InMobi then would use that database to infer the physical location of consumers based on the networks they were near, even when consumers had turned off location collection on their device.

The FTC alleges that InMobi also violated the Children's Online Privacy Protection Act (COPPA) by collecting this information from apps that were clearly directed at children, in spite of promising that it did not do so. The complaint noted that InMobi's software tracked location in thousands of child-directed apps with hundreds of millions of users without following the steps required by COPPA to get a parent or guardian's consent to collect and use a child's personal information.

Under the terms of its settlement with the FTC, InMobi is subject to a $4 million civil penalty, which is suspended to $950,000 based on the company's financial condition. In addition, the company will be required to delete all information it collected from children, and will be

prohibited from further violations of COPPA.

In addition, InMobi will be prohibited from collecting consumers' location information without their affirmative express consent for it to be collected, and will be required to honor consumers' location privacy settings. The company will also be required to delete the location information of consumers it collected without their consent and will be prohibited from further misrepresenting its privacy practices. The settlement also will require InMobi to institute a comprehensive privacy program that will be independently audited every two years for the next 20 years.

The Commission vote to authorize the staff to refer the complaint to the U.S. Department of Justice and to approve the proposed stipulated order was 3-0. The DOJ filed the complaint and proposed stipulated order on behalf of the Commission in U.S. District Court for the Northern District of California**.**

**NOTE:** The Commission authorizes the filing of a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. Stipulated orders have the force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about consumer topics and file a consumer complaint online or by calling 1-877-FTC-HELP (382-4357).  Like the FTC on , follow us on , read our blogs and subscribe to press releases for the latest FTC news and resources.

# EXHIBIT 61

# How to view your location history in Google Maps

androidcentral.com/how-view-your-location-history-google-maps

July 20, 2018

What's on your timeline? See where you've traveled with Google Maps.

Harish Jonnalagadda

20 Jul 2018



Google Maps has a nifty Timeline feature that lets you browse the places you've visited along with the routes traveled. The feature was overhauled in 2015, and Google has added the ability to collate images you've taken at a particular location, allowing you to get a better overview of your travels.

It certainly comes in handy if you're looking to see all the images you took at a particular location, or if you're trying to get a highlight of your weekly or monthly activity.

- How to view your location history in Google Maps
- How to disable location tracking

1. Launch **Google Maps**.
2. Tap the **more button** (three horizontal lines) on the top left corner.
3. Tap **your timeline**.
4. Tap the **calendar icon** to view a particular day.



5. Swipe left or right to **switch months**.
6. Tap a **date** to view your **location history**. You'll see the route traveled, along with the duration and length of the overall journey.



## How to disable location tracking

Timeline is certainly a useful feature if you're interested in looking at your previous travel data, but it also comes off as creepy (Google tracks *everything*). Fortunately, you can easily turn off location tracking in Maps.

1. Tap the **more button** (three horizontal lines) on the top left corner.
2. Tap **Settings**.
3. Tap **Personal content**.



4. Tap the field that says **Location History is on** under **Location Settings**.
5. Tap the **switch** next to each device for which you'd like to disable location tracking.



There's also the option to pause tracking for your account as a whole. To do so, toggle **Location History** to off, and select **OK** in the dialog box that follows.

That's all there is to it! I like the timeline feature as it gives me a detailed look at where I've been over the course of the month (and how much time I wasted being stuck in traffic).

What are your thoughts on the location history feature? Like it? Feel like it's an intrusion of your privacy? Sound off in the comments below.

**Updated July 2018:** This article was updated with the latest steps on how to view your location history within Google Maps.

# EXHIBIT 62

# The Google tracking feature you didn't know you'd switched on

**S** nakedsecurity.sophos.com/2017/10/03/the-google-tracking-feature-you-didnt-know-youd-switched-

October 3, 2017

03 Oct 2017



## Post navigation

Previous: How a Twitter troll was slain

Next: Google is making encryption mandatory for sites on 45 Top-Level Domains

by Matt Boddy

It's National Cybersecurity Awareness Month (NCSAM) and this week's theme is simple steps to online safety. Here's a simple step for you: see if you have Google's Your Timeline turned on and, if you do, switch it off.

## Google's Your Timeline

Using GPS, Wi-Fi and cell tower data, Google's  Your Timeline can paint a very accurate picture of your daily life. If you've got it switched on, it stores every step you take and everywhere you go.

And the thing is, lots of people seem to have it switched on without even realising, including me, and my favourite hats come in tinfoil.

I was surprised it had slipped past me so I started asking other people if they had it switched on too. More often than not, without making a conscious decision to let Google follow them around, they had.

In the end I decided to ask 20 people at random and write down the answers. The result of my short, non-scientific survey? 95% of the people I asked – a mixture of people in technical and non-technical roles – had location history, or its slightly less obnoxious iPhone equivalent Frequent Locations (Significant Locations in iOS 11), turned on, tracking their every step, without realising.

Check for yourself. On Android it's under Settings > Location > Google Location History.

DEEP LEARNING FOR DEEPER CYBERSECURITY

Watch Video

## It's your Timeline (and Google's)

So what exactly is Google Timeline? Google says: "Your timeline in Google Maps helps you find the places you've been and the routes you've travelled. Your timeline is private, so only you can see it."

Only you. And Google.

Google's reasoning for the timeline feature is that, if you want to remember the name of that bar or café you visited yesterday, last week, last month, last year… you can simply visit Your Timeline. The technology behind this is impressive, but the privacy and security implications are, for some, quite terrifying.

Where you go says everything about you: where you live, where you work, where you hang out, the places you visit, how often and at what time. If you're a frequent visitor to your local hospital's cancer clinic, Google knows. If you're having an affair, it's in there. If you're a courier moving large amounts of cash, that data is being shared over the internet and stored in a data centre somewhere. If you're in the military or the police it knows where you're stationed and, if you're moving, your direction of travel.

Even if the data were stored anonymously (and it isn't clear if it is or not) that would be cold comfort. Anonymous data has a way of being less anonymous than you think, and the more anonymous data you have, the easier it is to unmask the individuals involved.

## So what does Google know?

To discover what Google Timeline knows about me, and you, I removed my tinfoil hat and opted to let it store my location history again.

Here's a journey from Oxford to London by car (indicated by the dark blue line) that's been accurately tracked to the point of tagging me at a service station I visited en-route.



Once in densely populated South London, using the telephone masts, local Wi-Fi and my phone's GPS, Your Timeline accurately plotted my movements. The colour of the tracking goes from dark blue to light blue as I change speed from driving to walking.

After accurately tracking my taxi journey into Clapham, Google Timeline then has a go at tagging me in a restaurant, Café Sol. Google will use this data to add to publicly available information such as "Popular Times", shown for Café Sol below:



Google provides the following statement in its support documentation on the anonymity of this data:

> To determine popular times and visit duration, Google uses aggregated and anonymised data from users who have opted in to Google Location History.

My memories of the evening are mildly hazy, but Google Timeline can tell me exactly what I did and where I went.

I'm not too bothered about Google using my boozy night for helpful data research, but it isn't about one night. It's about every day and every night and the pattern of my daily life. It's about all this data being stored and accessible by… I don't know who, now and in the future.

Google will store this data for years, as you can see in my screenshot below.



So how did I, and almost all the people I asked at random, end up with Location History turned on?

The option appears when you set up Google Now. For me that happened after a factory reset. When you're busy clicking 'next', 'next', 'finish' and don't have two hours to spend reading everything on screen, it's easy to miss:



My tinfoil hat is back on now.

On Android 7 it was as simple as going to Settings > Location (under personal) > Google Location History and selecting 'off'. For comprehensive details on switching off and deleting your location history, go to Google's Manage or delete your Location History page.

Apple iPhones have a similar feature hidden deep within their settings. Go to Privacy > Location Services >System Services > Frequent Locations.

# EXHIBIT 63

# How to Disable Google Location History

**wikihow.com**/Disable-Google-Location-History

Tech Team
Verified

When you use some Google products like Google Search and Google Maps, Google collects your location information. This allows Google to better provide you with the most relevant search results based on your location and more personalized features in Google applications.

## Steps



1. **Go to Google Activity controls page.** Open myaccount.google.com/activitycontrols in your browser and sign in with your Google account.



2. **Navigate to "Location History" section.** You can see it under the **Web & App Activity** segment.



3. **Turn off the Location History.** Toggle off



the blue switch, right across **Location History.** Then a pop-up box will appear there.



4. **Confirm your changes.** Just click on the **PAUSE** button at bottom of the pop-up box.



5. **Done.** Note that this setting doesn't delete your previous location history. but you can delete your private location history data from Google maps timeline settings.

## Community Q&A

Search

Add New Question

Ask a Question

200 characters left

Include your email address to get a message when this question is answered.

Submit

- Already answered
- Not a question
- Bad question
- Other

## Tips

- In an Android phone, go to **Settings> Location> Google Location History** and turn of the Google Location History.
- Disabling Location History doesn't turn off Location Reporting or location services for your device.

## Warnings

Pausing Google Location History doesn't delete any previous activity.

## Sources and Citations

- https://support.google.com/accounts/answer/3118687
- https://myaccount.google.com/