**LIEFF CABRASER HEIMANN**
  **& BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN**
  **& BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Interim Co-Lead Class Counsel*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Rachel Johnson (SBN 331351)
rjohnson@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD<br><br>**DECLARATION OF MICHAEL W. SOBOL IN SUPPORT OF MOTION TO REOPEN DISCOVERY** |

I, Michael W. Sobol, declare and state as follows:

I am a member in good standing of the California State Bar, a partner in the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP, and Interim Co-Lead Class Counsel in these proceedings.  I submit this Declaration in support of Plaintiffs' Motion to Reopen Discovery.  I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.

1.     This litigation commenced in August 2018 and was consolidated before this Court on December 11, 2018.  *See* Dkt. 51.

2.     Plaintiffs' served their first discovery requests on April 24, 2019, and Google served Initial Disclosures on May 20, 2019.  True and correct copies of Plaintiffs' First Set of Requests for Production of Documents, Plaintiffs' First Set of Interrogatories, and Google's Initial Disclosures are attached hereto as **Exhibits 1**, **2**, and **3**, respectively.

3.     On June 4, 2019 and September 4, 2019, Google served objections and limited responses to Plaintiffs' First Set of Requests for Production and First Set of Interrogatories, the substance of which are contained within **Exhibit 4**.  Google would not produce responsive documents without a formal protective order, which was entered on December 9, 2019, following contentious negotiations that nearly required resolution of a discovery dispute.  *See* Dkt. 102, 112.

4.     On December 19, 2019, this Court dismissed Plaintiffs' Consolidated Amended Complaint with leave to amend.  *See* Dkt. 113.  On December 30, Google produced supplemental responses to two of Plaintiffs' interrogatories, and certain documents that its counsel stated had been collected prior to December 19.  A true and correct copy of Google's December 30, 2019 interrogatory responses is attached hereto as **Exhibit 4**.  A portion of these responses is redacted because it is the subject of Plaintiffs' pending Motion to Unseal.  *See* Dkt. 139.

5.     The Court entered a stipulated discovery stay on January 14, 2020, which Plaintiffs had agreed to as a condition for Google's agreement to extend the deadline for Plaintiffs to file their First Consolidated Amended Complaint (FAC) until the resolution of Plaintiffs' request for interlocutory review.  *See* Dkt. 118.  The Court denied Plaintiffs' request to certify the

1   dismissal order for interlocutory review on April 15, 2020, and Plaintiffs moved for

2   reconsideration on May 21, 2020.  *See* Dkts. 126, 129.

3         6.      On or around May 27, 2020, Plaintiffs' counsel became aware of a parallel

4   investigation into Google's location tracking practices undertaken by the Arizona Attorney

5   General ("AZAG") based on reporting in the Washington Post regarding a complaint the AZAG

6   filed that same day.  The complaint the AZAG filed, commencing the action *State of Arizona v.*

7   *Google LLC*, No. CV2020-006219 ("AZAG Action") was attached as Exhibit 32 to the Plaintiffs'

8   FAC (Dkt. 131-1).  It was heavily redacted.

9         7.      On May 27, 2020, this Court denied Plaintiffs' Motion for Reconsideration, and

10  Plaintiffs' filed their FAC on July 6, 2020.  *See* Dkts. 129, 131.  At the time Plaintiffs' filed their

11  FAC, the AZAG complaint remained very heavily redacted, with exhibits under seal.

12        8.      On September 25, 2020, I initiated a meet and confer with Google seeking its

13  consent to reopen discovery in this matter.  As of the time of this filing, counsel for Google has

14  not agreed.

15        9.      The AZAG has made certain materials filed in the AZAG Action available online,

16  at https://www.azag.gov/media/interest.  The following documents were downloaded from that

17  site.  The redactions in the exhibits below were present in the files as they appeared on that site.

18        10.     Attached hereto as **Exhibit 5** is a true and correct copy of Exhibit 209 to the

19  AZAG's Motion for Partial Summary Judgment filed in the AZAG Action, bearing Bates GOOG-

20  GLAZ-00057477 to GOOG-GLAZ-00057479.

21        11.     Attached hereto as **Exhibit 6** is a true and correct copy of Exhibit 202 to the

22  Motion for Partial Summary Judgment filed in the AZAG action, which states that it contains

23  Google's Consolidated Final Responses to the First, Second, and Third Civil Investigative

24  Demands in the AZAG action, accompanied by a cover letter dated February 21, 2020.

25        12.     Attached hereto as **Exhibit 7** is a true and correct copy of the AZAG's Notice of

26  Lodging Unredacted Complaint and Exhibits filed in the AZAG action, dated July 17, 2020.

27

28

2044413.2

CASE NO. 5:18-CV-05062-EJD
DECL. ISO MOTION TO REOPEN DISCOVERY

13.     Attached hereto as **Exhibit 8** is a true and correct copy of the Arizona Attorney General's Complaint for Injunctive and Other Relief, dated May 27, 2020, as released with fewer redactions on August 21, 2020.

14.     Attached hereto as **Exhibit 9** is a true and correct copy of the AZAG's Motion for Partial Summary Judgment filed in the AZAG action, dated August 25, 2020.

15.     Attached hereto as **Exhibit 10** is a true and correct copy of the AZAG's Separate Statement of Facts in Support of the AZAG's Motion for Partial Summary Judgment.

16.     Attached hereto as **Exhibit 11** is a true and correct copy of Exhibit 268 to the Motion for Partial Summary Judgment filed in the AZAG Action, bearing Bates GOOG-GLAZ-00078652 to GOOG-GLAZ-00078654.

17.     Attached hereto as **Exhibit 12** is a true and correct copy of Exhibit 236 to the Motion for Partial Summary Judgment filed in the AZAG Action, bearing Bates GOOG-GLAZ-00027379 to GOOG-GLAZ-00027384.

18.     Attached hereto as **Exhibit 13** is a true and correct copy of excerpts from Exhibit 19 to the Motion for Partial Summary Judgment filed in the AZAG Action.

19.     Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from Exhibit 18 to the Motion for Partial Summary Judgment filed in the AZAG Action.

20.     Attached hereto as **Exhibit 15** is a true and correct copy of Exhibit 20 to the Motion for Partial Summary Judgment filed in the AZAG Action, bearing Bates GOOG-GLAZ-00001521 to GOOG-GLAZ-00001524.

21.     Attached hereto as **Exhibit 16** is a true and correct copy of Exhibit 215 to the Motion for Partial Summary Judgment filed in the AZAG Action, bearing Bates GOOG-GLAZ-00163209 to GOOG-GLAZ-00163215.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30th day of September, 2020 at Brooklyn, New York.

_____
Michael W. Sobol

# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Interim Co-Lead Class Counsel*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Alex R. Straus (SBN 321366)
astraus@ahdootwolfson.com
Brad King (SBN 274399)
bking@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| IN RE GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD<br><br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUDCTION OF DOCUMENTS** |
|---|---|

1    PROPOUNDING PARTY:     Plaintiffs

2    RESPONDING PARTY:      Defendant Google, LLC

3    SET NUMBER:            ONE (1)

4
5          Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff requests that

6    Defendant produce for inspection and copying the documents and electronically stored

     information described herein, at the offices of Lieff, Cabraser, Heimann & Bernstein, LLP,
7
     275 Battery Street, 29th Floor, San Francisco, California, 94111, within 30 days of the service of
8
     these requests.  In accordance with Rule 34(b), Defendants shall provide written responses to the
9
     following requests and shall produce the requested documents as they are kept in the ordinary and
10
     usual course of business or shall organize and label the documents to correspond with the
11
     categories in this request.
12
                                      **DEFINITIONS**
13
14   (a)      **"Communication"** means the conveyance (in the form of facts, ideas, thoughts,

15             opinions, data, inquiries or otherwise) of information and includes, without limitation,

16             correspondence, memoranda, reports, presentations, face-to-face conversations, telephone

               conversations, text messages, instant messages, voice messages, negotiations, agreements,
17
               inquiries, understandings, meetings, letters, notes, telegrams, mail, email, exchanges of
18
               recorded information, and postings of any type.  The term "Communication" includes
19
               instances where one party disseminates information that the other party receives but does
20
               not respond to.
21
     (b)      **"Document(s)"** means all materials within the full scope of Fed. R. Civ. P. 34 including
22
               but not limited to:  all writings and recordings, including the originals, drafts and all non-
23
               identical copies, whether different from the original by reason of any notation made on
24
               such copies or otherwise (including but without limitation to, email and attachments,
25
               correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes,
26
               contracts, reports, studies, checks, statements, tags, labels, invoices, brochures,
27
               periodicals, receipts, returns, summaries, pamphlets, books, interoffice and intra-office
28

1    Communications, instant messages, chats, offers, notations of any sort of conversations,

2    working papers, applications, permits, file wrappers, indices, telephone calls, meetings or

3    printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications,

4    changes and amendments of any of the foregoing), graphic or aural representations of any

5    kind (including without limitation, photographs, charts, microfiche, microfilm, videotape,

6    recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical,

7    magnetic, optical or electric records or representations of any kind (including without

8    limitation, computer files and programs, tapes, cassettes, discs, recordings), including

9    Metadata.

10   (c)    **"ESI"** or **"Electronically Stored Information"** refers to information and Documents (as

11   defined within this section) within the full scope of Fed. R. Civ. P. 34—with all Metadata

12   intact—created, manipulated, communicated, stored, and best utilized in digital form, and

13   stored on Electronic Media.  Examples of ESI include e-mail, messages posted on

14   electronic message boards, forum postings, support tickets, videos, discussion boards,

15   Data, source code, websites, Microsoft Word files, Microsoft Excel files, and instant

16   messages.

17   (d)    **"Identify," with respect to Documents**, means to give, to the extent known, the (a) type

18   of Document; (b) general subject matter; (c) date of the Document; (d) author(s), (e)

19   addressee(s), and (f) recipient(s).

20   (e)    **"Identify," with respect to Persons**, means to give, to the extent known, the Person's full

21   name, present or last known address, and when referring to a natural person, additionally,

22   the present or last known place of employment. Once a Person has been identified in

23   accordance with this subparagraph, only the name of that Person need be listed in

24   response to subsequent discovery requesting the identification of that Person.

25   (f)    **"Including"** means "including but not limited to" and "including without limitation."

26   (g)    **"Relate(s)," "Related to"** or **"Relating to"** shall be construed to mean referring to,

27   reflecting, concerning, pertaining to or in any manner being connected with the matter

28   discussed, in whole or in part.

(h)    **"You," "Your,"** and **"Google"** shall mean Google, LLC, XXVI Holdings, Inc., and Alphabet, Inc., and any of its directors, officers, employees, partners, members, representatives, agents (including attorneys, accountants, consultants, investment advisors or bankers), and any other person purporting to act on its behalf.  In the case of business entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities, successor entities, divisions, departments, groups, acquired entities and/or related entities or any other entity acting or purporting to act on its behalf.

## INSTRUCTIONS

(a)    If You cannot respond to any request completely, respond to the extent possible. Make a reasonable and good-faith effort to obtain the information needed to respond fully to the request by inquiry to other persons. If You contend that You do not know or—after fully exercising due diligence—cannot determine the answer to any part of an interrogatory, You shall: (a) state that You do not know or cannot determine the remaining information; (b) describe the reason why You do not know or cannot determine the information; (c) describe the steps You took to attempt to determine the information; (d) provide the name and address of any person or entity that You believe might have that information; and (e) answer to the extent You do know the information.

(b)    If You object to any of these requests for production , or any definition or instruction incorporated therein, state the reasons for Your objection with specificity and answer the request for production to the extent it is not objectionable. The attorney making an objection shall sign that objection. If You file a timely objection to any portion of a request for production, definition, or instruction, respond to the remaining portion.

(c)    If You refuse to answer a request for production, in whole or part, for any reason, including but not limited to any claim of privilege, clearly describe the asserted privilege or grounds for refusing to answer with respect to the request for production. If any form of privilege, whether based on statute or otherwise, is claimed as a ground for not responding to any request for production, or any part thereof, each and every fact upon which the

privilege is based, including sufficient facts for the Court to make a full determination as to whether the claim of privilege is valid, shall be set forth in complete detail. Produce any purportedly privileged document containing non-privileged material and redact only the purportedly privileged portion. With respect to a document to which a privilege is being claimed, the following information at the minimum should be provided: (1) date; (2) author; (3) names and addresses of any persons who receive copies, if any; (4) title; (5) type of tangible thing, letter, memorandum, telegram, report, etc.; and (6) a description of the subject matter sufficient to determine whether the privilege is properly invoked (without revealing privileged information).

(d)    Documents produced in response to these requests for production shall be produced as they are kept in the regular course of business.

(e)    Your obligation to respond to these requests for production is ongoing. Except as otherwise provided, these requests for production shall be deemed to be continuing and any information or documents relating in any way to them that You acquire, which becomes known to You up to and including the time of trial, shall be furnished by You to Plaintiffs within a reasonable time after such information is acquired or becomes known. Similarly, any information or documents provided in response to these requests for production that is later found to be incomplete or incorrect, or to have become incomplete or incorrect because of changed circumstances should be completed or corrected by means of supplemental responses.

(f)    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope.

(g)    The use of the singular shall be deemed to include the plural; the use of masculine, feminine, or neutral genders shall include each gender, as appropriate in context; and the use of the gerund or other tense of a verb which is a defined term shall be construed to fit within that term's definition.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**  All Documents and communications between You and the Congress of the United States Relating to Your responses to the April 23, 2019 letter from the Committee on Energy and Commerce addressed to Mr. Sundar Pichai, attached hereto as **Exhibit A**.

**REQUEST FOR PRODUCTION NO. 2:**  All non-privileged Documents reviewed or relied upon in Your preparation of written responses to the April 23, 2019 letter from the Congress of the United States, Committee on Energy and Commerce, addressed to Mr. Sundar Pichai, attached hereto as **Exhibit A**.

**REQUEST FOR PRODUCTION NO. 3:**  Documents reflecting and/or Identifying which Persons participated in the preparation of Your responses to the April 23, 2019 letter from the Congress of the United States House of Representatives, Committee on Energy and Commerce, addressed to Mr. Sundar Pichai, attached hereto as **Exhibit A**.

**REQUEST FOR PRODUCTION NO. 4:**  All non-privileged Documents reviewed or relied upon in Your preparation of written responses to Plaintiffs' First Set of Interrogatories.

1     Dated:  April 24, 2019                    **LIEFF CABRASER HEIMAN & BERNSTEIN, LLP**

2

3                                               By: */s Michael W. Sobol*_____
                                                   Michael W. Sobol
4
                                                Michael W. Sobol (SBN 194857)
5                                               msobol@lchb.com
                                                Melissa Gardner (SBN 289096)
6                                               mgardner@lchb.com
                                                Michael Levin-Gesundheit (SBN 292930)
7                                               mlevin@lchb.com
                                                **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
8                                               275 Battery Street, 29th Floor
                                                San Francisco, CA  94111
9                                               Telephone:  415.956.1000
                                                Facsimile:  415.956.1008
10
                                                Nicholas Diamand (*pro hac vice*)
11                                              ndiamand@lchb.com
                                                **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
12                                              250 Hudson Street, 8th Floor
                                                New York, NY  10013
13                                              Telephone:  212.355.9500
                                                Facsimile:  212.355.9592
14
                                                Tina Wolfson (SBN 174806)
15                                              twolfson@ahdootwolfson.com
                                                Alex R. Straus (SBN 321366)
16                                              astraus@ahdootwolfson.com
                                                Brad King (SBN 274399)
17                                              bking@ahdootwolfson.com
                                                **AHDOOT & WOLFSON, PC**
18                                              10728 Lindbrook Drive
                                                Los Angeles, CA 90024
19                                              Telephone: 310.474.9111
                                                Facsimile: 310.474.8585
20
                                                *Interim Co-Lead Class Counsel*
21

22

23

24

25

26

27

28

CASE NO. 5:18-CV-05062-EJD
PLAINTIFFS' FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS

# Exhibit A

FRANK PALLONE, JR., NEW JERSEY

CHAIRMAN

GREG WALDEN, OREGON

RANKING MEMBER

ONE HUNDRED SIXTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

April 23, 2019

Mr. Sundar Pichai
Chief Executive Officer
Google
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Pichai:

We are writing in response to concerning reports about a massive database of precise location information on hundreds of millions of consumers known inside Google as "Sensorvault."[1]  According to recent reports, Google tracks and stores precise location information on a huge volume of consumers, including practically every consumer with an Android mobile device, in some cases storing information dating back to 2009.[2]

The potential ramifications for consumer privacy are far reaching and concerning when examining the purposes for the Sensorvault database and how precise location information could be shared with third parties.

First, according to the reports, Google collects precise location information in numerous ways including from the location history function on Android phones, Google searches, and Google apps that have location enabled.[3]  Second, precise location information is reportedly collected even when people are not making calls or using apps, which enables Google to track the "whole pattern of life" of an individual.[4]  Finally, Google reportedly never destroys any of the precise location information it captures in the Sensorvault database, and has therefore

---

[1] *Tracking Phones, Google Is a Dragnet for the Police*, New York Times (Apr. 13, 2019).

[2] *Google's Sensorvault Is a Boon for Law Enforcement. This Is How It Works*, New York Times (Apr. 13, 2019).

[3] *Id.*

[4] *See* note 1.

Mr. Sundar Pichai
April 23, 2019
Page 2

compiled an extraordinarily detailed picture of the movements and whereabouts of a vast number of consumers stretching back more than a decade.[5]

As part of the Committee's ongoing commitment to protect the privacy of the American people and to understand the benefits and risks of various data collection and use practices, we would like to know the purposes for which Google maintains the Sensorvault database and the extent to which Google shares precise location information from this database with third parties. To that end, please provide answers to the following questions by May 7, 2019:

1. What information does Google store in the Sensorvault database and for what purposes does Google use this information?  Please describe each use in detail.  If the types of information in the database or the purposes for which such information is used have changed over time, explain any such changes in chronological order.

2. Please describe which affiliates/subsidiaries of Alphabet have access to or use the data or analytics derived from the data in the Sensorvault database.

3. Does Google maintain other databases of precise location information?  If so, how does the Sensorvault database differ from other such databases and how is the data from such databases used?

4. Who is able to access the information in the Sensorvault database?  Include in your response both the number of Google employees with access to the Sensorvault database and the roles and responsibilities of any persons with access.

5. What are the sources from which Google collects the information maintained in the Sensorvault database and any other database identified in response to question 3? Specifically, describe any Google services, mobile applications, devices, or any other means through which Google obtains the information.

   a. If consumers are required to "opt in" to the collection of precise location information, describe with specificity how consumers "opt in" to the service, and the notice provided to such consumers about the purposes for which Google collects the information.  If any such "opt in" has changed over time, describe those changes.

   b. If consumers may "opt out" of the collection of precise location information, describe with specificity how consumers "opt out" and the notice provided to such consumers about the purposes for which Google collects the information.  If any such "opt out" has changed over time, describe those changes.

6. To the extent that a consumer has requested that precise location data not be shared with Google, through opt-outs or other mechanisms, do Android phones continue to collect

---

[5] *Id.*

Mr. Sundar Pichai
April 23, 2019
Page 3

precise location data on the device or store such precise location information on the device?  If so, to the extent that the consumer subsequently allows location data to be shared with Google, is that formerly stored precise location information transmitted to Google?  Under what other circumstances would the device continue to transmit precise location information to Google when a consumer has requested that precise location information not be shared with Google?

7.  How accurate is the precise location information stored in the Sensorvault database? Include in your response both the accuracy of the precise location information and the accuracy of attributing such information to a single individual.

8.  What controls, if any, does Google provide to consumers to limit or revoke Google's access to the information stored in the Sensorvault database?  Does Google provide consumers a means to delete data stored in Sensorvault? If so, describe in detail how consumers may do so.

9.  What is Google's retention policy with respect to precise location information stored in the Sensorvault database?  For what purpose(s) does Google maintain precise location information going back to 2009?

10. Does Google share, sell, license, or otherwise disclose precise location information (including deidentified data) from the Sensorvault database with any third parties other than law enforcement?  If so, identify the types of businesses receiving such information and the purpose for disclosing any such information.  If the data is deidentified, provide a description of how it is deidentified.

Mr. Sundar Pichai
April 23, 2019
Page 4

     In addition to providing the written responses requested, please make arrangements to provide Committee staff with a briefing on these topics to occur no later than May 10, 2019. Thank you for your attention.  If you have any questions, please contact Lisa Goldman of the Majority Staff at (202) 225-2927 and Melissa Froelich of the Minority Staff at (202)-226-3641.

                     Sincerely,

Frank Pallone, Jr.
Chairman

Greg Walden
Ranking Member

Jan Schakowsky
Chair
Subcommittee on Consumer
   Protection and Commerce

Cathy McMorris Rodgers
Ranking Member
Subcommittee on Consumer
   Protection and Commerce

1

**LIEFF CABRASER HEIMANN**
   **& BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Alex R. Straus (SBN 321366)
astraus@ahdootwolfson.com
Brad King (SBN 274399)
bking@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

**LIEFF CABRASER HEIMANN**
   **& BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Interim Co-Lead Class Counsel*

2

3

4

5

6

7

8

9

10

11

12 | **UNITED STATES DISTRICT COURT**

13 | **NORTHERN DISTRICT OF CALIFORNIA**

14 | **SAN JOSE DIVISION**

15

16

17 | IN RE GOOGLE LOCATION HISTORY LITIGATION

Case No. 5:18-cv-05062-EJD

**PROOF OF SERVICE BY ELECTRONIC MAIL AND U.S. MAIL**

18

19

20       I am a citizen of the United States and employed in San Francisco County, California.  I

21 am over the age of eighteen years and not a party to the within-entitled action.  My business

22 address is 275 Battery Street, 29th Floor, San Francisco, California  94111-3339.

23       I am also readily familiar with this firm's practice for collection and processing of

24 correspondence for mailing with the United States Postal Service.  Following ordinary business

25 practices, an envelope was sealed and placed for collection and mailing on this date, and would,

26 in the ordinary course of business, be deposited with the United States Postal Service on this date.

27       On April 24, 2019, I caused to be served copies of the following document(s):

28       **1.      PLAINTIFF'S FIRST SET OF REQUESTS FOR**

1        **PRODUCTION OF DOCUMENTS;** and

2        **2.      PROOF OF SERVICE BY ELECTRONIC MAIL AND U.S.
                   MAIL**

3
on the following party in this action through its respective counsel:

4
         Benedict Y. Hur (bhur@keker.com)
5        Benjamin Berkowitz (bberkowitz@keker.com)
         Christina Lee (clee@keker.com)
6        Kathryn E. Bowen (kbowen@keker.com)
         Thomas Edward Gorman (tgorman@keker.com)
7        KEKER, VAN NEST & PETERS LLP
         633 Battery Street
8        San Francisco, CA 94111-1809

9        Additionally, on the same date, I attached PDF copies of the documents listed above to an

10    email and sent that email to the email addresses listed above.

11       Executed on April 24, 2019, at San Francisco, California.

12

13
                                              By:  __/s Michael Levin-Gesundheit_____
14                                                   Michael Levin-Gesundheit

15

16

17    1717689.2

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE BY EMAIL AND U.S. MAIL
                                                                 CASE NO. 5:18-CV-05062-EJD

# EXHIBIT 2

**LIEFF CABRASER HEIMANN
      & BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Alex R. Straus (SBN 321366)
astraus@ahdootwolfson.com
Brad King (SBN 274399)
bking@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

**LIEFF CABRASER HEIMANN
      & BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Interim Co-Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD<br><br>**PLAINTIFFS' FIRST SET OF INTERROGATORIES** |

1    PROPOUNDING PARTY:    Plaintiffs

2    RESPONDING PARTY:     Defendant Google, LLC

3    SET NUMBER:           ONE (1)

4            Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff requests that

5    Defendant respond to the following Interrogatories to the offices of Lieff, Cabraser, Heimann &

6    Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco, California, 94111, within thirty

7    (30) days of service.

8                                      **<u>DEFINITIONS</u>**

9    (a)    **"Action"** means the case captioned *In Re Google Location History Litigation*; Case No.

10          5:18-cv-05062-EJD (N.D. Cal.).

11   (b)    **"Architecture"** or **"Technology"** refers to each piece of Google infrastructure—

12          including but not limited to source code, software, applications, databases, configuration

13          tables, servers, hardware, and/or networks—utilized to implement or otherwise facilitate

14          any of Your services.

15   (c)    **"Communication"** means the conveyance (in the form of facts, ideas, thoughts, opinions,

16          data, inquiries or otherwise) of information and includes, without limitation,

17          correspondence, memoranda, reports, presentations, face-to-face conversations, telephone

18          conversations, text messages, instant messages, voice messages, negotiations, agreements,

19          inquiries, understandings, meetings, letters, notes, telegrams, mail, email, exchanges of

20          recorded information, and postings of any type.  The term "Communication" includes

21          instances where one party disseminates information that the other party receives but does

22          not respond to.

23   (d)    **"Data"** means any representation, such as characters or analog quantities, to which

24          meaning is or might be assigned, as well as any representation of information in a

25          formalized manner suitable for communication, interpretation, or processing.

26   (e)    **"Document(s)"** means all materials within the full scope of Fed. R. Civ. P. 34 including

27          but not limited to:  all writings and recordings, including the originals, drafts and all non-

28          identical copies, whether different from the original by reason of any notation made on

1     such copies or otherwise (including but without limitation to, email and attachments,

2     correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes,

3     contracts, reports, studies, checks, statements, tags, labels, invoices, brochures,

4     periodicals, receipts, returns, summaries, pamphlets, books, interoffice and intra-office

5     Communications, instant messages, chats, offers, notations of any sort of conversations,

6     working papers, applications, permits, file wrappers, indices, telephone calls, meetings or

7     printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications,

8     changes and amendments of any of the foregoing), graphic or aural representations of any

9     kind (including without limitation, photographs, charts, microfiche, microfilm, videotape,

10    recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical,

11    magnetic, optical or electric records or representations of any kind (including without

12    limitation, computer files and programs, tapes, cassettes, discs, recordings), including

13    Metadata.

14    (f)    **"ESI"** or **"Electronically Stored Information"** refers to information and Documents (as

15        defined within this section) within the full scope of Fed. R. Civ. P. 34—with all Metadata

16        intact—created, manipulated, communicated, stored, and best utilized in digital form, and

17        stored on Electronic Media.  Examples of ESI include e-mail, messages posted on

18        electronic message boards, forum postings, support tickets, videos, discussion boards,

19        Data, source code, websites, Microsoft Word files, Microsoft Excel files, and instant

20        messages.

21    (g)    **"User"** refers to any person who uses the Android operating system or other mobile

22        device equipped with Google software.

23    (h)    **"Identify," with respect to Documents**, means to give, to the extent known, the (a) type

24        of Document; (b) general subject matter; (c) date of the Document; (d) author(s), (e)

25        addressee(s), and (f) recipient(s).

26    (i)    **"Identify," with respect to Persons**, means to give, to the extent known, the Person's full

27        name, present or last known address, and when referring to a natural person, additionally,

28        the present or last known place of employment. Once a Person has been identified in

1    accordance with this subparagraph, only the name of that Person need be listed in

2    response to subsequent discovery requesting the identification of that Person.

3    (j)    **"Including"** means "including but not limited to" and "including without limitation."

4    (k)    **"Location Information"** means any record of Users' location and/or movement Google

5    collects or has collected from Users' mobile devices, regardless of the manner of the

6    collection, transmission, or storage of the data or what Google calls the particular Service,

7    system, functionality, offering, or otherwise for the collection, transmission, or storage of

8    location and/or movement information (*e.g.*, Location History, Web & App Activity,

9    Sensorvault, Latitude. etc.).

10   (l)    **"Person"** means any natural person or any business, legal or governmental entity or

11   association.

12   (m)    **"Plaintiffs"** refer to the named plaintiffs in this Action.

13   (n)    **"Process"** refers to a series of discrete steps, ordered and undertaken to achieve a specific

14   goal or set of goals that facilitate Google's operation.

15   (o)    **"Relate(s)," "Related to"** or **"Relating to"** shall be construed to mean referring to,

16   reflecting, concerning, pertaining to or in any manner being connected with the matter

17   discussed, in whole or in part.

18   (p)    **"Profile"** means any Data, collected by You from any source and associated by You with

19   specific Persons (including any computers, browsers, apps, mobile devices or other

20   Internet-enabled devices of such Persons).

21   (q)    **"You," "Your,"** and **"Google"** shall mean Google, LLC, XXVI Holdings, Inc., and

22   Alphabet, Inc., and any of its directors, officers, employees, partners, members,

23   representatives, agents (including attorneys, accountants, consultants, investment advisors

24   or bankers), and any other person purporting to act on its behalf.  In the case of business

25   entities, these defined terms include parents, subsidiaries, affiliates, predecessor entities,

26   successor entities, divisions, departments, groups, acquired entities and/or related entities

27   or any other entity acting or purporting to act on its behalf.

28

(r)    **"Your Services"** includes all businesses owned, operated, or otherwise controlled by Google during the Relevant Time Period.

## **RULES OF CONSTRUCTION**

1.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the  discovery  request  all responses that might otherwise be construed to be outside of its scope.

2.    "Any," "all," and "each" shall be construed as any, all and each.

3.    The singular form of a noun or pronoun includes the plural form and vice versa.

4.    The use of any tense of any verb shall also include within its meaning all other tenses of that verb.

5.    A term or word defined herein is meant to include both the lower and upper case reference to such term or word.

6.    Any headings which appear in the Interrogatories section have been inserted for the purpose of convenience and ready reference. They do not purport to, and are not intended to, define, limit, or extend the scope or intent of the Interrogatories to which they pertain.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  Identify the dates upon which Google first proposed (internally) and first disclosed (externally) options, settings, preferences, or other tools of any kind purporting to allow Users to choose whether Google stores and/or collects Location Information.

**INTERROGATORY NO. 2:**  Identify the date upon which Google first retained any Location Information from any User whose pertinent Google option, setting, preference, or otherwise was set, either by choice or default, to indicate that Google should not retain Location Information,. The response to this Interrogatory should include the first date upon which Google retained Location Information despite a "Location History" setting in the "off" position.

**INTERROGATORY NO. 3:**  With the exception of law enforcement in response to a court order, identify all third parties (including other Alphabet companies) to whom Google has disclosed any Location Information and indicate whether Google sold this information or provided it free of charge.

1  **INTERROGATORY NO. 4:** Identify by name, purpose, sequence, and physical location each

2  Process and/or piece of Architecture involved in the creation, development, transmission,

3  maintenance and/or storage of Location Information.

4  **INTERROGATORY NO. 5:** Identify all ways in which Google or other Alphabet companies use

5  and/or analyze Location Information.  The response to this Interrogatory should include an

6  explanation of any commercial, educational, research and development, or other use of the data.

7  **INTERROGATORY NO. 6:** Identify when and under what circumstances, if any, Google has

8  purged or destroyed Location Information it has collected from Users.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 5:18-CV-05062-EJD
PLAINTIFFS' FIRST SET OF INTERROGATORIES

1   Dated: April 24, 2019                    **LIEFF CABRASER HEIMAN & BERNSTEIN, LLP**

2

3                                            By: */s Michael W. Sobol*
                                                 Michael W. Sobol
4
                                             Michael W. Sobol (SBN 194857)
5                                            msobol@lchb.com
                                             Melissa Gardner (SBN 289096)
6                                            mgardner@lchb.com
                                             Michael Levin-Gesundheit (SBN 292930)
7                                            mlevin@lchb.com
                                             **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
8                                            275 Battery Street, 29th Floor
                                             San Francisco, CA  94111
9                                            Telephone:  415.956.1000
                                             Facsimile:  415.956.1008
10
                                             Nicholas Diamand (*pro hac vice*)
11                                           ndiamand@lchb.com
                                             **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
12                                           250 Hudson Street, 8th Floor
                                             New York, NY  10013
13                                           Telephone:  212.355.9500
                                             Facsimile:  212.355.9592
14
                                             Tina Wolfson (SBN 174806)
15                                           twolfson@ahdootwolfson.com
                                             Alex R. Straus (SBN 321366)
16                                           astraus@ahdootwolfson.com
                                             Brad King (SBN 274399)
17                                           bking@ahdootwolfson.com
                                             **AHDOOT & WOLFSON, PC**
18                                           10728 Lindbrook Drive
                                             Los Angeles, CA 90024
19                                           Telephone: 310.474.9111
                                             Facsimile: 310.474.8585
20
                                             *Interim Co-Lead Class Counsel*
21

22

23

24

25

26

27

28

CASE NO. 5:18-CV-05062-EJD
PLAINTIFFS' FIRST SET OF INTERROGATORIES

1
2
3
4
5
6

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Alex R. Straus (SBN 321366)
astraus@ahdootwolfson.com
Brad King (SBN 274399)
bking@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

7
8
9
10

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

11

*Interim Co-Lead Class Counsel*

12
13
14

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

15
16
17
18
19

IN RE GOOGLE LOCATION HISTORY
LITIGATION

Case No. 5:18-cv-05062-EJD

**PROOF OF SERVICE BY ELECTRONIC
MAIL AND U.S. MAIL**

20
21
22

        I am a citizen of the United States and employed in San Francisco County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 275 Battery Street, 29th Floor, San Francisco, California  94111-3339.

23
24
25
26

        I am also readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Following ordinary business practices, an envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

27

        On April 24, 2019, I caused to be served copies of the following document(s):

28

        1.        **PLAINTIFF'S FIRST SET OF INTERROGATORIES;** and

PROOF OF SERVICE BY EMAIL AND U.S. MAIL
CASE NO. 5:18-CV-05062-EJD

1

**2.      PROOF OF SERVICE BY ELECTRONIC MAIL AND U.S.
            MAIL**

2

3
on the following party in this action through its respective counsel:

4
        Benedict Y. Hur (bhur@keker.com)
        Benjamin Berkowitz (bberkowitz@keker.com)
        Christina Lee (clee@keker.com)

5
        Kathryn E. Bowen (kbowen@keker.com)
        Thomas Edward Gorman (tgorman@keker.com)

6
        KEKER, VAN NEST & PETERS LLP
        633 Battery Street

7
        San Francisco, CA 94111-1809

8
        Additionally, on the same date, I attached PDF copies of the documents listed above to an

9
email and sent that email to the email addresses listed above.

10
        Executed on April 24, 2019, at San Francisco, California.

11

12
                                        By:   __/s Michael Levin-Gesundheit_____

13
                                              Michael Levin-Gesundheit

14

15

16

17
1718632.3

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE BY EMAIL AND U.S. MAIL
                                                     CASE NO. 5:18-CV-05062-EJD

# EXHIBIT 3

KEKER, VAN NEST & PETERS LLP
BENEDICT Y. HUR - # 224018
bhur@keker.com
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
THOMAS E. GORMAN - # 279409
tgorman@keker.com
KATHRYN BOWEN - # 312649
kbowen@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:  GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD<br><br>**DEFENDANT'S INITIAL DISCLOSURES**<br><br><br>Judge:       Hon. Edward J. Davila<br><br>Date Filed: November 2, 2018<br><br>Trial Date:  None Set |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant Google LLC hereby provides the following initial disclosures to Plaintiffs.  These disclosures are made based on information that is reasonably available to Defendant at this time and at this stage of the proceedings.  By making these disclosures, Defendant does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this lawsuit.  Rather, these disclosures represent a good-faith effort by Defendant to identify information currently available to it that falls within the scope of Rule 26(a)(1).  Accordingly, these disclosures do not include information that may be used solely for impeachment purposes.  In addition, discovery and further investigation and analysis may yield other information.

At this time, the pleadings remain unsettled.  To the extent that this case moves beyond the pleading stage, and as additional information becomes available, Defendant reserves the right to supplement, revise, correct, clarify, or otherwise amend these disclosures and/or to use documents not described herein.  Defendant also reserves the right to use any documents or information disclosed or provided by any other party or person for any purpose to the fullest extent permitted by law, and Defendant reserves the right to rely upon the individuals identified below for subjects other than those identified in these disclosures.

These disclosures are made without waiver of, and without prejudice to, any objections Defendant may have regarding the subject matter of these disclosures or any documents or individuals identified herein.  Defendant expressly reserves all objections, including but not limited to relevance, attorney-client privilege, work-product protection, any other applicable privilege or protection against discovery under federal or state law, undue burden, materiality, overbreadth, proportionality, and admissibility.  Furthermore, these disclosures are made with the expectation that a protective order, or some other limitation on the production and use of the documents and information identified herein, will be agreed upon by the parties and entered by the Court.

All of the disclosures set forth below are made subject to the above qualifications.

///

1326460

1

## I.     PERSONS LIKELY TO HAVE DISCOVERABLE INFORMATION

After a good-faith inquiry and based on the information reasonably available at this time, Defendant believes that the following individuals (aside from the parties themselves) may have discoverable information that Defendant may use to support its claims or defenses.  In making these disclosures, Defendant does not waive its right to object, pursuant to any applicable Federal or Local Rule, to the deposition or trial testimony of any of the individuals listed below.

| Name | Contact | Knowledge |
|------|---------|-----------|
| David Monsees | Contact through counsel at Keker, Van Nest & Peters LLP 633 Battery Street San Francisco, CA 94111 (415) 391-5400 | Information regarding Google's collection of user location information, terms of service and privacy policies. |
| Marlo McGriff | Contact through counsel at Keker, Van Nest & Peters LLP 633 Battery Street San Francisco, CA 94111 (415) 391-5400 | Information regarding Google's collection of user location information, terms of service and privacy policies. |

## II.     DESCRIPTION OF DOCUMENTS

Based upon the information reasonably available at this time, Defendant identifies the following categories of documents in its possession, custody, or control that it may use to support its claims or defenses.  These disclosures do not include expert material that may be developed, which will be disclosed pursuant to the Federal Rules of Civil Procedure and the Court's scheduling order.  This disclosure does not constitute an admission as to the relevance or admissibility of the identified materials or a waiver of any attorney-client privilege, work-product protection, or any other applicable protection or immunity from discovery.  Because discovery is just beginning and Defendant's search for documents that it may use to support its defenses is ongoing, Defendant reserves its right to identify additional documents as discovery proceeds. Defendant will produce copies of and/or, depending on the volume of materials that Plaintiffs request to review, will proffer access to these documents and things at a mutually agreeable time and location subject to the provisions of any protective orders and the Court's other orders in this

1326460

action concerning discovery, including the discovery of electronically stored information ("ESI").

The categories are:

1.  Documents concerning Google's Terms of Service and Privacy Policy.

2.  Documents concerning Google's policies and practices regarding Location History and Web & App Activity settings.

3.  Documents concerning Google's disclosures regarding collection of certain user location information.

The foregoing documents are located at Google LLC and/or Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, are publicly available, and/or, on information and belief, are already in the possession of Plaintiffs.

## III.    COMPUTATION OF DAMAGES

Defendant does not claim damages against Plaintiffs at this time, but reserves its rights to do so, and to supplement these disclosures, as additional information becomes known.

## IV.    INSURANCE

Defendant is investigating whether any insurance policy may be applicable to Plaintiffs' asserted claims and will produce any applicable insurance agreement once the Court has approved of a protective order in this case.  Defendant reserves its rights to supplement this information if additional information later becomes known.

In providing the above initial disclosures, Defendant does not waive any objections, defenses or applicable privileges.  Defendant will supplement these disclosures to the extent required by the Federal Rules of Civil Procedure and the Local Rules of the Court.

Dated:  May 20, 2019                                KEKER, VAN NEST & PETERS LLP

                                                        By:     */s/ Benedict Y. Hur*
                                                                BENEDICT Y. HUR
                                                                BENJAMIN BERKOWITZ
                                                                THOMAS E. GORMAN
                                                                KATHRYN BOWEN

                                                                Attorneys for Defendant GOOGLE LLC

1326460

1

PROOF OF SERVICE

2

3

4

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

5

On May 20, 2019, I served the following document(s):

6

**DEFENDANT'S INITIAL DISCLOSURES**

7

☑   by regular **UNITED STATES MAIL** by placing Copy in a sealed envelope addressed as

8

shown below. I am readily familiar with the practice of Keker, Van Nest & Peters LLP for collection and processing of correspondence for mailing. According to that practice, items

9

are deposited with the United States Postal Service at San Francisco, California on that same day with postage thereon fully prepaid. I am aware that, on motion of the party

10

served, service is presumed invalid if the postal cancellation date or the postage meter date is more than one day after the date of deposit for mailing stated in this affidavit.

11

12

☑   by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission completed

13

without error.

14

Tina Wolfson                                    *Interim Co-Load Class Counsel*
Alex R. Straus

15

Brad King

16

AHDOOT & WOLFSON, PC
10728 Lindbrook Drive

17

Los Angeles, CA 90024
twolfson@ahdootwolfson.com

18

astraus@ahdootwolfson.com
bking@ahdootwolfson.com

19

20

Michael W. Sobol                                *Interim Co-Load Class Counsel*
Melissa Gardner

21

Michael Levin-Gesundheit

22

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

23

275 Battery Street, 29th Floor
San Francisco, CA 94111

24

msobol@lchb.com
mgardner@lchb.com

25

mlevin@lchb.com

26

27

28

1326460

1  | Nicholas Diamand                    *Interim Co-Load Class Counsel*
2  | LIEFF CABRASER HEIMANN
   | & BERNSTEIN, LLP
3  | 250 Hudson Street, 8th Floor
   | New York, NY 10013
4  | ndiamand@lchb.com

5  | Executed on May 20, 2019, at San Francisco, California.  I declare under penalty of perjury under
6  | the laws of the State of California that the above is true and correct.

7

8  | Dawn Curran

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1326460

# EXHIBIT 4

1    KEKER, VAN NEST & PETERS LLP
      BENJAMIN BERKOWITZ - # 244441
2    bberkowitz@keker.com
      THOMAS E. GORMAN - # 279409
3    tgorman@keker.com
      CHRISTOPHER S. SUN - # 308945
4    csun@keker.com
      CHRISTINA LEE - # 314339
5    clee@keker.com
      633 Battery Street
6    San Francisco, CA 94111-1809
      Telephone:    415 391 5400
7    Facsimile:    415 397 7188

8    Attorneys for Defendant GOOGLE LLC

9

                UNITED STATES DISTRICT COURT

10

            NORTHERN DISTRICT OF CALIFORNIA

11

                  SAN JOSE DIVISION

12

| | |
|---|---|
| IN RE:  GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD |
| | **DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| | Date Filed:  November 2, 2018 |
| | Trial Date:  None Set |
| | **Contains information designated CONFIDENTIAL under Protective Order** |

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

PROPOUNDING PARTY:   Plaintiffs

RESPONDING PARTY:   Defendant GOOGLE LLC

SET:   ONE (Nos. 1-6)

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Rule 33-1 of the Local Rules of the United States District Court for the Northern District of California ("Local Rules"), Defendant Google LLC ("Google") hereby provides this supplemental response to Plaintiffs' First Set of Interrogatories (Nos. 3-4) dated April 24, 2019, as follows.

## **GENERAL STATEMENT AND OBJECTIONS**

These responses and objections are made solely for the purpose of and in relation to this matter.  Google has not completed its investigation, discovery, analysis, legal research, and preparation for trial in this matter.  The responses herein are based only upon the information and documentation that is presently available and known to Google and which has been identified as containing potentially relevant information.  It is possible that further investigation, discovery, analysis, legal research, and/or preparation may result in the ascertainment of additional documentation, or provide additional meaning to currently known factual conclusions and legal contentions, all of which may result in the modification of these objections and responses. Accordingly, Google reserves the right to amend and/or supplement its responses and objections and to make any additional objections that may become apparent.  By this statement, however, Google does not agree to or adopt any duty to supplement beyond those set forth in the Federal Rule of Civil Procedure, the Local Rules, or any applicable rule or order.

The following general objections apply to every interrogatory as propounded by Plaintiffs, and are incorporated into each of the following specific responses by reference as if set forth in full therein.

1.     Plaintiffs are not entitled to discovery about Google's general practices regarding data storage and collection, including the databases in which Google allegedly stores location information and those persons with access to these databases.  That information is not relevant or

1   probative of whether Plaintiffs consented to the collection of location information or whether any

2   such collection could be actionable under Plaintiffs' asserted claims.

3        2.       Google objects to each and every interrogatory to the extent that it fails to specify

4   any relevant temporal limitations.  Unless otherwise specified, Google will limit its responses to

5   the time period relevant to Plaintiffs' claims and alleged use of Android devices or operating

6   systems.

7        3.       Google objects to the interrogatories and accompanying definitions and

8   instructions to the extent that they seek information protected from disclosure by the attorney-

9   client privilege, the work-product doctrine, the common-interest privilege, the right to privacy

10  embodied in the U.S. Constitution, or any other applicable privilege, protection, or immunity.

11  Any inadvertent disclosure of such information shall not be deemed a waiver of any such

12  privilege or protection.

13       4.       Google objects to the interrogatories and accompanying definitions and

14  instructions to the extent that they seek confidential, proprietary, and/or trade-secret information.

15  Google will provide responses containing such information only subject to the terms of the

16  protective order entered by the Court in this action on December 9, 2019.  Google reserves the

17  right to seek additional protections beyond those provided in the protective order to the extent

18  appropriate for any particularly sensitive information, and to object to such information's

19  disclosure altogether if, for example, the information's relevance to this litigation is substantially

20  outweighed by the risk of harm posed by its disclosure in light of the protections available.

21       5.       Google objects to the interrogatories and accompanying definitions and

22  instructions to the extent that they seek information that is subject to confidentiality or non-

23  disclosure agreements with other parties.  Google shall disclose such information only to the

24  extent that Google is permitted to do so under its agreements with such parties and only after

25  those parties receive appropriate notice and are provided with a reasonable opportunity to raise

26  objections, and the Court resolves any such objections.

27                      **OBJECTIONS TO DEFINITIONS**

28       1.       Google objects to each and every paragraph of the section labeled "Definitions" to

2

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

the extent the definitions purportedly set forth therein would (a) expand the definition of a term beyond its ordinary usage in the English language; (b) create undue burden for Google when propounding its responses and objections to Plaintiffs' Interrogatories; and/or (c) impose obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other rules or orders of the Court.  Google will respond to the interrogatories consistent with the ordinary English meaning of the words and its obligations under the law.

2.      Google objects to the purported definitions of "You," "Your," and "Google" to the extent such definitions refer to XXVI Holdings, Inc. and Alphabet, Inc., which are not parties to this proceeding.  Google similarly objects to these terms to the extent that they seek information about any other entities, trade names, or subsidiaries' operating businesses owned or controlled by Google, or that Google is owned or controlled by, who are not parties to this proceeding.  Google responds on behalf of itself only and no other person or entities.  Google will construe these terms to mean Google LLC.  Google also objects to these terms as vague, unintelligible, inconsistent with ordinary English usage, overbroad, unduly burdensome, and imposing obligations that exceed those imposed by the rules of discovery.

3.      Google objects to the definitions of "communication" and "document(s)" to the extent that such definitions render any interrogatory overly broad or unduly burdensome, seeks information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence, or imposes obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other applicable rules or orders.  Google further objects to these definitions to the extent that they render any interrogatory overly broad and unduly burdensome by requiring: (i) restoration of documents or data that are not retained in the ordinary course of business and that reside exclusively on extant backup tapes of electronic media; (ii) recovery of documents or data that have been deleted or are fragmented; (iii) collection of documents or data

that reside exclusively on mobile devices such as, without limitation, smartphones, tablets, personal digital assistants, and hand-held wireless devices; and (iv) collection of documents or data that reside exclusively on systems not maintained, controlled, or sanctioned for corporate use by Defendant.

4.      Google objects to Plaintiffs' definition of "ESI" or "Electronically Stored Information" to the extent it conflicts with or extends beyond any Court order regarding appropriate and mutually applicable procedures for requesting and producing ESI and related metadata.

5.      Google objects to Plaintiffs' definition of "User" to the extent that such definitions render any interrogatory overly broad or unduly burdensome, seeks information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence, or imposes obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other applicable rules or orders.  Google will construe "User" to mean an individual who uses an Android or iOS device to access Google's web services and applications (e.g. Gmail, Maps, Search, etc.) while logged in to the individual's Google account.

6.      Google objects to Plaintiffs' definition of "Location Information" to the extent that such definitions render any interrogatory overly broad or unduly burdensome, seeks information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence, or imposes obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other applicable rules or orders.  In addition, Google objects that Plaintiffs' definition is unduly confusing to the extent it purports to apply unexpected and atextual meanings (the plain meaning of "location information" does not mean "movement information" or require collection from a mobile device, or use of Google software, or creation of a record in Google's data systems).  Google will construe these interrogatories to request information on "Google Stored Geolocation

4
DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

Data," to mean location information that is determined using inputs from a User's mobile-device sensors (e.g. GPS, Wi-Fi, Bluetooth) saved to a user's Google Account (as distinguished from storage in a User's device or systems or in non-Google devices or systems).

7.      Google objects to Plaintiffs' definition of "Architecture" and "Technology" to the extent that such definitions render any interrogatory overly broad or unduly burdensome, seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence, or imposes obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other applicable rules or orders.

8.      Google objects to Plaintiffs' definition of "Process" to the extent that such definition renders any interrogatory overly broad or unduly burdensome, seeks information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence, or imposes obligations and demands on Google beyond those contemplated by the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, this Court's Standing Order, or any other applicable rules or orders.

**SUPPLEMENTAL RESPONSES AND OBJECTION TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify the dates upon which Google first proposed (internally) and first disclosed (externally) options, settings, preferences, or other tools of any kind purporting to allow Users to choose whether Google stores and/or collects Location Information.

**RESPONSE TO INTERROGATORY NO. 1 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and potentially seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it

incorporates Plaintiffs' objectionable definitions of "User" and "Location Information" and responds below consistent with its definition of "User" and "Location Information" described in its general objections above.  Google further objects to this interrogatory to the extent that it seeks the disclosure of confidential information.  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  To the extent Plaintiffs are seeking the approximate launch date of the Location History setting, that setting was first introduced in 2014.  Google's investigation is continuing and Google may amend this response at a later date.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (September 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and potentially seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definitions of "User" and "Location Information" and responds below consistent with its definition of "User" and "Location Information" described in its general objections above.  Google further objects to this interrogatory to the extent that it seeks the disclosure of confidential information.  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  To the extent Plaintiffs are seeking the approximate launch date of Location History as an independent account setting, that setting was first introduced in 2014.  Prior to 2014, a location history functionality was introduced as a feature of Latitude in approximately November 2009.  Google's investigation is continuing and Google may amend this response at a later date.

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

**INTERROGATORY NO. 2:**

Identify the date upon which Google first retained any Location Information from any User whose pertinent Google option, setting, preference, or otherwise was set, either by choice or default, to indicate that Google should not retain Location Information.  The response to this Interrogatory should include the first date upon which Google retained Location Information despite a "Location History" setting in the "off" position.

**RESPONSE TO INTERROGATORY NO. 2 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definitions of "User" and "Location Information."  Google further objects to this interrogatory to the extent that it seeks the disclosure of confidential information.  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Google respects users' settings selections.  The user location information that Google collects and stores depends on a number of factors, including the user's device, the product or service being used and an individual user's Google Account settings.  The Location History and Web & App Activity settings are distinct Google Account settings that a user can choose to enable or disable at any time.  When Location History and Web & App Activity are disabled, they do not provide user location information to Google.  These Google Account settings do not affect or control device settings, which vary based on the specific device and which Google may not create or control.

The Location History setting was first introduced in 2014.  Location History is a distinct product Google provides to Google Account users that saves a private map of where the user goes with his/her signed-in devices, even when the user is not using a Google service.  Location

7

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

History is off by default and users must opt-in to enable it.  Account holders can disable Location

History at any time.  Pausing Location History does not disable a user's Web & App Activity

setting.

Web & App Activity is a distinct Google Account setting that stores a user's Google

activity data, including user location information, to My Activity (https://myactivity.google.com)

in his or her Google account.  If a user has enabled the Web & App Activity setting, the user has

enabled Web & App Activity to collect location information.  The fact that a user has not

separately opted-in to Location History, a separate Google product, does not affect his or her

ability to enable or disable Web & App Activity at any time.

Google discloses how it collects user data, including location information, in its Privacy

Policy (available at https://policies.google.com/privacy), on the Location Data page (available at

https://policies.google.com/technologies/location-data), and within the Location History and Web

& App Activity settings.  Google's investigation is continuing and Google may amend this

response at a later date.

**INTERROGATORY NO. 3:**

With the exception of law enforcement in response to a court order, identify all third

parties (including other Alphabet companies) to whom Google has disclosed any Location

Information and indicate whether Google sold this information or provided it free of charge.

**RESPONSE TO INTERROGATORY NO. 3 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and

disproportionate to the needs of the case because it is not limited to information relating to the

allegations of Plaintiffs' complaint and potentially seeks information relating to products not at

issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to

a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it

incorporates Plaintiffs' objectionable definition of "Location Information."  Google further

objects to this interrogatory to the extent that it seeks the disclosure of confidential information.

Google further objects to responding because the Court has not yet entered a confidentiality order

in this case.  Google further objects to this interrogatory to the extent it seeks information

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Google will respond after a suitable confidentiality order is in place.  Google's investigation is continuing and Google may amend this response at a later date.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3 (December 17, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and potentially seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definition of "Location Information."  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Except in response to a court order or other lawful process, Google does not disclose to third parties individual users' Google Stored Geolocation Data.  Google's investigation is continuing and Google may amend this response at a later date.

**INTERROGATORY NO. 4:**

Identify by name, purpose, sequence, and physical location each Process and/or piece of Architecture involved in the creation, development, transmission, maintenance and/or storage of Location Information.

**RESPONSE TO INTERROGATORY NO. 4 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates

9
DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

1   Plaintiffs' objectionable definitions of "Process," "Architecture," and "Location Information."

2   Google further objects to this interrogatory to the extent that it seeks the disclosure of trade

3   secrets or other confidential research, development, or commercial information.  Google further

4   objects to responding because the Court has not yet entered a confidentiality order in this case.

5   Google further objects to this interrogatory to the extent it seeks information protected by the

6   attorney-client privilege or attorney work product doctrine, or any applicable privilege or

7   protection.

8          Subject to and without waiving these objections, Google states the following.  Google will

9   respond after a suitable confidentiality order is in place.  Google's investigation is continuing and

10  Google may amend this response at a later date.

11  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4 (December 17, 2019)**

12  **[Response contains information designated CONFIDENTIAL under Protective Order]:**

Sealed Text - Subject to Pending Motion to Unseal

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

Sealed Text - Subject to Pending Motion to Unseal

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Google's investigation is continuing and Google may amend this response at a later date.

2    **INTERROGATORY NO. 5:**

3    Identify all ways in which Google or other Alphabet companies use and/or analyze

4    Location Information.  The response to this Interrogatory should include an explanation of any

5    commercial, educational, research and development, or other use of the data.

6    **RESPONSE TO INTERROGATORY NO. 5 (June 4, 2019):**

7    Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and

8    disproportionate to the needs of the case because it is not limited to information relating to the

9    allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this

10   case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame

11   relevant to this litigation.  Google further objects to this interrogatory to the extent it seeks

12   information relating to "other Alphabet companies" and any other entities who are not parties to

13   this proceeding.  Google further objects to this interrogatory to the extent it incorporates

14   Plaintiffs' objectionable definition of "Location Information."  Google further objects to this

15   interrogatory to the extent that it seeks the disclosure of trade secrets or other confidential

16   research, development, or commercial information.  Google further objects to this interrogatory to

17   the extent it seeks information protected by the attorney-client privilege or attorney work product

18   doctrine, or any applicable privilege or protection.

19   Subject to and without waiving these objections, Google states the following.  Google's

20   Privacy Policy and user instructional videos describe the information that Google collects, why it

21   collects that information, and how Google keeps that information secure.  The Privacy Policy

22   explains to users how Google uses location information in a section entitled, "Information Google

23   collects," with a subsection titled, "Your location information."  As Google's Privacy Policy

24   states, Google "collect[s] information about your location when you use our services, which helps

25   us offer features like driving directions for your weekend getaway or showtimes for movies

26   playing near you."

27   For example, location information can be used to provide a range of functionality,

28   including ensuring that Google products and services use the correct default language based on a

12

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

user's location, providing search results that relate to a relevant place, or providing optional account features, such as current traffic predictions.  Google also uses user location information collected when Location History and Web & App Activity are enabled to provide advertising services to signed-in users.  Google does not use information from Location History and Web & App Activity to serve personalized ads if a signed-in user has opted out of ads personalization features.  Google's investigation is continuing and Google may amend this response at a later date.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (September 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it seeks information relating to "other Alphabet companies" and any other entities who are not parties to this proceeding.  Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definition of "Location Information."  Google further objects to this interrogatory to the extent that it seeks the disclosure of trade secrets or other confidential research, development, or commercial information.  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Google's Privacy Policy and user instructional videos describe the information that Google collects, why it collects that information, and how Google keeps that information secure.  The Privacy Policy explains to users how Google uses location information in a section entitled, "Information Google collects," with a subsection titled, "Your location information."  As Google's Privacy Policy states, Google "collect[s] information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you."

Consistent with the Google Privacy Policy, Google may use data associated with a user's Google Account—including Location History data, if available—to provide services, to improve the quality of services and to develop new ones, to improve security by protecting against fraud and abuse, and to conduct analytics and measurement to understand how Google's services are being used. For example, location information can be used to provide a range of functionality, including ensuring that Google products and services use the correct default language based on a user's location, providing search results that relate to a relevant place, or providing optional account features, such as current traffic predictions. For users who choose to opt in to Location History, Google also uses location information to display to users the places they have been in Google Maps Timeline. Google also uses user location information collected when Location History and Web & App Activity are enabled to provide advertising services to signed-in users. Google does not use information from Location History and Web & App Activity to serve personalized ads if a signed-in user has opted out of ads personalization features. Google does not share, sell, license, or otherwise disclose precise location information pertaining to specific users. Google's investigation is continuing and Google may amend this response at a later date.

**INTERROGATORY NO. 6:**

Identify when and under what circumstances, if any, Google has purged or destroyed Location Information it has collected from Users.

**RESPONSE TO INTERROGATORY NO. 6 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this case. Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation. Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definition of "Location Information." Google further objects to this interrogatory to the extent that it seeks the disclosure of trade secrets or other confidential research, development, or commercial information. Google further objects to responding because the Court has not yet entered a confidentiality order in this case. Google further objects to this

1   interrogatory to the extent it seeks information protected by the attorney-client privilege or

2   attorney work product doctrine, or any applicable privilege or protection.

3          Subject to and without waiving these objections, Google responds as follows.  Pursuant to

4   Federal Rule of Civil Procedure 33(d), Google will produce documents in response to this

5   interrogatory.  Google's investigation is continuing and Google may amend this response at a

6   later date.

7
          Dated:  December 17, 2019                    KEKER, VAN NEST & PETERS LLP
8

9                                          By:     /s/ Benjamin Berkowitz

10                                                 BENJAMIN BERKOWITZ
                                                   THOMAS E. GORMAN
11                                                 CHRISTOPHER S. SUN
                                                   CHRISTINA LEE
12
                                                   Attorneys for Defendant GOOGLE LLC
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1360655

**VERIFICATION**

I, Marlo McGriff, declare:

I am a Product Manager at Google LLC, and I have been authorized to make this verification on its behalf.

I have read Google's Responses and Supplemental Responses to Plaintiffs' First Set of Interrogatories, dated April 24, 2019, and know the contents thereof. I declare that, based on reasonable inquiry, the facts set forth therein are correct and true to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Mountain View, California, on this  20  day of December 2019.

_____

MARLO McGRIFF

16

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made.  I am over the age of eighteen years and not a party to the within action.  My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On December 30, 2019, I served the following document(s):

**DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

☑   by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail to GLH-leadplaintiffs@ahdootwolfson.com a true and correct copy scanned into an electronic file in Adobe "pdf" format.  The transmission was reported as complete and without error.

| | |
|---|---|
| Tina Wolfson | *Interim Co-Lead Class Counsel* |
| Brad King | |
| AHDOOT & WOLFSON, PC | |
| 10728 Lindbrook Drive | |
| Los Angeles, CA 90024 | |
| | |
| Michael W. Sobol | *Interim Co-Lead Class Counsel* |
| Melissa Gardner | |
| Michael Levin-Gesundheit | |
| LIEFF CABRASER HEIMANN | |
| & BERNSTEIN, LLP | |
| 275 Battery Street, 29th Floor | |
| San Francisco, CA 94111 | |
| | |
| Nicholas Diamand | *Interim Co-Lead Class Counsel* |
| LIEFF CABRASER HEIMANN | |
| & BERNSTEIN, LLP | |
| 250 Hudson Street, 8th Floor | |
| New York, NY 10013 | |

Executed on December 30, 2019, at San Francisco, California.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

*Elizabeth Myrddin*

Elizabeth Myrddin

16

# EXHIBIT 5

Exhibit 209



**From:**
**To:**
**Sent:**      Mon, 06 Feb 2017 21:02:51 +0000
**Subject:**   Re: user location product excellence
**Cc:**

On Mon, Feb 6, 2017 at 08:53 ███████████████ wrote:

--

On 2 February 2017 at 20:00, ████████████████ wrote:

On Thu, Feb 2, 2017 at 1:56 PM ████████████████ wrote:

hey ████, I'll go ahead and schedule a 1:1 to get some guidance as to how to package all of this discussion in one item that's presentable to ████
To be clear - Platform Excellence, as I initially conceived of it, is not a Critical User Journey. It's a client-facing excellence for ████████████████ org is in the same boat, so to speak. I think I'll follow that track separately from what the CUJs that ████ is our task force is looking at. (unless you guys think we should have a Platform Excellence as an entry in that list and focus on internal "users" a la Geo as a Platform). I didn't get the sense that the task force is particularly passionate about platforms.

I have the same sense. I'm not sure if I have very good ideas about platform excellence either. ████████████████████████████████

That said, we have Location as a product umbrella that includes Location History, ████████ and a bunch of other stuff that's super messy. And it's a Critical User Journey to make sense

out of this mess. This is what I'd like to pursue as part of the task force (and I need help from ▇▇▇▇▇▇ por favor :) ).

▇▇

▇▇

On Thu, Feb 2, 2017 at 8:55 AM, ▇▇▇▇▇▇▇▇▇▇▇▇ wrote:

▇▇, regarding your last point, what do you feel we should put together as a vehicle for persuasion to the PE task force?

Should it be questions, answers/proposal, or a sad story about our current state?

On Thu, Feb 2, 2017 at 08:52 ▇▇▇▇▇▇▇▇ wrote:

Very good points. Thanks for carring about it!

I'm adding ▇▇ and ▇▇ who have been helping build a robust PE story around user location.

Also, take a look at ▇▇▇▇ - work in progress, trying to rein in the overall mess that we have with regards to data collection, consent, and storage.

I hope we could land on ▇▇ top 5 as "make user location work and make it simple".

On Thu, Feb 2, 2017 at 08:32 ▇▇▇▇▇▇▇▇ wrote:

I wrote this note on the main thread with ▇▇

"User location issues. I have trouble framing exactly the CUJ here. I believe users mostly expect that Google knows their precise location when they are using GMM or searching from a mobile device. Yet we often don't know where they are. How can we provide a good location for every user who wants it? How can we be clear and transparent when we don't know precisely where they are? How can we do a great job of respecting people's privacy when they don't want to share their location. Tests: This one feels pretty broad. In fact there's a team in local that has been working across 3 PAs to make progress on the issue."

I think these issues are kind of related to your platform excellence ideas. As I think about it:
- Users expect we know where they are right now almost all of the time.
- Do users with significant privacy concerns understand what data we are saving? Do they know how to control when we store location information?

GOOG-GLAZ-00057478

- Can we have a foreground only model? Lots of users don't care about location history.
- Do users understand how their apps location usage connects to system-settings or resource
    usage?

Perhaps we should talk about this 1:1 and see if we can figure out how to be most persuasive in
    the larger task force.



GOOG-GLAZ-00057479

# EXHIBIT 6

Exhibit 202



2901 North Central Avenue
Suite 2000
Phoenix, AZ 85012-2788

+1.602.351.8000
+1.602.648.7000
PerkinsCoie.com

February 21, 2020

Jean-Jacques Cabou
JCabou@perkinscoie.com
D.   +1.602.351.8003
F.   +1.602.648.7003

**VIA E-MAIL BEAU.ROYSDEN@AZAG.GOV**

Brunn (Beau) Roysden III
Chief, Appeals & Constitutional Litigation Division
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004

**Re:    Consolidated Final Responses to the First, Second, and Third Civil Investigative Demands**

Dear Beau:

We write in further response to the Civil Investigative Demands (CIDs) by the Attorney General's Office (AGO). Below we provide a comprehensive document listing Google's final responses to the First, Second, and Third CIDs. This response represents several hundred hours of collective work by Google.  Google believes that it fully satisfies its obligations with respect to the First, Second, and Third CIDs.  To the extent the AGO disagrees, Google requests an in-person, meet-and-confer discussion in the very near future, perhaps in conjunction with one of the several upcoming EUOs at which we will be together.

This letter is not intended to and does not waive any applicable privileges or protections, including any attorney-client, work product, or other privileges or constitutional protections. Should any privilege or protection apply to the information provided to you, such disclosure was inadvertent and was not intended to constitute a waiver of such privilege or protection. In such an instance, we respectfully request the return of such material to our firm pursuant to our agreement. By responding here, or otherwise, Google does not waive any of its objections, and Google specifically reserves its right to raise, at any time, any substantive or procedural objections it may have.

Finally, we also request that this response, and all correspondence regarding the CIDs, be afforded confidential status pursuant to the Confidentiality Agreement in this matter, the Consumer Fraud Act, A.R.S. § 44-1525 et seq., and the Arizona Public Records Law, A.R.S. § 39-121 et seq.

Sincerely,

**CONFIDENTIAL**
147291338.1

Jean-Jacques Cabou
JC:jm

**CONFIDENTIAL**
147291338.1

## INTRODUCTION AND RESERVATION OF RIGHTS

Google provides the below responses and information to respond to the discovery demands by the AGO and its outside counsel. As stated previously, including in Google's August 26, 2019 letter, if, notwithstanding Google's efforts to comply with the AGO's discovery demands, an enforcement petition or judicial complaint of any kind is brought against Google, it reserves the right to assert any claim, defense, or argument it may have.

**CONFIDENTIAL**
147291338.1

## GOOGLE'S RESPONSES TO THE FIRST CID

**I.      DEMANDS FOR INFORMATION**

### Demands for Information Regarding User Location Tracking

**DEMAND FOR INFORMATION NO. 1**
**Explain the types of data Google collects from which a user's location can be determined.**

INITIAL RESPONSE (April 17, 2019): The user location information that Google may collect depends on a number of factors. As Google explains in its Privacy Policy (available at https://policies.google.com/privacy#infocollect), user location information includes information from inputs such as search queries and other information the user chooses to provide to Google (e.g., destination address for driving directions), users' IP addresses, device sensors (as explained further below in Response to DFI No. 2), and device signals including GPS, information cellular networks provide to a device, information from nearby Wi-Fi networks, and information from nearby Bluetooth devices. Location information can be used to provide a range of functionality, including ensuring that Google products and services use the correct default language based on a user's location, providing search results that relate to a relevant place, or providing optional account features, such as current traffic predictions.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 2**
**Explain how user location data is collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): As we explain in our Privacy Policy and above in response to Demand for Information No. 1, the user location information that Google collects depends on a number of factors, including the product or service being used and an individual user's settings. As described in Google's Privacy Policy and public documentation, when users interact with Google products and services, including when certain Google Account features and settings are enabled, location information may be collected. Further, this location information may be characterized as providing implicit or explicit information about a user's location.

4

**CONFIDENTIAL**
147291338.1

Implicit user location information does not tell Google where a user's device is located, but through user inputs, Google may infer that a user is either interested in a place or that the user might be at a place. An example of implicit user location information would be a user inputting a search query for a particular place. For example, if a user conducts a Google Search for "Eiffel Tower" Google may infer that the user may like to see information for places near Paris, and Google can then use that inference to provide localized recommendations about those places.

When users use or interact with certain Google products and services, their devices may send explicit user location information to enable Google to provide those products and services. Explicit user location information contains information about where a device is located and comprises the location information types described below. Some Google products and services, such as turn-by-turn navigation in Google Maps for mobile, require explicit device location. For these products and services, users must turn on device-based settings that can be used to derive precise location.

The source and nature of the explicit user location types that Google collects are described below as well as in the Google Privacy Policy:

- **GPS**

GPS is a radio navigation system that is relatively precise. It works by using radio waves between satellites and a receiver inside a device to geolocate the device. The device's GPS receiver uses data from the satellite signals to triangulate where the device is and what time it is.

- **Device sensors**

Built-in sensors on devices measure motion, orientation, and various environmental conditions. The Android OS supports a number of these different sensor types, which vary from device to device. These sensors are used to provide a variety of functionality to Android OS developers—such as the ability to measure device movement or positioning to support motion-based games, or to report a compass bearing for a travel application.

Android OS application developers, including Google, can use accelerometers, gravity sensors, gyroscopes, rotational vector sensors, barometers, orientation sensors, and magnetometers to more precisely determine a device's location. For example, Google uses the accelerometer readings to help determine the device's orientation and direction, the gyrometer helps determine if a user is turning, and the barometer can help determine the user's elevation.

- **Cellular Network Information**

Depending on the type of network to which the device is connected, Google may collect the tower-broadcasted latitude and longitude of the cell tower from which the device is receiving service.

5

**CONFIDENTIAL**
147291338.1

- **Wi-Fi & Bluetooth Scanning**

These settings (on a user's device) allow apps and services to scan for publicly available information from nearby devices (for example, Wi-Fi access points or Bluetooth beacons). These settings allow the user's device to scan for nearby networks or other devices, even when Wi-Fi or Bluetooth connectivity settings are disabled on a user's device.

- **IP Address**

IP address information is another type of information that Google collects, stores, and uses, as explained in Google's Privacy Policy. IP addresses are required for devices to be able to connect to one another through the Internet and are necessary for online services to function. Because IP addresses are usually assigned in geographic blocks, they may be used to provide an estimate of the location from which a device is connecting to the Internet. Inferring location based on an IP address alone can be quite inaccurate. Nonetheless, Google may use IP addresses when other more precise location information may be unavailable or in connection with available user location information.

Google may need to roughly estimate a user's location by using an IP address, even when particular device and Google Account settings affecting other user location information are disabled. For example, it is important for Google to approximate the location of its users to comply with certain legal requirements, such as restrictions on advertising for gambling services, which differ by jurisdiction. Google may also collect, store, and use user location information to help detect fraud or other suspicious activity on a user's account. For example, IP address information may enable users to determine when their Google Accounts have been compromised by unusual activity. Users can review the dates and times on which their Google Accounts have been accessed, as well as the IP address and general location from which these accesses occurred.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it, including in answering DFI No. 7, below. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Additionally, Google made three witnesses available for examinations under oath, who were prepared to speak about how user location information is collected in connection with Android and Google

6

Accounts. Further, as we mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about how user location information is collected in connection with Google-authored apps and Google search through a web browser.

Furthermore, in its April 17, 2019 response, Google comprehensively answered how it collects location information. In response to Demand for Information No. 2, Google described GPS, device sensors, IP Addresses and scanning for Wi-Fi, Bluetooth, and cellular network information. Moreover, in its response to Demand for Information No. 7, Google provided additional explanations about location information collection via Google Account (including Location History, Web & App Activity, and Google Location Sharing) and device settings, including the Device Location Setting, Google Location Accuracy (formerly known as Google Location Services), and Usage & Diagnostics. Google also explained that the user location information that Google collects depends on a number of factors, including the product or service being used and an individual user's settings. In its June 20, 2019 supplemental response, Google asserted that "it ha[d] fully responded" and said "[i]f there are follow-up questions regarding this response" to "please let us know."

Your January 17, 2020 letter says that "Google's response does not mention products that the AGO now knows are involved in user location data collection, such as the FLP (Fused Location Provider) or ULR (User Location Reporting). *See, e.g.,* ▮▮▮ EUO Tr. at 66:1–8; ▮▮▮ EUO Tr. at 68:11–69:18." Your letter reflects a misunderstanding of relevant facts. First, Fused Location Provider does not collect location information. It "can provide estimated location received from Google Location Services." *See, e.g.,* ▮▮▮ EUO Tr. at 60:21–23. Google described Google Location Services (now known as Google Location Accuracy) in its written responses, including as early as April 17, 2019. Second, User Location Reporting is tied to the Google Location History Product, which Google described in multiple Demands for Information, including, for example, Demands No. 4–8, 11, 12, 15, 17, and 18. Google specifically explained in its responses, including on April 17 and September 4, 2019, that "users can also opt out a particular device from collecting and reporting user location to Location History."

**DEMAND FOR INFORMATION NO. 3**
**Describe the user location data collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts, including the precision of the data and the frequency with which the data is collected.**

INITIAL RESPONSE (April 17, 2019): We describe the location information that Google collects in response to Demand for Information No. 2 above. The frequency with which location information is collected depends on a number of factors, including how often the user is interacting with Google products and services, the product or service being used, and an individual user's settings. For example, if Web & App Activity is enabled for a user's Account, the frequency of collection will

7

depend on the user's web activity or other interactions with Google products and services (e.g., finding a place in Maps).

The degree of precision of location information is also described in response to Demand for Information No. 2. As we explain above, user location inputs may be characterized as providing implicit or explicit information about a user's location. Implicit user location information does not tell Google where a user's device is located, but through user input allows Google to infer that a user is either interested in a place or that the user might be at a place. Explicit user location information contains information about where a device is located, and enables Google to provide its products and services to users.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Specifically, Google's April 17, 2019 response to this Demand explained that Google described the degree of precision of location information in response to Demand for Information No. 2. There, Google addressed precision of GPS, IP Address, device sensors, implicit location information, and Google Maps location information.

Google also produced multiple informative documents on the topic of the precision of location information. For example:

- GOOG-GLAZ-00044520 - GOOG-GLAZ-00044770: Discusses the precision of numerous kinds of information from inputs including Wi-Fi, GPS, Compass, and magnetometers.
- GOOG-GLAZ-00173091 - GOOG-GLAZ-00173105: Discusses the precision of location in the context of indoor navigation.
- GOOG-GLAZ-00171989 - GOOG-GLAZ-00171995: Discusses the precision of location in the context of indoor navigation.
- GOOG-GLAZ-00171906 - GOOG-GLAZ-00171908: Discusses the coarsening of location across Google and the ███████████████████

8

**CONFIDENTIAL**
147291338.1

- GOOG-GLAZ-00090592 - GOOG-GLAZ-00090600: Discusses ███████████ in logging" and its application.
- GOOG-GLAZ-00159799 - GOOG-GLAZ-00159801: Discusses coarsening non-device location in search.
- GOOG-GLAZ-00141961 - GOOG-GLAZ-00141986: User Location Newsletter.
- GOOG-GLAZ-00096793 - GOOG-GLAZ-00096823: Entitled "Precise IP."

Additionally, Google made three witnesses available for examinations under oath, who were prepared to speak about the user location information collected in connection with Android and Google Accounts, including the precision of the information and the frequency with which the information is collected. Further, as we mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about the user location information collected in connection with Google-authored apps and Google search through a web browser, including the precision of the information and the frequency with which the information is collected.

Your January 17, 2020 letter alleges that "Google's 6/20/2019 response is devoid of any substantive information." As an example, you cite the topic of changes to the precision of WAA location information in 2014/2015 or early 2019. See ████████ EUO Tr. at 185:19–187:11, 193:10–194:19, 195:11–19, 197:25–204:22. Your citation to Google's testimony is proof that Google made knowledgeable witnesses available on the topic. Further, on September 4, 2019, Google responded to all of the AGO's Demands for Information and Requests for Production on this topic. Google's responses and productions specifically addressed the topics of the storage of device-based location as part of Web & App Activity in 2014/2015, and its 2019 changes to coarsen Web & App Activity location information. This includes Google's production of relevant launch reports and other documents in response to Requests for Production No. 7 and 18 and Google's written responses to Demands for Information No. 22, 23, and 25 in the AGO's Third CID.

Furthermore, for example, for Web & App Activity before 2015, device location was coarsened to approximately a neighborhood-sized area with a sufficient number of unique users (e.g., 1,000). When precise location was added in 2015, the location provided by the user's device was stored, which could be a precise lat/lon. In 2019, the device-based Web & App Activity location was moved to a coarser level than it was in 2015, approximately a city-sized area with a sufficient number of unique users (e.g., +1,000).

**DEMAND FOR INFORMATION NO. 4**
**Explain how Google stores and deletes user location data collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts, including the length and location of storage.**

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (April 17, 2019): As Google explains in its Privacy Policy and above in response to Demands for Information Nos. 1-3, the way that Google collects, stores, and deletes user location information depends on a number of factors, including the product or service being used and an individual user's settings. For example, users can change their device location settings in the "Security and location" section of their Pixel. In their Google Account, users can remove Location History entries from their Timeline and Web & App Activity entries from their My Activity page at any time (available at https://myaccount.google.com/activitycontrols).

As Google explains on its Data Retention page (available at https://policies.google.com/technologies/retention), as a general matter, when a user deletes data in the user's Google Account, Google starts the process of removing it from the product and its systems. Google also tries to ensure that its products and services protect information from accidental or malicious deletion, including of user location information. Because of this, there may be delays between when users delete something and when copies are deleted from Google's active and backup servers. Google products and services also use encrypted backup storage as another layer of protection to help recover from potential disasters. Data can remain on these systems for up to six months.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

In addition to explaining Google's general policies about data deletion, Google's April 17, 2019 response also explained that users could view, manage, and delete their Location History and Web & App Activity data at any time.

Additionally, Google made three witnesses available for examinations under oath, who were prepared to speak about how Google stores and deletes user location information collected in connection with Android and Google Accounts, including the length and location of storage. Further, as we mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about how Google stores and deletes user location information collected in connection with Google-authored apps and Google search through a web browser, including the length and location of storage.

**CONFIDENTIAL**
147291338.1

Again, because of the overbroad scope of this DFI, it is difficult for Google to provide useful information.  But subject to and without waiving its objections, Google stores and deletes user location information including but not limited to as follows:

| Store | Data Stored | Retention/Deletion[1] |
|---|---|---|
| SensorVault/Location History | Location information for users that have enabled Location History. | Deleted upon user request and/or account closure. |
| Web & App Activity | Coarse location information from which a user used a Google service. | Deleted upon user request and/or account closure. |
| ██████ | Cache of recent user location, coarse or precise depending upon account/device settings. | Deleted upon user request and/or account closure or, if neither of those occurs, within two months of collection. |
| Google Location Accuracy and Google Location Services | Location information for users with Google Location Accuracy/ Google Location Services on - not tied with user's account. | ██████ |

Google also produced multiple informative documents on the topic of the length and location of storage of location information. For example,

- GOOG-GLAZ-00176439 - GOOG-GLAZ-00176441: Discusses the length of data storage.
- GOOG-GLAZ-00175307 - GOOG-GLAZ-00175312: Discusses the length of data storage in the specific context of advertising.
- GOOG-GLAZ-00093216 - GOOG-GLAZ-00093244: Discusses SensorVault.
- GOOG-GLAZ-00168023 - GOOG-GLAZ-00168032: Discusses specific retention for different data types.
- GOOG-GLAZ-00167051 - GOOG-GLAZ-00167056: Discusses various locations in which data is stored.

---

[1] The information provided in this column is also subject to Google's Privacy and Data Retention Policy, available at https://policies.google.com/technologies/retention.

**CONFIDENTIAL**
147291338.1

- GOOG-GLAZ-00082159 - GOOG-GLAZ-00082160: Discusses "LH retention storyline."
- GOOG-GLAZ-00154824 - GOOG-GLAZ-00154826: Discusses Writing Location History Setting.
- GOOG-GLAZ-00151237 - GOOG-GLAZ-00151247: Discusses SensorVault storage requirements and retentions.
- GOOG-GLAZ-00196328 - GOOG-GLAZ-00196330: Discusses "retention plans."

Moreover, in response to more detailed questions about user location information deletion and storage in the AGO's Third CID, Google provided additional narrative information. For example, in response to Demand for Information No. 10, which asked more specifically about deletion of user location information outside of Location History and Web & App Activity, Google provided relevant information for all of its Google Mobile Services products:

- Google
- Chrome Browser
- Gmail
- Google Maps
- YouTube
- Google Play Store
- Drive
- Google Play Music
- Google Play Movies
- Duo
- Google Photos

Google also provided additional information about the storage and deletion of user location information in relation to Location History and Web & App Activity in its response to the Third CID. Specifically, Google explained that it introduced a feature in May of 2019 that allows users to set the information to auto-delete after 3 or 18 months, or to be retained indefinitely for users to manage and delete when they wish.

Furthermore, the AGO's Fourth CID asks additional questions about how and under what circumstances Google stores and deletes user location information (for example, in Demands for Information No. 1, 4, 12, and 13), which Google is in the process of responding to.

Finally, the specific example your January 17 letter cites from documents Bates-stamped GOOG-GLAZ-00031110 simply elaborates on information Google already provided. As Google explained in its original response to this Demand, "as a general matter, when a user deletes data in the user's Google

**CONFIDENTIAL**
147291338.1

Account, Google starts the process of removing it from the product and its systems. Google also tries to ensure that its products and services protect information from accidental or malicious deletion, including of user location information. Because of this, there may be delays between when users delete something and when copies are deleted from Google's active and backup servers."

**DEMAND FOR INFORMATION NO. 5**
**Explain how Google uses user location data collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Google's Privacy Policy and user instructional videos describe the information that Google collects, why it collects that information, and how Google keeps that information secure. The Privacy Policy specifically explains to users how Google uses location information in a section entitled, "Information Google collects," with a subsection titled, "Your location information." Under Google's Terms of Service and Privacy Policy, users agree that Google can collect information about location. As Google's Privacy Policy states, we "collect information about your location when you use our services, which helps us offer features like driving directions for your weekend getaway or showtimes for movies playing near you."

As we explain in our response above to Demand for Information No. 2, and in our Location Data page (available at https://policies.google.com/technologies/location-data), user location inputs may be characterized as providing implicit or explicit information about a user's location. Implicit user location information does not tell Google where a user's device is located, but through user inputs, allows Google to infer that a user is either interested in a place or that the user might be at a place. Explicit user location information contains information about where a device is located, and enables Google to provide its products and services to users.

Google also uses user location information collected when Location History and Web & App Activity are enabled to provide advertising services to signed-in users. Google does not use information from Location History and Web & App Activity if a signed-in user has opted out of ads personalization features. When Location History and Web & App Activity are disabled, they do not provide user location information to Google.

Additionally, Google uses location information from users who have enabled Location History to report aggregated and anonymised statistics to advertisers—for example, aggregate number of store visit conversions. Store visit reports provide advertisers with only anonymized and aggregated statistics about how ad clicks and viewable impressions are followed by visits to stores, and cannot be tied to individual ad clicks, viewable impressions, or individuals.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

13

**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:

In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Google made three witnesses available for examinations under oath, who were prepared to speak about how Google uses user location information collected in connection with Android and Google Accounts. Further, as we mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about how Google uses user location information collected in connection with Google-authored apps and Google search through a web browser.

Your January 17 letter asks about ████████. Google produced multiple documents on ████████ and ████████ each of which are proprietary technologies important to Google's location-related work, including:

- GOOG-GLAZ-00173493 - GOOG-GLAZ-00173503: Describing, among other things, Google's work "to build platforms that allow other teams within Google to leverage ████████ data."
- GOOG-GLAZ-00168730 - GOOG-GLAZ-00168818: Describes uses of ████ data.
- GOOG-GLAZ-00168710 - GOOG-GLAZ-00168714: Describes uses of ████ data.
- GOOG-GLAZ-00022990 - GOOG-GLAZ-00022990: Discussing "raw location clients."
- GOOG-GLAZ-00167051 - GOOG-GLAZ-00167056: Discussing integration of ████████ location signals.
- GOOG-GLAZ-00082055 - GOOG-GLAZ-00082059: Discussing GoogleFit and PlaceVault.
- GOOG-GLAZ-00153420 - GOOG-GLAZ-00153423: Discussing the "upcoming launch of ████████"
- GOOG-GLAZ-00077279 - GOOG-GLAZ-00077355: Describing Timeline and the History of Timeline, including its data sources and other particulars.
- GOOG-GLAZ-00034858 - GOOG-GLAZ-00034946: Discussing the "Location Platform Summit- Welcome."
- GOOG-GLAZ-00141961 - GOOG-GLAZ-00141986: User Location Newsletter.
- GOOG-GLAZ-00162682 - GOOG-GLAZ-00163027: Geo June 2017 "████████ Review."
- GOOG-GLAZ-00147911 - GOOG-GLAZ-00147946: ████████ Ads Targeting Slides.

14

**CONFIDENTIAL**
147291338.1

Moreover, Google is in the process of responding to your Fourth CID, which specifically asks about ████ in Demand for Information No. 12.

**DEMAND FOR INFORMATION NO. 6**
**Explain the disclosure to third parties of user location data collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): As described in our General Objections and here more specifically, Google cannot respond with regard to devices, browsers, applications, or other products and services that it does not create, own, or control. We respond to this Demand for Information to the extent possible based on information regarding Google Account-level settings, Android on Pixel devices, and as a general matter, with regard to Google products and services.

*Pixel Devices.* On the Pixel (and many third-party Android devices), users may grant their express consent for individual third-party apps to access the Android device location permission. The settings that allow a user to control this access are explained further below in response to Demand for Information No. 7.

*Google Products and Services.* Certain Google products and services may have an option or a setting that allow a user to choose to share user location with a third party. Given the number of Google products and services, it is not possible for Google to respond to this overbroad and burdensome request with regard to each product and service.

*Location History, Web & App Activity, Usage & Diagnostics.* Information on a specific user's location that Google collects via Google Account and device settings for Location History, Usage & Diagnostics, and Web & App Activity is not shared with third parties. However, aggregated and anonymized information that cannot be used to identify the location of a particular user is used by Google and third parties to develop and improve products, for system optimization, advertising, and other purposes.

*Google Location Sharing.* Google Location Sharing is the only Google Account setting that allows a user to choose to share his or her location with third parties. Please refer to our response to Demand for Information No. 7 for how users control that setting and the sharing of location information with third parties.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a

**CONFIDENTIAL**
147291338.1

Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Google's April 17, 2019 response explained the specific controls available for users to manage the sharing of location information to third parties for Pixel Devices, certain Google products and services, Location History, Web & App Activity, and Google Location Sharing. In its June 20, 2019 supplemental response, Google asserted that "it ha[d] fully responded" and said "[i]f there are follow-up questions regarding this response" to "please let us know."

Additionally, Google made three witnesses available for examinations under oath, who were prepared to speak about the disclosure to third parties, if any, of user location information collected in connection with Android and Google Accounts. Further, as we mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about the disclosure to third parties, if any, of user location information collected in connection with Google-authored apps and Google search through a web browser.

Your January 17 letter asked for additional information about the types of situations in which data is shared with third parties, what precisely is shared, and the frequency of this sharing. Again, Google reasserts its objections to the breadth of this question, but provides additional examples and information below. Google would also like to reiterate that it has produced thousands of pages of documents that contain additional responsive information.

- Store Sales Visits

This is a feature that Google offers to a select group of approved advertising customers that uses aggregated and anonymized data from users that have opted into Location History to tell advertisers how their online ad clicks and viewable impressions influence physical store visits. Only certain advertising customers are approved. The feature is not available to advertisers with sensitive location categories related to healthcare, religion, adult content, and children. In addition, advertisers must meet certain criteria such as having sufficient store visits data on the backend to attribute to ad click or viewable impressions traffic and pass Google's user privacy thresholds.

The data that Google provides to advertisers is an aggregated statistic. It will show, for example, how an increase of x% in ad spend, can result in y% increase in store visits and z% increase in online conversions. Store visit data is based on anonymous, aggregated statistics, using differential privacy

16

**CONFIDENTIAL**
147291338.1

techniques from which users cannot be reidentified. Google creates modeled numbers by using current and past data on the number of people who click or view an advertiser's ads and later visit their store. Store visit data cannot be tied to individual ad clicks, viewable impressions, or people. The data is available to advertisers to access in their Google Ads account at any time.

- Emergency Location Services (ELS) / ███████████████████████

Android Emergency Location Services (ELS) helps mobile network operators, emergency infrastructure providers, and governments provide more accurate location information to first responders during an emergency. ELS uses the location technologies on an Android phone, including cell, GPS and WiFi signals, and device sensors, to estimate an accurate emergency location. The location is often ████████████████████████ and is calculated by the █████ ELS is solely for the use of emergency service providers, and location is sent from the user's device to emergency services only when the user explicitly places an emergency call, either directly or through their mobile network.

- **Google Person Finder**

On several occasions of catastrophe—such as during large earthquakes, tsunamis, or acts of terrorism—Google has made its Person Finder application available to users. This application is a message board-like service that, with a user's consent, allows them to share their current location and other pertinent information with a wide audience to facilitate their rescue by emergency services personnel or reunite them with family members.

## Demands for Information Regarding User Privacy Controls

**DEMAND FOR INFORMATION NO. 7**
**Explain whether and how a user can prevent Google or any third party from collecting his or her location data in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Users have a number of options to control how their location information is collected and shared. For example, users can enable or disable device location controls, as well as deny apps access to location on an app-by-app level. Specifically, users can adjust the following device or Google Account settings:

Devices

- **Device's Location Setting**

17

**CONFIDENTIAL**
147291338.1

On the Pixel (and many Android devices), a device-level setting controls device-based location. When the device's location setting is on, apps with the user's permission can access the device's location. Users can change the setting at any time in the "Security & location" panel of their Pixel. If a user disables this setting for their device, then no apps can access the device's location. Note that apps or websites connecting to the Internet may continue to use other signals like IP address, or other information the user provides, to infer information about the user's location. Google, for example, may use IP-based location to prevent abuse or to ensure users get search results that are relevant to their location (for example, people searching for "football" in England likely want different results than people searching for "football" in the U.S.).

- **Google Location Accuracy (formerly known as Google Location Services) ("GLA")**

GLA is a network-based location service that collects data to improve location accuracy and provide certain location information to the apps and services with the requisite permissions. Users can change the setting at any time from their Pixel device's "Security & location" panel. The information Google collects from GLA is linked to a temporary and rotating device identifier that is not used by or shared with other services. It is not connected with any identifier that would associate that data with a specific user.

- **Usage & Diagnostics**

The optional Usage & Diagnostics setting helps Google improve Android OS based on information about how devices are used and work. When this setting is enabled, Google collects IP addresses. When the Usage & Diagnostic setting is disabled, Google may still collect user location information via other relevant settings.

Google Account

- **Location History**

This is a distinct product Google provides to Google Account holders that saves a private map (that is not accessible to or shared with third parties) of where the user goes with his or her signed-in devices, even when the user is not using a Google service. Location History is disabled by default and users must opt in to enable it. Opting in to Location History allows Google to build a user's Timeline (which users can review and delete at any time at https://maps.google.com/timeline) of the places the user's devices have been and to provide more personalized features across Google products and services, such as traffic predictions for their daily commute.

- **Web & App Activity**

This is a Google Account setting that stores a user's Google activity data to My Activity (https://myactivity.google.com) in their Google Account. The user location information that is saved

**CONFIDENTIAL**
147291338.1

as a result of Web & App Activity (which users can review and delete in My Activity at any time) is collected and stored in a user's Google Account when the user is engaging with a Google product and has Web & App Activity enabled. For example, when a user uses Google Search or Google Maps to search for "restaurant," Google collects the search term as well as information about that activity, including IP address and location information, so that the search results returned to the user will show nearby restaurant options.

- **Google Location Sharing**

Google Location Sharing allows Account holders to share their real-time location with others. Account holders choose whom they want to share their location with and for how long. For example, a user may share their estimated time of arrival with a friend once they are navigating on a journey to see them. A user may also create a share that will expire after a defined period of time, such as with friends during a vacation. Finally, a user may create an ongoing share (for example, with a family member) and decide to stop the share at a later date.

Google provides users centralized dashboards to control their Account-level and device-level location, privacy, and security settings.

Additionally, and as we explain above in response to Demand for Information No. 4, users can manage device location settings in the "Security and location" settings and their Google Account settings at https://myaccount.google.com/activitycontrols. Users can remove Location History entries from their Timeline at any time and Web & App Activity entries from their My Activity page at any time.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 8**
**Explain whether and how a user can entirely prevent Google or any third party from collecting his or her location data.**

INITIAL RESPONSE (April 17, 2019): Google cannot respond with regard to users' interactions with third parties, nor can it respond with regard to mobile devices that have settings that are neither designed nor controlled by Google. Google focuses its response on Google Account settings that control the collection and use of location information for Location History, Web & App Activity, and Google Location Sharing, as well as certain Pixel device level settings.

The CID defines "User location data" as "any data from which a user's location can be determined, including but not limited to location information collected through device sensors, GPS, Wi-Fi,

**CONFIDENTIAL**
147291338.1

Bluetooth, cell towers, and IP addresses." As Google explains in its Privacy Policy, mobile device and Google Account settings enable users to manage location information collection. As a general matter, IP addresses are required for devices to be able to connect to one another through the Internet and are necessary for online services to function. As a result, in order to use and interact with products and services from mobile and other devices, IP address information is transmitted when device or Account settings are disabled.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:

As Google has previously explained, in order to use and interact with products and services from mobile and other devices, IP address information is transmitted when device or Account settings are disabled. Among other things, this information helps Google approximate the location of its users to comply with certain legal requirements, such as restrictions on the supply of gambling services or advertising services, which differ by jurisdiction. Google may also collect, store, and use location information to help detect fraud or other suspicious activity on a user's account. In addition, IP address information may enable users to determine when their Google Accounts have been compromised by unusual activity.

**DEMAND FOR INFORMATION NO. 9**
**Explain whether and how, during the set up process for an Android device, the user can turn off any settings, functions, or permissions relating to the collection of user location data, and identify any such settings, functions, or permissions that the user cannot turn off at that point.**

INITIAL RESPONSE (April 17, 2019): As described in our General Objections, it is not possible for Google to provide responses regarding the numerous manufacturers and variations and versions of Android devices they design, develop, or market. These devices may have different user interfaces and settings. Consistent with our objections, Google's response to this Demand for Information is thus limited to Pixel devices.

When a user sets up a Pixel-running Android Pie (version 9.0 and up), they are prompted to manage the device location setting. The user's choice for this setting will also apply to the Google Location Accuracy ("GLA") setting described in response to Demand for Information No. 8 above. On Pixel devices running older versions of Android, users were presented with an option to manage the GLA setting during set up and would exit the set up with the device location toggle setting enabled. Users can manage these settings any time after device set up.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

20

**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 10

**Explain whether and how, after completing the set up process for an Android device, the user can turn off any settings, functions, or permissions relating to the collection of user location data, and identify any such settings, functions, or permissions that the user cannot turn off after the set up process.**

INITIAL RESPONSE (April 17, 2019): As described in our General Objections, it is not possible for Google to provide responses regarding the numerous manufacturers and variations and versions of Android devices they design, develop, or market. These devices may have different user interfaces and settings. Consistent with our objections, Google's response to this Demand for Information is thus limited to Pixel devices.

At any time after setting up a Pixel device, a user can disable any or all of the device settings, functions, or permissions described above in response to Demand for Information No. 7.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 11

**Explain whether and how Google collects, stores, uses, deletes, and discloses user location data when the user turns off the Location History setting of his or her Google Account but keeps the Web & App Activity setting turned on.**

INITIAL RESPONSE (April 17, 2019): The Web & App Activity Google Account setting is described above in Demand for Information No. 7. It is a distinct and separate Google Account setting from Location History. Users can access and manage the Web & App Activity Google Account setting at any time from their Google Account.

As we explain in our Privacy Policy and above in response to Demands for Information Nos. 1-4 the user location information that Google collects and stores depends on a number of factors, including the product or service being used and an individual user's settings. When a user pauses Location History, Google presents specific disclosures to remind the user that Google may still use location information that we received from their use of other Google products or services.

21

**CONFIDENTIAL**
147291338.1

If a user has Web & App Activity enabled, when they use a Google service, like Google Maps or Search, Google may process information about that activity including location information. Google discloses how it handles user data in the Google Privacy Policy (available at https://policies.google.com/privacy) and Location Data page (available at https://policies.google.com/technologies/location-data), within the Web & App Activity setting itself, and in various publicly-available help center pages. When Web & App Activity is enabled, certain user location information is stored alongside the user's Google Account alongside the activity and can be viewed, managed, and deleted in My Activity (available at https://myaccount.google.com/activitycontrols).

As a general matter, as described above, IP addresses are required for devices to be able to connect to one another through the Internet and are necessary for online services to function. As a result, in order to use and interact with products and services from mobile and other devices, IP address information is transmitted, even when location settings are disabled.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 12**
**Describe the user location data that Google collects (including through the Android operating system or through Google-authored apps or Google websites running or accessed through an Android device or iOS device) when the user turns off both the Location History and the Web & App Activity settings of his or her Google Account, including location data collected through IP addresses, GPS, Wi-Fi scanning, Bluetooth scanning, cell tower information, barometer, or any other sensors.**

INITIAL RESPONSE (April 17, 2019): As we explain in our Privacy Policy and above in response to Demands for Information Nos. 1-4, the user location information that Google collects and stores depends on a number of factors, including the product or service being used and an individual user's settings. As we explain above in response to Demand for Information No. 7, the Location History and Web & App Activity settings are distinct Google Account settings that a user can choose to enable or disable at any time. These Google Account settings do not affect or control device settings, which vary based on the specific device and which Google does not create or control.

Android or iOS mobile devices have settings that enable users to control the collection of device-based location information. IP addresses are required for devices to be able to connect to the Internet and are necessary for online services to function. As a result, in order to use and interact with products and services from mobile and other devices, IP address information is transmitted, even when location settings are disabled.

**CONFIDENTIAL**
147291338.1

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 13

**Explain whether and how Google collects, stores, uses, deletes, and discloses user location data when the user turns off the Location setting of an Android device, and describe the user location data so collected.**

INITIAL RESPONSE (April 17, 2019): Please refer to our responses to Demands for Information Nos. 10-12.

SUPPLEMENTAL RESPONSE (June 20, 2019): Please also refer to our response to Demand for Information No. 7. Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 14

**Explain whether and how Google collects, stores, uses, deletes, and discloses the location data of any user of a device made by an entity other than Google, but on which the user has installed a Google-authored app or through which the user accesses a Google Account, when the user has otherwise disabled location tracking on the device.**

INITIAL RESPONSE (April 17, 2019): As described in our General Objections, Google cannot respond with regard to the conduct of third parties, nor can it respond with regard to Android or other devices that have settings that are neither designed or controlled by Google.

With regard to Google Account settings, and Google's collection and use of location information when a user has disabled locating settings, please refer to our responses to Demands for Information Nos. 10-12.

Given the number of Google products and services, it is not possible for Google to respond to this overbroad and burdensome request with regard to each product and service that a user may install on a mobile device.

23

As a general matter, as described above, IP addresses are required for devices to be able to connect to one another through the Internet and are necessary for online services to function. As a result, in order to use and interact with products and services from mobile and other devices, IP address information is transmitted, even when location settings are disabled.

SUPPLEMENTAL RESPONSE (June 20, 2019): Please also refer to our response to Demand for Information No. 7. Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 15**
**Explain the means by which third-party apps accessible through Android collect user location data, including when (a) the user turns off the Location setting of the device, (b) the user turns off the Location History setting of his or her Google Account but leaves the Web & App Activity setting turned on, and (c) the user turns off both the Location History and the Web & App Activity settings, and describe the user location data collected in all such cases.**

INITIAL RESPONSE (April 17, 2019): As we explain above in response to Demands for Information Nos. 7 and 12, Location History and Web & App Activity are distinct Google Account features that a user can choose to enable or disable at any time. These Google Account settings do not affect or control mobile device settings, which vary based on the specific device. As we explain above in response to Demand for Information No. 2, mobile devices have settings that enable users to control the collection of device-based location information. Also, as described in our General Objections, Google cannot respond with regard to the conduct of third parties, nor can it respond with regard to Android or other devices that have settings that are neither designed or controlled by Google.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 16**
**Explain how users can delete the user location data Google collects in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

24

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (April 17, 2019): We address deletion of location information in our responses to Demands for Information Nos. 2, 4, and 11 above.

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 17**
**Explain whether and how user location data is collected through the Location History setting even when the user turns off that setting, and then stored once the user turns that setting back on.**

INITIAL RESPONSE (April 17, 2019): As we explain above in response to Demand for Information No. 7, Location History is a distinct product that allows Google Account holders to save a private map of where the user goes with his or her signed-in devices. Opting in to Location History allows Google to build a private Timeline of the places the user's devices have been and to provide more personalized products and services, such as traffic predictions for their daily commute. Google stores Timeline information until an Account holder edits or deletes it. Account holders can disable Location History at any time, and they can edit or delete their Timeline at any time.

When Location History is paused, the product no longer saves the user's location information to the user's private Timeline (users can also opt out a particular device from collecting and reporting user location to Location History). However, pausing Location History—the distinct product—does not disable other settings that affect the collection of user location information (e.g., IP addresses).

When a user pauses Location History, Google presents specific disclosures to remind him or her that Google may still use location information that Google receives from his or her use of other products and services. For example, if a user has Web & App Activity enabled, when they use a Google product or service like Google Maps or Search, Google may process user location information including the device's IP address and other user location information.

Google discloses how it collects user data, including location information, in its Privacy Policy (available at https://policies.google.com/privacy), on the Location Data page (available at https://policies.google.com/technologies/location-data), and within the settings described above, in response to Demand for Information No. 7, and in help center pages.

25

**CONFIDENTIAL**
147291338.1

SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Demand for Information, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

<u>**Demands for Information Regarding Tracking of Arizonans**</u>

**DEMAND FOR INFORMATION NO. 18**
**Identify the number of users in Arizona whose location data you have collected in connection with Android, Google-authored apps, Google search through a web browser, and Google Accounts. Specify the number of Arizona users whose location data you collected even when (a) the user had turned off the Location setting of his or her Android device, (b) the user had turned off the Location History setting of his or her Google Account but left the Web & App Activity setting turned on, and (c) the user had turned off both the Location History and the Web & App Activity settings.**

INITIAL RESPONSE (April 17, 2019): In the ordinary course of its business, Google does not determine, or maintain any document stating, the number of users in Arizona who have had Google Accounts during certain periods of time. Neither does Google, in the regular course of its business, determine or maintain any document stating, the number of users in Arizona who may have had Location History or Web & App Activity enabled or paused.

SUPPLEMENTAL RESPONSE (June 20, 2019): As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified information maintained in the ordinary course that states the number of users in the manner described in DFI 18. However, with regard to the specific scenarios described in (a)-(c) of DFI 18, as we have previously explained, the user location information that Google collects and stores depends on a number of factors, including the product or service being used and an individual user's settings. For instance, every device connected to the Internet is assigned an IP address and these numbers are usually assigned in geographic blocks. Thus, an IP address can often be used to identify the location from which a device is connecting to the Internet.

When a user pauses Location History, Google presents specific disclosures to remind the user that Google may still use location information that we received from their use of other Google products or services.

26

**CONFIDENTIAL**
147291338.1

Google explains in its Privacy Policy (available at https://policies.google.com/privacy), and in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), that Google collects IP addresses.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 19**
**Identify the number of times that you have refused to disclose the user location data, however collected, of any Arizonan when requested by any third party, including law enforcement.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Demand for Information as vague and ambiguous, overly broad, and irrelevant to any investigation under the Arizona Consumer Fraud Act. Subject to and without waiving its objections, Google refers the AGO to its semi-annual Transparency Report, which provides information about the requests for user data Google receives from government agencies, courts, and parties in civil litigation (https://transparencyreport.google.com/).

SUPPLEMENTAL RESPONSE (June 20, 2019): Google continues to object to this request, including for the reasons stated previously. Google does not maintain the data requested on a state-by-state basis. National data, among others, is in the Transparency Report discussed below.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 20**
**Identify all third-party advertising firms that you worked with to create TV, print, video, and digital ads run or viewed in Arizona relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts. (Examples would include the T-Mobile G1 ads run in 2008, the "be together. not the same." ad campaign run during 2014-2016, and the Fred Rogers ad run in 2018.) For each such advertising firm, also provide the relevant dates, the names/titles of the advertising campaigns, and the types of ads created.**

INITIAL RESPONSE (April 17, 2019): We object to this Demand for Information as unduly broad, overly burdensome, and irrelevant to the extent that it seeks information about advertisements that

**CONFIDENTIAL**
147291338.1

do not relate to the collection, use, or disclosure of user location information, which appears to be the focus of the Attorney General's investigation.

SUPPLEMENTAL RESPONSE (June 20, 2019): Google continues to object to this request, including for the reasons stated previously.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google continues to object as stated above.  This item has not been the subject of any discussion between Google and the AGO to date.

<u>**Demands for Information Relating to Responses to**</u>
<u>**This Civil Investigation Demand**</u>

**DEMAND FOR INFORMATION NO. 21**
**Identify all natural persons from whom documents were collected for possible production by respondent in response to this Civil Investigative Demand (i.e., "custodians") and the specific Bates range in the production applicable to each custodian.**

INITIAL RESPONSE (April 17, 2019): Google did not collect any documents from individual custodians in order to prepare its response to this CID.

SUPPLEMENTAL RESPONSE (June 20, 2019): Documents were collected from ███████████ and ███████████ and are labeled GOOG-GLAZ-00001205 to GOOG-GLAZ-1479.

FINAL RESPONSE:

Google has collected documents from these custodians:



**CONFIDENTIAL**
147291338.1

28

**DEMAND FOR INFORMATION NO. 22**
**To the best of your knowledge and belief, are you producing or otherwise making available for examination with your response to this Civil Investigative Demand all non-privileged documents responsive to numbers 1–21 of the Requests to Produce Documents, below, that are in your possession, custody, or control?**

INITIAL RESPONSE (April 17, 2019): Subject to the responses and the objections set forth here and in Google's February 28, 2019 letter, Google is producing non-privileged, responsive information.

SUPPLEMENTAL RESPONSE (June 20, 2019): As stated above, Google's effort to comply with the broad requests contained in the AGO's RFPs is ongoing and includes continued production of responsive, non-privileged materials. Google will continue to update the AGO on the status of Google's efforts, including when its anticipated production is complete.

FINAL RESPONSE:

As of the date of this response, Google asserts that it has completed its document production of responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating certain feedback from the AGO.

**DEMAND FOR INFORMATION NO. 23**
**To the extent that your answer to demand 22 is not an unequivocal "yes," are the reasons why all non-privileged, responsive documents in your possession, custody, or control are not being collected and produced set forth in the response to each request in accordance with the instructions?**

INITIAL RESPONSE (April 17, 2019): Google has asserted responses and objections here and in our February 28, 2019 letter.

SUPPLEMENTAL RESPONSE (June 20, 2019): Google has provided these Supplemental Responses as part of its continuing effort to respond to the AGO's numerous demands for investigative discovery. Google's efforts are ongoing and a complete catalogue of those efforts and their results cannot be provided at this time. Google has described above the status of its efforts, the currently-known limitations thereon, and other information related to their status. Google will continue to update the AGO on the status of its efforts, including when its anticipated production is complete.

FINAL RESPONSE:

As of the date of this response, Google asserts that it has completed its document production of responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating certain feedback from the AGO.

29

**CONFIDENTIAL**
147291338.1

## II.    REQUESTS TO PRODUCE DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1**
**Produce all DOCUMENTS referenced, reviewed, or relied on in providing your responses to the above demands for information in this Civil Investigative Demand. In your response below, provide the specific bates range(s) for these documents and identify the demand(s) for information to which each document applies.**

INITIAL RESPONSE (April 17, 2019): Google is producing with its response, as Bates-stamped GOOG-GLAZ-00000001 to GOOG-GLAZ-00000057 and GOOG-GLAZ-00000871 to GOOG-GLAZ-00000875, copies of the following records:

https://policies.google.com/privacy (DFIs Nos. 1, 11, 17)
https://policies.google.com/technologies/retention (DFIs Nos. 4)
https://policies.google.com/technologies/location-data (DFIs Nos. 5, 11, 17)
https://support.google.com/transparencyreport/answer/7381738 (DFIs Nos. 19)
https://transparencyreport.google.com/user-data/overview (DFIs Nos. 19)

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Based on our understanding of this Request for Production, Google asserts that it has fully responded to it. If there are follow-up questions regarding this response, please let us know.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO 2**
**Produce organizational charts or other similar documents sufficient to show the names of the relevant present and former Google employees with responsibilities for each of the following areas as they relate to Android, Google-authored apps, Google search through a web browser, and Google Accounts used by consumers in Arizona. Account for the full relevant time period.**

**a. The user set up process for Android mobile devices after a user turns it on for the first time.**
**b. The collection, storage, use, deletion, and disclosure of user location data relating to Google-authored apps running on Android and iOS mobile devices.**
**c. The collection, storage, use, deletion, and disclosure of user location data relating to Google searches run on Android and iOS mobile devices.**

30

**CONFIDENTIAL**
147291338.1

**d. The Settings app/panel in Android and any settings that relate to the collection, storage, use, deletion, or disclosure of any user location data.**

**e. Google Accounts and any settings, functions, and permissions on Google Accounts that relate to the collection, storage, use, deletion, or disclosure of any user location data.**

**f. Advertising to consumers relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

**g. Communications with users (including tutorials, help pages and videos, "how to" pages and videos, and blog posts) relating to settings on Android, Google-authored apps, Google search through a web browser, or Google Accounts and the collection, storage, use, deletion, or disclosure of any user location data collected through Android mobile devices, Google-authored apps, Google search through a web browser, and Google Accounts.**

**h. User privacy for Android, Google-authored apps, Google search through a web browser, and Google Accounts relating to the collection, storage, use, deletion, or disclosure of any user location data.**

**i. Google's marketing and sales to advertisers of any and all types of location-aware advertising products and services (including targeting ads to specific locations or interests, local campaigns, tracking the effectiveness of online ads at driving foot traffic, and building user profiles for ads based in part on the user's location data).**

**j. Google's communications to third-party developers relating to the collection, storage, use, deletion, and disclosure of user location data collected by such third-party apps running on Android.**

INITIAL RESPONSE (April 17, 2019): Google objects to this request as overly broad and unduly burdensome in seeking organizational charts for detailed functions that would not constitute one unit or division of employees at Google. Google does not maintain, in the ordinary course of business, organizational charts of this type, and would be forced to create extensive work product that would not remain current once generated. Additionally, it is not clear how all of these documents being requested for all the topics listed above are relevant to the location-related requests.

SUPPLEMENTAL RESPONSE (May 30, 2019): In the absence of more detailed guidance regarding the AGO's investigation, Google does not understand the relevance of this Request to the AGO's location-focused investigation and therefore reiterates its objection on this ground. In addition, Google reiterates that it does not maintain organizational charts in the ordinary course of business. In order to provide responsive information to the AGO's investigation as we understand it, Google notes that the person most knowledgeable about Location History is ████████████████████████ ███████████████████ and the person most knowledgeable about Web & App Activity is ████████████

31

**CONFIDENTIAL**
147291338.1

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): As discussed during our last telephone call, to answer this request Google is instead providing the following information:

Google has previously responded that the person most knowledgeable about Location History is █████████████████████████████), and the person most knowledgeable about Web & App Activity is █████████████████████████████). Google is in the process of collecting and producing responsive, non-privileged records for which these two employees were custodians.

Mr█████ reports to ███████████████████████████████████. Mr. ██████ reports to ██████████████████████████████ And Mr.██████ reports to senior management. Google reiterates that Mr.█████ is the person most knowledgeable about Location History.

Mr█████ reports to ████████████████████ Mr.██████ reports to ████████ And Mr.██████ reports to senior management. Google reiterates that Mr█████ is the person most knowledgeable about Web & App Activity.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO 3**
**Produce a representative example of the complete user set up process in English (including all screens seen by the user and showing all pictures, icons, text, and pop-ups visible to the user, and all linked documents such Google's terms of use and privacy policy) for each version of the set up process for Android mobile devices used in Arizona during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00000058 to GOOG-GLAZ-00000128. Google's response to this RFP is limited to Pixel devices. The first Google Pixel device was released in October 2016. Google's response to this RFP is limited to January 1, 2017 - January 30, 2019.

32

Please see the documents Bates-stamped GOOG-GLAZ-00000491 to GOOG-GLAZ-00000781, for the Google Terms of Service and Privacy Policy in effect from January 1, 2017 - January 30, 2019. SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced a responsive representative example and cited it in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google has conducted a diligent search for and previously produced all responsive documents regarding the set up of Pixel devices.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 4**
**Produce documents (including screen shots or images) sufficient to show all portions of the Settings app/panel on Android relevant to turning on or off particular settings, functions, or permissions relating to Location, Web & App Activity, and Location History for all versions of Android used in Arizona during the relevant time period, as well as all notifications or other explanations provided to users when turning on or off any of the foregoing.**

INITIAL RESPONSE (April 17, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00000129 to GOOG-GLAZ-00000149. Google's response to this RFP is limited to Pixel devices. The first Google Pixel device was released in October 2016. Google's response to this RFP is limited to January 1, 2017 - January 30, 2019.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google has conducted a diligent search for and previously produced all responsive documents regarding the relevant settings of Pixel devices.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

33

**CONFIDENTIAL**
147291338.1

**REQUEST FOR PRODUCTION NO. 5: Produce documents (including screen shots or images) sufficient to show all portions of the Google Accounts website relevant to users in Arizona during the relevant time period turning on or off particular settings, functions, or permissions relating to the collection, storage, use, deletion, or disclosure of any user location data, as well as all notifications or other explanations provided to users when turning on or off any of the foregoing.**

INITIAL RESPONSE (April 17, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00000150 to GOOG-GLAZ-00000170. Google's response to this RFP is limited to January 1, 2017 - January 30, 2019.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google is producing responsive documents Bates-stamped GOOG-GLAZ-00001114 to GOOG-GLAZ-00001141.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 6**
**Produce all support pages relating to Location, Location Services, Web & App Activity, My Activity, and Location History for Android mobile devices or Google Accounts used in Arizona during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00000171 to GOOG-GLAZ-00000427. As described in our Responses and Objections to the CID's Instructions, "Location" and "Location Services" can potentially refer to a broad range of settings and features that may have no connection to Google's products or services. For example, devices other than the Pixel may have device settings referred to as Location or Location Services. Google's response to this RFP is thus limited to statements made about the Pixel device location toggle and the Pixel setting Google Location Accuracy, as well as the requested Google Account features that control the collection of location information (i.e., Web & App Activity and Location History) between January 1, 2017 - January 30, 2019.

**CONFIDENTIAL**
147291338.1

34

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response. Google supplements its response with new responsive Help Center materials currently available online, Bates-stamped GOOG-GLAZ-00000876 to GOOG-GLAZ-00000949. Google anticipates producing by June 12, 2019 further responsive Help Center materials showing how they appeared online between January 30, 2019, and before today.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Earlier this week, Google produced documents Bates-stamped GOOG-GLAZ-00001059 to GOOG-GLAZ-00001113. These documents reflect additional prior versions of Google's Help Center pages.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 7**
**Produce the English versions of all contracts and policies with users in Arizona (including privacy policies and terms of service) relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts for the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00000428 to GOOG-GLAZ-00000781, the Google Terms of Service and Privacy Policy in effect from January 1, 2017 - January 30, 2019.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google's prior productions included its Terms of Service and Privacy Policy in effect from January 1, 2017 - January 30, 2019. Google objects to further production on the grounds previously stated.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 8**
**CONFIDENTIAL**
147291338.1

**Produce all contracts and policies with third-party Android app developers, and all Google advertisements, presentations, sales communications, videos, tutorials, webpages, and blog posts addressed to third-party app developers, relating to user location data.**

INITIAL RESPONSE (April 17, 2019): Google is producing the following documents Bates-stamped GOOG-GLAZ-00000782 to GOOG-GLAZ-00000862:

Google APIs Terms of Service
Google API Services: User Data Policy
Google Play Developer Distribution Agreement
Google Play Developer Policy Center

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive documents and cited them in its initial response.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google's prior productions included its consumer-facing contracts and policies. Google objects to further production on the grounds previously stated.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 9**
**Produce a representative example of each television advertisement run in a geographic area including any part of Arizona by Google or a third-party partner of Google (such as a hardware manufacturer, telephone carrier, or electronics retailer) during the relevant time period relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent that it seeks information that is seemingly irrelevant to the Attorney General's investigation and/or outside of the scope of the Attorney General's investigatory authority. Google also does not maintain this information in the ordinary course of business as Google does not categorize the information requested by U.S. state.

**CONFIDENTIAL**
147291338.1

Given the broad scope and timeframe for the request, it would help Google to respond if we understood how (if at all) these requests relate to the location-focused requests. The request on its face reflects an entirely separate topic.

SUPPLEMENTAL RESPONSE (May 30, 2019): In the absence of more detailed guidance regarding the AGO's investigation, Google does not understand the relevance of this Request to the AGO's location-focused investigation and therefore reiterates its objection on this ground. Subject to and without waiving Google's objections to this Request, since our meet-and-confer call on May 23, we have worked to identify television advertisements that are relevant to the AGO's investigation, as we understand it, that ran in a geographic area including any part of Arizona between January 1, 2017 and the present, and that are in Google's possession, custody, and control. As of today, we have not located television advertisements for Location History or Web & App Activity. If we locate any such responsive materials, we will promptly produce representative examples.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. Google remains in the process of searching and reviewing for responsive documents. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google previously conducted a search of information regarding the Geo product area, which includes Google Maps and other geo products, to find a representative sample of online advertisements that Google ran for the Location History, Web & App Activity, and Google Maps products. Google previously produced these advertisements to the AGO on June 20, 2019. Google has not located any responsive television advertisements.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 10**
**Produce a representative example of each print advertisement (e.g., newspaper ads, magazine ads) run in a geographic area including any part of Arizona by or on behalf of Google during the relevant time period relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent that it seeks information that is seemingly irrelevant to the Attorney General's investigation and/or

CONFIDENTIAL
147291338.1

outside of the scope of the Attorney General's investigatory authority. Google also does not maintain this information in the ordinary course of business as Google does not categorize the information requested by U.S. state.

Given the broad scope and timeframe for the request, it would help Google to respond if we understood how (if at all) these requests relate to the location-focused requests. The request on its face reflects an entirely separate topic.

SUPPLEMENTAL RESPONSE (May 30, 2019): In the absence of more detailed guidance regarding the AGO's investigation, Google does not understand the relevance of this Request to the AGO's location-focused investigation and therefore reiterates its objection on this ground. Subject to and without waiving Google's objections to this Request, since our meet-and-confer call on May 23, we have worked to identify print advertisements that are relevant to the AGO's investigation, as we understand it, that ran in a geographic area including any part of Arizona between January 1, 2017 and the present and that are in Google's possession, custody, and control. As of today, we have not located print advertisements for Location History or Web & App Activity. If we locate any such responsive materials, we will promptly produce representative examples.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. Google remains in the process of searching and reviewing for responsive documents. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google previously conducted a search of information regarding the Geo product area, which includes Google Maps and other geo products, to find a representative sample of online advertisements that Google ran for the Location History, Web & App Activity, and Google Maps products. Google previously produced advertisements to the AGO on June 20, 2019. Google did not locate any responsive traditional print media advertisements, but did produce ads that ran online.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 11**
**Produce a representative example of each online advertisement (e.g., digital ads, text ads, pop-up ads, video ads, online ads) run in a geographic area including any part of Arizona by**

**CONFIDENTIAL**
147291338.1

**Google or a third-party partner of Google (such as a hardware manufacturer, telephone carrier, or electronics retailer) during the relevant time period relating to Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent that it seeks information that is seemingly irrelevant to the Attorney General's investigation and/or outside of the scope of the Attorney General's investigatory authority. Google does not maintain this information in the ordinary course of business as Google does not categorize the information requested by U.S. state.

SUPPLEMENTAL RESPONSE (May 30, 2019): In the absence of more detailed guidance regarding the AGO's investigation, Google does not understand the relevance of this Request to the AGO's location-focused investigation and therefore reiterates its objection on this ground. Subject to and without waiving Google's objections to this Request, since our meet-and-confer call on May 23, we have worked to identify online advertisements that are relevant to the AGO's investigation, as we understand it, that ran in a geographic area including any part of Arizona between January 1, 2017 and the present and that are in Google's possession, custody, and control. As of today, we have not located online advertisements for Location History or Web & App Activity. If we locate any such responsive materials, we will promptly produce representative examples.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. Google is producing responsive documents Bates-stamped GOOG-GLAZ-00001142 to GOOG-GLAZ-00001204. Google remains in the process of searching and reviewing for responsive documents. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google previously conducted a search of information regarding the Geo product area, which includes Google Maps and other geo products, to find a representative sample of online advertisements that Google ran for the Location History, Web & App Activity, and Google Maps products. Google previously produced advertisements to the AGO on June 20, 2019. Google has not identified additional responsive records within its possession, custody, or control.

FINAL RESPONSE:
After conducting a diligent search to respond to Requests for Production 9–11, on June 20, 2019, Google produced advertisements related to Location History, Web & App Activity, and Google Maps. In your letter dated January 17, 2020, you asked Google to provide the dates that the advertisements in question were first shown to the public.

The content produced in documents Bates-stamped GOOG-GLAZ-00001142 - GOOG-GLAZ-00001198 appeared on the Apple App Store Landing page (at https://apps.apple.com/us/app/google-maps-transit-food/id585027354) and the Google Play Store

**CONFIDENTIAL**
147291338.1

landing                              page                              (at
https://play.google.com/store/apps/details?id=com.google.android.apps.maps&hl=en_US),      and
was captured for production in June 2019. The product images on those pages were first made
available on the following dates:

- GOOG-GLAZ-00001142 - GOOG-GLAZ-00001143, GOOG-GLAZ-00001180 - GOOG-GLAZ-00001182:  07/30/2018
- GOOG-GLAZ-00001162:  GOOG-GLAZ-00001163,
- GOOG-GLAZ-00001165:  08/26/2016
- GOOG-GLAZ-00001164:  Google is unable to determine the exact date the image in this document was first made available to the public, but it believes it was around March 2016.
- GOOG-GLAZ-00001195:  07/20/2018

For the YouTube files, Google is able to provide the below information and is also producing additional metadata in GOOG-GLAZ-00200233 - GOOG-GLAZ-00200237:

- GOOG-GLAZ-00001202:  https://www.youtube.com/watch?v=7ZrW-_nKSfs (published 12/10/2018)
- GOOG-GLAZ-00001203: https://www.youtube.com/watch?v=ogfYd705cRs&feature=youtu.be&t=1h17m34s (published 05/08/2018)
- GOOG-GLAZ-00001204:    https://www.youtube.com/watch?v=Q_XPrk824Vs&t=65s (published 12/13/2018)

For the Twitter files, Google is able to provide the following additional information:

- GOOG-GLAZ-00001199:    https://twitter.com/googlemaps/status/861661514549219330 (published 05/08/2017; collected June 2019)
- GOOG-GLAZ-00001200:    https://twitter.com/googlemaps/status/959456310197739520 (published 02/02/2018; collected June 2019)
- GOOG-GLAZ-00001201:    https://twitter.com/googlemaps/status/966776119625121792 (published 02/ 22/2018; collected June 2019)

**REQUEST FOR PRODUCTION NO. 12**
**Produce all tutorials, "how to" videos, or product explanations created by Google or a third-party partner of Google (such as a hardware manufacturer, telephone carrier, or electronic retailer) relating to the collection, storage, use, deletion, or disclosure of user location data**

CONFIDENTIAL
147291338.1

**obtained from Android, Google-authored apps, Google search through a web browser, and Google Accounts.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent it seeks information not in the possession, custody, or control of Google. Google is producing files Bates-stamped GOOG-GLAZ-00000863 to GOOG-GLAZ-00000870, which include a video in the Google Privacy Policy under *Your location information*? And "Types of Location Information," https://policies.google.com/technologies/location-data.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google has produced responsive materials and cited them in its initial response. Google supplements its response with new responsive material currently available online, Bates-stamped GOOG-GLAZ-00000950. Subject to and without waiving Google's objections to this Request, Google has conducted a reasonable search to identify responsive documents and to date has not identified additional responsive records within Google's possession, custody, or control.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. Google remains in the process of searching and reviewing for responsive documents. We will update you on our progress

THIRD SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified additional responsive records within its possession, custody, or control.

FINAL RESPONSE:

In your letter dated January 17, 2020, you express surprise about the volume of Google's production in response to this Request. You also point to publicly-available material that you searched for and that you allege is responsive. The Request specifically asks for content that relates to "the collection, storage, use, deletion, or disclosure of user location data." In the context of the AGO's consumer-protection investigation, Google reasonably understood this Request to be seeking tutorials for Google users (in other words, consumers). The material you cite in your letter, however, is not such a tutorial. It is a marketing document that describes certain ads features for Google's advertising customers. So, it is neither a tutorial, nor is it aimed at consumers.

Google reiterates that it has conducted a reasonable search for, and has produced, responsive material. Complying with the breadth of the AGO's Request, which (i) covers every single Google product and service, (ii) spans more than thirteen years, and (iii) defines "user location data" to include IP addresses, which are required for all devices to be able to connect to the internet, is impossible. Google has made a good-faith effort to provide the AGO with relevant, useful, and responsive information by conducting a reasonable search for tutorial-like material aimed at Google consumers, and focused

41

**CONFIDENTIAL**
147291338.1

on Google Account settings, that users can use to control the collection, storage, use, deletion, or disclosure of their location information.

**REQUEST FOR PRODUCTION NO. 13**
**Produce all communications and other documents relating to the Associated Press article of August 13, 2018 entitled "Google tracks your movements, like it or not," including all communications and other documents relating to the changes you made after that article's publication to your representations about the collection, storage, use, or disclosure of user location data and about users' ability to prevent you and third parties from doing any of those things.**

INITIAL RESPONSE (April 17, 2019): Google objects to the "all communications and other documents" scope of this Request for Production, as it is overly broad and unduly burdensome. To the extent this Request for Production seeks attorney-client privileged communications, Google also objects to producing such documents as protected by the privilege. Google is willing to meet and confer about an appropriate scope of information.

SUPPLEMENTAL RESPONSE (May 30, 2019): Subject to and without waiving Google's objections to this Request, Google is conducting a keyword search of the email records of relevant custodians to identify any non-privileged responsive documents. The search and review process is underway. Google currently anticipates that the process will be complete and any non-privileged responsive documents will be produced on or before June 12, 2019.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00001205 to GOOG-GLAZ-00001479. Google remains in the process of searching and reviewing for responsive documents. We will update you on our progress.

FINAL RESPONSE:
Based on our understanding of this Request for Production, Google has no additional information to provide related to it.

**REQUEST FOR PRODUCTION NO. 14**
**Produce all communications and other documents relating to the New York Times article of December 10, 2018 entitled "Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret," including all communications and other documents relating to the changes you made after that article's publication to your representations about the collection, storage, use, or disclosure of user location data and about users' ability to prevent you and third parties from doing any of those things.**

INITIAL RESPONSE (April 17, 2019): Google objects to the "all communications and other documents" scope of this Request for Production, as it is overly broad and unduly burdensome. To

**CONFIDENTIAL**
147291338.1

the extent this Request for Production seeks attorney-client privileged communications, Google also objects to producing such documents as protected by the privilege. Google is willing to meet and confer about an appropriate scope of information.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google continues to object to this request for the reasons stated below and as not relevant to the AGO's investigation of Google's policies, practices, and representations because the article referenced does not relate to or reference collection of location information when the Google Account settings Web & App Activity or Location History are enabled or disabled. Google is willing to search for responsive information if the AGO provides appropriate guidance on what aspects of this article are relevant to its investigation.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Absent clarification from the AGO on the relevance of this Request, Google reiterates its objections below.

FINAL RESPONSE:
Based on our understanding of this Request for Production, Google has no additional information to provide related to it.

**REQUEST FOR PRODUCTION NO. 15**
**Produce documents sufficient to show the amount of money Google spent on advertising in Arizona (or, if such data is not state-specific, in the United States) relating to the Android operating system, Android devices, Google-authored apps, Google search through a web browser, and Google Accounts for each year during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent it seeks sensitive and competitive business information. Additionally, Google objects to this Request for Production as Google does not maintain records in the ordinary course of business that categorize the information requested by U.S. state. Relatedly, because this Request for Production seeks information and data not connected to the state of Arizona and thus not relevant to this investigation, Google objects to this request as falling outside the Attorney General's authority related to this investigation. Preparing such information also would be unduly burdensome and difficult. Finally, Google does not understand how (if at all) this request relates to the location-focused requests as, on its face, it reflects an entirely separate topic.

SUPPLEMENTAL RESPONSE (May 30, 2019): In the absence of more detailed guidance regarding the AGO's investigation, and because Google does not sell the location information of a specific Google user, Google does not understand the relevance of this Request to the AGO's location-focused investigation and therefore reiterates its objection on this ground. Subject to and without waiving Google's objections to this Request, since our meet-and-confer call on May 23, we have worked to identify television, print, and online advertisements that are relevant to the AGO's investigation, as we understand it, that ran in a geographic area including any part of Arizona between January 1, 2017 and the present and that are in Google's possession, custody, and control. As of today,

**CONFIDENTIAL**
147291338.1

43

we have not located television, print, or online advertisements related to Location History or Web & App Activity. If we locate any such materials, we will promptly produce information relating to the advertising spend for those materials.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): Google does not maintain documentation collecting or summarizing the amounts that Google spent to advertise these Google products or services. Previous efforts to respond to this request focused on Location History or Web & App Activity alone, but Google now is attempting to determine the amount Google spends to advertise all these Google products and services. Because this request covers numerous Google products and services and because Google does not maintain a single document (or even several documents) collecting or summarizing these amounts, Google is unable to answer this request at this time. Google is working to attempt to determine this amount. Google will keep you updated on its progress and expected response date.

FOURTH SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified information kept in the ordinary course of business that specifically states the amount of money Google spent on advertising in Arizona relating to the Android operating system, Android devices, Google-authored apps, Google search through a web browser, and Google Accounts for each year during the relevant time period the number. In order to satisfy the Attorney General's request for information, Google has made an effort to estimate the marketing spend in the United States for the following Google Mobile Services and Android:



CONFIDENTIAL
147291338.1



FINAL RESPONSE:

Your January 17, 2020 letter asked Google to supplement this response by including all Android devices for which Google has information in its possession, custody, or control. Google is able to additionally provide its marketing spend for Pixel mobile devices, but Google is not able to break down the data by device.



Your January 17, 2020 letter also asked Google to answer the following questions:

1. Which Google employees were involved in collecting or compiling this data? Please also identify their titles.

- 
- 

2. Please explain where Google's figures are derived from. For example, from which documents, repositories or other systems was this data collected?

Google queried its Oracle Hyperion financial database.

3. Google stated that the figures it provided were estimates. Please explain how Google arrived at these estimates from the raw data.

For certain products, like ▮▮▮, Google's marketing spend was combined with other communications products, so Google had to ask one of its financial data analysts to split the ▮▮ marketing spend.

45

**CONFIDENTIAL**
147291338.1

**REQUEST FOR PRODUCTION NO. 16**
**Produce documents sufficient to show the number of users of the Android operating system in Arizona during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): In the ordinary course of its business, Google does not determine, or maintain any document stating, the number of users of the Android OS in Arizona. Further, Google objects to this Request for Production to the extent it seeks information regarding third-party Android devices, which is not under its possession, custody, or control.

SUPPLEMENTAL RESPONSE (May 30, 2019): Subject to and without waiving Google's objections to this Request, Google reiterates that it does not currently maintain an existing document stating the information sought by this Request. It is nonetheless in the process of trying to determine what, if any, information can be compiled to provide a substantive response to this Request and will further supplement this response as soon as possible.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request. Google remains in the process of determining whether it can provide other information responsive to this request.

FOURTH SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified information kept in the ordinary course of business that specifically states the number of users of the Android operating system in Arizona during the relevant time period. Android is an open source software that can be used by anyone without a license. In order to satisfy the Attorney General's request for information, Google has made an effort to estimate the number of users of an Android operating system based on limited nationwide data available for device activations of Google-licensed Android mobile devices. Google estimates the number of Android devices in Arizona at:

- 2016 - ███
- 2017 ███
- 2018 - ███
- 2019 (January - July) - ███

FINAL RESPONSE:
Your January 17, 2020 letter asked Google to answer the following questions:

1. Which Google employees were involved in collecting or compiling this data? Please also identify their titles.

**CONFIDENTIAL**
147291338.1

Other than legal counsel, Google employees involved were:



2. Please explain where Google's figures are derived from. For example, from which documents, repositories or other systems was this data collected?

In order to provide these estimates, Google had to query its Android Device Configuration Service database, which contains data related to Android device activation.

3. Google stated that the figures it provided were estimates. Please explain how Google arrived at these estimates from the raw data.

As we explained in our previous response dated December 31, 2019, Google has made an effort to estimate the number of users of an Android operating system based on limited nationwide data available for device activations of Google-licensed Android mobile devices. For the limited time period for which Google had this data, Google estimated Arizona numbers by counting activations with zipcodes inferred to be between 85001 and 86999.

**REQUEST FOR PRODUCTION NO. 17**
**Produce documents sufficient to show the number of users of a Google Account, Google-authored app, or Google search through a web browser in Arizona during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): In the ordinary course of its business, Google does not determine, or maintain any document stating, the number of users of a Google Account, Google-authored app, or Google search through a web browser in Arizona. In addition, Google objects to this Request for Production to the extent it seeks information which is not under its possession, custody, or control.

SUPPLEMENTAL RESPONSE (May 30, 2019): Subject to and without waiving Google's objections to this Request, Google reiterates that it does not currently maintain an existing document stating the information sought by this Request. It is nonetheless in the process of trying to determine what, if any, information can be compiled to provide a substantive response to this Request and will further supplement this response as soon as possible.

**CONFIDENTIAL**
147291338.1

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request. Google remains in the process of determining whether it can provide other information responsive to this request.

FOURTH SUPPLEMENTAL RESPONSE (Jan. 17, 2020): As we stated previously, Google does not maintain an existing document stating the information sought by this Request. Google undertook a reasonable effort to compile responsive data for this request. Based on available Google Account data, Google is providing monthly numbers (excluding prepay and terms customers) of purchases for the time period of Jan 2017 to November 2019, where the billing address of the form of payment used was associated with an Arizona zip code.[2]



---

[2] These numbers do not necessarily represent unique account holders across months and years.

48

**CONFIDENTIAL**
147291338.1



FINAL RESPONSE:

Google responded to this request on January 17, 2020.  Based on our understanding of this Request for Production, Google has no additional information to provide related to it.

**REQUEST FOR PRODUCTION NO. 18**

**Produce documents sufficient to show the number of users for whom any location information was collected or stored as a result of the user's use of an Android mobile device, Google Account, Google-authored app, or Google search through a web browser, and for which the user was based in Arizona at any point during the relevant time period.**

49

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production as Google does not maintain this information in the ordinary course of business categorized by U.S. state. In addition, Google objects to this Request for Production to the extent it seeks information regarding third-party Android devices, which is not under its possession, custody, or control.

SUPPLEMENTAL RESPONSE (May 30, 2019): Subject to and without waiving Google's objections to this Request, Google reiterates that it does not currently maintain an existing document stating the information sought by this Request. It is nonetheless in the process of trying to determine what, if any, information can be compiled to provide a substantive response to this Request and will further supplement this response as soon as possible.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): As Google explains in its Privacy Policy (available at https://policies.google.com/privacy), in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/ location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google collects IP addresses. Every device connected to the Internet is assigned an IP address and these numbers are usually assigned in geographic blocks. Thus, an IP address can often be used to identify the location from which a device is connecting to the Internet.

FINAL RESPONSE:
As Google previously stated, Google collects IP addresses, which the AGO included in its definition of "User Location Data." See, e.g., First Civil Investigative Demand, pg. 6 ("'User location data' means any data from which a user's location can be determined, including but not limited to location information collected through device sensors, GPS, Wi-Fi, Bluetooth, cell towers, and IP addresses."). Google explains in its Privacy Policy (available at https://policies.google.com/privacy) and in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), that Google collects IP addresses.

**Google has previously produced a number of other responsive documents including but not limited to:**

50

- GOOG-GLAZ-00080897 - GOOG-GLAZ-00080951: "Growth Opportunities for Location."

**REQUEST FOR PRODUCTION NO. 19**
**Produce documents sufficient to show the revenue Google received from the use by consumers of Android mobile devices in Arizona, including revenue from advertisements displayed to users of Android devices in Arizona during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production to the extent it seeks sensitive and competitive business information. Google also objects to this Request for Production as Google does not maintain this information in the ordinary course of business categorized by U.S. state. Preparing such information would be burdensome and difficult. In addition, Google objects to this Request as seeking information irrelevant to this investigation.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google reasserts its initial relevancy objection, and reasserts the other objections made below. Google understands the AGO's investigation relates to the collection and use of location information, and specifically, via the Google Account settings Location History and Web & App Activity. Google does not understand, and the AGO has not provided any guidance, regarding any nexus of revenue from Android mobile devices and location information.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00001544 to GOOG-GLAZ-00002105. Google does not maintain documents showing revenue received from Android mobile devices in Arizona, including revenue from advertisements displayed to users of Android devices in Arizona. Google therefore is producing financial statements from 2014 to 2018 that show revenue from all Google products and services, including for Android mobile devices and from advertising. These financial statements identify total revenues as follows: $65,674,000,000 in 2014, $75,544,000,000 in 2015, $89,984,000,000 in 2016, $110,378,000,000 in 2017, and $136,224,000,000 in 2018. In addition, Google remains in the process of determining whether it can provide other information responsive to this request.

FOURTH SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified documents maintained in the ordinary course of business that reflect revenue on a state level. In order to satisfy the Attorney General's request for information, Google has made an effort to estimate revenue for Arizona relating to mobile devices using Android OS by using nationwide data for Search Ads shown on Google.com for the period of January 1, 2014 - June 30, 2019. That estimate is ██████████

51

FINAL RESPONSE:

In your letter dated January 17, 2020, you asked Google to answer the following:

1. Which Google employees were involved in collecting or compiling this data? Please also identify their titles.

- 

2. Please explain where Google's figures are derived from. For example, from which documents, repositories or other systems was this data collected?

3. What does "Search Ads shown on Google.com" mean? For example, does it include only those ads shown on searches done via Google.com? Does it include searches via other points of entry? Does it include searches done on mobile, desktop, and tablet?

"Search Ads shown on Google.com" are ads that appear on the Google Search Results page on Google.com. This Request for Production asked about Android mobile devices, so Google limited its response to Android mobile devices.

4. Please provide a breakdown of the estimate by year since 2014.

|  |  |
|---|---|
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |
| ■ | ■ |

**REQUEST FOR PRODUCTION NO. 20**
**Produce documents sufficient to show the revenue Google received from the use by consumers of Google Accounts and of Google-authored apps or Google websites on iOS**

**CONFIDENTIAL**
147291338.1

**devices in Arizona, including revenue from advertisements displayed to such users when using iOS devices during the relevant time period.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production as Google does not maintain this information in the ordinary course of business categorized by U.S. state. Preparing such information would be burdensome and difficult. Additionally, Google objects to this Request as seeking information irrelevant to this investigation.

SUPPLEMENTAL RESPONSE (May 30, 2019): Google reasserts its initial relevancy objection, and reasserts the other objections made below. Google understands the AGO's investigation relates to the collection and use of location information, and specifically, via the Google Account settings Location History and Web & App Activity. Google does not understand, and the AGO has not provided any guidance, regarding any nexus of revenue from apps and websites, and location information.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial relevancy objection and reasserts the other objections made. As previously stated, Google does not maintain such documents in the ordinary course of business. We are currently attempting to ascertain whether this information can be determined through other means. We will update you on our progress.

THIRD SUPPLEMENTAL RESPONSE (Sept. 4, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00001544 to GOOG-GLAZ-00002105. Google does not maintain documents showing revenue received from the use by consumers of Google Accounts and of Google-authored apps or Google websites on iOS devices in Arizona, including revenue from advertisements displayed to such users when using iOS devices. Google therefore is producing financial statements from 2014 to 2018 that show revenue from all Google products and services, including for Google Accounts, Google-authored apps, Google websites on iOS devices, and revenue from advertisements displayed to such users. These financial statements identify total revenues as follows: $65,674,000,000 in 2014, $75,544,000,000 in 2015, $89,984,000,000 in 2016, $110,378,000,000 in 2017, and $136,224,000,000 in 2018. In addition, Google remains in the process of determining whether it can provide other information responsive to this request.

FOURTH SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google has not identified documents maintained in the ordinary course of business that reflect revenue on a state level. In order to satisfy the Attorney General's request for information Google has made an effort to estimate revenue for Arizona relating to mobile devices using iOS by using nationwide data for Search Ads shown on Google.com for the period of January 1, 2014 - June 30, 2019. That estimate is ███████████

FINAL RESPONSE:

In your letter dated January 17, 2020, you asked Google to answer the following:

**CONFIDENTIAL**
147291338.1

1. Which Google employees were involved in collecting or compiling this data? Please also identify their titles.

- ████████████████████████████████████████

2. Please explain where Google's figures are derived from. For example, from which documents, repositories or other systems was this data collected?

████████████████████████████████████████████████████

3. What does "Search Ads shown on Google.com" mean? For example, does it include only those ads shown on searches done via Google.com? Does it include searches via other points of entry? Does it include searches done on mobile, desktop, and tablet?

"Search Ads shown on Google.com" are ads that appear on the Google Search Results page on Google.com. The numbers provided in this response are for Apple mobile devices (iOS devices).

4. Please provide a breakdown of the estimate by year since 2014.

| | |
|---|---|
| ████ | ████████ |
| ████ | ████████ |
| ████ | ████████ |
| ████ | █████████ |
| ███ | ████████ |
| ██████ | ███████ |

**REQUEST FOR PRODUCTION NO. 21**
**Produce all complaints or inquiries you have received from users in Arizona about your collection, storage, use, or disclosure of user location data or about users' ability to prevent you from doing any of those things and all of your responses regarding the same.**

INITIAL RESPONSE (April 17, 2019): Google objects to this Request for Production because the word "location" is a general and widely-used term that will not meaningfully identify specifically relevant documents. Additionally, Google objects to this Request for Production as Google does not

**CONFIDENTIAL**
147291338.1

maintain this information in the ordinary course of business categorized by U.S. state. As a consequence, locating such information would be unduly burdensome. Google is willing to meet and confer about an appropriate scope of, and response to, this Request.

SUPPLEMENTAL RESPONSE (May 30, 2019): Subject to and without waiving Google's objections to this Request, Google is conducting a keyword search of its system for storing communications from users. The search and review process is underway, and Google is working to produce these as soon as possible.

SECOND SUPPLEMENTAL RESPONSE (June 20, 2019): Google remains in the process of searching and reviewing for responsive documents. We will supplement this response when we can, and we anticipate doing so by June 28, 2019.

FINAL RESPONSE:

On June 27, 2019, Google produced responsive information found after a diligent search in documents Bates-stamped GOOG-GLAZ-00001480 - GOOG-GLAZ-00001507. Based on that search, Google has produced responsive documents and has not identified further responsive documents.

**CONFIDENTIAL**
147291338.1

## GOOGLE'S RESPONSES TO AGO'S SECOND CID

### I.      DEMANDS FOR INFORMATION

**DEMAND FOR INFORMATION NO. 1**
**To the best of your knowledge and belief, are you producing or otherwise making available for examination with your response to this Civil Investigative Demand all non-privileged documents responsive to numbers 1–2 of the Requests to Produce Documents, below, that are in your possession, custody, or control?**

FINAL RESPONSE:
As further described below, yes, to the best of Google's knowledge and belief, it produced all non-privileged and responsive documents.

Regarding Request for Production No. 1, on June 20, 2019, Google produced documents Bates-stamped GOOG-GLAZ-00000951 to GOOG-GLAZ-00001058, containing the written testimony and responses to Questions for the Record submitted by its ███████████ and ███████████ ████████████, including all exhibits and attachments thereto. Google confirms that no other non-privileged materials within the scope described above were submitted to Congress in connection with the hearings on September 26, 2018, and December 11, 2018.

Regarding Request for Production No. 2, in its June 20, 2019 response, Google objected, stating that the documents selected by counsel and reviewed by Mr. ██████ and Mr ██████ in preparation for their testimonies are protected by attorney-client privilege and/or the work-product doctrine and, on these grounds, Google did not produce documents responsive to the request.

**DEMAND FOR INFORMATION NO. 2**
**To the extent that your answer to demand 1 is not an unequivocal "yes," are the reasons why all non-privileged, responsive documents in your possession, custody, or control are not being collected and produced set forth in the response to each request in accordance with the instructions?**

FINAL RESPONSE:
Please see Google's response to Demand for Information No. 1.  Based on our understanding of this Request for Production, Google has no additional information to provide related to it.

**CONFIDENTIAL**
147291338.1

## II.     REQUESTS TO PRODUCE DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1**

**Produce all documents relating to consumer location tracking or location-data collection, storage, or dissemination by Google or by third-parties that were shared with Congress, any house of Congress, any committee or subcommittee of Congress, any senator or member of Congress, or any congressional staff before or after the Senate Commerce, Science, and Transportation Committee hearing on September 26, 2018 or the House Judiciary Committee hearing on December 11, 2018. This includes but is not limited to any such documents provided, shown, read, referenced, or summarized, in whole or in part, to any senators or members of Congress or staff on Google's own initiative or in response to any formal or informal request; the written testimony submitted by ███████████ and ███████ ███████████ including all exhibits and attachments thereto; and the written responses to committee members' or staff's questions submitted before or after the hearings, including all exhibits and attachments thereto.**

INITIAL RESPONSE (May 30, 2019): Google objects to this Request for Production because the hearings held before the Senate Commerce, Science, and Transportation Committee on September 26, 2018, and the House Judiciary Committee on December 11, 2018, did not focus on consumer location tracking or location-data collection, storage, or dissemination by Google or by third parties.

Subject to and without waiving its objections, Google is producing, Bates-stamped as GOOG-GLAZ-00000951 to GOOG-GLAZ-00001058, the written testimony and responses to Questions for the Record submitted by its ███████████ and ███████████████████, including all exhibits and attachments thereto. We are in the process of confirming that no other non-confidential materials within the scope described above were submitted to Congress in connection with the hearings on September 26, 2018, and December 11, 2018.

SUPPLEMENTAL RESPONSE (June 20, 2019): Google has conducted a diligent search for and previously produced all responsive documents regarding this Request for Production.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 2**
**Produce all documents relating to consumer location tracking or location-data collection, storage, or dissemination by Google or by third-parties that were referenced, reviewed, or relied on in preparing for or providing Google ██████████████████ testimony before the Senate Commerce, Science, and Transportation Committee hearing on September**

**CONFIDENTIAL**
147291338.1

**26, 2018 or Google ████████████ testimony before the House Judiciary Committee hearing on December 11, 2018.**

INITIAL RESPONSE (May 30, 2019): Google objects to this Request for Production on the grounds that the documents selected by counsel and reviewed by Mr. ████ and Mr. ████ in preparation for their testimonies are protected by attorney-client privilege and/or the work-product doctrine and, on these grounds, will not produce documents responsive to this request. *See State ex rel. Corbin v. Ybarra*, 161 Ariz. 188, 192 (1989) (citing with approval *United States v. Noble*, 422 U.S. 225, 238 (19785)), which recognized that "societal interests were far better served when attorneys have the opportunity for 'thorough preparation and presentation of each side of the case'"); *see also* 1 Testimonial Privileges § 2.5 (3d ed. 2017) ("Most courts recognize that when an attorney exercises professional skill in compiling selected documents while preparing the client's case, the documents (as compiled) reflect the attorney's mental impressions and should be afforded work product protection.").

SUPPLEMENTAL RESPONSE (June 20, 2019): Google reasserts its initial objections made below.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**CONFIDENTIAL**
147291338.1

## GOOGLE'S RESPONSES TO AGO'S THIRD CID

## I.  DEMANDS FOR INFORMATION

**DEMAND FOR INFORMATION NO. 1**

**Describe the path that User Location Data takes, beginning with the initial collection by device sensors (i.e., "below" the stack (7/11/19 ▮▮▮▮ EUO Rough Tr. at 81:13-83:23)), and ending with storage in Sensor Vault, and identify all instances where the location data is "stored" by Google in any form. Identify documents sufficient to confirm the information provided in your response.**

INITIAL RESPONSE (Sept. 4, 2019): As Google has described in prior written responses, for a user who enables Location History, a distinct and opt-in Google Account setting, the user has asked Google to save a private map of where the user goes with his or her signed-in devices. As requested, Google's response to this Request focuses on the path of data stored in Sensorvault when a user enables Location History.

This response describes an example of a data path to illustrate as a general matter the way collection, transmission, and storage can occur. This example is therefore not intended as a comprehensive description of every possible path that data could take on a device to Sensorvault. Providing that detailed of a response is not possible given the variety of combinations of device settings and user choices about settings. If the AGO has other examples about which it is interested, Google is willing to meet and confer about providing further information.



---

[3] As Google explained in previous responses, users can opt any device out of reporting to Location History.

**CONFIDENTIAL**
147291338.1



**Location History data is stored with these major repositories:**

1. Sensorvault (previously Placevault): the history of lat/long locations and associated sensors with users that opted in to Location History.
2. Semantic database: this is a layer of semantic inference data on top of the raw Sensorvault data. This simply means that the data has been given a semantic description, such as "McDonald's" for a place, or "driving on (example road)" for activity segments. This makes locations more user-friendly and understandable than geo coordinates, for example.
3. 

Internal Google product teams can seek permission to access the data described above, and depending on the use of the data, may access and/or store location information. Any team that needs to store the Location History tied to an individual user is required to respect user deletion choices.

---

[4] Google Location Services stores a short-term record of the device's query for its location; this record is not associated with the user's Google Account.

**CONFIDENTIAL**
147291338.1

**FINAL RESPONSE:**

Your January 17 Letter asks Google to supplement its previous responses by describing additional paths user location information takes. Specifically, you ask about the following scenarios:

**1. Location History on, Location Reporting on, ▨/GLA on, battery saver mode off**

In order to answer this question, Google is making the following assumptions: (i) the device is running on Android 8, (ii) the device's Location Master toggle is enabled, (iii) "▨/GLA on" and "Battery saver mode off" means the device is in *High Accuracy* mode, and (iv) the user is signed into their Google Account on the device. As the documents Google produced in response to Request for Production 4 of the First CID (e.g., GOOG-GLAZ-00000131) show, when ▨ had various modes, users could select *High Accuracy*, *Battery Saving*, or *Device only* mode. The disclosure to users explained that Google would improve location accuracy only when users selected *High Accuracy* or *Battery saving* mode. In those modes, the device might use, for example, Wi-Fi and mobile network information to calculate location. In *Device only* mode, the device only calculated location based on GPS.



**2. Location History on, Location Reporting on, ▨/GLA off, battery saver mode on**

As explained above, the documents produced in response to RFP 4 of the First CID (e.g., GOOG-GLAZ-00000131) show that when ▨ had various modes, users could select *High Accuracy*, *Battery Saving*, or *Device only* mode. The disclosure to users explained that Google would improve location accuracy only when users selected *High Accuracy* or *Battery saving* mode. In those modes, the device might use, for example, Wi-Fi and mobile network information to calculate location. In *Device only* mode, the device only calculated location based on GPS.

Google thus understands this question to be asking about a situation where (i) the device is running on Android 8, (ii) the device's Location Master toggle is enabled, (iii) Battery saving mode is enabled,

**CONFIDENTIAL**
147291338.1

and (iv) the user is signed in to their Google Account on the device. This is the same scenario that Google described in its September 4, 2019 response.

**3. Location History on, Location Reporting on, ▮▮▮ /GLA off, battery saver mode off**

As explained above, the documents produced in response to Request for Production 4 of the First CID (e.g., GOOG-GLAZ-00000131) show that when ▮▮▮ had various modes, users could select *High Accuracy*, *Battery Saving*, or *Device only* mode. The disclosure to users explained that Google would improve location accuracy only when users selected *High Accuracy* or *Battery saving* mode. In those modes, the device might use, for example, Wi-Fi and mobile network information to calculate location. In *Device only* mode, the device only calculated location based on GPS.

Google thus understands this question to be asking about a situation where (i) the device is running on Android 8, (ii) the device's Location Master toggle is enabled, (iii) "▮▮▮ /GLA off" and "Battery saver mode off" means *Device only* mode is on (where the phone only uses GPS to determine location and ▮▮▮ is not improving location accuracy), and (iv) the user is signed into their Google Account on the device.



2.  The user's location information is stored in Sensorvault (previously known as Placevault). The data stored in Sensorvault is not available to third parties. The user can enable Google Location Sharing, which shares the user's location, based on information calculated and available from their Location History, with any person who the user herself designates.

## DEMAND FOR INFORMATION NO. 2
**Identify all clients, groups, teams or people, internal or external to Google, that have direct access to Location History location data.**

INITIAL RESPONSE (Sept. 4, 2019): Access to the Location History data stored in a user's account is limited to internal Google services and products. No parties external to Google have direct access to a user's Location History data.

Any Google teams' access to Location History data is subject to review and compliance with usage policies. To be considered for permission to access Location History data, the team must submit a detailed request that includes information about the Privacy Working Group they work with, their Privacy Design Documents (which are privileged documents created to seek the advice of counsel

**CONFIDENTIAL**
147291338.1

advising on the product), and their relevant launch report documentation. The team also must identify their product counsel contact. Additionally, Google requires that the requester seeking access to the data for a specific team and use have a certain level of seniority.

The groups of Google teams that can and do seek approval to access Location History data in Sensorvault are listed below in response to Demand for Information No. 5.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 3**
**Identify all clients, groups, teams, servers or other subdivisions at Google where User Location Data in any form (whether or not aggregated or anonymized) is stored.**

INITIAL RESPONSE (Sept. 4, 2019): Google objects to this request as overly broad and unduly burdensome. Specifically, the term "User Location Data" is overly broad and not within a reasonable definition. As an initial matter, defining "User Location Data" as "data from which a user's location can be determined" suggests that even extremely coarse location information (e.g., country level) could conceivably be included in the definition. Furthermore, including IP address within that definition, when an IP address is needed for any device to connect to and function on the internet, renders this defined term even more unwieldy. Especially when combined with an all inclusive request like this Demand for Information, such a vague term renders the demand prohibitively burdensome.

Notwithstanding this objection, Google provides the following information in an effort to be responsive to this request:

Google previously provided written responses to the First Civil Investigative Demand ("First CID") that described Google Account level location settings.

There are three major repositories that store Location History data: Sensorvault, a semantic database, and ███████████████. These repositories are described in further detail in response to Demand for Information No. 1. Sensorvault stores the location information that a user can share with a third party when the user enables Location Sharing.

The repository that stores users' Web & App Activity data is called ██████████.

63

Location data that Google saves from the Usage & Diagnostics setting is stored in ████████ and in corresponding internal logging platforms. It is associated with a user's account for users that have Web & App Activity enabled, as Google explained in response to the First CID. When Usage & Diagnostics data is not associated with a Google user's account because the user does not have the additional Web & App Activity setting (the sub-setting to "Include Chrome history and activity from sites, apps, and devices that use Google services") enabled, the data is not associated with a user's Account in ████████ and also is stored in Google's internal logging platforms. Both systems have access controls for teams that log and read data from these repositories.

Other Google products and services may receive and store a user's location information, e.g., IP addresses, when a user interacts directly with the product or service from a mobile device. For example, Google's ██████ team receives and temporarily stores location information when users interact with Google Maps. That team assists in providing geolocation information that enables Google Maps to respond to the user's query to the app. IP address information is needed to operate and offer Google services, and is used for legal compliance and other product operations.

With regard to the request's reference for information about aggregated and/or anonymized location information, Google needs a more detailed understanding of what types of information to which the AGO is referring. Google is willing to meet and confer to determine whether additional information about Google teams' storage of information can be provided.[5]

FINAL RESPONSE:
In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Specifically, Google's September 4, 2019 response described where location information is stored for Location History, Web & App Activity, and Usage & Diagnostics. Google also explained that other

---

[5] Google also reiterates its objection to this Demand, and others that reference "aggregated" or "anonymized" data, that such data not associated with a specific user's account is not a proper subject of the Attorney General's investigation under the Arizona Consumer Fraud Act.

**CONFIDENTIAL**
147291338.1

products and services may receive and store a user's location information, and mentioned ██ as an example.

In addition, as explained above in response to Demand for Information No. 4 of the First CID, Google also produced multiple informative documents on the topic of the storage of location information.

Furthermore, the AGO's Fourth CID asks about 18 additional potential data stores, which Google is in the process of responding to.

Your January 17 letter also asked Google to confirm whether the semantic database is known or referred to by any other name. It is also referred to as ██

Finally, your January 17 letter asked Google to identify where the following information is stored:

- information that is tied to a rotating device ID (see, e.g., ██ EUO Tr. page 98)
- Location History data that is used in an "anonymized and aggregated manner" for ads purposes (as described by Google in its response to CID 3, DFI 4)
- anonymized use of Web & App Activity location data (as described by Google in response to CID 3, DFI 8)

For information tied to a rotating device ID, this information is not stored, collectively, in a specific location.  Rather, information is stored in the datastore that is specific to the relevant Google product.

For anonymized, aggregated Location History information used for ads (as described by Google in its Response to CID 3, DFI 4), this information is stored in the ████████████ repository.  For more information about this repository, please refer to Google's Response to Demand for Information No. 1 of the Third CID.

For anonymized Web & App Activity location information (as described by Google in response to CID 3, DFI 8), this coarsened location information is stored in ████████ anonymous logs that ████████████████████████████████████████████

## DEMAND FOR INFORMATION NO. 4
**Identify all clients, groups, teams or people, internal or external to Google, that use Location History location data.**

65

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (Sept. 4, 2019): As we explain in response to Demand for Information No. 2, no parties external to Google have access to or use Location History information that indicates any individual user's location. Each team that has direct access to Location History location data, as explained in response to Demand for Information No. 2, has a process to seek approval and get access to Location History data and is able to use the data for their product or feature implementation in accordance with their user data access request and Google's policies. It is not possible for Google to explain each and every use case, but in response to Demand for Information No. 5, Google has provided examples of how each team that has access to the data uses it.

As Google explained in its previous responses to the First CID, Google also uses Location History data in an anonymized and aggregated manner, for users that choose to opt-in to the product, to help advertisers measure how often an online ad campaign helps drive traffic to physical stores or properties. Google does not share any individually identifying Location History information with advertisers. Store visit data cannot be tied to individual ad clicks, viewable impressions, or people.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 5**
**Identify all approved uses of Location History location data. (See 7/11/19 ▮▮▮▮▮ EUO**
**Rough Tr. at 231:10-22).**

INITIAL RESPONSE (Sept. 4, 2019): Google provides below teams that had approved uses for Location History information, along with representative examples of each team's use case. It is not practical for Google to identify in a static answer all approved uses given the evolving nature of the work of product teams, which is the reason that Google's Privacy Policy and product-related pages describe broadly the ways in which Google uses data. As we explain in response to Demand for Information No. 1, all teams accessing Location History data must seek approval and must use the data in accordance with Google's policies regarding data access and Google's Privacy Policy.



66

**CONFIDENTIAL**
147291338.1



67

CONFIDENTIAL
147291338.1



FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 6**

**Describe the path that Web & App Activity location data takes, beginning with the initial collection by device sensors, and ending with the location data's storage in Web & App Activity. (See 7/12/19 ▇▇▇▇ EUO Rough Tr. at 208:19-210:18).**

INITIAL RESPONSE (Sept. 4, 2019): As Google has described in prior written responses, for users who enable Web & App Activity, Google saves the user's activity (e.g., search queries) on Google products and services in the user's Google Account.

The location that is associated with the user's activity on Google products and services is obtained from the device's location services Application Programming Interfaces (API). The device can derive location from sensor data and information about things near a user's device, such as Wi-Fi access points and cell towers, and is provided to the Google products and services via APIs.

If location information is not available from device sensors or otherwise is not part of the user's action (e.g., the user has disabled their device-level location setting), the Web & App Activity entry for that action will not include device-based calculated location. The entry will still include the IP address associated with the user's activity. IP addresses are required for devices to be able to connect to one another through the Internet and are necessary for online services to function.

Below Google sets forth two examples of a path starting with a user's search, which is saved in Web & App Activity. This response is not intended as a comprehensive description of every possible path

**CONFIDENTIAL**
147291338.1

that data could take when a user has enabled Web & App Activity. Providing that detailed of a response is not possible given the variety of combinations of device settings and user choices about settings. If the AGO has other examples about which it is interested, Google is willing to meet and confer about providing further information.

The following is an example of a search query for a Google Account with Web & App Activity ON using a device with system location OFF or when device location is otherwise unavailable.



The following is an example search query for a Google Account with Web & App Activity ON using a device with system location ON and the OS location permission ON for the Google App.



**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:

Your January 17 letter asked Google to respond to the following questions:

**1. To which settings do "system location" and "OS location permission" refer?**

"System location" refers to, for example, Google Location Services on a Google-licensed Android device. "OS location permission" refers to, for example, the Location Master toggle on a Google-licensed Android device.

**2. Does the term "devices location services API" refer to the Fused Location Provider API? If not, to which API(s) does it refer?**

This example was meant to be device agnostic. Thus, the APIs used on iOS devices may be different than APIs used on Android devices. For Google-licensed Android devices, Fused Location Provider is an API that provides location to apps and services with the requisite user permission.

**3. What is intended by the term "Google servers," and are these the same servers referenced by Mr.** ▮▮▮▮ **See** ▮▮▮▮ **EUO Tr. at 218:15–220:6.**

"Google servers" as used by Mr. ▮▮▮▮ refers, generically, to any Google web service that a user may connect to through, for example, the Internet or an app.

**4. What is intended by the term "device sensors"?**

"Device sensors" has the same meaning as that which Ms. ▮▮ used.  Device sensors also are explained more in Google's Response to DFI No. 2 of the First CID.

**DEMAND FOR INFORMATION NO. 7**
**Identify all clients, groups, teams or people, internal or external to Google, who have direct access to Web & App Activity location data. (See 7/12/19** ▮▮▮▮ **EUO Rough Tr. at 121:20–123:10).**

INITIAL RESPONSE (Sept. 4, 2019): Access to information stored in a user's Web & App Activity is limited to internal Google services, and such access is subject to review and must be in compliance with policy. No parties external to Google have direct access to a user's Web & App Activity data.

**CONFIDENTIAL**
147291338.1

As Google explains in its Privacy Policy (available at https://policies.google.com/privacy) and in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google may store user information for use across Google's products and services. Web & App Activity data is specifically used to help Google give users more personalized experiences across Google services. This includes things like faster searches, better recommendations, and useful ads, both on and off Google. In order to provide this personalization to users, various teams at Google use Web & App Activity data for as long as the user chooses to keep it associated with their account.

One type of data that Web & App Activity stores is coarsened device-based location data saved from a user's interactions with Google Search, Maps, and Assistant. According to Google's policies, teams may only access data that they use. So, while teams using a user's past searches to personalize search results would be able to view the coarsened device-based location data in Web & App Activity, they would not access that location data unless they had a use case permitted by Google's policies, examples of which we explain in response to Demand for Information No. 8.

Given Web & App Activity is used by many teams to improve Google users' experiences across Google products and services, in the time provided to respond to this Demand for Information, Google was not able to identify a mechanism to list all teams that can access Web & App Activity data generally. Google is in the process of determining if there is a mechanism to do so and will keep you updated on its progress.

SUPPLEMENTAL RESPONSE (Jan. 17, 2020): Please see Google's response to Demand for Information No. 8, which explains examples of authorized uses for which certain teams accessed device-based Web & App Activity location data. As Google previously explained, various teams at Google are able to view Web & App Activity data, to use it in compliance with Google's policies for permitted use cases.

FINAL RESPONSE:
Google responded to this demand on December 31, 2019, and January 17, 2020. Additionally, Google produced documents responsive to this DFI on February 14, 2020, at GOOG-GLAZ-00203130 - GOOG-GLAZ-00203442.

**CONFIDENTIAL**
147291338.1

**DEMAND FOR INFORMATION NO. 8**
**Identify all clients, groups, teams or people, internal or external to Google, that make use of Web & App Activity location data.**

INITIAL RESPONSE (Sept. 4, 2019): As we explain in response to Demand for Information No. 7, no parties external to Google have access to or use location information stored in Web & App Activity. Per Google's policies, all internal clients that want to use the device-based location data saved in Web & App Activity must seek approval for their product or feature implementation.

To accurately respond to this request and verify which teams are in fact using Web & App activity device-based location data, Google needs to query data sources including logs, which it was not possible to do in the time provided to respond. Google is in the process of working on this request and will keep you updated on its progress.

There are generally three types of uses for which teams use device-based location from Web & App Activity. The first is to display to users their Web & App Activity in their Google Account and allow users to edit and manage that data. The second use case is to get location for a user at the time of a user's interaction with a Google product or service in order to deliver a more relevant and personalized experience. An example might be a user searching for "weather in Paris" followed by "things to do" where Google would infer that the user means "things to do in Paris." This data may also be used to show the user more relevant ads. The third use of the data is related to product development, improvement, or analysis. This could include, for example, using data at an aggregated level for the query "restaurants near me" to improve search results for users in a given area.

SUPPLEMENTAL RESPONSE (Jan. 17, 2020): Based on a query of Google's systems, the following is a representative list of teams with access to and their use of device-based Web & App Activity location data:



**CONFIDENTIAL**
147291338.1



**FINAL RESPONSE:**
Google responded to this demand on December 31, 2019, and January 17, 2020. Additionally, Google produced documents responsive to this DFI on February 14, 2020.

**DEMAND FOR INFORMATION NO. 9**
**Identify all approved uses of Web & App Activity location data. (See 7/12/19** ████████ **EUO Rough Tr. at 122:2-123:10).**

INITIAL RESPONSE (Sept. 4, 2019): It is not possible for Google to explain each and every use case of Web & App Activity device-based location data. Google has provided three examples of the uses for WAA data as part of its response to Demand for Information 8. In order to respond to Demand for Information No. 8, Google is working to identify teams that use Web & App Activity device-based location. If Google is able to do so, Google will provide representative examples of the ways in which the teams use the data in response to the current demand.

SUPPLEMENTAL RESPONSE (Jan. 17, 2020): Please see Google's response to Demand for Information No. 8, which explains examples of authorized uses for which certain teams accessed device-based Web & App Activity location data.

FINAL RESPONSE:
Google responded to this demand on December 31, 2019, and January 17, 2020. Additionally, Google is producing documents Bates-stamped produced documents responsive to this DFI on February 14, 2020.

**DEMAND FOR INFORMATION NO. 10**
**Identify any and all other means Google uses to collect, store, transmit, use, delete or disclose User Location Data outside of Location History and Web & App Activity.**

INITIAL RESPONSE (Sept. 4, 2019): Google objects to this request as overly broad and unduly burdensome. Specifically, the term "User Location Data" is overly broad and not within a reasonable

**CONFIDENTIAL**
147291338.1

definition. As an initial matter, defining "User Location Data" as "data from which a user's location can be determined" suggests that even extremely coarse location information (e.g., country level) could conceivably be included in the definition. Furthermore, including IP address within that definition, when an IP address is needed for any device to connect to and function on the internet, renders this defined term even more unwieldy. Especially when combined with an all inclusive request like this Demand for Information, such a vague term renders the demand prohibitively burdensome.

Google is making a good-faith effort to respond by providing information about how its suite of GMS products collect, store, transmit, use, delete, and disclose location information, as the AGO has specifically inquired about these services in Request for Production No. 5:

As Google explains in its Privacy Policy (available at https://policies.google.com/privacy), in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google collects, stores, and uses a number of categories of location information.

## *Collection*

Google may collect location information in the following general ways:

### IP Addresses

Every device connected to the Internet is assigned an IP address and these numbers are usually assigned in geographic blocks. Thus, an IP address can often be used to identify the location from which a device is connecting to the Internet. IP addresses are needed to operate and offer Google services, including for legal compliance and other product operations.

### User Provided Information

Users may provide Google with billing address information or address delivery information in a number of Google products and services. In addition, when users create a Google Account, they may (but are not required to) provide an address. Users may also provide phone numbers associated with their Google account, the area code of which may infer a user's location. In certain products, such as Maps, users may input a home or work address. Finally, users provide information to Google when they enter queries on Search or Maps such as "restaurants near me."

**CONFIDENTIAL**
147291338.1

<u>Device Sensors</u>

A number of Google products and services can request access to device-based location, as calculated and provided by the device. As Google explained in its response dated April 17, 2019, to Demand for Information No. 7 of the First CID, Google Location Accuracy (formerly known as Google Location Services) ("GLA") is a network-based location service that collects data to improve location accuracy and provide certain location information to the apps and services with the requisite permissions. The information Google collects from GLA is linked to a temporary and rotating device identifier that is not used by or shared with other services. It is not connected with any identifier that would associate that data with a specific user.

Below we explain how the GMS products may collect location information.

**Google**
Google may collect search terms associated with a user's search, which may allow Google to infer a user's location. In addition, Google Search may request device-based location.

**Chrome Browser**
The Chrome browser can request access to device-based location.

**Gmail**
Gmail may collect user location information from messages, for example, in order to create a calendar entry for an upcoming event (e.g. dinner reservation at [example]). In addition, Gmail will have location metadata associated with certain attachments like photos or videos. As part of the Gmail/Google Account creation process, users may also provide an address to associate with their account.

**Google Maps**
Maps can collect various location information such as users' queries, device-based location for providing navigation directions, or the location of manual entries that users may save such as their home/work addresses or favorite/saved locations. Maps may also collect location information from other Google products to provide a more personalized user experience. For example, a user's upcoming reservation sent in a Gmail message may display on their Google Maps.

**YouTube**
The YouTube service may request access to device-based location.

**CONFIDENTIAL**
147291338.1

**Google Play Store**

As a commercial service, Google Play collects user/developer billing information. Play also requests access to device-based location.

**Drive**

Google Drive stores users' files in the cloud. To the extent that the files contain user location information, for example the metadata associated with a photo, Drive has that information saved for the user.

**Google Play Music**

As a commercial service, Google Play Music may collect user/artist billing information. Play Music may also request access to device-based location.

**Google Play Movies**

As a commercial service, Google Play Movies may collect user/artist billing information. Play Movies may also request access to device-based location.



As a video-calling app, █████ may collect location information based on phone numbers.

**Google Photos**

Google Photos may collect geolocation EXIF data from any uploaded photos.

*Usage*

**Google**

This app uses location information to provide users with more personalized and relevant search results. This helps Google respond to queries like "restaurants near me."

**Chrome Browser**

The Chrome browser will allow sites to access the user's location for a number of reasons, including being able to surface relevant content to a user based on location (including for legal obligations -- e.g. users in the EEA must provide consent to websites to use cookies). In addition, the Chrome browser allows users to save addresses for auto-filling and stores location in a way that users can manage (e.g., block certain sites or allow certain sites access to location without having to re-request permission).

76

**CONFIDENTIAL**
147291338.1

**Gmail**

Gmail may use the location data from messages to populate other Google products with personalized information for the user. This could include upcoming travel or dining reservations on Calendar and on Google Maps.

**Google Maps**

As a Geo-focused product, Google Maps uses location in a variety of ways including to show users locations they searched for, to provide navigation, and to personalize and recommend places on a map. Maps also displays to users relevant location information based on things like appointments and reservations that a user may have in Gmail or Calendar.

**YouTube**

YouTube uses location information, for example, to provide users with localized and personalized results, such as surfacing local artists. In addition, YouTube previously used aggregated and anonymized location data to provide wireless carriers network quality information. YouTube also uses location information to restrict access to content as necessary to comply with legal obligations, for example in licensing agreements.

**Google Play Store**

The Google Play Store uses location information, for example, to send and receive billing and payment information, provide users with relevant app recommendations, and restrict access to content as necessary to comply with legal obligations, for example in licensing agreements.

**Google Drive**

Google Drive may use IP addresses to determine which Google Drive server should be used to fulfill a user's request in order to reduce latency and be as expedient as possible.

**Google Play Music**

Play Music uses location information, for example, to send and receive billing and payment information, provide users with relevant app recommendations, and restrict access to content as necessary to comply with legal obligations, for example in licensing agreements.

**Google Play Movies**

Play Movies uses location information, for example, to send and receive billing and payment information, provide users with relevant content recommendations, and restrict access to content as necessary to comply with legal obligations, for example in licensing agreements.

77

**CONFIDENTIAL**

147291338.1

 may use IP address to determine a user's country and check if the service is available there.

**Google Photos**
Photos uses location information, for example, to help users search for photographs from a particular place, to display the location information to the viewer of the photo, and to recognize famous objects and landmarks in a photo, such as the Statue of Liberty or the Eiffel Tower.

*Disclosure*

**Google**
Users conducting searches can see the location that Google Search is using at the bottom of the Google Search Results Page.

**Chrome Browser**
When the user grants a third-party site permission to access location, the Chrome browser will transmit that location to the site. Users are made aware of this request by a browser pop-up.

**Gmail**
Gmail allows users to send information to other users, and to the extent that includes location information, this will be transmitted to others.

**Google Maps**
Maps allows users to choose to share Map locations with others by clicking the "Share" options.

**YouTube**
As explained above, Google used to provide network quality information to third parties based on aggregated and anonymized YouTube location data.

**Google Play Store**
When users interact with apps on Google Play, they may grant those apps permission to access their location. In addition, developers may access a user's billing information to complete transactions.

78

**Drive**

Google Drive allows users to share files with others. To the extent there is location information associated with or in the file, that information may be viewable to others with whom the user has chosen to share the files.

**Google Play Music**

Content providers may access a user's billing information to complete transactions.

**Google Play Movies**

Content providers may access a user's billing information to complete transactions.

█ allows others to see the user's phone number, which can provide information about the user's location.

**Google Photos**

Users may choose to share images in Google Photos with others who will be able to view the location metadata information of the photograph.

*Storage & Deletion*

**Google**

For users that have Web & App Activity enabled, Google saves their search results and associated location information in the users' Google Accounts. Users can delete that data at any time. Google recently introduced a feature to allow users to set the data to auto-delete after 3 or 18 months, or to be retained indefinitely for users to manage and delete when they wish.

**Chrome Browser**

Chrome History may be saved in a user's Web & App Activity with relevant location information, which the user can edit or delete at any time. Also, users can delete any addresses they have stored in Chrome.

**Gmail**

Users can delete their Gmail content, including location information, at any time.

**CONFIDENTIAL**
147291338.1

**Google Maps**

Users can delete any of their saved locations in Maps at anytime. In addition, Timeline in Maps provides the user interface to manage and delete Location History. Search queries in Maps are saved in a user's Google Account if the user has Web & App Activity enabled, which the user can manage and delete at anytime.

**YouTube**

Users cannot delete the aggregated and anonymized network quality information data described above, as that data is not associated with any user.

**Google Play Store**

Users are able to revoke the location permission for any apps at any time. In addition, users can update their account or billing addresses at any time.

**Drive**

Users can delete files and their associated location information at any time.

**Google Play Music**

Users can update their account or billing addresses at any time.

**Google Play Movies**

Users can update their account or billing addresses at any time.

 stores a user's phone number which users can update at any time.

**Google Photos**

Users can delete any of their photos along with the associated location information. Additionally, users can remove access permission to photos that they have chosen to share with others via the sharing functionality, so that those users can no longer see the photo and associated metadata that may include location.

_Transmission_

Data is routinely transmitted between users and Google when users interact with the Internet and on Google's products and services. Like other data, location data can be transmitted to Google passively (e.g., Google receives an IP address) and actively (e.g., Google asks a user to provide their billing

80

**CONFIDENTIAL**
147291338.1

address as part of a transaction and the user enters the information into a form). If the AGO has particular examples about which it is interested, Google is willing to meet and confer about providing further information.

FINAL RESPONSE:

In Google's February 28, 2019 letter to the AGO and in its first response to the First CID, Google objected to requests to the extent that they were overly broad and unduly burdensome in defining a Relevant Time Period of more than 10 years—January 1, 2007 - present—across such a broad range of products and services. Google explained that in the absence of appropriate limitations, the scope was not manageable and made it difficult for Google to provide useful information in a timely and efficient manner. Subject to and without waiving those objections, Google provided detailed and substantive narrative responses and produced documents.

Additionally, Google made a witness, ███████ available for examinations under oath, who was prepared to speak about how user location information is collected in connection with Android. Further, as mutually agreed, Google is making a fourth witness available for examination under oath later this month to speak about how user location information is collected in connection with Google-authored apps and Google search through a web browser.

Your January 17 letter asked about Google Play Services. As Ms. ███ explained in her deposition, Google Play Services is synonymous with GMS Core, which is comprised of many services. Ms. ██ explained that she is responsible for the location services within Google Play Services. (See ██ EUO Tr. at 62:23-25). She provided detailed information on how those location services work, including the Fused Location Provider API and the Geofencing API. Google's September 4, 2019 response discussed the Fused Location Provider API, for example.

Your January 17 letter also asked about Google's IP Address objection. As Google has stated, Google collects IP addresses, which the AGO included in its definition of "User Location Data." See, e.g., First Civil Investigative Demand, pg. 6 ("'User location data' means any data from which a user's location can be determined, including but not limited to location information collected through device sensors, GPS, Wi-Fi, Bluetooth, cell towers, and IP addresses."). Google has explained that including IP address within that definition, when an IP address is needed for any device to connect to and function on the internet, renders this defined term unwieldy, especially when combined with an all inclusive request like this Demand for Information. Google cannot answer this request given how expansively the AGO has defined User Location Data.

81

**CONFIDENTIAL**
147291338.1

As your January 17 letter pointed out, Google has made a good-faith effort to respond to this request by explaining its location practices for the GMS products:

- Google
- Chrome Browser
- Gmail
- Google Maps
- YouTube
- Google Play Store
- Drive
- Google Play Music
- Google Play Movies
- ███
- Google Photos

Google is also in the process of responding to the AGO's Fourth CID, which asks about specific additional Google products and services.

**DEMAND FOR INFORMATION NO. 11**
**For each of the means identified in Demand For Information No. 10, identify all clients, groups, teams or people within Google who have direct access to any and all User Location Data collected, stored, transmitted, used, deleted or disclosed by Google.**

INITIAL RESPONSE (Sept. 4, 2019): The broad scope of this demand makes it impractical and overly burdensome for Google to identify each team or person across the company who has access to location information. The difficulty in complying with this demand is illustrated by how apps and services interact with a user's mobile device. To the extent that a user is interacting with a Google product on a mobile device, IP address may be collected in order to respond to user requests to the product. For example, if a user seeks directions or wants to identify a location in Google Maps from a mobile device, a request for information is sent directly to Google via the app. When a user sends a request via the app, Google will receive the user's IP address in order to return a response (i.e., to send information back to the app in response to the request).

As Google explains in its Privacy Policy (available at https://policies.google.com/privacy) and in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-

**CONFIDENTIAL**
147291338.1

82

00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google may store user information for use across Google's products and services.

As we describe in response to Demands for Information Nos. 1-9, for users that are signed in to Google and that are using Google's products and services identified in Demand for Information No. 10, Google only stores the associated location data in the user's Google Account using Sensorvault and ██████████ if they have Location History or Web & App Activity, respectively, enabled. The teams that can access and use the data in these repositories are explained above in response to Demands for Information Nos. 1-9.

Google is willing to meet and confer to determine whether additional information about Google teams' access of information can be provided.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 12

**For each of the means identified in Demand For Information No. 10, identify all clients, groups, teams or people within Google that use any and all User Location Data collected, stored, transmitted, used, deleted or disclosed by Google.**

INITIAL RESPONSE (Sept. 4, 2019): Please see our response to Demand for Information No. 11.

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 13

**For each of the means identified in Demand For Information No. 10, identify all approved uses of any and all User Location Data collected, stored, transmitted, used, deleted or disclosed by Google.**

INITIAL RESPONSE (Sept. 4, 2019): Please see our response to Demand for Information No. 11.

**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

## DEMAND FOR INFORMATION NO. 14

**For each of the means identified in Demand For Information No. 10, identify the path that location data takes, beginning with the initial collection by device sensors, and ending with its use or storage by Google.**

INITIAL RESPONSE (Sept. 4, 2019): Google objects to this request as overly broad and unduly burdensome. Specifically, the term "User Location Data" is overly broad and not within a reasonable definition. As an initial matter, defining "User Location Data" as "data from which a user's location can be determined" suggests that even extremely coarse location information (e.g., country level) could conceivably be included in the definition. Furthermore, including IP address within that definition, when an IP address is needed for any device to connect to and function on the internet, renders this defined term even more unwieldy. Especially when combined with an all inclusive request like this Demand for Information, such a vague term renders the demand prohibitively burdensome. In response to Demand for Information No. 10, Google has made a good-faith effort to provide a number of examples of how its products and services collect, use, store, transmit, delete and disclose location data.

Despite the overly broad scope of this request, to the extent that the AGO is seeking to understand another path that data takes beyond the specific responses to Demands for Information 1 (Location History) and 6 (Web & App Activity), Google is willing to meet and confer about data paths for location information relating to specific Google products, for example, Google Search or Google Maps.

FINAL RESPONSE:
Google's Response to DFI No. 6 of the Third CID outlines a representative path that location information can take from device to storage in a Google Account for Google Search and Google Maps.

## DEMAND FOR INFORMATION NO. 15

**Identify the person(s) most knowledgeable about the aggregation and anonymization of User Location Data (e.g., via the "aggregation and anonymization" team (7/11/19 ▮▮▮▮ EUO Rough Tr. at 236:10-14)) that is collected, transmitted, stored, used, deleted or disclosed via Location History.**

84
**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (Sept. 4, 2019): The person most knowledgeable about the aggregation and anonymization of user location information is ███████████

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 16**

**Identify the person(s) most knowledgeable regarding Google's collection, storage, use and transmission of User Location Data, as it relates to each of the following (i) Google Mobile Services, (ii) Google Play Services, (iii) the Android Operating System, (iv) the ██████ team, (v) Google Maps, (vi) web browser(s) and (vii) any other group (except for Web & App Activity or Location History) involved in collection, storage, use and/or transmission of User Location Data.**

INITIAL RESPONSE (Sept. 4, 2019):

*(i) Google Mobile Services*

As explained in our letter dated August 26, 2019, Google Mobile Services (GMS) is a collection of Google applications and APIs that help support functionality across devices. We are providing information about the specific Google applications that are included in GMS in the United States and that use location information:

- Google
- Chrome
- Gmail
- Maps
- YouTube
- Play Store
- Drive
- Play Music
- Play Movies
- ██████
- Photos

**CONFIDENTIAL**
147291338.1

The person most knowledgeable regarding Google's collection, storage, use and transmission of user location information, as it relates to these products, is ███████████

### (ii) Google Play Services

Please see response to (i) above.

### (iii) the Android Operating System

The person most knowledgeable regarding Google's collection, storage, use, and transmission of user location information, as it relates to the Android Operating System is ██████

### (iv) the ████████ team

The person most knowledgeable regarding Google's collection, storage, use and transmission of user location information, as it relates to ██████ is ███████████

### (v) Google Maps

Please see response to (i) above.

### (vi) web browser(s) and (vii) any other group (except for Web & App Activity or Location History)

Please see response to (i) above.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 17**
**Identify the person(s) most knowledgeable regarding Google's collection, storage, use and transmission of User Location Data company wide, including the collection, storage and/or transmission of User Location Data from one group to another.**

INITIAL RESPONSE (Sept. 4, 2019): The person most knowledgeable is ███████████

86

FINAL RESPONSE:

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 18**

**Identify the people, including their titles and groups or teams they are a part of, who were at the meeting referenced in the August 13, 2018 email from** ███████ **as reflected in GOOG-GLAZ-00001521 at 1523.**

INITIAL RESPONSE (Sept. 4, 2019): Google is unable to confirm this information.

FINAL RESPONSE:

Google inquired of Ms ███ and Mr. ███████ regarding this meeting. Neither has any recollection of the attendees; neither recalls attending the meeting themselves. The invited attendees from Google were: █████████████████████, and ████████. These Googlers are all members of the Communications team.

**DEMAND FOR INFORMATION NO. 19**

**Describe in detail the hierarchical structure of Google's "Geo" product area, including each "component," "team," "product," "product focus" and "service" within Geo. (For reference, see 7/11/19** ███████ **EUO Rough Tr. at 34:7-42:15, 52:8-55:8). Include the person(s) (along with title) who oversees, supervises or is otherwise in charge of each hierarchical level.**

INITIAL RESPONSE (Sept. 4, 2019): As ███████ testified in his July 12, 2019 examination under oath and as Google has explained previously, Google does not have a traditional organizational structure. Google maintains a more informal, organic organizational structure of business components and employees that continuously change (in varying degrees) to meet various demands. Google does not maintain a chart or list identifying the "hierarchical structure of Google's 'Geo' product area." That said, this response identifies several representative examples of the "teams" (and their leaders) within Geo. This response uses "teams" to refer to any subset of Geo. This example is not intended as a comprehensive identification of every single "component," "team," "product," "product focus," and "service" within Geo. Providing such a response is not possible given the numerous informal, organic "teams" within Geo. If the AGO has other examples about which it is interested, Google is willing to meet and confer about providing further information.

"Geo" is a product area within Google that is overseen by ███████. Ms. ███████ is a ███████ at Google.

87

**CONFIDENTIAL**

147291338.1

"Location Platform" is a team within Geo that is overseen by ███████ and █████████. Mr. ██████ is a ██████████, and Mr. ██████ is a ██████████.

"Timeline" is a team within Location Platform that is overseen by ███████ and █████████. Mr. ██████ is a ██████████ and Mr. ██████ is a ███████.

"Location History" is a team within Location Platform that is overseen by ███████ and ████ ████. Mr. ██████ is a ██████████, and Mr ██████ is a ██████████.

"Sensorvault" (previously "Placevault") is a team that serves Location History and that is overseen by █████ and ███████. Mr. ██████ is a ██████████, and Mr. ██████ is a ███████.

"Inference Layer" is a team within Location History that is overseen by ███████ and ████ ████ Mr. ██████ is a ██████████, and Mr ██████ is a ██████████.

"Quality" is a team within the Location Platform that is overseen by ███████ and ████ ████ Mr. ██████ is a ██████████, and Mr ██████ is a ██████████.

"IP Geo" is a team within Geo that is overseen by ██████ and ███████. Mr. ████ is a ██████████, and Mr ██████ is a ██████████.

█████ is a team within Geo that is overseen by ██████ and ███████. Mr. ████ is a ██████████, and Mr. ██████ is a ███████.

"Geo product experience" is a team within Geo that is overseen by ███████. Mr. ██████ is a ██████ at Google.

"Google Maps Mobile" is a team within Google Maps that is overseen by ███████. Mr. ██████ is a ██████ at Google.

FINAL RESPONSE:

To reiterate, Google does not maintain a formal, static organizational chart. Based on our understanding of this Demand for Information, Google has no additional information to provide

**CONFIDENTIAL**
147291338.1

related to it.

**DEMAND FOR INFORMATION NO. 20**
**Describe in detail the hierarchical structure of Google's "Knowledge" product area, including**
**each "component," "team," "product," "product focus" and "service" within Knowledge.**
**(For reference, see 7/12/19** ███████ **EUO Rough Tr. at 39:11-47:20). Include the person(s)**
**(along with title) who oversees, supervises or is otherwise in charge of each hierarchical level.**

INITIAL RESPONSE (Sept. 4, 2019): As ███████████ testified in his July 12, 2019 examination
under oath and as Google has explained previously, Google does not have a traditional organizational
structure. Google maintains a more informal, organic organizational structure of business components
and employees that continuously change (in varying degrees) to meet various demands. Google does
not maintain a chart or list identifying the "hierarchical structure of Google's 'Knowledge' product
area" (now known as "Search & Assistant"). That said, this response identifies several representative
examples of the "teams" (and their leaders) within Search & Assistant. This response uses "teams" to
refer to any subset of Search & Assistant. This example is not intended as a comprehensive
identification of every single "component," "team," "product," "product focus," and "service" within
Search & Assistant. Providing such a response is not possible given the numerous informal, organic
"teams" within Search & Assistant. If the AGO has other examples about which it is interested,
Google is willing to meet and confer about providing further information.



"Search & Assistant" (previously "Knowledge") is a product area within Google that is overseen by
███████. Mr ██████ is a ████████████ at Google.

"Search" is a team within Search & Assistant that is overseen by ███████. Mr. ███ is a █████████
at Google.

"Google Assistant" is a team within Search & Assistant that is overseen by ████████. Mr.
███████ is a ██████ent at Google.

"Search Platforms" is a team within Search & Assistant that is overseen by ████████. Mr.
███████ is a ████████ at Google.

"News Content/Proactive Search" is a team within Search & Assistant that is overseen by ████
██████ Mr ██████ is a ███████████ at Google.

89

"Ranking & Eval Tech Advisors" is a team within Search & Assistant that is overseen by ████████. Mr ████ is ████ at Google.

"Web Search" is a team within Search that is overseen by ████████ Mr.████ is a ████████ at Google.

"Image Search" is a team within Search that is overseen by ████████. Ms ████████ is ████████ at Google.

"Search Logs" is a team within Search that is overseen by ████████ Ms. ████ is a ████████ at Google.

"Scholar Search" is a team within Search that is overseen by ████████. Mr. ████ is a ████r at Google.

████████ is a team within Search that is overseen by ████████. Mr. ████████ is a ████████ at Google.

"Research and Machine Intelligence" is a team within Search & Assistant that is overseen by ████████ Mr. ████ is a ████ at Google.

"Technical Infrastructure" is a team within Search & Assistant that is overseen by ████████ Mr. ████████ is a ████████ at Google.

FINAL RESPONSE:
To reiterate, Google does not maintain a formal, static organizational chart.  Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 21**
**Describe in detail the hierarchical structure of Google's "Ads" product area, including each "component," "team," "product," "product focus" and "service" within Ads. (For reference, see 7/12/19 ████████ EUO Rough Tr. at 39:11-47:20). Include the person(s) (along with title) who oversees, supervises or is otherwise in charge of each hierarchical level.**

INITIAL RESPONSE (Sept. 4, 2019): As ████████ testified in his July 12, 2019 examination under oath and as Google has explained previously, Google does not have a traditional organizational structure. Google maintains a more informal, organic organizational structure of business components

**CONFIDENTIAL**
147291338.1

and employees that continuously change (in varying degrees) to meet various demands. Google does not maintain a chart or list identifying the "hierarchical structure of Google's 'Ads' product area." That said, this response identifies several representative examples of the "teams" (and their leaders) within Ads. This response uses "teams" to refer to any subset of Ads. This example is not intended as a comprehensive identification of every single "component," "team," "product," "product focus," and "service" within Ads. Providing such a response is not possible given the numerous informal, organic "teams" within Geo. If the AGO has other examples about which it is interested, Google is willing to meet and confer about providing further information.



"Ads" is a product area within Google that is overseen by ████████████. Mr ████████ is a ████████████████ at Google.

"Display Ads" is a team within Ads that is overseen by ████████████. Mr. ██████ is a ██████ at Google.

"Search Ads" is a team within Ads that is overseen by ████████████. Mr. ██████ is a ████r at Google.

"Google Properties & Platforms" is a team within Ads that is overseen by ████████. Mr. ████r is a ████████ at Google.

"Shopping, Travel" is a team within Ads that is overseen by ████████████. Mr ████████ is a ████ ████████ at Google.

"Next Billion Users, Payments" is a team within Ads that is overseen by ████████████. Mr. ████████ is a ████████████ at Google.

"Display, Video & Apps" is a team within Ads that is overseen by ████████. Ms. ██████ is a ████ ████████ at Google.

"Reach User Experience" is a team within Ads that is overseen by ████████████. Ms. ████████ is a ████████████ at Google.

"Measurement & Analytics" is a team within Ads that is overseen by ████████████. Ms. ████████ is a ████████ at Google.

FINAL RESPONSE:

91

**CONFIDENTIAL**
147291338.1

To reiterate, Google does not maintain a formal, static organizational chart.  Since Google's Initial Response, some of the above information has changed.  For example, "Display Ads" is overseen by ███████ and ███████████, who are both ███████████.  "Shopping, Travel" now is within the "Commerce" organization—rather than Ads.  "Display, Video & Apps" now is called "Apps, Video, & Display."  "Measurement & Analytics" now is called "Analytics, Insights, and Measurement."  And "Ads Privacy and Safety" is a new team within Ads that is overseen by ██ ███████.  Mr. ███████ is a ███████████ at Google.

Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 22**
**Describe in detail the change(s) relating to "coarsening," i.e., "making the location appropriate," with respect to User Location Data that is collected, stored, used and/or displayed in Web & App Activity in early 2019. (For reference, see 7/12/19 ███████ EUO Rough Tr. at 176:18-178:10, 184:9-185:17).**

INITIAL RESPONSE (Sept. 4, 2019): We believe that Mr. ███████ referred to "making the location approximate," and have responded accordingly. For location information associated with a user's activity on Google's Search, Maps, and Assistant products, Google made a privacy-enhancing decision to store less precise location data than the user's device is technically capable of providing (e.g., based on the device-sensors and GPS). In addition, Google took steps to make the previous location data stored in users' Google Accounts more coarse. This change occurred in and around April of 2019.

FINAL RESPONSE:
Though it did improve personalization for users, like more accurate areas of interest, it was determined that precise location did not contribute significant improvement to the use of Web & App Activity location information beyond the previous approximate location precision. Before 2015, device location was coarsened to approximately a neighborhood-sized area with a sufficient number of unique users (e.g., 1,000). When precise location was added in 2015, the location provided by the user's device was stored, which could be a precise lat/lon. In 2019 the device-based Web & App Activity location was moved to a coarser level than it was in 2015, approximately a city-sized area with a sufficient number of unique users (e.g., +1,000). Various teams in Geo, Search, and Ads worked on implementing the changes.

**DEMAND FOR INFORMATION NO. 23**
**Identify and describe all disclosures by Google, or changes to Google's public-facing disclosure documents, relating to "coarsening," i.e., "making the location appropriate," of**

92

**User Location Data in Web & App Activity in early 2019. (For reference, see 7/12/19 ▮▮▮▮▮ EUO Rough Tr. at 176:18-178:10, 184:9-185:17). Identify responsive documents by Bates number. If there are no documents, state "None."**

INITIAL RESPONSE (Sept. 4, 2019): Google has multiple express disclosures to users about how it collects, uses, and saves location information, including specifically in connection the Web & App Activity Google Account feature.

The fact that Google stores location information as part of Web & App Activity is disclosed in many places, including:

Google's Privacy Policy

Google's Privacy Policy (available at https://policies.google.com/privacy?hl=en) expressly tells users that "We collect information about your location when you use our services." The Privacy Policy explains how location is determined with varying degrees of accuracy, explaining the different data that can be collected from devices, user-provided information, and data depending on the user's activity on the device and their selected device and account settings. Each explanation has a link for users to click to learn additional information.

The section on Privacy Controls explains how users "Decide what types of activity [they'd] like saved in [their] account." There is a direct link to Activity Controls, which takes a user to the page where they can review, manage, edit, or delete Web & App Activity Data. In navigating to their Google Account and interacting with their Google Account settings, users would see the type of location data stored in their Account.

The relevant parts of Google's Privacy Policy have not been updated in the timeframe inquired about in this request.

Google's Location Data Policy Page

Google publishes a page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data). Google has updated this page from time-to-time to provide users additional information. This page specifically addresses how Google may know a user's location based on the user's activity on Google services and explains that it may be stored in the user's Account, depending on their settings:

**CONFIDENTIAL**
147291338.1

"As you use our services, we may infer that you're interested in a place even if your device isn't telling us exactly where you are. For example, if you search for "Cafes in Paris", we may assume that you would like to see places near Paris and show you results of cafes there. Depending on your settings, this type of information may be stored with your account and used as one signal to decide whether you might still be in Paris when you do more searches at a later time."

Google last updated this page in June 2019 (see document Bates-stamped GOOG-GLAZ-00002731 - GOOG-GLAZ-00002733). Google produced versions of this page in prior productions.The prior versions of this page also disclosed that "[Google] may collect and use a few types of location information - depending on the products and features you're using - to provide you with a more useful experience on Google."

_Help Center Page_

Google's help center page about Web & App Activity (available at https://support.google.com/ websearch/answer/54068) explains to users that "When Web & App Activity is on, Google saves information like:

- Searches and other things you do on Google products and services, like Maps
- Your location, language, IP address, referrer, and whether you use a browser or an app
- Ads you click, or things you buy on an advertiser's site
- Information on your device like recent apps or contact names you searched for"

The relevant part of this help center page has not been updated in the timeframe inquired about in this request (see documents Bates-stamped GOOG-GLAZ-00002728 - GOOG-GLAZ-00002730 and GOOG-GLAZ-00002812 - GOOG-GLAZ-00002814).

To be clear, though, deciding to coarsen location information saved in a user's MyActivity based on their Web & App Activity was a privacy-enhancing decision. Google of course considers many obligations when deciding whether to update public-facing documentation. Because Google is constantly seeking to improve and enhance its products and services—especially when it comes to user privacy—not all product changes and features result in such updates. One reason for this is that the change will be apparent to the user as he or she interacts with the product in the normal course. Another reason is that there is no new decision or action required from the user and that an update in that instance might cause "user fatigue" and result in them paying less attention to important communications. Finally, whether an update to public-facing documentation is needed must be

94

**CONFIDENTIAL**
147291338.1

balanced with the challenges of updating text across multiple surfaces and languages and the user benefit of doing this when users have other ways to understand product functionality.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 24**
**Describe how, whether and the extent to which Google continues to collect, store and use more "precise" User Location Data for purposes other than Web & App Activity, after the "coarsening" changed in early 2019 that was described at the July 12, 2019 EUO of Google through** ▮▮▮▮▮▮ **(For reference, see 7/12/19** ▮▮▮▮ **EUO Rough Tr. at 176:18-178:10, 184:9-185:17).**

INITIAL RESPONSE (Sept. 4, 2019): As Google's Privacy Policy and Location Data Policy Page describe, some location information is not precise and may allow an inference of a user's location, but not the exact location (e.g., a user types in a Search query for "pizza place in Phoenix"). Latitude and longitude information from GPS sensors, which may be collected from a user's device when device location settings are enabled, is more precise location information. A user can disable Web & App Activity (the Google Account setting), and still have enabled device location settings and app settings in order to use Google apps and services like Google Maps.

FINAL RESPONSE:
Google collects, stores, and uses more precise user location information in certain instances besides in relation to Web & App Activity. Android Emergency Location Services (ELS) helps mobile network operators, emergency infrastructure providers, and governments provide more accurate location information to first responders during an emergency. ELS uses the location technologie 

. The location is often more accurate and reliable than cell tower IDs and is calculated by ▮▮▮▮▮▮▮▮▮▮. ELS is solely for the use of emergency service providers, and location is sent from the user's device to emergency services only when the user explicitly places an emergency call, either directly or through their mobile network.

Additionally, Google Pay's Tap To Pay contactless payment feature lets users pay merchants for goods and services by using their Android phones. As a part of processing payments, Google may receive the name and location of the merchant at which this service is being used. When made available to

**CONFIDENTIAL**
147291338.1

Google, users may review a list of contactless payments they've made in the Google Pay app alongside this location information.

Furthermore, users of Google's Hangouts instant messaging application may choose to send others a message including location information. This location can either be sourced from the device's location services API, or can be a location that the user manually specifies (e.g., the user could search for and attach the location of the Eiffel Tower to a message while physically present in the United States). Locations are not automatically sent to others via this platform, and mentioning a location in one message in a conversation does not automatically append location to all subsequent messages.

**DEMAND FOR INFORMATION NO. 25**
**Describe in detail the change(s) relating to the precision of User Location Data, or otherwise relating to the collection, storage and/or use by Google of User Location Data in Web & App Activity in 2014 or 2015. (For reference, see 7/12/19** ███████ **EUO Rough Tr. at 185:2-11, 186:10-18, 188:24-195:17).**

INITIAL RESPONSE (Sept. 4, 2019): In order to provide a more personalized experience to Google users, Google started storing precise device-based location as part of Web & App Activity from users' interactions on Google Search and Google Maps in September of 2015. This change did not affect Google's use of IP addresses which Google had been storing for users with Web & App Activity enabled prior to September 2015. Google also stores precise device-based location data from user's interactions with the Google Assistant in a user's Web & App Activity, if they have the setting enabled.

FINAL RESPONSE:
Please see our Response to Demand for Information No. 22.  Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 26**
**Identify and describe all disclosures by Google, or changes to Google's public-facing disclosure documents, relating to changes in the precision of User Location Data, or otherwise relating to the collection, storage and/or use by Google of User Location Data in Web & App Activity in 2014 or 2015. (For reference, see 7/12/19** ███████ **EUO Rough Tr. at 185:2-11, 186:10-18, 188:24-195:17). Identify responsive documents by Bates number. If there are no documents, state "None."**

96

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (Sept. 4, 2019): During the relevant timeframe, Google's use and storage of location information as part of a user's activity on Google products and services was disclosed to users in the following ways:

*User's Google Account in MyActivity*

 When Google started saving location in connection with Web & App Activity, users could log in to their Google Account and see the location data being saved. Users could also, of course, manage the setting, and edit and delete any of the associated data.

*Google's Privacy Policy*

Google's Privacy Policies, as modified and updated throughout the years, explains Google's collection, storage, and use of user data—including the location data. Google is producing the full copies of its Privacy Policies from 2014 and 2015 in documents Bates-stamped GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782 and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811.

*Help Center Page*

Google updated its help center page for Web & App Activity (available at https://support. google.com/websearch/answer/54068) to give more detail about the types of user data being stored in a user's account. The update specifically explained that location was saved as part of Web & App Activity. Previously, the help center page already explained to users that IP addresses were being saved. Google is producing the version of the help center page where this disclosure was made.

FINAL RESPONSE:

Google previously produced documents that are responsive to this Demand for Information, including the help center page for Web & App Activity at GOOG-GLAZ-00002812-GOOG-GLAZ-00002814.  This page specifically explained that location was saved as part of Web & App Activity. Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 27**

**Was there any way for a user to know that Google had started collecting finer location data in the Web & App Activity starting in 2014 or 2015, other than by logging into the user's activity feed and comparing past and future collections? If so, describe in detail.**

97

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (Sept. 4, 2019): Please see our responses to Demands for Information Nos. 23 and 26, which explain ways in which Google disclosed (and continues to disclose) its collection of location data in Web & App Activity, including through the user's Google Account, Google's Privacy Policy, and Google's Web & App Activity help center page.

FINAL RESPONSE:
Based on our understanding of this Demand for Information, Google has no additional information to provide related to it.

**DEMAND FOR INFORMATION NO. 28**
**As part of the set-up for Google Accounts created before 2018, did the user receive any disclosure that Web & App Activity includes User Location Data? Is [sic] so, explain and identify responsive documents.**

INITIAL RESPONSE (Sept. 4, 2019): When users create a Google Account, they are presented with disclosures relating to Privacy & Terms that explain Google's Privacy Policy and Terms of Service and that provide a link to both of those documents. As explained above, Google's Privacy Policy expressly discloses to users the data that Google collects—including location data. The Google Account creation flow Privacy & Terms section before 2018 specifically informed users that "When you search for a restaurant on Google Maps or watch a video on YouTube, for example, we process information about that activity - including information like the video you watched, device ODs, IP addresses, cookie data, and location...Depending on your account settings, some of this data may be associated with your Google Account and we treat this data as personal information. You can control how we collect and use this data at My Account (myaccount.google.com)." Google is producing documents Bates-stamped GOOG-GLAZ-00002783 to GOOG-GLAZ-00002793 that show a Google Account creation flow with this language.

FINAL RESPONSE:
As part of the set-up for Google Accounts before 2018, users received disclosures that Google collected location information when the user interacted with Google's products and services, and that, depending on account settings, the data may have been stored in the user's Google Account. Google is producing screenshots of a pre-2018 Google Account set-up in documents Bates-stamped GOOG-GLAZ-00203120 - GOOG-GLAZ-00203129.

**CONFIDENTIAL**
147291338.1

## II.   REQUESTS TO PRODUCE DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1
**Produce documents sufficient to identify all clients, internal or external to Google, who can access, receive or make use of user location data from Location History.**

INITIAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request. Google had to query a registry to view information to inform the response to the Demand for Information requesting this information.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

### REQUEST FOR PRODUCTION NO. 2
**Produce the "list of uses that have been approved" as an "appropriate use" of location data from Location History, as described by ▆▆▆▆▆▆▆ at his July 11, 2019 deposition. (See 7/11/19 ▆▆▆▆▆ EUO Rough Tr. at 231:1 0-22).**

INITIAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request.

Google has a registry that contains the descriptions of the proposed data use cases that teams requesting access to Location History submit, in accordance with Google's user data access policies and Location History team guidance (a privileged document that was prepared by counsel). These access requests are privileged because they are part of a process by which teams solicit and receive legal advice and ultimately approval for the proposed data access and use.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

### REQUEST FOR PRODUCTION NO. 3
**Produce documents sufficient to identify all clients, internal or external to Google, who can access, receive or make use of user location data from Web & App Activity.**

**CONFIDENTIAL**
147291338.1

99

INITIAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request. Google remains in the process of determining whether it can provide other information responsive to this request.

SUPPLEMENTAL RESPONSE (Jan. 17, 2020): Google does not maintain an existing document stating the teams that can access, receive or make use of Web & App Activity device-based location data. Google had to query its systems in order to respond to the Demands for Information 7 and 8.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 4: Produce document(s) sufficient to show "the complete list of access" to location data coming from, going to or otherwise associated with any Web & App Activity. (See 7/12/19 ▮▮▮▮▮ EUO Rough Tr. at 90:18-91 :19).**

INITIAL RESPONSE (Sept. 4, 2019): Google does not maintain an existing document stating the information sought by this Request. Google remains in the process of determining whether it can provide other information responsive to this request.

SUPPLEMENTAL RESPONSE (Jan. 17, 2020): Google does not maintain an existing document stating the complete access list to Web & App Activity device-based location data. Google had to query its systems in order to respond to the Demands for Information 7 and 8.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 5**
**Produce documents sufficient to identify all clients, internal or external to Google, who can access, receive or make use of user location data from Google Mobile Services.**

**CONFIDENTIAL**
147291338.1

INITIAL RESPONSE (Sept. 4, 2019): Google objects to this request as overly broad and unduly burdensome. Specifically, the term "User Location Data" is overly broad and not within a reasonable definition. As an initial matter, defining "User Location Data" as "data from which a user's location can be determined" suggests that even extremely coarse location information (e.g., country level) could conceivably be included in the definition. Furthermore, including IP address within that definition, when an IP address is needed for any device to connect to and function on the internet, renders this defined term even more unwieldy. Especially when combined with an all inclusive request like this Request for Production, such a vague term renders the demand prohibitively burdensome. In response to Demand for Information No. 10, Google has made a good-faith effort to provide a number of examples of how its GMS products use and share location data. If there are any specific GMS products that the AGO would like additional information about, Google is willing to meet and confer to discuss providing such information.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 6**
**Produce documents sufficient to identify all clients, internal or external to Google, who can access, receive or make use of user location data from Google Play Services.**

INITIAL RESPONSE (Sept. 4, 2019): Google Play is one of the GMS products, so please see our response to Request for Production No. 5, which explains why this request is overbroad and unduly burdensome.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 7**
**Produce any and all launch documents and similar documents related to the following launches.**
    **a. "████ web view launch"" (see 7/12/19 ████ EUO Rough Tr. at 295:6-14);**
    **b. "████ language"" or ""████ text updates"" (see 7/12/19 ████ EUO Rough**
    **Tr. at 334:17-25);**

**CONFIDENTIAL**
147291338.1



c. ""Location History and Web and App Activity help center changes and/or help center changes"" (see 7/12/19 ▮▮▮▮ EUO Rough Tr. at 335:23-336:6);

d. ""Account creation change"" or ""account creation update"" (see 7/12/19 ▮▮▮▮ EUO Rough Tr. at 365:17-366:17);

e. ""Coarsening,"" i.e., ""making the location appropriate"" with respect to user location data that is collected, stored, used and/or displayed by Web & App Activity (see 7/12/19 ▮▮▮▮ EUO Rough Tr. at 176:18-178:10, 184:9-185:17); and

f. Changes in the precision of user location data in Web & App Activity in 2014 or 2015 (see 7/12/19 ▮▮▮▮ EUO Rough at 185:2-11, 186:10-18, 188:24-195:17).

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing potentially responsive documents. This Request is particularly difficult to comply with as a practical matter, but we will keep you updated on our progress and expected production date. In addition to being voluminous, these launch reports are stored in a database from which information is not easily exportable in a reviewable and production-ready format. In order to comply with this Request, Google needs to run searches across its launch reports in order to locate potentially responsive information. The reports then need to be extracted from the repository, loaded to the review platform, and reviewed for responsiveness and privilege.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 8**
**Produce any and all documents, emails, IMs, Google Hangouts threads or other transmissions or communications relating to Project Lance.**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing custodial data sources for potentially responsive material. We will keep you updated on our progress and expected production date.

102

**CONFIDENTIAL**
147291338.1

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January, 2019.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 9**

**Produce any and all documents, emails, IMs, Google Hangouts threads or other transmissions or communications relating to "fixing" location history or other user location data issues as referenced in the August 13, 2018 email from ████████ in GOOG-GLAZ-00001521 at 1523.**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing custodial data sources for potentially responsive material. We will keep you updated on our progress and expected production date.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 10**

**Produce any and all documents related to Google's anti-fragmentation requirement for third-party developers/manufacturers who want to have Google-authored apps pre-installed on their devices.**

INITIAL RESPONSE (Sept. 4, 2019): Google is producing documents Bates-stamped GOOG-GLAZ-00002106 to GOOG-GLAZ-00002724.

103

**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 11: Produce any and all documents, emails, IMs, Google Hangouts threads or other transmissions or communications relating to the document entitled "updated statement for AP LH story" as referenced in the August 13, 2018 email from** ███████████ **as reflected in GOOG-GLAZ-00001216.**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing custodial data sources for potentially responsive material. We will keep you updated on our progress and expected production date.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 12**
**Produce the document entitled "updated statement for AP LH story" as referenced in the August 13, 2018 email from** ███████████ **as reflected in GOOG-GLAZ-00001216.**

INITIAL RESPONSE (Sept. 4, 2019): Google produced this document in full at GOOG-GLAZ-00001235 (PROD005).

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 13**
**Produce the document described as "go**████████████████ **in the August 17, 2018 email from** ██████████ **as reflected in GOOG-GLAZ-00001528.**

**CONFIDENTIAL**

104

INITIAL RESPONSE (Sept. 4, 2019): Google is withholding production of this document because it is privileged. This document was created by and at the direction of counsel for the purpose of giving legal advice.

FINAL RESPONSE:

Google is providing the following information about the assertion of privilege over the document:

| DATE COLLECTED | E-MAIL FROM / AUTHOR / CUSTODIAN | PRIVILEGE DESCRIPTION | PRIVILEGE ASSERTION | REDACTED (YES/NO) |
|---|---|---|---|---|
| 26/08/2019 | ████ | Draft memorandum containing and reflecting legal advice of ████ regarding privacy and policy compliance issues prepared in anticipation of regulatory investigation. | Attorney-Client Communication, Attorney Work Product | No |

**REQUEST FOR PRODUCTION NO. 14**
**Produce the document described as "g**████**** in the August 17, 2018 email from** ████ **as reflected in GOOG-GLAZ-00001528.**

INITIAL RESPONSE (Sept. 4, 2019): Google is withholding production of this document because it is privileged. This document was created by and at the direction of counsel for the purpose of giving legal advice.

FINAL RESPONSE:

Google is providing the following information about the assertion of privilege over the document:

105

| DATE COLLECTED | E-MAIL FROM / AUTHOR / CUSTODIAN | PRIVILEGE DESCRIPTION | PRIVILEGE ASSERTION | REDACTED (YES/NO) |
|---|---|---|---|---|
| 26/08/2019 | ██████ | Draft memorandum reflecting legal advice of ██████* regarding privacy and policy compliance issues prepared in anticipation of regulatory investigation. | Attorney-Client Communication, Attorney Work Product | No |

**REQUEST FOR PRODUCTION NO. 15**

**Produce Google's communications to third-party developers relating to the collection, storage, use, deletion and disclosure of user location data collected by third-party apps running on Android.**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing potentially responsive documents. We will keep you updated on our progress and expected production date.

One reason it is difficult to collect these documents quickly is because there are a number of documents that may be relevant to the request. Further, these communications are stored in a repository that requires backend searching to identify a potentially relevant population of communications. After that identification process, Google needs to collect those documents and load them to the review platform. Then, Google can begin to review for responsiveness.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 16**

106

**CONFIDENTIAL**

147291338.1

**Produce documents sufficient to show whether and the extent to which Google collects, stores and/or uses any user location data associated with users who are not signed into a Google Account. (See 7/12/19** ████████ **EUO Rough Tr. at 391 :1-5).**

INITIAL RESPONSE (Sept. 4, 2019): As Google explains in its Privacy Policy (available at https://policies.google.com/privacy), in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google collects IP addresses. Every device connected to the Internet is assigned an IP address and these numbers are usually assigned in geographic blocks. Thus, an IP address can often be used to identify the location from which a device is connecting to the Internet.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

## REQUEST FOR PRODUCTION NO. 17
**Produce documents sufficient to show how, whether and the extent to which Google collects, stores and/or uses any user location data from activity that was conducted before a user signs into a Google Account. (See 7/12/19** ████████ **EUO Rough Tr. at 391 :25-393:15).**

INITIAL RESPONSE (Sept. 4, 2019): As Google explains in its Privacy Policy (available at https://policies.google.com/privacy), in additional disclosures on the page titled How Google Uses Location Information (available at https://policies.google.com/technologies/location-data, and produced in documents Bates-stamped GOOG-GLAZ-00002725 - GOOG-GLAZ-00002727, GOOG-GLAZ-00002734 - GOOG-GLAZ-00002782, and GOOG-GLAZ-00002794 - GOOG-GLAZ-00002811), Google collects IP addresses. Every device connected to the Internet is assigned an IP address and these numbers are usually assigned in geographic blocks. Thus, an IP address can often be used to identify the location from which a device is connecting to the Internet.

107

**CONFIDENTIAL**
147291338.1

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 18**

**All documents relating to the "coarsening," i.e., "making the location appropriate" with respect to user location data that is collected, stored, used and/or displayed in Web & App Activity in early 2019. (For reference, see 7/12/19 ▮▮▮▮ EUO Rough at 176:18-178:10, 184:9-185:17).**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing potentially responsive documents. Google anticipates that documents that may be responsive to this request may exist in the custodial document population or the launch report document population. Please see our response to Request for Production No. 7 for the reasons why discovery related to the launch reports is time-consuming and difficult. Google will keep you updated on its progress and expected response date.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:

Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 19**

**All documents relating to changes in the precision of user location data, or otherwise relating to the collection, storage and/or use by Google of user location data in Web & App Activity in 2014 or 2015. (For reference, see 7/12/19 ▮▮▮▮ EUO Rough at 185:2-11, 186:10-18, 188:24-195:17).**

INITIAL RESPONSE (Sept. 4, 2019): Google is in the process of collecting and reviewing potentially responsive documents. Google anticipates that documents that may be responsive to this request may exist in the custodial document population or the launch report document population. Please see our response to Request for Production No. 7 for the reasons why discovery related to the launch reports

**CONFIDENTIAL**
147291338.1

is time-consuming and difficult. Google will keep you updated on its progress and expected response date.

SUPPLEMENTAL RESPONSE (Dec. 31, 2019): Google will complete its rolling document production that contains documents responsive to this request by mid-January 2019.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**REQUEST FOR PRODUCTION NO. 20**
**Documents sufficient to confirm your responses to Demand For Information Nos. 1-28.**

INITIAL RESPONSE (Sept. 4, 2019): The documents that Google relied on for its responses are noted in each individual response above.

FINAL RESPONSE:
Google completed its rolling production for CIDs 1-3 on February 14, 2020, which contained responsive, non-privileged material from the custodians, date ranges, and search terms previously disclosed to and incorporating feedback from the AGO.

**CONFIDENTIAL**
147291338.1

# EXHIBIT 7

1  **MARK BRNOVICH**
   **ATTORNEY GENERAL**
2  Firm State Bar No. 14000

3  Joseph A. Kanefield (State Bar No. 15838)
4  Brunn W. Roysden III (State Bar No. 28698)
   Oramel H. Skinner (State Bar No. 032891)
5  Michael S. Catlett (State Bar No. 025238)
   Christopher Sloot (State Bar No. 034196)
6    *Assistant Attorneys General*
   2005 N. Central Ave.
7  Phoenix, Arizona 85004
   Telephone:  (602) 542-8958
8  Beau.Roysden@azag.gov
   O.H.Skinner@azag.gov
9  Michael.Catlett@azag.gov
   Christopher.Sloot@azag.gov
10 ACL@azag.gov
11
   [Additional Counsel on Signature Page]
12
13 *Attorneys for Plaintiff*
   *State of Arizona ex rel. Mark Brnovich,*
14 *Attorney General*

15         **THE SUPERIOR COURT OF THE STATE OF ARIZONA**

16             **IN AND FOR THE COUNTY OF MARICOPA**

17

18 STATE OF ARIZONA, *ex rel.* MARK          ) Case No: CV2020-006219
   BRNOVICH, Attorney General,               )
19                                            ) **NOTICE OF LODGING**
                                              ) **UNREDACTED COMPLAINT AND**
20              Plaintiff,                     ) **EXHIBITS PURSUANT TO**
                                              ) **ARIZONA RULE OF CIVIL**
21       v.                                   ) **PROCEDURE 5.4(g)(3)**
                                              )
22 GOOGLE LLC, a Delaware limited liability  ) Assigned to the Hon. Timothy Thomason
   company,                                  )
23                                            )
              Defendant.                       ) **(COMPLEX CALENDAR)**
24                                            )
                                              )
25                                            )
                                              )
26

27

28

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

## <u>TABLE OF CONTENTS</u>

I.    PROCEDURAL POSTURE AND THE STATE'S REQUESTS .................................... 1

II.   BACKGROUND ................................................................................................. 1

III.  ARGUMENT .................................................................................................... 3

      A.    The Requirements in Rule 5.4 Apply to the State's Complaint and Exhibits.......... 3

      B.    The Public Also has a Constitutional Right to Access the State's Complaint and Exhibits................................................................................................. 4

      C.    The  Public's Constitutional Right to Access Is Extremely Strong Here. ............... 5

      D.    Google Cannot Meet the Requirements of Rule 5.4(c)(2) for Sealing. ................... 7

            1.    Publicly Available Information Cannot Be Sealed. ................................... 9

            2.    Internal Information That Is Not Confidential Cannot Be Sealed. ............. 10

            3.    Information Concerning Arizona's Investigation Cannot Be Sealed.......... 12

      E.    Google Cannot Meet The Requirements of Rule 5.4 for Sealing Nearly All Exhibits in Their Entirety. ........................................................................ 13

      F.    Google Has Waived Any Assertions of Confidentiality. .................................... 14

      G.    Google's Other Likely Arguments Fail.......................................................... 15

IV.   CONCLUSION .............................................................................................. 17

1  The State files this Notice of Lodging pursuant to Civil Rule 5.4(g)(3).  The documents
2  being lodged pursuant to Rule 5.4(e) are: Exhibit B, an unredacted version of the Complaint
3  with yellow highlights of the parts that (post-meet and confer) Google will timely seek to seal
4  pursuant to Rule 5.4(g)(4); Exhibit C, unredacted copies of the Complaint's non-public exhibits
5  with green highlights for portions the State believes *at a minimum* should <u>not</u> be sealed; and
6  Exhibit F, an exhibit identifying "buckets" of information in the Complaint to facilitate the
7  Court's determination of what, if any, portions meet Rule 5.4(c)(2)'s requirements for sealing.

8  ## I.    PROCEDURAL POSTURE AND THE STATE'S REQUESTS

9  This lodging is the first step in the process of determining what parts of the Complaint
10  should be under seal, if any.  The next step in the process is Google filing a timely motion to
11  seal.  In expectation of that filing, the State respectfully makes two requests.  *First*, that the
12  Court deny in full any motion to seal by Google pursuant to 5.4(g)(4), as the Complaint and
13  exhibits that the State is lodging here do not contain materials that meet the strict requirements
14  of 5.4(c)(2).  *Second*, to the extent the Court orders any sealing, it should carefully limit the
15  amount sealed so that the "proposed restriction … is no greater than necessary to preserve the
16  confidentiality of information subject to the overriding interest."  *See* Rule 5.4(c)(2)(C).

17  ## II.    BACKGROUND

18  This case arises from an investigation under the Consumer Fraud Act, A.R.S. § 44-1521
19  *et seq.*, into deceptive and unfair acts and practices that relate to Google's collection, use,
20  storage, and (lack of) deletion of its users' location data.  *See, e.g.*, Complaint ¶¶22-32.

21  On August 13, 2018, the Associated Press published *Google tracks your movements, like
22  it or not*, discussing Google's Location History service, which enables users to view where they
23  have been.  At the time, Google informed its users, "with Location History off, the places you
24  go are no longer stored."  But the article revealed that this statement was blatantly false—even
25  with Location History off, Google surreptitiously collects users' location information through
26  another setting called Web & App Activity and uses that information to sell ads.  The AG's
27  investigation confirmed the findings of the AP article, and also uncovered widespread and
28  systematic use of deceptive and unfair acts and practices by Google to obtain users' location

1   information—including as part of activating and setting up the user's Android phone after
2   purchase; advertising its devices and services to users; selling ad placements to advertisers; and
3   serving ads to users as part of Google's lucrative advertising business.

4       The governing statutory framework gives the Attorney General ("AG") investigative
5   powers, A.R.S. § 44-1524, and provides that information or evidence provided during an
6   investigation "shall be confidential and shall not be made public unless in the judgment of the
7   attorney general the ends of justice and the public interest will be served by the publication
8   thereof, provided that the names of the interested parties shall not be made public." A.R.S. § 44-
9   1525. During the investigation, the parties executed a Confidentiality Agreement. April 12,
10  2019 Agreement. (Ex. A). That Agreement acknowledges the framework of A.R.S. § 44-1525,
11  and also allows Google to "mark as 'Confidential' any materials or information it produces or
12  otherwise discloses to the AGO that Google reasonably believes contains sensitive information
13  ('Designated Materials')." (*Id.* ¶ 3). Google marked "Confidential" the vast majority of
14  information and materials provided during the investigation, regardless of whether they actually
15  contain "sensitive information." The State has never agreed with Google's designations.

16      The Agreement recognizes that the State may use Designated Materials in connection
17  with litigation arising from the investigation. The Agreement also allows the State to file
18  Designated Materials in the public record, so long as it "either file[s] the Designated Materials
19  under seal or afford[s] Google at least 10 days advanced notice, in either case consistent with the
20  applicable rules, regulations, and/or orders of the relevant tribunal." (*Id.* ¶ 9). Importantly, "the
21  AGO reserve[d] the right to oppose any request for sealing, to ask the court to unseal Designated
22  Materials, and/or to challenge any confidentiality designations by Google, in each case in whole
23  or in part." (*Id.*). Google bears "the burden of defending its designations." (*Id.*).

24      On May 27, 2020, the State filed a Complaint against Google for violations of the
25  Consumer Fraud Act. The Complaint details extensive unfair and deceptive acts and practices
26  by Google, with citations to documents and testimony obtained during the AG's investigation.
27  The Complaint also describes Google's efforts to delay and impede the investigation. The State
28  spent considerable time drafting the Complaint in a manner to exclude materials it believed

would meet the requirements of Rule 5.4(c)(2) for filing under seal.  But to permit the parties to follow the Rule 5.4(g) process, the State redacted any material Google had designated "Confidential" during the investigation, and also allegations relying upon such information.

On the same day (May 27), the State provided notice to Google as follows: "[I]t is the judgment of the Attorney General that, consistent with Arizona Rule of Civil Procedure 5.4, the ends of justice and the public interest will be served by making these materials public, *see* A.R.S. § 44-1525."  The State further provided 10 days' notice to Google, pursuant to ¶9 of the Confidentiality Agreement, that the State intends to file the entire unredacted Complaint (including exhibits) in the public record.  On July 15, 2020, Google confirmed that it seeks to seal "all information that is redacted in the version of the Complaint filed publicly on May 27, 2020," including a vast majority of the exhibits.  (Ex. D).  The only exceptions were seven exhibits that Google has agreed could be filed publicly—subject to heavy redactions.  The State is filing these redacted exhibits publicly.

During the meet-and-confer process (which spanned six weeks and included many hours of telephone calls and extensive written correspondence), Google offered no real justification for sealing any of the information and materials that it seeks to seal, much less all of it.  The State disagrees with Google's attempt to seal any portion of the Complaint or exhibits and now submits this Notice so that Google can defend its proposed sealing and redactions to the Court.

## III.   ARGUMENT

### A.   The Requirements in Rule 5.4 Apply to the State's Complaint and Exhibits.

Under Rule 5.4(c)(2), the Court may seal a "document" only if it expressly finds (i) "an overriding interest exists that supports filing the document under seal and overcomes the right of public access to it," (ii) a "substantial probability exists" that the party seeking to file under seal would be prejudiced without the sealing of materials, (iii) "the proposed restriction on public access to the document is no greater than necessary to preserve the confidentiality of the information subject to the overriding interest," and (iv) "no reasonable, less restrictive alternative exists to preserve the confidentiality of the information subject to the overriding interest."  Rule 5.4(b)(1) broadly defines a "document" as "any filing, exhibit, record, or other

1   documentary material to be filed or lodged with the court."  The Complaint and exhibits clearly

2   fall within the definition of a "document," and thus Google must satisfy the four requirements in

3   Rule 5.4(c)(2) if any portion of the State's Complaint or exhibits are to be sealed.

4        **B.**    **The Public Also has a Constitutional Right to Access the State's Complaint and Exhibits.**

5

6        Rule 5.4(c)(2)'s "substantive standards are drawn from federal and Arizona case law, and

7   reflect the constitutional presumption favoring the public's right of access to court proceedings."

8   Rule 5.4, comment 3; *see also* Ariz. R. Supreme Ct. 123(c)(1) ("Historically, this state has

9   always favored open government and an informed citizenry. In the tradition, the records in all

10   courts and administrative offices of the Judicial Department of the State of Arizona are

11   presumed to be open to any member of the public . . . ."). The constitutional right of public

12   access is strongly presumed for "civil proceedings and associated records and documents,"

13   including the case-initiating complaint. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 786

14   (9th Cir. 2014). The public's right of access under the Arizona Constitution is even broader than

15   under the U.S. Constitution. *Mtn. States Tel. & Tel. v. ACC,* 150 Ariz. 350, 355 (1989).

16        Not only does the express language of Rule 5.4(b)(1) include complaints as a "document"

17   triggering its requirements, but the public has a constitutional right to immediately access the

18   Complaint upon filing. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 591–94 (9th Cir. 2020)

19   ("*Planet III*"). Immediate public access "'plays a particularly significant role' in the public's

20   ability to ably scrutinize 'the judicial process and the government as a whole.'" *Id.* at 592; *see*

21   *also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir.

22   2016) ("easily conclud[ing]" that "presumption of access" applies to complaint); *TriQuint*

23   *Semiconductor, Inc. v. Avago Techs.,* 2010 WL 2474387, at *1 (D. Ariz. June 11, 2010)

24   ("motions to seal the complaint must meet the compelling reasons standard"); *Reyna v. Arris*

25   *Int'l, PLC*, No, 17-CV-01834-LHK, 2018 WL 1400513, at *2 (N.D. Cal. Mar. 20, 2018)

26   ("courts have held that the compelling reasons standard applies to the sealing of a complaint

27   precisely because the complaint forms the foundation of the lawsuit"). In *Bernstein*, the district

28   court denied a ***joint*** motion to seal a complaint that had been quickly dismissed, rejecting the

1  parties' contention that the information should be sealed because of "confidential client

2  information." *Bernstein*, 814 F.3d at 136.  The Second Circuit affirmed: "pleadings—even in

3  settled cases—are Judicial records subject to a presumption of public access." *Id.* at 140.

4        The same goes for the Complaint's exhibits.  Not only does Rule 5.4(b)(1) define

5  "document" to include an "exhibit," but the constitutional right of public access also applies to

6  exhibits attached to a complaint.  *FTC v. AbbVie Prods.*, 713 F.3d 54, 63 (11th Cir. 2013)

7  (public has a presumptive right to access complaint, including exhibits).  Arizona courts view

8  exhibits as part of the complaint "for all purposes."  *Kyles v. Contractors/Eng'rs Supply, Inc.*,

9  190 Ariz. 403, 406–07 (App. 1997).  For example, on a motion to dismiss, "[a] complaint's

10  exhibits . . . are not 'outside the pleading.'"  *Coleman v. City of Mesa*, 230 Ariz. 352, 356

11  (2012).  Indeed, Google has already filed a motion to dismiss, which cites individual exhibits

12  (*see, e.g.*, Mot. at 4:11, 5:1, 9:21, 9:25) and even purports to characterize the entire "1,200 pages

13  of exhibits" (*id.* at 10:22–11:2).  Like the complaint itself, the exhibits are "judicial records" and

14  presumptively public.

15        **C.    The  Public's Constitutional Right to Access Is Extremely Strong Here.**

16        "When the litigation involves matters of significant public concern," the public's right of

17  access to court records "may be asserted more forcefully."  *Unknown Parties v. Johnson*, No.

18  CV-15-00250-TUC-DCB, 2016 WL 8199309, at *4 (D. Ariz. 2016); *see also In re Coordinated

19  Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 101 F.R.D. 34, 38–39 (C.D. Cal.

20  1984) (finding significant public concern where collusion to raise retail oil prices "affected the

21  lives of all Americans"); *Lockyer v. Safeway*, 355 F.Supp.2d 1111, 1124 (C.D. Cal. 2005)

22  (unsealing records showing evidence of Sherman Act violations by grocery stores); *Apple, Inc.

23  v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2012 WL 2936432, at *2 (N.D. Cal. July 18,

24  2012) (denying motion to seal where a "plethora of media and general public scrutiny of" court

25  proceedings showed significant public interest and created a "strong presumption of public

26  access"); *Lucy Chi v. Univ. of S. Cal.*, No. 2:18-cv-04258-SVW-GJS, 2019 WL 3315282, at *7

27  (C.D. Cal. May 21, 2019) (no compelling interest in light of "extensive media coverage" and

28  where public access would "further the public narrative" about important societal issues).

1

2

3

4

5

6

7

Here, the serious allegations raised in the Complaint against Google affect millions of Arizonans (as well as 120 million Americans) who are Android users (as of 2018)[1]—plus many other Arizonans who give Google their location information through other means, such as Google apps. The State brought this action in light of Google's illegal business practices concerning its collection, use, storage, and deletion of its users' highly sensitive location information. (*See* Compl. ¶¶ 1–7). The location data collected is a critical part of Google's advertising business, which generates $135 billion **yearly**. (*See id.* ¶¶ 3–5).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The public has a significant interest in these proceedings, especially given that their data is obtained through violations of user privacy and consent. That major news outlets reported on the Complaint mere hours after it was filed, only reinforces this fact that this is a matter of major public concern.[2] Indeed, it is not just the underlying facts but also the very fact that the AG has taken action that is a matter of public concern, particularly given the robust public discussion about regulation of technology companies (and actions by tech companies in light of this potential government regulation and enforcement). The Complaint *itself* continues to be cited by major news outlets as part of this public discussion and debate. *See, e.g.*, *Google makes auto-deleting data the default for new accounts*, CNet.com (June 24, 2020) (specifically noting that this major change in Google's practices "comes as Google already faces severe criticism over its data collection policies from lawmakers and state officials. Last month, the search giant was hit by a consumer fraud lawsuit filed by Arizona Attorney General Mark Brnovich, alleging the search giant deceives its users in order to collect location data from their phones. Brnovich's complaint accuses Google of leading people to believe they disabled settings for gathering that type of information, when the settings were still turned on.").[3] Information in the Complaint and exhibits is critical to that on-going public discourse. *See Planet III*, 947 F.3d at 589.

24

25

26

27

28

---

[1] *See* https://www.statista.com/statistics/232786/forecast-of-andrioid-users-in-the-us.
[2] *See, e.g.*, https://www.washingtonpost.com/technology/2020/05/27/google-android-privacy-lawsuit/; https://www.reuters.com/article/us-google-arizona-lawsuit/u-s-state-of-arizona-files-consumer-fraud-lawsuit-against-google-idUSKBN2333CP.
[3] *See* https://www.cnet.com/news/google-makes-auto-deleting-data-the-default-for-new-accounts/

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

1    Furthermore, "the State has a strong interest in informing its citizens about this suit that

2  was brought on their behalf." *Lockyer*, 355 F.Supp.2d at 1125–26.  The CFA is a remedial

3  mechanism "designed to root out and eliminate unlawful practices in merchant-consumer

4  transactions." *Powers v. Guaranty RV Inc.,* 229 Ariz. 555, 561 (2012).  Thus, "the public's

5  interest in access to a proceeding involving the State's allegations of *harm to the public* weighs

6  especially heavily in favor of access." *Lockyer*, 355 F.Supp.2d at 1124 (emphasis in original).

7  The AG firmly believes that the information should be fully available to the public.

8         **D.    Google Cannot Meet the Requirements of Rule 5.4(c)(2) for Sealing.**

9         Google cannot show that the unredacted Complaint and exhibits should be sealed.

10  Google's unilateral designations do not establish that the materials are confidential, nor are they

11  a basis for sealing information so designated.  Per the Confidentiality Agreement, the AGO can

12  challenge designations and oppose any efforts to seal, and Google bears the burden of defending

13  its designations.  (Ex. A ¶ 9).  A confidentiality agreement by itself does not warrant sealing a

14  document filed with the court.  *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV 09-

15  1531-PHX-JAT, 2010 WL 2474387, at *1 (D. Ariz. June 11, 2010).  Even for materials

16  produced subject to a protective order—which is not the case here—the producing party's

17  designation is insufficient to establish that the materials are in fact "confidential," much less an

18  interest that overcomes the right of public access.  *Kamakana v. City & Cty. of Honolulu*, 447

19  F.3d 1172, 1183 (9th Cir. 2006) (protective order insufficient for sealing).

20         Google also cannot satisfy any of the requirements contained in Rule 5.4(c).  Google

21  cannot substantiate "an overriding interest" for the materials it seeks to seal, much less one that

22  overcomes "the right of public access to it," as required by Rule 5.4(c)(2)(A).  On the contrary,

23  much of the information that Google seeks to seal is publicly available, discernible from public

24  materials, or simply "internal" Google information (available to thousands of employees) that is

25  not particularly sensitive.  Nor has Google substantiated any particular prejudice—at least not

26  during the month-and-a-half meet-and-confer process—that it would suffer "without the sealing

27  of materials."  Rule 5.4(c)(2)(B).  Instead, Google simply wants to prevent the public from

28  seeing the details corroborating the AG's findings.  That is not a basis for sealing the materials.

1    Equally problematic is the vast scope of Google's proposed redactions and request for

2  sealing.  Google's proposed restriction on public access must be "no greater than necessary to

3  preserve the confidentiality of the information subject to the overriding interest," and Google

4  must show that "no reasonable, less restrictive alternative exists to preserve the confidentiality

5  of the information subject to the overriding interest."  Rule 5.4(c)(2)(C), (D).  Notably, courts

6  often deny a motion to seal altogether when the parties seek to redact entire swaths of

7  information that are not narrowly tailored.  *See, e.g.*, *D'Agnese v. Novartis Pharm. Corp.*, No.

8  CV 12-0749-PHX-JAT, 2012 WL 3744717, at *2 (D. Ariz. Aug. 27, 2012) (no sealing

9  warranted—even where the documents contained "internal company communications"—where

10  defendant failed to "identify and redact only information that it claims is confidential"); *Am.

11  Traffic Solutions, Inc. v. Redflex Traffic Sys.*, No. No. CV-08-02051-PHX-FJM, 2010 WL

12  481408, at *2 (D. Ariz. Feb. 8, 2010) (denying motion to seal where "[t]he parties make no

13  attempt to describe the specific portions of documents that they believe meet [the compelling

14  reasons] standard"); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846 LHK (PSG), 2012 WL

15  4120541, at *2 (N.D. Cal. Sept. 18, 2012) (denying motions to seal under the more lenient

16  "good cause" standard where redactions were not narrowly tailored).

17    During the investigation, Google designated as "confidential" nearly every document

18  produced, every page of every examination and every word in every written discovery response.

19  In the Complaint, Google likewise wants to redact anything and everything that derives from the

20  investigation.  For example, Google seeks to redact entire portions of the Complaint, the entirety

21  of nearly all exhibits, and all quotations or information derived from any testimony, document or

22  other information provided during the investigation.  Google also seeks to redact most of the

23  specifics concerning its wrongdoing in the Complaint.  (*E.g.*, Compl. § IV).  Google even insists

24  on redacting names of witnesses who were examined—even though Google routinely releases

25  public statements in the press attributable to these same employees.  Thus, Google's proposed

26  sealing and redactions would significantly undermine "the public's ability to ably scrutinize"

27  this matter of great public interest, *Planet III*, 947 F.3d at 592, even as its PR team has accused

28  the State of "mischaracteriz[ing]" its services.

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

For the court's convenience, the State has divided the provisionally redacted information into categories or "buckets" based on the nature of that information: (i) information that is publicly available or ascertainable, (ii) information that—although not necessarily public—is not confidential, and (iii) information that concerns the State's underlying investigation of Google.  The State spent hours meeting and conferring with Google, line-by-line, to confirm the portions of the Complaint that fit into each "bucket"; Google never agreed or disagreed.  At the conclusion of this six-week effort, Google purported to categorize the exhibits into five new categories (Ex. D at 2), but Google never explained what materials fit into any category.

### 1.    Publicly Available Information Cannot Be Sealed.

Much of the information Google seeks to seal is either publicly available or readily ascertainable.  (*See* Ex. F at 1–4).  *Orca Commc'ns Unlimited, LLC v. Noder*, 233 Ariz. 411, 417 (App. 2013) ("Information easily or readily available to the public remains public knowledge and not protectable as confidential information even if a member of the public may have to expend substantial time to gather it and comprehend its significance."), *aff'd and depublished in part on other grounds*, 236 Ariz. 180 (2014).  The State opposes Google's request.

This bucket mostly consists of information relating to Google's various user-facing products, features, settings and public information about Google and its policies.  Google purports to make this information available to the public including through Google's public-facing help pages, privacy policies, and the open source Android Operating System, so it is unclear on what basis Google seeks to seal the information.  During the parties' discussions, Google failed to articulate any basis for sealing this information, apart from the fact that the information is contained in documents or testimony that Google unilaterally marked as "confidential."  That is not a proper basis for sealing court records.  *PCT Int'l Inc. v. Holland Electronics LLC*, No. CV-12-01797-PHX-JAT, 2014 WL 6471419 at *3 (D. Ariz. Nov. 18, 2014) ("Because PCT has publicly disclosed [the information] . . . . PCT has not shown that these documents should be filed under seal.").

Google also fails to substantiate any basis for sealing the names, much less ***titles***, of witnesses.  Most of these are individuals designated as corporate representatives, and all of them

-9-

worked on matters "at the heart of [the] case."  *Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8199309, at *5 (finding no compelling reason to redact names despite privacy and relevancy objections).  Many of these individuals—including those identified in paragraphs 52, 62, 71 and 93—are often named and quoted in the press.  Google cannot explain, much less substantiate, why any of these individuals would be subject to harassment.  *See State of Arizona ex. rel. Brnovich v. Kapoor*, No. CV2019-010695, Complaint, ¶ 49 (Ariz. Super. Ct. July 17, 2019) (naming a defendant's employee); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 26 (1984) (sealing names only after affidavits describing threats of physical harm and defaming statements were submitted); *Apple*, No. 11-CV-01846 LHK (PSG), 2012 WL 4120541, at *2 (denying motion to seal under the more lenient "good cause" standard "descriptions of exhibits and names of deposed Apple employees").

Google also invokes the language about "interested parties" in A.R.S. § 44-1525 as a basis for redacting names, (Ex. D at 2), but that provision has nothing to do with sealing information in a judicial document.  Nor does it purport to override the constitutional protections discussed here.  Witnesses are not "interested parties."  The statutory language creates a narrow exception to the general public records law so as to protect the integrity of the AG's consumer fraud investigations, which is why the AG has statutory authority to make materials public.  *See Carlson v. Pima County*, 141 Ariz. 487, 490 (1984).  Before 1980, the statute provided that "[n]o information or evidence provided the attorney general by a person pursuant to this article shall be admitted in evidence, or used in any manner whatsoever, in any criminal prosecution." Laws 1980, Ch. 76, § 4.  That year, the Legislature removed that limitation (*id.*); since then, there has never been a limitation on how the AG can use materials produced during an investigation in later civil proceedings, including by relying on them to make assertions in a publicly available complaint.

## 2.    Internal Information That Is Not Confidential Cannot Be Sealed.

The second bucket of information Google seeks to seal includes information that is not confidential, even if it is not necessarily "public."  This includes (i) internal communications commenting on Google's products and services, (ii) information concerning Google's internal

1   treatment of location data, (iii) Google's communications with and information regarding third

2   parties, (iv) the names and definitions of internal Google platforms and services, and (v) the

3   names of Google witnesses examined in this investigation and appearing in the exhibits.  (Ex. F

4   at 5–7).  The State opposes Google's request to seal this information.

5        As an initial matter, Google cannot substantiate any basis for sealing internal

6   communications, information concerning Google's internal treatment of location data, and

7   communications with third parties (subcategories (i) through (iii)).    In meet-and-confer

8   discussions, Google has simply pointed out that the information is "non-public."  But that is not

9   a proper basis for sealing court records.  *Bernstein*, 814 F.3d at 136; *Ingram v. Pac. Gas & Elec.*

10  *Co.,* No. 12-CV-02777-JST, 2013 WL 5340697, at *3 (N.D. Cal. Sept. 24, 2013) ("PG & E's

11  argument that the guidelines constitute a trade secret conflates trade secrets with ordinary

12  secrets. Information does not have value to a competitor merely because the competitor does not

13  have access to it.") (internal quotation marks omitted).  Indeed, "general assertions that the

14  information is confidential or a trade secret" or "conclusory statements" that disclosure would

15  cause competitive harm is not sufficient to provide an overriding interest to seal otherwise

16  public materials.[4]  *Allstate Ins. Co. v. Balle*, No. 2:10-CV-02205-APG-NJ, 2014 WL 1300924,

17  at *1 (D. Nev. March 27, 2014) (denying motion to seal) (internal quotation marks omitted).

18  Despite the State giving Google ample opportunity during the meet and confer process, Google

19  cannot show that any particular information in the Complaint is a trade secret, much less that

20  disclosure would cause Google financial or other harm. And Google has never explained why it

21  would be prejudiced from the disclosure of this information.  Rule 5.4(c)(2)(B).

22       Nor has Google shown that its interest—whatever it may be—overrides the presumption

23  of public access.  On the contrary, consumers have a strong interest in learning how their own

24

25  [4] In fact, in many instances, this information is already available to the public.  *See, e.g.*
    https://www.linkedin.com/in/darshan-thaker-b46aa847/ (referring to "HULK (Holistic User-
26  Location Knowledge)";
    https://patentimages.storage.googleapis.com/c8/69/e6/2809a5d75cc2af/US20130254309A1.pdf
27  at 5 (referring to "IPGeo services" used to "determine approximated geographical location" via
    IP address).

28

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

1    data is surreptitiously collected and used by Google.  *See FTC v. Amazon.com, Inc.*, No. C14-
2    1038-JCC, 2016 WL 3382532, at *2 (W.D. Wash. June 20, 2016).  (*See also supra* § III.C
3    (citing cases involving matters of significant public concern)).  Given the wrongdoing alleged in
4    this case—and given Google's public response—both the U.S. and Arizona constitutions protect
5    the public's right to evaluate "what [Google] officials knew and when, how they designed and
6    targeted their product, consumers' response, and [Google]'s policy changes."  *Amazon.com,*
7    *Inc.*, No. C14-1038-JCC, 2016 WL 3382532, at *2 (finding strong public interest in access to
8    court records).  If all that weren't enough, Google cannot even show that its proposed wholesale
9    sealing of this information "is no greater than necessary" or that it is the least restrictive means
10   to preserve any overriding interest (Rule 5.4(c)(2)(C) and (D)).

11        This is not the first time Google has attempted to seal information based only on
12   generalized assertions of harm.  In *Dunbar v. Google, Inc.*, Google sought to seal portions of the
13   plaintiff's motion for leave to file a third amended complaint.  No. 5:12-cv-003305-LHK, 2012
14   WL 6202719, at *1 (N.D. Cal. Dec. 12, 2012).  The information in that motion, according to
15   Google, needed to be sealed because they described confidential technical aspects of how
16   Google scans for, uses, and stores data, "including for the delivery of personalized
17   advertising"—similar to the facts at issue here—and "that disclosing this information would
18   allow Google's competitors to 'examin[e] the mechanisms that Google designed for its own
19   proprietary use,' thereby providing Google's competitors with 'an unfair advantage in designing
20   their own systems.'"  *Id.* at *3.  But the court was not persuaded by these generalized reasons,
21   even under the more lenient "good cause" standard of Fed. R. Civ. P. 26(c), because Google
22   failed to make a particularized showing as to each document it sought to seal by, for example,
23   explaining the specific unfair advantage competitors would earn if exposed to each piece of
24   information.  *Id.* at *3–4; *see also id.* at *7 (denying motion to seal deposition excerpts).

25        **3.    Information Concerning Arizona's Investigation Cannot Be Sealed.**

26        The State also opposes Google's attempt to seal nearly all of Section IV of the
27   Complaint, which describes the AG's pre-Complaint investigation.  (*See* Ex. F at 8).  Google's
28   attempt to hide its wrongdoing from the public only demonstrates that Google's actions have

-12-

been willful and intentional.  *See* A.R.S. § 44-1531(B); *see also State ex rel. Corbin v. United Energy Corp. of Am.*, 151 Ariz. 45, 51–52 (App. 1986).  Google contends that these materials must be sealed because the investigation itself was "confidential."  (Ex. D at 2).  But that bald assertion does not overcome the strong presumption of public access, particularly where they are directly relevant to the State's underlying cause of action.

Again, such investigations are confidential to protect the integrity of the AG's consumer fraud investigations, as well as the identity of complainants and victims (*see supra* § III.D.2)—concerns which are no longer present here.  *See also Kamakana*, 447 F.3d at 1183 (reliance on protective order not sufficient to seal documents).  The AG is vested with authority to publicly disclose his investigation if "in the judgment of the attorney general the ends of justice and the public interest will be served by the publication thereof, provided that the names of the interested parties shall not be made public."  A.R.S. § 44-1525.  Given that this is a matter of great public interest and concern, the AG believes that the entirety of Section IV should be publicly available.

### E.   Google Cannot Meet The Requirements of Rule 5.4 for Sealing Nearly All Exhibits in Their Entirety.

Google's bases for sealing the exhibits filed with the Complaint are (i) that they were included among Google's blanket confidentiality designations in the underlying investigation, and (ii) they "are the kind of documents that courts routinely maintain under seal."  (Ex. D at 2).  As explained, the Confidentiality Agreement does not prevent the State from filing them publicly.  In any case, Google has the burden to explain, ***for each piece of information***, the specific "overriding interest," how it would be prejudiced by disclosure, how its proposed restriction (wholesale sealing) is no greater than necessary, and how no reasonable, less restrictive alternative (such as targeted redactions) exists.  Rule 5.4(c)(2); *Dunbar*, No. 5:12-cv-003305-LHK, 2012 WL 6202719, at *1 (generalized assertions of harm not sufficient); *Allstate*, No. 2:10-CV-02205-APG-NJ, 2014 WL 1300924, at *1 (same); *Am. Traffic Solutions*, No. CV-08-02051-PHX-FJM, 2010 WL 481408, at *2 (denying motion to seal for failure to "describe the specific portions of documents" meeting the "compelling reasons" standard).  Despite

repeatedly requesting Google provide this information during the meet and confer process, Google failed to do so.  Indeed, the State has long asked Google to sort the exhibits it seeks to seal into categories or "buckets" for the Court's ease of review.  Google failed to do even that. Days before the State filed this Notice, Google finally proposed buckets, but it did not populate them with the exhibits or explain with specificity why each (or even any) of the exhibits met the standard described in Rule 5.4(c)(2).  (*See* Ex. D at 2).  Because Google cannot meet the stringent requirements of Rule 5.4(c)(2) with respect to the State's exhibits, the Court should permit them to be publicly filed.

### F.      Google Has Waived Any Assertions of Confidentiality.

Google's proposed sealing is particularly problematic given Google's own public statements regarding the subject matter of this case and its public filings in this case.  Google itself expends significant resources monitoring this media attention, including the August 2018 AP article that instituted the AG's investigation.  (*See* Compl. ¶¶ 54–57).  Google has also invited this public discussion over its location data practices.  In response to this lawsuit, Google claimed that the State "mischaracterized [its] services."[5]  And that "[it] look[s] forward to setting the record straight."  *Id.*  Google cannot publicly accuse the State of mischaracterizing the Designated Materials while at the same time preventing the public from reviewing those materials.  *Cf. Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 155 (App. 2009) (attorney-client privilege waived where used as both sword and shield).

More fundamentally, Google has now filed a motion to dismiss—on the public docket— that expressly seeks a ruling with respect to the sufficiency of the Complaint, including the exhibits.  Google publicly challenges (and often describes) the very allegations that it seeks to seal.   For example, Google publicly mischaracterizes the State's allegations concerning Google's interactions with OEMs (*see* Mot. at 14 (suggesting that the State is supposedly trying to assert claims on behalf of OEMS)), while trying to seal the detailed allegations and

---

[5]  https://www.theverge.com/2020/5/27/21272625/ arizona-ag-sues-google-location-tracking-android-allegations.

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

supporting documents showing how Google coopted OEMs into Google's scheme for deceiving consumers.  (*E.g.*, Compl. ¶¶ 114-128, 142, 161j).   Similarly, Google publicly contends that the Complaint fails to allege intent (Motion at 13), yet Google redacts large swaths of the Complaint and exhibits that show Google acted knowingly and deliberately (*e.g.*, Compl. ¶¶ 26, 30, 43-47, 49, 61, 65–70, 75, 77, 81–86, 88-89, 94, 99–104, 107, 109, 114–28, 131, 134–36).   Google likewise redacts all allegations concerning its delay and impeding of the AG's investigation (*Id.* ¶¶ 138–54), which further evidences Google's willfulness.

In other instances, Google publicly describes much of the same information that it wants to seal in the Complaint.  For example, Google wants to seal nearly all allegations concerning ads personalization, including the fact that Google still serves location-based ads when users opt out.  (*E.g.*, Compl. ¶¶ 9e, 98–104, 161p, 161q).  Even so, Google discloses the same information in its own motion, while citing the paragraphs that are redacted.  (Mot. at 13:3-5).  Similarly, Google purports to characterize allegations relating to the Location Master and System Updates, while citing to paragraphs 91, 105-09 and 161f of the Complaint, which Google has fully or substantially redacted.  (Mot. at 12:20-23).  Google insists its services are not a "sale," (*id.* at 8), but Google wants to seal the seemingly non-confidential testimony explaining what consideration is exchanged (*e.g.*, Compl. 8:23-25).   Painting with broad strokes, Google contends that the Complaint fails to sets forth any violations (Mot. at 1:16–17) or purports to identify allegations that are lacking in the entire "45-page complaint with over 1,200 pages of exhibits" (*id.* at 10:23–24), most of which Google wants to seal.  Google cannot litigate its motion to dismiss on the public record, while trying seal the Complaint and exhibits that are the subject of Google's motion.

### G.    Google's Other Likely Arguments Fail.

In the face of the extensive legal authority cited above, Google still insists "there is no public interest in disclosure of discovery materials in connection with a non-dispositive motion." (Ex. D at 1).  Google mostly cites cases concerning *unfiled* discovery, which the Supreme Court held "are not public components of a civil trial."  *Seattle Times*, 467 U.S. at 33; *see also Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (noting exception for

1   sealed discovery submitted with nondispositive motion). Here, Google is trying to seal the

2   Complaint—not unfiled discovery—and therefore the presumption of public access has

3   attached. *See Lewis R. Pyle Mem'l Hosp.*, 149 Ariz. at 197 ("Even though information may be

4   discoverable per Rule 26(b)(1), such information is not ordinarily public information ***until***

5   ***introduced into evidence or filed with the clerk of the court*.") (emphasis added); *Ctr. for Auto*

6   *Safety*, 809 F.3d at 99 (holding that the exception is limited to pleadings that are only

7   "tangentially related to the underlying cause of action").

8       Arizona courts, like federal courts, explicitly distinguish between unfiled discovery and

9   materials filed with the Court. *See* Ariz. R. Civ. P. 5.1(c)(2)(B) (providing that discovery "may

10  not be filed" unless relevant to a determination of an issue before the court); *see also Bond v.*

11  *Utreras*, 585 F.3d 1061, 1075–76 (7th Cir. 2009) ("The rights of the public kick in when

12  material produced during discovery is filed with the court."). As explained, both Arizona and

13  Ninth Circuit authority confirms the public's presumptive right of access to a Complaint.[6]

14      Google also insists other courts routinely seal the kinds of documents that it seeks to seal

15  here, (Ex. D at 2), but the cases it cites largely undermine its claim. In *In re Google Inc. Gmail*

16  *Litig.*, No. 13-MD-02430-LHK, 2014 WL 10537440, at *2, *5 (N.D. Cal. Aug. 6, 2014), the

17  court largely ***denied*** a request to seal information "critical to public understanding of the cause

18  of action in this case" and otherwise public, and only permitted narrowly tailored redactions on a

19  particularized, document-by-document basis. Similarly, in *Apple Inc. v. Samsung Elecs., Co.*,

20  727 F.3d 1214, 1226 (Fed. Cir. 2013), the court only sealed "limited portions" of proprietary

21  financial documents that were not introduced into evidence, not considered by the jury, and not

22  "essential to the public's understanding of the jury's damages award," and only because the

23

24  ---

     [6] Google cites *Mercury Interactive Corp. v. Klein*, which declines public access where "the
     Complaint's exhibits did not become a basis for adjudication" when a demurrer for lack of

25  standing is sustained. 70 Cal. Rptr. 3d 88, 121 (Ct. App. 2007) (demurrer did not deal "with the
     underlying factual claims" and "exhibits were not submitted as a basis for adjudication"). Since

26  then, the Ninth Circuit has rejected the notion "that the public character of judicial records
     depends on whether the proceedings have progressed to a stage requiring a judge to act on the

27  papers." *Planet III*, 947 F.3d at 591–92. And unlike in *Mercury*, Google's motion to dismiss
     challenges the State's factual claims and puts at issue what is or is not alleged in the Complaint.

28

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

1  parties already agreed to "make public all of the information contained in these documents that
2  was actually cited by the parties or the district court."  Here, Google's proposed sealing is a far
3  cry from what the courts allowed in *Apple* or *Gmail*.  Google also cites cases from other
4  jurisdictions applying a different standard from what the Ninth Circuit and Arizona courts
5  require[7] or where—unlike the present case—the public's interest in accessing to the complaint
6  was "minimal."[8]  Also, most of the Google's authorities involved sealed materials produced
7  subject to a protective order.  Here, there is no court order precluding the State from publicly
8  filing the materials.  Rather, the materials produced were subject to a Confidentiality Agreement
9  and a statutory scheme—both of which recognize the AG's discretion to use the materials in
10  connection with litigation and make them public.

**IV.   CONCLUSION**

12      The Court should reject Google's efforts to seal large swaths of the Complaint and
13  exhibits, which are presumptively public.  Google cannot articulate a compelling interest for
14  sealing this information, much less one that overrides the public's strong interest in the facts
15  surrounding this case.  Neither can Google establish prejudice beyond embarrassment.  Finally,
16  Google's proposed restriction on public access—wholesale sealing of a vast majority of the
17  exhibits and much of the Complaint—is far greater than necessary.

Dated:  July 17, 2020                    MARK BRNOVICH
                                         ATTORNEY GENERAL
                                         By: */s/ Brunn W. Roysden III*
                                         Joseph A. Kanefield
                                         Brunn W. Roysden III
                                         Oramel H. Skinner
                                         Michael S. Catlett
                                         Christopher Sloot
                                         *Assistant Attorneys General*

---

[7] *A.L. v. Walt Disney Parks & Resorts US, Inc.*, No. 614CV1544ORL22GJK, 2020 WL 1138254, at *1 (M.D. Fla. Mar. 9, 2020) (applying "good cause," not "compelling interest"); *Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 341 n.7 (S.D. Iowa 1993) (sealing trial exhibits because "compelling showing" standard is "inconsistent with the Eighth Circuit's view).
[8] *IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013).

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

Guy Ruttenberg (CA Bar No. 207937)
(*pro hac vice* application forthcoming)
Michael Eshaghian (CA Bar No. 300869)
(*pro hac vice* application forthcoming)
RUTTENBERG IP LAW, A
PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, California 90067
Telephone: (310) 627-2270
guy@ruttenbergiplaw.com
mike@ruttenbergiplaw.com

David H. Thompson (DC Bar No. 450503)
(*pro hac vice* application forthcoming)
Peter A. Patterson (DC Bar No. 998668)
(*pro hac vice* application forthcoming)
COOPER & KIRK PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com
ppaterson@cooperkirk.com

*Attorneys for Plaintiff State of Arizona ex rel. Mark Brnovich, Attorney General*

## **GOOD FAITH CONSULTATION CERTIFICATE**

Pursuant to Rule of Civil Procedure 5.4(g)(3), I certify that the parties engaged in good-faith consultation under Rule 7.1(h).

  */s/ Guy Ruttenberg* _____

COPY of the foregoing Notice, as well as
Exhibits A, D, and E to this Notice FILED
with the Court this 17th day of July, 2020.

COPY of Exhibits B, C, and F to this Notice
LODGED in a sealed envelope with the Clerk
of Court pursuant to Rule 5.4(e)(1)(A), (2)
this 17th day of July, 2020.

COURTESY COPY of the foregoing Notice;
Exhibits A, D, and E to this Notice; and, in a
sealed envelope, Exhibits B, C, and F to this Notice
HAND DELIVERED pursuant to Rule 5.4(e)(1)(B)
this 17th day of July, 2020 to:

Chambers of Judge Thomason
101 W. Jefferson St.
Phoenix, AZ 85003

COPY of the foregoing Notice and Exhibits
HAND DELIVERED this 17th day of July, 2020 to:

J Cabou
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ 85012
*Counsel for Defendant Google LLC*

 */s/ Brunn W. Roysden III*

NOTICE OF LODGING PURSUANT TO ARIZONA RULE OF CIVIL PROCEDURE 5.4(g)(3)

# EXHIBIT 8

1 | **MARK BRNOVICH**
2 | **ATTORNEY GENERAL**
  | Firm State Bar No. 14000

3 | Joseph A. Kanefield (State Bar No. 15838)
  | Brunn W. Roysden III (State Bar No. 28698)
4 | Oramel H. Skinner (State Bar No. 032891)
  | Michael S. Catlett (State Bar No. 025238)
5 | Christopher Sloot (State Bar No. 034196)
  | *Assistant Attorneys General*
6 | 2005 N. Central Ave.
  | Phoenix, Arizona 85004
7 | Telephone:  (602) 542-8958
  | Beau.Roysden@azag.gov
8 | O.H.Skinner@azag.gov
  | Michael.Catlett@azag.gov
9 | Christopher.Sloot@azag.gov
  | ACL@azag.gov
10 |
  | [Additional Counsel on Signature Page]
11 |
  | *Attorneys for Plaintiff*
12 | *State of Arizona ex rel. Mark Brnovich,*
  | *Attorney General*
13 |

**THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| STATE OF ARIZONA, *ex rel.* MARK BRNOVICH, Attorney General, | ) | Case No: |
|---|---|---|
| Plaintiff, | ) ) | **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |
| v. | ) ) | Assigned to the Hon: _____ |
| GOOGLE LLC, a Delaware limited liability company, | ) ) | (Non-classified; Consumer Fraud) |
| Defendant. | ) ) | REQUEST ASSIGNMENT TO COMPLEX COURT |
| | ) ) | **JURY TRIAL DEMANDED** |
| _____ | )_ | |

## **TABLE OF CONTENTS**

*Page*

I.     INTRODUCTION ................................................................................................. 1

II.    PARTIES, JURISDICTION, AND VENUE ........................................................ 5

       A.    Plaintiff ................................................................................................... 5

       B.    Defendant ................................................................................................ 5

       C.    Jurisdiction and Venue ............................................................................ 5

III.   FACTUAL ALLEGATIONS .............................................................................. 6

       A.    Google Engages in Acts and Practices In Connection With the Sale and
             Advertisement of Merchandise In And Affecting The State of Arizona ........................... 6

       B.    Overview of Google's Many Location-Related Settings ................................ 10

       C.    Google Admits Its Location-Related Settings Are a "Mess" That Mislead and
             Deceive ................................................................................................. 12

             1.    Google Misleads and Deceives Users Through Its Location History and
                   Web & App Activity Settings. .................................................... 14

             2.    Google Misleads Users Into Sharing Their Location Via Its Misleading
                   WiFi Scanning and WiFi Connectivity Settings ............................. 19

       D.    Google Uses Its Users' Locations Even When Users Turn Off the Relevant
             Permissions ........................................................................................... 21

             1.    Google Shares Location with Apps That Users Explicitly Forbid From
                   Using Location ...................................................................... 21

             2.    Google Collects Location Data Even When Users Turn Their Device
                   Location Off ......................................................................... 24

             3.    Google Serves Personalized Ads Based on User Location Even When
                   Users Turn Off Personalization ................................................. 26

       E.    Google Automatically Changes the State of Permissions Without Notifying Users ........ 27

       F.    Google Changes the Android User Interface to Increase Location ███████████
             at the Expense of User Choice and Consent ............................................. 29

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1

## TABLE OF CONTENTS (*cont.*)

2

*Page*

3
4
G.    Google Misleads and Deceives Users Regarding Its Deletion of Their Location Information ................................................................................................... 33

5
H.    Google Has Engaged In Willful Violations Of The Arizona Consumer Fraud Act ........ 34

6
7
IV.    ARIZONA'S INVESTIGATION INTO GOOGLE'S  UNFAIR AND DECEPTIVE ACTS AND PRACTICES ................................................................................................ 36

8
V.    CLAIM FOR RELIEF ..................................................................................................... 41

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff State of Arizona *ex rel.* Mark Brnovich, Attorney General, for its Complaint against Defendant Google LLC ("Google"), alleges as follows:

## I.   INTRODUCTION

1.      This case concerns Google's widespread and systemic use of deceptive and unfair business practices to obtain information about the location of its users, including its users in Arizona, which Google then exploits to power its lucrative advertising business.

2.      The average consumer likely associates Google with its popular products and services including Google Search, Google Maps, the Google Chrome browser, YouTube, and Android, but these products and services are not Google's principal business.

3.      From a revenue perspective, Google's principal business is selling advertisements and displaying them to the users of Google's products and services.

4.      This reality is reflected by Google's financials. In 2019, for example, over 80% of Google's massive revenues—$135 billion out of $161 billion total—were generated by advertising.

5.      Google's advertising revenues are driven by the company's collection of detailed information about its users, including information about where those users are located. Location information allows Google to enable advertisers to target users in a specific geographic location, and it also allows Google to validate the effectiveness of ads by reporting to advertisers how often online ad clicks are converted into real-world store visits.

6.      Given the lucrative nature of Google's advertising business, which depends on having detailed location information about its users, Google goes to great lengths to collect its users' location information. Indeed, according to Harvard Professor Shoshana Zuboff, "Google's proprietary methods enable it to surveil, capture, expand, construct and claim behavioral" data, "including data that users intentionally choose not to share." *See* Shoshana Zuboff, The Age of Surveillance Capitalism 80 (2019). In this regard, individual users of Google products and services are the targets of a sweeping surveillance apparatus designed to collect their behavioral data *en masse*, including data pertaining to user location. *Id.* at 8–10.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

7.     The tactics Google deploys to surveil its users' locations—including users in Arizona—include willfully deceptive and unfair acts and practices within the meaning of the Arizona Consumer Fraud Act.

8.     One aspect of Google's deceptive conduct came into public view with the August 2018 publication of an Associated Press article entitled, "Google tracks your movements, like it or not." The article discusses Google's Location History service, which enables users to view where they have been. Google provided users the ability to disable Location History. At the same time, Google told users that "with Location History off, the places you go are no longer stored." But the AP article revealed that this statement was blatantly false—even with Location History off, Google would surreptitiously collect location information through other settings such as Web & App Activity and use that information to sell ads.

9.     Arizona's investigation has revealed that Google's deceptive and unfair conduct extends well beyond its false Location History disclosure. Indeed, such acts and practices pervade Google's seemingly relentless drive to (i) collect as much user location information as possible and (ii) make it exceedingly hard for users to understand what is going on with their location information, let alone opt-out of this morass. This is demonstrated by the following examples:

a.   As described in the AP article, with Location History off, Google continues to collect location information through Web & App Activity—a title that reveals nothing about the setting's connection to harvesting location data. Through Web & App Activity, Google logs information relating to a user's activity on Google websites and apps, such as conducting a search on Google Search. A critical component of this information from Google's perspective is a user's location. Nevertheless, until early- to mid-2018, Google's disclosures during account creation made no mention of the fact that location information was collected through Web & App Activity, which defaulted to "on." And even today the title itself is misleading by failing to disclose any connection to location.

b.   Devices running the Android operating system have a device-level location setting. Google tells users that "the types of data we collect depend in part on your device and

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

account settings. For example, you can turn your Android device's location on or off using the device's settings app." A reasonable conclusion from this disclosure is that "off means off"—*i.e.*, that Google simply will not collect and exploit user location information when a device's location setting is turned off. But that is not true.



c.   Google's WiFi settings mislead users about Google's collection and use of location information. There are two relevant settings—WiFi scanning and WiFi connectivity. Only the WiFi scanning setting is presented within location settings, which would lead a reasonable user to believe that turning it off would result in Google no longer discerning a user's location through WiFi scans. ████████████████████████ ████████████████████████████████████████████████████ ████████████

d.   In recent versions of Android, individual Google apps ask for the user's permission to use their location data. A reasonable inference is that, if the user denies this app-level permission to an app, that app will not be able to use the user's location. But this is not true—Google apps that are denied permission by the user can still obtain location information from other Google apps and products that *have* been granted permission.

e.   The ████████████ deception also manifests in ads personalization. As explained above, Google serves personalized ads to its users based in part on information Google has about a user's location. Google purports, however, to allow users to opt out of ads personalization by turning off a setting of that name ("GAP"). But contrary to what a reasonable user would expect, turning ads personalization off does not stop Google from presenting ads based on a user's location. Rather, Google will instead

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

simply present ads based on more general location information. Moreover, Google

has a *second* ads service ("DoubleClick") through which it serves ads on third-party

websites. The setting that controls DoubleClick's service of location-based ads is in a

completely separate user interface from the GAP setting. And, like the GAP setting, if

a user turns off the DoubleClick setting, Google will still target the user with

DoubleClick ads based on the user's coarse location. Even worse, the DoubleClick

setting has no effect on the GAP setting, and vice versa. Thus, a user who thought she

had opted out of receiving ads based on her location is wrong on two counts: Google

still serves her location-based ads (based on her coarse location) via that same

service, and Google also serves location-based ads (based on more precise location

signals) via the other service.

f.   Users are more likely to disable their device's location setting if they are readily

offered such a setting. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████

10.   Users, including in Arizona, have come to rely on Google's products and services on a
daily basis. At the same time, through these deceptive and unfair acts and practices, Google makes it
impractical if not impossible for users to meaningfully opt-out of Google's collection of location
information, should the users seek to do so.

11.   Google has engaged in these deceptive and unfair acts and practices with the purpose of
enhancing its ability to collect and profit from user location information. And profited it has, to the tune
of over $134 billion in advertising revenue in 2019 alone. On information and belief, hundreds of
millions of dollars of these advertising revenues were generated from ads presented to millions of users
in the State of Arizona.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

12.     Arizona brings this action to put a stop to Google's deceptive and unfair acts and practices; force Google to disgorge all profits, gains, gross receipts, and other benefits obtained for the period of time when it engaged in any unlawful practice; recover restitution for Arizona consumers; and impose civil penalties for Google's willful violations of the Arizona Consumer Fraud Act.

## II.     PARTIES, JURISDICTION, AND VENUE

### A.     Plaintiff

13.     Plaintiff is the State of Arizona, *ex rel.* Mark Brnovich, Attorney General ("Arizona"). The Attorney General is authorized to bring this action in the name of the State under A.R.S. § 44-1521 *et seq.*

### B.     Defendant

14.     Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California.

15.     Google is a technology company that specializes in Internet-related products and services, which include online advertising technologies, search, cloud computing, and other software and hardware.

16.     Google markets and advertises its products and services throughout the United States, and on information and belief the number of Google's Arizona users is in the millions.

17.     Google touts that "[i]n 2019, [it] helped provide $6.22 billion of economic activity for 28,900 Arizona businesses, publishers, nonprofits, creators, and developers."[1]

18.     At all relevant times Google acted with the knowledge and understanding that the activities described in this Complaint would affect users of Google's products and services throughout the United States, including in the State of Arizona.

### C.     Jurisdiction and Venue

19.     This Court has subject-matter jurisdiction over this matter, including under Article VI, Section 14 of the Arizona Constitution.

---

[1] https://economicimpact.google.com/state/az/.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

20.     This Court may enter appropriate orders both prior to and following a determination of liability pursuant to the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

21.     Venue is proper in Maricopa County pursuant to A.R.S. § 12-401.

### III.     FACTUAL ALLEGATIONS

**A.     Google Engages in Acts and Practices In Connection With the Sale and Advertisement of Merchandise In And Affecting The State of Arizona**

22.     Google's deceptive and unfair acts and practices alleged herein are in connection with the sale or advertisement of merchandise for several reasons, including the following:

    a.  Google sells its own Android devices to consumers in Arizona, and those devices both run Google's proprietary forks of the Android operating system and come preloaded with several Google apps. As part of activating and setting up their phones after purchasing them for consideration, consumers purportedly "consent" to the settings described herein that result in Google's collection of location data. Google's acts, practices, representations, and omissions regarding those settings, including during setup, are thus in connection with the sale of Google's Android phones.

    b.  Google creates both software that is part of the Android operating system (*i.e.*, proprietary forks) and also Google apps that it causes to be included on Android devices sold by other manufacturers to consumers in Arizona. As part of activating and setting up those devices after purchasing them for consideration, consumers purportedly "consent" to the settings described herein and Google's collection of location data. Google's acts, practices, representations, and omissions regarding those settings are thus in connection with the sale of certain third-party Android phones.

    c.  Google advertises the devices and software described in (a) and (b), *supra*, to consumers. Google also advertises software that runs on other operating systems (*e.g.*, iOS). Google's acts, practices, representations, and omissions when advertising devices and software are thus in connection with the advertisement of merchandise.

    d.  Google sells ad placements (*i.e.*, "merchandise") to third parties for consideration (Google's principal business), which advertisements are powered by the fruits of the

deceptive and unfair acts and practices alleged herein relating to collection of user location data. Google's acts, practices, representations, and omissions when selling ad placements to purchasers of such ad placements are thus in connection with the sale of merchandise.

e.  Google markets (*i.e.*, advertises) its ad business to potential and actual buyers of its advertisements. Google's acts, practices, representations, and omissions when marketing its ad business to potential buyers of ads are thus in connection with the advertisement of merchandise.

f.  Google's unfair and deceptive acts and practices lead to targeted advertisements to Arizona consumers based on user location data, and Google also tracks "conversions" of such ads to physical store visits. Google's acts, practices, representations, and omissions when serving advertisements to consumers on behalf of the third parties who have purchased such ads, and tracking conversions from such ads, are thus in connection with the advertisement and sale of merchandise by those third parties.

23.  Google's own "device" offerings include smartphones in the Google Pixel and Google Nexus families of phones. For example, Google has sold and/or advertised the following devices:

- Google Pixel family
  - Pixel C (released 2015)
  - Pixelbook (released 2017)
  - Pixel Slate (released 2018)
  - Pixel 1 (released 2016)
  - Pixel 2 (released 2017)
  - Pixel 3 (released 2018)
  - Pixel 4 (released 2019)
- Google Nexus family
  - Nexus One (released January 2010)
  - Nexus S (released December 2010)
  - Galaxy Nexus (released November 2011)

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1        o        Nexus 4 (released November 2012)

2        o        Nexus 5 (released November 2013)

3        o        Nexus 6 (released November 2014)

4        o        Nexus 5X (released October 2015)

5        o        Nexus 6P (released September 2015)

6        24.     On information and belief, Google, through agreements with third-party manufacturers

7    such as Samsung and carriers such as Verizon, causes its Android software and apps to be pre-installed

8    on phones and devices that are sold to consumers in Arizona, and which consumers "consent" to as part

9    of the setup process after buying such phones and devices.

10       25.     Google also sells, advertises and/or otherwise offers for consideration various software

11   services to Arizona consumers, either directly or indirectly. For example, Google's software offerings

12   include the Android operating system ("Android"), Google-authored apps ("Google apps"), Google

13   Accounts, and Google web browsers, such as Chrome. In its privacy policy, Google defines its services

14   as including (i) "Google apps, sites, and devices, like Search, YouTube, and Google Home," (ii)

15   "Platforms like the Chrome browser and Android operating system," and (iii) "Products that are

16   integrated into third-party apps and sites, like ads and embedded Google Maps." Ex. 72 (GOOG-GLAZ-

17   00000715) at 715.

18       26.     In consideration for use of Google's software products and devices, Google collects, *inter*

19   *alia*, "information about your location when you use our services, which helps us offer features like

20   driving directions for your weekend getaway or showtimes for movies playing near you." *Id.* at 718.

21   Google tells consumers it must collect this data "to deliver our services," "ensure our services are

22   working as intended," "develop new services," and "show you personalized ads." *Id.* at 719. Google's

23   ██████████████████████████████████████████████████████████████████████████████████

24   confirmed that Google's products, such as Search and Maps, are only free because Google is able to

25   display ads to users of these products. 3/6/2020 ██████ EUO Tr. at 368:1–369:17; *see also id.* at 370:4–

26   24 (understanding Google's "products" and "services" to be interchangeable, and giving Google Maps

27   and Search as examples); 2/28/2020 ██████ EUO Tr. at 327:17–18 ("'Service' and 'product' are used

28   interchangeably at Google.").

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

27.     Google also collects users' location data from its Android operating system. Google's Android is a popular smartphone operating system in the United States. Beyond smartphones, Android also runs on various other types of devices, such as tablets, televisions, home appliances, and fitness trackers. Android is also the operating system that is installed on all of Google's own smartphone devices.

28.     Android is technically an open-source software, meaning that anyone can take the Android source code, modify it in any way, and install it on a compatible device. Such modifications are called "forks" of Android.

29.     While third-party smartphone manufacturers ("OEMs") are technically free to pre-install any Android fork on their phones, a "vast majority" of Android phones sold in the United States install Google's version of Android. 2/28/2020 ████ EUO Tr. at 448:9–17.

30.     Google causes its preferred versions of Android to be pre-installed on many smartphones, and forbids OEMs from pre-installing any Google apps (such as Search or Maps) on other versions of Android. Google has a large incentive to do this: its own version of Android contains Google Mobile Services ("GMS"), which makes it easier for Google to collect location information from users.[2] Indeed, ████████████████████████████████████████████████████████████████████ ██████████████████████ 2/28/2020 ████ EUO Tr. at 444:8–445:9; *see also* Ex. 201 (GOOG-GLAZ-00149241) ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

31.     The location data that Google collects—from any source—adds an enormous amount of value to Google's advertising offerings. As explained above, Google is primarily an advertising

---

[2] GMS "is a collection of apps and services that an OEM is required to have to . . . license Android." 9/25/2019 ████ EUO Tr. at 139:1–6. That collection includes "software libraries, APIs, and other software, including YouTube, Maps, and Google Play." *Id.* at 138:4–10; *see also* https://www.android.com/gms/ (GMS is "a collection of Google applications and APIs that help support functionality across devices. These apps work together seamlessly to ensure your device provides a great user experience right out of the box.").

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

company—in 2019, Google made $161 billion in revenue, of which $135 billion (84%) came from advertising.

32.     For instance, one of Google's advertising offerings is called Store Visits. With this product, Google is able to inform its advertisers how effective their ads are by informing them when viewing an ad online drives a physical store visit. Google is only able to do this by collecting massive amounts of user location data.

**B.     Overview of Google's Many Location-Related Settings**

33.     As explained further below, Google's products and services include a web of interrelated settings that relate to Google's collection of a user's location-related information. These settings, individually and collectively, are in many cases deceptive, and their use by Google to collect users' location data is unfair and deceptive.

34.     The settings fall into three categories: (i) account-level, (ii) device-level, and (iii) app-level. In many instances, these settings are defaulted to enable collection of user location data, unless the user affirmatively disables the settings. In many instances, the settings can conflict with one another, but Google collects user location data regardless. In many instances, locating and/or understanding the appropriate setting is extraordinarily difficult and confusing.

35.     Device-level settings are those that are specific to a given hardware device, like a smartphone or tablet. A user may have a single Google Account that is used on multiple devices. For example, a device-level location setting may be turned off for that user's Pixel phone, but turned on for the user's tablet.

36.     Account-level settings are those that apply to a user's entire Google Account and are propagated to all devices associated with that Google Account.

37.     App-level settings are settings specific to a particular app. An app-level setting can relate to a Google app, such as Google Maps. An app-level setting can also apply to third-party apps that are installed on an Android device.

38.     Although these various settings have changed over time (including recently), the following table includes some of the relevant settings today:

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

| Setting Name | Category | Description |
|---|---|---|
| Device Location (or Location Master) | Device-level setting | This setting is the main location setting on a device and controls whether a device's location setting is on. When it is on, GPS is used to obtain a user's location. |
| Google Location Accuracy (formerly known as Google Location Services) ("GLA") | Device-level setting | GLA is a network-based location service that uses signals other than GPS to obtain a user's location. Specifically, GLA obtains location from WiFi, cellular networks and a variety of sensors (barometer, gyroscope, magnetometer, and accelerometer). |
| Usage & Diagnostics | Device-level setting | When turned on, this setting purportedly helps Google improve the Android operating system ("OS"). It collects the user's IP addresses, which can be used to infer location. |
| WiFi Scanning | Device-level setting | This setting allows apps and services to be able to obtain WiFi scans even when the WiFi setting is off. Google can use WiFi scans to augment the location information it obtains. |
| Bluetooth Scanning | Device-level setting | This setting allows apps and services to be able to obtain Bluetooth scans even when the Bluetooth setting is off. Google can use Bluetooth scans to augment the location information it obtains. |
| App-level location permission | App-level setting | When on, this setting gives an app permission to access the location of the corresponding device's location. |
| Location History ("LH") | Account-level setting | When on, this setting allows Google to build a comprehensive list of everywhere the user goes with their devices that also have Location Reporting (explained below) turned on, even when the user is not using a Google service. LH also powers a product called Timeline, which is a user-facing product in which users can view and delete the places they have been. |
| Location Reporting | Device-level setting | This is a sub-setting of LH. When on, it enables the device to report location via Google's Location History setting. |
| Web & App Activity ("WAA") | Account-level setting | When this setting is on, Google saves a user's Google activity. For example, when a user uses Google Search or Google Maps to search for "restaurants near me," Google collects the search term as well as information about that activity, such as a user's location and IP address. WAA also powers a product called My Activity, which is a user-facing product in which users can view and delete their WAA. |
| Supplemental Web & App Activity ("sWAA") | Device- and account-level setting | This is a sub-setting to WAA. When it is on, it allows a user's Chrome history and activity from websites and apps that use Google services to be collected. |
| Google Location Sharing | Account-level setting | This setting allows a Google Account holder to share his real-time location with others. |

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

| Setting Name | Category | Description |
|---|---|---|
| Google Ad Personalization ("GAP") | Account-level setting | When off, this setting purports to prevent Google from targeting a user with ads based on the user's location. |

*See, e.g.*, Ex. 202 (Google's Consolidated Final Responses to the First, Second, and Third CIDs ("Google's Responses to CIDs 1–3")) at 17–20 (4/17/2019 response to DFI 7 from the First CID); Ex. 203 (GOOG-GLAZ-00076994) at 7000–002; 9/25/2019 ███ EUO Tr. at 83:11–89:14.

39.     Location History in particular is central to Google's revenue stream. Among other things, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ Ex. 204 (GOOG-GLAZ-00085882) at 882.

40.     ██████████████████████████████████████████████████ ████████████████████████ *Id.*

41.     ████████████████████████████████████████ ████████████████████████ *Id.*

## C.     Google Admits Its Location-Related Settings Are a "Mess" That Mislead and Deceive

42.     The array of location-related settings described above misleads and deceives users of Google's products into believing that they are not sharing location information when they actually are. Their use by Google also constitutes unfair acts and practices.

43.     Indeed, for years, Google has known that the user experience they designed misleads and deceives users. The evidence obtained from within Google—such as internal emails, presentations, and memos—is overwhelming in this regard. Ex. 56 (GOOG-GLAZ-00002914) (October 2014 presentation regarding "Simplifying Location History Settings (on Android)"); Ex. 205 (GOOG-GLAZ-00055259) at 259 ████████████████████████████████

44.     Google's own employees have clearly identified the problem:

- ████████████████████████████████████████████████████ ████████████████████████████ Ex. 206 (GOOG-GLAZ-00055452) at 452.

- "The current UI feels like it is designed to make things possible, yet difficult enough that people won't figure it out." Ex. 207 (GOOG-GLAZ-00077898) at 899.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

- "Some people (including even Googlers) don't know that there is a global switch and a per-device switch." Ex. 208 (GOOG-GLAZ-00055552) at 553.

- ███████████████████████████████████████████████████████
  ██████ Ex. 209 (GOOG-GLAZ-00057477) at 477.

- ███████████████████████████████████████████████████
  ████████████████████████████████████████████ Ex. 210
  (GOOG-GLAZ-00057940) at 940.

- ██████████████████████████████████████████████████
  ███████████████████████████████████████████ 9/25/2019
  ███ EUO Tr. at 275:9–277:6.

- ████████████████████████████████████████████████
  █████████████████████████████████████████████████████████
  ███████████████████████████████████████ Ex. 211 (GOOG-GLAZ-
  00017790) at 790–91.

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████ Ex. 212 (GOOG-GLAZ-00161717) at 717.

- █████████████████████████████████████████████████
  ██████████████████████████ Ex. 213 (GOOG-GLAZ-00028891) at 896–97.

- █████████████████████████████████████████████████████
  █████████████ Ex. 214 (GOOG-GLAZ-00101814) at 14.

- "So our messaging around [location tracking] is enough to confuse a privacy focused Google-SWE. That's not good." Ex. 215 (GOOG-GLAZ-00163209) at 213.

45. Even top-level Google employees do not understand under what conditions Google collects location data. *See, e.g.*, Ex. 43 (GOOG-GLAZ-00031017) at 019–23 ██████████████
███████████████ at the time (9/25/2019 ███ EUO Tr. at 49:17–50), expressing confusion regarding how three different location-related settings interact).

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

46.     Though Google has published a variety of documentation for users, ███████████

██████████████████████████████████ *See* Ex. 216 (GOOG-GLAZ-

00078009) at 037 ███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ 059 ████████████████████████████████

████████████████████████████████████

████████████████████████████████ Ex. 214 (GOOG-GLAZ-

00101814) at 814 ████████████████████████████████████████

47.     The result of this complex web of settings and purported "consents" is an "overall

mess . . . with regards to data collection, consent and storage" (Ex. 209 (GOOG-GLAZ-00057477) at

478) that misleads users into handing over their location data to Google.

48.     Thus, though Google claims to have obtained consent to collect and store its users' data,

that consent is based on a misleading user interface, as well as other unfair and deceptive acts and

practices.

49.     ████████████████████████████████████████████████████

████████████ *See* Ex. 217 (GOOG-GLAZ-00046967) at 968 ████████████████

████████████████████████████ And Google even collects data without

user consent, as explained more fully below. *E.g.*, Ex. 218 (GOOG-GLAZ-00114667) at 667–68

████████████████████████████████████████████████████████

████████████████████

**1.    Google Misleads and Deceives Users Through Its Location History and Web & App**

**Activity Settings**

50.     While Google obtains its users' location information through numerous settings and

products, two of the primary settings through which Google misleads, deceives, and conceals material

facts from users are Location History and Web & App Activity.

-14-

51.     On August 13, 2018, the AP published an exclusive report titled "Google tracks your movements, like it or not" that publicly exposed this deception.[3] The article explained how Google "records your movements even when you explicitly tell it not to."

52.     Until the AP article was published, Google represented on its public help page regarding Location History that "You can turn off Location History at any time. With Location History off, the places you go are no longer stored." Ex. 8 (old Google help page titled "Manage or delete your Location History"); *see also* 7/11/2019 ████ EUO Tr. at 29:10–31:2.

53.     But that was not true. Even with Location History off, Google still collected and stored location data via (at least) its Web & App Activity setting. Thus, for example, a user who had Location History off and looked up the weather where he lived or searched the web with Google's Search app would still unknowingly send Google his location.

54.     The day the AP story was published, Google turned into crisis mode and held a self-styled "Oh Shit" meeting in reaction to the story. Ex. 20 (GOOG-GLAZ-00001521) at 523; Ex. 23 (GOOG-GLAZ-00001371) at 373. Discussed at that meeting were "where we are in terms of fixing 'location history'" and how to simplify Google's location settings. Ex. 20 (GOOG-GLAZ-00001521) at 523.

55.     Google closely monitored the AP story in a detailed media report which tracked, among other statistics, the volume of mentions of the story on social media (3 days later, that number was 62,000 (not including Facebook mentions)), hour-by-hour mentions, the list of media covering the story, and even tweets from specific individuals like politicians and reporters. Ex. 219 (GOOG-GLAZ-00001422).

56.     Even Google's ████████ was directly involved in the aftermath of the publication of the AP article. Mr. ████ called a ████████ meeting to get "constant" updates on the issues covered by the article from his direct reports, including from ████████, the ████████ ████████ 3/6/2020 ████ EUO Tr. at 176:10–178:11.

---

[3] https://apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracks-your-movements,-like-it-or-not.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

57. ███████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
Ex. 24 (GOOG-GLAZ-00001458) at 464–65. ██████████████
███████████████████████████████████████████
██████████████. *Id.* at 466.

58.     After the AP story was published, Google updated its help page to remove the disclosure "With Location History off, the places you go are no longer stored." Ex. 11 (GOOG-GLAZ-00000927). In other words, Google attempted to "fix" this particular deception only when it was caught.

59.     Testimony from Google employees and Google's internal documents confirm the conclusion of the AP story. 7/11/2019 ██████ EUO Tr. at 139:13–17 ████████████████
██████████████████████████████████████████
██████████████ Indeed, █████████████████████████
█████████████████████ Ex. 220 (GOOG-GLAZ-00057237) at 238; *see also* Ex. 221 (GOOG-GLAZ-00146003) at 007 ████████████████████████
██████████████████████; Ex. 213 (GOOG-GLAZ-00028891) at 894–95 ████████
████████████████████████████████████████
███████████████████████████████████
██████████████████████████.

60. ████████████████████████████████████████
███ Ex. 222 (GOOG-GLAZ-00069965) at 965 ██████████████████
██████.

61.     Multiple Google employees admit that Google's disclosures regarding WAA and LH are misleading:

- "Although I know it works and what the difference between 'Location' and 'Location History' is, I did not know that Web and App activity had anything to do with location. Also seems like we are not very good at explaining this to users." Ex. 19 (GOOG-GLAZ-00001288) at 289.

-16-

- "Indeed we aren't very good at explaining this to users. Add me to the list of Googlers who didn't understand how this worked an [sic] was surprised when I read the article . . . we shipped a UI that confuses users"). *Id.* at 290.

- ████████████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 223 (GOOG-GLAZ-00057861) at 861.

- "The complaint in this article is that if you have Web and App Activity enabled and the location toggle enabled, then your search history entries contain your approximate location at the time you made a query. It's also not possible to remove them by clearing your location history, which is counter-intuitive – you have to clear your search history instead." Ex. 224 (GOOG-GLAZ-00149867) at 868.

- "Definitely confusing from a user point of view if we need googlers [to] explain it to us." *Id.* at 867.

- "I agree with the article. Location off should mean location off, not except for this case or that case." Ex. 18 (GOOG-GLAZ-00001266) at 270.

- "[C]omms and policy are looking for an update on where we are in terms of fixing 'location history' fixes and having one single place to turn off instead of 3." Ex. 20 (GOOG-GLAZ-00001521) at 523.

62.     Completely independent of its connection to Location History, Web & App Activity itself is another source of deceptive and unfair acts and practices and unlawful concealment by Google. Until around early- to mid-2018, Google's disclosures during account creation made no mention of the fact that location information was collected via WAA, which is defaulted to "on." 7/12/2019 ████████ EUO Tr. at 175:7–15, 374:1–13.

63.     Even after Google changed this policy, users had to click on a "Learn More" link to view that disclosure until late 2018, when Google finally disclosed that WAA may include location data collection without users having to click on "Learn More." *Id.* at 376:15–3. Thus, users who had set up an account prior to 2018 would never receive a disclosure that WAA collects location data when setting up their account on a new device. *Id.* at 381:16–23. The same was true after account setup if a user wanted

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

to enable a Google product that required WAA to be "on": the WAA disclosure made no mention of location collection. Ex. 225 (GOOG-GLAZ-00101684) at 684 (Google Now setup interface requiring WAA opt-in without disclosing its connection to location).

64.    Additionally, until Android Q, an Android user could not directly access the WAA settings on his phone. 7/12/2019 ▮▮▮▮ EUO Tr. at 164:16–166:19.[4] Instead, a user would have to navigate to the device's settings, then to a Google link which took the user to his Google Account, then navigate down to WAA. *Id.*

65.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 226 (GOOG-GLAZ-00107030) at 030 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[5]

66.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 7/12/2019 ▮▮▮▮ EUO Tr. at 182:23–194:12. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 183:24–184:10; Ex. 227 (GOOG-GLAZ-00084080) at 1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

67.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 228 (GOOG-GLAZ-00106193) at 194.

68.    Notably, Google did not make "any changes to the privacy policy, terms and conditions, help desk or help center website . . . that reflected the change." 7/12/2019 ▮▮▮▮ EUO Tr. at 195:11–

---

[4] At least prior to Android Q, the same was true of the Location History setting. *See* 7/12/2019 ▮▮▮▮ EUO Tr. at 165:13–166:4, 170:6–171:1. Android Q, also known as Android 10, was released on September 3, 2019. *See* https://www.theverge.com/2019/9/3/20842507/google-android-10-q-pixel-release-download-availability.

[5] ▮▮▮▮▮▮▮▮▮▮▮ 7/12/2019 ▮▮▮▮ EUO Tr. at 69:15–18.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

205:22; Ex. 202 (Google's Responses to CIDs 1–3) at 92–95 (9/4/2019 response to DFI 23 from the Third CID) ("The relevant parts of Google's Privacy Policy have not been updated in the timeframe inquired about."). Rather, the only way users would have been able to see the change is if they happened to notice that their WAA data was suddenly more precise/coarsened via the My Activity tool. Thus, Google actively concealed and suppressed the type of location information it collected from its users.

69. ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████ ████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████ 2/27/2020 ██ EUO Tr. at 52:22–58:13.[6] ██████████████████████████████

████████████████ *Id.* at 55:3–13. ███████████████

██████████████ *Id.* at 58:14–59:2.

70. Thus, even when users explicitly tell Google that they do not want their web and app activity to be tracked, Google ignores those requests and collects that data (including location-related data), thereby deceiving users and promising something it does not deliver.

**2. Google Misleads Users Into Sharing Their Location Via Its Misleading WiFi Scanning and WiFi Connectivity Settings**

71. One of Google's location settings is WiFi Scanning. WiFi Scanning and WiFi connectivity are independent settings, and both can be switched off. 9/25/2019 ██ EUO Tr. at 90:2–7. Whereas the WiFi connectivity setting "allows a connection to WiFi or cuts off a connection to WiFi,"

---

[6] "Zwieback" is a term used within Google that refers to a specific cookie that is assigned to "any visitor to Google.com or a Google owned and operated property," regardless of whether they are signed in or out. 2/27/2020 ██ EUO Tr. at 57:20–58:13. "GAIA" is the Google account identifier and refers to a signed-in Google user. *Id.* at 157:10–20.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1    the WiFi Scanning setting controls whether "system apps and third-party apps can request WiFi scans."[7]

2    *Id.* at 117:4–118:5.

3        72.    Google's written disclosures at most suggest to users only that WiFi Scanning (as

4    opposed to WiFi connectivity) is related to location data. Ex. 230 (GOOG-GLAZ-00001105) at 106

5    ("To help apps get better location info, you can let your device scan for nearby Wi-Fi access points . . .

6    Tap Advanced > Scanning . . . Turn Wi-Fi scanning . . . on or off"). ████████████████

7    ████████████████████████████████████████

8        73.    The user interface for the WiFi Scanning setting is housed within location settings, while

9    the WiFi connectivity setting itself is separate.[8] This leads users to believe that the two functions

10    (scanning and connectivity) are separate, and that if they disable the WiFi Scanning permission on their

11    device, Google no longer collects, uses, or stores location information derived from WiFi scans.

12        74.    However, Google Location Accuracy (GLA; formerly known as Google Location

13    Services) gets location data from WiFi scans when *either* the WiFi Scanning setting ██████

14    ████████████████ is on. 9/25/2019 ████ EUO Tr. at 88:23–89:10. If WiFi Scanning is *off*, "Google

15    will periodically collect WiFi scans in order to build the estimated location for where WiFi Access

16    Points are," so long as other toggles (*e.g.*, GLA and ████████████ are on. *Id.* at 91:2–7. Further, as

17    of at least November 1, 2017, ████████████████████████████████

18    ████████████████████████████████████████████████

19    ████████████████████████ Ex. 43 (GOOG-GLAZ-00031017) at 022.

20        75.    Thus, despite the user attempting to prevent the reporting of WiFi-based location data—

21    and despite the user affirmatively turning the Location Master off—████████████████

22    ████████████████████████

23

24

25    ——————————————

26    [7] ████████████████████████████████████████████ Ex. 231 (GOOG-GLAZ-00109617) at 617 ██████

27    *Id.*

   [8] Depending on the OEM and build of Android, the path can look like Settings > Privacy and safety >

28    Location > Improve accuracy > WiFi scanning. *See* https://www.solveyourtech.com/turn-off-wifi-
   bluetooth-scanning-location-accuracy-android-marshmallow/.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

76.     In short, the separation of the WiFi Scanning and WiFi connectivity settings misleads users into providing location data to Google even if they do not want to. Google's disclosures suggest disabling "WiFi Scanning" will prevent Google from scanning nearby WiFi access points. But Google will collect location data via WiFi, so long as GLA is enabled and one of either WiFi scanning or ████ is enabled.

77.     ████████████████████████████████████████ and "a bit of a mess that we are working to clear up." *See* Ex. 43 (GOOG-GLAZ-00031017) at 020–21. ███████ ███████████████████████████ *Id.* at 021.[9] ████████████████████████████████ ███████████████████████████████████████████████ *Id.* at 021–22.[10]

78.     In addition to deceiving consumers through the WiFi setting described above, ████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 021.

**D.     Google Uses Its Users' Locations Even When Users Turn Off the Relevant Permissions**

**1.     Google Shares Location with Apps That Users Explicitly Forbid From Using Location**

79.     In more recent versions of Android, individual apps ask for the user's permission to use location data, and users can change this permission through their settings. This permissions structure is called a "run-time" permission model; before this model, Google used an "install-time" model that

---

[9] Android P became publicly available on August 6, 2018. https://www.theverge.com/circuitbreaker/2018/8/6/17656294/essential-phone-android-9-pie-update-now-available.

[10] In response to a notice to examine Google under oath pursuant to A.R.S. § 44-1524, Google designated Ms. ████ to testify, *inter alia*, as to "Google's practices regarding the collection, transmission, storage, deletion, usage and/or disclosure of user location data through the Android operating system."

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1   sought a user's permission only when the app was installed for the first time. 9/25/2019 ██ EUO Tr. at

2   163:3–12, 215:3–216:7. Run-time permissions were introduced with Android Marshmallow. *Id.*[11]

3         80.     Thus, under the run-time model, Google represents to its users that a given app would not

4   be able to obtain a user's location if the user denies app-level location permissions. Ex. 232 (GOOG-

5   GLAZ-00027697) at 700 ███████████████████████████████████████████

6   ████████████████████████████████████ Ex. 233 (GOOG-GLAZ-00000381) at 381

7   (public-facing help page explaining that users "can control which apps can see and use your phone's

8   location. For example, you could let Google Maps use your phone's location to give you driving

9   directions, but not share the location with a game or social media app.").

10        81.     ███████████████████████████████████████████████

11  █████████████████████████████████████████████████████████

12  ██████████████████████████████ Ex. 45 (GOOG-GLAZ-00005829) at 829–

13  32 ██████████████████████████████████████████

14  ████████████████████████████ ; Ex. 234 (GOOG-GLAZ-00060013) at 013

15  ████████████████████████████████████ ; Ex. 114

16  (GOOG-GLAZ-00198467) at 469 ████████████████████████████████

17  █████████████████████████████████████████████████████████

18  ██████████████████████████████ ;[12] Ex. 235 (GOOG-GLAZ-00150448) at

19  449 ████████████████████████████ ; Ex. 236 (GOOG-GLAZ-00027379) at

20  379–83 (indicating that "cross-product data use . . . may hurt user trust if we are providing locations to

21  XYZ via the ULR-loophole when the user has explicitly denied it," and that Google has been aware of

22  the issue "for 2+ years"); Ex. 237 (GOOG-GLAZ-00096366) at 378 ██████████████████

23  ██████████████████████████████████████████████████ .

24

25  _____

26  [11] Android Marshmallow was publicly released in October 2015.
    https://www.theverge.com/2015/10/5/9454437/android-6-0-marshmallow-now-available.

27  [12] ██████ is a service within Google that returns an estimate of a user's location given multiple inputs,
    such as the user's device location, Location History, and ████ signals. *See* 2/27/2020 ████ EUO Tr.

28  at 117:1–3, 119:17–19. ████ , in turn, is a service within Google that maps IP addresses to geographic
    locations. *See id.* at 98:19–99:4.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

82. ████████████████████████████████████████████

████████████████████ Ex. 45 (GOOG-GLAZ-00005829) at 829. In technical terms, ████████

████████████████████████████████████████████████████

██████████████ (Ex. 238 (GOOG-GLAZ-00027688) at 689)—████████████████

████████████████ Ex. 232 (GOOG-GLAZ-00027697) at 697; *see also* Ex. 214 (GOOG-

GLAZ-00101814) at 814 ████████████████████████████████

████████████████████████

83. ████████████████████████████████████████████████

████████████████████ Ex. 45 (GOOG-GLAZ-00005829) at 829 ████████████

██████████████████████████.

84. ████████████████████████████████████████████████

██████████████████. *See* Ex. 47 (GOOG-GLAZ-00033771) at 772 ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ On information and belief, Mr. ████ did not direct

Google to correct these "borrowed" permissions, nor has Google done so.

85. ██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. 235 (GOOG-GLAZ-00150448) at 452

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████.

86. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1      **2.     Google Collects Location Data Even When Users Turn Their Device Location Off**

2      87.    ████████████████████████████████████████

3     ████████████████████████████████████████████████

4     ████████████████████████ Ex. 239 (GOOG-GLAZ-00037593) at 640. And Google

5 consistently makes representations that location data is collected and stored only when the respective

6 settings are turned on. *E.g.*, Ex. 8 at 1 ("With Location History off, the places you go are no longer

7 stored"); Ex. 72 (GOOG-GLAZ-00000715) at 718 ("The types of data we collect depend in part on your

8 device and account settings. For example, you can turn your Android device's location on or off using

9 the device's settings app").

10      88.    Thus, a reasonable belief for users is that, when they turn their device's Location Master

11 off, Google no longer collects, stores, or uses any location information. ████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████ Ex. 240 (GOOG-

14 GLAZ-00157550) at 550; *see also* Ex. 69 (GOOG-GLAZ-00096793) at 807 ████████

15 ████████████████████████████████████████

16      89.    Moreover, users of Google's products have absolutely no control over whether Google

17 can use their IP addresses to derive a location and serve ads based on that location. 5/8/2020 ████

18 EUO Tr. at 271:23–272:1 ████████████████████████████████████████

19 ████████████████████████; 2/28/2020 ████ EUO Tr. at 517:15–23 ████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████); 5/21/2020 ████████ Rough EUO Tr. at 98:4–

23 6 ████████████████████████████████

24      90.    ████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████ *See* Ex. 241 (GOOG-GLAZ-00097091) at 092.

27      91.    ████████████████████████████████████

28 ████████████████████████████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



1

2

3

4

5 *See id.*; *see also* Ex. 242 (GOOG-GLAZ-00101518) at 518

6

7

8

9 92.

10 Ex. 243 (GOOG-GLAZ-00111292) at

11 320.

12 93.

13

14 (Ex. 84 (GOOG-GLAZ-00079712) at 712 even if the user has

15 since turned off location history")),

16

17

18 3/6/2020

19 EUO Tr. at 378:14–379:6.

20 94.

21

22

23

24

25

26 Ex. 244 (GOOG-GLAZ-00031991) at 991.

27

28

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

95.     In short, Google collects user location data even when users expressly try to turn off location settings and reasonably believe that their locations are no longer being collected.

**3.     Google Serves Personalized Ads Based on User Location Even When Users Turn Off Personalization**

96.     Google's culpable conduct is not limited solely to collecting location data in a misleading and deceiving way; it also uses location data for ads in ways that mislead and deceive users, including those in Arizona.

97.     Google serves ads to its users based in part on location data retrieved from, among other settings, Location History and Web & App Activity. 9/25/2019 ▮▮ EUO Tr. at 222:10–25. Google purports to allow users to opt-out of this advertisement personalization; in order to do so, Google provides an account-level toggle in a user's Google Account under "Data & Personalization." Ex. 245 (GOOG-GLAZ-00000415) at 415 ("You can change where you see personalized ads or stop Google from using your activity to personalize ads.").

98.     Such a toggle implies that the user has control over whether Google will serve ads based on the user's location. But ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 70 (GOOG-GLAZ-00085629) at 636.

99.     Indeed, as confirmed by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ even if a user opts out of ad personalization, Google *still* uses the user's real-time location to serve ads. 5/21/2020 ▮▮ Rough EUO Tr. at 114:9–115:11. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 84:14–19.

100.    Moreover, the "GAP" (Google ad personalization) setting only affects ads served on Google owned-and-operated properties—not ads served on third party websites using Google's DoubleClick service. *See* 2/27/2020 ▮▮ EUO Tr. at 172:2–15; 2/28/2020 ▮▮ EUO Tr. 318:24–319:7.

101.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 2/27/2020 ▮▮ EUO Tr. at 163:6–16, 167:8–22. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.*

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

102. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ 2/27/2020 █████ EUO Tr. at 172:2–15 (when GAP is off,

Google still targets users with ads based on their location through DoubleClick).

103. ████████████████████████████████████

████████████████████████████████ 2/27/2020 ██████ EUO Tr. at

189:18–190:17.

104. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████ .

**E.    Google Automatically Changes the State of Permissions Without Notifying Users**

105.    Presumably, the entire point of including various toggles and consents on devices and

accounts is to give the user control over the state of their device and/or account. However, Google has

pushed a variety of updates that automatically change the user's location settings and defaults without

informing the user, much less seeking or obtaining consent.

106.    For example, in August 2016, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Ex. 79 (GOOG-GLAZ-00057389) at 389; *see also* Ex. 246 (GOOG-GLAZ-00058103) at

104 ("As of Aug 2016, switching the account level sWAA bit will toggle the device-level sWAA for all

devices owned by the GAIA" resulting in "a fairly large increase in devices reporting appusage [sic]

since Aug").[13] ████████████████████████████████████

---

[13] As described above, sWAA is a setting, housed within WAA as a checkbox, that collects data from

████████████████████████████████████████ in WAA. Ex.

203 (GOOG-GLAZ-00076994) at 7002. This supplemental setting is itself misleading for users. *See* Ex.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮

6    107.   In another example, in around 2017, ▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 78 (GOOG-GLAZ-00070610) at 610. ▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*; *see also* Ex. 248 (GOOG-GLAZ-00070491)

15 at 491 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

17    108.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 3/6/2020 ▮▮▮ EUO Tr. at 286:19–287:24,

20 290:14–291:24.

21    109.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 Ex. 249 (GOOG-GLAZ-00125482) at 490 ▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮ Ex. 250 (GOOG-GLAZ-00065187) at 192 ▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ——————————————

28 247 (GOOG-GLAZ-00126368) at 384 ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



1  ███████████████████████████████████ Ex. 251

2  (GOOG-GLAZ-00127414) at 414–16 ██████████████████████████

3  ████████████████████████████████████

4  ██████████████████████████████

**F.  Google Changes the Android User Interface to Increase Location** ███████ **at the**
**Expense of User Choice and Consent**

110.    Google invests tremendous resources trying to persuade users to hand over their precise location data. Increasing the number of users who do is a significant driver of ad revenue for Google. As a result, Google deliberately tries to minimize opportunities for users to disable location settings, and Android's architecture is designed to conceal the opportunities that do exist.

111.    ██████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████ Ex. 51 (GOOG-GLAZ-00026768) at 769–72
████████████

112.    ██████████████████████████████
████████████████ 9/25/2019 ██ EUO Tr. at 199:4–6.
██████████████████████████████
██████████████████. Ex. 51 (GOOG-GLAZ-00026768) at 770. ██
██████████████████████████████
██████████████████ *Id.* at 769–77.[14]

113.    One change to the Android UI was a change to the Quick Settings ("QS") panel on Android KitKat. The QS panel becomes visible when a user pulls down from the top of the screen at almost any point on an Android device. 9/25/2019 ██ EUO Tr. at 202:15–22. The panel includes toggles for various popularly used settings, such as WiFi. The QS panel previously included a toggle for

---

[14] Android KitKat was publicly released on October 31, 2013. *See* https://googleblog.blogspot.com/2013/10/android-for-all-and-new-nexus-5.html.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1   the Location Master;

2   ███████████████████████████████████   Ex. 51 (GOOG-GLAZ-00026768) at 772; Ex. 71 (GOOG-

3   GLAZ-00027187) at 196 ██████████████████████████

4   ████████████

5       114.   ███████████████████████████████████

6   ███████████████████████████████████   Ex. 51 (GOOG-GLAZ-00026768) at

7   768–72. ███████████████████████████████████

8   ███████████████████████████████████   Ex. 61 (GOOG-GLAZ-

9   00026360) at 360. ███████████████████████

10      *Id.* at 361 ██████████████████████████

11   ███████████████████████████████████.[15]

12      115.   ███████████████████████████████████

13   ███████████████████████████████████

14   ███████████████████████████████████   *See* Ex. 52 (GOOG-

15   GLAZ-00005425) at 428; *see also* Ex. 252 (GOOG-GLAZ-00028327) at 327 ██████

16   ██████████████████████████████

17      116.   ███████████████████████████████████

18   ███████████████████████████████████

19   ███████████████████████████████████   Ex. 52 (GOOG-GLAZ-

20   00005425) at 429. ██████████████████████

21   ████████

22      117.   ███████████████████████████████████

23   ███████████████████████████████████

24   ███████████████████████████████   Ex. 51 (GOOG-GLAZ-00026768) at 785; *see also*

25   9/25/2019 ████ EUO Tr. at 238:10–239:3; Ex. 253 (GOOG-GLAZ-00028014) at 014–25

26

27   ────────────────

28   [15] ███████████████████████████████

-30-
COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



118. █████████████████████

█████████████████████████ Ex. 254 (GOOG-GLAZ-00115868) at 868 (sheet1, cell G14).

███████████████████████ Ex. 53 (GOOG-GLAZ-00026843) at 850. ███████

████████████████████ *Id*. at 847–50. ████████

████████████████████████████ *See id.* at 846–47.

119. ████████████████████

████████████████████ Ex. 255 (GOOG-GLAZ-00027518) at 518; Ex. 256 (GOOG-GLAZ-00029585) at 615.

120. ████████████████████████ Ex. 257 (GOOG-GLAZ-00032539) at 539.

121. ███████████████████ Ex. 52 (GOOG-GLAZ-00005425) at 431. ████████

███████████████████ *Id.* at 426. ████████

*Id.* at 426. ███████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF



COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



*Id.*

18   127. ███████████████████████████████████████████████████████████████████

19   ████████████████████ *Id.*

20   128. ████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████

23

24   **G.    Google Misleads and Deceives Users Regarding Its Deletion of Their Location Information**

25   129.    Google admits that, until at least as late as 2015, ████████████████████████

26   ████████████████████████████████ Ex. 214 (GOOG-GLAZ-00101814) at 814. At some

27   subsequent time, Google started purporting to offer users control over whether and how Google retains

28   their information. In particular, Google now represents that users are able to delete the location data that

-33-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

it has collected and stored. Ex. 36 (GOOG-GLAZ-00000001) at 001–02 ("We'll keep this data in your Google Account until you choose to remove it," "[w]hen you delete data in your Google account, we immediately start the process of removing it from the product and our systems"); *see also* Ex. 202 (Google's Responses to CIDs 1–3) at 79–80 (9/47/2019 response to DFI 10 from the Third CID) ("For users that have Web & App Activity enabled, Google saves their search results and associated location information in the users' Google Accounts. Users can delete that data at any time.").

130.    But while users may believe that Google deleted their location data, Google nonetheless retains that data for much longer.

131.    While that by itself is misleading and deceptive, what is worse is that Google's user-facing interface displays data being deleted immediately—opposite to what Google actually does. Ex. 59 (GOOG-GLAZ-00031110) at 124 ██████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████ Ex. 258 (GOOG-GLAZ-00065293) at 295 ████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████ (emphasis in original).

**H.    Google Has Engaged In Willful Violations Of The Arizona Consumer Fraud Act**

132.    Google's many violations of the Arizona Consumer fraud act were willful, *i.e.* it knew or should have known its conduct was of the nature prohibited by the Arizona Consumer Fraud Act.

133.    Google willfully misleads and deceives users into enabling collection of their location data and using and storing their location data in ways users do not know or understand. Google also willfully engages in unfair acts and practices, including through the conduct described above.

134.    Some of this evidence was described above, and more is set forth here and below:

•    ████████████████████████████████████████████████ ████ . . . We have location as a product umbrella that includes Location History, ████, and a bunch of other stuff that's super messy. And it's a Critical User Journey to make sense out of this mess." Ex. 209 (GOOG-GLAZ-00057477) at 477–78.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

- ████████████████████████ Ex. 259 (GOOG-GLAZ-00078007) at 807.
- ██████████████████████████████████████
████████████████████████████████
██ Ex. 216 (GOOG-GLAZ-00078009) at 018.
- ████████████████████████████████████
███████████████████████████████ Ex.
260 (GOOG-GLAZ-00057339) at 340.
- ██████████████████████████████████
████████████████ Ex. 270 (GOOG-GLAZ-00055829) at 851.
- ███████████████████████████
██████████████████████████████████
██████████████████████████████████
█████████ Ex. 261 (GOOG-GLAZ-00099239) at 239.
- ██████████████████████████████████
███████████████████████████
██████████████████ Ex. 262 (GOOG-GLAZ-
00117506) at 506.

135.    Google has known about these issues since at least 2012. Ex. 263 (GOOG-GLAZ-
00100799) at 800 ██████████████████████████
███████████████████████████████
████████

136.    ████████████████████████
██████████████████████████████████████
████████████████████ Ex. 260 (GOOG-GLAZ-00057339) at 339.
████████████████████

- Simplifying device-level location data settings. *Id.* at 339 █████████████
███████████████████████████

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

███████████████████████████████ Ex. 264 (GOOG-GLAZ-00048459) at 478

█████████████████████████████████████████████

• ███████████████████████████ *Id.*; Ex. 265 (GOOG-GLAZ-00078761) at 761

██████████████████████████████████████ Ex. 266 (GOOG-GLAZ-

00151516) at 517 ██████████████████████████████████████████

████████████████████████████████████

• The 2018 AP Article and the interaction between WAA and LH. Ex. 23 (GOOG-GLAZ-

00001371) at 373 ███████ asked that we have a 'Location' ████████ update in Leads" in

response to the AP News Cycle); Ex. 267 (GOOG-GLAZ-00035559) at 559 (email chain

regarding LH/WAA interaction meeting with ██████); Ex. 268 (GOOG-GLAZ-00078652) at 52

(notes regarding LH/WAA interaction, including ██████ opinion).

• ███████████████████████████████████████ Ex.

47 (GOOG-GLAZ-00033771) at 72 ██████████████████████

• ███████████ Ex. 269 (GOOG-GLAZ-00073037) at 037–43 ██████████

███████████████████████████████████████████

██████

• ██████████████████████████████████

## IV.   ARIZONA'S INVESTIGATION INTO GOOGLE'S
## UNFAIR AND DECEPTIVE ACTS AND PRACTICES

137.   The Arizona Attorney General's Office ("AGO") first became aware of Google's

potential violations of the Arizona Consumer Fraud Act in connection with the collection of user

location data after the Associated Press published the article entitled, "Google tracks your movements,

like it or not."

138.   Thereafter, the AGO served a First Civil Investigative Demand ("CID") on Google on

January 30, 2019 to investigate Google's location data collection practices.

139.   Google has impeded the AGO's investigation for months on end.

140.   For months, beginning with service of the First CID, Google was uncooperative with the

AGO's investigation. Despite the extensive and highly technical nature of the information sought by the

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

AGO—both in the First CID and in two subsequent CIDs up to that point—Google at first produced only 402 documents totaling 1543 pages (mostly poor-quality reproductions of publicly available information) and failed to substantively respond to *any* of the AGO's Demands for Information. Over these months, the AGO repeatedly expressed its frustrations to Google. Repeatedly, Google promised to deliver information but failed to follow through.

141.   As it relates to products operating on the Android operating systems, Google insisted for months that it could not provide (and did not have) responsive information or documents apart from Google's own Pixel-branded phones. For months, Google also claimed it did not have documents or information concerning the collection of user location data on devices using the Android operating systems (outside of those installed on Pixel devices), or concerning the operation of any of Google's own apps installed on non-Pixel phones. Google's reason was that it purportedly had no control over how third-party OEMs modified the open-source Android software. The AGO's investigation later confirmed that Google's positions were inaccurate and misleading. Google witness ███████ testified that he was the ████████████████████████████████████████████████ in the Android operating software that is responsible for computing location. 3/6/2020 ███ EUO Tr. at 67:20–70:11. Mr. ██████ confirmed unequivocally that this FLP was not necessarily designed for Google-branded smartphones, but more broadly for "Android devices more generally." *Id.* at 71:7–17.

142.   As other witnesses explained, while Android is an open-source software, Google exercises control over what version of Android a vast majority of OEMs install on their devices: if any OEMs want to install Google's library of very popular apps (included in GMS, which include, for example, Google Maps and Search), OEMs must install Google's preferred version of Android. 2/28/2020 ███ EUO Tr. at 448:9–17; 9/25/2019 ███ EUO Tr. at 139:1–140:21. Google perpetuates its location data collection through any phone—made by Google or not—that has GMS installed. 2/28/2020 ███ EUO Tr. at 444:8–445:17, 448:9–17; *see also* 9/25/2019 ███ EUO Tr. at 64:6–13.

143.   In other words, contrary to Google's long-standing position in the investigation, Google very much has information and documents concerning the collection of user location data from "Android devices more generally" because, among other things, Google designed and controls that

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

collection process through the FLP in the Android operating system. Indeed, Google collects data about the number of devices reporting Location History not only from all Android devices, but also from iOS devices. 3/6/2020 ███ EUO Tr. at 122:6–124:2.

144.    Similarly, when the AGO requested information concerning ad revenue early in the investigation, Google objected that it "does not understand, and the AGO has not provided any guidance, regarding any nexus of revenue from the Android mobile devices and location information." Ex. 202 (Google's Response to CIDs 1–3) at 51 (5/30/2019 response to RFP 19 from the First CID). ███

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

5/21/2020 ███ Rough EUO Tr. at 84:15–19.

145.    Google also took it upon itself to dictate the scope of the AGO's investigation. For example, for months Google insisted that the AGO's investigation was somehow limited to the facts identified in the AP news article, while refusing to provide any other information or documents, even as the AGO repeatedly instructed Google otherwise. Similarly, Google insisted that the AGO's investigation is somehow limited to a one-year period. Google initially agreed to search for documents covering only a six-month time period and, even as to that time period, Google refused to do any kind of meaningful search or production.

146.    For months, Google also refused to provide testimony under oath as to any of the topics identified by the AGO. For example, on May 11, 2019, the AGO served a subpoena seeking testimony from Google's person most knowledgeable as to twenty topics identified in the subpoena. Google refused to provide testimony on the topics identified by the AGO and, instead, Google identified its own topics for which it was willing to provide testimony. But even as to those topics, Google did not provide straightforward testimony.

147.    More fundamentally, for months, Google tried to cabin all questioning of its witnesses to the *inner* workings of *either* Location History *or* Web & App Activity. The AGO's investigation ultimately revealed that much of the location related data for Google products and services is provided

-38-

by (or though) a group known as ███, which is based in Switzerland. ███ (and its components) serve over 250 internal products and services (*i.e.*, "clients") at Google. Those clients are often grouped into two categories: consumer facing (*e.g.*, Location History) and monetization (*i.e.*, ads). *See* 5/8/2020 ███ EUO Tr. at 167:19–169:25; 3/6/2020 ███ EUO Tr. at 398:18–401:17. Location History and Web & App Activity are user-facing settings. By restricting questions to the inner workings of either of those settings, Google tried to evade any questioning as to how user location data is collected or used more broadly.

148.   The AGO finally obtained more cooperation when the AGO threatened to file a petition to judicially enforce Google's compliance with outstanding discovery requests in late August 2019—over eight months after the AGO served its First CID.

149.   Yet even after Google increased its cooperation, it still consistently hamstrung the AGO's investigation by still failing to live up to promises it made. For example, Google repeatedly promised production of documents and written responses by certain deadlines but regularly failed to produce them on time, or even at all. Google similarly promised to make witnesses available for examination by certain dates, and then failed to comply with its own unilaterally set timetable.

150.   When the AGO subpoenaed Google for testimony specifically addressing Google's broader location practices—a subject spanning 17 topics—Google designated just a single witness, ███, who was far from prepared. Mr. ███ was not knowledgeable about subjects that are fundamental to Google's ability to obtain a user's location—all of which he was designated to testify about—such as ███, Google's ability to collect location information from signed-out users, ███, Google's aggregation of location data, and a white paper titled "Google, Android, the end of Notice-and-Choice." 2/27/2020 ███ EUO Tr. at 59:17–61:15, 115:4–17, 124:17–125:5, 144:15–19, 194:17–195:2; 2/28/2020 ███ EUO Tr. at 447:15–22, 448:18–449:19, 450:2–451:10, 458:24–459:5. This is not surprising: Mr. ███ spent only 20 minutes speaking to a single non-lawyer ███ as

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

1  part of his preparation (all regarding one specific subject), with the remaining time spent speaking to

2  lawyers.[16] 2/27/2020 ████ EUO Tr. at 34:1–35:7, 115:18–23.

3      151.    Mr. ████ did not know the answers to many questions that fell squarely within his

4  designated topics, and he referred the AGO to Mr. ████ for answers. But when Mr. ████ was

5  later deposed, he also claimed ignorance. In one clear example, Mr. ████ claimed he discussed "the

6  inputs into ████" with Mr. ████ to prepare for his EUO, but when Mr. ████ was asked, "Do

7  you know what the inputs to ████ are?" he responded, "I do not." 2/27/2020 ████ EUO Tr. at

8  115:18–23; 5/8/2020 ████ EUO Tr. at 115:11–17. In another example, ████ explained that

9  prior to coarsening user locations to 3 square kilometers in certain instances (as it apparently does

10 today), Google coarsened user locations to 1 square kilometer, but he did not know what Google's

11 coarsening policy was prior to the 1-square-kilometer policy—he referred the AGO to Mr. ████ for

12 the answer to that question. 2/27/2020 ████ EUO Tr. at 125:2–12. However, Mr. ████ was

13 unknowledgeable even about the 1-square-kilometer policy. 5/8/2020 ████ EUO Tr. at 61:7–18,

14 102:17–103:6.

15     152.    Indeed, Mr. ████ referred the AGO to yet another Google employee, ████

16 who is located in Zurich and is supposedly actually knowledgeable about the relevant Google

17 technologies. *E.g.*, 5/8/2020 ████ EUO Tr. at 57:9–12, 59:25–60:17, 61:3–62:4, 79:10–80:12,

18 115:15–20; *see also id.* at 111:22–24 ("Q. Who is the person or group of people at Google most familiar

19 with ████ A. ████").

20     153.    In another attempt to get testimony on ████ on July 31, 2019 and again on January 10,

21 2020, the AGO served a subpoena for an EUO of ████ who was had been identified at an earlier

22 examination as leading the ████ team. Google refused to comply. At some point, Mr. ████

23 ████ apparently replaced Mr. ████ as the head of ████. Google failed to disclose that

24

25 [16] Mr. ████ spoke with Mr. ████ regarding ████, but Mr. ████, the leader of the ████

26 team, later testified that he only spends about 10% of his day-to-day work on ████ and led the ████

27 team only because his direct report actually oversees it; indeed, Mr. ████ had very little actual

   knowledge on the workings of ████ and made clear he only exercised a general managerial role.

28 5/8/2020 ████ EUO Tr. at 28:4–21, 59:18–60:17, 61:3–6, 64:24–65:7, 70:16–71:6, 72:16–74:8,
   106:6–19.

-40-

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

information to the AGO for nearly ten months, until this was revealed at the EUO of Mr. ████. Mr.

████ has also not been examined, nor has anyone communicated with Mr. ████ in preparation

for providing testimony to the AGO.

154. ████████████████████████████████████████

████████████████████████. None of the designated Google witnesses were

prepared to explain these features or the documents describing those features.

155. In short, the AGO's pre-suit investigation has been prejudiced by Google's uncooperative

conduct, delay tactics, and general failure to comply with the AGO's discovery demands. Even so, the

AGO's investigation to date has uncovered and confirmed the wrongdoing alleged herein.

## V.   CLAIM FOR RELIEF

## ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1521, *et seq.*)

156. Arizona realleges and incorporates by reference all prior paragraphs as though fully set

forth herein.

157. The Arizona Consumer Fraud Act provides that "[t]he act, use or employment by any

person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise,

misrepresentation, or concealment, suppression or omission of any material fact with intent that others

rely upon such concealment, suppression or omission, in connection with the sale or advertisement of

any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is

declared to be an unlawful practice." A.R.S. § 44-1522(A).

158. Google is a "person" within the meaning of A.R.S. § 44-1521(6).

159. The Google products and services described in this Complaint, including but not limited

to Google apps, sites, and devices, Google Accounts, Google ads, and platforms like Google Chrome

and Android, are "merchandise" within the meaning of A.R.S. § 44-1521(5).

160. Google has systematically engaged in activities with a tendency or capacity to deceive

consumers. Google engaged in unlawful practices by employing deception, deceptive or unfair practices,

false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material

facts with intent that others rely upon such concealment, suppression or omission, in connection with the

sale and advertisement of Google products and services.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

161.    In particular, and as described above, Google's unlawful practices, in violation of the Arizona Consumer Fraud Act, include the following:

a.  Engaging in deceptive and unfair acts and practices by making the deceptive misrepresentation and false promise that "[w]ith Location History off, the places you go are no longer stored," when in fact Google continued to collect and store user location information even with Location History turned off.

b.  Concealing, suppressing, or omitting the material fact that Google continued to collect and store user location information even with Location History turned off.

c.  Concealing, suppressing, or omitting during account creation the material fact that location information was collected through Web & App Activity—which defaulted to "on."

d.  Engaging in deceptive and unfair acts and practices by making the deceptive misrepresentation and false promise that users "can turn [their] Android device's location on or off using the device's settings app" despite the fact that █████ ████████████████████████████████████████████████████ ██████.

e.  Concealing, suppressing, or omitting the material fact that █████████████ ████████████████████████████████████████████████████.

f.  Engaging in deceptive and unfair acts and practices by █████████████ ███████████████████████████████████████████████████ ███████████████████████████████████.

g.  Concealing, suppressing, or omitting the material fact that ███████████ ████████████████████████████████████████████████████ █████████████████████████████████.

h.  Engaging in deceptive and unfair acts and practices by knowingly maintaining a misleading and diverse array of settings related to location tracking that makes it difficult if not impossible to understand the conditions in which Google will collect location data.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

i.  Concealing, suppressing, or omitting the material facts about the conditions in which Google will collect location data.

j.  Engaging in deceptive and unfair acts and practices by ████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████

k.  Concealing, suppressing, or omitting the material fact that location settings were on.

l.  Engaging in deceptive and unfair acts and practices by failing to disclose that Google apps that have been denied permission to access location data can still obtain that data from other Google apps that have been granted permission.

m.  Concealing, suppressing, or omitting the material fact that Google apps that have been denied permission to access location data can still obtain that data from other Google apps that have been granted permission.

n.  Engaging in deceptive and unfair acts and practices by knowingly maintaining a confusing and misleading presentation of the WiFi scanning and WiFi connectivity settings that ████████████████████████████████████ ████████████████████████████

o.  Concealing, suppressing, or omitting the material fact that ███████████████ ████████████████████████████████████

p.  Engaging in deceptive and unfair acts and practices by continuing to present location-based advertisements to users even after they have opted out of ad personalization, and maintaining two separate settings relating to location-based advertising that users find confusing, to the extent that they are even aware of them at all.

q.  Concealing, suppressing, or omitting the material fact that Google would continue to collect and store users' location information unless they disabled two separate settings relating to location-based advertising, and that even with both settings disabled Google would still use user location data to target ads.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

r. Engaging in deceptive and unfair acts and practices by misleading users into believing that Google immediately deletes their location-related data when, in reality, Google keeps the data long afterwards.

s. Concealing, suppressing, or omitting the material fact that Google did not immediately delete location-related data, and in reality, kept the data long afterwards.

162. With respect to its concealment, suppression, and omission of material facts described above, Google intends that users rely on the concealment, suppression, or omission.

163. Consumers in Arizona have in fact been the subject of deception, deceptive/unfair acts/practices, false pretense and promises, misrepresentations, and concealment, suppression, or omission of material facts described above.

164. Google's purpose in engaging in these unlawful practices is simple: increasing revenue and profit. Google generates over one hundred billion dollars of revenue and tens of billions of dollars of profit every year from advertising, including, on information and belief, hundreds of millions of dollars from ads shown to users in Arizona. These advertising profits are driven in large part by Google's ability to collect and store its users' location data, which enables Google to sell advertisers on the ability to target ads to users in particular locations. It also enables Google to track "conversions" of ad clicks to store visits. Google therefore goes to great lengths to collect location information from its users, including by engaging in the unlawful activities alleged in this Complaint. Those unlawful activities were done in connection with the sale or advertisement of merchandise within the meaning of A.R.S. § 44-1522(A).

165. While engaging in the unlawful acts and practices alleged in this Complaint, Google has at all times acted "willfully" as defined by A.R.S. § 44-1531: Google knew or should have known that its conduct was of the nature prohibited by the Arizona Consumer Fraud Act.

166. Google's violations present a continuing harm and the unlawful acts and practices complained of here affect the public interest.

167. Google's actions to date have failed to fully address the misleading and deceptive nature of its business activities and the company continues to engage in acts prohibited by the Arizona Consumer Fraud Act.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

**PRAYER FOR RELIEF**

WHEREFORE, Arizona respectfully requests that the Court enter Judgment against Google as follows:

A.      Order Google to disgorge all profits, gains, gross receipts, and other benefits obtained by means of any unlawful practice as alleged herein, pursuant to A.R.S. §44-1528(A)(3);

B.      Order Google to pay full restitution to consumers, pursuant to A.R.S. §44-1528(A)(2);

C.      Order Google to pay Arizona a civil penalty of not more than $10,000 for each willful violation of the Arizona Consumer Fraud Act, pursuant to A.R.S. § 44-1531;

D.      Enter an injunction against Google, permanently prohibiting it from continuing the unlawful acts and practices alleged in this Complaint or doing any acts in furtherance of such unlawful acts of practices, pursuant to A.R.S. § 44-1528(A)(1);

E.      Order Google to pay Arizona its costs of investigation and prosecution of this matter, including its reasonable attorneys' fees, pursuant to A.R.S. § 44-1534; and

F.      Award Arizona such further relief as the Court deems just and proper under the circumstances.

Dated:  May 27, 2020

MARK BRNOVICH
ATTORNEY GENERAL
By: */s/ Brunn W. Roysden III*
Joseph A. Kanefield
Brunn W. Roysden III
Oramel H. Skinner
Michael S. Catlett
Christopher Sloot
    *Assistant Attorneys General*

Guy Ruttenberg (CA Bar No. 207937)
(*pro hac vice* application forthcoming)
Michael Eshaghian (CA Bar No. 300869)
(*pro hac vice* application forthcoming)
RUTTENBERG IP LAW, A PROFESSIONAL
CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, California 90067
Telephone: (310) 627-2270
guy@ruttenbergiplaw.com
mike@ruttenbergiplaw.com

David H. Thompson (DC Bar No. 450503)
(*pro hac vice* application forthcoming)
Peter A. Patterson (DC Bar No. 998668)
(*pro hac vice* application forthcoming)
COOPER & KIRK PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com
ppaterson@cooperkirk.com

*Attorneys for Plaintiff State of Arizona ex rel. Mark Brnovich, Attorney General*

-45-

# EXHIBIT 9

**MARK BRNOVICH**
**ATTORNEY GENERAL**
Firm State Bar No. 14000

Joseph A. Kanefield (State Bar No. 15838)
Brunn W. Roysden III (State Bar No. 28698)
Oramel H. Skinner (State Bar No. 032891)
Michael S. Catlett (State Bar No. 025238)
Christopher Sloot (State Bar No. 034196)
  *Assistant Attorneys General*
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone:  (602) 542-8958
Beau.Roysden@azag.gov
O.H.Skinner@azag.gov
Michael.Catlett@azag.gov
Christopher.Sloot@azag.gov
ACL@azag.gov

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*
*State of Arizona ex rel. Mark Brnovich,*
*Attorney General*

## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, *ex rel.* MARK BRNOVICH, Attorney General, | Case No: CV2020-006219 |
| Plaintiff, | **STATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | Assigned to the Hon. Timothy Thomason |
| GOOGLE LLC, a Delaware limited liability company, | **(COMPLEX CALENDAR)** |
| Defendant. | **\*\*ORAL ARGUMENT REQUESTED\*\*** |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 2

    A.   Google is an Advertising Company. ....................................................... 2

    B.   Android ................................................................................................... 2

    C.   Google's Relevant Settings. ................................................................... 3

        1.   Location History and Web & App Activity. .............................. 3

        2.   The Location Master. ................................................................. 5

III. LEGAL STANDARD ......................................................................................... 5

IV.  ARGUMENT ...................................................................................................... 7

    A.   Google Engaged in Deceptive Acts and Practices. ................................ 7

        1.   Google Made False Statements to Users Regarding LH. ........... 7

        2.   Google Created the Deceptive Net Impression That WAA Is Unrelated to Location. ................................................................. 8

        3.   Google Designed Its User Interface to Deceptively Influence Users to Keep Location On and ██████████████████████ ................. 11

        4.   Users Were Actually Deceived by Google's Practices. ............. 14

    B.   Google's Deceptive Acts and Practices Were in Connection with Sales and Advertisements of Merchandise. .......................................... 16

V.   CONCLUSION ................................................................................................. 17

# I.   INTRODUCTION

Undisputed facts show that Google employs widespread deceptive acts and practices to obtain its users' location data in connection with its advertising business. As a matter of law, this violates the Consumer Fraud Act ("CFA"), A.R.S. §§ 44-1521 to -1534.

Though it purports to be a technology company, from a revenue perspective Google is an advertising company. Because Google's collection of its users' location data is fundamental to its massive advertising revenue, it goes to great lengths to obtain this data. The State's pre-suit investigation uncovered an operation breathtaking in scale. Google collects its users' location data via a multitude of settings and sources that its own engineers admit "feels like it is designed to make things possible, yet difficult enough that people won't figure it out." [SOF ¶ 127].

When the Associated Press reported that Google's representation "[w]ith Location History off, the places you go are no longer stored" was false, Google faced an international scandal. ███████████████████████████. [SOF ¶ 131]. Internally, Google executives rushed to assemble what they called an "'Oh Shit' meeting," and Google ██████████████ called for "constant" updates. [SOF ¶¶ 139–40]. ████████████████ ████████████████████████████████████████ removed the statement only when caught red-handed. Worse yet, the false statement was only a small part of Google's massive, multi-year operation designed to obtain and monetize user location data through deceptive acts and practices. Indeed, ██████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████. [SOF ¶¶ 59–62].

Google made deceptive and false statements, repeatedly and habitually omitted material information, and made it harder to access settings in order to get users to hand over location data that Google then used to sell and serve advertisements of merchandise. Although the State alleges many other deceptive and unfair practices, the instant Motion focuses on Android devices from 2015–April 2019 and three of Google's most important location-related settings: Location History, Web & App Activity, and the Location Master. As to the issues raised here, the facts are undisputed, and this Court should grant partial summary judgment on liability.

## II. FACTUAL BACKGROUND

### A.  Google is an Advertising Company.

Google is primarily an advertising company. In 2018, for instance, Google made $136 billion in revenue, of which $116 billion (85%) came from advertising. [SOF ¶ 3]. ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ [SOF ¶ 4]. ██████████

████████████████████████████████████████████████

███████████████████████████████████████████. [SOF ¶ 5]. ████████

████████████████████████████. [SOF ¶ 6]. Google allows advertisers to ███████

██████████████████████████ and enables them to geo-target an area as granular as "a small radius around your business" or as large as "cities, states, or entire countries." [SOF ¶ 7]. ██████████████████████████████████

██████████ [SOF ¶ 8]. ████████████████████████████████████

████████████████████████████████████████████████████████████ [SOF

¶ 9]. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████. [SOF ¶ 11].

### B.  Android

Android is a Google-sponsored operating system that can run on smartphones, computers, tablets and other devices. [SOF ¶ 15]. ██████████████████████

████████████████████. [SOF ¶ 16]. ██████████████████████████

████████████████████████████████████. [SOF ¶ 17].

Android is technically an open-source software, meaning that anyone can modify the source code and install it on a compatible device. Such modifications are called Android "forks." [SOF ¶ 18]. While third-party device manufacturers ("OEMs") are theoretically free to pre-install any Android fork on their phones, the vast majority of Android phones sold in the U.S. have Google's version. [SOF ¶ 19]. █████████████████████████

████████████████████████████████████████████████████████

MOTION FOR PARTIAL SUMMARY JUDGMENT

██████████████████████████████.[1] [SOF ¶ 20]. Google has a large incentive to do this: its own version of Android contains Google Mobile Services ("GMS"), which makes it easier for Google to collect location information from users. [SOF ¶ 21]. ████████ ████████████████████████████████████████████████ ██████████████████. [SOF ¶ 22].

## C. Google's Relevant Settings.

Google's products and services include a complicated web of interrelated settings that implicate Google's collection, storage and use of user location data. These settings fall into three categories: (i) account-level, (ii) device-level and (iii) app-level. Account-level settings are those that apply to a user's entire Google Account and cover all activity associated with that Account, regardless of device. [SOF ¶ 23]. Device-level settings are those that are specific to a given hardware device, like a smartphone or tablet. [SOF ¶ 24]. App-level settings are settings specific to a particular app. [SOF ¶ 25]. The settings at issue in this Motion include Location History ("LH"), Web & App Activity ("WAA"), and the Location Master ("LM").

### 1. Location History and Web & App Activity.

Both LH and WAA are account-level settings. [SOF ¶ 26]. Google describes LH as a setting that "saves a private map . . . of where the user goes with his or her signed-in devices, even when the user is not using a Google service." [SOF ¶ 27]. "Opting in to Location History allows Google to build a user's Timeline . . . of the places the user's devices have been and to provide more personalized features across Google products and services . . . ."[2] [SOF ¶ 28]. ██ ████████████████████████████████████. [SOF ¶ 30]. ████████████████████████████████████ ████████████████████████████ ████████████████████████████████████████ [SOF ¶ 31]. ████████████████████████

---

[1] In this Motion, "Android" refers to Google's version of Android that Google causes to be pre-installed, unless otherwise indicated by context.
[2] Timeline is a user-facing product that allows users to view and manage the location data collected by LH. [SOF ¶ 29].

MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ████████████████████████████████████. [SOF ¶ 32]. ████████████

2   ██████████████████. [SOF ¶ 33]. ██████████████████████████

3   ████████████████████████████████████████████. [SOF ¶ 33].

4       WAA is another account-level setting "that stores a user's Google activity data to My

5   Activity . . . in their Google Account."[3] [SOF ¶ 34]. "The user location information that is saved

6   as a result of Web & App Activity . . . is collected and stored in a user's Google Account when

7   the user is engaging with a Google product and has Web & App Activity enabled. For example,

8   when a user uses Google Search or Google Maps to search for 'restaurant,' Google collects the

9   search term as well as information about that activity, including IP address and location

10  information, so that the search results returned to the user will show nearby restaurant options."

11  [SOF ¶ 36]. ████████████████████. [SOF ¶ 37].

12      WAA stores a user's location data, ████████████████████. [SOF ¶¶ 38–39].

13  "Implicit user location information ██████████████████ does not tell Google where

14  a user's device is located, but through user inputs, Google may infer that a user is either

15  interested in a place or that the user might be at a place. . . . For example, if a user conducts a

16  Google Search for 'Eiffel Tower' Google may infer that the user may like to see information for

17  places near Paris, and Google can then use that inference to provide localized recommendations

18  about those places." [SOF ¶¶ 40–41]. On the other hand, explicit user location information refers

19  to "information about where a device is located" derived from a variety of sensors such as ████

20  ████████████████████████████. [SOF ¶ 42]. ████████████████████

21  ████████████████████████████████████████████████

22  ████████████. [SOF ¶¶ 39–43]. ██████████████████████████

23  ████████████████████████████████████████████████

24  ████████ [SOF ¶ 44].

25          ████████████████████████████████████████

26  ████████████████████████████████. [SOF ¶ 45]. ████████████████

27

28  ---
[3] My Activity is a user-facing product that allows users to view and manage the data (including location data) saved by WAA. [SOF ¶ 35].

MOTION FOR PARTIAL SUMMARY JUDGMENT

1 ████████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████ [SOF ¶ 46]. Before 2015, the location data

4 stored by WAA was coarsened to "approximately a neighborhood-sized area with a sufficient

5 number of unique users." [SOF ¶ 47]. But in 2015, Google began storing precise WAA location

6 data, namely precise latitude/longitude—the same precision with which LH location data is

7 saved. [SOF ¶ 48]. This saving of precise location lasted until April 2019 when Google reverted

8 to storing coarser location. [SOF ¶ 49].

9 ████████████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████. [SOF ¶ 50].

11 **2. The Location Master.**

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████. [SOF ¶ 51]. ████████████████████████

14 █████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████. [SOF ¶ 52]. ██████████████████████████████

16 ███████████████. [SOF ¶ 53].

## III. LEGAL STANDARD

17

18 Summary judgment is appropriate where there are no genuine issues of material fact and

19 the moving party is entitled to a judgment as a matter of law. *Orme School v. Reeves*, 166 Ariz.

20 301, 305 (1990). The burden of proof for establishing a violation of the CFA is a preponderance

21 of the evidence. *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 343–44 (App. 1983).

22 The CFA "is a broadly drafted remedial provision designed to eliminate unlawful

23 practices in merchant-consumer transactions." *Madsen v. W. Am. Mortgage Co.*, 143 Ariz. 614,

24 618 (App. 1985); *see also* State's Resp. to MTD at 5–6 (collecting and discussing cases). The

25 CFA prohibits (i) "[t]he act, use or employment by any person[4] of any deception, deceptive or

26 unfair act or practice, fraud, false pretense, false promise, misrepresentation," (the "Act Clause")

27

28 ─────────────────────────
[4] "Person" includes a business entity or association. A.R.S. § 44-1521(6). Google is a Delaware limited liability company.

─────────────────────────
MOTION FOR PARTIAL SUMMARY JUDGMENT

1  or "concealment, suppression or omission of any material fact with intent that others rely on
2  such concealment, suppression or omission" (the "Omission Clause"); (ii) "in connection with
3  the sale or advertisement of any merchandise." A.R.S. § 44-1522(A); *see also RAJI (Civil)*
4  *Comm'l Torts Instrs. 21 Consumer Fraud (Elements of Claim)* cmt. 4 (2017) (recognizing State
5  need only prove these two elements).

6       The term "deception" in the CFA includes "representations that have a 'tendency and
7  capacity' to convey misleading impressions to consumers even though interpretations that would
8  not be misleading also are possible." *Madsen*, 143 Ariz. at 618. That tendency and capacity is
9  determined from the perspective of the "least sophisticated reader" in light of "all that is
10 reasonably implied, not just from what is said." *Id.* Moreover, "[t]echnical correctness of the
11 representations is irrelevant if the capacity to mislead is found." *Id.*; *see also* State's Resp. to
12 MTD at 6 (collecting cases). Consistent with this, "[a] solicitation may be likely to mislead by
13 virtue of the net impression it creates even though [it] also contains truthful disclosures." *FTC v.*
14 *Cyberspace.com, LLC*, 453 F.3d 1196, 1198 (9th Cir. 2006); *see also Donaldson v. Read*
15 *Magazine, Inc.*, 333 U.S. 178, 188 (1948) (stating "[a]dvertisements as a whole may be
16 completely misleading although every sentence separately considered is literally true").[5]

17      While courts must find an intent that others rely in connection with conduct analyzed
18 under the Omission Clause, if the concealment, suppression or omission was "routine and
19 repeated," such conduct falls under the Act Clause, meaning that no finding of intent beyond
20 intent to do the act is required. *State ex rel. Horne v. AutoZone, Inc.*, 229 Ariz. 358, 361–62 ¶14
21 (2012) (*AutoZone II*) ("[A] finder of fact could well find a practice subject to the Act Clause.");
22 *see also State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*, 128 Ariz. 483, 486 (App. 1981)
23 (only intent under Act Clause is intent to do the act).

24

25 [5] In construing the CFA, "courts may use as a guide" federal decisions interpreting the FTC Act,
   A.R.S. § 44-1522(C), and federal courts uniformly conclude that acts or practices that create a
26 deceptive net impression violate the FTC Act. *See, e.g., Fanning v. FTC*, 821 F.3d 164, 170 (1st
   Cir. 2016); *Indep. Directory Corp. v. FTC*, 188 F.2d 468, 470 (2d Cir. 1951); *Am. Home Prods.*
27 *Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611,
   631 (6th Cir. 2014); *Nat'l Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir. 1964); *FTC v.*
28 *Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 39–40 (D.C. Cir. 1985).

MOTION FOR PARTIAL SUMMARY JUDGMENT

**IV. ARGUMENT**

    **A.  Google Engaged in Deceptive Acts and Practices.**

    The Court should grant partial summary judgment that from 2015 to April 2019, for Android devices, Google violated the CFA through its deceptive acts and practices surrounding its LH, WAA, and LM settings. As established below, Google's acts and practices toward users of its services and products were false and deceptive warranting summary judgement under highly persuasive case law. *See supra* n.5 (discussing § 44-1522(C)).[6] Although Google's wrongdoing extends beyond the timeline and conduct described here, this Motion focuses on the areas where Google's deceptive acts and practices are established by undisputed evidence.

    **1.  Google Made False Statements to Users Regarding LH.**

    From 2015 to April 2019, Google's consistent and repeated public disclosures both falsely stated that with LH off "the places you go are no longer stored" and also created a deceptive net impression that WAA did not relate to location tracking.

    Google owns and maintains a number of webpages purporting to inform consumers regarding its various location-related settings, including a webpage titled "Manage or delete your Location History." For years, Google used that page to inform consumers that "[w]ith Location History off, the places you go are no longer stored." [SOF ¶ 54]. ███████████████████

███████████████████████████████████████████████████████████████████.

[SOF ¶¶ 38–50]. ███████████████████████████████████████████████

███████████████████████████████████████████. [SOF ¶ 55].

    Compounding this misrepresentation, Google's disclosures include a page titled "Manage your Android device's location settings," where Google explains that it "has a number of location-based services," but falsely lists only LH as the setting relevant to "the places your

---

[6] Federal decisions interpreting the FTC Act have granted summary judgment on deceptiveness. *E.g.*, *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 422–23 (9th Cir. 2018) (affirming summary judgment under deceptive net impression theory); *Cyberspace.com*, 453 F.3d at 1198–202 (affirming summary judgment notwithstanding disclosures where mailers "created the deceptive impression that . . . check was simply a refund or rebate rather than an offer for services"); *Fanning*, 821 F.3d 164, 170–72 (affirming FTC summary decision that reputation website gave overall net impression that its content was user-created when most pages were automatically generated); *see also CFPB v. Gordon*, 819 F.3d 1179, 1192–93 & n.7 (9th Cir. 2016) (that defendant ceased certain deceptive statements does not prevent summary judgment).

MOTION FOR PARTIAL SUMMARY JUDGMENT

device has been." [SOF ¶ 56]. Today, Google still deceptively states that if users want to "stop sharing your location with Google," they can do so by "changing your settings, but Google may still suggest a location based on your IP address, recent locations, or Location History"—with no mention that Google tracks and saves location data using WAA. [SOF ¶ 57]. Earlier versions of this page—including one within the relevant time period—do not even have that disclosure; instead, they merely explain how to "Turn your location on or off," "Check and update your location," and "Troubleshoot location problems." [SOF ¶ 58].

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████. [SOF ¶¶ 59–63]. ██████

████████████████████████████████████████. [SOF ¶ 62]. ██████████

████████████████████████████████████████████████████████

██████████████████████████ [SOF ¶¶ 64–65; *see also* SOF ¶¶ 66–68].

During the State's investigation, ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████

████████

[SOF ¶ 55]. Yet, Google **still** tries to hide this and other information about how it collects and uses location data. *See, e.g.*, Google's Proposed Redacted Compl. ¶¶ 9(b), 30, 59–60, 66–67.

## 2. Google Created the Deceptive Net Impression That WAA Is Unrelated to Location.

At least until April 2019 (when Google contends it stopped saving precise location data via WAA), Google engaged in deceptive practices to hide its use of WAA to store location data for advertising purposes. Again, Google's deceptive practices go far beyond the WAA setting, but this motion focuses on WAA because the relevant facts are undisputed.

Google's deceptive practices concerning the WAA setting began at the onset of its relationship with its customers: ████████████████████████████████

MOTION FOR PARTIAL SUMMARY JUDGMENT

1    ████████████████████████████████████. [SOF ¶ 69]. █████████████████████

2    ████████████████████████████████████████████. [SOF ¶ 70].

3    ██████████████████████████████████████████████████████

4    ██████████████████████████████████████████████

5    ███████████████████████████. [SOF ¶ 71]. Further, until about September 2019, Android

6    users could not even directly access the WAA setting on their devices. [SOF ¶¶ 72–73]. Instead,

7    a user would have to navigate to settings, then follow a link to his Google Account, then

8    navigate down to WAA. [SOF ¶ 74]. These practices were all the more deceptive because of

9    Google's (i) repeated false and deceptive statements about the impact of turning LH off, (ii)

10   practice of repeatedly failing to otherwise inform consumers that WAA collects precise location

11   data; and (iii) practice of defaulting WAA to "on." *See AutoZone II*, 229 Ariz. at 361–62 ¶14

12   ("routine and repeated" omissions are properly analyzed under the Act Clause of the CFA).

13          Google's affirmative disclosures were also deceptive as to WAA's relationship with

14   location. In a page titled "Control how your activity across the web is saved & used," Google

15   explains that WAA "Make[s] it easier for you to see and control activity that's saved to your

16   account and how it's used" and "Let[s] Google use this activity to show you more relevant ads

17   on our services and on websites and apps that partner with us." [SOF ¶ 76]. It does not disclose

18   any connection to location tracking or storage. [SOF ¶ 77]. In another section on the same page

19   titled "Details about activity & ads," Google says the following: "Information about your

20   activity helps us make our services faster, smarter, and more useful. For example, if you search

21   for 'mountain bikes,' you may see an ad for sports equipment when you're browsing a site that

22   shows ads served by Google." [SOF ¶ 78].[7] But Google does not connect this example with the

23   WAA setting. Further, consistent with Google's practice of concealing WAA's relationship to

24   location, there is no disclosure that WAA stores a user's ***precise*** location.

25   _____

26   [7] Other versions produced by Google of this same page (none were produced with metadata
     indicating their dates) replace the "mountain bike" example with the following: "For example,

27   when you let Google know your location, you won't get ads for stores in other regions." [SOF
     ¶ 79]. To the extent this statement was made during the relevant time period, its vague and

28   indirect nature fails to tie WAA (which remains nameless in the heading or subsequent text)
     specifically to location storage.

MOTION FOR PARTIAL SUMMARY JUDGMENT

During its investigation, the AG asked Google to identify any disclosure during the set-up process for accounts created before 2018 that WAA collects user location data. [SOF ¶ 80]. Tellingly, in its sworn response, Google pointed to a screenshot that makes no mention of the WAA setting, much less the fact that it stores *precise* location information. [SOF ¶ 81].

Indeed, where Google did directly reference WAA's relationship with location, it was in hard-to-find spots and only in vague terms that did not disclose WAA's storage of *precise* location. For example, Google buries a reference to WAA's relationship with location in a page titled "See & control your Web & App Activity." [SOF ¶ 82]. Even here, a user has to find the relevant page, scroll down to a link called "Info about your searches & more" (facially, nothing to do with location), expand that link, then see that Google subtly stated that WAA "saves information like: . . . Your location." [SOF ¶ 83]. Similarly, ████████████████, when pausing LH, users were shown text that stated, "[W]hen you pause Location History, places you go with your devices will stop being added to your Location History map"—with no mention of WAA at all. [SOF ¶ 84]. ████████████████████████████████████████
████████████████████████████ [SOF ¶ 85].[8] In neither of these instances did Google disclose that WAA saves ██████ location data (*i.e.*, ▪ ████████████) or location data ████████████████████████. [SOF ¶ 88].

As late as November 30, 2018, even Google's Privacy & Terms page did not disclose that WAA saves location data. [SOF ¶ 90]. Instead, Google misleadingly explained, "if you type in 'Eiffel Tower', we infer that you may like to see information for places near Paris, and we can then use that to provide recommendations about those local places to you." [SOF ¶ 91]. Again, Google did not connect that disclosure with the WAA setting, and it said nothing of the ███████ and *precise* location information saved by WAA. Indeed, the vast majority of information on the page (before Google changed it after November 2018) was regarding *LH's* collection of location data [SOF ¶ 92]—leaving users with the deceptive net impression that only LH, and not WAA,

---

[8] ████████████████████, Google presents six paragraphs of text when a user paused LH. [SOF ¶ 86]. In the middle of this wall of small text—and visible only after the user scrolls down—Google states that "location data may be saved as part of activity on Search and Maps when your Web & App Activity setting is on." [SOF ¶ 87].

MOTION FOR PARTIAL SUMMARY JUDGMENT

1    stored their precise location data. And again, these disclosures are particularly misleading when

2    coupled with Google's statement that "With Location History off, the places you go are no

3    longer stored," discussed above. *AMG Capital Mgmt.*, 910 F.3d at 422–23 (9th Cir. 2018)

4    (affirming summary judgment under deceptive net impression theory, where web-based program

5    required user to understand "densely packed text" and then take "affirmative action").

6         Google also changed the precision with which it stores location via WAA (*see supra*,

7    discussing coarse storage before 2015, then precise storage for at least four years thereafter, then

8    reverting to coarse storage in April 2019)—also without informing users of these changes. ██

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████ [SOF

11   ¶ 93]. Notably, however, Google did not make "any changes to the privacy policy, terms and

12   conditions, help desk or help center website . . . that reflected the change." [SOF ¶ 94]. Rather,

13   the only way users would have been able to see the change is if they happened to open the My

14   Activity tool and notice that the data was suddenly more precise. [SOF ¶ 95].

15        In sum, Google made false statements (*i.e.*, "With Location History off, the places you go

16   are no longer stored."), misrepresented its settings (*i.e.*, by implying that LH was the only

17   setting that stored a user's precise location), and routinely and repeatedly omitted material facts

18   (*i.e.*, that WAA collected a user's ██████ and precise location information)—all of which added

19   up to deceptive practices by Google to obtain as much user location information as it could for

20   the purpose of ever more ad revenue. *See AutoZone II*, 229 Ariz. at 361–62 ¶14 ("routine and

21   repeated" omissions are properly analyzed under the Act Clause of the CFA, which does not

22   include an element of intent that others rely on omissions).

23        **3.  Google Designed Its User Interface to Deceptively Influence Users to Keep**

24            **Location On and ██████████████████████████.**

25        Google's deceptive practices were not isolated only to the account-level settings of LH

26   and WAA. Rather, Google also deceptively designed its user interface ("UI")—██████████

27   ████████████████████████—in order to influence users to keep their LM on.

28

MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████ [SOF ¶ 96]. ████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████. [SOF ¶ 97]. ████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████ [SOF ¶ 98].

8           One such change to the Android UI was a change to the Quick Settings ("QS") panel on

9   Android KitKat (the version released around 2013) in Q2 of 2014. [SOF ¶ 99]. This panel

10  becomes visible when a user pulls down from the top of the screen on an Android device. [SOF

11  ¶ 100]. It includes toggles for various popularly used settings. [SOF ¶ 101]. ████████████

12  ████████████████████████████████████████. [SOF ¶ 102].

13          ████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████. [SOF ¶ 103]. ████████

16  ████████████████████████████████████████████████████████.

17  [SOF ¶ 104]. ████████████████████████████████████

18  ████████████████████████████████████████████. [SOF ¶ 105].

19  ████████████████████████████████████████████████████

20  ████████████. [SOF ¶ 106 (████████████████████████████████████

21  ████████████████████████████████████████)].

22          ████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████. [SOF ¶¶ 107–

25  08]. ████████████████████████████████████

26

27

28

MOTION FOR PARTIAL SUMMARY JUDGMENT

1 ███████████████████████████████████████████████

2 ████████████████ [9] [SOF ¶ 109].

3      But Google did not stop there. ██████████████████████

4 ████████████████████████████████████████ [SOF ¶ 111]. █████████

5 ███████████████████████████████████████████████

6 ███ . ██████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ███ . [SOF ¶ 112]. ██████████████████████████████

9 ███████████████████████████████████████████████

10 █████████████████████████████████████████████ . [SOF

11 ¶ 113]. ████████████████████████████████████████

12 ████████████████████████████████████ [SOF ¶ 114], █████

13 ████████████████████████████████ . For example, ████████

14 ███████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ██████████████████████████████ . [SOF ¶ 115]. ████████████

17 ████████████████████████ . [SOF ¶ 116; *see also* SOF ¶¶ 117–19 (███████

18 ███████████████████████████████████████████████

19 ██████████████████████████████████████ )]. ██████████████

20 ███████████████████████████████████████████████

21 ███████████████████████ . [SOF ¶ 120]. ██████████████████

22 ████████████████████████████████████ . [SOF ¶ 121].

23             █████████████████████████████ :

24 

25 

26 

27 ────────────────────────────

28 [9] █████████████████████████████████████ [SOF ¶ 110].

MOTION FOR PARTIAL SUMMARY JUDGMENT

[SOF ¶ 122]. ██████████████████████████████████████████████

██████████████████████████████████. [SOF ¶ 123]. ██████████████

██████████████████████████████████. [SOF ¶ 124 (██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████)].

   Indeed, undisputed evidence shows that the LM setting—██████████████

██████—actually causes deception. ████████████████████████████

██████████████████████. [SOF ¶ 125 (██████████████████████

████████████████████████████████████████████████████████),

¶ 126 (███████████████████████████████████████████████████

██████████████████████████), ¶ 127 ("The current UI *feels* like it is designed to

make things possible, yet difficult enough that people won't figure it out.")]. Google's deceptive

act ████████████████████████████████ only compounded this confusion, as there is

evidence that ████████████████████████████████████████████████████

███████████████████████. [SOF ¶ 128 ("I **thought** I had location tracking turned off

on my phone. However the location toggle in the quick settings was on. So our messaging

around this is enough to confuse a privacy focused Google-SWE. That's not good.")].

### 4.  Users Were Actually Deceived by Google's Practices.

   Evidence of actual deception, or of Google users' reliance on Google's deceptive

practices, is not necessary in CFA actions brought by the State. *People ex rel. Babbitt v. Green

Acres Tr.*, 127 Ariz. 160, 168 (App. 1980), *superseded on other grounds*. "Although proof of

actual deception is unnecessary to establish a violation . . . , such proof is highly probative to

show that a practice is likely to mislead consumers . . . ." *Cyberspace.com*, 453 F.3d at 1201

(cleaned up); *accord E.M.A. Nationwide*, 767 F.3d at 633; *AMG Capital Mgmt.*, 910 F.3d at

425. The evidence shows that Google, in fact, deceived its users.

   On August 13, 2018, the Associated Press reported that Google continued collecting

location data via WAA even when LH was off. [SOF ¶ 129]. ████████████████████████

1 ███████████████████████████████████████████████████████

2 ██████████████. [SOF ¶ 130]. ██████████████████████████

3 ██████████████████████████████████████████████████████

4 ████████████. [SOF ¶ 131]. Amidst the fallout, Google updated its LH help page to remove the

5 disclosure "With Location History off, the places you go are no longer stored." [SOF ¶ 132].

6 █████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ███████████████████████. [SOF ¶ 133].

9     In internal discussions regarding the AP report, Google's own employees acknowledged

10 Google's deceptive practices surrounding LH and WAA. [SOF ¶ 134 ("Although I know it

11 works and what the difference between 'Location' and 'Location History' is, I did not know that

12 Web and App activity had anything to do with location. Also seems like we are not very good at

13 explaining this to users."), ¶ 135 ("Indeed we aren't very good at explaining this to users. Add

14 me to the list of Googlers who didn't understand how this worked an [sic] was surprised when I

15 read the article . . . we shipped a [user interface] that confuses users. . . . "), ¶ 136 ("The

16 complaint in this article is that if you have Web and App Activity enabled and the location

17 toggle enabled, then your search history entries contain your approximate location at the time

18 you made a query. It's also not possible to remove them by clearing your location history, which

19 is counter-intuitive – you have to clear your search history instead."), ¶ 137 ("Definitely

20 confusing from a user point of view if we need googlers [to] explain it to us.") ¶ 138 ("I agree

21 with the article. Location off should mean location off, not except for this case or that case."),

22 ¶¶ 139–40 ("[C]omms and policy are looking for an update on where we are in terms of fixing

23 'location history' fixes and having one single place to turn off instead of 3.")].

24 ██████████████████████████████████████████████████

25 ███████████████. [SOF ¶ 141 (████████████████████████████

26 █████████████████████████████████████████████████████

27 ████████████████████); *see also* ¶ 142 (█████████████████

28 █████████████████████████████████)]. ████████████████

MOTION FOR PARTIAL SUMMARY JUDGMENT

████████████████████████████████████

████████. [SOF ¶ 143]. In short, not only were users of Google's products deceived by Google's deceptive practices, but Google's own employees were, as well.

\* \* \*

The undisputed evidence confirms that Google engaged in deceptive acts and practices at least from 2015 to April 2019 with respect to Android devices in collecting its users' location information. These deceptive practices and acts included (i) making the false statement that "[w]ith Location History off, the places you go are no longer stored," when in fact Google continued to collect and store users' location information even when LH was off; (ii) misrepresenting its settings by implying that LH was the only setting that stored a user's precise location; (iii) creating the deceptive net impression that WAA did not relate to location; and (iv) deceptively changing its UI to ████████████████████████████████
████████████████. Google engaged in each of these acts and practices to deceive consumers into unwittingly giving up their location data to drive up Google's profit.

**B.   Google's Deceptive Acts and Practices Were in Connection with Sales and Advertisements of Merchandise.**

This Court should also grant partial summary judgment that the deceptive acts and practices described in the previous section are in connection with the sale or advertisement of merchandise. "In connection with" is to be read broadly, and it does not require that the unlawful conduct precede, cause, or induce the transaction at issue. This language "does not expressly require a direct merchant-consumer transaction," *Watts v. Medicis Pharmaceutical Corp.*, 239 Ariz. 19, 28 ¶31 (2016), and encompasses conduct "regardless of whether the deceiver is the seller," *State ex rel. Woods v. Sgrillo*, 176 Ariz. 148, 149 (App. 1993); *see also* State's Resp. to MTD at 5-12 (collecting cases). Google's deceptive acts and practices described above were "in connection with the sale or advertisement of . . . merchandise" in multiple ways. *See* A.R.S. §§ 44-1521(1), (5), (7) (defining "advertisement," "merchandise," and "sale").

Google's deceptive acts and practices are in connection with the sale and advertisement of Android devices—both its own devices (which it does not dispute are covered by the CFA)

MOTION FOR PARTIAL SUMMARY JUDGMENT

1  and OEM devices that license Android. *See* State's Resp. to MTD at 6–12. To use the Android

2  devices they purchase in any meaningful way, users must set up a Google Account. [SOF

3  ¶ 144]. ████████████████████████████████████████████████████

4  ████████████████████████████████. [SOF ¶ 145]; *see Dunlap v. Jimmy GMC*

5  *of Tucson, Inc.*, 136 Ariz. 338, 342 (App. 1983) (CFA applies "prior to, as well as after,

6  [customers'] acceptance of delivery"). Additionally, Google's false and deceptive statements

7  regarding LH and WAA are "in connection with" the sale or advertisement of Android phones.

8  [SOF ¶¶ 55–58, 69–95]; *see Fanning*, 821 F.3d at 171 (statements on "About Us" page of

9  website were sufficient to trigger liability under FTC Act).

10  Google's deceptive acts and practices are also in connection with the advertisement of

11  merchandise and with the sale of merchandise (*i.e.*, Google's services of displaying

12  advertisements of third-parties' merchandise to consumers in return for payment). As described

13  above, █████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  █████████████████████████████████. [*See also* SOF ¶¶ 33, 146 ("Google also uses

16  user location information collected when Location History and Web & App Activity are enabled

17  to provide advertising services to signed-in users.")]. Google thus "uses" deceptive acts and

18  practices to obtain its users' location data, which, in turn, is "used" by Google to make its paid

19  advertising services more attractive to third parties, since advertisers are now able to target

20  potential customers based on the customers' location. [*E.g.*, SOF ¶ 147 (████████████

21  ████████████████████)]; *see also* State's Resp. to MTD at 6–12; *Powers v. Guaranty RV,*

22  *Inc.*, 229 Ariz. 555, 560 ¶17 (App. 2012) (CFA prohibits "***the 'use'*** of any" deceptive or unfair

23  act or practice) (emphasis added).

24  **V. CONCLUSION**

25  The State respectfully requests that the Court grant partial summary judgment that

26  Google violated the CFA through its deceptive acts and practices surrounding its LH, WAA, and

27  LM settings as described above in Android devices from 2015 to April 2019.

28

MOTION FOR PARTIAL SUMMARY JUDGMENT

1

2   Dated:  August 25, 2020                     MARK BRNOVICH
                                                ATTORNEY GENERAL
3                                               By: /s/ Brunn W. Roysden III
                                                Joseph A. Kanefield
4                                               Brunn W. Roysden III
                                                Oramel H. Skinner
5                                               Michael S. Catlett
                                                Christopher Sloot
6                                                   Assistant Attorneys General

7

8   Guy Ruttenberg* (CA Bar No. 207937)         David H. Thompson* (DC Bar No. 450503)
    Michael Eshaghian* (CA Bar No. 300869)      Peter A. Patterson* (DC Bar No. 998668)
9   RUTTENBERG IP LAW, A                         COOPER & KIRK PLLC
    PROFESSIONAL CORPORATION                     1523 New Hampshire Ave NW
10  1801 Century Park East, Suite 1920           Washington, DC 20036
    Los Angeles, California 90067                Telephone: (202) 220-9600
11  Telephone: (310) 627-2270                    dthompson@cooperkirk.com
    guy@ruttenbergiplaw.com                      ppaterson@cooperkirk.com
12  mike@ruttenbergiplaw.com

13

14  *Attorneys for Plaintiff State of Arizona ex rel. Mark Brnovich, Attorney General*

15  *Pro hac vice* granted

16  COPY of the foregoing FILED
17  with the Court this 25th day of August, 2020.

18  COPY of the foregoing EMAILED
19  this 25th day of August 2020 to:

20  Jean-Jacques Cabou (#022835)
21  Alexis E. Danneman (#030478)
    Matthew R. Koerner (#035018)
22  PERKINS COIE LLP
23  2901 N. Central Ave., Suite 2000
    Phoenix, AZ 85012
24  JCabou@perkinscoie.com
25  ADanneman@perkinscoie.com
    MKoerner@perkinscoie.com
26  DocketPHX@perkinscoie.com

27
28  Benedict Y. Hur
    Simona A. Agnolucci

-18-

MOTION FOR PARTIAL SUMMARY JUDGMENT

Joshua D. Anderson
WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.858.7401
bhur@willkie.com
sagnolucci@willkie.com
jdanderson@willkie.com
*Counsel for Defendant Google LLC*

 _/s/ Brunn W. Roysden III____

MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 10

1
2

**MARK BRNOVICH**
**ATTORNEY GENERAL**
Firm State Bar No. 14000

3
4
5
6
7
8
9
10
11

Joseph A. Kanefield (State Bar No. 15838)
Brunn W. Roysden III (State Bar No. 28698)
Oramel H. Skinner (State Bar No. 032891)
Michael S. Catlett (State Bar No. 025238)
Christopher Sloot (State Bar No. 034196)
  *Assistant Attorneys General*
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone:  (602) 542-8958
Beau.Roysden@azag.gov
O.H.Skinner@azag.gov
Michael.Catlett@azag.gov
Christopher.Sloot@azag.gov
ACL@azag.gov

12

[Additional Counsel on Signature Page]

13
14

*Attorneys for Plaintiff*
*State of Arizona ex rel. Mark Brnovich,*
*Attorney Generalf*

15

**THE SUPERIOR COURT OF THE STATE OF ARIZONA**

16

**IN AND FOR THE COUNTY OF MARICOPA**

17

18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| STATE OF ARIZONA, *ex rel.* MARK BRNOVICH, Attorney General,<br><br>                    Plaintiff,<br><br>          v.<br><br>GOOGLE LLC, a Delaware limited liability company,<br><br>                    Defendant. | Case No: CV2020-006219<br><br>**STATE'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Assigned to the Hon. Timothy Thomason<br><br>**(COMPLEX CALENDAR)** |

Plaintiff State of Arizona *ex rel.* Mark Brnovich, Attorney General ("State") files this Separate Statement of Facts in Support of its Partial Motion for Summary Judgment.

**I.     AUTHENTICITY OF RELEVANT DOCUMENTS.**

1.     The authenticity of relevant documents is discussed in the accompanying Declaration of Michael Eshaghian.

2.     [intentionally omitted]

**II.    GOOGLE IS AN ADVERTISING COMPANY.**

3.     In 2018, Google made $136 billion in revenue, of which $116 billion (85%) came from advertising.  (Ex. 292 (GOOG-GLAZ000001916) at 945).

4.     ████████████████████████████████████████ ████████████████████████████████████████ (Ex. 278 (5/21/2020 ████████ EUO Tr.) at 25:7–13).

5.     ████████████████████████████████████████ ████████████████████████████████████████ ████.  (*Id.* at 29:13–23, 139:5–141:2).

6.     ████████████████████████████████████████.  (*Id.* at 141:3–11).

7.     Google allows advertisers to ████████████████████████ ████████ and enables them to geo-target an area as granular as "a small radius around your business" or as large as "cities, states, or entire countries."  (*Id.*; *id.* at 40:18–41:25; Ex. 122 at 1).

8.     ████████████████████████████████████████.  (Ex. 278 (5/21/2020 ████████ EUO Tr.) at 90:4–9).

9.     ████████████████████████████████████████ ████████████████████████████ (*Id.* at 44:17–45:2).

10.    ████████████████████████████████████████.  (*Id.* at 178:3–7; Ex. 275 (2/28/2020 ████████ EUO Tr.) at 309:10–15; 8/21/2020 Berlin Decl. ISO

1    Google's Mot. to Seal ¶ 6 (████████████████████████████████████
2    ████████████████████); .
3         11.   ██████████████████████████████████████████████████████
4    ████████████████████. (Ex. 274 (2/27/2020 ██████ EUO Tr.) at 143:7–20; Ex. 272
5    (7/12/2019 ██████ EUO Tr.) at 112:4–16, 113:13–24; Ex. 202 (Google's 2/21/2020 Responses
6    to CIDs 1–3) at 13, 69); Ex. 288 (Google's 4/30/2020 Response to CID 4) at 15; 8/21/2020
7    Rothfuss Decl. ISO Google's Mot. to Seal ¶ 5 (████████████████████████████████
8    ████████████████████).
9         12.   ███████████████████████████████████████████████
10   ████████████████████████████████████████████████████████
11   ██████████████████████████████████████████████████████████████
12   ███████████████████████████████████████████ (Ex. 278 (5/21/2020 ████████████
13   EUO Tr.) at 36:10–37:1, 38:18–39:8).
14        13.   ████████████████████████████████████████████████
15   ███████████████████████████████████████████████████████
16   ████████████████████████████████ (*Id.* at 37:3–14).
17        14.   ██████████████████████████████████████████████ (*Id.* at
18   39:10–21).
19   **III.   ANDROID.**
20        15.   ███████████████████████████████████████████████
21   ████████████████████████. (*See* Ex. 273 (9/25/2019 ██████ EUO Tr.) at 62:16–63:3;
22   Ex. 275 (2/28/2020 ██████ EUO Tr.) at 342:13–344:6).
23        16.   ██████████████████████████████████████████████. (Ex. 275
24   (2/28/2020 ██████ EUO Tr.) at 342:13–343:9).
25        17.   ████████████████████████████████████████████
26   █████████████████████████████████. (*See* Ex. 51 (GOOG-GLAZ-
27   00026768) at 783–786).
28

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

18.     Android is technically an open-source software, meaning that anyone can modify the source code and install it on a compatible device. Such modifications are called Android "forks." (Ex. 273 (9/25/2019 ████ EUO Tr.) at 139:9–140:9).

19.     While third-party device manufacturers ("OEMs") are theoretically free to pre-install any Android fork on their phones, the vast majority of Android phones sold in the U.S. have Google's version. (Ex. 275 (2/28/2020 ████ EUO Tr.) at 448:9–17).

20.     ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████.[1] (Ex. 273 (9/25/2019 ████ EUO Tr.) at 137:20–140:21; Ex. 276 (3/6/2020 ████
EUO Tr.) at 74:17–75:4; Google's MTD at 14).

21.     Google's own version of Android contains Google Mobile Services ("GMS"), which makes it easier for Google to collect location information from users. (Ex. 273 (9/25/2019 ████ EUO Tr.) at 137:20–139:6).

22.     ████████████████████████████████████████████
████████████████████████████████████████. (Ex. 275 (2/28/2020 ████ EUO Tr.) at 343:10–344:6, 444:8–445:9; Ex. 276 (3/6/2020 ████ EUO Tr.) at 69:4–76:13; Ex. 273 (9/25/2019 ████ EUO Tr.) at 64:6–13; *see also* Ex. 201 (GOOG-GLAZ-00149241) at 241 (████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████); 8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 19 (████████████████
████████████████████████████████████████████
████████████████████████████████
████████████████████).

---

[1] As used in this Statement of Fact, "Android" refers to Google's version of Android that Google causes to be pre-installed.

**IV.     GOOGLE'S RELEVANT SETTINGS FOR THE INSTANT MOTION.**

23.     Of the three types of Google settings, account-level settings are those that apply to a user's entire Google Account and cover all activity associated with that Account, regardless of device.  (Ex. 272 (7/12/2019 ███████ EUO Tr.) at 134:11–135:4).

24.     Of the three types of Google settings, device-level settings are those that are specific to a given hardware device, like a smartphone or tablet.  (*See* Ex. 279 (GOOG-GLAZ-00000054) at 055).

25.     Of the three types of Google settings, app-level settings are settings specific to a particular app.  (*See* Ex. 273 (9/25/2019 ███████ EUO Tr.) at 273:19–24).

26.     Both Location History ("LH") and Web & App Activity ("WAA") are account-level settings.  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 18).

27.     Google describes LH as a setting that "saves a private map . . . of where the user goes with his or her signed-in devices, even when the user is not using a Google service."  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 18).

28.     "Opting in to Location History allows Google to build a user's Timeline . . . of the places the user's devices have been and to provide more personalized features across Google products and services . . . ."  (*Id.*).

29.     Timeline is a user-facing product that allows users to view and manage the location data collected by LH.  (Ex. 271 (7/11/2019 ███████ EUO Tr.) at 218:13–219:5).

30.     ███████████████████████████████████████████████████.  (*Id.* at 66:11–22).

31.     ████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████ (Ex. 204 (GOOG-GLAZ-00085882) at 882).

32.   ████████████████████████████████████████████

████████████████████████████.[2]  (*Id.*; *see also*

8/21/2020 McGriff Decl. ISO Google's Mot. to Seal ¶ 13 (███████████████

████████████████████████)).

33.   ████████████████████████████████████████

█████████████████████████████████████████████████

████████  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 66; *see also id.* at 66–68

(█████████████████)).

34.   WAA is another account-level setting "that stores a user's Google activity data to My Activity . . . in their Google Account."  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 18–19).

35.   My Activity is a user-facing product that allows users to view and manage the data (including location data) saved by WAA.  (Ex. 272 (7/12/2019 ████████ EUO Tr.) at 188:22–189:2).

36.   "The user location information that is saved as a result of Web & App Activity . . . is collected and stored in a user's Google Account when the user is engaging with a Google product and has Web & App Activity enabled.  For example, when a user uses Google Search or Google Maps to search for 'restaurant,' Google collects the search term as well as information about that activity, including IP address and location information, so that the search results returned to the user will show nearby restaurant options."  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 18–19).

37.   ████████████████████.  (Ex. 272 (7/12/2019 Monsees EUO Tr.) at 175:7–176:18).

38.   WAA saves a user's location data.  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 18–19; Ex. 272 (7/12/2019 ████████ EUO Tr.) at 83:12–84:25, 85:23–86:8, 89:20–91:22)).

---

[2] The metadata produced by Google for Exhibit 204 indicates a "DATECREATED" of February 8, 2019.  (Declaration of Michael Eshaghian at ¶ 37).

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

39. ███████████████████████████████████. (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 87:17–92:10, 184:11–185:18).

40. "Implicit user location information does not tell Google where a user's device is located, but through user inputs, Google may infer that a user is either interested in a place or that the user might be at a place. . . . For example, if a user conducts a Google Search for 'Eiffel Tower' Google may infer that the user may like to see information for places near Paris, and Google can then use that inference to provide localized recommendations about those places." (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 4–5).

41. ████████████████████████████████ (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 434:3–22).

42. "Explicit user location information contains information about where a device is located" and derives location from a variety of sensors such as ████████████ ████████████████. (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 4–6; *id.* at 17, 69–70; *see also* Ex. 272 (7/12/2019 ██████ EUO Tr.) at 93:11–23).

43. ███████████████████████████████. (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 184:11–185:18).

44. ████████████████████████████████████ ████████████████████████████ (*Id.* at 89:20–90:8).

45. ██████████████████████████████ ██████████████████████. (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 69:3–18, 93:24–94:17; Ex. 202 (Google's Responses to CIDs 1–3) at 63); Ex. 274 (2/27/2020 ██████ EUO Tr.) at 49:18–20, 185:17–186:24).

46. ██████████████████████████████ ████████████████████████████████ ████████████████████████████████ (Ex.

272 (7/12/2019 ▆▆▆▆▆ EUO Tr.) at 98:19–100:9; *see also* Ex. 202 (Google's Responses to CIDs 1–3) at 72–73 (listing various uses of WAA location data)).

47.     Before 2015, the location data stored by WAA was coarsened to "approximately a neighborhood-sized area with a sufficient number of unique users."  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 92).

48.     But in 2015, Google began storing precise WAA location data, namely precise latitude/longitude—the same precision with which LH location data is saved.  (*Id.*; *see also* Ex. 274 (7/12/2020 ▆▆▆▆▆ EUO Tr.) at 183:3–10 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆)).

49.     This saving of precise location lasted until April 2019 when Google reverted to storing coarser location.  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 92, 68–69 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆)).

50.     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. (Ex. 272 (7/12/2019 ▆▆▆▆▆ EUO Tr.) at 244:10–245:18).

51.     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. (Ex. 273 (9/25/2019 ▆▆▆ EUO Tr.) at 59:16–60:6).

52.     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. (*Id.* at 60:7–17, 66:12–23, 73:2–15, 92:23–93:23).

53.     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 15, 17–19; Ex. 271 (7/11/2019 ▆▆▆▆▆ EUO Tr.) at 74:22–76:8).

## V.     GOOGLE'S DECEPTIVE ACTS AND PRACTICES.

54.     At least until around the end of 2018, in a webpage titled "Manage or delete your Location History," Google stated that "[w]ith Location History off, the places you go are no

1    longer stored."  (Ex. 8 at 1; *see also* Ex. 271 (7/11/2019 ████████ EUO Tr.) at 29:10–31:2

2    (█████████████████████████████████████████████████████████████████████████

3    █████); 112:23–113:8 (█████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    ████████████████████████); (Ex. 11 (GOOG-GLAZ-00000927); Ex. 271 (7/11/2019

6    ███████ EUO Tr.) at 147:5–149:19 (████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████).

8         55.    ██████████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████. (Ex. 275 (2/28/2020 ████████ EUO

11   Tr.) at 464:10–16; *see also* Ex. 271 (7/11/2019 ████████ EUO Tr.) at 139:13–17 (████████

12   ████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████); Ex. 220 (GOOG-GLAZ-00057237) at

14   238 (█████████████████████████████████████████████████████

15   ████████████████);[3] Ex. 221 (GOOG-GLAZ-00146003) at 007 (████████████████████████

16   ████████████████████████████████);[4] Ex. 213 (GOOG-

17   GLAZ-00028891) at 894–95 (███████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████)).

20        56.    In a webpage titled "Manage your Android device's location settings," Google

21   states that it "has a number of location-based services," and lists only LH as being the setting

22   relevant to "the places your device has been."  (Ex. 280 (GOOG-GLAZ-00001105) at 105). The

---

[3] *See also* 8/21/2020 McGriff Decl. ISO Google's Mot. to Seal ¶ 19 (█████████████████████

████████████████████████████ .

[4] *See also* 8/21/2020 Berlin Decl. ISO Google's Mot. to Seal ¶ 18 (█████████████████████████

████████████ .

1   exclusion of WAA from this webpage dates was true during the relevant period for the Motion.[5]

2   (*See also* Ex. 281 (GOOG-GLAZ-00000876) (webpage titled "Change your Google app location

3   settings" discussing LH but not WAA)[6]).

4       57.    Today, Google states that if users wants to "stop sharing your location with

5   Google," they can do so by "changing your settings, but Google may still suggest a location

6   based on your IP address, recent locations, or Location History"—with no mention of the

7   location information saved by WAA.  (Ex. 282 (GOOG-GLAZ-00000942) at 942).

8       58.    An earlier version of the page referenced paragraph 57 within the relevant time

9   period (July 31, 2017) does not even have that disclosure; instead, Google merely explain how

10   to "Turn your location on or off," "Check and update your location," and "Troubleshoot location

11   problems."  (Ex. 297 at Ex. A pp. 1–2).

12      59.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 274 (2/27/2020 ▮▮▮▮

13   EUO Tr.) at 143:11–20).

14      60.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 274 (2/27/2020 ▮▮▮▮ EUO Tr.) at 98:19–

16   100:10; 8/21/2020 Berlin Decl. ISO Google's Mot. to Seal ¶ 6).

17      61.    Users of online services must provide the IP address of their device when using

18   online services like Google's.  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 6).

19      62.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 277

21   (5/8/2020 ▮▮▮▮▮ EUO Tr.) at 271:23–272:1; Ex. 275 (2/28/2020 ▮▮▮▮ EUO Tr. at 517:15–

22   23); Ex. 278 (5/21/2020 ▮▮▮▮▮ EUO Tr.) at 103:5–7).

23

24

---

25   [5] Google produced this document without any metadata indicating when it was created.
    (Declaration of Michael Eshaghian at ¶ 52).  An older version of this page from mid-2016
26   similarly did not discuss WAA.  (Ex. 297 at Ex. A pp. 3–4).

27   [6] Google produced this document without any metadata indicating when it was created.
    (Declaration of Michael Eshaghian at ¶ 53).  Nevertheless, archived versions of this page from
28   mid-2016 and mid-2018 also do not discuss WAA.  (Ex. 297 at Ex. A pp. 5–8).

63. ██████████████████████████████████████
████████████████████████████████████. (Ex. 274 (2/27/2020
████ EUO Tr.) at 116:9–117:23 (███████████████████████████
███████████████████████████████████████████
█████████), 266:15–277:2 (████████████████████████████████); Ex. 288
(Google's 4/30/2020 Responses to CID 4) at 15 (██████████████████
████████████████)).

64. ████████████████████████████████
███████████████. (Ex. 274 (2/27/2020 ████ EUO Tr.) at 144:20–
145:1).

65. ██████████████████████████████████
███████████████ (Ex. 71 (GOOG-GLAZ-00027187) at 189; *see also*
8/21/2020 Berlin Decl. ISO Google's Mot. to Seal ¶ 11 (████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████).

66. ██████████████████████████████████████.
(Ex. 222 (GOOG-GLAZ-00069965) at 965 (██████████████████████
███████); *see also* 8/21/2020 Berlin Decl. ISO Google's Mot. to Seal ¶ 21 (████
████████████████████████████████████████████
████████████████████)).

67. ██████████████████████████████████
██████████████████████████████████. (Ex. 275 (2/28/2020
████ EUO Tr.) at 473:9–16; *see also* at Ex. 274 (2/27/2020 ████ EUO Tr.) at 153:11–154:2).

68. ██████████████████████████████████
████████████████████████████████████. (Ex. 275 (2/28/2020 ████
EUO Tr.) at 473:1–8).

69. ████████████████████████████████████████
████████████████████████. (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 373:18–374:13).

70. ████████████████████████████████████████
█████████████████████████████████████████. (*Id.* at 381:16–23).

71. █████████████████████████████████████
█████████████████████████. (*Id.* at 373:18–375:4).

72. Until Android version Q, Android users could not directly access the WAA or LH settings on their phones. (*Id.* at 164:16–166:19, 169:19–171:1).

73. Android Q, also known as Android 10, was publicly released in about September 2019. (Ex. 273 (9/25/2019 ██████ EUO Tr.) at 163:13–18).

74. Until Android Q, a user would have to navigate to the device's settings, then to a Google link which took the user to his Google Account, then navigate down to WAA. (Ex. 272 (7/12/2019 ██████ EUO Tr.) at 164:16–166:19).

75. Even with respect to Google's affirmative disclosures outside the device itself, Google created a net deceptive impression that WAA is not tied to location. (*E.g.*, Ex. 284 (GOOG-GLAZ-00000885) at 885).

76. For example, in a page titled "Control how your activity across the web is saved & used," Google explains that WAA "Make[s] it easier for you to see and control activity that's saved to your account and how it's used" and "Let[s] Google use this activity to show you more relevant ads on our services and on websites and apps that partner with us." (Ex. 284 (GOOG-GLAZ-00000885) at 885).

77. In the page referenced in paragraph 76, however, Google does not disclose WAA's connection to location storage. (*Id.*).

78. In another section on the same page referenced in paragraph 76 titled "Details about activity & ads," Google gives an example of how WAA works (without actually stating that it is describing WAA): "Information about your activity helps us make our services faster,

smarter, and more useful.  For example, if you search for 'mountain bikes,' you may see an ad for sports equipment when you're browsing a site that shows ads served by Google."  (*Id.* at 887).  There is no disclosure of WAA's connection to saving a user's location.  (*Id.*).

79.     Another version produced by Google of the same page referenced in paragraph 76 (neither of which were produced with metadata indicating their dates (Declaration of Michael Eshaghian ¶¶ 56–57)) replaces the "mountain bike" example with the following: "For example, when you let Google know your location, you won't get ads for stores in other regions."  (Ex. 285 (GOOG-GLAZ-00000424) at 425).

80.     During its investigation, the AG asked Google to identify any disclosure during the set-up process for accounts created before 2018 that WAA collects user location data.  (Ex. 202 (Google's 2/21/2020 Responses to CIDs 1–3) at 98).

81.     In its sworn response, Google pointed to a screenshot that makes no mention of the WAA setting, much less the fact that its stores ***precise*** location information.  (*Id.* at 98 (citing Ex. 295 (GOOG-GLAZ-00203120) at 125–26).

82.     Even today, Google buries a reference to WAA's relationship with location in a page titled "See & control your Web & App Activity." (Ex. 286 (GOOG-GLAZ-00001111) at 111).

83.     To find the disclosure referenced in paragraph 82, a user must find the relevant page, scroll down to a link called "Info about your searches & more," expand that link, then see that Google states that WAA "saves information like: . . . Your location."  (*Id.*).[7]

84.     ███████████████, when pausing LH, users were shown text that stated, "[W]hen you pause Location History, places you go with your devices will stop being added to your Location History map"—with no mention of WAA at all. (Ex. 16 (GOOG-GLAZ-00000150) at 151; Ex. 272 (7/12/2019 ███████ EUO Tr.) at 291:14–293:14; Ex. 29 (GOOG-GLAZ-00001366) at 366 (███████████████████████)).

---

[7] Google produced this document without any metadata indicating when it was created. (Declaration of Michael Eshaghian at ¶ 58).  An archived version of the page from May 5, 2018 is substantially the same.  (Ex. 298 at Ex. B pp. 1–2).

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

85. ██████████████████████████████████████████

██████████████████████████████████████ (Ex. 272

(7/12/2019 ████████ EUO Tr.) at 320:22–321:15).

86.     After the end of 2018, when a user turned off LH, Google presented six

paragraphs of text.  (Ex. 16 (GOOG-GLAZ-00000150) at 154–55; Ex. 29 (GOOG-GLAZ-

00001366) at 366 (██████████████████████████)).

87.     In the middle of the text referenced in paragraph 86—and visible only after the

user scrolls down—Google stated that "location data may be saved as part of activity on Search

and Maps when your Web & App Activity setting is on."  (Ex. 16 (GOOG-GLAZ-00000150) at

155).

88.     In neither of the instances referenced in paragraphs 84 or 86 does Google disclose

that WAA saves ████████ location data or location data ████████████████████.

(*See* Ex. 286 (GOOG-GLAZ-00001111) at 111–12; Ex. 16 (GOOG-GLAZ-00000150) at 154–

55).

89.     [intentionally omitted]

90.     As late as November 30, 2018, Google's Privacy & Terms page was completely

devoid of any mention of WAA.  (Ex. 297 at Ex. A pp. 11–12).

91.     As late as November 30, 2018, in the page referenced in paragraph 90, Google

explained that "if you type in 'Eiffel Tower', we infer that you may like to see information for

places near Paris, and we can then use that to provide recommendations about those local places

to you."  (*Id.*).

92.     As late as November 30, 2018, the vast majority of the information on the page

referenced in paragraph 90 references collection of location data by LH.  (*Id.*)

93.     Google's change to having WAA collect precise (instead of coarsened) location

data in 2015 ████████████████████████████████████████████

████████████████████████████████████████████

████████ (Ex. 228 (GOOG-GLAZ-00106193) at 194; *see also* 8/21/2020 Monsees Decl. ISO

Google's Mot. to Seal ¶ 9 (████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████))

3      94.     When Google made the changed referenced in paragraph 93, it did not make "any

4 changes to the privacy policy, terms and conditions, help desk or help center website . . . that

5 reflected the change."  (Ex. 272 (7/12/2019 ████████ EUO Tr.) at 195:11–205:22; Ex. 202

6 (Google's 2/21/2020 Responses to CIDs 1–3) at 92–95 ("The relevant parts of Google's Privacy

7 Policy have not been updated in the timeframe inquired about.")).

8      95.     The only way users would have been able to see the change referenced in

9 paragraph 93 is if they happened to open the My Activity tool and notice that the data was

10 suddenly more precise.  (*See* Ex. 272 (7/12/2019 ████████ EUO Tr.) at 205:4–23 (Google's

11 designated witness on its public statements regarding WAA stating that he was not aware of

12 other methods)).

13 **VI.**    **GOOGLE DECEIVED ITS USERS VIA ITS USER INTERFACE**

14      96.  ████████████████████████████████████████

15 ████████████████████████████████ (Ex. 273 (9/25/2019 ████

16 EUO Tr.) at 199:4–6).

17      97.  ████████████████████████████████████

18 ████████████████████████████████████████████████.

19 (Ex. 51 (GOOG-GLAZ-00026768) at 770; Ex. 50 (GOOG-GLAZ-00026480) at 481; *see also*

20 Ex. 273 (9/25/2019 ████ EUO Tr.) at 197:8–200:25 (discussing Ex. 50)).

21      98.  ████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████ (Ex. 50 (GOOG-GLAZ-00026481) at 481–82 (████

25 ████████████████████████████████████████

26

27

28

1    ▬▬▬▬▬▬▬▬▬▬▬); Ex. 51 (GOOG-GLAZ-00026768) at 769–72

2    (▬▬▬▬▬▬▬▬▬▬▬)[8]).

3        99.    In the second quarter of 2014, Google made a UI change to the Quick Settings

4    ("QS") panel on Android KitKat (*i.e.*, the Android version released around 2013).  (Ex. 51

5    (GOOG-GLAZ-00026768) at 769; Ex. 273 (9/25/2019 ▬▬ EUO Tr.) at 201:16–202:9).

6        100.    Generally, in the Android UI, the QS panel becomes visible when a user pulls

7    down from the top of the screen on an Android device.  (Ex. 273 (9/25/2019 ▬▬ EUO Tr.) at

8    202:15–22).

9        101.    In the Android UI, the QS panel includes toggles for various popularly used

10   settings.  (*Id.*).

11       102.    ▬▬▬▬▬▬▬▬▬▬▬▬

12   ▬▬▬▬▬▬.  (Ex. 51 (GOOG-GLAZ-00026768) at 772; Ex. 71 (GOOG-GLAZ-

13   00027187) at 196 (▬▬▬▬▬▬▬▬

14   ▬▬▬▬▬); *see also* 8/21/2020 Berlin Decl. ISO Google's Mot. to Seal ¶ 11

15   (▬▬▬▬▬▬▬▬▬▬)).

16       103.    ▬▬▬▬▬▬▬▬▬▬

17   ▬▬▬▬▬▬▬▬▬▬▬

18   ▬▬▬▬▬▬▬▬▬▬.  (Ex. 51

19   (GOOG-GLAZ-00026768) at 769–72; *see also* Ex. 273 (9/25/2019 ▬▬ EUO Tr.) at 211:12–

20   21).

21

22

23

24

25   ───────────────

26   [8] *See also* 8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 11 (▬▬▬▬▬▬

27   ▬▬▬▬▬▬▬▬▬▬▬

28   ▬▬▬▬▬▬▬▬▬▬▬

     ▬▬▬▬▬▬.

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT



104. ██████████████████████████████████████████
██████████████████████████████████████████████. (Ex. 51 (GOOG-GLAZ-00026768) at 769–77).

105. ██████████████████████████████████████████
██████████████████████████████████████████. (Ex. 61 (GOOG-GLAZ-00026360) at 360).

106. ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████)).

107. ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████. (*See* Ex. 52 (GOOG-GLAZ-00005425) at 428; *see also* Ex. 252 (GOOG-GLAZ-00028327) at 327 (███████████

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ███████████████████████████████████████████); *see also*

2   8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 23 (████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ██████████████████).

7        108.   ██████████████████████████████████████████████

8   █████████████████████████████████████. (Ex. 294 (GOOG-GLAZ-

9   00029585) at 614; Ex. 273 (9/25/2019 ████ EUO Tr.) at 201:25–202:9; Ex. 274 (2/28/2020

10   ████ EUO Tr.) at 402:8-11 (█████████████████████████)).

11        109.   ██████████████████████████████████████████████

12   ████████████████████████████████. (Ex. 202 (Google's 2/21/2020

13   Responses to CIDs 1–3) at 20; Ex. 273 (9/25/2019 ████ EUO Tr.) at 163:13–18 (███████

14   ██████████████████); Ex. 274 (2/28/2020 ████ EUO Tr.) at 402:8-11 (███████

15   ████████████████)).

16        110.   ████████████████████████████████████████

17   ██████████████████████████████. (Ex. 202 (Google's 2/21/2020

18   Responses to CIDs 1–3) at 20).

19        111.   ████████████████████████████████████████

20   ████████████████████████████████████████████ (Ex. 290

21   (GOOG-GLAZ-00032447) at 449; *see also* Declaration of Michael Eshaghian ¶ 62 (explaining

22   that metadata produced by Google in connection with Exhibit 290 indicates that Exhibit 290 was

23   created on May 23, 2017).

24        112.   ██████████████████████████████████████████████

25   ██████████████████████████████████████████████

26   ██████████████████████████. (Ex. 51 (GOOG-GLAZ-00026768) at 785; *see*

27   *also* 8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 11 (████████████████████

28   ████████████████████████████████████

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1 ██████████████████████████████████████

2 ████).Ex. 273 (9/25/2019 ███ EUO Tr.) at 238:10–239:3; Ex. 253 (GOOG-GLAZ-

3 00028014) at 014–25 (█████████████████████████████████████

4 ████████████████████████████)).

5 113. ███████████████████████████████

6 ████████████████████████████████████████████

7 ███████████████████████████. (Ex. 254 (GOOG-GLAZ-00115868) at 868

8 (sheet1, cell G14)).

9 114. ████████████████████████████████

10 ██████████████████████████████████

11 ████████████ (Ex. 53 (GOOG-GLAZ-00026843) at 850; *see also* Ex. 273 (9/25/2019 ███

12 EUO Tr.) at 253:1–254:22).

13 115. ██████████████████████████████████

14 ███████████████████████████████████████

15 ███████████████████████████████████████. (*Id.* at

16 847–50).

17 116. ██████████████████████████████

18 ████████████████████. (*See id.* at 846–47; *see also id.* at 844 (████████████

19 ████████████████████████████████████████████

20 ██████████████); *see also* 8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 27 (████████

21 ████████████████████████████████████

22 █████████████████████████████████).

23 117. █████████████████████████████████

24 ███████████████████████████████████████ (Ex.

25 52 (GOOG-GLAZ-00005425) at 428).

26 118. ███████████████████████████████

27 ████████████████████████████████████████

28 ████████████████████████████ (*Id.* at 425).

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

119. ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████ (*Id.*).

120. ██████████████████████████████████████
████████████████████████. (Ex. 255 (GOOG-GLAZ-00027518) at 518).

121. ██████████████████████████████████████
████████████████████. (Ex. 257 (GOOG-GLAZ-00032539) at 539–40; *see also*
8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 17 (████████████████████
██████████████████████████████████████
██████████████████████).

122. ██████████████████████████████████████
██████████████████████████████████████:

|  | ████████████████ |
|---|---|
| ████████████████ | |
| ████████████████ | |

(Ex. 290 (GOOG-GLAZ-00032447) at 450).

123. ██████████████████████████████████████
██████████████████████████████. (Ex. 254 (GOOG-GLAZ-
00115868) at 868 (sheet1, rows 12–14); *see also* 8/21/2020 Chai Decl. ISO Google's Mot. to
Seal ¶ 32 (████████████████████████).

124. ██████████████████████████████████████
██████████████████████████████████████
████████████████. (*See* Ex. 61 (GOOG-GLAZ-00026360) at 361 (████████████
██████████████████████████████████████
██████████████████████████████████████

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  ███████████████████████████████████); *see also* 8/21/2020 Chai Decl. ISO

2  Google's Mot. to Seal ¶ 14 (███████████████████████████████

3  ███████████████████).

4       125.    ██████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████

7  █████████████████████████ (Ex. 206 (GOOG-GLAZ-00055452) at 452; *see also*

8  8/21/2020 Chai Decl. ISO Google's Mot. to Seal ¶ 21 (████████████████████████████

9  ██████████████████████████████████████

10  ██████████████████████████████████████████████).

11       126.    ██████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ██████████████████████████████████████████

15  ██████████████████████████████████████████████████ (Ex.

16  213 (GOOG-GLAZ-00028891) at 896; *see also* 8/21/2020 Chai Decl. ISO Google's Mot. to

17  Seal ¶ 8 (████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  █████████████████████████).

21       127.    On around August 13, 2018, a Google employee named ████████████ said the

22  following in an internal email thread: "The current UI *feels* like it is designed to make things

23  possible, yet difficult enough that people won't figure it out."  (Ex. 18 (GOOG-GLAZ-

24  00001266) at 270).

25       128.    At least one Google software engineer (████████████████) acknowledged that

26  a user would look to the QS panel to determine whether the location functionality on an Android

27  phone is on.  (Ex. 215 (GOOG-GLAZ-00163209) at 213 ("Speaking as a user, WTF? More

28  specifically I **thought** I had location tracking turned off on my phone.  However the

1  location toggle in the quick settings was on.  So our messaging around this is enough to confuse

2  a privacy focused Google-SWE.  That's not good.")).

3  **VII.    <u>USERS WERE ACTUALLY DECEIVED BY GOOGLE.</u>**

4       129.    On August 13, 2018, the Associated Press reported that Google continued saving

5  location data via WAA even when LH was off.  (Ex. 3 (AP article); Ex. 18 (GOOG-GLAZ-

6  00001266) at 266–70 (text of AP article circulated internally at Google)).

7       130.    ████████████████████████████████████████████████

8  ████████████████████████████████████████████.  (Ex. 24 (GOOG-GLAZ-

9  00001458) at 464–65; Ex. 271 (7/11/2019 ████████ EUO Tr.) at 295:13–17).

10      131.    ████████████████████████████████████████████████

11 ████████████████████████████████████████████████.  (*Id.* at 466; *see*

12 *also* 8/21/2020 Monsees Decl. ISO Google's Mot. to Seal ¶ 15 (████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████).

17      132.    Amidst the fallout, Google updated its LH help page to remove the disclosure

18 "With Location History off, the places you go are no longer stored."  (*See* Ex. 11 (GOOG-

19 GLAZ-00000927); *see also* Ex. 271 (7/11/2019 ████████ EUO Tr.) at 147:5–149:19 (████

20 ████████████████████████████████████████████████

21 ████████████████████████)).

22      133.    ████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████.  (Ex. 27

25 (GOOG-GLAZ-00001446) at 448).

26      134.    On around August 14, 2018, a Google employee named ████████████ said

27 the following in an internal email thread about the AP article: "Although I know it works and

28 what the difference between 'Location' and 'Location History' is, I did not know that Web and

-21-

App activity had anything to do with location. Also seems like we are not very good at explaining this to users." (Ex. 19 (GOOG-GLAZ-00001288) at 289)

135.   On around August 14, 2018, a Google software engineer named ███████ ██████ (also discussed above in paragraph 128) said the following in the same internal email thread about the AP article: "Indeed we aren't very good at explaining this to users.  Add me to the list of Googlers who didn't understand how this worked an [sic] was surprised when I read the article.  Of course, we shouldn't have to explain this to users.  The real failure is that we shipped a [user interface] that confuses users and requires explanation." (*Id.* at 290).

136.   On around August 14, 2018, a Google employee named ████████████ said the following in the same internal email thread about the AP article: "The complaint in this article is that if you have Web and App Activity enabled and the location toggle enabled, then your search history entries contain your approximate location at the time you made a query.  It's also not possible to remove them by clearing your location history, which is counter-intuitive – you have to clear your search history instead." (*Id.* at 288).

137.   On around August 14, 2018, a Google employee named ████████████ said the following in the same internal email thread about the AP article: "Definitely confusing from a user point of view if we need googlers [to] explain it to us." (*Id.* at 289).

138.   On around August 13, 2018, a Google employee named ████████████ said the following in another internal email thread about the AP article: "I agree with the article.  Location off should mean location off, not except for this case or that case." (Ex. 18 (GOOG-GLAZ-00001266) at 270).

139.   On around August 13, 2018, ██████████████████████████ ████████████████████, sent ██████████████[9] an email with the subject "AP Story on Location." (Ex. 20 (GOOG-GLAZ-00001521) at 523.

_____

[9] ████████████████████████████████████████████████████. (Ex. 274 (2/27/2020 ████████ EUO Tr.) at 70:16–73:10). ██████████████████████████████ ██████████████████████████████████████ (Ex. 275 (2/28/2020 ████████ EUO Tr.) at 352:9–353:6).

140.   On the Monday after the AP article was published, Google held an "Oh Shit" meeting about the AP article.  (*Id.*).  In the email referenced in paragraph 139, ████████ said:

> Your name came up today during our Monday morning "Oh Shit" meeting in relation to this <u>story</u>.  Both comms and policy are looking for an update on where we are in terms of fixing "location history" fixes [sic] and having one single place to turn off instead of 3:
>
> "There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."
>
> Who should I reach out to for an update?

(*Id.*).  Additionally, ████████████████, was directly involved in the aftermath of the AP article.  On around August 14, 2018, Mr. ██████ called a ████████████ meeting to get "constant" updates on the issues covered by the article from his direct reports, including from ████████████, the ████████████████████████. (Ex. 23 (GOOG-GLAZ-00001371) at 373; Ex. 276 (3/6/2020 ████████ EUO Tr.) at 176:10–178:11).

141.   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (Ex. 223 (GOOG-GLAZ-00057861) at 861; *see also* 8/21/2020 Monsees Decl. ISO Google's Mot. to Seal ¶ 11 (████████████████████████████████████████████████████████████████).

---

[10] ████████████████████████████████████████████████████████████ (Ex. 272 (7/12/2019 ████████ EUO Tr.) at 72:13–73:7). ████████████. (*Id.*)

142. ███████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████ (Ex. 30 (GOOG-GLAZ-00001374) at 374; *see also* (Ex. 272
(7/12/2019 ████████ EUO Tr.) at 340:2–341:9 (████████████████████████████
████████████████████████████████
████ )).

143. ███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████ (Ex. 299 (GOOG-GLAZ-00078009) at 037.

## VIII.  **GOOGLE'S DECEPTIVE ACTS AND PRACTICES WERE IN CONNECTION WITH SALES AND ADVERTISEMENT OF MERCHANDISE.**

144.  After users purchase an Android device, they must set up a Google Account to be able to use their device in any meaningful way.  (Ex. 15 (GOOG-GLAZ-00000058) at 93 ("Without a Google Account, you won't be able to: Download apps, music, games, and other content from Google Play; Back up your apps to Google, and sync Google services like Calendar and Contacts with your device; Activate device protection features.")).

145. ██████████████████████████████████
████████████████████████████████. (Ex. 291 (GOOG-GLAZ-
00016196) at 196; Ex. 272 (7/12/2019 ████████ EUO Tr.) at 174:8–20; Ex. 289 (GOOG-GLAZ-
00122386) at 386).

146.  "Google also uses user location information collected when Location History and Web & App Activity are enabled to provide advertising services to signed-in users."  (Ex. 202 (Google's Responses to CIDs 1–3) at 13).

147. ██████████████████████████████████
██████████████████████████████████

1

2 ████████████████████████████████████ (Ex. 293

3 (GOOG-GLAZ-00135059) at 059.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated:  August 25, 2020

MARK BRNOVICH
ATTORNEY GENERAL
By: */s/ Brunn W. Roysden III*
Joseph A. Kanefield
Brunn W. Roysden III
Oramel H. Skinner
Michael S. Catlett
Christopher Sloot
    *Assistant Attorneys General*

Guy Ruttenberg* (CA Bar No. 207937)
Michael Eshaghian* (CA Bar No. 300869)
RUTTENBERG IP LAW, A
PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, California 90067
Telephone: (310) 627-2270
guy@ruttenbergiplaw.com
mike@ruttenbergiplaw.com

David H. Thompson* (DC Bar No. 450503)
Peter A. Patterson* (DC Bar No. 998668)
COOPER & KIRK PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com
ppaterson@cooperkirk.com

*Attorneys for Plaintiff State of Arizona ex rel. Mark Brnovich, Attorney General*

**Pro hac vice* granted

COPY of the foregoing FILED
with the Court this 25th day of August, 2020.

COPY of the foregoing EMAILED
this 25th day of August 2020 to:

Jean-Jacques Cabou (#022835)
Alexis E. Danneman (#030478)
Matthew R. Koerner (#035018)
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ 85012
JCabou@perkinscoie.com
ADanneman@perkinscoie.com
MKoerner@perkinscoie.com
DocketPHX@perkinscoie.com

Benedict Y. Hur
Simona A. Agnolucci
Joshua D. Anderson

-26-

WILLKIE FARR & GALLAGHER LLP
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.858.7401
bhur@willkie.com
sagnolucci@willkie.com
jdanderson@willkie.com
*Counsel for Defendant Google LLC*

 */s/ Brunn W. Roysden III____*

SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 11

Exhibit 268

Let's pretend LH never existed and think about the ▮▮▮▮ data from a privacy perspective.

We have the user's consent to collect and use their location. Either from the Android app permissions, or ios app permission, or web api permissions.

We then use the location in reasonable and expected ways, like ▮▮▮▮▮▮▮▮▮▮

We then

Consent/Collection, ▮▮▮▮ Use, **Storage, Retention**, Offline Use, **Transparency, Control**.

An article would be written about Google tracks your location and movements!

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Issues brought up by the article**
- **It's surprising that WAA contains locations**
  - Imagine if Location History did not exist.It is surprising.
- **LH does not disable all location histories**
  - WAI. There are lots of "location histories", like ▮▮▮▮▮▮▮. Probably others.



, we don't want to force fit ▮▮▮▮

-

**Issues brought up by the article**
- It's surprising that WAA contains locations
  - Imagine if Location History did not exist. We would have largely the same article (Google tracks your movements!)
  - It is surprising.

- LH does not disable all location histories
  - WAI. There are lots of "location histories", like WAA, Fi, Photos. Probably others. Impossible to find them all and prevent new ones from being created
  - Infeasible to change. LH not made to be a Google wide control, we don't want to force fit this to existing logging. Infeasible to respect device-level controls as required.
  - Solvable through messaging

**Suggested course of action**



Notes

- **Retention** will likely include per product user configurable retention settings. What the buckets and defaults has not been finalized, but will likely vary by product.
- WAA will be



  ] We don't think for Google makes sense for a few reasons.

  - ] I think we need to talk more about how such a proposal fits in with

- ○ Let's look at 

**Problems with mingling LH + WAA:**
- Retention periods impacting each other

Collection, ▮▮▮ Use, **Storage, Retention,** Offline Use, **Transparency, Control**.

GOOG-GLAZ-00078654

# EXHIBIT 12

Exhibit 236



From:
To:
**Sent:** Mon, 27 Feb 2017 23:37:44 -0800
**Subject:** Re:
**Cc:**

*REDACTED - PRIVILEGE*

Let's say, if the users actually wanted this                    which app gets what
permission,        I challenge you to sketch out a solution by which device-level permissions
could be enforced server-side. Remember: besides Android, we have iOS, desktop, Chrome, and
a bunch of other surfaces where notions of an "app" might not even exist. Personally, I can't
think of a world where we do a good and thorough job with runtime permissions across Google
apps that doesn't confuse the hell out of our users and make the lives of eng and PM folk hell -
by fragmenting the user base into dozens if not hundreds of odd states where the data can't flow
in some directions.

I'm down to brainstorm this more with L+C and Android Platform. Like I said, Google isn't the
only one 'publisher' of apps where data is shared across. Facebook and Uber are very much in the
same bucket, and it's definitely broader than just location (e.g., contacts between FB main app
and FB messenger seems like a very sensible data to share).

On Mon, Feb 27, 2017 at 6:16 PM,                                        wrote:

The WAA opt-in covers gaia-keyed, long-term retention of user activity with 1st party
Google products. It was originally known as the search history opt-in. In practice includes
web search, maps, images, news, assistant, etc., and is used to
                                . It is an account-level control that is enabled by default for
new accounts (except dasher). About 85% of signed-in search users have it on.

*REDACTED - PRIVILEGE*

live independently of what is retained in location history.

On Mon, Feb 27, 2017 at 7:28 PM,                                   wrote:

On Mon, Feb 27, 2017 at 3:32 PM,                                wrote:

Got it, thanks ███

What's WAAH opt-in? Is this a prompt that shows up during set-up? Device level or account level? One opt-in for all Google apps?

This is WAAH: ████████████████████████████████████
This is ███ portal where all the toggles are for WAAH, LH, etc: ███

I believe WAAH opt-in happens pretty liberally from a number of places, including Android setup (when Google Now is activated).

Here are a couple of slides to give you an idea of what's in WAAH and who uses it. (███ ███ correct me if only a subset of those is WAAH)

Thanks!
█

On Mon, Feb 27, 2017 at 3:20 PM, ███████████████████████████ wrote:

Thanks, ███

Second scenario is not exclusive of ULR. It has to do with Web & App Activity History (aka WAAH) opt-in. A user can have both WAAH and LH - and many users do.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████ *REDACTED - PRIVILEGE* ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
█████████████████████████████████████████

Also, I'm fairly certain that this cross-app data sharing is it unique to Google.

Sorry, typo. I meant to say I'm fairly certain that the cross-app data sharing is NOT unique to Google.

Concrete (hypothetical, but very plausible) example: Uber and Uber Eats. Uber app has a permission to get your location. Let's say they analyze your usage and establish your daily commute routine (aka user location model). You install Uber Eats and decline it access to your location on device. Uber Eats can still determine where you are based on the user location model established from locations collected via the main Uber app.

Another example (doesn't even have to be different apps): let's say you have two devices, both running Google Now. One has location permission and one doesn't. Can Google Now give you push notifications to both devices based on locations collected on just one device?

Apps like Facebook and Uber are very likely already doing it as well, via own backends. I'm curious if Android Platform has a position on solving this more broadly.

On Mon, Feb 27, 2017 at 13:51 ██████████████████████████ wrote:

> Sure, we'll follow up with ██████████, I'll include you in the review as well and you can fwd if needed (it's usually Fridays at 10am, but we have a backup ██████ for the next few weeks, so I'll have to verify if he can attend this week).
> Just so I'm clear - this use case is when the user has opted into ULR, but opted out of the app-level location permission for a Google app. That Google app could be getting location from the server through ULR/ PV/ SLF. Correct?

What's the second scenario? If the user doesn't have ULR, but is using Google App 1 and that app is saving the location points it gets and shares it in the backend with Google App 2 (who does not have app-level location permissions)? What is ████████████
████████████████████

████████████████ is protobuf that encapsulates device location once it gets to a Google server. It's just a unified way to pass device location around servers. (████████████████ part of ████████

██████ is essentially where WAAH data is stored and processed.
██████████ a backend built by Google Now team that essentially collects a bunch of signals (including current location) in both ephemeral and persistent way. I'm getting into the weeds here, so I hope ██████████████████ would make a drawing showing how all of these things relate to one another.

Thanks,
██

On Mon, Feb 27, 2017 at 12:16 PM, ██████████████████████████> wrote:

On Mon, Feb 27, 2017 at 9:14 AM, ██████████████████████> wrote:

On Mon, Feb 27, 2017 at 8:49 AM, ████████████████████████> wrote:

████████████████

CONFIDENTIAL



Great timing. ███████████ and I just had a conversation about location logging (in WAAH or LH) and this particular question is about location use across products (via backend channels). ███ is going to take a look at what products do the logging in WAAH ███████.

My understanding is that nothing is current stopping one Google product (A) from using location logged by another Google product (B) if ███ approves the A<-B use. In fact, our landmark privacy policy came into existence pretty much for the very reason of enabling cross-product data use. That's why a separation on Android doesn't really make sense: Google products are currently allowed to [almost completely freely - with PWG oversight] exchange data. ████████ do you have any thoughts on this?

For runtime permissions, we explicitly ask the user "Allow XYZ to use location?" and the user can select Deny. I feel like we may hurt user trust if we are providing locations to XYZ via the ULR-loophole when the user has explicitly denied it. It's possible that it may not be a serious concern, but I'd be more comfortable if we have an "official policy" on this for M/N/O (in addition to planning for P/Q). Maybe discuss this in the next ████ meeting? ███, could you please add this to the agenda?

Sounds good. To be clear - ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████

I don't have a very good understanding of (2) yet. ████████████ cover that area and ███ (cc'd) was interested in following up as well. We captured some manifestations of (2) in ████████, so we'd like to get into next level of detail there.

I doubt that we'll find any kind of runtime permission checking on the back end; e.g., between GMM, Now, and Websearch, I'm fairly certain the location data is shared freely regardless of where it came from. I don't even think there is a technically coherent way to implement cross-app permissions outside of mobile world (how would we even do it? would the users even want it? if we had it, would it be easy to understand for anyone?).
So, it stands to reason that we should try to get the user story right on Android; Apple/iOS will probably follow (e.g., how does Uber do this?).

████████ would you keep us updated on what ███ says?
Perhaps one or two of {myself, ████████████████} could attend.

Btw, ███ - do you have a sense of how permissions are enforced by Context Manager in GCore? E.g., can a 1p app (GSA/GMM/etc) get recent locations collected by ULR via Context Manager if it doesn't have direct access to device location?



My thinking is that we should go in the direction of ███████████████

Agreed.

On Mon, Feb 27, 2017 at 8:20 AM, ████████████████ wrote:

Agree the issue is not necessarily specific to ███
Do we have a list of known products not checking for permission?

On Feb 27, 2017 08:04, ████████████████ > wrote:

Hey ███, this ███████ existed for 2+ years ███████████████

On Sun, Feb 26, 2017 at 10:19 AM, ████████████████ wrote:

In addition to solving for P/Q, we need a stopgap solution ██████████ ███
███████████████. Can we list all the clients of ███, and make
sure they are complying with the runtime permission?

On Fri, Feb 24, 2017 at 8:09 PM, ████████████████ wrote:

Hi ███ you are referring to this █████████ right? If so, kudos to you for you being
aware of it!
It has been nagging us for ages and I'd like to see how we could structure the new
Android P/Q permissions such that ███████████

I suggested that ███████████████████
███████████████ - "can Google have

your Location?" - and that permission is applied, as an umbrella, to all other Google apps. There are some caveats, of course (e.g., does it apply to YouTube? Waze?), but I think this is the cleanest way to solve the problem.

███ if you aren't aware of it, let's chat some more. I'd really like to solve it all together as we move forward with the new ███████████████ and ████████

███ █

On Fri, Feb 24, 2017 at 4:42 PM, ████████████████ > wrote:

Following our conversation, I had a question about how server-side systems (including ███ or ████████████ ) are dealing with Android's runtime permissions.
Suppose a user has disabled permissions to, say, GMM. With client-side location, GMM will not get location, as the user intended. However, they can still get a place card (e.g. Riddler) via ULR--> ███ -->GMM server --> GMM client. (ULR has GmsCore's location permissions, not GMM's). This seems like a bypass to Android's permissions model.

- How are the various teams using ███ (e.g. Riddler) dealing with this today?
- Is there a solution other than apps "self-policing" ?

Thanks,

███

--

███████

# EXHIBIT 13

Exhibit 19

**From:**
**To:**
**Subject:** [Industryinfo] Digest for ████████ - 25 updates in 7 topics
**Sent:** Tue, 14 Aug 2018 17:43:51 +0000

Google Groups

## Topic digest
View all topics

• AP Exclusive: Google tracks your movements, like it or not - 11 Updates
• Musk Mulls Taking Tesla Private, Valuing Company at $82 Billion - 3 Updates
• "Google plans censored search engine for China" - The Intercept - 4 Updates
• [NY Times Op-Ed] A Better Way to Ban Alex Jones - 1 Update
• Brandon Downey: "Some thoughts on an Old Approach to China by Google." - 4 Updates
• Artificial intelligence 'did not miss a single urgent case' - 1 Update
• Google's censored Chinese search engine: a catalogue of ethical violations? - 1 Update

## AP Exclusive: Google tracks your movements, like it or not

Aug 14 10:01AM +0200

+1

Aug 14 10:50AM +0200

There are three location-related settings on Android:

Location History: this controls whether your location is recorded in your timeline in Google Maps.

Location toggle on the device: simplifying a little, this controls whether GPS is enabled and can be found in the notification pulldown. If this is off, the phone will not attempt to determine its precise location. Most people never turn this off, since it will prevent Maps from telling you where you are.

Web and App Activity: a catch-all for recording search and Assistant query history. If you turn this off, you can't use Assistant.

The complaint in this article is that if you have Web and App Activity enabled and the location toggle enabled, then your search history entries contain your approximate location at the time you made the query. It's also not possible to remove them by clearing your location history, which is counter-intuitive - you have to clear your search history instead.

EXHIBIT NO. 19

P. Frederickson, CSR, CCR

CONFIDENTIAL

GOOG-GLAZ-00001288

Aug 14 11:27AM +0200

Definitely confusing from a user point of view if we need googlers explain
it to us :)

[image: Google Logo]

Google Cloud Platform UX
London, UK

On Tue, Aug 14, 2018 at 11:17 AM
wrote:

---

Aug 14 12:45PM +0200

Although I know how it works and what the difference between "Location" and
"Location History" is, I did not know Web and App activity had anything to
do with location.

Also seems like we are not very good at explaining this to users.

Here is the screenshot from "My activity" setting:
https://screenshot.googleplex.com/s3AeEc4ZsEo

And When You click on Learn More:
https://screenshot.googleplex.com/qfNYTUS9h3C

cheers

--
*.* *                        *
*.* Publisher Solutions Consultant gPS
* . *Google Inc.

CONFIDENTIAL

█████████████████████████

*This email may be confidential and privileged. If you received this
communication by mistake, please don't forward it to anyone else, please
erase all copies and attachments, and please let me know that it has gone
to the wrong person.The above terms reflect a potential business
arrangement, are provided solely as a basis for further discussion, and are
not intended to be and do not constitute a legally binding obligation. No
legally binding obligations will be created, implied, or inferred until an
agreement in final form is executed in writing by all parties involved.*

*This sample code is an experimental, unsupported Beta Feature (as such
term is defined in the Google DoubleClick Platform Services Terms and
Conditions, Advertising Platform Agreement, or Google Services Agreement
related to AdX, that is in place between your company and the applicable
Google entity that entered into such agreement, whichever is currently in
effect (the "Agreement")). This sample code is hereby provided to you by
the applicable Google entity that entered into the Agreement. It is
provided for your convenience and is intended to model a possible solution.*

On Tue, Aug 14, 2018 at 11:28 AM ███████████████████
wrote:

████████ ██ ███████████  Aug 14 08:26AM -0400

> Although I know how it works and what the difference between "Location" and
"Location History" is, I did not know Web and App activity had anything to do with
location.

> Also seems like we are not very good at explaining this to users.

Indeed we aren't very good at explaining this to users. Add me to the
list of Googlers who didn't understand how this worked an was
surprised when I read the article.

Of course, we shouldn't have to explain this to users. The real
failure is that we shipped a UI that confuses users and requires
explanation. We should redesign the UI so it's obvious what's

GOOG-GLAZ-00001290



happening, and make it easy for users to choose the settings they want in one place without parsing complex details about product interactions.

Aug 14 02:35PM +0200

Please don't comment!

14. Aug. 2018, 14:27:

Aug 14 02:37PM +0200

Why?

Aug 14 01:39PM +0100

*REDACTED - PRIVILEGE*

On Tue, Aug 14, 2018 at 1:26 PM
wrote:

Aug 14 02:52PM +0200

GOOG-GLAZ-00001291

# EXHIBIT 14

Exhibit 18

**From:** ██████████
**To:** ██████████
**Subject:** [Industryinfo] Digest for ██████████     20 updates in 7 topics
**Sent:** Tue, 14 Aug 2018 07:28:18 +0000

████████████████

Google Groups

## Topic digest
View all topics

- AP Exclusive: Google tracks your movements, like it or not - 3 Updates
- Caesars Palace not-so-Praetorian guards intimidate DEF CON goers, seize soldering irons - 1 Update
- That New Android Update Broke a Key Perk of the Pixel XL - 3 Updates
- Musk Mulls Taking Tesla Private, Valuing Company at $82 Billion - 6 Updates
- "Google plans censored search engine for China" - The Intercept - 3 Updates
- [NY Times Op-Ed] A Better Way to Ban Alex Jones - 3 Updates
- Axios: "How tech fuels authoritarians" - 1 Update

## AP Exclusive: Google tracks your movements, like it or not

████████████     ████████████     Aug 13 04:06PM +0200

IIRC we've had reports like this in the past on this list but I don't
remember major outlets like AP reporting this.

https://apnews.com/828aefab64d4411bac257a07c1af0ecb

---

SAN FRANCISCO (AP) — Google wants to know where you go so badly that it
records your movements even when you explicitly tell it not to.

An Associated Press investigation found that many Google services on
Android devices and iPhones store your location data even if you've used
privacy settings that say they will prevent it from doing so.

Computer-science researchers at Princeton confirmed these findings at the
AP's request.

For the most part, Google is upfront about asking permission to use your
location information. An app like Google Maps will remind you to allow
access to location if you use it for navigating. If you agree to let it
record your location over time, Google Maps will display that history for
you in a "timeline" that maps out your daily movements.

Storing your minute-by-minute travels carries privacy risks and has been
used by police to determine the location of suspects — such as a warrant
that police in Raleigh, North Carolina, served on Google last year to find

EXHIBIT NO. 18

P. Frederickson, CSR, CCR

devices near a murder scene. So the company will let you "pause" a setting
called Location History.

Google says that will prevent the company from remembering where you've
been. Google's support page on the subject states: "You can turn off
Location History at any time. With Location History off, the places you go
are no longer stored."

That isn't true. Even with Location History paused, some Google apps
automatically store time-stamped location data without asking.

For example, Google stores a snapshot of where you are when you merely open
its Maps app. Automatic daily weather updates on Android phones pinpoint
roughly where you are. And some searches that have nothing to do with
location, like "chocolate chip cookies," or "kids science kits," pinpoint
your precise latitude and longitude — accurate to the square foot — and
save it to your Google account.

The privacy issue affects some two billion users of devices that run
Google's Android operating software and hundreds of millions of worldwide
iPhone users who rely on Google for maps or search.

Storing location data in violation of a user's preferences is wrong, said
Jonathan Mayer, a Princeton computer scientist and former chief
technologist for the Federal Communications Commission's enforcement
bureau. A researcher from Mayer's lab confirmed the AP's findings on
multiple Android devices; the AP conducted its own tests on several iPhones
that found the same behavior.

"If you're going to allow users to turn off something called 'Location
History,' then all the places where you maintain location history should be
turned off," Mayer said. "That seems like a pretty straightforward position
to have."

Google says it is being perfectly clear.

"There are a number of different ways that Google may use location to
improve people's experience, including: Location History, Web and App
Activity, and through device-level Location Services," a Google
spokesperson said in a statement to the AP. "We provide clear descriptions
of these tools, and robust controls so people can turn them on or off, and
delete their histories at any time."

To stop Google from saving these location markers, the company says, users
can turn off another setting, one that does not specifically reference
location information. Called "Web and App Activity" and enabled by default,

GOOG-GLAZ-00001267

that setting stores a variety of information from Google apps and websites to your Google account.

When paused, it will prevent activity on any device from being saved to your account. But leaving "Web & App Activity" on and turning "Location History" off only prevents Google from adding your movements to the "timeline," its visualization of your daily travels. It does not stop Google's collection of other location markers.

You can delete these location markers by hand, but it's a painstaking process since you have to select them individually, unless you want to delete all of your stored activity.

You can see the stored location markers on a page in your Google account at myactivity.google.com, although they're typically scattered under several different headers, many of which are unrelated to location.

To demonstrate how powerful these other markers can be, the AP created a visual map of the movements of Princeton postdoctoral researcher Gunes Acar, who carried an Android phone with Location history off, and shared a record of his Google account.

The map includes Acar's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, The AP didn't plot the most telling and frequent marker — his home address.

Huge tech companies are under increasing scrutiny over their data practices, following a series of privacy scandals at Facebook and new data-privacy rules recently adopted by the European Union. Last year, the business news site Quartz found that Google was tracking Android users by collecting the addresses of nearby cellphone towers even if all location services were off. Google changed the practice and insisted it never recorded the data anyway.

Critics say Google's insistence on tracking its users' locations stems from its drive to boost advertising revenue.

"They build advertising information out of data," said Peter Lenz, the senior geospatial analyst at Dstillery, a rival advertising technology company. "More data for them presumably means more profit."

The AP learned of the issue from K. Shankari, a graduate researcher at UC Berkeley who studies the commuting patterns of volunteers in order to help urban planners. She noticed that her Android phone prompted her to rate a shopping trip to Kohl's, even though she had turned Location History off.

"So how did Google Maps know where I was?" she asked in a blog post .

The AP wasn't able to recreate Shankari's experience exactly. But its attempts to do so revealed Google's tracking. The findings disturbed her.

"I am not opposed to background location tracking in principle," she said. "It just really bothers me that it is not explicitly stated."

Google offers a more accurate description of how Location History actually works in a place you'd only see if you turn it off — a popup that appears when you "pause" Location History on your Google account webpage . There the company notes that "some location data may be saved as part of your activity on other Google services, like Search and Maps."

Google offers additional information in a popup that appears if you re-activate the "Web & App Activity" setting — an uncommon action for many users, since this setting is on by default. That popup states that, when active, the setting "saves the things you do on Google sites, apps, and services ... and associated information, like location."

Warnings when you're about to turn Location History off via Android and iPhone device settings are more difficult to interpret. On Android, the popup explains that "places you go with your devices will stop being added to your Location History map." On the iPhone, it simply reads, "None of your Google apps will be able to store location data in Location History."

The iPhone text is technically true if potentially misleading. With Location History off, Google Maps and other apps store your whereabouts in a section of your account called "My Activity," not "Location History."

Since 2014, Google has let advertisers track the effectiveness of online ads at driving foot traffic , a feature that Google has said relies on user location histories.

The company is pushing further into such location-aware tracking to drive ad revenue, which rose 20 percent last year to $95.4 billion. At a Google Marketing Live summit in July, Google executives unveiled a new tool called "local campaigns" that dynamically uses ads to boost in-person store visits. It says it can measure how well a campaign drove foot traffic with data pulled from Google users' location histories.

Google also says location records stored in My Activity are used to target ads. Ad buyers can target ads to specific locations — say, a mile radius around a particular landmark — and typically have to pay more to reach this narrower audience.

GOOG-GLAZ-00001269

While disabling "Web & App Activity" will stop Google from storing location markers, it also prevents Google from storing information generated by searches and other activity. That can limit the effectiveness of the Google Assistant, the company's digital concierge.

Sean O'Brien, a Yale Privacy Lab researcher with whom the AP shared its findings, said it is "disingenuous" for Google to continuously record these locations even when users disable Location History. "To me, it's something people should know," he said.

████████  █████████        : Aug 13 06:51PM -0700

I agree with the article. Location off should mean location off; not except for this case or that case.

The current UI *feels* like it is designed to make things possible, yet difficult enough that people won't figure it out. New exceptions, defaulted to on, silently appearing in settings menus you may never see is <redacted>.

The general concept of what I'd like to see on the location settings :

Location: On/Off (Off disables everything; On enables the ones selected items)
Enable GPS location (on/off)
Enable Bluetooth location (on/off)
Enable Bluetooth to report, even when Bluetooth is off (on/off)
Enable Web/App Activity (on/off)
Enable ... (on/off)

We already have this menu/style for non-Google apps.

This way the user can see and set, in ONE place all of the items related to location. If users find it useful for all of the bluetooth settings to be together, then have the "enable bluetooth to report location when bluetooth is off" in both menus.

Btw. Thank you whomever added the option for bluetooth to not respond to queries when bluetooth is off. (It used to respond, thereby giving location information away, even when location and bluetooth were off.)

On Mon, Aug 13, 2018 at 7:06 AM, ████████████████████

GOOG-GLAZ-00001270

wrote:

> Aug 14 12:03AM -0700

It is a bit complicated, and we might need better messaging.

There is a general location tracking for figuring out your home, work
locations, and routines (you go to a cafe at the same time every week, then
you might get a notification for that etc). This seems to run in the
background all time.

But there is also a location information passed on with individual
requests, like when you search for "Walmart", or ask for weather forecast.
each app, search, news, home, etc seem to have a separate setting.

There is a valid use case. I might want to keep getting local results,
while disabling always on location tracking. Or disable location in weather
but keep it in news, etc.

On Monday, August 13, 2018 at 6:52:57 PM UTC-7, O          wrote:

Back to top
## Caesars Palace not-so-Praetorian guards intimidate DEF CON goers, seize soldering irons

Aug 13 04:30PM -0700

https://arstechnica.com/tech-policy/2018/08/security-theater-meets-def-con-as-room-searches-spark-controversy/

Caesars Palace not-so-Praetorian guards intimidate DEF CON goers, seize
soldering irons Hotel policies drafted after last October's mass shooting
arrive just in time for DEF CON.

Sean Gallagher <https://arstechnica.com/author/sean-gallagher/> -
8/13/2018, 3:40 PM

In the wake of the mass shooting in Las Vegas in October of 2017, hotels in
the city started drafting more aggressive policies regarding security. Just
as Caesars Entertainment was rolling out its new security policies, the
company ran head on into DEF CON—an event with privacy tightly linked to
its culture.

CONFIDENTIAL

# EXHIBIT 15

Exhibit 20



**From:**
**To:**
**Received:**          Tue, 14 Aug 2018 14:31:58 -0700
**Subject:**   Re: AP Story on Location
**Cc:**

*REDACTED - PRIVILEGE*

On Tue, Aug 14, 2018 at 12:17 PM                                         wrote:

*REDACTED - PRIVILEGE*

On Tue, Aug 14, 2018 at 8:45 AM                                     wrote:

*REDACTED - PRIVILEGE*

On Mon, Aug 13, 2018 at 12:53 PM                                     wrote:

*REDACTED - PRIVILEGE*

EXHIBIT NO. 20

P. Frederickson, CSR, CCR

CONFIDENTIAL

GOOG-GLAZ-00001521

On Mon, Aug 13, 2018 at 12:33 PM ▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:



*REDACTED - PRIVILEGE*

On Mon, Aug 13, 2018 at 11:58 AM ▮▮▮▮▮▮▮▮▮▮ wrote:

PRIVILEDGED & CONFIDENTAL

Hi ▮▮▮



*REDACTED - PRIVILEGE*

CONFIDENTIAL



*REDACTED - PRIVILEGE*

On Mon, Aug 13, 2018 at 10:15 AM [REDACTED] wrote:

On Mon, Aug 13, 2018 at 9:38 AM [REDACTED] wrote:

Good Morning ▮. I am back from vacation.
Your name came up today during our Monday morning "Oh Shit" meeting in relation to this story.
Both comms and policy are looking for an update on where we are in terms of fixing "location history" fixes and having one single place to turn off instead of 3:

"There are a number of different ways that Google may use location to improve people's experience, including: Location History, Web and App Activity, and through device-level Location Services," a Google spokesperson said in a statement to the AP. "We provide clear descriptions of these tools, and robust controls so people can turn them on or off, and delete their histories at any time."

Who should I reach out to for an update?

Thanks!

--

--

--

GOOG-GLAZ-00001523

--
mail: ████████████████████
visit: 1600 Amphitheater Parkway, Mountain View, CA 94043
call: ███████████

CONFIDENTIAL

# EXHIBIT 16

Exhibit 215

**From:**
**To:**
**Sent:**     Mon, 15 Apr 2019 16:23:20 -0700
**Subject:**  Re: ███████ Tracking Phones, Google Is a Dragnet for the Police
**Cc:**

On Mon, Apr 15, 2019, 4:16 PM ███████████████████ > wrote:

> If a taxi driver's path was deemed 'good enough' for law enforcement to ask for & us to release their personal information, that's enough for me to want to ask some questions.

> Sure, you should reach out to our lawyercats with questions about how we respond to warrants.

I doubt anyone is going to give you an answer on industryinfo, and I for one will surely not speculate.

> I feel like erring on the side of validating people's expectations for keeping their information away from potentially unreasonable uses by the government is anyone's job who works here.
> ██

>> On Apr 15, 2019, at 3:46 PM, ███████████████ > wrote:

> They did randomly search for people in the area though, in my opinion.

I don't have enough information, from the article or otherwise, to assess that :)

On Mon, Apr 15, 2019 at 3:42 PM ███████████████ > wrote:

> They did randomly search for people in the area though, in my opinion. The initial phase of the warrant provides anonymized locations of many devices in a given region over an asked-for period of time.
> From the article:
> --
"Often, Google employees said, the company responds to a single warrant with location information on dozens or hundreds of devices."

"This year, one Google employee said, the company received as many as 180 requests in one week. Google declined to confirm precise numbers."

"The new orders, sometimes called 'geofence' warrants, specify an area and a time

period, and Google gathers information from Sensorvault about the devices that were there. It labels them with anonymous ID numbers, and detectives look at locations and movement patterns to see if any appear relevant to the crime. Once they narrow the field to a few devices they think belong to suspects or witnesses, Google reveals the users' names and other information."

"The areas they targeted ranged from single buildings to multiple blocks, and most sought data over a few hours. In the Austin case, warrants covered several dozen houses around each bombing location, for times ranging from 12 hours to a week. It wasn't clear whether Google responded to all the requests, and multiple officials said they had seen the company push back on broad searches."

--

I am dubious that 180 times in one week, law enforcement officers had amazingly specific information that would allow them to precisely identify one person's path in a way that wouldn't accidentally ensnare others.

Here's just one instance mentioned in passing of accidentally ensnaring someone looks like: "In Minnesota, for example, the name of an innocent man was released to a local journalist after it became part of the police record. Investigators had his information because he was within 170 feet of a burglary. Reached by a reporter, the man said he was surprised about the release of his data and thought he might have appeared because he was a cabdriver. "I drive everywhere," he said."

███

> On Apr 15, 2019, at 3:29 PM, ████████████████ wrote:

My point was that the warrant requires some initial evidence to obtain, which in this case is footage of the person's vehicle linked with the crime; it's not like they were fishing for any random person who happened to be in the area, which I agree would've been far more scary.

On Mon, Apr 15, 2019 at 3:19 PM ████████████████████ wrote:

> I don't think the headline is what's scary here though. It's the geofence warrant.
>
> ███

> > On Apr 15, 2019, at 2:48 PM, ████████
> > ███████████████ wrote:

Something no one in this thread has mentioned yet is the fact that the crime

was committed with the person's car, and the police
had actual footage putting the car in that location. The
explanation given here is:
> Last month, the police arrested another man: his mother's ex-boyfriend,
who had sometimes used ███████ car.

What makes this even stranger is, if the ex-boyfriend was driving the car,
then why was his location in the area? To that, they
give the following answer:
> his investigation found that ██████████ had sometimes signed in to other
people's phones to check his Google account.

While it's easy to see a headline like this and reach directly for the panic
button, I think the actual circumstances here are fairly
unique.

On Monday, April 15, 2019 at 2:37:07 PM UTC-7, ██████████ wrote:

Moving to ██████████████████████ for
the GMM release process.

On Mon, Apr 15, 2019 at 2:31 PM ████████████████████ > wrote:

████████████████

Cross-posting this thread to the Google Maps Mobile discussion group for
visibility.

On Mon, Apr 15, 2019 at 2:23 PM ███████████████████
wrote:

Merely carrying a cell phone enters you into that
territory, as the police have been using cell-tower
location data for many years.
Specifically with Google, #2 "location history" is
what you are concerned about. NYT has a
discussion on how to disable it:

https://www.nytimes.com/2019/04/13/technology/google-sensorvault-
location-tracking.html

On Monday, April 15, 2019 at 2:19:00 PM UTC-7, ██████████ wrote:

I think this is where the problem lies.
I'd want to know which of these options (some?)

GOOG-GLAZ-00163211

all? none?) enter me into the wrongful-arrest
lottery.

And I'd want that to be very clear to even the least technical people.

███

On Apr 15, 2019, at 2:13 PM,███
███ wrote:

It looks to me you're mixing a few things:
1) **Device-level location**: that's the "Location" on the quick settings or
"Location Services", that enables your
device to use GPS & other info to
obtain the device's location.
Naturally, if you turn that off, you can
get the phone's location, and can't use
navigation, or find your location on
Maps.

2) **Google account Location History**: this is the "Location history"
toggle you find in your Google
account settings, and enables
recording of your location history in
your Google Activity. If you disable
this, everything still seems to work
(expect products/features that use
your location history, naturally).

3) **Your Timeline**: this is the Google Maps feature that takes your
location history and converts to your
"itinerary", with places you visited
and activities. Turning this off has no
impact on your Location History

Google Maps doesn't need (1) enabled to work (I just tested it), but it
does need (1) enabled to (duh) have
your location. It doesn't need (2)
enabled to work, or (3).

> What else won't work without Location services? Navigation? Play
store? Netflix? GPS tracking?

Location services IS GPS tracking. I just tested and all of that work
with location services disabled.

GOOG-GLAZ-00163212

except for navigation as, naturally,
you won't have your location to be
able to navigate.

In practice, only (1) and (2) matter.



On Mon, Apr 15, 2019 at 2:00 PM                           wrote:

On Mon, Apr 15, 2019 at 4:13 PM

                                  > wrote:

>

> > Is there an internal document anywhere that lists all of the cases
                              where location information is
                              recorded when the user has opted-out
                              of location sharing?

>

> If you disable the Location toggle on Android (it's available in Quick
                              Settings), there are no such cases.
                              The phone doesn't localize, so no
                              location data is stored, because no
                              location data is generated.

>

Speaking as a user, WTF? More specifically I **thought** I had
location tracking turned off on my phone. However the location toggle
in the quick settings was on. So our messaging around this is enough
to confuse a privacy focused Google-SWE. That's not good.

Second, after turning off the Location toggle, I go to maps. Now it
can't find my location and prompts me to turn location services back
on. That's **two** fails:

Fail #1: Maps refuses to take No for an answer. Although I turned off
location services 20 seconds earlier, Maps is trying to make me second
guess my conscious decision. This is the "Not Now, maybe later"
antipattern that we still can't seem to wean ourselves off of. What
else won't work without Location services? Navigation? Play store?
Netflix? GPS tracking?

GOOG-GLAZ-00163213

Fail #2: *I* should be able to get *my* location on *my* phone
without
sharing that information with Google. This may be how Apple is
eating
our lunch. I'm not an iOS expert by any means, but it seems Apple
does
not rely nearly as heavily as we do on transmitting user-identified
information into the cloud into order to work with it. They're much
more likely to leave the user's data on the user's devices.

--

█████████████

--
--
[GOOGLE CONFIDENTIAL]

You received this message because you are subscribed to the Google
Groups "Industryinfo" group.
To unsubscribe from this group, send email to
███████████████

For more options, visit this group at

████████████████████████.

--

███████████████████████

--
You received this message because you are subscribed to the Google Groups
██████████████████████
To unsubscribe from this group and stop receiving emails from it, send an
email to █████████
To post to this group, send email to ████████████████.
To view this discussion on the web visit
████████████████████
████████████████████████
████████████████████

CONFIDENTIAL

GOOG-GLAZ-00163214

--

--
[GOOGLE CONFIDENTIAL]

You received this message because you are subscribed to the Google
Groups "Industryinfo" group.
To unsubscribe from this group, send email to

For more options, visit this group at

--

--
 --
--
[GOOGLE CONFIDENTIAL]

You received this message because you are subscribed to the Google
Groups "Industryinfo" group.
To unsubscribe from this group, send email to

For more options, visit this group at