# EXHIBIT A

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN**
**& BERNSTEIN, LLP**
Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Interim Co-Lead Class Counsel*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     THE PARTIES............................................................................................................... 4

III.    JURISDICTION AND VENUE ................................................................................... 11

IV.     CHOICE OF LAW ...................................................................................................... 11

V.      INTRADISTRICT ASSIGNMENT............................................................................. 12

VI.     STATEMENT OF FACTS .......................................................................................... 12

        A.      Google Assured Its Users That They Could Prevent Google's Tracking of
                their Locations............................................................................................... 12

        B.      Google Stores Comprehensive Location Information Regardless of Privacy
                Settings........................................................................................................... 15

        C.      Google's Conduct is an Egregious Invasion of Personal Privacy, Personal
                Security, and Personal Dignity....................................................................... 21

        D.      It Is Not Possible to Prevent Google's Collection of Location Information
                Through the Controls It Purports to Give Consumers. .................................. 27

        E.      Google Stores User's Location Data without their Consent to Further its
                Commercial Interests. .................................................................................... 34

        F.      Google Continues Its Deceptive Behavior..................................................... 38

        G.      Google's Storage of Location Data Defies Reasonable Expectations of
                Privacy and Egregiously Violates Established Social Norms.......................... 40

                1.      Plaintiffs' Expectations of Privacy are Enshrined in Law. ................. 41

                2.      Plaintiffs' Expectations Reflect Widely Held Social Norms. ................ 42

                3.      Parents Have a Reasonable and Universal Expectation of Privacy
                        for their Children................................................................................. 48

                4.      The Federal Trade Commission Has Identified Surreptitious
                        Tracking and Storage of Location Information as a Deceptive Trade
                        Practice................................................................................................ 51

        H.      Google's Deception Compounds the Outrageous Nature of its Conduct. ........... 52

VII.    CLASS ALLEGATIONS ............................................................................................ 55

VIII.   FRAUDULENT CONCEALMENT AND TOLLING................................................... 57

IX.     CAUSES OF ACTION ............................................................................................... 58

Count One (Intrusion Upon Seclusion)........................................................................... 58

Count Two (California Constitutional Right to Privacy)................................................. 59

Count Three (Unjust Enrichment (Quasi-Contract Claim for Restitution and
Disgorgement) or, alternatively, Breach of Contract)...................................................... 60

1

**TABLE OF CONTENTS**
(continued)

2

Page

3   II.   PRAYER FOR RELIEF.................................................................................................. 62

4   III.   DEMAND FOR JURY TRIAL...................................................................................... 63

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.     INTRODUCTION**[1]

2           1.      This case addresses the surreptitious, non-consensual, tracking of millions of

3    mobile device users' geolocation by Defendant Google LLC ("Google").  For years, Google has

4    been encouraging its users to enable location services, ostensibly to "enhance"  users'

5    "experience" of various mobile device functions, including by assuring users that certain device

6    settings can prevent Google from tracking their movements and storing a record of their

7    geolocations.  Contrary to its reassurances to its users, Google tracks and stores users' locations

8    and movements to amass a vast and comprehensive store of highly valuable geolocation data

9    which it has and continues to commercially exploit.

10          2.      Google promoted its "Location History" setting as a powerful user control, with

11   the promise that if the feature set to "off," then "the places you go are no longer stored."  Google

12   assured individuals that they could prevent Google from creating and storing a record of their

13   movement by disabling Location History on their mobile devices or in their Google Accounts.

14   This simply was not true.

15          3.      In August 2018, the press reported that even when users had opted *out* of Location

16   History, Google recorded historical location data comprehensive enough to map out the course of

17   a user's movements from location to location throughout the day, and day after day.  Despite the

18   recognized sensitivity of location data, Google stores this data against the express instructions and

19   expectations of its users.  As reported by the Associated Press ("AP"), "Google wants to know

20   where you go so badly that it records your movements even when you explicitly tell it not to."[2]

21   The AP Report—corroborated by respected cyber security researchers at Princeton University—

22   found that Google technology, embedded in more than two billion mobile devices, stores

23   individuals' location information indefinitely even if users activate a privacy setting purporting to

24   _____

25   [1] Pursuant to this Court's Civil Standing Order, a red-line document showing changes made to the previously-filed Consolidated Class Action Complaint is attached hereto as Exhibit ("Ex.") 1.
26   The addition of Plaintiffs Michael Childs and Noe Gamboa, and Count 3, to this Amended Consolidated Class Action Complaint are contingent upon the Court's ruling on Plaintiffs' Motion for Leave, filed herewith.
27   [2] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not,* The Associated
28   Press (August 13, 2018) (Ex. 2, hereinafter "AP Report").

prevent Google from doing so.  Google Senior Privacy Counsel was forced to admit Google's

ongoing, invasive practices in March 2019, in testimony before Congress:

> Q. Google collects geolocation data even if location history is turned off, correct?
>
> A. **Yes, Senator, it can** in order to operate other services … (inaudible)
>
> Q: Let's just – let's just get that on the record. Google collects geolocation history and information even if location history is turned off.  Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned off – turned off by scanning Wi-Fi networks around them throughout the day? Do you think he'd be surprised by that?[3]

4.      Google again confirmed, in response to questions posed on April 23, 2019 by the

United States House of Representatives, that in addition to Location History's ability to amass

vast quantities of location data for Google, "[o]ther Google products may store precise location

information."

5.      In response to these revelations in the AP Report, by researchers at Princeton

University, and then in Google's recent testimony before the United States Congress, Google has

offered only confusing and obfuscating direction and explanation of its privacy settings and

practices as they relate to a user's "account," and still to this day refuses to confirm whether it is

possible to prevent it from storing location information by adjusting "settings" or otherwise.

6.      Google has failed, and continues to fail, to respect and abide by the very privacy

choices that it ostensibly extended to its users.  Google retains and continues to collect location

data under circumstances where no reasonable consumers would expect that to occur.  Google

gathers location data when apps and services "update" automatically on a device.  It gathers

location data when it performs services that have nothing to do with the user's location.  It gathers

location data regardless of whether users tell it not to do so, by opting out of the Location History

---

[3] *See* Testimony of Will Devries, Google Senior Privacy Counsel, United States Senate Judiciary Committee, *GDPR & California Consumer Privacy Act: Opt-Ins, Consumer Control, and the Impact on Competition and Innovation* (March 12, 2019), at 14 (Ex. 3).  In subsequent testimony, Mr. Devries consistently failed to answer directly the Senator's questions regarding whether Devries thought users, including underage users, "would be surprised" by Google's practices. *Id.* at 15-16.

setting.  Despite users expressly declining to give Google permission to track and store a digital record of their movements, Google does just that, creating a detailed and encyclopedic chronology of users' movements and storing it in a vastly exploitable, profitable database.

7. Data concerning consumers' habits, customs and patterns are currency today, and as geolocation data is particularly rich and personal, it is particularly valuable currency.  Google derives substantial benefits from location data, including increased revenues from advertising and a competitive advantage across a range of lucrative industries.

8. The ramifications of unauthorized access to the highly personal details of stored location history can be severe, and individuals accordingly go to great lengths to safeguard not only their own location information, but, in the case of parents and guardians, also that of their minor children.

9. Google's outrageous conduct violates its users' reasonable expectations of privacy. The intent and efforts of privacy- and security-conscious individuals to safeguard their personal information—particularly sensitive location information—must be respected.  As confirmed by the Supreme Court in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), location data is highly sensitive and presents a privacy interest protected by law. When stored and tracked over time, location history "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 2217 (quotation marks and citation omitted).  As Chief Justice John Roberts stated, "a cell phone—almost a 'feature of human anatomy[]'—tracks nearly exactly the movements of its owner . . . .   A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," and when a third-party has access to the information stored on one's cell phone, that entity "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).  Google's own Chief

1    Executive Officer has formally acknowledged that consumers have a privacy interest in in their

2    geolocation, and precise geolocation information is "considered highly, highly sensitive."[4]

3           10.     While falsely characterizing its illusory privacy controls as meaningful, Google

4    deceptively and unconscionably deprived and continues to deprive Plaintiffs and Class members

5    of one of the most fundamental autonomy and privacy rights: the ability to control access to and

6    knowledge of their whereabouts and their movement over time.  This is true not only for Plaintiffs

7    and Class members, but also for their children, whose location information they sought to protect.

8    Indeed, as discussed in further detail below, recognition and respect for child privacy and parental

9    control are enshrined in longstanding societal norms and protected by the law.  Google's conduct

10   gives rise to three claims brought in this lawsuit: (1) violation of California's Constitutional Right

11   to Privacy, (2) intrusion upon seclusion, and (3) unjust enrichment (quasi-contract claim for

12   restitution and disgorgement)/breach of contract.[5]

13   **II.     THE PARTIES**

14          11.     **Plaintiff Napoleon Patacsil** resides in San Diego, California.  From 2016 until the

15   present, Plaintiff Patacsil has owned and used, and continues to own and use, an Apple iPhone

16   with various Google apps and functionalities downloaded onto the mobile device, including

17   Google Maps. In an express effort to protect his location history—and thus his privacy and

18   security—from efforts by Google, and any other third-parties, to record and access his location

19   over time, Mr. Patacsil turned the "Location History" setting to "off" on his Google Account.

20   Based upon the terminology used by Google (*e.g.* "Location History"), the context, and

21   representations by Google to the effect that turning "Location History" off would prevent his

22   location information from being stored and that Google would respect his privacy settings, Mr.

23   Patacsil believed that this would prevent Google from storing a record of his location history.

24

25   [4] *See* Testimony of Sundar Pichai, Google Chief Executive Officer, Transcript of United States

26   House of Representatives Judiciary Committee, *Transparency and Accountability: Examining Google and its Data Collection, use and Filtering Practices* (December 11, 2018), at 53 (Ex. 4).

27   [5] Plaintiffs' unjust enrichment (quasi-contract claim for restitution and disgorgement)/breach of contract claim is contingent on the Court granting Plaintiffs' Motion for Leave, filed concurrently

28   herewith.

Despite Mr. Patacsil's "Location History" settings, Google continued to store his precise location information.

12.     Prior to acquiring the iPhone in approximately 2016, Plaintiff Patacsil owned and used an Android mobile device.  Android is a mobile operating system developed by Google.  In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to track and record his location over time, Mr. Patacsil turned the "Location History" setting to "off" on this mobile device.  Based upon the terminology used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Patacsil believed that this would prevent Google from storing a record of his location history. Despite Mr. Patacsil's "Location History" settings, Google continued to track and store his precise, comprehensive location information.

13.     Throughout the relevant time period, Mr. Patacsil carried his mobile device virtually everywhere he went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

14.     In the interest of protecting his privacy and security, Mr. Patacsil does not recite here the precise locations that he took his mobile device with the "Location History" setting off during the relevant time, but does allege that the following could be determined from Mr. Patacsil's location history: his eating habits; his shopping habits; his exercise habits; whether he, or those in his care, receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he is involved in the activities of his children (if any), and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

15.     **Plaintiff Michael Childs**[6] resides in Boca Raton, Florida, with his minor children K.C.1 and K.C.2.  From at least July 2018 until the present, Plaintiff Childs and his children have owned and used, and continue to own and use, Apple iPhone mobile devices, with various Google apps and functionalities downloaded onto the mobile devices, including YouTube.

16.     In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to record and access his location over time, Mr. Childs ensured that the "Location History" setting was turned "off" on his Google Account. Based upon the terminology used by Google (e.g. "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Childs believed that this would prevent Google from storing a record of his location history. Despite Mr. Childs's "Location History" settings, Google continued to track and store his precise, comprehensive location information.

17.     In an express effort to protect children's location history—and thus their privacy and security—from efforts by Google, and any other third-parties, to record and access their location over time, Mr. Childs checked that the "Location History" setting was turned to "off" on his children's Google Accounts.  Based upon the terminology used by Google (e.g. "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent their location information from being stored and that Google would respect their privacy settings, Mr. Childs and his minor children believed that this would prevent Google from storing a record of the children's location history. Despite his children's "Location History" settings, Google continued to track and store their precise, comprehensive location information.

18.     Throughout the relevant time period, both Mr. Childs and his minor children each carried their respective mobile devices virtually everywhere they went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

---

[6] The addition of Michael Childs as a named Plaintiff is subject to Plaintiffs' Motion for Leave, filed herewith.

19.     In the interest of protecting his privacy and security, and the privacy and security of his children, Mr. Childs does not recite here the precise locations that he or his children took their mobile devices with the "Location History" setting off during the relevant time, but examples of places where Google would have tracked him and/or his children without permission include: School, beach, Starbucks, mall, home, friends' homes, restaurants, sports competitions and/or events.

20.     In addition, the following could be determined from Mr. Childs's location history: his eating habits; his shopping habits; his exercise habits; whether he receives frequent medical or psychological care and the types of medical or psychological care providers he sees; the extent to which he is involved in the activities of his children, and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

21.     Plaintiff Childs further alleges that the following information regarding his minor children could be determined from their location history: their eating habits; their shopping habits; their exercise habits; whether their receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which they are involved in before or after-school activities, and what those activities are; how, where, and to what extent they socialize; where their friends and associates reside; whether and where they have any recurring appointments; whether and where they attend religious services; how often they take public transit, walks, or are driven, and which routes; whether they have attended any political rallies or protests; whether they are home-schooled or attend school outside of the home, which school, and whether they have good attendance.

22.     **Plaintiff Najat Oshana** resides in Modesto, California. From at least 2012 until the present, Plaintiff Oshana has owned and used, and continues to own and use, an Android

1   mobile device, with various Google apps and functionalities downloaded onto the mobile device,

2   including Google Maps.  In an express effort to protect her location history—and thus her privacy

3   and security—from efforts by Google, and any other third-parties, to record and access her

4   location over time, Ms. Oshana turned the "Location History" setting to "off" on her Google

5   Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and

6   representations by Google to the effect that turning "Location History" off would prevent her

7   location information from being stored and that Google would respect her privacy settings, Ms.

8   Oshana believed that this would prevent Google from storing a record of her location history.

9   Despite Ms. Oshana's "Location History" settings, Google continued to track and store her

10  precise, comprehensive location information.

11      23.     Throughout the relevant time period, Ms. Oshana carried her mobile device

12  virtually everywhere she went throughout the day, including when traveling by vehicle or

13  otherwise on public thoroughfares and when entering commercial spaces, medical care providers,

14  private offices, and private residences.

15      24.     In the interest of protecting her privacy and security, Ms. Oshana does not recite

16  here the precise locations that she took her mobile device with the "Location History" setting off

17  during the relevant time, but does allege that the following could be determined from her location

18  history: her eating habits; her shopping habits; her exercise habits; whether she, or those in her

19  care, receive frequent medical or psychological care and the types of medical or psychological

20  care providers seen; the extent to which she is involved in the activities of her children (if any),

21  and what those activities are; how, where, and to what extent she socializes; where her friends

22  and associates reside; whether and where she has any recurring appointments; whether and where

23  she attends religious services; how often she takes public transit, walks, or drives, and which

24  routes; where she parks her car; whether and where she is employed and her work schedule;

25  where she banks; whether she has attended any political rallies or protests; and whether and when

26  she visited the polls on election day, and which poll.

27      25.     **Plaintiff Nurudaaym Mahon** resides in Douglasville, Georgia.  From at least

28  2013 until the present, Plaintiff Mahon has owned and used, and continues to own and use, an

Android mobile device. In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to record and access his location over time, Mr. Mahon turned the "Location History" setting to "off" on his Google Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Mahon believed that this would prevent Google from storing a record of his location history. Despite Mr. Mahon's "Location History" settings, Google continued to track and store his precise, comprehensive location information.

26.     Throughout the relevant time period, Mr. Mahon carried his mobile device virtually everywhere he went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

27.     In the interest of protecting his privacy and security, Mr. Mahon does not recite here the precise locations that he took his mobile device with the "Location History" setting off during the relevant time, but does allege that the following could be determined from Mr. Mahon's location history: his eating habits; his shopping habits; his exercise habits; whether he, or those in his care, receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he is involved in the activities of his children (if any), and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

28.      **Plaintiff Noe Gamboa**[7] resides in Alsip, Illinois.  From at least 2010 until the present, Plaintiff Gamboa has owned and used, and continues to own and use, an Apple iPhone with various Google apps and functionalities downloaded onto the mobile device including, at times, Google Maps.  In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to record and access his location over time, Mr. Gamboa turned the "Location History" setting to "off" on his device. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Gamboa believed that this would prevent Google from storing a record of his location history. Despite Mr. Gamboa's "Location History" settings, Google continued to store his precise location information.

29.      Throughout the relevant time period, Mr. Gamboa carried his mobile device virtually everywhere he went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

30.      In the interest of protecting his privacy and security, Mr. Gamboa does not recite here the precise locations that he took his mobile device with the "Location History" setting off during the relevant time, but does allege that the following could be determined from Mr. Gamboa's location history: his eating habits; his shopping habits; his exercise habits; whether he, or those in his care, receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he is involved in the activities of his children and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where

---

[7] The addition of Noe Gamboa as a named Plaintiff is subject to Plaintiffs' Motion for Leave, filed herewith.

1    he banks; whether he has attended any political rallies or protests; and whether and when he

2    visited the polls on election day, and which poll.

3        31.    **Defendant Google LLC** ("Google," "Defendant," or "the Company") is a United

4    States public corporation headquartered in Mountain View, California, and incorporated under the

5    laws of Delaware. Google is a sophisticated mobile operating system and mobile applications

6    ("apps") developer in the business of commercializing personal data extracted from the use of

7    tools and services connected to the internet.  As such, Google is aware of, and benefits from the

8    conduct described herein.  Indeed, this forms a core component, among others, of its business

9    model.

10   **III.    JURISDICTION AND VENUE**

11       32.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

12   §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the

13   sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed

14   Class are citizens of a state different from defendant.

15       33.    This Court has personal jurisdiction over Defendant because Defendant owns and

16   operates a business that is headquartered in the Northern District of California and conducts

17   substantial business throughout California.  Google expressly consents to the jurisdiction of the

18   federal or state courts of Santa Clara County, California, USA through its Terms of Service.[8]

19       34.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1), as Google

20   is headquartered in this district.

21   **IV.    CHOICE OF LAW**

22       35.    California law governs the substantive legal issues in this case.  Google's Terms of

23   Service provide in pertinent part that California law will apply to any disputes arising out of or

24   relating to Google's terms or services.[9]

25

26   _____

27   [8] Google, *Google Terms of Service* (effective March 31, 2020) (Ex. 5); *see also* Google, *Google Terms of* Service (last modified October 25, 2017) (Ex. 6).

28   [9] *Id.*

1    V.     **INTRADISTRICT ASSIGNMENT**

2        36.     Pursuant to Civil L.R. 3-2(c), assignment to this division is proper because a

3    substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this district.

4    Defendants market their products throughout the United States, including in Santa Clara County.

5    Additionally, Google is headquartered in Mountain View, California, which is located within

6    Santa Clara County.

7        37.     Assignment to this division is also proper pursuant to Google's Terms of Service,

8    which state in pertinent part that all claims arising out of or relating to Google's terms or services

9    will be litigated "exclusively in the federal or state courts of Santa Clara County, California,

10   USA, and [users] and Google consent to personal jurisdiction in those courts."[10]

11   VI.    **STATEMENT OF FACTS**

12       A.     **Google Assured Its Users That They Could Prevent Google's Tracking of
                their Locations.**

13       38.     According to a 2018 report by the Pew Research Center, the vast majority of

14   Americans—95%—own a cellphone; 77% of Americans own smartphones.[11]  Globally, an

15   estimated 5 billion people are connected through mobile devices, with approximately one-half of

16   those using smartphones.[12]  The overwhelming majority of mobile devices run on one of two

17   operating systems: Android or iOS, which are developed by Google and Apple, respectively.[13]

18       39.     On each of these operating systems, users expect to customize their devices to

19   their preferences by "managing" various functionalities of their devices.  They can, for example,

20   change their time zone, preferred language, or screen brightness.  Included among these

21   functionalities is the option to turn on or off the retention of "Location History"—that is, the

22   individual's precise historical location information.[14]  In its Terms of Service until the language

23   ─────────────────────

24   [10] *Id.  See also* Google, *Google Terms of* Service (last modified October 25, 2017) (Ex. 6).
     [11] Pew Research Center, *Mobile Fact Sheet* (February 5, 2018) (Ex. 7).

25   [12] David George et al., *Global Mobile Trends 2017,* GSMA Intelligence (September 2017) (Ex. 8).

26   [13]  James Vincent, *99.6 percent of new smartphones run Android or iOS*, The Verge (February 16,
     2017) (Ex. 9).

27   [14] As used herein, "location information" refers to any and all data obtained through an
     individual's mobile device, which allows for the identification of that individual's location either
28   in the present or, when stored, through historic record.

was removed in March of 2020, Google represented that it would "respect the choices you make to limit sharing or visibility settings in your Google Account." [15]   In its Privacy Policy, Google consistently has promised that "across our services, you can adjust your privacy settings to control what we collect and how your information is used."[16] Up until the time its true conduct became public, Google also falsely represented that, for its operating system, turning "Location History" off would prevent the company from storing location data reflecting where an individual using a device with its Android operating system had been.

40.     In addition to developing the Android operating system, Google also develops apps that can be downloaded on Android and iOS devices.  Google purports to allow users to make customized settings and privacy decisions at the app level.  Google tells users that they can choose to share location information with some apps, for specified purposes, but choose *not* to share that information with other apps.  Google also claims that a user can share location information with a certain app at some times (*e.g.*, when the app is in active use), but not at others.  Google falsely represented that, for its apps, turning "Location History" off would prevent the company from storing location data reflecting in detail where an individual with Google apps downloaded had been.

41.     Google specifically—though falsely—assured users of both its apps and its mobile devices that it would not store their location information if users denied or revoked its permission to do so through their privacy settings.  Google's support page on the subject stated: "You can turn off Location History at any time. **With Location History off, the places you go are no longer stored.**"[17]

---

[15] *Google Terms of Service* (last modified October 25, 2017) (Ex. 6).

[16] *Google Privacy Policy* (effective July 1, 2020) (Ex. 10).  Although Google amended its privacy policy more than sixteen times in the past six years, it has consistently made representations to the effect that users control what data Google collects about them through settings that users can customize.

[17] Archived version of Google Account Help, *Manage or delete your Location History*, (August 16, 2018) (emphasis added) (Ex. 11).

42.     Google instructed Android mobile device owners how to turn off Location History on their devices, by going to the device's "Settings" tab, as follows:[18]

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

43.     For users of Apple devices such as iPhones and iPads, Google purported to explain that a user must log into her online account with Google to turn off "Location History" (as it does not control the Apple device's operating system), and that turning "Location History" off would "stop[] saving new location information":[19]

---

[18] *Id.*

[19] Archived version of Google Account Help, *Location history for iPhone & iPad* (July 30, 2018) (Ex. 12).

## Turn Location History on or off

Location History stores your location data from all devices that are signed in to your Google Account.

**Note:** When you pause Location History, it doesn't delete previous activity, it only stops saving new location information.

## Using your browser

1. Go to the Location history ☑ section of your Google Account.
2. Turn **Location History** on or off.
   - **Off:** Confirm by tapping **Pause**.
   - **On:** Confirm by tapping **Turn on**.

## Using the Google app

1. Open the Google app G.
2. At the top right, tap your account photo. You might need to sign in.
3. Tap **My Account** › **Personal info and privacy** › **Activity controls** › **Google Location History**.
4. Turn the setting on or off. If you turn it off, confirm by tapping **Stop storing location**.

44.    Google affirmatively represented to both Android and Apple device users that turning off "Location History" would result in Google ceasing to store an individual's location information.

**B.    Google Stores Comprehensive Location Information Regardless of Privacy Settings.**

45.    Consistent with the instructions for users to manage Google's permissions respecting their location information described above, Google published a support page to instruct users on how to manage and delete the user's "Location History" which stated, "[w]ith Location History off, the places you go are no longer stored.  When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account."[20]

46.    Users who visited Google's Privacy Policy for more information received further confirmation that unless they opted to turn "Location History" *on*, they were not "allow[ing]"

_____

[20] Archived version of Google Account Help, *Manage or delete your Location History*, (August 16, 2018) (Ex. 11).

Google to store information about their location, from any Google app or service.  Specifically, as of at least December 18, 2017, Google's Privacy Policy expansively stated "[w]hen you use Google services, we may collect and process information about your actual location. We use various technologies to determine location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points and cell towers."[21]  The phrase "may collect and process information about your actual location" was hyperlinked, and clicking on it for more information took users to a page further illustrating that, through the Location History setting, users could control Google's permissions to store location data used by any Google app or service:

> Location History **allows** Google to store a history of your location data from all devices where you are logged into your Google Account and have enabled Location Reporting. Location History and Location Reporting data may be used by any Google app or service.[22]

47.  Google's representations were false.  As the AP Report revealed, turning off "Location History" only stopped Google from creating a location timeline that the *user* could view.  Google, however, tracked and continues to track the device users and store a meticulous record of their precise locations.

48.  Contrary to Google's representations, even when "Location History" is turned off, whether at the Google Account level or the individual device level, a user's location is stored, and continues to be stored, by Google.  The limited discovery undertaken to date in this action confirms that Google maintains at least one confidential "data store" it calls "Footprints," to house location data compiled through Web & App Activity. [23]

---

[21] Archived version of Google Privacy Policy (last modified December 18, 2017) (Ex. 13); *see also* Christina Bonnington, *How Google Uses Wi-Fi Networks to Figure Out Your Exact Location*, Slate (June 20, 2018) ("Any time a GPS-enabled Android device picks up your router's broadcast signal, it can pinpoint its location and relay that information to Google's location servers.") (Ex. 14).

[22] Archived version of "may collect and process information about your actual location" page hyperlinked from Google Privacy Policy (last modified December 18, 2017) (emphasis added) (Ex. 15).  Additional hyperlinked text ("Learn More") within this hyperlinked page routed users back to the Account Help page *Manage or delete your Location History*, which contained instructions to "Turn Location History on or off" (*see* Ex. 11).

[23] Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories (Ex. 64), at 11.

49.     Google's data stores are vast.  Google's mobile applications—such as Google Maps, Google Search, Google Hangouts, and "camera" apps—are ubiquitous in contemporary life, and gather location data on their users almost incessantly.  The data stores are also largely hidden from view.  Google closely controls what users can learn about the data Google has collected about them.  In the current version of Google's Privacy Policy, for example, users are advised broadly that Google uses "various technologies" to collect, and store, information, "including [but, it appears, not necessarily limited to] cookies, pixel tags, local storage, such as browser web storage or application data caches, databases, and server logs."[24] Little is publicly known, but at a minimum, based on the limited information available to users with the appropriate technical tools, it has been confirmed that location data is captured and then stored consistently by Google-controlled features on a given user's mobile device, including, *inter alia*, the Google Maps app, weather apps, and searches made with the device's mobile browser.  As reported by the AP:

> For example, Google stores a snapshot of where you are when you merely open its Maps app. Automatic daily weather updates on Android phones pinpoint roughly where you are. And some searches that have nothing to do with location, like "chocolate chip cookies," or "kids science kits," pinpoint your precise latitude and longitude — accurate to the square foot — and save it to your Google account.[25]

50.     European researchers have corroborated the AP's findings.  On November 27, 2018, Norwegian consumer protection organization Forbrukerrådet published a report entitled "Every Step You Take, *How deceptive design lets Google track users 24/7*," which examined "how Google continuously tracks the location of its users through a number of different technologies . . .  implemented and enabled through the features "Location History" and "Web & App Activity," with reference to user testing of Android-enabled devices.[26]  Forbrukerrådet

---

[24] *Google Privacy Policy*, *supra* n.16 (Ex. 10). This limited disclosure first appeared in Google's privacy policy only on May 25, 2 018.  *See generally* https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy Policies*).

[25] AP Report (Ex. 2).

[26] Forbrukerrådet (Norwegian Consumer Council), *Every Step You Take, How deceptive design lets Google track users 24/7* (November 27, 2018) (Ex. 16).

concluded that consumers are deceived into being tracked when they use Google services, through multiple techniques including hiding information and deceptive design, and that Google's practices are unethical.[27]

51.     Google's ability to gather geolocation information is unparalleled. Google has access to a startling array of technologies for determining the location of a given user's mobile devices, the user's direction and speed of travel, and the user's proximity to other users and locations.  At a minimum, Google collects location data via GPS data, IP addresses, sensor data from devices, "[i]nformation about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices,"[28] and, as disclosed confidentially in Google's 2019 responses to questions from the U.S. Legislature, via "place proximity reports, timestamp information for the reports, and sensor data such as barometer, gyrometer, and magnetometer." In addition, Google:

> collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.[29]

Thus, in addition to collecting location data via the operation of various apps on consumers' devices, Google also collects data from other sources which allows it to amass and correlate data to create a comprehensive tracking and profiling of its users.

52.     The proliferation of Google Android apps allow for a continuous flow of personal data to Google's servers, even when a user is not interacting with those apps.  Google's Android operating system alone hosts more than 2 million applications (most having nothing to do with the user's location, such as mobile health analysis, payment services, social networking, and

---

[27] *Id.*

[28] *Google Privacy Policy*, *supra* n.16 (Ex. 10).

[29] *Id.*

music streaming).[30]  In October 2018, it was reported that approximately 90% of such applications sent personal data to Google.[31]  This data sharing occurs whether or not users interact with the apps on their devices.  For example, "[a]ccording to a study conducted by Vanderbilt University, a dormant, stationary Android phone, with Google Chrome active in the background, communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour."[32]

53.     The Vanderbilt study demonstrated that, when using an Android device, "even if a user does not interact with any key Google applications, Google is still able to collect considerable information through its advertiser and publisher products," and that "location information constituted 35% of all the data samples sent to Google."[33]  This data collection "is driven largely by data activity from Google's publisher and advertiser products (e.g. Google Analytics, DoubleClick, AdWords),"[34] all of which Google continued when users opted out of Location History, by saving the information via Web & App Activity or otherwise, despite its representations that their data would not be stored.  Forbrukerrådet's report similarly observes that "[o]n Android, allowing any particular app to access location data will allow the service to collect this information in the background, not just while the app is actively in use."[35]

54.     Users of Apple products are also severely affected.  "While using an iOS device, if a user decides to forgo the use of *any* Google product (i.e. no Android, no Chrome, no Google applications), and visits only non-Google webpages, the number of times data is communicated to Google servers still remains surprisingly high.  This communication is driven purely by advertiser/publisher services.  The number of times such Google services are called from an iOS

---

[30] *See generally* Google Play Store, https://play.google.com/store/apps?hl=en_US (last visited June 25,2020).

[31] Steve McCaskill, *'Nine in ten' Android apps send data to Google*, TechRadar Pro (October 24, 2018) (Ex. 17).

[32] Ex. 4 at 4.

[33] (Vanderbilt Study), Douglas C. Schmidt, *Google Data Collection*, Digital Content Next (August 15, 2018) (Ex. 18) at 3-4.

[34] *Id.* at 3.

[35] Ex. 16, at 9.

device is similar to an Android device.  In this experiment, the total magnitude of data communicated to Google servers from an iOS device is found to be approximately half of that from the Android device."[36]

55.     Google does not provide any means, let alone any straightforward means, for users to ascertain the full extent of location information collected about them.  Google offers tools such as "My Activity"[37] and "Takeout"[38] for viewing and downloading data in an individual's "Google Account," but provides no confirmation that the "Account" represents the full compendium of data Google itself has stored about the individual.  These tools provide the illusion that individuals can understand, control, and delete the data that Google collects and has concerning them.  In fact, researchers at Vanderbilt warn that these tools "do not paint a complete picture of the size and scale of Google's data collection," noting that, among other things, "analysis of actual data traffic passed to Google's servers" would be necessary to get a more complete picture.[39]

56.     Google does not even confirm that users can actually delete location data using Google's tools for deleting location data.  Google's current privacy policy states that "[w]hen you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our servers **or retained only in anonymized form**."[40]  Google—since this caveat was added to its policies in October 2019—now claims the right to store "deleted" data in another format.  This is troublesome for many reasons, including that Google is uniquely able to de-anonymize stored location data, and in all events may continue to use even ostensibly

---

[36] *Id.* at 4.

[37] Google states that "My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity." *Google Privacy Policy* (Ex. 10).

[38] *See, e.g.*, Google Account, *Google Takeout*, available at https://takeout.google.com/settings/takeout (last visited July 3, 2020).

[39] Ex. 18 (Vanderbilt Study) at 9.

[40] *Google Privacy Policy*, *supra* n.**Error! Bookmark not defined.**, at 14 (Ex. 10) (emphasis added). Google quietly added this caveat to the "Retaining your Information" section of its Privacy Policy for the first time, on October 15, 2019. *See generally* https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy Policies*).

anonymized location data to serve "personalized" advertisements to users, regardless of the preferences those users express.

57.     Google holds numerous patents concerning the collection, treatment and analysis of geolocation data.[41]  These proprietary technologies demonstrate Google's capabilities and longstanding interests in obtaining and using a comprehensive and precise record of users' locations and movements, and, on information and belief, reveal its ability to de-anonymize location data.

58.     Google's secretive location tracking and storage practices are not only deceptive and unethical, they are directly contrary to users' reasonable expectations of privacy.  As Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau, Jonathan Mayer, stated: "If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off. That seems like a pretty straightforward position to have."[42]

**C.     Google's Conduct is an Egregious Invasion of Personal Privacy, Personal Security, and Personal Dignity.**

59.     Google's "Location History" is profoundly granular and revealing.  Each time Google captures an individual's location information, it stores several data points, including but not limited to: timestamp (the exact moment in time that the data was captured), latitude, longitude, velocity, altitude, and activity.  The "activity" data point even appears to reflect *how* an individual is moving.  Activity values include "IN_VEHICLE," "IN_ROAD_VEHICLE,"

---

[41] Google's patent entitled "Determining device location using multiple sources of location data," for example, explains how Google can determine the precise location of a device that may be communicating multiple, varying sources of location data (*e.g.*, Wi-Fi and GPS) to Google simultaneously.  U.S. Patent No. 10,310,090 (issued June 4, 2019); *see also* U.S. Patent No. 10,274,346 (issued Apr. 30, 2019) ("Determining quality of a location-determination algorithm associated with a mobile device by processing a log of sensor data"); U.S. Patent No. 10,148,772 (issued Dec. 4, 2018) ("System and method for automatically pushing location-specific content to users"); U.S. Patent No. 10,180,980 (issued Jan. 15, 2019) ("Methods and systems for eliminating duplicate events").

[42] AP Report, *supra* n.2 (Ex. 2).

"IN_FOUR_WHEELER_VEHICLE" (Figure 1); [43] "EXITING_VEHICLE" (Figure 2);

"WALKING," "ON_FOOT" (Figure 3); "STILL" (Figure 4); and "TILTING" (Figure 5).

*Figure 1:*

```
}, {
  "timestampMs" : "1542042899598",
  "latitudeE7" : 347366509,
  "longitudeE7" : -922687181,
  "accuracy" : 44,
  "activity" : [ {
    "timestampMs" : "1542042874895",
    "activity" : [ {
      "type" : "IN_VEHICLE",
      "confidence" : 100
    }, {
      "type" : "IN_ROAD_VEHICLE",
      "confidence" : 100
    }, {
      "type" : "IN_FOUR_WHEELER_VEHICLE",
      "confidence" : 99
    } ]
```

*Figure 2:*

```
}, {
  "timestampMs" : "1537297638882",
  "activity" : [ {
    "type" : "EXITING_VEHICLE",
    "confidence" : 100
  } ]
```

*Figure 3:*

```
}, {
  "timestampMs" : "1537296563477",
  "activity" : [ {
    "type" : "ON_FOOT",
    "confidence" : 100
  }, {
    "type" : "WALKING",
    "confidence" : 100
  } ]
```

*Figure 4:*

---

[43] The following figures show location information collected by Google, captured by forensic testing conducted as part of counsel's investigation of this matter, and do not show Plaintiffs' location information or other data.

```
}, {
  "timestampMs" : "1541747209048",
  "latitudeE7" : 347430195,
  "longitudeE7" : -922773730,
  "accuracy" : 16,
  "velocity" : 0,
  "altitude" : 91,
  "verticalAccuracy" : 32,
  "activity" : [ {
    "timestampMs" : "1541747208913",
    "activity" : [ {
      "type" : "STILL",
      "confidence" : 100
    } ]
```

*Figure 5:*

```
}, {
  "timestampMs" : "1541723208156",
  "latitudeE7" : 347428915,
  "longitudeE7" : -922776871,
  "accuracy" : 55,
  "velocity" : 0,
  "heading" : 231,
  "altitude" : 273,
  "verticalAccuracy" : 128,
  "activity" : [ {
    "timestampMs" : "1541719739275",
    "activity" : [ {
      "type" : "TILTING",
      "confidence" : 100
    } ]
  } ]
```

60.     Additional activity values include "RUNNING," "IN_RAIL_VEHICLE," "IN_TWO_WHEELER_VEHICLE," "ON_BICYCLE," and "UNKNOWN."

61.     Google also measures, on a scale from 1 to 100, how sure it is that the user is actually engaging in that type of movement.[44]

62.     Thus, for a given individual, Google not only stores a record of where, specifically, she is, at what time, and for what duration; Google also discerns how fast she is traveling, whether it is on foot or in a vehicle (and which specific vehicle), and whether she is entering or exiting a given vehicle.

63.     The location information stored by Google in violation of its representations and Class members' permissions is personally identifying, in and of itself.  As early as 2013, before

_____

[44] Ex. 18 (Vanderbilt Study) at 12-13.

the technological advances of the past seven years and those to come, researchers found that 95% of individuals in a dataset of 1.5 million people whose locations were tracked hourly for fifteen months could be identified by cross-referencing only **four** time-stamped location data points.[45]  A more recent 2018 study at MIT, cross-referencing GPS data from smartphones, call logs, and time-stamped transit logs collected in Singapore in 2011, achieved consistent results (95% identification)  in less than one week.[46]  That Google can identify individuals from the vast quantities of data it has collected—even "deleted" data stored in "anonymized form," can readily be inferred.

64.     Google imposes no limitations on its own ability to cross-reference points in its stores of user data.  In 2012, Google announced that it would eliminate distinctions between data collected from different Google products and services for purposes of its advertising, data analysis, and other activities, saying specifically that Google "may combine information you've provided from one service with information from other services," and "[w]e'll treat you as a single user across all our products."[47]  The current iteration of Google's Privacy Policy also provides that Google collects identifying data from "publicly accessible sources," and "trusted partners, including marketing partners," as well as "information from advertisers to provide advertising and research services on their behalf." [48]  In addition to data Google collects about users from other sources, any user's Google Account may include additional items of personally identifying information input by the user, such as the user's phone number, address, and payment information.

---

[45] Yves-Alexandre de Montjoye, et al., *Unique in the Crowd: The privacy bounds of human mobility* (March 25, 2013) (Ex. 19).

[46] Rob Matheson, MIT News Office, *The privacy risks of compiling mobility data* (December 7, 2018) (Ex. 20) at 3.

[47] Alma Whitten, Updating our privacy policies and terms of service, Google Official Blog (January 24, 2012) (Ex. 21).  Reports at the time indicated that Google's motivation was to improve Google's ability to monitor users' interaction with and responses to advertising campaigns—consolidated data from multiple distinct interfaces would, for example, provide Google more opportunities to determine whether users made a purchase using a different interface than the one in which the ads were initially shown.

[48] *Google Privacy Policy, supra* n.16 (Ex. 10).

65.     As further reporting in the *New York Times* and other news outlets demonstrates, the issues presented in this action are of grave concern to everyone with a smartphone.  *New York Times* reporters gained access to a relatively small trove of ostensibly "anonymized" location data, and these reporters were able to tie the cell phone "pings" included in that data to individual members of society with ease, generating maps of, essentially, those individuals' entire daily lives.  As these reporters observed:

> This granular location data — the kind that is collected by hundreds of mobile apps and then shared with dozens of location data brokers — may seem like a catalog of the mundane. But the aggregate is closer to total surveillance — an exact record of the rhythms of a living, breathing community.[49]

66.     Reporters have shown that with access to publicly available information, location data can be used to ascertain the movements even of the United States President, confirming that in the absence of effective tools to disable location tracking, no ordinary consumer is exempt from highly targeted and individualized surveillance.[50]

67.     Moreover, when an individual's precise location is stored over a period of time, access to that stored location information by itself provides an intimate, and individually-identifying, profile of that individual's movements throughout life.  Google's stored location information is linked with *other* personally-identifying information, including an individual's name, email address, and potentially many other personally-identifying data points.  Specifically, location information stored by Google is stored in an individual's Google Account (in addition to other repositories known to Google, such as the "Footprints" data store) where it is linked to the other data in that account, including the individual's name and email address.  These are required data points for establishing a Google Account.

68.     Google has created the means to illicitly compile extremely valuable, personal, and important time-stamped data points, contrary to users' express direction to Google.  A relatively

---

[49] Charlie Warzel and Stuart A. Thompson, *Where Even the Children Are Being Tracked*, New York Times (December 21, 2019) at 1 (Ex. 22).
[50] *See* Stuart A. Thompson and Charlie Warzel, *How to Track President Trump*, New York Times (December 20, 2019) (Ex. 23).

minimal amount of location data would confirm to Google where a person lives and works, because those locations will occur most frequently in any data set.  This data would also enable Google to cross-reference and conduct unlimited analysis toward unmerited, improper, and monetizable insights into users' private lives, including without limitation into their social, professional, and other relationships, whether and to what extent they perform activities or travel with others, when two people first meet, how they might influence one another, and when common living arrangements and other relationships begin and end.

69.     The collection and storage of users' geolocation data itself violated users' reasonable expectations of privacy, and also puts them at increased risk for further privacy violations.  Data breaches and other security vulnerabilities are increasingly common among companies that store user data.  As a major aggregator of valuable personally identifying and other information, Google is an obvious target for hackers.  Any information that Google stores may eventually be stolen, if it has not already been.  As recently as October 2018, for example, Google announced that it had discovered vulnerability in its Google+ program that exposed personal account information to third-parties, contrary to its user agreements and representations.  Reportedly, in order to protect its public image, Google failed to disclose that information to the public for months, and came clean only *after* the security risk was discovered by the media.[51]

70.     In addition, despite security measures in place, individual Google accounts are sometimes compromised and may be taken over by criminals and others who would use the information stored there for nefarious purposes, such as stalking, harassment, identity theft, and phishing the associates of the targeted Google user.  In many respects, the *only* sure way to prevent sensitive location histories from falling into unauthorized hands is to keep no records in the first instance.  Through its duplicitous conduct, misrepresentations, and omissions here,

---

[51] *See* Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*, The Wall Street Journal (October 8, 2018), available at https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194? (last visited July 3, 2020). Shortly thereafter, Google shut down the Google+ product entirely.  Bill Chappell, *Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed*, NPR (Dec. 11, 2018), available at https://www.npr.org/2018/12/11/675529798/with-52-5-million-users-data-exposed-on-google-google-quickens-shutdown (last visited July 3, 2020).

Google denied Plaintiffs and Class members the very option it expressly—and falsely—touted it was providing them.

**D.      It Is Not Possible to Prevent Google's Collection of Location Information Through the Controls It Purports to Give Consumers.**

71.      Google's first location-enabled mobile service, "My Location," launched as part of Google Maps on November 28, 2007.  In its introduction to the service, Google said that My Location used cell tower communications to pinpoint the user's real-time location in the form of a "magical blue circle" displayed on Google Maps. [52]

72.      Acknowledging that users view their location data as highly sensitive, Google's My Location launch announcement included an informational video that promised users who enabled the My Location feature complete anonymity, and described the feature as a transient use by Google of cellular tower data to "display" (not store) location information, at such time as "My Location" was in use (not indefinitely):

> So how does it work?  Each time you use your phone to make a call, send a text message, or view a web site, the information goes through towers which provide your phone with reception.  A tower picks up your call and connects you to your aunt Molly. The same thing happens when you fire up Google Maps for mobile.  The tower gives you the reception you need to access map information. These towers also help Google **display** your location.  Each tower has a unique footprint. **When you access My Location, Google calculates an estimated location of your handset based on the unique footprint of nearby towers.** It's not GPS, but it comes pretty close.  The location accuracy may vary and the service gets better the more you use it. **You might ask, does Google know where I am?  The answer is no.** In order for you to receive a normal call, your phone needs to locate and connect to a nearby tower.  Google uses the same location information for My Location. It tells Google where a handset is, but not who's using it, their phone number, or any other personal information.  **And if you want, you can always disable the feature. . . .** [53]

73.      On February 4, 2009, Google launched Latitude, another feature of Google Maps, which transmitted the real-time location information described above to other Latitude

---

[52] Mike Chu, *New magical blue circle on your map*, Google Mobile Blog (November 28, 2007) (transcription of excerpt from embedded video at 1:15-2:14) (Ex. 24).

[53] *Id*.

1    subscribers (specified by the user), on an opt-in basis.[54]  In connection with the launch of this

2    feature, Google again promised to protect and respect user privacy, and specifically

3    acknowledged the sensitivity of location data, stating: "Fun aside, **we recognize the sensitivity of**

4    **location data**, so we've built fine-grained privacy controls right into the application."[55]  Nine

5    months later, on November 10, 2009, Google introduced a new "Location History" feature, which

6    would allow users to "store, view, and manage" their own past Latitude locations indefinitely,

7    assuring users that "[o]f course, you can always delete selected history or your entire location

8    history at any time."[56]

9         74.    In or around July 2013, Google retired Latitude.  Google has not retired Location

10   History.

11        75.    Contrary to the plain language and simple process set forth in the Google support

12   pages referenced above (*e.g.*, "With Location History off, the places you go are no longer

13   stored."), in the face of emerging public scrutiny in August 2018 of its location tracking practices,

14   Google was forced to admit for the first time that the Location History setting alone does not

15   prevent the collection of location data, but rather other settings acted in contradiction to Location

16   History to collect and store a user's *location history*.  The first indication that other settings

17   facilitated location tracking regardless of the Location History setting did not come from Google,

18   but rather from other media reports which  initially suggested that to *actually* and effectively

19   prevent Google from storing location information, users must navigate to and understand an

20   additional, deeply-buried and non-obvious setting titled "Web & App Activity."  As of the date of

21   the filing of this complaint, some two years after the controversy arose, Google has still not

22   publicly confirmed that Web & App Activity is the only Google feature which enables storing

23   location data in a user's account when users opt out of Location History.

24

25   [54] Charles Mendis, *Locate your friends in real time with Google Latitude*, Google Mobile Blog
     (February 4, 2009) (Ex. 25).
26   [55] Vic Gundotra, *See where your friends are with Google Latitude*, Google Official Blog
     (February 4, 2009) (emphasis added) (Ex. 26).
27   [56] Chris Lambert, *Google Latitude, now with Location History & Alerts*, Google Mobile Blog
     (November 10, 2009) (Ex. 27).
28

76.     These initial media reports, and not Google, first suggested that a user could prevent tracking and storage of location information by Google by turning off the "Web & App Activity" setting on her Google account.  To do so, reports indicated that a user must sign in to her Google account on a browser (if an iPhone user) or through the Android settings menu (on an Android device).  In the browser, she can access her account settings by finding "Google Account" in the dropdown menu in the upper right-hand corner, then select "Personal Info & Privacy," choose "Manage your Google Activity," then click "Go to Activity Controls."  Once there, a setting called "Web & App Activity" is revealed, which can then be toggled off.  A series of screenshots demonstrating these steps is attached hereto as Exhibit 28.

77.     The AP Report illustrated Google's comprehensive location tracking with Location History turned off, but with "Web & App Activity" enabled, as it is by default, with a visual map of the movements of an Android phone.  The map shows the location information that was tracked and stored by Google, and includes the investigator's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, the AP did not plot the most common marker stored by Google— his home address. The map plots time-stamped GPS coordinates from a Google Account, demonstrating that Google repeatedly captured and stored the investigator's locations and movements.  For example, over the course of approximately **eight** hours (from 2:18 p.m. to 10:07 p.m.) on July 15, 2018, Google captured 22 different time-stamped coordinates as shown in the images below, with each pinpoint captured that day shown in red.







78.     Although multiple media outlets suggested, following publication of the AP

Report, that turning off "Web & App Activity" (on top of disabling "Location History") would be

effective to prevent the storage of location information, and some attributed the information to

Google,[57] express confirmation of the overall effectiveness of this process seems to be absent

[57] *See, e.g.*, Emily Dreyfuss, *How to Stop Google From Tracking Your Location*, Wired (August
13, 2018) ("To actually turn off location tracking, Google says you have to navigate to a setting
buried deep in your Google Account called Web & App Activity, which is set by default to share
your information, including not just location but IP address and more.") (Ex. 29); Associated
Press, *Google Found to Track the Location of Users Who Have Opted Out*, NBC News
(August 13, 2018) ("To stop Google from saving these location markers, the company says, users

from Google-branded webpages.  As of the date of this filing nearly two years after the AP

Report was published, the Google Support page on the topic still does not definitively confirm

that turning off "Web & App Activity" would actually prevent Google from storing specific,

time-stamped, precise location information about a user.  The page does not state that turning off

"Web & App Activity" terminates all storage of users' location data; rather, the page as amended

following revelations by the AP now warns that after Location History has been turned off, other

Google "sites, apps, and services," collect location information, and "[i]f you have other settings

*like* Web & App Activity turned *on*" location data *may still be saved*.[58]

79.     Although, subsequent to the media reports concerning Google's intentional

collection of location data when Location History is off, Google has had to finally admit that Web

& App Activity independently collects location data, Google has failed and continues to fail to

inform its users whether Web & App Activity is the only Google feature storing location data

when users opt out of Location History.

80.     Web & App Activity is simply the only data capturing tool that Google has been

forced to acknowledge to the public, to date.  The full scope of Google's geolocation data

collection remains a closely guarded secret.  As an example, Google also collects location data

through users' interaction with Wi-Fi access points.  Google suggests that users of its Android

devices can exercise control over Google's collection of location data in this manner by turning

off a device-level setting called "Wi-Fi Scanning."  However, Plaintiffs are informed and believe

that Google continues to collect location data through Wi-Fi access points even if a user turns off

this setting, and even if a user turns off Location History.[59]

81.     The AP reported in August 2018 that a Google spokesperson all but acknowledged

that Google discerns and stores its users' location histories through additional, as yet

---

can turn off another setting, one that does not specifically reference location information. Called 'Web and App Activity' and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.") (Ex. 30).
[58] Google Account Help, *Manage Your Location History* (last visited June 24, 2020) (Ex. 31) (emphasis added).
[59] *See, e.g.*, Complaint in *Arizona v. Google LLC*, Case No. CV2020-006219 (Az. Sup. Ct. May 27, 2020), at ¶¶ 72-74 (Ex. 32).

1  undiscovered, means.  The spokesperson reportedly stated, "There are a number of different ways

2  that Google may use location to improve people's experience, *including*: Location History, Web

3  and App Activity, *and* through device-level Location Services."[60]  Accordingly, it appears that

4  users may need to adjust even more settings to prevent Google from storing location information,

5  or indeed, it may be that no amount of denying "permissions" to Google would protect one's

6  location information from being stored.

7      82.     Google's communications to its users on the purpose of function of Web & App

8  Activity, and the means to disable its function, have been deliberately confusing and misleading.

9  The conflicting array of location-related settings misleads and deceives users of Google's

10  products who have turned off "Location History" into believing that their location information is

11  private, when it is actually being fed into Google's data stores.  Making matters worse, Google

12  automatically changes the state of permissions with regard to these various location-date-related

13  controls without notifying users.  Through various updates to its products, Google has

14  automatically changed users' location settings and default settings, without notice or consent.[61]

15  In all events, Google has failed to disclose the true state of affairs to Plaintiffs and Class

16  members, and instead affirmatively misrepresented that they could protect their privacy by opting

17  out of having their location information stored.

18      83.     Disabling Web & App Activity in addition to Location History is deliberately

19  presented in counter-intuitive and confusing ways.  Google obfuscated that the "Web & App

20  Activity" setting is related to location, and instead represents that it is the "Location History"

21  setting that controls geolocation tracking.  Indeed, in Google's description of these "Controls,"

22  the "Web & App Activity" setting resides directly *above*—but separate and apart from—

23  the "Location History" option, indicating that settings related to location and those related to web

24

25

26  [60] AP Report, *supra* n.2 (emphasis added) (Ex. 2).

27  [61] *Arizona v. Google LLC* Complaint, *supra* n.59 (Ex. 32), at ¶¶ 105-128 (The Arizona Attorney General's complaint, which was informed by the opportunity to conduct factual discovery, contains an entire section, mostly redacted from public view, entitled, "Google Automatically

28  Changes the State of Permissions without Notifying Users").

and app activity are distinct. [62]  Further, until at least November 2018, Google's vague description

of what "Web & App Activity" does—that it "[s]aves your activity on Google sites and apps to

give you faster searches, better recommendations, and more personalized experiences in Maps,

Search, and other Google services"[63]—would not put a user on notice that it relates to location

tracking accurate to less than a meter.  For a user to obtain any more detail about the "Web &

App Activity" setting, she had to click through to "[l]earn more," then scroll to what's saved as

"Web & App Activity," and open a section that is by default collapsed, entitled,  "[i]nfo about

your searches & more" before Google even *mentioned* that the setting is related to location

tracking.[64]  A user therefore had insufficient notice of the storage and tracking of location

information, particularly in light of separate representations and reporting that the "Location

History" setting is what allows individuals to control Google's storage and tracking of their

location information.

84.     Google intentionally hides the nature of its location tracking and obfuscates the

opt-out process (if the opt-out process is indeed effective).  Before its conduct was uncovered in

the AP Report, Google provided at least *three* support pages on location titled: "Manage or delete

your Location History,"[65] "Turn location on or off for your Android device,"[66] and "Manage

location settings for Android apps."[67]  Strikingly, at the time this litigation commenced, none of

---

[62] Archived version of Google Account Help, *Activity Controls* (November 3, 2018) (Ex. 33).

[63] *Id.* (Ex. 33). Prior versions of this explanation were even less informative. In October of 2016 and May of 2018 (and, on information and belief, throughout the interim), Google described "Web & App Activity" as a setting that would "Save your search activity on apps and in browsers to make searches faster and get customized experiences in Search, Maps, Now, and other Google products." (Ex. 34).  In November 2018, Google revised its description of Web & App Activity to acknowledge that it "[s]aves . . . associated info like location." *See Activity Controls,* https://myaccount.google.com/intro/activitycontrols (visited November 19, 2018; last visited July 2, 2020).

[64] These actions would take the user to Google Search Help, *See & control your search activity* available at https://support.google.com/websearch/answer/54068 (visited November 16, 2018, exhibit prepared by Plaintiffs' counsel April 29, 2019); (Ex. 35).

[65] Archived version of Google Account Help, *Manage or delete your Location History*, (August 16, 2018) (Ex. 11); Revised archived version of same (August 18, 2018) (Ex. 36).

[66] Archived version of Google Account Help, *Turn location on or off for your Android device* (August 16, 2018) (Ex. 37).

[67] Android Help, *Manage location settings for Android apps* (July 29, 2018) (Ex. 38).

these made any mention of "Web & App Activity"—to date, the only way identified to *potentially* prevent Google from tracking user location.

**E.**     **Google Stores User's Location Data without their Consent to Further its Commercial Interests.**

85.     The full scale of Google's use, analysis, commercialization and dissemination of the location data it stores has never been adequately disclosed to its users.  What is known is that Google's ability to monetize such data is unrivaled even in an industry that routinely profits from surveillance of consumers.  Google can use this information in myriad ways for profit, including to sell advertising that is precisely, unprecedently targeted.  It can track where and when consumers shop, the establishments they pass once or every day, which restaurants they frequent, the doctors they visit, where they pump their gas.

86.     Google acknowledges publicly today—but did not prior to the initiation of this lawsuit—that location information collected even when Location History is off is used for a variety of Google's own purposes, including to target advertising.[68]  Google leverages the detailed information it stores about its users, including information about where those users are presently located, where they have been, and where they are likely to be in the future, to drive its advertising revenues.

87.     A platform that can tailor advertisements to consumers based on location data are attractive to marketers.  In 2018, a market research firm conducted a survey of manager-level and above marketers at consumer brands and advertising agencies regarding their use of location information.  The survey found that 89 percent of respondents increased sales, 86 percent grew their customer base, and 84 percent engaged customers by use of location data.  The survey found that the use of location data by consumer brands and advertising agencies will grow from to 94 percent of firms in 2020 (from 84 percent in 2019), with the top use (at 67 percent) being advertising.[69]

---

[68] *See Google Privacy Policy*, *supra* n.16.

[69] Lawless Research, *2019 Location-Based Marketing Report*, available at https://static1.squarespace.com/static/5e9491b0c2923c644bacc529/t/5ec812b6e3537d3e3e336c09/1590170297097/Factual-2019-Location-Based-Market-Report.pdf (last visited July 1, 2020).

88.     Google's collection of users' historical locations and movements, particularly when combined with the other data in Google's possession, allow it to serve advertisements to consumers who are likely to make a purchase or fit a targeted profile, and thus to charge would-be advertisers more for Google's services than advertising platforms without the same breadth of information about individual consumers could demand. Indeed, the apps and operating systems that Google develops and distributes, such as the apps recording data to Web & App Activity, are designed to attract and maintain users' attention, both  in order to generate data informative of consumers' habits and tastes, and also to provide a platform through which Google can serve ads to precisely-targeted audiences.  At its core, Google is an extremely profitable advertising company.  In its annual report for 2019, Google explained "How we make money"—"We generate revenues primarily by delivering both performance advertising and brand advertising." Alphabet Inc. Form 10-K, 2019, at 6.  And, that year, those revenues exceeded $161 billion. *See id*. at 51.

89.     A central feature of "Google Ads," as the service is currently called, is that it allows prospective advertisers to "Decide where to advertise," promising to "get [their advertisements] in front of the right people."[70]  While certain Google account-level settings such as "Ad Personalization" ostensibly provide a modicum of user control over Google's ability to use the data it collects to increase the value of its advertising platform, Google admits that it collects and uses location data to feed users "personalized" ads, regardless of whether such users have turned off Ad Personalization: "With personalization off, ads you see can still be based on general factors, like the subject of what you're looking at, the time of day, ***or your general location***."[71]  Google in fact discourages users from turning off the Ad Personalization setting, because it generates enormous revenue for Google and is a major revenue stream.  Today, if a user attempts to turn off Ad Personalization, he or she will first be led to a warning page,

---

[70] Google Ads (ads.google.com), *How it works* tab (Ex. 39).

[71] Google Ad Settings, Ad personalization (last visited July 2, 2020), available at https://adssettings.google.com. *See also Arizona v. Google LLC* Complaint, *supra* n.59 (Ex. 32), at 3 (discussing "deception in ads personalization" related to Google's Ads Personalization setting, although the details of Google's misconduct are entirely redacted).

informing the user that: he or she will continue to receive ads, although they will be "less useful

to you"; that the user will "no longer be able to turn off ads from specific advertiser"; and that

"Any advertisers or interests you've turned off won't be saved."[72]

90.     Stored location information thus unquestionably allows Google to direct

advertisements to users in specific geographic locations, users who frequently travel through or

near those locations, and users whose profiles and projected behavior patterns—built using data

about their movements and locations—suggest they would react to certain advertisements in a

way that is profitable to the advertiser, and thus to google.  Google offers services for targeting

advertisements to users based on the users having been "recently in a location," something that

can only be determined when geolocation data is stored.[73]  In explaining to advertisers how to

"[t]arget your ads to people in—or who've shown interest in—geographic locations," Google

explains that it may detect users' "location[s] of interest" by evaluating "[a] person's past

physical locations."[74]  The data is fundamental to the fees Google sets for its services and

Google's resulting profits.  It is what enables Google to sell valuable services to third parties.

91.     At least one way that Google may use location information to serve targeted

advertisements to users, irrespective of such users' account settings, is described, *inter alia*, in its

patent for "Generating user information for use in targeted advertising."  U.S. Patent No.

9,235,849 (issued Jan. 12, 2016).  There, Google describes how "Geolocation information" can be

used to serve targeted advertising, and how it "may include information specifying one or more of

one or more countries, one or more (inter-country) regions, one or more states, one or more metro

areas, one or more cities, one or more towns, one or more boroughs, one or more areas with

common zip codes, one or more areas with common telephone area codes, one or more areas

served by common cable head end stations, one or more areas served by common network access

points or nodes, etc. It may include latitude and/or longitude, or a range thereof. It may include

---

[72] Google Ad Settings, Ad personalization (last visited July 2, 2020), available at
https://adssettings.google.com.
[73] Google Ads Help, *About advanced location options* (last visited June 30, 2020) (Ex. 40).
[74] Google Ads Help, *About targeting geographic locations* (last visited June 29, 2020) (Ex. 41).

1    information, such as an IP address, from which a user location can be estimated."  *Id.* at § 4.1.4.

2    As demonstrated by the AP Report, the "areas" at issue can be narrowed to show the precise

3    locations of a single individual.

4    92.    Relying on Google's '849 patent and a multitude of other sources, Harvard

5    professor Shoshana Zuboff explains how "Google's proprietary methods enable it to surveil,

6    capture, expand, construct, and claim behavioral [data], including data that users intentionally

7    choose not to share."[75]  Information users "choose not to share" includes location data that was

8    not meant to be stored after users opted out of Location History.

9    93.    Furthermore, building user profiles and generating advertising revenues are not the

10   only lucrative uses to which Google puts the location data it collects without consent.  Google

11   also uses location data to "build better services," to "maintain & improve [Google's] services,"  to

12   "develop new services," and to "measure performance,"[76] all of which enables Google to create

13   operational efficiencies and be competitive in a wide array of industries in addition to the

14   marketplace for consumer attention (advertising), where it also excels.  Google may also use

15   collections of locations and movements to develop new products in many different fields,

16   including in artificial intelligence, media, public health, finance, real estate, or surveillance and

17   law enforcement.

18   94.    Despite the fact that Google uses location data to generate unparalleled returns as

19   an advertising platform, as well as to further cost-saving advances in technological development

20   and otherwise, Google tells consumers something different.  In the portion of its current Privacy

21   Policy regarding "Your location information," Google asserts it collects such data for *users'*

22   benefit, to "offer features like driving directions for your weekend getaway or showtimes for

23   movies playing near you."[77]

24

25

26   [75] Shoshana Zuboff (2019) *The Age of Surveillance Capitalism*, Perseus Books, LLC, at 80 &
     n.44.

27   [76] *Google Privacy Policy*, *supra* n.16 (Ex. 10).

28   [77] *Id.*, at "Your location information."

95.     As with the extent of the location data it collects and stores, and how the data is stored, Google does not publicly disclose all of the uses to which that data is put, nor the precise measure of Google's profits and other benefits that result.  Google has enriched itself at the expense of consumers' individual rights and privacy interests.

## F.     Google Continues Its Deceptive Behavior.

96.     Google's users are still being deceived and tracked without consent.  As of the date of filing this Consolidated Complaint, if an individual goes to Google's Help Center[78] and inquires "How can I stop Google Tracking My Location?,"  the very first answer Google provides is still to "Manage your location history," directing the user to the "Location History" tool, which does *not* stop Google tracking the user's location.  None of the immediate results identify every step a user must take to achieve that result; indeed, it is unclear whether a means to truly prevent Google from storing Plaintiffs' and Class members' location data even exists.

97.     In its initial response to the AP Report on August 13, 2018, Google did not deny storing users' location information in contravention of their settings, but rather defended itself by falsely stating: "We provide clear descriptions of these tools."[79]

98.     Google's assertion that "clear descriptions" exist is incorrect.  *First*, Google disingenuously and publicly represented that preventing the storage of location data is as easy as turning "off" a settings switch, all the while aware that such action would be ineffective.  Google silently endorsed well-known technology periodicals that, as set forth in paragraph 136, propagated Google's falsehood that toggling off "Location History" is an effective tool to prevent tracking.  *Second*, while perpetuating the myth of an effective "Location History" switch, Google failed to make reasonably clear to users that they must take at least one wholly separate, complicated, and poorly-labeled route in order to turn off location tracking (if this route is in fact effective), *i.e.*, locating, identifying, and understanding a deeply-buried and non-obvious setting titled "Web & App Activity."[80]

---

[78] Google Help, *How can I stop Google Tracking My Location?* (last visited June 24, 2020), search performed at https://support.google.com.
[79] AP Report, *supra* n.2 (Ex. 2).
[80] This function is set by default to share the user's information, including location.

99.     Three days after the AP Report was published, on August 16, 2018, Google reversed course and revised the description on its help page for the "Location History" setting—which previously stated simply "With Location History off, the places you go are no longer stored"—to read:

> This setting does not affect other location services on your device, like Google Location Services and Find My Device. Some location data may be saved as part of your activity on other services, like Search and Maps. When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account.[81]

100.    With this revision, Google disclosed *for the first time* that Google "may" track "some" users even after they have turned "Location History" off.

101.    Google has since amended its public-facing statements further.  In addition to revealing that "[s]ome location data may continue to be saved in other settings," Google now provides more previously-concealed "examples" of how Google "may" collect and store information regardless of a user's Location History permissions, including through the user's "camera app."[82]

102.    However, Google's new language remains vague, ambiguous, and deceptive—particularly through the use of unclear language such as "*some* location data" and "*may* collect and store information."  Google fails to clearly and definitively disclose what location data is saved, and when.  In January 2019, the French National Data Protection Commission ("CNIL") addressed complaints regarding Google's data collection and use disclosures, and ultimately fined Google €50 million for failing to be transparent as required by the European Union's General Data Protection Regulation ("GDPR").  In its reported findings, CNIL noted, among other things, that relevant information about Google's geolocation tracking practices is "accessible after several steps only," that "information is not always clear nor comprehensive," and that "[u]sers are not able to fully understand the extent of the processing operations carried out."[83]

---

[81] Compare Ex. 11 (August 16, 2018 archived version captured at 04:09 a.m.) with Ex. 36 (August 18, 2018 archived version).
[82] *Manage Your Location History*, *supra* n.58 (Ex. 31).
[83] CNIL, *The CNIL's Restricted Committee Imposes a Financial Penalty of 50 Million Euros*

103.     In an amendment to its Privacy Policy dated January 22, 2019, Google introduced a new and dramatically different explanation of "Location History."  Whereas Google previously and pervasively described Location History as the tool that would "allow" Google to store a history of location data from any source (see *supra* paragraph 45), which users could turn "off" to prevent location data from being stored (see *supra* paragraphs 40-45), Google has now redefined it altogether, as nothing more than "a private map of where you go with your signed-in devices,"[84] providing insufficient explanation of its functioning.

104.     Further, Google still fails to specify what, if any, location data tracking is ceased when a user turns "Location History" off.  Google *still* fails to clearly disclose the "Web & App Activity" setting, and how (and whether) it, or any other number of permissions settings, can be used to effectively prevent Google from recording location information.  As discussed at Section VI.F, *infra*, as of the filing of this Consolidated Complaint, when an individual queries Google's Help Center on how to stop Google from tracking location information, Location History is still presented as an effective tool.

## G.     Google's Storage of Location Data Defies Reasonable Expectations of Privacy and Egregiously Violates Established Social Norms.

105.     Each of the following acts defy social norms and invade reasonable privacy expectations: Tracking and storing detailed location information contrary to users' consent, affirmatively misleading users regarding their ability to opt out, and failing to disclose that a history of users' locations are stored in perpetuity.  Normally, mobile device and Internet users such as Plaintiffs are able to control the flow of sensitive information about themselves through "settings" and "permissions" that they grant, or withhold, from third parties, particularly private parties such as Google.  Plaintiffs' and Class members' expectations that those settings and permissions would be heeded and effective, and that they could travel without creating a record of their movements, are eminently reasonable.

---

*against Google LLC* (January 21, 2019) (Ex. 42).  In June 2020, the fine was upheld on appeal.
[84] *Google Privacy Policy*, *supra* n.16 (Ex. 10).  *See also*
https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy Policies*).

106.    Google falsely represented to Plaintiffs and Class members that it would not store their location information, thus creating the false impression that Class members could use Google's services in a privacy-protective manner.  Insofar as Google might need location information to provide class members with Google services such as Google Maps, with Location History disabled, any authorization to access location information for those services would only be granted for a specified, limited, and *transient* purpose.  Google gathered location data far in excess of any need to fulfill the limited purposes occasionally authorized by consumers, and thus far in excess of the data Google ever suggested it would collect.  Furthermore, by disabling Location History, Plaintiffs directed Google not to store any of their location information for any subsequent access, analysis, or use.  Storage creates additional risks of privacy harms, including because if location information is not stored, it cannot subsequently be used. Moreover, the storage of location information creates an individually identifiable, comprehensive record of that person, reflecting a wealth of detail about her associations ranging from familial to political to professional to religious and more.

107.    Plaintiffs and Class members took specific steps to protect their privacy and personal security (as well as the privacy and security of their minor children), and made reasonable efforts to stop Google from storing information regarding their whereabouts and day-to-day activities.  Based on Google's representations and omissions, context, and industry norms, they expected Google to heed and follow their instructions and, as a result, expected that their whereabouts would be *private*, not stored on Google's servers along with other personally-identifying information and data.  Those reasonable expectations were consistent with sentiments that are widely shared in American society and elsewhere, and grounded in long-standing social norms and jurisprudence protecting privacy.

### 1.    Plaintiffs' Expectations of Privacy are Enshrined in Law.

108.    Invasion of privacy has been recognized as a common law tort for more than a century.  In *Griswold v. Connecticut*, 381 U.S. 479 (1965), the Supreme Court confirmed the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right of privacy older than the Bill of Rights."  Most recently, the Supreme Court specifically recognized

the reasonable expectation of privacy a person has in the location information generated by her cell phone, in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  For its part, California amended its constitution in 1972 to specifically enumerate a right to privacy in its very first section.  *See* Cal. Const. Art. I, § 1.

109.    The law provides especially robust protections for geolocation privacy.  In 1998, the California Legislature enacted California Penal Code 637.7, which states "No person or entity in this state shall use an electronic tracking device to determine the location or movement of a person."  (Cal. Pen. Code, § 637.7 (a)).  This measure was accompanied by the statement that reads: "The Legislature finds and declares that the right to privacy is fundamental in a free and civilized society and that the increasing use of electronic surveillance devices is eroding personal liberty. The Legislature declares that electronic tracking of a person's location without that person's knowledge violates that person's reasonable expectation of privacy." (Stats. 1998, ch. 449, § 1).

## 2.    Plaintiffs' Expectations Reflect Widely Held Social Norms.

110.    As observed by the Supreme Court in *Carpenter*, a smartphone, tablet, or other mobile device is a constant in many people's lives. Indeed, an Internet-connected digital device is a pre-requisite for modern life, necessary for the full continuum of daily activities, from work to commerce to communication (both professional and personal) to obtaining basic government services.  Because of the indispensable nature of connected devices to the entire spectrum of daily life, many Americans carry their mobile devices everywhere they go.  In a 2015 study, 94% of smartphone owners said they carry their phone with them frequently, and 82% say they never or rarely turn their phones off.[85]  Likewise, Plaintiffs here carry their devices with them on a regular basis throughout the day.

111.    In light of the ubiquity of Internet-enabled mobile devices, and in light of those same devices' capacity for near perfect surveillance, society unequivocally has embraced the need to secure and enforce the right of all people to determine for themselves when, and to what extent,

---

[85] Lee Rainie and Kathryn Zickuhr, *Americans' Views on Mobile Etiquette*, Pew Research Center (August 26, 2015) (Ex. 43).

1  data produced by these devices regarding peoples' lives and activities will be shared, cataloged,

2  and analyzed.

3      112.   By collecting and storing location data without consumers' awareness or consent,

4  Google has violated social norms that are firmly established in American culture and law.  It is

5  widely recognized that "Americans would never consent to a government directive that all

6  citizens carry a device that broadcast, in real time, their physical location and archived that

7  information in repositories that could be shared among powerful, faceless institutions."[86]

8  Musician Mary Milliben, whom the *New York Times* identified based on a trove of location data

9  derived from mobile devices, cautioned, "To know that you have a list of place I have been, and

10  my phone is connected to that, that's scary.  What's the business of a company benefiting off of

11  knowing where I am?"[87]

12      113.   In May 2020, the Attorney General of Arizona commenced an action alleging

13  "willfully deceptive and unfair acts and practices" by Google, for making it "impractical if not

14  impossible for users to meaningfully opt-out of Google's collection of location information."[88]

15  The Attorney General's complaint reveals that it is has had the benefit of obtaining relevant

16  information from Google pursuant to its investigatory powers, however, the facts learnt from that

17  investigation are being kept hidden from Google's users, as much of the relevant facts have been

18  redacted from the public record.  That investigation was followed by the Attorney General's

19  finding as set forth in its complaint that "even with Location History off, Google would

20  surreptitiously collect location information through other settings such as Web & App Activity

21  and use that information to sell ads."[89]  The complaint also suggests that there is significant

22  information, known to Google, that has not yet been disclosed in this action.  The complaint

23  explains that "Arizona's investigation has revealed that Google's deceptive and unfair conduct

24

25  [86] Charlie Warzel & Stuart A. Thompson, *Where Even the Children Are Being Tracked*, New
    York Times (December 21, 2019) (Ex. 22).

26  [87] *Id.*

27  [88] Ryan Randazzo, *Arizona attorney general sues Google, alleges the tech giant fraudulently
    collects users' location data*, azcentral. (May 27, 2020) (Ex. 45).

28  [89] *Arizona v. Google LLC* Complaint, *supra* n.59 (Ex. 32), at 2.

extends well beyond its false Location History disclosure," including a "relentless drive" by Google to "make it exceedingly hard for users to understand what is going on with their location information, let alone opt out of this morass."[90] According to the complaint, Location History and Web & App Activity are "two of the primary settings through which Google misleads, deceives, and conceals material information from consumers," but at least ten additional "settings" may relate to Google's collection of location data from mobile devices.[91]  The Attorney General found that Google's array of settings "misleads and deceives users of Google's products into believing that they are not sharing location information when they actually are."[92] Among those are "Device-Level" settings such as "Wi-Fi scanning" and "Wi-Fi connectivity" which can be switched off, ostensibly to provide user control over Google's ability to track their locations using Wi-Fi sensors, but which actually "mislead[] users into providing location to Google even if they do not want to," according to the Attorney General's investigation.[93]

114.    Federal lawmakers also have challenged the fundamental disconnect between consumer expectations, and conduct such as Google's with respect to the collection, storage, and use of personal data.  On June 18, 2020, Senator Sherrod Brown of Ohio introduced a bill founded upon the longstanding principle that "the right to privacy protects the individual from intrusions into seclusion, protects individual autonomy, safeguards fair use of data that pertains to the individual, [and] advances the just use of data."[94]  Senator Brown's Data Accountability and Transparency Act of 2020 would incorporate societal standards into federal law, by prohibiting collection, use, or sharing of personal data except for certain purposes, such as providing a requested good or service.[95]  As aptly summarized by Justin Brookman, director for consumer privacy and technology policy at Consumer Reports, the bill would codify the common

---

[90] *Id.*

[91] *Id.*, at 11-12, 14.

[92] *Id.*, at 11-12.

[93] *Id.* at 21.

[94] Data Accountability and Transparency Act of 2020, Discussion Draft, available at https://www.banking.senate.gov/download/brown_2020-data-discussion-draft.

[95] *Id.*

understanding (currently protected at common law) that "[c]ompanies should only use and share personal data to deliver the services and products we ask for."[96]

115.    These social norms and expectations are also well-established outside the United States.  As the United Kingdom of Great Britain's Court of Appeal held in a case against Google concerning its unauthorized collection of browser data: "'Privacy lies at the heart of liberty in a modern state.  A proper degree of liberty is essential for the well-being and development of an individual.'"  *Lloyd v. Google LLC*, [2019] EWCA Civ 1599, at ¶ 49 (2019).

116.    On November 27, 2018, the same day Forbrukerrådet published its research regarding unethical location tracking practices by Google (*supra*, paragraph 49), seven European consumer organizations—Forbrukerrådet, Consumentenbond (The Netherlands), Ekpizo (Greece), dTest (Czech Republic), Zveza Potrošnikov Slovenije (Slovenia), Federacja Konsumentów (Poland) and Sveriges Konsumenter (Sweden)—filed complaints with their national data protection authorities, alleging practices by Google similar to the allegations herein.[97]  In January 2019, the Swedish Data Protection Authority *Datainspektionen* demanded that Google explain why Google's access to the location data of users of mobile users through "Location History" and "Web & App Activity" do not violate the GDPR.[98]  On January 21, 2019, Dutch consumer organization Consumentenbond presented Google with a petition signed by more than 50,000 consumers that objected to the secret storage of location information by Google.[99]

117.    On October 29, 2019 Australia's Competition and Consumer Commission brought suit against Google alleging that misleading representations about Location History and Web & App Activity wrongfully enabled Google to collect, keep, and use "highly sensitive and valuable personal information about consumers' location without them making an informed choice."[100]

---

[96] Allison Grande, *Senate Bill Would Curtail Data Use, Create New Privacy Cop*, Law 360 (June 18, 2020) (Ex. 46).

[97] Press Release, *Consumer groups across Europe file complaints against Google for breach of GDPR* (November 27, 2018) (Ex. 47).

[98] Datainspektionen, *Request for Reply and Further Clarification to Google LLC* (January 18, 2019) (Ex. 48).

[99] Janene Pieters, *Dutch Petition against Google's Location Tracking Gets 50,000 Signatures*, Nltimes.nl (January 22, 2019) (Ex. 49).

[100] Rachel Pannett, *Google to Face Court on Claims It Misled Australians on Personal Data*, The

And on February 4, 2020, having received complaints concerning Google's location tracking practices from numerous European consumer organizations, the Irish Data Protection Commission announced that it would undertake an independent investigation of whether Google has a valid legal basis for processing the location data of its users and whether it meets its transparency obligations.[101]

118.    Google itself has long acknowledged the importance of user control over privacy settings. In 2009, when announcing its Latitude location-sharing feature, Google again emphasized both the sensitivity of location data and the privacy implications: "Fun aside, we recognize the sensitivity of location data, so we've built fine-grained privacy controls right into the application."[102] And when Location History was first launched, in 2009, Google promised that users "can disable it at any time."[103]  In September of this year, Google's Chief Privacy Officer testified to United States Senate Committee on Commerce, Science, and Transportation that "users trust [Google] to keep their personal information confidential *and under their control*."[104] In testimony on December 11, 2018 at the House Judiciary Committee hearing on Transparency and Accountability, Google's Chief Executive Officer expressly agreed that geolocation tracking of consumers (such as Plaintiffs and Class members here) should occur, if at all, only on an *opt-in* basis because precise geolocation information is "considered highly, highly sensitive."[105]

---

Wall Street Journal (October 29, 2019) (Ex. 50).

[101]   *Data Protection Commission launches Statutory Inquiry into Google's processing of location data and transparency surrounding that processing*, Irish Data Protection Commission (February 4, 2020) (Ex. 51).

[102] *See, supra*, n.55 (Ex. 26).

[103] *See, supra*, n.56 (Ex. 27).

[104] Written Testimony of Keith Enright Chief Privacy Officer, United States Senate Committee on Commerce, Science, and Transportation, *Examining Safeguards for Consumer Data Privacy*, (September 26, 2018) (emphasis added), at 2 (Ex. 52).

[105] Representative Karen Handel asked: "For years, a Federal Trade Commission, on a bipartisan basis, has affirmed that precise geolocation information is considered highly, highly sensitive. And that consumers must opt in to that. Do you agree with that?"  Google's Chief Executive Officer responded: "Yes, I agree with that." *See* Testimony of Sundar Pichai, Google Chief Executive Officer, United States House of Representatives Judiciary Committee, *Transparency and Accountability: Examining Google and its Data Collection, use and Filtering Practices* (December 11, 2018) at 53 (Ex. 4).

119.    According to a poll by the Pew Research Center, 93% of adults believe that being in control of who can get information about them is important, and 90% believe that controlling what information is collected about them is important.[106]  Additionally, Americans say they do not approve of observation without consent: 88% say it is important that they not have someone watch or listen to them without their permission.[107]

120.    According to a 2013 Pew Research study, "86% of Internet users have tried to be anonymous online and taken at least one step to try to mask their behavior or avoid being tracked."[108]  For example, 64% percent of adults claim to clear their cookies and browser histories in an attempt to be less visible online.[109]  Such behaviors exemplify people's expectation that their personal information—including their location—will not be tracked by others without their consent or permission, and that settings claiming to allow them to protect such information will be effective.

121.    A 2010 study comparing the opinions of young adults between the ages of 18 to 24 with other age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage of young adults were in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions.[110]  For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.[111]

122.    The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them."

---

[106] Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Research Center (May 20, 2015) (Ex. 53).
[107] *Id.*
[108] Lee Rainie, et al., *Anonymity, Privacy, and Security Online*, Pew Research Center (September 5, 2013) (Ex. 54).
[109] *Id.*
[110] Chris Hoofnagle, et al., *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies*, University of Pennsylvania Scholarly Commons (April 14, 2010) (Ex. 55).
[111] *Id.* at 11.

A majority of the 18- to 24-year-olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's personal information illegally; across all age groups, 69% of individuals opted for the highest fine.  Beyond a fine, approximately half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally: putting them out of business and imposing jail time.[112]

### 3.   Parents Have a Reasonable and Universal Expectation of Privacy for their Children.

123.    In surreptitiously and deceitfully tracking and recording individuals' location information, Google tracked minor children, a practice that is especially and universally reviled.

124.    Parents' interest in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by society.  There is a strong tradition of parental concern for the nurture and upbringing of children in light of children's vulnerable predispositions.  Our society recognizes that parents should maintain control over who interacts with their children and how, in order to ensure the safe and fair treatment of their children.

125.     By way of example, American society has expressed heightened concern for the exploitation of children in numerous ways:

a.      At common law, children under the age of eighteen do not have full capacity to enter into binding contracts with others.  The law shields minors from their lack of judgment, cognitive development, and experience.

b.      Under state law, children are frequently protected via parental consent requirements.  Cal. Civ. Code § 3344 requires "the prior consent of [a] parent or legal guardian" in order for a person to use the name or likeness of a minor under the age of eighteen for advertising purposes.  The California Education Code does not allow access to personal data collected from students without parental consent.  (Cal. Educ. Code § 49076(a)).  Various bills pending before the California State legislature seek to protect parental autonomy over children

---

[112] *Id.* at 15-16.

engaged in online activities.  In addition, the State of California filed an *amicus curiae* brief in *Fraley, et al. v. Facebook, Inc.*, 11-cv-01726 (N.D. Cal., filed Apr. 4, 2011) in which it stated: "Protecting children's information is of particular importance, because of their still-developing capacities and the potential for misuse of their information to affect their futures."

c.      State laws also outright ban certain forms of targeted advertising to children.  The California Student Online Personal Information Protection Act ("SOPIPA") requires that operators of mobile applications marketed for use in K-12 schools not engage in "targeted advertising," "amass a profile" of children, or sell children's information, based upon any information, including "persistent unique identifiers" (including geolocation), that the operator has acquired through use of its apps or services.

d.      At the federal level, the Children's Online Privacy Protection Act ("COPPA") protects, *inter alia*, children's Personal Data from being collected and used for targeted advertising purposes without parental consent, and reflects a clear nationwide norm about parents' expectations to be involved in how companies profile and track their children through use of technology.

126.    Legislative commentary about the need for federal law to provide protections for children provides another expression of society's expectation that companies should not track children's activities without obtaining parental consent.  For example, when discussing the need for federal legislation to protect children's privacy—which eventually led to Congress passing COPPA—Senator Richard Bryan (the primary author of the COPPA bill) stated:  "Parents do not always have the knowledge, the ability, or the opportunity to monitor their children's online activities, and that is why Web site operators should get parental consent prior to soliciting personal information.  The legislation that Senator McCain and I have introduced will *give parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent*."[113]

---

[113] *S. 2326: Children's Online Privacy Protection Act of 1998*, Hearing before Senate Subcommittee on Communications, Statement of Sen. Bryan, S. Hrg. 105-1069, at 4 (September 23, 1998) (emphasis added) (Ex. 56).

127.     The advertising industry's own privacy standards, and the self-regulatory agencies which serve it, also support enhanced protections for children online, including obtaining parental consent.  For example, "[t]he majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%)."[114]

128.     In the same vein, the Children's Advertising Review Unit, an arm of the advertising industry's self-regulation branch, recommends that companies take the following steps, *inter alia*, to meet consumers' reasonable expectations of privacy and avoid violating the law:

a.     Advertisers have special responsibilities when collecting data from children online.  They should take into account the limited knowledge, experience, sophistication and maturity of the audience, and must clearly disclose to website or online service users their information collection and tracking practices, information uses, and the means for correcting or removing the information. These disclosures should be prominent and readily accessible before information is collected.

b.     They should disclose passive means of collecting information from children (*e.g.*, navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

c.     They must obtain "verifiable parental consent" before they collect, use or disclose personal information to third-parties, except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.

d.     To respect the privacy of parents, they should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time. [115]

---

[114] Kristien Daems, et al., *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. Marketing Comms. 8 (2017) (Ex. 57).
[115] Children's Advertising Review Unit, *Self-Regulatory Program for Children's Advertising* (2014), at 17 (Ex. 58).

129.     Survey research confirms that societal expectations respecting children's rights to be free from unknown location tracking are fundamental.  A survey published in 2012 by two leading nonprofit groups, the Center for Digital Democracy and Common Sense Media, found that 91% of both parents and adults believe it is not "OK" for advertisers to collect information about a child's location from that child's mobile phone, and 94% of parents and 91% of adults agree that advertisers should receive the parent's permission before putting tracking software on a child's computer.[116]

130.     By surreptitiously tracking and storing the location information of minor children, and providing misleading and outright deceptive disclosures regarding its practices, Google has breached parents' and their children's reasonable expectation of privacy, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

**4.      The Federal Trade Commission Has Identified Surreptitious Tracking and Storage of Location Information as a Deceptive Trade Practice.**

131.     The Federal Trade Commission ("FTC" or Agency) has determined that tracking individuals' geolocations without permission (and in contravention of their instructions) is a deceptive trade practice.  Indeed, the FTC expressly weighed in on the legality of the very type of behavior complained of herein, and found it to be a deceptive trade practice, in violation of Section 5 of the Federal Trade Commission Act.

132.     In June 2016, the FTC announced that it had entered into a settlement agreement with a mobile advertising company, InMobi PTE, after the Agency charged InMobi with deceptively tracking the locations of hundreds of millions of people without their knowledge or consent in order to serve advertisements tailored to individual people based on where they lived or places they visited.

---

[116] Center for Digital Democracy, *New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act (COPPA): Majority express concerns about new marketing and data-collection practices* (December 6, 2012), at 1 (Ex. 59).

133.    In that highly analogous case, the FTC alleged that InMobi represented to its users that: (i) its advertising software would only track users' locations when they opted in to such tracking, and (ii) it would conduct such tracking in a manner consistent with users' device privacy settings.[117]  According to the FTC complaint, however, InMobi was actually tracking consumers' locations whether or not the apps using InMobi's software asked for users' permission to do so, and engaged in tracking even when users explicitly *denied* permission to track and store location information.[118]

134.    As a result of the FTC enforcement action, InMobi agreed to pay $950,000 in civil penalties and implement a comprehensive privacy program, including a prohibition from collecting individuals' location information without their affirmative express consent and a requirement that InMobi honor consumers' location privacy settings.  The company was required to delete all of the user location information it had collected and stored without consent and was prohibited from further misrepresenting its data collection practices.  The settlement also required InMobi to institute a comprehensive privacy program to be independently audited every two years for 20 years from the date of settlement.[119]

135.    The activities engaged in by Google, as detailed in this complaint, mirror location tracking activities condemned and sanctioned by the FTC.

**H.    Google's Deception Compounds the Outrageous Nature of its Conduct.**

136.    Google claimed to offer people a choice when it came to their location information.  In stating that users could adjust privacy settings to control whether Google stores their location, Google warranted that it would respect those users' privacy choices.  In reality, Google rendered users' choices meaningless: Google stored location data despite the permissions

---

[117] Federal Trade Commission, *Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission* (June 22, 2016) (Ex. 60).

[118] *Id.*

[119] Stipulated Order for Permanent Injunction and Civil Penalty Judgment, *United States of America v. InMobi Pte, Ltd.*, Case No. 3:16-cv-3474 (N.D. Cal. [June 22, 2016]) (Dkt. No. 2-1), available at https://www.ftc.gov/system/files/documents/cases/160622inmobistip.pdf.

and instructions that users provided through those very settings. Google's storage and tracking of users' location information and movement history was surreptitious and purposely deceptive.

137.    Not only were Google's representations about privacy *likely* to deceive people, Google *did* deceive the billions of people who use its products.  Not only did ordinary users, including Plaintiffs, reasonably conclude that turning "Location History" off meant that their location would not be tracked and stored, but sophisticated media professionals who cover developments in technology, as well as knowledgeable computer scientists, academics, and regulators, were also deceived.  For example:

    a.    Only two weeks before the AP Report was published, a website devoted exclusively to topics concerning mobile devices running on Google's Android platform ("Android Central") published an article titled "How to view your location history in Google Maps," under the heading "How to disable location tracking."  In the article, the author—based on Google's misrepresentations—writes, "There's also the option to pause tracking for your account as a whole. To do so, toggle **Location History** to off, and select **OK** in the dialog box that follows.  That's all there is to it!"[120]

    b.    Similarly, the computer security firm Sophos publishes a website dedicated to mobile privacy and security topics, called "Naked Security."  In an October 2017 article, the author stated—based on Google's misrepresentations—that preventing Google from tracking you "was as simple as going to Settings > Location (under personal) > Google Location History and selecting 'off'.  For comprehensive details on switching off and deleting your location history, go to Google's Manage or delete your Location History page."[121]  As discussed in paragraphs 40-45, *supra*, this page instructed users to utilize the "Location History" setting to prevent location tracking.

---

[120] Harish Jonnalagadda, *How to view your location history in Google Maps*, Android Central (July 20, 2018) (emphasis in original) (Ex. 61).
[121] Matt Boddy, *The Google tracking feature you didn't know you'd switched on*, NakedSecurity by Sophos (October 3, 2017) (Ex. 62).

c.      An online tutorial on WikiHow, titled "How to Disable Google Location History," explains—based on Google's misrepresentations—that "[w]hen you use some Google products like Google Search and Google Maps, Google collects your location information," and further indicates that the way to disable this location tracking is by following the steps described in paragraphs 41-42, *supra*.  This tutorial shows that the authors believed "Location History" was the key to preventing storage of location data, and only referred to the "Web & App Activity" section as a landmark for navigating to "Location History," and not as a setting that implicated the storage or use of location information in any way.  Specifically, it stated: "Navigate to 'Location History' section. You can see it under the Web & App Activity segment." [122]  The article does not indicate that "Web & App Activity" settings control location tracking and storage.

138.    Additionally, in the AP Report, multiple sophisticated researchers, regulators, and elected officials stated—based on Google's misrepresentations—that they believed Google's representations concerning the efficacy of the "Location History" setting to be deceitful.  They stated that they were unaware that Google tracked individuals even if "Location History" had been turned off.  For example, Jonathan Mayer, a Princeton computer scientist and former chief technologist for the Federal Communications Commission's Enforcement Bureau, stated, "If you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off.  That seems like a pretty straightforward position to have."[123]

139.    Lawmakers were misled as well.  Senator Mark Warner of Virginia indicated that Google's "corporate practices . . . diverge wildly from the totally reasonable expectations of their users."[124]  Representative Frank Pallone of New Jersey called for "comprehensive consumer privacy and data security legislation" in the wake of the AP Report.[125]  In response to suggestions by Google's counsel at a recent Senate Judiciary Committee Hearing that Google's storage and

---

[122] WikiHow, *How to Disable Google Location History* (printed on November 19, 2018) (Ex. 63).
[123] AP Report, *supra* n.2 (Ex. 2).
[124] *Id.*
[125] *Id.*

use of location information is "complicated," Senator Josh Hawley stated: "I think when somebody turns off their user information, their location history, they expect the location tracking to be off.  But it's not in fact.  They don't have a way, apparently, to turn it off. . . .  What's complicated is you don't allow consumers to stop your tracking of them.  You tell them that you do.  You would anticipate that they do.  A consumer would have a reasonable expectation based on what you've told them that they're not being tracked, but in fact you're still tracking it.  You're still gathering the information, and you're still using it."[126]

## VII.    CLASS ALLEGATIONS

140.    Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes, which are jointly referred to throughout this Complaint as the "Class:"

> **Android Class:** All natural persons residing in the United States who used Android mobile devices and whose location information was stored by Google while "Location History" was disabled.

> **Apple Class:** All natural persons residing in the United States who used Apple mobile devices and whose location information was stored by Google while "Location History" was disabled.

> **Parent Subclass**: All parents and/or legal guardians of persons who, while such persons were younger than the age of 18, used mobile devices, and whose location information was stored by Google while "Location History" was disabled.

141.    Plaintiff Patacsil seeks to represent the Android Class and Apple Class; Plaintiffs Oshana and Mahon seek to represent the Android Class; Plaintiff Gamboa seeks to represent the Apple Class; and Plaintiff Childs seeks to represent the Parent Subclass.

142.    Excluded from each Class are the following individuals: officers and directors of Google and its parents, subsidiaries, affiliates, and any entity in which Google has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

---

[126] Testimony of Will Devries, *supra* n.3, at 15-16 (Ex. 3).

143.    Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

144.    This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a.    Each Class is so numerous that joinder of all members is impracticable. Upon information and belief, Class members number in the millions.

b.    There are questions of law or fact common to the Classes.  These questions include, but are not limited to, the following:

i.    Whether Google's acts and practices complained of herein amount to egregious breaches of social norms;

ii.    Whether Google acted intentionally in violating Plaintiffs' and Class members' privacy rights;

iii.    Whether Google was unjustly enriched and/or breached a contract as a result of its violations of Plaintiffs' and Class privacy rights;

iv.    Whether an injunction should issue; and

v.    Whether declaratory relief should be granted.

c.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class members, took efforts to prevent their mobile devices' location information from being recorded and stored by Google.  Plaintiff Childs, like all Parent Subclass members, took efforts to prevent his minor child's mobile device's location information from being recorded and stored by Google.  Despite these efforts and contrary to Google's representations, Plaintiffs and Class members nonetheless had their location information recorded and stored by Google.  Plaintiffs and the Class members did not consent to Google's storage of their location information, which acts form the basis for this suit.

d.    Moreover, like all Class members, Plaintiffs suffer a substantial risk of repeated injury in the future.  Each Plaintiff continues to use a mobile device that is capable of reporting location data to Google.  Google has shown deliberate indifference to Plaintiffs' and Class members' instructions regarding storing their location information, and has indeed taken

pains to deceive and mislead Plaintiffs (and all Class members) and to conduct its business contrary to their instruction, and contrary to the plain meaning of its own terms of service in favor of surreptitiously and deceitfully storing location information.  Google's deceptive and deliberate actions have thwarted and continue to threaten Plaintiffs' (and Class members') ability to exercise control over their own privacy while using their devices.  Because the conduct complained of herein is systemic, Plaintiffs and all Class members face substantial risk of the same injury in the future.  Google's conduct is common to all Class members and represents a common pattern of conduct resulting in injury to all members of the Class.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to any other Class member.

e.      Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class members.  Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation.  Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class.  Federal Rule of Civil Procedure 23(a)(4) and 23(g) are satisfied.

f.      In acting as above-alleged, and in failing and refusing to cease and desist despite public outcry, Google has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

g.      Injunctive relief is necessary to prevent further unlawful and unfair conduct by Google.  Money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Google from continuing to commit its illegal and unfair violations of privacy.

**VIII.   FRAUDULENT CONCEALMENT AND TOLLING**

145.    The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above.  Plaintiffs and Class members were ignorant of

1    the information essential to the pursuit of these claims, without any fault or lack of diligence on

2    their own part.

3         146.    At the time the action was filed, Defendant was under a duty to disclose the true

4    character, quality, and nature of its activities to Plaintiffs and Class members.  Defendant is

5    therefore estopped from relying on any statute of limitations.

6         147.    Defendant's fraudulent concealment is common to the Class.

7    **IX.**    **CAUSES OF ACTION**[127]

8
9    **Count One**<br>**(Intrusion Upon Seclusion)**

10        148.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

11        149.    Plaintiffs and Class members have reasonable expectations of privacy in their

12   mobile devices and their online behavior, generally.  Plaintiffs' and Class members' private

13   affairs include their locations.

14        150.    The reasonableness of such expectations of privacy is supported by Google's

15   unique position to monitor Plaintiffs' and Class members' behavior through its access to

16   Plaintiffs' and Class members' private mobile devices.  It is further supported by the surreptitious

17   and non-intuitive nature of Defendant's tracking.

18        151.    Google intentionally intruded on and into Plaintiffs' and Class members' solitude,

19   seclusion, or private affairs by intentionally and comprehensively tracking their locations and

20   movements. Additionally, for members of the Android Parent and Apple Parent Subclasses,

21   Google's wanton and surreptitious tracking and storing of Subclass members' children's location

22   information was an intentional intrusion on and into the solitude, seclusion, or private affairs of

23   Subclass members and their children.

24        152.    These intrusions are highly offensive to a reasonable person.  This is evidenced by,

25   *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter*

26   

---

27   [127] On December 19, 2019, the Court order the dismissal of the claim under CIPA.  ECF No. 113.
Plaintiffs reserve their rights to appeal that order, though they do not reallege their CIPA claim
28   here.

opinion), legislation enacted by Congress and the California legislature, rules promulgated and enforcement actions undertaken by the FTC, petitions and litigation initiated in the United States and abroad, countless studies, op-eds, and articles decrying location tracking, and Google's own statements.  Moreover, Google engaged in true tracking of location information deceptively and in direct contradiction of the express instructions of Plaintiffs and the members of the Class.  Also supporting the highly offensive nature of Defendant's conduct is the fact that Defendant's principal goal was to surreptitiously monitor Plaintiffs and Class members.

153.    Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

154.    Google's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

155.    As a result of Google's actions, Plaintiffs and Class members seek damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Google's actions—which were malicious, oppressive, and willful— were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Google from engaging in future misconduct.

## Count Two
### (California Constitutional Right to Privacy)

156.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

157.    Plaintiffs and Class members have reasonable expectations of privacy in their mobile devices and their online behavior, generally.  Plaintiffs' and Class members' private affairs include their behavior on their mobile devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by location tracking.

158.    Google intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, right of privacy, or private affairs by intentionally and comprehensively tracking their locations and movements.  Additionally, for members of the Parent Subclass, Google's wanton and surreptitious tracking and storing of Subclass members' children's location information was

1    an intentional intrusion on and into the solitude, seclusion, right of privacy, or private affairs of

2    Subclass members and their children.

3         159.   These intrusions are highly offensive to a reasonable person, because they

4    disclosed sensitive and confidential location information, constituting an egregious breach of

5    social norms.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and

6    forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress and the

7    California legislature, rules promulgated and enforcement actions undertaken by the FTC,

8    petitions and litigation initiated in the United States and abroad,  countless studies, op-eds, and

9    articles decrying location tracking, and Google's own statements.

10        160.   Plaintiffs and Class members were harmed by the intrusion into their private

11   affairs as detailed throughout this Complaint.

12        161.   Google's actions and conduct complained of herein were a substantial factor in

13   causing the harm suffered by Plaintiffs and Class members.

14        162.   As a result of Google's actions, Plaintiffs and Class members seek damages and

15   punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek

16   punitive damages because Google's actions—which were malicious, oppressive, and willful—

17   were calculated to injure Plaintiffs and Class members and made in conscious disregard of

18   Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Google from

19   engaging in future misconduct.

20                            **Count Three**[128]
                **(Unjust Enrichment (Quasi-Contract Claim for Restitution and Disgorgement) or,**
21                         **alternatively, Breach of Contract)**

22        163.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

23        164.   Plaintiffs and Class members unwittingly conferred a benefit upon Google.

24   Google took and retained valuable personal location information belonging to Plaintiffs and Class

25

26

27   ───────────────

28   [128] Plaintiffs plead this Count contingent on the Court granting Plaintiffs' Motion for Leave, filed
     herewith.

1    members when it intentionally and comprehensively tracked their locations and movements

2    without their consent.

3         165.    Google was enriched when it utilized Plaintiffs and Class members' location

4    information stored without consent for its own financial advantage to optimize its advertising

5    platform, including by allowing its paying advertisers to target Plaintiffs and Class members for

6    lucrative advertisements based on previous locations they had visited.

7         166.    Google was enriched when it utilized Plaintiffs and Class members' location

8    information stored without consent for its own financial advantage to build better services, to

9    maintain and improve Google's services, to develop new services, and to measure performance,

10   all of which enable Google to, and which Google does use, to create operational efficiencies and

11   be competitive in a wide array of industries.

12        167.    In exchange for Plaintiffs' and Class members' loss of privacy and the financial

13   benefits Google enjoyed as a result thereof, including, but not limited to, advertising profits,

14   Plaintiffs and Class members received nothing.

15        168.    It would be inequitable for Google to retain the benefits it has unjustly received.

16   Therefore, as a result of Google's actions, Plaintiffs and Class members seek an order that Google

17   disgorge the profits and other benefits it has unjustly obtained.

18        169.    Alternatively, to the extent Google successfully asserts that the Terms of Service

19   form a binding contract that sufficiently defines the parties' rights regarding Google's use of

20   Plaintiffs' and Class members' location information, thereby rendering a claim for unjust

21   enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that

22   Google's conduct constitutes a breach of any such binding contract.  Although Google has

23   amended its privacy policy more than sixteen times in the past six years, it has consistently made

24   representations promising that users control what data Google collects about them through

25   settings that users can customize.  For example, Google's Terms of Service incorporate Google's

26   Privacy Policy, and in that Privacy Policy, Google promises that "you can adjust your privacy

27

28

settings to control what we collect and how your information is used." [129]   By virtue of Google's conduct as alleged herein, including the storing of Plaintiffs' and Class members' location information in contravention of their Location History setting, Google breached the relevant promises it made in the Terms of Service.

## II.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Google and that the Court grant the following:

A.   An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, that Plaintiffs' attorneys shall be appointed as Class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that Class notice be promptly issued;

B.   Judgment against Google for Plaintiffs' and Class members' asserted causes of action;

C.   Appropriate declaratory relief against Google;

D.   Injunctive relief in the form of, *inter alia*, an order enjoining Google from continuing its practice of recording and using Plaintiffs' and Class members' location information against their instructions;

E.   Injunctive relief requiring Google to destroy all data acquired, created, or otherwise obtained from the unlawful recording and storage of the location information of Plaintiff and Class members;

F.   An order awarding Plaintiffs and the Class members damages, special damages, general damages, restitution, and disgorgement of profits, benefits, and any other value unjustly obtained to prevent and/or remedy Google's unjust enrichment;

G.   An order requiring Google to pay punitive damages and exemplary damages;

H.   An order requiring Google to pay pre-judgment and post-judgment interest;

I.   Reasonable attorney's fees and costs reasonably incurred; and

---

[129] *Google Privacy Policy* (effective July 1, 2020) (Ex. 10).

1      J.      Any and all other and further relief to which Plaintiffs and the Class may be

2  entitled.

3  **III.    DEMAND FOR JURY TRIAL**

4      Plaintiffs hereby demand a trial by jury of all issues so triable.

5

6  Dated: July 6, 2020                    Respectfully Submitted,

7                                         */s/  Michael W. Sobol*

8                                         Michael W. Sobol (SBN 194857)
                                          msobol@lchb.com
9                                         Melissa Gardner (SBN 289096)
                                          mgardner@lchb.com
10                                        Michael Levin-Gesundheit (SBN 292930)
                                          mlevin@lchb.com
11                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                          275 Battery Street, 29th Floor
12                                        San Francisco, CA  94111-3339
                                          Telephone:  415.956.1000
13                                        Facsimile:  415.956.1008

14                                        Nicholas Diamand (*pro hac vice*)
                                          ndiamand@lchb.com
15                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                          250 Hudson Street, 8th Floor
16                                        New York,  NY 10013
                                          Telephone:  212.355.9500
17                                        Facsimile:  212.355.9592

18                                        */s/  Tina Wolfson*

19                                        Tina Wolfson (SBN 174806)
                                          twolfson@ahdootwolfson.com
20                                        Theodore Maya (SBN 223242)
                                          tmaya@ahdootwolfson.com
21                                        Bradley King (SBN 274399)
                                          bking@ahdootwolfson.com
22                                        Christopher Stiner (SBN 276033)
                                          cstiner@ahdootwolfson.com
23                                        AHDOOT & WOLFSON, PC
                                          10728 Lindbrook Drive
24                                        Los Angeles, CA 90024
                                          Telephone: 310.474.9111
25                                        Facsimile: 310.474.8585

26                                        *Interim Co-Lead Class Counsel*

27

28

1                                      Hank Bates (SBN 167688)
                                     hbates@cbplaw.com

2                                      CARNEY BATES & PULLIAM, PLLC
                                     519 W. 7th St.

3                                      Little Rock, AR 72201

4                                      Telephone:  501.312.8500
                                     Facsimile:  501.312.8505

5

6                                      Rosemary M. Rivas (SBN 209147)
                                     rrivas@zlk.com

7                                      LEVI & KORSINSKY, LLP
                                     388 Market Street, Suite 1300

8                                      San Francisco, CA 94111
                                     Telephone: 415.373.1671

9                                      Facsimile: 415.484.1294

10

11                                      Paul R. Wood (*pro hac vice*)
                                     woodp@fdazar.com

12                                      FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                     14426 East Evans Avenue

13                                      Aurora, CO 80014
                                     Telephone: 303.757.3300

14                                      Facsimile: 720.213.5131

15                                      Melissa R. Emert (pro hac vice)
                                     memert@kgglawy.com

16                                      KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
                                     747 Chestnut Ridge Road, Suite 200

17                                      Chestnut Ridge, NY 10977
                                     Telephone: 845.356.2570

18                                      Facsimile: 845.356.4336

19

20                                      Andrew J. Brown (SBN 160562)
                                     andrewb@thebrownlawfirm.com

21                                      THE LAW OFFICES OF ANDREW J. BROWN
                                     501 W. Broadway, Suite 1490

22                                      San Diego, CA 92101
                                     Telephone: 619.501.6550

23

24                                      *Interim Class Counsel*

25

26

27

28     2005191.10

# EXHIBIT 1

1

**LIEFF CABRASER HEIMANN**
   **& BERNSTEIN, LLP**

2   Michael W. Sobol (SBN 194857)
msobol@lchb.com

3   Melissa Gardner (SBN 289096)
mgardner@lchb.com

4   Michael Levin-Gesundheit (SBN 292930)
mlevin@lchb.com

5   275 Battery Street, 29th Floor
San Francisco, CA  94111

6   Telephone:  415.956.1000
Facsimile:  415.956.1008

7   **LIEFF CABRASER HEIMANN**
   **& BERNSTEIN, LLP**

8   Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com

9   250 Hudson Street, 8th Floor
New York, NY  10013

10   Telephone:  212.355.9500
Facsimile:  212.355.9592

11   *Interim Co-Lead Class Counsel*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
~~Alex R. Straus~~Theodore Maya (SBN
~~321366~~223242)
~~astraus~~tmaya@ahdootwolfson.com
~~Brad~~Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15                            **SAN JOSE DIVISION**

16

17   IN RE GOOGLE LOCATION HISTORY
LITIGATION

Case No. 5:18-cv-05062-EJD

18

**AMENDED CONSOLIDATED CLASS
ACTION COMPLAINT**

19

20   **CLASS ACTION**

21   **DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   THE PARTIES ..................................................................................................... 63

III.  JURISDICTION AND VENUE ........................................................................ 1411

IV.   CHOICE OF LAW ............................................................................................ 1411

V.    INTRADISTRICT ASSIGNMENT ................................................................. 1412

VI.   STATEMENT OF FACTS ................................................................................ 1512

      A.    Google Stores Location Information Regardless of Privacy Settings.............. 1815

      B.    Google's Conduct Poses a Serious Threat to Personal Privacy, Personal
            Security, and Personal Dignity.......................................................................... 2417

      C.    Preventing Google's Storage of Location Information—If Possible—Is Far
            More Complex than Google Represents.............................................................. 3021

      D.    Google's Ineffective Response to the AP Report and to This Litigation
            Confirms and Continues Its Deceptive Behavior................................................ 3826

      E.    Google's Surreptitious Storage of Location Data Defies Reasonable
            Expectations of Privacy and Egregiously Violates Established Social
            Norms.................................................................................................................. 4429

            1.    Plaintiffs' Expectations of Privacy are Enshrined in Law. ...................... 4630

            2.    Plaintiffs' Expectations Reflect Widely-Held Social Norms.................... 4630

            3.    Parents Have a Reasonable and Universal Expectation of Privacy
                  for their Children...................................................................................... 5234

            4.    The Federal Trade Commission Has Identified Surreptitious
                  Tracking and Storage of Location Information as a Deceptive Trade
                  Practice...................................................................................................... 5637

      F.    Google's Deception Compounds the Outrageous Nature of its Conduct. ......... 5738

VII.  CLASS ALLEGATIONS .................................................................................. 6041

VIII. FRAUDULENT CONCEALMENT AND TOLLING ..................................... 6345

IX.   CAUSES OF ACTION ...................................................................................... 6445

      Count One (Violations of CIPA, Cal. Pen. Code §§ 630, *et seq.*) ..................... 6445

      Count Two (Intrusion Upon Seclusion) .............................................................. 6647

      Count Three (California Constitutional Right to Privacy) ................................... 6849

X.    PRAYER FOR RELIEF ..................................................................................... 7050

XI.   DEMAND FOR JURY TRIAL ......................................................................... 7151

I.    INTRODUCTION ................................................................................................. 1

II.   THE PARTIES ..................................................................................................... 6

**TABLE OF CONTENTS**
(continued)

Page

III.   JURISDICTION AND VENUE ................................................................................ 14

IV.   CHOICE OF LAW ................................................................................................... 14

V.   INTRADISTRICT ASSIGNMENT .......................................................................... 14

VI.   STATEMENT OF FACTS ........................................................................................ 15

    A.   Google Assured Its Users That They Could Prevent Google's Tracking of
        their Locations.................................................................................................. 15

    B.   Google Stores Comprehensive Location Information Regardless of Privacy
        Settings............................................................................................................. 18

    C.   Google's Conduct is an Egregious Invasion of Personal Privacy, Personal
        Security, and Personal Dignity........................................................................ 24

    D.   It Is Not Possible to Prevent Google's Collection of Location Information
        Through the Controls It Purports to Give Consumers. .................................... 30

    E.   Google Stores User's Location Data without their Consent to Further its
        Commercial Interests. ..................................................................................... 38

    F.   Google Continues Its Deceptive Behavior...................................................... 42

    G.   Google's Storage of Location Data Defies Reasonable Expectations of
        Privacy and Egregiously Violates Established Social Norms........................... 44

        1.   Plaintiffs' Expectations of Privacy are Enshrined in Law. ................. 46

        2.   Plaintiffs' Expectations Reflect Widely Held Social Norms. ................... 46

        3.   Parents Have a Reasonable and Universal Expectation of Privacy
            for their Children................................................................................. 52

        4.   The Federal Trade Commission Has Identified Surreptitious
            Tracking and Storage of Location Information as a Deceptive Trade
            Practice. ............................................................................................... 56

    H.   Google's Deception Compounds the Outrageous Nature of its Conduct. ............ 57

VII.   CLASS ALLEGATIONS .......................................................................................... 59

VIII.   FRAUDULENT CONCEALMENT AND TOLLING ............................................... 63

IX.   CAUSES OF ACTION ............................................................................................. 64

Count One (Intrusion Upon Seclusion)............................................................................ 64

Count Two (California Constitutional Right to Privacy).................................................. 68

Count Three (Unjust Enrichment (Quasi-Contract Claim for Restitution and
Disgorgement) or, alternatively, Breach of Contract)...................................................... 69

II.   PRAYER FOR RELIEF............................................................................................ 70

III.   DEMAND FOR JURY TRIAL................................................................................. 71

**TABLE OF CONTENTS**
(continued)

**Page**

1    **I.    INTRODUCTION**[1]

2        1.    This case addresses the surreptitious, non-consensual, tracking of millions of

3    mobile device users' geolocation by Defendant Google LLC ("Google").  For years, Google has

4    ~~misled people who use~~been encouraging its ~~products and~~users to enable location services, ~~telling~~

5    ~~them that if they activate or deactivate~~ ostensibly to "enhance"  users' "experience" of various

6    mobile device functions, including by assuring users that certain device settings ~~it will~~can prevent

7    Google from tracking their movements and storing a record of their geolocations.  ~~Google's~~

8    ~~dishonest behavior was first publicly exposed by investigative reporting in August 2018.  Today,~~

9    ~~Google's recent changes~~Contrary to its ~~disclosures equivocate~~reassurances to its users, Google

10   tracks and stores users' locations and movements to amass a vast and comprehensive store of

11   highly valuable geolocation data which it has and continues to commercially exploit.

12       2.    Google promoted its "Location History" setting as a powerful user control, with

13   the promise that if the feature set to "off," then "the places you go are no longer stored."  Google

14   assured individuals that they could prevent Google from creating and storing a record of their

15   movement by disabling Location History on their mobile devices or in their Google Accounts.

16   This simply was not true.

17       3.    In August 2018, the press reported that even when users had opted *out* of Location

18   History, Google recorded historical location data comprehensive enough to map out the course of

19   a user's movements from location to location throughout the day, and day after day.  Despite the

20   recognized sensitivity of location data, Google stores this data against the express instructions and

21   expectations of its users. ~~continue to obfuscate its ongoing~~As reported by the Associated Press

22   ("AP"), "Google wants to know where you go so badly that it records your movements even

23   when you explicitly tell it not to."[2]  The AP Report—corroborated by respected cyber security

24   _____

25   [1] Pursuant to this Court's Civil Standing Order, a red-line document showing changes made to the
     previously-filed Consolidated Class Action Complaint is attached hereto as Exhibit ("Ex.") 1.

26   The addition of Plaintiffs Michael Childs and Noe Gamboa, and Count 3, to this Amended
     Consolidated Class Action Complaint are contingent upon the Court's ruling on Plaintiffs'

27   Motion for Leave, filed herewith.
     [2] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not,* The Associated

28   Press (August 13, 2018) (Ex. 2, hereinafter "AP Report").

researchers at Princeton University—found that Google technology, embedded in more than two billion mobile devices, stores individuals' location information indefinitely even if users activate a privacy setting purporting to prevent Google from doing so.  Google Senior Privacy Counsel was forced to admit Google's ongoing, invasive practices in March 2019, in testimony before Congress:

> Q. Google collects geolocation data even if location history is turned off, correct?
>
> A. **Yes, Senator, it can** in order to operate other services … (inaudible)
>
> Q: Let's just – let's just get that on the record. Google collects geolocation history and information even if location history is turned off.  Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned off – turned off by scanning Wi-Fi networks around them throughout the day? Do you think he'd be surprised by that?[3]

4.    ~~behavior.~~  Google again confirmed, in response to questions posed on April 23, 2019 by the United States House of Representatives, that in addition to Location History's ability to amass vast quantities of location data for Google, "[o]ther Google products may store precise location information."

5.     In response to these revelations in the AP Report, by researchers at Princeton University, and then in Google's recent testimony before the United States Congress, Google has offered only confusing and obfuscating direction and explanation of its privacy settings and practices as they relate to a user's "account," and still to this day refuses to confirm whether it is possible to prevent it from storing location information by adjusting "settings" or otherwise.

~~1.~~6.    Google has failed, and continues to fail, to respect and abide by the very privacy choices that it ostensibly extended to its users.  Google retains and continues to collect location data under circumstances where no reasonable consumers would expect that to occur.  Google

---

[3] *See* Testimony of Will Devries, Google Senior Privacy Counsel, United States Senate Judiciary Committee, *GDPR & California Consumer Privacy Act: Opt-Ins, Consumer Control, and the Impact on Competition and Innovation* (March 12, 2019), at 14 (Ex. 3).  In subsequent testimony, Mr. Devries consistently failed to answer directly the Senator's questions regarding whether Devries thought users, including underage users, "would be surprised" by Google's practices.  *Id.* at 15-16.

gathers location data when apps and services "update" automatically on a device.  It gathers location data when it performs services that have nothing to do with the user's location.  It gathers location data regardless of whether users tell it not to do so, by opting out of the Location History setting.  Despite users expressly declining to give Google permission to track and store a digital record of their movements, Google does just that, creating a detailed and encyclopedic chronology of users' movements and storing it in a ~~vast~~vastly exploitable, profitable database.

~~2.~~7.    Data concerning consumers' habits, customs and patterns are currency today, and as geolocation data is particularly rich and personal, it is particularly valuable currency.  Google derives substantial benefits from location data, including increased revenues from advertising and a competitive advantage across a range of lucrative industries.

8.    The ramifications of unauthorized access to the highly personal details of stored location history can be severe, and individuals accordingly go to great lengths to safeguard not only their own location information, but, in the case of parents and guardians, also that of their minor children.

~~3.~~9.    Google's ~~deceptive and~~ outrageous conduct violates its users' reasonable expectations of privacy.  The intent and efforts of privacy- and security-conscious individuals to safeguard their personal information—particularly sensitive location information—must be respected.  As ~~recently~~ confirmed by the Supreme Court in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), location data is highly sensitive~~.~~ and presents a privacy interest protected by law.  When stored and tracked over time, location history "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 2217 (quotation marks and citation omitted).  As Chief Justice John Roberts stated, "a cell phone—almost a 'feature of human anatomy[]'—tracks nearly exactly the movements of its owner . . . .   A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," and when a third-party has access to the information stored on one's cell phone, that entity "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).

Google's own Chief Executive Officer has formally acknowledged that consumers have a privacy interest in in their geolocation, and precise geolocation information is "considered highly, highly sensitive."[4]

4.    The ramifications of unauthorized access to the highly personal details of a stored location history can be severe, and individuals accordingly go to great lengths to safeguard not only their own location information, but, in the case of parents and guardians, also that of their minor children.

5.1.    Despite the recognized sensitivity of location data, Google stores this data against the express instructions and expectations of its users.  As reported in August 2018 by the Associated Press ("AP"), "Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to."[5]  The AP Report – corroborated by respected cyber security researchers at Princeton University – found that Google technology, embedded in more than two billion mobile devices, stores individuals' location information indefinitely even if users activate a privacy setting purporting to prevent Google from doing so.  Google Senior Privacy Counsel was forced to admit Google's ongoing, invasive practices last month, in testimony before Congress:

Q. Google collects geolocation data even if location history is turned off, correct?

A. Yes, Senator, it can in order to operate other services … (inaudible)

Q: Let's just – let's just get that on the record. Google collects geolocation history and information even if location history is turned off.  Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned – turned off by scanning Wi-Fi networks around them throughout the day? Do you think he'd be surprised by that?[6]

---

[4] *See* Testimony of Sundar Pichai, Google Chief Executive Officer, Transcript of United States House of Representatives Judiciary Committee, *Transparency and Accountability: Examining Google and its Data Collection, use and Filtering Practices* (December 11, 2018), at 53 (Ex. 14).

[5] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not,* The Associated Press (August 13, 2018) (Ex. 2, hereinafter "AP Report").

[6] *See* Testimony of Will Devries, Google Senior Privacy Counsel, United States Senate Judiciary Committee, *GDPR & California Consumer Privacy Act: Opt-Ins, Consumer Control, and the*

6.      Until it was exposed by the media, this litigation, and then Congress, Google itself fraudulently assured individuals that they could prevent Google from creating and storing a record of their movement by disabling a feature called "Location History" on their mobile devices or in their Google Accounts.  Google represented that a user "can turn off Location History at any time.  With Location History off, the places you go are no longer stored."[7]  This simply was not true.  As revealed in the AP Report and the researchers at Princeton University, and then in Google's recent testimony before the United States Congress, Google accesses and stores the precise geolocation information of users who have affirmatively turned off the "Location History" setting.  Google modified—and continues to modify—this and other representations after the publication of the AP Report and the resulting public outcry, as discussed in Sections VI.C and VI.D, *infra*.

7.10.    While falsely characterizing its illusory privacy controls as meaningful, Google deceptively and unconscionably deprived and continues to deprive Plaintiffs and Class members of one of the most fundamental autonomy and privacy rights: the ability to control access to and knowledge of their whereabouts and their movement over time.  This is true not only for Plaintiffs and Class members, but also for their children, whose location information they sought to protect.  Indeed, as discussed in further detail below, recognition and respect for child privacy and parental control are enshrined in longstanding societal norms and protected by the law.  Google's conduct violates the California Invasion of Privacy Act (Cal. Pen. Code §§ 630, *et seq.* ("CIPA")) and gives rise to three claims brought in this lawsuit: (1) violation of California's Constitutional Right to Privacy, and constitutes an unlawful(2) intrusion upon seclusion., and (3) unjust enrichment (quasi-contract claim for restitution and disgorgement)/breach of contract.[8]

---

*Impact on Competition and Innovation* (Mar.March 12, 2019), at 14 (Ex. 3).  In subsequent testimony, Mr. Devries consistently failed to answer directly the Senator's questions regarding whether Devries thought users, including underage users, "would be surprised" by Google's practices.  *Id.* at 15-16.

[7] Archived version of Google Account Help, *Manage or delete your Location History*, (August 16, 2018) (Ex. 4).

[8] Plaintiffs' unjust enrichment (quasi-contract claim for restitution and disgorgement)/breach of contract claim is contingent on the Court granting Plaintiffs' Motion for Leave, filed concurrently herewith.

## II.     THE PARTIES

8.11.   **Plaintiff Napoleon Patacsil** resides in San Diego, California.  From 2016 until the present, Plaintiff Patacsil has owned and used, and continues to own and use, an Apple iPhone with various Google apps and functionalities downloaded onto the mobile device, including Google Maps. In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to record and access his location over time, Mr. Patacsil turned the "Location History" setting to "off" on his Google Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Patacsil believed that this would prevent Google from storing a record of his location history. Despite Mr. Patacsil's "Location History" settings, Google continued to store his precise location information.

9.12.   Prior to acquiring the iPhone in approximately 2016, Plaintiff Patacsil owned and used an Android mobile device.  Android is a mobile operating system developed by Google.  In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to track and record his location over time, Mr. Patacsil turned the "Location History" setting to "off" on this mobile device.  Based upon the terminology used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect that turning "Location History" off would prevent his location information from being stored and that Google would respect his privacy settings, Mr. Patacsil believed that this would prevent Google from storing a record of his location history. Despite Mr. Patacsil's "Location History" settings, Google continued to track and store his precise, comprehensive location information.

10.13.   Throughout the relevant time period, Mr. Patacsil carried his mobile device virtually everywhere he went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

11.14.  In the interest of protecting his privacy and security, Mr. Patacsil does not recite here the precise locations that he took his mobile device with the "Location History" setting off during the relevant time, but does allege that the following could be determined from Mr. Patacsil's location history: his eating habits; his shopping habits; his exercise habits; whether he, or those in his care, receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he is involved in the activities of his children (if any), and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

12.15.  **Plaintiff ~~Richard Dixon~~Michael Childs**[9] resides in ~~Long Beach, California~~Boca Raton, Florida, with his minor ~~child L.D.~~children K.C.1 and K.C.2.  From at least ~~2012~~July 2018 until the present, Plaintiff ~~Dixon has~~Childs and his children have owned and used, and ~~continues~~continue to own and use, ~~an Android~~Apple iPhone mobile ~~device~~devices, with various Google apps and functionalities downloaded onto the mobile ~~device~~devices, including ~~Google Maps.  From at least 2016 to the present, Plaintiff Dixon's minor child has used, and continues to use, an Apple iPhone with various Google apps and functionalities downloaded onto the mobile device, including Google Maps.  From approximately 2014 until 2016, Plaintiff Dixon's minor child used an Android mobile device, with various Google apps and functionalities downloaded onto the mobile device, including Google Maps~~YouTube.

13.16.  In an express effort to protect his location history—and thus his privacy and security—from efforts by Google, and any other third-parties, to record and access his location over time, Mr. ~~Dixon turned~~Childs ensured that the "Location History" setting ~~to~~was turned "off" on his Google Account. Based upon the terminology used by Google (e.g. "Location History"),

---

[9] The addition of Michael Childs as a named Plaintiff is subject to Plaintiffs' Motion for Leave, filed herewith.

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

1   the context, and representations by Google to the effect that turning "Location History" off would

2   prevent his location information from being stored and that Google would respect his privacy

3   settings, Mr. ~~Dixon~~Childs believed that this would prevent Google from storing a record of his

4   location history. Despite Mr. ~~Dixon's~~Childs's "Location History" settings, Google continued to

5   track and store his precise, comprehensive location information.

6   ~~14.~~17.   In an express effort to protect ~~his~~children's location history—and thus ~~his~~their

7   privacy and security—from efforts by Google, and any other third-parties, to record and access

8   ~~his~~their location over time, Mr. ~~Dixon's minor child turned~~ Childs checked that the "Location

9   History" setting was turned to "off" on his children's Google ~~Account.~~Accounts.   Based upon the

10   terminology used by Google (e.g. "Location History"), the context, and representations by

11   Google to the effect that turning "Location History" off would prevent ~~his~~their location

12   information from being stored and that Google would respect ~~his~~their privacy settings, Mr.

13   ~~Dixon~~Childs and his minor ~~child~~children believed that this would prevent Google from storing a

14   record of ~~his~~the children's location history. Despite ~~L.D.'s~~his children's "Location History"

15   settings, Google continued to track and store ~~L.D.'s~~their precise, comprehensive location

16   information.

17   ~~15.~~18.   Throughout the relevant time period, both Mr. ~~Dixon~~Childs and his minor

18   ~~child~~children each carried their respective mobile devices virtually everywhere they went

19   throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and

20   when entering commercial spaces, medical care providers, private offices, and private

21   residences.

22   19.   In the interest of protecting his privacy and security, and the privacy and security

23   of his ~~child~~children, Mr. ~~Dixon~~Childs does not recite here the precise locations that he or ~~L.D.~~his

24   children took their mobile devices with the "Location History" setting off during the relevant

25   time, but ~~does allege that~~examples of places where Google would have tracked him and/or his

26   children without permission include: School, beach, Starbucks, mall, home, friends' homes,

27   restaurants, sports competitions and/or events.

28

16.20.  In addition, the following could be determined from Mr. Dixon'sChilds's location history: his eating habits; his shopping habits; his exercise habits; whether he receives frequent medical or psychological care and the types of medical or psychological care providers he sees; the extent to which he is involved in the activities of his children, and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

17.21.  Plaintiff DixonChilds further alleges that the following information regarding his minor childchildren could be determined from L.D.'stheir location history: histheir eating habits; histheir shopping habits; histheir exercise habits; whether he receivestheir receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he isthey are involved in before or after-school activities, and what those activities are; how, where, and to what extent he socializesthey socialize; where histheir friends and associates reside; whether and where he hasthey have any recurring appointments; whether and where he attendsthey attend religious services; how often he takesthey take public transit, walks, or isare driven, and which routes; whether he hasthey have attended any political rallies or protests; whether he isthey are home-schooled or attendsattend school outside of the home, which school, and whether he hasthey have good attendance.

18.22.  **Plaintiff Najat Oshana** resides in Modesto, California. From at least 2012 until the present, Plaintiff Oshana has owned and used, and continues to own and use, an Android mobile device, with various Google apps and functionalities downloaded onto the mobile device, including Google Maps.  In an express effort to protect her location history—and thus her privacy and security—from efforts by Google, and any other third-parties, to record and access her location over time, Ms. Oshana turned the "Location History" setting to "off" on her Google Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and

1   representations by Google to the effect that turning "Location History" off would prevent her

2   location information from being stored and that Google would respect her privacy settings, Ms.

3   Oshana believed that this would prevent Google from storing a record of her location history.

4   Despite Ms. Oshana's "Location History" settings, Google continued to track and store her

5   precise, comprehensive location information.

6          19.23.  Throughout the relevant time period, Ms. Oshana carried her mobile device

7   virtually everywhere she went throughout the day, including when traveling by vehicle or

8   otherwise on public thoroughfares and when entering commercial spaces, medical care providers,

9   private offices, and private residences.

10          20.24.  In the interest of protecting her privacy and security, Ms. Oshana does not recite

11   here the precise locations that she took her mobile device with the "Location History" setting off

12   during the relevant time, but does allege that the following could be determined from her location

13   history: her eating habits; her shopping habits; her exercise habits; whether she, or those in her

14   care, receive frequent medical or psychological care and the types of medical or psychological

15   care providers seen; the extent to which she is involved in the activities of her children (if any),

16   and what those activities are; how, where, and to what extent she socializes; where her friends

17   and associates reside; whether and where she has any recurring appointments; whether and where

18   she attends religious services; how often she takes public transit, walks, or drives, and which

19   routes; where she parks her car; whether and where she is employed and her work schedule;

20   where she banks; whether she has attended any political rallies or protests; and whether and when

21   she visited the polls on election day, and which poll.

22          21.    **Plaintiff Mark Carson** resides in St. Petersburg, Florida.  From 2011 until the

23   present, Plaintiff Carson has owned and used, and continues to own and use, an Apple mobile

24   device with various Google apps and functionalities downloaded onto the mobile device,

25   including Google Maps.  In an express effort to protect his location history—and thus his privacy

26   and security—from efforts by Google, and any other third-parties, to record and access his

27   location over time, Mr. Carson turned the "Location History" setting to "off" on his Google

28   Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and

1  ~~representations by Google to the effect that turning "Location History" off would prevent his~~

2  ~~location information from being stored and that Google would respect his privacy settings, Mr.~~

3  ~~Carson believed that this would prevent Google from storing a record of his location history.~~

4  ~~Despite Mr. Carson's "Location History" settings, Google continued to store his precise location~~

5  ~~information.~~

6  ~~22.     Throughout the relevant time period, Mr. Carson carried his mobile device~~

7  ~~virtually everywhere he went throughout the day, including when traveling by vehicle or~~

8  ~~otherwise on public thoroughfares and when entering commercial spaces, medical care providers,~~

9  ~~private offices, and private residences.~~

10  ~~23.     In the interest of protecting his privacy and security, Mr. Carson does not recite~~

11  ~~here the precise locations that he took his mobile device with the "Location History" setting off~~

12  ~~during the relevant time, but does allege that the following could be determined from Mr.~~

13  ~~Carson's location history: his eating habits; his shopping habits; his exercise habits; whether he,~~

14  ~~or those in his care, receive frequent medical or psychological care and the types of medical or~~

15  ~~psychological care providers seen; the extent to which he is involved in the activities of his~~

16  ~~children (if any), and what those activities are; how, where, and to what extent he socializes;~~

17  ~~where his friends and associates reside; whether and where he has any recurring appointments;~~

18  ~~whether and where he attends religious services; how often he takes public transit, walks, or~~

19  ~~drives, and which routes; where he parks his car; whether and where he is employed and his work~~

20  ~~schedule; where he banks; whether he has attended any political rallies or protests; and whether~~

21  ~~and when he visited the polls on election day, and which poll.~~

22       ~~24.~~25.  **Plaintiff Nurudaaym Mahon** resides in Douglasville, Georgia.  From at least

23  2013 until the present, Plaintiff Mahon has owned and used, and continues to own and use, an

24  Android mobile device.  In an express effort to protect his location history—and thus his privacy

25  and security—from efforts by Google, and any other third-parties, to record and access his

26  location over time, Mr. Mahon turned the "Location History" setting to "off" on his Google

27  Account. Based upon the terminology used by Google (*e.g.* "Location History"), the context, and

28  representations by Google to the effect that turning "Location History" off would prevent his

location information from being stored and that Google would respect his privacy settings, Mr. Mahon believed that this would prevent Google from storing a record of his location history. Despite Mr. Mahon's "Location History" settings, Google continued to track and store his precise, comprehensive location information.

25.26.   Throughout the relevant time period, Mr. Mahon carried his mobile device virtually everywhere he went throughout the day, including when traveling by vehicle or otherwise on public thoroughfares and when entering commercial spaces, medical care providers, private offices, and private residences.

26.27.   In the interest of protecting his privacy and security, Mr. Mahon does not recite here the precise locations that he took his mobile device with the "Location History" setting off during the relevant time, but does allege that the following could be determined from Mr. Mahon's location history: his eating habits; his shopping habits; his exercise habits; whether he, or those in his care, receive frequent medical or psychological care and the types of medical or psychological care providers seen; the extent to which he is involved in the activities of his children (if any), and what those activities are; how, where, and to what extent he socializes; where his friends and associates reside; whether and where he has any recurring appointments; whether and where he attends religious services; how often he takes public transit, walks, or drives, and which routes; where he parks his car; whether and where he is employed and his work schedule; where he banks; whether he has attended any political rallies or protests; and whether and when he visited the polls on election day, and which poll.

27.28.   **Plaintiff Aichi AliNoe Gamboa[10]** resides in Los Angeles, California.Alsip, Illinois.   From at least 20152010 until the present, Plaintiff AliGamboa has owned and used, and continues to own and use, an Apple iPhone, with various Google apps and functionalities downloaded onto the mobile device, including, at times, Google Maps.   In an express effort to protect herhis location history—and thus herhis privacy and security—from efforts by Google, and any other third-parties, to record and access herhis location over time, Ms. AliMr. Gamboa

---

[10] The addition of Noe Gamboa as a named Plaintiff is subject to Plaintiffs' Motion for Leave, filed herewith.

1    turned the "Location History" setting to "off" on ~~his device.~~ Based upon the terminology used by

2    Google (*e.g.* "Location History"), the context, and representations by Google to the effect that

3    turning "Location History" off would prevent his location information from being stored and that

4    Google would respect his privacy settings, Mr. ~~her Google Account. Based upon the terminology~~

5    ~~used by Google (*e.g.* "Location History"), the context, and representations by Google to the effect~~

6    ~~that turning "Location History" off would prevent her location information from being stored and~~

7    ~~that Google would respect her privacy settings, Ms. Ali~~Gamboa believed that this would prevent

8    Google from storing a record of ~~her~~his location history. Despite ~~Ms. Ali's~~Mr. Gamboa's

9    "Location History" settings, Google continued to store ~~her~~his precise location information.

10       ~~28.~~29.  Throughout the relevant time period, ~~Ms. Ali~~Mr. Gamboa carried ~~her~~his mobile

11   device virtually everywhere ~~she~~he went throughout the day, including when traveling by vehicle

12   or otherwise on public thoroughfares and when entering commercial spaces, medical care

13   providers, private offices, and private residences.

14       ~~29.~~30.  In the interest of protecting ~~her~~his privacy and security, ~~Ms. Ali~~Mr. Gamboa does

15   not recite here the precise locations that ~~she~~he took ~~her~~his mobile device with the "Location

16   History" setting off during the relevant time, but does allege that the following could be

17   determined from ~~her~~Mr. Gamboa's location history: ~~her~~his eating habits; ~~her~~his shopping habits;

18   ~~her~~his exercise habits; whether ~~she~~he, or those in ~~her~~his care, receive frequent medical or

19   psychological care and the types of medical or psychological care providers seen; the extent to

20   which ~~she~~he is involved in the activities of ~~her~~his children ~~(if any),~~ and what those activities are;

21   how, where, and to what extent ~~she~~he socializes; where ~~her~~his friends and associates reside;

22   whether and where ~~she~~he has any recurring appointments; whether and where ~~she~~he attends

23   religious services; how often ~~she~~he takes public transit, walks, or drives, and which routes; where

24   ~~she~~he parks ~~her~~his car; whether and where ~~she~~he is employed and ~~her~~his work schedule; where

25   ~~she~~he banks; whether ~~she~~he has attended any political rallies or protests; and whether and when

26   ~~she~~he visited the polls on election day, and which poll.

27       ~~30.~~31.  **Defendant Google LLC** ("Google," "Defendant," or "the Company") is a United

28   States public corporation headquartered in Mountain View, California, and incorporated under the

1   laws of Delaware. Google is a sophisticated mobile operating system and mobile applications

2   ("apps") developer in the business of commercializing personal data extracted from the use of

3   tools and services connected to the internet.  As such, Google is aware of, and benefits from the

4   conduct described herein.  Indeed, this forms a core component, among others, of its business

5   model.

## III.   JURISDICTION AND VENUE

7   ~~31.~~32.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

8   §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the

9   sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed

10   Class are citizens of a state different from defendant.

11   ~~32.~~33.  This Court has personal jurisdiction over Defendant because Defendant owns and

12   operates a business that is headquartered in the Northern District of California and conducts

13   substantial business throughout California.  Google expressly consents to the jurisdiction of the

14   federal or state courts of Santa Clara County, California, USA through its Terms of Service.[11]

15   ~~33.~~34.  Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1), as Google

16   is headquartered in this district.

## IV.   CHOICE OF LAW

18   ~~34.~~35.  California law governs the substantive legal issues in this case.  Google's Terms of

19   Service provide in pertinent part that California law will apply to any disputes arising out of or

20   relating to Google's terms or services.[12]

## V.   INTRADISTRICT ASSIGNMENT

22   ~~35.~~36.  Pursuant to Civil L.R. 3-2(c), assignment to this division is proper because a

23   substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this district.

24   Defendants market their products throughout the United States, including in Santa Clara County.

---

[11] Google, *Google Terms of Service* (effective March 31, 2020) (Ex. 5); *see also* Google, *Google Terms of* Service (last modified October 25, 2017) (Ex. ~~5~~6).
[12] *Id.*

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

Additionally, Google is headquartered in Mountain View, California, which is located within Santa Clara County.

36.37.  Assignment to this division is also proper pursuant to Google's Terms of Service, which state in pertinent part that all claims arising out of or relating to Google's terms or services "will be litigated "exclusively in the federal or state courts of Santa Clara County, California, USA, and [users] and Google consent to personal jurisdiction in those courts."[13]

## VI.    STATEMENT OF FACTS

### A.    Google Assured Its Users That They Could Prevent Google's Tracking of their Locations.

37.38.  According to a 2018 report by the Pew Research Center, the vast majority of Americans—95%—own a cellphone; 77% of Americans own smartphones.[14]  Globally, an estimated 5 billion people are connected through mobile devices, with approximately one-half of those using smartphones.[15]  The overwhelming majority of mobile devices run on one of two operating systems: Android or iOS, which are developed by Google and Apple, respectively. [16]

38.39.  On each of these operating systems, users expect to customize their devices to their preferences by "managing" various functionalities of their devices.  They can, for example, change their time zone, preferred language, or screen brightness.  Included among these functionalities is the option to turn on or off the retention of "Location History"—that is, the individual's precise historical location information.[17]  In its Terms of Service until the language was removed in March of 2020, Google representsrepresented that it "will would "respect the choices you make to limit sharing or visibility settings in your Google Account." [18]   In its Privacy Policy, Google statesconsistently has promised that "across our services, you can adjust

---

[13] Id. Id.  See also Google, *Google Terms of* Service (last modified October 25, 2017) (Ex. 6).

[14] Pew Research Center, *Mobile Fact Sheet* (February 5, 2018) (Ex. 67).

[15] David George et al., *Global Mobile Trends 2017,* GSMA Intelligence (September 2017) (Ex. 78).

[16]  James Vincent, *99.6 percent of new smartphones run Android or iOS*, The Verge (February 16, 2017) (Ex. 89).

[17]  As used herein, "location information" refers to any and all data obtained through an individual's mobile device, which allows for the identification of that individual's location either in the present or, when stored, through historic record.

[18] *Google Terms of Service* (last modified October 25, 2017) (Ex. 56).

1    your privacy settings to control what we collect and how your information is used."[19]  Up until

2    the time its true conduct became public, Google also falsely represented that, for its operating

3    system, turning "Location History" off would prevent the company from storing location data

4    reflecting where an individual using a device with its Android operating system had been.

5    39.40.  In addition to developing the Android operating system, Google also develops

6    apps that can be downloaded on Android and iOS devices.  Google purports to allow users to

7    make customized settings and privacy decisions at the app level.  Google tells users that they can

8    choose to share location information with some apps, for specified purposes, but choose *not* to

9    share that information with other apps.  Google also claims that a user can share location

10   information with a certain app at some times (*e.g.*, when the app is in active use), but not at

11   others.  Google falsely represented that, for its apps, turning "Location History" off would

12   prevent the company from storing location data reflecting in detail where an individual with

13   Google apps downloaded had been.

14   40.41.  Google specifically—though falsely—assured users of both its apps and its mobile

15   devices that it would not store their location information if users denied or revoked its permission

16   to do so through their privacy settings.  Google's support page on the subject stated: "You can

17   turn off Location History at any time. **With Location History off, the places you go are no**

18   **longer stored**."[20]

19   41.42.  Google purportedly instructed Android mobile device owners how to turn off

20   Location History on their devices, by going to the device's "Settings" tab, as follows:[21]

21

22

23

24
_____

25   [19] *Google Privacy Policy* (last modified January 22, 2019 effective July 1, 2020) (Ex. 9 10).
     Although Google amended its privacy policy more than sixteen times in the past five six years, it

26   has consistently made representations to the effect that users control what data Google collects
     about them through settings that users can customize.

27   [20] Archived version of Google Account Help, *Manage or delete your Location History*, (August
     16, 2018) (emphasis added) (Ex. 4 11).

28   [21] *Id.*

1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
2. At the top, tap **Data & personalization**.
3. Under "Activity controls," tap **Location History**.
4. Turn **Location History** on or off for your account or devices:
   - For your whole account and all devices associated with it, turn **Use Location History** on or off.
   - For a certain device only, turn that device's history on or off.

   1. On your Android phone or tablet, open your device's Settings app ⚙ > **Google** > **Google Account**.
   2. At the top, tap **Data & personalization**.
   3. Under "Activity controls," tap **Location History**.
   4. Turn **Location History** on or off for your account or devices:
      - For your whole account and all devices associated with it, turn **Use Location History** on or off.
      - For a certain device only, turn that device's history on or off.

42.43.  For users of Apple devices such as iPhones and iPads, Google purported to explain that a user must log into her online account with Google to turn off "Location History" (as it does not control the Apple device's operating system), and that turning "Location History" off would "stop[] saving new location information":[22]

---

[22] Archived version of Google Account Help, *Location history for iPhone & iPad* (July 30, 2018) (Ex. 1012).

## Turn Location History on or off

Location History stores your location data from all devices that are signed in to your Google Account.

**Note:** When you pause Location History, it doesn't delete previous activity, it only stops saving new location information.

## Using your browser

1. Go to the Location history ☑ section of your Google Account.
2. Turn **Location History** on or off.
   • **Off:** Confirm by tapping **Pause**.
   • **On:** Confirm by tapping **Turn on**.

## Using the Google app

1. Open the Google app G .
2. At the top right, tap your account photo. You might need to sign in.
3. Tap **My Account** ❯ **Personal info and privacy** ❯ **Activity controls** ❯ **Google Location History**.
4. Turn the setting on or off. If you turn it off, confirm by tapping **Stop storing location**.

~~43.~~44.  Google affirmatively represented to both Android and Apple device users that turning off "Location History" would result in Google ceasing to store an individual's location information.

**B.     Google Stores Comprehensive Location Information Regardless of Privacy Settings.**

~~44.~~45.  Consistent with the instructions for users to manage Google's permissions respecting their location information described above, Google published a support page to instruct users on how to manage and delete the user's "Location History" which stated, "[w]ith Location History off, the places you go are no longer stored.  When you turn off Location History for your Google Account, it's off for all devices associated with that Google Account."[23]

~~45.~~46.  Users who visited Google's Privacy Policy for more information received further confirmation that unless they opted to turn "Location History" *on*, they were not "allow[ing]"

----

[23] Archived version of Google Account Help, *Manage or delete your Location History*, (August 16, 2018) (Ex. ~~4~~11).

Google to store information about their location, from any Google app or service.  Specifically, as of at least December 18, 2017, Google's Privacy Policy expansively stated "[w]hen you use Google services, we may collect and process information about your actual location. We use various technologies to determine location, including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points and cell towers."[24]  The phrase "may collect and process information about your actual location" was hyperlinked, and clicking on it for more information took users to a page further illustrating that, through the Location History setting, users could control Google's permissions to store location data used by any Google app or service:

> Location History **allows** Google to store a history of your location
> data from all devices where you are logged into your Google Account
> and have enabled Location Reporting. Location History and Location
> Reporting data may be used by any Google app or service.[25]

46.47.  Google's representations were false.  As the AP Report revealed, turning off "Location History" only stopped Google from creating a location timeline that the *user* could view.  Google, however, tracked and continues to track the device users and store a meticulous record of their precise locations.

48.    Contrary to Google's representations, even when "Location History" is turned off, whether at the Google Account level or the individual device level, a user's location is stored, and on information and belief, continues to be stored, every timeby Google.  The limited discovery undertaken to date in this action confirms that Google maintains at least one

---

[24] Archived version of Google Privacy Policy (last modified December 18, 2017) (Ex. 1113); *see also* Christina Bonnington, *How Google Uses Wi-Fi Networks to Figure Out Your Exact Location*, Slate (June 20, 2018) ("Any time a GPS-enabled Android device picks up your router's broadcast signal, it can pinpoint its location and relay that information to Google's location servers.") (Ex. 14).

[25] Archived version of "may collect and process information about your actual location" page hyperlinked from Google Privacy Policy (last modified December 18, 2017) (emphasis added) (Ex. 1215).  Additional hyperlinked text ("Learn More") within this hyperlinked page routed users back to the Account Help page *Manage or delete your Location History*, which contained instructions to "Turn Location History on or off" (*see* Ex. 411).

1   confidential "data store" it calls "Footprints," to house location data compiled through Web &

2   App Activity. [26]

3        48. 50.  Google's data stores are vast.  Google's mobile applications—such as Google

4   Maps, Google Search, Google Hangouts, and "camera" apps—are ubiquitous in contemporary

5   life, and gather location data on their users almost incessantly.  The data stores are also largely

6   hidden from view.  Google closely controls what users can learn about the data Google has

7   collected about them.  In the current version of Google's Privacy Policy, for example, users are

8   advised broadly that Google uses "various technologies" to collect, and store, information,

9   "including [but, it appears, not necessarily limited to] cookies, pixel tags, local storage, such as

10  browser web storage or application data caches, databases, and server logs."[27] Little is publicly

11  known, but at a minimum, based on the limited information available to users with the

12  appropriate technical tools, it has been confirmed that location data is captured and then stored

13  consistently by Google-controlled features on her a given user's mobile device are active,

14  including, *inter alia*, the Google Maps app, weather apps, and searches made with the device's

15  mobile browser.  As reported by the AP:

16          For example, Google stores a snapshot of where you are when you
               merely open its Maps app. Automatic daily weather updates on
17             Android phones pinpoint roughly where you are. And some
               searches that have nothing to do with location, like "chocolate chip
18             cookies," or "kids science kits," pinpoint your precise latitude and
               longitude — accurate to the square foot — and save it to your
19             Google account.[28]

20       49. 51.  European researchers have corroborated the AP's findings.  On November 27,

21  2018, Norwegian consumer protection organization Forbrukerrådet published a report entitled

22  "Every Step You Take, *How deceptive design lets Google track users 24/7*," which examined

23  "how Google continuously tracks the location of its users through a number of different

24  _____

25  [26] Defendant Google LLC's Supplemental Objections and Responses to Plaintiffs' First Set of
     Interrogatories (Ex. 64), at 11.

26  [27] *Google Privacy Policy, supra* n.16 (Ex. 10). This limited disclosure first appeared in Google's
     privacy policy only on May 25, 2 018.  *See generally*

27  https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy
     Policies*).

28  [28] AP Report (Ex. 2).

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

technologies . . .  implemented and enabled through the features "Location History" and "Web & App Activity," with reference to user testing of Android-enabled devices.[29]  Forbrukerrådet concluded that consumers are deceived into being tracked when they use Google services, through multiple techniques including hiding information and deceptive design, and that Google's practices are unethical.[30]

52.     Google's ability to gather geolocation information is unparalleled. Google has access to a startling array of technologies for determining the location of a given user's mobile devices, the user's direction and speed of travel, and the user's proximity to other users and locations.  At a minimum, Google collects location data via GPS data, IP addresses, sensor data from devices, "[i]nformation about things near your device, such as Wi-Fi access points, cell towers, and Bluetooth-enabled devices,"[31] and, as disclosed confidentially in Google's 2019 responses to questions from the U.S. Legislature, via "place proximity reports, timestamp information for the reports, and sensor data such as barometer, gyrometer, and magnetometer." In addition, Google:

collects information about you from publicly accessible sources. For example, if your name appears in your local newspaper, Google's Search engine may index that article and display it to other people if they search for your name. We may also collect information about you from trusted partners, including marketing partners who provide us with information about potential customers of our business services, and security partners who provide us with information to protect against abuse. We also receive information from advertisers to provide advertising and research services on their behalf.[32]

Thus, in addition to collecting location data via the operation of various apps on consumers' devices, Google also collects data from other sources which allows it to amass and correlate data to create a comprehensive tracking and profiling of its users.

---

[29] Forbrukerrådet (Norwegian Consumer Council), *Every Step You Take, How deceptive design lets Google track users 24/7* (November 27, 2018) (Ex. ~~13~~16).

[30] *Id.*

[31] *Google Privacy Policy, supra* n.16 (Ex. 10).

[32] *Id.*

52.     The proliferation of Google Android apps allow for a continuous flow of personal data to Google's servers, even when a user is not interacting with those apps.  Google's Android operating system alone hosts more than 2 million applications (most having nothing to do with the user's location, such as mobile health analysis, payment services, social networking, and music streaming).[33]  In October 2018, it was reported that approximately 90% of such applications sent personal data to Google.[34]  This data sharing occurs whether or not users interact with the apps on their devices.  For example, "[a]ccording to a study conducted by Vanderbilt University, a dormant, stationary Android phone, with Google Chrome active in the background, communicated location information to Google 340 times during a 24-hour period, or at an average of 14 data communications per hour."[35]

53.     The Vanderbilt study demonstrated that, when using an Android device, "even if a user does not interact with any key Google applications, Google is still able to collect considerable information through its advertiser and publisher products," and that "location information constituted 35% of all the data samples sent to Google."[36]  This data collection "is driven largely by data activity from Google's publisher and advertiser products (e.g. Google Analytics, DoubleClick, AdWords),"[37] all of which Google continued when users opted out of Location History, by saving the information via Web & App Activity or otherwise, despite its representations that their data would not be stored.  Forbrukerrådet's report similarly observes that "[o]n Android, allowing any particular app to access location data will allow the service to collect this information in the background, not just while the app is actively in use."[38]

---

[33] *See generally* Google Play Store, https://play.google.com/store/apps?hl=en_US (last visited June 25, 2020).
[34] Steve McCaskill, *'Nine in ten' Android apps send data to Google*, TechRadar Pro (October 24, 2018) (Ex. 17).
[35] Ex. 4 at 4.
[36] (Vanderbilt Study), Douglas C. Schmidt, *Google Data Collection*, Digital Content Next (August 15, 2018) (Ex. 18) at 3-4.
[37] *Id.* at 3.
[38] Ex. 16, at 9.

54.     Users of Apple products are also severely affected.  "While using an iOS device, if a user decides to forgo the use of *any* Google product (i.e. no Android, no Chrome, no Google applications), and visits only non-Google webpages, the number of times data is communicated to Google servers still remains surprisingly high.  This communication is driven purely by advertiser/publisher services.  The number of times such Google services are called from an iOS device is similar to an Android device.  In this experiment, the total magnitude of data communicated to Google servers from an iOS device is found to be approximately half of that from the Android device."[39]

55.     Google does not provide any means, let alone any straightforward means, for users to ascertain the full extent of location information collected about them.  Google offers tools such as "My Activity"[40] and "Takeout"[41] for viewing and downloading data in an individual's "Google Account," but provides no confirmation that the "Account" represents the full compendium of data Google itself has stored about the individual.  These tools provide the illusion that individuals can understand, control, and delete the data that Google collects and has concerning them.  In fact, researchers at Vanderbilt warn that these tools "do not paint a complete picture of the size and scale of Google's data collection," noting that, among other things, "analysis of actual data traffic passed to Google's servers" would be necessary to get a more complete picture.[42]

56.     Google does not even confirm that users can actually delete location data using Google's tools for deleting location data.  Google's current privacy policy states that "[w]hen you delete data, we follow a deletion process to make sure that your data is safely and completely removed from our servers **or retained only in anonymized form**."[43]  Google—since this caveat

---

[39] *Id.* at 4.

[40] Google states that "My Activity allows you to review and control data that's created when you use Google services, like searches you've done or your visits to Google Play. You can browse by date and by topic, and delete part or all of your activity." *Google Privacy Policy* (Ex. 10).

[41] *See, e.g.*, Google Account, *Google Takeout*, available at https://takeout.google.com/settings/takeout (last visited July 3, 2020).

[42] Ex. 18 (Vanderbilt Study) at 9.

[43] *Google Privacy Policy*, *supra* n16, at 14 (Ex. 10) (emphasis added). Google quietly added this caveat to the "Retaining your Information" section of its Privacy Policy for the first time, on

was added to its policies in October 2019—now claims the right to store "deleted" data in another

format.  This is troublesome for many reasons, including that Google is uniquely able to de-

anonymize stored location data, and in all events may continue to use even ostensibly

anonymized location data to serve "personalized" advertisements to users, regardless of the

preferences those users express.

57.     Google holds numerous patents concerning the collection, treatment and analysis

of geolocation data.[44]  These proprietary technologies demonstrate Google's capabilities and

longstanding interests in obtaining and using a comprehensive and precise record of users'

locations and movements, and, on information and belief, reveal its ability to de-anonymize

location data.

49.58.  Google's secretive location tracking and storage practices are not only deceptive

and unethical, they are directly contrary to users' reasonable expectations of privacy.  As

Princeton computer scientist and former chief technologist for the Federal Communications

Commission's enforcement bureau, Jonathan Mayer, stated: "If you're going to allow users to

turn off something called 'Location History,' then all the places where you maintain location

history should be turned off. That seems like a pretty straightforward position to have."[45]

**C.     Google's Conduct ~~Poses a Serious Threat to~~ is an Egregious Invasion of Personal Privacy, Personal Security, and Personal Dignity.**

50.59.  Google's "Location History" is profoundly granular and revealing.  Each time

Google captures an individual's location information, it stores several data points, including but

---

October 15, 2019. *See generally*  https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy Policies*).

[44] Google's patent entitled "Determining device location using multiple sources of location data," for example, explains how Google can determine the precise location of a device that may be communicating multiple, varying sources of location data (*e.g.*, Wi-Fi and GPS) to Google simultaneously.  U.S. Patent No. 10,310,090 (issued June 4, 2019); *see also* U.S. Patent No. 10,274,346 (issued Apr. 30, 2019) ("Determining quality of a location-determination algorithm associated with a mobile device by processing a log of sensor data"); U.S. Patent No. 10,148,772 (issued Dec. 4, 2018) ("System and method for automatically pushing location-specific content to users"); U.S. Patent No. 10,180,980 (issued Jan. 15, 2019) ("Methods and systems for eliminating duplicate events").

[45] AP Report, *supra* n.2 (Ex. 2).

not limited to: timestamp (the exact moment in time that the data was captured), latitude, longitude, velocity, altitude, and activity.  The "activity" data point even appears to reflect *how* an individual is moving.  Activity values include "IN_VEHICLE," "IN_ROAD_VEHICLE," "IN_FOUR_WHEELER_VEHICLE" (Figure 1); [46] "EXITING_VEHICLE" (Figure 2); "WALKING," "ON_FOOT" (Figure 3); "STILL" (Figure 4); and "TILTING" (Figure 5).

*Figure 1:*

```
}, {
  "timestampMs" : "1542042899598",
  "latitudeE7" : 347366509,
  "longitudeE7" : -922687181,
  "accuracy" : 44,
  "activity" : [ {
    "timestampMs" : "1542042874895",
    "activity" : [ {
      "type" : "IN_VEHICLE",
      "confidence" : 100
    }, {
      "type" : "IN_ROAD_VEHICLE",
      "confidence" : 100
    }, {
      "type" : "IN_FOUR_WHEELER_VEHICLE",
      "confidence" : 99
    } ]
```

*Figure 2:*

```
}, {
  "timestampMs" : "1537297638882",
  "activity" : [ {
    "type" : "EXITING_VEHICLE",
    "confidence" : 100
  } ]
```

*Figure 3:*

```
}, {
  "timestampMs" : "1537296563477",
  "activity" : [ {
    "type" : "ON_FOOT",
    "confidence" : 100
  }, {
    "type" : "WALKING",
    "confidence" : 100
  } ]
```

[46] The following figures show location information collected by Google, captured by forensic testing conducted as part of counsel's investigation of this matter, and do not show Plaintiffs' location information or other data.

*Figure 4:*

```
}, {
  "timestampMs" : "1541747209048",
  "latitudeE7" : 347430195,
  "longitudeE7" : -922773730,
  "accuracy" : 16,
  "velocity" : 0,
  "altitude" : 91,
  "verticalAccuracy" : 32,
  "activity" : [ {
    "timestampMs" : "1541747208913",
    "activity" : [ {
      "type" : "STILL",
      "confidence" : 100
    } ]
```

*Figure 5:*

```
}, {
  "timestampMs" : "1541723208156",
  "latitudeE7" : 347428915,
  "longitudeE7" : -922776871,
  "accuracy" : 55,
  "velocity" : 0,
  "heading" : 231,
  "altitude" : 273,
  "verticalAccuracy" : 128,
  "activity" : [ {
    "timestampMs" : "1541719739275",
    "activity" : [ {
      "type" : "TILTING",
      "confidence" : 100
    } ]
  } ]
```

~~51.~~60.  Additional activity values include "RUNNING," "IN_RAIL_VEHICLE," "IN_TWO_WHEELER_VEHICLE," "ON_BICYCLE," and "UNKNOWN."

~~52.~~61.  Google also measures, on a scale from 1 to 100, how sure it is that the user is actually engaging in that type of movement.[47]

~~53.~~62.  Thus, for a given individual, Google not only stores a record of where, specifically, she is, at what time, and for what duration; Google also discerns how fast she is traveling, whether it is on foot or in a vehicle (and which specific vehicle), and whether she is entering or exiting a given vehicle.

---

[47] ~~Douglas C. Schmidt, *Google Data Collection*, Digital Content Next (August 15, 2018), at pp. 12-13 (Ex. 14).~~  Ex. 18 (Vanderbilt Study) at 12-13.

63.     The location information stored by Google in violation of its representations and Class members' permissions is personally identifying, in and of itself.  ~~When~~As early as 2013, before the technological advances of the past seven years and those to come, researchers found that 95% of individuals in a dataset of 1.5 million people whose locations were tracked hourly for fifteen months could be identified by cross-referencing only **four** time-stamped location data points.[48]  A more recent 2018 study at MIT, cross-referencing GPS data from smartphones, call logs, and time-stamped transit logs collected in Singapore in 2011, achieved consistent results (95% identification)  in less than one week.[49]  That Google can identify individuals from the vast quantities of data it has collected—even "deleted" data stored in "anonymized form," can readily be inferred.

64.     Google imposes no limitations on its own ability to cross-reference points in its stores of user data.  In 2012, Google announced that it would eliminate distinctions between data collected from different Google products and services for purposes of its advertising, data analysis, and other activities, saying specifically that Google "may combine information you've provided from one service with information from other services," and "[w]e'll treat you as a single user across all our products."[50]  The current iteration of Google's Privacy Policy also provides that Google collects identifying data from "publicly accessible sources," and "trusted partners, including marketing partners," as well as "information from advertisers to provide advertising and research services on their behalf." [51]  In addition to data Google collects about users from other sources, any user's Google Account may include additional items of personally

---

[48] Yves-Alexandre de Montjoye, et al., *Unique in the Crowd: The privacy bounds of human mobility* (March 25, 2013) (Ex. 19).

[49] Rob Matheson, MIT News Office, *The privacy risks of compiling mobility data* (December 7, 2018) (Ex. 20) at 3.

[50] Alma Whitten, Updating our privacy policies and terms of service, Google Official Blog (January 24, 2012) (Ex. 15).  Reports at the time indicated that Google's motivation was to improve Google's ability to monitor users' interaction with and responses to advertising campaigns—consolidated data from multiple distinct interfaces would, for example, provide Google more opportunities to determine whether users made a purchase using a different interface than the one in which the ads were initially shown.

[51] *Google Privacy Policy* (last modified January 22, 2019)*, supra* n.16 (Ex. 10).

identifying information input by the user, such as the user's phone number, address, and payment information.

66.    As further reporting in the *New York Times* and other news outlets demonstrates, the issues presented in this action are of grave concern to everyone with a smartphone.  *New York Times* reporters gained access to a relatively small trove of ostensibly "anonymized" location data, and these reporters were able to tie the cell phone "pings" included in that data to individual members of society with ease, generating maps of, essentially, those individuals' entire daily lives.  As these reporters observed:

> This granular location data — the kind that is collected by hundreds of mobile apps and then shared with dozens of location data brokers — may seem like a catalog of the mundane. But the aggregate is closer to total surveillance — an exact record of the rhythms of a living, breathing community.[52]

67.    Reporters have shown that with access to publicly available information, location data can be used to ascertain the movements even of the United States President, confirming that in the absence of effective tools to disable location tracking, no ordinary consumer is exempt from highly targeted and individualized surveillance.[53]

~~56.~~68.  Moreover, when an individual's precise location is stored over a period of time, access to that stored location information by itself provides an intimate, and individually-identifying, profile of that individual's movements throughout life.  ~~Moreover,~~ Google's stored location information is linked with *other* personally-identifying information, including an individual's name, email address, and potentially many other personally-identifying data points.  Specifically, ~~all~~ location information stored by Google is stored in an individual's Google Account (in addition to other repositories known to Google, such as the "Footprints" data store) where it is linked to the other data in that account, including the individual's name and email address.  These are required data points for establishing a Google Account.

---

[52] Charlie Warzel and Stuart A. Thompson, *Where Even the Children Are Being Tracked*, New York Times (December 21, 2019) at 1 (Ex. 22).
[53] *See* Stuart A. Thompson and Charlie Warzel, *How to Track President Trump*, New York Times (December 20, 2019) (Ex. 23).

1    ~~55.~~1.   ~~In 2012, Google announced that it would eliminate distinctions between data~~

2    ~~collected from different Google products and services for purposes of its advertising, data~~

3    ~~analysis, and other activities, saying specifically that Google "may combine information you've~~

4    ~~provided from one service with information from other services," and "[w]e'll treat you as a~~

5    ~~single user across all our products."~~[54]   ~~The current iteration of Google's Privacy Policy also~~

6    ~~provides that Google "may" combine the location information it acquires with "information that's~~

7    ~~publicly available online or from other public sources," as well as information "about you from~~

8    ~~trusted partners, including marketing partners," and "information from advertisers to provide~~

9    ~~advertising and research services on their behalf."~~[55]   ~~In addition to data Google collects about~~

10   ~~users from other sources, any user's Google Account may include additional items of personally~~

11   ~~identifying information input by the user, such as the user's phone number, address, and payment~~

12   ~~information.~~

13   ~~56.~~68.   Google has created the means to illicitly compile extremely valuable, personal, and

14   important time-stamped data points, contrary to users' express direction to Google.  ~~This data~~

15   ~~would~~A relatively minimal amount of location data would confirm to Google where a person

16   lives and works, because those locations will occur most frequently in any data set.  This data

17   would also enable Google to cross-reference and conduct unlimited analysis toward unmerited,

18   improper, and monetizable insights into users' private lives, including without limitation into

19   their social, professional, and other relationships, whether and to what extent they perform

20   activities or travel with others, when two people first meet, how they might influence one another,

21   and when common living arrangements and other relationships begin and end.

22

23

24   ---
     [54] ~~Alma Whitten, Updating our privacy policies and terms of service, Google Official Blog~~
25   ~~(January 24, 2012) (Ex. 15).  See also Eyder Peralta, Google's New Privacy Policy Will Allow~~
     ~~Tracking Across Services, NPR (January 25, 2012) (Ex. 16).~~21).  ~~Reports at the time indicated~~
26   ~~that Google's motivation was to improve Google's ability to monitor users' interaction with and~~
     ~~responses to advertising campaigns—consolidated data from multiple distinct interfaces would,~~
27   ~~for example, provide Google more opportunities to determine whether users made a purchase~~
     ~~using a different interface than the one in which the ads were initially shown.~~
28   [55] ~~Google Privacy Policy (last modified January 22, 2019),~~, supra n.~~13~~16 (Ex. 9)).

57.69.  The collection and storage of users' geolocation data itself violated users' reasonable expectations of privacy, and also puts them at increased risk for further privacy violations.  Data breaches and other security vulnerabilities are increasingly common among companies that store user data.  As a major aggregator of valuable personally identifying and other information, Google is an obvious target for hackers.  Any information that Google stores may eventually be stolen, if it has not already been.  As recently as October 2018, for example, Google announced that it had discovered a vulnerability in its Google+ program that exposed personal account information to third-parties, contrary to its user agreements and representations. Reportedly, in order to protect its public image, Google failed to disclose that information to the public for months, and came clean only *after* the security risk was discovered by the media.[56]

58.70.  In addition, despite security measures in place, individual Google accounts are sometimes compromised and may be taken over by criminals and others who would use the information stored there for nefarious purposes, such as stalking, harassment, identity theft, and phishing the associates of the targeted Google user.  In many respects, the *only* sure way to prevent sensitive location histories from falling into unauthorized hands is to keep no records in the first instance.  Through its duplicitous conduct, misrepresentations, and omissions here, Google denied Plaintiffs and Class members the very option it expressly—and falsely—touted it was providing them.

**D.    ~~Preventing~~It Is Not Possible to Prevent Google's ~~Storage~~Collection of Location Information—~~If Possible—Is Far More Complex than Google Represents~~ Through the Controls It Purports to Give Consumers.**

59.71.  Google's first location-enabled mobile service, "My Location," launched as part of Google Maps on November 28, 2007.  In its introduction to the service, Google said that My

---

[56] *See* Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*, The Wall Street Journal (October 8, 2018) (Ex. 17).), available at https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194? (last visited July 3, 2020). Shortly thereafter, Google shut down the Google+ product entirely.  Bill Chappell, *Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed*, NPR (Dec. 11, 2018) (Ex. 18).11, 2018), available at https://www.npr.org/2018/12/11/675529798/with-52-5-million-users-data-exposed-on-google-google-quickens-shutdown (last visited July 3, 2020).

Location used cell tower communications to pinpoint the user's real-time location in the form of a "magical blue circle" displayed on Google Maps. [57]

~~60.~~72.  Acknowledging that users view their location data as highly sensitive, Google's My Location launch announcement included an informational video that promised users who enabled the My Location feature complete anonymity, and described the feature as a transient use by Google of cellular tower data to "display" (not store) location information, at such time as "My Location" was in use (not indefinitely):

> So how does it work?  Each time you use your phone to make a call, send a text message, or view a web site, the information goes through towers which provide your phone with reception.  A tower picks up your call and connects you to your aunt Molly. The same thing happens when you fire up Google Maps for mobile.  The tower gives you the reception you need to access map information. These towers also help Google **display** your location.  Each tower has a unique footprint.  **When you access My Location, Google calculates an estimated location of your handset based on the unique footprint of nearby towers.**  It's not GPS, but it comes pretty close.  The location accuracy may vary and the service gets better the more you use it.  **You might ask, does Google know where I am?  The answer is no.**  In order for you to receive a normal call, your phone needs to locate and connect to a nearby tower.  Google uses the same location information for My Location. It tells Google where a handset is, but not who's using it, their phone number, or any other personal information.  **And if you want, you can always disable the feature. . . .** [58]

~~61.~~73.  On February 4, 2009, Google launched Latitude, another feature of Google Maps, which transmitted the real-time location information described above to other Latitude subscribers (specified by the user), on an opt-in basis. [59]  In connection with the launch of this feature, Google again promised to protect and respect user privacy, and specifically acknowledged the sensitivity of location data, stating: "Fun aside, **we recognize the sensitivity of location data**, so we've built fine-grained privacy controls right into the application." [60]  Nine

---

[57] Mike Chu, *New magical blue circle on your map*, Google Mobile Blog (November 28, 2007) (transcription of excerpt from embedded video at 1:15-2:14) (Ex. ~~19~~24).

[58] *Id.*

[59] Charles Mendis, *Locate your friends in real time with Google Latitude*, Google Mobile Blog (February 4, 2009) (Ex. ~~20~~25).

[60] Vic Gundotra, *See where your friends are with Google Latitude*, Google Official Blog (February 4, 2009) (emphasis added) (Ex. ~~21~~26).

1   months later, on November 10, 2009, Google introduced a new "Location History" feature, which

2   would allow users to "store, view, and manage" their own past Latitude locations indefinitely,

3   assuring users that "[o]f course, you can always delete selected history or your entire location

4   history at any time."[61]

5       62.74.  In or around July 2013, Google retired Latitude.  Google has not retired Location

6   History.

7       63.75.  Contrary to the plain language and simple process set forth in the Google support

8   pages referenced above (*e.g.*, "With Location History off, the places you go are no longer

9   stored."), reports after the AP Report initially suggested that in order in the face of emerging

10   public scrutiny in August 2018 of its location tracking practices, Google was forced to admit for

11   the first time that the Location History setting alone does not prevent the collection of location

12   data, but rather other settings acted in contradiction to Location History to collect and store a

13   user's *location history*.  The first indication that other settings facilitated location tracking

14   regardless of the Location History setting did not come from Google, but rather from other media

15   reports which  initially suggested that to *actually* and effectively prevent Google from storing

16   location information, users must navigate to and understand an additional, deeply-buried and non-

17   obvious setting titled "Web & App Activity."  As of the date of the filing of this complaint, some

18   two years after the controversy arose, Google has still not publicly confirmed that Web & App

19   Activity is the only Google feature which enables storing location data in a user's account when

20   users opt out of Location History.

21       64.76.  Following publication of the AP Report, it was reported These initial media reports,

22   and not Google, first suggested that a user could prevent tracking and storage of location

23   information by Google by turning off the "Web & App Activity" setting on her Google account.

24   To do so, reports indicated that a user must sign in to her Google account on a browser (if an

25   iPhone user) or through the Android settings menu (on an Android device).  In the browser, she

26   can access her account settings by finding "Google Account" in the dropdown menu in the upper

27
28   _____

[61] Chris Lambert, *Google Latitude, now with Location History & Alerts*, Google Mobile Blog
(November 10, 2009) (Ex. 2227).

right-hand corner, then select "Personal Info & Privacy," choose "Manage your Google Activity," then click "Go to Activity Controls."  Once there, a setting called "Web & App Activity" is revealed, which can then be toggled off.  A series of screenshots demonstrating these steps is attached hereto as Exhibit ~~23~~28.

~~65.~~77.  ~~Thus, unless "Web & App Activity" is disabled~~ *in addition to* ~~"Location History,"~~ ~~Google continues to store individuals'~~ The AP Report illustrated Google's comprehensive location ~~information.  This is made evident in the AP Report, which included a visual map of the~~ ~~movements of its investigator, who carried an Android phone~~tracking with Location History turned off ~~(,~~ but with "Web & App Activity" enabled~~)~~., as it is by default, with a visual map of the movements of an Android phone.  The map shows the location information that was tracked and stored by Google, and includes the investigator's train commute on two trips to New York and visits to The High Line park, Chelsea Market, Hell's Kitchen, Central Park and Harlem. To protect his privacy, the AP did not plot the most common marker stored by Google—his home address. The map plots time-stamped GPS coordinates from a Google Account, demonstrating that Google repeatedly captured and stored the investigator's locations and movements.  For example, over the course of approximately **eight** hours (from 2:18 p.m. to 10:07 p.m.) on July 15, 2018, Google captured 22 different time-stamped coordinates as shown in the images below, with each pinpoint captured that day shown in red.







~~66.~~78.  Although multiple media outlets _suggested_, following publication of the AP

Report, ~~suggested~~ that turning off "Web & App Activity" (on top of disabling "Location

History") would be effective to prevent the storage of location information, and some attributed

the information to Google,[62] express confirmation of the overall effectiveness of this process

---

[62] _See, e.g._, Emily Dreyfuss, _How to Stop Google From Tracking Your Location_, Wired (August 13, 2018) ("To actually turn off location tracking, Google says you have to navigate to a setting buried deep in your Google Account called Web & App Activity, which is set by default to share your information, including not just location but IP address and more.") (Ex. ~~24~~29); Associated Press, _Google Found to Track the Location of Users Who Have Opted Out_, NBC News (August 13, 2018) ("To stop Google from saving these location markers, the company says, users can turn off another setting, one that does not specifically reference location information. Called

seems to be absent from Google-branded webpages.  As of the date of this filing nearly two years after the AP Report was published, the Google Support page on the topic still does not definitively confirm that turning off "Web & App Activity" would actually prevent Google from storing specific, time-stamped, precise location information about a user.  The page does not state that turning off "Web & App Activity" terminates all storage of users' location data; rather, the page as amended following revelations by the AP, now warns that after Location History has been turned off, other Google "sites, apps, and services," collect location information, and "[i]f you have other settings *like* Web & App Activity turned *on*" location data *may still be saved*.[63]

79.    Similarly, the Although, subsequent to the media reports concerning Google's intentional collection of location data when Location History is off, Google has had to finally admit that Web & App Activity independently collects location data, Google has failed and continues to fail to inform its users whether Web & App Activity is the only Google feature storing location data when users opt out of Location History.

80.    Web & App Activity is simply the only data capturing tool that Google has been forced to acknowledge to the public, to date.  The full scope of Google's geolocation data collection remains a closely guarded secret.  As an example, Google also collects location data through users' interaction with Wi-Fi access points.  Google suggests that users of its Android devices can exercise control over Google's collection of location data in this manner by turning off a device-level setting called "Wi-Fi Scanning."  However, Plaintiffs are informed and believe that Google continues to collect location data through Wi-Fi access points even if a user turns off this setting, and even if a user turns off Location History.[64]

81.    The AP reported in August 2018 that a Google spokesperson all but acknowledged that Google discerns and stores its users' location histories through other means, the details and

---

[63] 'Web and App Activity' and enabled by default, that setting stores a variety of information from Google apps and websites to your Google account.") (Ex. 2530).

[63] Google Account Help, *Manage Your Location History* (last visited April 29, 2019 June 24, 2020) (Ex. 2631) (emphasis added).

[64] *See, e.g.*, Complaint in *Arizona v. Google LLC*, Case No. CV2020-006219 (Az. Sup. Ct. May 27, 2020), at ¶¶ 72-74 (Ex. 32).

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

extent of which Google has not publicized.additional, as yet undiscovered, means.  The spokesperson reportedly stated, "There are a number of different ways that Google may use location to improve people's experience, *including*: Location History, Web and App Activity, *and* through device-level Location Services."[65]  Accordingly, it appears that users may need to adjust even more settings to prevent Google from storing location information, or indeed, it may be that no amount of denying "permissions" to Google would protect one's location information from being stored.

67.82.  Google's communications to its users on the purpose of function of Web & App Activity, and the means to disable its function, have been deliberately confusing and misleading.  The conflicting array of location-related settings misleads and deceives users of Google's products who have turned off "Location History" into believing that their location information is private, when it is actually being fed into Google's data stores.  Making matters worse, Google automatically changes the state of permissions with regard to these various location-date-related controls without notifying users.  Through various updates to its products, Google has automatically changed users' location settings and default settings, without notice or consent.[66]  In all events, Google has failed to disclose the true state of affairs to Plaintiffs and Class members, and instead affirmatively misrepresented that they could protect their privacy by opting out of having their location information stored.

68.83.  To the extent that the reports regarding "Disabling Web & App Activity" settings are correct, the process in addition to prevent one's location data from being stored was not merelyLocation History is deliberately presented in counter-intuitive, it was deceptive: and confusing ways.  Google obfuscated that the "Web & App Activity" setting is related to location, and instead represents that it is the "Location History" setting that controls geolocation tracking.  Indeed, in Google's description of these "Controls," the "Web & App Activity" setting resides

---

[65] AP Report, *supra* n.2 (emphasis added) (Ex. 2).

[66] *Arizona v. Google LLC* Complaint, *supra* n.64 (Ex. 32), at ¶¶ 105-128 (The Arizona Attorney General's complaint, which was informed by the opportunity to conduct factual discovery, contains an entire section, mostly redacted from public view, entitled, "Google Automatically Changes the State of Permissions without Notifying Users").

1    directly *above*—but separate and apart from—the "Location History" option, indicating that

2    settings related to location and those related to web and app activity are distinct.[67]  Further, until

3    at least November 2018, Google's vague description of what "Web & App Activity" does—that it

4    "[s]aves your activity on Google sites and apps to give you faster searches, better

5    recommendations, and more personalized experiences in Maps, Search, and other Google

6    services"[68]—would not put a user on notice that it relates to location tracking accurate to less than

7    a meter.  For a user to obtain any more detail about the "Web & App Activity" setting, she had to

8    click through to "[l]earn more," then scroll to what's saved as "Web & App Activity," and open a

9    section that is by default collapsed, entitled,  "[i]nfo about your searches & more" before Google

10   even *mentioned* that the setting is related to location tracking.[69]  A user therefore had insufficient

11   notice of the storage and tracking of location information, particularly in light of separate

12   representations and reporting that the "Location History" setting is what allows individuals to

13   control Google's storage and tracking of their location information.

14          69.84.   Google intentionally hides the nature of its location tracking and obfuscates the

15   opt-out process (if the opt-out process is indeed effective).  Before its conduct was uncovered in

16   the AP Report, Google provided at least *three* support pages on location titled: "Manage or delete

17   your Location History,"[70] "Turn location on or off for your Android device,"[71] and "Manage

18

19

20   [67] Archived version of Google Account Help, *Activity Controls* (November 3, 2018) (Ex. 2733).

21   [68] *Id.* (Ex. 2733). Prior versions of this explanation were even less informative.  In October of
     2016 and May of 2018 (and, on information and belief, throughout the interim), Google described
     "Web & App Activity" as a setting that would "Save your search activity on apps and in browsers

22   to make searches faster and get customized experiences in Search, Maps, Now, and other Google
     products." (Ex. 2834).  In November 2018, Google revised its description of Web & App Activity

23   to acknowledge that it "[s]aves . . . associated info like location." *See Activity Controls,*
     https://myaccount.google.com/intro/activitycontrols (visited November 19, 2018; last visited

24   April 29, 2019July 2, 2020).

25   [69] These actions would take the user to Google Search Help, *See & control your search activity*
     available at https://support.google.com/websearch/answer/54068 (visited November 16, 2018, last

26   visitedexhibit prepared by Plaintiffs' counsel April 29, 2019); (Ex. 2935).
     [70] Archived version of Google Account Help, *Manage or delete your Location History*, (August

27   16, 2018) (Ex. 411); Revised archived version of same (August 18, 2018) (Ex. 3036).
     [71] Archived version of Google Account Help, *Turn location on or off for your Android device*

28   (August 16, 2018) (Ex. 3137).

location settings for Android apps."[72]  Strikingly, at the time this litigation commenced, none of these made any mention of "Web & App Activity"—to date, the only way identified to *potentially* prevent Google from tracking user location.

E.     ~~Google's Ineffective Response to the AP Report and to This Litigation Confirms and Continues Its Deceptive Behavior.~~

E.     Google Stores User's Location Data without their Consent to Further its Commercial Interests.

85.     The full scale of Google's use, analysis, commercialization and dissemination of the location data it stores has never been adequately disclosed to its users.  What is known is that Google's ability to monetize such data is unrivaled even in an industry that routinely profits from surveillance of consumers.  Google can use this information in myriad ways for profit, including to sell advertising that is precisely, unprecedently targeted.  It can track where and when consumers shop, the establishments they pass once or every day, which restaurants they frequent, the doctors they visit, where they pump their gas.

86.     Google acknowledges publicly today—but did not prior to the initiation of this lawsuit—that location information collected even when Location History is off is used for a variety of Google's own purposes, including to target advertising.[73]  Google leverages the detailed information it stores about its users, including information about where those users are presently located, where they have been, and where they are likely to be in the future, to drive its advertising revenues.

87.     A platform that can tailor advertisements to consumers based on location data are attractive to marketers.  In 2018, a market research firm conducted a survey of manager-level and above marketers at consumer brands and advertising agencies regarding their use of location information.  The survey found that 89 percent of respondents increased sales, 86 percent grew their customer base, and 84 percent engaged customers by use of location data.  The survey found that the use of location data by consumer brands and advertising agencies will grow from to 94

---

[72] Android Help, *Manage location settings for Android apps* (July 29, 2018) (Ex. ~~32~~38).
[73] *See Google Privacy Policy*, *supra* n.19.

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

1    percent of firms in 2020 (from 84 percent in 2019), with the top use (at 67 percent) being

2    advertising.[74]

3          88.    Google's collection of users' historical locations and movements, particularly

4    when combined with the other data in Google's possession, allow it to serve advertisements to

5    consumers who are likely to make a purchase or fit a targeted profile, and thus to charge would-

6    be advertisers more for Google's services than advertising platforms without the same breadth of

7    information about individual consumers could demand. Indeed, the apps and operating systems

8    that Google develops and distributes, such as the apps recording data to Web & App Activity, are

9    designed to attract and maintain users' attention, both  in order to generate data informative of

10   consumers' habits and tastes, and also to provide a platform through which Google can serve ads

11   to precisely-targeted audiences.  At its core, Google is an extremely profitable advertising

12   company.  In its annual report for 2019, Google explained "How we make money"—"We

13   generate revenues primarily by delivering both performance advertising and brand advertising."

14   Alphabet Inc. Form 10-K, 2019, at 6.  And, that year, those revenues exceeded $161 billion.  *See*

15   *id.* at 51.

16          89.    A central feature of "Google Ads," as the service is currently called, is that it

17   allows prospective advertisers to "Decide where to advertise," promising to "get [their

18   advertisements] in front of the right people."[75]  While certain Google account-level settings such

19   as "Ad Personalization" ostensibly provide a modicum of user control over Google's ability to

20   use the data it collects to increase the value of its advertising platform, Google admits that it

21   collects and uses location data to feed users "personalized" ads, regardless of whether such users

22   have turned off Ad Personalization: "With personalization off, ads you see can still be based on

23   general factors, like the subject of what you're looking at, the time of day, ***or your general***

24   ***location***."[76]  Google in fact discourages users from turning off the Ad Personalization setting,

25

[74] Lawless Research, *2019 Location-Based Marketing Report*, available at
https://static1.squarespace.com/static/5e9491b0c2923c644bacc529/t/5ec812b6e3537d3e3e336c09/1590170297097/Factual-2019-Location-Based-Market-Report.pdf (last visited July 1, 2020).
[75] Google Ads (ads.google.com), *How it works* tab (Ex. 39).
[76] Google Ad Settings, Ad personalization (last visited July 2, 2020), available at

1   because it generates enormous revenue for Google and is a major revenue stream.  Today, if a

2   user attempts to turn off Ad Personalization, he or she will first be led to a warning page,

3   informing the user that: he or she will continue to receive ads, although they will be "less useful

4   to you"; that the user will "no longer be able to turn off ads from specific advertiser"; and that

5   "Any advertisers or interests you've turned off won't be saved."[77]

6          90.     Stored location information thus unquestionably allows Google to direct

7   advertisements to users in specific geographic locations, users who frequently travel through or

8   near those locations, and users whose profiles and projected behavior patterns—built using data

9   about their movements and locations—suggest they would react to certain advertisements in a

10  way that is profitable to the advertiser, and thus to google.  Google offers services for targeting

11  advertisements to users based on the users having been "recently in a location," something that

12  can only be determined when geolocation data is stored.[78]  In explaining to advertisers how to

13  "[t]arget your ads to people in—or who've shown interest in—geographic locations," Google

14  explains that it may detect users' "location[s] of interest" by evaluating "[a] person's past

15  physical locations."[79]  The data is fundamental to the fees Google sets for its services and

16  Google's resulting profits.  It is what enables Google to sell valuable services to third parties.

17         91.     At least one way that Google may use location information to serve targeted

18  advertisements to users, irrespective of such users' account settings, is described, *inter alia*, in its

19  patent for "Generating user information for use in targeted advertising."  U.S. Patent No.

20  9,235,849 (issued Jan. 12, 2016).  There, Google describes how "Geolocation information" can be

21  used to serve targeted advertising, and how it "may include information specifying one or more of

22  one or more countries, one or more (inter-country) regions, one or more states, one or more metro

23  areas, one or more cities, one or more towns, one or more boroughs, one or more areas with

24

25  https://adssettings.google.com. *See also Arizona v. Google LLC* Complaint, *supra* n.64 (Ex. 32),
    at 3 (discussing "deception in ads personalization" related to Google's Ads Personalization
    setting, although the details of Google's misconduct are entirely redacted).

26  [77] Google Ad Settings, Ad personalization (last visited July 2, 2020), available at
    https://adssettings.google.com.

27  [78] Google Ads Help, *About advanced location options* (last visited June 30, 2020) (Ex. 40).

28  [79] Google Ads Help, *About targeting geographic locations* (last visited June 29, 2020) (Ex. 41).

1   common zip codes, one or more areas with common telephone area codes, one or more areas

2   served by common cable head end stations, one or more areas served by common network access

3   points or nodes, etc. It may include latitude and/or longitude, or a range thereof. It may include

4   information, such as an IP address, from which a user location can be estimated." *Id.* at § 4.1.4.

5   As demonstrated by the AP Report, the "areas" at issue can be narrowed to show the precise

6   locations of a single individual.

7        92.   Relying on Google's '849 patent and a multitude of other sources, Harvard

8   professor Shoshana Zuboff explains how "Google's proprietary methods enable it to surveil,

9   capture, expand, construct, and claim behavioral [data], including data that users intentionally

10  choose not to share."[80]  Information users "choose not to share" includes location data that was

11  not meant to be stored after users opted out of Location History.

12       93.   Furthermore, building user profiles and generating advertising revenues are not the

13  only lucrative uses to which Google puts the location data it collects without consent.  Google

14  also uses location data to "build better services," to "maintain & improve [Google's] services,"  to

15  "develop new services," and to "measure performance,"[81] all of which enables Google to create

16  operational efficiencies and be competitive in a wide array of industries in addition to the

17  marketplace for consumer attention (advertising), where it also excels.  Google may also use

18  collections of locations and movements to develop new products in many different fields,

19  including in artificial intelligence, media, public health, finance, real estate, or surveillance and

20  law enforcement.

21       94.   Despite the fact that Google uses location data to generate unparalleled returns as

22  an advertising platform, as well as to further cost-saving advances in technological development

23  and otherwise, Google tells consumers something different.  In the portion of its current Privacy

24  Policy regarding "Your location information," Google asserts it collects such data for *users'*

25

26  _____

27  [80] Shoshana Zuboff (2019) *The Age of Surveillance Capitalism*, Perseus Books, LLC, at 80 &
    n.44.

28  [81] *Google Privacy Policy, supra* n.16 (Ex. 10).

1    benefit, to "offer features like driving directions for your weekend getaway or showtimes for

2    movies playing near you."[82]

3         95.     As with the extent of the location data it collects and stores, and how the data is

4    stored, Google does not publicly disclose all of the uses to which that data is put, nor the precise

5    measure of Google's profits and other benefits that result.  Google has enriched itself at the

6    expense of consumers' individual rights and privacy interests.

7         **F.     Google Continues Its Deceptive Behavior.**

8         96.     Google's users are still being deceived and tracked without consent.  As of the date

9    of filing this Consolidated Complaint, if an individual goes to Google's Help Center[83] and

10   inquires "How can I stop Google Tracking My Location?,"  the very first answer Google provides

11   is still to "Manage your location history," directing the user to the "Location History" tool, which

12   does *not* stop Google tracking the user's location.  None of the immediate results identify every

13   step a user must take to achieve that result; indeed, it is unclear whether a means to truly prevent

14   Google from storing Plaintiffs' and Class members' location data even exists.

15        70.97.  In its initial response to the AP Report on August 13, 2018, Google did not deny

16   storing users' location information in contravention of their settings, but rather defended itself by

17   falsely stating: "We provide clear descriptions of these tools."[84]

18        71.98.  Google's assertion that "clear descriptions" exist is incorrect.  *First*, Google

19   disingenuously and publicly represented that preventing the storage of location data is as easy as

20   turning "off" a settings switch, all the while aware that such action would be ineffective.  Google

21   silently endorsed well-known technology periodicals that, as set forth in paragraph 106136,

22   propagated Google's falsehood that toggling off "Location History" is an effective tool to prevent

23   tracking.  *Second*, while perpetuating the myth of an effective "Location History" switch, Google

24   failed to make reasonably clear to users that they must take at least one wholly separate,

25

26   ---

     [82] *Id.*, at "Your location information."

27   [83] Google Help, *How can I stop Google Tracking My Location?* (last visited June 24, 2020),
     search performed at https://support.google.com.

28   [84] AP Report, *supra* n.2 (Ex. 2).

complicated, and poorly-labeled route in order to turn off location tracking (if this route is in fact

effective), *i.e.*, locating, identifying, and understanding a deeply-buried and non-obvious setting

titled "Web & App Activity."[85]

72.99.   Three days after the AP Report was published, on August 16, 2018, Google

reversed course and revised the description on its help page for the "Location History" setting—

which previously stated simply "With Location History off, the places you go are no longer

stored"—to read:

> This setting does not affect other location services on your device, like
> Google Location Services and Find My Device. Some location data
> may be saved as part of your activity on other services, like Search and
> Maps. When you turn off Location History for your Google Account,
> it's off for all devices associated with that Google Account.[86]

73.100.   With this revision, Google disclosed *for the first time* that Google "may"

track "some" users even after they have turned "Location History" off.

74.101.   Google has since amended its public-facing statements further.  In addition

to revealing that "[s]ome location data may continue to be saved in other settings," Google now

provides more previously-concealed "examples" of how Google "may" collect and store

information regardless of a user's Location History permissions, including through the user's

"camera app."[87]

75.102.   However, Google's new language remains vague, ambiguous, and

deceptive—particularly through the use of unclear language such as "*some* location data" and

"*may* collect and store information."  Google fails to clearly and definitively disclose what

location data is saved, and when.  In January 2019, the French National Data Protection

Commission ("CNIL") addressed complaints regarding Google's data collection and use

disclosures, and ultimately fined Google €50 million for failing to be transparent as required by

the European Union's General Data Protection Regulation ("GDPR").  In its reported findings,

---

[85] This function is set by default to share the user's information, including location.

[86] Compare Ex. 411 (August 16, 2018 archived version captured at 04:09 a.m.) with Ex. 3036 (August 18, 2018 archived version).

[87] *Manage Your Location History*, *supra* n. 35.63 (Ex. 2631).

CNIL noted, among other things, that relevant information about Google's geolocation tracking practices is "accessible after several steps only," that "information is not always clear nor comprehensive," and that "[u]sers are not able to fully understand the extent of the processing operations carried out."[88]

76.103.    In an amendment to its Privacy Policy dated January 22, 2019, Google introduced a new and dramatically different explanation of "Location History."  Whereas Google previously and pervasively described Location History as the tool that would "allow" Google to store a history of location data from any source (see *supra* paragraph 45), which users could turn "off" to prevent location data from being stored (see *supra* paragraphs 40-45), Google has now redefined it altogether, as nothing more than "a private map of where you go with your signed-in devices,"[89]  providing insufficient explanation of its functioning.

77.104.    Further, Google still fails to specify what, if any, location data tracking is ceased when a user turns "Location History" off.  Google *still* fails to clearly disclose the "Web & App Activity" setting, and how (and whether) it, or any other number of permissions settings, can be used to effectively prevent Google from recording location information.  As discussed at Section VI.F, *infra*, as of the filing of this Consolidated Complaint, when an individual queries Google's Help Center on how to stop Google from tracking location information, Location History is still presented as an effective tool.

### F.G.    Google's ~~Surreptitious~~ Storage of Location Data Defies Reasonable Expectations of Privacy and Egregiously Violates Established Social Norms.

78.105.    Each of the following acts defy social norms and invade reasonable privacy expectations: Tracking and storing detailed location information contrary to users' consent, affirmatively misleading users regarding their ability to opt out, and failing to disclose that a history of users' locations are stored in perpetuity.  Normally, mobile device and Internet users

---

[88]  CNIL, *The CNIL's Restricted Committee Imposes a Financial Penalty of 50 Million Euros against Google LLC* (January 21, 2019) (Ex. ~~33).~~42).  In June 2020, the fine was upheld on appeal.
[89]  *Google Privacy Policy* ~~(last modified January 22, 2019).,~~ *supra* n.~~13~~16 (Ex. ~~9).~~10).  *See also* https://policies.google.com/privacy/archive?hl=en-US (listing of archived Google *Privacy Policies*).

such as Plaintiffs are able to control the flow of sensitive information about themselves through "settings" and "permissions" that they grant, or withhold, from third parties, particularly private parties such as Google.  Plaintiffs' and Class members' expectations that those settings and permissions would be heeded and effective, and that they could travel without creating a record of their movements, are eminently reasonable.

79.106.        Google falsely represented to Plaintiffs and Class members that it would not store their location information, thus creating the false impression that Class members could use Google's services in a privacy-protective manner.  Insofar as Google might need location information to provide class members with Google services such as Google Maps, with Location History disabled, any authorization to access location information for those services would only be granted for a specified, limited, and *transient* purpose.  ~~By~~Google gathered location data far in excess of any need to fulfill the limited purposes occasionally authorized by consumers, and thus far in excess of the data Google ever suggested it would collect.  Furthermore, by disabling Location History, Plaintiffs directed Google not to store ~~such~~any of their location information for any subsequent access, analysis, or use.  Storage creates additional risks of privacy harms, including because if location information is not stored, it cannot subsequently be used. Moreover, the storage of location information creates an individually  identifiable, comprehensive record of that person, reflecting a wealth of detail about her associations ranging from familial to political to professional to religious and more.

80.107.        Plaintiffs and Class members took specific steps to protect their privacy and personal security (as well as the privacy and security of their minor children), and made reasonable efforts to stop Google from storing information regarding their whereabouts and day-to-day activities.  Based on Google's representations and omissions, context, and industry norms, they expected Google to heed and follow their instructions and, as a result, expected that their whereabouts would be *private*, not stored on Google's servers along with other personally-identifying information and data.  Those reasonable expectations were consistent with sentiments that are widely shared in American society and elsewhere, and grounded in long-standing social norms and jurisprudence protecting privacy.

1      **1.      Plaintiffs' Expectations of Privacy are Enshrined in Law.**

2      ~~81.~~108.          Invasion of privacy has been recognized as a common law tort for more

3      than a century.  In *Griswold v. Connecticut*, 381 U.S. 479 (1965), the Supreme Court confirmed

4      the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right

5      of privacy older than the Bill of Rights."  Most recently, the Supreme Court specifically

6      recognized the reasonable expectation of privacy a person has in the location information

7      generated by her cell phone, in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  For its part,

8      California amended its constitution in 1972 to specifically enumerate a right to privacy in its very

9      first section.  *See* Cal. Const. Art. I, § 1.

10     ~~82.~~109.          The law provides especially robust protections for geolocation privacy.  In

11     1998, the California Legislature enacted California Penal Code 637.7, which states "No person or

12     entity in this state shall use an electronic tracking device to determine the location or movement

13     of a person."  (Cal. Pen. Code, § 637.7 (a)).  This measure was accompanied by the statement that

14     reads: "The Legislature finds and declares that the right to privacy is fundamental in a free and

15     civilized society and that the increasing use of electronic surveillance devices is eroding personal

16     liberty. The Legislature declares that electronic tracking of a person's location without that

17     person's knowledge violates that person's reasonable expectation of privacy." (Stats. 1998, ch.

18     449, § 1).

19     **2.      Plaintiffs' Expectations Reflect Widely -Held Social Norms.**

20     ~~83.~~110.          As observed by the Supreme Court in *Carpenter*, a smartphone, tablet, or

21     other mobile device is a constant in many people's lives. Indeed, an Internet-connected digital

22     device is a pre-requisite for modern life, necessary for the full continuum of daily activities, from

23     work to commerce to communication (both professional and personal) to obtaining basic

24     government services.  Because of the indispensable nature of connected devices to the entire

25     spectrum of daily life, many Americans carry their mobile devices everywhere they go.  In a 2015

26     study, 94% of smartphone owners said they carry their phone with them frequently, and 82% say

27

28

they never or rarely turn their phones off.[90]  Likewise, Plaintiffs here carry their devices with them on a regular basis throughout the day.

84.111.      In light of the ubiquity of Internet-enabled mobile devices, and in light of those same devices' capacity for near perfect surveillance, society unequivocally has embraced the need to secure and enforce the right of all people to determine for themselves when, and to what extent, data produced by these devices regarding peoples' lives and activities will be shared, cataloged, and analyzed.

112.    By collecting and storing location data without consumers' awareness or consent, Google has violated social norms that are firmly established in American culture and law.  It is widely recognized that "Americans would never consent to a government directive that all citizens carry a device that broadcast, in real time, their physical location and archived that information in repositories that could be shared among powerful, faceless institutions."[91] Musician Mary Milliben, whom the *New York Times* identified based on a trove of location data derived from mobile devices, cautioned, "To know that you have a list of place I have been, and my phone is connected to that, that's scary.  What's the business of a company benefiting off of knowing where I am?"[92]

113.    In May 2020, the Attorney General of Arizona commenced an action alleging "willfully deceptive and unfair acts and practices" by Google, for making it "impractical if not impossible for users to meaningfully opt-out of Google's collection of location information."[93] The Attorney General's complaint reveals that it is has had the benefit of obtaining relevant information from Google pursuant to its investigatory powers, however, the facts learnt from that investigation are being kept hidden from Google's users, as much of the relevant facts have been redacted from the public record.  That investigation was followed by the Attorney General's

---

[90] Lee Rainie and Kathryn Zickuhr, *Americans' Views on Mobile Etiquette*, Pew Research Center (August 26, 2015) (Ex. 3443).

[91] Charlie Warzel & Stuart A. Thompson, *Where Even the Children Are Being Tracked*, New York Times (December 21, 2019) (Ex. 22).

[92] *Id.*

[93] Ryan Randazzo, *Arizona attorney general sues Google, alleges the tech giant fraudulently collects users' location data*, azcentral. (May 27, 2020) (Ex. 45).

1  finding as set forth in its complaint that "even with Location History off, Google would

2  surreptitiously collect location information through other settings such as Web & App Activity

3  and use that information to sell ads."[94]  The complaint also suggests that there is significant

4  information, known to Google, that has not yet been disclosed in this action.  The complaint

5  explains that "Arizona's investigation has revealed that Google's deceptive and unfair conduct

6  extends well beyond its false Location History disclosure," including a "relentless drive" by

7  Google to "make it exceedingly hard for users to understand what is going on with their location

8  information, let alone opt out of this morass."[95] According to the complaint, Location History and

9  Web & App Activity are "two of the primary settings through which Google misleads, deceives,

10  and conceals material information from consumers," but at least ten additional "settings" may

11  relate to Google's collection of location data from mobile devices.[96]  The Attorney General found

12  that Google's array of settings "misleads and deceives users of Google's products into believing

13  that they are not sharing location information when they actually are."[97] Among those are

14  "Device-Level" settings such as "Wi-Fi scanning" and "Wi-Fi connectivity" which can be

15  switched off, ostensibly to provide user control over Google's ability to track their locations using

16  Wi-Fi sensors, but which actually "mislead[] users into providing location to Google even if they

17  do not want to," according to the Attorney General's investigation.[98]

18       114.   Federal lawmakers also have challenged the fundamental disconnect between

19  consumer expectations, and conduct such as Google's with respect to the collection, storage, and

20  use of personal data.  On June 18, 2020, Senator Sherrod Brown of Ohio introduced a bill

21  founded upon the longstanding principle that "the right to privacy protects the individual from

22  intrusions into seclusion, protects individual autonomy, safeguards fair use of data that pertains to

23  the individual, [and] advances the just use of data."[99]  Senator Brown's Data Accountability and

24  _____

25  [94] *Arizona v. Google LLC* Complaint, *supra* n.64 (Ex. 32), at 2.
   [95] *Id.*

26  [96] *Id.*, at 11-12, 14.
   [97] *Id.*, at 11-12.

27  [98] *Id.* at 21.

28  [99] Data Accountability and Transparency Act of 2020, Discussion Draft, available at

1    Transparency Act of 2020 would incorporate societal standards into federal law, by prohibiting

2    collection, use, or sharing of personal data except for certain purposes, such as providing a

3    requested good or service.[100]  As aptly summarized by Justin Brookman, director for consumer

4    privacy and technology policy at Consumer Reports, the bill would codify the common

5    understanding (currently protected at common law) that "[c]ompanies should only use and share

6    personal data to deliver the services and products we ask for."[101]

7        115.   These social norms and expectations are also well-established outside the United

8    States.  As the United Kingdom of Great Britain's Court of Appeal held in a case against Google

9    concerning its unauthorized collection of browser data: "'Privacy lies at the heart of liberty in a

10   modern state.  A proper degree of liberty is essential for the well-being and development of an

11   individual.'"  *Lloyd v. Google LLC*, [2019] EWCA Civ 1599, at ¶ 49 (2019).

12       ~~85.~~116.       On November 27, 2018, the same day Forbrukerrådet published its

13   research regarding unethical location tracking practices by Google (*supra*, paragraph ~~48~~49), seven

14   European consumer organizations—Forbrukerrådet, Consumentenbond (The Netherlands),

15   Ekpizo (Greece), dTest (Czech Republic), Zveza Potrošnikov Slovenije (Slovenia), Federacja

16   Konsumentów (Poland) and Sveriges Konsumenter (Sweden)—filed complaints with their

17   national data protection authorities, alleging practices by Google similar to the allegations

18   herein.[102]  In January 2019, the Swedish Data Protection Authority *Datainspektionen* demanded

19   that Google explain why Google's access to the location data of users of mobile users through

20   "Location History" and "Web & App Activity" do not violate the GDPR.[103]  On ~~Monday,~~ January

21   21, 2019, Dutch consumer organization Consumentenbond presented Google with a petition

22

23

---

24   https://www.banking.senate.gov/download/brown_2020-data-discussion-draft.
     [100] *Id.*
25   [101] Allison Grande, *Senate Bill Would Curtail Data Use, Create New Privacy Cop*, Law 360 (June
     18, 2020) (Ex. 46).
26   [102]  Press Release, *Consumer groups across Europe file complaints against Google for breach of
     GDPR* (November 27, 2018) (Ex. ~~35~~47).
27   [103]  Datainspektionen, *Request for Reply and Further Clarification to Google LLC* (January 18,
28   2019) (Ex. ~~36~~48).

1  signed by more than 50,000 consumers that objected to the secret storage of location information

2  by Google. [104]

3      117.    On October 29, 2019 Australia's Competition and Consumer Commission brought

4  suit against Google alleging that misleading representations about Location History and Web &

5  App Activity wrongfully enabled Google to collect, keep, and use "highly sensitive and valuable

6  personal information about consumers' location without them making an informed choice."[105]

7  And on February 4, 2020, having received complaints concerning Google's location tracking

8  practices from numerous European consumer organizations, the Irish Data Protection

9  Commission announced that it would undertake an independent investigation of whether Google

10  has a valid legal basis for processing the location data of its users and whether it meets its

11  transparency obligations.[106]

12      86.118.        Google itself has long acknowledged the importance of user control over

13  privacy settings. In 2009, when announcing its Latitude location-sharing feature, Google again

14  emphasized both the sensitivity of location data and the privacy implications: "Fun aside, we

15  recognize the sensitivity of location data, so we've~we've~ built fine-grained privacy controls right

16  into the application."[107] And when Location History was first launched, in 2009, Google

17  promised that users "can disable it at any time."[108]  In September of this year, Google's Chief

18  Privacy Officer testified to United States Senate Committee on Commerce, Science, and

19  Transportation that "users trust [Google] to keep their personal information confidential *and*

20  *under their control*."[109] In testimony on December 11, 2018 at the House Judiciary Committee

21  _____

22  [104]  Janene Pieters, *Dutch Petition against Google's Location Tracking Gets 50,000 Signatures*,
Nltimes.nl (January 22, 2019) (Ex. 37~49).

23  [105]  Rachel Pannett, *Google to Face Court on Claims It Misled Australians on Personal Data*, The
Wall Street Journal (October 29, 2019) (Ex. 50).

24  [106]  *Data Protection Commission launches Statutory Inquiry into Google's processing of location
data and transparency surrounding that processing*, Irish Data Protection Commission (February

25  4, 2020) (Ex. 51).

26  [107]  *See, supra*, n.32~60 (Ex. 21~26).

[108]  *See, supra*, n.33~61 (Ex. 22~27).

27  [109]  Written Testimony of Keith Enright Chief Privacy Officer, United States Senate Committee on
Commerce, Science, and Transportation, *Examining Safeguards for Consumer Data Privacy*,

28  (September 26, 2018) (emphasis added~)~, at 2 (Ex. 38~52).

hearing on Transparency and Accountability, Google's Chief Executive Officer expressly agreed that geolocation tracking of consumers (such as Plaintiffs and Class members here) should occur, if at all, only on an *opt-in* basis because precise geolocation information is "considered highly, highly sensitive."[110]

87.119.        According to a poll by the Pew Research Center, 93% of adults believe that being in control of who can get information about them is important, and 90% believe that controlling what information is collected about them is important.[111]  Additionally, Americans say they do not approve of observation without consent: 88% say it is important that they not have someone watch or listen to them without their permission.[112]

88.120.        According to a 2013 Pew Research study, "86% of Internet users have tried to be anonymous online and taken at least one step to try to mask their behavior or avoid being tracked."[113]  For example, 64% percent of adults claim to clear their cookies and browser histories in an attempt to be less visible online.[114]  Such behaviors exemplify people's expectation that their personal information—including their location—will not be tracked by others without their consent or permission, and that settings claiming to allow them to protect such information will be effective.

89.121.        A 2010 study comparing the opinions of young adults between the ages of 18 to 24 with other age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage of young adults were in harmony with older Americans regarding concerns about

---

[110] Representative Karen Handel asked: "For years, a Federal Trade Commission, on a bipartisan basis, has affirmed that precise geolocation information is considered highly, highly sensitive. And that consumers must opt in to that. Do you agree with that?"  Google's Chief Executive Officer responded: "Yes, I agree with that." *See* Testimony of Sundar Pichai, Google Chief Executive Officer, United States House of Representatives Judiciary Committee, *Transparency and Accountability: Examining Google and its Data Collection, use and Filtering Practices* (Dec.December 11, 2018) at 53 (Ex. 14).

[111] Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance,* Pew Research Center (May 20, 2015) (Ex. 3953).

[112] *Id.*

[113] Lee Rainie, et al., *Anonymity, Privacy, and Security Online*, Pew Research Center (September 5, 2013) (Ex. 4054).

[114] *Id.*

online privacy, norms, and policy suggestions.[115]  For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.[116]

90.122.      The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them."  A majority of the 18- to 24-year-olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's personal information illegally; across all age groups, 69% of individuals opted for the highest fine.  Beyond a fine, approximately half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally: putting them out of business and imposing jail time.[117]

### 3.    Parents Have a Reasonable and Universal Expectation of Privacy for their Children.

91.123.      In surreptitiously and deceitfully tracking and recording individuals' location information, Google tracked minor children, a practice that is especially and universally reviled.

92.124.      Parents' interest in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by society.  There is a strong tradition of parental concern for the nurture and upbringing of children in light of children's vulnerable predispositions.  Our society recognizes that parents should maintain control over who interacts with their children and how, in order to ensure the safe and fair treatment of their children.

---

[115] Chris Hoofnagle, et al., *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies*, University of Pennsylvania Scholarly Commons (April 14, 2010) (Ex. 4155).
[116] *Id.* at 11.
[117] *Id.* at 15-16.

93.125.        By way of example, American society has expressed heightened concern for the exploitation of children in numerous ways:

a.        At common law, children under the age of eighteen do not have full capacity to enter into binding contracts with others.  The law shields minors from their lack of judgment, cognitive development, and experience.

b.        Under state law, children are frequently protected via parental consent requirements.  Cal. Civ. Code § 3344 requires "the prior consent of [a] parent or legal guardian" in order for a person to use the name or likeness of a minor under the age of eighteen for advertising purposes.  The California Education Code does not allow access to personal data collected from students without parental consent.  (Cal. Educ. Code § 49076(a)).  Various bills pending before the California State legislature seek to protect parental autonomy over children engaged in online activities.  In addition, the State of California filed an *amicus curiae* brief in *Fraley, et al. v. Facebook, Inc*., 11-cv-01726 (N.D. Cal., filed Apr. 4, 2011) in which it stated: "Protecting children's information is of particular importance, because of their still-developing capacities and the potential for misuse of their information to affect their futures."

c.        State laws also outright ban certain forms of targeted advertising to children.  The California Student Online Personal Information Protection Act ("SOPIPA") requires that operators of mobile applications marketed for use in K-12 schools not engage in "targeted advertising," "amass a profile" of children, or sell children's information, based upon any information, including "persistent unique identifiers" (including geolocation), that the operator has acquired through use of its apps or services.

d.        At the federal level, the Children's Online Privacy Protection Act ("COPPA") protects, *inter alia*, children's Personal Data from being collected and used for targeted advertising purposes without parental consent, and reflects a clear nationwide norm about parents' expectations to be involved in how companies profile and track their children through use of technology.

94.126.        Legislative commentary about the need for federal law to provide protections for children provides another expression of society's expectation that companies

1   should not track children's activities without obtaining parental consent.  For example, when

2   discussing the need for federal legislation to protect children's privacy—which eventually led to

3   Congress passing COPPA—Senator Richard Bryan (the primary author of the COPPA bill)

4   stated:  "Parents do not always have the knowledge, the ability, or the opportunity to monitor

5   their children's online activities, and that is why Web site operators should get parental consent

6   prior to soliciting personal information.  The legislation that Senator McCain and I have

7   introduced will *give parents the reassurance that when our children are on the Internet they will*

8   *not be asked to give out personal information to commercial Web site operators without parental*

9   *consent.*"[118]

10   ~~95.~~127.         The advertising industry's own privacy standards, and the self-regulatory

11   agencies which serve it, also support enhanced protections for children online, including

12   obtaining parental consent.  For example, "[t]he majority of advertisers agree with the statement

13   that parents should give their permission for the data collection of their children (89.5%) and

14   teenagers (78.9%)."[119]

15   ~~96.~~128.         In the same vein, the Children's Advertising Review Unit, an arm of the

16   advertising industry's self-regulation branch, recommends that companies take the following

17   steps, *inter alia*, to meet consumers' reasonable expectations of privacy and avoid violating the

18   law:

19               a.      Advertisers have special responsibilities when collecting data from

20   children online.  They should take into account the limited knowledge, experience, sophistication

21   and maturity of the audience, and must clearly disclose to website or online service users their

22   information collection and tracking practices, information uses, and the means for correcting or

23   removing the information. These disclosures should be prominent and readily accessible before

24   information is collected.

25   _____

26   [118] *S. 2326: Children's Online Privacy Protection Act of 1998*, Hearing before Senate
     Subcommittee on Communications, Statement of Sen. Bryan, S. Hrg. 105-1069, at 4

27   (~~Sept.~~September 23, 1998) (emphasis added) (Ex. ~~42~~56).
     [119] Kristien Daems, et al., *Advertisers' perceptions regarding the ethical appropriateness of new*

28   *advertising formats aimed at minors*, J. Marketing Comms. 8 (2017) (Ex. ~~43~~57).

b.      They should disclose passive means of collecting information from children (*e.g.*, navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

c.      They must obtain "verifiable parental consent" before they collect, use or disclose personal information to third-parties, except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.

d.      To respect the privacy of parents, they should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time. [120]

97.129.      Survey research confirms that societal expectations respecting children's rights to be free from unknown location tracking are fundamental.  A survey published in 2012 by two leading nonprofit groups, the Center for Digital Democracy and Common Sense Media, found that 91% of both parents and adults believe it is not "OK" for advertisers to collect information about a child's location from that child's mobile phone, and 94% of parents and 91% of adults agree that advertisers should receive the parent's permission before putting tracking software on a child's computer.[121]

98.130.      By surreptitiously tracking and storing the location information of minor children, and providing misleading and outright deceptive disclosures regarding its practices, Google has breached parents' and their children's reasonable expectation of privacy, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

---

[120] Children's Advertising Review Unit, *Self-Regulatory Program for Children's Advertising* (2014)), at 17 (Ex. 4458).

[121] Center for Digital Democracy, *New Survey Reveals Strong Support for Updating Children's Online Privacy Protection Act (COPPA): Majority express concerns about new marketing and data-collection practices* (December 6, 2012)), at 1 (Ex. 4559).

4. **The Federal Trade Commission Has Identified Surreptitious Tracking and Storage of Location Information as a Deceptive Trade Practice.**

~~99.~~131.        The Federal Trade Commission ("FTC" or Agency) has determined that tracking individuals' geolocations without permission (and in contravention of their instructions) is a deceptive trade practice.  Indeed, the FTC expressly weighed in on the legality of the very type of behavior complained of herein, and found it to be a deceptive trade practice, in violation of Section 5 of the Federal Trade Commission Act.

~~100.~~132.        In June 2016, the FTC announced that it had entered into a settlement agreement with a mobile advertising company, InMobi PTE, after the Agency charged InMobi with deceptively tracking the locations of hundreds of millions of people without their knowledge or consent in order to serve advertisements tailored to individual people based on where they lived or places they visited.

~~101.~~133.        In that highly analogous case, the FTC alleged that InMobi represented to its users that: (i) its advertising software would only track users' locations when they opted in to such tracking, and (ii) it would conduct such tracking in a manner consistent with users' device privacy settings.[122]  According to the FTC complaint,[123] however, InMobi was actually tracking consumers' locations whether or not the apps using InMobi's software asked for users' permission to do so, and engaged in tracking even when users explicitly *denied* permission to track and store location information.[124]

~~102.~~134.        As a result of the FTC enforcement action, InMobi agreed to pay $950,000 in civil penalties and implement a comprehensive privacy program, including a prohibition from collecting individuals' location information without their affirmative express consent and a requirement that InMobi honor consumers' location privacy settings.  The company was required to delete all of the user location information it had collected and stored without consent and was

---

[122] Federal Trade Commission, *Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission* (June 22, 2016) (Ex. ~~46~~60).
~~[123] *Id.*~~
[124] *Id.*

1    prohibited from further misrepresenting its data collection practices.  The settlement also required

2    InMobi to institute a comprehensive privacy program to be independently audited every two years

3    for 20 years from the date of settlement.[125]

4        103.135.        The activities engaged in by Google, as detailed in this complaint, mirror

5    location tracking activities condemned and sanctioned by the FTC.

6        **G.H.   Google's Deception Compounds the Outrageous Nature of its Conduct.**

7        104.136.        Google claimed to offer people a choice when it came to their location

8    information.  In stating that users could adjust privacy settings to control whether Google stores

9    their location, Google warranted that it would respect those users' privacy choices.  In reality,

10   Google rendered users' choices meaningless: Google stored location data despite the permissions

11   and instructions that users provided through those very settings. Google's storage and tracking of

12   users' location information and movement history was surreptitious and purposely deceptive.

13       105.137.        Not only were Google's representations about privacy *likely* to deceive

14   people, Google *did* deceive the billions of people who use its products.  Not only did ordinary

15   users, including Plaintiffs, reasonably conclude that turning "Location History" off meant that

16   their location would not be tracked and stored, but sophisticated media professionals who cover

17   developments in technology, as well as knowledgeable computer scientists, academics, and

18   regulators, were also deceived.  For example:

19          a.       Only two weeks before the AP Report was published, a website devoted

20   exclusively to topics concerning mobile devices running on Google's Android platform

21   ("Android Central") published an article titled "How to view your location history in Google

22   Maps," under the heading "How to disable location tracking."  In the article, the author—based

23   on Google's misrepresentations—writes, "There's also the option to pause tracking for your

24

25

26   _____

27   [125] Stipulated Order for Permanent Injunction and Civil Penalty Judgment, *United States of America v. InMobi Pte, Ltd.*, Case No. 3:16-cv-3474 (N.D. Cal. [June 22, 2016]) (Dkt. No. 2-1) (Ex. 47).2-1), available at

28   https://www.ftc.gov/system/files/documents/cases/160622inmobistip.pdf.

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

1  account as a whole. To do so, toggle **Location History** to off, and select **OK** in the dialog box

2  that follows.  That's all there is to it!"[126]

3          b.      Similarly, the computer security firm Sophos publishes a website dedicated

4  to mobile privacy and security topics, called "Naked Security."  In an October 2017 article, the

5  author stated—based on Google's misrepresentations—that preventing Google from tracking you

6  "was as simple as going to Settings > Location (under personal) > Google Location History and

7  selecting 'off'.  For comprehensive details on switching off and deleting your location history, go

8  to Google's Manage or delete your Location History page."[127]  As discussed in paragraphs 40-45,

9  *supra*, this page instructed users to utilize the "Location History" setting to prevent location

10  tracking.

11          c.      An online tutorial on WikiHow, titled "How to Disable Google Location

12  History," explains—based on Google's misrepresentations—that "[w]hen you use some Google

13  products like Google Search and Google Maps, Google collects your location information," and

14  further indicates that the way to disable this location tracking is by following the steps described

15  in paragraphs 41-42, *supra*.  This tutorial shows that the authors believed "Location History" was

16  the key to preventing storage of location data, and only referred to the "Web & App Activity"

17  section as a landmark for navigating to "Location History," and not as a setting that implicated

18  the storage or use of location information in any way.  Specifically, it stated: "Navigate to

19  'Location History' section. You can see it under the Web & App Activity segment." [128]  The

20  article does not indicate that "Web & App Activity" settings control location tracking and storage.

21          ~~106.~~138.      Additionally, in the AP Report, multiple sophisticated researchers,

22  regulators, and elected officials stated—based on Google's misrepresentations—that they

23  believed Google's representations concerning the efficacy of the "Location History" setting to be

24

25  [126] Harish Jonnalagadda, *How to view your location history in Google Maps*, Android Central
   (July 20, 2018) (emphasis in original) (Ex. ~~48~~61).

26  [127] Matt Boddy, *The Google tracking feature you didn't know you'd switched on*, NakedSecurity
   by Sophos (October 3, 2017) (Ex. ~~49~~62).

27  [128] WikiHow, *How to Disable Google Location History* (~~last visited~~printed on November 19,
   2018) (Ex. ~~50~~63).

28

1    deceitful.  They stated that they were unaware that Google tracked individuals even if "Location

2    History" had been turned off.  For example, Jonathan Mayer, a Princeton computer scientist and

3    former chief technologist for the Federal Communications Commission's Enforcement Bureau,

4    stated, "If you're going to allow users to turn off something called 'Location History,' then all the

5    places where you maintain location history should be turned off.  That seems like a pretty

6    straightforward position to have."[129]

7            107.139.         Lawmakers were misled as well.  Senator Mark Warner of Virginia

8    indicated that Google's "corporate practices . . . diverge wildly from the totally reasonable

9    expectations of their users."[130]  Representative Frank Pallone of New Jersey called for

10   "comprehensive consumer privacy and data security legislation" in the wake of the AP Report.[131]

11   In response to suggestions by Google's counsel at a recent Senate Judiciary Committee Hearing

12   that Google's storage and use of location information is "complicated," Senator Josh Hawley

13   stated: "I think when somebody turns off their user information, their location history, they expect

14   the location tracking to be off.  But it's not in fact.  They don't have a way, apparently, to turn it

15   off. . . .  What's complicated is you don't allow consumers to stop your tracking of them.  You

16   tell them that you do.  You would anticipate that they do.  A consumer would have a reasonable

17   expectation based on what you've told them that they're not being tracked, but in fact you're still

18   tracking it.  You're still gathering the information, and you're still using it."[132]

19           108.    The extent of Google's use, analysis, commercialization and dissemination of the

20   location data it stores has not been publicized, however, this information can be used in myriad

21   ways by Google, including to sell advertising that is precisely, unprecedentedly targeted.  It can

22   track where and when consumers shop, the establishments they pass once or every day, which

23   restaurants they frequent, the doctors they visit, where they pump their gas.  Google, the

24   quintessence of Big Data, can exponentially increase the value of a single atom of data.  There

25

26   [129] AP Report, *supra* n.2 (Ex. 2).

27   [130] *Id.*
     [131] *Id.*

28   [132] Testimony of Will Devries, *supra* n.3, at 15-16 (Ex. 3).

1   can be no doubt that data this rich and raw is a precious treasure trove.  On April 23, 2019, the

2   United States House of Representatives, Committee on Energy and Commerce, demanded Google

3   answer 10 detailed questions in writing within two weeks regarding "concerning reports" that

4   Google has been storing location information on hundreds of millions of consumers in perpetuity

5   in a database Google calls its "Sensorvault," and other as-yet unidentified databases.[133]

6       109.    Google's misrepresentations continue, despite public outcry following the AP

7   Report, and despite Google's recent suggestion in its Privacy Policy that Location History

8   functions as little more than a personalized map.  Users are still being deceived and tracked

9   without consent.  As of the date of filing this Consolidated Complaint, if an individual goes to

10  Google's Help Center[134] and inquires "How can I stop Google Tracking My Location?," the very

11  first answer Google provides her is to "Manage your location history" and directs her to the

12  "Location History" tool, which does *not* stop Google tracking her location.  None of the

13  immediate results identify every step a user must take to achieve that result; indeed, it is unclear

14  whether a means to truly prevent Google from storing Plaintiffs' and Class members' location

15  data even exists.

16  **VII.    CLASS ALLEGATIONS**

17      110.140.    Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules

18  of Civil Procedure, individually and on behalf of all members of the following classes, which are

19  jointly referred to throughout this Complaint as the "Class:"

20          **Android Class:** All natural persons residing in the United States
            who used Android mobile devices, who turned off "Location
21          History," and whose location information was nonetheless stored by
            Google while "Location History" was disabled.
22
            **Apple Class:** All natural persons residing in the United States who
23          used Apple mobile devices, who turned off "Location History," and
            whose location information was nonetheless stored by Google
24          while "Location History" was disabled.

25

26  ────────────────
    [133] Letter from Greg Walden, United States House of Representatives Committee on Energy and
27  Commerce to Sundar Pichai, Google LLC Chief Executive Office (April 23, 2019) (Ex. 51).
    [134] Google Help, *availableHow can I stop Google Tracking My Location?* (last visited June 24,
28  2020), search performed at https://support.google.com/?hl=en (last visited April 29, 2018)..

**Android Parent Subclass**: All parents and/or legal guardians of persons who, while such persons were younger than the age of 18, used Android mobile devices, who turned off "Location History," and whose location information was nonetheless stored by Google while "Location History" was disabled.

~~Apple~~ **Parent Subclass**: All parents and/or legal guardians of persons who, while such persons were younger than the age of 18, used ~~Apple~~ mobile devices, ~~who turned off "Location History,"~~ and whose location information was ~~nonetheless~~ stored by Google while "Location History" was disabled.

**U.S. Android Subclass:** All natural persons residing in the United States who used Android mobile devices, who turned off "Location History," and whose location information was nonetheless stored by Google while "Location History" was disabled.

**U.S. Apple Subclass:** All natural persons residing in the United States who used Apple mobile devices, who turned off "Location History," and whose location information was nonetheless stored by Google while "Location History" was disabled.

~~111.~~141.       Plaintiff Patacsil seeks to represent the Android Class and Apple Class~~, and U.S. Android Subclass and U.S. Apple Subclass~~; Plaintiffs ~~Dixon,~~ Oshana, and Mahon seek to represent the Android Class ~~and U.S. Android Subclass; Plaintiffs Ali and Carson seek to represent the Apple Class and U.S. Apple Subclass; and;~~ Plaintiff ~~Dixon~~Gamboa seeks to represent the ~~Android Parent Subclass~~Apple Class; and Plaintiff Childs seeks to represent the ~~Apple~~ Parent Subclass.

~~112.~~142.       Excluded from each Class are the following individuals: officers and directors of Google and its parents, subsidiaries, affiliates, and any entity in which Google has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

~~113.~~143.       Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

~~114.~~144.       This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a.       Each Class is so numerous that joinder of all members is impracticable. Upon information and belief, Class members number in the millions.

b.      There are questions of law or fact common to the Classes.  These questions include, but are not limited to, the following:

~~i.      Whether Google's acts and practices complained of herein amount to the use of an electronic tracking device to determine the location or movement of a person, in violation of Cal. Pen. Code § 637.7;~~

~~ii.      Whether the technologies utilized by Google are "electronic tracking devices" under Cal. Pen. Code § 637.7(d);~~

~~iii.~~i.      Whether Google's acts and practices complained of herein amount to egregious breaches of social norms;

~~iv.~~ii.      Whether Google acted intentionally in violating Plaintiffs' and Class members' privacy rights;

iii.      Whether Google was unjustly enriched and/or breached a contract as a result of its violations of Plaintiffs' and Class privacy rights;

~~v.~~iv.      Whether an injunction should issue; and

~~vi.~~v.      Whether declaratory relief should be granted.

c.      Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class members, took efforts to prevent their mobile devices' location information from being recorded and stored by Google.  Plaintiff ~~Dixon~~Childs, like all Parent Subclass members, took efforts to prevent his minor child's mobile device's location information from being recorded and stored by Google.  Despite these efforts and contrary to Google's representations, Plaintiffs and Class members nonetheless had their location information recorded and stored by Google. Plaintiffs and the Class members did not consent to Google's storage of their location information, which acts form the basis for this suit.

d.      Moreover, like all Class members, Plaintiffs suffer a substantial risk of repeated injury in the future.  Each Plaintiff continues to use a mobile device that is capable of reporting location data to Google.  Google has shown deliberate indifference to Plaintiffs' and Class members' instructions regarding storing their location information, and has indeed taken pains to deceive and mislead Plaintiffs (and all Class members) and to conduct its business

contrary to their instruction, and contrary to the plain meaning of its own terms of service in favor of surreptitiously and deceitfully storing location information.  Google's deceptive and deliberate actions have thwarted and continue to threaten Plaintiffs' (and Class members') ability to exercise control over their own privacy while using their devices.  Because the conduct complained of herein is systemic, Plaintiffs and all Class members face substantial risk of the same injury in the future.  Google's conduct is common to all Class members and represents a common pattern of conduct resulting in injury to all members of the Class.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to any other Class member.

e.      Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class members.  Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation.  Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class.  Federal Rule of Civil Procedure 23(a)(4) and 23(g) are satisfied.

f.      In acting as above-alleged, and in failing and refusing to cease and desist despite public outcry, Google has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

g.      Injunctive relief is necessary to prevent further unlawful and unfair conduct by Google.  Money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Google from continuing to commit its illegal and unfair violations of privacy.

**VIII.   FRAUDULENT CONCEALMENT AND TOLLING**

~~115.~~145.      The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above.  Plaintiffs and Class members were

1  ignorant of the information essential to the pursuit of these claims, without any fault or lack of

2  diligence on their own part.

3      ~~116.~~146.       At the time the action was filed, Defendant was under a duty to disclose the

4  true character, quality, and nature of its activities to Plaintiffs and Class members.  Defendant is

5  therefore estopped from relying on any statute of limitations.

6      ~~117.~~147.       Defendant's fraudulent concealment is common to the Class.

7  **IX.    CAUSES OF ACTION**[135]

8                    **Count One**
                    **(Violations of CIPA, Cal. Pen. Code §§ 630, *et seq.*)**
9

10     ~~118.1.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.~~

11     ~~119.    Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that~~

12 ~~advances in science and technology have led to the development of new devices and techniques~~

13 ~~for the purpose of eavesdropping upon private communication and that the invasion of privacy~~

14 ~~resulting from the continual and increasing use of such devices and techniques has created a~~

15 ~~serious threat to the free exercise of personal liberties and cannot be tolerated in a free and~~

16 ~~civilized society."~~

17     ~~120.    Google's acts and practices complained of herein, engaged in for purposes of~~

18 ~~storing and tracking indefinitely the location information of mobile device users and thus~~

19 ~~determining their movement over time (and all other inferences derivable therefrom), without~~

20 ~~their consent—and indeed in direct contravention of instructions clearly expressed through~~

21 ~~turning off the "Location History" setting—violated and continues to violate Cal. Pen. Code §~~

22 ~~637.7.~~

23     ~~121.    Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to~~

24 ~~determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic~~

25

26

---

27 [135] On December 19, 2019, the Court order the dismissal of the claim under CIPA.  ECF No. 113.
   Plaintiffs reserve their rights to appeal that order, though they do not reallege their CIPA claim
28 here.

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

1   tracking device" means "any device attached to a vehicle or other movable thing that reveals its

2   location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

3        122.   In direct violation of this prohibition and without the consent of Plaintiffs or Class

4   members—and indeed in direct contravention of those individuals' clearly-expressed wishes—

5   Google continued to record, store, and use the location and movement of Plaintiffs and Class

6   members after they disabled the "Location History" setting on their mobile devices.

7        123.   As described herein, Google utilized "electronic tracking devices" as defined by

8   Cal. Pen. Code § 637.7(d), in that Google used "devices"—including the GPS hardware, the

9   cellular radio and/or the WiFi chip, all of which are mechanical or electronic equipment—

10  attached to, and located within, each Class member's mobile device (a "movable thing") to

11  "reveal[] its location or movement by the transmission of electronic signals."

12       124.   Alternatively, as described herein, Google used each Class member's mobile

13  device as an "electronic tracking device" which when placed or attached on or within movable

14  things "reveal[ed]" each device's "location or movement by the transmission of electronic

15  signals." Vehicles—including cars, buses, trains, bicycles and other forms of transportation—are

16  obvious examples of such moveable things. Other personal property—such as clothing, purses,

17  briefcases, backpacks, are also "movable things" in that people use them to go about their

18  business and travel in the world. Google not only stores and tracks when an individual traveled in

19  a vehicle, but also what type of vehicle the individual traveled in. Google's technology enables it

20  to analyze and determine whether an individual utilized a rail vehicle, a road vehicle, a two-

21  wheeled vehicle, a four-wheeled vehicle, or a bicycle. Likewise, Google can determine if an

22  individual is traveling by foot. Whatever movable thing the device is attached to, a location and

23  associated data can be determined. As Chief Justice Roberts explained in *Carpenter*, "a cell

24  phone—almost a feature of the human anatomy—tracks nearly exactly the movements of its

25  owner" and "achieves near perfect surveillance, as if it had attached an ankle monitor to the

26  phone's user." 138 S. Ct. 2218.

27       125.   Google unlawfully used those electronic tracking devices "to determine the

28  location or movement of a person"—namely, Plaintiffs and Class members. Google engaged in

- 65 -

1    such storage and tracking of each Class member's movement after each Class member had

2    expressly communicated to Google that Google did not have their consent to do so, by turning off

3    Location History.  Moreover, Google, itself, had affirmatively (but falsely) stated that it would

4    not store and track each Class member's movement once the individual turned off Location

5    History.

6         126.    Additionally, for members of the Android Parent and Apple Parent Subclasses,

7    Google's wanton and surreptitious tracking and storing of Class members' children's location

8    information violated Cal. Pen. Code § 637.7 for the same reasons as described in the preceding

9    paragraphs.  Namely, Google used electronic tracking devices to determine the location or

10   movements of those Subclass members' minor children, in direct contravention of Subclass

11   members' wishes and instruction.

12        127.    As a result of Google's violations of Cal. Pen. Code § 637.7, and pursuant to Cal.

13   Pen. Code § 637.2, Plaintiffs and Class members are entitled to the following relief:

14            a.    A declaration that Google's conduct violates CIPA;

15            b.    Statutory damages and/or trebled actual damages;

16            c.    Injunctive relief in the form of, *inter alia*, an order enjoining Google from

17   geolocating Class members in violation of CIPA;

18            d.    Injunctive relief in the form of, *inter alia*, an order requiring Google to

19   destroy all data created or otherwise obtained from its illegal geolocation of Class members; and

20            e.    An award of attorney's fees and costs of litigation as provided by CIPA,

21   the private attorney general doctrine existing at common law and also codified at California Civil

22   Code Section 1021.5, and all other applicable laws.

23                              **~~Count Two~~**
                              **(Intrusion Upon Seclusion)**
24

25        ~~128.~~148.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

26        ~~129.~~149.    Plaintiffs and Class members have reasonable expectations of privacy in

27   their mobile devices and their online behavior, generally.  Plaintiffs' and Class members' private

28   affairs include their locations.

130.150.     The reasonableness of such expectations of privacy is supported by Google's unique position to monitor Plaintiffs' and Class members' behavior through its access to Plaintiffs' and Class members' private mobile devices.  It is further supported by the surreptitious and non-intuitive nature of Defendant's tracking.

131.151.     DefendantGoogle intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, or private affairs by intentionally geolocating them.and comprehensively tracking their locations and movements. Additionally, for members of the Android Parent and Apple Parent Subclasses, Google's wanton and surreptitious tracking and storing of Subclass members' children's location information was an intentional intrusion on and into the solitude, seclusion, or private affairs of Subclass members and their children.

132.152.     These intrusions are highly offensive to a reasonable person.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress and the California legislature, rules promulgated and enforcement actions undertaken by the FTC, petitions and litigation initiated in the United States and abroad, countless studies, op-eds, and articles decrying location tracking, and Google's own statements.  Moreover, Google engaged in true tracking of location information deceptively and in direct contradiction of the express instructions of Plaintiffs and the members of the Class.  Also supporting the highly offensive nature of Defendant's conduct is the fact that Defendant's principal goal was to surreptitiously monitor Plaintiffs and Class members.

133.153.     Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

134.154.     Google's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

135.155.     As a result of Google's actions, Plaintiffs and Class members seek damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Google's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious

disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Google from engaging in future misconduct.

**Count ~~Three~~Two**
**(California Constitutional Right to Privacy)**

~~136.~~156.      Plaintiffs repeat and reallege all preceding paragraphs contained herein.

~~137.~~157.      Plaintiffs and Class members have reasonable expectations of privacy in their mobile devices and their online behavior, generally.  Plaintiffs' and Class members' private affairs include their behavior on their mobile devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by location tracking.

~~138.~~158.      Google intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, right of privacy, or private affairs by intentionally and comprehensively tracking their ~~location.~~locations and movements.  Additionally, for members of the ~~Android~~ Parent ~~and Apple Parent Subclasses~~Subclass, Google's wanton and surreptitious tracking and storing of Subclass members' children's location information was an intentional intrusion on and into the solitude, seclusion, right of privacy, or private affairs of Subclass members and their children.

~~139.~~159.      These intrusions are highly offensive to a reasonable person, because they disclosed sensitive and confidential location information, constituting an egregious breach of social norms.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress and the California legislature, rules promulgated and enforcement actions undertaken by the FTC, petitions and litigation initiated in the United States and abroad,  countless studies, op-eds, and articles decrying location tracking, and Google's own statements.

~~140.~~160.      Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

~~141.~~161.      Google's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

142.162.        As a result of Google's actions, Plaintiffs and Class members seek damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Google's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Google from engaging in future misconduct.

**Count Three[136]**

**(Unjust Enrichment (Quasi-Contract Claim for Restitution and Disgorgement) or, alternatively, Breach of Contract)**

163.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

164.    Plaintiffs and Class members unwittingly conferred a benefit upon Google. Google took and retained valuable personal location information belonging to Plaintiffs and Class members when it intentionally and comprehensively tracked their locations and movements without their consent.

165.    Google was enriched when it utilized Plaintiffs and Class members' location information stored without consent for its own financial advantage to optimize its advertising platform, including by allowing its paying advertisers to target Plaintiffs and Class members for lucrative advertisements based on previous locations they had visited.

166.    Google was enriched when it utilized Plaintiffs and Class members' location information stored without consent for its own financial advantage to build better services, to maintain and improve Google's services, to develop new services, and to measure performance, all of which enable Google to, and which Google does use, to create operational efficiencies and be competitive in a wide array of industries.

167.    In exchange for Plaintiffs' and Class members' loss of privacy and the financial benefits Google enjoyed as a result thereof, including, but not limited to, advertising profits, Plaintiffs and Class members received nothing.

---

[136] Plaintiffs plead this Count contingent on the Court granting Plaintiffs' Motion for Leave, filed herewith.

1    168.    It would be inequitable for Google to retain the benefits it has unjustly received.

2    Therefore, as a result of Google's actions, Plaintiffs and Class members seek an order that Google

3    disgorge the profits and other benefits it has unjustly obtained.

4        169.    Alternatively, to the extent Google successfully asserts that the Terms of Service

5    form a binding contract that sufficiently defines the parties' rights regarding Google's use of

6    Plaintiffs' and Class members' location information, thereby rendering a claim for unjust

7    enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that

8    Google's conduct constitutes a breach of any such binding contract.  Although Google has

9    amended its privacy policy more than sixteen times in the past six years, it has consistently made

10   representations promising that users control what data Google collects about them through

11   settings that users can customize.  For example, Google's Terms of Service incorporate Google's

12   Privacy Policy, and in that Privacy Policy, Google promises that "you can adjust your privacy

13   settings to control what we collect and how your information is used." [137]  By virtue of Google's

14   conduct as alleged herein, including the storing of Plaintiffs' and Class members' location

15   information in contravention of their Location History setting, Google breached the relevant

16   promises it made in the Terms of Service.

17   ~~X.~~**II.    PRAYER FOR RELIEF**

18       WHEREFORE, Plaintiffs request that judgment be entered against Google and that the

19   Court grant the following:

20       A.    An order determining that this action may be maintained as a class action under

21   Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives,

22   that Plaintiffs' attorneys shall be appointed as Class counsel pursuant to Rule 23(g) of the Federal

23   Rules of Civil Procedure, and that Class notice be promptly issued;

24       B.    Judgment against Google for Plaintiffs' and Class members' asserted causes of

25   action;

26       C.    Appropriate declaratory relief against Google;

27   ———————————————————

28   [137] *Google Privacy Policy* (effective July 1, 2020) (Ex. 10).

1
2
3

      D.      Injunctive relief in the form of, *inter alia*, an order enjoining Google from continuing its practice of recording and using Plaintiffs' and Class members' location information against their instructions ~~and in violation of CIPA~~;

4
5
6

      E.      Injunctive relief ~~related to CIPA in the form of, *inter alia*, an order~~ requiring Google to destroy all data acquired, created, or otherwise obtained from the unlawful recording and storage of the location information of Plaintiff and Class members;

7

      ~~F.      An award of damages pursuant to Cal. Pen. Code § 637.2;~~

8
9
10

      ~~G.~~F.      An order awarding Plaintiffs and the Class members damages, special damages, general damages, ~~and~~ restitution, and disgorgement of profits, benefits, and any other value unjustly obtained to prevent and/or remedy Google's unjust enrichment;

11

      ~~H.~~G.      An order requiring Google to pay punitive damages and exemplary damages;

12

      ~~I.~~H.      An order requiring Google to pay pre-judgment and post-judgment interest;

13

      ~~J.~~I.      Reasonable attorney's fees and costs reasonably incurred; and

14
15

      ~~K.~~J.      Any and all other and further relief to which Plaintiffs and the Class may be entitled.

16

**~~XI.~~III.  DEMAND FOR JURY TRIAL**

17

      Plaintiffs hereby demand a trial by jury of all issues so triable.

18
19

Dated: ~~July 6, 2020~~July 6, 2020      Respectfully Submitted,

20

      */s/  Michael W. Sobol*

21
22
23
24
25
26

      Michael W. Sobol (SBN 194857)
      msobol@lchb.com
      Melissa Gardner (SBN 289096)
      mgardner@lchb.com
      Michael Levin-Gesundheit (SBN 292930)
      mlevin@lchb.com
      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
      275 Battery Street, 29th Floor
      San Francisco, CA  94111-3339
      Telephone:  415.956.1000
      Facsimile:  415.956.1008

27
28

1

2

Nicholas Diamand (*pro hac vice*)
ndiamand@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York,  NY 10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

3

4

5

6

/s/  Tina Wolfson

7

8

9

10

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
~~Alex R. Straus~~Theodore Maya (SBN ~~321366~~223242)
~~astraus~~tmaya@ahdootwolfson.com
~~Brad~~Bradley King (SBN 274399)
bking@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, CA 90024
Telephone: 310.474.9111
Facsimile: 310.474.8585

11

12

13

14

*Interim Co-Lead Class Counsel*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 5:18-CV-05062-EJD
AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hank Bates (SBN 167688)
hbates@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

Rosemary M. Rivas (SBN 209147)
rrivas@zlk.com
LEVI & KORSINSKY, LLP
~~44 Montgomery~~388 Market Street, Suite ~~650~~1300
San Francisco, CA ~~94104~~94111
Telephone: 415.373.1671
Facsimile: 415.484.1294

~~Ivy T. Ngo (SBN 249860)~~
~~ngoi~~Paul R. Wood (*pro hac vice*)
woodp@fdazar.com
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone: 303.757.3300
Facsimile: 720.213.5131

Melissa R. Emert (pro hac vice)
memert@~~ssbny~~kgglawy.com
~~STULL, STULL & BRODY~~
~~6 East 45th Street~~
~~New York~~KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY ~~10017~~10977
Telephone: ~~212.687.7230~~845.356.2570
Facsimile: ~~212.490.2022~~845.356.4336

Andrew J. Brown (SBN 160562)
andrewb@thebrownlawfirm.com
THE LAW OFFICES OF ANDREW J. BROWN
501 W. Broadway, Suite 1490
San Diego, CA 92101
Telephone: 619.501.6550

*Interim Class Counsel*

1686217.11

2005191.10

# EXHIBIT 64

1 | KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
2 | bberkowitz@keker.com
THOMAS E. GORMAN - # 279409
3 | tgorman@keker.com
CHRISTOPHER S. SUN - # 308945
4 | csun@keker.com
CHRISTINA LEE - # 314339
5 | clee@keker.com
633 Battery Street
6 | San Francisco, CA 94111-1809
Telephone:    415 391 5400
7 | Facsimile:    415 397 7188

8 | Attorneys for Defendant GOOGLE LLC

9 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:  GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD |
| | **DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| | Date Filed:  November 2, 2018 |
| | Trial Date:  None Set |
| | **Contains information designated CONFIDENTIAL under Protective Order** |

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Google will respond after a suitable confidentiality order is in place.  Google's investigation is continuing and Google may amend this response at a later date.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3 (December 17, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and potentially seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates Plaintiffs' objectionable definition of "Location Information."  Google further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work product doctrine, or any applicable privilege or protection.

Subject to and without waiving these objections, Google states the following.  Except in response to a court order or other lawful process, Google does not disclose to third parties individual users' Google Stored Geolocation Data.  Google's investigation is continuing and Google may amend this response at a later date.

**INTERROGATORY NO. 4:**

Identify by name, purpose, sequence, and physical location each Process and/or piece of Architecture involved in the creation, development, transmission, maintenance and/or storage of Location Information.

**RESPONSE TO INTERROGATORY NO. 4 (June 4, 2019):**

Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and disproportionate to the needs of the case because it is not limited to information relating to the allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

1   Plaintiffs' objectionable definitions of "Process," "Architecture," and "Location Information."

2   Google further objects to this interrogatory to the extent that it seeks the disclosure of trade

3   secrets or other confidential research, development, or commercial information.  Google further

4   objects to responding because the Court has not yet entered a confidentiality order in this case.

5   Google further objects to this interrogatory to the extent it seeks information protected by the

6   attorney-client privilege or attorney work product doctrine, or any applicable privilege or

7   protection.

8         Subject to and without waiving these objections, Google states the following.  Google will

9   respond after a suitable confidentiality order is in place.  Google's investigation is continuing and

10  Google may amend this response at a later date.

11  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4 (December 17, 2019)**

12  **[Response contains information designated CONFIDENTIAL under Protective Order]:**

13        Google objects to this interrogatory as compound, vague, ambiguous, overbroad, and

14  disproportionate to the needs of the case because it is not limited to information relating to the

15  allegations of Plaintiffs' complaint and seeks information relating to products not at issue in this

16  case.  Google further objects to this interrogatory to the extent that it is not limited to a time frame

17  relevant to this litigation.  Google further objects to this interrogatory to the extent it incorporates

18  Plaintiffs' objectionable definitions of "Process," "Architecture," and "Location Information."

19  Google further objects to this interrogatory to the extent it seeks information protected by the

20  attorney-client privilege or attorney work product doctrine, or any applicable privilege or

21  protection.

22        Subject to and without waiving these objections, Google states the following.  Depending

23  on a particular user's device, usage, and settings, any of the following common methods may be

24  used to arrive at an estimated device location:

25  -   **GPS**:  GPS is a radio navigation system that works by using radio waves between

26        satellites and a receiver inside a device to geolocate the device. The device's GPS

27        receiver uses data from multiple satellite signals to triangulate where the device is.

28  -   **Cellular Network Information**:  Depending on the type of network to which a user's

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

device is connected, a user's device may create location information derived from tower-broadcasted latitude and longitude location of the cell tower.

- **Wi-Fi & Bluetooth**:  These functions enable user devices to infer location based on scans for publicly available information from nearby devices, such as Wi-Fi access points or Bluetooth beacons.

- **Internet Protocol (IP) Address**:  IP addresses are required for devices to be able to connect to one another through the internet and are necessary for online services to function. Because IP addresses are usually assigned in geographic blocks, they may be used to provide an estimate of the location from which a device is communicating over the internet.

These implementations are enabled by a variety of device components working together, including antennae, batteries, microprocessors, Wi-Fi chips, RAM, ROM, GNSS/GPS receivers, RF transceivers, Bluetooth chips, flash memory chips, along with many, many other components.

A user who has enabled settings to allow their device to estimate location information may also configure settings that store that estimated location information in the user's Google Account.  If a user chooses to store that location information in the user's Google Account, the information remains available to the user, including through the user's individualized login to myaccount.google.com or to www.google.com/maps/timeline.  A user who configures settings to store location information in their Google Account may nonetheless delete that information from their Google Account at any time or set the information to be automatically deleted from their Google Account on a schedule.  If a user enables Location History, the user's Location History information is stored in a Google data store called Sensorvault (which was formerly called Placevault).  If a user enables Web & App Activity, the user's Web & App Activity data is stored in a data store called Footprints.  Even if users enable Location History or Web & App Activity, they may choose to delete that data or set the information to be auto-deleted on a schedule from Timeline or MyActivity in their Google Account.  A user can access their Google Account or Timeline in order to manage and delete the data from their home, work, or "on the go" using their computer or mobile device.

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655

1

2                                    **VERIFICATION**

3

4

5    I, Marlo McGriff, declare:

6          I am a Product Manager at Google LLC, and I have been authorized to make this

7    verification on its behalf.

8          I have read Google's Responses and Supplemental Responses to Plaintiffs' First Set of

9    Interrogatories, dated April 24, 2019, and know the contents thereof.  I declare that, based on

10   reasonable inquiry, the facts set forth therein are correct and true to the best of my knowledge,

11   information, and belief.

12         I declare under penalty of perjury that the foregoing is true and correct.

13         Executed at Mountain View, California, on this __20__ day of December 2019.

14

15

16

17   _____
                 MARLO McGRIFF
18

19

20

21

22

23

24

25

26

27

28

16

DEFENDANT GOOGLE LLC'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES
Case No. 5:18-cv-05062-EJD

1360655