Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objectors John Andren, Matthew Lilley, and Joseph S. St. John*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD |
| ———————————————————— | **OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN** |
| JOHN ANDREN, MATTHEW LILLEY, and JOSEPH S. ST. JOHN, | |
| Objectors. | Time:        9:00 A.M.<br>Date:        April 18, 2024<br>Judge:       Hon. Edward J. Davila<br>Courtroom:   4, 5th Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................................i

TABLE OF AUTHORITIES ................................................................................................................ii

INTRODUCTION ...............................................................................................................................1

I.      Objectors Andren, Lilley, and St. John are members of the settlement class. ...........................2

II.     The district court has a fiduciary duty to the unnamed class members and there is no presumption in favor of settlement approval...........................................................................3

III.    The settlement flunks Rule 23(e)(2)(C)(ii) by improperly favoring third-party nonprofits over class members through its *cy pres* provision. ...........................................................................4

        A.      The settlement resorts to *cy pres* prematurely. ..................................................................7

        B.      Without class members' affirmative election, *cy pres* constitutes compelled speech in violation of the First Amendment...................................................................................... 12

        C.      The Court must consider the preexisting relationships between the *cy pres* recipients, class counsel, and the defendant. And many of the proposed recipients are otherwise improper even if significant affiliations are somehow permissible. ........................................... 14

                1.      *Cy pres* beneficiaries should not have a preexisting relationship with class counsel. ........................................................................................................... 17

                2.      Preexisting relationships between the defendant and the *cy pres* recipients undermine the theoretical value of the settlement........................................... 18

        D.      The *cy pres* selection process is improper, opaque, and includes potential recipients mismatched with the class. ............................................................................................... 19

IV.     In the alternative, if there is no practicable way to afford relief to individual class members, then the putative class cannot be certified........................................................................... 20

        A.      Representatives who propose a plenary class release in exchange for a zero-recovery settlement are not adequately representing the class. ................................................... 20

        B.      If distributions to individual class members are impracticable, then a class action is not superior to other available methods of adjudicating the controversy................................. 21

V.      If the Court approves the certification and settlement, it should decline to grant the $18.6 million attorneys' award request........................................................................................... 22

        A.      *Cy pres* is not a direct benefit to the class, and the appropriate fee award is zero. ................. 22

        B.      Regardless, an above-benchmark attorney request of 30% is excessive..................................... 23

CONCLUSION.................................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Al-Haramain Islamic Found., Inc. v. Bush,*
633 F. Supp. 2d 949 (N.D. Cal. 2009) ............................................................................15

*In re Asbestos Sch. Litig.,*
46 F.3d 1284 (3d Cir. 1994) ...........................................................................................13

*In re Baby Prods. Antitrust Litig..,*
708 F.3d 163 (3d Cir. 2013) ...................................................................... 5, 11, 23-24

*In re BankAmerica Corp. Secs. Litig.,*
775 F.3d 1060 (8th Cir. 2015) ............................................................... 4-5, 10-11

*Bateman v. Am. Multi-Cinema, Inc.,*
623 F.3d 708 (9th Cir. 2010) ........................................................................................21

*In re Bluetooth Headset Prod. Liab. Litig.,*
654 F.3d 935 (9th Cir. 2011) .................................................................................. 22, 24

*Boudreaux v. La. Bar Ass'n,*
86 F.4th 620 (5th Cir. 2023) .........................................................................................13

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) ........................................................................................4

*Buckley v. Valeo,*
424 U.S. 1 (1976) ...........................................................................................................13

*Cahill v. PSC,*
556 N.E.2d 133 (N.Y. 1990) .........................................................................................13

*In re Carrier iQ, Inc., Consumer Privacy Litig.,*
2016 WL 4474366, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) ...............9

*Cottle v. Plaid Inc.,*
2021 WL 5415252, 2021 U.S. Dist. LEXIS 224314 (N.D. Cal. Nov. 19, 2021) ...............8

*Cottle v. Plaid Inc.,*
2022 U.S. Dist. LEXIS 128967 (N.D. Cal. Jul. 20, 2022) ...................................................9

*Daniels v. Aeropostale W.,*
No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081 (N.D. Cal. May 29, 2014)...................20-21

*Davis v. East Baton Rouge Par. Sch. Bd.,*
78 F.3d 920 (5th Cir. 1996) ...........................................................................................14

*Dennis v. Kellogg Co.,*
697 F.3d 858 (9th Cir. 2012) ................................................................. 5, 14, 17-20

*In re Dry Max Pampers Litig.,*
724 F.3d 713 (6th Cir. 2013) ......................................................... 3-4, 12, 20

*Dugan v. Lloyds TSB Bank*,
   2013 WL 1703375, 2013 U.S. Dist. LEXIS 56617 (N.D. Cal. Apr. 19, 2013) .................................5

*In re Facebook Internet Tracking Litig.*,
   2022 U.S. Dist. LEXIS 205651, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022)........................ 2, 9

*Fishman v. Tiger Nat. Gas Inc.*,
   2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) .........................................................................23

*Fraley v. Facebook, Inc.*,
   No. C 11-1726 RS, 2012 U.S. Dist. LEXIS 116526 (N.D. Cal. Aug. 17, 2012) .......................... 6, 8

*Fraley v. Facebook, Inc.*,
   966 F. Supp. 2d 939 (N.D. Cal. 2013) .............................................................................. 9, 11

*Frank v. Gaos*,
   139 S. Ct. 1041 (2019) .................................................................... 1, 4, 5, 7, 21

*In re Google Buzz Privacy Litig.*,
   2011 WL 7460099 (N.D. Cal. June 2, 2011). .....................................................................20

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   934 F.3d 316 (3d Cir. 2019) .......................................................................................... 6, 18

*In re Google Plus Profile Litig.*,
   2021 WL 242887, 2021 U.S. Dist. LEXIS 13571 (N.D. Cal. Jan. 25, 2021) ........................... 2, 7, 8

*In re Google Referrer Header Litig.*,
   869 F.3d 737 (9th Cir. 2017),
   *vacated sub nom. Frank v. Gaos*, 139 S. Ct. 1041 (2019)................................................1, 7, 18

*In re Google Referrer Header Litig.*,
   2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442 (N.D. Cal. Oct. 16, 2023) ........................ 2, 7-9

*In re Google Inc. Street View Elec. Commc'n*,
   21 F.4th 1102 (9th Cir. 2021) .........................................................1, 4-7, 11, 14, 18, 21-23

*Harris v. Quinn*,
   573 U.S. 616 (2014).....................................................................................................12-13

*Hawes v. Macy's*,
   2023 WL 8811499, 2023 U.S. Dist. LEXIS 226617 (S.D. Ohio. Dec. 20, 2023) .....................15-16

*Hawthorne v. Umpqua Bank*,
   2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) .....................................................................23

*In re Heartland Payment Sys., Inc.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) .............................................................................24

*Hesse v. Godiva*,
   No. 19-cv-0972-LAP, 2022 U.S. Dist. LEXIS 72641 (S.D.N.Y. Apr. 20, 2022)...........................15

*In re HP Inkjet Printer Litig.*,
   716 F.3d 1173 (9th Cir. 2013) .........................................................................................4

*Janus v. AFSCME, Council 31*,
    138 S. Ct. 2448 (2018) ....................................................................................................... 13-14

*Jasmen v. Best Buy Co.*,
    No. C-05-5056, 2011 U.S. Dist. LEXIS 170795 (N.D. Cal. Nov. 9, 2011) ......................... 15

*Keirsey v. eBay, Inc.*,
    2014 WL 644738 (N.D. Cal. Feb. 18, 2014) ....................................................................... 23

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ..................................................................................... 7, 13

*Knapp v. Art.com*,
    283 F. Supp. 3d 823 (N.D. Cal. 2017); .............................................................................. 18

*Knox v. Service Employees Int'l Union, Loc. 1000*,
    567 U.S. 298 (2012) ......................................................................................................... 13

*Koby v. ARS Nat'l Servs.*,
    846 F.3d 1071 (9th Cir. 2017) .......................................................................... 6, 12, 19, 21

*In re Livingsocial Mktg. and Sales Practices Litig.*,
    298 F.R.D. 1 (D.D.C. 2013) ............................................................................................. 24

*Mandujano v. Basic Vegetable Prods., Inc.*,
    541 F.2d 832 (9th Cir. 1976) ............................................................................................... 6

*McDonough v. Toys "R" Us*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ................................................................................. 11

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ............................................................................................... 4

*In re Microsoft Corp. Antitrust Litig.*,
    185 F. Supp. 2d 519 (D. Md. 2002) ................................................................................. 14

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ....................................................................................... 6, 20

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) ............................................................................................ 20

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ......................................................................................................... 12

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ......................................................................... 5, 14, 18, 20

*In re NSA Telecomms. Records Order Litig.*,
    483 F. Supp. 2d 934 (N.D. Cal. 2007) ............................................................................. 15

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ................................................................................ 7, 11, 22-23

*Perry v. FleetBoston Fin. Corp.*,
    229 F.R.D. 105 (E.D. Pa. 2005) ........................................................................................24

*In re Pet Food Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010) ...........................................................................................10

*Pierce v. Visteon Corp.*,
    791 F.3d 782 (7th Cir. 2015) ..........................................................................................20

*Powers v. Eichen*,
    229 F.3d 1249 (9th Cir. 2000) ........................................................................................23

*Prescott v. Bayer Healthcare LLC*,
    No. 20-cv-00102-NC, 2021 U.S. Dist. LEXIS 82495 (N.D. Cal. Apr. 29, 2021) ............19

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ...........................................................................................12

*Radcliffe v. Experian Info. Solutions*,
    715 F.3d 1157 (9th Cir. 2013) ................................................................................. 17, 20

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ............................................................................................4

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ..........................................................................................19

*Roes v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ..........................................................................................4

*Rubio-Delgado v. Aerotek, Inc.*,
    2015 WL 1503436, 2015 U.S. Dist. LEXIS 43871 (N.D. Cal. Apr. 1, 2015) ..................10

*Schwarzschild v. Tse*,
    69 F.3d 293 (9th Cir. 1995) .......................................................................................21-22

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ........................................................................................................6

*In re Sony VAIO Computer Notebook Trackpad Litig.*,
    No. 09-cv-2109 (S.D. Cal. Aug. 7, 2017) ........................................................................9

*Sourovelis v. City of Philadelphia*,
    515 F. Supp. 3d 321 (E.D. Pa. 2021) ..............................................................................17

*Spotswood v. Hertz Corp.*,
    2019 WL 498822, 2019 U.S. Dist. LEXIS 20536 (D. Md. Feb. 7, 2019) ........................18

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ..........................................................................................12

*In re Subway Footlong Sandwich Mkt'g and Sales Practices Litig.*,
    869 F.3d 551 (7th Cir. 2017) ..........................................................................................21

*Supler v. FKAACS, Inc.*,
   2012 U.S. Dist. LEXIS 159210 (E.D.N.C. Nov. 6, 2012) ................................................21

*In re TD Ameritrade Accountholder Litig.*,
   266 F.R.D. 418 (N.D. Cal. 2009) ....................................................................................24

*Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship.*,
   874 F.3d 692 (11th Cir. 2017) ........................................................................................20

*Weeks v. Kellogg Co.*,
   No. CV 09-08102 (MMM) (RZx),
   2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) .............................................24

*Zapeda v. PayPal*,
   No. C 10-2500 SBA, 2014 U.S. Dist LEXIS 24388 (N.D. Cal. Feb. 24, 2014) ..........  6, 8

*Zapeda v. PayPal*,
   No. C 10-2500 SBA,
   2017 U.S. Dist. LEXIS 43672, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) .............. 8, 11, 23

## **Constitutional Provisions, Rules, and Statutes**

Fed. R. Civ. P. 23 ...............................................................................................................4, 6, 10

Fed. R. Civ. P. 23(a)(4) ...............................................................................................................20

Fed. R. Civ. P. 23(b)(3) ...............................................................................................................21

Fed. R. Civ. P. 23(e) .......................................................................................................................2

Fed. R. Civ. P. 23(e)(2) ............................................................................................................ 1, 4

Fed. R. Civ. P. 23(e)(2)(C)(ii) .................................................................................................. 4, 7

Fed. R. Civ. P. 23(e)(2)(D) ...................................................................................................... 5, 17

Fed. R. Civ. P. 23(g)(4) ...............................................................................................................20

Fed. R. Civ. P. 23(h) ................................................................................................................ 2, 24

U.S. Const., Am. I ...............................................................................................................2, 12-14

U.S. Const., Am. V ......................................................................................................................10

## **Other Authorities**

American Law Institute,
   *Principles of the Law of Aggregate Litig.* § 1.05, cmt. f (2010)......................................7

American Law Institute,
   *Principles of the Law of Aggregate Litig.* § 3.07(a) (2010).............................................7

American Law Institute,
   *Principles of the Law of Aggregate Litig.* § 3.07 cmt. (b) (2010) ......................................... 7, 13, 18

Federal Rules Committee,
   Advisory Committee Notes on 2003 Amendments to Rule 23 ........................................................ 22

Frank, Theodore H.,
   Statement before the House Judiciary Committee Subcommittee on the Constitution and
   Civil Justice, *Examination of Litigation Abuse* (Mar. 13, 2013) ................................................ 5

*Frank v. Gaos*,
   Transcript of Oral Arg. No. 17-961 (Oct. 31, 2018) ........................................................................ 10

Leslie, Christopher R.,
   *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
   59 FLA. L. REV. 71 (2007) ................................................................................................................ 13

Levie, Shay,
   *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*,
   79 GEO. WASH. L. REV. 1065 (2011) ................................................................................................ 10

Liptak, Adam,
   *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007 ...................................................... 15

*Lundy v. Meta Platforms*,
   Amended Class Action Settlement Agreement and Release,
   No. 18-cv-06793-JD, Dkt. 188-1 ................................................................................................ 9-10

McComb, Deborah,
   Declaration re Settlement Claims, *Poertner v. The Gillette Co.*,
   No. 6:12-v-00803-GAP-DAB Dkt. 156 (M.D. Fla. Apr. 22, 2014) ...................................................... 9

Parloff, Roger,
   *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012) ...................... 14, 19

*Pennsylvania v. Google, LLC*,
   Assurance of Voluntary Compliance,
   No. 221101371 (Phila. Ct. Com. Pl. Nov. 14, 2022) .................................................................. 10-12

Redish, Martin H., Peter Julian, & Samantha Zyontz,
   *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*,
   62 FLA. L. REV. 617 (2010) ........................................................................................................ 5, 11

Rubenstein, William B.,
   2d Expert Declaration, *In re Facebook Biometric Info. Privacy Litig.*,
   No. 15-cv-3747, Dkt. 517-2 (N.D. Cal. Dec. 14, 2020) ...................................................................... 8

Smith, D. Brooks,
   *Class Action and Aggregate Litigation: A Comparative International Analysis*,
   124 PENN ST. L. REV. 303 (2020) ................................................................................................ 6, 16

Strange, Brian R.,
    Declaration in Support of Class Plaintiffs' Response to Objection of Theodore H. Frank,
    *In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    No. 12-md-2358, Dkt. 172-2 (D. Del. Jan. 4, 2017) ............................................................................19

Tidmarsh, Jay,
    *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L. REV. 767 (2013).............................................6

Transcript of Preliminary Approval Hearing,
    *In re Google Referrer Header Litig.*, No. 10-cv-04809-EJD, Dkt. 174 (N.D. Cal. May 7, 2023) ..........8

Wasserman, Rhonda,
    *Cy Pres in Class Action Settlements*, 88 U.S.C. L. REV. 97 (2014)....................................................23-24

Weisbrot, Steven,
    Declaration, *In re Google Plus Litig.*,
    No. 18-cv-06164-EJD, Dkt. 129-1 (N.D. Cal. Jul. 15, 2022) ..............................................................8

Weisbrot, Steven,
    Declaration, *Lundy v. Meta Platforms*,
    18-cv-06793-JD, Dkt. 188-1 (N.D. Cal. Feb. 15, 2023) ......................................................................9

Weisbrot, Steven,
    Supp. Declaration, *Lundy v. Meta Platforms*,
    18-cv-06793-JD, Dkt. 211-1 (N.D. Cal. Nov. 2, 2023) ......................................................................9

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

## INTRODUCTION

To paraphrase Yogi Berra, this all-*cy pres* Google settlement is *déjà vu* all over again. This Court criticized at a fairness hearing, but eventually approved, the $0 all-*cy pres* settlement in *In re Google Referrer Header Privacy Litigation*, No. 5:10-cv-04809-EJD (N.D. Cal. Mar. 31, 2015). The Ninth Circuit affirmed in a split decision. 869 F.3d 737 (9th Cir. 2017). The Supreme Court granted certiorari and vacated without reaching the merits; Justice Thomas dissented, agreeing with objectors that the settlement violated Rule 23. *Frank v. Gaos*, 139 S. Ct. 1041, 1047 (2019) (Thomas, J., dissenting). Though the parties claimed that distribution was "infeasible," 869 F.3d at 742, on remand, rather than risk further review, the parties instead agreed to distribute cash in a $23 million common fund to the class. Now, Google and class counsel again try to distribute a common fund to *cy pres* recipients only, though the *per capita* amount is over twice the *Google Referrer* common fund.

The Ninth Circuit has since approved another Google *cy pres* settlement. *In re Google Inc. Street View Elec. Commc'n*, 21 F.4th 1102 (9th Cir. 2021). But the circumstances of *Google Street View* do not present themselves here. Class members can easily identify themselves and the sheer size of the fund ($62 million, nearly five times the size of the *Google Street View* fund) might be distributed with any reasonable claims rate. *See* Section III.A, below. Never before has a federal court confronted an all-*cy pres* settlement of this magnitude. This Court should not be the first to endorse it.

As in *Frank v. Gaos*, the nonprofit Hamilton Lincoln Law Institute and its objector clients continue to maintain that such *cy pres* settlements inherently fail Fed. R. Civ. Proc. 23(e)(2), and believe that the Supreme Court will eventually agree. *Accord Google Street View*, 21 F.4th at 1122-25 (Bade, J., concurring) (positing similar views). We file this objection to preserve our legal arguments. But we also ask this Court to exercise its discretion, given its experience in *Google Referrer*, to reject the settlement. We are unaware of any federal appellate court that has ever reversed a district court decision to reject a settlement as being unfair.

Plaintiffs alleged an "outrageous," "egregious," and "unconscionabl[e]" violation of two hundred million Google users' privacy rights. Amended Consolidated Class Action Complaint, Dkt. 131. The proposed settlement demands that the users release Google from all claims relating to the collection, use, or disclosure of their location data. Yet those individuals will not see one penny of the $62 million settlement fund. Instead, the entire net fund will go to third-party "*cy pres*" recipients, even though it would be practicable to allow class members to recover through a claims-made process with a *pro rata* distribution. This structure should fail the

fairness requirement of Rule 23(e). Moreover, several of the proposed *cy pres* recipients have prior relationships with the parties' counsel, or with Google. Preexisting relationships with the defendant undermine the value of the settlement to the class. Preexisting relationships with counsel qualify as improper conflicts of interest. Even more fundamentally, *cy pres* without the affirmative consent of class members constitutes compelled speech in contravention of the First Amendment. These defects render the settlement substantively unfair.

The argument that "economic infeasibility" prevents distribution is bogus. As the Theodore H. Frank declaration demonstrates, distribution to class members is feasible; using a claims process, distributions regularly occur in settlements with millions of unknown unnamed class members and a settlement fund of less than a dollar per class member. Class counsel knows it, Google knows it, and this Court has approved more than one successful settlement with this distribution. *See, e.g.*, *Google Referrer*, 2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442 (N.D. Cal. Oct. 16, 2023) ($23M common fund distributed through claims process in settlement with about 193 million class members) (awarding fees to objectors' attorneys); *In re Facebook Internet Tracking Litig.*, 2022 U.S. Dist. LEXIS 205651, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) ($90M common fund distributed through a claim process in a settlement with about 124 million class members); *In re Google Plus Profile Litig.*, 2021 WL 242887, 2021 U.S. Dist. LEXIS 13571 (N.D. Cal. Jan. 25, 2021) ($7.5M common fund distributed through a claims process in settlement with about 10 million class members).

Class counsel owes a fiduciary duty to the absent class members to put their interests ahead of third-party nonprofits. And when courts create the incentives for class counsel to put their clients first, attorneys respond. When courts have sustained objections by Objectors' counsel to *cy pres*, class members have received millions of dollars more that class counsel previously claimed was infeasible to distribute. *E.g.*, *Google Referrer*, 2023 U.S. Dist. LEXIS 185442. Here, a zealous fiduciary would be advising clients to opt out of a settlement in which they gained no compensation but lost their rights to sue.

Finally, in the alternative, if the Court approves the settlement, the Rule 23(h) request is excessive and the Court should reduce it.

## I.   Objectors Andren, Lilley, and St. John are members of the settlement class.

Objectors John Michael Andren, Matthew Gregory Lilley, and Joseph Scott St. John (collectively "Objectors"), during the class period and while residing in the United States, owned and used mobile devices

while their Google Account "Location History" setting was disabled. *See* Decl. of John Andren, ¶ 6; Decl. of Matthew Lilley ¶ 6; Decl. of Joseph S. St. John ¶¶ 6, 9. Specifically, Andren used an iPhone, iPad, and Apple laptop to use various Google services, including at least Gmail, Google Search, Google Maps, YouTube, Google Drive, Google Translate, and Google Calendar while his personal Google account was logged in and "Location History" setting was off. Andren Decl. ¶ 9. Similarly, Lilley used personal Android devices, including multiple Motorola Moto "G" phones to use various Google services as detailed in his declaration while his personal Google account was logged in and "Location History" setting was off. Lilley Decl. ¶¶ 6-7. Similarly, St. John used an Apple iPhone to use various Google services while his personal Google account was logged in and "Location History" setting was off. St. John Decl. ¶¶ 6-7, 9-10. On information and belief, Google acquired and stored the Objectors' location information when using various Google-related apps. *Id.*; Andren Decl. ¶ 9; Lilley Decl. ¶¶ 6-7. The Objectors' declarations document their current addresses and email addresses. None of the Objectors is within any of the classes of persons excluded from the settlement. St. John Decl. ¶ 11; Andren Decl. ¶ 9; Lilley Decl. ¶ 8. They are thus members of the class.

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents the Objectors pro bono, and CCAF attorney Theodore H. Frank intends to appear at the fairness hearing on their behalf. CCAF represents class members pro bono where class counsel employs unfair procedures, including the misuse of *cy pres*, to benefit themselves at the expense of the class. *See generally* Declaration of Theodore H. Frank ¶¶ 42-44. Since its 2009 founding, CCAF has recouped over $200 million for class members by driving settling parties to reach an improved bargain or by reducing outsized fee awards. *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time); Frank Decl ¶ 44. Objectors bring this objection through CCAF in good faith to protect the interests of the class. Andren Decl. ¶ 7; Lilley Decl. ¶ 13; St. John Decl. ¶ 16. Their objection applies to the entire class; they join any non-frivolous objections not inconsistent with this one.

## II.  The district court has a fiduciary duty to the unnamed class members and there is no presumption in favor of settlement approval.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements

affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.*

To guard against this danger, a district court must act as a "fiduciary for the class … with a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). It "must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (internal quotations omitted). And it must not "assume the passive role" that is appropriate for an unopposed motion in ordinary bilateral litigation. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014).

There is no presumption in favor of settlement approval: the proponents of a settlement bear the burden of proving its fairness. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 & n.12 (9th Cir. 2019); *accord In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782 (9th Cir. 2022). Any such presumption would depart from Rule 23(e)(2), which "assumes that a class action settlement is invalid." *Briseño v. Henderson*, 998 F.3d 1014, 1030 (9th Cir. 2021).

## III.   The settlement flunks Rule 23(e)(2)(C)(ii) by improperly favoring third-party nonprofits over class members through its *cy pres* provision.

Rule 23(e)(2)(C)(ii) requires that courts evaluate class-action settlements with regard to "the effectiveness of any proposed method of distributing relief to the class." The effectiveness here is worse than zero: the *cy pres* is not targeted to class members; opt-outs get the same thing class members do; and tens of millions being given away to third parties instead of the class. Objectors thus agree with Justice Thomas's *Gaos* dissent and the suggestion in Judge Bade's *Google Street View* concurrence: *cy pres* has no place in Rule 23 settlements. Ninth Circuit law currently disagrees, but we make these objections to preserve the legal questions for future appellate review, and to ask this Court to exercise its discretion to reject the settlement. And even if *Google Street View* were correctly decided, this settlement is distinguishable.

Non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *Google Street View*, 21 F.4th at 1123-25 (Bade, J., concurring) (citing cases).

Even the Ninth Circuit warns of the dangers of *cy pres*. *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (warning that *cy pres* settlements can easily become a "paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("*cy pres* doctrine … poses many nascent dangers to the fairness of the distribution process"). Put simply, no class complaint includes a request for *cy pres* in its prayer for relief; it is "not a form of relief to the absent class members and should not be treated as such." *Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting).

"*Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Baby Prods.*"). Commentators have observed these same defects. *See, e.g.,* Martin H. Redish, Peter Julian, & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617 (2010); Theodore H. Frank, Statement before the House Judiciary Committee Subcommittee on the Constitution and Civil Justice, *Examination of Litigation Abuse* (Mar. 13, 2013).[1]

Redish defines *ex ante cy pres* as an award "designated as part of a settlement agreement" where:

> (1) an amount *and* at least one charity was named as a recipient of part of the fund from the outset and the charity's receipt of the award was not contingent on there being remaining/unclaimed funds in the settlement fund, or (2) the entire award was given to at least one charity with no attempt to compensate the absent class members.

62 FLA. L. REV. at 657 n.171. The relief here is an example of the latter. The Settlement (¶¶40-42) will disburse the entire net settlement fund to non-class member beneficiaries, with nothing for class members. (Perhaps some stakeholders of the *cy pres* recipients are class members, but there is no legitimate reason to favor those recipients over other class members. Fed. R. Civ. Proc. 23(e)(2)(D); *Dugan v. Lloyds TSB Bank*, 2013 WL 1703375, 2013 U.S. Dist. LEXIS 56617, at *10 (N.D. Cal. Apr. 19, 2013). To the extent recipients are members of the class, the settlement violates Rule 23(e)(2)(D) by favoring some class members over others..)

Compared with residual *cy pres*—third-party awards made only after class members fail to cash checks that are distributed—*ex ante cy pres* stands on even shakier footing. *Google Street View*, 21 F.4th at 1125 (Bade, J.,

---

[1] *Available at* https://web.archive.org/web/20170720195547/https://cei.org/sites/default/files/Testimony%20-%20Cy%20Pres.pdf.

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

concurring) ("question[ing] whether *cy pres* awards are inherently unfair when the class receives no meaningful relief"); *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071 (9th Cir. 2017) (rejecting all-*cy pres* settlement); *Molski v. Gleich*, 318 F.3d 937, 954-55 (9th Cir. 2003) (same); *Zepeda v. PayPal*, 2014 U.S. Dist LEXIS 24388, at *21 (N.D. Cal. Feb. 24, 2014) (same); *Fraley v. Facebook*, 2012 WL 5835366, 2012 U.S. Dist. LEXIS 116526, at *4-*7 (N.D. Cal. Aug. 17, 2012) (same); *compare Google Street View,* 21 F.4th at 1115 (affirming all-*cy pres* settlement where there was "no alternative way" to get money to class members). "This form of *cy pres* stands on the weakest ground because *cy pres* is no longer a last-resort solution for a problem of claims administration. The concern for compensating victims is ignored…" Jay Tidmarsh, *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L. REV. 767, 770-71 (2013). Such settlements "whose only monetary distributions are to class counsel, class representatives, and *cy pres* recipients, as in this case, present[] the risk of a still greater misalignment of interests." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 327 (3d Cir. 2019). In short, as the former Chief Judge of the Third Circuit has classified them, all-*cy pres* settlements like the proposal here are "egregious" examples of "cy pres gone wrong." D. Brooks Smith, *Class Action and Aggregate Litigation: A Comparative International Analysis*, 124 PENN ST. L. REV. 303, 337 (2020).

Preferring non-compensatory *cy pres* might be acceptable if the class were a free-floating entity, existing only to permit class counsel to operate as a private attorney general. But Rule 23 is not a substantive bounty-hunting provision; Rule 23 is a procedural joinder device that aggregates real individuals with real claims into a class if certain prerequisites are satisfied. *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins.,* 559 U.S. 393, 408 (2010) (class action is a "species" of joinder). Thus, the plaintiff-class itself as a legal entity "is not the client. Rather, the class attorney continues to have responsibilities to each individual member of the class even when negotiating a settlement." *Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 834-35 (9th Cir. 1976) (cleaned up). But *cy pres* confers no "unique consideration" on class members. If it provides any benefits, it is only the same "generalized benefits as opt-outs or non-class-members." *Google Street View*, 21 F.4th at 1124 (Bade, J., concurring). Counsel's duty to their client works hand in glove with the proper role of the judiciary— "provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring) (cleaned up).

*Google Street View*, the leading Ninth Circuit precedent on the issue, is not to the contrary. 21 F.4th 1102 (9th Cir. 2021). *Google Street View* affirmed a settlement that distributed a $9 million net fund to third parties

instead of direct payments to a 60 million-member class. *Id.* at 1114-15. But it only did so because class member self-identification through a claims process would have amounted to "pure speculation." *Id.* at 1115. There was no "viable way for a claims administrator to verify *any* claimant's entitlement to settlement funds." *Id.* at 1114. Here, no speculation is needed; Google provides a tool to determine whether class members' accounts' Location History was disabled, and Google stores information routinely and ubiquitously (at least when class members are using Google services). *See, e.g.*, Decl. of Daniel Talavera, Dkt. 329 at 7 (giving example of Google Search). Thus, a claims-process distribution is feasible, no different than dozens of other class-action settlements with millions of class members who self-identify to claim settlement funds worth less than a dollar per class member. *See, e.g.*, *Google Referrer*; *Google Plus*; *see generally* Frank Decl. ¶¶ 35-39 (compiling cases).[2]

### A.  The settlement resorts to *cy pres* prematurely.

*Cy pres* is improper when it is feasible to make distributions to class members. *E.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014); *cf.* Fed. R. Civ. P. 23(e)(2)(C)(ii). Section 3.07(a) of the ALI *Principles of the Law of Aggregate Litigation* succinctly states the limitation: "If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members." The last-resort rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles §3.07 cmt. (b)).

The relevant question then is whether it would be practicable to distribute the $62 million settlement fund to self-identifying class members through a claims-made process. And the answer is indisputably yes. In *Google Referrer*, this Court approved a settlement that distributed a $23 million fund (less administrative costs and attorneys' fees) among a class of about 193 million persons using a claims process. 2.56 million class members submitted claims, for a claims rate of 1.33%. 2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442,

---

[2] *Google Referrer* held that a *per capita* entitlement of $0.04 qualifies as *de minimis* and justifies a *cy pres*-only settlement regardless of the feasibility of a claims process, but this Ninth Circuit decision, which split with every other appellate circuit to consider the question, was vacated by *Gaos*. On remand, the parties settled by establishing a common fund of about $0.12 per class member, and distributing $7.70 payments to millions of class members through a claims process, demonstrating that what objectors seek here is economically feasible. 2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442 (N.D. Cal. Oct. 16, 2023).

at *9. In *Google Plus*, this Court approved a settlement that distributed a $7.5 million fund (less administrative costs and attorneys' fees) over a class of about 10 million members. 2021 WL 242887, 2021 U.S. Dist. LEXIS 13571 (N.D. Cal. Jan. 25, 2021) (Davila, J.). Ultimately, because of the efficiency of electronic payments, the settlement compensated more than 1.4 million class members to the tune of $3 million. Declaration of Steven Weisbrot, *Google Plus*, No. 18-cv-06164-EJD, Dkt. 129-1 (N.D. Cal. Jul. 15, 2022). This Court has recognized the greater "efficiencies … that exist now" because of electronic "direct deposit" processes that avoid physical checks. Transcript of Preliminary Approval Hearing, *Google Referrer*, No. 10-cv-04809-EJD, Dkt. 174 at 14 (N.D. Cal. May 7, 2023).

In *Fraley v. Facebook, Inc.*, the class of Facebook users numbered over 100 million, and the parties at first proposed a *cy pres*-only settlement, alleging that class distributions were "simply not practicable in th[e] case, given the size of the class." *Fraley*, 2012 U.S. Dist. LEXIS 116526, at *6. Judge Seeborg refused to accept the proposal because "[m]erely pointing to the infeasibility of dividing up the agreed-to $10 million recovery … is insufficient … to justify resort to purely *cy pres* payments." 2012 U.S. Dist. LEXIS 116526, at *5. After the court denied approval, the agreement was then restructured as a claims-made settlement disbursing cash directly to class members, with the court ultimately augmenting the baseline $10 awards by 50%. 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013) ("*Fraley II*").

Similarly, in *Zepeda v. PayPal*, after Judge Armstrong rejected a proposed *cy pres*-only settlement as unfair, the settling parties returned to the court with an approvable common fund structure that distributed no less than $1.8 million directly to class members. *Compare Zepeda*, 2014 U.S. Dist LEXIS 24388, at *21 (N.D. Cal. Feb. 24, 2014), *with Zepeda*, 2017 U.S. Dist. LEXIS 43672, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) (approving amended settlement). Frank's declaration documents myriad other settlements that demonstrate the feasibility of a claims process with $62 million and millions of class members. Frank Decl. ¶¶ 35-39.

Survey evidence confirms the feasibility of a claims process with *pro rata* distribution. The average claims rate for classes with more than several million class members is less than 1.5%. *See* 2d Expert Declaration of Prof. William B. Rubenstein ¶ 5, *In re Facebook Biometric Info. Privacy Litig.*, No. 15-cv-3747, Dkt. 517-2 (N.D. Cal. Dec. 14, 2020); *accord Cottle v. Plaid Inc.*, 2021 WL 5415252, 2021 U.S. Dist. LEXIS 224314 (N.D. Cal. Nov. 19, 2021) (crediting administrator declaration that in five settlements it administered in cases involving tens of millions of class members; average claims rate was 1.41%). A well-respected settlement administration

company conducted a wide-ranging survey that concluded "settlements with little or no direct mail notice will almost always have a claims rate of less than one percent (1%)." Declaration of Deborah McComb re Settlement Claims ¶5, *Poertner v. The Gillette Co.*, No. 6:12-v-00803-GAP-DAB, Dkt. 156 (M.D. Fla. Apr. 22, 2014). Another administrator "sampled and compared 3 of the largest class settlements" it had administered, and found that using "a variety of methods to provide notice," the "average claim filing rate for these cases is 1.88%." Declaration of Steven Weisbrot ¶ 48, *Lundy v. Meta Platforms*, 18-cv-06793-JD, Dkt. 188-1 (N.D. Cal. Feb. 15, 2023). Because the percentage of class members that will submit claims in these types of settlements is invariably low, a claims-made settlement would not be economically infeasible.

Recent data points reveal that this is true in low-stakes internet consumer settlements with or without direct notice. *Google Referrer* (1.33% claims rate from class of 193 million); Supplemental Declaration of Steven Weisbrot, *Lundy*, No. 18-cv-06793-JD, Dkt. 211-1 (N.D. Cal. Nov. 2, 2023) (claims rate of 1.3% from estimated class of 70 million); *Facebook Internet Tracking* (1.25% claims rate from class of 124 million); *Cottle*, 2022 U.S. Dist. LEXIS 128967 (N.D. Cal. Jul. 20, 2022) (1.28% claims rate from class of 98 million); *In re Carrier iQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, 2016 U.S. Dist. LEXIS 114235, at *28 (N.D. Cal. Aug. 25, 2016) (0.14% claims rate even with direct notice component); *In re Sony VAIO Computer Notebook Trackpad Litig.*, No. 09-cv-2109, Dkt. 378 (S.D. Cal. Aug. 7, 2017) (0.44% of class claiming either $5 or $25 without proof of purchase). *Google Referrer*, *Facebook Internet Tracking,* and *Fraley* show that even where a class numbers over one hundred million a claims process with is feasible, especially using electronic payments.

Plaintiffs implausibly suggest that a claims-made settlement could garner an outlier 7% claims rate—amounting to what would be an extraordinary 17 million claims. Preliminary Approval Mot., Dkt. 327 at 24. And, if so, each claim would only be worth a $2.50 share of the net settlement fund, making *cy pres* (in plaintiffs' view) "the greatest benefit of any form of monetary relief that could be realized here." *Id.* Plaintiffs are mistaken in several ways. *First*, as just discussed, a 17 million person, 7% take rate is unlikely, and five times a typical rate. *Second*, given nearly seamless electronic processes of Venmo, PayPal, Google Pay, and so on, $2.50 payments are economically viable. Because $2.50 is greater than $0, electing $0 is a betrayal of class interests. *Third*, even if $2.50 payments were a contingency that must be avoided, there are obvious ways of doing so besides simply giving the class's money away to third parties. A settlement could contain a contingency "in the event … that a *pro rata* distribution to Settlement Members is not economically or administratively feasible"

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

after an accounting of valid claims. *See* Amended Class Action Settlement Agreement and Release, *Lundy*, No. 18-cv-06793-JD, Dkt. 188-1 ¶ 64.1. It could say, "if we receive more than X million valid claims, we will randomly sample the valid claims and select X million for a payment of *pro rata* shares." *See generally* Shay Levie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 GEO. WASH. L. REV. 1065 (2011). As Justice Kavanaugh explained at oral argument in *Frank*, "at least it's someone who—who, quote, to use your analogy, paid for the lottery ticket as opposed to giving the billion dollar award to someone who didn't buy the lottery ticket." Transcript of Oral Arg. 60, *Frank v. Gaos*, No. 17-961 (Oct. 31, 2018).

Again, typical claims rates indicate that no contingency would even be necessary here. If 1.5% of the 247.7 million estimated class members submit a claim each class member would receive about $12 from the net settlement fund.

It is one of the few advantages of a claims-made process that otherwise-unknown absent class members are able to self-identify. *See Rubio-Delgado v. Aerotek, Inc.,* 2015 WL 1503436, 2015 U.S. Dist. LEXIS 43871, at *7 (N.D. Cal. Apr. 1, 2015) (observing that claim forms can permit identification of those "difficult to identify"). The nature of representational litigation under Rule 23 and the Due Process Clause of the Constitution demand prioritizing class relief even when the representatives believe that third-party payments are the most efficient use of settlement funds. It would always be more "efficient" in the strictest sense of the word to distribute settlement proceeds to a select group of nonprofits because the settling parties can thereby eliminate most of the administrative overhead costs. But maximizing efficiency for efficiency's sake cannot be the sufficient justification for a *cy pres* settlement required by courts.

Nor does Rule 23 allow counsel the discretion to declare anything besides class distributions the "greatest" (Dkt. 327 at 14) way to allocate settlement funds. *BankAmerica*, 775 F.3d at 1065 ("flatly reject[ing]" the idea that *cy pres* recipients could ever be more "worthy" than class members). That concept would "endorse[] judicially impermissible misappropriation of monies gathered to settle complex disputes among private parties" and is a reason that class action *cy pres* is "inherently dubious." *Id* (internal quotation omitted). By definition, *cy pres* can never surpass what is "next best"; "[c]ertainly, this law suit is not charitable." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 363 (3d Cir. 2010) (Weis, J., concurring and dissenting).

That Google has already paid hundreds of millions of dollars to various state attorneys general offers no support for the propriety of *cy pres* here. *See, e.g.*, Assurance of Voluntary Compliance, *Pennsylvania v. Google,*

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

*LLC*, No. 221101371 (Phila. Ct. Com. Pl. Nov. 14, 2022) (40 state settlement requiring $391.5m payment).[3] These civil penalties were paid to governmental entities in settlement of enforcement actions; "[t]he private causes of action aggregated in this class action—as in many others—were created by Congress to allow plaintiffs to recover compensatory damages for their injuries." *Baby Prods.*, 708 F.3d at 173.

Which alternate method the parties elect is not crucial; what matters is that non-compensatory *cy pres* remains the last resort. Direct payment matters. "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Baby Prods.*, 708 F.3d at 178; *id.* at 178-79 (counsel has "responsibility to seek an award that adequately prioritizes direct benefit to the class" and fees should reflect that fact). "Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Id.* at 174. If *cy pres* is an excessive share of the total relative to direct class recovery, a district court should "urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards." *Id.*

Where there is a will, there is a way. When courts demand more of settling parties on behalf of class members, they get more. For example, after *Baby Products* rejected a settlement that would pay class counsel $14 million, nonprofits about $15 million, and class members less than $3 million, class counsel on remand, wishing to avoid a fee reduction, restructured the settlement to eliminate superfluous *cy pres* in favor of direct class distributions. This improved class recovery by nearly $15 million. *McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626 (E.D. Pa. 2015). *Fraley* and *Zepeda*, both discussed above, are similar examples; so are the Eighth Circuit case of *BankAmerica* and the Seventh Circuit case of *Pearson*.

 But here class counsel did not negotiate for using the fund to compensate class members. Rather, in dereliction of their fiduciary obligations, class counsel proposes to give that money away to non-class entities, and, worse to organizations they have a significant prior affiliation with. The bare legitimacy of *cy pres* in the class action context is controvertible with good reason. *See, e.g.*, *Google Street View*, 21 F.4th at 1123-24 (9th Cir. 2021) (Bade, J., concurring) (discussing "increasing skepticism" of *cy pres*); Redish., *supra*. Although *cy pres* has been given a narrow berth in the Ninth Circuit, *Google Street View* does not dictate approval of this scenario, and the law of every other circuit to consider the question requires that this application of *cy pres* be rejected

---

[3] *Available at* https://web.archive.org/web/20221120214927/https://www.attorneygeneral.gov/wp-content/uploads/2022/11/2022-11-14-PA-v.-Google-LLC-AVC-efile.pdf.

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

for these reasons.

The settling parties may respond by pointing to the settlement's supposed injunctive benefits. Settlement ¶¶ 43-44 & Exhibit C. But this "relief" is mere illusion, duplicating Google's preexisting voluntary actions or obligations imposed by the 2022 consent decree that resolved dozens of state enforcement actions against the company. *See* Assurance of Voluntary Compliance, *supra*. For instance, Exhibit C obligates Google to refrain from misrepresentations *it affirmatively withdrew in 2018* and to keep the retention policy *it implemented in 2020*. Restating those obligations offers "no real value"; Google is "already doing" it. *Koby v. ARS Nat. Svcs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017). So too with much of the other supposed "relief." For example, Google is already enjoined from making further misrepresentations. Assurance ¶ 42. And Exhibit C purports to obligate Google to send a notification to users with location information enabled. But Google is already so obligated. Assurance ¶ 43(a), (c). Exhibit C purports to obligate Google to maintain a webpage explaining its policies. Again, Google is already so obligated. Assurance ¶ 44. Exhibit C purports to obligate Google to conduct internal assessments before materially changing its location information policies. Again, Google is already so obligated. Assurance ¶58.

Settlement relief that replicates the *status quo ante* is not valuable consideration for the waiver of class members' claims. *Koby*, 846 F.3d at 1080; *Pampers*, 724 F.3d at 719; *Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003). "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund …" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir. 1998) (internal quotation omitted). Any reliance on this inert injunctive relief to justify the settlement and fee award would demonstrate why the Ninth Circuit has cautioned that injunctive relief is "easily manipulable by overreaching lawyers." *Staton*, 327 F.3d at 974.

**B.    Without class members' affirmative election, *cy pres* constitutes compelled speech in violation of the First Amendment.**

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 573 U.S. 616, 656 (2014). Contributing to charity is expressive and associational activity protected by the First Amendment. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). Concomitantly, individuals have a right to refrain from making donations, a right to be free from compulsion to engage in expressive and associational activity.

*See, e.g., Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) ("Because the compelled subsidization of speech seriously impinges on First Amendment rights, it cannot be casually allowed."); *Knox v. Service Employees Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) (Government cannot "compel the endorsement of ideas it approves.").

These principles render unconsented-to class action third-party awards (at least those awards like this one that will be reserved for organizations that advance policy positions and seek to influence the direction of the law) unconstitutional. Three premises support this conclusion. *First*, "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474 (citing *ALI Principles* § 3.07 cmt. (b)). Though each class members' share of the settlement fund is "small in amount, because it spread across the entire [class]," the monetary support to the third parties is "direct." *Cahill v. PSC*, 556 N.E.2d 133, 136 (N.Y. 1990); *see also Boudreaux v. La. Bar Ass'n*, 86 F.4th 620, 636-37 (5th Cir. 2023) (no *de minimis* exception in the context of compelled speech and association). *Second*, a third-party donation is an expression of support, association, and endorsement of the third party's agenda and activities. *See, e.g., Buckley v. Valeo*, 424 U.S. 1 (1976); *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.). "[C]ompelled funding of the speech of other private speakers or groups presents the same dangers as compelled speech." *Harris*, 573 U.S. at 647 (internal quotation omitted). *Third*, absent class members are compelled to participate in the donations by the Court's order disbursing the funds to the *cy pres* recipients. It is not enough that class members may exclude themselves from the class; silence is not consent and a waiver of First Amendment rights "cannot be presumed." *Janus*, 138 S. Ct. at 2486. "Unless [individuals] clearly and affirmatively consent before any money is taken from them, this standard cannot be met." *Id.*; *see generally* Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

Worse still, the proposed recipients are self-described advocacy groups that advance contentious public policy positions with which at least some class members, including Objectors, disagree. *See* Andren Decl. ¶ 12; Lilley Decl. ¶ 10; St. John Decl. ¶ 13. All three object to organizations that work against their interests or values being subsidized, even to work on different issues: as discussed in the introduction, money is fungible, even when it is earmarked for a specific cause. "In simple terms, the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

speech furthers the interests of the person who does not want to pay." *Janus*, 138 S. Ct. at 2467. And reaching a satisfactory private class settlement does not rise to the level of a critical or "compelling" governmental interest, and does not justify infringing absent class members' rights. *Cf. Davis v. East Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 929 n.8 (5th Cir. 1996) (possibility of "lengthen[ing] the process" of settlement does not justify infringing First Amendment rights).

*Google Street View*, despite *Janus*, holds that affording class members the right to exit the class action resolves any compelled speech problem. 21 F.4th at 1118-19. To distinguish *Janus*, *Google Street View* notes that the funds "could not feasibly be paid to class members." *Id.* at 1119. Again, class distributions are feasible here. But either way, approving the settlement's *cy pres* provision would violate the First Amendment. If necessary, Objectors preserve this issue for further appeal and reconsideration of *Google Street View*'s holding.

C.     **The Court must consider the preexisting relationships between the *cy pres* recipients, class counsel, and the defendant. And many of the proposed recipients are otherwise improper even if significant affiliations are somehow permissible.**

In *Nachshin*, the Ninth Circuit explained that "[t]o remedy some of these concerns" with *cy pres*, "*cy pres* distribution must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members." 663 F.3d at 1039. The relationships between *cy pres* recipients and the parties and their attorneys must be scrutinized because of the dangers posed by *cy pres* and, more specifically, their distribution of millions of dollars due to class members for their injuries with minimal oversight. *See id.* at 1038. For example, a defendant could steer distributions to a favored nonprofit with which it already does business, or use the *cy pres* distribution to achieve business ends (such as back-scratching a nonprofit that supports it in special-interest disputes over, say, copyright). *Dennis*, 697 F.3d at 867-68 (ruminating on these issues); *SEC v. Bear, Stearns & Co.*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009); Roger Parloff, *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012) (noting criticism of Google Buzz settlement that steered *cy pres* to organizations that Google paid to lobby or consult for it). In one infamous example, Microsoft sought to donate licenses for Windows software to schools as part of an antitrust class action settlement, essentially using *cy pres* as a marketing tool that would have frozen out its competitors. *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519 (D. Md. 2002).

On the other hand, if the *cy pres* recipient relates to plaintiffs' counsel, class counsel would be double-

compensated: the attorney indirectly benefits both from the *cy pres* distribution, and then makes a claim for attorneys' fees based on the size of the cy pres. Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007).

The parties have several connections—many acknowledged—between themselves and the proposed *cy pres* recipients.

- Multiple attorneys from the litigating parties and Google employees have attended the universities slated to receive millions of dollars in funds, including Harvard, Yale, Fordham, MIT, UCLA, and Georgetown, most of which already have massive endowments, and it seems smaller centers engaged in privacy work at universities were excluded. *See* Dkts. 349, 352.

- Law firms on both sides of this case have represented the Regents of the University of California, the body that governs UCLA and other state universities. Dkt. 352.

- Multiple attorneys from the law firms litigating the case sit on the boards of the proposed recipients. *See, e.g.*, Dkts. 332, 338 (disclosing at least six attorneys and Google employees who have served on recipients' boards); *see also* Dkt. 349 (disclosing that an appearing attorney for Lieff is expected to join the board for the ACLU Foundation of Northern California this year).

- Both defense counsel and plaintiffs' counsel also have deep ties with the proposed ACLU recipients. *See* Dkts. 332, 338. Defense counsel has provided pro bono services and served as co-counsel with the ACLU, and Lieff Cabraser is considering a "potential collaboration" with the group to jointly pursue other litigation together, as it has in the past. Dkt. 349. This collaboration would merely be the latest in a cozy relationship between Lieff Cabraser and the ACLU. Examples of additional collaboration not disclosed in their filings in violation of Settlement ¶ 41.6 are Lieff Cabraser and the ACLU's representation of plaintiffs together in *Jasmen v. Best Buy Co.*, No. C-05-5056, 2011 U.S. Dist. LEXIS 170795 (N.D. Cal. Nov. 9, 2011), and *Al-Haramain Islamic Found., Inc. v. Bush*, 633 F. Supp. 2d 949 (N.D. Cal. 2009).

- Lieff Cabraser also failed to disclose its co-counsel history with the Electronic Frontier Foundation ("EFF") in violation of Settlement ¶ 41.6. *See In re NSA Telecomms. Records Order Litig.*, 483 F. Supp. 2d 934 (N.D. Cal. 2007).

- That Google—and its counsel—admittedly provide funding to a number of the recipients raises the longstanding concern that defendants will channel *cy pres* to favored recipients to ensure they obtain funding, which allows the defendant (and here it's counsel) to save money by reducing their direct funding. *See* Dkt. 332 (describing Google and Keker, Van Nest's donations to the EFF, ACLU, Berkman Center at Harvard University, Center for Democracy and Technology, and at least three others).

These ties—involving both sets of counsel and the defendant—are especially troublesome because of the controversial nature of the work of the ACLU and other recipients that millions of class members would

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

not wish to support, including work to support abortion access and DEI-type work. *See, e.g.*, Frank Decl. Ex. 1 (ACLU of Northern California proposal describing its privacy law work to include "new and creative ways to utilize constitutional privacy law" to counter "attack[s on] reproductive and LGBTQ rights" and "build greater connection with racial justice, economic justice, and other issues."). It's not just the ACLU that engages in controversial and politicized work—highlighting one reason that *cy pres* is misplaced in the class-action context. For instance, Georgetown's Center on Privacy and Technology's "two most active projects" involve "the impact of … surveillance on [grocery store workers'] ability to organize" and "hold[ing] corporations accountable for discrimination in algorithmic decision making systems"—both highly charged topics. *See id.* Ex. 12. Meanwhile, Free Press "bring[s] a civil rights and racial justice lens to legal and policy debates," has selectively focused on the deletion of location data for those visiting abortion clinics, and intends to advocate to the Federal Trade Commission. *See id.* Ex. 11. The Information Society Project at Yale, which "draft[s] legislation, produc[es] comments for administrative agencies, draft[s] amicus briefs, and litigat[es], acts as "an incubator of novel litigation strategies and legal theories designed to advance reproductive rights and justice," and would use the funding to focus on "algorithmic justice." *See id.* Ex. 21. And, the Rose Foundation—which seeks *cy pres* solely as a slush fund for it to make its own grants unreviewable by the class—boasts that it has DEI as "core organizational values that are expressed in all grantmaking" and it racially discriminates by giving "preference" to applicants that will "specifically benefit[]" "BIPOC communities." *See id.* Ex. 19. These are just examples. Nearly all of the recipients have an objectionable history or mission; or propose an improper geographic mismatch between those targeted by their proposals and the U.S.-based class; or propose a program to benefit people otherwise unrelated to the class, as the Frank Declaration, which this objection incorporates by reference, further details. And millions of class members would not wish to support organizations that support racial discrimination, net neutrality, labor activism, abortion, or any of the other policy work that attracts less heated controversy but still is not universally agreed upon.

Even if this Court does not wish to reach the larger constitutional question, *see* Section III.B above, it should hold that *cy pres* recipients advocating for controversial, ideological and political causes are not appropriate recipients under *Dennis*'s "next best" standard. *See Hesse v. Godiva,* No. 19-cv-0972-LAP, 2022 U.S. Dist. LEXIS 72641, at *25 (S.D.N.Y. Apr. 20, 2022) (rejecting *cy pres* recipient that "engages in controversial, polarizing advocacy"); *Hawes v. Macy's,* 2023 WL 8811499, 2023 U.S. Dist. LEXIS 226617, at *43 (S.D. Ohio.

Dec. 20, 2023) (rejecting consumer class settlement where proposed *cy pres* recipient advocated "for socialized medicine," pursues "climate justice," and fights against "the growing threat of authoritarianism in rural communities"). "[P]owerful interest group[s]" that "conduct[] political activity in many fields wholly unrelated to privacy and technology" are not suitable recipients in a settlement of this litigation. Smith, 124 PENN ST. L. REV. at 337. "[A] cy pres award is not a vehicle by which the court, the parties, or counsel may use monies from the class settlement to propagate their own brand of social justice." *Sourovelis v. City of Philadelphia*, 515 F. Supp. 3d 321, 342 (E.D. Pa. 2021).

Where, as here, lead class counsel has a history of litigating cases with a *cy pres* recipient and its affiliates, there is the unacceptable appearance of divided loyalties of class counsel. And because Google is already an established donor to several of the *cy pres* recipients, the value of the settlement will be less beneficial to the class than it would appear: this is merely a shift in accounting entries, with no evidence that the *cy pres* is not displacing donations Google would already make.

Many of the grant proposals seek to hire new, or are earmarked for existing, academics or staff. To the extent any of those payees are members of the class (and random chance suggests that this will be so), the settlement will violate Rule 23(e)(2)(D), by giving five- and six-digit sums to some privileged class members, but nothing to others.

And it is inequitable, inefficient, and regressive for class members' money to go instead to wealthy universities and nonprofits. Money is fungible. If a proposed program to be funded by the *cy pres* here were worthwhile, an MIT—with an endowment of $17.4 billion—would fund it itself, and the *cy pres* money simply subsidizes the expenditures from MIT's already-full pockets. And if MIT were not going to engage in the program without the *cy pres* award's artificial grant-process requirements, then it is simply a misallocation of resources. Similarly, Harvard has an endowment of over fifty billion dollars; the ACLU's two-year *profits* from April 1, 2016 to March 31, 2018 were over $124 million.

### 1. *Cy pres* **beneficiaries should not have a preexisting relationship with class counsel.**

"The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1167 (9th Cir. 2013) (internal quotation omitted). "Cy pres distributions present a particular

danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis*, 858 F.3d at 867; *see also Nachshin*, 663 F.3d at 1039 (criticizing *cy pres* where "the selection process may answer to the whims and self-interests of the parties [or] their counsel"); *Google Cookie*, 934 F.3d 316 (vacating settlement approval where class counsel sat on board of a *cy pres* recipient).

Here, counsel for both the class and the defendant have litigated cases with the ACLU or its state-based affiliates and EFF. Such a recipient is not independent and free from conflict and thus "is not an appropriate designee." *Knapp v. Art.com*, 283 F. Supp. 3d 823, 835 (N.D. Cal. 2017) (even where a proposed recipient would otherwise be an "acceptable *cy pres* beneficiary," it is not an appropriate designee where "class counsel's firm is co-counsel with [the proposed recipient] in another matter"); *cf. also Spotswood v. Hertz Corp.*, 2019 WL 498822, 2019 U.S. Dist. LEXIS 20536, at *36-*38 (D. Md. Feb. 7, 2019) (determining attorney who co-counseled with putative class counsel on other matters could not adequately represent class's interests as class representative). The Court should decline to approve any recipient that has a co-counsel or pro bono history with the law firms representing the parties.

According to the American Law Institute, "[a] cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." ALI Principles §3.07 cmt. (b); *accord Google Cookie*, 934 F.3d at 331 (adopting §3.07 cmt. b standard); *Google Referrer*, 869 F.3d at 749 (Wallace, J., dissenting) (advocating adopting same). Although *Google Street View* creates a circuit split by rejecting the "significant prior affiliation" standard, 21 F.4th at 1120, objectors preserve the right to advocate for it in any appeal.

### 2. Preexisting relationships between the defendant and the *cy pres* recipients undermine the theoretical value of the settlement.

As the Ninth Circuit has warned, "[t]he issue of the valuation of [the *cy pres*] aspect of a settlement must be examined with great care to eliminate the possibility that it serves only the "self-interests" of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis*, 697 F.3d at 868. Google acknowledges that it already is or has been a donor to the ACLU, Berkman Center for Internet and Society at Harvard Cener for Democracy and Technology, Connect Safely, EFF, Future of Privacy Forum, and Yale Law School Information Society Project. Dkt. 332. Both the class's attorneys and Google and other large tech firms routinely settle class action cases with *cy pres* donations to these entities. *See* Dkt. 338 (ACLU,

MIT Internet Privacy Research Initiative, and Privacy Rights Clearinghouse from Google and Plaid). *Cy pres* donations can grow to constitute a sizable portion of a nonprofit's annual budget. *See* Frank Decl. Ex. 7 at 4 (itemizing EFF's 42 *cy pres* awards totaling over $17 million since 2010); Roger Parloff, *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012). One can reasonably fear that large tech firms can use the carrot of *cy pres* to ingratiate themselves with organizations who would otherwise serve independent watchdog roles. Even without consciously compromising their missions, nonprofits might reflexively be less likely to step on Google's toes, lest they cause Google to exercise its veto power over their *cy pres* funding in future cases. *See* Declaration of Brian R. Strange in Support of Class Plaintiffs' Response to Objection of Theodore H. Frank, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, No. 12-md-2358, Dkt. 172-2 at 3 (D. Del. Jan. 4, 2017) (describing how Google vetoed four of ten proposed *cy pres* recipients, as allowed under class settlement).

When the defendant is already a contributor to a proposed *cy pres* recipient, there is no demonstrable value added by the defendant's agreement to give money to that institution. *See Dennis*, 697 F.3d at 867-68; *see also Prescott v. Bayer Healthcare LLC*, No. 20-cv-00102-NC, 2021 U.S. Dist. LEXIS 82495, *8 (N.D. Cal. Apr. 29, 2021) (denying preliminary approval of settlement with *cy pres* residual to organization that defendant donates to). Agreeing to do something that the defendant is already doing is not a cognizable class benefit. *Koby*, 846 F.3d at 1080; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 286 (7th Cir. 2002) (it is the "incremental benefits" that matter). Nothing in the settlement prevents Google from offsetting future donations that it otherwise would made. The point is not that "these funds" would have been used for donations, it's that other fungible funds might have been. An agreement for Google to shift accounting entries is of no incremental value to the class.

At the very least, the preexisting relationships between Google, the parties' attorneys, and the *cy pres* recipients demand discounting the putative value of the settlement.

### D.   The *cy pres* selection process is improper, opaque, and includes potential recipients mismatched with the class.

More generally, the parties appear to be considering at least 21 potential *cy pres* recipients, with the proposals collected on the settlement website. The Settlement improperly requires the Court to "[d]etermine which Proposed *Cy Pres* Recipients shall be Approved," "and determine what percentage of the Net Settlement Fund is to be distributed to each." Dkt. 328-1 ¶ 48.4. Judicial selection of *cy pres* recipients raises the problem

of creating, at a minimum, an appearance of a conflict of interest. In a previous Google class action, the district court judge notoriously sua sponte ordered residual *cy pres* funds be paid to a center at a university where the judge taught. *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3 (N.D. Cal. June 2, 2011). Because the parties have not moved for final approval and disclosed the final list of proposed *cy pres* recipients or the percentage of the net settlement fund they are requesting, Objectors reserve the right to supplement their objection. They object now to the Settlement's involvement of the Court and the selection process's opacity, under which class members do not know how many and which recipients will ultimately be submitted to the Court for funding, or for what amount. Based on the proposals provided, however, nearly all of the 21 potential entities have geographic or other mismatch or failed to meet the settlement's disclosure requirements, as the Frank Declaration details. *See generally Nachshin*, 663 F.3d 1034; *Dennis*, 697 F.3d at 858; Frank Decl.

## IV. In the alternative, if there is no practicable way to afford relief to individual class members, then the putative class cannot be certified.

### A. Representatives who propose a plenary class release in exchange for a zero-recovery settlement are not adequately representing the class.

Rule 23(a)(4) conditions class certification upon showing that "the representative parties will fairly and adequately protect the interests of the class." Rule 23(g)(4) imparts an equivalent duty on class counsel. Fiduciary duty "forbids a lead lawyer from advancing his or her own interests by acting to the detriment of the persons on whose behalf the lead lawyer is empowered to act." *ALI Principles* § 1.05, cmt. f. Class counsel must maximize class recovery. "[I]t is unfathomable that the class's lawyer would try to sabotage the recovery of some of his clients." *Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015). When class counsel is "motivated by a desire to grab attorney's fees instead of a desire to secure the best settlement possible for the class, it violate[s] its ethical duty to the class." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship.*, 874 F.3d 692, 694 (11th Cir. 2017). Likewise, the named representatives may not "leverage" "the class device" for their own benefit. *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006). If they are "more concerned with maximizing their own gain than with judging the adequacy of the settlement as it applies to class members at large," they fail to satisfy Rule 23(a)(4)." *Radcliffe*, 715 F.3d at 1165 (cleaned up).

The *cy pres*-only settlement—combined with a sizable clear-sailing attorneys' fee, sizable incentive awards, and a donation to a nonprofit working with class counsel—combine to demonstrate inadequate

representation. *See, e.g.*, *Pampers*, 724 F.3d at 721; *Molski*, 318 F.3d at 956. "No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars." *Daniels v. Aeropostale W.*, No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081, at *8 (N.D. Cal. May 29, 2014); *accord Koby*, 846 F.3d at 1080. "The lack of any benefit for the class renders the settlement unfair and unreasonable." *Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting) (cleaned up). Worse still, "the fact that class counsel and the named plaintiffs were willing to settle the class claims without obtaining any relief for the class—while securing significant benefits for themselves—strongly suggests that the interests of the class were not adequately represented." *Id.*

"A class settlement that results in fees for class counsel but yields no meaningful relief for the class is no better than a racket." *In re Subway Footlong Sandwich Mkt'g and Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (internal quotation omitted). Class members would be unequivocally better off opting out; yet their fiduciaries intend to bind them to a general release in exchange for no meaningful relief. Class counsel has breached their duty to the class by not advising absent class members of the superiority of opting out *en masse*.

*Google Street View* rejects this argument. 21 F.3d at 1122. Objectors preserve it here for further review.

### B. If distributions to individual class members are impracticable, then a class action is not superior to other available methods of adjudicating the controversy.

Another prerequisite of class certification is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If a settlement class certification "serves only as a vehicle through which to extinguish the absent class members' claims without providing them any relief" because it would be too impractical to distribute the settlement funds to class members, then a class action is not a superior means of adjudicating this controversy. *Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting); *see also Supler v. FKAACS, Inc.*, No. 5-11-CV-00229-FL, 2012 U.S. Dist. LEXIS 159210, at *10-*11 (E.D.N.C. Nov. 6, 2012) (holding that because "benefits to putative class members" from *cy pres* payments "are attenuated and insignificant, class certification does not promote judicial efficiency.") (cleaned up).

If a claim of infeasibility is true, then Rule 23(b)(3) claims should not proceed on a class basis. Superiority must be contemplated from the perspective of putative absent class members, among other angles. *Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010) (citation omitted). This settlement intends to release the class's rights in exchange for no compensatory relief. From the perspective of a class member, that cannot be a superior method of adjudicating this

controversy. Superiority demands the possibility of class benefit at the time of certification. *Cf. Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995) (indicating that courts should not certify classes after a defendant prevails against named plaintiffs on the merits). A *cy pres* settlement, in which many beneficiaries are already receiving donations from the defendant, is not superior in either fairness or efficiency to other methods of adjudication.

*Google Street View* rejects this argument. 21 F.3d at 1115-16. Objectors preserve it for any appeal.

## V.   If the Court approves the certification and settlement, it should decline to grant the $18.6 million attorneys' award request.

Plaintiffs request an eye-watering $18.6 million, calculated based on an above-benchmark 30% of the $62 million settlement fund, for a settlement that provides $0 to the class. The Court should recognize that the $18.6 million request is unreasonable even if this Court disagrees that the settlement should not be approved or the class should not be certified. *See* Dkt. 351. As part of their role as fiduciaries, "courts have an independent obligation to ensure the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

### A.   *Cy pres* is not a direct benefit to the class, and the appropriate fee award is zero.

*Cy pres* is not an actual benefit to the class and should not be counted as such for purposes of attorneys' fees. *Pearson*, 772 F.3d at 784. Although the Ninth Circuit has noted that "there is no uniform rule that district courts must discount the value of *any cy pres* relief," precedent requires courts to "consider a settlement's benefit to the class in determining appropriate attorneys' fees." *Google Street View*, 21 F.4th at 1121. Accordingly, this Court should scrutinize the benefit actually provided to the class by paying nearly $62 million to third parties. Is there any consideration for the release of claims, or is everything for the general public, or worse, a single university's students? Even if the Court finds that the *cy pres* relief was sufficient for settlement approval, the reasonableness of the fees must relate to results obtained—the actual benefit to the class. *See Bluetooth*, 654 F.3d at 944; *see also* Advisory Committee Notes on 2003 Amendments to Rule 23. Judge Bade expressed her doubt "that *cy pres* awards to uninjured third parties should qualify as an indirect benefit to injured class members," and "was concerned that the *cy pres* remedy is purely punitive, with defendants paying millions of

dollars in what are essentially civil fines to class counsel and third parties while providing no compensation to injured class members." *Google Street View*, 21 F.4th at 1125 (Bade, J., concurring) (cleaned up). Here, because class counsel has achieved no direct benefit for the class, any attorney-fee award from this settlement would be impermissibly disproportionate under *Pearson*. 772 F.3d at 784. The proper fee award is $0.

### B.    Regardless, an above-benchmark attorney request of 30% is excessive.

If the Court is inclined to award attorneys' fees, class counsel's 30% request is excessive in that it exceeds the Ninth Circuit's 25% benchmark. An award of 30% would ignore the legal principle that "class counsel should not be" "indifferent to whether funds are distributed to [class members] or to cy pres recipients" because the class is not. *Baby Prods.*, 708 F.3d at 178. In particular, plaintiffs settled for a quarter per class member (Dkt. 327 at 1 (noting class size of 247.7 million)), with the only supposed injunctive relief being illusory. Class counsel's reliance on the injunctive relief is misplaced, and the relief should not be credited as a class benefit, as it mirrors Google's preexisting voluntary actions or obligations imposed by the 2022 consent decree. It is inequitable and creates poor incentives systemically for class counsel to recover so little for the class's claims, yet be paid above the benchmark rate as if they had won the case.

A district court must supply reasons for deviating from the 25% benchmark. *E.g.*, *Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000). "That contingency fee litigation doesn't always result in a recovery as large as plaintiff's counsel originally estimated is not a 'special consideration'—it's the nature of the beast." *Keirsey v. eBay, Inc.*, 2014 WL 644738, at *3 (N.D. Cal. Feb. 18, 2014) (refusing to deviate from 25% to the requested 31% even though it would provide only a .23 multiplier on class counsel's lodestar); *Hawthorne v. Umpqua Bank*, 2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) (refusing to deviate upward to 33% even where the fee request was less than lodestar, and class recovery was 38% of potential recovery); *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *20-*23 (refusing to deviate upward to 28% even where 28% was less than full lodestar); *Fishman v. Tiger Nat. Gas Inc.*, 2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) (27% of net fund is "too high"; awarding 25%, though less than half of counsel's claimed lodestar).

There is no reason to deviate higher, but there is good reason to deviate lower than 25%. Because "class counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class," it is "appropriate for the court to decrease the award." *Baby Prods.*, 708 F.3d at 178; *accord* Rhonda

Wasserman, *Cy Pres in Class Action Settlements*, 88 U.S.C. L. REV. 97, 135-46 (2014) (advocating for "presumptive reduction of attorneys' fees" where settlement includes significant *cy pres* component).

A dollar that goes to *cy pres* is less valuable than a dollar that goes directly to a class member. Although obligating Google to donate to third parties may impose a cost on Google (as long as those donations are not merely a change in accounting entries), compensable settlement value "is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). District courts awarding fees often recognize this reality. *E.g.*, *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012) (discounting *cy pres* by 50% when awarding fees); *In re Livingsocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 19, 22 (D.D.C. 2013) (cutting fees to 18% in consideration of "proportion of the award that is going to cy pres"); *Weeks v. Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472, at *111 (C.D. Cal. Nov. 23, 2011) (reducing to 16.2%); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 123 n.9 (E.D. Pa. 2005) (excluding *cy pres* and non-economic injunctive relief from settlement valuation).

If this Court endorses a rule that makes class counsel financially indifferent between a settlement that awards cash directly to class members and a *cy pres*-only settlement, the parties will always agree to the *cy pres* arrangement and unnamed class members will be permanently left out in the cold. Defendants will prefer to make payments to third parties to whom they are already donating money rather than payments to absent class members, and plaintiffs' attorneys will happily support the organizations they already support through co-counsel relationships, pro bono work, and board service.

The problem is especially acute given the conflicts of interest between class counsel and some recipients. Class counsel slants a settlement to send money to their friends instead of their clients, and then effectively double-dips with a commission on the self-dealing. It would be a sanctionable scandal if class counsel steered common-fund money to a settlement administrator with this sort of conflict. Why is it less so when it's a *cy pres* beneficiary?

Ultimately, "courts need to consider the level of direct benefit provided to the class in calculating attorneys' fees." *Baby Prods.*, 708 F.3d at 170. If the court is inclined to approve the settlement and certification, to comply with Rule 23(h), it should reduce the fee award to no more than 10% of the $62 million *cy pres* fund.

**CONCLUSION**

The court should deny final approval of the settlement, either because the settlement is unfair because distribution is feasible, or because class certification is inappropriate. If the settlement is approved, class counsel is not entitled to fees, and, at a minimum, not entitled to the 30% it has requested.

Dated: March 4, 2024                  Respectfully submitted,

                                     _/s/ Theodore H. Frank_
                                     Theodore H. Frank (SBN 196332)
                                     HAMILTON LINCOLN LAW INSTITUTE
                                     CENTER FOR CLASS ACTION FAIRNESS
                                     1629 K Street NW, Suite 300
                                     Washington, DC 20006
                                     Voice: 703-203-3848
                                     Email: ted.frank@hlli.org

                                     _Attorneys for Objectors John Andren,_
                                     _Matthew Lilley, and Joseph S. St. John_

The court's order (Dkt. 345 ¶ 21) suggests objectors are to sign the "objection"; to avoid any collateral litigation over the ambiguity whether a signed declaration is sufficient, objectors' signatures are on the next three pages.

1   I am one of the objectors and I have authorized my attorney to file this objection.

2

3   _____

4   Objector John Andren

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I am one of the objectors and I have authorized my attorney to file this objection.

_____

Objector Matthew Lilley

I am one of the objectors and I have authorized my attorney to file this objection.

_____

Objector Joseph S. St. John

OBJECTION OF JOHN ANDREN, MATTHEW LILLEY, AND JOSEPH S. ST. JOHN

1

2

<u>PROOF OF SERVICE</u>

3

    I hereby certify that on this day I electronically filed this Objection using the CM/ECF filing system thus effecting service of such filing on all ECF registered attorneys in this case.

4

5

    DATED this 4th day of March, 2024.

6

                              */s/ Theodore H. Frank*
                              Theodore H. Frank

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28