Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objectors John Andren,*
*Matthew Lilley, and Joseph S. St. John*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GOOGLE LOCATION HISTORY LITIGATION | Case No. 5:18-cv-05062-EJD |
| | **DECLARATION OF THEODORE FRANK IN SUPPORT OF OBJECTION** |
| JOHN ANDREN, MATTHEW LILLEY, and JOSEPH S. ST. JOHN, | Time:        9:00 A.M. |
| Objectors. | Date:        April 18, 2024 |
| | Judge:       Hon. Edward J. Davila |
| | Courtroom:   4, 5th Floor |

I, Theodore Frank, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. My full name is Theodore Harold Frank. My business address is Hamilton Lincoln Law Institute, Center for Class Action Fairness, 1629 K Street NW, Suite 300, Washington, DC 20006. My telephone number is 703-203-3848. My email address is ted.frank@hlli.org.

3. I am Director of Litigation at the non-profit Hamilton Lincoln Law Institute ("HLLI"), and a Senior Attorney with its Center for Class Action Fairness ("CCAF"). I represent the objectors John Andren, Matthew Lilley, and Joseph S. St. John in objecting to the proposed settlement, class certification, and fee request.

## I.   Factual Basis for Objection of Andren, Lilley, and St. John

4. The specific grounds of my clients' objections are identified in their contemporaneously-filed Objection.

5. However, the papers filed before the objection deadline are incomplete. We do not know the selection process for ultimate *cy pres* recipients or the division of settlement fund moneys to them. Class counsel continues to supplement the docket with new proposed *cy pres* recipients. We reserve the right to supplement this objection as new information is revealed after the objection deadline.

### A.   Exhibits and Problems with Many of the *Cy Pres* Recipients' Applications

6. The proposed *cy pres* recipients' applications are not in the record, but instead on the settlement website. This was a problem in *Frank v. Gaos*, and we put them in the record here, with commentary demonstrating why each of the twenty-one recipients are improper.

7. Attached as Exhibit 1 is a true and correct copy of the *cy pres* proposal of ACLU Foundation of Northern California. The proposal is expressly ideological, describing its privacy law work to include "new and creative ways to utilize constitutional privacy law" to counter "attack[s on] reproductive and LGBTQ rights" and "build greater connection with racial justice, economic justice, and other issues." Racial justice has proven to be a codeword for support for racial discrimination, as well as anti-Semitic policies establishing quotas limiting Jewish participation that would otherwise be "disproportionate" relative to "people of color."

1   The application proposes to spend money on "intersectional relationships," and privacy issues relating to

2   "gender-affirming care." "Privacy" for "gender-affirming care" often includes the controversial goal of

3   allowing school employees to recruit minors for irreversible medical procedures without notifying their parents.

4   The stated target of the project are "people far and wide" with particular attention to "people of color." They

5   acknowledge previous *cy pres* grants of over $1.8 million.

6          8.     Attached as Exhibit 2 is a true and correct copy of the *cy pres* proposal of the ACLU Foundation.

7   They propose general funding and funding of five affiliates. The stated target population is "all U.S. persons,"

8   as well as "non-U.S. internet users." They fail to disclose their full *cy pres* history in violation of the settlement,

9   but acknowledge $1.6 million in recent *cy pres* awards.

10          9.     Attached as Exhibit 3 is a true and correct copy of the *cy pres* proposal of the Berkman Klein

11   Center at Harvard University. Harvard University, which has a $50 billion endowment, is currently being sued

12   for its discrimination against Jews on campus, and recently lost a Supreme Court case relating to its

13   discrimination against Asians. (HLLI filed an *amicus* in support of the successful petitioners in that case.)

14   Harvard University regularly takes controversial positions in *amicus* briefs before the Supreme Court. The stated

15   target population includes "the broader public" and "academics." They fail to disclose their full *cy pres* history.

16         10.     Attached as Exhibit 4 is a true and correct copy of the *cy pres* proposal of the Center for

17   Democracy & Technology. The application trumpets the organization's opposition to "data-driven

18   discrimination," its work with organizations supporting "LGBTQ+ rights" and "reproductive rights," and

19   support for "equity… considerations in the use of technology in education and government services" with a

20   "lens of equity and justice across our work." "Equity" has proven to be a codeword for support for racial

21   discrimination and anti-Semitic policies establishing quotas limiting Jewish participation that would otherwise

22   be "disproportionate" relative to "people of color." CDT expressly plans to use the *cy pres* for legislative and

23   regulatory advocacy. The stated target population is "all people" with special attention to "historically

24   marginalized communities." They disclose over $2.9 million in *cy pres* awards.

25         11.     Attached as Exhibit 5 is a true and correct copy of the *cy pres* proposal of ConnectSafely. It has

26   a 73% Charity Navigator rating. The target population is "families and educators with information that applies

27   to children, teens and parents."

28

1       12.    Attached as Exhibit 6 is a true and correct copy of the *cy pres* proposal of the Data & Society

2 Research Institute. They trumpet their support for "approaches to technology design and governance that are

3 grounded in equity and just outcomes." "Equity" has proven to be a codeword for support for racial

4 discrimination and anti-Semitic policies establishing quotas limiting Jewish participation that would otherwise

5 be "disproportionate" relative to "people of color." They propose to spend on "direct collaborations with

6 policymakers and government leaders" seeking "policy impact" in the legislative and regulatory sphere. The

7 target population is the "general public."

8       13.    Attached as Exhibit 7 is a true and correct copy of the *cy pres* proposal of the Electronic Frontier

9 Foundation. They emphasize their support for abortion. They previously received over $17 million in *cy pres*

10 awards. The target population is the "tech users the world over."

11      14.    Attached as Exhibit 8 is a true and correct copy of the *cy pres* proposal of EPIC. They fail to

12 disclose their full *cy pres* history. They do not disclose the proposed target population of their proposed grant.

13      15.    Attached as Exhibit 9 is a true and correct copy of the *cy pres* proposal of Fordham University

14 School of Law. They emphasize their spending in support of opportunities for Fordham Law students and

15 focus their educational efforts in Manhattan. They disclose $195,000 in previous *cy pres* awards. The target

16 population includes "visiting researchers," "local communities and populations in the Global South."

17      16.    Attached as Exhibit 10 is a true and correct copy of the *cy pres* proposal of the Future of Privacy

18 Forum, an international organization with only one of its four offices in the US. They disclose $172,000 in

19 previous *cy pres* awards, but seek $3 million here for general expenses including "fringe benefits" for their staff.

20 The target population is a "range of stakeholders" including "academics," "policymakers," "data protection

21 compliance experts," and the "public."

22      17.    Attached as Exhibit 11 is a true and correct copy of the *cy pres* proposal of "Free Press." They

23 trumpet their support for the controversial "net neutrality" regulation. Their 2020 "Stop Hate for Profit"

24 campaign that their application trumpets demanded that Facebook censor legitimate criticism of violence

25 associated with Black Lives Matter protests. They trumpet their support for "racial justice," which has proven

26 to be a codeword for support for racial discrimination and anti-Semitic policies establishing quotas limiting

27 Jewish participation that would otherwise be "disproportionate" relative to "people of color." They

28 acknowledge that they wish to use the funding for regulatory and legislative advocacy (including against "online

DECLARATION OF THEODORE FRANK

discrimination") and to promote abortion. They disclose $75,000 in previous *cy pres* awards, but seek $5 million here for general expenses, which would mostly be staff payroll. The target population is "all Americans" prioritizing "communities of color."

18.     Attached as Exhibit 12 is a true and correct copy of the *cy pres* proposal of Georgetown Law Center. Georgetown Law does not value academic freedom, and constructively fired prominent conservative Ilya Shapiro. They trumpet their support for "access to reproductive healthcare" and support of a clinic that benefits Georgetown Law students. They previously received $1 million in *cy pres* from another $0 Google settlement, but request $1.9 million here, including for funding for existing staffing and "career planning support" for their staff. The target population is "everyone in the country" with "opportunities for young people interested in public interest technology careers."

19.     Attached as Exhibit 13 is a true and correct copy of the *cy pres* proposal of Internet Archive, which seeks $3 million to create a new program in "next generation data literacy" that they didn't wish to fund with their existing $26 million of annual expenditures. The target population is "global in scope" and "multinational."

20.     Attached as Exhibit 14 is a true and correct copy of the *cy pres* proposal of The Markup, a publication founded in 2020 in the oversaturated journalism market. They seek $6 million over two years to fund half of their operating budget. The target population is "a national audience."

21.     Attached as Exhibit 15 is a true and correct copy of the *cy pres* proposal of MIT, a university with a $23.5 billion endowment being investigated for Title VI violations against Jews, but requesting $2.467 million here. They've previously received $1 million in *cy pres* funding. The target population for one of their proposed new projects is "computer science undergraduates."

22.     Attached as Exhibit 16 is a true and correct copy of the *cy pres* proposal of National Cybersecurity Alliance. They propose to expand their budget for "Data Privacy Week" from $110,000 to $500,000. The target population includes "public and private sector organizations"; "the majority of participants in our champions program came from the tech sector, academia, and government organizations."

23.     Attached as Exhibit 17 is a true and correct copy of the *cy pres* proposal of NYU, a university with an endowment of $5.9 billion currently being sued for discrimination against Jews. They disclose just

under $1 million in previous *cy pres* awards. The target population includes "(undergraduate or graduate) students taking classes relating to technology law/policy or privacy."

24.     Attached as Exhibit 18 is a true and correct copy of the *cy pres* proposal of Privacy Rights Clearinghouse. They disclose over $2.7 million in previous *cy pres* awards, but seek $1.95 million here. They do not disclose the target population. They acknowledge that they "focus[] strategic advocacy in California."

25.     Attached as Exhibit 19 is a true and correct copy of the *cy pres* proposal of the Rose Foundation. They trumpet their support for "economic equity" and "social justice." They disclose over $19 million in previous *cy pres* awards, but seek $3 to $10 million dollars here to be a middleman soliciting and awarding their own grant proposals. The class would not have the opportunity to object to these grant proposals. They say their grant proposals will illegally "give preference" to work that specifically benefits "BIPOC communities which are part of the overall class."

26.     Attached as Exhibit 20 is a true and correct copy of the *cy pres* proposal of UCLA, a university with an endowment of over $5 billion, being sued for discrimination against Jews. The program to be funded was established in 2020, and seeks just under $3 million, of which over 6% is a "UCLA Foundation fee." The target population is "students," with secondary effects on "employers [being] able to recruit more thoughtful employees."

27.     Attached as Exhibit 21 is a true and correct copy of the *cy pres* proposal of Yale Law School. Yale is a university with an endowment of over $40 billion being investigated for Title VI violations against Jews. They seek funding for an "algorithmic justice" project, but don't describe it. They seek $2.6 million here for three fellows and a Director, with an unknown amount going to "institutional costs for hosting and supporting the fellows." The target population is "the public."

## B.     Significant Prior Affiliations in the *Cy Pres* Recipients

28.     The parties have a number of connections—many acknowledged, and some unacknowledged—between themselves and the proposed *cy pres* recipients. We were able to find several undisclosed conflicts and affiliations, and are not confident we will not find more before the April fairness hearing. We reserve the right to supplement the objection if more undisclosed affiliations come to light.

29.     Multiple attorneys from the litigating parties and Google employees have attended the universities slated to receive millions of dollars in funds, including Harvard, Yale, Fordham, MIT, UCLA, and Georgetown, most of which already have massive endowments, and it appears that smaller centers engaged in privacy work at universities were excluded. *See* Dkts. 349, 352.

30.     Law firms on both sides of this case have represented the Regents of the University of California, the body that governs UCLA and other state universities. Dkt. 352.

31.     Multiple attorneys from the law firms litigating the case sit on the boards of the proposed recipients. *See, e.g.*, Dkts. 332, 338 (disclosing at least seven attorneys and Google employees who have served on recipients' boards); *see also* Dkt. 349 (disclosing that an appearing attorney for Lieff is expected to join the board for the ACLU Foundation of Northern California this year).

32.     Both defense counsel and plaintiffs' counsel also have deep ties with the proposed recipient ACLU. *See* Dkts. 332, 338. Defense counsel has provided pro bono services and served as co-counsel with the ACLU, and Lieff Cabraser is considering a "potential collaboration" with the group to jointly pursue other litigation together, as it has in the past. Dkt. 349. This collaboration would merely be the latest in a cozy relationship between Lieff Cabraser and the ACLU. Examples of additional collaboration not disclosed in their filings in violation of Settlement ¶ 41.6 are Lieff Cabraser and the ACLU's representation of plaintiffs together in *Jasmen v. Best Buy Co.*, No. C-05-5056, 2011 U.S. Dist. LEXIS 170795 (N.D. Cal. Nov. 9, 2011), and *Al-Haramain Islamic Foundation, Inc. v. Bush*, 633 F. Supp. 2d 949 (N.D. Cal. 2009).

33.     Lieff Cabraser also failed to disclose its co-counsel history with the Electronic Frontier Foundation ("EFF") in violation of Settlement ¶ 41.6. *See In re NSA Telecomms. Records Order Litig.*, 483 F. Supp. 2d 934 (N.D. Cal. 2007).

34.     That Google—and its counsel—admittedly provide funding to a number of the recipients raises the longstanding concern that defendants will channel *cy pres* to favored recipients to ensure they obtain funding, which allows the defendant (and here it's counsel) to save money by reducing their direct funding. *See* Dkt. 332 (describing Google and Keker, Van Nest's donations to the EFF, ACLU, Berkman Center at Harvard University, Center for Democracy and Technology, and at least three others).

**C.      Feasibility of Distribution**

35.      Through my experience with CCAF, I have learned that it is economically feasible to distribute $63 million to multi-million member classes. In this very court, I represented myself and another class member in *In re Google Referrer Header Privacy Litigation*, No. 10-cv-04809-EJD. The parties in that case originally claimed that it was economically infeasible to distribute a fund to 193 million class members. But the settlement on remand after the Supreme Court vacated the Ninth Circuit's affirmance in *Frank v. Gaos* created a $23 million common fund to pay class members, about $0.12/class member, with less than $0.09/class member available after attorneys' fees, objector attorneys' fees, and settlement administration costs. Even with an above average 1.3% claims rate, the settlement ultimately paid $7.70 to each of over 2 million claimants.

36.      I represented myself and another class member in objecting to the second settlement and fee request in *Fraley v. Facebook Inc.*, No. 11-cv-01726 RS (N.D. Cal.), a privacy class action brought on behalf of some 150 million Facebook users. There, class counsel originally proposed to distribute $10 million to *cy pres* beneficiaries in lieu of any payments to class members on the theory that the class was simply too large to get direct benefit to class members. However, after Judge Seeborg rejected that proposed agreement (*see Fraley v. Facebook, Inc.*, 2012 U.S. Dist. LEXIS 116526 (N.D. Cal. Aug. 17, 2012)), the settling parties returned with a second settlement proposal that would permit class members to make claims against the settlement fund for $10 each. Ultimately, class members submitted only 614,000 claims (a claims rate of 0.4%), thus undersubscribing the fund and allowing the Court room to augment claim values upwards to $15. *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013). Despite including a direct-notice component, administrative costs in Fraley only amounted to $900,000. *Fraley*, No. 11-cv-01726, Dkt. 336 at 3. *Fraley* and *Google Referrer* demonstrate that administrative costs of a class claims process need not cannibalize the much larger common fund of this settlement.

37.      I am also aware of the cases listed in the following chart, each of which supports the feasibility of actual class member payments in this case through a claims process, and some of which were approved by this Court:

| Case Name | Size of Class | Gross Cash Settlement Amount[1] | Administrative Costs |
|---|---|---|---|
| *In re Google Referrer Header Priv. Litig.*, No. 5:10-cv-04809-EJD (N.D. Cal.) | ~193 million | $23 million | Estimated at ~ $1.5 million |
| *Fraley v. Facebook, Inc.*, No. 11-cv-1726 RS (N.D. Cal. 2013) | ~150 million | $20 million | ~$900,000 |
| *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD (N.D. Cal.) | ~124 million | $90 million | $2.44 million |
| *Koller v. Med Foods, Inc.*, No. 3:14-CV-2400-RS (N.D. Cal.) | Unknown (150 million bottles sold during class period) | $7 million | $432,700 |
| *Cottle v. Plaid Inc.*, No. 20-cv-03056-DMR (N.D. Cal.) | ~98 million | $58 million | $3,935,528.56 |
| *Lundy v. Meta Platforms*, No. 18-cv-06793-JD (N.D. Cal.) | ~70 million | $37.5 million | $1,331,252 |
| *In re Conagra Foods, Inc.*, No. 11-cv-5379-CJC (C.D. Cal. 2019), *reversed on other grounds, Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) | > 31 million | Less than $8,500,000 | "no more than $660,000" |
| *In re Carrier iQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) | ~30 million | $9 million | $655,500 |
| *Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK (N.D. Cal.) | ~20.8 million | $13 million | $716,750 |
| *Leiner v. Johnson & Johnson Consumer Companies, Inc.*, No. 1:15-cv-05876 (N.D. Ill.) | ~12.9 million | $5 million | $439,222 |
| *In re LivingSocial Marketing and Sales Practices Litig.* No. 11-mc-00472, 298 F.R.D. 1 (D.D.C. 2013) | ~10.9 million | $7.58 million | ~$130,000 See Dkt. 40. (included direct notice) |
| *Zepeda v. PayPal*, No. 10-cv-02500-SBA, 2017 WL 1113293, 2017 U.S. Dist. LEXIS 43672 (N.D. Cal. Mar. 24, 2017) | ~10.5 million | $3.2 million | Capped at $400,000 (included direct notice) |
| *Thomas Iglesias v. Ferrara Candy Co.*, No. 3:17-cv-00849-VC (N.D. Cal.) | >10 million | $2.5 million | Capped at $522,000 |
| *In re Sony PS3 "Other OS" Litigation*, No. 10-cv-01811-YGR (N.D. Cal.) | 10 million | $3.75 million | $495,000 |

---

[1] This figure includes payments to class members, fees and expenses to class counsel, and notice and administration costs payments to the administrator.

| Case Name | Size of Class | Gross Cash Settlement Amount[1] | Administrative Costs |
|---|---|---|---|
| *In re Google Plus Profile Litigation*, No. 18-cv-06164-EJD (N.D. Cal.) | ~10 million | $7.5 million | Estimated at $265,000 |
| *Chester v. The TJX Cos., Inc.*, No. 15-cv-0437, 2017 WL 6205788 (C.D. Cal. Dec. 5, 2017) | ~8 million | $8.5 million | Estimated at $500,000 (included direct notice) |
| *Kumar v. Salov North America Corp.*, 4:14-cv-02411-YGR (N.D. Cal.) | ~5.4 million | Less than $1.7 million | Preliminary cost est. $450,000 |
| *Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) | ~5 million | $5.3 million | Class counsel represented administration costs as $170,000.<br><br>Settlement established administration fund of $300,000 |
| *Frohberg v. Cumberland Packing Corp.*, No. 14-cv-00748 (E.D.N.Y.), *terms available at* http://web.archive.org/web/20160528175123/https://www.steviaintherawsettlement.com/ | ~ 2 million | Up to $1.5 million | Capped at $210,000 |
| *Shestopal v. Follett Higher Education Group Inc.*, Case No. 15-cv-8980 (N.D. Ill) | ~1.9 million | $3.5 million | Capped at $499,000 (included direct notice) |
| *Aguiar v. Merisant Co.,* 14-cv-00670 (C.D. Cal.), *terms available at* http://web.archive.org/web/20160329153716/https://www.pureviasweetenersettlement.com/ | ~1.2-2.4 million | $1.65 million | Unknown (included direct notice to part of class) |
| *Dashnaw v. New Balance Ath., Inc.,* 2019 U.S. Dist. LEXIS 126183, 2019 WL 3413444 (S.D. Cal. Jul. 29, 2019) | ~1.1 million | $1.4 million | Capped at $200,000 |
| *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276 (E.D. Mich. 2017) | >1 million | $2.7 million | $650,000 |

| Case Name | Size of Class | Gross Cash Settlement Amount[1] | Administrative Costs |
|---|---|---|---|
| *Bezdek v. Vibram USA, Inc*, No. 12-cv-10513 (D. Mass.), *terms available at* http://web.archive.org/web/20160503083715/https://www.fivefingerssettlement.com/ | Unknown, millions of products sold during class period | $3.75 million | Unknown, (included direct notice to ~300,000 class members) |
| *Stephenson v. Neutrogena Corp.*, No. C 12-00426 PJH (N.D. Cal.) | Unknown | $1.8 million | Capped at $500,000 |
| *In re LinkedIn User Privacy Litig.*, No. 12-cv-03088, 309 F.R.D. 573 (N.D. Cal.), *terms available at* http://web.archive.org/web/20150801221322/https://www.linkedinclassactionsettlement.com/Home.aspx | ~800,000 | $1.25 million | $140,000 (included direct notice) |
| *Lagarde v. Support.com, Inc.*, No. 12-cv-0609, 2013 U.S. Dist. LEXIS 42725 (N.D. Cal. Mar. 25, 2013) | ~759,000 | $8.595 million | Capped at $100,000 (included direct notice) |

38.     In many of the above cases, the identities of class members were unknown to the settling parties, yet a claims process was employed to allow absent class members to self-identify.

39.     In particular, after *Frank v. Gaos*, Google chose not to agree to a *cy pres*-only settlement in this Court in *In re Google Plus Profile Litigation* and in *Google Referrer*, though they involve the same sort of ratios of settlement money to class size (or lower) as the *cy pres* settlements it is currently defending in court here and in *Google Cookie*.

## II.  Hamilton Lincoln Law Institute and Center for Class Action Fairness

40.     In my experience, and as this Court has previously seen, class counsel often responds to CCAF objections by making a variety of spurious *ad hominem* attacks. This Court and the vast majority of district court judges do not fall for such transparent and abusive tactics. My clients' objections are not less valid because a court has criticized me in the past any more than the settlement becomes more unfair because a court criticized abusive billing by and then sanctioned Lieff Cabraser, class counsel in this case. *See Ark. Teacher Retirement Sys. v. State St. Bank & Trust Co.*, 232 F. Supp. 3d 189 (D. Mass. 2017); *ATRS v. State St. Bank & Trust Co.*, 512 F.

Supp. 3d 196 (D. Mass. 2020), *aff'd* 25 F.4th 55 (1st Cir. 2022). But ironically, Lieff Cabraser has been among the most aggressive class counsel firms to engage in *ad hominem* attacks. On multiple occasions, the Seventh Circuit has expressly disapproved these attacks when made by other counsel. *See In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 (7th Cir. 2022) (finding *ad hominem* attacks "improper and not at all persuasive" and observing that "Frank's track record…speaks for itself."); *Pearson*, 968 F.3d at 831 n.1 ("the merits of an objection are relevant, not amateurism or experience"). In an effort to anticipate such attacks and to avoid collateral litigation over a right to file a reply preventing a one-sided record, I discuss CCAF's history and refute the most common *ad hominem* attacks below. If the Court is inclined to disregard these irrelevant *ad hominem* attacks, it can avoid these collateral disputes and Section II of this declaration entirely.

41.     I founded CCAF, which eventually became a 501(c)(3) non-profit public-interest law firm based out of Washington, DC, in 2009. In 2015, CCAF merged into the non-profit 501(c)(3) Competitive Enterprise Institute ("CEI") and became a division within their law and litigation unit. In January 2019, CCAF became part of HLLI, a new non-profit 501(c)(3) public-interest law firm founded in 2018.

42.     CCAF's mission is to litigate on behalf of class members against unfair class action procedures and settlements. *See, e.g., Stericycle*, 35 F.4th at 572 & n.11 (citing cases); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (praising CCAF's work); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement") (rejecting settlement approval and certification.). CCAF has won over 200 million dollars for class members and received national acclaim for its work. *See, e.g.*, Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013 ("the leading critic of abusive class action settlements"); Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, FORTUNE, Dec. 15, 2015 ("the nation's most relentless warrior against class-action fee abuse"); The Editorial Board, *The Anthem Class-Action Con*, WALL ST. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the Anthem data breach MDL). Academics have recognized CCAF for developing "the expertise to spot problematic settlement

1  provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL

2  INQUIRIES IN LAW 47, 55-57 & n.37 (2018).

3      43.     CCAF has been successful, winning reversal or remand in dozens of federal appeals decided to

4  date. *E.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019); *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712 (3d Cir. 2023); *In*

5  *re Broiler Chicken Antitrust Litig.*, 80 F.4th 797 (7th Cir. 2023); *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243

6  (11th Cir. 2023); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769 (9th Cir. 2022); *In re Stericycle Sec. Litig.*, 35

7  F.4th 555 (7th Cir. 2022); *McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021); *Briseño v. Henderson*, 998

8  F.3d 1014 (9th Cir. 2021); *Berni v. Barilla S.P.A*, 964 F.3d 141 (2d Cir. 2020); *Pearson v. Target Corp.*, 968 F.3d

9  827 (7th Cir. 2020); *In re Lithium Ion Batteries Antitrust Litig.*, 777 Fed. Appx. 221 (9th Cir. 2019) (unpublished);

10  *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3d Cir. 2019); *In re EasySaver Rewards Litig.*,

11  906 F.3d 747 (9th Cir. 2018); *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In re Target Corp.*

12  *Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718

13  (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015) (unpublished); *In re*

14  *BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014);

15  *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe Apple Powe rAdapter Litig.*, 571 Fed. Appx.

16  560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet*

17  *Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir.

18  2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir.

19  2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d

20  935 (9th Cir. 2011). A number of these appeals centered around or otherwise challenged misuse of *cy pres*,

21  similar to the objections my clients raise in this case. *See Frank*; *Google Cookie*; *BankAmerica*; *Pearson*; *Baby Products*;

22  *Nachshin*. While, like most experienced litigators, we have not won every appeal we have litigated, CCAF has

23  won the majority of them.

24      44.     CCAF has won more than $200 million for class members by driving the settling parties to

25  reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after*

26  *classaction lawsuits*, BOSTON GLOBE (Dec. 17, 2016) (more than $100 million at time). In particular, we have

27  won tens of millions of dollars for class members by successfully objecting to *cy pres* provisions. *E.g., Google*

28  *Referrer* ($0 all-*cy pres* settlement becomes a $23 million common fund on remand); *McDonough v. Toys "R" Us*,

80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing fees, and thus increasing class recovery, by more than $26 million to account for a "significantly overstated lodestar"); *In re Apple Inc. Sec. Litig.*, No. 5:06-cv- 05208-JF, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) (parties nullify objection by eliminating $2.5 million of *cy pres* and augmenting the class fund by that amount).

### A. Preempting *Ad Hominem* Attacks

45.     Class counsel often try to tar CCAF as "professional objectors," and then cite court opinions criticizing for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But this is not the non-profit CCAF's *modus operandi*, so the court opinions class counsel rely upon to tar CCAF are inapposite. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n. 150 (2003) (public interest groups are not professional objectors); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements, and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. For-profit "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as CCAF has to triage dozens of requests for *pro bono* representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF objects to only a small fraction of the number of unfair class action settlements and fee requests it sees.

46.     While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively

as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

47.    Indeed, CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it has initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See, e.g., Pearson v. Target Corp.*, 893 F.3d 980 (7th Cir. 2018); *see generally* Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, WALL ST. J., Dec. 7, 2016.

48.    Between 2012 and 2015, I had a private practice unrelated to my CCAF work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Thereafter, Mr. Bandas was criticized by the Southern District of New York after I ceased to represent him, and class counsel in other cases often cites that language and attempts to attribute it to me. *See Garber v. Office of the Comm'r of Baseball,* 2017 WL 752183, 2017 U.S. Dist. LEXIS 27394, at *35 n.9 (S.D.N.Y. Feb. 27, 2017). Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using language like "forced to disclose" and "secret." The insinuations are false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas, and won both of them. There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services for a client. CCAF has never had an attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF.

49.    Firms whose fees we have objected to have previously cited to *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While

the *Wyeth* court did criticize our client's objection (after mischaracterizing the nature of that objection), it ultimately agreed with our client that class counsel's fee request was too high, and reduced it by several million dollars to the benefit of shareholder class members.

50.    Class counsel frequently cite a 2010 case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in this Circuit on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr. Frank's goals are policy-oriented as opposed to economic and self-serving" and even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp. 2d at 813-17.

51.    Lieff Cabraser has in another case cited a January 2020 opinion from the *Equifax Data Breach Litigation* MDL in the Northern District of Georgia accusing me in a conclusory sentence of making "false and misleading" statements about a settlement in rejecting my objections. I had no notice that the court was considering making that finding, and no opportunity to respond to the accusations. I have no idea what the district court thinks I said in either my papers or publicly that is false or misleading, because the district court identifies no such false or misleading statements. The court appears to have conflated me with attorneys who use the objection process to engage in extortion. I personally have argued and won similar appeals on the same Rule 23(a)(4) objection we made in *Equifax*, including in the Ninth Circuit against Lieff Cabraser. *In re Lithium Ion Batteries Antitrust Litig.*, 777 Fed. Appx. 221 (9th Cir. 2019). Everything we filed and that I have said publicly about the *Equifax* case and about this case is true and correct.

52.    A district court judge recently criticized my objection to a coupon settlement in *In re Johnson & Johnson Sunscreen Marketing Litigation* (S.D. Fla. 2022). The criticism was mysterious; the opinion purports to quote a CCAF attorney asking for "a better settlement" without proposing any solutions for accomplishing this, but that language is entirely absent from the fairness hearing transcript; and my objection, the fairness hearing transcript, and my proposed order reveal that my objection proposed a different settlement that appropriately reallocated the disproportionate attorney fees from the attorneys to the class. I have appealed, with oral argument scheduled in June; the case is controlled by our victory in the Eleventh Circuit in *Williams*,

which endorsed *Briseño* and my theory of Rule 23(e)(2)(C)(ii), and I thus expect the appellate court to vacate the decision. (Another possible grounds for vacating the decision is that the plaintiffs in *J&J* failed to take my suggestion that they amend a complaint that failed to adequately allege Article III standing, and the district court disregarded my proposed order requiring it to evaluate Article III standing. *Williams* suggests that this will be fatal to the decision.) Notwithstanding the critical opinion, class counsel takes my appeal and objection seriously enough that they retained my friend, Supreme Court advocate Ashley Keller, to argue the Eleventh Circuit appeal in June, which is not a sign of a frivolous case.

53.     CCAF has no interest in pursuing "baseless objections," because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. We are confronted with many more opportunities to object (or appeal erroneous settlement approvals) than we have resources to use, and make painful decisions several times a year picking and choosing which cases to pursue, and even which issues to pursue within the case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair.

54.     While I am often accused of being an "ideological objector," the ideology of CCAF's objections is merely the correct application of Rule 23 to ensure the fair treatment of class members. Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of any particular objection—has no basis in reality. I have been writing and speaking about class actions publicly for nearly a decade, including in testimony before state and federal legislative subcommittees, and I have never asked for an end to the class action device, just proposed reforms for ending the abuse of class actions and class-action settlements. That I oppose class action abuse no more means that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of Consumer Reports from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014

DECLARATION OF THEODORE FRANK

presentation in New York that was broadcast nationally on C-SPAN and in my Supreme Court briefing in *Frank v. Gaos*. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I was the putative class representative in a federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMOCorp., Inc.*, No. 4:17-cv-870 (E.D. Mo.).

55.     On October 1, 2015, after consultation with its board of directors and its donors, CCAF merged with the much larger Competitive Enterprise Institute ("CEI"). Prior to its merger with CEI, CCAF never took or solicited money from corporate donors other than court-awarded attorneys' fees. CEI, which is much larger than CCAF, does take a percentage of its donations from corporate donors. As part of the merger agreement, I negotiated a commitment that CEI would not permit donors to interfere with CCAF's case selection or case management. In the event of a breach of this commitment, I was permitted to treat the breach as a constructive discharge entitling me to substantial severance pay. CCAF attorneys made several filings in several cases opposed by CEI donors, including Google.

56.     CEI was willing to merge with CCAF because it supported CCAF's pro-consumer mission and success in challenging abusive class-action settlements and fee requests. But it is a large organization affiliated with dozens of scholars who take a variety of controversial positions. Neither I nor CCAF's clients agree with all of those positions, and they should not be ascribed to me, my clients, or this objection, any more than my support for a Pigouvian carbon tax should be ascribed to CEI scholars who have publicly opposed it.

57.     CCAF has since left CEI, and is now part of the Hamilton Lincoln Law Institute, which receives no corporate funding, no funding from Koch entities, and no funding from the Chamber of Commerce. We did not consult any of our donors about the objection in this case, except for the one small donor who is an objector in this case and retained us to represent him.

58.     Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibility of a fee award never factors into CCAF's decision to accept a representation or object to an unfair class-action settlement or fee request.

59.     HLLI pays me on a salary basis that does not vary with the result in any case. HLLI and CCAF attorneys do not receive a contingent bonus based on success in any case, a structure that would be contrary to I.R.S. restrictions.

60.     CCAF's history in requesting attorneys' fees reflects this approach. Despite having made dozens of successful objections and having won over $200 million on behalf of class members, CCAF has not requested attorneys' fees in the majority of its cases or even in the majority of its appellate victories. CCAF regularly passes up the opportunity to seek fees to which it is legally entitled. In *Classmates*, for example, CCAF withdrew its fee request and instead asked the district court to award money to the class; the court subsequently found that an award of $100,000 "if anything" "would have undercompensated CCAF." *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501, at *11 (W.D. Wash. June 15, 2012). In other cases, CCAF has asked the court for a fraction of the fees to which it would be legally entitled based on the benefit CCAF achieved for the class and asked for any fee award over that fractional amount be returned to the class settlement fund. In *Petrobras*, despite winning tens of millions of dollars for the class, we requested less than $200,000 in fees. *See In re Petrobras Secs. Litig.*, 786 Fed. Appx. 274 (2d Cir. 2019).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 4, 2024, in Houston, Texas.

*/s/ Theodore H. Frank*
Theodore H. Frank